# EXHIBIT UU

# REDACTED PUBLIC VERSION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE          )

ANTITRUST LITIGATION               )

                                   )    No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:          )

ALL ACTIONS.                       )

_____    )


CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEO DEPOSITION OF GEORGE LUCAS


MARCH 28, 2013


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

```
 1            THE VIDEOGRAPHER:  Okay.  If there are no
 2     stipulations, will the court reporter please swear in the
 3     witness.
 4                          *  *  *
 5                    GEORGE LUCAS,
 6     having been first duly sworn, testified as follows:
 7
 8                    EXAMINATION
 9     BY MR. SAVERI:
10        Q.   Good morning, Mr. Lucas.
11        A.   Good morning.
12        Q.   Do you understand you're under oath here today?
13        A.   Yes.
14        Q.   And do you understand that when you took the
15     oath you promised to tell the truth?
16        A.   Yes.
17        Q.   And do you understand that the oath you gave is
18     just as binding as it would have been if given in front
19     of a jury in this case?
20        A.   Yes.
21        Q.   Okay.  Where do you work?  What's your business
22     address?
23        A.   I -- to be quite honest, I'm not quite sure.  I
24     think it's 5858 Lucas Valley Road.
25        Q.   Okay.  And where do you reside?
```

1      A.   I lie -- reside at ███████████.

2      Q.   In --

3      A.   ████████████.

4      Q.   ███████████████████?

5      A.   Yeah.

6      Q.   And, Mr. Lucas, I am fighting a cold which has

7  affected my hearing a little bit, so I may ask you to

8  speak up a little bit.

9      A.   Okay.

10     Q.   Okay?  Thank you.

11          Now, do you know what this litigation is about?

12     A.   Yes.

13     Q.   Can you tell me what you understand that the

14  litigation is about.

15     A.   There was a federal case brought against

16  Lucasfilm along with a lot of other companies, and

17  ultimately our connection to it has to do with -- I had

18  split off Pixar from Lucasfilm, and we, at that point --

19  I had talked to Ed Catmull about how we were splitting up

20  the employees, and that even though I knew they weren't

21  in the film business, I knew that was their desire, and

22  that we would, instead of destroy each other, we would

23  talk to each other about anybody who wanted to move from

24  one company to the other, and we wouldn't actively try to

25  raid each other's companies.

1    Q.   How did you learn that information that you

2    just gave me?

3         MR. KEKER:   Object to the extent it calls for

4    attorney-client information.   Talk about what you

5    learned, not from your lawyers.

6    BY MR. SAVERI:

7    Q.   Did you -- did you learn any of that

8    information you just gave me, other than from your

9    lawyers?

10   A.   I have a very vague remembrance of that

11   conversation with Ed Catmull.

12   Q.   Okay.   And I'm going to ask you some more

13   questions about that, but just can you generally tell me

14   when you recall that conversation -- when your

15   conversation with Ed Catmull happened.

16   A.   It was in the very early '90s.

17   Q.   Okay.   Now, let me ask you a couple other

18   questions.   Did you, in preparation for the deposition

19   today -- did you look at any documents?

20   A.   Yes.

21   Q.   And were those documents that your lawyers

22   provided to you to review?

23   A.   Yes.

24   Q.   Okay.   So in preparation for the deposition

25   today, did you yourself go to look at your records or

1    entire period of time?

2        A.    Yes.

3        Q.    Okay.  As you sit here today, do you maintain

4    any ownership interest in Lucasfilm?

5        A.    No.

6        Q.    So when -- when Lucasfilm was sold to Disney,

7    did you dispose of your entire ownership interest in

8    Lucasfilm?

9        A.    Yes.

10        Q.    Now, was -- there was a point in time, and

11    we'll talk about it in a few minutes, where Lucasfilm

12    owned Pixar, correct?

13        A.    Well, at that point it was called the Lucasfilm

14    Computer Division.

15        Q.    Okay.  As you sit here today, do you -- do you

16    own any interest in Pixar?

17        A.    No.

18        Q.    And does Lucasfilm own any interest in Pixar?

19        A.    No.

20        Q.    Were there written agreements that memorialized

21    the terms of the sale of Lucasfilm to Disney?

22        A.    Yes.

23        Q.    Do any of those written agreements, to the best

24    of your recollection, say anything about the subject of

25    recruiting or hiring?

1       A.   No.

2       Q.   Okay.

3       A.   Not that I know of.

4       Q.   I missed this, but a few minutes ago you

5   identified the -- the name of the company that actually

6   owned Pixar.  I think it was -- would you tell me the

7   name of that company.

8       A.   That owned Pixar?

9       Q.   That owned Pixar.  I think you said it was --

10           MR. KEKER:  No.  He said Lucasfilm Computer.

11           THE WITNESS:  No, there was no -- Pixar was a

12   computer.  It was no not a company.

13   BY MR. SAVERI:

14       Q.   Okay.

15       A.   It simply a division of Lucasfilm.  It was the

16   computer division.  It was our tech, research and

17   development company.

18       Q.   Okay.

19       A.   Or division.

20       Q.   I got it.

21           Now, when did you sell your -- your interest in

22   the technology or the -- or the division associated with

23   Pixar?

24       A.   I'm not absolutely sure.  It was in the mid

25   '80s.

1      Q.    Okay.  And subsequent to that are you aware

2  that the purchasers of that interest set up a company

3  called Pixar?

4      A.    Yes.

5      Q.    Okay.  And subsequent to that time, did

6  Lucasfilm or some portion of that company do business

7  with Pixar?

8      A.    Well, that, I'm not sure of.  I know that we

9  were very close.

10     Q.    Okay.

11     A.    And that, you know, obviously we were the same

12  company for a long time.

13     Q.    Right.

14     A.    And so everybody knew each other.  And we

15  definitely worked on many of Pixar's movies as a sound

16  company.

17     Q.    Okay.  So let's -- let's go through that a

18  little bit.

19           Subsequent to the time that you sold your

20  interest and the company became Pixar, could you describe

21  for me the nature of -- of any collaborations between

22  Lucasfilm and Pixar, generally?

23     A.    Generally, apart from -- specifically apart

24  from us -- them being a client at Skywalker Sound, and

25  the fact that ILM, Industrial Light & Magic, which the

1     A.   Yes.

2     Q.   And could you tell me when it contracted?

3     A.   Well, it was mostly ILM, and when ILM was

4  between movies, even though we tried to retrain -- I mean

5  retain as many people as we could, we, you know -- they

6  would have to let certain people go in order to get

7  through the -- the spot where there was no business.

8     Q.   And then when business kind of started back up

9  again, were people hired to -- to do the job on those

10 projects?

11    A.   Yes.  But most of the people were put on

12 vacation.

13    Q.   Okay.

14    A.   And in training, things like that.  But then

15 there were -- every time we would start a project, we'd

16 have to hire more people, depending on how much business

17 we had.

18    Q.   And this kind of in and out that you've been

19 talking about, was that essentially a -- a feature of --

20 of -- of ILM's workforce?

21    A.   Yes.

22    Q.   Okay.  And when -- can you give me a general

23 sense of kind of the magnitude of the kind of in and out

24 at ILM when you -- when ILM was going through a period

25 when they were busy with projects to a period where they

1    weren't?

2         A.   That's hard to say.  Because as the company

3    grew and became more successful, the numbers shifted,

4    and, you know, the -- you know, it's hard for me to know

5    exactly how many they were letting go.

6         Q.   And then in terms generally of the Lucasfilm

7    workforce, how many -- or how much of that was ILM?

8         A.   I'm not sure, but it was quite a bit.  It was

9    probably 30 percent.

10        Q.   Okay.

11        A.   40 percent.

12        Q.   Is it your view that the recruiting and

13   retention of top talent was important to the success of

14   Lucasfilm?

15        A.   Yes.

16        Q.   Okay.  And how -- and can you explain that to

17   me.  How or why was it important?

18        A.   Well, I always -- the rule we had, or the rule

19   that I put down for everybody, was that since we started

20   the industry in terms of -- basically that main concern

21   was ILM, because the top talent in the other areas are

22   available, we can always go out and get somebody else.

23   Or, you know -- but I had said that we cannot get into a

24   bidding war with other companies because we don't have

25   the margins for that sort of thing.

1        And I said if somebody comes and says that they

2    want -- you know, another company offered them a lot of

3    money, we say, great, go work for them.  Good luck.  If

4    you want, come back, but, you know, we can't afford that.

