# EXHIBIT WW

# REDACTED PUBLIC VERSION

```
 1              UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN JOSE DIVISION

 4

 5

 6   IN RE:  HIGH-TECH EMPLOYEE     )

 7   ANTITRUST LITIGATION           )

 8                                  )   No. 11-CV-2509-LHK

 9   THIS DOCUMENT RELATES TO:      )

10   ALL ACTIONS.                   )

11   _____)

12

13

14         CONFIDENTIAL - ATTORNEYS' EYES ONLY

15        VIDEO DEPOSITION OF JAN VAN DER VOORT

16               February 5, 2013

17

18

19   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25
```

10:20:11  1    it's Nacasio.

10:20:17  2         Q.  Can you tell me on the next page, which is

10:20:24  3    13721, it's titled 2008 Projected Growth.  Can you tell

10:20:31  4    me how you -- well, did you prepare this page?

10:20:35  5         A.  No.

10:20:36  6         Q.  Did BZ prepare this page?

10:20:38  7         A.  Yes.

10:20:39  8         Q.  Do you know how she determined how many -- how

10:20:43  9    she determined the estimated hires for 2008?

10:20:49 10         A.  Yes, I do know.

10:20:50 11         Q.  Would you please tell me how she determined the

10:20:53 12    estimated hires for 2008?

10:20:58 13         A.  She, after speaking with the heads of each of

10:21:02 14    the business units, determined what their hiring needs

10:21:05 15    were going to be, and that would be indicated by the

10:21:08 16    growth column.  And these are estimated.  Attrition was

10:21:14 17    basically a formulaic, this is what our turnover looks

10:21:18 18    likes so therefore we would expect to have approximately

10:21:21 19    this many people exiting the company for one reason or

10:21:23 20    another.  And that gives you the total number of new

10:21:27 21    hires by division that would be anticipated.

10:21:33 22         Q.  Do you know how close this projection came to

10:21:38 23    reality?  Do you know whether the hires in 2008 were

10:21:42 24    approximately 540?

10:21:43 25         A.  Yes, they were.

| | | |
|---|---|---|
| 10:21:58 | 1 | Q.  So I want to turn to the next page, 16657. |
| 10:22:04 | 2 | MR. HARRIS:  I'm sorry, what was the Bates |
| 10:22:05 | 3 | number? |
| 10:22:06 | 4 | MS. LEEBOVE:  I'm sorry, that was the LFL |
| 10:22:08 | 5 | number, it's LUCAS13722. |
| 10:22:10 | 6 | MR. HARRIS:  Okay. |
| 10:22:13 | 7 | MS. LEEBOVE:  Q.  Actually, I'm looking at |
| 10:22:14 | 8 | that along with 13723. |
| 10:22:18 | 9 | Did you -- Ms. van der Voort, did you prepare |
| 10:22:19 | 10 | these two pages, 13722 and 13723? |
| 10:22:23 | 11 | A.  No. |
| 10:22:25 | 12 | Q.  Did BZ Petroff prepare them? |
| 10:22:28 | 13 | A.  Yes. |
| 10:22:29 | 14 | Q.  Do you know what this means on page 13722 where |
| 10:22:32 | 15 | it says for LEC, "Talent hard to find, 'passive' |
| 10:22:36 | 16 | candidates"? |
| 10:22:37 | 17 | A.  Yes. |
| 10:22:39 | 18 | Q.  What does that mean? |
| 10:22:40 | 19 | A.  It means that people are -- the type of talent |
| 10:22:44 | 20 | we were looking for was hard to find.  There was lots of |
| 10:22:47 | 21 | competition in the games industry, and that people were |
| 10:22:51 | 22 | not generally out actively looking for new employment. |
| 10:22:56 | 23 | Q.  Is that what a passive candidate is? |
| 10:22:59 | 24 | A.  That's what BZ meant when she referred to it |
| 10:23:02 | 25 | here. |

10:23:03  1      Q.   Someone who is not actively looking for

10:23:05  2  employment?

10:23:18  3           Do you know what the -- in the row for LAL it

10:23:23  4  says, "Easy to recruit junior talent/senior difficult."

10:23:26  5           Can you tell me what that means?

10:23:32  6      A.   Pretty self-explanatory.  The junior talent was

10:23:34  7  readily available.  The senior talent was less readily

10:23:37  8  available in the area.

10:23:46  9      Q.   LAS, I believe you mentioned, was the Singapore

10:23:51 10  operation?

10:23:51 11      A.   Correct.

10:23:55 12      Q.   For LFL/LECL, it also says, "Junior talent

10:24:00 13  easy/senior very difficult to find; lots of

10:24:04 14  competition."

10:24:06 15           What does that mean to you?

10:24:09 16      A.   Pretty much the same thing as for animation.

10:24:13 17  Junior talent is easy.  As in probably any industry I've

10:24:16 18  ever been involved in, senior talent is very hard to

10:24:19 19  find, so....

10:24:35 20      Q.   On page 13723, did BZ Petroff prepare this

10:24:46 21  page?

10:24:46 22      A.   Yes.

10:24:47 23      Q.   Do you agree with her most difficult and least

10:24:52 24  difficult examples of positions to fill?

10:24:58 25      A.   Well, I wasn't running the recruiting

10:25:02  1    organization, so this was BZ's take on what the hardest

10:25:06  2    jobs were that she was tasked with.

10:25:08  3        Q.  Okay.

10:25:09  4        A.  So generally, yes.

10:25:12  5        Q.  Do you have any sense of where these types

10:25:14  6    of -- these are examples of positions to fill.  I think

10:25:19  7    that on a previous page, on just the prior page, it

10:25:22  8    mentioned, for instance, for LEC, which I believe you

10:25:24  9    mentioned was Lucas Arts, the games division?

10:25:27 10        A.  Correct.

10:25:29 11        Q.  That talent is hard to find, candidates were

10:25:33 12    passive.  Would that apply, do you believe, to senior

10:25:40 13    game engineers?  That they were hard to find and passive

10:25:45 14    candidates?

10:25:46 15        A.  Generally.

10:25:47 16        Q.  Do you have any sense of where those passive

10:25:51 17    candidates -- the kinds of places where those passive

10:25:53 18    candidates would work?

10:25:55 19            MR. HARRIS:  Objection.  Calls for speculation.

10:25:59 20            MS. LEEBOVE:  Q.  You can answer if you are

10:26:00 21    able to.

10:26:01 22            Do you have any sense of where those folks

10:26:02 23    might work?

10:26:03 24        A.  I would have to guess.

10:26:05 25        Q.  Can you guess?

Jan van der Voort                                          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:26:07  1              MR. HARRIS:  Objection.  Calls for speculation.

10:26:08  2              THE WITNESS:  No.

10:26:13  3              MS. LEEBOVE:  Q.  Do you have any sense of

10:26:14  4     what type of companies game designers worked at

10:26:17  5     besides Lucas?

10:26:20  6          A.  Can you repeat that question.

10:26:22  7          Q.  Do you have any sense of which companies game

10:26:25  8     designers worked for?

10:26:28  9          A.  Yes.

10:26:29 10          Q.  Which companies were those?  Or who would those

10:26:32 11     be?

10:26:34 12          A.  Lots of game companies; Ubisoft, Electronic

10:26:39 13     Arts, Activision, Blizzard.  Lots of smaller companies

10:26:46 14     as well.

10:26:46 15          Q.  Do you know whether Lucas had agreements with

10:26:52 16     any of those companies not to recruit their employees?

10:26:55 17          A.  I don't know as I sit here.

10:27:14 18          Q.  Can you tell me where, if you have a sense,

10:27:17 19     where R&D engineers might have worked if they weren't

10:27:22 20     working at Lucas?

10:27:24 21              MR. HARRIS:  Objection.  Calls for speculation.

10:27:28 22              THE WITNESS:  I don't know.

10:27:30 23              MS. LEEBOVE:  Q.  What are Python

10:27:37 24     programmers?

10:27:38 25          A.  You are probably as familiar with programming

| | | |
|---|---|---|
| 10:35:09 | 1 | things that I mentioned earlier, such as trade fairs and |
| 10:35:14 | 2 | SIGGRAPH, S-I-G-G-R-A-P-H. |
| 10:35:24 | 3 | Q.  Okay.  I'm going to turn to the next page, |
| 10:35:26 | 4 | 13725.  The first bullet point says, "Lucasfilm |
| 10:35:36 | 5 | companies are at ███████████ of comp range for SF |
| 10:35:40 | 6 | Bay Area." |
| 10:35:41 | 7 | Do you know what that means? |
| 10:35:42 | 8 | A.  Yes. |
| 10:35:43 | 9 | Q.  What does that mean? |
| 10:35:45 | 10 | A.  That overall, the compensation that we targeted |
| 10:35:51 | 11 | and achieved was at the ███████████████ of the |
| 10:36:00 | 12 | market for -- of the Bay Area. |
| 10:36:08 | 13 | Q.  You said "targeted and achieved"; does that |
| 10:36:10 | 14 | mean that nobody was outside of that range? |
| 10:36:13 | 15 | A.  No.  But generally that's where people fell. |
| 10:36:19 | 16 | Q.  How did know where Lucas stood in terms of the |
| 10:36:23 | 17 | percentage of compensation?  Was this based on surveys? |
| 10:36:27 | 18 | A.  Yes. |
| 10:36:33 | 19 | Q.  Which surveys? |
| 10:36:35 | 20 | A.  The ones I referenced earlier. |
| 10:36:37 | 21 | Q.  Croner, Radford? |
| 10:36:39 | 22 | A.  Croner, Radford. |
| 10:36:40 | 23 | Q.  Any others? |
| 10:36:41 | 24 | A.  As I mentioned, I didn't have an exhaustive |
| 10:36:44 | 25 | list of names, but whatever they were. |

10:36:52  1        Q.   Okay.   Turning to the next page.   LUCAS13726.

10:37:04  2   No. 3 - Competition in the Bay Area.   Is it your

10:37:07  3   understanding that this -- that competition in the

10:37:09  4   Bay Area refers to competition for employees?

10:37:12  5        A.   Yes.

10:37:17  6        Q.   Is this a page that you prepared or did

10:37:19  7   BZ Petroff prepare this page?

10:37:27  8        A.   BZ.

10:37:27  9        Q.   That second bullet point, it says, "Pixar,

10:37:33 10   IM Digital, PDI, Tippett," T-I-P-P-E-T-T, "Orphanage, EA

10:37:40 11   Redwood," is that Electronic Arts Redwood?

10:37:44 12        A.   Redwood Shores, yeah.

10:37:46 13        Q.   Redwood Shores.

10:37:49 14             Did you regard these employers as the chief

10:37:55 15   competitors for employees at the time?

10:37:57 16        A.   They were among the competitors.

10:38:06 17        Q.   Are there any other competitors for employees

10:38:10 18   that you would add to this list to make it complete?

