# EXHIBIT AAA

# REDACTED PUBLIC VERSION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE      )

ANTITRUST LITIGATION           )

                               )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:      )

ALL ACTIONS.                   )

_____)


CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEO DEPOSITION OF JAMES MORRIS


AUGUST 3, 2012


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

| | | |
|---|---|---|
| 11:44:42 | 1 | Q.   What was Lucasfilm's response to your |
| 11:44:47 | 2 | notification? |
| 11:44:48 | 3 | A.   They -- they were fine -- fine with it. |
| 11:44:50 | 4 | Q.   They approved it? |
| 11:44:51 | 5 | A.   Well -- |
| 11:44:52 | 6 | MS. HENN:  Objection. |
| 11:44:52 | 7 | THE WITNESS:  I wouldn't say they approved it. |
| 11:44:54 | 8 | It wasn't up for approval.  It was just they -- they |
| 11:44:57 | 9 | weren't -- they weren't mad at me. |
| 11:44:59 | 10 | BY MR. HARVEY: |
| 11:44:59 | 11 | Q.   Okay.  And one more question about the document |
| 11:45:02 | 12 | in front of you.  Is it your testimony that in reviewing |
| 11:45:07 | 13 | this document, that it refreshed your recollection about |
| 11:45:11 | 14 | the problem Pixar had with Image Movers Digital? |
| 11:45:15 | 15 | MS. HENN:  Objection.  Mischaracterizing |
| 11:45:17 | 16 | testimony. |
| 11:45:19 | 17 | THE WITNESS:  In reviewing this document, it |
| 11:45:21 | 18 | reminded me of Image Movers Digital and a conversation I |
| 11:45:26 | 19 | had with Ed Catmull about a concern that Phil Tippett had |
| 11:45:32 | 20 | raised to me.  That's my testimony. |
| 11:45:33 | 21 | BY MR. HARVEY: |
| 11:45:34 | 22 | Q.   And that concern was with IMD's raiding; is |
| 11:45:38 | 23 | that correct? |
| 11:45:39 | 24 | A.   That's correct. |
| 11:45:42 | 25 | Q.   You can put that to the side. |

```
11:45:48  1            Did Pixar have a gentleman's agreement with

11:45:51  2   Lucasfilm?

11:45:53  3       A.   Pixar had a gentleman's agreement with

11:45:55  4   Industrial Light & Magic.

11:45:57  5       Q.   It was only Industrial Light & Magic?

11:46:00  6            MS. HENN:  Objection.  Vague.

11:46:04  7            THE WITNESS:  My knowledge of the gentleman's

11:46:06  8   agreement was that it was between Industrial Light &

11:46:08  9   Magic and Pixar.

11:46:13 10   BY MR. HARVEY:

11:46:17 11       Q.   And when did that agreement begin?

11:46:20 12       A.   I don't know when that agreement began.  I'm

11:46:27 13   not sure.

11:46:28 14       Q.   As far as you know, how far back did it go?

11:46:33 15       A.   I became aware of that relationship -- I can't

11:46:41 16   remember exactly when.  In the early '90s.  I don't know

11:46:45 17   how long it had existed prior to.

11:46:52 18       Q.   And I believe you testified that you know that

11:46:53 19   it concerned ILM.

11:46:55 20       A.   Yes.

11:46:55 21       Q.   Do you know whether it concerned any other

11:46:58 22   entity at Lucas?

11:46:59 23            MS. HENN:  Objection.  Asked and answered.

11:47:02 24            THE WITNESS:  I am unaware of other Lucas

11:47:04 25   entities having a relationship with Pixar of that sort.
```

```
11:47:10   1    BY MR. HARVEY:
11:47:10   2         Q.   So you don't know one way or the other.
11:47:12   3              MS. HENN:  Objection.  Mischaracterizes the
11:47:13   4    testimony.
11:47:15   5              THE WITNESS:  I am not aware of any activities
11:47:18   6    outside of Industrial Light & Magic relating to that
11:47:21   7    agreement.
11:47:25   8    BY MR. HARVEY:
11:47:44   9         Q.   Is it possible that the agreement concerned
11:47:46  10    other entities at Lucas, but you didn't know about it?
11:47:49  11              MS. HENN:  Objection.  Calls for speculation.
11:47:50  12              THE WITNESS:  I -- I don't know.
11:47:52  13    BY MR. HARVEY:
11:47:53  14         Q.   You don't know whether it's possible?
11:47:56  15              MS. HENN:  Calls for speculation.
11:48:00  16              MR. HARVEY:  It is a metaphysical question
11:48:01  17    only.
11:48:05  18    BY MR. HARVEY:
11:48:09  19         Q.   Do you have any reason to think that -- that
11:48:13  20    any other Lucasfilm entity was excluded from the
11:48:18  21    gentleman's agreement?
11:48:19  22         A.   I was only aware of it as a relationship
11:48:22  23    between Industrial Light & Magic and Pixar.  So I can't
11:48:27  24    speak to exclusions, because it didn't seem to be that
11:48:30  25    far reaching.
```

| | | |
|---|---|---|
| 11:52:39 | 1 | MS. HENN:  Objection.  He says he hasn't seen |
| 11:52:41 | 2 | it before. |
| 11:52:41 | 3 | THE WITNESS:  I haven't seen it, and also |
| 11:52:43 | 4 | I'm -- I'd be curious to know what the date is, because |
| 11:52:47 | 5 | I'm having trouble understanding some of the people in |
| 11:52:48 | 6 | these positions.  What is the date of this document? |
| 11:52:52 | 7 | BY MR. HARVEY: |
| 11:52:56 | 8 | Q.   I believe it was created in approximately 2005. |
| 11:52:59 | 9 | A.   Well, the -- the reason I bring it up is that |
| 11:53:03 | 10 | Gail Currey at Lucasfilm animation, that happened as I |
| 11:53:07 | 11 | was leaving the company.  So it seems that this is after |
| 11:53:14 | 12 | my time there.  So it would probably be useful if we knew |
| 11:53:18 | 13 | what the time horizon was on this.  But I haven't seen it |
| 11:53:22 | 14 | before.  I -- they may have been produced after I was |
| 11:53:24 | 15 | there. |
| 11:53:26 | 16 | Q.   Does it confirm your understanding of the |
| 11:53:29 | 17 | gentleman's agreement? |
| 11:53:31 | 18 | A.   It doesn't confirm my understanding of the |
| 11:53:35 | 19 | agreement. |
| 11:53:38 | 20 | Q.   Does the agreement, as you understand it, |
| 11:53:39 | 21 | differ from the agreement as it's described in this |
| 11:53:43 | 22 | document? |
| 11:53:43 | 23 | MS. HENN:  Objection.  Vague. |
| 11:53:48 | 24 | THE WITNESS:  The agreement that I was |
| 11:53:51 | 25 | operating under was not this detailed or elaborate. |

