# EXHIBIT W TO
# CISNEROS DECLARATION
# REDACTED VERSION

1              UNITED STATES DISTRICT COURT

2             NORTHERN DISTRICT OF CALIFORNIA

3                   SAN JOSE DIVISION

4

5

6    IN RE:  HIGH-TECH EMPLOYEE     )

7    ANTITRUST LITIGATION           )

8                                   )   No. 11-CV-2509-LHK

9    THIS DOCUMENT RELATES TO:      )

10   ALL ACTIONS.                   )

11   _____)

12

13

14

15          VIDEO DEPOSITION OF SHONA BROWN

16                 January 30, 2013

17

18

19   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25

09:23:47 1    would be a very hands-on corporate strategy group.

09:23:55 2        Q.  And could you elaborate what you mean by People

09:23:57 3    Operations.

09:24:02 4        A.  The People Operations group is a name that I

09:24:06 5    chose because it -- primarily because the group was

09:24:13 6    inclusive of human resources but broader than that.

09:24:17 7    The focus was what you might call administrative G&A

09:24:21 8    pieces so, for example, the chefs all used to work for

09:24:24 9    me.  We had quite a few of them.  But it was inclusive

09:24:28 10   of all of the traditional aspects of human resources,

09:24:32 11   some parts that you might include in facilities, some

09:24:36 12   parts you might include in finance.

09:24:39 13       Q.  And you mentioned GMA.  What does that stand

09:24:44 14   for?

09:24:44 15       A.  G&A, sorry.  Functionally G&A, I guess it's

09:24:49 16   general and administrative.

09:24:52 17       Q.  Oh.

09:24:53 18           MR. RUBIN:  G&A.

09:24:56 19           THE WITNESS:  Yeah.  Sorry.  Ampersand.

09:25:00 20           MR. HARVEY:  Q.  Okay.  In your role as vice

09:25:01 21   president of business operations, you oversaw Google's

09:25:06 22   recruiting, correct?

09:25:10 23       A.  Yes.  Recruiting was a -- was part of my

09:25:13 24   group's mandate, and I would have had somebody -- I

09:25:19 25   would have had somebody running recruiting, though I do

| | | |
|---|---|---|
| 09:25:23 | 1 | not recall at that time who it was to be honest. |
| 09:25:25 | 2 | Q.  Is that the role Mr. Geshuri eventually |
| 09:25:28 | 3 | occupied? |
| 09:25:28 | 4 | A.  At one point in time, Mr. Geshuri was running a |
| 09:25:32 | 5 | good chunk of recruiting. |
| 09:25:42 | 6 | Q.  Was compensation part of your purview? |
| 09:25:44 | 7 | A.  Yes.  Compensation was also part of that People |
| 09:25:47 | 8 | Operations group's purview. |
| 09:25:50 | 9 | Q.  And so you had responsibility to design and |
| 09:25:56 | 10 | supervise a -- pardon me, supervise compensation at |
| 09:26:00 | 11 | Google company wide, correct? |
| 09:26:03 | 12 | A.  I would say that that's a fair description, |
| 09:26:04 | 13 | that the purview included design and monitoring and |
| 09:26:09 | 14 | oversight for compensation programs across the company. |
| 09:26:12 | 15 | Yes. |
| 09:26:16 | 16 | Q.  And these responsibilities -- and these |
| 09:26:23 | 17 | responsibilities, as you've described them, did you keep |
| 09:26:30 | 18 | that -- those responsibilities until you moved to head |
| 09:26:37 | 19 | Google.org? |
| 09:26:41 | 20 | A.  No.  I did not keep the responsibilities for |
| 09:26:44 | 21 | that entire period of time.  At a point, I actually |
| 09:26:50 | 22 | transitioned all of the People Operations group under |
| 09:26:55 | 23 | the responsibility of Laszlo Bock who did report to me. |
| 09:27:00 | 24 | And then at a point in time, I moved Laszlo from |
| 09:27:04 | 25 | reporting to me up to reporting to Eric so that I was no |

| | | |
|---|---|---|
| 09:27:07 | 1 | longer operationally responsible for that group.  That |
| 09:27:14 | 2 | happened prior to me moving to my responsibilities with |
| 09:27:17 | 3 | Google.org so I continued on in my responsibilities with |
| 09:27:22 | 4 | business operations while not having any direct |
| 09:27:24 | 5 | oversight over People Operations. |
| 09:27:27 | 6 | Q.  What I'm trying to pinpoint is when those moves |
| 09:27:31 | 7 | happened.  So starting in I believe you said August of |
| 09:27:35 | 8 | 2003, you had this wider set of responsibilities |
| 09:27:37 | 9 | reporting directly to Eric Schmidt. |
| 09:27:41 | 10 | When did you move what you described as People |
| 09:27:46 | 11 | Operations to Laszlo Bock? |
| 09:27:48 | 12 | A.  I don't actually recall specifically when |
| 09:27:53 | 13 | Laszlo moved from reporting to me to reporting to Eric. |
| 09:27:58 | 14 | Q.  But when did Laszlo Bock enter the picture so |
| 09:28:01 | 15 | that he took over some of those responsibilities but |
| 09:28:03 | 16 | reported to you? |
| 09:28:06 | 17 | A.  I don't recall when we hired Laszlo, but I |
| 09:28:09 | 18 | hired Laszlo to come in and work for me.  And I gave him |
| 09:28:13 | 19 | a set of responsibilities in People Operations.  I don't |
| 09:28:17 | 20 | recall if I gave him all of the pieces when he first |
| 09:28:21 | 21 | joined or not, actually. |
| 09:28:24 | 22 | Ultimately, I gave him all of the pieces of |
| 09:28:26 | 23 | People Operations, rolling up to him, reporting to me |
| 09:28:31 | 24 | and then at some point in time, I transitioned him to |
| 09:28:34 | 25 | report directly to Eric Schmidt. |

09:43:19  1   Rosenberg was also part of the executive management

09:43:22  2   group, correct?

09:43:24  3        A.  For the period of time in which I was a member

09:43:28  4   of the management group, I'll use that term to represent

09:43:33  5   Eric's staff meetings, whether it was called one acronym

09:43:37  6   or another.

09:43:38  7        Q.  Sure.

09:43:39  8        A.  Jonathan Rosenberg was also a member of the

09:43:42  9   same group.

09:43:43  10       Q.  Okay.  Was Laszlo Bock ever a member of the

09:43:48  11  executive management group?

09:43:57  12       A.  I don't recall whether there was a period of

09:43:59  13  time at which he joined the staff meeting on a regular

09:44:05  14  basis, so I actually just don't remember.  He was not a

09:44:09  15  member of the earlier group.  It's my recollection that

09:44:16  16  he did join a set of meetings later on once his -- once

09:44:23  17  his responsibilities changed in the sense that he

09:44:26  18  reported to Eric rather than reporting to me.

09:44:29  19            I don't recall whether we formally had him as a

09:44:32  20  member of the OC or whatever acronym we were using at

09:44:39  21  the time or whether he was coming on an as-needed basis

09:44:42  22  to those meetings.  I'm not remembering.

09:44:45  23       Q.  Did other members of Google's board of

09:44:48  24  directors ever attend meetings of the executive

09:44:50  25  management group?

09:44:52  1      A.  There were no members from the board that

09:44:55  2   regularly -- there were no board members that regularly

09:44:58  3   attended our management meetings, no.

09:45:02  4      Q.  Were there any board members aside from

09:45:08  5   Schmidt, Page and Brin, who ever attended a meeting of

09:45:12  6   the executive management group?

09:45:14  7      A.  There were no board members that regularly

09:45:16  8   attended.  The other attendee that did attend was Bill

09:45:24  9   Campbell.  But it's my understanding that he was not

09:45:25 10   technically a board member.

09:45:29 11      Q.  How often did Bill Campbell attend the meetings

09:45:32 12   of the executive management group?

09:45:35 13      A.  Bill Campbell was a fairly regular attendee at

09:45:40 14   the Eric staff meeting.

09:45:46 15      Q.  Do you have an understanding of whether Bill

09:45:48 16   Campbell received emails directly from the EMG

09:45:51 17   distribution list?

09:45:54 18      A.  I don't know whether he did or not.

09:45:55 19      Q.  Okay.  What was your understanding of Bill

09:46:25 20   Campbell's role at Google?

09:46:28 21      A.  Bill Campbell's role at Google was to be an

09:46:32 22   advisor, senior advisor to the executive team.

09:46:38 23      Q.  And is that why he attended and participated in

09:46:41 24   meetings of executive management group?

09:46:46 25      A.  Yes.  The context was that he was advising the

| | | |
|---|---|---|
| 09:46:50 | 1 | senior team, and as such, he would participate on a |
| 09:46:53 | 2 | relatively regular basis in our senior team staff |
| 09:46:58 | 3 | meetings. |
| 09:47:00 | 4 | Q.  Do you have any knowledge of whether Google |
| 09:47:04 | 5 | ever discussed potential conflicts of interest with |
| 09:47:08 | 6 | Mr. Campbell connected with his work for Google? |
| 09:47:12 | 7 | A.  I'm sorry, could you clarify. |
| 09:47:14 | 8 | Q.  Well, it's an unusual situation from our |
| 09:47:18 | 9 | perspective in that Bill Campbell was the chairman of |
| 09:47:22 | 10 | Intuit at the time, correct? |
| 09:47:23 | 11 | MR. RUBIN:  Well, I'm going to object to the -- |
| 09:47:24 | 12 | if she says correct, then she's agreeing with the first |
| 09:47:27 | 13 | part about the unusual situation.  So if you want to |
| 09:47:29 | 14 | clarify the question and just ask her -- |
| 09:47:32 | 15 | MR. HARVEY:  I'll stipulate -- |
| 09:47:32 | 16 | MR. RUBIN:  -- the factual piece. |
| 09:47:33 | 17 | MR. HARVEY:  I'll just ask the question. |
| 09:47:35 | 18 | Q.  You understood, at the time, that Bill Campbell |
| 09:47:37 | 19 | was the chairman of Intuit, correct? |
| 09:47:40 | 20 | A.  It's my understanding that Bill Campbell was |
| 09:47:42 | 21 | the chairman of Intuit.  I'm not -- I actually don't |
| 09:47:45 | 22 | know exactly when he was or wasn't the chair relative to |
| 09:47:49 | 23 | when he was our advisor at Google.  But it's definitely |
| 09:47:54 | 24 | my understanding that there was a significant overlap. |
| 09:47:58 | 25 | Q.  Did you have an understanding that Bill |

| | | |
|---|---|---|
| 09:47:59 | 1 | Campbell was also a director on the board of Apple? |
| 09:48:03 | 2 | A.  It was my understanding that Bill was on the |
| 09:48:05 | 3 | board of Apple.  Again, I don't know actually when he |
| 09:48:09 | 4 | joined that board relative to when he started advising |
| 09:48:13 | 5 | at Google.  But I definitely had the understanding that |
| 09:48:15 | 6 | during that period, he was on the board of Apple at some |
| 09:48:19 | 7 | point in time, yes. |
| 09:48:21 | 8 | Q.  Do you have any knowledge of any concern at |
| 09:48:26 | 9 | Google that there might be conflicts of interest in |
| 09:48:29 | 10 | connection with Bill Campbell's work for Google? |
| 09:48:32 | 11 | MR. RUBIN:  Objection.  Vague.  Ambiguous.  Any |
| 09:48:35 | 12 | knowledge at Google.  Any concern at Google.  Excuse me. |
| 09:48:41 | 13 | THE WITNESS:  Can you be clearer about -- I'm |
| 09:48:43 | 14 | unclear about the potential conflict of interest you're |
| 09:48:46 | 15 | trying to identify.  Could you be more specific. |
| 09:48:50 | 16 | MR. HARVEY:  Q.  Sure. |
| 09:48:50 | 17 | Do you have any knowledge of any communications |
| 09:48:52 | 18 | with Mr. Campbell about any potential or actual |
| 09:48:55 | 19 | conflicts of interest? |
| 09:48:56 | 20 | MR. RUBIN:  Between somebody at Google and |
| 09:48:58 | 21 | Mr. Campbell? |
| 09:49:00 | 22 | MR. HARVEY:  The question as posed. |
| 09:49:02 | 23 | MR. RUBIN:  Okay.  Well, objection.  Ambiguous. |
| 09:49:07 | 24 | THE WITNESS:  I have no knowledge personally of |
| 09:49:11 | 25 | Bill ever having a conversation with me in which he was |

09:49:14  1    sharing information with me that I viewed as a conflict

09:49:16  2    of interest.

