# EXHIBIT Z TO
# CISNEROS DECLARATION
# REDACTED VERSION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE      )

ANTITRUST LITIGATION           )

                               )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:      )

ALL ACTIONS.                   )

_____)


ATTORNEYS' EYES ONLY - HIGHLY CONFIDENTIAL


VIDEO DEPOSITION OF ARNNON GESHURI


AUGUST 17, 2012


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

09:42:24  1  staffing organization as it currently existed when I --

09:42:27  2  when I joined, and to see what it would take to build an

09:42:29  3  infrastructure on the staffing side to help Google scale

09:42:34  4  up to its now kind of -- its insatiable appetite for

09:42:41  5  great talent.

09:42:42  6          So I analyzed the staffing group, looked at the

09:42:45  7  infrastructure and -- and made a design plan of how I

09:42:48  8  would scale up the staffing organization to -- to

09:42:51  9  accommodate the acquisition of talent.  And that was all

09:42:56  10  encompassing of what my role was there --

09:42:59  11      Q.   So that --

09:42:59  12      A.   -- of the head of staffing.

09:43:01  13      Q.   That one category describes basically what you

09:43:03  14  did --

09:43:04  15      A.   Yes.

09:43:04  16      Q.   -- as head of staffing.  Okay.

09:43:16  17          And remind me when you held the title of head

09:43:19  18  of staffing in terms of -- I mean it started in October

09:43:22  19  of 2004, and then how long did that last until your first

09:43:25  20  promotion?

09:43:27  21      A.   Yeah, I -- I -- you know, I don't quite recall

09:43:30  22  because it -- I'll give you some general -- if I -- I'll

09:43:33  23  just use my best memory.

09:43:35  24      Q.   Sure.

09:43:35  25      A.   Because my -- my role and responsibilities

09:43:37   1   expanded.  So it wasn't actually a change of role.  It

09:43:40   2   was just acknowledgment that I was doing the right -- the

09:43:43   3   right thing in my job.  So my job responsibilities still

09:43:47   4   focused on that -- on that core thing of how do I create

09:43:50   5   infrastructure that will scale with the organization.  So

09:43:53   6   it must have been within the first eight months probably,

09:43:55   7   eight months to a year, I was promoted to the first level

09:44:00   8   director, and then it was -- it was probably, you know, a

09:44:06   9   year, year-and-a-half after that, that I was promoted to

09:44:09  10   senior director of -- of staffing.

09:44:14  11        Q.   Okay.  So -- so after your change in title to

09:44:20  12   first-level director, I believe you said that your

09:44:24  13   responsibilities remained the same.  So would it be

09:44:26  14   correct to say that -- that your staffing

09:44:29  15   responsibilities encompassed your responsibilities as a

09:44:33  16   first level director of staffing?

09:44:35  17        A.   Yes.

09:44:35  18        Q.   So there were no other categories or additional

09:44:38  19   duties that were added at that time?

09:44:39  20        A.   No.  It was just scaling the operations.  So --

09:44:42  21   so the scope of the role expanded, so instead of having

09:44:46  22   the 40 recruiters when I started, you know, I grew the

09:44:50  23   organization to almost 900 staffing professionals.  So

09:44:52  24   you could see the scale of -- of what needed to be done.

09:44:56  25   It just expanded.

| | | |
|---|---|---|
| 09:44:58 | 1 | And then creating the infrastructure that would |
| 09:45:00 | 2 | support all the amazing talent, because we would have |
| 09:45:04 | 3 | over -- every year we'd have over 2 million applications |
| 09:45:07 | 4 | that would come to us.  We would do 160,000 on-site |
| 09:45:12 | 5 | interviews in a year.  We would be hiring 200 people a |
| 09:45:17 | 6 | week.  I mean this was -- it was a grand scale, and it |
| 09:45:20 | 7 | was during the -- the amazing growth of the company.  So |
| 09:45:24 | 8 | my responsibility was -- to solve those goals, to get the |
| 09:45:29 | 9 | talent onboard, it was scaling that operation.  So it -- |
| 09:45:32 | 10 | it provided amazing talent for the company. |
| 09:45:35 | 11 | Q.   Sure.  Okay.  So then your third title, I |
| 09:45:43 | 12 | guess, was senior director of staffing? |
| 09:45:45 | 13 | A.   Uh-huh.  That's correct. |
| 09:45:48 | 14 | Q.   Okay. |
| 09:45:49 | 15 | A.   The same responsibilities. |
| 09:45:50 | 16 | Q.   Right.  And I believe you testified earlier |
| 09:45:55 | 17 | that you had a hybrid -- |
| 09:45:57 | 18 | A.   My last year there. |
| 09:45:58 | 19 | Q.   -- role -- |
| 09:45:59 | 20 | A.   1 -- I did four -- you know, four years in -- |
| 09:46:01 | 21 | in the staffing function and then I wanted to do a |
| 09:46:04 | 22 | little -- something a little bit different, so I did |
| 09:46:06 | 23 | employee relations for the HR -- kind of HR director |
| 09:46:11 | 24 | in -- more generalized for the engineering organization. |
| 09:46:14 | 25 | Q.   Okay.  So that was your fourth title? |

09:46:16  1      A.   My -- my -- yeah.  That was my last year there.

09:46:18  2      Q.   And that was director of HR?

09:46:21  3      A.   Yeah.  Director of HR, exactly.

09:46:23  4      Q.   Okay.

09:46:24  5      A.   I gave up my staffing responsibilities the last

09:46:26  6  year I was there.

09:46:44  7      Q.   Okay.  So I think in terms of talking about

09:46:45  8  what you did, I think it makes sense to group your time

09:46:51  9  for the first three titles, which involved staffing,

09:46:54 10  we'll just talk about that together, because it sounded

09:46:56 11  like that was one kind of unbroken project of scaling

09:47:00 12  Google, correct?

09:47:01 13      A.   Yes.  My -- my role was the same, just -- just

09:47:02 14  scaled.

09:47:03 15      Q.   Okay.  During this time, did you -- did you

09:47:15 16  have any input or responsibilities with regard to

09:47:18 17  compensation?

09:47:19 18      A.   No.  I never touched compensation.

09:47:21 19      Q.   And that includes when you were director of HR,

09:47:24 20  correct?

09:47:25 21      A.   Yes.  It was -- it was all employee relations

09:47:27 22  as described before, people's interaction within the work

09:47:30 23  environment.  So they had a whole different group that

09:47:32 24  was responsible for compensation, totally different team,

09:47:35 25  and I didn't touch compensation numbers.  I had no

| | | |
|---|---|---|
| 10:15:35 | 1 | fill that job through the various methods that you come |
| 10:15:37 | 2 | up with, it's up to that recruiter to get it done. |
| 10:15:42 | 3 | Q.   And those methods included sourcing, correct? |
| 10:15:46 | 4 | A.   Those methods included sourcing. |
| 10:15:50 | 5 | Q.   Do you have any idea in terms of breakdown by |
| 10:15:54 | 6 | time what proportion of time that the recruiting |
| 10:15:59 | 7 | organization spent on the sourcing part of it in terms of |
| 10:16:03 | 8 | relying on that sourcing method. |
| 10:16:05 | 9 | MR. RUBIN:  You're saying in terms of person |
| 10:16:07 | 10 | hours? |
| 10:16:08 | 11 | MR. HARVEY:  Yes. |
| 10:16:12 | 12 | THE WITNESS:  I -- I -- I -- so I'm not quite |
| 10:16:14 | 13 | sure how it's broken down.  I would -- I would -- the |
| 10:16:18 | 14 | recruiters -- one of the things that I mentioned before |
| 10:16:21 | 15 | is that we had over 2 million applications that came in, |
| 10:16:26 | 16 | and a recruiter's pipeline was pretty full.  So their |
| 10:16:33 | 17 | responsibility was to get through that pipeline the |
| 10:16:35 | 18 | majority of the time, and -- and whether that came from |
| 10:16:37 | 19 | the employee referral program or through the extranet |
| 10:16:42 | 20 | website -- so I don't know the exact breakdown. |
| 10:16:46 | 21 | BY MR. HARVEY: |
| 10:16:47 | 22 | Q.   But the primary responsibility of a recruiter |
| 10:16:50 | 23 | is to find good people, correct? |
| 10:16:52 | 24 | A.   The primary responsibility is to find good |
| 10:16:54 | 25 | people that will fit the roles within the company, the |

```
10:16:58   1    company's needs at the time.

10:16:59   2         Q.   And so -- okay.  That's fine.

10:17:16   3              And the recruiting organization, I believe you

10:17:19   4    said that when you were hired, there were 40 people in

10:17:22   5    this organization, and when you left, there were

10:17:24   6    approximately 900, correct?

10:17:27   7         A.   Not exactly.  So during the heyday, or as we

10:17:32   8    ramped up, we -- we hit around 850, 900 staffing

10:17:37   9    professionals in the company.  But when I left, it was a

10:17:41  10    different number, which I don't -- I don't know, because

10:17:43  11    I was out of that role when I left the company.

10:17:46  12              So -- so basically -- but during its most

10:17:49  13    prolific time, it was around 900 people.

10:17:53  14         Q.   And what years fell into this prolific period?

10:17:57  15         A.   It was probably the -- well, it wasn't

10:17:59  16    immediate, because I had to build up to that.  So it was

10:18:02  17    probably -- maybe my second or third year there, those

10:18:06  18    are the two -- the two years.

10:18:08  19         Q.   So 2005, 2006?

10:18:10  20         A.   This was -- yeah, and I think that was parallel

10:18:14  21    to the growth of the company.  We can look at the

10:18:16  22    headcount numbers of the company, but you can see how it

10:18:19  23    was a pretty big spike in growth.

10:18:21  24         Q.   Sure.  And let's see.

10:18:24  25              When you became the director of HR, I take it
```

10:18:29   1   in approximately the beginning of 2009, roughly how many

10:18:32   2   people worked in the recruiting organization?

