# EXHIBIT BB TO
# CISNEROS DECLARATION
# REDACTED VERSION

1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3                        SAN JOSE DIVISION

4

5

6      IN RE:  HIGH-TECH EMPLOYEE      )

7      ANTITRUST LITIGATION            )

8                                      )   No. 11-CV-2509-LHK

9      THIS DOCUMENT RELATES TO:       )

10     ALL ACTIONS.                    )

11     _____)

12

13

14          HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15           VIDEO DEPOSITION OF JONATHAN ROSENBERG

16                      March 13, 2013

17

18

19     REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25

Deposition of Jonathan Rosenberg                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 10:09:53 | 1 | working for Google? |
| 10:09:54 | 2 | A.  Palm. |
| 10:09:59 | 3 | Q.  And when did you work for Palm, approximately? |
| 10:10:02 | 4 | A.  For approximately three months prior to the |
| 10:10:05 | 5 | start of my employment at Google. |
| 10:10:15 | 6 | Q.  And was your title vice president of software? |
| 10:10:20 | 7 | A.  It was vice president of something, I don't |
| 10:10:22 | 8 | recall whether or not it was specifically software. |
| 10:10:25 | 9 | Q.  Okay. |
| 10:10:30 | 10 | THE VIDEOGRAPHER:  Excuse me, Jonathan, could |
| 10:10:33 | 11 | you scoot over toward the court reporter a little. |
| 10:10:36 | 12 | THE WITNESS:  Sure. |
| 10:10:37 | 13 | THE VIDEOGRAPHER:  Thank you. |
| 10:10:38 | 14 | MR. HARVEY:  Q.  Could you describe, |
| 10:10:39 | 15 | generally, what your responsibilities were as a vice |
| 10:10:41 | 16 | president at Palm. |
| 10:10:47 | 17 | A.  I was in charge of the features and functions |
| 10:10:51 | 18 | of the software and services that were integrated into |
| 10:10:56 | 19 | the Palm Pilot.  So it was a traditional product |
| 10:11:00 | 20 | management position governing understanding of market |
| 10:11:05 | 21 | competition features and functions. |
| 10:11:12 | 22 | Q.  Did you have a relationship with Edward |
| 10:11:17 | 23 | Colligan? |
| 10:11:19 | 24 | MR. RUBIN:  Objection.  Form. |
| 10:11:21 | 25 | MR. HARVEY:  Q.  Let me clarify.  Actually, |

| | | |
|---|---|---|
| 10:11:25 | 1 | give me a moment. |
| 10:11:48 | 2 | When you worked at Palm, did you have any |
| 10:11:50 | 3 | overlap with Edward Colligan where the two of you both |
| 10:11:54 | 4 | worked for Palm at the same time? |
| 10:11:56 | 5 | A.  Possibly. |
| 10:11:56 | 6 | Q.  But you are not sure sitting here today? |
| 10:11:59 | 7 | A.  I'm not. |
| 10:12:08 | 8 | Q.  Do you know Mr. Colligan personally? |
| 10:12:10 | 9 | A.  I believe I have met him, but I couldn't pick |
| 10:12:12 | 10 | him out of a crowd. |
| 10:12:14 | 11 | Q.  Do you recall the last time you met him? |
| 10:12:16 | 12 | A.  No. |
| 10:12:17 | 13 | Q.  Okay.  Do you recall the last time you |
| 10:12:19 | 14 | communicated with him? |
| 10:12:20 | 15 | A.  No. |
| 10:12:29 | 16 | Q.  Okay.  While you were at Palm, did you have any |
| 10:12:32 | 17 | responsibilities regarding recruiting or -- I'm sorry -- |
| 10:12:37 | 18 | firmwide recruiting? |
| 10:12:40 | 19 | A.  I did not. |
| 10:12:42 | 20 | Q.  Did you have any responsibilities with respect |
| 10:12:43 | 21 | to firmwide compensation design? |
| 10:12:48 | 22 | A.  My responsibilities were similar to my answer |
| 10:12:50 | 23 | that I gave you at Apple.  I was responsible for the |
| 10:12:53 | 24 | implementation. |
| 10:12:54 | 25 | Q.  Okay.  When did you begin to work for Google? |

10:13:12  1    A.   February of 2002.

10:13:20  2    Q.   And what was your first position?

10:13:24  3    A.   Running product management.

10:13:28  4    Q.   And that's running product management for the

10:13:30  5    entire company?

10:13:35  6    A.   Correct.

10:13:40  7    Q.   Approximately how long did you maintain that

10:13:45  8    primary responsibility at Google?

10:13:48  9    A.   Nine years and a few months.

10:14:03 10    Q.   Did you have any other primary responsibilities

10:14:05 11    in that role from when you started until -- well, let me

10:14:16 12    be more specific about it.  Can you place, say, by month

10:14:22 13    or approximately when your responsibilities changed from

10:14:25 14    running product management for Google to something else?

10:14:28 15    A.   Approximately April of 2011.

10:14:42 16    Q.   And what were your primary responsibilities

10:14:44 17    beginning in April of 2011?

10:14:52 18    A.   I became an advisor to the office of the CEO.

10:14:55 19    So I became an advisor to Larry, and my responsibilities

10:14:59 20    were not particularly well defined.

10:15:02 21    Q.   Is that the role you currently have?

10:15:13 22    A.   Yes, it is.

10:15:14 23    Q.   Okay.  While you were running product

10:15:18 24    management at Google, I believe you said from February

10:15:23 25    2002 through April of 2011, could you describe generally

10:15:27  1   what your primary responsibilities and job duties were.

10:15:33  2       A.  My role was a functional role.  The company was

10:15:37  3   organized functionally.  So I ran the product

10:15:40  4   organization which interacted primarily with the

10:15:44  5   engineering organizations, marketing, sales, and

10:15:48  6   business development organizations.  For some period the

10:15:53  7   traditional outbound marketing efforts -- product

10:15:56  8   marketing efforts were also under my purview.

10:16:04  9         The role of product management was similar to

10:16:06 10   the role of product management in many other technology

10:16:09 11   firms in the country, understanding the landscape -- the

10:16:12 12   competitive landscape, understanding the consumer and

10:16:17 13   market needs, and producing products and delivering the

10:16:22 14   features and functions that the market is interested in

10:16:25 15   against a time line that's consistent with the

10:16:28 16   management goals and strategy and plan for the company

10:16:34 17       Q.  And any time during this period from February

10:16:36 18   2002 through April of 2011, was one of your primary

10:16:44 19   responsibilities firmwide recruiting?

10:16:53 20       A.  I certainly participated in firmwide recruiting

10:16:56 21   efforts.  I was not the lead recruiter for the firm.

10:17:04 22       Q.  And was that true throughout the period, or was

10:17:06 23   it only true for a certain portion of that period?

10:17:15 24       A.  Recruiting was always an important component of

10:17:17 25   my role.

| | |
|---|---|
| 10:17:18 1 | Q.  And the same question for firmwide compensation |
| 10:17:23 2 | design; was that ever an important part of your role or |
| 10:17:26 3 | any part of your role? |
| 10:17:32 4 | A.  As a functional vice president, my role was |
| 10:17:35 5 | primarily to administer compensation policies.  And as a |
| 10:17:39 6 | member of Eric's senior management team, I provided |
| 10:17:45 7 | input on compensation practices and policies from time |
| 10:17:48 8 | to time as the issues came up. |
| 10:17:55 9 | Q.  And did you have any other responsibilities |
| 10:17:57 10 | concerning compensation apart from what you just |
| 10:17:59 11 | described? |
| 10:18:02 12 | A.  Not that I can specifically think of. |
| 10:18:05 13 | Q.  Okay.  And throughout this period, from |
| 10:18:26 14 | February 2002 through April of 2011, the senior |
| 10:18:33 15 | management who reported directly to, in the beginning |
| 10:18:39 16 | Mr. Schmidt, that group was usually referred to as the |
| 10:18:42 17 | executive management group; is that correct? |
| 10:18:46 18 | A.  That was one term by which we were referred, |
| 10:18:49 19 | yes. |
| 10:18:51 20 | Q.  And let me see if I have this straight.  I hope |
| 10:18:54 21 | I do.  Was it referred to as the executive management |
| 10:19:01 22 | group until the term changed to the operating committee |
| 10:19:09 23 | in 2009? |
| 10:19:11 24 | A.  Yes.  That sounds familiar. |
| 10:19:14 25 | Q.  And then in 2011 when Larry Page took over from |

```
10:19:19  1    Eric Schmidt, it was sometimes referred to as Larry's

10:19:24  2    team; is that right?

10:19:25  3         A.  That sounds right.

10:19:27  4         Q.  Okay.  And this group of individuals I'll refer

10:19:37  5    to as the EMG typically met every week on Mondays,

10:19:42  6    correct?

10:19:43  7         A.  Traditionally we met on Mondays, yes.

10:19:47  8         Q.  Did you typically attend those meetings?

10:19:48  9         A.  Almost -- it was my highest priority to attend

10:19:51 10    those meetings relative to anything else that I was

10:19:54 11    doing.  So generally, yes.

10:19:56 12         Q.  So if you were -- if you were in the area

10:20:00 13    geographically at the time, you made it a priority to

10:20:04 14    attend those meetings every Monday?

10:20:17 15         A.  Absolutely.

10:20:53 16             (Reporter interruption.)

10:21:01 17             MR. HARVEY:  Q.  When you switched to an

10:21:07 18    advisor to Larry Page, I believe you said that the

10:21:11 19    responsibilities weren't defined very well; is that

10:21:13 20    correct?

10:21:14 21         A.  Uh-huh.

10:21:15 22         Q.  What did you typically do in that capacity as

10:21:17 23    an advisor to Mr. Page?

10:21:21 24         A.  Well, I started by taking a long vacation.  I

10:21:29 25    then returned and began to look for areas in the company
```

10:28:19  1    Mr. Campbell about his testimony?

10:28:20  2              MR. RUBIN:  Objection.  Form.

10:28:22  3              THE WITNESS:  I did not.

10:28:23  4              MR. HARVEY:  Q.  I just have to run through

10:28:24  5    it quickly.

10:28:25  6         Did you speak with Ms. Brown about her

10:28:27  7    testimony?

10:28:27  8         A.  I did not.

10:28:28  9              MR. RUBIN:  Objection.  Form.

10:28:29 10              THE WITNESS:  All right.

10:28:30 11              MR. RUBIN:  We could have a standing objection

10:28:31 12    if we're going to --

10:28:32 13              THE WITNESS:  He's going to object in all, and

10:28:33 14    my answer is going to be "I did not."  But I'm happy to

10:28:36 15    keep going.

10:28:37 16              MR. RUBIN:  So objection.  Form.

10:28:38 17              We can have a standing objection each name,

10:28:39 18    given the question --

10:28:40 19              MR. HARVEY:  There are only two more.

10:28:41 20              MR. RUBIN:  Okay.

10:28:42 21              MR. HARVEY:  Q.  Did you speak to

10:28:43 22    Mr. Eustace about his testimony?

10:28:45 23              MR. RUBIN:  Objection.  Form.

10:28:46 24              THE WITNESS:  I did not.

10:28:47 25              MR. HARVEY:  Q.  Did you speak to

Deposition of Jonathan Rosenberg                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 10:28:48 | 1 | Mr. Kordestani about his testimony? |
| 10:28:50 | 2 | MR. RUBIN:  Objection.  Form. |
| 10:28:51 | 3 | THE WITNESS:  I did not. |
| 10:28:57 | 4 | MR. HARVEY:  Thank you. |
| 10:29:10 | 5 | Q.  Do you recall appearing at an event in |
| 10:29:13 | 6 | Half Moon Bay called the Think Tomorrow Today conference |
| 10:29:16 | 7 | on June 6th, 2008? |
| 10:29:21 | 8 | A.  I recall attending many events at that |
| 10:29:24 | 9 | particular venue, and it was my custom to go to these |
| 10:29:28 | 10 | events.  I don't specifically recall the Think Tomorrow |
| 10:29:31 | 11 | event. |
| 10:29:34 | 12 | Q.  Do you recall, on that date at that event, |
| 10:29:40 | 13 | being interviewed by Bill Campbell on stage in front of |
| 10:29:42 | 14 | an audience? |
| 10:29:45 | 15 | A.  I do recall being interviewed by Bill Campbell |
| 10:29:48 | 16 | at an event. |
| 10:29:53 | 17 | Q.  Okay.  So this event happened to be videotaped, |
| 10:29:56 | 18 | and it's on YouTube.  So I have the video with me today, |
| 10:30:00 | 19 | and I'm going to introduce a recording of the video as |
| 10:30:11 | 20 | Plaintiffs' Exhibit 1750, I believe, so that will just |
| 10:30:12 | 21 | be part of the record. |
| 10:30:13 | 22 | (Whereupon, Exhibit 1750 was marked for |
| 10:30:13 | 23 | identification.) |
| 10:30:14 | 24 | MR. HARVEY:  Q.  I have the YouTube video |
| 10:30:15 | 25 | on this laptop. |

Deposition of Jonathan Rosenberg                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:30:17  1        A.   Okay.

10:30:18  2        Q.   So I'm going to start it.  And if you could,

10:30:23  3   for however long you need, just until you can verify

10:30:25  4   that this video is, in fact, a video of that event, and

10:30:29  5   the individuals on stage are, in fact, you and

10:30:32  6   Mr. Campbell.

10:30:35  7        A.   Sure.

10:30:43  8             MR. HARVEY:  Is there anything we need to do?

10:30:49  9             (Discussion off the record.)

10:30:51 10             THE WITNESS:  I don't think it will be

10:30:53 11   particularly difficult for me to verify that that's me

10:30:56 12   and Mr. Campbell, so....

10:30:57 13             MR. HARVEY:  Q.  Can you do it without me

10:30:57 14   even playing it?

10:30:58 15        A.   Yes.  That's me and Mr. Campbell.

10:31:01 16        Q.   That makes it easier.

10:31:01 17             I'm going to play a couple of segments and then

10:31:03 18   I'll ask you about them.  The first one, let's see if I

10:31:06 19   can do this, starts at 2 minutes and 40 seconds in.  Let

10:31:19 20   me try to get there.

10:31:22 21        A.   Good chance I can get there faster than you.

10:31:24 22        Q.   I have no doubt that's true.

10:31:31 23             All right.  Here we go.

10:31:39 24             [video played]

10:31:40 25             "And I sort of felt bad because, you know, he

| | | |
|---|---|---|
| 10:31:42 | 1 | was obviously a smart guy and he had been |
| 10:31:43 | 2 | thrown out.  So I ran out, and Riley said, |
| 10:31:46 | 3 | well, if you are advocating how Google is, why |
| 10:31:49 | 4 | don't you come work for us.  I sort of thought |
| 10:31:52 | 5 | about it.  I had this kind of nice cushy job as |
| 10:31:55 | 6 | senior vice president of [inaudible] home.  And |
| 10:31:57 | 7 | I said, well, your search engine is really |
| 10:31:59 | 8 | cool, but how are you going to make money.  And |
| 10:32:02 | 9 | Larry said to me, and it was the spring of |
| 10:32:06 | 10 | 1999, he said search is what" -- |
| 10:32:08 | 11 | MR. HARVEY:  Q.  Okay.  Did you first |
| 10:32:18 | 12 | consider working for Google as a result of the |
| 10:32:21 | 13 | conversation you described here with Larry Page |
| 10:32:25 | 14 | talking to you directly about the possibility? |
| 10:32:28 | 15 | A.  I'm not sure I understand the question. |
| 10:32:30 | 16 | Q.  Sure.  Part of the video I played is you |
| 10:32:35 | 17 | describing a conversation you had with Larry Page about |
| 10:32:42 | 18 | working for Google, correct? |
| 10:32:45 | 19 | A.  Yes. |
| 10:32:45 | 20 | Q.  And I'll just ask the question directly.  I'll |
| 10:32:48 | 21 | disconnect it from the video. |
| 10:32:53 | 22 | Did you first consider working for Google when |
| 10:32:55 | 23 | Larry Page asked you to consider that? |
| 10:32:58 | 24 | A.  Hard to say. |
| 10:33:03 | 25 | Q.  Did you -- well, how did it happen that you |

10:33:08   1   moved from Palm to Google in that -- I'll be more

10:33:12   2   specific -- more specific about it.

10:33:17   3          Did you apply or did someone from Google

10:33:19   4   recruit you?

10:33:20   5          MR. RUBIN:  Objection.  Form.

10:33:21   6          THE WITNESS:  I was recruited to Google long

10:33:23   7   before I was at Palm.  This discussion that I'm

10:33:25   8   referencing took place two years prior.

