# EXHIBIT CC TO
# CISNEROS DECLARATION
# REDACTED VERSION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IN RE:  HIGH-TECH EMPLOYEE        )

ANTITRUST LITIGATION             )

                                 )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:        )

ALL ACTIONS.                     )

_____)

HIGHLY CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

VIDEO DEPOSITION OF ERIC SCHMIDT

FEBRUARY 20, 2013

Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

10:40:14  1    come to an end?

10:40:16  2        A.   1997.

10:40:16  3        Q.   And then where did you go, sir?

10:40:18  4        A.   Novell as the CEO.

10:40:20  5        Q.   And when were you with Novell?

10:40:22  6        A.   1997 until 2001.

10:40:24  7        Q.   And then where did you go in 2001?

10:40:26  8        A.   Came here to Google.

10:40:28  9        Q.   And what was your initial position with Google?

10:40:32 10        A.   It's complicated.  I came in as chairman for

10:40:36 11    two months, and then I became CEO for ten years.  And I

10:40:43 12    was chairman on and off a bunch of times.

10:40:45 13        Q.   All right.  Were you on the board of directors

10:40:47 14    throughout that time period?

10:40:48 15        A.   Yes, I was.

10:40:49 16        Q.   And what is your current position at Google?

10:40:52 17        A.   I'm now the executive chairman and member of

10:40:54 18    the board of Google.

10:40:56 19        Q.   What is the executive chairman position?

10:40:59 20        A.   Whatever I'd like it to be.

10:41:04 21        Q.   And -- all right, sir.

10:41:06 22             Do you have an understanding as to what the

10:41:08 23    lawsuit that we're here is all about?

10:41:10 24        A.   I do.

10:41:10 25        Q.   What is your understanding of the claims that

10:41:12 1    are being made?

10:41:16 2        A.   Well, I won't represent your claims.  You can

10:41:19 3    represent your claims.  My understanding is that this is

10:41:23 4    an argument over the hiring practices that existed

10:41:27 5    between roughly 2005 and roughly 2009 between the

10:41:31 6    companies whose lawyers are represented here in the room.

10:41:34 7        Q.   And what is it about -- what understanding, if

10:41:37 8    any, do you have about the nature of the hiring practices

10:41:40 9    that are in question?

10:41:43 10       A.   Well, I -- the -- the term that's generally

10:41:46 11   used is the do-not-call rules, if that's what you're

10:41:49 12   referring to.

10:41:50 13       Q.   What does that mean to you, when you use that

10:41:52 14   term?

10:41:57 15       A.   It's easier if I state it as a fact rather than

10:42:00 16   how I -- how it means to me.

10:42:01 17            During this period of time -- and, again, I

10:42:05 18   will represent what Google did, as opposed to what the

10:42:08 19   other companies did; they can speak for themselves.  We

10:42:11 20   had various practices, for better -- best -- best way to

10:42:20 21   describe it is we had various practices where we would

10:42:23 22   choose not to call and recruit people from other

10:42:26 23   companies for various periods of time for various

10:42:29 24   reasons.

10:42:33 25       Q.   And do you have an understanding as to what the

10:42:35  1   claims are that are being made by the Plaintiffs with

10:42:37  2   respect to those practices?

10:42:41  3          MR. RUBIN:  And I'm going to instruct

10:42:42  4   Mr. Schmidt, make sure that in any response that he

10:42:47  5   doesn't convey privileged information.  So if you can

10:42:49  6   answer the question without conveying what lawyers have

10:42:51  7   told you, then you should answer, but if you can't, then

10:42:55  8   you should not answer the question.

10:42:57  9          THE WITNESS:  Unfortunately, in order to answer

10:42:58  10  your question, I have to divulge the contents of a

10:43:01  11  conversation that was legally privileged.

10:43:04  12  BY MR. HEIMANN:

10:43:04  13      Q.   All right.  Do you have any other understanding

10:43:06  14  outside of what your lawyers have told you about the

10:43:08  15  nature of the claims that are being made?

10:43:11  16      A.   No.

10:43:11  17      Q.   Have you reviewed any of the pleadings that

10:43:14  18  have been filed in the case?

10:43:17  19      A.   I'm sorry.  Pleadings are what?

10:43:19  20      Q.   Pleadings are documents that are filed by the

10:43:23  21  law -- lawyers representing the parties that are filed

10:43:25  22  with the Court; for example, the Complaint in the case or

10:43:28  23  motions in the case.

10:43:30  24      A.   That's what I thought.  Okay.  The answer is

10:43:31  25  no.

11:14:56   1          Have you had a chance to look at this?

11:14:58   2      A.   I have.

11:14:59   3      Q.   This is an email exchange in the same time

11:15:01   4   frame, and is part of one we just looked at.

11:15:06   5          Do you see that?

11:15:07   6      A.   I do.

11:15:08   7      Q.   All right.  And focusing on the concluding

11:15:21   8   email, this is from Shona Brown to Mr. Shader with copies

11:15:26   9   to several folks, but I don't believe to you, correct?

11:15:29  10      A.   That is correct.

11:15:30  11      Q.   All right.  And in any event, she, in replying

11:15:34  12   to Mr. Shader's follow-up email about the subject that he

11:15:37  13   had raised initially, says, "Just going through email" --

11:15:41  14   excuse me -- "Just going through mail, and I think this

11:15:44  15   may have gotten buried in the Thanksgiving mail bag.

11:15:48  16   Sorry.  To clarify, I was not comfortable putting Good on

11:15:51  17   a, quote, 'do-not-call,' close quote, list.  We don't

11:15:54  18   have such a list as we find it not practical to create

11:15:57  19   nor to manage."  Let me stop there.

11:16:00  20          Were you familiar with the term, "do-not-call

11:16:02  21   list" at the time?

11:16:04  22      A.   I don't -- I don't -- I have no recollection of

11:16:06  23   this, period, so -- I -- I would know what a do-not-call

11:16:11  24   list in general, but you asked it during this period.  I

11:16:13  25   don't -- I don't remember any of this.

11:16:16  1       Q.   You don't remember the email exchange.  I

11:16:19  2   understand.

11:16:19  3       A.   Well, I didn't see it.  I did not see this

11:16:22  4   email exchange at all, so --

11:16:23  5       Q.   You did not see the top part.

11:16:25  6       A.   I did not see, to be precise, any of the first

11:16:30  7   page.  I did not see the top of the second page.  All I

11:16:34  8   saw was the "Danny, we have a new VP of business

11:16:38  9   operations in HR."

11:16:41 10       Q.   Is it correct, as far as you know, that Google

11:16:50 11   did not have a do-not-call list as of this point in time?

11:16:53 12       A.   I do not know.

11:16:54 13       Q.   One way or the other?

11:16:55 14       A.   I don't know.

11:17:01 15       Q.   Do you recall any conversations, either during

11:17:07 16   this time period or going forward in time, at Google

11:17:10 17   about this topic of do-not-call list or no poaching?

11:17:17 18       A.   Well, I'm -- I'm aware that we ultimately had a

11:17:21 19   do-not-call list, and I have vague recollections of

11:17:24 20   conversations in -- verbal conversations about it.

11:17:28 21       Q.   What -- even though your recollections are

11:17:30 22   vague, what do you recall?

11:17:32 23       A.   Well, as I indicated, I remember a big

11:17:35 24   kerfuffle involving Apple.

11:17:37 25       Q.   We'll get to that.

11:17:39  1       A.    Over that.

11:17:40  2             MR. RUBIN:  So you don't want him to share his

11:17:42  3   memory?

11:17:42  4             MR. HEIMANN:  No, I want him to answer the

11:17:45  5   question.  I'm just telling him -- we'll get to it, but I

11:17:46  6   do want to know your best recollections as you sit here.

11:17:49  7             THE WITNESS:  And I remember at some point

11:17:52  8   discussing to have some of the board members not be --

11:17:56  9   you know, their companies not be -- not be targeted, in

11:17:59 10   whatever the correct term is.  And that's sort of all I

11:18:02 11   really remember.

11:18:02 12   BY MR. HEIMANN:

11:18:03 13       Q.    Do you recall who you had those conversations

11:18:05 14   with?

11:18:08 15       A.    Well, again, these are very vague, but they

11:18:10 16   would have been with Shona and/or Bill Campbell.

11:18:17 17       Q.    Why would they have been with Mr. Campbell?  I

11:18:20 18   understand with Shona.

11:18:21 19       A.    Bill Campbell was my coach.

11:18:24 20       Q.    What does that mean?

11:18:26 21       A.    Informal advisor, provide guidance to the

11:18:29 22   manager, a coach.  Understand it as a coach in other

11:18:35 23   areas as well.

11:18:36 24             Someone I could talk to to ask questions and

11:18:38 25   get some advice from; how to handle difficult situations.

| | | |
|---|---|---|
| 11:18:42 | 1 | Q.   To your knowledge, at the time was he serving |
| 11:18:44 | 2 | in that capacity for any other companies? |
| 11:18:46 | 3 | A.   He was certainly playing a similar role for |
| 11:18:50 | 4 | Steve Jobs. |
| 11:18:52 | 5 | Q.   At Apple? |
| 11:18:53 | 6 | A.   That is correct. |
| 11:18:54 | 7 | Q.   Any other companies that you are aware of? |
| 11:18:57 | 8 | A.   I'm sure that he was doing it in others, but he |
| 11:19:00 | 9 | would have to tell you the details. |
| 11:19:17 | 10 | Q.   Let's go to Exhibit 556. |
| 11:20:22 | 11 |      Have you had a chance to look at this? |
| 11:20:23 | 12 | A.   I have. |
| 11:20:24 | 13 | Q.   This is an email exchange from August of 2004 |
| 11:20:27 | 14 | involving yourself and others.  Do you see that? |
| 11:20:29 | 15 | A.   I do. |
| 11:20:30 | 16 | Q.   And shortly prior to the email exchange, Google |
| 11:20:35 | 17 | had gone to an IPO; is that right? |
| 11:20:40 | 18 | A.   We went public in August 18th, 2004.  So it |
| 11:20:44 | 19 | would have been two weeks before. |
| 11:20:46 | 20 | Q.   Literally just two weeks before? |
| 11:20:47 | 21 | A.   Literally right then. |
| 11:20:50 | 22 | Q.   And you begin the email exchange by writing to |
| 11:20:52 | 23 | Ms. Brown and to two others.  Who are the two others that |
| 11:20:56 | 24 | you wrote to? |
| 11:20:57 | 25 | A.   Larry Page and Sergey Brin, who were the |

```
11:21:00  1    co-founders, and my colleagues running the company.

11:21:02  2         Q.   And you wrote, ████████████████████████

11:21:05  3    ███████████████████████████████████████████████

11:21:08  4    ████████████████████████████████████████████

11:21:11  5    ██████████████████████████████████████"

11:21:16  6         And then dropping down to the last sentence of

11:21:20  7    your email, "We need to address this.  Apparently MSFT,"

11:21:23  8    that's an abbreviation for Microsoft, correct?

11:21:26  9         A.   That's correct.

11:21:27 10         Q.   -- "and Yahoo have a, quote, 'bidding war,'

11:21:29 11    close quote, approach."

11:21:32 12         Do you recall this email exchange, by the way?

11:21:34 13         A.   I do not.

11:21:34 14         Q.   Nonetheless, can you tell us what you meant by

11:21:38 15    "bidding war approach"?

11:21:44 16         A.   I don't recall the email, but I can tell you

11:21:49 17    what I probably meant.

11:21:50 18         Q.   Fair enough.

11:21:51 19         A.   I probably meant that -- that Yahoo and

11:21:54 20    Microsoft will do whatever it takes to overpay candidates

11:22:02 21    of great talent.  This -- this email appears to be about

11:22:12 22    hiring new hires, and it would appear that I am concerned

11:22:17 23    that ██████████████████████████████████████████

11:22:21 24    ████████████████████████████████████████████████

11:22:25 25    ██████████████████████████████████████
```

| | |
|---|---|
| 11:22:27 1 | candidates into the company.  That's how I would |
| 11:22:33 2 | interpret that paragraph. |
| 11:22:34 3 | Q.   Okay.  And then Ms. Brown responds to your |
| 11:22:41 4 | email, as I -- as I read this, and she says, in part, "In |
| 11:22:45 5 | my opinion, we are clearly experiencing an intense battle |
| 11:22:49 6 | for top talent, with a win-at-all-costs approach from a |
| 11:22:53 7 | number of our key competitors. |
| 11:22:57 8 | "Philosophically I believe we should pay to get |
| 11:23:00 9 | the talent; even overpay to a certain degree.  It is a |
| 11:23:02 10 | bidding war that I believe we cannot afford to lose." |
| 11:23:04 11 | Did you agree with that at the time? |
| 11:23:11 12 | A.   I don't remember this so -- is there a response |
| 11:23:16 13 | from me to this? |
| 11:23:18 14 | Q.   Do you mean am I going to show you a response? |
| 11:23:21 15 | A.   Yeah. |
| 11:23:21 16 | Q.   The answer is, no, I don't have a response. |
| 11:23:24 17 | A.   Then I don't -- I don't recall what I |
| 11:23:25 18 | thought -- |
| 11:23:25 19 | Q.   All right. |
| 11:23:26 20 | A.   -- at the time.  I mean if there were a |
| 11:23:28 21 | response, then maybe that would clarify what I thought at |
| 11:23:30 22 | the time. |
| 11:23:31 23 | Q.   If there were a response, I would definitely |
| 11:23:33 24 | show it to you. |
| 11:23:34 25 | A.   Okay. |

```
11:23:34  1        Q.   She goes on to say, in part, "███████████

11:23:38  2   ████████████████████████████████████████████████████

11:23:44  3   ██████████████████████████████████████████

11:23:47  4   ████████████████████████████████████████████████████

11:23:50  5   ████████████████

11:23:51  6             "We also don't want to go out of alignment from

11:23:54  7   an internal equity perspective."

11:23:58  8             Recognizing that you don't recall this email,

11:24:00  9   though, do you have an understanding of what "internal

11:24:03 10   equity perspective" is referring to there?

11:24:06 11        A.   Well, I can tell you what the term means if

11:24:08 12   you're an HR person.

11:24:09 13        Q.   Okay.

11:24:10 14        A.   Okay.  And it's -- the definition of "internal

11:24:13 15   equity" is you don't want to be -- if you are an HR

11:24:16 16   person -- having two people in similar roles and one

11:24:21 17   having massively different compensation than the other.

11:24:23 18        Q.   And in the context of the bidding war, was that

11:24:26 19   a concern?

11:24:28 20        A.   It would appear to be her concern.

11:24:31 21        Q.   Well, would you have shared the concern at the

11:24:33 22   time, do you think?

11:24:34 23        A.   Well, again, you are asking me to think about

11:24:36 24   what I thought in August 2004 on the subject.

11:24:39 25        Q.   Well, or generally what your business
```

11:24:42   1    philosophy is with respect to the issue, yes.  That is

11:24:46   2    something else that might answer the question.

11:24:47   3       A.  Well, as a general statement, Google paid an

11:24:50   4    enormous amount to our employees by virtue of stock

11:24:55   5    appreciation.  So by virtue of the success of the

11:24:59   6    company, good luck, all those things, ██████████████

11:25:04   7    ████████████████████████████████████████████████████

11:25:09   8    ███████████████████████████████████████████

11:25:13   9    ████████████.  And so at this point the company has just

11:25:18  10    gone public, and so it's like every employee has just won

11:25:22  11    the lottery.  It is this huge amount of additional

11:25:26  12    compensation coming in.

11:25:27  13            So I think my -- my reaction to this period,

11:25:31  14    this is two weeks after the IPO, would be one of concern

11:25:34  15    of how do we maintain such a high compensation strategy

11:25:38  16    for our future employees?  That's how I would have

11:25:42  17    thought about it.

11:25:52  18       Q.  Do you recall any conversations with Ms. Brown

11:25:55  19    circa this time period about the bidding war issue that

11:25:59  20    she raises?

11:26:00  21       A.  As I said, I don't remember.

11:26:08  22       Q.  Let's take a look at Exhibit 557 next.

11:26:16  23            MR. RUBIN:  Let me know when you want to take a

11:26:17  24    break.

11:26:18  25            THE WITNESS:  That's fine.  We'll just keep

11:30:31 1   relevant to this legal -- legal issue, but by this time,

11:30:36 2   Microsoft is busy building a search engine to compete

11:30:40 3   with us or either has -- has announced that they are

11:30:43 4   going to come in and kill us with products that they

11:30:45 5   haven't shipped yet, and so on and so on.  They are

11:30:48 6   highly competitive during this period, and that

11:30:50 7   continues.

11:30:55 8            And I should be clear that Apple was not

11:30:57 9   building a search engine to compete with us, and search

11:31:01 10   was 98 or 99 percent of our revenue.  That would be the

11:31:04 11   definition of a competitor.

11:31:08 12      Q.   Well, I'm really trying to get an understanding

11:31:12 13   of this notion of friendly, because it is -- I'm sure you

11:31:14 14   appreciate it is somewhat vague.

11:31:17 15            Did you consider any company that you were not

11:31:19 16   a direct competitor with to be a friendly company?

11:31:24 17      A.   No.  That's not what I said.

11:31:27 18      Q.   Okay.  So that's why I want to get at -- what

11:31:29 19   was it about the relationship with Apple, aside from the

11:31:32 20   fact that they weren't a competitor, that made them a

11:31:34 21   friendly company?

11:31:35 22      A.   Well, start with the fact that Apple was trying

11:31:37 23   to build great and beautiful products; that Apple at the

11:31:42 24   time was working on a thing called WebKit, which was the

11:31:45 25   source for Safari, which is part of an open source piece

| | | |
|---|---|---|
| 11:31:51 | 1 | of software which we admired.  As I indicated we were |
| 11:31:54 | 2 | either in conversations or we had already done a search |
| 11:31:57 | 3 | deal with them, that would make them friendly.  We were |
| 11:32:00 | 4 | providing search services to them.  So customer, partner. |
| 11:32:03 | 5 | The word "friendly" here can be -- it's |
| 11:32:06 | 6 | deliberately vague.  All right?  There is no precise |
| 11:32:09 | 7 | definition of friend or foe.  In our industry these days, |
| 11:32:13 | 8 | you have people who are both -- you have both |
| 11:32:17 | 9 | competitive -- competition and partnering within the same |
| 11:32:20 | 10 | firm now.  That's a maturation of the industry. |
| 11:32:24 | 11 | Q.  And when you say the term "friendly" is |
| 11:32:26 | 12 | deliberately vague, why is that? |
| 11:32:28 | 13 | A.  I mean I don't define the word "friendly."  I'm |
| 11:32:31 | 14 | just defining it how I use it. |
| 11:32:32 | 15 | Q.  I know, but you said it was deliberately vague, |
| 11:32:35 | 16 | as if somebody intended it to be a vague term. |
| 11:32:37 | 17 | A.  That is not what I meant. |
| 11:32:38 | 18 | Q.  What did you mean, then? |
| 11:32:40 | 19 | A.  Okay.  Well, then I will not say the word |
| 11:32:43 | 20 | "deliberately."  It doesn't have a precise meaning. |
| 11:32:52 | 21 | Q.  Do you recall what, if anything, happened as a |
| 11:32:55 | 22 | result of this communication between Mr. Jobs and I think |
| 11:33:00 | 23 | it's Sergey Brin? |
| 11:33:05 | 24 | A.  Well, there is -- there is subsequent |
| 11:33:07 | 25 | correspondence about this, but in general -- as a general |

11:33:11 1   statement, we began to look very carefully at Apple

11:33:17 2   recruiting, and then I believe we stopped recruiting from

11:33:21 3   that team, and maybe from all of Apple.

