# EXHIBIT JJ TO
# CISNEROS DECLARATION
# REDACTED VERSION

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3                   SAN JOSE DIVISION

 4

 5

 6   IN RE:  HIGH-TECH EMPLOYEE     )

 7   ANTITRUST LITIGATION           )

 8                                  )   No. 11-CV-2509-LHK

 9   THIS DOCUMENT RELATES TO:      )

10   ALL ACTIONS.                   )

11   _____)

12

13

14         CONFIDENTIAL - ATTORNEYS' EYES ONLY

15          VIDEO DEPOSITION OF PAUL OTELLINI

16                  January 29, 2013

17

18

19   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25
```

09:25:33 1     A.  No.

09:25:35 2     Q.  And did you ever take away notes from any of

09:25:39 3  the Google board meetings?

09:25:40 4     A.  No.

09:25:41 5     Q.  And in preparation for any of the Google board

09:25:45 6  meetings or subcommittees of the Google board, did you

09:25:47 7  ever make notes or make any kind of other written

09:25:51 8  record?

09:25:52 9     A.  Well, as I said earlier, I would make --

09:25:54 10  particularly in the LDCC book -- I would make notes and

09:25:58 11  questions to ask when I got to the meeting.

09:26:01 12     Q.  And you've not kept any of those; is that

09:26:03 13  correct?

09:26:03 14     A.  No.  Yes, that's correct.

09:26:07 15     Q.  Who told you not to keep any records?

09:26:09 16     MR. PICKETT:  Objection.  No foundation.

09:26:11 17     MR. SAVERI:  Q.  Did anybody tell you not

09:26:12 18  to keep them?

09:26:14 19     A.  No.

09:26:24 20     Q.  During the time -- or during -- well, strike

09:26:27 21  that.

09:26:30 22     At any meeting of the Google board or the LDCC,

09:26:36 23  or any communications with any of its members

09:26:40 24  surrounding the functions of those groups, did you ever

09:26:44 25  discuss how or in what amounts Intel compensated its

09:26:53  1    employees?

09:26:56  2              MR. PICKETT:  Can you read that back?  It's a

09:26:57  3    little long.

09:26:58  4              THE WITNESS:  Could you please.  Yeah.

09:27:13  5              (Record read as follows:  At any meeting of the

09:27:13  6              Google board or the LDCC, or any communications

09:27:13  7              with any of its members surrounding the

09:27:13  8              functions of those groups, did you ever discuss

09:27:13  9              how or in what amounts Intel compensated its

09:27:13 10              employees?)

09:27:16 11              THE WITNESS:  Generally, no.  I can remember

09:27:18 12    one specific instance where I liked Intel's format for

09:27:23 13    how we looked at our vice president and above

09:27:27 14    compensation and sent that to them and said could we

09:27:29 15    see -- could I see the Google information in a similar

09:27:32 16    format.

09:27:33 17              MR. SAVERI:  Q.  So other than that one

09:27:38 18    occasion, you don't recall ever sharing or

09:27:42 19    communicating information regarding how Intel

09:27:46 20    compensated or paid its employees with the Google

09:27:49 21    board or its subcommittees?

09:27:51 22         A.  We may have had a conversation if it was, you

09:27:53 23    know, what's -- how do you handle meritocracy, how do

09:28:00 24    you handle equity versus bonuses, those kind of -- at

09:28:02 25    the philosophical level.  I know that -- at least Intel

09:28:06  1    participates in giving its comp data to an organization

09:28:13  2    which anonymizes it for industry surveys.

09:28:17  3         Q.  So just focusing on that last piece, those are

09:28:20  4    third-party survey companies, correct?

09:28:22  5         A.  Yes, they are.

09:28:23  6         Q.  And in connection with those -- strike that.

09:28:31  7         Does Intel provide information to those survey

09:28:33  8    companies?

09:28:34  9         A.  I believe we do.

09:28:35 10         Q.  And does Intel also subscribe to the surveys

09:28:37 11    that those survey companies prepare?

09:28:40 12         A.  I would assume so but you need to ask the HR

09:28:42 13    folks.

09:28:42 14         Q.  When you say "the HR folks," who -- are there

09:28:45 15    particular people --

09:28:46 16         A.  You could start with Richard Taylor who is our

09:28:49 17    senior VP and director of HR.

09:28:51 18         Q.  Do you have the names of any of those survey

09:28:53 19    companies in mind?

09:28:54 20         A.  No.

09:28:55 21         Q.  So other than the surveys, and I guess what you

09:29:07 22    characterize as a philosophical discussion, I think you

09:29:10 23    identified at least one occasion where you provided more

09:29:14 24    specific information to Google board members regarding

09:29:18 25    Intel's compensation structure; is that correct?

09:29:22   1      A.  I sent a table over that talked about how our

09:29:28   2   various VPs are compensated relative -- I think it was

09:29:32   3   equity areas -- I wanted to see the amount in dollars

09:29:35   4   versus share units.  And Google was showing them in

09:29:37   5   share units at the time, so it was difficult to

09:29:40   6   calculate how much Google was proposing to pay different

09:29:44   7   levels of their vice presidents.

09:29:46   8      Q.  And so where did you get the information from

09:29:49   9   Intel?

09:29:50  10      A.  From reports that I had seen at Intel.

09:29:52  11      Q.  And how did you send it to the Google people?

09:29:55  12      A.  I don't know if I handed it to her, to Shona,

09:29:57  13   or mailed it to her or Laszlo.  It was a long time ago.

09:30:09  14      Q.  In your role, with respect to the Google board

09:30:15  15   or the LDCC, did you ever see or receive similar

09:30:20  16   information from other companies other than Google?

09:30:25  17      A.  Oh, no.  Not that I know of.  I mean, they

09:30:27  18   would have their version of market.  And they would talk

09:30:32  19   about market, but I assumed it came from third-party

09:30:36  20   data sources.

09:30:36  21      Q.  So I guess what I'm trying to figure out is, I

09:30:39  22   understand that you sent around or -- I don't want to

09:30:45  23   put words in your mouth.  You transmitted, in some

09:30:48  24   fashion to Shona Brown, some information about Intel's

09:30:52  25   system?

09:30:52  1          MR. PICKETT:  You mean in that one instance?

09:30:54  2          MR. SAVERI:  Q.  Yes.

09:30:55  3      A.  Yeah, but it's not confidential information.

09:30:57  4      Q.  So I guess I'm curious.  Did you -- was that

09:31:00  5  information circulated to other participants in the LDCC

09:31:05  6  or other board members?

09:31:06  7      A.  I think it was actually published in the book.

09:31:09  8  Because they responded to -- or I can't remember if it

09:31:11  9  was in the book or what.  But they did respond to my

09:31:14  10  request by changing their format so I could see the

09:31:19  11  Google officers' compensation ranges in a format that I

09:31:24  12  was comfortable with.

09:31:26  13      Q.  Did Mr. Levinson who was at Genentech at the

09:31:30  14  time, or Mr. Campbell who was at Intuit at the time,

09:31:32  15  ever provide similar information from their companies

09:31:35  16  that you saw?

09:31:36  17      A.  Not that I'm aware of.

09:31:38  18      Q.  Now, in connection with your role at Google,

09:31:41  19  were you asked, from time to time, to approve increased

09:31:46  20  compensation to deal with competitive threats from other

09:31:50  21  companies that sought to hire Google employees?

09:31:53  22      A.  Yes.

09:31:55  23      Q.  Could you describe generally what the -- what

09:31:59  24  the problem was or when you had to do that?

09:32:03  25      A.  Well, specifically there was a threshold above

Deposition of Paul Otellini

In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

09:32:07  1    which ████████████████████████████████████████

09:32:12  2    ████████████████████████████████████████████████

09:32:15  3    ████████████████████████  ████████████████████

09:32:21  4    ████████████████████████████████████████████ it

09:32:25  5    came to us.  So something in that range.

09:32:28  6         Q.  Well, did -- is it fair to say that Google

09:32:45  7    sought to raise compensation to its employees in those

09:32:51  8    circumstances in order to retain them?

09:32:55  9         A.  ████████████████████████████████████████

09:32:58 10    ████████████████████████████████████  ██████████

09:33:00 11    ████████████████████████████████████████

09:33:03 12    ██████████████████  ████████████████████████████

09:33:07 13    ████████████████████████████████████████████

09:33:12 14    ████████████████████████████████████████

09:33:15 15         Q.  Well, you approved these counteroffers

09:33:16 16    yourself, didn't you?

09:33:17 17         A.  ████████████████████████████████

09:33:19 18         Q.  But you were asked to vote, correct?

09:33:21 19         A.  Yes.

09:33:22 20         Q.  And you voted yourself, right?

09:33:24 21         A.  Yes.

09:33:25 22         Q.  And you made up your own mind with respect to

09:33:27 23    that vote, right?

09:33:27 24         A.  Yes.

09:33:28 25         Q.  And when you approved it, generally, could you

09:33:30  1    describe for me why you thought it was in Google's

09:33:33  2    interest to approve it?

09:33:34  3        A.  Well, usually they were, you know, ██████

09:33:38  4    ██████████  ████████████████████████████████

09:33:42  5    ██████████████████  ██████████████████████

09:33:46  6    ██████████████████████████████  ████████

09:33:48  7    ██████████████████████████████

09:33:50  8    ████████████████████████████

09:33:54  9    ██████████████████████████████████████

09:33:58 10    ████████████████████████████

09:34:01 11    ██████████████████████████████████

09:34:04 12    ████████████████████████

09:34:07 13        The art of how algorithms work and so forth in

09:34:11 14    search is very arcane.  And that knowledge base of how

09:34:15 15    the company operated, you know, on a -- is a very

09:34:19 16    competitive, I think, trade secret that they would want

09:34:22 17    to retain.  So the argument was always ██████████

09:34:25 18    ████████████████████████████

09:34:29 19    ████████████████████████████████████

09:34:32 20    ██████████████  ██████████████████████████

09:34:36 21    ████████████

09:34:37 22        Q.  Fair enough.  But is it fair to say that all

09:34:40 23    the people -- well, is it fair to say that the

09:34:47 24    counteroffers that you were asked to approve weren't

09:34:51 25    limited to engineers or people who were working on

| | | |
|---|---|---|
| 09:57:13 | 1 | MR. SAVERI:  Yes.  Sorry about that. |
| 09:57:18 | 2 | Q.  Are you aware that Intel had agreements with |
| 09:57:21 | 3 | certain other companies that limited the ability of the |