5        So -- and I said the key to our success is our

6    human resources department and our scouts.  What we do is

7    we find young people, we train them, we get them up to

8    speed, and I had to constantly tell the -- the presidents

9    of the various entities that if -- there is nobody

10   invaluable.  If somebody can get a better job, let them

11   do it.  I know it's hard to go back and start over again,

12   but ultimately it's better than getting into a bidding

13   war with other companies.

14       And with that, that was the basic premise for

15   the way we ran the companies.  We tried to run a very,

16   very good company for people.  We paid people good wages.

17   We have lots of benefits, more than most companies.  And

18   if they want the lifestyle, they'll stay.  If they don't,

19   they just want the money, they'll go somewhere else.

20       Q.   How generally did Lucasfilm go about recruiting

21   or finding the -- the good people during the time that

22   the company was growing?

23       A.   I'm not sure.  You know, the -- you know, it's

24   a big company.  I know mostly -- the areas I know is in

25   visual effects, but even then I don't -- you know, I

1    wasn't involved in any of that.

2         Q.    Okay.  Did -- you mentioned a minute ago the

3    human resources or HR.

4         A.    Uh-huh.

5         Q.    I think you -- I don't know if you called it a

6    department or --

7         A.    Well, it -- it varies.  I mean that's a

8    generality --

9         Q.    Okay.

10        A.    -- to describe the people that recruit.

11        Q.    Okay.  And --

12        A.    There were recruiters, and sometimes each

13   company, or each or division or company or whatever,

14   would had their own, because they were specialized.

15        Q.    As a general matter, though, was it the HR

16   department or HR people who were responsible for

17   recruiting at the company?

18        A.    I'd say those -- sometimes it was consolidated,

19   sometimes it was left -- it was in the divisions, because

20   the consolidated group didn't have the expertise to, you

21   know, make judgments on people who are, you know, very

22   esoteric in terms of their qualifications.

23        Q.    Did -- did you or did Lucasfilm hire outside

24   recruiters to help in recruiting efforts?

25        A.    I -- I don't know.

1        Q.    Okay.  In particular -- when there were times

2    when particular projects were wrapping up, did Lucasfilm

3    hire contract people to help with recruiting efforts?

4        A.    That, I don't recall.

5        Q.    Okay.  Who would you identify as the person who

6    is most knowledgeable at the company about Lucasfilm's

7    recruiting efforts?

8        A.    That, I don't know.

9        Q.    Now, you -- you spoke a minute ago about some

10   of your ideas or principles or rules regarding

11   compensation.  Let me ask you a couple more questions

12   about that.

13            Did you think as part of what you needed to --

14   strike that.

15            In order to recruit or retain the talent you

16   needed at the company, did you think having a -- a fair

17   compensation structure was important?

18        A.    Yes.

19        Q.    Okay.  Did you believe it was fair to pay a

20   wage that was competitive with other companies where your

21   employees might have the qualities to find a job?

22        A.    Say that again.

23        Q.    Let me -- let me ask a better question.

24            You're aware that your employees had skills

25   that were marketable, correct?

1        A.    Yes.

2        Q.    And they could go get other jobs at other

3    places.

4        A.    Yes.

5        Q.    In order to retain -- to recruit or retain them

6    to your company, did you believe that you needed to

7    provide them compensation that was competitive with their

8    other employment alternatives?

9        A.    No.

10       Q.    Was compensation -- was -- did you believe that

11   what you were paying your employees had anything to do

12   with whether you could recruit or retain people to the

13   company?

14       A.    Yes.

15       Q.    And did -- what role did it play?

16       A.    What?  In compensation?

17       Q.    Yes.

18       A.    Yeah.  We wanted to pay people a fair salary.

19       Q.    Now, in -- in determining salaries, did you

20   look at what other companies paid?

21       A.    Yes.

22       Q.    And how did you use what other companies paid

23   in determining what you would pay to people that were

24   employed at your company or -- or people that you might

25   recruit to your company?

1      A.   We were about on even keel with everybody.

2      Q.   And when you say "even keel" what do you mean?

3      A.   I mean we were paying about the same within a

4  range of salaries.  We were paying what mostly everybody

5  else was paying.

6      Q.   When you set compensation levels, did you look

7  at other -- at the information you had about what other

8  companies paid as a benchmark in determining what to pay

9  your folks?

10     A.   Yes.

11     Q.   And did you use an arithmetic benchmark?

12     A.   I don't know.  They -- it was an outside

13  consultant that came in and did it.

14     Q.   Do you know who was the outside consultant?

15     A.   I have no idea.

16     Q.   At least aspirationally, did you try to set

17  your compensation levels at some percentage of what you

18  understood market rates to be?

19     A.   I -- we tried to set them at market rates.

20     Q.   Okay.  I mean, for example, did you try to set

21  your compensation basic levels at -- at ███████, for

22  example?

23     A.   No.  No.  It was -- we were within a very close

24  range of what the average was.

25     Q.   Okay.  And where did you get the information

 1    about the range?  From the outside companies?

 2         A.   Yes.

 3         Q.   Now, a few minutes ago I think you said at

 4    least at the end of -- of your tenure, Lucasfilm employed

 5    approximately 1800 to 2000 people, somewhere in there; is

 6    that right?

 7         A.   Right.

 8         Q.   In what physical locations did Lucasfilm

 9    operate?

10         A.   Here at the Presidio, in -- in Lucas Valley --

11         Q.   Right.

12         A.   -- and in Singapore.  And then we had little

13    offshoot operations, small ones, which I don't even know

14    how many there are, in places like the -- in Canada, down

15    in L.A., you know, other places.

16         Q.   Did you have an operation in the U.K.?

17         A.   Well, you mean when I -- when we -- when I

18    left?

19         Q.   Okay.  I -- that's what the question was.

20         A.   What?

21         Q.   So was there a point in time when you operated

22    a physical location in the U.K.?

23         A.   Yes.

24         Q.   And I take it, then, by the time -- at the end

25    of your tenure, that was closed.

1      A.   Yes.

2      Q.   As a cost, how important were your costs of

3  labor?

4      A.   Very important.

5      Q.   Can you tell me approximately what percentage

6  of your costs were labor costs.

7      A.   I don't know.

8      Q.   Okay.  In -- in your recruiting efforts, did --

9  did you or people who worked in the HR department or

10  other places that were responsible for recruiting, did

11  you target particular companies as places where you

12  thought you could -- you could recruit talent that suited

13  your needs?

14      A.   No.

15      Q.   Does -- or did Lucasfilm have any policy of not

16  recruiting or hiring from any companies?

17      A.   I had a general -- again, it's not a rule.

18  It's not a dictate.  But I had -- we had a general

19  policy, because we were out to promote other digital

20  companies and help them, that the -- we weren't going to

21  try to recruit people from them.  If people wanted to

22  leave that company, because they were tired of working in

23  New Zealand and they wanted to move back home, we

24  would -- we could recruit them, but not to go and say,

25  will you work for us?  We'll pay you more.  Or, will you

1    work for us?

2           Because mostly all those companies were started

3    by people who worked here.  So they all went off and

4    started other companies and we weren't about to try to --

5    to damage them in any way.  It's not a normal industrial

6    competitive situation.

7           Q.    You said other digital companies?

8           A.    Yes, digital -- visual effects, anything.  You

9    know, mostly the -- mostly I'm focusing on the digital

10   people.

11          Q.    Okay.  So can you give me some examples of the

12   companies that your -- you had this policy with -- or

13   excuse me.

14          Could you give me examples of the -- these

15   digital companies that you had a policy with respect to?

16          A.    Generally, all companies.  It's not a company.

17          Q.    Okay.  But I mean can you give me the names of

18   companies that you can think of that were -- that were

19   primary examples of companies that would -- would fall

20   within that category.

21          A.    Well, there were other visual effects

22   companies.  The -- the companies in England, Weta, which

23   is, you know, England is Frame Storm, New Zealand, Weta.

24   In L.A. it was Rhythm and Hues, and, you know, generally,

25   that was those companies.

1    Q.    Now, and -- let me ask you about what the --

2    what the policy was.  Was the policy that you would not

3    recruit or hire people from those companies under any

4    circumstances, or was it --

5    A.    No.  It was that we would not try to raid them

6    and we would not recruit there.  We would not consciously

7    make a phone call and say, "Will you leave your company

8    and come work for us?"