10:38:13 19             MR. HARRIS:   Objection.   Calls for a narrative.

10:38:17 20             You could answer.

10:38:18 21             THE WITNESS:   We actually recruit

10:38:21 22   internationally.   So I couldn't even begin to put a

10:38:24 23   complete list of companies together that would be our

10:38:28 24   competition for employees.

10:38:31 25             MS. LEEBOVE:   Q.   Jumping down to the next

10:38:32  1    line it says, "Google, Yahoo, Silicon Valley, etc."

10:38:37  2         Do you regard those companies as competitors

10:38:40  3    for employees as well?

10:38:41  4         A.  As I just said, yeah.  We have a pretty broad

10:38:45  5    net that we cast, and they would fall in that.

10:38:56  6         Q.  Do you know whether Lucas had agreements with

10:38:59  7    any of the companies listed on this page not to recruit

10:39:02  8    their employees or to limit recruiting in any way?

10:39:05  9         MR. HARRIS:  Objection.  Vague.  Compound.

10:39:07 10         MS. LEEBOVE:  Let me reask that question.

10:39:10 11         Q.  Do you know whether Lucas had any agreements

10:39:11 12    with any of the companies listed on this page to limit

10:39:15 13    recruiting in any way?

10:39:18 14         MR. HARRIS:  Objection.  Vague.

10:39:27 15         MS. LEEBOVE:  Q.  Are you able to answer?

10:39:31 16         A.  Can you restate the question.

10:39:35 17         Q.  Do you know whether Lucas had an agreement with

10:39:38 18    Pixar to limit recruiting?

10:39:41 19         A.  We had --

10:39:42 20         MR. HARRIS:  Objection.  Vague.

10:39:44 21         Go ahead.

10:39:47 22         THE WITNESS:  We had a gentleman's agreement,

10:39:50 23    it wasn't an agreement if you want to think about

10:39:54 24    something official in writing, that limited contact from

10:39:59 25    HR and recruiting with Pixar.  But it didn't limit us

10:40:02  1    from hiring each other's employees.

10:40:08  2            MS. LEEBOVE:  Q.  Do you know whether Lucas

10:40:09  3    had an agreement, any sort of agreement, with

10:40:11  4    IM Digital --

10:40:14  5            MR. HARRIS:  Objection.

10:40:14  6            MS. LEEBOVE:  Q.  -- that would limit

10:40:16  7    recruiting employees?

10:40:18  8            MR. HARRIS:  Objection.  Vague.

10:40:26  9            THE WITNESS:  There was something about

10:40:27 10    IM Digital that I became aware of that was ongoing when

10:40:31 11    I arrived.  My understanding was more about IP, so I

10:40:41 12    can't really comment on that.

10:40:46 13            MS. LEEBOVE:  Q.  Did you understand there

10:40:47 14    to be an agreed limitation on recruiting between

10:40:49 15    Lucas and IM Digital?

10:40:52 16        A.  No, I did not.

10:40:56 17        Q.  Do you know whether there was any sort of

10:40:57 18    agreement limiting recruiting between Lucas and PDI?

10:41:02 19        A.  Not that I know of.

10:41:07 20        Q.  Do you know whether there was any sort of

10:41:09 21    agreement limiting recruiting between Lucas and Tippett?

10:41:14 22        A.  Not that I know of.

10:41:15 23        Q.  Do you know whether there was any sort of

10:41:17 24    agreement limiting recruiting between Lucas and the

10:41:19 25    Orphanage?

10:47:32  1    would have retention on a page like this and have that

10:47:36  2    bullet point on there, because it is expensive.  If you

10:47:41  3    have excessive turnover, then you have higher recruiting

10:47:46  4    and training costs.

10:47:53  5              MS. LEEBOVE:  Q.  Did you believe that

10:47:54  6    Lucas had excessive turnover of employees?

10:47:56  7              MR. HARRIS:  Objection.  Vague.

10:48:00  8              Go ahead.

10:48:01  9              THE WITNESS:  Not generally, no.

10:48:15 10              MS. LEEBOVE:  Q.  Did you create strategies

10:48:16 11    to keep people at Lucas?  Especially those working

10:48:19 12    on company growth related projects?

10:48:24 13              MR. HARRIS:  Objection.  Compound.  Vague.

10:48:30 14              THE WITNESS:  I did not, no.

10:48:37 15              MS. LEEBOVE:  Q.  As you sit here today,

10:48:37 16    can you think of any strategies that would keep

10:48:41 17    people at Lucas while working on company

10:48:45 18    growth-related projects?

10:48:50 19              MR. HARRIS:  Object to the form.

10:48:51 20              THE WITNESS:  Not as I sit here today.

10:49:16 21              MS. LEEBOVE:  Q.  Would you turn, please,

10:49:22 22    to page 13734.  This looks like another draft of the

10:49:31 23    page we just looked at, perhaps, or maybe you can

10:49:37 24    tell me what this is.  The page we just looked at,

10:49:40 25    13728 says No. 5 - Retention.  This page 13734 says

10:49:45  1   No. 4 - Retention, and lists some different points.

10:49:55  2          Do you know whether both of these pages were

10:49:57  3   part of your presentation to the board of directors in

10:49:59  4   October of 2007?

10:50:01  5      A.  I don't recall.

10:50:10  6      Q.  Page 13734 refers to, "Focus on retention of

10:50:13  7   key people."  That's the third bullet point there.

10:50:16  8          Do you know which key people this bullet point

10:50:19  9   is referring to?

10:50:21 10          MR. HARRIS:  Objection.  Calls for speculation.

10:50:25 11          You can answer.

10:50:28 12          THE WITNESS:  Key people isn't person specific.

10:50:31 13   It's a category of people who might be key to either a

10:50:34 14   specific project or a particular production.  That's not

10:50:41 15   key people identified A, B, C, D, E.

10:50:46 16          MS. LEEBOVE:  Q.  Are there particular

10:50:47 17   categories of people who you consider key people in

10:50:49 18   the organization?

10:50:51 19      A.  In general, creative people are considered key.

10:50:59 20   George is a creative person, that's his -- that's his

10:51:07 21   life, basically.

10:51:09 22      Q.  Are you referring to George Lucas?

10:51:11 23      A.  Yes.

10:51:19 24      Q.  In your position as chief administrative

10:51:21 25   officer, do you have any -- where does George Lucas fall

10:51:26  1    in the organizational structure, vis-a-vis your

10:51:30  2    position?  You don't -- let me strike that.

10:51:32  3          Do you report to George Lucas at all?

10:51:34  4      A.  No.

10:51:36  5      Q.  Do you interact with George Lucas in your work

10:51:39  6    as the chief administrative officer?

10:51:40  7      A.  No.

10:51:49  8      Q.  The second bullet point here says, "Recruiting

10:51:51  9    and training is very expensive, average cost to replace

10:51:54 10    an employee is 50 percent of annual comp."

10:51:59 11          Do you agree with that statement?

10:52:06 12      A.  Generally, yes.  And I'm qualifying it because

10:52:10 13    it depends on what the employee's role is and what type

10:52:14 14    of training is involved.

10:52:26 15      Q.  Can you give me an example of an inexpensive

10:52:30 16    employee to replace?

10:52:32 17      A.  An inexpensive?

10:52:34 18      Q.  Well, this bullet point states that replacing

10:52:37 19    employees is expensive.

10:52:38 20      A.  Right.

10:52:39 21          MR. HARRIS:  Objection.

10:52:39 22          MS. LEEBOVE:  Q.  So I'm wondering if you

10:52:40 23    can tell me whether there are any employees who can

10:52:42 24    be replaced inexpensively.

10:52:44 25          MR. HARRIS:  Objection.  Misstates the

11:47:21  1              MR. HARRIS:  Go ahead.

11:47:22  2              THE WITNESS:  At the time of this email, I was

11:47:23  3    just learning about this.  So it was all new to me.

11:47:27  4              MS. LEEBOVE:  Q.  When you received this

11:47:29  5    email, did you know about the gentleman's agreement

11:47:32  6    at all?

11:47:34  7         A.  I don't honestly recall.

11:47:49  8         Q.  And you emailed Sharon, "Can you make sure to

11:47:51  9    pass along Lori's contact info?"

11:47:56  10             You were asking -- is a reference to Lori

11:47:59  11   McAdams at Pixar?

11:47:59  12        A.  Yes.

11:48:13  13        Q.  So based on this message, is it your

11:48:15  14   understanding that an employee quit Pixar to come to

11:48:21  15   Lucas and the Lucas folks had not contacted Pixar about

11:48:25  16   that before it happened?

11:48:28  17             MR. HARRIS:  Object to the form of the

11:48:29  18   question.

11:48:34  19             THE WITNESS:  At the time of this email, all I

11:48:36  20   knew was exactly what was written on here.

11:48:38  21             MS. LEEBOVE:  Q.  Okay.  It says, "Lori

11:48:45  22   says this one isn't a big deal, but she wants to

11:48:47  23   make sure the process is in place."

11:48:51  24             Do you know what process this email is

11:48:53  25   referring to?  What the process is?

11:48:56  1          A.  I did not at the time of the email, no.

11:49:12  2          Q.  Do you know what the process is now?

11:49:15  3              MR. HARRIS:  Object to the form of the

11:49:16  4  question.

11:49:17  5              MS. LEEBOVE:  Q.  At this -- you testified

11:49:19  6  that at the time of this email you didn't know what

11:49:21  7  the process is that Sharon Coker is referring to.

11:49:25  8  Now do you know what the process is that Sharon

11:49:28  9  Coker was referring to?

11:49:29 10          A.  Yes.

11:49:30 11          Q.  What was the process?

11:49:33 12          A.  There was, again, a gentleman's agreement that

11:49:38 13  grew out of Lucasfilm's and Pixar's early relationship.

11:49:44 14  Pixar was actually part of Lucas at one point.  And

11:49:50 15  George sold, and they retained a close working

11:49:57 16  relationship.

11:49:58 17              At the time in 2007 when I started, and even

11:50:00 18  through today, we work on a lot of things together.  We

11:50:03 19  share technology.  I believe Skywalker Sound does almost

11:50:08 20  all of Pixar's sound work for them.

11:50:11 21              And so there was a close relationship, even

11:50:15 22  though Pixar was not owned anymore by Lucasfilm.  And

11:50:21 23  the gentleman's agreement grew out of, A, that

11:50:24 24  relationship, but also, my understanding, that there was

11:50:29 25  a desire on both companies' parts to make sure that

11:50:33  1    productions that we were involved in, work that we were

11:50:36  2    doing, whether together or separately, didn't get

11:50:39  3    compromised by key employees -- I use that term not in

11:50:42  4    the former reference, but somebody important to a

11:50:45  5    particular project -- would leave in the middle.