| | | |
|---|---|---|
| 11:54:00 | 1 | BY MR. HARVEY: |
| 11:54:10 | 2 | Q.   Could you walk me through the gentleman's |
| 11:54:13 | 3 | agreement between Lucas and Pixar as you understood it. |
| 11:54:16 | 4 | MS. HENN:  Objection.  Vague. |
| 11:54:21 | 5 | THE WITNESS:  When you say "walk through," |
| 11:54:23 | 6 | what -- are you talking -- when?  Can you be a little |
| 11:54:26 | 7 | more specific about what you -- |
| 11:54:28 | 8 | BY MR. HARVEY: |
| 11:54:28 | 9 | Q.   Please explain the terms of the agreement as |
| 11:54:30 | 10 | you understood it. |
| 11:54:31 | 11 | A.   Well, I don't know when the agreement started, |
| 11:54:33 | 12 | but the understanding, when I came around to it, was |
| 11:54:37 | 13 | that, because of business relationships that existed and |
| 11:54:44 | 14 | because Pixar had been a part of our company and the same |
| 11:54:51 | 15 | company that we were going to not proactively recruit |
| 11:54:56 | 16 | from Pixar.  This is from my ILM perspective.  And |
| 11:55:02 | 17 | that they, and least as a guideline, weren't going to be |
| 11:55:07 | 18 | proactively recruiting from Industrial Light & Magic. |
| 11:55:12 | 19 | Q.   I'm sorry.  Were there any other terms of the |
| 11:55:14 | 20 | agreement as you understood it? |
| 11:55:15 | 21 | A.   Yeah, that if an employee wanted to leave one |
| 11:55:18 | 22 | company to go to another, that we would support that, and |
| 11:55:26 | 23 | the only thing we would do was confer to make sure that |
| 11:55:30 | 24 | that employee wasn't leaving a project at an inopportune |
| 11:55:37 | 25 | time that would cause either company an inability to |

11:55:41  1  deliver a project.

11:55:46  2      Q.  Was there a process whereby if a hire would

11:55:51  3  create a problem, the current employer could -- could

11:55:55  4  prevent that hiring from taking place?

11:55:57  5      A.  No.  The -- the basic understanding was that

11:56:01  6  we'd try to be flexible if a couple extra weeks would

11:56:06  7  help get a project on or -- or allow them to restaff it

11:56:08  8  or something.  It was just if -- if there was an issue of

11:56:11  9  that sort.  It wasn't -- wasn't to preclude anybody

11:56:16 10  leaving.

11:56:19 11      Q.  Were there any other terms of the agreement, as

11:56:21 12  you understood it?

11:56:25 13      A.  No.  That -- that was basically it.  We

11:56:29 14  wouldn't actively recruit, and -- and we would work out

11:56:32 15  if there were any timing details, we'd see what we could

11:56:37 16  do if there was an issue.

11:56:39 17      Q.  And that was true throughout the time when you

11:56:44 18  worked for the Lucas companies; is that right?

11:56:45 19      A.  Yes.

11:56:46 20          MS. HENN:  Objection.  Vague.

11:56:47 21  BY MR. HARVEY:

11:56:48 22      Q.  So -- so it's true when you started, it was

11:56:51 23  true when you left?

11:56:52 24          MS. HENN:  Objection.  Vague.

11:56:53 25          THE WITNESS:  It -- it was true at Industrial

```
11:56:55  1   Light & Magic.  You -- you used the word "Lucas
11:56:58  2   companies," and I -- as I've said, I wasn't aware that --
11:57:00  3   during my tenure that there was anything outside of ILM
11:57:04  4   that was falling under that.
11:57:06  5   BY MR. HARVEY:
11:57:07  6        Q.   And then when you moved to Pixar, did you
11:57:11  7   understand that that agreement was still in effect?
11:57:14  8        A.   Yes.
11:57:16  9        Q.   And how did you understand that?
11:57:18 10             MS. HENN:  Objection.  Vague.
11:57:21 11             THE WITNESS:  When I moved to Pixar, I guess I
11:57:23 12   didn't presume that my leaving Industrial Light & Magic
11:57:28 13   would change that.  I didn't confirm it.  I just -- we
11:57:32 14   just didn't change.  Nothing precipitated a change.
11:57:38 15             MR. HARVEY:  You know, I think we've reached
11:57:40 16   the point where we said we would break for lunch.  So why
11:57:43 17   don't we do that.
11:57:44 18             THE WITNESS:  Okay.
11:57:44 19             MR. HARVEY:  And we'll reconvene after lunch.
11:57:47 20             THE WITNESS:  All right.
11:57:47 21             THE VIDEOGRAPHER:  We are now off the record at
11:57:49 22   11:57.
11:57:49 23             (Luncheon recess was taken.)
13:04:43 24             THE VIDEOGRAPHER:  We are now on the record at
13:04:44 25   1:04.
```