09:49:18  3             MR. HARVEY:  Q.  Well, let me clarify.

09:49:19  4    Because I'm not asking about you to form a view on

09:49:23  5    whether there were or were not conflicts of

09:49:24  6    interest.

09:49:25  7             What I'm asking about is whether you have any

09:49:27  8    knowledge that the topic ever came up, either with Bill

09:49:30  9    Campbell present or when he wasn't present, and say you

09:49:35  10   and Eric Schmidt or anybody else at Google brought up

09:49:38  11   the issue.

09:49:39  12            MR. RUBIN:  Objection.  Vague.

09:49:44  13            THE WITNESS:  I don't recall any conversations

09:49:46  14   on the topic of conflict of interest and Bill Campbell,

09:49:54  15   if that's what you're asking.

09:49:55  16            MR. HARVEY:  Q.  Did Google take any steps

09:49:57  17   to identify potential conflicts of interest that

09:49:59  18   Bill Campbell might have?

09:50:00  19        A.  I'm not aware of any specific steps that we

09:50:02  20   took to identify conflicts of interest.  No.

09:50:06  21        Q.  So Google didn't try to create any ethical

09:50:10  22   walls to screen Bill Campbell off from topics that might

09:50:14  23   implicate any conflicts of interest, correct?

09:50:16  24            MR. RUBIN:  Objection.  Mischaracterizes prior

09:50:18  25   testimony.  Vague.

| | | |
|---|---|---|
| 09:50:24 | 1 | THE WITNESS: I said I wasn't familiar with any |
| 09:50:26 | 2 | conversations in which the topic of conflict of interest |
| 09:50:29 | 3 | and Bill Campbell were discussed. |
| 09:50:34 | 4 | MR. HARVEY: Q. But I'm asking a slightly |
| 09:50:35 | 5 | different question now, which is, do you have any |
| 09:50:38 | 6 | knowledge of Google taking any steps to create any |
| 09:50:42 | 7 | ethical walls concerning Bill Campbell that would screen |
| 09:50:47 | 8 | him off from certain topics where there might be a |
| 09:50:52 | 9 | conflict of interest? |
| 09:50:55 | 10 | MR. RUBIN: Objection. Vague. Lacks |
| 09:51:00 | 11 | foundation and vague. Ambiguous. |
| 09:51:02 | 12 | THE WITNESS: I'm unclear what you mean by an |
| 09:51:04 | 13 | ethical wall, so I'm having difficulty answering your |
| 09:51:07 | 14 | question. |
| 09:51:12 | 15 | MR. HARVEY: Q. Sure. So why don't I use a |
| 09:51:13 | 16 | concrete example. |
| 09:51:16 | 17 | You discussed Google's recruiting efforts with |
| 09:51:18 | 18 | Bill Campbell, correct? |
| 09:51:19 | 19 | MR. RUBIN: Objection. Vague. |
| 09:51:26 | 20 | THE WITNESS: I think the question is too |
| 09:51:28 | 21 | broad. I don't have -- I mean, I don't -- I don't know |
| 09:51:30 | 22 | what you mean by discussing our recruiting efforts. |
| 09:51:32 | 23 | Could you be more specific. |
| 09:51:37 | 24 | MR. HARVEY: Q. Google recruited people, |
| 09:51:38 | 25 | correct? |

09:51:39  1      A.  Google had a recruiting team, of course, that

09:51:45  2  we built in order to hire people into the company.  Yes.

09:51:50  3      Q.  And those people on your team who Google hired

09:51:54  4  did, in fact, recruit, correct?

09:51:58  5      A.  Sorry, I -- did we have a team of -- a staffing

09:52:02  6  organization was the term that we used.

09:52:04  7      Q.  Okay.

09:52:05  8      A.  In the staffing organization, we had members of

09:52:10  9  that team, there were a set of different roles.  Those

09:52:14 10  roles were designed to try to hire people into Google.

09:52:17 11  Yes.

09:52:19 12      Q.  And were there any instances in which a member

09:52:21 13  of that staffing team contacted an employee of Intuit to

09:52:25 14  recruit them?

09:52:28 15      A.  I can't recall any specific instances, but it's

09:52:33 16  entirely possible.

09:52:35 17      Q.  Okay.  We'll get to that later.  But just for

09:52:44 18  now, in that situation --

09:52:47 19          MR. RUBIN:  Are you getting to it now, or are

09:52:49 20  you switching subjects?

09:52:50 21          MR. HARVEY:  Please.

09:53:06 22      Q.  Okay.  Would you have felt comfortable

09:53:09 23  discussing Google's recruiting of Intuit employees with

09:53:14 24  Bill Campbell?

09:53:14 25          MR. RUBIN:  Objection.  Vague as to

09:53:16  1    comfortable.

09:53:23  2          THE WITNESS:  I feel like you're asking me a

09:53:24  3    hypothetical question.

09:53:27  4          I don't recall ever having discussed our

09:53:30  5    staffing team or recruiting efforts with Bill Campbell.

09:53:36  6          MR. HARVEY:  Q.  Do you recall any

09:53:39  7    instances in which the topic of Google's recruiting

09:53:46  8    came up at executive management group meetings?

09:53:56  9          A.  At our executive staff meetings over the years,

09:54:00 10    certainly the topic of hiring and how we were doing on

09:54:10 11    our hiring would certainly have come up.

09:54:17 12          Q.  And Bill Campbell participated in those

09:54:19 13    meetings, correct?

09:54:22 14          A.  Bill Campbell, as I stated earlier,

09:54:25 15    participated on a relatively regular basis in those

09:54:29 16    meetings.  I don't recall which meetings he was in or

09:54:32 17    not and which topics came up when he was there or not.

09:54:36 18    He wasn't in all the meetings.

09:54:38 19          Q.  Do you recall whether Bill Campbell attended

09:54:40 20    any meetings of executive management group in which the

09:54:44 21    topic of Google's recruiting was discussed?

09:54:48 22          A.  I don't recall.

09:54:52 23          Q.  Do you recall whether at any meeting of the

09:54:56 24    EMG, whether Bill Campbell ever recused himself from any

09:55:01 25    topic?

| | | |
|---|---|---|
| 09:55:14 | 1 | A.  I don't recall Bill ever needing to recuse |
| 09:55:18 | 2 | himself from any staff meeting that I was participating |
| 09:55:25 | 3 | in.  And no, I can't recall such an incident. |
| 09:55:28 | 4 | Q.  Do you recall any incident in which a member of |
| 09:55:31 | 5 | the EMG asked Mr. Campbell to leave so that the EMG |
| 09:55:41 | 6 | could have a discussion without him present? |
| 09:55:47 | 7 | A.  I don't recall a meeting of -- a staff meeting |
| 09:55:49 | 8 | where such an incident occurred in which Bill was asked |
| 09:55:52 | 9 | to leave.  No, I don't recall. |
| 09:55:54 | 10 | Q.  Did Bill Campbell also participate in meetings |
| 09:55:56 | 11 | of the OC? |
| 09:56:00 | 12 | A.  Bill participated regularly in this staff |
| 09:56:03 | 13 | meeting which, at some point in time, I believe, was |
| 09:56:07 | 14 | called OC rather than EMG.  So just like with EMG, he |
| 09:56:10 | 15 | would certainly have participated in meetings of the OC |
| 09:56:15 | 16 | on a regular basis, not a hundred percent of the time. |
| 09:56:22 | 17 | Q.  Do you have any knowledge of whether Bill |
| 09:56:24 | 18 | Campbell attended any meetings of Google's board? |
| 09:56:29 | 19 | A.  Bill Campbell did regularly attend board |
| 09:56:31 | 20 | meetings of Google's board.  Yes. |
| 09:56:37 | 21 | Q.  Did you regularly attend meetings of Google's |
| 09:56:39 | 22 | board? |
| 09:56:41 | 23 | A.  I regularly attended Google's board meetings, |
| 09:56:50 | 24 | not a hundred percent of the time, but I regularly |
| 09:56:52 | 25 | attended.  Yes. |

09:57:05  1      Q.  Do you know whether Google had any formal

09:57:08  2  contractual relationship with Mr. Campbell?

09:57:14  3      A.  Bill Campbell played this advisor role.  By

09:57:20  4  contractual relationship, at some point in this period,

09:57:22  5  he -- we, for administrative purposes, made him an

09:57:25  6  employee, so I would consider that a contract.  I don't

09:57:29  7  recall exactly when that period was.

09:57:32  8          His role prior to and after becoming an

09:57:34  9  employee was the same.  We just decided to formalize it

09:57:39 10  in an employee relationship for administrative purposes.

09:57:43 11      Q.  And what were those administrative purposes?

09:57:46 12      A.  I actually don't recall the details other than

09:57:50 13  that it was administrative trivia such that it didn't

09:57:54 14  reach my level of discussion.

09:57:56 15      Q.  Okay.  Do you know when -- well, first, do you

09:58:02 16  know whether Google ever paid Mr. Campbell for the

09:58:06 17  advice he provided?

09:58:14 18      A.  I don't know specifically when -- I actually

09:58:18 19  don't know specifically -- I don't know.  Sorry.

09:58:42 20      Q.  And are you still employed at Google?

09:58:45 21      A.  I am still an employee of Google.

09:58:47 22      Q.  But you've announced that you're leaving,

09:58:49 23  correct?

09:58:50 24      A.  I announced my retirement -- retirement from

09:58:55 25  Google just before Christmas.  I have taken on a new

| | | |
|---|---|---|
| 10:03:18 | 1 | MR. HARVEY:  What kind of break do you want to |
| 10:03:19 | 2 | take? |
| 10:03:20 | 3 | MR. RUBIN:  Ten minutes. |
| 10:03:20 | 4 | MR. HARVEY:  That's fine. |
| 10:03:21 | 5 | THE VIDEOGRAPHER:  The time is 10:03 a.m. |
| 10:03:23 | 6 | We're going off the record.  Sorry.  This is end of |
| 10:03:29 | 7 | video No. 1. |
| 10:03:30 | 8 | Off the record. |
| 10:03:33 | 9 | (Recess taken.) |
| 10:07:30 | 10 | THE VIDEOGRAPHER:  This is the beginning of |
| 10:18:48 | 11 | video No. 2 in the deposition of Shona Brown.  The time |
| 10:18:50 | 12 | is 10:18 a.m. |
| 10:18:52 | 13 | We're back on the record. |
| 10:18:56 | 14 | MR. HARVEY:  Q.  I believe you mentioned |
| 10:18:57 | 15 | earlier that Google recruited people, correct? |
| 10:19:03 | 16 | A.  Yes.  Google recruited people. |
| 10:19:06 | 17 | Q.  And during your time at Google, Google grew at |
| 10:19:10 | 18 | a rapid pace, correct? |
| 10:19:11 | 19 | MR. RUBIN:  Objection.  Vague. |
| 10:19:17 | 20 | THE WITNESS:  Google grew significantly as an |
| 10:19:19 | 21 | organization from the time that I joined through the |
| 10:19:21 | 22 | period in question.  Yes. |
| 10:19:24 | 23 | MR. HARVEY:  Q.  And -- well, why don't I |
| 10:19:28 | 24 | do this with more specificity.  Give me one moment. |
| 10:19:56 | 25 | I'm going to show you what has been marked as |