10:18:36   3        A.   I -- I don't -- I actually don't recall.

10:18:39   4        Q.   Was it more than 500?

10:18:41   5        A.   Yeah, I -- I don't -- I don't recall.  It was

10:18:43   6   in the hundreds, but I don't -- I don't recall the exact

10:18:46   7   number when I left.

10:18:52   8        Q.   Did you rely exclusively on Google employees as

10:18:55   9   part of this recruiting function, or did you also

10:18:57  10   occasionally rely on third-party recruiters?

10:19:01  11             MR. RUBIN:  Objection.  Vague as to "third

10:19:03  12   parties."

10:19:04  13             THE WITNESS:  Describe third-party recruiters

10:19:06  14   to me, if you don't mind.

10:19:08  15   BY MR. HARVEY:

10:19:08  16        Q.   Anyone who would recruit on Google's behalf who

10:19:12  17   was not on Google's direct payroll.

10:19:14  18             MR. RUBIN:  Same objection.

10:19:16  19             THE WITNESS:  So we -- so -- from my -- from

10:19:22  20   how we structure the organization, just really briefly,

10:19:27  21   is that for very senior level hires, we on occasion would

10:19:32  22   use a search firm that would help us to find very senior

10:19:36  23   people.

10:19:38  24   BY MR. HARVEY:

10:19:40  25        Q.   Would you use -- well, were there any other

10:22:57  1    and utilize, and that was -- that was how they structured

10:23:03  2    their organization.

10:23:05  3        Q.   And how many individuals worked in the sourcing

10:23:08  4    team when you were first hired at Google?

10:23:11  5        A.   There were -- if I recall correctly, there were

10:23:14  6    ████  at the time.  It was just 40 recruiters when I first

10:23:18  7    started.  ███████████████████████████████

10:23:20  8        Q.   And then how did you grow the sourcing team

10:23:23  9    during your time at Google?

10:23:25  10              MR. RUBIN:  Objection.  Vague.

10:23:27  11              THE WITNESS:  So my responsibility was to build

10:23:32  12   the infrastructure for a successful group.  I focused on

10:23:36  13   building recruiters and making sure we had enough volume

10:23:40  14   recruiters to handle the influx of applicants.

10:23:44  15              And then as a need came up where we needed to

10:23:47  16   find diamonds in the rough, great candidates, I created a

10:23:53  17   team of folks doing research in finding excellent talent.

10:23:58  18   BY MR. HARVEY:

10:23:58  19       Q.   And what was the first hire for the sourcing

10:24:00  20   team -- I'm sorry.  When was the first hire?

10:24:03  21       A.   I -- I don't -- I don't recall.  Honestly,

10:24:06  22   again, I don't remember exactly when I first hired a

10:24:08  23   sourcer.  Yeah.  I don't -- I don't recall.  I can't

10:24:12  24   answer.  I don't know exactly when.  It was a -- it

10:24:15  25   was -- I don't know when.

10:24:18  1        Q.   Do you remember whether it was in 2004 or 2005?

10:24:23  2             MR. RUBIN:  Objection.  Calls for speculation.

10:24:24  3             THE WITNESS:  Yeah, I still don't remember

10:24:25  4   exactly when we hired the first sourcer.  It's just not

10:24:28  5   specific to me.  I can't remember.

10:24:30  6   BY MR. HARVEY:

10:24:30  7        Q.   How many people worked in sourcing when it was

10:24:33  8   at its largest size?

10:24:36  9        A.   I -- I probably had -- of order of magnitude,

10:24:44 10   probably ████████ people doing sourcing, out of a team of

10:24:48 11   900.

10:24:49 12        Q.   Oh, so you're including that within the 900?

10:24:53 13        A.   Yeah.

10:24:53 14        Q.   In terms of --

10:24:53 15        A.   I said that -- before I mentioned 900 staffing

10:24:55 16   overall.

10:24:56 17        Q.   I see.  Thank you.

10:25:09 18             And then moving on to your final role at

10:25:11 19   Google, when you were director of HR, could you -- could

10:25:18 20   you kind of describe categories of responsibilities you

10:25:22 21   had in that role.

10:25:24 22        A.   Yeah.  I -- I was basically responsible for --

10:25:29 23   for a specific area within -- within the engineering

10:25:32 24   organization to support the employee base.  So that means

10:25:35 25   that I handled employee relations issues.  I helped to

10:25:44  1   deal with, you know, personal -- or like ergonomic

10:25:50  2   issues, when people had problems with their work space,

10:25:53  3   or if they had medical problems how they got on

10:25:55  4   disability and things like that.  So I basically just

10:25:57  5   handled a variety of employee issues to help -- to help

10:26:01  6   those groups function within the work environment.

10:26:12  7        Q.   And did you have any other responsibilities

10:26:14  8   while you were in HR, aside from the ones that you

10:26:18  9   described?

10:26:18  10        A.   There was a variety -- whatever it was -- there

10:26:19  11   was a variety of roles, but it all focused on -- Dean, it

10:26:23  12   all focused on the -- the interaction of employees, you

10:26:28  13   know, if managers had a low performer, helping them walk

10:26:31  14   through that, how to -- how to help that employee get

10:26:35  15   better or whatever else we need to do.  So that -- so

10:26:38  16   basically I was -- I was responsible for helping managers

10:26:41  17   and employees just deal with the work environment.  But

10:26:44  18   the issues were pretty varied, and I just helped to --

10:26:47  19   helped them to make it through the -- make it through and

10:26:50  20   be a better -- better person as an outcome.

10:27:37  21             MR. HARVEY:  I believe this is Exhibit 170.  If

10:27:38  22   you could please mark this and hand it to the witness.

10:27:41  23             (Exhibit 170 was marked for identification.)

10:27:41  24   BY MR. HARVEY:

10:27:42  25        Q.   This document is a PDF of the current bios of

| | | |
|---|---|---|
| 12:28:20 | 1 | drive that. |
| 12:28:24 | 2 | Q.   But that included sourcing, correct? |
| 12:28:26 | 3 | A.   It includes sourcing. |
| 12:28:28 | 4 | Q.   The email continues, "However, we do need to be |
| 12:28:30 | 5 | respectful" -- I'm sorry, "we do need to be respectively |
| 12:28:33 | 6 | and sensitive about how we do it.  I don't think this is |
| 12:28:35 | 7 | consistently happening.  One practical suggestion that |
| 12:28:39 | 8 | came up today that we can tell recruiters as a tangible |
| 12:28:41 | 9 | action item --" |
| 12:28:43 | 10 | MR. RUBIN:  You might need to go a little |
| 12:28:45 | 11 | slower for the court reporter, when you're reading. |
| 12:28:52 | 12 | THE REPORTER:  It would be swell. |
| 12:28:54 | 13 | MR. HARVEY:  I will be slower.  Thank you. |
| 12:28:56 | 14 | Q.   I'll start with, "However, we do need to be |
| 12:28:58 | 15 | respectively and sensitive about how we do it.  I don't |
| 12:29:03 | 16 | think this is consistently happening.  One practical |
| 12:29:08 | 17 | suggestion that came up today that we can tell recruiters |
| 12:29:11 | 18 | as a tangible action item is to be targeted in proactive |
| 12:29:16 | 19 | recruiting into these companies.  In other words, we |
| 12:29:19 | 20 | should not do what MS does," and I believe that's |
| 12:29:22 | 21 | Microsoft, "which is get a Rolodex of engineers and just |
| 12:29:26 | 22 | call everyone, one after another.  It is fine for |
| 12:29:29 | 23 | recruiters to call into these companies with a specific |
| 12:29:29 | 24 | individual they're chasing." |
| 12:29:32 | 25 | Were -- let me pause here. |

| | | |
|---|---|---|
| 12:29:39 | 1 | Was it your understanding that Google's |
| 12:29:42 | 2 | recruiters were permitted to call into companies with a |
| 12:29:46 | 3 | specific individual they were chasing? |
| 12:29:50 | 4 | A. So I -- this was a -- this was early on. I |
| 12:29:53 | 5 | just -- I just got there, so I was just getting my |
| 12:29:56 | 6 | footing. But historically, when I ran staffing |
| 12:30:00 | 7 | organizations, recruiters of course used sourcing as one |
| 12:30:04 | 8 | of the methodologies to go and get people. |
| 12:30:07 | 9 | Q. Okay. And then you responded, what looks like |
| 12:30:12 | 10 | the next day, and you say, "There is definitely a side to |
| 12:30:18 | 11 | recruiting that boasts a 'no holds barred' attitude when |
| 12:30:18 | 12 | it comes to hunting for candidates." Is that the |
| 12:30:25 | 13 | aggression that you were just referring to? |
| 12:30:27 | 14 | A. I said in -- the -- to me, aggressiveness is |
| 12:30:31 | 15 | all the recruiters need to be unrelenting and make sure |
| 12:30:35 | 16 | they hit their goals, because there was a lot of pressure |
| 12:30:38 | 17 | on me and the staffing organization to hit our numbers, |
| 12:30:41 | 18 | which we did. |
| 12:30:42 | 19 | And -- and -- and I don't -- I didn't want |
| 12:30:45 | 20 | recruiters on the team that could not fulfill that. So |
| 12:30:48 | 21 | we -- we really wanted strong -- a strong team, to be |
| 12:30:51 | 22 | effective and productive. |
| 12:30:54 | 23 | Q. What kind of pressure did you receive to meet |
| 12:30:56 | 24 | your goals? |
| 12:30:58 | 25 | A. The -- the company -- the -- the company had -- |

12:31:02  1   I mentioned this before in testimony, where the company

12:31:04  2   had a hiring plan, and -- and I'm -- personally, I'm a

12:31:10  3   very achievement-oriented person, and so you give me a

12:31:14  4   plan and I will make sure that we as an organization will

12:31:17  5   hit -- hit the numbers.