10:33:31   9          MR. HARVEY:  Q.  Oh, I see.  And was that

10:33:34  10   conversation with Mr. Page the first conversation

10:33:36  11   that occurred about the possibility of you working

10:33:39  12   for Google?

10:33:40  13      A.  It may have been, it may not.  I don't recall

10:33:42  14   the first conversation.

10:33:45  15      Q.  Do you recall that the first conversation was

10:33:47  16   initiated by someone at Google?

10:33:51  17      A.  First conversation was initiated by a

10:33:54  18   recruiter.

10:33:58  19      Q.  And that was a recruiter at Google?

10:34:01  20      A.  No.

10:34:03  21      Q.  Who was the recruiter?

10:34:05  22      A.  The recruiter was Stephen Combs.

10:34:08  23      Q.  And who did Mr. Combs work for?

10:34:11  24      A.  I believe he worked for a company called

10:34:13  25   Juntunen and Combs.  His partner was somebody Juntunen.

10:34:17 1  But by that point he might have been working for a

10:34:19 2  company called the Bridgegate Group.

10:34:22 3      Q.  Was this company a company that specialized in

10:34:25 4  recruiting?

10:34:26 5      A.  Yes.

10:34:27 6      Q.  Did Google retain that company to recruit you?

10:34:29 7      A.  I believe they did.

10:34:30 8      Q.  Okay.  Did you submit an application to Google

10:34:37 9  in advance of being contacted by Mr. Combs?

10:34:44 10     A.  I did not.

10:34:45 11     Q.  Okay.  And who did you -- I'm sorry.  Strike

10:34:51 12 that.

10:34:52 13         What company did you work for at the time that

10:34:54 14 you were contacted by Mr. Combs?

10:34:58 15     A.  The @Home Network.

10:35:00 16         (Reporter clarification.)

10:35:01 17         THE WITNESS:  The @Home Network.  At sign,

10:35:04 18 H-O-M-E, capital N, Network.

10:35:09 19         MR. HARVEY:  Q.  Okay.  I'm going to play

10:35:11 20 one other segment from this, which I believe starts

10:35:16 21 at approximately 19 minutes and 25 seconds in.

10:35:36 22         I'm going to play about two minutes of video

10:35:38 23 and then I'll ask you a couple of questions about your

10:35:39 24 statements.

10:35:43 25         [video played]

| | | |
|---|---|---|
| 10:35:43 | 1 | "...who wants to be an engineering trainer. |
| 10:35:51 | 2 | So take one click deeper and talk about the |
| 10:35:52 | 3 | recruiting process. |
| 10:35:54 | 4 | What I first experienced with the recruiting |
| 10:35:54 | 5 | process -- it was cute.  I showed up my first |
| 10:35:55 | 6 | day and there were six people in my group; |
| 10:35:58 | 7 | Susan, Sala (phonetic) and Marissa, who you |
| 10:36:01 | 8 | probably see a lot of press about were there. |
| 10:36:03 | 9 | And they were doing recruiting.  So I was, |
| 10:36:05 | 10 | like, you're all sitting there with your |
| 10:36:08 | 11 | laptops open.  What the hell are you doing? |
| 10:36:09 | 12 | The answer is, we're looking for good people. |
| 10:36:11 | 13 | I'm, like, where?  They're, like, we're using |
| 10:36:14 | 14 | Google.  I said, well, don't you have |
| 10:36:16 | 15 | recruiters to do that?  Don't lots of people |
| 10:36:18 | 16 | want to work here?  Aren't they all applying? |
| 10:36:20 | 17 | And they said, no, we don't want the people who |
| 10:36:24 | 18 | are applying.  We want the best people in the |
| 10:36:26 | 19 | world.  I said, well, how do you find them? |
| 10:36:28 | 20 | They said, well, we're looking for generalists, |
| 10:36:30 | 21 | and we all just got out of college.  So we know |
| 10:36:34 | 22 | the awards at all of our colleges.  At Stanford |
| 10:36:37 | 23 | there is like a Boothe prize for writing.  If |
| 10:36:38 | 24 | you need a marketing person, get the person |
| 10:36:40 | 25 | with the Boothe prize.  So they're literally |

| | | |
|---|---|---|
| 10:36:44 | 1 | running searches.  And they all know their |
| 10:36:49 | 2 | colleges well.  They all went to big schools. |
| 10:36:51 | 3 | I went to, like, little, rinky-dink Claremont |
| 10:36:53 | 4 | McKenna College in Southern California.   There |
| 10:36:54 | 5 | is, like, 200 graduates a year.  So I type in |
| 10:36:58 | 6 | suma cum laude Claremont McKenna College, and I |
| 10:36:58 | 7 | find two people and, you know, I try to |
| 10:37:00 | 8 | convince them to join Google.  And then I |
| 10:37:03 | 9 | realize I'm not adding any value.  Every week |
| 10:37:05 | 10 | I'm showing up in this room, and they're |
| 10:37:08 | 11 | running searches, finding great people, and |
| 10:37:10 | 12 | giving the great people to the recruiters and |
| 10:37:11 | 13 | saying, just send these -- just tell these |
| 10:37:13 | 14 | people there is a plane ticket to Mountain View |
| 10:37:15 | 15 | and we want to hire them.  So I decided that I |
| 10:37:20 | 16 | needed to add some value because I was busy |
| 10:37:22 | 17 | arguing with Larry about the product lines.  He |
| 10:37:25 | 18 | didn't think I was a useful executive.  So I |
| 10:37:29 | 19 | thought, well, I'll try a different search.  So |
| 10:37:32 | 20 | I discovered there was an award at India |
| 10:37:32 | 21 | Institute of Technology called the Gold Medal |
| 10:37:32 | 22 | Award.  And I ran a search and I found four |
| 10:37:32 | 23 | people, Prashan, Sihndar, Deep, (phonetic) who |
| 10:37:32 | 24 | won the Gold Medal Award at India Institute of |
| 10:37:32 | 25 | Technology.  And I said to the recruiter, call |

| | | |
|---|---|---|
| 10:37:32 | 1 | these people and explain to them why they |
| 10:37:32 | 2 | should work at Google.  And if they don't agree |
| 10:37:53 | 3 | with you, let me explain it to them.  And so -- |
| 10:37:56 | 4 | and it worked.  Like, suddenly we hired a few |
| 10:37:59 | 5 | people.  And so the recruiting dynamic is |
| 10:38:04 | 6 | different.  It's not the adverse selection of |
| 10:38:06 | 7 | the people that want you, it's the people that |
| 10:38:07 | 8 | you want.  The next thing, which is really |
| 10:38:10 | 9 | different" -- |
| 10:38:13 | 10 | MR. RUBIN:  And I'll just object to form. |
| 10:38:14 | 11 | Rule 106. |
| 10:38:17 | 12 | MR. HARVEY:  Q.  Okay.  There are a couple |
| 10:38:22 | 13 | of statements you made in that segment.  And I'm |
| 10:38:24 | 14 | just going to repeat them to you because it's |
| 10:38:26 | 15 | easier, given the technology, for me just to say it, |
| 10:38:30 | 16 | and then I'll ask you to explain kind of what you |
| 10:38:32 | 17 | meant by that statement. |
| 10:38:33 | 18 | A.  Okay. |
| 10:38:34 | 19 | Q.  The first is, we don't want the people who are |
| 10:38:38 | 20 | applying, we want the best people in the world. |
| 10:38:42 | 21 | MR. RUBIN:  Objection.  Form. |
| 10:38:43 | 22 | MR. HARVEY:  Q.  What did you mean by that |
| 10:38:45 | 23 | statement? |
| 10:38:46 | 24 | MR. RUBIN:  Sorry.  I thought you were done, |
| 10:38:47 | 25 | Dean, I'm sorry. |

10:38:49  1          Objection.  Form.

10:38:55  2          THE WITNESS:  I'm not sure how to provide

10:38:58  3   additional clarification beyond what I said.

10:39:03  4          MR. HARVEY:  Q.  Okay.  The second

10:39:07  5   statement that I want to ask you about is, it's not

10:39:10  6   the adverse selection of the people that want you,

10:39:14  7   it's the people that you want.  Could you explain

10:39:17  8   what you meant by that statement.

10:39:19  9          MR. RUBIN:  Objection.  Form.

10:39:32 10          THE WITNESS:  Repeat the statement.

10:39:34 11          MR. HARVEY:  Q.  Sure.  It's not the

10:39:35 12   adverse selection of the people that want you, it's

10:39:39 13   the people that you want.

10:39:42 14          MR. RUBIN:  Objection.  Form.

10:39:45 15          THE WITNESS:  I guess you would have to be more

10:39:46 16   specific about what portion of that statement you want

10:39:48 17   me to clarify.

10:39:50 18          MR. HARVEY:  Q.  Sure.  Why don't we break

10:39:51 19   it up.  When you used the phrase "adverse selection"

10:39:55 20   in the context of individuals applying to Google,

10:39:59 21   what did you mean by that?

10:40:08 22       A.  That there is a bias related to the set of

10:40:13 23   people who apply as opposed to those who don't.

10:40:17 24       Q.  And what is that bias?

10:40:18 25       A.  That the people who apply, on average, aren't

| | | |
|---|---|---|
| 10:40:21 | 1 | as good. |
| 10:40:24 | 2 | Q.  And Google wanted to hire the best people it |
| 10:40:27 | 3 | could? |
| 10:40:28 | 4 | MR. RUBIN:  Objection.  Form. |
| 10:40:30 | 5 | MR. HARVEY:  Q.  Correct? |
| 10:40:31 | 6 | A.  As a general rule, Google always wanted to hire |
| 10:40:39 | 7 | the best people it could. |
| 10:40:45 | 8 | Q.  Okay.  I think that's it for the video portion |
| 10:40:47 | 9 | of the deposition. |
| 10:40:56 | 10 | MR. RUBIN:  At a break, Dean, can we get a |
| 10:40:57 | 11 | copy?  Do you have another -- |
| 10:41:00 | 12 | MR. HARVEY:  I can give it to you right now. |
| 10:41:02 | 13 | MR. RUBIN:  Great.  Thank you. |
| 10:41:45 | 14 | MR. HARVEY:  Q.  In your experience at |
| 10:41:46 | 15 | Google, would you say that the typical employee knew |
| 10:41:51 | 16 | what comparable employees were being paid at Google? |
| 10:41:54 | 17 | MR. RUBIN:  Objection.  Form. |
| 10:41:57 | 18 | THE WITNESS:  I don't know. |
| 10:41:59 | 19 | MR. HARVEY:  Q.  You don't have an opinion |
| 10:42:00 | 20 | one way or another? |
| 10:42:02 | 21 | A.  I don't. |
| 10:42:02 | 22 | MR. RUBIN:  Objection.  Form. |
| 10:42:10 | 23 | MR. HARVEY:  Q.  Did you think it was |
| 10:42:11 | 24 | important not to share compensation ranges, |
| 10:42:19 | 25 | compensation information about employees generally |

| | | |
|---|---|---|
| 10:42:20 | 1 | with the wider population at Google? |
| 10:42:23 | 2 | MR. RUBIN:  Objection.  Form. |
| 10:42:28 | 3 | THE WITNESS:  I guess you have to -- can you -- |
| 10:42:30 | 4 | I don't understand exactly what you are asking. |
| 10:42:32 | 5 | MR. HARVEY:  Q.  Sure.  So let me take a |
| 10:42:34 | 6 | step back for a moment. |
| 10:42:36 | 7 | You had information about what various |
| 10:42:39 | 8 | engineers who worked for you were getting paid, correct? |
| 10:42:43 | 9 | A.  I did. |
| 10:42:44 | 10 | Q.  And that information was superior, in many |
| 10:42:47 | 11 | ways, to the information that the engineers themselves |
| 10:42:51 | 12 | had about what their colleagues were getting paid, |
| 10:42:54 | 13 | correct? |
| 10:42:54 | 14 | MR. RUBIN:  Objection.  Form. |
| 10:43:01 | 15 | THE WITNESS:  I had information that other |
| 10:43:02 | 16 | people did not. |
| 10:43:03 | 17 | MR. HARVEY:  Q.  Was it important to you to |
| 10:43:05 | 18 | keep that information from the wider population at |
| 10:43:10 | 19 | Google. |
| 10:43:11 | 20 | MR. RUBIN:  Objection.  Form. |
| 10:43:16 | 21 | THE WITNESS:  As a general rule, salary |
| 10:43:18 | 22 | information is something which is kept confidential, and |
| 10:43:22 | 23 | I -- I generally administered that policy. |
| 10:43:28 | 24 | MR. HARVEY:  Q.  Do you agree with that |
| 10:43:29 | 25 | policy? |

11:30:29  1    a chance to read through her email?

11:30:33  2         A.  I have.

11:30:37  3         Q.  And there is a rule No. 2 there starting on

11:30:40  4    page 2, where she says that, "If there is a list of

11:30:48  5    strategic partners with whom we will compete for talent,

11:30:50  6    but we want to be as transparent about it as possible,

11:30:54  7    then we make a different rule, which says:  We will

11:30:57  8    engage in interviews with these individuals.  But we

11:31:00  9    will inform them ONCE they have a formal offer from

11:31:03  10   Google, that their employer needs to be given an

11:31:07  11   opportunity to counter."

11:31:11  12        Do you recall considering this rule at the time

11:31:15  13   in response to Mr. Shader's request?

11:31:20  14        A.  I do not.

11:31:25  15        Q.  Do you recall why, in rule No. 2 as Ms. Brown

11:31:32  16   describes it, Google would inform the current employer

11:31:36  17   only after Google had extended a formal offer to the

11:31:41  18   candidate?

11:31:42  19        MR. RUBIN:  Objection.  Form.

11:31:52  20        THE WITNESS:  I don't.

11:31:54  21        MR. HARVEY:  Q.  Sitting here today, apart

11:31:55  22   from this document, do you have any views on why

11:32:00  23   that might be the right thing to do?

11:32:02  24        MR. RUBIN:  Objection.  Form.

11:32:08  25        THE WITNESS:  I'm sure I could come up with a

| | | |
|---|---|---|
| 11:32:09 | 1 | number of reasons.  One primary reason would be the |
| 11:32:11 | 2 | confidentiality of the candidate. |
| 11:32:14 | 3 |     MR. HARVEY:  Q.  And could you elaborate on |
| 11:32:15 | 4 | that a little bit.  What confidentiality concern are |
| 11:32:19 | 5 | you describing? |
| 11:32:21 | 6 |     A.  A candidate might not want his employer to know |
| 11:32:24 | 7 | that he's interviewing with another firm. |
| 11:32:26 | 8 |     Q.  And why might a candidate not want his or her |
| 11:32:31 | 9 | employer to know that he's interviewing with another |
| 11:32:33 | 10 | firm, or she's interviewing with another firm? |
| 11:32:37 | 11 |     A.  I'm sure there are a whole host of relatively |
| 11:32:40 | 12 | obvious reasons that any reasonable person can think of. |
| 11:32:43 | 13 |     Q.  And what would those obvious reasons be? |
| 11:32:47 | 14 |     MR. RUBIN:  Objection.  Form. |
| 11:32:57 | 15 |     THE WITNESS:  Can you be specific and give me |
| 11:32:59 | 16 | some possibilities?  I can tell you whether I agree or |
| 11:33:01 | 17 | disagree with them rather than just guessing. |
| 11:33:03 | 18 |     MR. HARVEY:  I don't want you to guess, but you |
| 11:33:04 | 19 | just said that there were some obvious reasons.  And so |
| 11:33:07 | 20 | I'd like to have you list what those obvious reasons |
| 11:33:11 | 21 | are. |
| 11:33:12 | 22 |     MR. RUBIN:  Objection.  Form. |
| 11:33:15 | 23 |     THE WITNESS:  One would be that they could be |
| 11:33:16 | 24 | perceived as disloyal. |
| 11:33:21 | 25 |     MR. HARVEY:  Q.  Are there any others? |

11:33:24   1        A.   Again, I can't make an exhaustive list for you.

11:33:28   2   I think as a general rule, it's obvious why employees

11:33:31   3   who are looking might not want their employers to know

11:33:34   4   that they're looking.

11:33:41   5        Q.   Okay.  Why don't we stick with the first reason

11:33:45   6   you gave, that the employer may be concerned that -- I'm

11:33:49   7   sorry -- that the employee may be concerned that his or

11:33:52   8   her employer would perceive that person as disloyal.

11:34:02   9            In that circumstance, where an employer

11:34:05  10   discovers that an employee is interviewing at another

11:34:09  11   company, why would that employer perceive that as a

11:34:16  12   disloyal act?

11:34:18  13            MR. RUBIN:  Objection.  Form.

11:34:23  14            THE WITNESS:  Again, there's lots of reasons.