11:33:25 4        Q.   And when did that happen, then?

11:33:26 5        A.   It would be after this, during this period.

11:33:29 6        Q.   Shortly after?

11:33:30 7        A.   I don't recall.

11:33:32 8        Q.   Let's focus on the timing, then.  The email

11:33:35 9   from Mr. Brin, assuming the date and time are correct, is

11:33:38 10  on Sunday morning, in the early morning, 1:00 o'clock.

11:33:46 11       A.   I see that, yes.

11:33:47 12       Q.   And he's talking about having received a call

11:33:49 13  from Mr. Jobs that very day.  So either Saturday, during

11:33:54 14  the day, or -- one would guess, rather than early Sunday

11:33:58 15  morning.  But in any event, right about the time that he

11:34:02 16  sends the email.

11:34:03 17       A.   Okay.

11:34:03 18       Q.   All right?  And then Ms. Brown responds even

11:34:08 19  earlier on the day, but this time on Monday at 4:30 in

11:34:12 20  the morning, assuming that that time is correct.

11:34:15 21       A.   Well, it is highly likely that Shona was not in

11:34:18 22  the same time zone to generate these time clocks, but it

11:34:22 23  is perfectly possible she was traveling when she saw it.

11:34:26 24  So those times would be California times.

11:34:27 25       Q.   Okay.  Well, let's go to the next exhibit,

| | | |
|---|---|---|
| 11:34:41 | 1 | Exhibit 561. |
| 11:35:20 | 2 | A.   Okay. |
| 11:35:20 | 3 | Q.   All right.  Let's focus on the email at the |
| 11:35:22 | 4 | top.  This is from Ms. Brown to Mr. Geshuri and |
| 11:35:30 | 5 | Ms. Gilbert with a copy to Stacy Sullivan. |
| 11:35:35 | 6 | Do you see that? |
| 11:35:35 | 7 | A.   I do. |
| 11:35:36 | 8 | Q.   And Mr. Geshuri at the time was what at Google? |
| 11:35:39 | 9 | Do you recall? |
| 11:35:41 | 10 | A.   Arnnon and Judy worked for Shona.  And they |
| 11:35:45 | 11 | were involved in human resources, recruiting, policy, et |
| 11:35:49 | 12 | cetera.  I don't know the specific roles of each. |
| 11:35:53 | 13 | Q.   And do you recall who Stacy Sullivan was at the |
| 11:35:56 | 14 | time at Google? |
| 11:35:57 | 15 | A.   Stacy Sullivan was the original vice president |
| 11:36:00 | 16 | or director of HR who was I believe at this point more of |
| 11:36:03 | 17 | a consultant helper to Shona.  So it would be fair to say |
| 11:36:07 | 18 | that Arnnon, Judy, and Stacy were the brain trust that |
| 11:36:13 | 19 | worked for Shona leading HR issues. |
| 11:36:16 | 20 | Q.   And she writes in the email, "We agreed in EMG |
| 11:36:19 | 21 | today that we would treat three companies in a special |
| 11:36:22 | 22 | way going forward."  Let me stop there. |
| 11:36:25 | 23 | What is -- what was the EMG at the time? |
| 11:36:28 | 24 | A.   EMG is an abbreviation for "Executive |
| 11:36:30 | 25 | Management Group."  It is a group that I ran.  And it met |

| | | |
|---|---|---|
| 11:39:03 | 1 | Q.   Fair enough. |
| 11:39:07 | 2 | Let me go to Exhibit 565 next. |
| 11:40:47 | 3 | So to try and set this in context, this appears |
| 11:40:50 | 4 | to me to be a branch email string originating with the |
| 11:40:54 | 5 | email that we looked at a moment ago from Mr. Brin, that |
| 11:40:59 | 6 | was Exhibit 557, talking about the call he got from Steve |
| 11:41:04 | 7 | Jobs.  Do you see that? |
| 11:41:06 | 8 | A.   I do. |
| 11:41:07 | 9 | Q.   All right.  And so -- I don't want to go |
| 11:41:10 | 10 | through all of it, but one of the responses to that email |
| 11:41:12 | 11 | was from Alan.  That would be Alan Eustace? |
| 11:41:18 | 12 | A.   That is correct. |
| 11:41:19 | 13 | Q.   And he talks about their efforts to recruit a |
| 11:41:21 | 14 | particular person from Apple from their Safari team. |
| 11:41:24 | 15 | A.   That is correct. |
| 11:41:26 | 16 | Q.   And then if we could move forward to the email, |
| 11:41:32 | 17 | on my copy it is the top of the third page, and it is an |
| 11:41:35 | 18 | email from Mr. Brin again, in which he -- the email is to |
| 11:41:41 | 19 | EMG at google.com, among others. |
| 11:41:44 | 20 | Do you see that? |
| 11:41:45 | 21 | A.   I do. |
| 11:41:45 | 22 | Q.   Was that the address for the members of the |
| 11:41:47 | 23 | executive management group? |
| 11:41:49 | 24 | A.   It is. |
| 11:41:49 | 25 | Q.   And he says, "So, I got another irate call from |

| | | |
|---|---|---|
| 11:41:53 | 1 | Jobs today.  I don't think we should let that determine |
| 11:41:56 | 2 | our hiring strategy, but thought I would let you know. |
| 11:42:00 | 3 | Basically he said, quote, 'If you hire a single one of |
| 11:42:03 | 4 | these people, that means war,' close quote.  I said I |
| 11:42:08 | 5 | could not promise any outcome, but I would discuss it |
| 11:42:11 | 6 | with the executive team again.  I asked if he expected us |
| 11:42:15 | 7 | to withdraw offers, and he said yes." |
| 11:42:17 | 8 | Let me stop there. |
| 11:42:18 | 9 | Do you recall this instance? |
| 11:42:22 | 10 | A.   As I -- the same answer as before.  I have a |
| 11:42:25 | 11 | general recollection that this occurred, but I don't have |
| 11:42:28 | 12 | the specific recollection of this email. |
| 11:42:29 | 13 | Q.   All right.  Do you have a general recollection |
| 11:42:31 | 14 | of Jobs being irate and making threats against Google? |
| 11:42:36 | 15 | A.   Yes. |
| 11:42:37 | 16 | Q.   And would that fit within your definition of |
| 11:42:39 | 17 | "friendly company"? |
| 11:42:46 | 18 | A.   It's -- it makes me uncomfortable to talk about |
| 11:42:49 | 19 | Steve Jobs as a friend who is dead, so I would refer you |
| 11:42:54 | 20 | to the books that have profiled his personality, and |
| 11:43:00 | 21 | Steve was a brilliant man who we all thought very highly |
| 11:43:07 | 22 | of, but occasionally we would have arguments with. |
| 11:43:10 | 23 | Q.   All right. |
| 11:43:11 | 24 | A.   And so that is inconsistent -- that is |
| 11:43:15 | 25 | independent of the statements about Apple.  So you asked |

| | | |
|---|---|---|
| 11:43:20 | 1 | me about -- you asked me about Steve -- you asked me |
| 11:43:23 | 2 | about an email from what Steve said, and then you |
| 11:43:25 | 3 | conflated that with Apple. |
| 11:43:27 | 4 |     Q.  Right.  I did.  Given Steve Jobs' |
| 11:43:31 | 5 | relationship -- |
| 11:43:32 | 6 |        MR. RUBIN:  Let him answer. |
| 11:43:33 | 7 |        THE WITNESS:  So I would encourage you to |
| 11:43:35 | 8 | ask -- you can ask a Steve question or an Apple question, |
| 11:43:39 | 9 | but they are in fact different. |
| 11:43:40 | 10 | BY MR. HEIMANN: |
| 11:43:41 | 11 |     Q.  That is what I'm interested in finding out. |
| 11:43:43 | 12 |        So are you saying that despite, for example, |
| 11:43:45 | 13 | the threat that was apparently made here to go to war, |
| 11:43:49 | 14 | that did not impact your view of Apple's relationship to |
| 11:43:53 | 15 | Google as a friendly company. |
| 11:43:55 | 16 |        MR. RUBIN:  Objection.  Mischaracterizes the |
| 11:43:57 | 17 | document and testimony. |
| 11:43:58 | 18 |        THE WITNESS:  Well, as I indicated, Steve's |
| 11:44:03 | 19 | alleged quote here, which of course I did not actually |
| 11:44:06 | 20 | hear, but Sergey is relaying, did not deter me from |
| 11:44:11 | 21 | ultimately going on the Apple board and being a very |
| 11:44:13 | 22 | close friend of Steve.  So the answer to your question is |
| 11:44:16 | 23 | obviously not. |
| 11:44:18 | 24 | BY MR. HEIMANN: |
| 11:44:19 | 25 |     Q.  Well, is it fair to say that one of the reasons |

| | | |
|---|---|---|
| 11:44:24 | 1 | that Google entered into the recruiting arrangement, or |
| 11:44:29 | 2 | agreement or practice with Apple, was in response to |
| 11:44:33 | 3 | Mr. Jobs' threats to go to war if you didn't? |
| 11:44:38 | 4 | MR. MITTELSTAEDT:  Objection.  Compound. |
| 11:44:40 | 5 | MR. RUBIN:  Objection.  Mischaracterizes prior |
| 11:44:42 | 6 | testimony. |
| 11:44:44 | 7 | THE WITNESS:  Okay.  So the way you said that, |
| 11:44:46 | 8 | the answer is no. |
| 11:44:47 | 9 | BY MR. HEIMANN: |
| 11:44:49 | 10 | Q.   Is there some way in which it could be better |
| 11:44:54 | 11 | phrased and the answer would be yes? |
| 11:44:56 | 12 | MR. MITTELSTAEDT:  Objection.  Argumentative. |
| 11:44:57 | 13 | THE WITNESS:  I -- I can't tell you how to ask |
| 11:44:59 | 14 | the question. |
| 11:45:00 | 15 | BY MR. HEIMANN: |
| 11:45:00 | 16 | Q.   Let me put it this way. |
| 11:45:02 | 17 | Did Mr. Jobs' threats have anything to do with |
| 11:45:06 | 18 | Google's deciding to treat Apple in the way you've |
| 11:45:10 | 19 | already described that Google decided to treat Apple? |
| 11:45:14 | 20 | A.   I would answer your question by saying that |
| 11:45:17 | 21 | Steve was unhappy, and Steve's unhappiness absolutely |
| 11:45:23 | 22 | influenced the change we made in recruiting practice, as |
| 11:45:28 | 23 | you'll see later in the mail messages.  You're using the |
| 11:45:32 | 24 | word "threats." |
| 11:45:33 | 25 | Q.   I'm using the word "threats" because that |

| | | |
|---|---|---|
| 11:45:36 | 1 | appears to be what Mr. Brin characterized it as. |
| 11:45:38 | 2 | A.   I wasn't -- I wasn't there.  So I -- I can't |
| 11:45:39 | 3 | speak as to the word "threats" and so forth. |
| 11:45:42 | 4 | The -- the word "threat" is very sensitive, |
| 11:45:44 | 5 | because if you actually read Walter Isaacson's book about |
| 11:45:49 | 6 | Steve, you'll see there's a lot of words and drama and so |
| 11:45:53 | 7 | forth, using the word "threats" about Google later.  So |
| 11:45:56 | 8 | I'd rather speak about things that I saw and I know. |
| 11:46:00 | 9 | But it's fair to say that the pressure -- the |
| 11:46:04 | 10 | pressure was put on Google by Steve personally to not |
| 11:46:08 | 11 | hire three people in -- in a Safari team, and we |
| 11:46:12 | 12 | responded to that pressure.  That is absolutely true. |
| 11:46:20 | 13 | Q.   And is it true that the ultimate response at |
| 11:46:22 | 14 | least in part was that Google decided not to hire any of |
| 11:46:26 | 15 | the people? |
| 11:46:27 | 16 | MR. RUBIN:  Objection.  Lacks foundation. |
| 11:46:29 | 17 | THE WITNESS:  I don't actually know that.  As I |
| 11:46:34 | 18 | read the mail messages, there was a big give and take on |
| 11:46:38 | 19 | that question.  But I actually don't know personally who |
| 11:46:41 | 20 | we hired and who we didn't out of the three. |
| 11:46:46 | 21 | BY MR. HEIMANN: |
| 11:47:02 | 22 | Q.   In terms of the executive management of Google |
| 11:47:11 | 23 | at this point in time, what was the nature of the |
| 11:47:14 | 24 | relationship between you and the three -- the two |
| 11:47:17 | 25 | cofounders? |

11:47:19 1      A.   The general term we used was the triumvirate,

11:47:22 2   and we worked in a partnership as we do today.  So each

11:47:27 3   of us had sort of relatively overlapping roles.  And a

11:47:32 4   simple rule would be that if somebody felt strongly, the

11:47:37 5   others couldn't -- couldn't just go do whatever they

11:47:40 6   want.  You have to kind of check with them.  But because

11:47:43 7   we're colleagues and friends and so forth, it worked

11:47:46 8   pretty well.

11:47:47 9           MR. HEIMANN:  Let me show you Exhibit 871 on

11:47:52 10  this subject.

11:48:12 11          (Exhibit 871 was marked for identification.)

11:48:12 12  BY MR. HEIMANN:

11:48:13 13      Q.   Let me ask you the question before you read

11:48:14 14  this, because it will be easier to have the question in

11:48:16 15  mind.  What I want to know is whether or not this is a

11:48:19 16  fair description of how you all functioned together at

11:48:22 17  Google.

11:48:33 18      A.   I see that I -- I did read -- read this.  I can

11:48:37 19  suggest a more accurate characterization.

11:48:40 20      Q.   Sure.

11:48:41 21      A.   If you go to the founders' letter, you will

11:48:44 22  find a paragraph which is a revision of this, the public

11:48:49 23  founders' letter.  But this is roughly -- this is roughly

11:48:53 24  what we were doing at the time.

11:48:55 25      Q.   And did this relationship continue forward in

| | | |
|---|---|---|
| 11:48:58 | 1 | time? |
| 11:48:59 | 2 | A.   Yes.  It may be easier for me to just describe |
| 11:49:06 | 3 | how I think it actually played out.  There was a set of |
| 11:49:08 | 4 | things which were largely operational which I was largely |
| 11:49:11 | 5 | in charge of.  Things involving product, product |
| 11:49:15 | 6 | strategy, Larry and Sergey tended to work on.  But we |
| 11:49:19 | 7 | were all involved in each other, so there were always |
| 11:49:22 | 8 | situations where we were together reviewing everything. |
| 11:49:28 | 9 | And if you were to ask them, they would say, Eric worked |
| 11:49:33 | 10 | on these areas, because that was his expertise, and they |
| 11:49:37 | 11 | worked on theirs.  That is how they would characterize |
| 11:49:39 | 12 | it. |
| 11:49:39 | 13 | Q.   How significant to Google was the workforce, |
| 11:49:42 | 14 | your employees? |
| 11:49:43 | 15 | A.   Crucial. |
| 11:49:44 | 16 | MR. RUBIN:  Objection.  Vague. |
| 11:49:46 | 17 | THE WITNESS:  Crucial. |
| 11:49:46 | 18 | BY MR. HEIMANN: |
| 11:49:46 | 19 | Q.   And was that something that the three of you |
| 11:49:49 | 20 | collaborated on, would it be fair to say? |
| 11:49:53 | 21 | A.   Of course. |
| 11:49:55 | 22 | MR. HEIMANN:  Why don't we take a break. |
| 11:49:56 | 23 | THE VIDEOGRAPHER:  We're now off the record at |
| 11:49:57 | 24 | 11:50. |
| 11:49:58 | 25 | (Recess was taken.) |

12:03:05  1           THE VIDEOGRAPHER:  We are now on the record at

12:03:06  2     12:03.

12:03:08  3     BY MR. HEIMANN:

12:03:08  4           Q.   Mr. Schmidt, I asked that Exhibit 199 be put

12:03:12  5     before you.

12:03:17  6           A.   I have that.

12:03:18  7           Q.   Sir, have you had a chance to look it over?

12:03:20  8           A.   I have.

12:03:20  9           Q.   This is an email from the same time period as

12:03:22 10     the other ones we were looking at just before we broke,

12:03:26 11     February 2005.  In this case it is from Mr. Campbell to

12:03:29 12     Mr. Jobs.  I don't see anyone else copied on it.

12:03:33 13           But in the email he wrote in part, "I'm heading

12:03:36 14     out of town in the a.m., off to Montana, and wanted to

12:03:41 15     give you the latest of what I heard from Google after

12:03:44 16     talking to Eric Schmidt.  Eric told me that he got

12:03:51 17     directly involved and firmly stopped all efforts to

12:03:53 18     recruit anyone from Apple."  Let me stop there.

12:03:56 19           Is that consistent with your recollection of

12:03:58 20     what happened?

12:04:00 21           A.   Well, I believe that he is overstating what we

12:04:03 22     did.  I believe he is saying -- he is referring to stop

12:04:09 23     all efforts to recruit the members of that specific team.

12:04:13 24           Q.   Why do you think that?