| 09:57:25 | 4 | parties to those agreements to recruit each other's |
| 09:57:30 | 5 | employees? |
| 09:57:31 | 6 | A.  Well, I was not aware of it at the time.  I |
| 09:57:33 | 7 | became aware that we had a list of companies as part of |
| 09:57:36 | 8 | the prep for this deposition. |
| 09:57:38 | 9 | Q.  Okay.  And prior to the prep for the |
| 09:57:41 | 10 | deposition, just so I'm clear, you weren't aware of |
| 09:57:43 | 11 | that? |
| 09:57:44 | 12 | A.  No. |
| 09:57:49 | 13 | MR. PICKETT:  Meaning -- your double |
| 09:57:51 | 14 | negatives -- |
| 09:57:52 | 15 | MR. SAVERI:  Okay.  Let me ask a better |
| 09:57:54 | 16 | question. |
| 09:57:55 | 17 | MR. PICKETT:  -- require some clarification. |
| 09:57:56 | 18 | MR. SAVERI:  Fair enough.  And I'll try again. |
| 09:57:59 | 19 | Q.  Before the prep -- and when you said the prep, |
| 09:58:02 | 20 | I'm assuming you are talking about the preparation for |
| 09:58:04 | 21 | the deposition today, correct? |
| 09:58:05 | 22 | A.  And the whole trial.  You know, the Consent |
| 09:58:08 | 23 | Decree stuff. |
| 09:58:09 | 24 | Q.  Okay.  Before that preparation, were you aware |
| 09:58:14 | 25 | that Intel had agreements with certain other companies |

09:58:18  1   that limited the ability of Intel and the other

09:58:25  2   companies to recruit each other's employees?

09:58:31  3       A.   No.   But I think that what I did learn was it

09:58:33  4   wasn't a limiting on recruiting or limiting on hiring,

09:58:37  5   it was a -- it was a don't solicit, as I understand it.

09:58:42  6   But I wasn't involved in creating it.

09:58:44  7       Q.   And I was using recruiting broadly, but fair

09:58:47  8   enough.   I appreciate the clarification.

09:58:50  9            Now, did -- did Intel have an agreement with

09:59:01  10  Google not to recruit each other's employees in any

09:59:07  11  fashion?

09:59:09  12      A.   Well, I have subsequently learned that Intel

09:59:14  13  had an agreement -- Intel had a practice to not go after

09:59:19  14  Google people, which I wasn't aware of.   And, you know,

09:59:23  15  there are instances of Google trying to hire key Intel

09:59:28  16  engineers that I did talk to Eric about, which I'm sure

09:59:30  17  we're going to talk about.

09:59:41  18      Q.   Do you believe that the agreement that you just

09:59:44  19  identified with Google was consistent with the code

09:59:47  20  of -- with the Intel code of conduct that we just went

09:59:51  21  over?

09:59:52  22      A.   Which agreement?

09:59:52  23           MR. PICKETT:   I think you misspoke, or at least

09:59:54  24  you ought to look back at the answer.

09:59:59  25           MR. SAVERI:   Q.   Well, let me go back to

10:00:00  1    that.   Now, do you know -- strike that.

10:00:08  2           Are you aware that Intel had an agreement with

10:00:11  3    Pixar that limited the ability of Intel and Pixar to

10:00:19  4    recruit each other's employees?

10:00:20  5        A.  I have no knowledge of that directly.

10:00:23  6        Q.  When you say you don't have any knowledge of

10:00:24  7    that directly, what do you mean by that?

10:00:26  8        A.  Well, I mean I heard their name on a list of

10:00:30  9    companies as part of the prep for this.

10:00:31  10       Q.  Okay.

10:00:32  11          MR. PICKETT:   And I'd advise that any

10:00:34  12    information obviously coming through the attorney is off

10:00:38  13    grounds.

10:00:39  14          MR. SAVERI:   That's fair.

10:00:39  15       Q.  And I just -- I just wanted to know when you

10:00:43  16    said directly what you meant by that.

10:00:45  17          Now, are you aware that Intel had an agreement

10:00:50  18    with Apple that limited the ability of Intel and Apple

10:00:56  19    to recruit each other's employees?

10:00:58  20       A.  Same answer.   No.

10:01:09  21       Q.  Are you aware that Intel had an agreement with

10:01:12  22    Sun Microsystem that limited the ability of Intel and

10:01:16  23    Sun Microsystem to recruit each other's employees?

10:01:19  24       A.  I don't know if they're -- someone mentioned

10:01:21  25    this list to me as part of the prep.   I don't remember

| | | |
|---|---|---|
| 11:04:32 | 1 | Q.  Okay.  At any point in time between the time |
| 11:04:47 | 2 | you became the Intel CEO and today, did you become aware |
| 11:04:52 | 3 | that there was a -- an agreement of the type set forth |
| 11:04:55 | 4 | here between Apple and Adobe? |
| 11:04:58 | 5 | A.  No. |
| 11:05:01 | 6 | Q.  Did you -- during that time period, did you |
| 11:05:03 | 7 | ever become aware that there was an agreement of the |
| 11:05:06 | 8 | type described here between Apple and Pixar? |
| 11:05:08 | 9 | A.  No. |
| 11:05:11 | 10 | Q.  During that period of time, did you ever become |
| 11:05:13 | 11 | aware that there was an agreement of the type described |
| 11:05:15 | 12 | here between Google and Intuit? |
| 11:05:17 | 13 | A.  No. |
| 11:05:18 | 14 | Q.  Okay.  Was the subject of the agreement between |
| 11:05:21 | 15 | Google and Intuit ever discussed at a Google board |
| 11:05:24 | 16 | meeting that you attended? |
| 11:05:25 | 17 | A.  No. |
| 11:05:26 | 18 | Q.  Or any subcommittee of a Google board? |
| 11:05:30 | 19 | A.  No. |
| 11:05:30 | 20 | Q.  Was it ever discussed between you and any |
| 11:05:32 | 21 | executive or employee of Google, including Mr. Schmidt, |
| 11:05:35 | 22 | Mr. Page, or Sergey Brin? |
| 11:05:38 | 23 | A.  This is Google-Intuit, right? |
| 11:05:40 | 24 | Q.  Yes. |
| 11:05:41 | 25 | A.  No. |

| 11:05:41 | 1  | Q.  Did you ever discuss this -- the subject at all |
| 11:05:45 | 2  | with Mr. Campbell?  Mr. Bill Campbell? |
| 11:05:49 | 3  | A.  No. |
| 11:06:05 | 4  | Q.  Did you know Steve Jobs? |
| 11:06:06 | 5  | A.  Yes. |
| 11:06:09 | 6  | Q.  How frequently did you talk to Mr. Jobs while |
| 11:06:12 | 7  | you were the CEO of Intel? |
| 11:06:14 | 8  | A.  It would depend on, you know, whether we were |
| 11:06:19 | 9  | deeply engaged in projects or not.  But certainly no |
| 11:06:21 | 10 | less than once a quarter. |
| 11:06:23 | 11 | Q.  Okay.  I mean, would you characterize your |
| 11:06:27 | 12 | communications with Mr. Jobs as frequent? |
| 11:06:30 | 13 | A.  Again, it depends on whether we were working on |
| 11:06:33 | 14 | something directly or just having ongoing business. |
| 11:06:35 | 15 | Q.  You said that you -- I think you said just a |
| 11:06:38 | 16 | second ago that you spoke with Mr. Jobs at least once a |
| 11:06:41 | 17 | quarter? |
| 11:06:41 | 18 | A.  Yes. |
| 11:06:42 | 19 | Q.  Were there times when you spoke with him more |
| 11:06:43 | 20 | frequently? |
| 11:06:45 | 21 | A.  Certainly. |
| 11:06:47 | 22 | Q.  And can you generally describe for me why you |
| 11:06:50 | 23 | would -- why you spoke to Mr. Jobs more frequently? |
| 11:06:53 | 24 | A.  Well, if we were engaging -- obviously when the |
| 11:06:56 | 25 | initial Apple-Google -- too many companies here. |

Deposition of Paul Otellini                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:07:01  1   Apple-Intel --

11:07:01  2         Q.   Sir, I'm glad you did it.  I thought it was

11:07:04  3   only me.

11:07:05  4         A.   When the original Apple-Intel design win

11:07:08  5   happened, I was with Steve for several months, you know,

11:07:11  6   several times a week over several months for working on

11:07:16  7   the agreement.  And then we went into implementation

11:07:19  8   mode and we managed the business and, you know, on a

11:07:21  9   quarterly basis with executive meetings.

11:07:24 10         Q.   During that period of time when you were

11:07:26 11   speaking more frequently with Mr. Jobs, did you discuss

11:07:28 12   the subject of recruiting or soliciting each other's

11:07:36 13   employees?

11:07:37 14         A.   No.

11:07:37 15         Q.   The subject never came up?

11:07:39 16         A.   No.

11:07:39 17         Q.   Did he ever tell you at any time that he had

11:07:42 18   reached agreements with executives at other technology

11:07:46 19   companies not to recruit each other's employees?

11:07:48 20         A.   No.

11:08:08 21         Q.   Now, going back for a second, again, to the

11:08:11 22   agreement between you and Mr. Schmidt, can you identify

11:08:15 23   any collaboration between Intel and Google that occurred

11:08:20 24   after that point in time that wouldn't have happened

11:08:23 25   absent the agreement between Google and Intel?

| | | |
|---|---|---|
| 11:08:30 | 1 | MR. PICKETT:  No foundation.  Objection. |
| 11:08:33 | 2 | THE WITNESS:  Does that mean I answer? |
| 11:08:34 | 3 | MR. PICKETT:  You can try.  But let's read the |
| 11:08:36 | 4 | question back. |
| 11:08:37 | 5 | MR. SAVERI:  I'm sorry.  Why don't you read the |
| 11:08:39 | 6 | question back. |
| 11:08:39 | 7 | And I'd like an answer, please. |
| 11:08:56 | 8 | (Record read as follows:  Now, going back for a |
| 11:08:56 | 9 | second again to the agreement between you and |
| 11:08:56 | 10 | Mr. Schmidt, can you identify any collaboration |
| 11:08:56 | 11 | between Intel and Google that occurred after |
| 11:08:56 | 12 | that point in time that wouldn't have happened |
| 11:08:56 | 13 | absent the agreement between Google and Intel?) |
| 11:08:58 | 14 | THE WITNESS:  As I think about the agreements, |
| 11:09:02 | 15 | so the collaboration, we had one in the data center, we |
| 11:09:05 | 16 | had one in data center efficiency, we had one in search |
| 11:09:11 | 17 | optimization, we had one around Google TV, we had one |
| 11:09:15 | 18 | around Android, one around Chrome, Chrome OS.  All of |
| 11:09:23 | 19 | those -- all of those happened.  It's speculative to say |
| 11:09:28 | 20 | I don't know that anything would not have happened in |
| 11:09:30 | 21 | the absence of the agreement. |
| 11:09:33 | 22 | But, you know, the companies were working well |
| 11:09:36 | 23 | together and were engaged broadly in a wide array of |
| 11:09:43 | 24 | projects as I delineated. |
| 11:09:44 | 25 | MR. SAVERI:  Q.  Now, prior to 2006 when |

11:09:47  1   you entered the agreement with Mr. Schmidt, had --

11:09:50  2   or strike that.

11:09:53  3        Prior to the time that you had reached the

11:09:55  4   agreement with Mr. Schmidt in 2006, had Google and Intel

11:10:00  5   collaborated on certain projects?

11:10:03  6        A.  Well, we -- I can't remember when the data

11:10:06  7   center optimization work started, which is what led to

11:10:10  8   the first instance.  It may have been in 2005, but I

11:10:15  9   doubt in the 2003-04 time frame that it existed.

11:10:20 10   Nothing that I can recall before, say, late '05.

11:10:25 11        Q.  And just so I'm clear about your testimony, was

11:10:28 12   the first collaboration, then, this data center in late

11:10:32 13   2005?  When I say collaboration, I mean collaboration

11:10:35 14   between Intel and Google.