9    Q.    So, for example, if a person who worked for

10   those -- one of those companies came to you and said,

11   "I'm interested in a job with you," would you --

12   A.    Yes.

13   Q.    -- would you talk to them?

14   A.    We would talk to them and we would, you know --

15   yeah.  Anybody that came in and -- and offered -- was

16   looking for a job, we would talk to them.

17   Q.    Now, in situations where someone was working

18   for one of these other digital companies and expressed to

19   you an interest in coming to work for you --

20   A.    Uh-huh.

21   Q.    -- did the policy that you have involve any

22   kind of notification to their current employer?

23   A.    Generally, no, if they were companies we didn't

24   know about, you know.  Eventually, we told them to tell

25   their boss, and -- but we didn't -- you know, to be real

1    honest with you, I don't actually know exactly the way

2    they did it, because I wasn't involved in it.

3         Q.   Okay.

4         A.   The ruling basically was, you know, if somebody

5    comes over the transom, we hire -- we will, you know, let

6    them apply, and then generally I don't know what they --

7    you know, what happened after that.

8         Q.   Okay.  And -- and so a couple of questions

9    about that.  You said generally that was the policy.

10             Is that a policy that you made?

11        A.   It was a -- it wasn't a policy.  It was my

12   wish.

13        Q.   Okay.  Did you express this wish to people who

14   worked for you?

15        A.   It was generally expressed not to raid other

16   companies.

17        Q.   Okay.  And did you tell, for example, Ms. Chau

18   that that was your wish?

19        A.   Yes.

20        Q.   Okay.  Did you -- when you told her that, did

21   you expect her to communicate that to the people that

22   worked for her that were responsible for -- for running

23   the recruiting function at the company?

24        A.   Yes.

25        Q.   Okay.  Now, I haven't seen any transoms here,

```
 1    so I was -- but the --

 2              Just following along, if -- if someone kind of,

 3    you know, came in over the transom and sought a job, from

 4    your perspective, your -- your policy did not require you

 5    to inform their employer -- their current employer that

 6    this person was looking for a job.

 7         A.   I don't know.

 8         Q.   Okay.  And did your policy also include any

 9    kind of rule about matching offers or counteroffers?

10         A.   I don't know.

11         Q.   Okay.  Now, were there any written agreements

12    in place between you and any of these other digital

13    companies with respect to -- with respect to the subject

14    of recruiting or hiring?

15         A.   No.

16         Q.   Okay.  And did -- or were any of these digital

17    companies owned by larger entities, like studios or other

18    businesses?

19         A.   Some of them were.

20         Q.   And did your policy that you described apply to

21    applications from people who worked, you know, in other

22    parts of those studios that owned the digital companies?

23         A.   I don't think so.

24         Q.   Okay.  Now, did you have a policy with respect

25    to recruiting or not recruiting from any companies other
```

1    than the digital companies you identified?

2         A.   Not that I know of.

3         Q.   Okay.  So, for example, did you have any policy

4    of recruiting or not recruiting with any studio,

5    generally?

6         A.   Well, there was a company up here that was

7    started by some people that used to work here and some

8    good friends of mine, who was backed by Disney, which was

9    a digital animation company.

10         Q.   Was that ImageMovers?

11         A.   Yes.

12         Q.   Okay.  We'll talk about that in a minute.

13              When did you become aware that the Department

14    of Justice was investigating Lucasfilm's understandings

15    or agreements with Pixar regarding cold calling?

16         A.   I can't really remember.  I'm not good with

17    dates.

18         Q.   Okay.  Do you recall how you became aware?

19         A.   I think it was brought up at a legal -- on a

20    board meeting with a legal review of what was going on.

21         Q.   Do you have any role in providing information

22    in connection with the Department of Justice

23    investigation?

24              MR. KEKER:  Object.  Don't talk about any

25    conversations you had with your lawyers.  That's covered

 1   by the attorney-client privilege.  But if it's -- there

 2   is some -- if you want -- would you reframe the question?

 3            MR. SAVERI:  Actually, let me -- I can probably

 4   do a better job.

 5   BY MR. SAVERI:

 6       Q.   Did you -- did you provide any documents -- I'm

 7   not asking you what the documents said, but did you

 8   provide any documents to any of the lawyers who were

 9   responding to the Department of Justice investigation?

10            MR. KEKER:  Same objection.

11   BY MR. SAVERI:

12       Q.   Did you -- did you ever speak to the Department

13   of Justice in connection with the investigation?

14       A.   No.

15       Q.   Did you provide a deposition or some kind of

16   sworn testimony to the Department of Justice in

17   connection with the investigation?

18       A.   No.

19       Q.   Okay.  Did you provide any written answers to

20   any questions from the Department of Justice?

21       A.   I can't remember.

22       Q.   Did you review any of the submissions made on

23   behalf of your company to the Department of Justice in

24   connection with their investigation?

25       A.   I think only at the end.

1     Q.   When you say "at the end," what do you mean?

2     A.   When they did their agreement to -- you know,

3  to the -- I don't know what you call it.

4     Q.   Let me help you.  Do you recall that there was

5  a final judgment entered?

6     A.   Yeah, in the final judgment.  I saw the final

7  judgment.

8     Q.   Okay.  Have -- have you been involved in

9  implementing the final judgment?

10    A.   No.

11    Q.   In connection with this case, were you involved

12  at all in any of the efforts to look for documents?

13    A.   No.

14    Q.   Now, when -- when did you -- strike that.

15         Did you agree with Pixar with respect to

16  recruiting or hiring from each other's employ -- from

17  each other's companies?

18    A.   Did I agree?

19    Q.   Did you enter into an agreement with -- with

20  Pixar with respect to recruiting or hiring from the two

21  companies?

22    A.   I wouldn't call it an "agreement."

23    Q.   Okay.  What would you --

24    A.   It was basically a conversation that -- my only

25  involvement was a conversation between Ed and myself

 1   about, since we were both fragile companies, that we

 2   wouldn't destroy each other.

 3       Q.   Okay.  And let me try to get your best

 4   recollection of -- of that communication.

 5           When was it?

 6       A.   It was during the time of the split, of the

 7   sale of the company to Steve Jobs.

 8       Q.   So that was in approximately 1985?

 9       A.   Yes, mid '80s, I guess.  I'm not good with

10   dates.

11       Q.   And can you tell me to the best of your

12   recollection who said what to whom during that

13   conversation?

14       A.   We were talking about that he was getting his

15   group together, and he was -- you know, there were some

16   people who were -- could be put every -- either way.  He

17   thought that they'd worked all that out and everything

18   with the head of ILM, and -- and the other parts of the

19   computer division, which weren't being sold, there was

20   only a small part, and he said he thought it was going

21   well.  I said, great.  But we should agree not to try to

22   run each other out of business.  I knew he wanted to go

23   into the film business, and when it came to that, you

24   know, we'll be helpful, but, you know, we -- I really

25   didn't want him raiding the company and trying to take

1   all the good people away.

2        Q.   Okay.  At the time that you had this

3   conversation with Mr. -- now, let me back up.

4             Did you discuss this on one occasion with

5   Mr. Catmull, or did it occur over the --

6        A.   It was just --

7        Q.   -- course of several communications?

8        A.   Just one, that one.

9        Q.   And at the time had you already reached a basic

10  understanding with Steve Jobs about what he was going to

11  pay for the assets that got spun off into Pixar?

12       A.   I -- probably.

13       Q.   Okay.

14       A.   I'm not really sure.

15       Q.   Just so I'm clear, you never talked about this

16  subject with Steve Jobs himself, correct?

17       A.   No.  This was purely between Ed and I.

18       Q.   Okay.  And when you discussed it with

19  Mr. Catmull, was the agreement about recruiting or hiring

20  company-wide?

21            MR. KEKER:  Objection.  He said it wasn't an

22  agreement.

23            THE WITNESS:  Yeah, it wasn't an agreement.

24  Company-wide in terms of everybody at the company?

25  //

1    BY MR. SAVERI:

2         Q.    Let me back up.

3              Your conversation about -- with Mr. Catmull,

4    when you had a discussion about what you would do with

5    respect to recruiting going forward, and that you didn't

6    want to attack or raid each other's companies, was the

7    discussion about the entirety of both companies?