11:50:48  6            So the agreement, as I understood it, was that

11:50:53  7    HR and recruiting would not reach out proactively to

11:51:00  8    Pixar's employees, nor Pixar's to us, and that if a job

11:51:05  9    offer were to be made, then they would be -- whoever was

11:51:11 10    offering the job would notify the other company's

11:51:15 11    contact, whoever that contact person was.

11:51:20 12        Q.  Was there any other element to the agreement

11:51:24 13    with Pixar besides the recruiting folks not proactively

11:51:29 14    contacting the other's employees?  You mentioned if an

11:51:33 15    offer is made, whoever offered notified the other's

11:51:36 16    company.  Was there any other component of that process?

11:51:40 17    Of the process that's referred to in this email?

11:51:43 18            MR. HARRIS:  Object to the form.

11:51:48 19            THE WITNESS:  My understanding was that the

11:51:51 20    offering company, in making the phone call, would not

11:51:55 21    reveal what the job offer was.  And that the current

11:52:02 22    existing employer was free to make a job offer to try to

11:52:06 23    save the employee if they wanted to.  If they felt like

11:52:09 24    it was appropriate.  If that person and position were

11:52:12 25    important to whatever key production elements were going

11:52:15  1   on at the time, that might make sense.

11:52:23  2           MS. LEEBOVE:  Q.  And Sharon's message

11:52:24  3   says, "I will make an introduction for Jan who will

11:52:28  4   be the point person for this in the future."

11:52:30  5           Is that why you were asking Sharon for Lori

11:52:32  6   McAdams' contact information?

11:52:33  7       A.  Yes.

11:52:38  8           MS. LEEBOVE:  Okay.  We have -- let's see.

11:52:44  9   This will be 691.

11:52:58  10          (Whereupon, Exhibit 691 was marked for

11:52:58  11          identification.)

11:53:04  12          MS. LEEBOVE:  We may want to mark a stack of

11:53:06  13  them.  The next one will be 328.

11:53:18  14          (Discussion off the record.)

11:53:21  15          MS. LEEBOVE:  Q.  You have,

11:53:22  16  Ms. van der Voort, I think everybody has a copy of

11:53:23  17  it, Exhibit No. -- what's been marked as Exhibit

11:53:26  18  No. 691.

11:53:31  19          MR. HARRIS:  Did you want to mark more and give

11:53:33  20  us all at once or -- it's your call, obviously.

11:53:37  21          MS. LEEBOVE:  Yeah.  I think -- well, we're

11:53:39  22  fine.  We can do it this way.

11:53:41  23          MR. HARRIS:  Okay.

11:53:43  24          MS. LEEBOVE:  Q.  So if you could take a

11:53:44  25  moment, Ms. van der Voort, and have a look at

11:53:46  1    Exhibit No. 691.

11:53:51  2            And do you recognize this document?  Looks like

11:53:56  3    you were cc'd on the top email, 5:01 p.m. from Lynwen

11:54:01  4    Brennan to Sharon Coker and Cassandra Kaiser.

11:54:07  5        A.  Yes, I do recognize it.

11:54:09  6        Q.  And can you tell me what was happening here?

11:54:11  7    What this email is about?

11:54:13  8            MR. HARRIS:  Objection.  Document speaks for

11:54:14  9    itself.  Vague.

11:54:21 10            THE WITNESS:  Lynwen was responding to Sharon's

11:54:24 11    email asking Lynwen if she knew who the candidate was.

11:54:28 12    And Lynwen was simply saying we haven't hired one.

11:54:33 13            MS. LEEBOVE:  Q.  So this seems to -- this

11:54:41 14    is Coker 328.

11:54:56 15            Ms. van der Voort, you've been handed Exhibit

11:54:57 16    No. 328, and I'm focusing on that top message.  And I

11:55:09 17    can tell you it looks to me like the folks at Lucas are

11:55:13 18    trying to figure out who this employee is that was

11:55:15 19    hired -- that Lucas hired away from Pixar.

11:55:21 20            Can you tell me what you believe is happening

11:55:22 21    in this email?

11:55:27 22        A.  It looks to me like Sharon was trying to sort

11:55:30 23    it out and find out who it was and where they might be

11:55:34 24    working.

11:55:40 25        Q.  And so the employee's name is ███████.

| | | |
|---|---|---|
| 12:10:09 | 1 | A. Recruiting, when I started, was not reporting |
| 12:10:13 | 2 | into HR, it was reporting into two of the business |
| 12:10:16 | 3 | leaders. |
| 12:10:17 | 4 | Q. Who? |
| 12:10:19 | 5 | A. Jim Ward, who was in charge of Lucas Arts, and |
| 12:10:22 | 6 | Gail Currey, who was in charge of animation. |
| 12:10:27 | 7 | Q. And then what happened? |
| 12:10:29 | 8 | A. Then BZ started reporting to me. |
| 12:10:56 | 9 | MR. HARRIS: Counsel, it's 12:10, so I'm going |
| 12:10:57 | 10 | to suggest if you are done with this document that we |
| 12:11:00 | 11 | break for lunch. |
| 12:11:01 | 12 | MS. LEEBOVE: Sure. We can. |
| 12:11:01 | 13 | MR. HARRIS: Does that work? |
| 12:11:02 | 14 | MS. LEEBOVE: That works. |
| 12:11:03 | 15 | THE VIDEOGRAPHER: This is the end of video |
| 12:11:04 | 16 | No. 2. The time is 12:11 p.m. We're going off the |
| 12:11:07 | 17 | record. |
| 01:05:32 | 18 | (Recess taken.) |
| 01:05:35 | 19 | THE VIDEOGRAPHER: This is the beginning of |
| 01:05:37 | 20 | video No. 3 in the deposition of Jan van der Voort. The |
| 01:05:40 | 21 | time is 1:05 p.m. We're back on the record. |
| 01:05:48 | 22 | MS. LEEBOVE: Q. Do you have a copy -- did |
| 01:05:50 | 23 | we give you Exhibit 331 yet? I don't believe we |
| 01:05:53 | 24 | did. |
| 01:06:00 | 25 | A. I don't have 331. |

01:06:19 1        Q.  Ms. van der Voort, I've just handed you Exhibit

01:06:21 2     331.  Appears to be an email or a couple of emails

01:06:26 3     between you and Sharon Coker with BZ Petroff included on

01:06:33 4     the most recent one at the top.

01:06:36 5            Let me know when you've had a moment to look at

01:06:38 6     it.

01:06:52 7        A.  Okay.

01:06:52 8        Q.  Can you tell me what you meant by, "BZ - let's

01:06:54 9     discuss so we make sure we don't slip."

01:06:58 10           MR. HARRIS:  Objection.  Lacks foundation.

01:07:04 11           You can answer.

01:07:05 12           THE WITNESS:  As part of Sharon's email, the

01:07:07 13    parenthetical portion that you queried me about earlier,

01:07:14 14    things fell through the crack when we split HR and

01:07:17 15    recruiting, I'm not sure it ever came up between BZ and

01:07:20 16    me.  And I'm now reading from Sharon's portion of the

01:07:22 17    email.  This was an attempt on my part to get BZ looped

01:07:28 18    in, so whatever process there was in place, we all had a

01:07:31 19    common understanding of that.

01:07:33 20           MS. LEEBOVE:  Q.  And looped in

01:07:35 21    specifically to the gentleman's agreement with

01:07:37 22    Pixar?

01:07:40 23        A.  Yes.

01:07:43 24        Q.  You had mentioned before the break that I

01:07:45 25    believe you said you knew the most about recruiting

01:07:48  1    presently in the company within Lucas at this point in

01:07:51  2    time?

01:07:52  3         A.  Yes, I did at this point in time.

01:07:54  4         Q.  Are you the -- are you currently the head of

01:07:56  5    recruiting?

01:07:57  6         A.  No.

01:08:00  7         Q.  Who is currently the head of recruiting?

01:08:02  8         A.  That position is open at the moment.

01:08:04  9         Q.  Okay.  How long has that position been open?

01:08:11 10         A.  Since January 1st.

01:08:14 11         Q.  Who held the position prior to January 1st?

01:08:17 12         A.  Cortney Erin, C-O-R-T-N-E-Y, E-R-I-N.

01:08:25 13         Q.  How long was Cortney Erin the -- was it -- is

01:08:31 14    it a she or a him -- she or a he?

01:08:34 15         A.  It was a she, and still is a she.

01:08:36 16         Q.  Good to know.

01:08:38 17             How long did -- was Cortney Erin the director

01:08:41 18    of recruiting?  Was that the title?  Or head of

01:08:43 19    recruiting?

01:08:44 20         A.  She was, I believe, the senior director of

01:08:46 21    talent acquisition.

01:08:47 22         Q.  How long was Cortney Erin the senior director

01:08:49 23    of talent acquisition?

01:08:52 24         A.  About a year and a half.

01:08:57 25         Q.  Had she come to Lucas in that role, or did

01:19:24  1          And this is going back to No. 328 where Sharon

01:19:28  2    Coker says, "Lori McAdams left me a message that one of

01:19:34  3    their PAs has given their resignation to come to ILM."

01:19:39  4          I'm just wondering if you....

01:19:45  5          A.  And I think -- sorry, there is no question

01:19:46  6    pending.

01:19:48  7          Q.  I'm wondering whether you can tell me whether,

01:19:50  8    in your opinion, should this information about ▆▆▆▆▆

01:19:53  9    ▆▆▆▆▆  have been conveyed to Lori McAdams under the

01:19:56  10   terms of the gentleman's agreement?

01:19:58  11         A.  Well, again, I'm days into this, and I read

01:20:04  12   what Gail Currey said.  It was a decision based on the

01:20:10  13   role of so low level, so evidently people with way more

01:20:13  14   experience in this than I did felt that a position like

01:20:16  15   this didn't really require a call.

01:20:22  16         Q.  But then you also wrote in Exhibit 331, let's

01:20:26  17   make sure we don't slip.  Let's discuss so we make sure

01:20:29  18   we don't slip.  Did you, at that time, consider the

01:20:33  19   ▆▆▆▆▆▆▆▆  incident a slip?

01:20:38  20         A.  Well, I think if you look at the time stamps on

01:20:41  21   these various emails, my email about BZ making sure we

01:20:50  22   don't slip preceded the email from Gail Currey who said

01:20:55  23   she didn't think it was a big deal.  And again, I would

01:20:58  24   repeat that I am a brand-new player in this whole little

01:21:01  25   party, so I'm learning as I go.

01:21:03   1       Q.  So what did you learn from this incident?

01:21:08   2       A.  Well, the beginnings of my learning about this

01:21:13   3   informal gentleman's agreement obviously, as I've

01:21:15   4   previously testified.  And while generally there would

01:21:21   5   be phone calls made, sometimes there weren't.

01:21:29   6       Q.  Did you learn from this incident that phone

01:21:31   7   calls should be made to Pixar when its employees were

01:21:35   8   offered positions with Lucas, regardless whether Lucas

01:21:38   9   considered the position low level or not?