| | | |
|---|---|---|
| 13:04:46 | 1 | BY MR. HARVEY: |
| 13:04:46 | 2 | Q.   Good afternoon, Mr. Morris. |
| 13:04:49 | 3 | A.   Hi. |
| 13:04:50 | 4 | Q.   So I believe we left off on the gentleman's |
| 13:04:53 | 5 | agreement between Lucasfilm and Pixar, and is it your |
| 13:04:58 | 6 | understanding that that gentleman's agreement continued |
| 13:05:02 | 7 | through the time when you were hired by Pixar, up through |
| 13:05:07 | 8 | a certain time, say, or does it continue to run? |
| 13:05:12 | 9 | MS. HENN:  Objection.  Vague; compound. |
| 13:05:18 | 10 | THE WITNESS:  There was nothing -- there was |
| 13:05:20 | 11 | nothing that told me it stopped after I joined Pixar. |
| 13:05:26 | 12 | And I -- I don't remember any specific things around it, |
| 13:05:32 | 13 | but it -- it -- it was -- it did continue after I -- I |
| 13:05:35 | 14 | moved over there, to the best of my knowledge.  I mean |
| 13:05:38 | 15 | nothing -- I -- I didn't have any reason to change it or |
| 13:05:41 | 16 | behave differently. |
| 13:05:43 | 17 | MS. HENN:  Excuse me.  Is there a need to have |
| 13:05:44 | 18 | him projected on the screen?  It's just a little |
| 13:05:47 | 19 | distracting. |
| 13:05:49 | 20 | MR. HARVEY:  Could we go off the record for a |
| 13:05:51 | 21 | moment? |
| 13:05:52 | 22 | THE VIDEOGRAPHER:  Sure.  We're now off the |
| 13:05:53 | 23 | record at 1:05. |
| 13:07:11 | 24 | (Discussion off the record.) |
| 13:07:16 | 25 | THE VIDEOGRAPHER:  We are now on the record at |

| | | |
|---|---|---|
| 13:07:18 | 1 | 1:07. |
| 13:07:21 | 2 | MS. HENN:  Madam Court Reporter, could you just |
| 13:07:22 | 3 | read the last question and answer for me.  I apologize. |
| 13:07:59 | 4 | (Record was read as follows: "QUESTION:  So I |
| 13:04:50 | 5 | believe we left off on the gentleman's agreement between |
| 13:04:53 | 6 | Lucasfilm and Pixar, and is it your understanding that |
| 13:04:59 | 7 | that gentleman's agreement continued through the time |
| 13:05:04 | 8 | when you were hired by Pixar, up through a certain time, |
| 13:05:09 | 9 | say, or does it continue to run? |
| 13:05:18 | 10 | "THE WITNESS:  There was nothing -- there was |
| 13:05:20 | 11 | nothing that told me it stopped after I joined Pixar. |
| 13:05:26 | 12 | And I -- I don't remember any specific things around it, |
| 13:05:32 | 13 | but it -- it -- it was -- it did continue after I -- I |
| 13:05:35 | 14 | moved over there, to the best of my knowledge.  I mean |
| 13:05:38 | 15 | nothing -- I -- I didn't have any reason to change it or |
| 13:05:41 | 16 | behave differently." |
| 13:08:00 | 17 | MS. HENN:  Thank you. |
| 13:08:03 | 18 | BY MR. HARVEY: |
| 13:08:04 | 19 | Q.  To your knowledge, is the agreement in effect |
| 13:08:07 | 20 | today? |
| 13:08:08 | 21 | A.  It is not. |
| 13:08:10 | 22 | Q.  Do you have a reason to think that it is not? |
| 13:08:13 | 23 | A.  I do. |
| 13:08:14 | 24 | Q.  And what is that reason? |
| 13:08:16 | 25 | A.  The reason is there was a consent decree |

13:08:23  1    agreement, at which point -- well, actually, I believe we

13:08:30  2    functionally had stopped before the dissent decree, but

13:08:35  3    there -- it's -- it's not in place anymore.

13:08:41  4         Q.    And when you say "functionally stopped," when

13:08:46  5    did Pixar functionally stop the gentleman's agreement

13:08:48  6    with Lucasfilm?

13:08:49  7         A.    Well, I don't think anything had happened to --

13:08:55  8    I don't think there was any activity around it for a

13:08:59  9    while.  I'm -- I don't know exact -- the right time, end

13:09:03  10   dates.  That would probably be something Lori McAdams

13:09:08  11   would have to speak to.

13:09:09  12        Q.    So you have no idea sitting here when the

13:09:14  13   gentleman's agreement functionally stopped?

13:09:17  14        A.    No.  I'm -- I'm guessing -- I don't know what

13:09:20  15   year -- a year before the DOJ consent decree, something

13:09:25  16   like that.

13:09:26  17        Q.    So sometime in 2009?

13:09:30  18        A.    I'm -- I don't really know.

13:09:35  19        Q.    Do you know a date by which it certainly

13:09:38  20   stopped?

13:09:40  21        A.    I don't know a date.

13:09:42  22        Q.    Would it have stopped with the -- with the

13:09:46  23   filing of the stipulated judgment with the Department of

13:09:48  24   Justice?

13:09:48  25        A.    I -- I don't know the answer.

13:10:25 1        Q.   Just one moment.   Could you tell me what Pixar

13:10:36 2    University is.

13:10:38 3        A.   Yeah, Pixar University is a -- a department we

13:10:44 4    have at Pixar that does a number of things.   They provide

13:10:50 5    classes for employees to attend of different sorts,

13:10:56 6    primarily enrichment classes, things outside of -- of

13:11:00 7    their job areas and so forth.   They also oversee training

13:11:07 8    for employees, different technical trainings, those kinds

13:11:10 9    of things.   And they -- they help put on events,

13:11:15 10   screenings and those types of things, and then they

13:11:18 11   oversee a museum show and -- and our -- and the Pixar

13:11:22 12   archives as well.

13:11:24 13       Q.   Are there videos that Pixar University puts

13:11:27 14   together that they make available to employees for

13:11:30 15   training purposes?

13:11:32 16       A.   Yeah, a lot -- lots of -- lots of videos.

13:11:34 17       Q.   And did you give a presentation for one of

13:11:36 18   these videos?

13:11:37 19       A.   Many.

13:11:38 20       Q.   Many?   Okay.   If we could switch to --

13:11:43 21            THE VIDEOGRAPHER:   Could we just go off the

13:11:44 22   record for a brief moment?

13:11:46 23            MR. HARVEY:   Sure.