| | | |
|---|---|---|
| 10:19:59 | 1 | Plaintiffs' Exhibit 634.  If you could take a look at |
| 10:20:03 | 2 | that and let me know when you're ready. |
| 10:20:07 | 3 | (Whereupon, Exhibit 634 was marked for |
| 10:20:07 | 4 | identification.) |
| 10:20:44 | 5 | THE WITNESS:  Okay.  I'm ready. |
| 10:20:47 | 6 | MR. HARVEY:  Q.  So I'm just going to |
| 10:20:48 | 7 | represent that this is a summary of data as produced |
| 10:20:52 | 8 | by Google to plaintiffs in this case. |
| 10:20:55 | 9 | And you began work in 2003 when the total |
| 10:21:00 | 10 | number of employees in Google's data was approximately |
| 10:21:04 | 11 | 1309, and for the most recent year, we have data, the |
| 10:21:08 | 12 | total number of employees is 17,890. |
| 10:21:12 | 13 | That represents significant growth, correct? |
| 10:21:16 | 14 | A.  Could I ask you a question about the data? |
| 10:21:18 | 15 | Q.  Please. |
| 10:21:19 | 16 | A.  Is this meant to be global data or U.S. only? |
| 10:21:22 | 17 | Q.  U.S. only. |
| 10:21:24 | 18 | A.  Okay.  That makes sense. |
| 10:21:28 | 19 | When I started, there were, I think, slightly |
| 10:21:31 | 20 | under a thousand people.  It looks consistent with this |
| 10:21:34 | 21 | data.  I have no reason to believe this is wrong. |
| 10:21:37 | 22 | Q.  Okay. |
| 10:21:38 | 23 | A.  And the adjective used is irrelevant, really. |
| 10:21:43 | 24 | I mean, you can just look at the numbers and we were |
| 10:21:45 | 25 | around a thousand, and as you point out, most recently |

| | | |
|---|---|---|
| 10:21:49 | 1 | in the U.S., looks like a little under 18,000. |
| 10:21:55 | 2 | Q.  Sure. |
| 10:21:55 | 3 | And Google experienced growth in the different |
| 10:21:58 | 4 | categories of employees described in this document, |
| 10:22:00 | 5 | correct? |
| 10:22:01 | 6 | MR. RUBIN:  Objection.  Vague. |
| 10:22:06 | 7 | THE WITNESS:  We could go through each of the |
| 10:22:08 | 8 | different functions line by line.  And I didn't actually |
| 10:22:14 | 9 | look to look quickly.  But if I take engineering, for |
| 10:22:18 | 10 | example -- well, it's unclear from this data, actually, |
| 10:22:25 | 11 | to be honest, how many employees you're growing and in |
| 10:22:29 | 12 | each of the different, because it's all in percentiles |
| 10:22:34 | 13 | based.  So we would have to debunk that into absolutes |
| 10:22:38 | 14 | to be clear but.... |
| 10:22:38 | 15 | MR. HARVEY:  Q.  Sure. |
| 10:22:38 | 16 | A.  I agree with you in the aggregate the |
| 10:22:40 | 17 | organization is getting bigger.  I can't tell you |
| 10:22:42 | 18 | exactly from this precisely which function is growing, |
| 10:22:46 | 19 | quote/unquote, rapidly. |
| 10:22:50 | 20 | Q.  Drawing on your own personal experience, you |
| 10:22:52 | 21 | know -- |
| 10:22:53 | 22 | A.  Yes. |
| 10:22:53 | 23 | Q.  -- regardless -- |
| 10:22:53 | 24 | A.  Yes. |
| 10:22:53 | 25 | Q.  -- of what this says here -- |

| | | |
|---|---|---|
| 10:22:55 | 1 | A.   Yes. |
| 10:22:57 | 2 | Q.   -- Google recruited for employees for a variety |
| 10:23:00 | 3 | of different titles and job responsibilities, correct? |
| 10:23:04 | 4 | A.   We had a large -- we were growing a diverse |
| 10:23:09 | 5 | operating company, I would say unlike if you were, for |
| 10:23:12 | 6 | example, hiring into a law firm where you are typically |
| 10:23:16 | 7 | bringing in people in very similar roles and similar |
| 10:23:19 | 8 | levels, so the number of different roles you're |
| 10:23:21 | 9 | recruiting for is quite small. |
| 10:23:22 | 10 | In contrast, in an operating company when |
| 10:23:24 | 11 | you're building it and as you get bigger, that grows. |
| 10:23:28 | 12 | You have a wide variety of roles that you're hiring for. |
| 10:23:32 | 13 | Yes. |
| 10:23:34 | 14 | Q.   Okay.  And why don't we focus on the recruiting |
| 10:23:37 | 15 | part of that hiring for a moment. |
| 10:23:39 | 16 | A.   Sorry, what do you mean by the recruiting part |
| 10:23:40 | 17 | of hiring?  I don't actually know. |
| 10:23:43 | 18 | Q.   Is that because, to you, hiring is part of |
| 10:23:45 | 19 | recruiting? |
| 10:23:47 | 20 | MR. RUBIN:  I think she's just asking you for a |
| 10:23:49 | 21 | clarification. |
| 10:23:50 | 22 | THE WITNESS:  Can you just clarify what you |
| 10:23:51 | 23 | mean by recruiting. |
| 10:23:53 | 24 | MR. RUBIN:  She's just asking you to clarify |
| 10:23:54 | 25 | your question. |

| | | |
|---|---|---|
| 10:41:51 | 1 | you have an understanding of whether Google had a |
| 10:41:53 | 2 | philosophy concerning pay? |
| 10:41:56 | 3 | A.  When I started at Google in 2003, we didn't |
| 10:42:01 | 4 | have a stated philosophy.  By that I mean, we didn't |
| 10:42:08 | 5 | have a set of specific do's and don'ts, or rules or |
| 10:42:16 | 6 | points of view on specific ways we would develop or |
| 10:42:22 | 7 | target pay.  None of that existed that needed to be |
| 10:42:28 | 8 | developed. |
| 10:42:29 | 9 | Q.  So in 2003, it was essentially a free-for-all |
| 10:42:32 | 10 | when it came to compensation at Google? |
| 10:42:35 | 11 | MR. RUBIN:  Objection.  Mischaracterizes prior |
| 10:42:37 | 12 | testimony. |
| 10:42:38 | 13 | THE WITNESS:  I wouldn't characterize our pay |
| 10:42:40 | 14 | practice as a free-for-all.  I would -- I would say that |
| 10:42:43 | 15 | we -- in 2003, my recollection is that there were a set |
| 10:42:51 | 16 | of biases that were not expressed very well in clear |
| 10:42:55 | 17 | guidelines that you could take to build out a set of |
| 10:43:01 | 18 | rules.  There were certainly sets of biases on |
| 10:43:06 | 19 | approaches to compensation. |
| 10:43:10 | 20 | MR. HARVEY:  Q.  What were those biases? |
| 10:43:12 | 21 | A.  So, for example, like many small, private |
| 10:43:17 | 22 | companies, you have an understanding that the most |
| 10:43:21 | 23 | valuable thing that you can offer to someone you're |
| 10:43:24 | 24 | trying to hire is an opportunity to participate in a |
| 10:43:28 | 25 | company that might go public.  So you have a point of |

10:43:32  1    view that you have some stock options.  At that time

10:43:36  2    options were universally used.

10:43:40  3         And so I would say a bias was, when you're

10:43:42  4    thinking about making an offer, you understood that

10:43:46  5    probably the most attractive thing you could offer was

10:43:51  6    some stock options from a compensation perspective.  So

10:43:56  7    I would -- to me, that doesn't translate into a very

10:44:00  8    concrete philosophy, the way you were using the term,

10:44:02  9    but it's a clear bias in the system.

10:44:05  10      Q.  Okay.  Did -- when you started, did Google try

10:44:11  11    to pay its employees fairly?

10:44:19  12      A.  From my perspective, and in all of the elements

10:44:22  13    where I led development of our pay practices, I was

10:44:27  14    always focused on trying to pay people fairly.  Of

10:44:29  15    course.

10:44:33  16         Your fair and my fair might be different.

10:44:34  17    That's the nature of compensation.  But of course, we

10:44:36  18    were trying to pay people fairly for, you know, for

10:44:40  19    their value.

10:44:43  20      Q.  So you said that our notions of fairness may

10:44:48  21    differ.  What did you understand fairness to mean in

10:44:51  22    that context?

10:44:52  23         MR. RUBIN:  Objection.  Vague.  Ambiguous.

10:44:54  24         THE WITNESS:  I think it's a high-level

10:44:55  25    question, but the way I would respond to your question

10:44:58  1   about what's fair in pay, is very simply, which is that

10:45:03  2   a person's overall pay, which could include many

10:45:08  3   elements, ought to reflect, overall, the value that

10:45:11  4   they're bring to the organization.  It's a sniff test.

10:45:18  5        MR. HARVEY:  Q.  Was a component of

10:45:20  6   fairness, as you saw it, that two -- two equally

10:45:27  7   valuable employees should be paid roughly the same?

10:45:30  8        A.  Unfortunately, in my experience, pay practices

10:45:33  9   are not that simple.

10:45:35  10        Just to take your very simple example, did

10:45:39  11  those two individuals join at the same time?  Have those

10:45:43  12  two individuals progressed at the same rate?  Are they

10:45:47  13  giving the same amount of value to me in this past

10:45:50  14  quarter, this past year, over their entire tenure at

10:45:53  15  Google?  How should I think about all of those?  What's

10:45:55  16  fair?  I don't think that's a very black-and-white

10:45:58  17  question.

10:45:58  18        So pay practices in my experience, you do try

10:46:00  19  to develop some principles.  For example, we believe our

10:46:04  20  options is a big part of value we can offer employees.

10:46:08  21  But then, in reality, it's a case-by-case basis.  It's

10:46:13  22  good management and attention to details and looking at

10:46:15  23  individuals that's going to generate the most fair

10:46:19  24  system, to use your term.

10:46:21  25        Q.  So I want to focus on the first part of your

| | | |
|---|---|---|
| 10:46:24 | 1 | answer where you gave me examples of how two employees |
| 10:46:27 | 2 | might be situated differently.  And let's think about |
| 10:46:32 | 3 | that for a moment. |
| 10:46:34 | 4 | Suppose there are two employees at Google who |
| 10:46:37 | 5 | are similarly situated in every way in which you |
| 10:46:42 | 6 | describe.  So for example, they were hired at the same |
| 10:46:45 | 7 | time, they have the same education, they're the same |
| 10:46:51 | 8 | age, and they provide the same value to the company. |
| 10:46:55 | 9 | Should they be paid the same? |
| 10:46:56 | 10 | MR. RUBIN:  Objection.  Calls for a |
| 10:46:58 | 11 | hypothetical response.  Calls for speculation. |
| 10:47:01 | 12 | THE WITNESS:  I'm afraid that it is a |
| 10:47:05 | 13 | hypothetical case.  And I will -- I'll repeat, which is |
| 10:47:08 | 14 | that on a case-by-case basis, you would look at those |
| 10:47:12 | 15 | two individuals, and we would need to sit down and look |
| 10:47:14 | 16 | at those two individuals and decide whether one factor |
| 10:47:19 | 17 | in determining their pay should be each of the other two |
| 10:47:22 | 18 | individuals.  And that would never be the sole factor, |
| 10:47:26 | 19 | of course.  Because you would also be looking at how |
| 10:47:30 | 20 | does the market pay these individuals.  You might also |
| 10:47:34 | 21 | be considering how much were they being paid before they |
| 10:47:37 | 22 | joined.  You might also be considering other parts of |
| 10:47:41 | 23 | the company and how did this role compare to that. |
| 10:47:46 | 24 | So in my experience, again, there are so many |
| 10:47:48 | 25 | factors that fair is a very difficult thing to define, |

| | | |
|---|---|---|
| 10:47:53 | 1 | and you just simply have to use your best judgment as a |
| 10:47:57 | 2 | manager, and you have to have your best possible list of |
| 10:48:01 | 3 | guiding principles.  And diligently work through, you |
| 10:48:04 | 4 | know, lists of people to try to do your best to be as, |
| 10:48:08 | 5 | quote, fair as possible. |
| 10:48:10 | 6 | MR. HARVEY:  Q.  And I acknowledge that |
| 10:48:11 | 7 | there are other relevant concerns.  But one |
| 10:48:13 | 8 | component of fairness is that in examples like that, |
| 10:48:19 | 9 | their compensation should be similar or comparable, |
| 10:48:21 | 10 | correct? |
| 10:48:23 | 11 | A.  I guess I'm not accepting your assertion of a |
| 10:48:26 | 12 | hypothetical that they necessarily need to be similar. |
| 10:48:29 | 13 | It is the case that when you are looking at an |
| 10:48:33 | 14 | individual's pay, one of the things you would consider |
| 10:48:37 | 15 | was the pay of other similar individuals.  One of many |
| 10:48:41 | 16 | factors.  Whether that would lead you to align that |
| 10:48:44 | 17 | person's pay with those other individuals is too |
| 10:48:47 | 18 | difficult to say in a hypothetical.  But you would |
| 10:48:50 | 19 | certainly look at that factor. |
| 10:48:52 | 20 | Q.  Are you familiar with the term internal equity? |
| 10:48:57 | 21 | A.  No.  It's not really a term that I typically |
| 10:48:59 | 22 | use. |
| 10:48:59 | 23 | Can you explain what you mean. |
| 10:49:02 | 24 | Q.  So your testimony is that you've never heard |
| 10:49:04 | 25 | the term? |