12:31:19  6           So -- so the pressure I felt was partially my

12:31:25  7   own pressure to make sure we delivered, and also I wanted

12:31:29  8   to make sure the company got the talent it needed to

12:31:32  9   achieve.  So each organization needed great talent, and I

12:31:36 10   delivered.

12:31:37 11       Q.   Did Shona Brown and Laszlo Bock make that

12:31:40 12   clear, that -- that Google's expectation was that you

12:31:43 13   would meet your goals?

12:31:45 14       A.   Well, what they said to me, or what I perceived

12:31:49 15   they said is, "Your job is to fill roles.  Your job is to

12:31:52 16   bring talent in, and that's -- that's -- that's your

12:31:55 17   responsibility."  And I was fully accountable for that

12:32:00 18   and fully accountable to make sure that Google grew.  And

12:32:03 19   it was made very clear.

12:32:05 20           And Laszlo was not part of the picture at this

12:32:08 21   point in time.  He was hired after this.  But Shona made

12:32:12 22   it very clear for me that I was brought onboard to build

12:32:15 23   an amazing talent organization, recruiting organization.

12:33:03 24       Q.   When you were first hired at Google, or any

12:33:05 25   time thereafter, did you ever have a discussion with

13:32:25  1    sounded good.

13:32:26  2        Q.   Jeanne Romano responds -- first, who is Jeanne

13:32:36  3    Romano or Jeanne, however it is pronounced?

13:32:40  4        A.   I believe she was a recruiter on the team.

13:32:42  5        Q.   Okay.  And she says, "Hi, I thought that Adobe

13:32:46  6    was once on the no-contact list.  Is it now?"

13:32:49  7             Do you know what she was referring to here?

13:32:53  8        A.   I don't recall the context around this email.

13:32:57  9        Q.   Was Adobe ever on a no-contact list, as far as

13:33:00 10    you know?

13:33:02 11             MR. RUBIN:  Objection.  Lacks foundation.

13:33:03 12             THE WITNESS:  Again, I don't recall.

13:33:04 13    BY MR. HARVEY:

13:33:05 14        Q.   Okay.  Do you remember what your response was

13:33:10 15    to this email?

13:33:14 16        A.   No, I don't remember this specific -- this

13:33:16 17    specific exchange.  I don't remember.

13:33:19 18        Q.   So she says here that she has some excellent

13:33:21 19    leads for Adobe, but had been holding off.  Do you

13:33:25 20    remember whether you instructed her to keep holding off

13:33:28 21    or to contact those leads?

13:33:29 22             MR. RUBIN:  Objection.  Calls for speculation.

13:33:31 23             THE WITNESS:  Again, I hold to my previous

13:33:34 24    statement.  I don't remember how I reacted to this

13:33:36 25    statement.

13:33:37   1    BY MR. HARVEY:

13:33:37   2        Q.   Okay.  Okay.  So this is -- or this was

13:34:00   3    September of 2005.  And during this time, you were trying

13:34:04   4    to get clarity for your organization and from your

13:34:08   5    superiors about what the do-not-call list should and

13:34:12   6    should not be, correct?

13:34:14   7        A.   There was a period of time, I don't remember

13:34:16   8    the exact dates, but a period of time where I -- I needed

13:34:20   9    to create a do-not-call structure.

13:34:22  10        Q.   And did you do that to make sure that everybody

13:34:24  11    in your organization was on the same page?

13:34:27  12        A.   Basically, the do-not-call provided a protocol

13:34:31  13    for the recruiting folks so we could manage around the

13:34:33  14    same set of protocols, basically.

13:34:36  15        Q.   And was a goal for that to provide clarity

13:34:39  16    regarding the confusion you described earlier?

13:34:42  17        A.   I don't -- I don't remember the -- the

13:34:43  18    interaction between those two periods of time.  But I was

13:34:47  19    asked to create at least a protocol for the staffing

13:34:51  20    team.

13:34:51  21        Q.   Who asked you?

13:34:53  22        A.   I believe at the time -- I don't recall -- I

13:34:57  23    don't recall exactly who asked me originally.

13:35:01  24             But I know somebody did.

13:35:03  25             MR. HARVEY:  Please mark this as Exhibit 179.

13:35:26  1            (Exhibit 179 was marked for identification.)

13:35:26  2            MR. HARVEY:   This document is stamped

13:35:27  3    GOOG-00007725.

13:35:35  4        Q.   And is this an email that Shona Brown sent you

13:35:39  5    on September 25th, 2005?

13:35:44  6        A.   Based on the "To, From," it looks like that's

13:35:46  7    the case.

13:35:47  8        Q.   Okay.  And that followed an email you sent her

13:35:51  9    that is also in this document on September 15th, 2005,

13:35:54 10    correct?

13:35:55 11        A.   Based on the email, it looks like that's the

13:35:57 12    case.

13:36:00 13        Q.   And in your email to Shona Brown you write,

13:36:03 14    "After speaking with Joan, enclosed is my recommendation

13:36:07 15    for a protocol around 'Do Not Cold Call' and 'Sensitive'

13:36:11 16    companies."

13:36:12 17            Who is the "Joan" you're referring to here?

13:36:14 18        A.   In this particular instance, it's Joan Braddi.

13:36:18 19        Q.   What was her role?

13:36:19 20        A.   She was a business partnership with recruiting,

13:36:23 21    if I remember correctly.

13:36:25 22        Q.   And in your -- in your recommendation for a

13:36:30 23    protocol, you state that, "The following companies have

13:36:34 24    special agreements and are part of the 'Do Not Cold Call'

13:36:39 25    list," and then you list Genentech, Intel, Apple, PayPal,

13:36:45 1   and Comcast.  Why did you use the word "agreements" again

13:36:52 2   here?

13:36:55 3       A.   Again, it was -- it was just my wording,

13:36:57 4   sounded good.

13:37:09 5       Q.   In Shona Brown's response, she says, "Sorry for

13:37:13 6   the delay in responding.  Omid" -- is that right?

13:37:17 7       A.   Omid.  That is correct.

13:37:18 8       Q.   "-- has been waiting for a response on this,

13:37:20 9   and the delay is entirely my fault.  I would like to

13:37:23 10  finalize with you Monday AM, and then present in EMG, so

13:37:27 11  Omid has his final version."

13:37:32 12          What is the EMG?

13:37:35 13      A.   In this case it's executive management group.

13:37:38 14      Q.   And who are the members of the EMG?

13:37:42 15      A.   At the time it was all the senior execs of the

13:37:45 16  company.

13:37:45 17      Q.   And that included Eric Schmidt, correct?

13:37:48 18      A.   Eric Schmidt was part of the EMG group at the

13:37:50 19  time.

13:37:51 20      Q.   Was Sergey Brin included in that?

13:37:53 21      A.   Yes.

13:37:53 22      Q.   And Larry Page?

13:37:55 23      A.   That's correct.

13:37:56 24      Q.   And Shona Brown?

13:37:57 25      A.   Shona Brown was, too.  That's correct.

13:38:06  1        Q.   And she says -- Shona Brown says, "I have a

13:38:09  2   couple of reactions.  First, I wonder if 'eBay, excluding

13:38:14  3   PayPal' should be on the sensitive list?  Second, I would

13:38:17  4   rephrase the EMG member call-in to be 'make a call

13:38:21  5   letting them know we have MADE an offer and by exception

13:38:25  6   if EMG deems necessary.'"

13:38:35  7             She's referring to parts of your email that I

13:38:38  8   didn't read, feel free to read those if you want to, but

13:38:40  9   when she says "make a call letting them know," the "them"

13:38:44 10   is the competing employer, correct?

13:38:50 11        A.   I think -- can I read the email?

13:38:52 12        Q.   Sure.

13:38:53 13        A.   -- in its entirety?

13:38:55 14        Q.   Please.  Please.

13:39:13 15        A.   After reading the email, it looks like on the

13:39:14 16   second page of the email, under "Executive Recruiting"

13:39:16 17   paragraph, referring -- I would make an assumption

13:39:19 18   referring to my assertion about the sensitive company

13:39:24 19   list.

13:39:34 20        Q.   She says that she would like to finalize it

13:39:37 21   with you Monday A.M.  Did you, in fact, meet with Shona

13:39:40 22   Brown to finalize the do-not-call list after this email?

13:39:44 23        A.   I don't -- I don't recall exactly when I met

13:39:46 24   with her, but she was -- I don't -- I don't recall,

13:39:52 25   actually.

13:39:53  1      Q.   Okay.  Do you know whether any of Google's

13:39:58  2   senior executives approved the do-not-call list?

13:40:02  3      A.   I didn't have visibility into their approval

13:40:08  4   process, because it was in the EMG session, and so I

13:40:12  5   didn't have any visibility what their approvals were.

13:40:17  6           MR. HARVEY:  14, please.  Please mark this as

13:40:26  7   Exhibit 180.