11:34:27  15   I don't -- I guess I don't understand exactly what you

11:34:29  16   are asking.

11:34:31  17            MR. HARVEY:  Q.  Well, I'm basically asking

11:34:33  18   you to expand on the point you've already made,

11:34:36  19   which is that an obvious reason why an employee may

11:34:39  20   not want to know -- or may not want their employer

11:34:43  21   to know that they're interviewing is that they could

11:34:46  22   be perceived as disloyal.  So I'm asking why is

11:34:49  23   that?  Why is that an obvious concern?

11:34:56  24            MR. RUBIN:  Objection.  Form.

11:35:00  25            THE WITNESS:  Because employees have

11:35:02  1    confidential information, and firms compete with each

11:35:06  2    other and often don't want confidential information

11:35:10  3    going from one company to another through an employee.

11:35:17  4              MR. HARVEY:  Q.  What about the disloyalty

11:35:20  5    piece?  What would be disloyal about interviewing

11:35:23  6    with other companies?

11:35:25  7              MR. RUBIN:  Objection.  Form.

11:35:27  8              THE WITNESS:  You would have to ask the manager

11:35:28  9    of the employee what their view of disloyalty is, but

11:35:33 10    I'm sure that many employees perceive that their

11:35:35 11    managers might think it disloyal, and it therefore not

11:35:38 12    to be in their self-interest to have their managers be

11:35:41 13    aware of the fact that they're looking for other

11:35:43 14    employment.

11:35:46 15              MR. HARVEY:  Q.  And it's fair to say that

11:35:49 16    when an employer learns that an employee is looking

11:35:54 17    around to work for another employer, that this

11:35:59 18    disloyalty concern could result in negative

11:36:04 19    consequences to the career of that employee should

11:36:07 20    that employee choose to stay at the current

11:36:09 21    employer?

11:36:09 22              MR. RUBIN:  Objection.  Form.

11:36:12 23              THE WITNESS:  It's a pretty complex statement.

11:36:15 24    I'm not sure I can speculate on the generality as to

11:36:21 25    whether or not it's true for different people in

11:36:22  1    different positions.

11:36:26  2            MR. HARVEY:  Q.  And I'm not asking you to

11:36:29  3    be specific about a particular person or to get into

11:36:32  4    anyone else's mind.

11:36:34  5            I guess what I'm asking is for you to rely on

11:36:37  6    your own knowledge, your own experience in the industry,

11:36:40  7    your own experience managing people for many years,

11:36:42  8    managing large groups of people.  Do you have an

11:36:47  9    understanding of the phenomenon that you earlier

11:36:49 10    described as an obvious one that an employer may view an

11:36:55 11    employee looking around for jobs elsewhere as an act of

11:37:01 12    disloyalty?

11:37:02 13            MR. RUBIN:  Objection.  Form.

11:37:06 14            THE WITNESS:  I believe some people would view

11:37:08 15    that news negatively, yes.

11:37:12 16            MR. HARVEY:  Q.  Would you have viewed that

11:37:14 17    news negatively if one of your employees were

11:37:16 18    shopping around for offers from other companies?

11:37:22 19        A.  It would very much depend on the employee and

11:37:24 20    the specific situation.  In some cases yes, and in some

11:37:27 21    cases, no.

11:37:35 22        Q.  Okay.  Back to the document.  If we could go to

11:37:47 23    your email in response to Ms. Brown's email on the first

11:37:52 24    page.  It looks like you added Eric Schmidt to the

11:38:02 25    conversation; is that correct?

11:38:06   1        A.  If this is the full thread and there's no other

11:38:09   2    pieces in between, then that statement is correct.

11:38:13   3        Q.  Okay.  And you begin your email by saying, "The

11:38:18   4    only company I know that we ever had a non-poaching

11:38:22   5    policy with was Yahoo and we dropped that policy

11:38:27   6    recently."

11:38:27   7            Sitting here today, do you recall that

11:38:30   8    non-poaching policy with respect to Yahoo?

11:38:33   9        A.  I do not.

11:38:33  10        Q.  You don't recall anything about it?

11:38:34  11        A.  I do not.

11:38:35  12        Q.  You don't recall whether the policy existed or

11:38:38  13    not?

11:38:40  14        A.  I do not.

11:38:40  15            MR. RUBIN:  Objection.  Form.

11:38:50  16            MR. HARVEY:  Q.  The next sentence says, "I

11:38:51  17    agree that the way to handle this is for you to

11:38:54  18    formalize a policy but I think rule No. 2 is more

11:38:58  19    appropriate for us."

11:39:04  20            Do you recall why you thought the way to handle

11:39:06  21    the situation was for Ms. Brown to formalize a policy?

11:39:10  22        A.  I do not.

11:39:12  23        Q.  Do you recall why you thought rule No. 2 was

11:39:15  24    more appropriate for Google?

11:39:19  25        A.  I recall that in general, I preferred rules

11:39:24  1    that restricted us less than rules that restricted us

11:39:27  2    more.

11:39:29  3         Q.  And when you say restricted us, you mean

11:39:31  4    Google's ability to recruit from wherever it wanted,

11:39:36  5    correct?

11:39:38  6         A.  I --

11:39:39  7         Q.  I'm sorry.  Let me just interrupt you.  I

11:39:41  8    apologize.  It was a very poorly phrased question.  Let

11:39:44  9    me ask a better one -- or try to ask a better one.

11:39:48  10             When you used the word "restricted," you were

11:39:52  11   referring to limitations on Google's ability to recruit,

11:39:55  12   correct?

11:39:56  13             MR. RUBIN:  Objection.  Form.

11:40:04  14             THE WITNESS:  Again, I'm simply referring to

11:40:07  15   any degree to which -- any degree to which, as a

11:40:15  16   manager, I have fewer options as opposed to more

11:40:18  17   options.  More options is always better.

11:40:29  18             MR. HARVEY:  Q.  And so the kinds of

11:40:31  19   restrictions that are being discussed here, such as

11:40:34  20   what you refer to as a no-poaching policy,

11:40:39  21   restrictions of those kind would have limited your

11:40:42  22   options, correct?

11:40:51  23        A.  It would depend on what was agreed to with

11:40:53  24   respect to such a policy.  In theory, such -- in

11:40:56  25   theory -- in theory, some policies could limit your

11:41:03 1    options relative to other policies if you adhered to

11:41:09 2    them.

11:41:09 3         Q.  So suppose, in this email string, you had

11:41:11 4    responded to Mr. Shader's request by saying something

11:41:15 5    like, great idea.  Let's agree that our recruiting teams

11:41:17 6    will not target each other's employees, say.

11:41:22 7         That -- that policy, that agreement, would have

11:41:27 8    limited Google's options in terms of its ability to

11:41:31 9    recruit employees, correct?

11:41:33 10             MR. RUBIN:  Objection.  Form.

11:41:36 11             THE WITNESS:  I'm not aware of any such

11:41:38 12   agreement, so I'm not sure how to answer your question.

11:41:43 13             MR. HARVEY:  Q.  All right.  We'll get to

11:41:44 14   this later.

11:41:59 15        If we go to the top of the document,

11:42:03 16   Mr. Schmidt chimes in and says, "From a purely selfish

11:42:08 17   Google position our policy should be to have 'no rule'."

11:42:15 18   Do you see that?

11:42:16 19        A.  I do.

11:42:18 20        Q.  Do you have an understanding of why -- well,

11:42:23 21   first of all, do you agree with that statement?

11:42:27 22             MR. RUBIN:  Objection.  Form.

11:42:33 23             THE WITNESS:  As a manager, I generally

11:42:36 24   preferred fewer rules to less.

11:42:38 25             MR. HARVEY:  Q.  And why is that?

11:42:39  1      A.   For the reason I gave before.  More options is

11:42:42  2   preferred to fewer.

11:42:44  3      Q.   And why did you have that preference in the

11:42:51  4   context of recruiting employees?

11:42:58  5      A.   Because a large portion of my job focused on

11:43:00  6   recruiting people, and I wanted to maximize the success

11:43:05  7   of my recruiting efforts.

11:43:16  8      Q.   And how would rules of the kind contemplated in

11:43:19  9   this document have potentially limited the success of

11:43:26  10  your recruiting efforts?

11:43:29  11            MR. RUBIN:  Objection.  Form.

11:43:30  12            THE WITNESS:  You have to give me a specific

11:43:32  13  example.

11:43:35  14            MR. HARVEY:  Q.  Well, why don't we go with

11:43:36  15  the example of Mr. Shader's request, which he says,

11:43:40  16  "I would appreciate it if you could ask your

11:43:43  17  recruiting teams not to target Good employees."

11:43:46  18            Suppose Google agreed with that request.  How

11:43:50  19  would that rule limit your ability to be successful in

11:43:56  20  the context of recruiting?

11:43:59  21            MR. RUBIN:  Objection.  Form.

11:44:01  22            THE WITNESS:  It doesn't say that Google agreed

11:44:02  23  to that.

11:44:03  24            MR. HARVEY:  Q.  Right.  And I'm not trying

11:44:04  25  to get you to say that Google did, because that's

Deposition of Jonathan Rosenberg          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 11:44:07 | 1 | not my point.  My point is just to try to understand |
| 11:44:10 | 2 | how, you know -- at this time it appears that Google |
| 11:44:14 | 3 | is considering different options.  And what I'm |
| 11:44:20 | 4 | trying to understand is what the potential |
| 11:44:24 | 5 | consequences would be of the possibilities being |
| 11:44:26 | 6 | considered. |
| 11:44:27 | 7 | And one possibility, presumably, is what |
| 11:44:30 | 8 | Mr. Shader requests in the email that starts this |
| 11:44:32 | 9 | conversation, which is, that Google would agree not to |
| 11:44:36 | 10 | recruit Good employees. |
| 11:44:37 | 11 | So my question is, what would be the |
| 11:44:38 | 12 | consequence of that if -- and I understand that you are |
| 11:44:42 | 13 | not saying that Google did -- but if Google agreed to |
| 11:44:46 | 14 | Mr. Shader's request? |
| 11:44:47 | 15 | MR. RUBIN:  Objection.  Form. |
| 11:44:53 | 16 | THE WITNESS:  If the company agreed not to hire |
| 11:44:55 | 17 | an individual and then chose to adhere to that, then |
| 11:44:59 | 18 | they couldn't hire the individual. |
| 11:45:02 | 19 | MR. HARVEY:  Q.  Okay.  And a limit on your |
| 11:45:04 | 20 | ability to hire individuals would potentially limit |
| 11:45:09 | 21 | your ability to be successful in your efforts to |
| 11:45:13 | 22 | recruit the best candidates for Google, correct? |
| 11:45:16 | 23 | MR. RUBIN:  Objection.  Form. |
| 11:45:24 | 24 | THE WITNESS:  I think I've answered that |
| 11:45:25 | 25 | question. |

11:52:13  1    understand this in the same way?

11:52:16  2              MR. RUBIN:  Objection.  Form.

11:52:17  3              THE WITNESS:  You'd have to ask Dr. Schmidt.

11:52:23  4              MR. HARVEY:  Q.  Well, you are on this

11:52:24  5    email, and I take it you don't remember, but you may

11:52:27  6    have had conversations with him on this topic at the

11:52:30  7    time or throughout the years, and you certainly know

11:52:35  8    Mr. Schmidt much better than I do.  When you

11:52:39  9    received this document, did you have an

11:52:40 10    understanding of what he meant here?

11:52:44 11              MR. RUBIN:  Objection.  Form.

11:52:53 12              THE WITNESS:  I think I added him to the thread

11:52:55 13    because I think he agreed with me.  That we wanted to

11:52:58 14    have as few rules as possible.  And insofar as we wanted

11:53:05 15    to be sensitive, there were companies that we did

11:53:09 16    business with, like Good Technologies which we were

11:53:13 17    working on a number of things with.  And when we wanted

11:53:16 18    to maintain good relations, it was a good idea to be

11:53:19 19    sensitive or careful, unless for some reason there were

11:53:23 20    some reasons not to.  And I don't know what he's

11:53:29 21    suggesting those reasons might or might not be.

11:53:43 22              MR. HARVEY:  Q.  Do you recall whether you

11:53:45 23    discussed with him at the time, or whether it was

11:53:47 24    part of this conversation, that if Google were to

11:53:52 25    restrict its recruiting activities, that that

| | |
|---|---|
| 11:53:55 | 1 | restriction would only make sense if the restriction |
| 11:53:58 | 2 | were mutual with the other company? |
| 11:54:01 | 3 | A. I do not. |
| 11:54:03 | 4 | Q. Okay. Do you recall whether the issue of the |
| 11:54:07 | 5 | restriction being contractually mandated came up apart |
| 11:54:11 | 6 | from this email? |
| 11:54:12 | 7 | A. No, I do not. |
| 11:54:14 | 8 | Q. Okay. Oh, one other question on this document |
| 11:54:24 | 9 | before we move on. Something I skipped over. If you go |
| 11:54:27 | 10 | back to the second email on this page that you wrote. |
| 11:54:33 | 11 | A. Uh-huh. |
| 11:54:33 | 12 | Q. And if you look to the second paragraph, and |
| 11:54:35 | 13 | the end of that paragraph, the last sentence, where you |
| 11:54:38 | 14 | said, "I do agree with your caveat that we never get |
| 11:54:42 | 15 | into bidding wars as a result of Rule number 2." |
| 11:54:47 | 16 | What did you mean by "bidding wars"? |
| 11:54:54 | 17 | A. It's not clear. |
| 11:55:00 | 18 | Q. Do you have an understanding, sitting here |
| 11:55:02 | 19 | today, of what the term bidding wars means in the |
| 11:55:05 | 20 | context of recruiting and hiring? |
| 11:55:07 | 21 | MR. RUBIN: Objection. Form. |
| 11:55:18 | 22 | THE WITNESS: In this context, my best guess |
| 11:55:20 | 23 | would be that it means a dynamic of iterative multiple |
| 11:55:25 | 24 | counteroffers. |
| 11:55:26 | 25 | MR. HARVEY: Q. And that's undesirable |

11:55:28  1    because at the end of that process, the eventual

11:55:31  2    compensation could be quite high, correct?

11:55:33  3            MR. RUBIN:  Objection.  Form.

11:55:35  4            THE WITNESS:  There are a number of reasons why

11:55:36  5    it could be undesirable.

11:55:40  6            MR. HARVEY:  Q.  Is an increase in the

11:55:45  7    eventual compensation one of the reasons?

11:55:47  8            MR. RUBIN:  Objection.  Form.

11:55:48  9            THE WITNESS:  It could be.

11:55:53 10            MR. HARVEY:  Q.  Sitting here today, do you

11:55:54 11    have a view on whether it is, in fact, a reason?

11:55:57 12            MR. RUBIN:  Objection.  Form.

11:55:59 13            THE WITNESS:  I cannot say specifically what

11:56:01 14    motivated me to write that sentence.

11:56:07 15            MR. HARVEY:  Q.  And what I'm asking about

11:56:09 16    now -- you can kind of put the document aside.  Just

11:56:13 17    sitting here today, and given your understanding of

11:56:18 18    bidding wars in the context of recruiting and

11:56:21 19    hiring --

11:56:22 20        A.  Uh-huh.

11:56:22 21        Q.  -- is one of the reasons why bidding wars are

11:56:26 22    undesirable is that the compensation for the individual

11:56:31 23    in question may be higher than you would otherwise want

11:56:35 24    it to be?

11:56:36 25            MR. RUBIN:  Objection.  Form.

Deposition of Jonathan Rosenberg                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 11:56:46 | 1 | THE WITNESS:  I guess you have to break the |
| 11:56:47 | 2 | question down and help me understand what you are |
| 11:56:48 | 3 | asking. |
| 11:56:49 | 4 | MR. HARVEY:  Q.  Sure.  Do you have a view |
| 11:56:51 | 5 | on whether -- all right.  Let me back up a moment. |
| 11:57:00 | 6 | If you were trying to buy a product or |
| 11:57:02 | 7 | services, generally you want to pay less rather than |
| 11:57:04 | 8 | more for that product or service, correct? |
| 11:57:06 | 9 | MR. RUBIN:  Objection.  Form. |
| 11:57:10 | 10 | THE WITNESS:  Generally in economics, cheaper |
| 11:57:12 | 11 | is preferred to more expensive, yes. |
| 11:57:16 | 12 | MR. HARVEY:  Q.  And in your role at |
| 11:57:18 | 13 | Google, you spent a lot of time thinking about -- |
| 11:57:20 | 14 | it's not usually termed this way, but I think in |
| 11:57:25 | 15 | reality it's what it is -- purchasing labor by |
| 11:57:30 | 16 | hiring employees and then paying those employees to |
| 11:57:32 | 17 | do things for Google, correct? |
| 11:57:34 | 18 | A.  I spent most of my time focused on hiring the |
| 11:57:41 | 19 | best talent possible and not thinking a great deal about |
| 11:57:44 | 20 | the state of the labor market or compensation practices. |
| 11:57:50 | 21 | Q.  Yeah.  And I'm glad you said that, because I'm |
| 11:57:52 | 22 | not asking about the wider labor market or anything. |
| 11:57:55 | 23 | I'm just asking about you and what you were doing at |
| 11:57:58 | 24 | Google. |
| 11:58:02 | 25 | Part of making sure that the best people in the |

11:58:05  1    world would come to work for Google was negotiating what

11:58:08  2    their compensation would be when they -- when they

11:58:11  3    worked at Google, correct?