12:04:14 25           A.   Because as far as I know we never stopped

| | | |
|---|---|---|
| 12:08:29 | 1 | communications between the people, because he has good |
| 12:08:33 | 2 | trust relationships with me and also with Steve.  So I |
| 12:08:36 | 3 | think he's simply trying to be helpful. |
| 12:08:38 | 4 | BY MR. HEIMANN: |
| 12:08:49 | 5 | Q.   Was the agreement with Apple about no cold |
| 12:08:58 | 6 | calling related to any specific corroboration or joint |
| 12:09:01 | 7 | effort at the time? |
| 12:09:03 | 8 | MR. RUBIN:  Collaboration, you mean? |
| 12:09:04 | 9 | BY MR. HEIMANN: |
| 12:09:05 | 10 | Q.   Collaboration, I'm sorry.  Thank you. |
| 12:09:09 | 11 | A.   Well, as I indicated, I believe we had a search |
| 12:09:11 | 12 | deal there, and I believe that we were in -- we were |
| 12:09:15 | 13 | discussing the maps technology there.  Apple is today a |
| 12:09:20 | 14 | very large customer of Google's, and until they did their |
| 12:09:26 | 15 | own maps a very large customer of our maps.  So we also |
| 12:09:29 | 16 | today have an extremely detailed collaboration involving |
| 12:09:33 | 17 | the very team that this names, because the team that this |
| 12:09:37 | 18 | is referring to, which is called WebKit, is the |
| 12:09:39 | 19 | foundation of the Chrome browser. |
| 12:09:43 | 20 | So we would have certainly anticipated some of |
| 12:09:48 | 21 | that, but we would not have foreseen all of it.  Exactly |
| 12:09:52 | 22 | where we were, I couldn't tell you. |
| 12:09:54 | 23 | Q.   So back to the question, was the agreement with |
| 12:09:55 | 24 | Apple regarding recruiting, cold calling, related to any |
| 12:10:00 | 25 | specific collaboration that existed at the time? |

12:10:04  1          MR. RUBIN:  Objection.  Asked and answered.

12:10:05  2          THE WITNESS:  As I said, I believe we had a

12:10:07  3   search deal during that period, and I believe these other

12:10:10  4   collaborations were at various levels of conversation.

12:10:13  5   BY MR. HEIMANN:

12:10:13  6      Q.   All right.  And so was the agreement limited to

12:10:15  7   the personnel that would be relevant to those

12:10:17  8   collaborations?

12:10:18  9          MR. RUBIN:  Objection.  Lacks foundation as to

12:10:19 10   "agreement."

12:10:22 11          THE WITNESS:  Okay.  Again, without -- without

12:10:24 12   getting too hung up on like the word "agreement" and so

12:10:27 13   forth, my recollection is it was limited to this WebKit

12:10:33 14   issue initially.

12:10:36 15   BY MR. HEIMANN:

12:10:37 16      Q.   And how do you square that with the exhibit

12:10:40 17   that I just showed you a moment ago, Exhibit 561?

12:10:49 18          MR. MITTELSTAEDT:  Object.  Argumentative.

12:10:51 19          THE WITNESS:  No.  I understand your question.

12:10:55 20          No, we put this in place because of the

12:10:58 21   relationship that we wanted to build starting with the

12:11:00 22   WebKit.

12:11:01 23   BY MR. HEIMANN:

12:11:02 24      Q.   Are you -- is it your testimony that this

12:11:05 25   agreement that the EMG reached was limited in some

12:11:11  1    respects to certain components of Apple, rather than

12:11:14  2    Apple generally?

12:11:15  3         A.   No.  I -- as I indicated, this -- my

12:11:18  4    recollection is this is the correct agreement.  So --

12:11:23  5         Q.   So it was company-wide in terms of Apple.

12:11:26  6         A.   Company-wide in terms of do not directly

12:11:28  7    call -- cold call the company.

12:11:31  8         Q.   And it applied to Apple and all of its

12:11:33  9    subsidiaries, correct?

12:11:35 10         A.   I would assume so.

12:11:36 11         Q.   And it was not geographically limited in any

12:11:39 12    respect?

12:11:39 13         A.   As far as I can tell.

12:11:41 14         Q.   Or in terms of timing?

12:11:45 15              MR. MITTELSTAEDT:  Objection.  Vague.

12:11:46 16    BY MR. HEIMANN:

12:11:47 17         Q.   Well, were there any time limits on it?

12:11:49 18         A.   No.  As you know, it is now ended.

12:11:52 19         Q.   I do know that.

12:11:53 20         A.   Yeah.

12:11:53 21         Q.   But there wasn't any time limit at the time it

12:11:55 22    was agreed upon.

12:11:58 23         A.   But, again, you are using the word "agreement."

12:12:01 24    We sat in the equivalent of this room and decided to do

12:12:04 25    this.

12:12:06  1      Q.   Well, isn't it true that Google had an

12:12:09  2   agreement with Apple that Google wouldn't cold call Apple

12:12:11  3   employees and Apple wouldn't cold call Google employees;

12:12:16  4   isn't that true?

12:12:18  5           MR. RUBIN:  Objection.  Lacks foundation.

12:12:19  6           THE WITNESS:  Again, you are using the word

12:12:22  7   "agreement" in a specific way.

12:12:23  8   BY MR. HEIMANN:

12:12:24  9      Q.   I'm using "agreement" in the common way that

12:12:26 10   agreement is used, just the English usage.

12:12:29 11      A.   But I --

12:12:30 12           MR. RUBIN:  Move to strike that.  So you should

12:12:33 13   ask questions, not respond.

12:12:34 14           THE WITNESS:  Well, I'm actually trying to

12:12:35 15   answer your question as directly as possible.

12:12:37 16   BY MR. HEIMANN:

12:12:38 17      Q.   Please.

12:12:39 18      A.   We on our own made this agreement.

12:12:43 19      Q.   And what is "this agreement"?

12:12:45 20      A.   What you see in Exhibit 561.

12:12:46 21      Q.   All right.  So you agreed -- when you say

12:12:49 22   "agreed," the EMG agreed; is that what you are saying?

12:12:53 23      A.   The executives of the company, the policy of

12:12:54 24   the company was to do what is in Exhibit 561.

12:12:58 25      Q.   Okay.

| | | |
|---|---|---|
| 12:12:58 | 1 | A.   And I -- and I approved it. |
| 12:12:59 | 2 | Q.   And did Google communicate that fact to Apple? |
| 12:13:06 | 3 | A.   I don't remember myself communicating this to |
| 12:13:11 | 4 | these people. |
| 12:13:12 | 5 | Q.   I didn't say did you do it.  Did Google do it? |
| 12:13:15 | 6 | A.   I was trying to answer your question. |
| 12:13:17 | 7 | I don't know of any communications aside from |
| 12:13:20 | 8 | the Bill Campbell email, which I didn't know about until |
| 12:13:23 | 9 | you showed it to me. |
| 12:13:24 | 10 | Q.   You hadn't seen that one before? |
| 12:13:26 | 11 | A.   That's a privileged question.  I had not seen |
| 12:13:28 | 12 | it before the privileged review. |
| 12:13:30 | 13 | Q.   I take issue with whether it was privileged. |
| 12:13:33 | 14 | Did you see that document in preparing for the |
| 12:13:35 | 15 | deposition? |
| 12:13:36 | 16 | MR. RUBIN:  Well, it is privileged.  You can |
| 12:13:37 | 17 | ask. |
| 12:13:39 | 18 | MR. HEIMANN:  You can argue it is privileged, |
| 12:13:41 | 19 | it doesn't mean it is privileged. |
| 12:13:42 | 20 | MR. RUBIN:  I am asserting privilege, and I'm |
| 12:13:44 | 21 | directing him not to answer that question. |
| 12:13:45 | 22 | THE WITNESS:  So I'm directed not to answer |
| 12:13:46 | 23 | that question? |
| 12:13:47 | 24 | MR. RUBIN:  Right. |
| 12:13:48 | 25 | MR. HEIMANN:  Only if you saw it.  If you |

12:13:49  1   didn't see it, you are to tell me you didn't see it.

12:13:52  2            MR. RUBIN:  No.

12:13:54  3            THE WITNESS:  Okay.

12:13:54  4            MR. RUBIN:  He has already indicated that there

12:13:56  5   is something related to the preparation about that email,

12:13:58  6   so I'm directing him not to answer the question.

12:14:01  7            MR. HEIMANN:  What's the basis for the

12:14:02  8   direction?

12:14:04  9            MR. RUBIN:  That it was something that -- that

12:14:07 10   he -- that the witness has indicated that he -- the only

12:14:11 11   knowledge he has of it relates to preparation.

12:14:14 12            MR. HEIMANN:  What's the legal basis for the

12:14:15 13   objection?

12:14:17 14            MR. RUBIN:  Because it is work product,

12:14:18 15   attorney-client privilege.

12:14:19 16            MR. HEIMANN:  Okay.  Both, you claim?

12:14:21 17            MR. RUBIN:  Yes.

12:14:21 18   BY MR. HEIMANN:

12:14:22 19        Q.   All right.  Was the understanding reciprocal on

12:14:33 20   Apple's part?

12:14:36 21            MR. RUBIN:  Objection.  Lacks foundation as to

12:14:37 22   "understanding."

12:14:38 23            THE WITNESS:  I don't know what Apple's policy

12:14:39 24   was with respect to us.  But I would have -- I would have

12:14:50 25   assumed that they would have done something similar, but

12:14:54  1    you characterized it as a mutual agreement between the

12:14:56  2    two companies.

12:14:57  3    BY MR. HEIMANN:

12:14:57  4        Q.    Uh-huh.

12:14:58  5        A.    Which is what I did not like in your question.

12:15:02  6    So I don't know if there was an agreement on the Apple

12:15:05  7    side with this kind of specificity.

12:15:08  8        Q.    Well, now you've qualified it.  Do you know

12:15:10  9    whether or not there was any agreement on Apple's side

12:15:13 10    with respect to cold calling into Google?

12:15:17 11            MR. RUBIN:  Objection.  Lacks foundation as to

12:15:18 12    "agreement."

12:15:21 13            THE WITNESS:  Again, I don't know what Apple --

12:15:22 14    as a general answer, I don't know what Apple's policy

12:15:25 15    with respect to cold calling into Google was.  I didn't,

12:15:29 16    and I don't now.

12:15:31 17    BY MR. HEIMANN:

12:15:31 18        Q.    So if I put it to you that, in fact, there was

12:15:34 19    an explicit agreement between Google and Apple not to

12:15:37 20    cold call each others' employees, you couldn't tell me

12:15:41 21    whether that was true or not.

12:15:42 22        A.    Are you -- are you informing me that that's

12:15:43 23    true?

12:15:44 24        Q.    I'll show you a document in a minute that says

12:15:46 25    that.

12:15:47  1        A.    Oh, I'd love --

12:15:48  2              MR. RUBIN:  Objection.  Objection.  Lacks

12:15:49  3    foundation.

12:15:49  4              THE WITNESS:  I'm looking forward to seeing

12:15:51  5    your document.

12:15:51  6    BY MR. HEIMANN:

12:15:52  7        Q.    But the answer is, you don't know of any such

12:15:54  8    mutual agreement between Apple and Google.

12:15:56  9        A.    I don't have direct knowledge that I can

12:15:59 10    recall.

12:16:00 11        Q.    Do you have indirect knowledge that you can

12:16:01 12    recall?

12:16:02 13        A.    Okay.  Again, I'm trying to answer your

12:16:04 14    questions precisely.  I don't have -- my guess would

12:16:09 15    be -- I guess I'm not supposed to guess in a deposition.

12:16:12 16        Q.    You can guess.

12:16:13 17        A.    My guess would be that -- that they had a

12:16:15 18    reciprocal arrangement of some kind, but I don't know the

12:16:18 19    details.

12:16:19 20        Q.    Did Mr. Brin ever tell you that he had reached

12:16:22 21    such an agreement with Mr. Jobs?

12:16:24 22              MR. RUBIN:  Objection.  Lacks foundation.

12:16:26 23              THE WITNESS:  I have no memory of such a

12:16:28 24    conversation.

         25    //

| | | |
|---|---|---|
| 12:16:28 | 1 | BY MR. HEIMANN: |
| 12:16:41 | 2 | Q.   Again, to Exhibit 561, that's the email from |
| 12:16:47 | 3 | Ms. Brown, Genentech is a company that is identified as |
| 12:16:53 | 4 | one of the three companies for this special arrangement. |
| 12:16:57 | 5 | Why? |
| 12:16:58 | 6 | A.   I have no -- I don't specifically recall the |
| 12:17:00 | 7 | conversation, as I said.  But I would observe that |
| 12:17:04 | 8 | Genentech, Intel, and Apple -- that Genentech and Intel |
| 12:17:10 | 9 | had board members that were board members of Google, and |
| 12:17:13 | 10 | Genentech was -- Art Levinson was the CEO of Genentech. |
| 12:17:18 | 11 | Paul Otellini was the CEO of Intel.  And Apple, of |
| 12:17:22 | 12 | course, I eventually got on their board, and Bill |
| 12:17:23 | 13 | Campbell was a board member of Apple. |
| 12:17:26 | 14 | So, again, my feeling would be -- I don't |
| 12:17:29 | 15 | precisely remember, would be that this was related -- and |
| 12:17:33 | 16 | I vaguely remember saying that we did not want a |
| 12:17:37 | 17 | situation where you had a sitting board member and we |
| 12:17:40 | 18 | were cold calling into their companies. |
| 12:17:43 | 19 | Q.   Now, at what level is that speculation and at |
| 12:17:47 | 20 | what level is that an actual memory of the reason for the |
| 12:17:51 | 21 | agreement with respect to Genentech? |
| 12:17:53 | 22 | A.   It's vague enough I can't give you a precise |
| 12:17:56 | 23 | answer, but I think it's probably true. |
| 12:17:58 | 24 | Q.   Was there any other reason you can think of for |
| 12:18:00 | 25 | Genentech being the subject of this agreement? |

| | | |
|---|---|---|
| 12:19:45 | 1 | A.   That is correct. |
| 12:20:03 | 2 | Q.   Let's take a look at Exhibit 563. |
| 12:20:34 | 3 | Have you had a chance to read this? |
| 12:20:35 | 4 | A.   I have. |
| 12:20:36 | 5 | Q.   So this is an email internal to Apple from |
| 12:20:39 | 6 | Danielle Lambert, or Lambert, I'm not sure of the |
| 12:20:43 | 7 | pronunciation.  Do you know who she was at the time? |
| 12:20:47 | 8 | A.   I do not. |
| 12:20:47 | 9 | Q.   And it is to U.S. recruiting, all at group |
| 12:20:51 | 10 | Apple.  Do you see that? |
| 12:20:53 | 11 | A.   I do. |
| 12:20:53 | 12 | Q.   And it is dated February of 2005. |
| 12:20:55 | 13 | A.   I do. |
| 12:20:56 | 14 | Q.   The same time that the emails we were looking |
| 12:20:58 | 15 | at a moment ago were dated, right? |
| 12:21:00 | 16 | A.   Yes. |
| 12:21:01 | 17 | Q.   And she wrote, "All, please add Google to |
| 12:21:04 | 18 | your," quote, "'hands-off,'" close quote, "list.  We |
| 12:21:08 | 19 | recently agreed not to recruit from one another.  So if |
| 12:21:11 | 20 | you hear of any recruiting they are doing against us, |
| 12:21:14 | 21 | please be sure to let me know.  Please also be sure to |
| 12:21:17 | 22 | honor our side of the deal." |
| 12:21:19 | 23 | Do you see that? |
| 12:21:20 | 24 | A.   I do. |
| 12:21:20 | 25 | Q.   How do you square that with your testimony |

12:21:22 1    there was not an agreement between Apple and Google?

12:21:26 2            MR. RUBIN:  Objection.  Lacks foundation;

12:21:27 3    argumentative.

12:21:29 4            THE WITNESS:  This is the first I've ever seen

12:21:30 5    of this email.  So I have no opinion about this email.

12:21:33 6    My testimony stands.

12:21:36 7    BY MR. HEIMANN:

12:21:36 8        Q.   Your testimony is there was no agreement

12:21:38 9    between the two not to recruit from each other, correct?

12:21:41 10           MR. RUBIN:  Objection.  Mischaracterizes his

12:21:42 11   prior testimony; lacks foundation.

12:21:45 12           THE WITNESS:  I tried to be very precise, and I

12:21:47 13   said that we made a decision, which is well characterized

12:21:51 14   in Exhibit 561, to not directly cold call into, among

12:21:57 15   other things, Apple.

12:21:59 16           I also told you that I don't know what Apple

12:22:02 17   did internally.  You've now presented evidence to me of

12:22:06 18   what Apple did internally, which is news to me.

12:22:08 19   BY MR. HEIMANN:

12:22:15 20       Q.   Was the actions with respect to cold calling

12:22:21 21   communicated to Google's board of directors?

12:22:26 22       A.   Well, it was certainly communicated to Bill

12:22:28 23   Campbell, who is an advisor to the Google board of

12:22:31 24   directors.  I don't recall -- I don't recall a discussion

12:22:37 25   at the board about this.

| | | |
|---|---|---|
| 12:22:38 | 1 | Q.   Did the board of directors approve it? |
| 12:22:41 | 2 | MR. RUBIN:  Objection.  Asked and answered. |
| 12:22:44 | 3 | THE WITNESS:  As I indicated, I have no |
| 12:22:45 | 4 | recollection of such a discussion.  However, it would not |
| 12:22:48 | 5 | have been -- it would not have required a board of |
| 12:22:50 | 6 | directors approval. |
| 12:22:51 | 7 | BY MR. HEIMANN: |
| 12:22:53 | 8 | Q.   Do you know whether or not there is any |
| 12:22:56 | 9 | discussion in the minutes of any meeting of the board of |
| 12:22:58 | 10 | directors? |
| 12:23:00 | 11 | A.   I do not. |
| 12:23:08 | 12 | Q.   Is it something of sufficient importance that |
| 12:23:11 | 13 | you think in all likelihood it would have been presented |
| 12:23:13 | 14 | to the board? |
| 12:23:14 | 15 | MR. RUBIN:  Objection.  Asked and answered. |
| 12:23:16 | 16 | THE WITNESS:  I think it's unlikely it would |
| 12:23:18 | 17 | have been presented to the board. |
| 12:23:19 | 18 | BY MR. HEIMANN: |
| 12:23:20 | 19 | Q.   Why do you say that? |
| 12:23:21 | 20 | A.   We were working on more important things. |
| 12:23:32 | 21 | Q.   I'll ask you to take a look at Exhibit 640. |
| 12:23:59 | 22 | This is a somewhat lengthy document.  I have |
| 12:24:01 | 23 | got one page and one section I'm going to focus on, but |
| 12:24:06 | 24 | you should at least take enough time to -- to familiarize |
| 12:24:09 | 25 | yourself with the document generally, and -- because what |

Deposition of Eric Schmidt                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

12:37:10  1      A.   This was, you know, as I indicated --

12:37:10  2      Q.   It is a long time ago.  I understand that.

12:37:12  3      A.   Eight years ago.  No.  This is the best I can

12:37:15  4  recall.

12:37:15  5      Q.   But I'm trying to find out whether you're

12:37:17  6  actually recalling something now, or whether you are, as

12:37:19  7  is natural, saying, this is what -- is this likely what I

12:37:22  8  would have been thinking about and why I said this.