11:10:36 15        A.  Obviously Google was using Intel parts for

11:10:39 16   their data centers.  Intel was designing the -- designed

11:10:43 17   boards for the data centers in the early days for them

11:10:45 18   and before the IPO.  I don't know that we had on-site

11:10:54 19   engineers, which is really what the genesis of the

11:10:57 20   original incident was.

11:11:00 21        Q.  Now, you said in your answer a few minutes ago

11:11:03 22   that you had a collaboration -- when I say you, I'm

11:11:06 23   saying -- I mean Intel.  That you said that Intel had a

11:11:10 24   collaboration between Google and Intel regarding search

11:11:14 25   optimization; do you recall that?

| | | |
|---|---|---|
| 11:11:15 | 1 | A.  Yes. |
| 11:11:16 | 2 | Q.  When did that collaboration begin? |
| 11:11:20 | 3 | A.  It was certainly in effect in early '06.  I |
| 11:11:22 | 4 | can't give you the time when it began.  And that was |
| 11:11:25 | 5 | around tuning -- helping them tune their software to run |
| 11:11:30 | 6 | faster on the new generation of Intel chips. |
| 11:11:38 | 7 | Q.  In terms of Intel's structure, who was the |
| 11:11:42 | 8 | person at Intel that was responsible for that search |
| 11:11:46 | 9 | optimization collaboration? |
| 11:11:49 | 10 | A.  Well, the work involved Intel experts in |
| 11:11:52 | 11 | microprocessor architecture, in compilers and in |
| 11:11:57 | 12 | optimization tools.  And those activities at that time |
| 11:12:05 | 13 | spanned a number of Intel executives. |
| 11:12:08 | 14 | Q.  Can you identify the one or two or three |
| 11:12:11 | 15 | people? |
| 11:12:12 | 16 | A.  Well, on the processor architecture it would |
| 11:12:18 | 17 | have been under Pat Gelsinger.  Under the compilers it |
| 11:12:23 | 18 | would have been Richard Wirt.  And under the -- and the |
| 11:12:30 | 19 | tools, I think were under Renee James at the time. |
| 11:12:34 | 20 | Q.  Now, you also mentioned a collaboration between |
| 11:12:38 | 21 | Google and Intel regarding Google TV, I believe; is that |
| 11:12:42 | 22 | correct? |
| 11:12:42 | 23 | A.  Yes, I did. |
| 11:12:43 | 24 | Q.  And when did that collaboration begin? |
| 11:12:53 | 25 | A.  I can't give you -- Google TV was launched, I |

| | | |
|---|---|---|
| 11:12:56 | 1 | think, in 2010.  So probably began a year before that. |
| 11:13:07 | 2 | Q.  And who, at Intel, was responsible for that |
| 11:13:10 | 3 | collaboration? |
| 11:13:14 | 4 | A.  It was under a gentleman who is no longer with |
| 11:13:16 | 5 | us named Eric Kim. |
| 11:13:19 | 6 | Q.  And how long did that collaboration last? |
| 11:13:23 | 7 | A.  Probably two years. |
| 11:13:26 | 8 | Q.  And you also mentioned that there was |
| 11:13:29 | 9 | collaboration about -- around Android, Chrome, |
| 11:13:34 | 10 | Chrome OS.  Do you recall -- |
| 11:13:37 | 11 | A.  Three separate topics. |
| 11:13:38 | 12 | Q.  And that was my question.  When did the |
| 11:13:40 | 13 | collaboration around Android begin? |
| 11:13:43 | 14 | A.  Several years ago. |
| 11:13:45 | 15 | Q.  Was it before or after the agreement with |
| 11:13:47 | 16 | Mr. Schmidt? |
| 11:13:49 | 17 | A.  Several years ago, so.... |
| 11:13:53 | 18 | Q.  Who at Intel was responsible for that |
| 11:13:55 | 19 | collaboration? |
| 11:13:56 | 20 | A.  I'm sorry, which one are we talking about now? |
| 11:13:59 | 21 | Q.  I'm sorry.  The Android. |
| 11:14:01 | 22 | A.  Android would be under Renee James. |
| 11:14:03 | 23 | Q.  You also mentioned, I think the second, was a |
| 11:14:05 | 24 | collaboration regarding Chrome; do you recall that? |
| 11:14:09 | 25 | A.  Chrome browser, yes.  Under Renee as well. |

| | | |
|---|---|---|
| 11:14:11 | 1 | Q.  When did that begin?  That collaboration? |
| 11:14:13 | 2 | A.  Before the Android one so maybe four years ago. |
| 11:14:16 | 3 | Q.  And you also mentioned Chrome OS, which is a |
| 11:14:19 | 4 | different one than the Chrome browser, correct? |
| 11:14:21 | 5 | A.  Right.  It's an operating system. |
| 11:14:23 | 6 | Q.  Right. |
| 11:14:24 | 7 | A.  And that was -- it would also be under Renee, |
| 11:14:25 | 8 | and that was probably in the last two or three years as |
| 11:14:29 | 9 | well. |
| 11:14:29 | 10 | MR. SAVERI:  Okay.  So it's -- can we go off |
| 11:14:35 | 11 | the record for a second? |
| 11:14:38 | 12 | THE VIDEOGRAPHER:  This is the end of video |
| 11:14:39 | 13 | No. 1.  We are now off the record at 11:14. |
| 11:14:50 | 14 | (Recess taken.) |
| 11:16:59 | 15 | THE VIDEOGRAPHER:  We are now on the record at |
| 11:29:09 | 16 | 11:29.  This is the beginning of video No. 2. |
| 11:29:14 | 17 | MR. SAVERI:  Q.  Going back for a second to |
| 11:29:16 | 18 | your first communication with Mr. Schmidt about the |
| 11:29:20 | 19 | agreement that we've been talking about.  Was there |
| 11:29:24 | 20 | someone at Intel who told you that Google was |
| 11:29:29 | 21 | recruiting Intel employees that caused you to call |
| 11:29:33 | 22 | Mr. Schmidt? |
| 11:29:33 | 23 | A.  Yes. |
| 11:29:34 | 24 | Q.  And who was that? |
| 11:29:36 | 25 | A.  It was either Richard Wirt or Renee.  I can't |

11:41:48  1    time.

11:41:49  2         Q.  And that's the same Diane Green who later

11:41:52  3    served on the Google board; is that correct?

11:41:53  4         A.  Yes, it is.

11:41:56  5         Q.  At the time of your communication with

11:41:59  6    Ms. James about the subject, was Ms. Green the CEO of

11:42:04  7    VMwear?

11:42:04  8         A.  Yes, she was.

11:42:08  9         Q.  And was that prior to when EMC acquired VMwear?

11:42:17  10   Do you recall?

11:42:18  11        A.  I'd have to go back and look.  I don't know.

11:42:20  12        Q.  Okay.

11:42:27  13        A.  I also have no knowledge of whether Renee ever

11:42:29  14   talked to Diane, so....

11:42:32  15        Q.  That was going to be --

11:42:33  16        A.  I don't know what ever happened to that.

11:42:35  17        Q.  Let me just follow up on that.  It's your

11:42:37  18   recollection that you asked Renee James to discuss the

11:42:43  19   subject of an agreement with Diane Green at VMwear,

11:42:48  20   correct?

11:42:49  21        A.  I think I said perhaps we should have a

11:42:51  22   no-poach kind of thing here on people that -- implicit

11:42:56  23   in that was we're working together on this stuff.

11:42:59  24        Q.  So my question, though, is to figure out where

11:43:04  25   that --

11:43:04  1      A.  What became of it.

11:43:05  2      Q.  -- where that went.

11:43:06  3      A.  I have no idea.  I never followed up.  I don't

11:43:08  4  remember ever hearing of losing people to VMwear, so

11:43:11  5  perhaps it never happened.  Who knows.

11:43:13  6      Q.  So let me break it up into pieces.  Do you know

11:43:16  7  if Ms. James ever contacted Ms. Green about that

11:43:18  8  subject?

11:43:19  9      A.  I don't know.

11:43:20 10      Q.  And do you -- did Ms. James ever tell you

11:43:23 11  whether or not she had spoken or communicated with

11:43:26 12  Ms. Green about that subject one way or the other?

11:43:28 13      A.  No.

11:43:30 14      Q.  As you sit here today, you have no knowledge

11:43:32 15  one way or another whether Ms. Green or Ms. James ever

11:43:36 16  discussed that subject?

11:43:37 17      A.  No, I don't.

11:43:39 18      Q.  Okay.  Did Intel continue to collaborate with

11:43:51 19  EMC after it acquired VMwear?

11:43:56 20      A.  Oh, yes.

11:43:57 21      Q.  Okay.  Now, does Intel, or has Intel,

11:44:10 22  collaborated with Microsoft during the time that you've

11:44:15 23  been CEO of Intel?

11:44:16 24      A.  Yes.

11:44:23 25      Q.  On what subjects or products has Intel

| | | |
|---|---|---|
| 11:44:26 | 1 | communicated with -- collaborated with Microsoft? |
| 11:44:29 | 2 | A.  Virtually everything we do and everything they |
| 11:44:31 | 3 | do.  I mean the -- you know, most of our chips run |
| 11:44:37 | 4 | Microsoft software somewhere along the way. |
| 11:44:42 | 5 | Q.  Did you ever approach Microsoft about an |
| 11:44:47 | 6 | agreement or an understanding with them not to solicit |
| 11:44:52 | 7 | each other's employees? |
| 11:44:54 | 8 | A.  No. |
| 11:44:58 | 9 | Q.  Has Intel historically solicited employees from |
| 11:45:02 | 10 | Microsoft? |
| 11:45:07 | 11 | A.  There are some people who work for Intel that |
| 11:45:09 | 12 | used to work at Microsoft.  I don't know how they |
| 11:45:11 | 13 | came -- how they came here. |
| 11:45:14 | 14 | Q.  And is the reverse true?  Are there people that |
| 11:45:18 | 15 | work at Microsoft that left Intel to go to work at |
| 11:45:21 | 16 | Microsoft? |
| 11:45:21 | 17 | A.  I don't know.  But if you did a venn diagram, |
| 11:45:24 | 18 | we're mostly chip people.  They're not a chip company, |
| 11:45:27 | 19 | so the intersection is really small. |
| 11:45:30 | 20 | Q.  And with that understanding, I'm just asking |
| 11:45:33 | 21 | the question whether you are aware whether people have |
| 11:45:35 | 22 | gone from Intel to Microsoft. |
| 11:45:37 | 23 | A.  I know, I think, of one person that has gone |
| 11:45:40 | 24 | from -- but there is probably others. |
| 11:45:45 | 25 | Q.  Is it fair to say that Intel has collaborated |

| | | |
|---|---|---|
| 11:45:48 | 1 | with a number of companies during the time that you've |
| 11:45:50 | 2 | been the CEO of Intel? |
| 11:45:52 | 3 | A.  Yes. |
| 11:45:54 | 4 | Q.  Does Intel have no-solicitation agreements with |
| 11:45:56 | 5 | any of them to the best of your knowledge, other than |
| 11:46:00 | 6 | the agreements or companies that we've talked about so |
| 11:46:04 | 7 | far? |
| 11:46:04 | 8 | MR. PICKETT:  Objection.  Vague.  You've talked |
| 11:46:07 | 9 | about lots of companies.  There has been a lot of |
| 11:46:08 | 10 | testimony there is no agreements whatever, so it's |
| 11:46:12 | 11 | hopelessly ambiguous. |
| 11:46:14 | 12 | THE WITNESS:  The only agreement I know of with |
| 11:46:16 | 13 | any company was the one I described with Eric at Google. |
| 11:47:13 | 14 | MR. SAVERI:  Q.  At any time from, I guess, |
| 11:47:17 | 15 | 2006 when you reached the agreement with Mr. Schmidt |
| 11:47:21 | 16 | until today, did you ever come to the conclusion |
| 11:47:24 | 17 | yourself that the agreement that you had reached |
| 11:47:29 | 18 | with Google was -- was unethical in any respect? |
| 11:47:36 | 19 | A.  No.  In fact, the Consent Decree, which still |
| 11:47:40 | 20 | allows it, validates my thinking that it was very fair. |
| 11:47:44 | 21 | Q.  During that time, did you ever come to the |
| 11:47:47 | 22 | personal conclusion that it was wrong to withhold |
| 11:47:58 | 23 | information regarding the fact of that agreement from |
| 11:48:03 | 24 | any employees at Intel? |
| 11:48:05 | 25 | A.  No.  Because if someone wanted to go to work at |

| | | |
|---|---|---|
| 11:48:08 | 1 | Google, they certainly had every ability to.  The jobs |
| 11:48:11 | 2 | were posted.  The recruiters were widely available.  We |