8         A.    Well, I don't think we got that specific.

9         Q.    Okay.

10        A.    It was simply -- it was simply, we are

11   splitting the company up.  You have a lot of the

12   technology, and we have a lot of the people that are

13   working with that technology.  And if the people in our

14   company want to go work for your company, that's fine.

15   If people in your company want to come to work for our

16   company, that's fine.  Let's not actively go out and try

17   to kill each other.  That was the thing.

18             Because we have always been a very -- we're not

19   a competitive company.  So we don't go out and, you

20   know -- and, you know, a lot of the people that work for

21   me are union people, and a lot of people that work for

22   him aren't.

23        Q.    When you said you won't kill each other, do you

24   mean not kill each other with respect to recruiting or

25   hiring?

1        A.    Yeah.

2        Q.    Okay.  Now, at the time that -- of the spinoff,

3    the organization that Catmull was talking about was

4    basically the people who had formerly worked for you that

5    were being spun off, correct?

6        A.    No.  That was just a general statement --

7        Q.    Okay.

8        A.    -- of, as we go down the road, we should try to

9    let people work between the companies, but we shouldn't

10   get into a competitive situation where we're trying to

11   put each other out of business.

12       Q.    Okay.  So at that time Mr. -- Ed Catmull knew

13   lots of people who worked for your company?

14       A.    Yeah, everybody.

15       Q.    And so when -- when -- you understood that when

16   he committed to this, he was -- he was committing to that

17   with respect to everybody who worked for your company, or

18   might work for your company in the future?

19       A.    Yeah.

20       Q.    And then at the time -- well, from your end,

21   you anticipated that -- that Pixar, Ed Catmull's

22   organization, would -- would continue and might hire

23   additional people, correct?

24       A.    Right.

25       Q.    And what you were saying, at least from your

1    part, is that you were not going to recruit actively

2    those people.  When I say "those people," I mean the

3    people that had left your company to work for

4    Mr. Catmull, or other people --

5         A.    Yeah.

6         Q.    -- that Mr. Catmull might hire.

7         A.    Right.

8         Q.    Now, did you -- do you recall who suggested

9    this?

10        A.    Nobody.  I did.

11        Q.    Okay.

12        A.    I mean it was simply, you know, common sense.

13        Q.    Okay.  Did -- was the terms of this

14   understanding or your conversation with Mr. Catmull ever

15   written down, to the best of your recollection?

16        A.    I -- I believe a memo was sent from ILM to

17   somebody at a point where they were getting worried about

18   something.  I don't -- I'm not sure.

19        Q.    Okay.  And can you give me a sense about when

20   that memo was written in relation to when you spoke about

21   it with -- when you spoke about the subject the first

22   time with Ed Catmull?

23        A.    I have no idea.

24        Q.    Was it 10 years?  Two days?

25        A.    I don't know.

1       Q.    Okay.  Now, other than discussions with Ed

2   Catmull, did you ever discuss this topic with anybody

3   else at Pixar?

4       A.    No.

5       Q.    Okay.  After you had this conversation with Ed

6   Catmull about recruiting, did you tell anybody at

7   Lucasfilm that you had had this discussion?

8       A.    It may have come up at ILM when they were

9   getting worried that they were going to lose all their

10  people.  And I said, no, we agreed not to raid each

11  other.

12      Q.    And was the point at which you were -- you

13  remember ILM getting worried, was that the time of the

14  spinoff?

15      A.    No.  I don't know when that was.

16      Q.    And who did you discuss that subject with at

17  ILM?

18      A.    It would have been with the president of the

19  company -- I mean the president of ILM.

20      Q.    Who was whom?

21      A.    At that time -- I'm not exactly sure which

22  president.  We've had a couple.  You know, Jim Morris or

23  Chrissie England, either one of them.

24      Q.    Do you recall discussing the subject, and when

25  I say the "subject," I mean the conversation or

1    understanding that you had with Ed Catmull, with

2    Mr. Morris?  Do you recall discussing that subject with

3    him at any time?

4         A.    He was the president of ILM.  So I'd say it was

5    either him or the other -- it was one of the main

6    presidents.  I mean Chrissie was the president for a long

7    time and Jim was the president for a long time.

8         Q.    Did Jim Morris ever tell you that he had had

9    his own discussions with folks at Pixar regarding the

10   subject of recruiting?

11        A.    No.

12        Q.    Did you discuss this subject of your

13   understanding with Ed Catmull at any time with Micheline

14   Chau?

15        A.    I don't think so.  I can't remember.

16        Q.    Do you know if she knew about this

17   understanding that you had with Pixar?

18        A.    I don't know.

19        Q.    To the best of your recollection, did Micheline

20   Chau ever come to you and say, we've got an issue about

21   Pixar recruiting someone in a way which is contrary to

22   the understanding that you have with Ed Catmull?

23        A.    I don't remember that.

24        Q.    Who is ███████████?

25        A.    I don't know him.

1      Q.    Or ▆▆▆▆▆?  Was there a lawyer that worked

2    for Lucasfilm that went to work for Pixar?

3      A.    I'm not good with names.

4      Q.    Okay.

5      A.    And I don't -- you know, I'm not, again, that

6    involved in the actual running of the company.

7      Q.    Was there ever a situation you recall where you

8    got upset that Pixar was recruiting or hiring someone

9    from Lucasfilm?

10      A.    No.

11      Q.    Okay.  Do you recall a situation where you ever

12    told Ed Catmull or someone that worked for his

13    organizations to stop recruiting people from Lucasfilm?

14      A.    No.

15      Q.    In your conversation with Ed Catmull, did you

16    discuss with him how you would handle the situation when

17    an employee did, in fact, want to leave one company for

18    the other?

19      A.    We had discussed the -- the fact of, you know,

20    if somebody want -- comes to them looking for a job and

21    wants to leave here, at least give us a heads-up that

22    that's what they're going to do.

23      Q.    I'm sorry.  Who would give whom the heads-up?

24      A.    Ed or somebody at Pixar would call us, whoever

25    the head of, like, ILM, and say, hey, this person is

1    looking for a job.  He's come here.  We just want to let

2    you know.

3        Q.    In that conversation with Ed Catmull, did you

4    discuss any limits or rules or procedures that you would

5    adopt with respect to offers?

6        A.    No, not at all.

7        Q.    Did you discuss with him the subject of

8    counteroffers?

9        A.    No.

10       Q.    Do you know what a counteroffer is?

11       A.    Yes.

12       Q.    Did you discuss with Ed Catmull the subject of

13   your interest in avoiding bidding wars between the two

14   companies?

15       A.    Well, no, but that was implied.

16       Q.    Okay.

17       A.    But it's not -- it's not a bidding war.  We

18   said our policy is to let people go.  We do not -- if

19   somebody says they got a better job at a higher pay, go

20   to it.  We shake their hand, we give them a great, you

21   know, exit bonus and all that sort of thing, and we send

22   them off, and we say, good luck.  Because those people

23   come back.  You know, it's a -- it's a gypsy pool.

24       Q.    It's a gypsy pool?

25       A.    Yeah.

 1      Q.   What do you mean by "gypsy pool"?

 2      A.   The people in the business that we're in go

 3  from company to company.  You know, they're not -- they

 4  come back and forth, back and forth, and then they go

 5  work for other companies, and then they come back.  It's

 6  not like, you know, if we lose somebody we lose them

 7  forever.  And if we do, our policy is to create a new

 8  one.

 9      Q.   Did -- other than the -- the occasion that you

10  identified that there was some memorialization of it with

11  respect to ILM, to the best of your knowledge, was there

12  ever any other writing between the two companies that

13  formalized or specified the terms of the understanding

14  between the two companies with respect to recruiting?

15      A.   Not that I know of.

16      Q.   For example, are you aware of any kind of email

17  correspondence between the two companies, either between

18  you and Mr. Catmull or -- or anybody within your

19  respective organizations, where the subject of the terms

20  of this understanding was -- was set forth?

21      A.   No.

22      Q.   Okay.  Were -- or was the agreement between you

23  and -- strike that.

24           Was -- to the best of your recollection, was

25  your policy or procedure arising from your conversation

1    that was produced by Pixar, would you agree with me that

2    they are generally consistent?