01:21:43  10       A.  I think that was the general intent, although

01:21:45  11   obviously it was not necessarily something that happened

01:21:49  12   all the time.  Based on one single event that I was

01:21:54  13   aware of at the time.

01:22:19  14       Q.  I believe this is the last document in this

01:22:20  15   chain, at least that I have to offer you.  It's Exhibit

01:22:23  16   No. 330.  It's already been marked.

01:22:28  17           It appears to be an email from you to Sharon

01:22:31  18   Coker dated Wednesday, April 18th at 1:22 a.m. which --

01:22:39  19   were you typically working at 1:22 a.m.?

01:22:45  20       A.  Sadly, sometimes, yes.

01:22:55  21       Q.  What did you mean here in this message by, "We

01:22:57  22   will coordinate with the recruiting staff"?

01:23:02  23           MR. HARRIS:  Objection.  Lacks foundation.

01:23:07  24           MS. LEEBOVE:  Q.  Did you write this email

01:23:08  25   message?

01:23:09  1        A.   Yes, I did.

01:23:11  2        Q.   What did you mean by, "We will coordinate with

01:23:13  3   the recruiting staff"?

01:23:17  4        A.   I think the part of the sentence preceding that

01:23:19  5   is, "BZ is going to call Lori," meaning I was handing it

01:23:22  6   off to BZ to make sure she and Lori had contact with

01:23:26  7   each other, and that BZ would coordinate with the

01:23:31  8   recruiting staff on our side to make sure that whatever

01:23:36  9   understandings of the gentleman's agreement need to be

01:23:39 10   passed along were passed along.

01:23:44 11        Q.   You also wrote, "I will get involved as

01:23:45 12   needed."  What did you mean by that?

01:23:52 13        A.   If things required my involvement, I would get

01:23:58 14   involved.  But this was really handing it off to BZ.

01:24:01 15        Q.   Okay.  I have three documents for you.  Okay.

01:24:37 16   The first is already marked as Exhibit 351.

01:24:45 17             694 and 695, please.

01:24:55 18             Sorry, 694 will be the one LUCAS00036222 and

01:24:59 19   Exhibit 695 will be the document that starts with the

01:25:03 20   Bates No. LUCAS00060611.

01:25:10 21             MR. HARRIS:  So I've got 351 here, that's

01:25:13 22   LUCAS00048666.

01:25:15 23             MS. LEEBOVE:  Correct.

01:25:16 24             MR. HARRIS:  And now I've got Bates ending

01:25:19 25   36222; what's that?

Jan van der Voort                                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:38:19   1    itself.

01:38:20   2         What I was doing was following up on my

01:38:26   3    recollection that we had a gentleman's agreement with

01:38:28   4    Pixar at some point and asking BZ, who was then the

01:38:31   5    owner of that process, to clarify.

01:38:35   6         MS. LEEBOVE:  Q.  Okay.  Who is ██████████

01:38:39   7    ██████?

01:38:43   8         A.  She was an assistant in the recruiting

01:38:45   9    department at that time.

01:38:46  10         Q.  Is she still there?  Does she still work for

01:38:49  11    Lucas?

01:38:49  12         A.  Yes, she does.

01:38:50  13         Q.  Does she still -- does ████████████ still

01:38:54  14    work in the recruiting department?

01:38:56  15         A.  No, she does not.

01:38:57  16         Q.  What is her present job with Lucasfilm?

01:38:59  17         A.  She is an executive assistant in Lucas Arts.

01:39:04  18         Q.  Who is she an assistant to?  Or is she just a

01:39:08  19    floating assistant?

01:39:10  20         A.  A floating executive assistant.  Yeah.

01:39:12  21         Q.  Does ████████████ still work for the company?

01:39:14  22         A.  No, she does not.

01:39:15  23         Q.  Do you know where she works now?

01:39:17  24         A.  No.

01:39:18  25         Q.  What was her job at the time of this email?

01:39:21  1        A.  She was a recruiter.

01:39:22  2        Q.  Okay.  Ms. van der Voort, you will be handed,

01:39:53  3   at some point very soon, what we're marking as

01:39:56  4   Exhibits 696 and 697.  9702 is 696.  This one is 697.

01:40:05  5            MR. HARRIS:  I'm sorry, which is which?

01:40:06  6            MS. LEEBOVE:  696 is going to be the one ending

01:40:08  7   in 9702.

01:40:10  8            MR. HARRIS:  696.

01:40:11  9            MS. LEEBOVE:  And 697 ends in 9707.

01:40:14 10            MR. HARRIS:  Thank you.

01:40:15 11            (Whereupon, Exhibits 696 and 697 were marked

01:40:15 12            for identification.)

01:40:38 13            MS. LEEBOVE:  Q.  And Ms. van der Voort, if

01:40:39 14   you could let me know when you've had a chance to

01:40:42 15   review Exhibits 696 and 697.

01:41:29 16        A.  Okay.

01:41:30 17        Q.  I'm looking first at Exhibit 696.  Can you tell

01:41:33 18   me what this document is?

01:41:36 19        A.  This is an email from Gail Currey to me about

01:41:45 20   interest that many companies had in ████ -- I'm going to

01:41:49 21   murder her last name, ████████████

01:41:55 22        Q.  I say ████████.

01:41:56 23        A.  ████████.  That is close enough.  ████████.

01:42:02 24        Q.  Okay.  So this is the -- Exhibit 696 is an

01:42:07 25   email.  Do you remember receiving this email from Gail

01:42:09  1      Currey?

01:42:10  2           A.  I don't remember.  I don't remember.

01:42:13  3           Q.  So who was ████?  ████?

01:42:20  4           A.  ████ was a recruiter supporting the

01:42:23  5      animation group.

01:42:33  6           Q.  So it appears here, then, that -- is Gail

01:42:39  7      Currey writing to you with a cc to Mich Chau to tell you

01:42:44  8      that Lori McAdams has called to inquire about ████?

01:42:49  9           A.  Yes.

01:42:50  10          Q.  Do you know -- do you know what sort of

01:42:55  11     opportunities Lori McAdams had in mind for ████ at

01:43:00  12     Pixar?

01:43:00  13          A.  I have no idea.

01:43:07  14          Q.  Do you have any idea what the salary range

01:43:13  15     might have been for any -- for the opportunity at Pixar?

01:43:20  16          A.  No idea.

01:43:34  17          Q.  Who's Gloria?  It says, "We know that Gloria is

01:43:37  18     after ████."

01:43:38  19          A.  I believe this refers to Gloria Borders.

01:43:42  20          Q.  Who is Gloria Borders?

01:43:44  21          A.  She was a former Lucasfilm employee, I don't

01:43:46  22     know exactly her capacity, and she was working for

01:43:49  23     somebody else.  I don't even know who it was.

01:43:52  24          Q.  And it says, "Certainly Sharon would take her

01:43:56  25     in a heartbeat."

01:43:58  1          Is that Sharon -- do you believe that's a

01:44:02  2    reference to Sharon Coker?

01:44:04  3        A.  That was my belief, yes.

01:44:12  4        Q.  Do you have any idea what the job title was

01:44:16  5    that Lori McAdams wanted to talk to ███ about?

01:44:21  6        A.  No.

01:44:21  7          MR. HARRIS:  Objection.  Calls for speculation.

01:44:24  8    Lacks foundation.

01:44:27  9          Go ahead.

01:44:27 10          THE WITNESS:  No idea whatsoever.

01:44:37 11          MS. LEEBOVE:  Q.  Do you know -- and do you

01:44:40 12    know whether Lori McAdams conveyed any salary

01:44:44 13    information at all to Gail Currey --

01:44:49 14        A.  I have no idea.

01:44:49 15        Q.  -- when she called to ask about ███?

01:44:51 16        A.  I have no idea.

01:44:58 17        Q.  Do you know where Sharon Coker worked at the

01:45:00 18    time of this email on August 20th, 2007?

01:45:04 19        A.  I believe she was with IM Digital.

01:45:10 20        Q.  That was the Sony Zemeckis company, do you

01:45:16 21    know?  IM Digital?

01:45:19 22        A.  I think it was the Disney company.

01:45:22 23        Q.  Okay.  So if we turn to Exhibit 697, we have

01:45:36 24    the second in time email is the one we just read on

01:45:40 25    Exhibit 696.  And then there is an email from you to

01:45:47  1    Gail Currey cc'd to Mich Chau at the top of Exhibit 697.

01:45:51  2    Do you see that?

01:45:52  3          A.  Yes.

01:45:53  4          Q.  Did you write that email message?

01:45:55  5          A.  Yes, I did.

01:46:01  6          Q.  You refer, in your message, to a comp

01:46:05  7    adjustment.  In the parentheses "with comp adjustment,

01:46:08  8    perhaps."

01:46:10  9              If you can take a look at this and just in the

01:46:11 10    context of this email, can you tell me whether you meant

01:46:13 11    a comp adjustment up or down?

01:46:19 12          A.  I would have meant a comp adjustment up, if

01:46:21 13    appropriate.  I think the context was that we wanted to

01:46:27 14    keep ███ interested and continue to expand her career,

01:46:36 15    and perhaps additional responsibilities would make

01:46:38 16    sense.  And if that happened, then perhaps a

01:46:41 17    compensation adjustment would be appropriate.

01:46:45 18          Q.  And the reason for either expanding her role or

01:46:52 19    giving her a comp adjustment would be, I believe you

01:46:57 20    just mentioned, to keep her working at Lucas?

01:46:59 21          A.  Yes.  And to keep her motivated and continue to

01:47:02 22    grow with us.  She was supporting one of the divisions

01:47:06 23    that was growing at the time, and she was a key part of

01:47:07 24    that.

01:47:18 25          Q.  Just backing up to the prior message you hadn't

01:47:20  1   received, when you wrote here, "Maybe we should get more

01:47:23  2   proactive - keep her involved, but in an expanded role

01:47:25  3   (with comp adjustment, perhaps)."

01:47:27  4        When you wrote that, you didn't know anything

01:47:31  5   about the potential salary offer that Lori McAdams might

01:47:38  6   have made for Pixar, correct?

01:47:40  7        A.  If any.  Or about any of the other ones, no.

01:47:45  8   Nothing whatsoever.

01:47:46  9        Q.  Okay.  Does ███████ still work for Lucas?

01:47:55 10        A.  No, she does not.

01:47:57 11        Q.  And what were the circumstances surrounding her

01:47:59 12   departure?

01:48:01 13        A.  She accepted another job, and I cannot remember

01:48:05 14   exactly who she went to directly.  I don't think she's

01:48:08 15   with them any longer.

01:48:13 16        Q.  Did she -- she didn't move to Pixar?

01:48:16 17        A.  No.  Not as far as I know.

01:48:27 18        Q.  Do you know whether ████ knew that Lori McAdams

01:48:29 19   was interested in her?

01:48:30 20        A.  I don't know.