13:11:47 24            THE VIDEOGRAPHER:   We're now off the record at

13:11:49 25   1:11.

| | | |
|---|---|---|
| 13:20:54 | 1 | friends." |
| 13:20:55 | 2 | (Video stops.) |
| 13:20:55 | 3 | BY MR. HARVEY: |
| 13:20:55 | 4 | Q.   I'm going to pause it here for a minute. |
| 13:20:57 | 5 | Is the man in that picture Ed Catmull? |
| 13:20:59 | 6 | A.   That's Ed Catmull. |
| 13:21:00 | 7 | MR. HARVEY:  I'll keep playing it. |
| 13:19:16 | 8 | (Video begins:) |
| 13:21:02 | 9 | MR. MORRIS:  "And so we got together every few |
| 13:21:05 | 10 | months at lunch or dinner and talked about things we were |
| 13:21:07 | 11 | going through, because both companies were going through |
| 13:21:10 | 12 | growth phases that entire time, really.  ILM went from |
| 13:21:14 | 13 | 250 to about 1400 people in the time I was there.  And |
| 13:21:18 | 14 | over that same span Pixar went from, I'm going to say, 30 |
| 13:21:21 | 15 | to 500, something like that.  So we were both struggling |
| 13:21:25 | 16 | with what does it mean to sort of help guide a company, |
| 13:21:28 | 17 | when it's going through that growth, how do you keep it |
| 13:21:32 | 18 | good, how do you keep the culture right, how do you do it |
| 13:21:35 | 19 | right?  How do you manage creative people in a way that |
| 13:21:41 | 20 | gives them the flexibility they need, but it is not |
| 13:21:43 | 21 | anarchy; all those types of things. |
| 13:21:45 | 22 | "So anyway, winding back forward, I came to one |
| 13:21:49 | 23 | of those lunches that we always had, I said, 'Oh, by the |
| 13:21:52 | 24 | way, Ed, I'm leaving the company, I just want you to hear |
| 13:21:55 | 25 | it from me, and I'm going -- I'm going to go produce |

13:21:58   1   again, if I can.'  He said, 'Great, come talk to use,

13:21:59   2   because we were going to talk to you about this anyway,

13:22:01   3   but we couldn't --'"

13:22:03   4          (Video ends.)

13:22:03   5          MR. HARVEY:  And that was the end of that file

13:22:05   6   as it was produced.

13:22:08   7          The next file I'm going to play was produced as

13:22:11   8   PIX00005296.

13:22:17   9          (Video begins:)

13:22:17   10         MR. MORRIS:  "We have an anti-poach clause

13:22:20   11  between the Lucas companies and -- and this company.  We

13:22:22   12  don't -- we don't recruit from one another, we don't

13:22:24   13  call -- if the people want to go from one company to the

13:22:28   14  other, we, you know, find a way to let that happen.  But

13:22:30   15  we have a -- sort of a gentleman's agreement that we've

13:22:32   16  honored pretty well here for the last many years.

13:22:36   17         "So I -- I came here, and I came here to

13:22:38   18  produce WALL-E, and that" --

13:22:40   19         (Video stops.)

13:22:40   20  BY MR. HARVEY:

13:22:41   21     Q.   Okay.  Now, these files were produced

13:22:44   22  differently, but was this part of the same presentation

13:22:48   23  as that first part?

13:22:51   24         MS. HENN:  Objection.  Vague.

13:22:52   25         THE WITNESS:  I -- I don't -- I mean I -- that

13:22:55  1    was me saying those things.  I don't recall if they were

13:22:58  2    the same presentation.  It looks like it.

13:23:01  3    BY MR. HARVEY:

13:23:01  4        Q.   In looking at those two -- these two videos,

13:23:05  5    and if you want me to replay anything, I'm happy to do

13:23:08  6    it, do you believe that they are the same presentation,

13:23:11  7    but two parts, where when the first video ends, the

13:23:14  8    second one begins?

13:23:15  9             MS. HENN:  Objection.  Vague.

13:23:17 10             THE WITNESS:  I -- I don't know if that would

13:23:18 11    have been the cut point per se, but it looks like it was

13:23:22 12    the same presentation, judging by the fact I'm wearing

13:23:25 13    the same clothes, although I'm not sure I'm not wearing

13:23:28 14    the same clothes today, so it's freaking me out.

13:23:31 15             MR. HARVEY:  I was thinking the same thing, but

13:23:33 16    I didn't say it.

13:23:34 17             THE WITNESS:  I think this has tiny dots on it,

13:23:37 18    so I'm thinking I changed up a little.  I don't know.

13:23:39 19    BY MR. HARVEY:

13:23:42 20        Q.   In this file, you say -- well, you describe the

13:23:45 21    gentleman's agreement between Lucasfilm and Pixar,

13:23:49 22    correct?

13:23:49 23        A.   Yes.

13:23:50 24        Q.   And -- and I have transcribed part of it so we

13:23:55 25    don't have to keep playing the video, but if you'd like

13:23:58   1    me to, I'd be happy to.  I believe the relevant section

13:24:02   2    begins, "We have an anti-poach clause between the Lucas

13:24:06   3    companies and this company."

13:24:07   4            Was that correct when you said it?

13:24:08   5        A.   Well, I don't know if it was technically

13:24:13   6    correct.  We have an agreement that we wouldn't recruit

13:24:16   7    from one another, and I -- I -- I -- obviously I was

13:24:19   8    speaking extemporaneously.  "Clause" is probably a

13:24:24   9    misnomer, but we certainly did have an agreement, a

13:24:28  10    verbal agreement.

13:24:29  11        Q.   Is there a reason why you said "the Lucas

13:24:31  12    companies" rather than "ILM"?

13:24:33  13        A.   No, I don't think so.  I think it was just in

13:24:35  14    the midst of talking.

13:24:39  15        Q.   Then you say, "We don't recruit from one

13:24:42  16    another and we don't call up.  If people want to go from

13:24:44  17    one company to the other, we find a way to let that

13:24:47  18    happen."  Were there any categories of employees that

13:24:52  19    this agreement was focused on?

13:24:57  20            MS. HENN:  Objection.  Vague.

13:24:58  21            THE WITNESS:  The disagreement?  I'm -- oh,

13:25:00  22    disagreement, you said?

13:25:01  23    BY MR. HARVEY:

13:25:02  24        Q.   Yes.

13:25:02  25        A.   No.  It was just a general relationship issue.

Deposition of James Morris                                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

13:25:06  1          Q.   But it concerns recruiting, correct?

13:25:09  2                MS. HENN:  Objection.  Vague.

13:25:11  3                THE WITNESS:  Just flesh that out for me, your

13:25:13  4     question a little bit more.

13:25:14  5     BY MR. HARVEY:

13:25:15  6          Q.   Sure.  The gentleman's agreement between

13:25:17  7     Lucasfilm and Pixar concerned recruiting, correct?