| | | |
|---|---|---|
| 10:49:05 | 1 | MR. RUBIN:  Objection.  Mischaracterizes her |
| 10:49:07 | 2 | testimony. |
| 10:49:09 | 3 | THE WITNESS:  I said that it's not a term that |
| 10:49:11 | 4 | I typically use.  I don't recall its usage in parlance |
| 10:49:17 | 5 | so I'm not exactly sure what -- it could mean a variety |
| 10:49:20 | 6 | of things. |
| 10:49:21 | 7 | MR. HARVEY:  Okay. |
| 10:49:32 | 8 | (Discussion off the record.) |
| 10:49:41 | 9 | MR. HARVEY:  Q.  I'm going to hand you |
| 10:49:45 | 10 | what's been marked Plaintiffs' Exhibit 564. |
| 10:49:48 | 11 | (Whereupon, Exhibit 564 was marked for |
| 10:49:48 | 12 | identification.) |
| 10:50:01 | 13 | MR. HARVEY:  Q.  Just let me know when |
| 10:50:01 | 14 | you're ready. |
| 10:50:02 | 15 | I'll just say that my questions are going to |
| 10:50:04 | 16 | be focused on Sheryl Sandberg's email of April 3rd on |
| 10:50:09 | 17 | the second page and your response. |
| 10:52:31 | 18 | A.  Okay.  I get the gist of it.  Depending on your |
| 10:52:33 | 19 | question, I may have to read more.  It's fairly lengthy. |
| 10:52:38 | 20 | Q.  Sure.  Sure.  I appreciate that. |
| 10:52:38 | 21 | Why don't we start with the bottom of page 1. |
| 10:52:41 | 22 | A.  Bottom of page 1.  Yes. |
| 10:52:48 | 23 | Q.  First, did you, in fact, send this email to |
| 10:52:52 | 24 | Sheryl Sandberg and others on April 3rd, 2004? |
| 10:52:56 | 25 | A.  I have no recollection of this email, but I |

10:55:51  1   way to think of it in a commonsense way is, if that

10:55:54  2   individual was to up and look for that very same job at

10:55:57  3   a different company, what are the ranges of pay that

10:56:01  4   might be possible if they were hireable in that.

10:56:04  5        Separately, I think of the internal market as

10:56:08  6   inside the company, irrespective of how other companies

10:56:12  7   think about that role, how does our -- how does the

10:56:14  8   internal market value that role relative to other roles

10:56:19  9   at Google.

10:56:21 10        Very simply put, if I looked at the pay range

10:56:23 11   of our service associate, and I looked at the pay range

10:56:28 12   of our engineering directors, let's say, it probably

10:56:32 13   wouldn't make sense if the pay range of the service

10:56:34 14   associate was the same as the pay range of the

10:56:38 15   engineering director, right?

10:56:40 16        Somewhat of a stupid example, but the point is,

10:56:42 17   you would think internally about these pay ranges for

10:56:45 18   these different roles.  And at some level,

10:56:48 19   commonsensically, those pay ranges should make sense for

10:56:52 20   the value internally of that role.

10:56:56 21        Often those two things overlap a lot, however,

10:57:00 22   there are instances in which a specific company -- and

10:57:05 23   I'm not really familiar in other companies that

10:57:07 24   deeply -- but for example, at Google, where there might

10:57:09 25   be a role that we actually value disproportionately

| | | |
|---|---|---|
| 10:57:14 | 1 | compared to how the outside market values it.  So we |
| 10:57:18 | 2 | might adjust our pay range for that. |
| 10:57:19 | 3 | So when I say internal market and external |
| 10:57:22 | 4 | market, broadly speaking, that's what I mean. |
| 10:57:25 | 5 | Q.  Great.  Thank you for that clarification. |
| 10:57:28 | 6 | In the internal market, I believe you use an |
| 10:57:31 | 7 | example of two employees where one has a title that |
| 10:57:37 | 8 | suggests that the range should be higher than the range |
| 10:57:41 | 9 | for another group of employees. |
| 10:57:44 | 10 | Was it important to maintain a certain |
| 10:57:47 | 11 | relationship in that way?  For example, if there were |
| 10:57:54 | 12 | different levels to a particular category of employee, |
| 10:57:56 | 13 | that employees in a lower level, when their pay went up, |
| 10:58:01 | 14 | then the compensation to employees at a higher level |
| 10:58:05 | 15 | would sometimes need to be adjusted to reflect that |
| 10:58:08 | 16 | shift? |
| 10:58:08 | 17 | MR. RUBIN:  Objection.  Vague.  Ambiguous. |
| 10:58:12 | 18 | Calls for speculation. |
| 10:58:19 | 19 | THE WITNESS:  That was a rather complicated |
| 10:58:20 | 20 | question.  If the question is that when you construct a |
| 10:58:27 | 21 | job ladder, for example, for sales in -- sales |
| 10:58:34 | 22 | associates.  And this is an example of part of a job |
| 10:58:37 | 23 | ladder in this email from Lourdes to Sheryl, I believe. |
| 10:58:45 | 24 | For example, if you looked at these different jobs which |
| 10:58:49 | 25 | are meant to be opportunities for someone to progress up |

| | | |
|---|---|---|
| 10:58:53 | 1 | their job ladder, when you constructed the pay scales, |
| 10:58:56 | 2 | you would be having a pay range that increased with |
| 10:59:02 | 3 | increased responsibility as you were promoted up that |
| 10:59:05 | 4 | job ladder. |
| 10:59:07 | 5 | It's -- I don't remember the specifics of any |
| 10:59:10 | 6 | of the job ladders.  I can tell you that it's not all -- |
| 10:59:15 | 7 | it's certainly not always clean in the sense that you |
| 10:59:18 | 8 | don't have some line, if you're in this job, you're paid |
| 10:59:22 | 9 | below X.  There's overlap.  But generally speaking, as |
| 10:59:25 | 10 | you went up a job ladder, as your responsibilities grew, |
| 10:59:28 | 11 | as your value grew, your pay range would also increase. |
| 10:59:33 | 12 | But there would be overlaps.  And also to our earlier |
| 10:59:38 | 13 | conversation, there would be exceptions.  Because pay is |
| 10:59:42 | 14 | individual.  Back to my earlier point. |
| 10:59:45 | 15 | MR. HARVEY:  Q.  It's individual, but it's part |
| 10:59:47 | 16 | of this company-wide system where you're trying to |
| 10:59:50 | 17 | maintain fairness in light of what you were discussing, |
| 10:59:53 | 18 | the external market facts, the internal market facts, |
| 10:59:56 | 19 | correct? |
| 10:59:56 | 20 | MR. RUBIN:  Objection.  Mischaracterizes |
| 10:59:58 | 21 | prior -- |
| 10:59:59 | 22 | THE WITNESS:  Sorry. |
| 10:59:59 | 23 | MR. RUBIN:  -- lengthy description. |
| 11:00:01 | 24 | THE WITNESS:  Could you just clarify your |
| 11:00:02 | 25 | question in there. |

11:00:03  1        MR. HARVEY:  Q.  Well, sure.

11:00:04  2        So I'm -- you stated that pay is individual,

11:00:07  3    but I want to go back to what we've been talking about

11:00:12  4    where Google and you, in trying to create this

11:00:16  5    compensation system, fairness was a principle that you

11:00:19  6    used in that system, correct?

11:00:22  7        MR. RUBIN:  Objection.  Vague.  Ambiguous.

11:00:24  8    Mischaracterizes prior testimony.

11:00:27  9        THE WITNESS:  I think when we talked about

11:00:29 10    fairness, we actually agreed or at least I asserted that

11:00:32 11    it was hard to define, so I'm not going to agree with

11:00:35 12    your statement.

11:00:35 13        If your question is whether or not when you

11:00:38 14    design pay structures for companies you think about

11:00:40 15    bands of pay and you think about different bands of pay

11:00:44 16    at different levels, then yes, we did that, and we tried

11:00:47 17    to create bands of pay that reflected the role the

11:00:50 18    individual was playing and -- and the value that they --

11:00:54 19    that role implied.

11:00:58 20        MR. HARVEY:  Q.  Okay.  Thanks.

11:01:00 21        Could you explain how those bands of pay, say

11:01:02 22    for any given job ladder, what was their relationship to

11:01:07 23    each other?  So for example, you know, comparing the

11:01:11 24    lower rungs, if I can put it that way, on the job ladder

11:01:14 25    to the higher rungs.

11:01:17  1          MR. RUBIN:  Objection.  Ambiguous.

11:01:22  2          THE WITNESS:  If your question is about the

11:01:24  3   size of the, you know, percent changes between the rungs

11:01:30  4   on a ladder or the ratios, I actually -- I'm the wrong

11:01:33  5   person to ask.  I don't remember those level of detail.

11:01:35  6          MR. HARVEY:  Q.  Who would be the right person

11:01:36  7   to ask?

11:01:39  8       A.  I'd have to speculate to decide at which level

11:01:46  9   of the organization individuals would remember that.  So

11:01:52  10  I -- I mean....

11:01:54  11      Q.  Well --

11:01:56  12      A.  Of course I was exposed to it over time, but

11:01:58  13  this is some time ago and I don't remember the

11:01:59  14  specifics.

11:02:01  15      Q.  Okay.  Can you explain how Google evaluated the

11:02:35  16  performance of its employees.

11:02:47  17      A.  I'm not sure that I can actually explain in an

11:02:52  18  oral statement how we evaluated our employees.

11:02:57  19          Can you break that down for me as well?  That's

11:03:00  20  like your previous, you know, initial question, very

11:03:05  21  broad.

11:03:06  22      Q.  Did Google, throughout your time there, make an

11:03:09  23  effort to have a systematic way of evaluating its

11:03:13  24  employees?

11:03:13  25      A.  Yes.  We attempted to systematically evaluate

11:03:17  1   our employees.

11:03:18  2        Q.  Did those methods change during your time at

11:03:23  3   Google?

11:03:24  4        A.  Yes.  Over the period of time in question, the

11:03:28  5   methods changed in terms of how we attempted to evaluate

11:03:31  6   our employees.

11:03:32  7        Q.  Why don't we go through it.

11:03:34  8            So starting in 2003, what was Google's method

11:03:40  9   for evaluating performance of its employees?

11:03:43  10           MR. RUBIN:  Objection.  Vague.

11:03:47  11           THE WITNESS:  Is it possible for you to ask me

11:03:49  12   a more specific aspect of evaluation that you're

11:03:53  13   interested in?

11:03:54  14           MR. HARVEY:  Q.  Well, as it relates to

11:03:55  15   making decisions about compensation.

11:04:00  16           MR. RUBIN:  Same objection.

11:04:09  17           THE WITNESS:  I'm struggling to answer your

11:04:10  18   question when we had, you know, such a vast array of

11:04:16  19   relevant elements, it seems to me.

11:04:18  20           Is there some particular part of how we

11:04:21  21   evaluated people that you're interested in that I could

11:04:24  22   address?

11:04:25  23           MR. HARVEY:  Q.  Yeah, why don't we get

11:04:27  24   more specific.