13:40:27  8           (Exhibit 180 was marked for identification.)

13:40:39  9           MR. HARVEY:  Exhibit 180 is a document produced

13:40:42 10   GOOG-00007731.

13:41:07 11      Q.   This is -- I should say that the first in time

13:41:09 12   email in this document, it appears as though Shona Brown

13:41:12 13   sent this to the EMG cc'ing Judy Gilbert, Stacy Sullivan,

13:41:20 14   and yourself.  Did you receive this email on October 4th,

13:41:23 15   2005?

13:41:23 16      A.   Based on the structure of this, it looks like I

13:41:26 17   did.

13:41:26 18      Q.   Okay.  She reiterates the language in your --

13:41:37 19   from Exhibit 179, and with the -- with a preface in

13:41:47 20   brackets that says, "Omid, Check with Arnnon before you

13:41:50 21   go live with this."  Did Omid check with you before going

13:41:56 22   live with this?

13:41:58 23           MR. RUBIN:  Objection.  Lacks foundation to

13:42:00 24   your initial sentence.

13:42:02 25           THE WITNESS:  I'm sorry.  Dean, I don't -- I

| | | |
|---|---|---|
| 13:42:04 | 1 | don't recall actually if he did. |
| 13:42:06 | 2 | BY MR. HARVEY: |
| 13:42:08 | 3 | Q.   And then she says, "Joan, Please confirm with |
| 13:42:11 | 4 | Arnnon that you are comfortable with this final wording." |
| 13:42:14 | 5 | Did she confirm with you that she was |
| 13:42:16 | 6 | comfortable with it? |
| 13:42:21 | 7 | A.   I don't -- I don't recall if she did or not. |
| 13:42:23 | 8 | It was a while ago. |
| 13:42:25 | 9 | Q.   And then in the email that you weren't cc'ed on |
| 13:42:28 | 10 | apparently, the first one at the top, is an email from |
| 13:42:31 | 11 | Eric Schmidt to Shona Brown, and Eric Schmidt says, "This |
| 13:42:38 | 12 | looks very good, Eric."  Did Shona Brown ever communicate |
| 13:42:41 | 13 | to you that Eric Schmidt approved the do-not-call list as |
| 13:42:47 | 14 | drafted in this document? |
| 13:42:48 | 15 | A.   Actually, I recall in that piece, but I do |
| 13:42:52 | 16 | recall she said that -- that to please go -- please go |
| 13:42:56 | 17 | ahead and proceed with the do-not-call list.  So I don't |
| 13:42:59 | 18 | recall that in any other conversation. |
| 13:43:06 | 19 | Q.   Did you speak with anyone about when or whether |
| 13:43:11 | 20 | this do-not-call list was presented to the EMG? |
| 13:43:16 | 21 | A.   I -- I didn't -- I -- based -- I only have the |
| 13:43:19 | 22 | recollection basically on this -- what's in Shona's |
| 13:43:23 | 23 | email, but I don't have a recollection of what you're |
| 13:43:27 | 24 | referring to. |
| 13:43:28 | 25 | Q.   So aside from this email, just sitting here |

13:43:30  1   today, do you have any recollection of whether the EMG --

13:43:33  2   or any knowledge of whether the EMG reviewed and

13:43:36  3   discussed the do-not-call list?

13:43:40  4        A.   Again, it was -- I apologize.  It was a

13:43:43  5   separate group, and that was the executive management

13:43:45  6   group, and then I came back, I think Shona came back and

13:43:49  7   said, go ahead and go live with the list.  So I don't

13:43:52  8   know what conversations happened.

13:43:54  9        Q.   Okay.  Do you have any knowledge of whether the

13:44:51 10   do-not-call list was shared outside of Google?

13:44:56 11        A.   As I mentioned before, I was -- I was all --

13:45:01 12   internally focused.  I had no visibility outside of that.

13:45:05 13   I just managed my staffing team and making sure that

13:45:09 14   the -- they had this as part of our structure.  That's

13:45:14 15   all.

13:45:14 16        Q.   So you have no knowledge either way whether the

13:45:16 17   do-not-call list was communicated outside of Google?

13:45:19 18        A.   I -- I had no visibility to anything besides

13:45:23 19   what I did in my job.

13:45:24 20        Q.   And by "visibility," do you mean that to be

13:45:26 21   synonymous with knowledge?

13:45:27 22        A.   To the best of my recollection -- of my memory,

13:45:29 23   I -- I -- I -- it was never -- I never knew of any

13:45:38 24   instance where this was communicated outside of the

13:45:40 25   company, ever.

13:45:45  1          Q.   Do you recall any discussion of whether -- if

13:45:48  2     it were communicated it would be better to do it

13:45:52  3     verbally, because it's best not to do it in writing?

13:45:59  4               MR. RUBIN:  Objection.  Lacks foundation.

13:46:00  5               THE WITNESS:  Back to my previous comment, I --

13:46:01  6     there was -- there was no discussion about it at all,

13:46:03  7     that I -- zero.  So I just worked on my internal team to

13:46:07  8     make sure they followed the protocol.

13:46:11  9               MR. HARVEY:  Please mark this as Exhibit 181.

13:46:13 10               (Exhibit 181 was marked for identification.)

13:46:25 11               MR. HARVEY:  Exhibit 181 is a document

13:46:27 12     produced, stamped GOOG-00058410.

13:46:36 13          Q.   Mr. Geshuri, if you look to the back of the

13:46:38 14     document, this is the same -- I mean it starts out as the

13:46:44 15     same email that you received on October 4th, 2005, from

13:46:48 16     Shona Brown, and then -- and then after that you're taken

13:46:56 17     off the cc list in further communications.  So the next

13:46:59 18     one in time is Eric Schmidt, this is from the document I

13:47:03 19     just showed you, where he says, "This looks very good,

13:47:06 20     Eric."  It appears that Shona Brown then forwarded that

13:47:10 21     to Omid, and Omid responded, "Great.  Can I edit and

13:47:14 22     forward the core policy to eBay/PP (only their respective

13:47:21 23     organizations listed, of course)?"

13:47:24 24               Did you ever speak with Omid about him

13:47:27 25     forwarding the core policy to eBay?

Deposition of Arnnon Geshuri                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

13:47:31  1        A.   Again, I -- very clear, I had no conversation

13:47:34  2    outside of my responsibilities.  So that never happened.

13:47:40  3        Q.   It never happened as far as you know, correct?

13:47:42  4        A.   From my interaction.  I never --

13:47:47  5        Q.   And then Shona Brown responds to Omid and she

13:47:50  6    says, "I am fine with this."

13:47:52  7             Then she says, "Eric - any concerns with Omid

13:47:55  8    sharing with eBay/PP the rules as they pertain to them?"

13:47:59  9             And then Eric Schmidt responds, "I would prefer

13:48:03 10    that Omid do it verbally since I don't want to create a

13:48:07 11    paper trail over which we could be sued later?  Not sure

13:48:10 12    about this.  Thanks, Eric."

13:48:12 13             Shona Brown responds, "Makes sense to do it

13:48:15 14    orally.  I agree."

13:48:20 15             Does this refresh your recollection about any

13:48:23 16    discussions you had with anybody about sharing the

13:48:25 17    do-not-call list with anyone outside of Google?

13:48:28 18        A.   My previous testimony is still consistent, I

13:48:31 19    never had any conversation around that.  I was -- my job

13:48:34 20    was internally focused to run the -- run the

13:48:37 21    organization.  That's it.  So I never talked to anybody

13:48:39 22    about it.

13:48:40 23        Q.   Did -- did you instruct your team not to

13:48:44 24    communicate the do-not-call list to anyone outside of

13:48:47 25    Google?

13:48:52  1      A.   I don't think I ever -- I don't think I ever

13:48:56  2    talked about the topic.  It was more of -- this was just

13:48:59  3    the -- a guideline that we had to follow, and that was

13:49:02  4    really it.  There was really nothing more than that.

13:49:35  5              MR. HARVEY:  Please mark this as Exhibit 182.

13:49:48  6              (Exhibit 182 was marked for identification.)

13:49:48  7              MR. HARVEY:  Exhibit 182 is a document produced

13:49:50  8    stamped GOOG-00008283.

13:49:59  9      Q.   It is a document with the title, "Special

13:50:01 10    Agreement Hiring Policy - Protocol for 'Do Not Cold Call'

13:50:04 11    and 'Sensitive' Companies."

13:50:08 12              Have you seen this document before?

13:50:10 13      A.   Yes, I have.

13:50:11 14      Q.   And I'll represent that based upon the

13:50:21 15    metadata, this document was produced from your files.

13:50:29 16              This is the formal do-not-call list, correct?

13:50:32 17      A.   It looks like it -- yeah.  This just looks like

13:50:34 18    the one that we had posted.

13:50:36 19      Q.   And this is the one that you were in charge of

13:50:39 20    communicating to your team, correct?

13:50:42 21      A.   I made sure the team was -- was definitely

13:50:44 22    aware of this protocol.

13:50:49 23      Q.   And, again -- well, first, this formal

13:50:55 24    do-not-call list here, it was reviewed by other people at

13:51:00 25    Google, correct?

Deposition of Arnnon Geshuri                              In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

13:51:01  1        A.    Only based on the email trail, that's to my

13:51:07  2    knowledge, that EMG, but then I posted it once I got

13:51:11  3    approval to do that.

13:51:12  4        Q.    And here again, you used the word "agreement"

13:51:14  5    twice, in the title of the document and then below in the

13:51:19  6    text.  The document begins, "The following companies have

13:51:22  7    special agreements with Google."