11:58:12  4            MR. RUBIN:  Objection.  Form.

11:58:20  5            THE WITNESS:  Restate the question again.

11:58:23  6            MR. HARVEY:  Q.  When you recruited and

11:58:26  7    hired people to work for Google, their compensation

11:58:30  8    at Google was a topic that came up during those

11:58:33  9    conversations, correct?

11:58:34 10        A.  Yes.

11:58:35 11        Q.  And of course the employees who had come worked

11:58:39 12    for Google cared about what their compensation would be

11:58:41 13    generally, correct?

11:58:43 14            MR. RUBIN:  Objection.  Form.

11:58:44 15            THE WITNESS:  I believe people care about

11:58:46 16    compensation.

11:58:48 17            MR. HARVEY:  Q.  Okay.  And so have there

11:58:56 18    ever been examples that you know of where Google

11:59:01 19    tried to hire someone and Google found itself in a

11:59:04 20    bidding war for that person with another company?

11:59:10 21        A.  Yes.

11:59:14 22        Q.  You would have preferred that the other

11:59:16 23    company, in those examples, or in that example, had no

11:59:18 24    interest in the employee, correct?

11:59:20 25            MR. RUBIN:  Objection.  Form.

| | | |
|---|---|---|
| 11:59:23 | 1 | THE WITNESS:  I would always prefer a path to |
| 11:59:25 | 2 | hiring an employee that had fewer obstacles to more. |
| 12:00:02 | 3 | MR. HARVEY:  Q.  If you could please look |
| 12:00:04 | 4 | at what's been previously marked as Exhibit 175. |
| 12:00:53 | 5 | A.  Okay.  I've read the document. |
| 12:00:55 | 6 | Q.  And so this is a different string that starts |
| 12:00:58 | 7 | with the same email. |
| 12:01:02 | 8 | If you could look to the top of page 2, there, |
| 12:01:05 | 9 | it looks like Mr. Shader follows up on his email of |
| 12:01:10 | 10 | November 4th and responds to the group, adding a couple |
| 12:01:16 | 11 | others, on November 15th, 2003.  Do you see that? |
| 12:01:21 | 12 | A.  Yes. |
| 12:01:26 | 13 | Q.  And then in Ms. Brown's response on the first |
| 12:01:29 | 14 | page she says (as read), "Sorry for the delay.  I think |
| 12:01:32 | 15 | that the reality is employees of Google or Good need to |
| 12:01:36 | 16 | be regarded as free agents, so I'm not comfortable |
| 12:01:41 | 17 | prohibiting the recruitment of a Good employee to Google |
| 12:01:44 | 18 | (or vis versa).  In addition, I'm not comfortable |
| 12:01:51 | 19 | betraying individual's privacy by revealing to Good when |
| 12:01:53 | 20 | we are in discussions with them (obviously if a |
| 12:01:57 | 21 | candidate does not ultimately get an offer, and yet it |
| 12:02:00 | 22 | is known they were shopping, the candidates will |
| 12:02:03 | 23 | perceive that negatively)." |
| 12:02:05 | 24 | Do you see that? |
| 12:02:05 | 25 | A.  I do. |

| | | |
|---|---|---|
| 12:02:06 | 1 | Q.  Do you recall whether Google had an internal |
| 12:02:12 | 2 | conversation about this topic that led with the outcome |
| 12:02:16 | 3 | of Ms. Brown responding in this way? |
| 12:02:22 | 4 | A.  I believe we did. |
| 12:02:24 | 5 | Q.  And could you describe those conversations, |
| 12:02:25 | 6 | please. |
| 12:02:27 | 7 | A.  Not with any greater accuracy than Shona is |
| 12:02:31 | 8 | codifying them in this email. |
| 12:02:34 | 9 | Q.  So Shona's description is an accurate |
| 12:02:37 | 10 | representation of the internal decision Google made in |
| 12:02:41 | 11 | how to respond to Mr. Shader? |
| 12:02:43 | 12 | A.  That, I don't know. |
| 12:02:44 | 13 | Q.  Do you not know because you can't remember? |
| 12:02:51 | 14 | A.  Yes. |
| 12:03:06 | 15 | MR. HARVEY:  Okay.  I'm done with that. |
| 12:03:13 | 16 | So this is something I forgot to mention to |
| 12:03:14 | 17 | you.  This is a document that was introduced on Monday, |
| 12:03:17 | 18 | but we don't have the stamped copies yet, so I'm just |
| 12:03:20 | 19 | going to describe it.  Do you want to mark it anyway? |
| 12:03:36 | 20 | (Discussion off the record.) |
| 12:03:47 | 21 | MR. HARVEY:  Why don't we go off the record for |
| 12:03:48 | 22 | a moment. |
| 12:03:49 | 23 | THE VIDEOGRAPHER:  We are now off the record at |
| 12:03:51 | 24 | 12:03. |
| 12:04:12 | 25 | (Recess taken.) |

Deposition of Jonathan Rosenberg                In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 12:04:26 | 1 | THE VIDEOGRAPHER:  We are now on the record at |
| 12:04:28 | 2 | 12:04. |
| 12:04:30 | 3 | MR. HARVEY:  Q.  Mr. Rosenberg, if you |
| 12:04:30 | 4 | could please take a look at a document that has been |
| 12:04:33 | 5 | previously introduced as Exhibit 1738. |
| 12:04:53 | 6 | A.  Okay. |
| 12:04:56 | 7 | Q.  Here Mr. Shader responds to Ms. Brown's |
| 12:04:58 | 8 | rejection by e-mailing you and Mr. Kordestani |
| 12:05:03 | 9 | separately, correct? |
| 12:05:04 | 10 | A.  Yes. |
| 12:05:07 | 11 | Q.  And in it, Mr. Shader wrote, "Hey, guys, I |
| 12:05:12 | 12 | think this is a surprising response given the 'small |
| 12:05:16 | 13 | Valley' phenomenon." |
| 12:05:18 | 14 | Do you know what he's referring to here? |
| 12:05:22 | 15 | A.  I do not know. |
| 12:05:24 | 16 | Q.  Have you ever heard the term "small Valley |
| 12:05:26 | 17 | phenomenon" in the context of recruiting and hiring? |
| 12:05:29 | 18 | MR. RUBIN:  Objection.  Form. |
| 12:05:31 | 19 | THE WITNESS:  I have not. |
| 12:05:36 | 20 | MR. HARVEY:  Q.  Okay.  And the next |
| 12:05:39 | 21 | sentence is, "Omid's and my personal experiences at |
| 12:05:45 | 22 | Netscape would suggest that it's sometimes hard to |
| 12:05:48 | 23 | anticipate the long-term consequences of decisions |
| 12:05:52 | 24 | that are made when things are going well." |
| 12:05:57 | 25 | Do you see that? |

12:05:58  1          A.  I do.

12:05:59  2          Q.  Do you have an understanding of what he was

12:06:01  3      saying here in terms of what the potential long-term

12:06:04  4      consequences would be?

12:06:07  5          A.  I do think I understand what he's saying.

12:06:11  6          Q.  And what's that?

12:06:12  7          A.  I think he's saying that Google is doing very

12:06:15  8      well, and I'm a partner of yours, and you are choosing

12:06:18  9      not to be helpful to me in this situation.  And when

12:06:23  10      things -- and it's a small world, and I don't appreciate

12:06:29  11      it.

12:06:31  12          Q.  Sort of suggesting that if Google needs

12:06:35  13      something from Good in the future, Google may not get

12:06:38  14      the answer it wants?

12:06:42  15              MR. RUBIN:  Objection.  Form.

12:06:46  16              THE WITNESS:  I don't know that that's what

12:06:47  17      he's saying, but he is clearly saying that -- he's

12:06:52  18      clearly indicating he's not happy with our choice --

12:06:56  19      with our decision.

12:06:59  20              MR. HARVEY:  Q.  Okay.  If we could

12:07:12  21      fast-forward to the next year, 2004.  This was a

12:07:18  22      time of, is it fair to say, explosive growth for

12:07:23  23      Google?

12:07:24  24          A.  We were expanding rapidly.

12:07:26  25          Q.  And that rapid expansion included hiring

12:07:28  1    rapidly, correct?

12:07:29  2        A.  That is correct.

12:07:42  3           MR. HARVEY:  This is a new exhibit.  I believe

12:07:48  4    we're at 1753.

12:08:00  5           (Whereupon, Exhibit 1753 was marked for

12:08:00  6           identification.)

12:08:06  7           MR. HARVEY:  Q.  If you could please take a

12:08:08  8    look at the document and let me know when you are

12:08:09  9    ready.

12:08:52 10        A.  Okay.

12:08:54 11        Q.  Without going through a fairly lengthy email --

12:09:00 12    well, first let me say, this is an email that

12:09:03 13    Ms. Brown -- pardon me, Ms. Brown sent to you and others

12:09:07 14    at Google on June 7th, 2004, correct?

12:09:12 15        A.  Correct.

12:09:14 16        Q.  Is it fair to say that the topic of this

12:09:16 17    conversation is planning for this rapid growth you just

12:09:20 18    described?

12:09:22 19           MR. RUBIN:  Objection.  Form.

12:09:26 20           THE WITNESS:  The topic of the email relates to

12:09:29 21    headcount planning and engineering hiring.

12:09:33 22           MR. HARVEY:  Q.  Okay.  Is it fair to say

12:09:40 23    that at this time, June 7th, 2004, Google was

12:09:45 24    gearing up to dramatically increase the rate at

12:09:49 25    which it was hiring employees?

| | | |
|---|---|---|
| 12:29:58 | 1 | MR. RUBIN:  Objection.  Form. |
| 12:30:08 | 2 | THE WITNESS:  I didn't -- I don't believe I |
| 12:30:10 | 3 | ever really fully understood it. |
| 12:30:14 | 4 | MR. HARVEY:  Q.  But did you understand |
| 12:30:15 | 5 | that it was for internal purposes only? |
| 12:30:18 | 6 | MR. RUBIN:  Objection.  Form. |
| 12:30:24 | 7 | THE WITNESS:  I don't know whether it was or |
| 12:30:25 | 8 | wasn't an internal confidential list or not. |
| 12:30:30 | 9 | MR. HARVEY:  Q.  So you don't know, sitting |
| 12:30:31 | 10 | here today, whether it was shared with other |
| 12:30:34 | 11 | companies? |
| 12:30:37 | 12 | A.  I don't. |
| 12:30:39 | 13 | Q.  Do you know, sitting here today, whether a |
| 12:30:42 | 14 | company was put on or off the list pursuant to an |
| 12:30:45 | 15 | agreement with that company who made similar commitments |
| 12:30:51 | 16 | to Google? |
| 12:30:51 | 17 | A.  I do not. |
| 12:30:53 | 18 | Q.  You don't know one way or the other? |
| 12:30:55 | 19 | A.  I don't. |
| 12:30:59 | 20 | Q.  Do you recall discussing the do-not-call list |
| 12:31:05 | 21 | at meetings of the executive management group? |
| 12:31:08 | 22 | A.  I vaguely recall discussions around recruiting |
| 12:31:12 | 23 | policies and procedures, companies and process -- |
| 12:31:18 | 24 | internal processes related to those companies. |
| 12:31:29 | 25 | Q.  And in those discussions, was Google's |

12:31:33  1    do-not-call list part of those discussions?

12:31:45  2         A.  I don't remember referring to the list as a

12:31:47  3    do-not-call list.  I remember discussions around the

12:31:51  4    issue of proactively cold calling individuals at other

12:31:57  5    companies or not doing so.

12:32:00  6         Q.  And you recall those discussions taking place

12:32:02  7    at meetings of the executive management group?

12:32:08  8         A.  I don't recall whether or not they were the

12:32:10  9    official Monday executive management group meetings or

12:32:15 10    other meetings with similar sets of individuals present.

12:32:18 11         Q.  Okay.  Do you recall when those discussions

12:32:23 12    began, approximately?

12:32:29 13         A.  Sometime after I started.  So no, I don't

12:32:33 14    recall exactly when they began.

12:32:45 15         Q.  Do you recall an event or communication that

12:32:51 16    prompted Google to discuss whether to create a

12:32:54 17    do-not-call list?

12:32:57 18              MR. RUBIN:  Objection.  Form.

12:33:01 19              THE WITNESS:  I recall events from other

12:33:05 20    individuals that caused us to discuss the policy.  I

12:33:11 21    don't know the direct -- I don't know the timing of the

12:33:14 22    do-not-call list, nor do I specifically recall the

12:33:17 23    do-not-call list.  So I can't link the causality between

12:33:24 24    the two.  But I do recall discussions based on

12:33:27 25    individuals voicing objections.

Deposition of Jonathan Rosenberg                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 12:33:30 | 1 | MR. HARVEY:  Q.  And these individuals were |
| 12:33:31 | 2 | typically the chief executives of other companies, |
| 12:33:34 | 3 | correct? |
| 12:33:40 | 4 | A.  I think more often than not, the escalation |
| 12:33:43 | 5 | would come through a chief executive, yes. |
| 12:33:46 | 6 | Q.  And those chief executives included Steve Jobs, |
| 12:33:48 | 7 | correct? |
| 12:33:49 | 8 | A.  Definitely. |
| 12:33:52 | 9 | Q.  And those chief executives included Paul |
| 12:33:55 | 10 | Otellini, correct? |
| 12:33:58 | 11 | A.  I don't recall Paul specifically calling us, |
| 12:34:02 | 12 | but I do recall discussions involving Paul on these |
| 12:34:09 | 13 | issues.  But I don't recall a particular discussion -- I |
| 12:34:12 | 14 | don't recall Paul initiating a discussion. |
| 12:34:15 | 15 | Q.  Do you recall anyone else initiating a |
| 12:34:16 | 16 | discussion with Paul about these issues? |
| 12:34:20 | 17 | A.  No.  I believe I was involved in discussions |
| 12:34:29 | 18 | with Paul, but I don't remember whether I initiated |
| 12:34:32 | 19 | them. |
| 12:34:33 | 20 | Q.  Okay.  Was Mr. Campbell -- well, he wasn't a |
| 12:34:45 | 21 | chief executive at the time.  I guess he was chairman of |
| 12:34:48 | 22 | the board of Intuit. |
| 12:34:49 | 23 | Was he one of those individuals who contacted |
| 12:34:53 | 24 | Google about concerns of Google's recruiting of |
| 12:34:58 | 25 | employees of his company? |

| | | |
|---|---|---|
| 12:35:00 | 1 | MR. RUBIN:  Objection.  Form. |
| 12:35:04 | 2 | THE WITNESS:  I believe Mr. Campbell was |
| 12:35:07 | 3 | present for some of these discussions.  He was usually |
| 12:35:09 | 4 | present during the Monday after -- he was often present |
| 12:35:11 | 5 | during the Monday afternoon meetings. |
| 12:35:22 | 6 | MR. HARVEY:  Q.  Do you recall what the |
| 12:35:23 | 7 | basic terms of Google's do-not-call list were with |
| 12:35:30 | 8 | respect to the limitations it imposed on Google? |
| 12:35:39 | 9 | MR. RUBIN:  Objection.  Form. |
| 12:35:39 | 10 | THE WITNESS:  Well, I don't exactly.  I believe |
| 12:35:41 | 11 | it changed over the course of time, and I was generally |
| 12:35:47 | 12 | ambiguous as to what -- I generally felt the |
| 12:35:53 | 13 | implications of whatever was on the list was ambiguous. |
| 12:35:59 | 14 | MR. HARVEY:  Q.  You thought the list |
| 12:36:03 | 15 | imposed ambiguous restrictions on Google? |
| 12:36:09 | 16 | A.  I never went through the details of what was on |
| 12:36:11 | 17 | the list, or paid super close attention to exactly how |
| 12:36:15 | 18 | the rules were articulated. |
| 12:36:20 | 19 | Q.  Do you have any kind of general understanding |
| 12:36:22 | 20 | of the limitations that were embodied in the do-not-call |
| 12:36:27 | 21 | list? |
| 12:36:27 | 22 | MR. RUBIN:  Objection.  Form. |
| 12:36:32 | 23 | THE WITNESS:  Again, since the -- since my |
| 12:36:34 | 24 | understanding of the policies evolved over time, I can't |
| 12:36:44 | 25 | tell you specifically what was embodied within those |

12:36:47 1    policies at any given point in time.