12:37:25  9           MR. RUBIN:   Objection.  Asked and answered;

12:37:27 10  argumentative and close to badgering.

12:37:30 11           THE WITNESS:  I've answered your question by

12:37:32 12  saying that I don't recall the specific typing of this

12:37:35 13  response, however, that my general view is what I told

12:37:40 14  you, and I'm sure that it was my general view then, too.

12:37:45 15  That's the best answer I can give you.

12:37:48 16           MR. HEIMANN:  Fair enough.  Fair enough.

12:37:59 17           Shall we break for lunch?  Is that all right?

12:38:05 18           MR. RUBIN:  If that's what you want to do.  I

12:38:07 19  think Eric is probably ready to keep going for a little

12:38:09 20  while longer, but --

12:38:10 21           MR. HEIMANN:  We're going to go on to the end,

12:38:12 22  so the question is only whether we eat now or wait.

12:38:15 23           THE WITNESS:  I think you should go on until

12:38:17 24  we're done, and I think we should work as hard as we can

12:38:20 25  to be done.

| | | |
|---|---|---|
| 12:38:20 | 1 | MR. HEIMANN:  I can't go on without lunch. |
| 12:38:24 | 2 | THE WITNESS:  Okay, then we should have lunch. |
| 12:38:25 | 3 | How long do you need for lunch? |
| 12:38:27 | 4 | MR. HEIMANN:  I don't know what is being |
| 12:38:28 | 5 | offered. |
| 12:38:31 | 6 | MR. RUBIN:  We can go off the record for lunch. |
| 12:38:33 | 7 | THE VIDEOGRAPHER:  This is the end of Video |
| 12:38:34 | 8 | No. 1.  We're now off the record at 12:38. |
| 12:38:38 | 9 | (Recess was taken.) |
| 13:14:20 | 10 | THE VIDEOGRAPHER:  We are now on the record at |
| 13:14:23 | 11 | 1:14.  This is the beginning of Video No. 2. |
| 13:14:27 | 12 | BY MR. HEIMANN: |
| 13:14:28 | 13 | Q.   Mr. Schmidt, if we could go back briefly to |
| 13:14:31 | 14 | Exhibit 640, that is the recruiting data and policy. |
| 13:14:35 | 15 | A.   I have it. |
| 13:14:37 | 16 | Q.   I've been informed that according to the |
| 13:14:38 | 17 | metadata the author of that document is Jane Sho, S-h-o. |
| 13:14:44 | 18 | Does that name mean anything to you? |
| 13:14:46 | 19 | A.   It does not. |
| 13:14:47 | 20 | Q.   Okay.  Did you take any steps to enforce the no |
| 13:14:55 | 21 | cold call policy at Google? |
| 13:14:59 | 22 | MR. RUBIN:  Objection.  Vague. |
| 13:15:01 | 23 | THE WITNESS:  What do you mean by "steps"? |
| 13:15:02 | 24 | BY MR. HEIMANN: |
| 13:15:03 | 25 | Q.   Did you do anything to enforce the policy? |

13:15:06 1     A.   Well, I approved it.

13:15:08 2     Q.   Right.  And after approving it, did you become

13:15:10 3 involved in any way in enforcing the policy and seeing to

13:15:13 4 it that it was carried out?

13:15:15 5     A.   Not that I'm aware -- nothing beyond approval.

13:15:20 6     Q.   Let's take a look at Exhibit 187, please.

13:16:02 7     Have you had a chance to look at that?

13:16:04 8     A.   I have.

13:16:04 9     Q.   Does it -- strike that.

13:16:05 10     Do you recall it at all?

13:16:06 11     A.   No.

13:16:07 12     Q.   Do you recall from time to time after the

13:16:10 13 policy respecting Apple was put into effect receiving

13:16:14 14 communications from Steve Jobs complaining about Google's

13:16:18 15 recruiting into Apple?

13:16:20 16     A.   I have a general recollection, but I don't

13:16:22 17 recall the specifics.

13:16:23 18     Q.   What's the extent of your general recollection?

13:16:26 19     A.   That whenever there was any recruiting

13:16:28 20 activity, we would hear from Steve one way or the other.

13:16:31 21     Q.   And did he typically communicate directly to

13:16:35 22 you about those matters?

13:16:37 23     MR. RUBIN:  Objection.  Lacks foundation.

13:16:41 24     THE WITNESS:  He would talk to whoever he had

13:16:43 25 spoken to the previous time on something else.  So he

| | | |
|---|---|---|
| 13:16:47 | 1 | would speak to myself.  He would speak to Bill Campbell. |
| 13:16:50 | 2 | For a while Alan Eustace was assigned to speak to Steve. |
| 13:16:59 | 3 | So it would depend. |
| 13:17:02 | 4 | BY MR. HEIMANN: |
| 13:17:03 | 5 |     Q.   Forgive me, I'm just not clear on your answer. |
| 13:17:05 | 6 |         When you said "he would speak to whomever he |
| 13:17:08 | 7 | had last spoken to," are you talking about Mr. Jobs would |
| 13:17:10 | 8 | speak to whomever he had last spoken? |
| 13:17:13 | 9 |     A.   That's correct. |
| 13:17:13 | 10 |     Q.   What is -- can you explain what you mean by |
| 13:17:14 | 11 | that? |
| 13:17:15 | 12 |     A.   Well, the company had interactions with Steve, |
| 13:17:18 | 13 | and Steve would call whoever he had most recently spoken |
| 13:17:21 | 14 | with on another subject to let them know of his |
| 13:17:24 | 15 | displeasure. |
| 13:17:25 | 16 |     Q.   And that was just his idiosyncratic practice? |
| 13:17:31 | 17 |     A.   I -- I'm not going to judge it.  So -- |
| 13:17:33 | 18 |     Q.   All right.  That was -- setting aside the |
| 13:17:36 | 19 | idiosyncratic, that was Mr. Jobs' apparent practice from |
| 13:17:41 | 20 | what you saw and observed? |
| 13:17:43 | 21 |         MR. RUBIN:  Objection.  Lacks foundation. |
| 13:17:44 | 22 |         THE WITNESS:  It is only my observation of what |
| 13:17:45 | 23 | happened.  I can't speculate on Steve's motivations. |
| 13:17:51 | 24 |         Again, let me remind you that I joined the |
| 13:17:53 | 25 | board about -- the board of Apple about -- at a time |

13:17:56  1   in -- coincident with this era, this period of time.

13:17:59  2   BY MR. HEIMANN:

13:18:00  3        Q.    I have it down that you joined in August of

13:18:02  4   2006.  Does that sound right?

13:18:04  5        A.    That sounds good.

13:18:05  6        Q.    And you were on the board up until or through

13:18:08  7   August 2009?

13:18:09  8        A.    That sounds about right.

13:18:10  9        Q.    And then you went off the board of Apple?

13:18:12 10        A.    That is correct.

13:18:13 11        Q.    Why?

13:18:14 12        A.    The conflicts between the company while I was

13:18:20 13   on the board -- it started with almost no conflict, and

13:18:24 14   then during the time I was on the board the iPhone was

13:18:28 15   announced, and then the android product line, which is

13:18:31 16   the primary competitor for the iPhone now, was announced,

13:18:36 17   and I had to recuse myself under the rules, which is the

13:18:39 18   right thing.  And it got to the point where I had to

13:18:41 19   recuse myself from too much, that I could not effectively

13:18:45 20   contribute as an Apple board member, and it was the right

13:18:48 21   decision to get off.

13:18:51 22        Q.    All right.  Sir, in this instance we're look at

13:18:53 23   Exhibit 187, apparently Mr. Jobs brought to your

13:18:56 24   attention his complaint about Google's recruiting into

13:18:59 25   his iPod group.

13:19:02   1          A.    I see that.

13:19:02   2          Q.    All right.  And I'm sorry.  Maybe I already

13:19:05   3    asked you that.  Do you recall this?

13:19:07   4          A.    I do not, although as I read this, it's

13:19:10   5    probably the case that new cell phone software group is

13:19:14   6    referring to android.

13:19:18   7          Q.    All right.  And then you responded to him

13:19:23   8    fairly promptly, saying you would look into it and

13:19:27   9    affirming or reaffirming the policy of no recruiting?

13:19:30  10          A.    That is correct.

13:19:32  11          Q.    If we could go next to Exhibit 250.

13:20:14  12          A.    Okay.

13:20:15  13          Q.    All right.  Do you have any recollection of

13:20:16  14    this email exchange?

13:20:17  15          A.    No.

13:20:34  16          Q.    In any event, what you've done -- strike that.

13:20:36  17                The email appears to be you're forwarding to

13:20:38  18    Mr. Jobs the information you had been provided about the

13:20:42  19    matter that he had asked about or complained about?

13:20:44  20          A.    That is correct.

13:20:50  21                MR. RUBIN:  Are you referring back to the prior

13:20:52  22    exhibit, or are you linking the two exhibits?

13:20:54  23                MR. HEIMANN:  I think I did, yeah.  Aren't they

13:20:59  24    linked?

13:21:13  25                THE WITNESS:  I'm going to presume that these

13:21:15  1    are two linked, but there is not a guarantee that they

13:21:18  2    are.

13:21:19  3              MS. BROWN:  I'll note for the record that the

13:21:20  4    date on the prior exhibit, Exhibit 187, appears to be in

13:21:24  5    February 2006, whereas the date on the Exhibit 250 is

13:21:27  6    '07.

13:21:29  7              THE WITNESS:  You are right.

13:21:30  8    BY MR. HEIMANN:

13:21:30  9        Q.  So that would suggest they are not.  My

13:21:32 10    apologies.

13:21:33 11        A.  Let's assume they are not.  This is referring

13:21:35 12    to some other incident, then.

13:21:37 13        Q.  So in this email, I'm talking about

13:22:11 14    Exhibit 250, and it is not clear to me who the author of

13:22:17 15    the email is that you forwarded to Mr. Jobs, but whoever

13:22:21 16    the author is, they reported that on this specific case

13:22:24 17    the source or who contacted this Apple employee should

13:22:30 18    not have and will be terminated within the hour.  Do you

13:22:32 19    see that?

13:22:33 20        A.  I do.

13:22:33 21        Q.  And then skipping down a bit it says, "In

13:22:35 22    general we have a very clear," quote, "'do not call,'"

13:22:39 23    close quote, "policy that is given to every staffing

13:22:44 24    professional," et cetera.

13:22:45 25              Do you see that?

13:22:46  1     A.    I do.

13:22:46  2     Q.    Was this a matter of such importance that it

13:22:48  3  justified termination of the person who offended the

13:22:52  4  policy as is indicated here?

13:22:54  5          MR. RUBIN:  Objection.  Argumentative.

13:22:57  6          THE WITNESS:  Well, as a general rule, Google

13:23:00  7  has a set of rules that the recruiters and everyone else

13:23:05  8  has to follow, and so I would assume reading this that

13:23:09  9  the manager observed that the recruiter had violated the

13:23:14 10  rules and was terminated.  It was relatively -- it's how

13:23:20 11  you deal with -- with errors in a company.

13:23:22 12  BY MR. HEIMANN:

13:23:22 13     Q.    Are you suggesting that every error committed

13:23:25 14  at Google resulted in termination?

13:23:28 15          MR. RUBIN:  Objection.  Mischaracterizes prior

13:23:29 16  testimony; argumentative.

13:23:32 17          THE WITNESS:  If it is a rule that you've been

13:23:33 18  told you have to follow or you'll lose your job, sure.

13:23:36 19  BY MR. HEIMANN:

13:23:37 20     Q.    And this was such a rule?

13:23:38 21     A.    I don't know, but I would infer it was.

13:23:46 22     Q.    Let's take a look at Exhibit 192.

13:24:08 23     A.    This explains to you the origin.

13:24:22 24     Q.    Right.

13:24:22 25     A.    Okay.  So what was your question?

| | | |
|---|---|---|
| 13:24:25 | 1 | Q.   So you've had a chance to look at this?  That's |
| 13:24:27 | 2 | the first question. |
| 13:24:28 | 3 | A.   Uh-huh. |
| 13:24:29 | 4 | Q.   This email string appears to begin with an |
| 13:24:31 | 5 | email from a Google recruiter to someone at Apple. |
| 13:24:36 | 6 | A.   That's -- I see that. |
| 13:24:37 | 7 | Q.   All right.  And then Steve Jobs forwards that |
| 13:24:41 | 8 | email to you with the statement, "I would be very pleased |
| 13:24:46 | 9 | if your recruiting department would stop doing this."  Do |
| 13:24:49 | 10 | you see that? |
| 13:24:50 | 11 | A.   That is correct. |
| 13:24:53 | 12 | Q.   And you responded to -- let me make sure I get |
| 13:25:01 | 13 | this right. |
| 13:25:02 | 14 | A.   I'll try to help you. |
| 13:25:03 | 15 | Q.   Sure. |
| 13:25:03 | 16 | A.   This is a forward where I'm forwarding Steve's |
| 13:25:06 | 17 | mail almost certainly to Shona. |
| 13:25:08 | 18 | Q.   Okay. |
| 13:25:10 | 19 | A.   Where I say to Shona, "I believe that we have a |
| 13:25:12 | 20 | no policy of recruiting from Apple."  Or perhaps it is |
| 13:25:16 | 21 | Arnnon.  I'm sending it to either Shona or Arnnon, or |
| 13:25:20 | 22 | whatever his name is, and then you can see the response |
| 13:25:24 | 23 | from Arnnon to me, and then you can see the response from |
| 13:25:27 | 24 | Shona to Arnnon in order. |
| 13:25:30 | 25 | Q.   Right.  So this would be -- so it is clear on |

13:25:33  1    the record, so Arnnon's response to you is the one on

13:25:36  2    March 8 which he writes, "on this specific case," et

13:25:40  3    cetera.

13:25:40  4         A.   That is correct.  You can see he has addressed

13:25:45  5    it to me.

13:25:45  6         Q.   Yes, sir.  And that is the email in which he

13:25:48  7    says the person will be terminated within the hour?

13:25:50  8         A.   Right.  And you'll also see above that Shona's

13:25:54  9    direction to Arnnon that we have a zero tolerance policy

13:25:58 10    for violating our policies, which should answer your

13:26:01 11    earlier question.

13:26:02 12         Q.   Right.  So this policy regarding recruiting

13:26:04 13    was, as she puts it here, "a zero tolerance policy" that

13:26:09 14    warranted immediate termination if violated.

13:26:12 15              MR. RUBIN:  Objection.  Mischaracterized the

13:26:15 16    document.

13:26:15 17              THE WITNESS:  Again, I'll let the document

13:26:17 18    speak for itself.  So --

13:26:18 19    BY MR. HEIMANN:

13:26:19 20         Q.   That's what the document says, right?

13:26:20 21              MR. RUBIN:  Objection.  Same objection.

13:26:22 22              THE WITNESS:  "I want it clear we have a zero

13:26:24 23    tolerance policy for violating our policies."  So I think

13:26:28 24    that's how I'd interpret it.

         25    //

| | | |
|---|---|---|
| 13:26:31 | 1 | BY MR. HEIMANN: |
| 13:26:32 | 2 | Q.   Right.   Now, focusing again on the policy with |
| 13:26:40 | 3 | respect to Apple, you've indicated in your prior |
| 13:26:45 | 4 | testimony that the policy was a no cold call policy.  I |
| 13:26:49 | 5 | think that's the fairest way to summarize it, right? |
| 13:26:51 | 6 | A.   Yeah, we call it a do-not-call policy. |
| 13:26:53 | 7 | Q.   Do-not-call policy, thank you. |
| 13:26:55 | 8 | A.   DNC. |
| 13:26:56 | 9 | Q.   But with respect to Apple, wasn't it more than |
| 13:26:59 | 10 | that, wasn't it also a do-not-hire unless Steve Jobs |
| 13:27:02 | 11 | okays the hire? |
| 13:27:03 | 12 | MR. RUBIN:  Objection.  Argumentative; lacks |
| 13:27:04 | 13 | foundation. |
| 13:27:06 | 14 | THE WITNESS:  That is not true. |
| 13:27:07 | 15 | BY MR. HEIMANN: |
| 13:27:08 | 16 | Q.   Let's take a look at Exhibit 278.  Have you had |
| 13:27:55 | 17 | a chance to take a look at this? |
| 13:27:57 | 18 | A.   I do. |
| 13:27:57 | 19 | Q.   This is an email from Mr. Eustace, Alan |
| 13:27:59 | 20 | Eustace, to Steve Jobs, correct? |
| 13:28:01 | 21 | A.   Uh-huh.  Yes. |
| 13:28:03 | 22 | Q.   And who is Mr. Eustace at Google at the time? |
| 13:28:06 | 23 | A.   Senior vice president of engineering. |
| 13:28:08 | 24 | Q.   That is a senior position, is it not? |
| 13:28:10 | 25 | A.   That is correct. |

13:28:11  1        Q.    And he copies Mr. Campbell and the two founders

13:28:14  2    of the company as well, correct?

13:28:16  3        A.    That's correct.

13:28:17  4        Q.    And he says in part, "Google would like to make

13:28:21  5    an offer to █████████████    --"  Is that how you

13:28:26  6    pronounce it?  Do you know?

13:28:28  7        A.    I don't know.

13:28:28  8        Q.    "-- to run a small engineering center in Paris.

13:28:31  9    Bill, Larry, Sergey" -- Sergey, sorry, "and ████████

13:28:35 10    believe it is important to get your blessing before

13:28:38 11    moving forward with this offer."

13:28:39 12             Skipping down to the last paragraph, "Google's

13:28:41 13    relationship with Apple is extremely important to us.  If

13:28:44 14    that relationship is any way threatened by this hire,

13:28:47 15    please let me know, and we will pass on this

13:28:50 16    opportunity."

13:28:50 17             Do you see that?

13:28:51 18        A.    I do.

13:28:52 19        Q.    Did you know anything about this at the time?

13:28:55 20        A.    I did not.  Or I should say, I don't have any

13:29:02 21    memory of it.

13:29:06 22        Q.    If we can go to Exhibit 648.

13:29:09 23             Have you had a chance to look at that?

13:29:55 24        A.    I have.