| 11:48:17 | 3 | had no policy or means of policing the policy, the |
| 11:48:22 | 4 | agreement that we talked about, and people left Intel in |
| 11:48:26 | 5 | large numbers to go to Google.  So I don't think there |
| 11:48:28 | 6 | were any ethics -- any ethics that -- at risk there. |
| 11:48:38 | 7 | Q.  Now, would you turn back to what was previously |
| 11:48:42 | 8 | marked as Exhibit 166.  It's the Final Judgment.  I |
| 11:48:45 | 9 | think you have the Competitive Impact Statement in front |
| 11:48:48 | 10 | of you. |
| 11:48:49 | 11 | A.  Yeah. |
| 11:48:54 | 12 | Q.  Do you have that document in front of you? |
| 11:48:55 | 13 | A.  I do. |
| 11:48:56 | 14 | Q.  Could you turn to page 5, to the section which |
| 11:48:59 | 15 | is Roman IV, Prohibited Conduct.  Do you have that in |
| 11:49:04 | 16 | front of you? |
| 11:49:04 | 17 | A.  Yes. |
| 11:49:05 | 18 | Q.  And if you will read along with me it says, |
| 11:49:08 | 19 | "Each defendant is enjoined from attempting to enter |
| 11:49:10 | 20 | into, entering into, maintaining or enforcing any |
| 11:49:14 | 21 | agreement with any other person to in any way refrain |
| 11:49:20 | 22 | from, requesting that any person in any way refrain |
| 11:49:24 | 23 | from, or pressuring any person in any way to refrain |
| 11:49:27 | 24 | from soliciting, cold calling, recruiting, or otherwise |
| 11:49:31 | 25 | competing for employees of the other person." |

02:02:46  1    would.

02:02:46  2        Q.  Fair enough.  Now, going back for a second, do

02:02:58  3    you believe that -- are you aware whether or not at any

02:03:04  4    time Intel tried to track or report on where or which

02:03:14  5    companies Intel employees left for?

02:03:17  6        A.  That's the question you asked me before.  I

02:03:19  7    don't know.  Like I said, sometimes people don't tell

02:03:22  8    you.  So whether they aggregate it or whether they take

02:03:26  9    judgment on it, I can't answer.

02:03:31  10       Q.  If Intel did try to study that, would that also

02:03:35  11   be something you would expect to be done by the HR

02:03:39  12   department?

02:03:40  13       A.  Yes.

02:03:40  14       Q.  Okay.  Now, going back for a second to the

02:03:53  15   materials you saw regarding Intel that you saw when you

02:03:57  16   were at -- when you participated on the Google board.

02:04:01  17       A.  Yes.

02:04:03  18       Q.  Can you tell me generally whether the amount of

02:04:11  19   employees that left Intel for Google declined or

02:04:17  20   increased in a material way over the years?  Was there

02:04:21  21   ever any trend that you can remember?

02:04:23  22       A.  I -- I mean, it's not something I ever tracked

02:04:25  23   or reported on.  So as I read the book, it -- it popped

02:04:29  24   up.  I know we were not in the top two companies, kind

02:04:33  25   of watched that.  We were always sort of in the top 10,

02:04:37 1   12 companies.

02:04:38 2       Q.  That's what I was curious about.  Were there

02:04:40 3   ever times when you thought, well, jeez, this is really

02:04:43 4   something, a lot of people are leaving Intel for Google?

02:04:46 5       A.  Well, not really.  Because, again, as I said we

02:04:48 6   weren't in the top two companies.  The top two companies

02:04:51 7   are other software companies, so that makes sense that

02:04:53 8   Google would hire a lot of other software people into a

02:04:56 9   software company.

02:04:57 10      We don't have, in the grand scheme of things,

02:04:59 11  that many software people, and Google is not going to

02:05:02 12  hire chip designers or, you know, manufacturing people,

02:05:05 13  which is half our employment base.  So the numbers

02:05:09 14  were -- you know, my recollection is the biggest year

02:05:14 15  was ████████  and the smallest year was ████████

02:05:18 16  Something like that.

02:05:19 17      Q.  And it kind of bounced around in between those

02:05:21 18  numbers over time?

02:05:22 19      A.  I think so.  But since I wasn't writing them

02:05:25 20  down and tracking it, I didn't really -- I never did

02:05:27 21  anything with it.

02:05:28 22      Q.  Okay.  Can you recall -- you mentioned that

02:05:32 23  there were one or two companies that were software

02:05:36 24  companies that you remember seeing at the top of this

02:05:38 25  report that was prepared at Google, correct?

| | | |
|---|---|---|
| 02:05:40 | 1 | A.  Yes. |
| 02:05:41 | 2 | Q.  Which companies were those? |
| 02:05:43 | 3 | A.  I don't know that I'm allowed to reveal that. |
| 02:05:47 | 4 | It was -- it's -- I think it's Google proprietary |
| 02:05:50 | 5 | information. |
| 02:05:51 | 6 | Q.  Well -- |
| 02:05:52 | 7 | A.  So I think you should ask one of the Google |
| 02:05:53 | 8 | people that information. |
| 02:05:54 | 9 | Q.  Well, I think I'm entitled to the answer from |
| 02:05:57 | 10 | you.  If you -- I'm happy that -- if you want to consult |
| 02:06:00 | 11 | at a break about it.  You don't need to do it now.  We |
| 02:06:03 | 12 | can come back to it. |
| 02:06:05 | 13 | MR. PICKETT:  Let's come back to it. |
| 02:06:06 | 14 | MR. SAVERI:  I don't think it's protected, but |
| 02:06:08 | 15 | I don't want to hold things up. |
| 02:06:09 | 16 | MR. PICKETT:  Sure. |
| 02:06:10 | 17 | (Whereupon, Exhibit 456 was marked for |
| 02:06:10 | 18 | identification.) |
| 02:06:34 | 19 | MR. SAVERI:  Q.  Sir, I'm handing you |
| 02:06:36 | 20 | what's been marked as 456.  It's a two-page document |
| 02:06:42 | 21 | with the Bates Nos. 76613DOC001638 through 1639. |
| 02:06:52 | 22 | Do you have that in front of you? |
| 02:06:53 | 23 | A.  Yes, I do. |
| 02:06:54 | 24 | Q.  Do you recognize the document? |
| 02:06:56 | 25 | A.  All but the graphic in the middle. |

02:16:50  1    programmers after this agreement?

02:16:51  2          A.  Google?

02:16:52  3          Q.  Excuse me.  Do you know whether VMwear hired

02:16:55  4    any Intel programmers after this?

02:16:57  5          A.  I don't know.

02:16:59  6          Q.  Okay.  We're about to run out of tape, so let's

02:17:05  7    stop.  We can either sit here and wait until they --

02:17:08  8    it's going to take a couple minutes.  I'm fine with

02:17:11  9    waiting.

02:17:12 10          MR. PICKETT:  Sure.

02:17:12 11          MR. SAVERI:  Unless you need to take a --

02:17:13 12    stretch your legs or something.

02:17:17 13          THE VIDEOGRAPHER:  This is the end of video

02:17:18 14    No. 2.  We are now off the record at 2:17.

02:17:25 15          (Recess taken.)

02:19:00 16          THE VIDEOGRAPHER:  We are now on the record at

02:19:02 17    2:19.  This is the beginning of video No. 3.

02:19:21 18          (Whereupon, Exhibit 458 was marked for

02:19:21 19          identification.)

02:19:37 20          MR. SAVERI:  Q.  Mr. Otellini, I've handed

02:19:38 21    you what's been marked as Exhibit 458.

02:19:41 22          Do you have that in front of you?

02:19:42 23          A.  I do.

02:19:43 24          Q.  It has the Bates No. 76616DOC007593 through

02:19:51 25    7595.  Draw your attention to the top of the first page

| | | |
|---|---|---|
| 02:19:57 | 1 | which is an email from you to Gabrielle Thompson, Patty |
| 02:20:01 | 2 | Murray, dated September 6th, 2007. |
| 02:20:08 | 3 | Will you take a moment to review it, please. |
| 02:20:15 | 4 | A.  Yes.  This is -- this looks funny to me. |
| 02:20:20 | 5 | Q.  Okay. |
| 02:20:20 | 6 | A.  I think it looks like things have been cut out. |
| 02:20:25 | 7 | Q.  Well, okay.  Maybe we should go through it.  I |
| 02:20:27 | 8 | mean, the copy -- certainly the part where it says |
| 02:20:30 | 9 | redacted -- |
| 02:20:31 | 10 | A.  Well, no, up top, even where it says Otellini |
| 02:20:34 | 11 | doesn't have my name.  And I don't know if -- who the |
| 02:20:38 | 12 | "yes" is from or what it -- is that -- I usually sign my |
| 02:20:43 | 13 | name, so -- it's not the font I use.  So it just doesn't |
| 02:20:47 | 14 | look familiar.  Other parts of the email look familiar. |
| 02:20:50 | 15 | Q.  Well, maybe we can work through it.  I'm just |
| 02:20:52 | 16 | working with what I was given. |
| 02:20:54 | 17 | So -- well, let me just start at the top of the |
| 02:21:08 | 18 | first page where it says "From" and it just has your |
| 02:21:11 | 19 | last name, Otellini. |
| 02:21:13 | 20 | Do you see that? |
| 02:21:14 | 21 | A.  I do. |
| 02:21:17 | 22 | Q.  Is it your testimony that you did not write |
| 02:21:19 | 23 | that email to Gabrielle Thompson? |
| 02:21:21 | 24 | A.  It is not familiar nor consistent with a |
| 02:21:26 | 25 | document I reviewed that had my real response.  My full |

02:21:29  1    response on it.

02:21:30  2         Q.  Okay.

02:21:31  3         A.  So I can't look at -- this feels like it's out

02:21:33  4    of context to me.

02:21:35  5         Q.  I'm just trying to figure out whether you

02:21:37  6    believe you wrote it or not.

02:21:39  7         A.  I don't know.

02:21:40  8         Q.  Okay.

02:21:41  9         A.  It's -- I saw a document that I know I wrote

02:21:45 10    yesterday that has everything but this top line and a

02:21:47 11    different header and a different response.  So what this

02:21:51 12    is, and where it came from, I can't help you with.

02:21:58 13         Q.  So let me just tell you, the Bates numbers

02:22:03 14    indicate that Intel produced it to us.  So let me just

02:22:06 15    ask you a couple questions about it and see where we go.

02:22:17 16              Let's just flip to the last page of the

02:22:19 17    document.  At the bottom of the document there is a

02:22:30 18    little message or an email from looks like Gary Qin,

02:22:38 19    Q-U-I-N (sic), to Gabrielle Thompson, dated Wednesday,

02:22:43 20    September 5th, 2007.  Starts at the bottom of the second

02:22:46 21    page and continues over to the top of the third page.

02:22:49 22         A.  Yes.

02:22:53 23         Q.  Well, first of all, do you know who Gary Quin

02:22:55 24    is or Qin?

02:22:58 25         A.  No.

02:42:03  1        Q.   Now, if you'll look at Exhibit 202.

02:42:07  2        A.   Yes.

02:42:07  3        Q.   Do you have that in front of you?

02:42:09  4        A.   I do.

02:42:11  5        Q.   And if you look at the top of that email, there

02:42:13  6    is an email to Gabrielle Thompson indicated sent by you

02:42:21  7    dated Thursday, September 6th, 2007 at --

02:42:26  8             MR. PICKETT:   To Thompson and Murray.

02:42:29  9             MR. SAVERI:   Correct.

02:42:29 10        Q.   -- at 7:41 p.m., so approximately 40 minutes

02:42:32 11    after the previous response.

02:42:34 12        A.   Yes.

02:42:35 13        Q.   Did you write this email, that is, the email

02:42:40 14    that's time stamped at 7:41 p.m. on September 6th, 2007,

02:42:46 15    to Ms. Thompson?

02:42:48 16        A.   Yes, I did.  It's got my font.  My name is on