3            MR. KEKER:  Same objection.

4            THE WITNESS:  Well, not technically consistent.

5    BY MR. SAVERI:

6        Q.    Okay.

7        A.    If we're doing it word by word.

8        Q.    But are they generally consistent?

9            MR. KEKER:  Same objection.

10           THE WITNESS:  Yeah, I mean we don't -- you

11   know, they won't counteroffer, and there is something

12   here that says, we'll try to save the relationship if we

13   can, if we want to -- if we want to retain them.  Those

14   are two opposite things.

15           You know, I don't know -- again, the save

16   conversation may or may not have anything to do with

17   salary.  It may have to do just simply with what -- you

18   know, what they're unhappy about.

19   BY MR. SAVERI:

20       Q.    Other than the provision about the save

21   conversation, would you agree with me that these two

22   descriptions of the understanding between the two

23   companies are largely consistent?

24           MR. KEKER:  Same objection.  Object as to form.

25           THE WITNESS:  Again, one -- the -- the -- ours

 1   is much more specific about what our things are.  But,

 2   again, this is the opinion of the person in HR.  I

 3   don't -- I don't know whether it came from any direction

 4   from anybody.

 5   BY MR. SAVERI:

 6        Q.   Did you ever tell Ms. Chau that you had a,

 7   quote/unquote, "gentleman's agreement" with Ed Catmull?

 8        A.   No.

 9        Q.   Did you ever use that terminology, to the best

10   of your recollection, in describing your conversation or

11   understanding with Ed Catmull?

12        A.   No.  I think the part of the agreement is not

13   to solicit each other's employees, is the crux of it.

14        Q.   So let me just go through it, then.

15        A.   There is a similarity between the two.

16        Q.   Okay.  So in Sharon Coker's email, which is the

17   Lucas document, she begins by saying, "We have a standing

18   agreement with Pixar, which I believe to be an informal

19   'gentleman's agreement' forged a few years ago (Mich

20   knows the history of it)" --

21             Again, "Mich" is Mich Chau, right?

22        A.   Yes.

23        Q.   -- "to call each other, HR to HR, whenever we

24   extend an offer to someone who works for the other

25   company."  Do you see that?

```
 1         A.    Yes.

 2         Q.    Would you agree with me that that's -- that

 3   paragraph is consistent with the first bullet point in

 4   Exhibit 137?

 5              MR. KEKER:  Object as to form.

 6              THE WITNESS:  They're similar.

 7   BY MR. SAVERI:

 8         Q.    And then a little bit farther down it says,

 9   "Pixar will not give us details on the comp or job role

10   they've offered, but if the employee shares it and we

11   want to -- and we want to counter, we can do so and Pixar

12   will not give the employee a different or additional

13   offer."  Do you see that?

14         A.    Uh-huh.  Yes.

15         Q.    Now, if you look at the last bullet on

16   Exhibit 137, it says, "Once we have had the conversation

17   with LFL, we never counter if the candidate comes back to

18   us with a better offer from Lucasfilm."  Do you see that?

19         A.    Yes.

20         Q.    Would you agree with me that those two

21   provisions are consistent?

22              MR. KEKER:  Object as to form.

23              THE WITNESS:  I guess they're similar.

24   BY MR. SAVERI:

25         Q.    Now, Sharon Coker writes, "We have agreed that
```

1    we want to avoid bidding wars."  Do you see that?

2         A.   Yes.

3         Q.   Did you want to avoid bidding wars with Pixar?

4         A.   No.  That wasn't the original intention of my

5    wish.

6         Q.   Okay.  But did you want to avoid bidding wars

7    with Pixar --

8         A.   No.

9         Q.   -- with respect to employees?

10        A.   No.

11        Q.   Did you have any feeling one way or another

12   about bidding wars with respect to Pixar?

13        A.   No.  I didn't -- no.

14        Q.   So it's your testimony that you didn't care if

15   you entered into a bidding war with Pixar with respect to

16   employees?

17             MR. KEKER:  Object as to form.

18   BY MR. SAVERI:

19        Q.   Did you care one way or the other about whether

20   you ended up in bidding wars with Pixar for particular

21   employees?

22        A.   I don't think we would have done it.  That

23   wasn't part of the wish.  The wish is if they came back

24   and counteroffered for more, we'd just say, go.

25        Q.   But in general, I think -- I mean we talked --

1      A.    This is an interpretation by the HR person, I

2  think, about the same people, really, who used to work

3  for each other.

4      Q.    But would you agree with me -- I think we

5  talked about this earlier today, that at least your --

6  part of your -- your philosophy with respect to

7  compensation was that if people wanted to get better jobs

8  somewhere else, they were free to go.

9      A.    They were.  They were absolutely free to go.

10      Q.    And in connection with that, you -- it was your

11  view that you didn't want to increase compensation to

12  prevent people from leaving the company.

13      A.    Well, that's not what I said.

14      Q.    Okay.  Well, that's what I'm asking you.

15          In connection with that, did you have a view

16  about whether, as a compensation philosophy, you wanted

17  to pay people, increase compensation, in order for them

18  to not leave the company?

19      A.    Can you say that again?

20      Q.    Okay.  In connection with your view, your

21  compensation philosophy, did you want to avoid or

22  discourage your people who were in charge of compensation

23  from increasing compensation to Lucasfilm employees who

24  were thinking about going to work somewhere else in order

25  to encourage them to stay at the company?

```
 1              Did you -- did you want to -- was it your --
 2    was it part of your philosophy to instruct the HR people
 3    not to increase compensation to prevent people from
 4    leaving the company?
 5              MR. KEKER:  Object as to form.
 6              THE WITNESS:  That was my philosophy.
 7    BY MR. SAVERI:
 8        Q.    Now, in Sharon Coker's email, she says about
 9    halfway down, "We do not have this arrangement with any
10    other studio."  Do you see that?
11        A.    Yes, I do.
12        Q.    To the best of your recollection, is that a
13    true statement?
14        A.    Yes.
15        Q.    Okay.  Now, she also says towards the bottom of
16    the document, "These guidelines are intended for the
17    situation where a Pixar employee has responded on their
18    own to one of our job postings directly (or vice versa).
19    Our employees are hands off to each other in terms of
20    soliciting talent."
21              Do you see that?
22        A.    Yes.
23        Q.    To the best of your recollection, is that a
24    true statement of fact?
25        A.    Yes.
```

 1        Q.    Now -- and again, did you ever discuss this

 2   subject, that is the subject -- the topics that are set

 3   forth in Sharon Coker's email with Sharon Coker?

 4        A.    No.

 5        Q.    Did you ever discuss them with Jan Van der

 6   Voort?

 7        A.    No.

 8        Q.    Did you ever discuss them with Steve Condiotti?

 9        A.    No.

10        Q.    Condiotti, excuse me.

11        A.    No.

12        Q.    Did you ever discuss them with Alan Keith?

13        A.    No.

14              MR. SAVERI:  You can put that aside.

15              (Exhibit 2435 was marked for identification.)

16   BY MR. SAVERI:

17        Q.    I've handed you what has been marked as

18   Exhibit 2435.  Do you have that in front of you?

19        A.    Uh-huh.

20        Q.    Again, this is a document produced to us by

21   Pixar.  In particular, I want to ask you about the

22   portion of the email at the bottom of the first page from

23   this gentleman named █████████ to someone named █████,

24   "Subject:  Spoke with George."

25        A.    Yes.

1      Q.    Okay.

2      A.    I think this is just a worksheet.

3      Q.    Okay.  And again, your role in the process was

4  to approve or -- or disapprove a recommendation that was

5  made to you by the compensation committee?

6      A.    Yes.

7      Q.    Can you ever recall a situation where you

8  didn't approve the recommendation?

9      A.    Not that I can remember.

10      Q.    Now, 2438, I believe you said, refers to

11  executive compensation set by the compensation committee

12  of the Lucas board, correct?

13      A.    Right.

14      Q.    Now, what about with respect to everybody else

15  at the company?  What was your role with respect -- with

16  respect to setting compensation for them?

17      A.    They -- every few years we would also check

18  with a survey company to also verify where we stood in

19  the pecking order.

20      Q.    Okay.  And would you undertake a similar kind

21  of process with respect to those nonexecutives with

22  respect to compensation?

23      A.    Those were used to help the administrative

24  staff work with the heads of the companies to alert them

25  to, you know, people or things where there -- you know,

 1   again, the same thing, where they weren't getting paid.

 2   They weren't -- we weren't competing with everybody else.

 3        Q.    Were -- at Lucasfilm, was there a regular

 4   process for setting compensation for -- for

 5   nonexecutives?