01:48:36 21        Q.  But pursuant to the gentleman's agreement, Lori

01:48:38 22   McAdams was not allowed to call ████ directly; is that

01:48:42 23   correct?

01:48:46 24        A.  Yes, pursuant to the gentleman's agreement.

01:48:47 25   But ████ was a very savvy recruiter and a pretty hot

01:48:54  1   commodity if you will say -- call it that, just based on

01:48:57  2   the level of interest that was expressed that we knew

01:48:59  3   about.  Who knows what she knew about.

01:49:06  4        Q.  Did Mich Chau have anything to say about your

01:49:09  5   email message on August 20th of 2007 -- well, did she

01:49:11  6   say anything to you about your email message of August

01:49:14  7   20th, 2007?

01:49:15  8        A.  Not that I recall.

01:49:44  9        Q.  All right.  I believe I am going to hand you --

01:49:46 10   or the court reporter may hand you what will be marked

01:49:49 11   Exhibit No. 698.

01:50:08 12             (Whereupon, Exhibit 698 was marked for

01:50:08 13             identification.)

01:50:16 14             MS. LEEBOVE:  Q.  So Ms. van der Voort,

01:50:17 15   you've been handed Exhibit No. 698.  It's a document

01:50:20 16   that -- the first page, anyway, is LUCAS00064138.

01:50:24 17        A.  Hang on.  I still have extra copies of this.

01:50:27 18   Is it just a two-page document?

01:50:31 19        Q.  Yes.  Front and back on the first page.

01:50:34 20             MR. HARRIS:  Does everyone have a copy?

01:50:41 21             MS. HENN:  I have a three-page document.

01:50:44 22             MS. LEEBOVE:  64138?

01:50:47 23             MS. HENN:  It's three pages.

01:50:48 24             MR. HARRIS:  Goes to 4140?

01:50:51 25             MS. LEEBOVE:  Yes.

02:16:27  1    alerting me to the fact that one of their employees had

02:16:29  2    gotten a call from an outside recruiter who was

02:16:33  3    allegedly representing Lucasfilm in a search.

02:16:42  4         Q.  Was the recruiter actually representing Lucas

02:16:46  5    in a search?

02:16:49  6         A.  I don't believe so.

02:16:53  7         Q.  I can tell you that from my review of the

02:16:55  8    documents, it looks like he -- the recruiter may have

02:16:59  9    taken some liberty about representing Lucas as his or

02:17:04 10    her client.

02:17:06 11             But in any case, it appears that it prompted

02:17:09 12    Lori McAdams to call you to ensure that the two

02:17:12 13    companies were still on the same page about the

02:17:15 14    gentleman's agreement.  Does that appear to be what

02:17:19 15    happened to you?

02:17:23 16             MR. HARRIS:  Objection.  Mischaracterizes the

02:17:25 17    document.  Vague.

02:17:32 18             THE WITNESS:  I'm not even clear what document

02:17:33 19    I'm looking at right now.

02:17:35 20             MS. LEEBOVE:  Q.  So I'm looking at

02:17:36 21    No. 700.

02:17:37 22         A.  Okay.

02:17:38 23         Q.  Just those few sentences at the top where it

02:17:40 24    says, "To close the loop, I spoke with Jan van der

02:17:42 25    Voort, the VP of HR at LFL who said she was in fact

02:17:46   1    aware of the understanding and very apologetic about

02:17:50   2    this recruiter.  She'll get on it and make sure any

02:17:53   3    outside recruiters are aware."

02:18:02   4          Does that sound like a fair summary of your

02:18:05   5    conversation with Lori McAdams?

02:18:06   6       A.  To the best of my recollection, yes.

02:18:25   7       Q.  If you could look to -- if you would look at

02:18:28   8    Exhibit 701, please.

02:18:46   9       A.  Okay.

02:18:48  10       Q.  Do you recognize this document?

02:18:55  11       A.  Yes, I do.

02:18:59  12       Q.  Does this top email message on Exhibit 701 look

02:19:04  13    like an email message that you sent to BZ Petroff on

02:19:07  14    Saturday, December 1st?

02:19:11  15       A.  Yes.

02:19:16  16       Q.  Do you know how -- or what BZ Petroff did in

02:19:19  17    response to your message?

02:19:22  18          MR. HARRIS:  Objection.  Vague.

02:19:27  19          MS. LEEBOVE:  Q.  Do you know whether BZ

02:19:29  20    Petroff tracked down the appropriate people and made

02:19:31  21    sure any agencies Lucas worked with were aware of

02:19:33  22    the policy about soliciting Pixar?

02:19:38  23       A.  I believe that she did.

02:19:48  24       Q.  And BZ worked for you, correct?

02:19:51  25       A.  Correct.

02:19:55  1        Q.  Was she generally pretty good about following

02:19:57  2   instructions?

02:19:58  3        A.  Yes.

02:20:12  4        Q.  I'm looking at Exhibit 702.  I just want to

02:20:15  5   confirm, if you could, that that is an email that you

02:20:19  6   sent to Lori McAdams.

02:20:21  7             MR. HARRIS:  Which email?

02:20:23  8             MS. LEEBOVE:  Q.  The most recent in time

02:20:25  9   at the top of the page, Saturday, December 1st,

02:20:27 10   2007, 12:23 a.m.  Did you speak to Lori McAdams on

02:20:36 11   around December 1st of 2007?

02:20:45 12        A.  I think in the prior email, it was on Friday,

02:20:48 13   November 30th that we spoke.

02:20:51 14        Q.  I see that.  It looks like you were up late on

02:20:54 15   Friday night working?

02:20:57 16        A.  There is a theme here.

02:21:03 17        Q.  Do you remember -- do you remember speaking

02:21:04 18   with Lori McAdams on, perhaps, Friday, November 30th

02:21:10 19   or -- probably Friday, November 30th?

02:21:12 20             MR. HARRIS:  Objection.  Asked and answered.

02:21:19 21             You can answer.

02:21:20 22             THE WITNESS:  Yeah.  I vaguely remember it.

02:21:23 23   Obviously there was a lot going on.  I was working at

02:21:27 24   12:23 a.m.

02:21:31 25             MS. LEEBOVE:  Q.  Do you remember what you

| | | |
|---|---|---|
| 02:21:32 | 1 | discussed with Lori? |
| 02:21:35 | 2 | MR. HARRIS:  Objection.  Asked and answered. |
| 02:21:50 | 3 | MS. LEEBOVE:  Q.  Do you remember |
| 02:21:51 | 4 | discussing the gentleman's agreement with Lori |
| 02:21:53 | 5 | McAdams around November 30th or December 1st of |
| 02:21:56 | 6 | 2007? |
| 02:21:59 | 7 | A.  I know we talked specifically about the, quote, |
| 02:22:02 | 8 | unquote, gentleman's agreement.  To the best of my |
| 02:22:04 | 9 | recollection, she just made me aware that one of her |
| 02:22:09 | 10 | people had been contacted by a search firm purporting to |
| 02:22:14 | 11 | be doing work for us.  And I had sort of -- first of |
| 02:22:18 | 12 | all, didn't know we had a search firm doing work for us. |
| 02:22:21 | 13 | Second of all, wanted to find out about it. |
| 02:22:30 | 14 | Q.  I have just one question for you about |
| 02:22:31 | 15 | Exhibit 703, if you could turn to that one.  And my |
| 02:22:36 | 16 | question is, who is Rob Levine?  If you know. |
| 02:22:40 | 17 | A.  Let me just look at this document first. |
| 02:22:42 | 18 | Q.  Sure. |
| 02:23:03 | 19 | A.  Rob Levine was a recruiter for us. |
| 02:23:22 | 20 | Q.  And if we look at Exhibit 704, do you recognize |
| 02:23:30 | 21 | this as an email from BZ Petroff to you on December 4th |
| 02:23:36 | 22 | of 2007?  Well, the most recent in time?  Do you |
| 02:23:41 | 23 | recognize the email that is most recent in time as an |
| 02:23:44 | 24 | email from BZ Petroff to you dated December 4th, 2007? |
| 02:23:49 | 25 | A.  Yes. |

02:36:14  1    are going to be multiple conversations about various

02:36:17  2    components of staying in any company, and they will --

02:36:21  3    the components will evolve.  But at the end of the day,

02:36:24  4    you reach the point where you say here's what the

02:36:27  5    package is going to look like if you stay.

02:36:36  6         Q.  And can you offer someone multiple packages to

02:36:40  7    choose from if they stay, or is there one offer that

02:36:44  8    they can choose if they wish to stay?

02:36:46  9              MR. HARRIS:  Objection.  Vague.  Compound.

02:36:52 10              Answer if you can.

02:36:58 11              THE WITNESS:  I'm trying to make sense of it.

02:37:00 12    I'm not having any luck.

02:37:02 13              MR. HARRIS:  You can have it read back if you

02:37:04 14    want.

02:37:05 15              THE WITNESS:  Yeah.  Please, read it back.

02:37:22 16              (Record read as follows:  And can you offer

02:37:22 17              someone multiple packages to choose from if

02:37:22 18              they stay, or is there one offer that they can

02:37:22 19              choose if they wish to stay?)

02:37:28 20              THE WITNESS:  The reason I'm confused is it's

02:37:30 21    never actually come up, to my knowledge.  So I'm having

02:37:36 22    a hard time imagining a scenario under which you would

02:37:39 23    say well you could take door B, C or whatever.  Normally

02:37:42 24    you are going to think about whatever is best for the

02:37:44 25    company and the individual combined, and that's what you

02:37:47 1   are going to offer them.  You are not going to offer

02:37:49 2   them a smorgasbord of opportunities.

02:37:56 3          MS. LEEBOVE:  Q.  Are you familiar with the

02:37:57 4   term "bidding war"?

02:37:59 5          A.  I've heard it.

02:38:00 6          Q.  What do you think it means?

02:38:05 7          A.  I think it's -- whether it's in recruiting or

02:38:10 8   any other business, where there is a back and forth sort

02:38:22 9   of tick, tick, tick, tick, back and forth exchange of

02:38:24 10  discussions about money, whether it's compensation or

02:38:29 11  price on a product or price for a product, competitive

02:38:33 12  television program, for example.

02:38:38 13         Q.  Did the gentleman's agreement between Lucas and

02:38:41 14  Pixar prevent the two companies from engaging in bidding

02:38:44 15  wars over employees?

02:38:52 16         A.  It did not prevent counteroffers, because those

02:38:57 17  were made.  If it made sense, either by Pixar or by

02:39:02 18  Lucasfilm, whoever was the current employer of the

02:39:06 19  individual.

02:39:12 20             What it did not allow was to continue to go

02:39:15 21  back and forth, which actually put the pressure rather

02:39:20 22  more on both companies to put their very best offer out

02:39:24 23  there.