13:25:22  8          A.   Yes.  The agreement was that we wouldn't

13:25:24  9     actively recruit from one another.

13:25:26  10         Q.   And were there any employees that -- that --

13:25:31  11    that either company was concerned about in the sense of

13:25:34  12    who would be recruited by the other company?

13:25:38  13               MS. HENN:  Objection.  Vague.

13:25:40  14               THE WITNESS:  No.  I don't think there was ever

13:25:41  15    any specific category of -- of individuals that -- that

13:25:46  16    that was about.  I mean, you know, it started -- we were

13:25:50  17    all sort of working together as the same company, and

13:25:53  18    then suddenly we were still in the same place and they

13:25:56  19    were there and we were there.  They were a separate

13:25:58  20    company.  It was like kind of a sister company situation,

13:26:01  21    but there wasn't any specific -- it was not intended to

13:26:04  22    be about anything specific.

13:26:05  23    BY MR. HARVEY:

13:26:07  24         Q.   In 2007, were Pixar and Lucasfilm separate

13:26:14  25    companies?

KRAMM COURT REPORTING          *CONFIDENTIAL - Attorneys' Eyes Only*          Page: 116

| | | |
|---|---|---|
| 13:26:14 | 1 | A.   In 2007? |
| 13:26:15 | 2 | Q.   Yes. |
| 13:26:16 | 3 | A.   Yes.  Pixar and Lucas were separate companies. |
| 13:26:20 | 4 | Q.   And they continue to be separate companies to |
| 13:26:22 | 5 | the present, correct? |
| 13:26:22 | 6 | A.   That's correct. |
| 13:26:24 | 7 | Q.   But this gentleman's agreement continued |
| 13:26:26 | 8 | through when they were separate companies on different |
| 13:26:29 | 9 | campuses, correct? |
| 13:26:30 | 10 | A.   Yes. |
| 13:26:36 | 11 | Q.   At one point you say in the video I just |
| 13:26:39 | 12 | played, that "If people want to go from one company to |
| 13:26:41 | 13 | the other, we find a way to let that happen."  What did |
| 13:26:45 | 14 | you mean by that? |
| 13:26:47 | 15 | A.   Well, when we had an employee that wanted to go |
| 13:26:51 | 16 | work at Pixar, I'll speak from the ILM side, if I can, |
| 13:26:56 | 17 | and -- in many ways, Pixar was in a different business |
| 13:27:01 | 18 | than we were, and most of the types of people that were |
| 13:27:04 | 19 | going because they were interested in working on animated |
| 13:27:09 | 20 | films instead of doing visual effects work, which was our |
| 13:27:13 | 21 | work.  So if somebody wanted to go, we sort of felt like, |
| 13:27:15 | 22 | well, that is kind of a career choice, and, great, good |
| 13:27:18 | 23 | for them, they're a great company, we love them, we have |
| 13:27:21 | 24 | a collegial relationship with them. |
| 13:27:24 | 25 | So when I say "let it happen," we'd find a way |

13:37:00  1    to 500, something like that.  So we were both struggling

13:37:04  2    with what does it mean to sort of help guide a company

13:37:07  3    when it's going through that growth, how do you keep it

13:37:10  4    good, how do you keep the culture right, how do you do it

13:37:13  5    right?  How do you manage creative people in a way that

13:37:19  6    gives them the flexibility they need, but it's not

13:37:22  7    anarchy; all those types of things.

13:37:24  8              "I came here to produce WALL-E, I met

13:37:27  9    Andrew" --

13:37:27  10             (Video stops.)

13:37:27  11   BY MR. HARVEY:

13:37:28  12       Q.   So if you notice, an interesting thing happened

13:37:30  13   at that point, where the video that ends with "all those

13:37:37  14   types of things" then skips over the discussion of the

13:37:41  15   gentleman's agreement and starts up again in discussing

13:37:47  16   your role with WALL-E.

13:37:51  17             Have you seen this video before?

13:37:55  18       A.   I saw what you showed to me before.

13:37:58  19       Q.   Have you seen this version of it?

13:38:03  20       A.   I have not seen this version of it.

13:38:07  21       Q.   Do you have any idea why the portion that

13:38:08  22   discusses the gentleman's agreement was deleted?

13:38:11  23       A.   I wasn't aware it was deleted until counsel

13:38:14  24   told me --

13:38:14  25             MS. HENN:  Objection.  You should not reveal --

13:38:17  1              THE WITNESS:  I'm sorry.

13:38:17  2              MS. HENN:  -- any communications with lawyers.

13:38:19  3              THE WITNESS:  I wasn't aware.

13:38:20  4  BY MR. HARVEY:

13:38:22  5      Q.   Do you know which version of the video is

13:38:25  6  available to employees if they wanted to look at the

13:38:27  7  video today?

13:38:29  8      A.   I don't know.

13:38:36  9              MR. HARVEY:  And that concludes the video

13:38:39 10  portion of the deposition.

13:38:42 11              THE VIDEOGRAPHER:  Could we go off the record

13:38:43 12  for just a moment?

13:38:44 13              MR. HARVEY:  Yes.

13:38:45 14              THE VIDEOGRAPHER:  We are now off the record at

13:38:46 15  1:38.

13:38:48 16              (Discussion off the record.)

13:40:34 17              THE VIDEOGRAPHER:  We are now on the record at

13:40:35 18  1:40.

13:40:38 19  BY MR. HARVEY:

13:40:43 20      Q.   Were there any time limits on the gentleman's

13:40:46 21  agreement, in the sense of was there a firm expiration

13:40:51 22  date when it would cease to be in effect?

13:40:55 23      A.   The -- the gentleman's agreement was

13:40:59 24  essentially kind of a casual understanding, really.  So

13:41:03 25  in terms of expiration, there was never anything like

13:41:06  1    that discussed, that I can recall.

13:41:09  2        Q.   Okay.  Were there any geographic limits, such

13:41:13  3    as the gentleman's agreement applied in San Francisco,

13:41:17  4    but not San Jose?

13:41:22  5        A.   When the gentleman's agreement -- when I was

13:41:26  6    involved with the Industrial Light & Magic, was in

13:41:30  7    San Rafael, and Pixar was there originally and then moved

13:41:33  8    over to the East Bay, but it didn't -- it was between

13:41:37  9    those two groups.  It wasn't geographically -- there --

13:41:42 10    there was no geographical aspect to it.