11:04:29  25   ███████████████████████████████████████

| | | |
|---|---|---|
| 11:04:32 | 1 | ███████████ |
| 11:04:36 | 2 | A.  Google had a mechanism of rating employees.  I |
| 11:04:43 | 3 | don't recall exactly when we put it into place, but very |
| 11:04:49 | 4 | early on.  And we continue to use a version of that |
| 11:04:54 | 5 | system -- let's say up through the period in question. |
| 11:04:58 | 6 | I'm less familiar with exactly what we're doing right |
| 11:05:01 | 7 | now. |
| 11:05:04 | 8 | Q.  Did Google use a pay system -- I'm sorry -- a |
| 11:05:07 | 9 | point system for evaluation from 2003 through 2010? |
| 11:05:15 | 10 | A.  ████████████████████████████████ |
| 11:05:23 | 11 | ███████████████████████████ |
| 11:05:28 | 12 | ██████████████  ████ |
| 11:05:35 | 13 | Q.  And were there -- well, first, are you familiar |
| 11:05:39 | 14 | with the term compensable factor. |
| 11:05:46 | 15 | A.  No, I'm not familiar with the term compensable |
| 11:05:49 | 16 | factor. |
| 11:05:50 | 17 | Q.  The point system, was it on a one-to-five |
| 11:05:53 | 18 | scale? |
| 11:05:54 | 19 | A.  ███████████████████ |
| 11:05:58 | 20 | ██████████████  ████████████████ |
| 11:06:04 | 21 | ████████  But that's my recollection in the period in |
| 11:06:07 | 22 | question. |
| 11:06:08 | 23 | Q.  ███████████████████████ |
| 11:06:14 | 24 | the individuals who ████████████████ |
| 11:06:17 | 25 | particular employees? |

11:06:20   1          MR. RUBIN:  Objection.  Vague.

11:06:26   2          THE WITNESS:  I can't answer your question in

11:06:27   3   terms of which named individual ███████████   to which

11:06:33   4   ███████████   ████████████████████

11:06:37   5   █████████████████████████████████

11:06:41   6   management chain, be responsible for ████████████

11:06:49   7   ██████████████████   ████████████████████

11:06:54   8   █████████████████████████████████

11:07:01   9          MR. HARVEY:  Q.  ████████████

11:07:02  10   ██████████████████████████

11:07:06  11   ██████████████████████████

11:07:09  12   ███████

11:07:10  13          A.  I'm sorry, I don't understand that last part of

11:07:12  14   your question.

11:07:14  15          Q.  So for a particular employee working for

11:07:18  16   Google, say in 2005 --

11:07:20  17          A.  Yes.

11:07:22  18          Q.  -- ████████████████████████

11:07:24  19   █████████████████

11:07:31  20          A.  I don't recall specifically 2005, but the most

11:07:35  21   common pattern throughout this period was that each

11:07:39  22   individual -- ████████████████████████

11:07:48  23              And at different times, ██████████

11:07:53  24   ██████████████████████████

11:07:59  25   ██████████████████████████

11:08:04  1  ████████████████

11:08:07  2      ███████████████████████████████████████

11:08:10  3  ███████████████████████████████████

11:08:15  4      Q.  Okay.  █████████████████████████

11:08:21  5  ████████████████████████████████████

11:08:23  6  ████████████████████████████████████████

11:08:27  7  ██████████████████████████████████████

11:08:32  8  ████████████████████████████████

11:08:42  9      A.  ████████████████████████████

11:08:46 10  ████████████████████████████████████████

11:08:51 11  ██████████  ██████████████████████████

11:08:58 12  ██████████████████████████████████████████

11:09:04 13  █████████████████████████████████████████

11:09:08 14  ███████████████████████████████████

11:09:12 15  ████████████

11:09:14 16      But generally speaking,  ███████████████

11:09:16 17  █████████████████████████████████████

11:09:21 18  ██████████████████████████████████████

11:09:24 19  █████████████████████████████████████

11:09:30 20  ██████████████████████████████████  ████

11:09:32 21  ████████████████████████████████████████

11:09:38 22  ████████████████████████████████████████

11:09:42 23  ████████████████████████

11:09:45 24      Q.  Okay.  Did Google have a single company-wide

11:10:00 25  budget for salary increases?

11:10:03  1           MR. RUBIN:  Ambiguous as to time.

11:10:07  2           MR. HARVEY:  Q.  From when you started

11:10:09  3    until the present time, to your knowledge.

11:10:18  4       A.  I don't remember the details of how we managed

11:10:23  5    budget relative to compensation changes, and it changed

11:10:30  6    over time. █████████████████████████████████████

11:10:38  7    ███████████████████████████████████████

11:10:42  8    ██████████████████████████████

11:10:46  9    ████████████████      █████████████████████

11:10:50 10    ████████████████████████████████████████

11:10:57 11    ████████████████████████      And it also was managed

11:11:01 12    differently at different points in time.

11:11:18 13       Q.  But for any given year, there was a budget for

11:11:22 14    compensation, correct?

11:11:24 15       A.  ████████████████████████████████

11:11:28 16    ██████████████████████████████████

11:11:33 17    ███████████████████████████████████████████

11:11:39 18    █████████████████████████   ████████████████

11:11:48 19    ████████████████████████████████

11:11:55 20    ██████████████████████████████

11:12:00 21    ██████████████████████████████████

11:12:03 22    ██████████████

11:12:08 23       Q.  Maybe I'm not being clear.  I'm not asking

11:12:10 24    about the relationship between budgets and compensation

11:12:14 25    decisions or timing or any of that.  I'm just asking a

11:24:31  1          Q.   Okay.  Have you ever discussed or thought about

11:24:42  2     whether, you know, Googlers choose to work for Google

11:24:46  3     for reasons other than money or benefits?

11:24:50  4               MR. RUBIN:  Objection.  Overly broad.  Calls

11:24:53  5     for speculation.

11:25:05  6               THE WITNESS:  The way I would answer your

11:25:06  7     question is rather than talk about why people join, I

11:25:08  8     would answer your question and explain why people stay.

11:25:13  9          On a routine basis, we conduct surveys of our

11:25:17 10     existing employees, and one of the questions we ask is,

11:25:22 11     why are you staying at Google.  And the answer, in my

11:25:27 12     time line of exposure to that, which overlaps with the

11:25:33 13     period in question, is relatively consistent.  People

11:25:37 14     choose to stay at Google because of the cohort they get

11:25:40 15     to work with.  In other words, they enjoy their

11:25:43 16     colleagues.  Because of the quality of the -- and nature

11:25:47 17     of the problems they get to work on.  In other words,

11:25:49 18     they get to do interesting work.  And those were

11:25:55 19     consistently the first and second factors that explained

11:25:59 20     why they chose to stay at Google.

11:26:02 21          And then the third was broadly described as the

11:26:05 22     work environment, which is different things to different

11:26:08 23     people.  For some people that's because they have -- we

11:26:12 24     have mother's rooms and mother's parking.  For other

11:26:18 25     people, it's because there was laundry rooms and free

| | | |
|---|---|---|
| 11:26:20 | 1 | food.  It depends on the individual.  But in general, |
| 11:26:22 | 2 | the work environment was always the third. |
| 11:26:26 | 3 | So that's a fact-based answer to your question |
| 11:26:28 | 4 | of why people at least were choosing to stay at Google. |
| 11:26:32 | 5 | MR. HARVEY:  Thank you. |
| 11:27:06 | 6 | Q.  Please take a look at what's been marked |
| 11:27:08 | 7 | Plaintiffs' Exhibit 551. |
| 11:27:09 | 8 | (Whereupon, Exhibit 551 was marked for |
| 11:27:09 | 9 | identification.) |
| 11:28:17 | 10 | THE WITNESS:  Okay. |
| 11:28:18 | 11 | MR. HARVEY:  Q.  I just want to get into |
| 11:28:19 | 12 | some of the vocabulary here and just walk through |
| 11:28:22 | 13 | the email. |
| 11:28:23 | 14 | Well, first I want to ask, who is Jeffrey |
| 11:28:27 | 15 | Donovan? |
| 11:28:31 | 16 | A.  My recollection is that Jeffrey was one of |
| 11:28:38 | 17 | the -- was in our law group somewhere.  I don't recall |
| 11:28:42 | 18 | that he was part of the people ops organization. |
| 11:28:58 | 19 | Q.  Okay.  Did he, in fact, send you this email -- |
| 11:29:00 | 20 | I guess you were cc'd -- on January 19th, 2004? |
| 11:29:05 | 21 | A.  I don't have any recollection of this email, |
| 11:29:07 | 22 | but I have no reason to believe that I wasn't cc'd on it |
| 11:29:11 | 23 | as this exhibit suggests. |
| 11:29:15 | 24 | Q.  If you go to point one in his email where he |
| 11:29:18 | 25 | says, "Confirm the levels for each person."  Are levels |

11:29:22  1    for employees a concept with which you're familiar?

11:29:30  2        A.  Yes.  The idea that we had employees at

11:29:33  3    different levels is a concept I'm familiar with.  I

11:29:38  4    don't know what he's specifically referring to here.

11:29:41  5    It's unclear.  But generally speaking, we'd had

11:29:46  6    different levels for employees.  Yes.

11:29:49  7        Q.  And just for clarity, I won't ask you to get

11:29:52  8    into Mr. Donovan's mind.  I'm just using this as a way

11:29:55  9    to get your understanding of what different terms mean.

11:30:00  10       So what did -- well, how did Google level its

11:30:07  11   employees?

11:30:07  12       MR. RUBIN:  How did Google -- I'm sorry?

11:30:09  13       MR. HARVEY:  It's not put very artfully.

11:30:10  14       Q.  But how did Google use leveling in the sense of

11:30:13  15   why was it relevant to compensation at Google?

11:30:20  16       A.  I'll try to answer your question.

11:30:22  17       We spoke earlier about the fact that you would

11:30:26  18   have what I refer to as a job ladder, and that

11:30:30  19   terminology may have changed over time.  But within a

11:30:36  20   job ladder, we would typically refer to, for example,

11:30:39  21   the lowest level position -- we would refer to those as

11:30:44  22   levels on a ladder.  So perhaps you were hired into an

11:30:50  23   entry level position.  It doesn't necessarily mean your

11:30:54  24   first job was the bottom of the ladder.

11:30:56  25       But there would be some position at the bottom

11:30:57 1    of a ladder which reflected a level, and then I think

11:31:02 2    sometimes it was called zero and sometimes one.  I don't

11:31:05 3    recall, and I think it changed over time.  But, you

11:31:07 4    know -- and then it was numbered for ease of

11:31:11 5    understanding that if you discussed a specific role, you

11:31:16 6    could understand that that role was at a specific level

11:31:19 7    on a certain job ladder.

11:31:25 8        Q.   Okay.  And the concept of -- well, scratch

11:31:29 9    that.

11:31:34 10            In the second point, he says, "Place unmatched

11:31:37 11   people into a level and give them a salary range."

11:31:42 12            Did -- or were there occasionally employees at

11:31:46 13   Google who weren't put into a level that Google

11:31:49 14   identified and then figured out where to put them?

11:31:52 15       A.   Again, I don't remember January of 2004 very

11:31:56 16   well.  What I do remember is that we needed to create

11:32:05 17   sets of these -- as we created new roles in the company,

11:32:11 18   we needed to create job ladders and we typically had

11:32:14 19   levels of them.  And it would certainly be the case in

11:32:19 20   January 2004 that on a regular basis, we would be

11:32:23 21   creating new group -- entire new groups for the company

11:32:28 22   which would imply new roles and would imply new ladders

11:32:34 23   and new levels, and it would certainly be the case that

11:32:37 24   those might be pre-populated, if you will.

11:32:40 25            So there would be employees who were performing

11:32:43  1   those roles ahead of us actually figuring out that we --

11:32:47  2   what the new job ladder would be and where the role sat

11:32:52  3   on it and levels and so on.

11:32:53  4         So the question of whether or not an individual

11:32:56  5   employee at some time may have existed in this period

11:33:00  6   and not have had a clear level or role for some period

11:33:05  7   of time, I think that's certainly the case, yes.

11:33:19  8         Q.  In point 2b, he says, "Include" -- I'm sorry.

11:33:23  9   He says, ███████████████████████████████

11:33:28 10   ███████████████████████████████

11:33:33 11         In your experience at Google, were there

11:33:35 12   ███████████████████████████████████████

11:33:37 13   ███████████████████

11:33:41 14         A.  I don't know what he means by ████████████

11:33:44 15   so I'm not going to try to interpret.  Let me answer

11:33:47 16   your question about whether or not we ever had

11:33:50 17   individuals who were ████████████

11:33:53 18         The answer to that question is, yes.  Which is

11:33:57 19   that you would hire individuals, and you would hire them

11:34:01 20   into a certain role.  And based on the interview process

11:34:06 21   and our anticipation of the value that they would add to

11:34:11 22   the company, we would slot them into a specific level.