13:51:29  8             Did you stick with the word "agreement" because

13:51:31  9    it sounded good?

13:51:31 10        A.    Yeah --

13:51:32 11             MR. RUBIN:  Objection.  Lacks foundation.

13:51:33 12             THE WITNESS:  Yeah, it was just my wording,

13:51:34 13    wasn't -- nothing more than that.

13:51:35 14    BY MR. HARVEY:

13:51:36 15        Q.    Did anyone at the EMG or Shona Brown tell you

13:51:39 16    to use a different word?

13:51:44 17        A.    I -- I had -- I had no edits from -- from when

13:51:46 18    I originally did this, so it was just basically some

13:51:49 19    wording I put down on paper.

13:51:51 20        Q.    In the document there are effective dates for

13:51:58 21    different categories of companies.  The first is

13:52:00 22    effective March 6th, 2005.  And in it it lists Genentech,

13:52:05 23    Intel Corporation, Apple Computer, PayPal Incorporated,

13:52:09 24    and Comcast Corporation.  What did you mean here by an

13:52:14 25    effective date of March 6, 2005?

13:52:26  1      A.   If I -- if I recall correctly, it was just

13:52:29  2  companies came on and off the list, so sometimes I would

13:52:32  3  put the date of when they came on so people had a little

13:52:35  4  bit of a knowledge base.  It just -- it helped in keeping

13:52:38  5  it organized.  That's all.

13:52:40  6      Q.   And who would tell you whether to put a company

13:52:43  7  on or off of the do-not-call list?

13:52:46  8      A.   It was usually an EMG member.

13:52:50  9      Q.   Could you please list the specific individuals

13:52:54 10  in your recollection that -- that told you when to -- to

13:52:58 11  add or remove a company on the do-not-call list?

13:53:02 12      A.   I -- I mostly interfaced with Shona Brown,

13:53:04 13  and -- who was my -- was my manager, along with Laszlo.

13:53:10 14  So they usually instructed me about protocol, and I --

13:53:15 15  that's the people I had.  They just told me what to do on

13:53:19 16  that.

13:53:19 17      Q.   Did you ever receive an instruction from Eric

13:53:21 18  Schmidt about what companies to add or take off the

13:53:25 19  do-not-call list?

13:53:26 20      A.   As I recall, it usually originated from Shona

13:53:30 21  who came -- broached the topic with me or just told me

13:53:33 22  the company it should go on, as far as I recall.

13:53:36 23      Q.   So you have no recollection of anyone aside

13:53:38 24  from Shona Brown and Laszlo?

13:53:41 25      A.   Not that my -- not that I remember.  They

13:53:43  1   usually, because they were in charge of staffing, they

13:53:47  2   usually told me what to do.

13:53:48  3       Q.   Okay.  When Shona Brown and Laszlo Bock told

13:54:00  4   you to take a company off a list or to add a company, did

13:54:03  5   you ever discuss with them why a company was being added?

13:54:08  6       A.   I honestly did not get in specifics about that.

13:54:12  7   This was -- again, the protocol was more of a nuisance

13:54:16  8   for me anyway.  So they just gave me instruction.  But I

13:54:19  9   didn't go into any detail around it at all.

13:54:24  10      Q.   Did they ever provide any explanation about why

13:54:27  11  a company would be taken off the list?

13:54:31  12      A.   Again, not to my recollection.  They just said

13:54:35  13  I was -- it was pretty -- it was pretty simple

13:54:38  14  conversation, as they said just remove or take off, and I

13:54:41  15  would just do it and go about my business.

13:55:08  16           MR. HARVEY:  Please mark this as Exhibit 183.

13:55:10  17           (Exhibit 183 was marked for identification.)

13:55:30  18           MR. HARVEY:  This document was produced Bates

13:55:32  19  stamped GOOG-00008342.

13:55:41  20      Q.   And this appears to be an update on the same

13:55:44  21  list.  This one, if you look on the bottom left, there is

13:55:48  22  a revision date, and this appears to be January 7th of

13:55:53  23  2008.  Does that indicate the date that the

13:55:58  24  do-not-cold-call policy was revised as reflected on this

13:56:03  25  document?

| | |
|---|---|
| 14:15:51 | 1 |
| 14:15:54 | 2 |
| 14:15:57 | 3 |
| 14:16:01 | 4 |
| 14:16:06 | 5 |
| 14:16:10 | 6 |
| 14:16:13 | 7 |
| 14:16:19 | 8 |
| 14:16:22 | 9 |
| 14:16:24 | 10 |
| 14:16:28 | 11 |
| 14:16:32 | 12 |
| 14:16:36 | 13 |
| 14:16:42 | 14 |
| 14:16:49 | 15 |
| 14:16:51 | 16 |
| 14:16:56 | 17 |
| 14:17:00 | 18 |
| 14:17:03 | 19 |
| 14:17:05 | 20 |
| 14:17:08 | 21 |
| 14:17:11 | 22 |
| 14:17:13 | 23 |
| 14:17:15 | 24 |
| 14:17:19 | 25 |

Q.   And the next line is on the same topic, "YES to
DNC candidates on networking sites," and then "(ONLY
IF)," in all caps, "they indicate they are looking AND,"
and "AND" is in all caps, "they provide their personal
email or phone number.  We can never initially contact a
DNC candidate at their current work address.  The key is
the DNC candidate is initiating the 'I am looking' and
there is written proof.  We should document that they've
indicated they were looking in the notes of the leads
system/ATS."

What written proof are you referring to here?

A.   It's -- it's pretty -- pretty general,
actually.  The -- the -- the -- the -- basically what --
what we had asked the -- the recruiters to do would be to
look at whether it's through the referral program that
someone had -- had reached out to, whether it's people
have emailed us, whether there is -- there is some proof.
I really want the recruiters to abide by the do-not-call
list.

So if -- if they're referred, there is a note
that says they were looking, and so forth, all of that is
open to the recruiters.  Just find some documentation
that actually said that the person is interested, whether
they clicked the box on LinkedIn, or whether they were
referred, and that would suffice.  So it's pretty broad.

| | | |
|---|---|---|
| 14:17:22 | 1 | Q.   Okay.  And then you say, "Here is the most |
| 14:17:24 | 2 | sticky one: |
| 14:17:25 | 3 | "For DNC candidates referred by other leads, we |
| 14:17:30 | 4 | need to make this squeaky clean." |
| 14:17:32 | 5 | And this includes the employee referral |
| 14:17:35 | 6 | program, correct? |
| 14:17:46 | 7 | MR. RUBIN:  Did you ask him, I'm sorry? |
| 14:17:48 | 8 | MR. HARVEY:  Yes, there is a question pending. |
| 14:17:49 | 9 | MR. RUBIN:  I'll just ask to repeat it. |
| 14:17:49 | 10 | MR. HARVEY:  Could you please repeat the |
| 14:17:49 | 11 | question? |
| 14:18:01 | 12 | (Record was read as follows:  "QUESTION:  Okay. |
| 14:18:01 | 13 | And then you say, 'Here is the most sticky one.  For DNC |
| 14:18:01 | 14 | candidates referred by other leads, we need to make this |
| 14:18:01 | 15 | squeaky clean.'  And this includes the employee referral |
| 14:18:01 | 16 | program, correct?") |
| 14:18:04 | 17 | THE WITNESS:  Well, so in this case, I believe |
| 14:18:11 | 18 | you're referring to the DNC candidates referred by other |
| 14:18:14 | 19 | leads, means other external candidates.  So the referral |
| 14:18:18 | 20 | program is primarily for the employees of the company. |
| 14:18:23 | 21 | So this would be if -- if we found out from a third party |
| 14:18:26 | 22 | that a person is interested, then we need to follow up |
| 14:18:28 | 23 | with that appropriately. |
| 14:18:31 | 24 | BY MR. HARVEY: |
| 14:18:32 | 25 | Q.   Well, I think -- why don't I go through it, |

14:18:34  1   because I think you might modify that, given the context

14:18:38  2   of this.  Why don't we -- just for this purpose, and then

14:18:42  3   we will go up and go through everything, but for the --

14:18:44  4   the second bullet point under this, it starts, "If a

14:18:48  5   Google employee indicates someone from a DNC company is

14:18:52  6   looking, we first need to make sure that the Googler did

14:18:56  7   not source this candidate."  And then in parentheses,

14:18:59  8   "(All Googlers fall under the same DNC rules).  If the

14:19:05  9   Googler did reach out and initiate first contact (for

14:19:09  10  example, at a cocktail party)" --

14:19:12  11       A.    Uh-huh.

14:19:12  12       Q.    -- "then we should walk away and not pursue the

14:19:15  13  lead."

14:19:16  14             So this discussion here concerns the employee

14:19:19  15  referral program, correct?

14:19:21  16       A.    On the second bullet, it would be -- may I read

14:19:26  17  it one more time, if you don't mind?

14:19:28  18       Q.    Well, it is right there in front of you.

14:19:30  19       A.    Yeah, I know.  Yeah, so that portion, I guess I

14:19:47  20  was looking at the first bullet originally, the second

14:19:50  21  portion is a lead.  So this was -- yeah, if a Googler

14:19:59  22  found somebody, I just -- I want to make sure that as a

14:20:01  23  company we were just doing the right thing.

14:20:05  24       Q.    And doing the right thing here --

14:20:07  25       A.    Is following the agreed -- you know, following

14:20:11  1   the protocol.

14:20:16  2        Q.   While we're on this bullet, I'll just finish

14:20:18  3   reading it.

14:20:19  4        A.   Okay.