12:36:49 2         MR. HARVEY:  Q.  But generally, if a

12:36:51 3    company was listed on the do-not-call list, then

12:36:56 4    Google could not cold call into that company,

12:36:59 5    correct?

12:37:01 6         MR. RUBIN:  Objection.  Form.

12:37:09 7         THE WITNESS:  If recruiters cold called into a

12:37:11 8    company that was on the list, they could expect that the

12:37:14 9    other company would escalate and be upset about it.

12:37:18 10        MR. HARVEY:  Q.  And that initial act of

12:37:19 11   the recruiter, if it happened, would have been in

12:37:22 12   violation of the do-not-call list, correct?

12:37:26 13        A.  I don't know.

12:37:35 14        Q.  Are you aware of any other companies, aside

12:37:38 15   from Google, that had a similar do-not-call list?

12:37:45 16        A.  No.

12:38:01 17        Q.  In your experience with other companies, did

12:38:04 18   any of those companies have anything similar to the

12:38:09 19   do-not-call list that Google created?

12:38:11 20        MR. RUBIN:  Objection.  Form.

12:38:16 21        THE WITNESS:  Again, I don't know the specifics

12:38:17 22   of what was on our list.  I believe that -- I believe

12:38:24 23   that I have heard of other companies who, in practice,

12:38:26 24   chose or chose not to allow their recruiters to solicit

12:38:31 25   employees of firms that they engaged in business with,

12:38:35 1  and that that is a generally common practice.  But not

12:38:41 2  familiar with the specifics of it.

12:38:50 3       MR. HARVEY:  Q.  What other companies do

12:38:51 4  you know of that had a list of companies that the

12:39:02 5  company could not cold call into?

12:39:15 6       A.  Again, I don't know of such a literal list or

12:39:21 7  what might be on the list.  I do remember when I was at

12:39:24 8  Dialog, which was a Knight Ridder subsidiary, that it

12:39:28 9  would not have been considered great form to

12:39:34 10 aggressively pursue the attorneys who were sent by a law

12:39:39 11 firm to help us with a particular project.

12:39:47 12      Q.  Do you know whether Dialog maintained a list of

12:39:51 13 companies that Dialog could not cold call into?

12:39:55 14      A.  No.  But I distinctly remember a conversation

12:39:58 15 about recruiting an attorney that we worked with.

12:40:03 16      Q.  When did that conversation occur, basically?

12:40:06 17      A.  I don't know.  Between 1990 and 1993.

12:40:18 18      Q.  Okay.  Aside from Dialog, are there any other

12:40:21 19 companies you know of that had a policy of not cold

12:40:28 20 calling into specific companies?

12:40:35 21      A.  Not that I know of.

12:40:38 22      Q.  Do you know whether Intel had such a policy?

12:40:40 23      MR. RUBIN:  Objection.  Form.

12:40:46 24      THE WITNESS:  No, I don't.

12:40:51 25      MR. HARVEY:  Q.  Did you ever discuss

| | | |
|---|---|---|
| 12:40:52 | 1 | Intel's recruiting activities with anyone at Intel? |
| 12:41:03 | 2 | A.  I believe I may have. |
| 12:41:07 | 3 | Q.  And what conversations are you thinking of? |
| 12:41:12 | 4 | A.  The only person at Intel who I had any regular |
| 12:41:14 | 5 | interaction with would have been Paul Otellini. |
| 12:41:18 | 6 | Q.  Do you recall anything that Paul Otellini said |
| 12:41:21 | 7 | to you about Intel's recruiting? |
| 12:41:23 | 8 | A.  No. |
| 12:41:29 | 9 | Q.  Do you know whether Intuit had a list of |
| 12:41:31 | 10 | companies that Intuit could not cold call into? |
| 12:41:36 | 11 | A.  I do not. |
| 12:41:38 | 12 | Q.  Do you know whether Apple had a list of |
| 12:41:40 | 13 | companies that Apple could not cold call into? |
| 12:41:44 | 14 | A.  I do not. |
| 12:42:07 | 15 | Q.  Was Google's do-not-call list ever discussed at |
| 12:42:11 | 16 | a meeting of Google's board of directors? |
| 12:42:15 | 17 | A.  It may have been. |
| 12:42:16 | 18 | Q.  And what makes you think that it may have been? |
| 12:42:26 | 19 | A.  Various parties who we've discussed here were |
| 12:42:28 | 20 | generally at those meetings.  And our hiring and |
| 12:42:38 | 21 | recruiting practices were reported on in those meetings. |
| 12:42:57 | 22 | Q.  And Mr. Campbell would often attend meetings of |
| 12:43:02 | 23 | Google's board of directors, correct? |
| 12:43:03 | 24 | A.  Yes. |
| 12:43:17 | 25 | Q.  Do you recall an irate call from Steve Jobs to |

| | | |
|---|---|---|
| 12:43:24 | 1 | Sergey Brin in February 2005? |
| 12:43:27 | 2 | A.  I recall the reporting of Steve being irate. |
| 12:43:32 | 3 | Q.  And what do you recall about that? |
| 12:43:44 | 4 | A.  That Steve was upset about -- I don't know |
| 12:43:49 | 5 | which particular conversation you are referring to.  I |
| 12:43:51 | 6 | recall a number of instances in which it was reported |
| 12:43:56 | 7 | that Steve was irate.  And I recall that the general |
| 12:44:02 | 8 | issues around which he was irate were the hiring of |
| 12:44:09 | 9 | Apple employees into Google. |
| 12:44:15 | 10 | Q.  Do you know who at Google Steve called to |
| 12:44:19 | 11 | discuss -- to discuss that issue? |
| 12:44:25 | 12 | A.  I believe at different times he called |
| 12:44:27 | 13 | different people.  I'm pretty confident that he called |
| 12:44:29 | 14 | both Eric -- I believe I remember Eric saying he had |
| 12:44:32 | 15 | received calls, and I believe I remember Sergey saying |
| 12:44:37 | 16 | he received calls. |
| 12:44:38 | 17 | Q.  Aside from Eric Schmidt, I take it, and Sergey |
| 12:44:41 | 18 | Brin, do you recall any other individuals at Google who |
| 12:44:46 | 19 | received these calls from Mr. Jobs? |
| 12:44:50 | 20 | A.  The only thing I recall specifically is that |
| 12:44:53 | 21 | Alan Eustace also had a lot of direct discussions with |
| 12:44:57 | 22 | Steve, but those were the three primary people who Steve |
| 12:45:00 | 23 | spoke to over the years.  I suppose in addition to |
| 12:45:03 | 24 | Larry.  I don't recall a discussion with Larry on this |
| 12:45:06 | 25 | issue. |

Deposition of Jonathan Rosenberg                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 12:45:09 | 1 | Q.  Was it -- well, how common, if at all, was it |
| 12:45:19 | 2 | for Steve Jobs to call someone at Google in an irate |
| 12:45:25 | 3 | fashion? |
| 12:45:27 | 4 | MR. RUBIN:  Objection.  Form. |
| 12:45:30 | 5 | THE WITNESS:  In my experience, our |
| 12:45:32 | 6 | interactions with Steve -- in our interactions with |
| 12:45:37 | 7 | Steve, he generally exhibited an irate, difficult, |
| 12:45:43 | 8 | ornery, and petulant behavior regarding his feelings |
| 12:45:47 | 9 | about our business dealings. |
| 12:45:52 | 10 | MR. HARVEY:  Q.  Did you have any -- that |
| 12:45:54 | 11 | will do. |
| 12:45:55 | 12 | Did you have any direct communications with |
| 12:45:58 | 13 | Steve Jobs? |
| 12:46:01 | 14 | A.  No.  Not beyond socially acknowledging his |
| 12:46:08 | 15 | existence in the context of events. |
| 12:46:14 | 16 | Q.  Did you ever attend meetings or conference |
| 12:46:17 | 17 | calls where Mr. Jobs participated? |
| 12:46:25 | 18 | A.  Not that I can recall. |
| 12:46:40 | 19 | Q.  Do you recall whether Google first created its |
| 12:46:48 | 20 | do-not-call list in response to one of these irate calls |
| 12:46:50 | 21 | from Steve Jobs? |
| 12:46:53 | 22 | A.  I recall substantive discussion in the time |
| 12:46:57 | 23 | frame -- occurring in the time frame of the call from |
| 12:47:01 | 24 | Steve.  I don't know the exact time lines around such a |
| 12:47:06 | 25 | list or changes to such a list. |

12:47:10   1      Q.   Why don't we go through some documents --

12:47:12   2      A.   Okay.

12:47:13   3      Q.   -- that I think can help you.

12:47:16   4           This first one, I don't believe has been

12:47:19   5   introduced before.

12:47:28   6           (Whereupon, Exhibit 1754 was marked for

12:47:28   7           identification.)

12:47:41   8           MR. HARVEY:  Q.  Please let me know once

12:47:42   9   you've had a chance to examine the document.

12:48:27  10      A.   Okay.

12:48:31  11      Q.   You know, I should have mentioned this earlier,

12:48:33  12   but you were on the emg@google.com email list during

12:48:38  13   this time, correct?

12:48:40  14      A.   Absolutely.

12:48:40  15      Q.   And you were throughout the time that you were

12:48:44  16   a member of the EMG, correct?

12:48:47  17      A.   Correct.

12:48:50  18      Q.   Did you receive this email from Mr. Brin, looks

12:48:54  19   like on February 13th, 2005?

12:48:57  20      A.   I'm sure I did.

12:48:57  21      Q.   And this email describes one of the irate calls

12:49:00  22   we were just talking about, correct?

12:49:01  23      A.   Yes, it does.

12:49:06  24      Q.   At the bottom of that first paragraph, Mr. Brin

12:49:10  25   wrote, "He made various veiled threats too, though I am

Deposition of Jonathan Rosenberg                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
12:49:15  1    not inclined to hold them against him too much, as he

12:49:19  2    seemed beside himself, (as Eric would say)."

12:49:25  3         Do you know what various veiled threats

12:49:31  4    Mr. Jobs made to Mr. Brin?

12:49:32  5         A.  No, I don't.

12:49:33  6         Q.  Did you ever discuss those veiled threats with

12:49:36  7    Mr. Brin?

12:49:36  8             MR. RUBIN:  Objection.  Form.

12:49:41  9             THE WITNESS:  It's possible.

12:49:44 10             MR. HARVEY:  Q.  But you don't remember if

12:49:45 11    they happened, what the substance of those

12:49:48 12    conversations were?

12:49:50 13         A.  I do not.

12:49:53 14         Q.  And here, in what I just read, Mr. Brin says

12:49:57 15    that Mr. Jobs seemed beside himself, as Eric would say.

12:50:02 16         Do you know what he's talking about there in

12:50:03 17    terms of sounds like a phrase that Eric Schmidt used to

12:50:12 18    describe Mr. Jobs?

12:50:13 19         A.  I think he's referring to the odd and

12:50:18 20    idiosyncratic manner of Steve's behavior when he engaged

12:50:24 21    with other companies and projected a great deal of anger

12:50:29 22    on an issue in a way that was unlike what many of us are

12:50:32 23    accustomed to with other executives.

12:50:54 24         Q.  Okay.  If you could look at Exhibit 561, which

12:50:57 25    appears to be written that Monday by Ms. Brown.
```

12:51:08 1      A.  The following Monday.

12:51:12 2      Q.  Yes.  Thank you.

12:51:32 3      A.  Okay.

12:51:34 4      Q.  Do you recall the meeting of the EMG described

12:51:38 5  in this document that took place on February 14th, 2005?

12:51:45 6      A.  I believe I was there, but I don't recall the

12:51:47 7  specifics of the meeting.

12:51:50 8      Q.  Do you recall, generally, that the senior

12:51:53 9  executives of Google at that meeting discussed Steve

12:51:58 10  Jobs' call and what to do about it?

12:52:04 11      A.  I don't recall the discussion occurred at that

12:52:07 12  management meeting, but it seems likely, given the dates

12:52:10 13  and times on these emails.

12:52:14 14      Q.  And Ms. Brown wrote in this email, "We agreed

12:52:20 15  in EMG today that we would treat three companies in a

12:52:25 16  special way going forward, Genentech, Intel, and Apple."

12:52:31 17          Do you know why Genentech and Intel were

12:52:33 18  included with Apple here?

12:52:35 19          MR. RUBIN:  Objection.  Form.

12:52:36 20          THE WITNESS:  I don't.

12:52:39 21          MR. HARVEY:  Q.  Do you know whether Paul

12:52:42 22  at Intel or Mr. Levinson at Genentech made similar

12:52:47 23  calls to Google at the time?

12:52:51 24      A.  I do not.

12:52:57 25      Q.  Do you recall anything about the discussion

Deposition of Jonathan Rosenberg                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 12:52:59 | 1 | that led to the decision to put these three companies on |
| 12:53:05 | 2 | a do-not-call list? |
| 12:53:09 | 3 | A.  I do not. |
| 12:53:22 | 4 | MR. HARVEY:  Okay.  I believe this will be |
| 12:53:39 | 5 | Exhibit 1755. |
| 12:53:53 | 6 | (Whereupon, Exhibit 1755 was marked for |
| 12:53:53 | 7 | identification.) |
| 12:53:58 | 8 | MR. HARVEY:  Q.  If you could please let me |
| 12:53:59 | 9 | know once you've had a chance to examine the |
| 12:54:02 | 10 | document. |
| 12:54:54 | 11 | A.  Okay. |
| 12:54:56 | 12 | Q.  Is this another example of the irate calls that |
| 12:55:00 | 13 | we were talking about earlier? |
| 12:55:01 | 14 | A.  Yes, it is. |
| 12:55:04 | 15 | Q.  And Mr. Brown -- I'm sorry.  Mr. Brin wrote |
| 12:55:10 | 16 | this to you and others on the following Thursday of that |
| 12:55:16 | 17 | week, February 17th, 2005; is that correct? |
| 12:55:19 | 18 | A.  Yes, it is. |
| 12:55:26 | 19 | Q.  And Mr. Brin wrote, in part, that Steve Jobs |
| 12:55:28 | 20 | said, "If you hire a single one of these people, that |
| 12:55:32 | 21 | means war." |
| 12:55:36 | 22 | Do you recall discussing this threat with |
| 12:55:41 | 23 | Mr. Brin or anyone else at Google? |
| 12:55:43 | 24 | MR. RUBIN:  Objection.  Form. |
| 12:55:45 | 25 | THE WITNESS:  I do not. |

| | | |
|---|---|---|
| 12:55:54 | 1 | MR. HARVEY:  Q.  Do you know whether |
| 12:55:59 | 2 | Mr. Campbell participated in the executive |
| 12:56:01 | 3 | management group meeting that occurred on Monday of |
| 12:56:03 | 4 | that week? |
| 12:56:05 | 5 | A.  I do not. |
| 12:56:06 | 6 | Q.  Do you have an understanding of why Mr. Brin |
| 12:56:09 | 7 | copied Mr. Campbell on this email? |
| 12:56:15 | 8 | MR. RUBIN:  Objection.  Form. |
| 12:56:19 | 9 | THE WITNESS:  Mr. Campbell was often copied on |
| 12:56:23 | 10 | emails related to the EMG. |
| 12:56:31 | 11 | MR. HARVEY:  Q.  Do you have an |
| 12:56:32 | 12 | understanding that Mr. Campbell had a relationship |
| 12:56:36 | 13 | with Mr. Jobs at the time? |
| 12:56:39 | 14 | A.  Yes, I do. |
| 12:56:41 | 15 | Q.  And what was that relationship, to your |
| 12:56:43 | 16 | understanding? |
| 12:56:46 | 17 | A.  They were business associates and friends. |
| 12:56:57 | 18 | Q.  Did Google ever use Mr. Campbell as kind of a |
| 12:57:06 | 19 | back channel to Mr. Jobs? |
| 12:57:12 | 20 | MR. RUBIN:  Objection.  Form. |
| 12:57:14 | 21 | THE WITNESS:  What's a back -- define back |
| 12:57:16 | 22 | channel. |
| 12:57:18 | 23 | MR. HARVEY:  Q.  As another means of |
| 12:57:20 | 24 | communication that is not a direct Google to Apple, |
| 12:57:25 | 25 | but where Mr. Campbell would talk to Mr. Jobs about |

| | | |
|---|---|---|
| 12:57:29 | 1 | a topic and then report back to Google. |
| 12:57:35 | 2 | A.  Mr. Campbell talked to the management team at |
| 12:57:36 | 3 | Google and Mr. Campbell talked to Mr. Jobs, and you'd |
| 12:57:43 | 4 | have to ask him specifically what he spoke about. |
| 12:57:49 | 5 | Q.  When there was some tension between Google and |
| 12:57:56 | 6 | Mr. Jobs, did Mr. Campbell ever try to diffuse that |
| 12:58:01 | 7 | tension by talking to Mr. Jobs on his own and then |
| 12:58:05 | 8 | reporting back to Google? |
| 12:58:07 | 9 | MR. RUBIN:  Objection.  Form. |
| 12:58:07 | 10 | THE WITNESS:  You would have to ask |
| 12:58:09 | 11 | Mr. Campbell. |
| 12:58:09 | 12 | MR. HARVEY:  Q.  Well, but you worked at |
| 12:58:11 | 13 | Google at the time, and you knew Mr. Campbell quite |
| 12:58:13 | 14 | well, so I'm asking you whether you're aware of that |
| 12:58:18 | 15 | ever occurring. |
| 12:58:19 | 16 | MR. RUBIN:  Same objection. |
| 12:58:21 | 17 | THE WITNESS:  It seems like the kind of thing |
| 12:58:24 | 18 | that -- it seems like the kind of thing that it's |
| 12:58:28 | 19 | reasonable to assume occurred.  I can't give you a |
| 12:58:31 | 20 | specific instance of it occurring. |
| 12:58:43 | 21 | MR. RUBIN:  How about one more document, Dean, |
| 12:58:44 | 22 | and then we'll break if that's okay.  Or you want to |
| 12:58:47 | 23 | break now? |
| 12:58:48 | 24 | MR. HARVEY:  Let me just see where I am.  You |
| 12:59:02 | 25 | know, I'd like to push through a bit longer, unless you |