13:29:55 25        Q.    So this is an email chain, I'll try to

| | | |
|---|---|---|
| 13:29:57 | 1 | summarize it rather than read through it, in which it |
| 13:30:01 | 2 | appears that Mr. Jobs had not responded to the email that |
| 13:30:04 | 3 | we saw just a moment ago. I'm looking at page 2, halfway |
| 13:30:08 | 4 | down it says, "Steve didn't respond to my email, but Bill |
| 13:30:12 | 5 | Campbell promised to call," et cetera. |
| 13:30:14 | 6 | A. That's what it says. |
| 13:30:16 | 7 | Q. And then looking at the first page there is an |
| 13:30:21 | 8 | email exchange involving whether or not Mr. Campbell had |
| 13:30:24 | 9 | had a chance to talk with Mr. Jobs yet about the subject. |
| 13:30:27 | 10 | Do you see that? |
| 13:30:27 | 11 | A. I do. |
| 13:30:28 | 12 | Q. And the last email is Mr. Campbell saying he is |
| 13:30:31 | 13 | going to be meeting with Mr. Jobs on Sunday. |
| 13:30:34 | 14 | A. I see that. |
| 13:30:35 | 15 | Q. Okay. Refresh your memory at all about this |
| 13:30:38 | 16 | incident at this point? |
| 13:30:40 | 17 | A. No. |
| 13:30:41 | 18 | Q. If we can go next, then, to Exhibit 650 -- no, |
| 13:30:48 | 19 | I'm sorry, Exhibit 279. |
| 13:31:14 | 20 | A. Okay. |
| 13:31:15 | 21 | Q. So now what I'm showing you is the response |
| 13:31:16 | 22 | that Mr. Jobs sent on the 9th of April the day after -- |
| 13:31:20 | 23 | or maybe the very day he spoke with Mr. Campbell, |
| 13:31:22 | 24 | according to Exhibit 648, in which Mr. Jobs wrote, "What |
| 13:31:28 | 25 | would ██████████ be working on? We would have a problem |

Deposition of Eric Schmidt          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 13:31:28 | 1 | if it is related to cell phone handsets, et cetera." |
| 13:31:31 | 2 |       Do you see that? |
| 13:31:31 | 3 |     A.    I do. |
| 13:31:32 | 4 |     Q.    And then Mr. Eustace responded to that email as |
| 13:31:36 | 5 | is indicated here, "Thank you very much for responding," |
| 13:31:38 | 6 | et cetera.  Do you see that? |
| 13:31:39 | 7 |     A.    I do. |
| 13:31:40 | 8 |     Q.    And if we can go next then to Exhibit 650. |
| 13:32:19 | 9 |     A.    I see that. |
| 13:32:19 | 10 |     Q.    So this begins with an email from Mr. Eustace |
| 13:32:21 | 11 | to Mr. Jobs on the 25th of April, describing the desire |
| 13:32:23 | 12 | to hire ███████ and four people who used to work for |
| 13:32:27 | 13 | him at Apple in Paris.  Do you see that? |
| 13:32:30 | 14 |     A.    Uh-huh. |
| 13:32:30 | 15 |     Q.    And then Mr. Jobs wrote back, "We strongly |
| 13:32:33 | 16 | prefer that you not hire these guys." |
| 13:32:34 | 17 |       Do you see that? |
| 13:32:35 | 18 |     A.    Yes. |
| 13:32:36 | 19 |     Q.    And then Mr. Eustace -- I'm sorry -- yes, |
| 13:32:45 | 20 | Mr. Eustace writes to ███████ relating that to him and |
| 13:32:48 | 21 | indicating that "We can't risk our relationship with |
| 13:32:50 | 22 | Apple to make this happen over his objection." |
| 13:32:52 | 23 |       Do you see that? |
| 13:32:53 | 24 |     A.    I see. |
| 13:32:54 | 25 |     Q.    All right.  And finally, if we go to |

13:32:57  1   Exhibit 653.

13:33:29  2        A.   Okay.

13:33:29  3        Q.   So this is what appears to me to be the

13:33:32  4   concluding email on the subject in which Mr. Eustace

13:33:35  5   wrote to Mr. Jobs on May 23 of 2006, saying, among other

13:33:38  6   things, that "Based on your strong preference that we not

13:33:42  7   hire the ex-Apple engineer, ███████, and I decided not

13:33:46  8   to open a Paris engineering center."

13:33:48  9        Do you see that?

13:33:53 10        A.   I do.

13:33:53 11        Q.   Once again, do you have any recollection of

13:33:55 12   knowing about this exchange?

13:33:56 13        A.   No, but I should note that we have an

13:33:59 14   engineering center now in Paris.

13:34:02 15        Q.   Glad to hear it, but the question is, how do

13:34:04 16   you square this with the notion that the agreement with

13:34:07 17   Apple did not involve requiring Mr. Jobs' permission for

13:34:11 18   hiring Apple people?

13:34:12 19             MR. RUBIN:  Objection.  Lacks foundation.

13:34:17 20             THE WITNESS:  Well, you -- as you can see, I

13:34:19 21   was not copied on any of this correspondence.

13:34:21 22   BY MR. HEIMANN:

13:34:21 23        Q.   I do.

13:34:22 24        A.   So I was not involved in this whole

13:34:24 25   transaction.  But I stated what I -- what I understood

13:34:28  1   the agreement between -- or whatever you want to

13:34:30  2   characterize them, that Google had about hiring Apple

13:34:34  3   people, which is do not call, but if people approached

13:34:36  4   us, we would pursue.  In this particular case, Alan seems

13:34:40  5   to have gone one step further for reasons that he would

13:34:43  6   have to tell you.

13:34:44  7           (Exhibit 861 was marked for identification.)

13:34:44  8   BY MR. HEIMANN:

13:34:44  9       Q.    All right.  Let me ask you to take a look at

13:34:47 10   Exhibit 861.  Have you had a chance to look at that?

13:35:19 11       A.    I have.

13:35:19 12       Q.    This is an email internal to Apple, as I

13:35:21 13   understand it, and the point I want to focus on is the

13:35:25 14   originating email from Daniel -- Danielle, excuse me,

13:35:28 15   Lambert to Mr. Jobs, June of 2006.  And in particular,

13:35:34 16   the second paragraph of that email, in which she said,

13:35:38 17   "We have been diving into the search for someone to lead

13:35:42 18   an ad sales team and surfacing some good folks.  We're

13:35:47 19   researching Google to see who's there and learn what we

13:35:49 20   can about their backgrounds, but are not directly calling

13:35:52 21   them directly given the agreement you and Sergey" -- I

13:35:57 22   hope I'm pronouncing it correctly -- "struck not to

13:36:00 23   recruit from one another."  Let me stop there.

13:36:07 24           Were you aware that such an agreement had been

13:36:09 25   reached between Mr. Jobs and Sergey Brin at Google?

13:36:13  1      A.   Well, I've already indicated that there was no

13:36:15  2   such agreement, in your terms.  I don't know what Sergey

13:36:21  3   may have said separately to Steve or what impressions he

13:36:24  4   may have given.  We -- I already showed you what we did.

13:36:30  5   You showed me an email from this Danielle Lambert woman,

13:36:33  6   who I don't know, which indicates that they were doing

13:36:36  7   something similar for us.

13:36:39  8      Q.   Well, to be fair, both that email and this

13:36:41  9   email speak in terms of an actual agreement between the

13:36:43 10   two companies not to recruit from each other, right?

13:36:48 11           MR. RUBIN:  Objection.  Argumentative; lacks

13:36:49 12   foundation.

13:36:49 13           THE WITNESS:  Well, I -- all I can see are the

13:36:51 14   words on the page.  So I -- it's very hard to interpret

13:36:55 15   an email in the context of a different company.  So --

13:36:59 16   you'd have to ask them.

13:37:18 17   BY MR. HEIMANN:

13:37:18 18      Q.   Well, let's look at a Google document on this

13:37:21 19   subject.  Let's look at Exhibit 661.

13:38:01 20           My focus is on the first page of the document.

13:38:19 21      A.   Okay.

13:38:19 22      Q.   First of all, do you recognize the document?

13:38:21 23      A.   I do not.

13:38:22 24      Q.   It's a Google document, correct?  It is from

13:38:28 25   Google's business records, right?

13:38:36  1      A.    I'm sorry.  Are you asking me?

13:38:37  2      Q.    Yes.

13:38:38  3      A.    I didn't produce the document, so I don't know.

13:38:40  4      Q.    When you say you, you mean you personally

13:38:42  5  didn't produce it, right?

13:38:44  6      A.    I -- I don't know where these documents come

13:38:46  7  from.

13:38:47  8      Q.    I'll tell you this document came from Google's

13:38:49  9  business records.

13:38:50 10      A.    And as I asked you previously, I don't know who

13:38:53 11  wrote these documents.  You told me the name of somebody

13:38:54 12  I didn't know.

13:38:54 13      Q.    Right.

13:38:54 14      A.    So if you could let me know who wrote it, that

13:38:56 15  would be helpful.

13:38:57 16      Q.    Well, I think this document was written by

13:38:59 17  Mr. Geshuri, is it not?

13:39:02 18           MR. HARVEY:  I have to double-check this

13:39:03 19  document specifically.

13:39:05 20           THE WITNESS:  Okay.

13:39:05 21  BY MR. HEIMANN:

13:39:06 22      Q.    In any event, there is no doubt it is a Google

13:39:08 23  document, in your mind, is there?

13:39:09 24      A.    Well, I would assume so, yeah.

13:39:11 25      Q.    And the title of the document at the part -- at

13:39:13  1   the very beginning says, "Google" in big letters,

13:39:16  2   "Special Agreement Hiring Policy," right?

13:39:18  3       A.   I see that.

13:39:19  4       Q.   Lower left-hand corner says it was a revision

13:39:22  5   from January of 2008, correct?

13:39:26  6       A.   Yes, it says that.

13:39:27  7       Q.   All right.  If you'll take a look at the text

13:39:29  8   about halfway down on the first page, just below the line

13:39:33  9   that goes across the page, it says, "The following

13:39:36 10   companies (and by association, their subsidiaries listed

13:39:40 11   in Appendix A) have a special agreement with Google and

13:39:44 12   are part of the 'Do Not Cold Call' list."

13:39:46 13            And then there is a list of parent companies

13:39:49 14   provided there.  Do you see that?

13:39:50 15       A.   I do.

13:39:51 16       Q.   And then it goes on to say, "For each of these

13:39:53 17   'Do Not Cold Call' companies, Google has agreed to the

13:39:57 18   following protocol."

13:39:58 19            Now, can you square that with -- strike that.

13:40:01 20            Doesn't that indicate to you that there were

13:40:02 21   actual agreements between Google and these companies

13:40:04 22   respecting the subject matter here?

13:40:09 23            MR. RUBIN:  Objection.  Lacks foundation.

13:40:12 24            THE WITNESS:  I didn't write these, and I

13:40:15 25   didn't write the word "agreement."  So I'm not aware of

13:40:18  1   agreements in the sense of written documents, if that's

13:40:21  2   what your question is.

13:40:21  3   BY MR. HEIMANN:

13:40:22  4        Q.   I said nothing about writing, sir.

13:40:24  5        A.   Well --

13:40:24  6        Q.   You understand agreements don't have to be in

13:40:26  7   writing to be agreements, right?

13:40:27  8        A.   Well, again --

13:40:29  9             MR. RUBIN:  Objection.  That's -- if you -- do

13:40:31 10   you have another question?

13:40:32 11   BY MR. HEIMANN:

13:40:32 12        Q.   That's a question.

13:40:34 13        A.   What is the question?

13:40:35 14        Q.   You understand, sir, that in business an

13:40:37 15   agreement doesn't have to be in writing in order for it

13:40:41 16   to be an agreement.

13:40:42 17        A.   As a -- that's true.  I can assure you that at

13:40:45 18   Google everything is in writing.

13:40:46 19        Q.   You don't have any gentleman's agreements at

13:40:49 20   Google, huh?

13:40:50 21        A.   They are generally a problem.

13:40:52 22        Q.   So back to the question here, were you aware of

13:40:56 23   the agreements that are specifically described here

13:41:01 24   between Google and these companies?

13:41:03 25             MR. RUBIN:  Objection.  Lacks foundation.

| | | |
|---|---|---|
| 13:41:06 | 1 | THE WITNESS:  Well, again, I'm not aware of |
| 13:41:07 | 2 | agreements, period.  I have previously testified that I |
| 13:41:12 | 3 | was aware of do-not-call decisions, if you want to call |
| 13:41:18 | 4 | them, with Apple, Genentech, IBM, Intel, and some of |
| 13:41:25 | 5 | these I was not aware of even now. |
| 13:41:29 | 6 | BY MR. HEIMANN: |
| 13:41:54 | 7 | Q.  Did the executive management group periodically |
| 13:41:57 | 8 | review the no cold call policy or agreements, whatever? |
| 13:42:04 | 9 | MR. RUBIN:  Objection.  Lacks foundation to the |
| 13:42:08 | 10 | extent there were agreements or whatever.  I mean it |
| 13:42:10 | 11 | would be easier just to call it a DNC list for clarity. |
| 13:42:13 | 12 | MR. HEIMANN:  I choose not to call it that, |
| 13:42:15 | 13 | because the documents refer to it as an agreement and as |
| 13:42:18 | 14 | a list, so I think I can use them in the alternative. |
| 13:42:20 | 15 | And the notion that there is no foundation for the use of |
| 13:42:22 | 16 | the word "agreements" in the face of these documents is |
| 13:42:25 | 17 | absurd. |
| 13:42:26 | 18 | MR. RUBIN:  You can call it whatever you want. |
| 13:42:27 | 19 | You'll be able to argue whatever you want.  I'm saying |
| 13:42:30 | 20 | for purposes of the deposition, I think you'll get fewer |
| 13:42:33 | 21 | objections if you just call it a DNC list. |
| 13:42:37 | 22 | MR. HEIMANN:  I'm sorry.  I lost my train of |
| 13:42:39 | 23 | thought there.  What was the question? |
| 13:42:51 | 24 | (Record was read as follows:  "Question:  Did |
| 13:42:51 | 25 | the executive management group periodically review the no |

| | | |
|---|---|---|
| 14:01:45 | 1 | MR. RUBIN:  Objection.  Vague. |
| 14:01:46 | 2 | THE WITNESS:  I don't know what Intel's policy |
| 14:01:48 | 3 | with respect to recruiting Google was. |
| 14:01:50 | 4 | BY MR. HEIMANN: |
| 14:01:50 | 5 | Q.   Don't you think it's likely that you did know |
| 14:01:52 | 6 | at the time? |
| 14:01:53 | 7 | MR. RUBIN:  Objection.  Argumentative; calls |
| 14:01:55 | 8 | for speculation. |
| 14:01:58 | 9 | THE WITNESS:  No.  I actually don't. |
| 14:01:59 | 10 | BY MR. HEIMANN: |
| 14:02:01 | 11 | Q.   And why is that? |
| 14:02:02 | 12 | A.   The relationship was unique because Paul was on |
| 14:02:07 | 13 | the Google board, whereas I was not on the Intel board. |
| 14:02:12 | 14 | So it is perfectly possible you could have different |
| 14:02:15 | 15 | policies in two different companies.  It is not |
| 14:02:17 | 16 | symmetric. |
| 14:02:18 | 17 | Q.   And the "Paul" in your answer is who? |
| 14:02:20 | 18 | A.   Otellini. |
| 14:02:22 | 19 | Q.   He was the CEO -- |
| 14:02:24 | 20 | A.   CEO of Intel. |
| 14:02:25 | 21 | Q.   Don't you think it likely that if there was an |
| 14:02:27 | 22 | actual agreement, whether in writing or not, between |
| 14:02:31 | 23 | Google and Intel about not recruiting from each others' |
| 14:02:35 | 24 | employees, that you would have been aware of that? |
| 14:02:37 | 25 | MR. RUBIN:  Objection.  Argumentative; calls |

14:02:39  1   for speculation; lacks foundation based on prior

14:02:42  2   testimony.

14:02:48  3              THE WITNESS:  As I previously said, we set the

14:02:50  4   policy based on what we thought was the right way to

14:02:53  5   treat these partners.  I have no memory of ever

14:02:58  6   discussing Intel's policy.

14:03:00  7   BY MR. HEIMANN:

14:03:01  8        Q.   Did Google tell these companies what Google's

14:03:05  9   policy was?

14:03:06  10        A.   I'm sure I spoke with Paul about this at some

14:03:09  11   point.

14:03:10  12        Q.   And you don't have any recollection of him

14:03:12  13   assuring you that Intel's practices and policies with

14:03:15  14   Google was the same as Google's was to Intel; is that

14:03:20  15   right?

14:03:20  16        A.   That's correct.  It's also -- it's important to

14:03:22  17   understand that it's at -- these situations are

14:03:24  18   asymmetric because at the time in question Google was

14:03:28  19   growing very, very dramatically, and so we were certainly

14:03:34  20   hiring lots of people from the Valley; whereas the other

14:03:36  21   companies might not have been in such a growth phase.  So

14:03:40  22   they're not -- they're not symmetric relationships.

14:03:43  23        Q.   And how does that relate to the question about

14:03:44  24   whether or not the agreements were reciprocal?

14:03:46  25        A.   Well, they don't have to be reciprocal to be

| | | |
|---|---|---|
| 14:03:48 | 1 | the right thing.  We could decide unilaterally to do the |
| 14:03:52 | 2 | right thing. |
| 14:03:52 | 3 | Q.   And not at all be troubled that the other |
| 14:03:54 | 4 | companies might be recruiting your best people right out |
| 14:03:57 | 5 | from under your nose? |
| 14:03:58 | 6 | A.   I think it's highly unlikely that Intel would |
| 14:04:02 | 7 | have recruited any of our best people at the current and |
| 14:04:04 | 8 | periods of time you are discussing. |
| 14:04:06 | 9 | Q.   How about not some of your best people, then? |
| 14:04:08 | 10 | MR. RUBIN:  I'm sorry? |
| 14:04:09 | 11 | BY MR. HEIMANN: |
| 14:04:10 | 12 | Q.   Some of your other people. |
| 14:04:11 | 13 | A.   We would argue that all of our people are our |
| 14:04:13 | 14 | best people. |
| 14:04:14 | 15 | Q.   That's right.  So you think it is likely that |
| 14:04:16 | 16 | they would have been recruiting at all from Google? |
| 14:04:18 | 17 | A.   Well, Google during this period was -- I don't |
| 14:04:21 | 18 | know how to describe it without sounding arrogant, but we |
| 14:04:24 | 19 | were the hottest company in the Valley to work for during |
| 14:04:27 | 20 | this period.  We were winning best places to work for, |
| 14:04:30 | 21 | you know, many, many other aspects. |
| 14:04:32 | 22 | So I think it is a fair characterization that |
| 14:04:36 | 23 | we -- that we would generally win such a competition. |
| 14:04:45 | 24 | Q.   So you are suggesting you didn't need it to be |
| 14:04:47 | 25 | reciprocal because you were such an attractive place to |

14:04:52  1    work; is that fair?