02:42:50 17    it, so....

02:42:52 18        Q.   Okay.  Now, thank you.  I appreciate your

02:42:55 19    patience with that.

02:43:02 20             You write, "Let me clarify.  We have nothing

02:43:06 21    signed."

02:43:06 22             Do you see that?

02:43:07 23        A.   Yes.

02:43:08 24        Q.   And, "We have a handshake 'no recruit' between

02:43:14 25    Eric and myself."

02:43:16  1          Do you see that?

02:43:17  2      A.  Yes, I do.

02:43:18  3      Q.  Is that, to the best of your recollection, an

02:43:21  4  accurate statement of the understanding or the

02:43:25  5  communications that you had with Mr. Schmidt?

02:43:28  6      A.  It's accurate, but I realize in the context of

02:43:32  7  this note it's ambiguous.  I was simply reiterating to

02:43:37  8  her, clarifying to her, that what I believe was the only

02:43:40  9  agreement we have, which was between Intel and Google on

02:43:47 10  collaborative -- deep collaborative engineering

02:43:50 11  activities.

02:43:50 12          And I realize she's asking me the other side of

02:43:54 13  that question which is is there anything that prohibits

02:43:57 14  Intel from recruiting from Google.  And the answer would

02:43:59 15  be no, if I had been more precise about my answer.

02:44:03 16      Q.  But first you said "Yes," and then in your

02:44:08 17  second, 202, you don't say no.

02:44:11 18      A.  Well, I don't know that I said yes.

02:44:13 19      Q.  Fair enough, sir, let's focus on 202.

02:44:16 20      A.  But I'm certainly saying let me clarify, and I

02:44:18 21  outlined the agreement we did have.  And I realized I'm

02:44:21 22  still not answering precisely her question, I'm

02:44:23 23  answering the other side of it, which to me was the only

02:44:26 24  agreement we have.

02:44:27 25      Q.  Now, when you say we have a handshake, what did

02:44:30  1    you mean by that?  Did you actually ever shake

02:44:34  2    Mr. Schmidt's hand?

02:44:35  3        A.  No.

02:44:35  4        Q.  It's a figure of speech?

02:44:36  5        A.  Yes.

02:44:44  6        Q.  But would you agree that when you used

02:44:46  7    "handshake," it was a shorthand for an agreement?

02:44:49  8        A.  It was the agreement that we talked about this

02:44:52  9    morning where I asked Eric on those specific instances

02:44:56 10    and he said, yes, I think that's fair.

02:44:59 11        Q.  And then you write, "I would not like this

02:45:01 12    broadly known."

02:45:03 13            Do you see that?

02:45:04 14        A.  Yes.

02:45:05 15        Q.  Why did you tell Ms. Thompson that you did not

02:45:09 16    want this broadly known?

02:45:10 17        A.  Because it had nothing to do with her.  It was

02:45:13 18    something that I had asked Google to do in terms of

02:45:17 19    their recruitment of Intel people in areas where we had

02:45:21 20    deep collaboration.  Gaby, as a recruiter, would have

02:45:26 21    nothing to do with that.

02:46:16 22        Q.  Did you ever come to think that the fact that

02:46:18 23    you didn't have anything written down with Mr. Schmidt

02:46:22 24    created a fair amount of ambiguity about exactly what

02:46:25 25    the understanding was between the two companies?

02:46:30  1      A.  Not particularly.  Remember, this was one way,

02:46:37  2  right?  So there was nothing for Intel people to

02:46:39  3  understand, per se.  And on their side, it was his to be

02:46:44  4  able to manage whatever he wanted to do on the Google

02:46:47  5  side to ensure that where we're collaborating, they

02:46:50  6  didn't go after our folks.

02:46:52  7      Q.  Well, I mean, but there were a number of emails

02:46:55  8  subsequent to the time that you had this communication

02:46:58  9  with Mr. Schmidt where people who reported to you at

02:47:02 10  Intel were confused and incorrect about what the

02:47:07 11  agreement was.

02:47:08 12          MR. PICKETT:  Number of emails you are

02:47:11 13  referring to, what are you referring to?

02:47:13 14          MR. SAVERI:  The ones I've shown you today.

02:47:16 15          MR. PICKETT:  There is only one, I think.

02:47:17 16  That's a number, I agree, but usually when we say there

02:47:19 17  is a number, that means there is a lot.

02:47:25 18          So I object it's ambiguous and no foundation.

02:47:31 19          MR. SAVERI:  Q.  Well, did you ever -- did

02:47:34 20  you ever consider whether or not it would be better

02:47:40 21  and would limit the ambiguity, which you've just

02:47:45 22  identified or responded to in this email about, if

02:47:49 23  you actually reduced this to writing?

02:47:52 24      A.  Not particularly.  Again, the ambiguity here

02:47:55 25  was mine as part of a quick response.

03:08:14   1    Q.  Is it fair to say, then, with this email you

03:08:17   2    informed Ms. James what Mr. Schmidt had told you about

03:08:20   3    Google's policy with respect to recruiting from Intel?

03:08:24   4    A.  Well, apparently.  But we've also established

03:08:26   5    that somehow, whether I told her or Richard told her

03:08:29   6    prior to this, a year prior to this, that she probably

03:08:33   7    knew.

03:08:39   8    Q.  Now, she writes back to you, "I will find

03:08:41   9    out...it has been a world wide phenomenon."

03:08:44   10   Do you see that?

03:08:45   11   A.  Yes.

03:08:46   12   Q.  Then she says, "Let me get the data.  I always

03:08:48   13   ask - did we ping them or visa versa.  R."

03:08:59   14   Does that indicate to you or refresh your

03:09:02   15   recollection that she knew for some time that there was

03:09:06   16   an agreement between Google -- well, strike that.

03:09:09   17   Does that refresh -- strike that.

03:09:13   18   Let me withdraw the question.

03:09:17   19   Did Renee James ever tell you who called in?

03:09:27   20   A.  Not that I remember.

03:10:18   21   Q.  Subsequent to Exhibit 462, did Eric Schmidt or

03:10:21   22   Laszlo Bock or anybody at Google tell you that they had

03:10:26   23   followed up and done an internal investigation regarding

03:10:31   24   the issues that Renee James raised with you and that you

03:10:35   25   passed on to Mr. Schmidt?

03:10:36  1        A.  No.

03:10:37  2        Q.  Did they ever tell you -- did Google ever tell

03:10:42  3   you that Google's recruiters were strictly following the

03:10:47  4   do-not-call policy regarding Intel --

03:10:49  5        A.  Well "they" who?  Laszlo?

03:10:51  6        Q.  Let me try to ask a different question.

03:10:53  7        A.  Sorry.

03:10:55  8        Q.  Did Eric Schmidt or Laszlo Bock or anybody at

03:10:59  9   Google tell you that they had done an investigation

03:11:04  10  internally at Google and confirm that Google's

03:11:12  11  recruiters were strictly following the do-not-call

03:11:16  12  policy regarding Intel?

03:11:21  13       A.  I don't remember.

03:11:21  14       Q.  Did Laszlo Bock or Eric Schmidt or anybody at

03:11:24  15  Google ever tell you that they had done an internal

03:11:28  16  investigation and confirmed that no one has called,

03:11:32  17  networked, or emailed into Intel or its subsidiaries

03:11:36  18  looking for talent?

03:11:38  19       A.  They may have.  I don't know.

03:11:39  20       Q.  Okay.  Do you know Arnnon Geshuri?

03:11:59  21       A.  No.

03:11:59  22       Q.  You've never spoken to the man?

03:12:00  23       A.  No.  Not that I know.

03:12:02  24       Q.  Okay.  You joined the Google board in 2003; is

03:12:49  25  that correct?

03:12:49  1        A.   Yes.

03:12:51  2        Q.   Upon your joining the Google board, did you

03:12:59  3   immediately suggest collaborations between the two

03:13:02  4   companies?

03:13:03  5        A.   Probably.  I know they were a relatively small

03:13:07  6   customer, but growing.  But I'd also met with Google

03:13:11  7   prior to my being on the board several times.

03:13:14  8        Q.   Okay.  Were there particular collaborations

03:13:17  9   that you suggested immediately upon joining the Google

03:13:20 10   board?

03:13:21 11        A.   I may have.  I don't know.

03:13:22 12        Q.   And is it --

03:13:23 13        A.   I remember that they wanted to tap into our

03:13:26 14   knowledge on how we scaled our company up, and they

03:13:30 15   wanted information from our finance teams and HR teams,

03:13:35 16   maybe the legal team as well, on just how companies

03:13:38 17   grow.  And we made our experts in those areas available

03:13:43 18   to them.

03:13:44 19             In terms of engineering, I know there was work,

03:13:47 20   because we talked about it this morning, in the '05 time

03:13:50 21   frame about the software collaboration.  And in the time

03:13:54 22   frame '03 to '05, we were -- most of the engineering

03:13:58 23   collaboration was around building motherboards for them

03:14:02 24   to run their data centers.

03:14:04 25        Q.   And to the best of your recollection, was the

03:14:06  1    collaboration during that 2003/2005 period limited to

03:14:10  2    the work done in connection with the motherboards for

03:14:13  3    data centers?

03:14:14  4         A.  Well, in addition to the other stuff I just

03:14:17  5    talked about in terms of how do companies grow, what are

03:14:20  6    your systems like.  Google was a startup, still, and

03:14:24  7    trying to figure out how to become a global company.

03:14:34  8         Q.  When did you begin discussing customized energy

03:14:42  9    efficient chips that you believed Intel could --

03:14:46  10        A.  Wasn't energy efficient chips, per se, it was

03:14:48  11   energy efficient data centers so it was not just the

03:14:51  12   chips.  Went beyond that.  That started out in the '05

03:14:54  13   time frame and came to fruition with announcement

03:14:58  14   probably '06, '07, '08 time frame on the -- energy

03:15:05  15   savers?  I can't remember the name.

03:15:07  16        Q.  Climate Savers?

03:15:09  17        A.  Climate Savers.  Thank you.

03:15:10  18             Do you have the date on that?

03:15:11  19        Q.  No, I don't.  That's why I was asking.

03:15:16  20        A.  Yeah.  It's in the probably '06, '07, '08

03:15:21  21   window.

03:15:22  22        Q.  Did Google and Intel collaborate in connection

03:15:37  23   with a company called Clearwire?

03:15:40  24        A.  We each invested in Clearwire, along with other

03:15:43  25   companies.

04:06:14  1   employees and current employees.  We have lost ███ of the

04:06:17  2   last ███ candidates with offers from both firms, ████████

04:06:22  3   ██████████████████████████████████████████████

04:06:24  4   ███████ "

04:06:25  5         Do you see that?

04:06:25  6     A.  Yes, I do.

04:06:27  7     Q.  At this time, did you believe -- were you