 6        A.    Yes.

 7        Q.    And what was that?

 8        A.    The -- the compensation was pretty much decided

 9   by the president of that company, and there -- there is a

10   review process, an HR process, a -- you know, a whole

11   thing.  And raises and bonuses and that whole thing was

12   sort of set up by the head of the company, and then it

13   would go to Mich, and she would approve it.

14        Q.    Did you have any role in that process?

15        A.    No.

16        Q.    Did -- was there a point in time in that

17   process where Mich Chau came to you and said, "This is

18   what we're going to do.  Do you approve it or not?"

19        A.    Yes.

20        Q.    Okay.  And did you, as part of that process,

21   ever disagree with any of the recommendations that

22   Ms. Chau gave you?

23        A.    I might have.  Yes, I can't remember.  Again,

24   you're talking 35 years, not just with her, but obviously

25   with the process.

1      Q.   Was the process annual?

2      A.   Yes.

3      Q.   Okay.  Did you have any role with -- with

4  respect to that process -- with respect to your direct

5  reports?

6      A.   Yes.

7      Q.   Okay.  Who were the direct reports that you

8  gave reviews to or had input into with respect to

9  compensation?

10     A.   Mich, my -- I have two assistants, my two

11  assistants.

12     Q.   Okay.

13     A.   And I had producers -- or a producer that

14  worked for me, and he was my direct report, too.

15     Q.   As part of the -- this kind of annual process,

16  was there a -- was there some kind of budgeting decision

17  that was made at the beginning of the process in terms

18  of, you know, a percentage increase of compensation or --

19  or anything like that?

20     A.   Well, I think there was.  I think there was

21  a -- a -- an overall what -- the business plan for that

22  year.

23     Q.   Right.

24     A.   And what they thought they were going to make.

25     Q.   Right.

1      A.   And then a part of this in terms of the

2  salaries was determined by how much money was left over.

3      Q.   Right.

4      A.   I mean not left over, but how much money we had

5  to work with.  And then at the end, if they met those

6  goals and we did that business and that kind of thing,

7  then they would get bonuses.

8      Q.   Okay.  Can you describe for me generally for

9  the nonexecutives what the kind of elements of

10  compensation were at Lucasfilm.

11     A.   Well, there was the salary.

12     Q.   A base salary.

13     A.   There was a company bonus --

14     Q.   Right.

15     A.   -- based on how that division did.  And then

16  there was a personal bonus depending on how that person

17  did.  And it was discretionary.

18     Q.   Now, were there job titles or job

19  classifications that were used as part of the

20  compensation structure at Lucasfilm?

21     A.   That, I don't know.

22     Q.   Okay.  For example, do you know if there were

23  salary ranges that were established within the structure

24  for people who had similar job titles or job

25  classifications?

1      A.   I think there were, yes.

2      Q.   Okay.  And who established those?

3      A.   I think it was done in the administrative

4  department and HR in relationship to, you know, trying to

5  keep things even.  I mean, you know, in terms of -- make

6  sure it was fair.

7      Q.   Right.  Did you have any role in setting salary

8  ranges for any particular job title or job

9  classification?

10      A.   No, not except -- except for Mich.

11      Q.   And that is why I started with --

12      A.   Yeah.

13      Q.   -- asking you about your direct reports.  But

14  I'm talking about more generally across the structure.

15      A.   No.  Occasionally they would come -- Mich would

16  come and say, "We want to give this guy a raise.  He's

17  been moving -- he -- we are moving him up from this to

18  that."  And I'd say, "Fine."

19      Q.   Okay.  So a couple of questions about that.

20           Do you have any role in determining -- okay.

21  First, do you have any role in determining changes to

22  salary ranges for any particular job title or job

23  classification?

24      A.   No.

25      Q.   Okay.  Did you have any role in determining

1   whether someone would be promoted from one job

2   classification to another?

3        A.   No.

4        Q.   Okay.  Did you have any kind of general

5   oversight rule about exceptions to base compensation?

6        A.   Well, no.

7        Q.   Let me try --

8        A.   It is hard to understand exactly what you are

9   saying, though.

10       Q.   Let me try to give you an example.  For

11   example, if there was a person whose job title placed

12   them at a position -- strike that.

13            If there was a person who, because of their job

14   title, would ordinarily receive a specific salary within

15   a job range, did it -- were there ever situations where

16   someone recommended that someone would receive

17   compensation outside the established range for that job

18   title?

19       A.   No.

20       Q.   Okay.  And what I was getting at is, did you

21   have any role in approving exceptions from the salary

22   range established for particular jobs or job titles?

23       A.   Well, again, some of the salaries were -- you

24   know, they're not even.  Some people worked for me 35, 40

25   years.

 1          THE WITNESS:  No.

 2    BY MR. SAVERI:

 3          Q.   Now, the -- the next paragraph is

 4    "Benchmarking."  Do you see that?

 5          A.   Uh-huh.

 6          Q.   It says, "Lucasfilm will benchmark total

 7    compensation at the ████████████  for most positions

 8    using compensation surveys that are relevant to the

 9    specific job or job family."  Do you see that?

10          A.   Yes.

11          Q.   Is that true?

12          A.   Yes.

13          Q.   Then it says, "Positions that are highly --"

14    excuse me.

15          "Positions that are defined as highly

16    competitive and/or critical to achieving business

17    objectives such as all studio and technical positions are

18    be --" it looks like there is a word missing -- "are be"

19    -- "are be benchmarked at the ████████████."

20          Do you see that?

21          A.   Yes.

22          Q.   Is that true?

23          A.   Yes.

24          Q.   Okay.  How did Lucasfilm identify which

25    positions were to be benchmarked at -- benchmarked at the

 1   ███████████████   as opposed to the  ████?

 2        A.    I don't know.

 3        Q.    Did you have any role in identifying or making

 4   that determination?

 5        A.    No.

 6        Q.    Now, this refers to "studio and technical

 7   positions as being examples of the highly competitive

 8   and/or critical to achieving business objectives jobs."

 9            Do you see that?

10        A.    Yes.

11        Q.    Do you agree that those were highly competitive

12   or -- and/or critical to achieving Lucas' business

13   objectives?

14        A.    Yes.

15        Q.    Were there others that you could identify which

16   would similarly fall in that category?

17        A.    Well, studio, I'm interpreting here, as meaning

18   the creatives at the production and ILM and those things

19   where you have, you know, highly specialized creative

20   people.

21        Q.    Okay.  And so --

22        A.    And technical positions are technical

23   positions.

24        Q.    Now, the next paragraph talks about base salary

25   adjustments and merit increases.  Do you see that?

1        A.    Yes.

2        Q.    And it says, "Base Salary Adjustments (Merit

3   Increases) will be done annually, linked to employee

4   performance reviews."  Is that true?

5        A.    Yes.

6        Q.    Then it says, "The level of increases will be

7   determined by analyzing both external market practices

8   and company performance and then will be awarded based on

9   individual performance."  Do you see that?

10       A.    Yes.

11       Q.    Is that true?

12       A.    Yes.

13       Q.    This document, if you turn to the first page of

14   it, the cover, is dated November 28th, 2007.

15       A.    Yes.

16       Q.    And it is for 2008.  Do you see that?

17       A.    For -- it says November -- yeah.

18       Q.    It is dated November 28th, 2007, but it looks

19   like it's meant to apply to 2008.  Do you see where --

20       A.    Okay.  I don't -- where is the --

21       Q.    Maybe I'm misunderstanding.

22       A.    I don't really know.  I mean --

23       Q.    Let me -- let me withdraw the question and just

24   ask you about -- have you turn back to the third page

25   again, which is what I was asking you about.

1      A.    Not that I directly know of.

2      Q.    Okay.  Was there a rule that prevented that?

3      A.    No.

4      Q.    Did you leave that -- was that -- was the

5  authority about that subject delegated to someone at the

6  company?

7      A.    Yes, whoever was in charge of the employees.

8      Q.    Okay.

9      A.    And what the situation was.

10      Q.    Okay.  Did -- was HR or someone in that

11  department given any of the authority with respect to

12  determine whether to counter or raise salary in order to

13  retain talent?

14      A.    I don't know.

15      Q.    Okay.  When you were thinking about what to do

16  about compensation on a going-forward basis, i.e.,

17  setting levels for a particular year, bonuses, or things

18  like that, did you look at this kind of information?