02:39:25 24         Q.  Okay.  So if you -- if Lucas made its save

02:39:30 25  offer and the candidate decides not to take it, under

02:39:34  1    the terms of the agreement, would Lucas get to make a

02:39:38  2    new and improved save offer?

02:39:41  3        A.  Not once they made the offer, no.

02:39:43  4        Q.  Okay.  If you could look, please, at the page

02:39:51  5    of Exhibit No. 129 that is -- at the bottom there is a

02:39:57  6    handwritten note it says 129.2, page 00002263.

02:40:04  7            Have you taken a moment to familiarize yourself

02:40:11  8    with the document?

02:40:15  9        A.  Yes.

02:40:17 10        Q.  Is this the document that Lori McAdams -- well,

02:40:25 11    Lori McAdams sent you this document, correct?

02:40:29 12        A.  Yes.

02:40:32 13        Q.  And to the best of your knowledge, does this

02:40:38 14    document set forth the complete gentleman's agreement

02:40:41 15    between Lucas and Pixar?

02:40:46 16        A.  Let me review it, please, again.

02:40:48 17        Q.  Please do.

02:41:19 18        A.  Yes, I think generally that sums it up.

02:41:21 19        Q.  Is there anything that you would -- you said

02:41:23 20    generally sums it up.  Is there anything that you would

02:41:24 21    add that isn't here that would make the agreement

02:41:32 22    complete?

02:41:38 23            MR. HARRIS:  Object to the form.

02:42:19 24            THE WITNESS:  I can't think of anything I would

02:42:21 25    add.

| | |
|---|---|
| 02:42:22 1 | MS. LEEBOVE:  Okay.  Will you mark this |
| 02:42:30 2 | Exhibit 706. |
| 02:42:32 3 | (Whereupon, Exhibit 706 was marked for |
| 02:42:32 4 | identification.) |
| 02:42:47 5 | MS. LEEBOVE:  Q.  Ms. van der Voort, you've |
| 02:42:47 6 | been handed Exhibit 706.  Can you confirm that |
| 02:43:00 7 | that's a copy of an email message you sent to BZ |
| 02:43:03 8 | Petroff on Wednesday, December 12th? |
| 02:43:07 9 | A.  Yes. |
| 02:43:08 10 | Q.  I'm sorry, did you say yes? |
| 02:43:10 11 | A.  Yes. |
| 02:43:11 12 | Q.  And this document doesn't have the attachment, |
| 02:43:16 13 | but am I correct to presume that you were sending to BZ |
| 02:43:24 14 | the complete email that Lori McAdams had sent to you |
| 02:43:26 15 | that included the written version of the agreement? |
| 02:43:31 16 | Had you meant to forward on Lori McAdams' |
| 02:43:34 17 | written agreement to BZ Petroff? |
| 02:43:37 18 | A.  That was the intent, yes. |
| 02:43:44 19 | Q.  Did you -- who did you suspect that BZ Petroff |
| 02:43:47 20 | might distribute the agreement to? |
| 02:43:51 21 | A.  Well, she supervised the recruiting team, so |
| 02:43:54 22 | anybody that she felt might need to be aware. |
| 02:44:03 23 | Q.  Do you know whether BZ Petroff circulated or |
| 02:44:07 24 | distributed the gentleman's agreement to her recruiting |
| 02:44:11 25 | team? |

02:44:14  1      A.   I'm not sure that this is the gentleman's

02:44:16  2   agreement, per se.  This is Lori McAdams' version of

02:44:20  3   what she believed it to be.

02:44:24  4      Q.   Did you tell me that you thought this was an

02:44:28  5   accurate -- well, we can go back to that question, then.

02:44:32  6           Do you believe this is an accurate statement of

02:44:33  7   what the agreement was between Lucas and Pixar?

02:44:39  8           MR. HARRIS:  Object to the form.

02:44:43  9           MS. LEEBOVE:  Q.  Do you believe that

02:44:43 10   Exhibit 129 sets forth an accurate statement of the

02:44:51 11   Lucas/Pixar gentleman's agreement?

02:44:54 12      A.   Yes, as far as I know.

02:45:04 13      Q.   And do you know whether BZ Petroff distributed

02:45:08 14   it to the recruiting team?

02:45:10 15      A.   I do not.

02:46:14 16           MS. LEEBOVE:  I believe we're at 707.

02:46:17 17           (Whereupon, Exhibit 707 was marked for

02:46:17 18           identification.)

02:46:18 19           MS. LEEBOVE:  Q.  You've been handed

02:46:19 20   Exhibit 707.  This document was produced by Pixar in

02:46:22 21   the litigation, the Bates number is PIX00004106.

02:46:30 22           MR. HARRIS:  It is?

02:46:32 23           MS. LEEBOVE:  Is it not?

02:46:33 24           MR. HARRIS:  I have 00004147.

02:46:37 25           THE WITNESS:  I have 4106.  You got the wrong

02:46:41  1    one.

02:47:22  2            MS. LEEBOVE:  Q.  No particular reason to

02:47:25  3    suspect you've seen this document before, but have

02:47:26  4    you seen this document before?

02:47:27  5        A.  No.

02:47:28  6        Q.  Do you recall receiving a message from Lori

02:47:31  7    McAdams around March 5th of 2008 regarding Pixar hiring

02:47:39  8    ███████████████████?

02:47:50  9        A.  No.

02:48:04 10        Q.  Do you have any reason to believe that Lori

02:48:06 11    McAdams didn't contact you about ██████████████████?

02:48:13 12        A.  No.

02:48:15 13        Q.  I have a question about the second paragraph of

02:48:17 14    the top email, Lori McAdams writes to Robin McDonald in

02:48:22 15    her organization.  "I get the sense that Jan is pretty

02:48:24 16    far removed from the operations, so I'm not sure how

02:48:29 17    long it'll take before Vanessa Hall or ██████████ manager

02:48:37 18    hears anything from Jan."

02:48:39 19            Do you have any idea of what she's talking

02:48:41 20    about?

02:48:42 21            MR. HARRIS:  Objection.  Calls for speculation.

02:48:44 22            MS. LEEBOVE:  Q.  Do you know?

02:49:00 23        A.  I have no idea.

02:49:04 24        Q.  Okay.  Do you have any idea what ████████

02:49:11 25    ████████████ job was at Lucas?

| | | |
|---|---|---|
| 02:54:33 | 1 | (Whereupon, Exhibit 708 was marked for |
| 02:54:33 | 2 | identification.) |
| 02:54:41 | 3 | MS. LEEBOVE:  Q.  If you could take a |
| 02:54:41 | 4 | moment to read that and then hold your thought |
| 02:54:45 | 5 | because I want to ask you a question about something |
| 02:54:47 | 6 | else first. |
| 02:55:16 | 7 | A.  Okay. |
| 02:55:17 | 8 | Q.  So the question that I have that relates to our |
| 02:55:20 | 9 | prior discussion was whether -- are you aware of any -- |
| 02:55:25 | 10 | scratch that. |
| 02:55:25 | 11 | Are you aware of any limitations on the |
| 02:55:28 | 12 | Lucas/Pixar agreement in terms of geography? |
| 02:55:32 | 13 | MR. HARRIS:  Object to the form. |
| 02:55:34 | 14 | MS. LEEBOVE:  Q.  So did the agreement |
| 02:55:36 | 15 | limit recruiting only with respect to employees in a |
| 02:55:38 | 16 | particular location or did it apply to employees |
| 02:55:42 | 17 | company-wide? |
| 02:55:43 | 18 | MR. HARRIS:  Object to the form.  Compound. |
| 02:55:47 | 19 | MS. LEEBOVE:  Q.  You ought to answer if |
| 02:55:49 | 20 | you are able. |
| 02:55:53 | 21 | A.  I'm not aware of any restrictions. |
| 02:55:56 | 22 | Q.  Okay.  By geography? |
| 02:55:59 | 23 | A.  By geography, yes.  Thank you for the |
| 02:56:02 | 24 | clarification. |
| 02:56:03 | 25 | Q.  Are you aware of any restrictions by job |

02:56:05  1    category?

02:56:06  2         A.  Well, let me amend that.  We're not talking

02:56:08  3    about Singapore.

02:56:11  4         Q.  We're not talking about Singapore.  Let's talk

02:56:12  5    about in the United States.  Are you aware of any

02:56:14  6    restrictions or any limitations to the Lucas/Pixar

02:56:18  7    gentleman's agreement?  Any geographical restrictions on

02:56:23  8    the Lucas/Pixar gentleman's agreement, at least insofar

02:56:24  9    as that agreement governed the United States?

02:56:28 10         A.  Not that I'm aware of.

02:56:29 11         Q.  Are you aware of any limitations on the Lucas

02:56:32 12    Pixar agreement in terms of job type or job category?

02:56:37 13         A.  Not that I'm aware of.

02:56:41 14         Q.  Okay.  All right.  On to Exhibit 708, which is

02:56:53 15    the document that contains a couple of different emails.

02:56:56 16    The first one, the most recent in time, appears to be

02:57:00 17    from Mich Chau to Lynwen Brennan, Vicki Dobbs, and to

02:57:08 18    you sent Friday, July 18th, 2008, regarding Lightstream

02:57:13 19    Animation Studios.

02:57:14 20              (Reporter clarification.)

02:57:15 21              MS. LEEBOVE:  Q.  The subject is,

02:57:15 22    "Lightstream Animation Studios:  Call for Talent."

02:57:19 23              Do you recognize this as an email Mich Chau

02:57:25 24    sent to you around July 18th, 2008?

02:57:29 25         A.  Yes.

02:57:34  1      Q.  Who is Lightstream Animation Studios?

02:57:40  2      A.  I'm not terribly familiar with them, but they

02:57:42  3  were a startup animation studio, as their name would

02:57:49  4  imply.  And they were obviously looking for the type of

02:57:54  5  talent that they listed under the following positions.

02:57:58  6      Q.  Is it your understanding that Lightstream is a

02:58:01  7  Bay Area company?

02:58:03  8      A.  I don't know where their base was, but based on

02:58:06  9  this email I learned that they were setting up some sort

02:58:10 10  of studio in Petaluma.

02:58:14 11      Q.  Okay.  Lynwen Brennan wrote to Mich Chau, Vicki

02:58:29 12  Dobbs, and to you on Thursday, July 17th.  "It would

02:58:33 13  seem from this mail that they're looking to grow a

02:58:36 14  little more than 20 at their Petaluma location.  Do you

02:58:39 15  think we should try and set up a similar deal with them

02:58:42 16  that we have with IMD and Pixar re competing for talent?

02:58:46 17  I think it would make sense as they know exactly who to

02:58:49 18  go for."

02:58:50 19          We see here that Mich Chau responded to Lynwen

02:58:53 20  Brennan.  Do you know whether you responded to Lynwen

02:58:55 21  Brennan?

02:58:56 22      A.  I don't believe I did.

02:58:58 23      Q.  Did you think that it would -- that Lucas

02:59:02 24  should have tried to set up a similar deal with

02:59:05 25  Lightstream Animation?