13:41:46 11            MR. HARVEY:  Okay.  Please mark this as the

13:42:31 12    next exhibit in order.

13:42:33 13            THE REPORTER:  Exhibit 158.

13:42:31 14            (Exhibit 158 was marked for identification.)

13:42:34 15    BY MR. HARVEY:

13:42:34 16        Q.   Please let me know once you've had a chance to

13:42:37 17    review the document.

13:43:32 18        A.   Okay.

13:43:32 19        Q.   I didn't say it before, but I'll say it now.

13:43:35 20    This document is Bates stamped PIX00009242.

13:43:39 21            Have you seen this document before?

13:43:41 22        A.   Well, my name is on it, but I don't recall it.

13:43:46 23        Q.   In looking at this document, did you receive

13:43:50 24    this document -- I'm sorry -- did you receive -- scratch

13:43:54 25    that.

13:43:55  1         Did you send the first email on the date

13:43:58  2   indicated to Lori McAdams?

13:44:02  3         MS. HENN:  Objection.  Vague.

13:44:06  4         THE WITNESS:  I -- it -- it's -- it's date

13:44:09  5   marked that I sent it, so I presume I did.

13:44:12  6   BY MR. HARVEY:

13:44:13  7      Q.   Okay.  And that first email that's dated

13:44:19  8   August 21st, 2006, at 8:40 a.m., you wrote, "I'm going to

13:44:23  9   go over and have lunch with Mich today, a peace keeping

13:44:27 10   mission."  Who is Mich?

13:44:30 11      A.   That's Mich Chau, who is the president of

13:44:33 12   Lucasfilm.

13:44:36 13      Q.   And what was the peace keeping mission you were

13:44:38 14   on?

13:44:39 15      A.   I can't remember, to tell you the truth.  I

13:44:41 16   must have done something to piss her off.

13:44:45 17      Q.   Okay.  You then say, "Can you remind me who the

13:44:48 18   TD is that they hired away from us about six months ago?"

13:44:52 19         What is a TD?

13:44:54 20      A.   A technical director.

13:44:56 21      Q.   And then you say, "I just want to have," quote,

13:44:58 22   "'quid pro quo,'" end quote, "ammo if I need it."  What

13:45:07 23   did you mean by "quid pro quo ammo"?

13:45:09 24      A.   Well, I don't recall the specific event, but

13:45:11 25   I -- I -- clearly there was some issue with the

| | | |
|---|---|---|
| 13:52:16 | 1 | As I said, this timing would be around the time that we |
| 13:52:21 | 2 | were having discussions about ███████. So I -- I'm |
| 13:52:27 | 3 | speculating that that might have been that. That's |
| 13:52:32 | 4 | around the time I last saw Mich, I think, at her offices. |
| 13:52:36 | 5 | BY MR. HARVEY: |
| 13:52:38 | 6 | Q. Did you keep the peace between Pixar and |
| 13:52:41 | 7 | Lucasfilm? |
| 13:52:42 | 8 | MS. HENN: Object to form. |
| 13:52:44 | 9 | THE WITNESS: Well, at the end of the day we're |
| 13:52:46 | 10 | a pretty good client to them, so I think that probably |
| 13:52:51 | 11 | helped, but we have a good company relationship. |
| 13:52:53 | 12 | BY MR. HARVEY: |
| 13:52:55 | 13 | Q. And a good relationship with regard to |
| 13:52:57 | 14 | recruiting; is that right? |
| 13:52:59 | 15 | A. Well -- |
| 13:52:59 | 16 | MS. HENN: Object to form. |
| 13:53:01 | 17 | THE WITNESS: You know, we -- we had a -- a |
| 13:53:04 | 18 | good relationship. We had an agreement with them that we |
| 13:53:07 | 19 | wouldn't actively recruit from one another. |
| 13:53:14 | 20 | BY MR. HARVEY: |
| 13:53:15 | 21 | Q. Great. |
| 13:53:16 | 22 | A. So the answer is, yes. |
| 13:53:40 | 23 | MR. HARVEY: Please mark this as the next |
| 13:53:41 | 24 | exhibit. |
| 13:53:43 | 25 | THE REPORTER: Exhibit 159. |

| | | |
|---|---|---|
| 13:53:45 | 1 | MR. HARVEY:  Please let me know once you have |
| 13:53:47 | 2 | had a chance to review the document.  The document is |
| 13:53:49 | 3 | Bates labeled PIX00009271. |
| 13:53:53 | 4 | (Exhibit 159 was marked for identification.) |
| 13:54:33 | 5 | THE WITNESS:  Okay. |
| 13:54:34 | 6 | BY MR. HARVEY: |
| 13:54:34 | 7 | Q.   Have you seen this document before? |
| 13:54:36 | 8 | A.   I don't recall it, but I wrote part of it. |
| 13:54:39 | 9 | Q.   Okay.  And that part includes your response on |
| 13:54:46 | 10 | February 8th, 2007, at 10:13 a.m. as indicated; is that |
| 13:54:52 | 11 | correct? |
| 13:54:53 | 12 | A.   Yes. |
| 13:54:54 | 13 | Q.   And there you write, and I think you -- well, |
| 13:54:58 | 14 | "Anyone" -- and I think you meant dying, "to get out of |
| 13:55:03 | 15 | Lucas that you know?"  Is that what you meant to write? |
| 13:55:10 | 16 | A.   I'm sorry.  Where are you referring to?  I'm |
| 13:55:12 | 17 | not seeing it. |
| 13:55:13 | 18 | Q.   It's in the middle of the page. |
| 13:55:15 | 19 | A.   Oh. |
| 13:55:15 | 20 | Q.   Your message on February 8th, 2007, at 10:13 |
| 13:55:20 | 21 | a.m., "Anyone dying to get out of Lucas that you know?" |
| 13:55:30 | 22 | MS. HENN:  Is there a question? |
| 13:55:31 | 23 | THE WITNESS:  Yes. |
| 13:55:31 | 24 | BY MR. HARVEY: |
| 13:55:32 | 25 | Q.   And "dying" there is just misspelled, correct? |

13:55:35  1        A.   Yes.