11:34:15 23         It's -- it did happen on occasion where we

11:34:18 24   simply guessed wrong, right?  The interview process is

11:34:22 25   well understood to be an imperfect process.  And the

| | | |
|---|---|---|
| 11:34:33 | 1 | █████████████████████████ |
| 11:34:37 | 2 | ██████████████████████████ |
| 11:34:41 | 3 | ███████████████████████ |
| 11:34:45 | 4 | █████████████████████████ |
| 11:34:49 | 5 | ████████████████████████ |
| 11:34:54 | 6 | ██████████████████████████ |
| 11:34:56 | 7 | █████████████████████████ |
| 11:35:00 | 8 | ██████████████████████████ |
| 11:35:03 | 9 | ████████████   █████████████ |
| 11:35:06 | 10 | ██████ |

```
11:35:13  11          MR. RUBIN:  Dean --

11:35:13  12          MR. HARVEY:  Yep.

11:35:13  13          MR. RUBIN:  -- I think it's a good time for a

11:35:15  14     break and I actually have to go to the restroom.

11:35:17  15          MR. HARVEY:  Well, I have no objection to that,

11:35:18  16     so....

11:35:19  17          MR. RUBIN:  Okay.  Good.

11:35:19  18          MR. HARVEY:  All right.

11:35:20  19          THE VIDEOGRAPHER:  The time is 11:35 a.m.

11:35:25  20     We're going off the record.  This is the end of video

11:35:29  21     No. 2.

11:35:35  22          (Recess taken.)

11:50:12  23          THE VIDEOGRAPHER:  This is the beginning of

11:50:14  24     video No. 3 in the deposition of Shona Brown.  The time

11:50:17  25     is 11:50 a.m.
```

| | | |
|---|---|---|
| 02:33:09 | 1 | THE VIDEOGRAPHER:  This is the end of video |
| 02:33:10 | 2 | No. 4.  The time is 1:33 p.m. -- 2:33 p.m. |
| 02:34:59 | 3 | We're going off the record. |
| 02:35:25 | 4 | (Recess taken.) |
| 02:43:27 | 5 | THE VIDEOGRAPHER:  This is the beginning of |
| 02:43:28 | 6 | video No. 5 in the deposition of Shona Brown.  The time |
| 02:43:32 | 7 | is 2:43 p.m. |
| 02:43:34 | 8 | We're back on the record. |
| 02:43:37 | 9 | MR. HARVEY:  Q.  I'd like to just go through |
| 02:43:38 | 10 | some of the key people in this case and just ask about |
| 02:43:43 | 11 | your relationship to them. |
| 02:43:44 | 12 | And starting with Steve Jobs, did you ever |
| 02:43:47 | 13 | communicate directly with Steve Jobs? |
| 02:43:51 | 14 | A.  I don't recall any direct communication between |
| 02:43:52 | 15 | myself and Steve Jobs.  No. |
| 02:44:02 | 16 | Q.  Did you ever discuss with Mr. Schmidt his |
| 02:44:05 | 17 | communications with Mr. Jobs? |
| 02:44:09 | 18 | A.  I have no recollection of a conversation with |
| 02:44:12 | 19 | Eric on any Steve Jobs communication, no. |
| 02:44:18 | 20 | Q.  Do you have any recollection of any |
| 02:44:22 | 21 | communications between Steve Jobs on the one hand and |
| 02:44:25 | 22 | someone at Google on the other? |
| 02:44:28 | 23 | A.  I'm generally aware that -- I mean, I don't |
| 02:44:35 | 24 | know what specifically, but I -- he had a relationship |
| 02:44:39 | 25 | with Eric.  Obviously, at some certain period, he was on |

02:44:43  1   the board.  They probably talked.  So I'm generally

02:44:46  2   aware that they had a relationship.

02:44:47  3         I'm generally aware that Steve and Bill

02:44:50  4   Campbell, who was also serving on the Apple board, had a

02:44:53  5   relationship.

02:44:58  6         I'm also generally aware that both Larry Page

02:45:02  7   and Sergey Brin were on friendly terms with Steve Jobs.

02:45:07  8   I don't know what that translated to in terms of

02:45:10  9   specific types or frequency of communication.

02:45:15 10         Q.  Aside from email -- I'm sorry, scratch that.

02:45:25 11         As far as you know, did Steve Jobs use an --

02:45:28 12   use an email address apart from sjobs@apple.com?

02:45:35 13         A.  I wasn't aware what his Apple email was.  I'm

02:45:37 14   not familiar with his email addresses.  Sorry.

02:45:41 15         Q.  Okay.  I'd like to move to Bill Campbell.  We

02:45:44 16   discussed him earlier and you brought him up just now.

02:45:51 17         How often, approximately, from, say, 2003 until

02:45:57 18   when you headed up Google.org did you communicate

02:46:01 19   directly with Bill Campbell?

02:46:10 20         A.  I would say, in most weeks, I would see Bill

02:46:15 21   Campbell, but maybe that means 70 percent of weeks I

02:46:19 22   would see Bill Campbell at least once in our

02:46:25 23   EMG/OC/whichever-acronym-we-were-using meeting.  I'm

02:46:31 24   just guessing on the percentiles, but it felt like more

02:46:35 25   than once a month and less than once a week in aggregate

| | | |
|---|---|---|
| 02:46:38 | 1 | across that period. |
| 02:46:47 | 2 | Q.  When you emailed Bill Campbell, did you always |
| 02:46:50 | 3 | use his Intuit.com email address? |
| 02:46:57 | 4 | A.  Sorry, I only have one email that I know of |
| 02:47:00 | 5 | that I used for Bill Campbell.  If that was -- was it an |
| 02:47:03 | 6 | Intuit.com one?  I don't know.  You'd have to show -- |
| 02:47:06 | 7 | Q.  I'm not sure which one you're referring to. |
| 02:47:08 | 8 | A.  You would have to show me an email from me to |
| 02:47:11 | 9 | him, but I'm only remembering that I had one email for |
| 02:47:14 | 10 | him.  I don't remember having more than one email for |
| 02:47:19 | 11 | him. |
| 02:47:20 | 12 | Q.  Okay.  Okay.  Fair enough. |
| 02:47:21 | 13 | Did you ever use more than one email address to |
| 02:47:30 | 14 | email Eric Schmidt? |
| 02:47:35 | 15 | A.  My recollection is that I only ever had his |
| 02:47:38 | 16 | Google email.  And that's the one that I used. |
| 02:47:43 | 17 | Q.  Okay.  Did you ever send an email to Paul |
| 02:47:52 | 18 | Otellini? |
| 02:47:54 | 19 | A.  I have sent emails to Paul Otellini in the |
| 02:47:57 | 20 | past.  I can't remember specifics, but yes, I have |
| 02:48:01 | 21 | emailed him. |
| 02:48:02 | 22 | Q.  Do you remember whether it was to his Intel.com |
| 02:48:04 | 23 | email address? |
| 02:48:06 | 24 | A.  I don't remember having more than one email |
| 02:48:08 | 25 | address for him.  Sorry, I just don't recall. |

| | | |
|---|---|---|
| 02:48:34 | 1 | Q.  When Google finalized its do-not-call list, |
| 02:48:40 | 2 | were there any communications with the board to -- to |
| 02:48:44 | 3 | explain to them the -- a decision that the EMG had made? |
| 02:48:50 | 4 | A.  Just to clarify, are you referring to when we |
| 02:48:53 | 5 | first created the do-not-call list? |
| 02:48:57 | 6 | Q.  Yes. |
| 02:48:58 | 7 | A.  My recollection of when we first created that |
| 02:49:01 | 8 | list was that it was, as we've discussed, an internal |
| 02:49:06 | 9 | management decision, and I don't recall any subsequent |
| 02:49:10 | 10 | communications other than to the people in the company |
| 02:49:13 | 11 | who needed to know in order to execute against the |
| 02:49:16 | 12 | do-not-call list. |
| 02:49:18 | 13 | Q.  So a do-not-call list was never discussed with |
| 02:49:20 | 14 | the board? |
| 02:49:22 | 15 | A.  Not that I'm aware of. |
| 02:49:24 | 16 | Q.  Okay.  Please examine Exhibit 566. |
| 02:50:02 | 17 | (Whereupon, Exhibit 566 was marked for |
| 02:50:02 | 18 | identification.) |
| 02:50:40 | 19 | THE WITNESS:  Okay. |
| 02:50:45 | 20 | MR. HARVEY:  Q.  Did Mr. Geshuri send this |
| 02:50:47 | 21 | email to you on September 15th, 2005? |
| 02:50:51 | 22 | A.  Again, I don't recall the specific incidents |
| 02:50:55 | 23 | but it certainly looks like an email from Arnnon to me |
| 02:50:58 | 24 | in September 2005. |
| 02:51:02 | 25 | Q.  You can put that to the side. |

04:06:23 1   actually.

04:06:24 2           If you could take a look at Exhibit -- I'm

04:06:26 3   sorry.  Just give me a moment.

04:06:33 4       A.  Sure.

04:06:46 5       Q.  Did Sheryl Sandberg report to you?

04:06:47 6       A.  No, Sheryl Sandberg did not report to me.

04:06:57 7       Q.  Who did she report to?

04:07:02 8           MR. RUBIN:  Objection as to time.  Ambiguity as

04:07:08 9   to time.

04:07:15 10          MR. HARVEY:  Q.  Well, at the time of the

04:07:17 11  document.  That would be on April 6th, 2006.

04:07:22 12      A.  My recollection is that for the bulk of the

04:07:25 13  time period in question, she reported in to Omid

04:07:31 14  Kordestani, but I'm not certain if she did very early in

04:07:34 15  the period.

04:07:35 16      Q.  Okay.

04:07:43 17      A.  At the time that she left Google, she reported

04:07:45 18  to Omid Kordestani.

04:08:20 19      Q.  For some reason, I don't seem to have copies of

04:08:22 20  this, but I'd just like to introduce it.

04:08:26 21          And if she could label this as Exhibit 637.

04:08:51 22          (Whereupon, Exhibit 637 was marked for

04:08:51 23          identification.)

04:08:52 24          MR. HARVEY:  And I apologize, Lee, but if you

04:08:54 25  could look at it --

04:08:55  1              MR. RUBIN:  Sure.

04:08:55  2              MR. HARVEY:  -- with the witness.

04:08:57  3         Q.  If you could please take a look at that

04:08:58  4    document.

04:09:32  5              And I would direct your attention to the part

04:09:34  6    of it that describes Intuit.  And I believe the date --

04:09:37  7    and correct me if I get it wrong, but I believe the

04:09:40  8    date -- the effective date for the Intuit line is April

04:09:43  9    10th of 2006, which is four days after this email.

04:09:46 10              And by this email, I'm referring to

04:09:47 11    Exhibit 575.

04:09:51 12         A.  Okay.

04:09:52 13         Q.  So does that refresh your recollection that at

04:09:55 14    the time, though Intuit was part of this document, it

04:09:59 15    was still limited to specific individuals?

04:10:03 16         A.  Honestly, my memory was that Intuit was always

04:10:05 17    on the list.  Looking at this, I'm -- I'm remembering

04:10:09 18    that there was these conversations.  My memory is they

04:10:13 19    never went anywhere, so I guess somehow in my brain,

04:10:16 20    they had always just been on the list fully.  It looks

04:10:20 21    like they clearly were on the list at this stage in

04:10:23 22    April of 2006 only for a limited set of individuals.

04:10:27 23         Q.  Okay.  Do you have any knowledge of Google ever

04:10:53 24    asking for Bill Campbell's permission to proceed to

04:10:57 25    discuss a potential offer with an Intuit employee?

04:11:04  1        A.  I don't have a specific recollection, but as

04:11:07  2    per earlier discussion, I have a memory that there were

04:11:11  3    a small number of these incoming requests when we had

04:11:20  4    made an unsolicited call into one of the companies on

04:11:24  5    the do-not-call list despite the policy existing where a

04:11:28  6    high-level complaint would come in.

04:11:30  7           It's a very small number of those complaints

04:11:32  8    over a number of years, and I just don't remember, as

04:11:37  9    with Intel, I don't remember if there was one from

04:11:40 10    Intuit, but it's quite -- it's quite possible that

04:11:43 11    that's the case.