14:20:19  5        Q.   "If the DNC candidate initiated contact and

14:20:23  6   approached the Googler at the same party, we should

14:20:26  7   communicate through the Googler that the lead needs to

14:20:29  8   contact us directly in writing or through jobs@google and

14:20:34  9   explicitly indicate that they are looking.  We need a

14:20:38  10  very clear paper trail that we did not proactively pursue

14:20:42  11  this candidate.  If we cannot come up with a good paper

14:20:45  12  trail, then we should most likely walk away from the

14:20:48  13  lead.  And, we can never initially contact a DNC

14:20:51  14  candidate at their current work address."

14:20:54  15       A.   Sure.

14:20:55  16       Q.   Okay.  So -- okay.

14:21:00  17            Actually, let's go up to the first bullet.

14:21:03  18            MR. RUBIN:  So you don't have a question about

14:21:04  19  that, what you just read?

14:21:06  20            MR. HARVEY:  No.

14:21:07  21            MR. RUBIN:  Okay.

14:21:07  22  BY MR. HARVEY:

14:21:08  23       Q.   I'm going to the first bullet.  "If a lead or a

14:21:10  24  reference indicates that someone from a DNC company is

14:21:13  25  looking, we need to message through the lead/reference to

| | | |
|---|---|---|
| 15:16:49 | 1 | Q.    Is this an email you wrote on March 8, 2007, to |
| 15:16:52 | 2 | Sue Polo and Swan Boon? |
| 15:16:55 | 3 | A.    According to this, yes. |
| 15:16:57 | 4 | Q.    And who was Sue Polo? |
| 15:17:02 | 5 | A.    She was a staffing leader and Swan was also a |
| 15:17:07 | 6 | lead recruiter at the time, both in my organization. |
| 15:17:12 | 7 | Q.    And you write, "I am getting pressure to |
| 15:17:14 | 8 | terminate Stephanie immediately and walk her out." |
| 15:17:18 | 9 | What pressure are you referring to here? |
| 15:17:22 | 10 | A.    In this case, again, I'm held accountable to my |
| 15:17:26 | 11 | team, and -- and when I -- in this case I spoke to -- to |
| 15:17:35 | 12 | Shona, and she said if there is a good -- a good reason |
| 15:17:39 | 13 | why we reached out, that would be great; but if not, you |
| 15:17:43 | 14 | need to think about termination of this person, because |
| 15:17:47 | 15 | they went against the do-not-call list. |
| 15:17:49 | 16 | Q.    What would have counted as a good reason? |
| 15:17:52 | 17 | A.    As it -- as it states in the -- in the policy |
| 15:17:55 | 18 | itself, so if -- if we found that there was -- this |
| 15:17:58 | 19 | person expressed interest in us, they applied to us, |
| 15:18:01 | 20 | they -- anything that showed that they had previously -- |
| 15:18:06 | 21 | the candidate or -- had previously approached us, that |
| 15:18:09 | 22 | would count as a good reason that they expressed |
| 15:18:12 | 23 | interest.  That would be fine. |
| 15:18:20 | 24 | Q.    And in this case, there were no such good |
| 15:18:23 | 25 | reasons, correct? |

| | | |
|---|---|---|
| 15:18:24 | 1 | A.    I did my due diligence, and there was no such |
| 15:18:27 | 2 | good reason. |
| 15:18:30 | 3 | MR. HARVEY:  No. 36. |
| 15:18:52 | 4 | Please mark this as the next exhibit. |
| 15:19:03 | 5 | THE REPORTER:  Exhibit 192. |
| 15:19:04 | 6 | (Exhibit 192 was marked for identification.) |
| 15:19:04 | 7 | MR. HARVEY:  Exhibit 192 is a document stamped |
| 15:19:06 | 8 | GOOG-00000107. |
| 15:19:11 | 9 | Q.    Please let me know once you've had a chance to |
| 15:19:13 | 10 | examine the document. |
| 15:19:14 | 11 | A.    Thanks, Dean.  Okay. |
| 15:19:32 | 12 | Q.    Did Shona Brown write this email to you cc'ing |
| 15:19:35 | 13 | Eric Schmidt, Laszlo Bock, and Judy Gilbert on March 11 |
| 15:19:40 | 14 | of 2007? |
| 15:19:41 | 15 | A.    It looks like that's the case. |
| 15:19:45 | 16 | Q.    It looks like this is her response to an email |
| 15:19:48 | 17 | that we just saw, and before I get to Shona's email, I |
| 15:19:54 | 18 | just want to say that, you know, in part of the email she |
| 15:19:57 | 19 | is responding to the one that you wrote, you said that -- |
| 15:20:02 | 20 | that the Apple -- I'm sorry -- that the sourcer will be |
| 15:20:04 | 21 | terminated within the hour. |
| 15:20:07 | 22 | Shona Brown responds, "Appropriate response. |
| 15:20:10 | 23 | Please make a public example of this termination with the |
| 15:20:14 | 24 | group." |
| 15:20:15 | 25 | Did you make a public example of the |

15:20:22  1    termination of Stephanie Buran?

15:20:25  2              MR. RUBIN:  Objection.  Vague.

15:20:35  3              THE WITNESS:  I actually honestly don't recall

15:20:37  4    how I responded to this.  I do know that -- that -- I do

15:20:45  5    recall sending out the -- sending out the do-not-call

15:20:50  6    policy one more time after this incident and letting

15:20:55  7    people know that it is really super important to adhere

15:20:58  8    to the protocols as we designed -- as we designed

15:21:01  9    internally, and -- but I don't recall any additional

15:21:05 10    public example that I did beyond that.

15:21:07 11    BY MR. HARVEY:

15:21:12 12         Q.   You then said, "Please also make it a very

15:21:14 13    strong part of new hire training for the group."  Did you

15:21:19 14    make it a very strong part of new hire training for your

15:21:25 15    group?

15:21:25 16         A.   As I recall, I did ask within our onboarding

15:21:31 17    process for new recruiters to make sure that the -- that

15:21:34 18    there was explicit mention of the do-not-call list so

15:21:38 19    that people were educated upfront, and make sure that

15:21:41 20    they had knowledge of the -- of the internal policy.

15:22:46 21              MR. HARVEY:  I'm going to move on to a slightly

15:22:48 22    different topic, which is how the do-not-call -- the

15:22:53 23    do-not-call list applied to Intuit.

15:23:15 24              Please mark this as the next exhibit.

15:23:27 25              THE REPORTER:  Exhibit 193.

| | | |
|---|---|---|
| 15:23:31 | 1 | MR. HARVEY:  Exhibit 193 is a document produced |
| 15:23:33 | 2 | with the stamp GOOG-00000090. |
| 15:23:39 | 3 | (Exhibit 193 was marked for identification.) |
| 15:23:43 | 4 | BY MR. HARVEY: |
| 15:23:43 | 5 | Q.   Please let me know once you've had a chance to |
| 15:23:48 | 6 | look at the document. |
| 15:24:41 | 7 | A.   Okay. |
| 15:24:41 | 8 | Q.   This is an email chain that you are not cc'ed |
| 15:25:08 | 9 | on, but you're referred to.  So I'm just going to use it |
| 15:25:11 | 10 | as a way to frame questions and hopefully refresh any |
| 15:25:15 | 11 | memory that you may have about the topics described. |
| 15:25:17 | 12 | This email chain begins -- and I'll -- when I |
| 15:25:19 | 13 | say "begin," I mean first in time -- with an email from |
| 15:25:24 | 14 | Kim Van der Zon from Egon Zehnder International.  This is |
| 15:25:30 | 15 | a recruiting firm you were describing earlier, correct? |
| 15:25:34 | 16 | A.   This is the one I was referring to earlier, |
| 15:25:36 | 17 | yes. |
| 15:25:37 | 18 | Q.   And here Kim Van der Zon contacts Mark Schar at |
| 15:25:45 | 19 | Intuit about an opening at Google, correct? |
| 15:25:48 | 20 | A.   I'm -- I'm reading the document as you are. |
| 15:25:51 | 21 | Q.   Do you have any independent knowledge that this |
| 15:25:55 | 22 | happened? |
| 15:25:55 | 23 | A.   I have no context at all of it. |
| 15:26:00 | 24 | Q.   It looks like Bill Campbell forwards this to |
| 15:26:04 | 25 | Jonathan Rosenberg at Google, among other undisclosed |

16:52:36  1        Q.   Okay.  So the first email in the string is an

16:52:40  2    email from Scott McNealy at Sun to Eric Schmidt on

16:52:46  3    January 10th, 2006.  Scott McNealy was the head of Sun at

16:52:53  4    the time; correct?

16:52:55  5        A.   I believe he was still the head of Sun.

16:52:58  6        Q.   And Scott McNealy wrote, "Can we talk about

16:53:02  7    Google's hiring of Sun folks?  It is beyond acceptable.

16:53:06  8    I'm around all week."  Then it gets forwarded to the EMG

16:53:15  9    group by Eric Schmidt, and Eric says, "Any idea on what I

16:53:21 10    should say to Scott?  How bad is the problem?"

16:53:25 11             And it looks like Jonathan Rosenberg loops you

16:53:29 12    in and says, "Arnnon, can you get us an analysis of the

16:53:32 13    number of Sun folks you've hired by month over the last

16:53:35 14    year?  I've seen a few recently."

16:53:39 15             Then you write, "I already sent an email

16:53:42 16    earlier today.  We are already working on this!"