```
12:59:05  1   want to take a break and I'll take a break.  That's
12:59:07  2   fine.
12:59:07  3            MR. RUBIN:  It's up to you.  I was thinking
12:59:09  4   it's getting a little late -- I mean, we're moving to
12:59:12  5   1:00 o'clock for lunch, if you can go another -- what do
12:59:15  6   you think, another ten minutes?
12:59:17  7            MR. HARVEY:  It depends.  There is this kind of
12:59:20  8   topic -- I mean, it might be 20, 30 minutes.
12:59:23  9            MR. RUBIN:  Let's go ahead and break now, then.
12:59:25 10            THE WITNESS:  Okay.  Let's break now.
12:59:26 11            THE VIDEOGRAPHER:  Okay.  We are now off the
12:59:27 12   record at 12:59.
01:22:55 13            (Recess taken.)
01:48:57 14            THE VIDEOGRAPHER:  We are now on the record at
01:49:00 15   1:48.
01:49:02 16            MR. HARVEY:  Q.  I believe before the break
01:49:03 17   we were talking about Mr. Campbell vis-a-vis Google
01:49:07 18   and Apple, and a week in February 2005 when Apple
01:49:14 19   created its do-not-call list.  Do you recall whether
01:49:20 20   that week, or thereabouts, Mr. Campbell reported the
01:49:26 21   fact that Apple -- or that Google would not recruit
01:49:31 22   from Apple any longer to Mr. Jobs?
01:49:35 23        A.  I do not, nor am I aware of there being an
01:49:39 24   Apple do-not-call list.  You said Apple created a
01:49:44 25   do-not-call list.  I thought we were talking about the
```

```
01:49:46   1    Google do-not-call list.

01:49:48   2         Q.  You're right, and that was my mistake.  Thank

01:49:51   3    you for the correction.  I was trying to refer to the

01:49:53   4    Google do-not-call list.

01:49:55   5         And I presume, then, that your answer wouldn't

01:49:58   6    change --

01:49:58   7         A.  Correct.

01:49:59   8         Q.  -- given that clarification.

01:50:05   9         If you could look at Exhibit 199.

01:50:13   10        Let me know when you are ready.

01:50:33   11        A.  Okay.

01:50:36   12        Q.  And I'll note I realize you are not on this

01:50:38   13   email.  That the email labeled Exhibit 199 was sent from

01:50:46   14   Bill Campbell to Steve Jobs on Friday of that week,

01:50:49   15   February 18th, 2005.

01:50:53   16        Did you ever discuss with Mr. Campbell the fact

01:50:55   17   that he had made this communication with Mr. Jobs?

01:50:59   18        A.  It's possible.

01:51:03   19        Q.  Do you recall anything about that conversation,

01:51:09   20   if it happened?

01:51:10   21        A.  No, I don't.

01:51:26   22        Q.  Is this email consistent with what you

01:51:30   23   understood Bill Campbell -- Bill Campbell's practices

01:51:40   24   with respect to communicating back and forth between

01:51:44   25   Google and Apple?
```

01:51:46  1        A.  It's clearly an example of Bill communicating

01:51:49  2    back and forth between us and Steve Jobs, yes.

01:51:56  3        Q.  Do you know whether Mr. Campbell reported back

01:51:59  4    to Google that Steve Jobs had agreed that the

01:52:07  5    restriction would be mutual?  That is, that Apple agreed

01:52:12  6    not to recruit out of Google?

01:52:15  7            MR. RUBIN:  Objection.  Form.

01:52:19  8            THE WITNESS:  I don't know.

01:52:23  9            MR. HARVEY:  Q.  Do you recall any

01:52:24 10    conversation with Mr. Campbell or anyone else on the

01:52:27 11    topic of whether -- whether Apple reciprocated and

01:52:35 12    agreed not to recruit Google employees?

01:52:40 13        A.  I recall that in the climate, that would seem

01:52:42 14    like an unlikely thing to be discussing because it --

01:52:46 15    the hiring dynamic was asymmetric.  We were hiring

01:52:51 16    people from them, they weren't really hiring people from

01:52:54 17    us.  We were about to go public or had recently gone

01:52:57 18    public.  So Apple's hiring of Google employees simply

01:53:02 19    wasn't an issue.

01:53:15 20        Q.  If you could please look at Exhibit 563.

01:53:28 21        A.  Okay.

01:53:29 22        Q.  And I'll note that this occurs in the same

01:53:32 23    month, shortly after the last email from Mr. Campbell to

01:53:36 24    Mr. Jobs.

01:53:41 25            Do you know who Danielle Lambert is?

01:53:43  1      A.  No, I don't.

01:53:55  2      Q.  Does this document refresh your recollection at

01:53:56  3   all about an agreement between Apple and Google not to

01:53:59  4   recruit from one another?

01:54:01  5      A.  No.

01:54:16  6      Q.  Do you know whether Mr. Jobs approached other

01:54:18  7   companies in a similar way for a similar purpose to get

01:54:23  8   other companies to agree not to recruit Apple employees?

01:54:26  9           MR. RUBIN:  Objection.  Form.

01:54:29  10           THE WITNESS:  I do not.

01:54:33  11           MR. HARVEY:  Q.  Did you ever discuss that

01:54:33  12   possibility with anyone at Apple -- I'm sorry, with

01:54:36  13   anyone at Google?

01:54:40  14           MR. RUBIN:  Objection.  Form.

01:54:42  15           THE WITNESS:  Not that I can recall.

01:54:54  16           MR. HARVEY:  Q.  If you can please take a

01:54:56  17   look at Exhibit 448.  And I'll represent to you that

01:55:13  18   this document is a little different than the other

01:55:15  19   documents I'll show you in that the first part of

01:55:17  20   the document was written for this case, and it's a

01:55:20  21   declaration of Mr. Colligan who was CEO of Palm at

01:55:25  22   the time of the events described.  And then there

01:55:27  23   are two emails attached to his declaration that are

01:55:32  24   communications between him and Mr. Jobs.

01:55:34  25      A.  Okay.  Well, I haven't read it all, but....

02:15:42  1          Okay.

02:15:45  2      Q.  You are not on this communication, but it

02:15:47  3  appears to be one in which Ms. Brown is asking for the

02:15:55  4  current version of the do-not-call list for a discussion

02:15:58  5  of -- at the executive management group that occurred on

02:16:07  6  the 23rd of April, 2007.

02:16:09  7          If you could turn to the attachment on the

02:16:11  8  first page, the heading states, "Protocol for 'Do Not

02:16:20  9  Cold Call' and 'Sensitive' Companies."  And then it

02:16:24 10  states, "The following companies (and by association,

02:16:27 11  their subsidiaries) have special agreements with Google

02:16:32 12  and are part of the 'Do Not Cold Call' list."  And then

02:16:37 13  several companies are listed.  Do you see that?

02:16:41 14      A.  Uh-huh.  Yes.

02:16:44 15      Q.  Is this, what I've read so far through the list

02:16:47 16  of parent companies, is that, to your knowledge, an

02:16:50 17  accurate description of Google's do-not-cold-call list

02:16:55 18  at the time?

02:16:56 19          MR. RUBIN:  Objection.  Form.

02:17:03 20          THE WITNESS:  I don't know.

02:17:04 21          MR. HARVEY:  Q.  You don't have an opinion

02:17:06 22  one way or the other?

02:17:10 23      A.  I do not.

02:17:15 24      Q.  Do you recall discussing -- or do you recall

02:17:19 25  this particular version of the do-not-call list being

02:17:23  1  passed out and discussed at the meeting of the EMG on

02:17:27  2  the 23rd of April, 2007?

02:17:30  3      A.  I do not.

02:17:32  4      Q.  Okay.  I believe you testified earlier that

02:18:24  5  Bill Campbell regularly attended meetings of the

02:18:28  6  executive management group?

02:18:30  7      A.  Correct.

02:18:31  8      Q.  So it's fair to say that he participated in

02:18:35  9  discussions concerning the do-not-call list, correct?

02:18:39  10      MR. RUBIN:  Objection.  Form.

02:18:46  11      THE WITNESS:  Bill often did not participate in

02:18:47  12  discussions but listened.  So I'm not sure that I can

02:18:49  13  say that he participated in discussions of the

02:18:52  14  do-not-call list.

02:18:53  15      MR. HARVEY:  Q.  Sure.  Why don't I clarify

02:18:55  16  the word participate.  Well, why don't I modify it.

02:19:00  17      Did Bill Campbell -- well, scratch that.

02:19:04  18      Is it fair to say that Bill Campbell attended

02:19:07  19  meetings at Google in which Google's do-not-call list

02:19:10  20  was discussed?

02:19:16  21      MR. RUBIN:  Objection.  Form.

02:19:19  22      THE WITNESS:  Bill was at the vast majority of

02:19:20  23  the management meetings, not as many of those as I was,

02:19:23  24  so I cannot separate out in my head which meetings he

02:19:26  25  was at and which meetings he wasn't.  But generally it

Deposition of Jonathan Rosenberg                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:19:30  1    does seem probable that over the course of time, he was

02:19:33  2    present when some of these issues were discussed.

02:19:41  3            MR. HARVEY:  Q.  Do you recall, in 2005,

02:19:42  4    Mr. Campbell contacting you to complain about

02:19:51  5    Google's recruiting of Intuit people?

02:19:53  6        A.  No, I do not.

02:20:04  7        Q.  If you could please take a look at Exhibit 193.

02:20:50  8        A.  Okay.

02:20:52  9        Q.  If you could focus on Bill Campbell, it looks

02:20:56 10    like an email to you, which is the second one up from

02:21:00 11    the bottom on the first page.

02:21:01 12        A.  Yes.

02:21:02 13        Q.  Did Bill Campbell write you this email on

02:21:04 14    November 18th, 2005?

02:21:06 15        A.  Yes.

02:21:08 16        Q.  And he says, "Jonathan, are you guys nuts."

02:21:11 17        A.  Yes.

02:21:15 18        Q.  What did you understand Mr. Campbell to be

02:21:17 19    doing here?

02:21:18 20        A.  I don't recall.  But from the context of the

02:21:20 21    thread, he's clearly referring to our recruiting a CMO

02:21:26 22    from Intuit.

02:21:31 23        Q.  In response to this, did you have any

02:21:35 24    communications with Mr. Campbell about Google's

02:21:39 25    recruiting of Intuit people?

02:21:43   1        A.  I don't recall.

02:21:47   2        Q.  Do you recall making any assurances to him that

02:21:50   3   Google would stop recruiting Intuit people?

02:21:53   4             MR. RUBIN:  Objection.  Form.

02:22:02   5             THE WITNESS:  I don't recall anything other

02:22:03   6   than escalating this to Shona and Martha, who evidently

02:22:10   7   said they would take care of it.

02:22:13   8             MR. HARVEY:  Q.  And the matter was taken

02:22:14   9   care of as far as you were concerned?

02:22:16  10             MR. RUBIN:  Objection.  Form.

02:22:19  11             THE WITNESS:  Well, the issue of -- I believe

02:22:24  12   recruiting for this particular individual -- well, I

02:22:27  13   guess I don't know.  Martha says, we can't call the CMO

02:22:44  14   after the first discussion, so I assume that was the end

02:22:47  15   of it.

02:22:59  16             MR. HARVEY:  Q.  Do you recall, subsequent

02:23:01  17   to that, Bill Campbell asking Shona Brown to put

02:23:09  18   Intuit on the do-not-call list?

02:23:12  19        A.  I don't.

02:23:14  20        Q.  Okay.  Do you recall having any discussions

02:23:36  21   with anyone at Google about putting Intuit fully on the

02:23:41  22   do-not-call list?

02:23:43  23             MR. RUBIN:  Objection.  Form.

02:23:46  24             THE WITNESS:  I don't.

02:24:15  25             MR. HARVEY:  Q.  Switching gears a bit to

02:31:33   1           THE WITNESS:  Unusual to -- say that again?  It

02:31:35   2   would be unusual?

02:31:36   3           MR. HARVEY:  Q.  This gets back to

02:31:37   4   something we discussed at the beginning, in that

02:31:40   5   here you appear to be saying that you're going to

02:31:47   6   notify ████'s management at Intel before actually

02:31:52   7   finalizing an agreement with ████ to come work for

02:31:55   8   Google --

02:31:57   9           MR. RUBIN:  Objection.  Form.

02:31:57  10           MR. HARVEY:  Q.  -- and so --

02:31:59  11           MR. RUBIN:  Sorry.  I thought you were done.

02:32:00  12           MR. HARVEY:  I'm trying to clarify the

02:32:01  13   question.

02:32:04  14       Q.  And so my question is, given our prior

02:32:11  15   conversation, would you agree that that's an unusual

02:32:14  16   thing for Google to do, given that you were putting ████

02:32:19  17   into an awkward spot?

02:32:21  18           MR. RUBIN:  Objection.  Form.

02:32:23  19           THE WITNESS:  I guess I just don't understand

02:32:24  20   what I'm being asked.

02:32:26  21           MR. HARVEY:  Q.  Here in this email you are

02:32:36  22   talking about notifying ████'s management before

02:32:38  23   even getting to the stage of specifically discussing

02:32:41  24   an offer with ████, correct?

02:32:47  25       A.  All I'm saying is that I had a discussion with

02:32:52  1    Bill and felt that a scenario could evolve in which I

02:32:57  2    want to give a courtesy call to Paul Otellini.  But ████

02:33:00  3    was coming tomorrow, and I'll find out how ████ wants to

02:33:05  4    handle the communication with his own management.  And

02:33:08  5    we haven't even gotten to the stage of specifically

02:33:10  6    discussing an offer yet.  So my next step is to speak to

02:33:14  7    ████ and then determine what I need to do next.

02:33:28  8         Q.  Do you recall what ████'s -- well, sorry.  Did

02:33:33  9    you, in fact, meet with ████ the next day?

02:33:35 10         A.  I don't remember.

02:33:39 11         Q.  Do you recall speaking with ████ about this

02:33:43 12    issue?

02:33:44 13         A.  I do not.

02:33:47 14         Q.  Did ████ come to work for Google?

02:33:49 15         A.  I don't know.

02:33:51 16         Q.  Okay.  That's something presumably we can

02:33:56 17    check.

02:34:11 18              Actually, this is the end of a segment.  Why

02:34:14 19    don't we take a break.

02:34:16 20              THE VIDEOGRAPHER:  We are now off the record at

02:34:17 21    2:34.

02:34:22 22              (Recess taken.)

02:48:36 23              THE VIDEOGRAPHER:  We are now on the record at

02:48:37 24    2:48.

02:48:38 25              MR. HARVEY:  Q.  I'm going to change topics

02:48:42  1    and go forward in time a bit --

02:48:45  2        A.  Okay.

02:48:45  3        Q.  -- to about 2007.

02:48:49  4        A.  Okay.

02:48:51  5        Q.  Do you recall that at about that time and in

02:48:53  6    that year, Google began to get particularly concerned

02:48:58  7    with Facebook's recruiting of Google employees?

02:49:03  8        A.  I don't recall that it was that time or year,

02:49:05  9    but it sounds roughly correct, and I do recall Google

02:49:09 10    being concerned about Facebook's recruiting.

02:49:14 11        Q.  And why did Facebook present a concern for

02:49:19 12    Google in that regard?

02:49:25 13        A.  Because they were the next hot, young, pre-IPO

02:49:30 14    startup company.

02:49:32 15        Q.  They were sort of like where Google was several

02:49:34 16    years prior?

02:49:35 17        A.  Relative to large, established companies in the

02:49:38 18    Valley, yes, in many ways, that analogy is correct.

02:49:44 19        Q.  And here, the roles were switched a bit where

02:49:48 20    Google had become something of an established company

02:49:51 21    trying to fend off the young upstart; is that fair?

02:50:06 22            MR. RUBIN:  Objection.  Form.

02:50:06 23            THE WITNESS:  I think as I said before, Google

02:50:08 24    was the -- at this stage, Facebook was the young, hot,

02:50:12 25    pre-IPO startup and Google was a larger, more

02:50:15  1    established firm.

02:50:17  2          MR. HARVEY:  Q.  Okay.  If you could please

02:50:34  3    take a look at Exhibit 660.

02:51:16  4          A.  Okay.

02:51:17  5          Q.  Okay.  Did you receive Mr. Brin's email here on

02:51:22  6    the 13th of October, 2007?

02:51:24  7          A.  Yes.

02:51:26  8          Q.  Okay.  And this is an example of the kinds of

02:51:28  9    discussions that Google was having about the retention

02:51:36 10    risk for Google employees presented by Facebook; is that

02:51:40 11    correct?

02:51:45 12          A.  That is -- the subject of discussion does

02:51:48 13    relate to Facebook and retention of Google employees.

02:51:54 14          Q.  And then you forwarded that email to Bill

02:51:56 15    Campbell the same day, correct?

02:51:58 16          A.  Yes.

02:52:02 17          Q.  Is there a reason why you would forward an

02:52:03 18    email like this to Mr. Campbell?

02:52:07 19          A.  Again, as my closest management advisor, with

02:52:11 20    whom I discussed many of the important issues on Eric's

02:52:17 21    staff, it was customary from time to time for me to send

02:52:22 22    messages to Eric's staff that he might not have received

02:52:26 23    to him.

02:52:30 24          Q.  And this threat that Facebook posed, this was

02:52:32 25    one of the topics you discussed with Mr. Campbell?

02:52:36  1            MR. RUBIN:  Objection.  Form.

02:52:41  2            THE WITNESS:  I did discuss the threat from

02:52:43  3    Facebook from time to time with Mr. Campbell.

02:52:52  4            MR. HARVEY:  Q.  What, to your knowledge,

02:52:54  5    was Mr. Campbell's view of how Google should respond

02:52:58  6    to the threat from Facebook?

02:53:03  7        A.  I don't remember his specific broad view, or

02:53:11  8    how it changed over time.

02:53:15  9        Q.  Do you recall discussing with him alternative

02:53:21 10    strategies in terms of how to retain Google employees in

02:53:29 11    light of the Facebook threat?

02:53:35 12        A.  I recall him being helpful as we attempted to

02:53:39 13    implement policies that would allow us to respond

02:53:45 14    expeditiously to Facebook's threats.

02:53:51 15        Q.  And what type of expeditious responses are you

02:54:01 16    referring to?

02:54:02 17        A.  ████████████████████████████████████████

02:54:04 18    ██████████████████████, counteroffers, speaking to

02:54:15 19    employees himself, if he could -- because he was a

02:54:18 20    management coach and mentor for them.  Any number of

02:54:22 21    measures.

02:54:26 22        Q.  Was Mr. Campbell helpful in getting the

02:54:30 23    relevant players at Google to agree that Google should

02:54:35 24    █████████████████████████████████████████████████

02:54:39 25    ███████████████████████████████████████████

Deposition of Jonathan Rosenberg                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
02:54:49  1        A.  ██████████████████████████████
02:54:51  2  ████████████████████████, and I recall often leaning
02:54:56  3  on Bill to get his assistance to help the management
02:54:58  4  team reach closure on important decisions.  I don't
02:55:02  5  specifically recall him assisting in that particular
02:55:08  6  way.
02:55:14  7        Q.  And would Bill's assistance include convincing
02:55:18  8  other senior members of Google's executive team, such as
02:55:22  9  Eric Schmidt?
02:55:24 10             MR. RUBIN:  Objection.  Form.
02:55:29 11             THE WITNESS:  Bill operated across the entire
02:55:30 12  management team, and he and I often discussed goals that
02:55:34 13  we collectively had and how to get to a decision or
02:55:41 14  action as quickly as possible.
02:56:01 15             MR. HARVEY:  Q.  If you could please take a
02:56:02 16  look at Exhibit 608.
02:56:39 17        A.  Okay.
02:56:48 18        Q.  Is this an example of the expeditious response
02:56:52 19  you were just describing?
02:56:53 20        A.  Yes, it appears to be.
02:56:56 21        Q.  And this is describing a policy Google had at
02:56:59 22  the point in time of ████████████████████████████████
02:57:04 23  ████████████████████████████████████████████
02:57:08 24  ████████
02:57:08 25        A.  Yes.
```