14:04:54  2         A.   Well --

14:04:54  3              MR. RUBIN:  Objection.  Argumentative;

14:04:56  4    mischaracterizes prior testimony.

14:04:57  5              THE WITNESS:  Again, these are your -- your

14:04:58  6    words.  What I would say is that we pride ourselves as

14:05:01  7    being the best place to work and we believe the best

14:05:03  8    people want to work at the best place, and we believe

14:05:06  9    that they should work at Google.  Our position is quite

14:05:09 10    clear.

14:05:10 11    BY MR. HEIMANN:

14:05:10 12         Q.   What is your relationship with Mr. Otellini?

14:05:12 13         A.   I think it's good as personal friends, and

14:05:15 14    she -- and he remains a board member.

14:05:21 15              MR. MITTELSTAEDT:  Remains a what?

14:05:25 16              MS. BROWN:  Board member.

14:05:25 17    BY MR. HEIMANN:

14:05:26 18         Q.   Let's take a look at some documents.  Start

14:05:28 19    with Exhibit 651.

14:06:03 20         A.   Okay.

14:06:03 21         Q.   All right.  Do you recognize this email?

14:06:06 22         A.   No.

14:06:07 23         Q.   All right.  It is an email exchange in May of

14:06:11 24    2006 between yourself and Mr. Otellini at Intel, right?

14:06:15 25         A.   That's correct.

14:06:15  1        Q.   And it begins with an email from Mr. Otellini

14:06:19  2   to you, subject, recruiting, which reads in part, "Sorry

14:06:24  3   to bother you again on this topic, but my guys are very

14:06:28  4   troubled by Google continuing to recruit our key

14:06:32  5   players."

14:06:33  6              And then he -- dropping down to the last

14:06:38  7   sentence in the email, he says, "Can you please reinforce

14:06:41  8   the no-recruiting agreement.  I would appreciate it.

14:06:45  9   Thanks, Paul."

14:06:46  10             Do you see that?

14:06:47  11       A.   I do.

14:06:47  12       Q.   And then you wrote to people at Google,

14:06:53  13   Ms. Brown and Mr. Geshuri, saying, "Can you review?  I

14:06:57  14   thought Intel was on our no-hire list."  Right?

14:07:01  15       A.   I see that.

14:07:02  16       Q.   And then Mr. Geshuri says, "I will investigate

14:07:04  17   and provide a report on this situation."  Right?

14:07:10  18       A.   Yes.

14:07:11  19       Q.   All right.  And you don't recall any of this, I

14:07:13  20   gather.

14:07:13  21       A.   That's correct.

14:07:14  22       Q.   And did you know what agreement Mr. Otellini

14:07:24  23   was talking about at the time?

14:07:25  24       A.   Well, as I said, I don't remember the -- the

14:07:27  25   email, but this would be the do-not-call policy that we

14:07:31  1  had in place.

14:07:33  2      Q.   Which he referred to as an agreement, correct?

14:07:37  3           MR. RUBIN:  Objection.  Calls for speculation;

14:07:41  4  foundation.

14:07:41  5           THE WITNESS:  I didn't write his words.

14:07:42  6  BY MR. HEIMANN:

14:07:43  7      Q.   You need to answer my question.  He called it

14:07:45  8  an agreement in this email, did he not?

14:07:47  9      A.   I observed --

14:07:48  10          MR. RUBIN:  Objection.  Lacks foundation; calls

14:07:48  11 for speculation.

14:07:49  12          THE WITNESS:  I observe he says the words

14:07:50  13 "no-recruiting agreement" in his email.

14:07:53  14          MR. RUBIN:  Just to clarify, an objection by

14:07:56  15 one, I think we have a standing understanding,

14:07:59  16 Mr. Heimann, that an -- an objection by one defendant is

14:08:02  17 incorporated for all defendants.

14:08:05  18          MR. HEIMANN:  I think that has been understood

14:08:07  19 from the beginning.

14:08:08  20          MR. RUBIN:  We hadn't said it on the record

14:08:10  21 today.

14:08:11  22          MR. HEIMANN:  I don't think it's necessary.

14:08:13  23          MR. RUBIN:  I'll take it back.

14:08:31  24 BY MR. HEIMANN:

14:08:32  25      Q.   Let's take a look at Exhibit 458.

Deposition of Eric Schmidt                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

14:09:07 1       A.   Okay.

14:09:08 2       Q.   All right.  Sir, this is an internal Intel

14:09:10 3   record.  As far as I know, nobody outside of Intel was

14:09:17 4   involved.  Certainly nobody from Google.

14:09:22 5           But if you'll focus on the email from Gabriel

14:09:26 6   Thompson to Patty Murray and to Paul Otellini at the top

14:09:29 7   of the first page, do you see that?

14:09:31 8       A.   I do.

14:09:32 9       Q.   Do you recognize any of the names, other than

14:09:33 10  Mr. Otellini, by any chance?

14:09:35 11      A.   I do not.

14:09:35 12      Q.   And the subject of that email is, "Global

14:09:40 13  gentleman agreement with Google."  Do you see that?

14:09:43 14      A.   I see it.

14:09:44 15      Q.   And the question that Ms. Thompson posed was,

14:09:48 16  "Are either of you aware of any agreement with Google

14:09:51 17  that prohibits us from recruiting Google's senior

14:09:54 18  talent?"  Do you see that?

14:09:55 19      A.   Uh-huh.

14:09:56 20      Q.   Mr. Otellini responded promptly, saying, "Yes."

14:10:02 21          Do you see that?

14:10:03 22      A.   I do.

14:10:05 23      Q.   And if you'll next go to Exhibit 202, 202

14:10:31 24  reproduces part of the email that I just showed you,

14:10:34 25  including the question being posed by Ms. Thompson, "Are

14:19:19   1  dealing with, did you personally review the public, or

14:19:19   2  did somebody screen those for you?

14:19:26   3       A.   My assistant screened it, and they do that

14:19:28   4  today.  So it is perfectly possible that mail sent to my

14:19:32   5  public address I did not see because my assistants missed

14:19:35   6  it, but I was quite thorough at reading my private

14:19:38   7  emails.  So my presumption is if it's a private email, I

14:19:41   8  did, in fact, read it.

14:19:43   9       Q.   All right.  So -- withdraw that.

14:20:02  10            Now, in his -- I know you're going to be

14:20:05  11  thinking as your counsel, I'm beating a dead horse, but

14:20:08  12  I'm going to have to beat it to death and then some.  In

14:20:11  13  his email to you he talks about a reciprocal

14:20:14  14  understanding.  Do you see that?

14:20:15  15       A.   I see he says, "I think we should have a

14:20:17  16  general understanding that we are not actively recruiting

14:20:20  17  from each other."

14:20:21  18       Q.   All right.  Did you reach such a general

14:20:22  19  understanding with him?

14:20:24  20            MR. RUBIN:  Objection.  Asked and answered.

14:20:25  21            THE WITNESS:  As I've previously said, I have

14:20:27  22  no memory of such an agreement, but it is obvious that

14:20:30  23  we -- we put them on the do-not-call list for a while,

14:20:33  24  from this email.

          25  //

Deposition of Eric Schmidt                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 14:20:38 | 1 | BY MR. HEIMANN: |
| 14:20:44 | 2 | Q.  Do you know how long they remained on the list? |
| 14:20:46 | 3 | A.  Well, as I read it, it says they were on for |
| 14:20:49 | 4 | two months.  I don't think that they were on very long, |
| 14:20:52 | 5 | because eventually our partnerships and plans did not |
| 14:20:56 | 6 | come together with Dell.  So it was probably not very |
| 14:21:01 | 7 | long. |
| 14:21:38 | 8 | Q.  So I know that you're speculating to some |
| 14:21:40 | 9 | extent.  You think in all likelihood they came out within |
| 14:21:44 | 10 | a reasonably short -- they came off the list within a |
| 14:21:46 | 11 | reasonably short period of time? |
| 14:21:49 | 12 | A.  Compared to some of the other companies, they |
| 14:21:51 | 13 | would have been on the list for a shorter period of time, |
| 14:21:54 | 14 | but I could not characterize to you what "shorter" is. |
| 14:22:33 | 15 | MR. HEIMANN:  Let me have you take a look next |
| 14:22:36 | 16 | at Exhibit 872. |
| 14:22:37 | 17 | (Exhibit 872 was marked for identification.) |
| 14:22:37 | 18 | BY MR. HEIMANN: |
| 14:23:25 | 19 | Q.  Have you had a chance to look at that? |
| 14:23:27 | 20 | A.  I have. |
| 14:23:27 | 21 | Q.  Do you recall the email at all? |
| 14:23:29 | 22 | A.  I don't recall the email, but I recall speaking |
| 14:23:32 | 23 | with Meg. |
| 14:23:33 | 24 | Q.  So you recall the conversation that is referred |
| 14:23:36 | 25 | to in the email; is that fair? |

14:23:38  1      A.   I -- I recall that we had a conversation.  I'm

14:23:40  2   sure this is what I wrote after the conversation.

14:23:43  3      Q.   Okay.  Tell me as best you recall what was said

14:23:46  4   in the conversation with Ms. Whitman.

14:23:48  5      A.   I think the email summarizes the conversations.

14:23:54  6   So that's -- I don't remember the specific subjects.

14:23:58  7   This is as good a memory as we're going to get eight

14:24:00  8   years ago, as I said.

14:24:02  9      Q.   Well, there is a reason for me doing this that

14:24:04 10   may not be clear to you.

14:24:06 11      A.   Okay.

14:24:06 12      Q.   The first question is, can you tell me of your

14:24:08 13   own recollection what was said, and if you can't, you

14:24:10 14   should say, "I don't know what" --

14:24:13 15      A.   I understand.  Again, I'm trying to be helpful

14:24:15 16   here.

14:24:16 17           I recall Meg calling me and complaining about

14:24:19 18   hiring.  I don't recall the specifics of what she said at

14:24:23 19   all.

14:24:24 20      Q.   All right.  Do you -- do you know or do you

14:24:26 21   recall whether eBay -- strike that.

14:24:29 22           Was she calling about eBay as opposed to

14:24:32 23   PayPal?

14:24:37 24           MR. MITTELSTAEDT:  Objection.  Lacks

14:24:37 25   foundation.

14:24:37  1          THE WITNESS:  Because I have had the benefit of

14:24:39  2   reading this email, I now recall that she was

14:24:41  3   particularly incensed that a Google recruiter had called

14:24:45  4   ██████████, who was her Number Two at the time.

14:24:48  5   BY MR. HEIMANN:

14:24:49  6      Q.   Okay.  Let me tell you something that I know

14:24:51  7   you know already, but just to be clear.

14:24:53  8           When -- when you -- when your memory gets

14:24:55  9   refreshed from documents, you did the right thing there,

14:25:00 10   tell me what your memory is.

14:25:02 11      A.   All right.

14:25:02 12      Q.   I'm not trying to confine you in unreasonable

14:25:05 13   ways as to how you go about answering these questions.

14:25:08 14           All right.  So the answer is, she was calling

14:25:11 15   in particular about one person who was an eBay employee,

14:25:14 16   if I understood you correctly.

14:25:16 17      A.   Yes.  Again, it is -- there is a couple of

14:25:20 18   things now.  I went to college with Meg.  Our children

14:25:23 19   went to school together.  I have socialized with Meg and

14:25:27 20   her husband.  After we went public, Meg invited me over

14:25:31 21   for a chat to advise me how to become a better public

14:25:36 22   company CEO.  Meg has been very gracious and very helpful

14:25:40 23   to me for many years.  I'm a very big supporter of Meg.

14:25:44 24   So if Meg calls me and she has got a problem, I'm going

14:25:48 25   to pay attention.

Deposition of Eric Schmidt                 In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

14:25:49  1        I don't recall the specifics aside from what

14:25:51  2    has been refreshed by my -- by this, but as I am trying

14:25:55  3    to be helpful and say, I'm sure this is accurately

14:25:57  4    what -- what was said.

14:25:59  5        Q.   So the first point of -- that you recorded of

14:26:03  6    the conversation was, "Google is the talk of the Valley

14:26:07  7    because we are driving salaries up across the board.

14:26:10  8    People are just waiting for us to fail -- or to fall,"

14:26:14  9    sorry, "and get back at us for our," quote, "'unfair,'"

14:26:18 10    close quote, "practices now."

14:26:19 11        Does that refresh your memory to any further

14:26:22 12    extent of what she said in regards to that aspect of

14:26:25 13    the --

14:26:26 14        A.   Same answer.

14:26:28 15        Q.   "Our recruiting practices" -- continuing on in

14:26:36 16    the email, "Our recruiting practices are," quote, "'zero

14:26:39 17    sum,' and it appears that somewhere in Google we are

14:26:41 18    targeting eBay to," quote, "'hurt them,'" close quote,

14:26:45 19    "and it's the reputation that we are doing this against

14:26:48 20    Yahoo, eBay, and MSFT," meaning Microsoft, and then in

14:26:55 21    paren, "(I denied this)."

14:26:58 22        I gather the parenthetical is your response to

14:27:00 23    her statement?

14:27:00 24        A.   Again, I'm writing down -- I'm very good about

14:27:04 25    these things.  She calls with a complaint, I write down

14:27:07  1    what she said, and then I give direction at what to do.

14:27:11  2            In this case, because number two, I was quite

14:27:14  3    sure was not true, I would have said to her, "I denied

14:27:18  4    this," and I noted this for the record, within Google.

14:27:21  5        Q.   All right.  What did you understand, if you

14:27:24  6    did, the reference to "zero sum" to mean?

14:27:28  7        A.   I don't recall the context in which she -- she

14:27:32  8    mentioned it.  That -- these are Meg's thoughts, not

14:27:36  9    mine.  I'm trying to channel them accurately in the

14:27:39 10    email, so -- again, it is helpful to remember that Google

14:27:47 11    has been public for a year.  Google is growing very

14:27:50 12    rapidly.  Google is the best place to work in the Valley.

14:27:55 13    There is all this press about Google taking over the

14:27:58 14    world, and it is clearly having an impact on partners,

14:28:01 15    competitors, and what have you, and that is the context

14:28:03 16    in which she probably had this feeling.

14:28:08 17        Q.   Was part of the reason -- well, let me withdraw

14:28:11 18    that.

14:28:11 19            Was the assertion that Google's recruiting

14:28:16 20    activities or hiring activities were having an impact on

14:28:20 21    salaries in the Valley an accurate one, from your point

14:28:23 22    of view?

14:28:25 23            MR. RUBIN:  Objection.  Lacks foundation; calls

14:28:26 24    for speculation.

14:28:29 25            THE WITNESS:  I don't know.  Because our

| | | |
|---|---|---|
| 14:28:33 | 1 | compensation was primarily driven by stock, not salaries. |
| 14:28:39 | 2 | So the correct behavior for an employee would be to take |
| 14:28:43 | 3 | a lower salary at Google and a higher stock position. |
| 14:28:47 | 4 | That is the economically correct behavior of an employee. |
| 14:28:51 | 5 | BY MR. HEIMANN: |
| 14:28:51 | 6 | Q.   Well, it depends on the point in time, right? |
| 14:28:54 | 7 | A.   I can assure you during this period of time it |
| 14:28:56 | 8 | was the correct behavior.  As to whether people did it, I |
| 14:28:59 | 9 | don't know.  Any analytical process would have said, take |
| 14:29:02 | 10 | the stock. |
| 14:29:02 | 11 | Q.   I wish I had. |
| 14:29:06 | 12 | But let me come back to the point.  She |
| 14:29:09 | 13 | apparently is making the point to you that at least from |
| 14:29:12 | 14 | her perspective, salaries across the board in the Valley, |
| 14:29:17 | 15 | and I assume that's referring to the Silicon Valley, are |
| 14:29:20 | 16 | being driven up. |
| 14:29:21 | 17 | A.   Yes.  That would be -- that would have been her |
| 14:29:22 | 18 | point. |
| 14:29:23 | 19 | Q.   And did you have a view on that at the time? |
| 14:29:25 | 20 | MR. RUBIN:  Objection.  Asked and answered. |
| 14:29:26 | 21 | THE WITNESS:  As I said, I don't recall my |
| 14:29:27 | 22 | response on this. |
| 14:29:28 | 23 | BY MR. HEIMANN: |
| 14:29:30 | 24 | Q.   Well, when you say "response," I'm not really |
| 14:29:32 | 25 | asking -- |

14:29:33  1        A.    Response to her.

14:29:34  2        Q.    Yes, I understand.  But I'm asking a different

14:29:35  3    question.

14:29:36  4              Did you have a view as to whether or not that

14:29:37  5    was an accurate assessment as to what was going on?

14:29:40  6              MR. RUBIN:  Same objection.  Asked and

14:29:41  7    answered.

14:29:42  8              THE WITNESS:  So as best I can recall in 2005,

14:29:47  9    I would say that we were driving compensation up, but not

14:29:51 10    salaries.

14:29:52 11              (Exhibit 873 was marked for identification.)

14:29:53 12    BY MR. HEIMANN:

14:30:16 13        Q.    Let's take a look next at Exhibit 873.

14:30:36 14        A.    Okay.

14:30:36 15        Q.    This is an email a few days later from yourself

14:30:38 16    to Mr. Campbell and Arnnon, again about -- in this case,

14:30:47 17    eBay, PayPal, and Meg.

14:30:53 18        A.    I see.

14:30:54 19        Q.    Do you recall the circumstances surrounding

14:30:56 20    your creation of this email?

14:30:57 21        A.    I do not.

14:31:00 22        Q.    Okay.

14:31:01 23        A.    Let me observe that this is four days after

14:31:03 24    the -- the previous email.

14:31:04 25        Q.    Yes.  You begin this email by saying, "My

| | | |
|---|---|---|
| 14:31:11 | 1 | summary on eBay is that the situation is bad and we can |
| 14:31:13 | 2 | improve it with some simple steps.  Nevertheless, we need |
| 14:31:17 | 3 | to be very, very careful with the statements we make and |
| 14:31:20 | 4 | the actions of our recruiters." |
| 14:31:27 | 5 | Was the -- the situation with eBay that you |
| 14:31:29 | 6 | described as "bad" the result of Google's recruiting |
| 14:31:34 | 7 | employees out of eBay? |
| 14:31:36 | 8 | MR. RUBIN:  Objection.  Lacks foundation. |
| 14:31:39 | 9 | THE WITNESS:  I'm going to -- again, I don't |
| 14:31:42 | 10 | recall the specifics.  I'm going to assume that this |
| 14:31:44 | 11 | is the -- this mail is simply a follow-up to the first |
| 14:31:47 | 12 | one, and it refers to the set of issues that are relayed |
| 14:31:53 | 13 | in the first email. |
| 14:31:53 | 14 | BY MR. HEIMANN: |
| 14:32:01 | 15 | Q.   Okay. |
| 14:32:02 | 16 | A.   So when I say the situation is bad, it doesn't |
| 14:32:03 | 17 | necessarily mean that it is factually bad on our side. |
| 14:32:06 | 18 | It's perceptions drive behavior.  We have a very |
| 14:32:10 | 19 | important partner who is very upset.  As I said, we had a |
| 14:32:14 | 20 | rough call from a good friend.  So -- |
| 14:32:24 | 21 | Q.   Down under paragraph (3) in this Exhibit 873 |
| 14:32:29 | 22 | you refer to an "internal complaint about us within |
| 14:32:31 | 23 | PayPal." |
| 14:32:35 | 24 | A.   I see this. |
| 14:32:36 | 25 | Q.   That appears to be distinct from the eBay |

15:22:07  1    would have lists similar to Google's list?