04:06:36  8   convinced that Facebook was increasingly winning against

04:06:38  9   Google in hiring new employees?

04:06:42 10     A.  I agree with the data here.

04:06:46 11     Q.  Did you agree that at this time Facebook was a

04:06:51 12   strong competitor with respect to hiring Google

04:06:59 13   employees?

04:06:59 14     A.  They were certainly recruiting people from

04:07:02 15   Google along with other startups.  I mean, if you go

04:07:05 16   back to the beginning of the note it talks about the

04:07:08 17   context of Facebook and other -- other startups in the

04:07:12 18   valley.

04:07:12 19     Q.  Is it fair to say, though, that at this time

04:07:14 20   Facebook was a prominent startup at the time?

04:07:19 21     A.  It was -- it was a prominent startup -- it was

04:07:22 22   a well-known startup at the time, but it wasn't the only

04:07:25 23   one that Google was losing employees to.

04:07:30 24     Q.  But you would agree with me that Laszlo Bock's

04:07:34 25   email to you focuses on Facebook?

04:07:37  1      A.  No.  He's making a general argument.  He starts

04:07:41  2  out talking about the paragraph above it, people getting

04:07:44  3  ██████████████████████████████████ from startups.  So

04:07:47  4  he's making a general argument about the war for talent

04:07:52  5  in the Valley.

04:07:54  6      Q.  Now, did you believe it was in Google's

04:08:33  7  interest to increase compensation to its employees and

04:08:35  8  others in order to retain them in light of these

04:08:40  9  circumstances, including the competitive thread of

04:08:43 10  startups, including Facebook?

04:08:45 11      A.  Yes, I did.  And I ended up voting for a

04:08:48 12  variant of this proposal.

04:08:49 13          MR. PICKETT:  And just to clarify, you say to

04:08:52 14  its employees.  ████████████████████████████████████

04:08:55 15  ████████

04:08:56 16          MR. SAVERI:  Yeah, and the general market

04:08:57 17  conditions that Mr. Otellini alluded to that Mr. Bock

04:09:00 18  describes.

04:09:02 19          You can -- you can put that aside.

04:09:46 20          (Whereupon, Exhibit 468 was marked for

04:09:46 21          identification.)

04:09:47 22          MR. SAVERI:  I've handed you Exhibit 468, it

04:09:51 23  has the Bates Nos. Google 00257207 through 210.

04:10:01 24          Again, it's a -- it's quite a complicated and

04:10:04 25  dense email.  I want to ask you about the portions of

04:10:08  1   this that communicated to you -- well, unfortunately

04:10:16  2   most of it is.

04:10:25  3          In particular, I want to ask you about the

04:10:26  4   portion of the email -- about the portion of the

04:10:29  5   document which is Mr. Schmidt's email to you that starts

04:10:31  6   on the bottom of page 1 and continues over to page 2.

04:10:36  7   And I guess your preceding response.

04:11:20  8          A.   Okay.

04:11:22  9          Q.   Well, let me do it this way:  At the bottom of

04:11:36 10   page 2, Mr. Bock writes to you and Mr. Levinson and Eric

04:11:40 11   Schmidt and others a long email regarding specific grant

04:11:44 12   proposals.

04:11:44 13          Do you see that?

04:11:45 14          A.   Yes.

04:11:46 15          Q.   And you write back on December 12, 2007 asking

04:11:51 16   two questions.

04:11:51 17          Do you see that?

04:11:52 18          A.   Yes.

04:11:55 19          Q.   And in item two you write, "I worry that we

04:12:06 20   will be in a situation of constant reaction."

04:12:10 21          Do you see that?

04:12:11 22          A.   Yes.

04:12:12 23          Q.   Can you explain to me what that -- what you

04:12:16 24   were worried about?

04:12:19 25          A.   Well, we had -- they had proposed a very large

04:12:22   1   ████████████████████████████

04:12:24   2   ████████████████████████████████

04:12:28   3   ████████████████████████████████████

04:12:34   4   ███████████

04:12:37   5   ███████████████████████████

04:12:39   6   ████████████████████████████████

04:12:41   7   ██████████████████  ████████████

04:12:44   8   ███████████████████████  ████████

04:12:47   9   ███████████  ██████████████████

04:12:51  10   ████████  █████████████████████████

04:12:53  11   ██████████████  ██████████████  And

04:12:58  12   Eric answers that above.

04:12:59  13        Q.   And his answer, in part, let me draw your

04:13:02  14   attention to it, is the paragraph that begins, "Our

04:13:04  15   ongoing policy."

04:13:05  16            Do you see that?

04:13:05  17        A.   I do.

04:13:06  18        Q.   He says, "Our ongoing policy is to try to break

04:13:10  19   the Facebook recruiting ██████████████████████

04:13:14  20   ██████████████████████████████████

04:13:16  21   ████████████████████████████"

04:13:19  22            Do you see that?

04:13:20  23        A.   Yes.

04:13:25  24        Q.   What did you understand him to mean by "break

04:13:28  25   the Facebook recruiting"?

04:13:31  1          MR. RUBIN:  Objection.  Calls for speculation.

04:13:34  2          THE WITNESS:  I interpreted this whole thing as

04:13:38  3   being ███████████████████████████████████████████

04:13:43  4   ████████████████████████████████████████████████

04:13:47  5   ████████████████████████████████████████████████

04:13:49  6   ████████████████████████████████████

04:13:52  7          MR. SAVERI:  Q.  And at least with respect

04:13:52  8   to this specific request, you consented, correct?

04:13:56  9       A.  Yes, I did.

04:13:57 10       Q.  And did you do that in order -- did you do that

04:13:59 11   because you believed it was necessary to keep the -- the

04:14:10 12   talent from going to Facebook?

04:14:13 13       A.  I'm only -- I'm only responding to two specific

04:14:16 14   individuals.  So we looked at the -- the names have been

04:14:20 15   redacted here, ███████████████    ████████████████

04:14:23 16   ██████████████████████████████████████████

04:14:26 17   ██████████    ████████████████████████████████

04:14:29 18   ████████████████████████████████████████████████

04:14:35 19   ████████████████

04:14:37 20       Q.  ████████████████████████████████████████

04:14:40 21   ██████████████████████████████████████████

04:14:42 22   ████████████████████████████████████████

04:14:46 23   ██████████████████████████████████

04:14:50 24   ████████████████████████████████████████████████

04:14:52 25   ██████████████████

04:14:53  1      A.  Well, people that had noticed that said they

04:14:56  2  wanted to go to another company somewhere.  I don't

04:14:59  3  think these were both Facebook.  That wasn't clear.

04:15:03  4  One is, and the other was ambiguous.

04:15:28  5      Q.  While you were participating in the LDCC, did

04:15:32  6  this process or effort to match -- excuse me.  Or to

04:15:40  7  address departures from Google to other companies,

04:15:49  8  including Facebook, continue?

04:15:53  9      A.  Yes.  But again, it was -- the comp committee

04:15:58 10  ███████████████████████████████████████  ██████████

04:16:01 11  ████████████████████████████  What the management team

04:16:05 12  was doing below that, I'm not sure I know.

04:16:07 13      Q.  Okay.  ████████████████████████████████████

04:16:10 14  ██████████████████████████████████████████████████████

04:16:17 15  ███████████████████████████  --

04:16:23 16      A.  Well, no, ██████████████████████████████████

04:16:26 17  ██████████████████████████████████████████████████████

04:16:28 18  ███████████████  ████████████████████████████

04:16:32 19      Q.  In the context of those discussions, did -- or

04:16:35 20  I guess discussions you attended at the -- at the board

04:16:39 21  generally, did you participate in any discussions

04:16:44 22  regarding Google's increasing compensation to lower-paid

04:16:50 23  employees to address competitive threats from Facebook

04:16:54 24  and other companies in the market?

04:16:56 25      A.  Well, there was a proposal that went to the

04:16:59   1   full board on changing the cash compensation composition

04:17:07   2   to all employees.  And that was meant to satisfy their

04:17:13   3   employees' request for more money in the bank each month

04:17:16   4   versus bonus, and to raise the overall compensation

04:17:19   5   from, target to philosophy, of being I think it's ▮



04:17:35   11       Q.  When was that?

04:17:36   12       A.  Well, it was after these, but not that long

04:17:38   13   after.  I think it was probably 2009, 2008 time frame.

04:17:44   14       Q.  Is that different than the -- than Google's

04:17:48   15   effort to make a 10 percent across the board --

04:17:52   16       A.  That's the process I'm talking about.  It

04:17:54   17   wasn't a 10 percent across the board comp increase.

04:17:56   18   Remember, it was a 10 percent change to base salary with

04:18:00   19   a corresponding reduction in bonus.

04:18:04   20       Q.  And that's also what's been referred to

04:18:07   21   colloquially as the big bang?

04:18:12   22       A.  Yes, it is.

04:18:12   23       Q.  Now, going back to 469 -- excuse me.  Excuse

04:18:16   24   me.

04:18:16   25       I had it in front of me and didn't give it to

04:18:18  1   you.  I'm sorry.  I apologize.

04:18:20  2            (Whereupon, Exhibit 469 was marked for

04:18:20  3            identification.)

04:18:27  4            MR. PICKETT:  He needs to put a sticker on it.

04:18:31  5            MR. SAVERI:  I'm sorry.  I was doing things too

04:18:33  6   quickly.

04:18:35  7       Q.  So do you have 469 in front of you?

04:18:46  8       A.  This is now June.

04:18:48  9       Q.  At the top of the chain, just so we're clear,

04:18:49 10   is an email from Art Levinson to Laszlo Bock dated

04:18:54 11   June 9, 2008, and the recipients are you, Eric Schmidt,

04:19:09 12   Bill Campbell, Shona Brown.

04:19:10 13            (Reporter clarification.)

04:20:33 14            THE WITNESS:  Okay.  I think I've got the gist

04:20:36 15   of it.

04:20:37 16            MR. SAVERI:  Q.  Let me take you up from

04:20:40 17   the back to the front of the document.  The first

04:20:43 18   part of the chain is an email from Laszlo Bock to

04:20:46 19   Art Levinson, yourself, Eric Schmidt, Bill Campbell,

04:20:52 20   Shona Brown, Frank Wagner and others.

04:20:54 21            Do you see that?

04:20:55 22       A.  Yes.

04:20:56 23       Q.  Now, Mr. Bock writes, "Art & Paul," that's

04:20:59 24   Mr. Levinson and yourself, correct?

04:21:01 25       A.  Yes.

04:22:31  1     Q.  ████████████████████████████

04:22:35  2     A.  ██████████████████████████████████████

04:22:38  3  █████████████████████████████████

04:22:41  4  █████████████████████████████████████████

04:22:46  5  ██████████████████████████████████████

04:22:51  6  ██████████████████████████████████████████

04:22:55  7  █████████████████████████

04:22:57  8     Q.  So do you agree that that was unusual?