19  When I say "this kind of information," I mean information

20  regarding your employees getting higher offers at other

21  places.  Did you look at that kind of information when

22  you were thinking about what you were going to do with

23  respect to compensation for the following year?

24      A.    No.

25      Q.    Okay.  Did it enter into your calculus at all?

1    A.   No.

2    Q.   So when you were thinking about what -- whether

3  to raise salaries for the coming year, you didn't care

4  whether or not competitive companies were raising

5  salaries to hire away --

6         MR. KEKER:   Objection to form.

7  BY MR. SAVERI:

8    Q.   -- talent?

9         MR. KEKER:   Object as to form.

10        You can answer.

11        THE WITNESS:   Well, again, this is a

12  specific -- I mean I don't -- I didn't know anything

13  about the -- this Sony group.   But when a company is

14  formed, they immediately go out and raid all the other

15  companies.   It's a big problem.   And they will pay

16  whatever it takes, even though it is irresponsible.   And,

17  of course, these companies are all out of business now,

18  because they paid everybody more than they could afford.

19        So we have to protect ourselves against that,

20  because that can completely wipe out a department.   In

21  this case it is the animation group which was working on

22  our TV show that we had to deliver, and we had to deliver

23  on time, no matter what.   So if they take away 30 of our

24  people, or key -- 10 of our key people, we're wiped out.

25  We'll go bankrupt.   So it's that close to the edge.

1          So in that situation -- and in this case, Gail

2    Currey was looking at, we're not going to get done if we

3    lose these people.  So in that particular case, it was

4    maybe we should offer some more money so he'll stay until

5    we can bolster up the rest of the people that have been

6    scavaged away to, you know, keep the pipeline going.

7    BY MR. SAVERI:

8          Q.   So from time to time new companies would come

9    into your -- into the space --

10         A.   Right.

11         Q.   -- and --

12         A.   It's -- it's a joint problem for the company.

13   It's the same thing with Digital Domain, it was the same

14   thing with Sony, it was the same thing with DEI, it was

15   the same -- you know, we have this a lot.  It is not just

16   a little thing.  And, you know, the result is, there's

17   only a couple of companies left.

18         Q.   So sometimes you would lose people.

19         A.   Yes.

20         Q.   And -- and sometimes they would go to companies

21   that ended up failing.

22         A.   Well, they would go to companies that would pay

23   them a lot more, and at the same time it would damage our

24   production line so that we couldn't get our job done on

25   time.  And in that case you have the supervisor there

1    panicking and saying, we're not going to get done.  We

2    have to hire a whole bunch more people and train them,

3    which takes, you know, a year, and then -- you know, and

4    still be on time.  And she was saying, that ain't going

5    to happen.

6        Q.   So from time to time did you kind of respond to

7    that competitive threat by -- well, not letting the

8    people go, but trying to do things to keep -- encourage

9    people to stay?

10       A.   No.  We would -- well, we'd encourage people to

11   stay, and in those situations we have a key person who

12   you have to have to keep going who is being wooed away by

13   another company who is going to pay triple what they are

14   getting, or in this case even 30 percent is a lot, and,

15   you know, you want to try to keep that in check.

16       Q.   Okay.  Well, from time to time, though --

17       A.   But it is on an individual basis.

18       Q.   And so from time to time on an individual basis

19   some compensation was raised.

20       A.   Yes.

21       Q.   Okay.  And was that something you decided?

22       A.   No.

23       Q.   And that was something that you delegated to

24   other people in the company.

25       A.   It was whoever was affected by it.

1     Q.   Okay.

2     A.   And then they would in the end say, we're way

3   overbudget because we had to do this, this, and this.

4     Q.   Okay.  Well, you never had that problem with

5   Pixar, right?

6     A.   No.

7     Q.   And that's in large part because you had an

8   understanding going back to Ed Catmull.

9     A.   But they didn't -- since they began from our

10  company, they didn't have to recruit a lot of people, and

11  in the beginning they weren't doing movies.  So it wasn't

12  until they started doing movies that it started to become

13  some kind of an issue.

14        And it was the same thing for them when we did

15  Star Wars and that sort of thing.  People wanted to move

16  back and forth between the companies.  They did move back

17  and forth between the companies a lot.

18     Q.   Let me hand you this document.  Let me just ask

19  you a question.  Exhibit 118 is a Croner Survey.

20     A.   Uh-huh.

21     Q.   And maybe I can just short-circuit.  Did you

22  ever see Croner Surveys like this?

23     A.   Let me look at the whole thing.  I don't think

24  so.

25     Q.   You should satisfy yourself that that's your

 1   answer, but that's my question.

 2        A.   No, I didn't.  I haven't seen this.

 3             MR. KEKER:  There is no question pending,

 4   George.

 5             MR. SAVERI:  Well, if you are satisfied you --

 6             THE WITNESS:  Yeah.

 7             MR. SAVERI:  Put it aside, then.

 8   BY MR. SAVERI:

 9        Q.   Let he hand you Exhibit 167.  This is the

10   "Competitive Impact Statement" that was filed in the

11   action by the Department of Justice against Lucasfilm.

12        A.   Okay.

13        Q.   I really only have questions about section II

14   which is on page 2 and 3, but the same thing, please take

15   whatever time you need to look at the document.

16        A.   Okay.

17        Q.   First, have you ever seen this document before?

18        A.   No.

19        Q.   In II, there is some text under the heading,

20   "Description of the Events Giving Rise to the Alleged

21   Violations of the Antitrust Laws."  Do you see where I

22   am?

23        A.   Right.  Uh-huh.

24        Q.   And it says, "Lucasfilm and Pixar are rival

25   digital animation studios."  Do you see that?

1       A.   Yes.

2       Q.   Is that a true statement?

3       A.   Yes.

4       Q.   And it says, "Beginning" --

5       A.   Well, no, actually.   I mean their features were

6  television.

7       Q.   Are you -- are you both animation studios?

8       A.   Yes.

9       Q.   "Beginning no later than January 2005,

10  Lucasfilm and Pixar agreed to a three-part protocol that

11  restricted the recruiting of each other's employees."   Do

12  you see that?

13      A.   Yes.

14      Q.   Is that true?

15      A.   Yes.

16      Q.   It says, "First, Lucasfilm and Pixar agreed

17  that they would not cold call each other's employees."

18  Do you see that?

19      A.   Yes.

20      Q.   Is that a true statement of fact?

21      A.   Yes.

22      Q.   Okay.   Let me just skip down.   It says,

23  "Second, they agreed to notify each other when making an

24  offer to an employee of the other firm."   Do you see

25  that?

```
 1          A.    Yes.

 2          Q.    Is that true?

 3          A.    Yes.

 4          Q.    Then it says, "Third, they agreed that when

 5   offering a position to the other company's employee,

 6   neither would counter offer above the initial offer."  Is

 7   that true?

 8          A.    I don't know.

 9          Q.    You don't know one way or the other.

10          A.    No, I don't.

11          Q.    Okay.  So you don't deny that's true.

12                MR. KEKER:  Object to the form.

13                THE WITNESS:  It obviously was repeated in the

14   memo, so --

15                MR. KEKER:  This is a DOJ memo.

16                MR. SAVERI:  Let me -- let me ask the questions

17   and have the witness answer them.

18          Q.    Now, it says, "The protocol covered all digital

19   animators and other employees of both firms and was not

20   limited by geography, job function, product group, or

21   time period."  Do you see that?

22          A.    Yep.

23          Q.    Is that true?

24          A.    I don't know.

25          Q.    Well, when you had your discussions with Ed
```

1  Catmull, were there any limitations with respect to

2  geography, job function, product group or time period?

3       A.   No.

4       Q.   Do you have any reason to believe that that was

5  changed in any way subsequent to that?

6       A.   Originally we were talking about digital.  The

7  people that worked at Pixar that used to work at

8  Lucasfilm.

9       Q.   Okay.  But subsequently you understood that

10 neither company would -- would actively recruit not only

11 digital animators, but other employees as well.

12      A.   Yeah.

13      Q.   And it says, "Senior executives at the two

14 firms agreed on the protocol through direct and explicit

15 communications."  Do you see that?

16      A.   Yes.

17      Q.   Now, you're a senior executive at the company,

18 right?

19      A.   Yes.

20      Q.   So -- well, is that statement true?

21      A.   No.

22      Q.   Why isn't it true?

23      A.   Well, if you're saying that I'm -- if they were

24 communicating with me, no.  If they were communicating

25 between Ed Catmull and Ms. Chau, yes.