02:59:06  1        A.  I honestly don't recall.

02:59:12  2        Q.  Do you know whether Lucas did set up a similar

02:59:16  3   deal with Lightstream Animation Studios that it had with

02:59:20  4   IMD and Pixar?

02:59:22  5        A.  Not that I'm aware of.  No.

02:59:28  6        Q.  Did you agree with Mich Chau that Lucas should

02:59:33  7   do as Lynwen suggested and set up a similar deal with

02:59:40  8   Lightstream as Lucas had with IMD and Pixar?

02:59:50  9             MR. HARRIS:  Object to the form.

03:00:04 10             You can answer.

03:00:11 11             THE WITNESS:  I, as I recall, wasn't all that

03:00:14 12   concerned with a studio with only 20 people in it, that

03:00:17 13   that was going to be a significant impact on our ability

03:00:23 14   to recruit.  Particularly given the IP and the type of

03:00:27 15   work that Lucasfilm gets in the door.

03:00:40 16             MS. LEEBOVE:  Q.  What would a similar deal

03:00:42 17   with Lightstream Animation Studios have

03:00:44 18   accomplished?

03:00:46 19             MR. HARRIS:  Objection.  Calls for speculation.

03:01:13 20             MS. LEEBOVE:  Q.  I'm waiting for your

03:01:14 21   answer.

03:01:15 22        A.  I have no idea what was in Lynwen's mind.

03:01:21 23        Q.  Do you have any independent notion about what

03:01:27 24   setting up a similar deal with Lightyear (sic) would

03:01:30 25   have accomplished?

03:01:33  1          MR. HARRIS:  Object to the form.

03:01:35  2          THE WITNESS:  Well, again, I don't know what

03:01:36  3     Lynwen had in mind, what specifics she was thinking of,

03:01:39  4     and I don't recall further conversation on it.

03:01:53  5          MS. LEEBOVE:  Q.  Did you weigh in at all

03:01:54  6     on Lynwen Brennan's question in her July 17th email?

03:02:00  7          A.  Not that I recall.

03:02:15  8          Q.  What do you understand that the purpose of a

03:02:19  9     restriction on recruiting -- or what do you understand

03:02:23 10     was the purpose served by agreed restrictions on

03:02:26 11     recruiting between companies?

03:02:28 12          MR. HARRIS:  Objection.  Vague.

03:02:35 13          THE WITNESS:  Can you be specific about what

03:02:37 14     restrictions?

03:02:38 15          MS. LEEBOVE:  Q.  Well, in this particular

03:02:41 16     email, Lynwen Brennan is referring to the agreement

03:02:45 17     with Pixar, and we've talked about that.  You

03:02:49 18     understand what the gentleman's agreement involved,

03:02:51 19     correct?

03:02:52 20          A.  Correct.

03:02:52 21          Q.  And so what do you think the purpose of that

03:02:54 22     agreement was?

03:02:57 23          MR. HARRIS:  Objection.  Calls for a narrative.

03:03:00 24     Vague.

03:03:05 25          THE WITNESS:  Well, as I discussed, seems like

03:03:09  1    a long time ago but it was only this morning, we talked

03:03:13  2    about the genesis of the agreement as I understood it,

03:03:16  3    and the genesis of Pixar, how it came to be an

03:03:20  4    independent company, and the fact that the two companies

03:03:23  5    were still very much in some ways partners and worked

03:03:30  6    collaboratively on a lot of projects together.

03:03:34  7         Again, Sky Sound did a lot of Pixar's sound

03:03:38  8    work, and it was to our mutual advantage to keep the

03:03:42  9    productions of both companies flowing in a timely and

03:03:49  10   production-deadline-driven manner.  So that's that

03:03:55  11   relationship as I described it and the logic behind the

03:04:03  12   gentleman's agreement.

03:04:05  13        MS. LEEBOVE:  Q.  But Lucas' agreement with

03:04:09  14   Pixar involved more than just the employees at Sky

03:04:11  15   Sound, correct?

03:04:13  16        A.  Yes.

03:04:17  17        Q.  And involved more than just the employees who

03:04:19  18   were directly working on projects together, correct?

03:04:23  19        A.  Correct.  It is important to note, I think,

03:04:28  20   that Lucasfilm's business was actually more varied than

03:04:34  21   Pixar's business was.  So you had Skywalker Sound and

03:04:40  22   Lucas Arts, which was a games company, ILM, which was

03:04:43  23   special effects, animation distribution and licensing.

03:04:48  24   So a lot of pieces of business that were not directly in

03:04:53  25   the animation space.

03:05:00  1          Q.  But the employees in both companies whose work

03:05:06  2     wasn't in the animation space were nonetheless covered

03:05:09  3     by the companies' gentleman's agreement, correct?

03:05:13  4          A.  That is my understanding, yes.

03:05:33  5               MR. HARRIS:  How are you doing?

03:05:34  6               THE WITNESS:  I just drank a lot of water.

03:05:36  7               MR. HARRIS:  Do you want a break?

03:05:37  8               THE WITNESS:  Can we, please, soon.

03:05:40  9               MR. HARRIS:  I think it's been about an hour.

03:05:42 10               MS. LEEBOVE:  If you would like a break, that's

03:05:44 11     fine.

03:05:44 12               THE VIDEOGRAPHER:  This is the end of video

03:05:45 13     No. 4.  The time is 3:05 p.m. we're going off the

03:05:48 14     record.

03:05:49 15               (Recess taken.)

03:16:01 16               THE VIDEOGRAPHER:  This is the beginning of

03:16:03 17     video No. 5 in the deposition of Jan van der Voort.  The

03:16:06 18     time is 3:16 p.m.  We're back on the record.

03:16:31 19               MS. LEEBOVE:  Q.  Ms. van der Voort, we

03:16:31 20     just left off with a document that -- or an email

03:16:39 21     that Mich Chau sent to Lynwen Brennan and Vickie

03:16:44 22     Dobbs as well as to you where she says, "Wow.  I

03:16:47 23     think we should do as you suggested."

03:16:48 24               I'm referring to Exhibit No. 708.  She appears

03:16:54 25     to be suggesting that Lucas should set up a deal with

03:17:01  1    Lightstream similar to the one with IMD and Pixar.  At

03:17:06  2    some point did it -- I'm assuming that -- well, you can

03:17:09  3    tell me -- at some point after the date of that message,

03:17:13  4    Friday, July 18th, 2008, did you come to understand that

03:17:19  5    Lucas was being investigated by the Department of

03:17:20  6    Justice for antitrust violations?

03:17:25  7            MR. HARRIS:  Objection to the extent your

03:17:27  8    question mischaracterizes the testimony -- or the

03:17:30  9    document and lacks foundation.  And I would also caution

03:17:33 10    the witness, as I have previously, in answering this

03:17:37 11    question, any information that you learned from an

03:17:40 12    attorney, either inside or outside would be privileged,

03:17:42 13    so don't reveal those communications.  But if you can

03:17:46 14    answer the question apart from those communications, you

03:17:49 15    can answer the question.

03:17:55 16            THE WITNESS:  Can you repeat the question,

03:17:56 17    please.

03:17:58 18            MS. LEEBOVE:  Q.  I can ask a new question

03:18:01 19    that may be the same as the old question, which was,

03:18:04 20    did you become aware, at some time after July 2008,

03:18:09 21    that the Department of Justice had begun to

03:18:12 22    investigate Lucas for antitrust violations?

03:18:15 23            MR. HARRIS:  Same caution.  Same objection.

03:18:24 24            THE WITNESS:  Outside of any discussion with

03:18:26 25    counsel, no.

04:22:53  1    Structure."  What is that?

04:23:02  2             MR. HARRIS:  Object to the form.

04:23:22  3             MS. LEEBOVE:  Q.  Is that an excerpt from

04:23:25  4    Lucasfilm's 2011 U.S. salary structure?

04:23:28  5         A.  Yes, it is.

04:23:29  6         Q.  Does the entire salary structure exist

04:23:32  7    somewhere?

04:23:34  8         A.  Yes.

04:23:36  9             MR. HARRIS:  Object to the form.

04:23:42 10             MS. LEEBOVE:  Q.  Does Lucas create a U.S.

04:23:45 11    salary structure each year?

04:23:50 12         A.  We review salaries each year, and this

04:23:55 13    particular document or excerpt called salary structure

04:24:00 14    is a list of the salary grades which go 1 through -- I'm

04:24:05 15    not sure what the top grade is, as I sit here.

04:24:10 16    Sometimes the structure moves from one year to another,

04:24:13 17    sometimes it doesn't.

04:24:16 18         Q.  When you say moves, do you mean that the

04:24:19 19    compensation figures change?

04:24:22 20         A.  Well, to be clear, these aren't compensation

04:24:25 21    figures.  These are salary ranges for different grades.

04:24:29 22         Q.  Okay.  What does that mean, salary ranges for

04:24:33 23    different grades?

04:24:34 24         A.  Well, if you look at the faintly highlighted

04:24:40 25    grade 17, it shows that for grade 17, the minimum salary

Jan van der Voort                                     In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

04:24:45  1    is ██████ based on the salary structure for that year,

04:24:53  2    the midpoint is ██████, and the maximum in that range for

04:25:00  3    that year would be ██████.

04:25:08  4         Q.  Are these salary figures specific to Lucas or

04:25:11  5    is this based on market data?

04:25:14  6         A.  These are specific to Lucas.

04:25:23  7         Q.  How are salary grades and salary ranges

04:25:27  8    determined?

04:25:28  9              MR. HARRIS:  Objection.  Compound.

04:25:39 10              You can answer.

04:25:41 11              THE WITNESS:  It really is a two-part question.

04:25:45 12    Salary grades, which is the column on the far left-hand

04:25:49 13    side of that little excerpt, are -- grades are

04:25:54 14    determined based on a job analysis that Michelle Maupin

04:26:01 15    or someone in the compensation area would do that looks

04:26:05 16    at various questions about level of responsibility and

04:26:11 17    level of independent action, et cetera, contribution to

04:26:14 18    the company.  And that determines where a particular job

04:26:20 19    would fall for a salary grade perspective.

04:26:25 20              Structure, which are the dollars associated

04:26:27 21    with each grade, are determined based on, first of all,

04:26:33 22    what we are willing to pay for roles in that general

04:26:40 23    jobs salary range, and also by looking at the survey

04:26:43 24    data that we've talked about multiple times before.

04:26:49 25              MS. LEEBOVE:  Q.  Do the salary grades

04:26:56  1    apply across the company?

04:27:02  2        A.  Yes.

04:27:04  3        Q.  And so just to clarify, there is one set of

04:27:07  4    salary grades that would apply and every employee of

04:27:13  5    Lucasfilm with fall into that salary grade?

04:27:17  6            MR. HARRIS:  Objection.  Mischaracterizes

04:27:17  7    testimony.  Vague.