13:55:42  2        Q.   And why did you write to Denise Ream whether

13:55:45  3    she knew of anyone dying to get out of Lucas?

13:55:50  4        A.   Denise Ream is a producer who we brought over

13:55:54  5    to Pixar from ILM, and I wondered if she knew anybody

13:56:00  6    over there that might be a good candidate that would be a

13:56:02  7    good cultural fit for the way we do things at Pixar.  It

13:56:07  8    looks like we were looking for a production accountant at

13:56:10  9    the time.

13:56:10  10       Q.   And Denise Ream responds, "I would love to see

13:56:14  11   Pam not come over here.  She actually lives in Berkeley.

13:56:17  12   I guess I can't approach her.  Right?"

13:56:20  13            Why do you think she said, "I guess I can't

13:56:23  14   approach her"?

13:56:24  15            MS. HENN:  Objection.  Calls for speculation.

13:56:28  16            THE WITNESS:  Again, you -- you'd have to ask

13:56:29  17   her.  I -- certainly I would presume since we openly

13:56:36  18   talked about with all our employees at both companies

13:56:39  19   that we didn't have a -- a -- you know, we didn't recruit

13:56:44  20   from one another actively.

13:56:50  21   BY MR. HARVEY:

13:56:51  22       Q.   And so that was your understanding of what she

13:56:52  23   meant?

13:56:53  24       A.   Yeah, I believe so.

13:56:54  25       Q.   And you responded, "You could check in, invite

| | | |
|---|---|---|
| 13:56:56 | 1 | her over for coffee, see if she offers up any opening. |
| 13:57:00 | 2 | If she did, we could talk to her.  If not, we'd have to |
| 13:57:01 | 3 | respect the truce." |
| 13:57:04 | 4 | What did you mean by "the truce"? |
| 13:57:07 | 5 | A.   That -- that -- gentleman's agreement, that we |
| 13:57:11 | 6 | wouldn't recruit from one another. |
| 13:57:32 | 7 | MS. HENN:  Would this be a good time for a |
| 13:57:34 | 8 | break?  We've been going about an hour. |
| 13:57:36 | 9 | MR. HARVEY:  Would you like to take a break? |
| 13:57:38 | 10 | THE WITNESS:  Sure. |
| 13:57:39 | 11 | THE VIDEOGRAPHER:  We are now off the record at |
| 13:57:40 | 12 | 1:57. |
| 13:57:41 | 13 | (Recess was taken.) |
| 14:13:39 | 14 | THE VIDEOGRAPHER:  We are now on the record at |
| 14:13:40 | 15 | 2:13. |
| 14:13:44 | 16 | MR. HARVEY:  During the break I discussed with |
| 14:13:46 | 17 | Ms. Henn Plaintiff's Exhibit 116 that was introduced |
| 14:13:51 | 18 | yesterday.  The document introduced was inadvertently |
| 14:13:55 | 19 | copied without a Bates stamp or confidentiality |
| 14:13:59 | 20 | designation, and with Ms. Henn's agreement, we will swap |
| 14:14:04 | 21 | out the version with the Bates stamp and the |
| 14:14:08 | 22 | confidentiality stamp. |
| 14:14:25 | 23 | MS. HENN:  Thank you.  That looks fine. |
| 14:14:26 | 24 | MR. HARVEY:  Do you agree to treat this |
| 14:14:28 | 25 | document with the Bates stamp as Plaintiffs Exhibit 116 |

| | | |
|---|---|---|
| 14:14:32 | 1 | for all purposes? |
| 14:14:33 | 2 | MS. HENN:  We do. |
| 14:14:38 | 3 | One other housekeeping matter, I believe under |
| 14:14:41 | 4 | the Protective Order these deposition transcripts are |
| 14:14:43 | 5 | provisionally designated CONFIDENTIAL for a 30-day |
| 14:14:47 | 6 | period.  We would like to provisionally designate this as |
| 14:14:50 | 7 | ATTORNEYS' EYES ONLY, if that is all right. |
| 14:14:54 | 8 | MR. HARVEY:  Sure.  And you'll send -- after |
| 14:14:54 | 9 | you've reviewed the portions that you believe merit that |
| 14:14:57 | 10 | designation. |
| 14:15:00 | 11 | MS. HENN:  Yes, we'll do that. |
| 14:15:08 | 12 | MR. HARVEY:  Okay.  Please label this as the |
| 14:15:26 | 13 | next exhibit. |
| 14:15:27 | 14 | THE REPORTER:  Exhibit 160. |
| 14:15:28 | 15 | (Exhibit 160 was marked for identification.) |
| 14:15:28 | 16 | MR. HARVEY:  This is a document Bates stamped |
| 14:15:31 | 17 | PIX00000239. |
| 14:15:34 | 18 | Q.  And, Mr. Morris, please let me know once you've |
| 14:15:36 | 19 | had a chance to review the document. |
| 14:15:38 | 20 | A.  Okay.  Okay. |
| 14:17:14 | 21 | Q.  Is this an email exchange that Mr. Catmull |
| 14:17:17 | 22 | forwarded to you on Friday, November 30th, 2007? |
| 14:17:20 | 23 | A.  It appears that it is.  I -- yes. |
| 14:17:26 | 24 | Q.  And does the email exchange concern an event |
| 14:17:35 | 25 | where a recruiter sent an email to Howard Look? |

15:21:16  1    means you should consider them.  We just have a courtesy

15:21:19  2    call when the offer is made, and then we don't counter

15:21:24  3    each other.  The same is true in reverse.  In case it's

15:21:27  4    helpful, attached is a document I wrote up awhile back to

15:21:29  5    help our team here know how it works.  Feel free to read

15:21:33  6    it and know that we know that LFL reciprocates."

15:21:38  7            And the document attached to this email is the

15:21:41  8    one on the second page.

15:21:42  9            If you can go to the second page, early in your

15:21:46 10    testimony you were a little bit unsure whether Lori

15:21:49 11    McAdams wrote this document.  Do you now have more

15:21:52 12    confidence that she wrote this document?

15:21:54 13            MS. HENN:  Objection to form.

15:21:56 14            THE WITNESS:  I don't know that she wrote this

15:21:57 15    document.  I'm -- somebody else may have written this

15:22:01 16    document.