04:11:46 12        Q.  What about for candidates who contacted Google

04:11:50 13    initially?  Did Google sometimes still ask for

04:11:55 14    permission to proceed with those candidates for

04:11:58 15    companies that were on the do-not-call list?

04:12:00 16        A.  Our policy always only applied to the

04:12:05 17    do-not-call situation.  My memory was refreshed this

04:12:09 18    week that there's one one-off situation, where I think

04:12:14 19    it's Laszlo makes to a conciliatory adjustor, although I

04:12:21 20    don't believe it was a candidate.  I believe it was a

04:12:23 21    potential person to call or very early stage, but I'm

04:12:26 22    sorry, I don't remember the details.  Perhaps that's

04:12:29 23    what you're referring to.

04:12:30 24        Q.  Yeah, I think I'm looking at the document.

04:12:32 25    Exhibit 586.

04:12:33  1              Is that the document you're talking about?

04:12:37  2       A.  Let's take a look.

04:12:38  3              (Whereupon, Exhibit 586 was marked for

04:12:38  4              identification.)

04:12:42  5       THE WITNESS:  Yes.  This is the one that my

04:12:43  6  memory was refreshed.

04:13:09  7       MR. HARVEY:  Q.  But at some point, Bill

04:13:11  8  Campbell requested that Intuit be added fully to the

04:13:14  9  do-not-call list, correct?

04:13:22 10       MR. RUBIN:  Objection.  Vague.

04:13:26 11       THE WITNESS:  I don't have a -- I don't have a

04:13:28 12  memory of -- well, as I said, just a few moments ago, my

04:13:34 13  memory, though flawed, is that Intuit was actually

04:13:38 14  always on the do-not-call list.

04:13:40 15              We've just looked at a sequence where, clearly,

04:13:42 16  they, at one point, was only a set of individuals.  I

04:13:46 17  don't remember when they transitioned from a set of

04:13:48 18  individuals to being fully on the list.

04:13:53 19       MR. HARVEY:  Q.  If you could look at

04:13:54 20  Exhibit 597.

04:13:58 21              (Whereupon, Exhibit 597 was marked for

04:13:58 22              identification.)

04:14:07 23       THE WITNESS:  Okay.

04:14:08 24       MR. HARVEY:  Q.  Does this refresh your

04:14:09 25  recollection of when Mr. Campbell requested that

05:11:20  1      Q.  When did Facebook [sic] begin entertaining the

05:11:34  2      idea of doing a company-wide raise that was referred to

05:11:39  3      internally as the big bang?

05:11:43  4      A.  Did you mean to say Google?

05:11:45  5      Q.  Yes, I did.  Thank you.  Sorry, it's getting

05:11:47  6      late.

05:11:53  7      A.  What we typically -- or what we have referred

05:11:54  8      to as big bang is when we announce a series of actions,

05:12:03  9      most notably the 10 percent salary increase.  And that

05:12:07  10     is -- I forget the exact date, to be honest, but it is

05:12:12  11     really an end point in an evolution.  It's best

05:12:16  12     understood if you look at our compensation over time.

05:12:18  13     We start as a very small company offering, some might

05:12:22  14     say, too small salaries.  We're always meritocratic.

05:12:30  15     There's some cash bonus in there, but our biggest

05:12:34  16     offering from a compensation perspective is our options

05:12:37  17     at that time.

05:12:38  18          As we become a public company, as the relative

05:12:41  19     rate of growth of our stock price, right, is -- is less

05:12:44  20     for newer employees coming in, we, like many other

05:12:48  21     companies, the nature of our compensation package, in

05:12:51  22     terms of what's attractive, starts to change.

05:12:54  23          We're also serving our employees throughout

05:12:56  24     this period.  And as you go from a small com -- startup

05:13:01  25     where everyone joining you has -- well, most people



05:13:05  1

05:13:08  2

05:13:09  3

05:13:10  4

05:13:13  5

05:13:16  6

05:13:20  7

05:13:22  8

05:13:25  9

05:13:29 10

05:13:31 11

05:13:33 12     So the outcome of that was a decision to

05:13:37 13 actually look at that and for -- the only incident I can

05:13:43 14 recall when we unilaterally, in other words, without a

05:13:46 15 performance orientation to it, we looked across the

05:13:49 16 whole company, and we said we're going to give a

05:13:51 17 10 percent -- it doesn't -- it was a percentile but

05:13:53 18 still, we gave it to everybody.  A 10 -- at least I

05:13:55 19 recall it being everybody.  A 10 percent raise and --

05:14:00 20

05:14:03 21     So from a responsibility perspective of thinking

05:14:06 22 about our -- you know, as a management team, it wasn't a

05:14:11 23 silly thing to do.

05:14:12 24     And what's interesting is the value that you

05:14:15 25 would get in terms of employees appreciating that, we



05:14:18  1  ████████████████████████████████████

05:14:21  2  █████████████  ████████████████████

05:14:25  3  ███████████████████████████████████

05:14:28  4  ███████████████████████████████████

05:14:30  5  That's the orientation behind it, and that leads up to

05:14:34  6  what's commonly called big bang or the announcement of

05:14:37  7  our -- our wage increase across the company.

05:14:39  8         To my knowledge, it's the only time we did

05:14:41  9  anything, you know, across everybody that wasn't

05:14:45 10  performance oriented and case by case and so on.

05:14:51 11         MR. HARVEY:  Q.  If you could please take a

05:14:53 12  look at Exhibit 625.

05:15:00 13         (Whereupon, Exhibit 625 was marked for

05:15:00 14         identification.)

05:15:14 15         MR. HARVEY:  Q.  And I'm only going to ask

05:15:15 16  you about Jonathan Rosenberg's email towards the top

05:15:20 17  and your response.

05:15:24 18     A.  Jonathan Rosenberg's -- oh, wait.  Sorry.  I

05:15:26 19  just want to see what's up.

05:15:34 20     Q.  Sure.

05:16:25 21     A.  Okay.

05:16:27 22     Q.  Did you write this email to the OC -- I'm

05:16:29 23  sorry -- to Jonathan Rosenberg copying the OC and Bill

05:16:33 24  Campbell on October 9th, 2010?

05:16:37 25     A.  Yes.  I don't recall the email, but it looks to

05:16:39  1    be an email from me to Jonathan in October 2010.  Yes.

05:16:44  2         Q.   Okay.  Starting with your email, what were you

05:16:49  3    referring to when you wrote, "The well-known downside of

05:16:52  4    what we have chosen to do"?

05:17:01  5         A.   I -- I don't remember what I'm referring to,

05:17:03  6    but in the context of Jonathan's email below, I'm

05:17:07  7    speaking to this point that we discussed earlier, which

05:17:10  8    is that when you are choosing to counteroffer at times,

05:17:16  9    even if you're thoughtful about it, if it starts to be

05:17:20  10   understood, you know, in pockets of the company or just

05:17:22  11   people start to feel like that's happening, you're going

05:17:25  12   to create some concerns about, well, if I'm not somebody

05:17:30  13   who's sought to leave the company and I haven't,

05:17:32  14   therefore, gotten a counteroffer, am I being treated

05:17:35  15   fairly in terms of the compensation that I get relative.

05:17:39  16        Now, they may not know the details, but their

05:17:43  17   gossip is usually worse than reality, right?  So that's

05:17:46  18   the point that I'm -- I -- I expect I'm alluding to

05:17:48  19   there.

05:17:49  20        Q.   Okay.  And -- well, could you explain what you

05:17:56  21   meant by the sentence, "And hope that big bang and other

05:18:02  22   efforts we take short circuits the whole loop

05:18:05  23   dramatically causing less people to seek other offers in

05:18:10  24   the first place"?

05:18:11  25        A.   Yes.  I would -- I mean, this is consistent

| | | |
|---|---|---|
| 05:24:29 | 1 | wrong sorts of people for the role that they were -- |
| 05:24:30 | 2 | they were trying to fill. |
| 05:24:32 | 3 | Q.  Was part of the reason why it was off base was |
| 05:24:37 | 4 | that it was Intuit recruiting an employee of Google? |
| 05:24:41 | 5 | MR. RUBIN:  Objection.  Lacks foundation. |
| 05:24:47 | 6 | THE WITNESS:  Honestly, my memory of this |
| 05:24:48 | 7 | incident is just that this was sort of embarrassing and |
| 05:24:52 | 8 | it wouldn't have mattered if it -- wherever the |
| 05:24:55 | 9 | executive was.  Executive of my level being approached |
| 05:24:59 | 10 | for this kind of a job was an indication of a poor |
| 05:25:02 | 11 | performing team, so I was trying to be helpful to Bill |
| 05:25:05 | 12 | and say -- figured he would know who to let know that |
| 05:25:09 | 13 | their team was a little off base. |
| 05:25:11 | 14 | MR. HARVEY:  Q.  Did you intend that Bill |
| 05:25:13 | 15 | Campbell would make sure that Intuit wouldn't make any |
| 05:25:16 | 16 | future recruiting efforts at Google? |
| 05:25:18 | 17 | A.  No.  Not at all.  This is merely me letting |
| 05:25:21 | 18 | Bill know that -- that, you know, somebody at Intuit is |
| 05:25:26 | 19 | a little confused in their job description. |
| 05:25:49 | 20 | Q.  Okay.  Following the DOJ investigation and the |
| 05:25:54 | 21 | dismantling of the do-not-call list, do you have an |
| 05:26:00 | 22 | understanding that Google currently pursues talent |
| 05:26:03 | 23 | wherever it might be, regardless of whether it's an |
| 05:26:06 | 24 | employee at Apple, an employee at Intel, an employee of |
| 05:26:10 | 25 | Intuit? |

05:26:12   1              MR. RUBIN:  Objection.  Vague.

05:26:17   2              THE WITNESS:  If you're asking what is the

05:26:19   3    current state of our policies with regard to any

05:26:24   4    do-not-call situations, I'm not up to date on whether

05:26:28   5    those exist and, you know, and if so, you know, anything

05:26:31   6    about them.  So I just don't know.

05:26:34   7              (Reporter clarification.)

05:26:34   8              THE WITNESS:  I'm just not up to date, and if

05:26:36   9    so, I just don't know whether they exist or not.

05:26:51  10              MR. HARVEY:  If you could take a look at

05:26:53  11    Exhibit 635.

05:26:54  12              (Whereupon, Exhibit 635 was marked for

05:26:54  13              identification.)

05:27:04  14              THE WITNESS:  Uh-huh.

05:27:05  15              MR. HARVEY:  Q.  Okay.  Laszlo Bock wrote

05:27:08  16    this email and sent it to members of Google's board

05:27:13  17    and copied Eric Schmidt, Larry Page, Sergey Brin,

05:27:18  18    Bill Campbell and yourself, correct?

05:27:20  19        A.  Yes.  This appears to be an email from Laszlo

05:27:24  20    in January 2011 to a number, if all the board members,

05:27:29  21    and then copying Kent, myself and Bill.  Yeah.

05:27:34  22        Q.  Could you look to the bottom of Mr. Bock's

05:27:37  23    email where he wrote that, "Google continues to look at

05:27:41  24    opportunities to recruit talented individuals from both

05:27:46  25    companies," being Facebook and Twitter, "as we do from

05:27:49  1    all sources of talented employees."

05:27:51  2          Do you see that?

05:27:52  3        A.  I do.

05:27:54  4        Q.  Is that your understanding, that as of 2011,

05:27:58  5    Google was looking for talented individuals from all

05:28:01  6    sources of talented employees?

05:28:05  7        A.  Well, the context of this email is our

05:28:12  8    recruiting from startups, such as Facebook and Twitter

05:28:15  9    and how that's going, and -- I mean, the statement of,

05:28:18 10    do we look for talented people where -- you know,

05:28:20 11    wherever we could find them is sort of true across our

05:28:23 12    history, our exception to that is this very limited

05:28:26 13    do-not-call list that we've been talking about today.

05:28:29 14          Other than that, I'm not aware of any attempts

05:28:32 15    to, you know, restrict the general point of, you know,

05:28:36 16    let's look for talented people.

05:28:41 17          MR. HARVEY:  Why don't we take a break.

05:28:44 18          MR. RUBIN:  Okay.  Wrapping up, you think?

05:28:46 19          MR. HARVEY:  No, but I'm just going to take a

05:28:48 20    break.

05:28:49 21          THE VIDEOGRAPHER:  The time is 5:28 p.m.  We're

05:28:51 22    going off the record.