16:53:46 17             MR. RUBIN:  You said you wrote -- isn't --

16:53:48 18             MR. HARVEY:  I'm sorry.  Thank you for the

16:53:49 19    clarification.  The top email is an email that Shona

16:53:52 20    Brown wrote -- including Arnnon Geshuri.

16:53:59 21        Q.   Did you, in fact, do an analysis of the number

16:54:01 22    of Sun folks that Google hired by month over the last

16:54:05 23    year?

16:54:05 24        A.   It was a common part of my job to -- if they

16:54:10 25    had a question about penetration into a certain company,

16:54:13   1   to go ahead and do a report of what the pipeline looked

16:54:17   2   like.  So I'm sure I produced the report.

16:54:20   3        Q.   When you say common part of your job, are you

16:54:23   4   referring to communication from another company to Eric

16:54:24   5   Schmidt that would prompt the fire drill, which would be

16:54:29   6   getting the facts of Google's recruiting efforts so that

16:54:32   7   Eric Schmidt could have a conversation with that person

16:54:34   8   from another company?

16:54:35   9        A.   No.

16:54:36  10             MR. RUBIN:  Objection.  Lacks foundation.

16:54:38  11             THE WITNESS:  No.  And I'll clarify that.  I'm

16:54:40  12   fine with that.  No.  I -- it depends on the source.

16:54:43  13   Sometimes it is just a general question internally,

16:54:46  14   whether there is a penetration into a certain company.

16:54:48  15   So I just produced the spreadsheets when needed.  Anybody

16:54:52  16   could ask internally how we're doing on a recruiting

16:54:56  17   perspective.  So it was just a -- part of the job to

16:54:59  18   produce a pipeline report.

16:55:00  19   BY MR. HARVEY:

16:55:02  20        Q.   How often did this kind of thing happen?  And

16:55:09  21   when I say "this kind of thing," I'm referring to what I

16:55:11  22   just described, which is the communication from another

16:55:14  23   company to Eric Schmidt or someone senior at Google about

16:55:17  24   Google's recruiting efforts, and then you do an analysis

16:55:20  25   of Google's recruiting and report it back up to the

16:55:23  1    person who made the request.

16:55:25  2               MR. RUBIN:  Objection.  Vague.

16:55:26  3               THE WITNESS:  Yeah.  So -- so I get requests

16:55:30  4    occasionally.  That means my staffing team is doing a

16:55:35  5    good job recruiting from a whole bunch of companies, and

16:55:38  6    I just provide transparency into the pipeline, it looks

16:55:42  7    like.  So it was -- it was not a -- not an issue to

16:55:45  8    produce those.

16:55:45  9    BY MR. HARVEY:

16:55:47  10         Q.   Sometimes the good job that your group was

16:55:51  11   doing would result in these kinds of -- in these kinds of

16:55:57  12   emails from other companies, correct?

16:55:58  13        A.   When -- when we were -- I'll rephrase that.

16:56:02  14             When we were being very effective, and we were,

16:56:04  15   as a staffing team, we would have occasionally notes from

16:56:09  16   companies that noticed that we were taking their top

16:56:12  17   talent.

16:56:14  18        Q.   And sometimes those notes resulted in those

16:56:17  19   companies being added to the do-not-call list, correct?

16:56:20  20             MR. RUBIN:  Objection.  Lacks foundation.

16:56:22  21             THE WITNESS:  Again, I -- as I stated before, I

16:56:24  22   don't know the rationale a lot of times regarding why

16:56:27  23   things were added.  I would get my -- my instructions

16:56:32  24   from Shona, who would say, would you please add this, but

16:56:35  25   I didn't really ask about the rationale.  I just went and

16:56:39 1   administered and made sure the team was still effective.

16:56:42 2   BY MR. HARVEY:

16:56:42 3       Q.   Did you notice the correlation between letters

16:56:45 4   from these other companies and requests from Shona Brown

16:56:49 5   to add companies to the do-not-call list?

16:56:52 6           MR. RUBIN:  Objection.  Calls for speculation;

16:56:53 7   lacks foundation.

16:56:57 8           THE WITNESS:  Again, I -- I -- I just received

16:56:59 9   instructions.  I mean it was -- it was pretty simple

16:57:03 10  where EMG would make a decision, and -- that I was not

16:57:07 11  privy to, and through Shona, and they would ask me to

16:57:12 12  occasionally modify the do-not-call list.  I don't know

16:57:16 13  all the rationale, the reasons behind it.  It -- it was

16:57:19 14  not my responsibility to know that.  I just wanted to

16:57:24 15  recruit.

16:57:24 16  BY MR. HARVEY:

16:57:25 17      Q.   And apart from the rationale, I'd like to ask

16:57:28 18  about the timing.  Did you notice that requests from

16:57:32 19  Shona Brown to add companies to the do-not-call list

16:57:35 20  tended to coincide with these kinds of communications

16:57:39 21  where there would be a complaint from another company?

16:57:43 22          MR. RUBIN:  Objection.  Vague; calls for

16:57:44 23  speculation.

16:57:45 24          THE WITNESS:  Again, I -- I didn't really focus

16:57:50 25  on the trends on this.  I just -- I just focused on if

| | | |
|---|---|---|
| 16:57:55 | 1 | they asked me to do something different, I'd go ahead and |
| 16:57:58 | 2 | do that.  So it wasn't really my responsibility, and it |
| 16:58:02 | 3 | was noise to me anyway.  I just went ahead and delivered |
| 16:58:05 | 4 | as -- as an organization. |
| 16:58:06 | 5 | BY MR. HARVEY: |
| 16:58:07 | 6 | Q.  Well, just sitting here and thinking about it, |
| 16:58:10 | 7 | because you were privy to both when a company would be |
| 16:58:14 | 8 | added to a do-not-call list and when you would have to do |
| 16:58:17 | 9 | this kind of fire drill, correct? |
| 16:58:20 | 10 | MR. RUBIN:  So that mischaracterizes prior |
| 16:58:22 | 11 | testimony and documents.  Objection.  Vague. |
| 16:58:30 | 12 | THE WITNESS:  Can I -- can you repeat it, sir? |
| 16:58:33 | 13 | BY MR. HARVEY: |
| 16:58:34 | 14 | Q.  Why don't I break it up. |
| 16:58:35 | 15 | You were the person who -- who added or removed |
| 16:58:39 | 16 | companies from the do-not-call list, correct? |
| 16:58:41 | 17 | A.  It was my responsibility to maintain the list. |
| 16:58:43 | 18 | Q.  Okay.  And you are also the person who would |
| 16:58:47 | 19 | put together an analysis of recruiting efforts that |
| 16:58:50 | 20 | responded to the nice letters from other companies to |
| 16:58:54 | 21 | Google, correct? |
| 16:58:55 | 22 | MR. RUBIN:  Objection.  Mischaracterizes prior |
| 16:58:56 | 23 | testimony in terms of referencing a comment to "nice |
| 16:59:02 | 24 | letters"; to this email at least. |
| 16:59:05 | 25 | THE WITNESS:  As I testified, whenever requests |

16:59:07  1    would come in, regardless of -- regardless, they would

16:59:11  2    ask how we're doing with penetration on a certain

16:59:14  3    company, how we were doing recruiting, and I would

16:59:17  4    produce a report.

16:59:18  5    BY MR. HARVEY:

16:59:18  6        Q.   And they would often ask you, correct?

16:59:20  7        A.   They would come to me first.

16:59:22  8        Q.   So you had these responsibilities.  I'm asking

16:59:23  9    not what you were focused on at the time or what your

16:59:26 10    goals were, but sitting here now, and looking back, was

16:59:29 11    there a correlation, was there a relationship between

16:59:34 12    when you were asked to add a company to the do-not-call

16:59:36 13    list and when you ran these kinds of reports?

16:59:39 14            MR. RUBIN:  Objection.  Calls for speculation;

16:59:41 15    lacks foundation.

16:59:43 16            THE WITNESS:  I had many more requests to run

16:59:46 17    reports than what I've seen here so far.  And I was

16:59:54 18    always producing some type of data for the company to

16:59:57 19    look at how we're -- how we were being effective.  So I

17:00:00 20    had a whole pool, and this was just one or two examples

17:00:05 21    of this particular situation, but I was asked plenty of

17:00:08 22    times to build metrics and reports on pipeline in a

17:00:12 23    variety of situations.  So it was pretty broad.

17:00:16 24    BY MR. HARVEY:

17:00:16 25        Q.   Were these reports sometimes followed by

17:00:19  1    requests to add the company that caused you to run the

17:00:23  2    report to the do-not-call list?

17:00:25  3           MR. RUBIN:  Objection.  Vague; lacks foundation

17:00:28  4    of this witness.

17:00:29  5           THE WITNESS:  Again, I did not make -- I did

17:00:32  6    not intentionally make that connection.  I was

17:00:37  7    responsible for just producing the report, and if they

17:00:39  8    came to me with a request following that, then I

17:00:42  9    complied.

17:00:43  10   BY MR. HARVEY:

17:00:43  11        Q.   Was there, in fact, a connection, regardless of

17:00:46  12   your intentions?

17:00:47  13        A.   That's -- that's outside of my -- my

17:00:48  14   responsibility, and I wasn't privy to that connection.

17:01:18  15          MR. RUBIN:  Dean, how much time do you think

17:01:20  16   you have left?  I'm just trying to decide whether we

17:01:23  17   should take another short break before you wrap up, or if

17:01:26  18   you have 10 or 15 minutes, we can keep going.

17:01:30  19          MR. HARVEY:  I have more time than that.  I

17:01:32  20   have -- well, we can take a break now.  That's fine.

17:01:38  21          MR. RUBIN:  How much time is left?