| | | |
|---|---|---|
| 02:57:18 | 1 | Q.  And did you receive this top email from |
| 02:57:20 | 2 | Mr. Schmidt on the 14th of November, 2007? |
| 02:57:22 | 3 | A.  I'm sure I did. |
| 02:57:23 | 4 | Q.  Okay.  Do you have an understanding of why |
| 02:57:28 | 5 | Mr. Schmidt was concerned that this policy was leaked to |
| 02:57:33 | 6 | other employees of Google? |
| 02:57:38 | 7 | A.  As a general rule, it was understood that |
| 02:57:43 | 8 | discussions that occurred at the senior management team |
| 02:57:48 | 9 | were not to be shared widely with employees unless it |
| 02:57:54 | 10 | was agreed that the information would be shared with |
| 02:57:56 | 11 | employees. |
| 02:58:16 | 12 | Q.  Did Google monitor how effective these |
| 02:58:18 | 13 | strategies were at retaining Google employees? |
| 02:58:22 | 14 | A.  Yes. |
| 02:58:24 | 15 | Q.  Do you recall what the view was about whether |
| 02:58:30 | 16 | efforts ██████████████████████ was effective |
| 02:58:33 | 17 | in retaining people? |
| 02:58:36 | 18 | A.  I believe we thought it was effective.  I don't |
| 02:58:38 | 19 | recall what the data showed, but I certainly believe |
| 02:58:42 | 20 | that the management team thought it was important and |
| 02:58:44 | 21 | strongly encouraged each other to do it. |
| 02:59:00 | 22 | Q.  Do you recall whether any members of the senior |
| 02:59:07 | 23 | executive team were concerned that ████████████ |
| 02:59:11 | 24 | ████████████████████████████████████, that |
| 02:59:15 | 25 | it would encourage people to go and shop for an offer |

02:59:17 1    from Facebook?

02:59:19 2          A.  Yeah.

02:59:26 3          Q.  And Sergey Brin held that opinion; is that

02:59:30 4    correct?

02:59:32 5          A.  I'm confident he articulated that opinion at

02:59:34 6    some points in time.  I don't know that he always held

02:59:37 7    that opinion, but I do recall hearing him say that.

02:59:58 8          Q.  If you would please look at Exhibit 613.

03:00:25 9          A.  Okay.

03:00:28 10         Q.  Did you receive this email from Ms. Mayer on

03:00:33 11   March 14th, 2008?

03:00:35 12         A.  Yes.

03:00:36 13         Q.  And this describes the concern we were just

03:00:40 14   talking about in terms of worrying that word would get

03:00:43 15   out to other Google employees that Google was making

03:00:47 16   counteroffers to certain employees; is that right?

03:00:57 17         A.  Yes.  It says that rumors and reports, that if

03:01:01 18   you want something, you should go out and get a

03:01:05 19   competitive offer.

03:01:19 20         Q.  Do you recall -- see, I guess summer of 2008 or

03:01:29 21   so, whether there was a discussion at Google to try an

03:01:35 22   alternative strategy, that is, to contact Facebook

03:01:41 23   directly and try to discourage Facebook from recruiting

03:01:45 24   Google people?

03:01:48 25         MR. RUBIN:  Objection.  Form.

03:01:49  1            THE WITNESS:  I don't recall the specific time,

03:01:51  2  but I do recall talking to Sheryl at Facebook about

03:01:57  3  minimizing the degree to which they recruited Google

03:02:00  4  employees.

03:02:02  5            MR. HARVEY:  Q.  And you know what, we'll

03:02:08  6  get to that in just a minute.  Before we -- I'll

03:02:11  7  show you those emails, we'll talk about it.

03:02:15  8            But for now, before you actually contacted

03:02:19  9  Sheryl Sandberg, do you recall discussions at Google

03:02:24 10  about trying to convince Facebook to enter into a truce

03:02:29 11  with Google with respect to recruiting?

03:02:32 12            MR. RUBIN:  Objection.  Form.

03:02:35 13            THE WITNESS:  I certainly don't recall the

03:02:37 14  timing of these things.  I recall many -- I'm aware of

03:02:43 15  the fact that there were many discussions regarding what

03:02:46 16  to do about the problem of Facebook recruiting Google

03:02:50 17  employees.

03:02:51 18            MR. HARVEY:  Q.  And was one potential

03:02:52 19  response seeking a truce with Facebook.

03:02:55 20            MR. RUBIN:  Objection.  Form.

03:02:58 21            THE WITNESS:  Well, as we talked about before

03:03:00 22  when we were talking about Apple, we weren't doing any

03:03:04 23  recruiting from them at the time.

03:03:08 24            MR. HARVEY:  Q.  Uh-huh.

03:03:09 25       A.  So the only thing I remember is trying to

03:03:11  1   minimize the degree to which they were recruiting from

03:03:14  2   us.

03:03:22  3        Q.  Google didn't try to recruit back employees

03:03:24  4   that it lost to Facebook?

03:03:27  5        A.  We did.  And, in fact, we recruited -- there is

03:03:31  6   an employee that we recruited back from Facebook, but it

03:03:34  7   had not -- the scope of our recruiting from Facebook had

03:03:37  8   not risen to a level that they seemed concerned about

03:03:40  9   it.  So I don't ever recall them bringing it up with us.

03:03:58 10        Q.  If you could please look at Exhibit 616.

03:04:33 11             I'm going to start by asking you about the last

03:04:36 12   email on the back.

03:04:37 13        A.  All right.

03:05:04 14             Okay.

03:05:06 15        Q.  Did you receive this email from Ms. Brown on

03:05:09 16   June 23rd, 2008?

03:05:11 17        A.  Yes.

03:05:12 18        Q.  Okay.  And in it she says that Bill Campbell,

03:05:16 19   you, and her spoke on that day about, "really doubling

03:05:22 20   down on our efforts to recruit back a couple of people,

03:05:25 21   I'd assume at a high cost, just to stem the tide and

03:05:30 22   give us a better negotiating position on a recruiting

03:05:34 23   'truce'."  Do you see that?

03:05:38 24        A.  I do.

03:05:39 25        Q.  Do you recall the conversation she's

03:05:41 1   describing?

03:05:42 2        A.  I don't.

03:05:44 3        Q.  Okay.  And then she continues, "Our intent

03:05:49 4   would be to only do this for 2 or 3 people (and then

03:05:53 5   stop, so we don't send a message that we will pay that

03:05:56 6   sort of price across the board) just enough to get a

03:06:00 7   truce."

03:06:03 8             Do you understand that that was a strategy that

03:06:11 9   Google attempted?

03:06:12 10            MR. RUBIN:  Objection.  Form.

03:06:14 11            THE WITNESS:  I understand that it's a sentence

03:06:16 12  that she wrote in this email.  I don't know that it was

03:06:21 13  a strategy that we attempted.  I know of an individual

03:06:25 14  we attempted to hire back.  But with respect to whether

03:06:31 15  or not that was an agreed-to company strategy, I don't

03:06:34 16  know.

03:06:48 17            MR. HARVEY:  Q.  And here's Exhibit 666,

03:06:51 18  which I believe is one of the emails you are

03:06:53 19  referring to between you and Sheryl Sandberg.

03:07:09 20       A.  Okay.  What portion do you want to talk about?

03:07:11 21       Q.  Sure.  I'm going to start by talking about, it

03:07:16 22  looks like, the beginning of your first email to her on

03:07:21 23  August 9th, 2008 that begins on page 3.

03:07:26 24       A.  Okay.

03:07:30 25       Q.  In the second paragraph you -- well first, let

| | | |
|---|---|---|
| 03:07:34 | 1 | me ask, did you send this email to Ms. Sandberg on |
| 03:07:39 | 2 | August 9th, 2008? |
| 03:07:45 | 3 | A.  Yes. |
| 03:07:46 | 4 | Q.  In the second paragraph you wrote, "I am sorry |
| 03:07:48 | 5 | that broader relations seem to be at Defcon 2 at the |
| 03:07:53 | 6 | corporate level with us right now.  Maybe there is a |
| 03:07:55 | 7 | path to navigate where we agree to stay out of each |
| 03:07:58 | 8 | other's way and do no harm."  Do you see that? |
| 03:08:02 | 9 | A.  Yes. |
| 03:08:02 | 10 | Q.  What were you referring to by Defcon 2? |
| 03:08:10 | 11 | A.  I assume it's an allusion to the Department of |
| 03:08:14 | 12 | Defense nuclear status levels, and I'm simply pointing |
| 03:08:20 | 13 | out in a colorful way that the companies are not happy |
| 03:08:24 | 14 | with each other at the moment. |
| 03:08:26 | 15 | Q.  And why weren't the companies happy with each |
| 03:08:29 | 16 | other? |
| 03:08:30 | 17 | A.  Primarily because of the number of people that |
| 03:08:32 | 18 | she was recruiting from Google, I believe. |
| 03:08:35 | 19 | Q.  Okay.  And then next sentence in that |
| 03:08:42 | 20 | paragraph is, "Maybe there is a path to navigate where |
| 03:08:47 | 21 | we agree to stay out of each other's way and do no |
| 03:08:50 | 22 | harm."  Do you see that? |
| 03:08:51 | 23 | A.  Uh-huh. |
| 03:08:52 | 24 | Q.  What path were you referring to here? |
| 03:08:55 | 25 | A.  Doesn't say. |

03:08:55  1      Q.  Well, but I have the fortune of having you in

03:08:59  2  front of me so I can ask you.

03:09:01  3      What did you mean by saying there is a path to

03:09:03  4  navigate where -- where the two of you would agree to

03:09:08  5  stay out of each other's way?

03:09:14  6      A.  Presumably that I could find out what we at

03:09:19  7  Google were upset about and try to convince her to stop.

03:09:23  8      Q.  To stop hiring Google people, correct?

03:09:27  9      A.  Or reduce it.

03:09:31  10     Q.  And then if you go up to Sandberg's response to

03:09:35  11 that, she asked the same question I asked about

03:09:38  12 Defcon 2.  And she says, you know, essentially that she

03:09:43  13 doesn't know what you are talking about.

03:09:45  14     And then in your response to her you wrote, "I

03:09:50  15 was referring to the broad relations between us,

03:09:54  16 primarily related to employees leaving from one company

03:09:56  17 and going to the other which have severely strained

03:09:59  18 relations."  Is that correct?

03:10:00  19     A.  Yeah.

03:10:02  20         MR. RUBIN:  Objection.  Form.

03:10:02  21         MR. HARVEY:  Q.  And that's essentially

03:10:04  22 what you were just talking about, correct?

03:10:06  23     A.  It's referring to the fact that she's hiring

03:10:08  24 Google employees at an inordinately fast rate.

03:10:15  25     Q.  And then in her reply to that she says, "On

03:10:23  1    that, I will say the same thing I keep saying.  We have

03:10:26  2    many applicants from all over -- including Google.  I

03:10:29  3    would say that our applicant pool is fairly broad and

03:10:33  4    Google does not represent an inordinate amount, but

03:10:36  5    there are a steady stream of people applying."  And then

03:10:40  6    she says, "We are being very strict on the Google

03:10:43  7    non-solicit."

03:10:44  8          Do you have an understanding what she means by

03:10:45  9    the "Google non-solicit"?