15:22:12  2        A.    I never thought about it.

15:22:14  3        Q.    Never crossed your mind?

15:22:15  4        A.    No.   It is not my problem.   They're -- we try

15:22:22  5    to run our own company, not somebody else's.   So --

15:22:27  6        Q.    Well --

15:22:36  7        A.    It is just the back division.

15:22:39  8        Q.    Did you think that Google was unique in the

15:22:42  9    Valley having a list of this sort?

15:22:47 10        A.    As I said, I didn't really think about it.

15:22:51 11    Because of the unique situation that was -- Google was

15:22:53 12    in, it would be perfectly reasonable from my perspective

15:22:59 13    that such lists did not exist or they had fell -- that

15:23:02 14    they had fallen off to the wayside, or what have you.

15:23:05 15        Q.    And why is that?

15:23:06 16        A.    Because as I indicated, during this period

15:23:09 17    Google was unusually favorable in terms of recruiting

15:23:11 18    talent, growth, press, great place to work.   We were in

15:23:15 19    our golden period, if you will.

15:23:26 20        Q.    And how does that relate to the notion of

15:23:29 21    thinking that Google was unique in having this list and

15:23:32 22    not knowing about any other companies similarly situated,

15:23:35 23    or being similarly situated?

15:23:40 24        A.    Again, your question implies that I should have

15:23:43 25    been thinking about other companies.

Deposition of Eric Schmidt                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

15:23:44  1      Q.   No.  No.  No.  My question doesn't imply

15:23:47  2   anything.

15:23:47  3      A.   No, no, but the -- the reasoning in the

15:23:49  4   question implies that.  But I -- I made a point of not

15:23:51  5   thinking about other companies.  I made a point of

15:23:53  6   thinking about Google.

15:24:04  7      Q.   How would you describe your relationship with

15:24:06  8   Mr. Jobs?

15:24:07  9      A.   Complicated.  And -- and again, as I said, his

15:24:13 10   death was very tragic for all of us, and I considered him

15:24:16 11   a good friend.

15:24:18 12      Q.   And how often did you, in the time period we're

15:24:22 13   talking about, interact with him, either face-to-face or

15:24:26 14   otherwise?

15:24:27 15      A.   Well, in the -- while I was on the board it was

15:24:30 16   relatively frequently, for a board member.  But it was

15:24:34 17   also not more frequently, because I would recuse myself

15:24:38 18   from Google Apple issues.  So for example, if there was a

15:24:42 19   Google problem, Steve would be forced to call Alan and

15:24:45 20   not me, because I had a two-hat problem.  And obviously I

15:24:49 21   knew him socially and a little bit before, and I also saw

15:24:52 22   him after I left the board as he became more ill.

15:24:55 23           So some -- you know, once a month kind of

15:24:58 24   frequencies.  Not weekly, but not yearly, if that's

15:25:03 25   helpful.

KRAMM COURT REPORTING       *HIGHLY CONFIDENTIAL - For Attorneys' Eyes Only*          Page: 168

| | | |
|---|---|---|
| 15:25:04 | 1 | Q.   Did you ever have occasion to talk with him |
| 15:25:06 | 2 | about his views regarding companies recruiting from each |
| 15:25:14 | 3 | other in the Valley? |
| 15:25:15 | 4 | A.   Well, I knew his view. |
| 15:25:17 | 5 | Q.   Which was? |
| 15:25:17 | 6 | A.   Which was that when you're in a partnership, |
| 15:25:19 | 7 | you shouldn't do it. |
| 15:25:21 | 8 | Q.   What do you mean by "partnership" now in that? |
| 15:25:23 | 9 | MR. RUBIN:  Well, objection.  Lacks foundation. |
| 15:25:27 | 10 | THE WITNESS:  Again, I was trying -- I was |
| 15:25:28 | 11 | trying to give you the context that because we were |
| 15:25:30 | 12 | working together, it was inappropriate in his view for us |
| 15:25:34 | 13 | to be calling in and hiring people.  And -- and he would |
| 15:25:40 | 14 | express this in unique Steve Jobs style. |
| 15:25:44 | 15 | BY MR. HEIMANN: |
| 15:25:45 | 16 | Q.   Which was? |
| 15:25:45 | 17 | A.   Loud.  But a -- but a fair reading of Steve is |
| 15:25:49 | 18 | he believed, for better or worse, that the world was a |
| 15:25:55 | 19 | better place when you had a partnership, a collaboration, |
| 15:25:58 | 20 | working together, whatever words you want to use, he |
| 15:26:01 | 21 | believed that you should not be hiring each others', you |
| 15:26:05 | 22 | know, technical people, and then cross-fertilizing all |
| 15:26:08 | 23 | that knowledge. |
| 15:26:09 | 24 | And I always believed, and I'll -- rather than |
| 15:26:13 | 25 | explaining I'll say what I believe -- because -- because |

| | | |
|---|---|---|
| 15:26:15 | 1 | Apple is so focused on unique intellectual property, it |
| 15:26:19 | 2 | was -- it was my belief and is my belief, that Apple |
| 15:26:22 | 3 | believed that if employees left, they would take some of |
| 15:26:27 | 4 | that unique intellectual property in their heads with |
| 15:26:29 | 5 | them.  That is my opinion. |
| 15:26:31 | 6 | That's -- that may or may not be what he |
| 15:26:33 | 7 | thought, but that's what I thought he thought. |
| 15:26:36 | 8 | Q.  Now, I know we've covered some of this before, |
| 15:26:38 | 9 | but I want to make sure I understand. |
| 15:26:40 | 10 | Was your understanding of Jobs' position that |
| 15:26:43 | 11 | any company that Apple was friendly with in the way that |
| 15:26:46 | 12 | you described it earlier would have fallen into this |
| 15:26:49 | 13 | category of companies you shouldn't be recruiting from? |
| 15:26:52 | 14 | MR. RUBIN:  Objection.  Misstates prior |
| 15:26:53 | 15 | testimony. |
| 15:26:55 | 16 | THE WITNESS:  I -- I never asked myself the |
| 15:26:58 | 17 | question of Steve's general view.  But it's fair to |
| 15:27:02 | 18 | extrapolate that if you had partnerships working together |
| 15:27:06 | 19 | in different kinds of relationships, he would have |
| 15:27:09 | 20 | extended that to others.  I notice with some humor that |
| 15:27:12 | 21 | we have such a list, from the words of their company, |
| 15:27:15 | 22 | which they list as Adobe, Garmin, Google, Intuit, |
| 15:27:19 | 23 | Microsoft Mac Division, and Nvidia, all of whom Apple had |
| 15:27:24 | 24 | effective partnerships with of one kind or another. |
| | 25 | // |

| | | |
|---|---|---|
| 15:27:27 | 1 | BY MR. HEIMANN: |
| 15:27:28 | 2 |    Q.   But those are not the only companies on the |
| 15:27:30 | 3 | list, right? |
| 15:27:30 | 4 |    A.   I'm just -- I'm just -- this is their list.  I |
| 15:27:32 | 5 | can't -- I didn't write this list.  This is their |
| 15:27:34 | 6 | opinion. |
| 15:27:34 | 7 |    Q.   I know, but since you're expressing an opinion |
| 15:27:36 | 8 | on part of it, I'm asking you about the others as well. |
| 15:27:40 | 9 |      There are others that don't have any such |
| 15:27:41 | 10 | explanation for them, right? |
| 15:27:43 | 11 |    A.   Which ones? |
| 15:27:45 | 12 |    Q.   Tech Data. |
| 15:27:47 | 13 |    A.   Oh, there is a second list. |
| 15:27:53 | 14 |    Q.   Longer than the first list, right? |
| 15:27:56 | 15 |    A.   Well, again, reading the email without judging |
| 15:28:00 | 16 | whether they should be on the list or not, Best Buy is |
| 15:28:02 | 17 | their largest distributor, Fry's is their large |
| 15:28:06 | 18 | distributor.  Art is on the board of Genentech. |
| 15:28:09 | 19 | Imagination, Ingram Micro, that is a distributor.  JCrew, |
| 15:28:14 | 20 | board member.  Mac Zone, distributor; Microsoft - Mac |
| 15:28:18 | 21 | Division, major partner; Nvidia, partner; PC connection, |
| 15:28:22 | 22 | PC Mall, distributors; Pixar, Steve's on the board of |
| 15:28:25 | 23 | Pixar; Tech Data, distributor; Zones, I assume that is a |
| 15:28:30 | 24 | distributor. |
| 15:28:30 | 25 |      That is how I would read that message, if I |

15:28:33  1   were internal to Apple.

15:28:43  2         Q.   What would be the reason for Lucasfilm to be on

15:28:46  3   their no-call list?

15:28:48  4         A.   As I indicated, I believe Steve was on the

15:28:51  5   board of Lucasfilm and I --

15:28:53  6         Q.   You said Pixar a moment ago.  You may be right.

15:28:56  7   I don't know.

15:28:57  8         A.   Well, you have Lucas -- I'm sorry.  Did I

15:29:01  9   misspeak?

15:29:03  10        Q.   No.  Pixar is on the list.

15:29:05  11        A.   Pixar is on the list.  Okay.  Lucasfilm, no, I

15:29:09  12   don't know.  I don't know that Steve was involved with

15:29:13  13   Lucasfilm.  Maybe he was.

15:29:14  14             MR. HEIMANN:  I'm told we are almost out of

15:29:16  15   tape, so why don't we take a short break.

15:29:18  16             THE VIDEOGRAPHER:  This is the end of Video

15:29:20  17   No. 2.  We're now off the record at 3:29.

15:29:22  18             (Recess was taken.)

15:31:04  19             THE VIDEOGRAPHER:  We are now on the record at

15:31:05  20   3:31.  This is the beginning of Video No. 3.

15:31:08  21   BY MR. HEIMANN:

15:31:09  22        Q.   Is it fair to say that Mr. Jobs made his views

15:31:11  23   that we've been talking about widely known within the

15:31:14  24   Valley?

15:31:15  25             MR. RUBIN:  Objection.  Vague.

Deposition of Eric Schmidt                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 15:31:18 | 1 | THE WITNESS:  I don't know that. |
| 15:31:20 | 2 | BY MR. HEIMANN: |
| 15:31:21 | 3 | Q.   Well, surely you weren't the only person that |
| 15:31:23 | 4 | was familiar with his views in that regard, were you? |
| 15:31:27 | 5 | MR. RUBIN:  Objection.  Calls for speculation. |
| 15:31:28 | 6 | THE WITNESS:  As I said, I don't have any -- I |
| 15:31:30 | 7 | don't have any independent knowledge of that.  I think it |
| 15:31:32 | 8 | is a reasonable presumption, given Steve's propensity for |
| 15:31:36 | 9 | making his point known, but I don't have any independent |
| 15:31:40 | 10 | knowledge of that. |
| 15:31:40 | 11 | BY MR. HEIMANN: |
| 15:31:41 | 12 | Q.   Do you recall discussing his views with others |
| 15:31:42 | 13 | in the Valley? |
| 15:31:44 | 14 | A.   I certainly discussed it with Google people and |
| 15:31:46 | 15 | Bill Campbell, but not others. |
| 15:31:53 | 16 | Q.   When you communicated with Mr. Jobs by email, |
| 15:31:55 | 17 | did he have more than one email that you used for him? |
| 15:32:00 | 18 | A.   I believe only one, sjobs@apple.com. |
| 15:32:05 | 19 | Q.   Let me ask you to look at Exhibit 448. |
| 15:32:26 | 20 | So this exhibit consists of a declaration from |
| 15:32:29 | 21 | Mr. Edward Colligan, and then an attachment which is in |
| 15:32:33 | 22 | the form of an email exchange.  Actually two emails. |
| 15:33:14 | 23 | A.   Okay. |
| 15:33:14 | 24 | Q.   Have you seen this material before? |
| 15:33:16 | 25 | A.   I have not. |

15:33:18  1      Q.   Do you know who Mr. Korrigan (sic) is?

15:33:20  2      A.   Colligan.

15:33:23  3      Q.   Colligan, I'm sorry.

15:33:24  4      A.   I know who he is.

15:33:27  5      Q.   Are you acquainted with him personally?

15:33:29  6      A.   I don't believe I've ever met him.  I may have

15:33:30  7  met him, but I don't remember what he looks like.

15:33:31  8      Q.   Did you have any knowledge of the exchange that

15:33:33  9  he describes in his declaration at the time, or at or

15:33:36 10  about the time it took place?

15:33:40 11      A.   No.

15:33:45 12      Q.   Were you aware that Mr. Jobs had approached

15:33:48 13  companies in the Valley seeking agreements that each

15:33:53 14  company not recruit from the other?

15:33:55 15           MR. RUBIN:  Objection.  Lacks foundation; asked

15:33:59 16  and answered.

15:33:59 17           THE WITNESS:  As I indicated, I was not

15:34:01 18  aware -- I was not aware of Steve's activities outside of

15:34:04 19  Google in this regard.

15:34:05 20  BY MR. HEIMANN:

15:34:19 21      Q.   Let me ask you to take a look at Exhibit 449.

15:34:28 22      A.   Is this something that would have gone to -- is

15:34:30 23  this part of the current trial?

15:34:32 24           MR. RUBIN:  This is a declaration he made in

15:34:33 25  the current trial.

Deposition of Eric Schmidt                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

15:37:45  1   what he was upset about, but it must have been this.

15:37:48  2   BY MR. HEIMANN:

15:37:48  3       Q.   How did you know he was upset about Rubinstein?

15:37:51  4       A.   I recall Steve mentioning it in one of his

15:37:54  5   discussions, but I don't remember discussing Palm.  So --

15:38:00  6       Q.   All right.

15:38:04  7       A.   Ah, okay.  Dan Lyons was the creator of "The

15:38:08  8   Secret Diary of Steve Jobs."  Now we know who he is.

15:38:12  9   Yes.  He wrote a satire of Steve, Dan Lyons, the author

15:38:19 10   of this document.  It is quite entertaining.  I have a

15:38:22 11   code name in "The Secret Diary of Steve Jobs."  So --

15:38:26 12       Q.   You have a code name?

15:38:27 13       A.   Yes.  I don't remember what it was.  But I

15:38:28 14   remember --

15:38:29 15       Q.   I was going to ask you for it.

15:38:30 16       A.   It is quite entertaining, so you should -- you

15:38:34 17   should take a look at it when you get a chance.

15:38:36 18       Q.   All right.  Okay.  I'm going to switch topics

15:38:39 19   again.

15:38:42 20            At some point did Facebook become a problem or

15:38:47 21   a concern for Google in connection with retaining

15:38:50 22   employees at Google?

15:38:52 23       A.   It did.

15:38:53 24       Q.   And can you tell us when that happened or when

15:38:55 25   it began?

15:39:00  1      A.   I won't get the dates right.  But somewhere

15:39:03  2   around 2008 or 2009 Facebook began -- Facebook hired

15:39:11  3   Sheryl Sandberg, who -- in perhaps 2006 or 2007, maybe

15:39:17  4   2007, and Sheryl had built our recruiting organization,

15:39:22  5   was an excellent recruiter, and as she went over to

15:39:25  6   Facebook, many people left Google to work for her in jobs

15:39:30  7   which they perceived as promotions.

15:39:33  8           There were also a number of engineering leaders

15:39:36  9   who also went to Facebook, and it became -- and it was

15:39:40 10   pretty clear that Facebook's management structure was

15:39:44 11   being built out of executives coming out of Google, which

15:39:47 12   is now a public company, Facebook was a private company.

15:40:02 13      Q.   So how did Google respond?

15:40:04 14      A.   Well, we had a series of internal discussions

15:40:06 15   or arguments about what to do, and we -- I remember

15:40:10 16   distinctly having the conversation about -- given that

15:40:16 17   they were playing by a different set of rules, because

15:40:19 18   they were offering equivalent salaries, but stock that in

15:40:26 19   theory would be worth a great deal of money, they could

15:40:29 20   make an offer to somebody and tell them it's going to be

15:40:32 21   worth X million dollars.

15:40:34 22           And so I remember a series of conversations,

15:40:37 23   which went something like this, what are we willing to do

15:40:42 24   to counter these offers?  And we concluded that we should

15:40:45 25   ████████████████████████████████████████████.



```
15:40:51  1
15:40:53  2
15:40:56  3
15:41:01  4
15:41:03  5      Q.   And who all was involved in the conversations
15:41:07  6  about the strategy or tactics to deal.
15:41:09  7                 With the problem?
15:41:11  8      A.
15:41:13  9
15:41:18 10
15:41:21 11
15:41:26 12
15:41:29 13
15:41:32 14
15:41:36 15
15:41:42 16
15:41:45 17
15:41:48 18
15:41:52 19      Q.   Was Bill Campbell involved in the discussions?
15:41:56 20      A.   I don't recall his involvement, but I'm sure he
15:41:58 21  was present.  So the answer is, yes, but I don't recall
15:42:02 22  specifics.
15:42:09 23      Q.   Let me ask you to take a look at Exhibit 660.
15:42:48 24      A.   Okay.
15:42:49 25      Q.   First of all, do you recognize this email
```

15:42:51  1    exchange?

15:42:53  2        A.   Not really.

15:42:54  3        Q.   But is it part of the conversation that you

15:42:58  4    just described in general terms?

15:42:59  5        A.   Yes.  This would be an example of this

15:43:02  6    conversation.

15:43:15  7        Q.   And the principal email here is from Mr. Brin

15:43:18  8    to the management committee and to Marissa Mayer, it

15:43:23  9    appears to be, correct?

15:43:24 10        A.   That's correct.

15:43:25 11        Q.   And who was Ms. Mayer at the time?

15:43:27 12        A.   So Marissa, who is now the CEO of Yahoo, was an

15:43:31 13    important early executive and worked for Jonathan running

15:43:34 14    many of the client groups.  Sergey and Marissa had a very

15:43:39 15    good working relationship, and I'm sure that he copied

15:43:42 16    her because she was involved in the conversation with

15:43:43 17    him.