04:23:04  9     A.  Well, it was -- it was consistent with the

04:23:06 10  whole philosophy around the ████████████████████████

04:23:13 11  ███████████████████████████████████

04:23:17 12  ██████████████████████  So it's not unusual from that

04:23:20 13  perspective.

04:23:22 14     Q.  Did Intel ever make preemptive grants in order

04:23:26 15  to retain people?

04:23:27 16     A.  I suspect back in the days when there were lots

04:23:31 17  of semiconductor startups we would have done that.

04:23:33 18     Q.  But by the time you took the helm of the

04:23:35 19  company --

04:23:36 20     A.  By the time Andy Grove took the helm of the

04:23:39 21  company.  Because the days of semiconductor startups

04:23:41 22  were the '70s.

04:23:43 23     Q.  So that was a thing of the past by the time you

04:23:45 24  had come to Intel --

04:23:46 25     A.  By then we were a big mature company and a big

| | | |
|---|---|---|
| 04:23:49 | 1 | mature industry. |
| 04:23:50 | 2 | Q.  If you turn to page 2 of the -- of the -- of |
| 04:23:55 | 3 | the email, I'm just kind of skipping ahead.  There is |
| 04:23:58 | 4 | another email from Mr. Bock to you and Mr. Levinson. |
| 04:24:06 | 5 | And there is a reference to an OSO director. |
| 04:24:09 | 6 | A.  Yes. |
| 04:24:10 | 7 | Q.  Was that ▆▆▆▆▆▆▆▆; do you recall? |
| 04:24:13 | 8 | A.  I don't recall. |
| 04:24:21 | 9 | Q.  In substance, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆ |
| 04:24:25 | 10 | ▆▆▆▆▆▆▆▆; is that a fair summary? |
| 04:24:28 | 11 | A.  I'm sorry.  Are you on the middle one here? |
| 04:24:30 | 12 | Q.  Yes. |
| 04:24:37 | 13 | MR. PICKETT:  Your question means approve, |
| 04:24:38 | 14 | not -- |
| 04:24:39 | 15 | MR. SAVERI:  Oh, excuse me. |
| 04:24:41 | 16 | MR. PICKETT:  -- personally to raise her comp. |
| 04:24:49 | 17 | MR. SAVERI:  I'm sorry.  Let me ask the |
| 04:24:50 | 18 | question again. |
| 04:24:51 | 19 | MR. PICKETT:  Sure. |
| 04:24:51 | 20 | MR. SAVERI:  Q.  Is it fair to say that the |
| 04:24:53 | 21 | point of Mr. Bock's message was to ▆▆▆▆▆▆ |
| 04:24:56 | 22 | ▆▆▆▆▆▆▆▆▆▆▆▆▆▆ |
| 04:25:02 | 23 | ▆▆▆▆▆▆▆▆▆▆▆▆▆ |
| 04:25:05 | 24 | ▆▆▆▆ |
| 04:25:07 | 25 | A.  It's hard -- I really have a hard time, because |

04:25:09  1    of the redactions, if this whole paragraph talks about a

04:25:14  2    single person or multiple people.  The top part talks

04:25:17  3    about the fact ███████████████████████████████

04:25:21  4    ███████ then it shifts to talking about another she.  Or

04:25:24  5    maybe the same she.  And then it says that someone

04:25:27  6    intends -- ████████████████████████████████████████

04:25:29  7    █████████████████████    ███████████████████████

04:25:33  8    ███████████████████████    So I think it's

04:25:36  9    all the same person, but I can't -- I can't put all the

04:25:39  10   pieces together.

04:25:40  11        Q.  Fair enough.  But whatever it was, you agreed

04:25:42  12   to it?

04:25:43  13        A.  Yes.

04:25:43  14        Q.  Okay.  And if you flip ahead in the document,

04:25:48  15   is it also fair to say that at least in this situation,

04:25:54  16   Google's efforts were successful because the person

04:25:58  17   decided to stay at Google?

04:26:01  18        A.  If that's the same person, yes.  That's, again,

04:26:05  19   redacted.

04:26:07  20             MR. SAVERI:  You can put that aside.

04:26:29  21             I'm sorry I've blown through all the numbers.

04:26:30  22   What's the next?

04:26:31  23             MR. PICKETT:  470.

04:26:34  24             (Whereupon, Exhibit 470 was marked for

04:26:34  25             identification.)

| | | |
|---|---|---|
| 04:26:36 | 1 | MR. SAVERI:  Q.  I've handed you what's |
| 04:26:37 | 2 | been marked as 470.  It has the Bates numbers |
| 04:26:53 | 3 | GOOG-HIGH-TECH-00455027 through 35. |
| 04:27:08 | 4 | It's rather a long document.  I'm going to ask |
| 04:27:11 | 5 | you about the portions of it that refer to you by name, |
| 04:27:15 | 6 | and then in particular the portions that are on page 2, |
| 04:27:23 | 7 | Summary of Key Guidance.  And then there is a section on |
| 04:27:27 | 8 | page 4 that talks about Talent Retention and Attraction. |
| 04:27:35 | 9 | A.  Well, you want me to read all that first? |
| 04:27:38 | 10 | Q.  I think you should read whatever you think you |
| 04:27:40 | 11 | need to be comfortable with the document. |
| 04:27:41 | 12 | A.  I don't remember the document, so it's -- |
| 04:27:44 | 13 | Q.  Okay. |
| 04:27:44 | 14 | A.  -- it will take a while. |
| 04:32:12 | 15 | Okay. |
| 04:32:12 | 16 | Q.  Have you had a chance to review the document? |
| 04:32:14 | 17 | A.  I have. |
| 04:32:15 | 18 | Q.  Now, at the top of the first page, the title of |
| 04:32:20 | 19 | the document says Minutes of a Regular Meeting of the |
| 04:32:24 | 20 | Leadership Development and Compensation Committee of the |
| 04:32:26 | 21 | Board of Directors of Google Inc. October 14th, 2009. |
| 04:32:31 | 22 | Do you see that? |
| 04:32:32 | 23 | A.  I do. |
| 04:32:35 | 24 | Q.  Is this an example of minutes of an LDCC |
| 04:32:39 | 25 | meeting that you attended? |

05:11:08  1   3308.

05:11:23  2          And Mr. Otellini, I'll just tell you the

05:11:25  3   question I'm going to ask.  I just want to know if this

05:11:27  4   is the revised compensation proposal that was also known

05:11:36  5   as the big bang that was approved by the Google board?

05:12:01  6      A.  I think so.

05:12:03  7      Q.  Now, the top of the -- the top of the email in

05:12:08  8   the Summary says, "On 13-October-2010, we presented a

05:12:12  9   compensation philosophy proposal to the LDCC and full

05:12:16 10   Board."

05:12:16 11          Do you see that?

05:12:17 12      A.  Yes.

05:12:18 13      Q.  Did the LDCC meet on that date?

05:12:21 14      A.  Well, if that's a board meeting, there is

05:12:24 15   typically an LDCC meeting in the morning.

05:12:26 16      Q.  Okay.  And just as a matter of corporate

05:12:29 17   governance, is it your recollection that there was an

05:12:32 18   LDCC meeting in the morning to discuss this?

05:12:35 19      A.  I think I just answered that question.

05:12:38 20      Q.  Was there a full board meeting in the

05:12:40 21   afternoon?

05:12:41 22      A.  I'd have to check my calendar.  This appears to

05:12:44 23   suggest that was the date.

05:12:46 24      Q.  And did you vote in favor of this?

05:12:49 25      A.  I don't know that there was a vote.  But I was

05:12:55  1   in favor of the program.

05:12:56  2        Q.  Was there anybody who participated in the LDCC

05:12:59  3   or the full board who was not in favor of the proposal?

05:13:02  4        A.  Not that I remember.

05:14:00  5            (Whereupon, Exhibit 474 was marked for

05:14:00  6            identification.)

05:14:23  7            MR. SAVERI:  Q.  I've handed you what's

05:14:24  8   been marked as Exhibit 474, Bates No. 76616DOC005972

05:14:34  9   to 973.

05:14:36  10           Draw your attention to the top of the first

05:14:38  11  page which is an email from Laszlo Bock to yourself with

05:14:42  12  copies to Eric Schmidt and Shona Brown and John Doerr

05:14:47  13  dated November 16, 2010.

05:14:48  14           Do you have that in front of you?

05:14:50  15       A.  I do.

05:14:51  16       Q.  Did you receive this email from Laszlo Bock on

05:14:53  17  or about the date that's indicated?

05:14:56  18       A.  Very likely.

05:14:57  19       Q.  Do you have any reason to believe you did not?

05:15:01  20       A.  No.

05:15:02  21       Q.  You can put that aside.

05:15:20  22           Did you believe the big bang was a success?

05:15:23  23       A.  I think it's still too soon to tell, but the

05:15:27  24  Google attrition rate in total is very good for the

05:15:32  25  Valley and their industry.  So as measured by that, it's

| | | |
|---|---|---|
| 05:15:38 | 1 | gotten better and we've retained a larger fraction of |
| 05:15:41 | 2 | our workforce. |
| 05:15:46 | 3 | (Whereupon, Exhibit 475 was marked for |
| 05:15:46 | 4 | identification.) |
| 05:16:06 | 5 | MR. SAVERI:  Q.  475 is an email from |
| 05:16:10 | 6 | Laszlo Bock to a number of individuals including |
| 05:16:17 | 7 | John Doerr, yourself, John Hennessy, Shirley |
| 05:16:20 | 8 | Tilghman and others. |
| 05:16:22 | 9 | And for purposes of the record, it's a document |
| 05:16:27 | 10 | with the Bates number Google 00252681. |
| 05:16:32 | 11 | Do you have that in front of you? |
| 05:16:33 | 12 | A.  Yes, I do. |
| 05:16:35 | 13 | Q.  Did you receive this email from Mr. Bock on or |
| 05:16:38 | 14 | about this date? |
| 05:16:39 | 15 | A.  Probably. |
| 05:16:40 | 16 | Q.  Now, were the individuals who were identified |
| 05:16:48 | 17 | here members of the Google board of directors? |
| 05:16:52 | 18 | A.  On the -- the "To" line, they are. |
| 05:16:59 | 19 | Q.  So in January of 2011, John Hennessy was a |
| 05:17:02 | 20 | member of the Google board, correct? |
| 05:17:04 | 21 | A.  Yes. |
| 05:17:05 | 22 | Q.  At the time, was he -- that's the John Hennessy |
| 05:17:07 | 23 | who is the president of Stanford? |
| 05:17:09 | 24 | A.  Yes. |
| 05:17:10 | 25 | Q.  And at this time, Shirley -- is it Tilghman? |

| | | |
|---|---|---|
| 05:17:16 | 1 | A.  Tilghman. |
| 05:17:18 | 2 | Q.  Was she the head of Princeton at the time? |
| 05:17:20 | 3 | A.  Yes. |
| 05:17:21 | 4 | Q.  And Ram Shriram -- okay.  And both Mr. Shriram |
| 05:17:29 | 5 | and Ann Mather were also members of the board? |
| 05:17:32 | 6 | A.  Yes. |
| 05:17:32 | 7 | Q.  And are the persons -- well, was Mr. Campbell a |
| 05:17:36 | 8 | member of the board at this time? |
| 05:17:37 | 9 | A.  No.  Nor has he ever been. |
| 05:17:42 | 10 | Q.  I understand that.  Mr. Schmidt, Larry Page, |
| 05:17:45 | 11 | Sergey Brin, Shona Brown, Kent Walker, at the time they |
| 05:17:49 | 12 | were all employees of Google, correct? |
| 05:17:51 | 13 | A.  Yes, they were. |
| 05:17:53 | 14 | Q.  Now, Mr. Bock writes, "At the January 12 Board |
| 05:17:56 | 15 | meeting, Sergey," that's Sergey Brin, "asked that we |
| 05:17:59 | 16 | provide the Board the number of hires we have made from |
| 05:18:01 | 17 | Facebook and Twitter, and that we include those data in |
| 05:18:04 | 18 | the Board materials going forward." |
| 05:18:06 | 19 | Do you see that? |
| 05:18:07 | 20 | A.  Yes. |
| 05:18:07 | 21 | Q.  And then there are some statistics set forth |
| 05:18:09 | 22 | regarding that subject. |
| 05:18:10 | 23 | Do you see that? |
| 05:18:11 | 24 | A.  I do. |
| 05:18:12 | 25 | Q.  Was it your understanding that this represented |

Deposition of Paul Otellini                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

05:18:15  1    an improvement at Google in its efforts to retain or

05:18:22  2    hire employees?

05:18:25  3        A.  I don't think this speaks to that.  This speaks

05:18:28  4    specifically to employees that came into Google from