1        Q.    And it says, "In furtherance of this agreement,

2    Pixar drafted the terms of the agreement with Lucasfilm

3    and communicated those written terms to Lucasfilm."  Do

4    you see that?

5        A.    Yeah.

6        Q.    Is that true?

7        A.    I wouldn't call it "terms of an agreement."

8        Q.    Well --

9        A.    I mean --

10       Q.    -- what would you call it?

11       A.    Just the understanding between the two

12   companies.

13       Q.    Okay.  And it says, "Both firms communicated

14   the agreement to management and select employees with

15   hiring or recruiting responsibilities."  Do you see that?

16       A.    Yes.

17       Q.    Is that true?

18       A.    Yes.

19       Q.    Now, it says, "Twice in 2007 Pixar complained

20   to Lucasfilm about recruiting efforts Lucasfilm had

21   made."  Do you see that?

22       A.    Yep.

23       Q.    And is that true?

24       A.    I don't know.

25       Q.    Okay.  Do you recall any incident in 2007 where

1    Pixar complained to Lucasfilm about Lucasfilm's

2    recruiting efforts?

3        A.    No.

4        Q.    And then it says, "Complaints about breaches of

5    the agreement led the two firms to alter their conduct

6    going forward to conform to the agreement."

7              Do you see that?

8        A.    Yes.

9        Q.    Do you know if that's true?

10       A.    No.

11       Q.    Now, the -- the next paragraph says -- well,

12   let me ask you a question before I get there.

13             Did you -- at Lucasfilm, who knew about your

14   understanding with Ed Catmull?

15       A.    I don't know.

16       Q.    Was it -- was it a matter of kind of public

17   knowledge within the company?

18       A.    That, I don't know either.

19       Q.    Okay.  Did you ever tell anybody that worked

20   for you that information regarding your conversations

21   with Ed Catmull were not to be widely disseminated or

22   described?

23       A.    No.

24       Q.    Okay.  Now, this says in the next paragraph,

25   "It eliminated a significant form of competition to

 1   attract digital animation employees and other employees

 2   covered by the agreement."  Do you see that?

 3        A.   Uh-huh.

 4        Q.   Would you agree that your agreement or your --

 5   your -- excuse me.

 6             Would you agree that your conversations with Ed

 7   Catmull served to head off any competition between the

 8   two companies to attract digital animation employees?

 9        A.   No.

10        Q.   Well, would you agree that the discussions you

11   had with Ed Catmull generally prevented, as you said,

12   efforts by the two companies that might have killed each

13   other?

14        A.   Right.  I was trying to -- we were trying to

15   protect the San Francisco film industry.  It is very,

16   very small.  It is very hard for us.  We're not like

17   Hollywood.  And the only way we can survive is if we do

18   it together.  United we stand, divided we fall.  This is

19   not like a regular capitalist kind of operation where

20   you're out to kill the other guy.  I'm promoting digital

21   technology for cinema, and I'm devoting a lot of my time

22   working with animators and with visual effects people to

23   try to expand the entire medium and discipline for

24   everybody.  When I came here, there were nobody -- there

25   was nobody.

1    Q.    Did you believe that if you were kind of

2    competing with Pixar for employees, and -- and recruiting

3    or raiding each other's talent, that you would -- that

4    would have limited your ability to do that?

5    A.    Yes.

6    Q.    And it would have made -- it's your testimony

7    that that kind of raiding or recruiting would have

8    limited the growth of the industry here.

9    A.    Definitely.  It's -- it's, you know -- it's a

10   very common thing in our business.  It is something that

11   comes -- Lucasfilm has been close to bankruptcy several

12   times because of it.  It's not something we take lightly.

13   And, as I say, most of the visual effects companies and a

14   lot of the animation companies now are broke.  They are

15   bankrupt, they're gone, or they've gone to Europe.

16   Q.    So it's your -- is it your testimony that were

17   you to -- were you to have competed with -- with Pixar

18   with respect to compensation or recruiting or retaining

19   talent, that you would have not been able to succeed as a

20   business?

21   A.    We would have been able to succeed, but my way

22   of looking at that is not in an adversary way.  My whole

23   life is dedicated to cooperation and helping people and

24   being together to help people to expand and create

25   something that wasn't there before.  It is only the

1    aren't like that.  We're -- the whole idea is that

2    obviously we are competitive in terms of trying to do the

3    best work, but we're not interested in doing it at

4    somebody else's expense.  And we're really interested in

5    promoting the idea of digital effects and digital

6    animation and also the -- the movie industry in

7    San Francisco.

8              MR. KEKER:  Thank you, Mr. Lucas.  No further

9    questions.

10             MR. SAVERI:  I have a couple of follow-up

11   questions.  I just want to make sure I understand this.

12

13                     FURTHER EXAMINATION

14   BY MR. SAVERI:

15        Q.   Mr. Keker just asked you about when you learned

16   about -- about what you learned about the legality of the

17   agreement with Pixar.  Do you recall that question?

18        A.   Yes.

19        Q.   Who did you -- who did you -- who provided

20   the -- the information from which you learned about the

21   legality of the agreement?

22             MR. KEKER:  Objection.  If it calls for

23   attorney-client privilege, you can say, "I learned it

24   from lawyers," but don't go beyond that.

25             THE WITNESS:  Okay.  I learned it from lawyers.

```
 1   BY MR. SAVERI:
 2        Q.   You didn't learn it from anybody else, other
 3   than lawyers?
 4        A.   No.
 5        Q.   Mr. Keker just asked you a couple of questions
 6   about your -- your first conversation with Ed Catmull.
 7             Do you recall that?
 8        A.   Yes.
 9        Q.   And to the best of your recollection, that
10   occurred sometime in 1985; is that about right?
11        A.   Yeah, whenever we did the -- I'm not good with
12   dates at all, but it was whenever we were selling the
13   company.
14        Q.   Was your conversation with Mr. Catmull part of
15   your negotiations with Steve Jobs regarding the business
16   terms of the spinoff of what became Pixar?
17        A.   No.  It had nothing to do with that.
18        Q.   Was that agreement or understanding part of the
19   purchase contract or whatever written document there was
20   that memorialized the terms of the spinoff?
21        A.   No.  To my best knowledge it happened after the
22   deal was closed.
23        Q.   And the -- the -- to the best of your
24   recollection, there was no written record prepared of the
25   conversation that you first had with Mr. Catmull in 1985.
```

1    A.   No.  At that point I was still his boss, and

2    collaborator and friend, and it really had nothing to do

3    with the deal.  I mean I'm not sure Steve Jobs even knew

4    about it.

5    Q.   Did you ever have a practice of keeping written

6    notes of what happened to you during -- or what you did

7    during your -- your business day?

8    A.   No.

9        MR. SAVERI:  I don't have any further

10   questions.

11       MR. KEKER:  Nor do I.

12       MR. PURCELL:  One thing, sorry, before we go

13   off the record, we would like to reserve the right to

14   have the witness review and sign the transcript, and we

15   would like the provision we designate the transcript

16   ATTORNEYS' EYES ONLY, and we'll down-designate the

17   majority of it, I'm sure, later on.

18       THE VIDEOGRAPHER:  This is the end of Video 3

19   of 3 and concludes today's proceedings.  The master

20   videos will be retained by Jordan Media.  We are now off

21   the record.  The time is 2:47.

22       (The deposition ended at 2:47 p.m.)

23

24                              _____

25                              GEORGE LUCAS

1          I, Rosalie A. Kramm, Certified Shorthand

2    Reporter licensed in the State of California, License No.

3    5469, hereby certify that the deponent was by me first

4    duly sworn and the foregoing testimony was reported by me

5    and was thereafter transcribed with computer-aided

6    transcription; that the foregoing is a full, complete,

7    and true record of said proceedings.

8          I further certify that I am not of counsel or

9    attorney for either of any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12         The dismantling, unsealing, or unbinding of the

13   original transcript will render the reporter's

14   certificates null and void.

15         In witness whereof, I have hereunto set my hand

16   this day:   April 9, 2013.

17         ___X___  Reading and Signing was requested.

18         _____  Reading and Signing was waived.

19         _____  Reading and signing was not requested.

20

21                    _____

22                    ROSALIE A. KRAMM

23                    CSR 5469, RPR, CRR

24

25