04:27:21  8            You can answer.

04:27:22  9            THE WITNESS:  Within the U.S., this structure

04:27:23  10   would apply to all jobs except the executive level, and

04:27:31  11   those jobs aren't graded.

04:27:39  12           MS. LEEBOVE:  Q.  Is it fair to say, then,

04:27:40  13   that every job within Lucasfilm, with the exception

04:27:47  14   of executive level jobs, have a corresponding salary

04:27:52  15   grade?

04:27:52  16           MR. HARRIS:  Objection.  Mischaracterizes

04:27:54  17   testimony.

04:28:01  18           You can answer.

04:28:02  19           THE WITNESS:  Yes.  With the exception of new

04:28:03  20   jobs or, you know, jobs that are just being developed.

04:28:07  21   Every job is assigned a salary grade.

04:28:11  22           MS. LEEBOVE:  Q.  And by "new jobs" just

04:28:13  23   now, did you mean newly created jobs that haven't

04:28:16  24   yet been assigned a salary grade?

04:28:17  25       A.  Correct.  Or jobs that may have changed

04:28:19  1    significantly in scope either to be greater in scope or

04:28:22  2    lesser in scope.

04:28:25  3        Q.  How many salary grades are there?  We see here

04:28:27  4    14 through 20.

04:28:29  5        A.  Well, I just testified that they go 1

04:28:33  6    through -- not sure whether it's, you know, 25, 26, 27.

04:28:36  7    Something like that.

04:28:42  8        Q.  Do both salaried and hourly employees have a

04:28:46  9    salary grade?

04:28:48 10        A.  Same structure applies to both salaried and

04:28:51 11    hourly employees.

04:28:57 12        Q.  For hourly employees, would the minimum and

04:29:02 13    maximum figures that appear on the salary structure,

04:29:07 14    would that appear as an annual figure or would it appear

04:29:10 15    as an hourly figure?  Would the minimum be X dollars per

04:29:13 16    hour or would it be an annual --

04:29:18 17        A.  The same --

04:29:19 18            MR. HARRIS:  Objection to the form of the

04:29:20 19    question.  Compound.  Vague.

04:29:23 20            You can answer.

04:29:24 21            THE WITNESS:  The same structure applies, and

04:29:27 22    it appears as an annualized salary for hourly employees.

04:29:37 23            MS. LEEBOVE:  Q.  How frequently are jobs

04:29:40 24    assessed for grading purposes -- scratch that.

04:29:42 25            How frequently are salary grades evaluated?

Jan van der Voort                                In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

04:29:52  1        MR. HARRIS:  Objection.  Vague.

04:29:59  2        THE WITNESS:  We look at survey data,

04:30:05  3   competitive survey data, each year.  And if we find that

04:30:08  4   there are some jobs that, based on the market data,

04:30:15  5   don't seem to make sense with our salary structure, we

04:30:19  6   would look at those.

04:30:23  7        MS. LEEBOVE:  Q.  Can you give me an

04:30:24  8   example of a job that wouldn't seem to make sense

04:30:26  9   with the salary structure that you would evaluate?

04:30:32 10        A.  Well, it's interesting.  This particular email

04:30:36 11   talks about a job that we may have misclassified.  There

04:30:42 12   is no market data for a stereoscopic supervisor that we

04:30:46 13   were aware of.  So in a situation like that, we have to

04:30:50 14   take our best guess at what we think the job might pay.

04:30:56 15   And that's what we did here.  So in this particular

04:30:59 16   case, the suggestion was perhaps we should think about

04:31:01 17   changing the grade to a grade 18 from a grade 17.

04:31:25 18        Q.  And so it looks like at a certain point here,

04:31:31 19   initially the emails involve folks -- Kim Diaz, Megan

04:31:39 20   Mowery, Sarah McArthur, you can read the names here as

04:31:42 21   well as I can, but then at a certain point the matter

04:31:45 22   was brought to your attention and to Michelle Maupin's

04:31:48 23   attention and to Steve Condiotti's attention by Amber

04:31:52 24   Remaley.

04:32:04 25        Whose job is it to make a final decision on the

04:36:01  1    entire animation group in the U.S.  And this would take

04:36:06  2    ████████████████████████.

04:36:13  3        So yeah, you could just sort of say we're going

04:36:16  4    to pay ████████, you could do something about the grade,

04:36:22  5    but the third leg of that stool is really what you have

04:36:25  6    to deal with from a compensation perspective, and that's

04:36:27  7    something that Lucas is very conservative about.  You

04:36:35  8    get a pot of money, and to the degree you pay a chunk of

04:36:39  9    that pot to this person or that person, the pot is

04:36:43 10    reduced and there is less available for other people.

04:36:57 11        Q.  I want to ask you more about what you just

04:36:59 12    said, but backing up a moment you said that one of the

04:37:02 13    reasons why you wouldn't want to pay a salary ████████

04:37:06 14    position a salary ████████ salary is because Lucas

04:37:13 15    didn't want its salary structure to become inflated; is

04:37:18 16    that correct?  I'm just wondering what that means.

04:37:22 17        MR. HARRIS:  I'll object to the extent that

04:37:24 18    misstates the prior testimony.

04:37:26 19        THE WITNESS:  What I said was we don't want to

04:37:29 20    inflate the salary structure, which means we don't want

04:37:31 21    to just automatically, with no good reason, inflate

04:37:34 22    salaries for precisely the reason I just talked about.

04:37:37 23    We don't have the money to do it.

04:37:39 24        So I think my answer was, from a practical

04:37:42 25    standpoint, no, there is no reason why you couldn't pay

Jan van der Voort                                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

04:37:45  1   ██████████████████████████.  From a financial

04:37:51  2   standpoint, you want to make sure that that's something

04:37:52  3   you really want to spend your money on.  And from a

04:37:57  4   technical standpoint, ████ is still within this salary

04:38:02  5   grade ██, so it's not -- there is nothing wrong with it.

04:38:10  6   It's really -- what is the right grade for that job

04:38:14  7   based on what we know about market data.  And as I said,

04:38:19  8   we weren't able to find much market data on this one

04:38:22  9   evidently.  And then what can you afford.

04:38:28  10          MS. LEEBOVE:  Q.  Are you familiar at all

04:38:30  11  with the term "internal equity"?

04:38:32  12       A.  Yes.

04:38:33  13       Q.  What does that mean to you?

04:38:37  14       A.  It means generally that you are aware of where

04:38:41  15  similarly situated employees are from a compensation

04:38:45  16  perspective, either within their division or across the

04:38:48  17  company depending on what you are looking at.

04:38:51  18       Q.  Is internal equity a consideration in setting

04:38:55  19  salary grades?

04:38:57  20       A.  It is a consideration, yes.

04:39:00  21       Q.  How is it -- how is it a consideration?  How do

04:39:03  22  you use it as a consideration in setting salary grades?

04:39:08  23       A.  Well, you would look at, again, similarly

04:39:15  24  situated people.  And to the degree that their skills

04:39:21  25  and experience and everything else about them are

04:39:24  1    similar, and they're in the same grade, they're going to

04:39:27  2    be in the same salary range, generally.  And when I talk

04:39:32  3    about salary range, I'm talking about they'll generally

04:39:36  4    be somewhere between the minimum, the midpoint, and the

04:39:38  5    maximum.

04:39:40  6         So that's a fairly wide spread.  If you look at

04:39:46  7    grade ██, for example, it could go from a minimum of ██

04:39:50  8    ████████  and change.

04:40:06  9         Q.  So you just mentioned the -- we just talked a

04:40:09 10    little bit about internal equity in the context of one

04:40:13 11    salary grade.  Does internal equity play any role in

04:40:18 12    terms of differentiating between salary grades?

04:40:28 13         A.  I'm really unclear on what you mean by that.

04:40:33 14         Q.  So -- and of course I have your testimony right

04:40:38 15    in front of me, which I wish I didn't, but I believe you

04:40:40 16    testified, and I'll -- and do correct me if I'm wrong,

04:40:48 17    that internal equity, that one factor of internal equity

04:40:51 18    is whether people in a particular salary grade who are

04:40:55 19    doing similar work are compensated similarly.  Does

04:40:59 20    that -- is that fair?

04:41:01 21         MR. HARRIS:  I'll object to the extent that

04:41:03 22    misstates prior testimony.

04:41:05 23         THE WITNESS:  Well, I think I then went on to

04:41:06 24    say that the -- by similar, I mean somewhere within the

04:41:12 25    salary structure range that I just talked about.  So as

04:41:17   1   I was just quoting, ████████ is the range for grade

04:41:20   2   ██, and generally speaking, you would see people in that

04:41:25   3   range.  There may be exceptions to it, but generally

04:41:27   4   speaking, that's what you would be looking at.

04:41:36   5          MS. LEEBOVE:  Q.  And so moving away from

04:41:38   6   this salary structure, does Lucasfilm employ

04:41:43   7   janitors?

04:41:45   8          A.  No.

04:41:46   9          Q.  Do they employ any sort of -- is there a

04:41:51   10  cleaning crew?  Is there a kitchen staff?  Are there --

04:41:58   11  are there secretaries?

04:42:00   12         MR. HARRIS:  Object to the form of the

04:42:01   13  question.

04:42:01   14         MS. LEEBOVE:  Q.  Okay.  Does Lucasfilm

04:42:04   15  employ administrative assistants?

04:42:06   16         A.  Yes.

04:42:07   17         Q.  What salary grade does an administrative

04:42:10   18  assistant fall into?

04:42:12   19         MR. HARRIS:  Objection.  Calls for speculation.

04:42:17   20         If you know, you can answer.

04:42:19   21         THE WITNESS:  There are different levels of

04:42:22   22  administrative assistants, so they would fall into

04:42:25   23  different levels.  And I can't tell you, as I sit here,

04:42:27   24  exactly what grades, various levels, administrative

04:42:30   25  assistants would fall into.

Jan van der Voort                                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

1          I, Gina V. Carbone, Certified Shorthand

2   Reporter licensed in the State of California, License

3   No. 8249, hereby certify that the deponent was by me

4   first duly sworn and the foregoing testimony was

5   reported by me and was thereafter transcribed with

6   computer-aided transcription; that the foregoing is a

7   full, complete, and true record of said proceedings.

8          I further certify that I am not of counsel or

9   attorney for either of any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12          The dismantling, unsealing, or unbinding of

13   the original transcript will render the reporter's

14   certificates null and void.

15          In witness whereof, I have hereunto set my

16   hand this day:  February 15, 2013.

17          ___X___ Reading and Signing was requested.

18          _____ Reading and Signing was waived.

19          _____ Reading and signing was not requested.

20

21

22          _____

23          GINA  V. CARBONE

24          CSR 8249, RPR, CCRR

25

KRAMM COURT REPORTING        *CONFIDENTIAL - ATTORNEYS' EYES ONLY*                Page: 212