15:22:02 17    BY MR. HARVEY:

15:22:02 18        Q.   Okay.  If Lori McAdams were to write an email

15:22:07 19    like this to Lucasfilm in the future, and attach an

15:22:13 20    attachment like this, would you discipline her?

15:22:16 21            MS. HENN:  Objection to form; calls for

15:22:17 22    speculation.

15:22:18 23            THE WITNESS:  I don't know.  When you say

15:22:19 24    "discipline," what -- I'm -- what do you --

         25    //

| | | |
|---|---|---|
| 15:22:22 | 1 | BY MR. HARVEY: |
| 15:22:23 | 2 | Q.  What actions would you take if in the future |
| 15:22:25 | 3 | you came across something like this? |
| 15:22:27 | 4 | MS. HENN:  Objection.  Calls for speculation. |
| 15:22:31 | 5 | THE WITNESS:  I -- I don't know.  It would |
| 15:22:32 | 6 | depend what the circumstances are and -- and where things |
| 15:22:37 | 7 | are. |
| 15:22:38 | 8 | BY MR. HARVEY: |
| 15:22:38 | 9 | Q.  What if you saw something identical to this? |
| 15:22:40 | 10 | What would be your response? |
| 15:22:45 | 11 | MS. HENN:  Same objection.  Calls for |
| 15:22:46 | 12 | speculation. |
| 15:23:02 | 13 | THE WITNESS:  Well, in general, we had an |
| 15:23:05 | 14 | agreement for a long period of time that we wouldn't |
| 15:23:08 | 15 | recruit from each other, and we are not doing that |
| 15:23:12 | 16 | anymore.  We rescinded that agreement. |
| 15:23:15 | 17 | So I wouldn't expect something like this in the |
| 15:23:17 | 18 | future. |
| 15:23:17 | 19 | BY MR. HARVEY: |
| 15:23:22 | 20 | Q.  But if something like this in the future |
| 15:23:24 | 21 | happened, what would your reaction be? |
| 15:23:26 | 22 | MS. HENN:  Objection to form; calls for |
| 15:23:27 | 23 | speculation. |
| 15:23:33 | 24 | THE WITNESS:  We don't -- we don't -- |
| | 25 | // |

| | | |
|---|---|---|
| 15:23:33 | 1 | BY MR. HARVEY: |
| 15:23:34 | 2 | Q.   I'm sorry.  Go ahead. |
| 15:23:35 | 3 | A.   Yeah, we don't recruit from one another |
| 15:23:37 | 4 | anymore, so I would talk to Lori about it and ask her not |
| 15:23:40 | 5 | to do it. |
| 15:23:43 | 6 | MR. HARVEY:  Sorry.  Could the reporter please |
| 15:23:48 | 7 | read back that answer. |
| 15:23:49 | 8 | THE WITNESS:  I think I said the answer wrong. |
| 15:23:51 | 9 | BY MR. HARVEY: |
| 15:23:52 | 10 | Q.   That's -- |
| 15:23:53 | 11 | MS. HENN:  Let's just hear it. |
| 15:23:59 | 12 | (Record was read as follows:  "ANSWER:  We |
| 15:23:59 | 13 | don't recruit from one another anymore, so I would talk |
| 15:23:59 | 14 | to Lori about it and ask her not to do it.") |
| 15:24:02 | 15 | BY MR. HARVEY: |
| 15:24:02 | 16 | Q.   Do you want to clarify that answer? |
| 15:24:04 | 17 | A.   Yes.  We don't not -- we -- we don't not |
| 15:24:07 | 18 | recruit from one another anymore, so we recruit from one |
| 15:24:11 | 19 | another more openly.  We don't have our gentleman's |
| 15:24:14 | 20 | agreement anymore. |
| 15:24:15 | 21 | Q.   And so you also said you would talk to Lori |
| 15:24:16 | 22 | about it and tell her to stop it.  Would you -- would you |
| 15:24:23 | 23 | report the activity to any regulatory authority? |
| 15:24:26 | 24 | MS. HENN:  Objection.  Calls for speculation. |
| 15:24:29 | 25 | THE WITNESS:  I would confer with counsel and |

16:41:10  1        I, Rosalie A. Kramm, Certified Shorthand

16:41:10  2   Reporter licensed in the State of California, License No.

16:41:10  3   5469, hereby certify that the deponent was by me first

16:41:10  4   duly sworn and the foregoing testimony was reported by me

16:41:10  5   and was thereafter transcribed with computer-aided

16:41:10  6   transcription; that the foregoing is a full, complete,

16:41:10  7   and true record of said proceedings.

16:41:10  8        I further certify that I am not of counsel or

16:41:10  9   attorney for either of any of the parties in the

16:41:10 10   foregoing proceeding and caption named or in any way

16:41:10 11   interested in the outcome of the cause in said caption.

16:41:10 12        The dismantling, unsealing, or unbinding of the

16:41:10 13   original transcript will render the reporter's

16:41:10 14   certificates null and void.

16:41:10 15        In witness whereof, I have hereunto set my hand

16:41:10 16   this day:   August 10, 2012.

16:41:10 17        ___X____  Reading and Signing was requested.

16:41:10 18        _____  Reading and Signing was waived.

16:41:10 19        _____  Reading and signing was not requested.

16:41:10 20

16:41:10 21        _____

16:41:10 22        ROSALIE A. KRAMM

16:41:10 23        CSR 5469, RPR, CRR

16:41:10 24

         25

ERRATA SHEET

Witness:  James Morris                              Date of Deposition:  August 3, 2012

Page     Line

17        16                 Change: "Malani" to "Mullaney"

                             Reason:  Spelling

57        17                 Change: "Tune" to "Toon"

                             Reason:  Spelling

_____ Subject to the above changes, I certify that the transcript is true and correct.

_____ No changes have been made.  I certify that the transcript is true and correct.

(signature)                                         (date) 9/12/12

ERRATA SHEET

Witness:  James Morris                          Date of Deposition:  August 3, 2012

Page     Line

17        16              Change: "Malani" to "Mullaney"

                          Reason:  Spelling

57        17              Change: "Tune" to "Toon"

                          Reason:  Spelling


__✓____ Subject to the above changes, I certify that the transcript is true and correct.

_____ No changes have been made.  I certify that the transcript is true and correct.


(signature)                                        9/12/12
                                                   (date)

DC: 4534915-2