05:28:52 23          (Recess taken.)

05:44:50 24          THE VIDEOGRAPHER:  The time is 5:44 p.m.  We're

05:44:53 25    back on the record.

05:44:57  1          MR. HARVEY:  Q.  If we could step back for

05:44:58  2   a moment and talk about the companies that appeared

05:45:01  3   on the do-not-call list.  First starting with Apple.

05:45:07  4          At any point during your time at Google, did

05:45:10  5   you have any reason to believe that Apple's policy was

05:45:15  6   not to cold call Google employees?

05:45:20  7      A.  I don't recall ever having any knowledge of any

05:45:23  8   specific Apple recruiting policies including a

05:45:28  9   do-not-call policy.

05:45:33 10      Q.  Given the communications between Mr. Schmidt

05:45:36 11   and Mr. Jobs that we went over earlier, does that

05:45:44 12   suggest to you that one of the reasons why Apple

05:45:47 13   appeared on the do-not-call list and continue to remain

05:45:50 14   on the do-not-call list was that the commitments not to

05:45:56 15   recruit were mutual?

05:45:57 16          MR. RUBIN:  Objection.  Calls for speculation.

05:46:02 17          THE WITNESS:  We've talked already about the

05:46:04 18   creation of the do-not-call list and my recollection of

05:46:06 19   it being a unit -- a unilateral policy that we wanted to

05:46:12 20   create to make us a better partner to work with.  That's

05:46:16 21   inclusive of Apple.  And that's my recollection of the

05:46:21 22   origins of the list.

05:46:25 23          MR. HARVEY:  Q.  Given what we've seen

05:46:26 24   today, what makes you believe that this was a

05:46:28 25   unilateral policy?

05:57:24  1   that we actually used outside compensation consultants,

05:57:27  2   but what he's suggesting is that this is reliable

05:57:32  3   information about the planned budget.  It's not clear to

05:57:34  4   me at all that a Googler actually called up, you know,

05:57:36  5   an Amazon person to accomplish this.  It's unclear from

05:57:40  6   the way he's expressed it.

05:57:42  7          MR. HARVEY:  Q.  When he says we called tech

05:57:44  8   companies, is there anything unclear about that?

05:57:46  9          A.  I --

05:57:46  10         MR. RUBIN:  I think that's what she's telling

05:57:47  11  you.  So objection.  Argumentative.  Not listening to

05:57:51  12  the answer.

05:57:55  13         THE WITNESS:  I'll just repeat that my

05:57:57  14  interpretation in an email like this at a summary level

05:58:00  15  when he says, we called tech companies, he's simply

05:58:03  16  trying to say that we have access to information that we

05:58:06  17  believe reliably comes from those companies directly

05:58:09  18  that this is their planned budgets.  I don't know how he

05:58:12  19  went about getting the information.

05:58:13  20         The context for this is the economy -- the

05:58:16  21  state of the economy in the fall of 2008 and trying to

05:58:19  22  understand whether or not other companies are thinking

05:58:22  23  it's appropriate when you have increasing portions of

05:58:26  24  the U.S. getting laid off, et cetera, to have the

05:58:30  25  technology sector giving increases and what is

| | | |
|---|---|---|
| 05:58:32 | 1 | appropriate. |
| 05:58:33 | 2 | It's -- it's -- it is common practice, across |
| 05:58:36 | 3 | compensation consultant firms to understand, you know, |
| 05:58:39 | 4 | what the sort of average salary increases -- the |
| 05:58:44 | 5 | information is usually dated but what the average salary |
| 05:58:47 | 6 | increases are to keep up with the increased cost of |
| 05:58:50 | 7 | living, et cetera.  So that's the context in which this |
| 05:58:51 | 8 | is being presented. |
| 05:58:53 | 9 | MR. HARVEY:  Q.  Can you identify a single |
| 05:58:56 | 10 | survey or a single consulting company that would provide |
| 05:59:00 | 11 | company-specific merit budgets that are -- |
| 05:59:07 | 12 | A.  I don't -- |
| 05:59:07 | 13 | Q.  -- yet to be finalized in one case? |
| 05:59:11 | 14 | A.  No, I don't know the de -- as I say, I don't |
| 05:59:12 | 15 | know the details of how he put together this |
| 05:59:14 | 16 | information. |
| 05:59:14 | 17 | Q.  Well, I'm just asking you, apart from the |
| 05:59:16 | 18 | document, can you identify a single survey company or |
| 05:59:20 | 19 | consultancy that would provide this kind of information |
| 05:59:24 | 20 | to Google? |
| 05:59:25 | 21 | A.  I don't have a good memory of exactly -- it's |
| 05:59:25 | 22 | been a while since I've actually looked at specific |
| 05:59:29 | 23 | survey data by survey companies and what they're able to |
| 05:59:32 | 24 | provide at what level.  So I can't tell you that. |
| 05:59:34 | 25 | Q.  Okay.  How did Google determine the pay ranges |

05:59:55  1   that we described earlier -- I'm sorry, that you

05:59:58  2   testified about earlier?

06:00:04  3       A.  I'll answer the question of how pay ranges were

06:00:07  4   created at a very high level because I think the details

06:00:10  5   of how that's done probably changes over the time period

06:00:13  6   in question.

06:00:16  7         But these components are probably a part of it

06:00:19  8   and, again, I'm -- I'm probably a bit too far above it

06:00:22  9   to give you the specifics.  But one is that you would

06:00:25 10   attempt to understand, for all of the roles in your

06:00:29 11   company, how they matched to roles in the -- outside in

06:00:33 12   the market.  So usually third parties are involved to

06:00:37 13   help companies with this process, but what you're trying

06:00:40 14   to understand is, if you will, a role match.

06:00:43 15         Sometimes you have roles inside your company

06:00:45 16   where that's very difficult to do.  You just don't hire

06:00:48 17   the same type of people to do the same type of job.  But

06:00:52 18   generally speaking, what you're trying to understand is,

06:00:53 19   for somebody who is in this role, what are other

06:00:57 20   companies paying people who do this kind of work.  So

06:01:00 21   that's one data point that you would use.

06:01:05 22         The term that's often used in reference to

06:01:07 23   that, and I don't know if we still use it, is a market

06:01:10 24   reference point.  And that's -- that's meant to be

06:01:13 25   describing a -- and it's different for different

06:01:17  1    types -- different parts of pay, but it's meant to be

06:01:20  2    describing either a mean or median associated with that

06:01:23  3    external market and that role.

06:01:26  4            The second part of your pay structure is,

06:01:29  5    though, then looking internally, right?  And you're

06:01:33  6    trying to understand, okay, the outside world thinks of

06:01:37  7    this role in the following way.  Terrific.  Is that

06:01:39  8    entirely consistent with how we think about that role?

06:01:43  9    Would we hire the very same types of people?  Would we

06:01:46 10    have them do really the very same types of work?  Would

06:01:49 11    we value them in the very same way?  If that's the case,

06:01:52 12    your pays -- your pay range might actually match

06:01:54 13    perfectly that pay range that is reflected in the

06:01:57 14    aggregate external market data.  If it's not, it will

06:02:01 15    differ.

06:02:03 16    ███████████████████████████████████████████████

06:02:05 17    ███████████████████████████████████████████████

06:02:07 18    ███████████████████████████   ███████████████████

06:02:11 19    ██████████████████████

06:02:12 20            And then another input would be, okay, great.

06:02:17 21    We understand pay ranges.  We've just compared ourself

06:02:19 22    to some companies who give no stock, say.  Or maybe they

06:02:23 23    have defined benefit plans and we don't, right?  So you

06:02:26 24    have to take into account the other elements of pay as

06:02:29 25    well and factor that into whether or not it's an apples

06:02:31  1   to apples as you think about your pay structure that

06:02:34  2   you're creating.

06:02:38  3        So at a high level -- now, exactly, you know,

06:02:41  4   how we did all of those steps, I think it changes a lot,

06:02:45  5   you know, over time.  It changes as we get bigger, more

06:02:48  6   complex, et cetera.  But generally speaking, those would

06:02:50  7   be inputs into -- it's my understanding of how you would

06:02:53  8   think about creating pay bands.

06:02:56  9        Q.  And would your answer stay the same for how

06:03:00 10   Google would determine range minimums and maximums?

06:03:07 11        A.  I think my answer is consistent with the

06:03:10 12   creation of pay bands, which for me, that includes mins

06:03:15 13   and maxes, as well as probably some sense of either a

06:03:19 14   median or a mean, whichever approach you're using.

06:03:22 15   People use different ways of doing it.

06:03:43 16             MR. HARVEY:  I think that's the end of my

06:03:48 17   questions on the current documentary record.

06:03:50 18             Unless you have any questions?

06:03:52 19             MR. RUBIN:  We don't have any questions.

06:03:53 20             So as I said in my letter to you on I think the

06:03:57 21   25th, either when your questions end or when seven hours

06:04:01 22   end, the deposition's closed, we know that there's a

06:04:03 23   pending motion to compel.  And as we said, although the

06:04:07 24   deposition is closed, if you are successful in that

06:04:09 25   motion and you come to us with particular documents that

06:04:11  1   you think it's imperative for you to be able to ask

06:04:17  2   Ms. Brown additional questions, we'll take that under

06:04:19  3   advisement.  But we reserve the right to take the

06:04:23  4   position that the deposition continues to be closed.

06:04:24  5           MR. HARVEY:  Well, I disagree that the

06:04:26  6   deposition is closed.  From plaintiffs' perspective, the

06:04:29  7   deposition will remain open pending the result of our

06:04:31  8   motion to compel.

06:04:32  9           I understand you're reserving all your

06:04:34 10   objections, but I want to make that clear for the

06:04:34 11   record.

06:04:35 12           MR. RUBIN:  Right.  And we just are invoking

06:04:37 13   the Federal Rules of Civil Procedure that says seven

06:04:39 14   hours.  You're ending, I think, at 6.54, so....

06:04:41 15           You do have six more minutes, but, otherwise,

06:04:43 16   the deposition is closed if you have no more questions.

06:04:47 17           MR. HARVEY:  Again, I'll just reiterate that

06:04:51 18   our position is that the deposition is not closed.  I

06:04:53 19   disagree with your characterization that a fixed seven

06:04:58 20   hours would be the extent of what we would be entitled

06:05:02 21   to on these facts and on these documents.

06:05:04 22           MR. RUBIN:  Okay.  Well, I think our letter

06:05:06 23   exchanges speak to our respective positions, so....

06:05:09 24           With that, the deposition is closed from

06:05:11 25   Google's perspective and thank you.

1    I, Gina V. Carbone, Certified Shorthand

2    Reporter licensed in the State of California, License

3    No. 8249, hereby certify that the deponent was by me

4    first duly sworn and the foregoing testimony was

5    reported by me and was thereafter transcribed with

6    computer-aided transcription; that the foregoing is a

7    full, complete, and true record of said proceedings.

8    I further certify that I am not of counsel or

9    attorney for either of any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12   The dismantling, unsealing, or unbinding of

13   the original transcript will render the reporter's

14   certificates null and void.

15   In witness whereof, I have hereunto set my

16   hand this day:  February 1, 2013.

17   _____ Reading and Signing was requested.

18   _____ Reading and Signing was waived.

19   ___X___ Reading and signing was not requested.

20

21

22   _____

23   GINA  V. CARBONE

24   CSR 8249, RPR, CCRR

25

| Page | Line | |
|------|------|---|
| 58 | 16 | Change: from "also was running." to "also was running staffing." |
| | | Reason: last word of sentence accidentally omitted from transcript |
| 205 | 19 | Change: from "adjusta" to "gesture" |
| | | Reason: incorrect word in transcript |
| 207 | 21 | Change: from "do-not policy" to "do-not call policy" |
| | | Reason: word policy accidentally omitted from transcript |
| ___ | ___ | Change: _____ |
| | | Reason: _____ |
| ___ | ___ | Change: _____ |
| | | Reason: _____ |
| ___ | ___ | Change: _____ |
| | | Reason: _____ |
| ___ | ___ | Change: _____ |
| | | Reason: _____ |

_Slb_____ Subject to the above changes, I certify that the transcript is true and correct.

_____ No changes have been made.  I certify that the transcript is true and correct.

_____                    _March 26/2013_
(signature)                                                  (date)