17:01:39  22          THE VIDEOGRAPHER:  We have about 38 minutes.

17:01:41  23          MR. RUBIN:  Let's take a short break.

17:01:44  24          THE VIDEOGRAPHER:  We're going off the record.

17:01:44  25   The time is 5:01 p.m.

| | | |
|---|---|---|
| 17:01:46 | 1 | (Recess was taken.) |
| 17:08:19 | 2 | THE VIDEOGRAPHER:  The time is 5:08.  We're |
| 17:08:21 | 3 | going back on the record. |
| 17:08:25 | 4 | BY MR. HARVEY: |
| 17:08:35 | 5 | Q.   As the do-not-call list operated over time, did |
| 17:08:39 | 6 | your recruiters ever express frustration to you that they |
| 17:08:43 | 7 | were being limited by the do-not-call list in terms of |
| 17:08:46 | 8 | their ability to recruit? |
| 17:08:49 | 9 | A.   The recruiters had full authority to work -- to |
| 17:08:53 | 10 | work all the different methodologies to find a person, |
| 17:08:57 | 11 | so -- so they -- they used the employee referral program, |
| 17:09:01 | 12 | they used the jobsite, different ways through to get to |
| 17:09:06 | 13 | people.  So they were just creative, and it never |
| 17:09:10 | 14 | hindered them from finding a great flow of talent from |
| 17:09:13 | 15 | any of the companies. |
| 17:09:20 | 16 | Q.   But the do-not-call list did impose |
| 17:09:22 | 17 | restrictions and rules on how they went about recruiting, |
| 17:09:26 | 18 | correct? |
| 17:09:28 | 19 | A.   You saw the -- the -- the -- how it was spelled |
| 17:09:32 | 20 | out in the document itself, so that was just -- we |
| 17:09:35 | 21 | followed that criteria. |
| 17:09:39 | 22 | Q.   And there could be severe penalties for |
| 17:09:44 | 23 | violating that agreement, correct? |
| 17:09:46 | 24 | MR. RUBIN:  Objection.  Vague as to "severe." |
| 17:09:50 | 25 | THE WITNESS:  We had one instance where I had |

17:09:53  1    to terminate a temp who violated the policy.

17:10:08  2              MR. HARVEY:  Please mark this as Exhibit 206.

17:10:23  3              (Exhibit 206 was marked for identification.)

17:10:24  4              MR. HARVEY:  Exhibit 206 is a document stamped

17:10:29  5    GOOG-00008249.

17:10:37  6        Q.   And please let me know once you've had a chance

17:10:39  7    to read the document.

17:10:40  8        A.   Okay.  Thanks.

17:11:15  9        Q.   Is this an email that you sent Jeff Miller on

17:11:19 10    November 4th, 2006?

17:11:20 11        A.   It looks like I had a correspondence with him

17:11:24 12    based on this.

17:11:26 13        Q.   And who is Jeff Miller?

17:11:27 14        A.   He's a recruiter.

17:11:30 15        Q.   The first email in time is an email, it looks

17:11:34 16    like you wrote it to your group, where the -- you say

17:11:38 17    that, "I would like to send out my periodic reminder to

17:11:41 18    everyone regarding the sensitive companies and

17:11:43 19    do-not-call list."  How regular were these reminders that

17:11:51 20    you sent out?

17:11:53 21        A.   They could be anywhere from four to six months.

17:11:56 22        Q.   Okay.  You also had a list of top ten documents

17:12:03 23    that people in your group could access, correct?  And the

17:12:06 24    do-not-call list was usually one of those top ten,

17:12:09 25    correct?

| | | |
|---|---|---|
| 17:12:10 | 1 | A.   I remember including that in my top ten list. |
| 17:12:15 | 2 | Q.   And here Jeff Miller responds to your reminder, |
| 17:12:19 | 3 | and he says, "I guess the candidates I have been sourcing |
| 17:12:22 | 4 | from Burger King, Jiffy Lube, and Der Wienerschnitzel are |
| 17:12:29 | 5 | still fair game.  Thanks." |
| 17:12:31 | 6 | That's sarcasm, correct? |
| 17:12:33 | 7 | A.   That was sarcasm. |
| 17:12:34 | 8 | Q.   And did you understand that to mean that he was |
| 17:12:37 | 9 | frustrated that he was limited in terms of companies he |
| 17:12:42 | 10 | could recruit from that he wanted to recruit from? |
| 17:12:45 | 11 | MR. RUBIN:  Objection.  Calls for speculation. |
| 17:12:47 | 12 | THE WITNESS:  Yeah.  I don't -- I don't know |
| 17:12:48 | 13 | what he was -- his motivation was. |
| 17:12:51 | 14 | BY MR. HARVEY: |
| 17:12:54 | 15 | Q.   And it's sarcasm because Google generally |
| 17:12:58 | 16 | doesn't source its employees from Burger King, correct? |
| 17:13:03 | 17 | MR. RUBIN:  Objection.  Calls for speculation. |
| 17:13:06 | 18 | THE WITNESS:  Consistent with my testimony, |
| 17:13:08 | 19 | wherever there is great talent, we'll find them. |
| 17:13:11 | 20 | BY MR. HARVEY: |
| 17:13:13 | 21 | Q.   Okay.  Do you know whether Google has ever |
| 17:13:21 | 22 | hired someone from Burger King? |
| 17:13:23 | 23 | A.   Right now, I have no idea if that -- if -- if |
| 17:13:26 | 24 | someone from Burger King came to us. |
| 17:13:34 | 25 | Q.   You respond, "Until we get some angry letters. |

17:13:36  1    Have a good weekend."  What did you mean by, "Until we

17:13:40  2    get some angry letters"?

17:13:44  3         A.   I was just -- I was just joking.  I don't quite

17:13:47  4    remember.  Joking with him, I guess.

17:13:50  5         Q.   And the joke is that if you got some angry

17:13:53  6    letters, then Burger King might be on the do-not-call

17:13:57  7    list, too, correct?

17:13:59  8              MR. RUBIN:  Objection.  Calls for speculation;

17:14:01  9    lacks foundation.

17:14:01  10             THE WITNESS:  Yeah.  I don't recall what we

17:14:03  11   were basing with that, but I was responding to his -- his

17:14:07  12   email.  So I don't recall what my thought was around

17:14:09  13   that.

17:14:09  14   BY MR. HARVEY:

17:14:10  15        Q.   Okay.  Was Yahoo ever on the do-not-call list?

17:14:33  16        A.   I don't remember if I ever put it on the list.

17:14:39  17        Q.   Were you ever instructed from those senior to

17:14:44  18   you to pull back on your recruiting efforts with regard

17:14:50  19   to Yahoo?

17:14:54  20        A.   There -- there was no -- again, there was --

17:14:58  21   there was no restriction from what companies we could

17:15:03  22   actually recruit out of.  So I don't -- I don't remember

17:15:05  23   any specific conversation around that.  Again, I followed

17:15:10  24   the do-not-call list, and that's -- that was my

17:15:13  25   guidelines.

17:15:17  1            MR. HARVEY:  Please mark this as Exhibit 207.

17:15:20  2            (Exhibit 207 was marked for identification.)

17:15:38  3            MR. HARVEY:  Exhibit 207 is a document produced

17:15:41  4    GOOG-00008601.

17:15:44  5       Q.   Please let me know once you've had a chance to

17:15:46  6    examine the document.

17:15:47  7       A.   Okay.  Thanks.  Okay.  Thank you.

17:17:14  8       Q.   Is this document an email you sent to Laszlo

17:17:17  9    Bock on February 7th of 2008?

17:17:21 10       A.   Based on this, it looks like I did.

17:17:22 11       Q.   If you go to the first email in time, it's an

17:17:26 12    email from Laszlo block to Eric Schmidt; Subject:

17:17:30 13    "Recruiting from Yahoo."  And Laszlo writes, "Eric, at

17:17:35 14    EMG on Monday you asked that we have our recruiting teams

17:17:39 15    start calling into Yahoo.  Have any advanced discussions

17:17:44 16    since then changed that guidance?  If not, Arnnon is

17:17:48 17    ready to get his teams moving."

17:17:50 18            Do you recall an instruction from Laszlo Bock

17:17:53 19    or from anyone else at Google to get ready to target

17:17:57 20    Yahoo for recruiting?

17:18:01 21       A.    I -- I didn't remember this until -- until this

17:18:04 22    email, but I was often asked to -- if there -- if the

17:18:11 23    company -- or if we felt based on our research there was

17:18:16 24    great talent somewhere, I was often asked to go and

17:18:18 25    research and look at different companies to find great

1              I, Rosalie A. Kramm, Certified Shorthand

2     Reporter licensed in the State of California, License No.

3     5469, hereby certify that the deponent was by me first

4     duly sworn and the foregoing testimony was reported by me

5     and was thereafter transcribed with computer-aided

6     transcription; that the foregoing is a full, complete,

7     and true record of said proceedings.

8              I further certify that I am not of counsel or

9     attorney for either of any of the parties in the

10    foregoing proceeding and caption named or in any way

11    interested in the outcome of the cause in said caption.

12             The dismantling, unsealing, or unbinding of the

13    original transcript will render the reporter's

14    certificates null and void.

15             In witness whereof, I have hereunto set my hand

16    this day:   August 24, 2012.

17             ___X____ Reading and Signing was requested.

18             _____ Reading and Signing was waived.

19             _____ Reading and signing was not requested.

20

21                              _____

22                              ROSALIE A. KRAMM

23                              CSR 5469, RPR, CRR

24

25