03:10:47 10          A.  I believe she's talking about the

03:10:49 11    nonsolicitation in a standard Google hiring agreement.

03:10:53 12          Q.  And that is that Google employees agreed in

03:11:02 13    some respect that if they left Google, they wouldn't try

03:11:05 14    to recruit their former coworkers or something to that

03:11:06 15    effect; is that what you mean?

03:11:08 16          A.  I believe it says they wouldn't solicit their

03:11:11 17    coworkers for a period of 12 months.

03:11:14 18          Q.  And then you responded to her in part by

03:11:29 19    saying, "My personal opinion is that I think you are

03:11:33 20    putting too much weight in your view of the notion of

03:11:35 21    'not soliciting' as though soliciting in itself is the

03:11:39 22    only thing that upsets people.  Rather, it is the

03:11:42 23    outcome of people going from one company to the other

03:11:44 24    which is problematic."

03:11:46 25          Do you see that?

03:11:47  1       A.   I do.

03:11:47  2       Q.   Okay.  I'll try to short-circuit some of this

03:11:55  3   so we can save some time.  She asks you of your view of

03:11:58  4   Google's hiring.  And then you responded to her, "My

03:12:01  5   view is we would be better off if neither of us did it.

03:12:04  6   If you all are, I sure as hell will try likewise."

03:12:08  7       Do you see that?

03:12:09  8       A.   Uh-huh.

03:12:11  9       Q.   Here you're offering to her a mutual commitment

03:12:15  10  that both companies would try to reduce the hiring from

03:12:17  11  the other; is that right?

03:12:22  12      A.   I'm not offer -- I don't see that I'm offering

03:12:24  13  any mutual commitment or establishing any agreement, I'm

03:12:28  14  just trying to get a dialogue moving in a direction

03:12:32  15  where she will reduce the scope of her hiring at Google.

03:12:41  16      Q.   But you are offering -- and I understand that

03:12:43  17  you are not entering into an agreement with this email.

03:12:46  18  But it seems to me that you're outlining the terms of a

03:12:51  19  truce with Facebook.  Is that a fair assessment?

03:12:58  20          MR. RUBIN:  Objection.  Form.

03:13:03  21          THE WITNESS:  I think I'm saying that I -- my

03:13:06  22  view is that it would be better off if neither of us did

03:13:11  23  it.

03:13:12  24          MR. HARVEY:  Q.  And by "it," you mean

03:13:15  25  hiring?

| | | |
|---|---|---|
| 03:13:16 | 1 | MR. RUBIN:  Objection.  Form. |
| 03:13:22 | 2 | THE WITNESS:  It would seem to me that hiring |
| 03:13:24 | 3 | in large -- hiring large numbers of employees from each |
| 03:13:26 | 4 | other, which seems to be the thing that I objected to at |
| 03:13:30 | 5 | the outset. |
| 03:13:35 | 6 | MR. HARVEY:  Q.  Okay.  If you could go to |
| 03:14:01 | 7 | the bottom of page 1 to Ms. Sandberg's response she |
| 03:14:07 | 8 | says, "That is not what I meant at all.  What I |
| 03:14:10 | 9 | meant is that Google grew by hiring from other firms |
| 03:14:13 | 10 | in our industry even when they minded and people |
| 03:14:16 | 11 | like Meg called Eric as we believed in a free labor |
| 03:14:20 | 12 | market." |
| 03:14:23 | 13 | Is it correct that Google grew by hiring from |
| 03:14:25 | 14 | other firms in the industry? |
| 03:14:31 | 15 | A.  In addition to hiring people straight out of |
| 03:14:34 | 16 | school, yes. |
| 03:14:39 | 17 | Q.  And then I'm just going to jump up to her email |
| 03:14:43 | 18 | to you on August 10th, 2008 at the very top where she |
| 03:14:50 | 19 | says, "I think what really happens is that companies who |
| 03:14:53 | 20 | have relationships agree in limited ways not solicit |
| 03:14:57 | 21 | from each other.  To my knowledge, Google has never |
| 03:15:01 | 22 | agreed not to hire from any company." |
| 03:15:02 | 23 | And then she says, "Google did agree not to |
| 03:15:05 | 24 | solicit from Intel, Apple, and maybe a few others due to |
| 03:15:09 | 25 | board relationships, but never not to hire." |

| | | |
|---|---|---|
| 03:15:15 | 1 | Is this a true statement of fact, as far as you |
| 03:15:18 | 2 | know, that Google agreed with Intel, Apple, and maybe a |
| 03:15:23 | 3 | few others not to solicit due to board relationships? |
| 03:15:27 | 4 | MR. RUBIN:  Objection.  Form. |
| 03:15:27 | 5 | THE WITNESS:  I don't know the causality of |
| 03:15:30 | 6 | agreements. |
| 03:15:36 | 7 | MR. HARVEY:  Q.  Okay.  Putting causality |
| 03:15:38 | 8 | aside, do you agree that Google, in fact, made these |
| 03:15:42 | 9 | agreements not to solicit with Intel, Apple and |
| 03:15:43 | 10 | maybe a few others. |
| 03:15:45 | 11 | MR. RUBIN:  Objection.  Form. |
| 03:15:47 | 12 | THE WITNESS:  I believe we had a do-not-call |
| 03:15:49 | 13 | list and a policy as articulated by Mr. Geshuri in the |
| 03:15:54 | 14 | note that we looked at earlier. |
| 03:15:57 | 15 | MR. HARVEY:  Q.  As far as you know, those |
| 03:15:59 | 16 | weren't pursuant to agreements? |
| 03:16:01 | 17 | MR. RUBIN:  Objection.  Form. |
| 03:16:02 | 18 | THE WITNESS:  I'm not aware of any agreements. |
| 03:16:05 | 19 | MR. HARVEY:  Q.  So you don't know one way |
| 03:16:06 | 20 | or the other? |
| 03:16:09 | 21 | MR. RUBIN:  Objection.  Form. |
| 03:16:09 | 22 | THE WITNESS:  I'm not aware of any agreements. |
| 03:16:12 | 23 | MR. HARVEY:  Q.  Okay.  Would you say that |
| 03:16:29 | 24 | your attempt to negotiate with Sheryl Sandberg was |
| 03:16:34 | 25 | unsuccessful? |

03:16:43  1            MR. RUBIN:  Objection.  Form.

03:16:48  2            THE WITNESS:  I didn't get -- I don't feel that

03:16:49  3    I had a satisfactory response from Sheryl in achieving

03:16:55  4    my objective.

03:16:57  5            MR. HARVEY:  Q.  And your objective was to

03:16:59  6    try to convince her to substantially decrease the

03:17:04  7    hiring Facebook was doing at Google, correct?

03:17:07  8        A.  My objective was to reduce the overall number

03:17:10  9    of employees that she was hiring from Google.

03:17:17  10       Q.  And then shortly following your attempt, which

03:17:19  11   I believe -- let me just look back at it -- was August

03:17:30  12   9th, a few days later, Omid Kordestani gave it a shot;

03:17:34  13   is that correct?

03:17:36  14           MR. RUBIN:  Objection.  Form.

03:17:38  15           THE WITNESS:  I don't know what "gave it a

03:17:40  16   shot" means, or when Omid spoke to Sheryl, but I'm sure

03:17:46  17   that from time to time Omid had calls with her as well.

03:17:53  18           MR. HARVEY:  Q.  Why don't we make it a bit

03:17:55  19   more concrete.  If you could please look at

03:17:57  20   Exhibit 619.

03:19:10  21       A.  Okay.

03:19:14  22       Q.  If you go to the last email Mr. Kordestani

03:19:18  23   wrote, did you receive this on August 13th, 2008?

03:19:24  24       A.  Yes.

03:19:24  25       Q.  And among other things, Mr. Kordestani

03:19:26  1    describes a meeting with Sheryl Sandberg in which he

03:19:32  2    complained about Facebook's rate of recruiting.  Do you

03:19:35  3    see that?

03:19:35  4         A.  Yeah.  It may have been a phone conversation.

03:19:37  5    Doesn't say there was a meeting.

03:19:39  6         Q.  I'll just point you to the subject of the

03:19:42  7    email.

03:19:42  8         A.  All right.  There was a meeting.

03:19:45  9         Q.  And as far as you understand it, Mr. Kordestani

03:19:48  10   was unsuccessful in convincing Sheryl Sandberg to reduce

03:19:54  11   the rate of hiring from Google?

03:19:59  12        A.  From reading that email, that would appear to

03:20:01  13   be the case.

03:20:04  14        Q.  And then if you turn to the first page, it's an

03:20:07  15   email you wrote in which you describe your discussion

03:20:14  16   with Sheryl; is that right?

03:20:17  17        A.  Yes.  It appears to be my summary of the

03:20:20  18   previous document.

03:20:22  19        Q.  Uh-huh.  If you could look to the text that

03:20:28  20   starts after the second big redacted box.

03:20:33  21        A.  Okay.

03:20:33  22        Q.  That begins, "I did have a brief side dialogue"

03:20:36  23   and then ends with a parenthetical?

03:20:39  24        A.  Yes.

03:20:39  25        Q.  In the parenthetical you wrote that she, Sheryl

| | | |
|---|---|---|
| 03:20:42 | 1 | Sandberg, also saw Shona later that day at a dinner.  Do |
| 03:20:47 | 2 | you see that? |
| 03:20:48 | 3 | A.  Yes. |
| 03:20:49 | 4 | Q.  Do you know whether Shona also had a |
| 03:20:55 | 5 | conversation with Sheryl Sandberg on this topic? |
| 03:21:01 | 6 | A.  Seems odd that I would put that in a |
| 03:21:03 | 7 | parenthetical if I hadn't -- if I were not aware of some |
| 03:21:08 | 8 | discussion, but I don't recall. |
| 03:21:12 | 9 | Q.  Okay.  And at this time or shortly thereafter, |
| 03:21:27 | 10 | did Mr. Campbell support these efforts to seek a truce |
| 03:21:32 | 11 | with Facebook? |
| 03:21:37 | 12 | MR. RUBIN:  Objection.  Form. |
| 03:21:37 | 13 | THE WITNESS:  I don't know. |
| 03:21:49 | 14 | MR. HARVEY:  Q.  If you could please look |
| 03:21:50 | 15 | at Exhibit 668. |
| 03:22:05 | 16 | A.  Okay. |
| 03:22:06 | 17 | Q.  And I'll note that this document -- just give |
| 03:22:13 | 18 | me one moment -- was written a few days after the prior |
| 03:22:19 | 19 | one. |
| 03:22:24 | 20 | If you go to the second email, did you write |
| 03:22:26 | 21 | that email to Bill Campbell, Rachel Whetstone and Omid |
| 03:22:30 | 22 | Kordestani? |
| 03:22:31 | 23 | A.  Yes. |
| 03:22:33 | 24 | Q.  And this is in response to Bill Campbell's |
| 03:22:36 | 25 | email in which he says, "Jonathan, who should contact |

| | | |
|---|---|---|
| 03:22:40 | 1 | Sheryl (or Mark) and get a cease fire.  We have to get a |
| 03:22:44 | 2 | truce."  Correct? |
| 03:22:45 | 3 | A.  Correct. |
| 03:22:46 | 4 | Q.  Okay.  And your response is, "Anybody BUT me!!! |
| 03:22:50 | 5 | That's a good job for brother Omid!" |
| 03:22:52 | 6 | A.  Yes. |
| 03:22:55 | 7 | Q.  And why did you suggest that brother Omid |
| 03:22:58 | 8 | should do it? |
| 03:22:59 | 9 | A.  Because clearly I was not enjoying the |
| 03:23:05 | 10 | interactions with Sheryl on this subject, and I was |
| 03:23:10 | 11 | hoping that somebody else on the management team would |
| 03:23:13 | 12 | take the next steps. |
| 03:23:16 | 13 | Q.  And then Bill Campbell responds, in all caps, |
| 03:23:18 | 14 | "YOU!" |
| 03:23:21 | 15 | Did you take any further steps after this to |
| 03:23:26 | 16 | seek a truce with Facebook? |
| 03:23:30 | 17 | MR. RUBIN:  Objection.  Form. |
| 03:23:32 | 18 | THE WITNESS:  I don't know what transpired |
| 03:23:34 | 19 | after this.  But if a threat existed where an action |
| 03:23:38 | 20 | needed to be taken and Bill Campbell indicated that I |
| 03:23:40 | 21 | was the next person to take the action, unless there is |
| 03:23:44 | 22 | some thread indicating to the contrary, I'm sure my next |
| 03:23:51 | 23 | step would be to follow up and do as Mr. Campbell |
| 03:23:54 | 24 | suggested. |
| 03:23:56 | 25 | MR. HARVEY:  Q.  Sitting here today, were |

| | | |
|---|---|---|
| 03:23:57 | 1 | you ever successful in seeking a truce with |
| 03:24:03 | 2 | Facebook? |
| 03:24:06 | 3 | MR. RUBIN:  Objection.  Form. |
| 03:24:11 | 4 | THE WITNESS:  I don't believe I was ever |
| 03:24:11 | 5 | successful in getting Sheryl to modify the behavior, if |
| 03:24:15 | 6 | we define modifying the behavior as -- as changing the |
| 03:24:22 | 7 | practices in which they were engaged in previously |
| 03:24:24 | 8 | related to hiring Google employees. |
| 03:24:33 | 9 | MR. HARVEY:  Q.  Okay.  This may be a good |
| 03:24:40 | 10 | time for a short break. |
| 03:24:41 | 11 | MR. RUBIN:  Okay. |
| 03:24:42 | 12 | THE VIDEOGRAPHER:  We are now off the record at |
| 03:24:43 | 13 | 3:24. |
| 03:24:48 | 14 | (Recess taken.) |
| 03:26:18 | 15 | THE VIDEOGRAPHER:  We are now on the record at |
| 03:26:20 | 16 | 3:26.  This is the end of video No. 2. |
| 03:26:23 | 17 | We are now off the record at 3:26. |
| 03:27:41 | 18 | (Recess taken.) |
| 03:33:40 | 19 | THE VIDEOGRAPHER:  We are now on the record at |
| 03:33:41 | 20 | 3:33.  This is the beginning of video No. 3. |
| 03:33:50 | 21 | MR. HARVEY:  Q.  Did you ever discuss |
| 03:33:52 | 22 | potential agreements regarding restricting hiring |
| 03:33:57 | 23 | with anyone at Apple from 2004 through 2010? |
| 03:34:05 | 24 | A.  Not that I recall. |
| 03:34:10 | 25 | Q.  Did the topic of Google restricting recruiting |

03:34:15  1   from Apple ever come up during any conversation you had

03:34:19  2   with anyone at Apple?

03:34:25  3       A.  Not that I recall.

03:34:30  4       Q.  Did the topic of Google restricting recruiting

03:34:34  5   from Intel ever come up during any conversation between

03:34:37  6   you and anyone at Intel?

03:34:41  7       A.  Not that I recall.

03:34:51  8       Q.  And aside from the communications we saw today,

03:34:57  9   did you ever have any communications with anyone at

03:35:00 10   Intuit regarding Google restricting its recruiting of

03:35:04 11   Intuit people?

03:35:11 12       A.  It's quite plausible, but I don't recall.  I

03:35:14 13   don't recall any specific conversations.

03:35:16 14       Q.  And it's plausible because those conversations

03:35:20 15   may have happened with Bill Campbell?

03:35:22 16       A.  They may have or they may have happened

03:35:23 17   directly with Intuit employees who got in touch with me

03:35:26 18   directly.

03:35:30 19       Q.  Do you have anything in mind there, or do you

03:35:33 20   remember anything more about those possible

03:35:35 21   conversations?

03:35:35 22       A.  No.  Just that I had more -- more conversations

03:35:39 23   with Intel employees because I -- there were some

03:35:42 24   snares, we were talking about some marketing

03:35:46 25   relationships with them for small and medium sized

1        I, Gina V. Carbone, Certified Shorthand

2   Reporter licensed in the State of California, License

3   No. 8249, hereby certify that the deponent was by me

4   first duly sworn and the foregoing testimony was

5   reported by me and was thereafter transcribed with

6   computer-aided transcription; that the foregoing is a

7   full, complete, and true record of said proceedings.

8        I further certify that I am not of counsel or

9   attorney for either of any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12        The dismantling, unsealing, or unbinding of

13   the original transcript will render the reporter's

14   certificates null and void.

15        In witness whereof, I have hereunto set my

16   hand this day:  March 25, 2013.

17        _____ Reading and Signing was requested.

18        _____ Reading and Signing was waived.

19        ___X___ Reading and signing was not requested.

20

21

22        _____

23                GINA  V. CARBONE

24                CSR 8249, CRR, CCRR

25