15:43:44 18        Q.   And as this email indicates, at least in part,

15:43:47 19    this was a time by which Facebook was posing a concern

15:43:53 20    for Google in terms of recruiting Google employees into

15:43:58 21    Facebook; is that right?

15:44:00 22        A.   That's correct.

15:44:00 23        Q.   And if we go to Exhibit 608 --

15:44:36 24        A.   Okay.

15:44:36 25        Q.   -- is this more of the same in terms of the

Deposition of Eric Schmidt                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

16:15:05  1   amount, but there are a steady stream of people applying.

16:15:08  2   We are being very strict on the Google non-solicit.  If

16:15:12  3   you hear of any violation of the non-solicit agreement,

16:15:16  4   please let me know, and we will look into it

16:15:19  5   immediately."

16:15:20  6           Now, I'll ask you again, did Google and

16:15:23  7   Facebook reach a non-solicit agreement between

16:15:26  8   themselves?

16:15:28  9           MR. RUBIN:  Objection.  Lacks foundation.

16:15:29 10           THE WITNESS:  As I've indicated before, to my

16:15:31 11   knowledge, there -- there was not, is not, and was never

16:15:36 12   a non-solicit agreement.  I do not know what she is

16:15:39 13   referring to there.

16:15:39 14   BY MR. HEIMANN:

16:15:41 15       Q.   Well, Mr. Rosenberg seemed to know.  He

16:15:44 16   responded, "My personal opinion is that I think you are

16:15:46 17   putting too much weight in your view of the notion of

16:15:49 18   non-soliciting, as though soliciting in itself is the

16:15:53 19   only thing that upsets people.  Rather, it is the outcome

16:15:56 20   of people going from one company to the other which is

16:15:59 21   problematic."

16:16:00 22           Do you see that?

16:16:03 23           MR. MITTELSTAEDT:  Object.  Argumentative.

16:16:04 24           THE WITNESS:  Again --

16:16:05 25           MR. RUBIN:  Same objection as before.  Lacks

16:16:07  1   foundation; asked and answered.

16:16:08  2             THE WITNESS:  You know, you are asking me to --

16:16:10  3   to parse a private conversation between Jonathan and

16:16:12  4   Sheryl.  I think you should just ask them.

16:16:17  5   BY MR. HEIMANN:

16:16:17  6        Q.   Well, we'll get to that, but I'm trying to find

16:16:20  7   out what your understanding and knowledge is of the

16:16:22  8   topic.

16:16:23  9             MR. RUBIN:  But he's not on the email.  So this

16:16:25 10   is really --

16:16:26 11             THE WITNESS:  But I have --

16:16:28 12             MR. RUBIN:  Beyond the witness' knowledge.

16:16:29 13             THE WITNESS:  I have answered your question

16:16:30 14   clearly.

16:16:31 15   BY MR. HEIMANN:

16:16:32 16        Q.   Okay.

16:16:32 17        A.   This is Jonathan complaining to Sheryl, and

16:16:35 18   there is no non-solicit agreement between the two

16:16:40 19   companies, to my knowledge.

16:16:45 20        Q.   Okay.  Let me ask you to take a look next at

16:18:04 21   Exhibit 674.

16:18:20 22             So we have now moved well forward in time.

16:18:23 23   This is in 2010.

16:18:28 24        A.   Okay.

16:18:29 25        Q.   I want to focus your attention, if I can, on

16:18:31  1    the email that is from Patrick Pichette to Shona Brown

16:18:40  2    and yourself, with a copy to Mr. Campbell.

16:18:42  3         A.   Yes.

16:18:42  4         Q.   And who was Mr. Pichette at the time?

16:18:46  5         A.   He was and is the chief financial officer of

16:18:48  6    the company.

16:18:49  7         Q.   All right.  And he is -- addresses a number of

16:18:53  8    topics in this email.  By the way, do you remember this

16:18:57  9    email, by any chance?  It is a little more current than

16:19:00 10    the stuff I've been showing you up to now.

16:19:04 11         A.   No.  I do not.

16:19:05 12         Q.   All right.  Paragraph 3 over on the second

16:19:07 13    page, involves, as he says it, "I wish to comment on the

16:19:14 14    VP/director issue.  Shona -- and we have discussed this

16:19:20 15    and she knows I have a somewhat different approach on

16:19:23 16    this topic."

16:19:24 17              Do you recall that issue at the time?

16:19:26 18         A.   I'm sorry.  Can you tell me which paragraph I'm

16:19:28 19    looking at?

16:19:29 20         Q.   Yes, it is in the second page of the email

16:19:30 21    exchange.

16:19:30 22         A.   Oh, I see it.  Okay.  I'm sorry.  Ask your

16:19:32 23    question again.  Sorry.

16:19:33 24         Q.   Yes.  Well, first of all, you'll see the topic

16:19:34 25    he is addressing in this portion of the email is the

| | | |
|---|---|---|
| 16:19:37 | 1 | VP/director issue, as he puts it.  Why don't you take a |
| 16:19:42 | 2 | moment to read through the substance there before I ask |
| 16:19:45 | 3 | you any more. |
| 16:19:51 | 4 | A.   Okay. |
| 16:19:52 | 5 | Q.   Do you recall what the VP/director issue was at |
| 16:19:54 | 6 | the time? |
| 16:19:57 | 7 | A.   I don't, but I can infer -- infer what it is |
| 16:20:03 | 8 | from the -- okay.  Anyway -- |
| 16:20:14 | 9 | Q.   All right. |
| 16:20:14 | 10 | A.   I don't specifically know what he meant by |
| 16:20:17 | 11 | VP/director issue. |
| 16:20:18 | 12 | Q.   I think it will become apparent when we focus |
| 16:20:20 | 13 | on some of the text here.  The second bullet point reads, |
| 16:20:23 | 14 | "Finally on the numbers of VPs I hold a different belief |
| 16:20:27 | 15 | than most. ███████████████████████ |
| 16:20:29 | 16 | ████████████████████████████████ |
| 16:20:34 | 17 | ████████████████████████████████ |
| 16:20:37 | 18 | ████████████████" |
| 16:20:39 | 19 | First of all, do you understand what he's |
| 16:20:40 | 20 | talking about there when he ████████████████ |
| 16:20:44 | 21 | ████████████ |
| 16:20:45 | 22 | A.   I do. |
| 16:20:46 | 23 | Q.   What is that? |
| 16:20:47 | 24 | A.   My position was to have a very small number of |
| 16:20:49 | 25 | VPs and a small number of directors, and that is my view, |

16:20:53  1   so I enforce that.

16:20:55  2

16:20:58  3

16:21:02  4

16:21:04  5

16:21:08  6

16:21:11  7

16:21:12  8           So what he's trying to tell you -- what he's

16:21:15  9   saying, as long as you have an internal discipline in

16:21:18 10   ranking, you know, you are a VP 1, you are a VP 3, you

16:21:22 11   are a VP 2, he -- he asserts he does not care how many

16:21:26 12   VPs we have, so he disagrees with me.

16:21:29 13           Q.   Have you changed your mind?

16:21:30 14           A.   No.

16:21:31 15           Q.   He goes on to say, skipping some of this, "What

16:21:34 16   matters is internal equity, not titles."  What is your

16:21:38 17   understanding of that?  Meaning, what is your

16:21:43 18   understanding of what he is saying there?

16:21:54 19           A.   I -- I can tell you how I would interpret that

16:21:56 20   paragraph.  I would interpret that that as long as the

16:21:59 21   people are correctly understood -- sorry.

16:22:01 22           The problem you have in the company is you have

16:22:03 23   an engineering person and a salesperson, and the

16:22:05 24   salesperson always wants a grandiose title, and the

16:22:09 25   engineering person doesn't care.  And the engineering

16:22:11  1   person correctly wants as much money as possible, and the

16:22:14  2   salesperson wants as much money as possible, but wants

16:22:18  3   the title, too.

16:22:19  4          So the way you solve this problem is you have

16:22:21  5   them have internal equity, that is they are in the same

16:22:25  6   salary range, and this person is a random boring vice

16:22:28  7   president and this -- and the salesperson is president of

16:22:30  8   the world.  Right?  That's -- and in fact, the other

16:22:34  9   thing you do is you compensate the engineering people

16:22:36 10   significantly higher than you do the salespeople anyway,

16:22:39 11   and that's the way the tech industry operates.  So that's

16:22:43 12   I think what he is referring to there.

16:22:44 13          Q.   Okay.  And do you -- what is the reference to

16:22:47 14   internal equity, or did you already --

16:22:49 15          A.   I read that as internal equity between

16:22:52 16   different -- dissimilar functions.

16:22:54 17          Q.   Okay.

16:22:54 18          A.   So internal equity meaning an engineering

16:22:57 19   executive needs to be ranked against a sales executive.

16:23:01 20   So how do you rank them?  Which one is more important?

16:23:04 21   How do you deal with their comp?  It is a classic HR

16:23:15 22   ranking problem.

16:23:34 23          Q.   What was the big bang?

16:23:42 24          A.   I believe --

16:23:42 25          Q.   Not the universal big bang.

16:23:44  1      A.   I believe the big bang refers to a combination

16:23:48  2  of salary increases and -- and stock increases that were

16:23:51  3  coincident after the stock market crash of 2008.

16:23:59  4      Q.   I'm sorry.  The last part of the question --

16:24:01  5      A.   So the stock market crashed in 2008.  Our stock

16:24:04  6  fell to $260.  We, and in particular I, drove a process

16:24:11  7  to do a stock repricing and compensation look during that

16:24:14  8  period, which I believe is what you're referring to by

16:24:16  9  the big bang.

16:24:17 10      Q.   What was the period, then, that the big bang

16:24:20 11  was put into effect?

16:24:21 12      A.   You'd have to show me the emails to get the

16:24:23 13  dates, but it is after the stock market crashed.

16:24:26 14      Q.   Well --

16:24:29 15      A.   My recollection is roughly the fall of 2008 and

16:24:32 16  past that.

16:24:52 17      Q.   Let me see if I have documents to deal with

16:24:54 18  this.  If I told you I think it is 2010, would I be way

16:25:01 19  off the mark?

16:25:07 20      A.   I may be confusing the stock market repricing

16:25:10 21  and then a subsequent salary increase, which is why

16:25:11 22  wanted to get the precise dates.  I could summarize in

16:25:15 23  general, if that would be helpful.

16:25:17 24      Q.   I'm thinking about, to try and shorten this up

16:25:19 25  a little bit -- what I recall was something like a 10

16:28:53  1    needed to increase our cash compensation, this has

16:28:57  2    ███████████████████████████████████████████

16:29:00  3    ███████████████████████████████████████████

16:29:03  4    ███████████████████████████████████

16:29:07  5         Q.   So I'm fascinated by that.  You have some of

16:29:10  6    the smartest people on the planet.  In fact you've made

16:29:13  7    every effort to hire --

16:29:13  8         A.   Yes.

16:29:13  9         Q.   -- very smart people.  How do they not get it?

16:29:16  10        A.   Because it involves financial judgment which

16:29:19  11   they are not trained for.  They don't understand

16:29:21  12   Black-Scholes algorithm.  They didn't do MBA and finance.

16:29:26  13   They don't have Ph.D.s in financial accounting.  They are

16:29:29  14   engineers.  They're very, very intelligent people.  But

16:29:32  15   in any case, I'm simply representing Laszlo's position.

16:29:36  16   Laszlo showed up with this analysis, which you can see

16:29:40  17   summarized here, and based on his detailed analysis, the

16:29:43  18   summary as we eventually did it.

16:29:46  19        Q.   Was the stock repricing in part intended to

16:29:49  20   meet the Facebook concern, for example?

16:29:52  21        A.   Not really.  ██████████████████████

16:29:57  22   ████████████████████████████████████████████████

16:30:02  23   ████████████████      ████████████████████

16:30:08  24   ████████████████████████████████████████████████

16:30:12  25   ██████████████████      ████████████████   █████████

Deposition of Eric Schmidt                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 16:30:15 | 1 | ████████████████████████████████ |
| 16:30:18 | 2 | ████████████████████████████████ |
| 16:30:23 | 3 | ████████████████████████ |
| 16:30:28 | 4 | Q.    So, now focusing briefly on this email from |
| 16:30:36 | 5 | Prasad Setty to yourself -- |
| 16:30:38 | 6 | A.    Yes. |
| 16:30:38 | 7 | Q.    -- and others; who was Mr. Setty at the time? |
| 16:30:40 | 8 | A.    Prasad is the analyst who worked for Laszlo, |
| 16:30:44 | 9 | who did all the financial modeling around compensation. |
| 16:30:48 | 10 | So he would be a true financial expert over compensation. |
| 16:30:52 | 11 | Q.    And focusing on paragraph 5 at page 2, "What |
| 16:30:57 | 12 | impact will this have on the Valley," are you with me? |
| 16:31:01 | 13 | A.    I see it. |
| 16:31:02 | 14 | Q.    The first point that he makes there is, "May |
| 16:31:04 | 15 | put pressure on pay for coveted technical jobs and |
| 16:31:07 | 16 | increased pay systematically for these jobs."  Do you see |
| 16:31:11 | 17 | that? |
| 16:31:11 | 18 | A.    I do. |
| 16:31:12 | 19 | Q.    Was that a subject of discussion that you |
| 16:31:14 | 20 | recalled at the time? |
| 16:31:14 | 21 | A.    I'm sure we talked about it. |
| 16:31:16 | 22 | Q.    In any event did it have that effect? |
| 16:31:22 | 23 | A.    I'm sure it did. |
| 16:31:34 | 24 | Q.    Let me ask you to take a look at Exhibit 621. |
| 16:31:39 | 25 | We are in the home stretch, for anybody who cares. |

| | | |
|---|---|---|
| 16:31:42 | 1 | MR. RUBIN:  Like ten minutes? |
| 16:31:50 | 2 | MR. HEIMANN:  No.  You'll need a restroom break |
| 16:31:52 | 3 | to be sure.  Let's do it now. |
| 16:31:57 | 4 | THE VIDEOGRAPHER:  We are now off the record at |
| 16:31:58 | 5 | 4:32. |
| 16:39:19 | 6 | (Recess was taken.) |
| 16:39:21 | 7 | THE VIDEOGRAPHER:  We are now on the record at |
| 16:39:23 | 8 | 4:39. |
| 16:39:26 | 9 | BY MR. HEIMANN: |
| 16:39:27 | 10 | Q.  I'm not going to bother with that one, |
| 16:39:29 | 11 | Mr. Schmidt. |
| 16:39:30 | 12 | A.  Okay. |
| 16:39:32 | 13 | Q.  During the time period we've been talking about |
| 16:39:37 | 14 | when Google had in place the do-not-call list and so |
| 16:39:40 | 15 | forth, did anyone ever question the legality of that |
| 16:39:43 | 16 | policy? |
| 16:39:48 | 17 | A.  I don't believe -- I don't -- I don't recall. |
| 16:39:51 | 18 | I have no recollection of any such discussion. |
| 16:39:53 | 19 | Q.  Did you ever seek legal advice from Google's |
| 16:39:56 | 20 | general counsel about it? |
| 16:39:59 | 21 | MR. RUBIN:  Objection.  I think even the answer |
| 16:40:01 | 22 | to that question, if it were -- it would be privileged. |
| 16:40:05 | 23 | MR. HEIMANN:  Not if it's no. |
| 16:40:07 | 24 | MR. RUBIN:  All right.  Then let's just take a |
| 16:40:08 | 25 | second. |

Deposition of Eric Schmidt     In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 16:40:09 | 1 | MR. HEIMANN:  Sure. |
| 16:40:09 | 2 | (Discussion off the record.) |
| 16:40:17 | 3 | BY MR. HEIMANN: |
| 16:40:17 | 4 | Q.   Back on the record. |
| 16:40:18 | 5 | A.   The answer to your question is, no. |
| 16:40:23 | 6 | MR. HEIMANN:  Is that on the record? |
| 16:40:25 | 7 | THE REPORTER:  Thank you. |
| 16:40:25 | 8 | BY MR. HEIMANN: |
| 16:40:25 | 9 | Q.   Do you know whether or not Google's general |
| 16:40:27 | 10 | counsel was aware of the policy? |
| 16:40:36 | 11 | MR. RUBIN:  Objection.  Lacks foundation. |
| 16:40:37 | 12 | THE WITNESS:  Do I know?  I have no knowledge |
| 16:40:38 | 13 | one way or the other. |
| 16:40:39 | 14 | BY MR. HEIMANN: |
| 16:40:41 | 15 | Q.   During the time period involved, did you ever |
| 16:40:44 | 16 | consider that the policy or practice might have an |
| 16:40:49 | 17 | adverse impact on employees in the Valley? |
| 16:41:00 | 18 | A.   Well, I certainly thought about the general |
| 16:41:01 | 19 | question of impact, yes. |
| 16:41:04 | 20 | Q.   And did you ever consider that it might have an |
| 16:41:06 | 21 | adverse impact on compensation for employees in the tech |
| 16:41:10 | 22 | sector in the Silicon Valley? |
| 16:41:12 | 23 | A.    I don't believe it did, so -- so the answer is, |
| 16:41:16 | 24 | I -- I thought about it and decided it didn't, in my |
| 16:41:20 | 25 | opinion. |

16:41:10  1          I, Rosalie A. Kramm, Certified Shorthand

16:41:10  2    Reporter licensed in the State of California, License No.

16:41:10  3    5469, hereby certify that the deponent was by me first

16:41:10  4    duly sworn and the foregoing testimony was reported by me

16:41:10  5    and was thereafter transcribed with computer-aided

16:41:10  6    transcription; that the foregoing is a full, complete,

16:41:10  7    and true record of said proceedings.

16:41:10  8          I further certify that I am not of counsel or

16:41:10  9    attorney for either of any of the parties in the

16:41:10 10    foregoing proceeding and caption named or in any way

16:41:10 11    interested in the outcome of the cause in said caption.

16:41:10 12          The dismantling, unsealing, or unbinding of the

16:41:10 13    original transcript will render the reporter's

16:41:10 14    certificates null and void.

16:41:10 15          In witness whereof, I have hereunto set my hand

16:41:10 16    this day:   February 23, 2013.

16:41:10 17          ___X____ Reading and Signing was requested.

16:41:10 18          _____ Reading and Signing was waived.

16:41:10 19          _____ Reading and signing was not requested.

16:41:10 20

16:41:10 21          _____

16:41:10 22          ROSALIE A. KRAMM

16:41:10 23          CSR 5469, RPR, CRR

16:41:10 24

         25