05:18:32  5    these firms.

05:18:34  6        Q.  Well, prior to this time, had Google been able

05:18:39  7    to recruit employees from these firms at similar levels?

05:18:46  8    Do you recall?

05:18:47  9        A.  I don't know.  I don't have the data.

05:18:49  10        Q.  Was that data that was provided to the Google

05:18:52  11    board?  That sort of data?

05:18:56  12            MR. RUBIN:  Objection.  Vague.

05:18:59  13            THE WITNESS:  I don't believe that we'd ever

05:19:01  14    asked for data in terms of hiring into Google from those

05:19:05  15    firms before this January 12th request where Sergey

05:19:10  16    requested it.

05:19:30  17            MR. SAVERI:  Q.  I'm going to switch

05:19:32  18    subjects for a second.  We've talked a couple times,

05:19:43  19    and perhaps more than a couple times today, about

05:19:45  20    something called focal; do you recall that?

05:19:48  21        A.  I mentioned the word.

05:19:54  22        Q.  What -- can you describe for me generally what

05:19:57  23    focal was with respect to the setting of compensation as

05:20:02  24    a general matter at Intel?

05:20:04  25        A.  Focal was the annual review process -- is the

05:20:09  1    annual review process.  Every employee in the company,

05:20:12  2    top to bottom, is reviewed, ranked and rated in terms of

05:20:17  3    their performance.  A performance assessment evaluation

05:20:21  4    is written and delivered to the employee.

05:20:25  5         As part of that process, people's compensation

05:20:27  6    is reviewed and adjustments are made, promotions are

05:20:33  7    made, performance warnings may be given.  A number of

05:20:38  8    things.

05:20:39  9         Q.  Was there anyone who worked for Intel whose

05:20:42 10    compensation wasn't part of the focal process?

05:20:47 11         A.  Yes.  The 16(b) officers.

05:20:50 12         Q.  Other than the 16(b) officers, was there

05:20:53 13    anybody whose compensation was not set --

05:21:00 14         A.  Through that process?  No.

05:21:02 15         Q.  And that included you?

05:21:04 16         A.  I'm a 16(b) officer.

05:21:05 17         Q.  I'm sorry.  Fair enough.

05:21:07 18         Now, as the CEO of the company, what was your

05:21:18 19    role in the focal process?

05:21:21 20         A.  I would approve the annual budget for the merit

05:21:28 21    increases, approve the annual budget for promotions in

05:21:33 22    terms of cost.  We would look at that by major

05:21:39 23    geography, major country, essentially.  Look at the

05:21:43 24    number of employees, the data behind that in terms of

05:21:47 25    market movements, attrition, those kinds of things.

05:21:49  1        We'd also look at the overall budget for stock,

05:21:54  2    both options and restricted shares and approve that.

05:22:00  3    That approval I would make, and then it would go -- on

05:22:02  4    the stock would go to the board for final approval.  And

05:22:10  5    I would do the direct evaluation and promotion

05:22:16  6    recommendations for my direct staff and for corporate

05:22:19  7    officers.

05:22:28  8        Q.  And on an employee-by-employee basis, what were

05:22:31  9    the basic elements of compensation that were set by the

05:22:34 10    focal process?

05:22:35 11        A.  Well, nothing on an employee-by-employee

05:22:38 12    basis --

05:22:38 13        Q.  That was --

05:22:39 14        A.  -- my level.  Right?

05:22:40 15        Q.  That was a poor question.  As part of the focal

05:22:43 16    process, was base compensation set?

05:22:45 17        A.  For whom?

05:22:47 18        Q.  For --

05:22:49 19        A.  For any given employee?  By his or her manager,

05:22:53 20    yes.

05:22:55 21        Q.  Were salary ranges established for particular

05:23:02 22    employee grades as part of the focal process?

05:23:06 23        A.  By job class and grade, yes, the human

05:23:09 24    resources department would have these large ranges of

05:23:12 25    compensation that would vary by country, by degree, by

05:23:18  1    were people working in engineering and nonengineering

05:23:20  2    and so forth.  And they would update those -- at least

05:23:25  3    review those and update them as needed.

05:23:28  4         Q.  As the CEO, did you have -- was it part of your

05:23:33  5    responsibility to set ranges for particular job

05:23:36  6    categories or job grades as part of the focal process?

05:23:39  7         A.  Not -- not -- not for the rank and file.  I

05:23:42  8    certainly would be involved in discussing any changes at

05:23:45  9    the executive ranks.

05:23:47 10         Q.  So organizationally, who was responsible for

05:23:50 11    setting salary ranges for particular employee grades

05:23:55 12    or --

05:23:57 13         A.  You used the word setting.  There's an entire

05:24:01 14    compensation department that's looking at, you know, the

05:24:04 15    120 countries in which we operate, what the markets are,

05:24:08 16    gathering data.  And that rolls up and is approved by --

05:24:12 17    at various levels in the organization by the various

05:24:15 18    managers who have oversee, whether it's at a certain

05:24:18 19    geography or at a corporate level.  Oversight.

05:24:28 20         Q.  Was there a particular person or department

05:24:33 21    that was responsible for the focal process?  Was it HR?

05:24:38 22         A.  HR -- well, HR would manage the process.  At

05:24:41 23    the end of the day, the employee's direct manager is the

05:24:45 24    one responsible.

05:24:47 25         Q.  Well, in terms of the -- well, would -- as a

05:24:50  1    matter of practice, did the HR department make a

05:24:52  2    recommendation to you as the CEO about -- well, what

05:24:57  3    kind of recommendations would they make to you as part

05:24:59  4    of the focal process?

05:25:01  5        A.  Well, I mentioned that already.  That was all

05:25:03  6    of -- the overall by country increases in merit and

05:25:08  7    promotion.  Budgets.  And I talked about the executive

05:25:12  8    ranks and the stock ranks.

05:25:14  9        Q.  Was there a particular time of year that the

05:25:15 10    focal process was started in?

05:25:18 11        A.  Yes.  Two different times of the year.  It

05:25:21 12    is -- the focal was delivered in April for all but the

05:25:25 13    officer ranks at the company, and is delivered in

05:25:29 14    January/February for the officer ranks.

05:25:32 15        Q.  What is T comp?

05:25:34 16        A.  That's a shorthand phrase for total

05:25:36 17    compensation.

05:25:40 18        Q.  And was T comp set as part of the focal process

05:25:45 19    too?

05:25:46 20        A.  T comp is an individual level number.  It

05:25:52 21    includes the individual's base salary, his or her bonus,

05:25:56 22    any of the variable pay packages and the equity grants.

05:26:00 23    So there is no T comp aggregate, except the large number

05:26:04 24    which is our total compensation cost.

05:26:14 25        Q.  Now, as a general matter, did you believe that

05:26:24 1    Intel established compensation based upon the market?

05:26:28 2        A.  That's been our principle and -- I'm sorry.  We

05:26:32 3    established -- we establish the ranges based upon our

05:26:35 4    view of the market, and then we target individuals

05:26:39 5    inside those based upon their experience, performance,

05:26:44 6    time in grade, those kinds of things.

05:27:40 7            (Whereupon, Exhibit 476 was marked for

05:27:40 8            identification.)

05:28:04 9        (Discussion off the record.)

05:28:12 10           MR. SAVERI:  Q.  Mr. Otellini, I've handed

05:28:22 11   you what's been marked as Exhibit 476.  It has the

05:28:23 12   Bates No. 76616DOC000763.

05:28:35 13       The top of the document is an email from you to

05:28:39 14   someone named Mark Fichtner.  Do you see that?

05:28:44 15       A.  Yes.

05:28:45 16       Q.  Did you write this email to Mr. Fichtner?

05:28:48 17       A.  Yes, I did.

05:28:49 18       Q.  And you say, "Our pay philosophy is

05:28:51 19   straightforward.  We pay salary and bonus based upon

05:28:54 20   market.  We remain very competitive there."

05:28:57 21       Do you see that?

05:28:58 22       A.  Yes.

05:28:58 23       Q.  Is that a -- an accurate statement?

05:29:00 24       A.  Yes.

05:29:08 25       Q.  Now, from time to time, did -- were you

05:52:12   1          Q.  But my question, sir, was after you wrote this

05:52:14   2    email, did you ever make any subsequent communication

05:52:18   3    to -- with respect to the subject further clarifying any

05:52:25   4    ambiguity in your response?

05:52:27   5          A.  You asked that question, I said no, and then I

05:52:29   6    went on and explained.

05:52:30   7          Q.  Now, when did you first -- subsequent to

05:52:46   8    writing your email, did you have any conversation with

05:52:52   9    Ms. Thompson or anybody else about this subject where

05:52:54  10    they raised any questions about what you meant in this

05:52:58  11    email?

05:52:59  12          A.  Not that I recall.

05:53:02  13              MR. SAVERI:  I think I'm done.  I'm certain I'm

05:53:04  14    done.

05:53:05  15              Thank you for your time, sir.

05:53:06  16              THE WITNESS:  Good.  I think I'm done.

05:53:08  17              MR. PICKETT:  Thank you.

05:53:08  18              THE VIDEOGRAPHER:  This is the end of video 4

05:53:09  19    of 4 and concludes today's proceedings.

05:53:12  20              The master videos will be retained by Jordan

05:53:13  21    Media.

05:53:15  22              We are now off the record and the time is 5:53.

06:47:44  23          (The deposition concluded at 5:53 PM)

06:47:44  24

          25

1          I, Gina V. Carbone, Certified Shorthand

2    Reporter licensed in the State of California, License

3    No. 8249, hereby certify that the deponent was by me

4    first duly sworn and the foregoing testimony was

5    reported by me and was thereafter transcribed with

6    computer-aided transcription; that the foregoing is a

7    full, complete, and true record of said proceedings.

8          I further certify that I am not of counsel or

9    attorney for either of any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12          The dismantling, unsealing, or unbinding of

13   the original transcript will render the reporter's

14   certificates null and void.

15          In witness whereof, I have hereunto set my

16   hand this day:  February 1, 2013.

17          _____ Reading and Signing was requested.

18          _____ Reading and Signing was waived.

19          ___X___ Reading and signing was not requested.

20

21

22          _____

23          GINA  V. CARBONE

24          CSR 8249, RPR, CCRR

25