# EXHIBIT 90 TO
# HARVEY DECLARATION
# REDACTED VERSION



**Economic Analysis of Google's Do Not Cold Call Policy**

**Dennis Carlton**
**Mary Coleman**
**David Weiskopf**

**April 1, 2010**

**Confidential Treatment Requested**

1101 K STREET NW, 8TH FLOOR, WASHINGTON, DC 20005 ┊ 202 589 3460 MAIN  202 589 3480 FAX ┊ COMPASSLEXECON.COM

CAMBRIDGE ┊ CHICAGO ┊ LOS ANGELES ┊ OAKLAND ┊ SAN FRANCISCO ┊ TUCSON ┊ WASHINGTON DC

CONFIDENTIAL ATTORNEYS EYES ONLY                              GOOG-HIGH TECH-00027965

# I.    Introduction

The goal of the antitrust laws is to enhance overall consumer or society's welfare by condemning conduct that unduly restricts competition and results in higher prices, lower output, reduced innovation, lower quality or other anticompetitive effects.  Thus the central inquiry in antitrust matters is whether the particular conduct at issue has resulted or is likely to result in anticompetitive harm.

The conduct of a firm or firms in the context of a potential antitrust violation can be analyzed using either the rule of reason or per se approach.  Under the rule of reason, a full inquiry is conducted regarding the competitive effects of the conduct under consideration in the markets at issue.  This can often be a complex and time consuming inquiry.  By contrast, conduct treated under a per se approach is presumed to be anticompetitive; establishing that the conduct occurred is enough to result in antitrust liability without the need to show directly anticompetitive harm from the behavior.  The economic basis of the per se approach is that certain conduct is "so unlikely to be procompetitive that the judicial efficiency of immediate condemnation without any detailed inquiry into the effects of the scheme outweighs the cost of banning any 'efficient' or procompetitive [conduct]."[1]

Determining that a particular behavior should be designated as per se illegal is not something that should be done lightly as it is important not to condemn behavior that may have

---

[1] Carlton, D., R. Gertner and A. Rosenfield, "Communication Among Competitors: Game Theory and Antitrust," *George Mason Law Review*, Vol. 5:3, 1997 at 425.

CONFIDENTIAL ATTORNEYS EYES ONLY                    GOOG-HIGH TECH-00027966

procompetitive benefits.  This is especially so when the behavior is unlikely to harm competition.
Rather, per se treatment should only be afforded to behavior, such as price fixing cartels, where
there is substantial experience showing that such behavior generally is likely to result in
competitive harm with little likelihood of procompetitive benefits from the behavior.  Where
there is limited experience with assessing the competitive impact of a type of behavior, such as
in the current case, use of a per se illegality rule is inappropriate, particularly given the general
trend away from the use of per se rules in the United States.

Thus, whether conduct should be treated as per se or under the rule of reason depends on
how likely are procompetitive versus anticompetitive effects from the conduct.  This assessment
has two components.  First, does the conduct have, at least in some cases, a plausible
procompetitive justification? If the answer is yes, that suggests the use of the rule of reason.
Second, is the conduct likely to cause competitive harm as well as have procompetitive effects?
If yes, then under the rule of reason, one has to balance the benefits against the harms.  However,
if the answer to the second inquiry is no, then the conclusion under the rule of reason is simple.
Allow the behavior because it can have only benefits and not any harm.  Of course, in cases
where anticompetitive harm is not likely, it makes little sense to apply a per se illegality rule,
whatever the potential procompetitive justifications for the behavior.  Not surprisingly, the per se
approach has generally been applied to a limited set of practices such as "naked" price-fixing
among horizontal competitors.  Such behavior, where the only purpose is to increase price and
reduce output, is assumed to reduce competition, and there would generally not be a
procompetitive justification for the behavior.

CONFIDENTIAL ATTORNEYS EYES ONLY                                                         GOOG-HIGH TECH-00027967

By contrast, collaboration among firms, as well as a wide variety of other conduct, has generally been considered under a rule of reason approach.[2]  The treatment of restrictions on the behavior of firms associated with the collaboration varies depending on whether these "restraints" are considered ancillary or "naked."  Whereas naked restraints lack any procompetitive virtue, ancillary restraints are viewed as potentially important to the functioning of the (implicitly) procompetitive collaboration itself.[3]  From an economic viewpoint, ancillary restraints should be analyzed using a rule of reason approach.

This paper addresses two questions.  First, from an economic viewpoint, should certain conduct of Google, specifically its "Do Not Cold Call" (DNCC) policy, be analyzed using the per se or rule of reason approach?[4]  We explain that because the policy or ones like it can well have procompetitive justifications, as we understand has been acknowledged by Department of

---

[2] *See*, for example, Shapiro, C. and R.D. Willig, "On the Antitrust Treatment of Production Joint Ventures," *Journal of Economic Perspectives*, Vol. 4, No. 3 1990 at 118 ("These policies [of the FTC and DOJ regarding production joint ventures] are founded on the rule of reason . . . the Department of Justice analyzes a horizontal production joint venture by first determining whether it genuinely relates to some form of economic integration of the parties' operations, rather than merely being a label for a 'naked agreement' on price or output among competitors.  Genuine production joint ventures are assessed for anticompetitive potential . . . and full account is taken of any procompetitive efficiencies.") and Werden, G.J., "Antitrust Analysis of Joint Ventures: An Overview," *Antitrust Law Journal*, Vol. 66, 1998 at 717 ("However, the only per se illegal joint ventures are those that are merely cartels.  Any genuine economic integration that plausibly could confer nontrivial social benefits suffices to take a joint venture outside the purview of the per se rule.").

[3] *See*, for example, Werden, G.J., "Antitrust Analysis of Joint Ventures: An Overview," *Antitrust Law Journal*, Vol. 66, 1998 at 706 ("An ancillary restraint is one that is reasonably necessary to the accomplishment of a venture's efficiency-enhancing purposes.").  Also *see* Werden, G.J., "When Does a Joint Venture Act as a Single Economic Entity?," *The CPI Antitrust Journal*, March 2010 (2) at 7 ("The treatment of a restraint on the conduct of a joint venture's participants outside the venture depends on whether it is ancillary, i.e., whether it 'has an 'organic connection' to the venture's operations and serves to make the venture operate more efficiently or effectively.'").

[4] We understand that DOJ staff alleges that there were bilateral agreements between Google and five other parties related to the DNCC policy.  For the purposes of this analysis, we assume that such agreements existed although we understand that whether there were such agreements is disputed by the parties.  We express no opinion as to whether such agreements existed.  We do not discuss IAC/Ask in this paper because it never appeared on Google's DNCC list.

3

Justice (DOJ) staff, it is appropriate to use the rule of reason.  Providing assurance to a collaborating firm that its employees will not be at risk of recruitment initiated by the partner can remove disincentives to collaboration and thereby lead to efficient collaboration.  We note here that the policy is not a "no hiring" policy where Google cannot hire from its collaboration partners but rather a much less restrictive policy where Google does not cold call employees of some of its collaboration partners.[5]

We also note that, if some form of restriction on cold calling (or recruiting generally) has a potential procompetitive justification, analysis of the particular restriction at issue requires a rule of reason approach to determine whether the net benefits from the restriction outweigh the potential harm.  The very notion that a particular restriction might be too broad indicates that one is attempting to make this balance.  It would be inappropriate to classify the restrictions that are "too broad" as per se illegal since determining whether the restrictions are too broad requires in essence a rule of reason analysis.

Second, is Google's conduct of the type that is likely to cause an antitrust harm, even assuming that there are no procompetitive justifications for it?  We explain that even in the absence of a procompetitive justification for the Google policy, there are likely no competitive harms from the DNCC policy.  Google's DNCC policy did not prevent Google from recruiting and hiring aggressively, even from among the limited group of collaboration partners implicated

---

[5] We would understand that there might be more of a debate as to whether a "no hiring" (or even possibly a do not cold call) agreement might be per se if it involved firms that were not collaboration partners (although then one would still need to assess whether there are other procompetitive justifications that might exist).  We understand, however, that all the companies at issue in this case had collaborations with Google.

4

by its DNCC policy.[6]  Throughout this time period, Google hired thousands of employees per year.  There is no indication that Google restricted its hiring or recruiting behavior overall.  Without an impact on Google's total hires, there can be no labor market impact.  Google recruiters had free rein beyond the DNCC policy, and Google recruited and hired numerous employees from the collaboration partners on the DNCC list.  Moreover, Google comprises such a small share of the relevant labor market that it is inconceivable that its behavior from the DNCC policy affected wage rates or total hiring.

That the policy is unlikely to cause antitrust harm is consistent with the existence of a procompetitive rationale for the policy, otherwise it would not make sense for Google to implement a policy that, if anything, would tend to increase its recruiting costs.  As noted above, the policy made it easier for Google to participate in efficiency enhancing collaborations with its partners because it allowed Google to tell its partners that it would not try to recruit the partners' employees unless those employees showed interest in potentially changing jobs.  It therefore follows that under the rule of reason there should be no antitrust liability.

This paper is organized as follows.  In Section II, we briefly describe Google's DNCC policy and the DOJ staff's allegation that it warrants per se treatment.  In Section III, we discuss the plausible procompetitive justifications for the policy.  Section IV establishes that the policy is

---

[6] Note, as discussed below, that Google's DNCC policy (Google Staffing's Hiring Policies and Protocols at 7 (Revision 1.7.2008)) includes the following language: ". . . we would accept internal or external references that indicated that an individual was 'looking' . . . And, of course, we will also accept direct solicitation from a candidate (this will most likely come into play when an individual's peer has recently joined us)."

CONFIDENTIAL ATTORNEYS EYES ONLY                    GOOG-HIGH TECH-00027970

unlikely to result in competitive harm even in the absence of a procompetitive justification, and

Section V provides our conclusion.

## II.   Google's DNCC Policy and DOJ Staff's Allegation That It Warrants Per Se Treatment

Google's DNCC policy is described in Google Staffing's "Hiring Policies and Protocols"

manual.  For a list of specific companies (which changed over time), Google instructed its

recruiters "Not to directly cold call into those companies . . . But,  . . . would accept internal or

external references that indicated that an individual was 'looking' . . . And, of course, . . . will

also accept direct solicitation from a candidate."[7]  As reflected in the manual, Google's policy

required its recruiters to refrain from "cold calling" all or a subset of employees working at a

limited number of its collaboration partners, such as Apple and IBM.  The policy was a narrow

limitation relating to one specific approach to recruiting.  Google's DNCC policy was not a "do

not hire" policy; in fact, the policy itself explicitly allows Google to pursue candidates employed

by companies on the DNCC list.[8]

We understand that DOJ staff is arguing that "bilateral agreements precluding unsolicited

recruiting are *per se* illegal."[9]  We also understand that DOJ staff considers the restraint as

overbroad to accomplish any potential procompetitive benefits from a restriction on unsolicited

recruiting.

_____

[7] Google Staffing's Hiring Policies and Protocols at 7 (Revision 1.7.2008).

[8] We confirmed this during a phone interview with Laszlo Bock, Vice President of People Operations at Google.

[9] "Joint Submission Regarding the Application of *Per Se* Treatment to Employee Non-Solicitation Agreements" (Paper submitted to US Dept of Justice on November 25, 2009) at 1.

6

### III.   Plausible Procompetitive Justifications Exist for Google's DNCC Policy

#### A.   Reasons for Limitations on Cold Calling of Business Partner Employees

During the time period when Google's DNCC policy was implemented, Google was growing very rapidly and was constantly seeking to add many employees.  At its peak, Google was receiving as many as 7,000 unsolicited resumes per day.[10]  From Google's beginnings in 1998 through early 2010, the firm grew from two employees to approximately 20,000.  This growth required rapid rates of hiring.  Toward the end of 2005, Google was hiring roughly nine new employees per day.  By 2007, the number of new hires grew to as many as 40 per day.[11]  As seen in Exhibit 1, Google hired several thousand employees per year from 2006 to 2009.

Recruiting employees, particularly a large number at once, is a time-consuming, costly and uncertain enterprise – both for the recruiting firm and potential employees.  Thus, firms that are growing will employ various methods to attempt to identify potential candidates and assess whether the candidates are likely a good fit for their firm.  For instance, during this time, Google posted math problems on billboards; threw massive parties to celebrate the opening of new offices; and publicized its attractiveness as a place to work (employee perks include free gourmet

---

[10] We learned this during a phone interview with Laszlo Bock, Vice President of People Operations at Google.

[11] "Google's Do Not Cold Call List" (White paper submitted to US Dept of Justice on January 18, 2010 by Cleary Gottlieb Steen & Hamilton) at 3.

CONFIDENTIAL ATTORNEYS EYES ONLY                    GOOG-HIGH TECH-00027972

food and onsite laundry).  Further, Google had as many as 800 recruiters while also working with external recruiting agencies.[12]

Amidst its rapid expansion, Google was also involved in collaborations with other firms (e.g., Apple and Intel).  In these collaborations, Google would have interactions with employees of its partners and gain information about the qualifications of those employees (and potentially indirectly information about other employees).  Collaboration partners would reasonably have concerns about whether exposing their employees to Google might lower Google's costs of identifying potential candidates from their firm and thus increase the likelihood of Google hiring away valued employees.  This would be a particular concern because for many partners, Google was expanding rapidly while the partners, such as Intel and IBM, were contracting or growing much less rapidly.[13]  Such a threat might make a partner less likely to collaborate or include its most valued employees, thus making it less likely that the procompetitive results of the collaboration would be achieved.  As a result, a restriction on Google initiating recruitment of employees associated with the collaboration may be a reasonable method to make partners more willing to participate in procompetitive collaborations.

---

[12] "Google's Do Not Cold Call List" (White paper submitted to US Dept of Justice on January 18, 2010 by Cleary Gottlieb Steen & Hamilton) at 3-5.

[13] See Exhibit 2, which shows for Google and Apple, IBM, Intel and Intuit, the compound annual growth rate in the number of employees between fiscal years 2005 to 2009.  This exhibit indicates that Google's employment grew at a compound annual rate of approximately 37%, whereas, for example, Intel's employment decreased at an annual rate of roughly 5% and IBM's employment grew at an annual rate of approximately 5%.  While Apple was also growing rapidly during this period, Google grew at a faster rate.

8

CONFIDENTIAL ATTORNEYS EYES ONLY                                                   GOOG-HIGH TECH-00027973

There is evidence indicating the reluctance of firms to collaborate with Google in the absence of limitations on Google's ability to recruit from collaborators.  For example, the following two executive-level e-mail exchanges took place between IBM and Google.[14]

> "I need to speak with you [Eric Schmidt, CEO of Google] about an important relationship issue between our companies.  It has been reported to me [Nick Donofrio, EVP, Innovation and Technology, IBM] that Google continues to recruit key IBM technical personnel.  This is difficult to understand if Google is serious about establishing deep business partnerships with IBM."[15]

> "As Nick Donofrio may have already discussed with you this kind of aggressive targeting of IBM employees for recruitment can only negatively affect our ability to work together. I understand from Nick, in reference to our companies' present and planned working relationship, you intended to stop this aggressive targeting of IBM employees."[16]

In addition, Mr. Wladawsky-Berger, IBM's VP, Strategy & Innovation said:

---

[14] We have also reviewed two submissions to DOJ by Hogan & Hartson, counsel for IBM ("The Anti-Trust Division Should Close Its Investigation of IBM as There Is No Basis for Finding a Per Se Violation of the Law", submitted on January 7, 2010 and letter from Janet McDavid of Hogan & Hartson to James Tierney of DOJ dated January 27, 2010).  These submissions clearly articulate and provide a wealth of evidence supporting the reluctance of IBM to collaborate with Google in the absence of limitations on Google's ability to recruit from IBM.  *See*, for example, "The Anti-Trust Division Should Close Its Investigation of IBM as There Is No Basis for Finding a Per Se Violation of the Law" at 2-4, 11 ███████████████████████████████████████████ ███████████████████████████████████████ [footnote omitted].  This concern, which IBM expressed throughout the years of IBM and Google's partnership, surfaced in contemporaneous documents within IBM and communications between IBM and Google.").  *See*, for example, the letter from Janet McDavid of Hogan & Hartson to James Tierney of DOJ dated January 27, 2010 at 4-8 ("As of early March 2006, IBM's ███████████████████████████████████ This concern about the impact of employee recruitment on the companies' collaborative relationship runs throughout the communications in which IBM and Google discussed the solicitation issue.").

[15] *See* GOOG-REC-100012881 (E-mail from Nicholas Donofrio, Executive Vice President, Innovation & Technology, IBM to Eric Schmidt, Chairman of the Board and Chief Executive Officer of Google dated April 6, 2007).

[16] *See* 12913004 (E-mail from Rodney C. Adkins, Senior Vice President of Development & Manufacturing, IBM Systems & Technology Group to Dr. Eric Schmidt, Chairman of the Board and Chief Executive Officer of Google dated August 13, 2007).

CONFIDENTIAL ATTORNEYS EYES ONLY                    GOOG-HIGH TECH-00027974

"[I]f Google was going to continue to hire away their A-team talent then 'I wonder if part of the deal is getting the A-team to partner is an agreement that we will not raid each other's top talent. Otherwise we may need to reserve the A-team for other partners . . . and send the next level teams to those partners who are not willing to play by the professional business etiquette rules."[17]

As another example, Google was certainly aware of Apple's sensitivity regarding Google's recruiting from Apple given that Google and Apple collaborated extensively with each other. According to an e-mail from Google to Apple in March 2006:

". . . Google's relationship with Apple is extremely important to us. If that relationship is [in] any way threatened by this hire, please let me know, and we will pass on this opportunity."[18]

Apple's sensitivity about important collaboration partners targeting its employees underscores the idea that collaborations could be jeopardized by the fear of losing key employees to the collaboration partner. During Google's DNCC policy with Apple, Google and Apple collaborated extensively, jointly pursuing numerous technology projects over the past five years (as discussed below). Thus, an important potential procompetitive effect of Google's DNCC policy is the incremental number (and improved quality) of procompetitive collaborations.

---

[17] *See* "The Anti-Trust Division Should Close Its Investigation of IBM as There Is No Basis for Finding a Per Se Violation of the Law" at 16.

[18] 176APPLE002151 (E-mail from Alan Eustace, SVP, Engineering at Google to Steve Jobs of Apple dated March 28, 2006). There is also evidence of sensitivity by Google's collaboration partners (e.g., Apple) regarding collaborations with others in the absence of limitations on recruiting. See, for example, 176APPLE002158 (E-mail from Mark Bentley of Apple to Patrick Burke and Peggie Louie of Apple dated December 11, 2006: "Are one of your recruiters going into Aspyr by chance? . . . Ron Okamoto just called me fairly upset. They are a fairly critical partner of ours, and their CEO just called Ron to ask him to get us to back way off. I told him I would put a stop to it asap.").

10

CONFIDENTIAL ATTORNEYS EYES ONLY

GOOG-HIGH TECH-00027975

There is also evidence that the timing of the various collaborations between Google and its partners, including collaborations memorialized in written agreements, coincided with the period of time when the DNCC policies with those partners was in force. We note that as a general matter, collaborations are often informal in nature or are not publicly disclosed. Below, we discuss selected collaborations of which we are aware, which clearly represent the "lower bound" of actual collaborations between Google and its partners.

Google's DNCC policy for Apple began in March 2005. The two firms have collaborated extensively over the past five years. As an example, Google began working with Apple on a collaboration involving iTunes in 2005. Further, Google's Android and Chrome browser team and Apple's Safari browser team have worked together for many years on bugs and proposed modifications to Apple's open-source WebKit project (which develops the engine for the Chrome and Safari browsers, as well as for others). Notably, Google expects to continue to work with Apple on the WebKit project well into the future.[19] Google and Apple have also collaborated on projects related to their consumer services on an ongoing basis.[20] For example, there were at least three agreements between Google's YouTube and Apple with effective dates in 2007 and 2008: a Product Integration Agreement (effective May 25, 2007); an Upload API License Agreement (effective August 8, 2007); and a Master iTunes Affiliate Agreement (effective January 30, 2008).

---

[19] "Google's Do Not Cold Call List" (White paper submitted to US Dept of Justice on January 18, 2010 by Cleary Gottlieb Steen & Hamilton) at 14.

[20] "Google's Do Not Cold Call List" (White paper submitted to US Dept of Justice on January 18, 2010 by Cleary Gottlieb Steen & Hamilton) at 14.

11

CONFIDENTIAL ATTORNEYS EYES ONLY                                        GOOG-HIGH TECH-00027976

As with Apple, Google's DNCC policy for Intel also began in March 2005.  In early 2006, a collaboration opportunity related to customized, energy-efficient computer chips began to take shape.  By the middle of 2007, this joint effort led to the formation of the Climate Savers Computing Initiative, a project focused on the creation of energy-efficient computers and components.  Google and Intel have also worked extensively on a wireless network initiative which analysts have praised for helping to launch 4G wireless technology.  Further, the two firms have collaborated on several projects to integrate software and services.  For example, in 2006, the two companies collaborated in the video search area by incorporating Google Video into Intel's Viiv digital media platform.[21]

Google's DNCC policy for IBM started in March 2007.  Prior to that date, Google and IBM were involved in numerous collaborations.  For example, for Lotus Notes customers who



---

[21] "Google's Do Not Cold Call List" (White paper submitted to US Dept of Justice on January 18, 2010 by Cleary Gottlieb Steen & Hamilton) at 20-21.

[22] This information was provided to us by Hogan & Hartson, counsel for IBM.

12

CONFIDENTIAL ATTORNEYS EYES ONLY

GOOG-HIGH TECH-00027977



Google's DNCC policy for Intuit began in April 2006 and was broadened in June 2007 to include all Intuit employees.  The companies collaborated extensively beginning no later than the middle of 2006 and the two companies have continued to collaborate with one another.  The collaboration included the integration of Google Desktop Search, Google Maps, Google AdWords, and Google Base into Intuit's QuickBooks 2007 products.[25]  On October 15, 2007, Google and Intuit signed an Amended and Restated Google-Intuit Product and Promotion Agreement (the original agreement was entered into on July 10, 2006).

---

[23] "Google's Do Not Cold Call List" (White paper submitted to US Dept of Justice on January 18, 2010 by Cleary Gottlieb Steen & Hamilton) at 24-25.

[24] Please *see* "The Anti-Trust Division Should Close Its Investigation of IBM as There Is No Basis for Finding a Per Se Violation of the Law", submitted on January 7, 2010 at 2.

[25] "Google's Do Not Cold Call List" (White paper submitted to US Dept of Justice on January 18, 2010 by Cleary Gottlieb Steen & Hamilton) at 28-29.

13

CONFIDENTIAL ATTORNEYS EYES ONLY                    GOOG-HIGH TECH-00027978

**B.      DOJ Staff Apparently Recognizes Potential Benefits of Google's DNCC Policy**

We understand that DOJ staff has indicated that a primary concern with Google's DNCC policy is that it is too broad (i.e., covers more employees than necessary).[26]  By suggesting that a narrower list of DNCC employees would be acceptable while the actual conduct is not, DOJ staff is implicitly conceding that some sort of restriction on cold calling by recruiters can be procompetitive because it facilitates efficient collaboration amongst firms.  This concession, in turn, implies that all such restrictions including the DNCC policy may be reasonable since it is an ancillary restraint and should be evaluated using the rule of reason to inquire whether the restraint is too broad.  Such an inquiry requires an assessment of the potential competitive harm from the restraint as enacted relative to potential benefits from the restraint.  Again, it is not appropriate to deem the "too broad" restrictions as per se illegal while treating the "narrower restrictions" as rule of reason since assessing whether a restriction is too broad in essence requires a rule of reason analysis.  Moreover, such an approach would likely create inefficiencies by deterring procompetitive restrictions since firms would not know a priori whether their approach would be judged too broad or not.

**C.      DNCC Policy Is a Reasonable Approach**

In the context of Google's phenomenal growth and its aggressive recruiting, the Google policy reflected in the DNCC list appears to be reasonable.  Compared to using employee lists, as

---

[26] "Joint Submission Regarding the Application of *Per Se* Treatment to Employee Non-Solicitation Agreements" (Paper submitted to US Dept of Justice on November 25, 2009) at 1.

14

suggested by the DOJ staff, or other ways of selecting which employees not to cold call, DNCC lists have some distinct advantages.  By focusing on employees at a small group of companies, the hundreds of recruiters working for Google are given an efficient "rule" that is easy to communicate and implement.  When Google communicates with its recruiters about whom not to cold call, it can provide a relatively short list of companies (including subsidiaries).  These lists, in turn, provide very straightforward guidance to recruiters:  Simply do not cold call any employees from these companies.  This may be particularly important in light of frequent turnover among recruiters and the relatively short duration of Google's contracts with many recruiters (a year or less).[27]  As mentioned above, Google had as many as 800 recruiters at a given time.  Many of those were contract recruiters who stayed with Google for no more than 12 months.[28]

In contrast, it would be costly and resource intensive to maintain, distribute and monitor accurate, real-time up-to-date lists of employee names as guidance on whom not to cold call. Lists of employee names would need to be constantly updated and communicated to all recruiters because, for example:

- Employees join and leave firms on a regular basis;
- Collaborations, however defined, are fluid and change, start and stop all the time – the members of collaboration teams also may change frequently; and
- Individuals get married (or divorced) and may change their last names.

---

[27] "Google's Do Not Cold Call List" (White paper submitted to US Dept of Justice on January 18, 2010 by Cleary Gottlieb Steen & Hamilton) at 5.

[28] "Google's Do Not Cold Call List" (White paper submitted to US Dept of Justice on January 18, 2010 by Cleary Gottlieb Steen & Hamilton) at 5.

15

CONFIDENTIAL ATTORNEYS EYES ONLY

GOOG-HIGH TECH-00027980

Another potential shortcoming of using narrowly targeted employee lists as DNCC lists is that collaboration partners might be concerned that the creation of such lists by the partner would signal to Google which employees the partner values most.  This could provide information regarding whom Google should pursue if the employee approaches Google in some way other than a cold call or at the end of the collaboration.  In addition, the partner might be concerned that recruiters could potentially use such lists when recruiting for firms other than Google.[29]

## IV.   Google's DNCC Policy is Unlikely to Result in Competitive Harm Even in the Absence of a Procompetitive Justification

We have just explained why a policy such as Google's may be procompetitive and therefore should be evaluated under a rule of reason.  In such situations, one tries to balance the procompetitive benefits against the anticompetitive harms.  But if there is no harm, then the balancing is easy to do and the conduct should incur no antitrust liability. That appears to be the situation here.

The issue to consider is whether Google's DNCC policy is likely to result in a restriction of competition in a well-defined labor market that would result in a reduction in the average wage (or salary) for workers in that market and a reduction in the number of workers employed or hours worked.  However, as discussed below, the DNCC policy is unlikely to have had a meaningful impact on any labor market for a variety of reasons.  We first explain why Google's

---

[29] This discussion of the advantages of a DNCC list and disadvantages of lists of employee names, for example, is consistent with what we learned during our phone interview with Laszlo Bock, Vice President of People Operations at Google.

16

                                       GOOG-HIGH TECH-00027981

DNCC policy is not likely to have had a significant effect on many individuals and then discuss why it should certainly not be considered to have had an anticompetitive effect in any relevant antitrust market.

    **A.**    **Limitation on Cold Calling by Google Unlikely to Affect Many Potential Google Job Candidates**

From the point of view of most employees at collaboration partners, there is likely to be little impact from Google's DNCC policy. For employees potentially interested in employment at Google (or changing jobs generally), the lack of cold calling by Google should have no impact on whether the employee and Google explore employment options and whether the employee chooses to move to Google. Importantly, the DNCC policy did not prevent a candidate from contacting a recruiter or Google directly about employment opportunities, and potential candidates had many methods to determine whether Google was seeking applications for candidates with their qualifications. Google utilized many options to convey information about recruiting needs such that many if not most potential candidates would have good information as to options at Google without cold calling. For example, Google posted job openings on its website; placed search-targeted ads in connection with online job queries; held numerous job fairs; advertised job openings in a variety of media outlets; and offered generous bonuses for employee referrals (thus encouraging the dissemination of job-related information via word of mouth).[30] Moreover, by participating in the collaboration and interacting with Google

---

[30] *See*, for example, "Google's Do Not Cold Call List" (White paper submitted to US Dept of Justice on January 18, 2010 by Cleary Gottlieb Steen & Hamilton) at 3-4.

CONFIDENTIAL ATTORNEYS EYES ONLY        GOOG-HIGH TECH-00027982

employees, partner employees will likely get information about Google and whether he/she might wish to work at Google, which makes it potentially more likely that the employee would follow up on these other sources of information about hiring.

It is possible that some collaborators' employees were not cold called per Google's DNCC policy and that, had they been, they might have been interested in exploring employment opportunities at Google.  Although it might be true that as a result of the DNCC policy some particular person was not cold called, as explained more fully below, this would not create an antitrust harm unless total employment or wages at Google were adversely affected, in the unlikely case that the DOJ considers Google a relevant antitrust market for labor, or unless total employment or wages in some relevant antitrust market for labor, as a whole, were adversely affected.  If one particular potential job candidate is not hired as a result of the DNCC policy but as a result another person is hired instead, total employment either at Google or in some relevant labor antitrust market is unchanged, and there would not be any antitrust harm.

It is unlikely that there would be many employees in the situation where they would have moved to Google if only they had been cold called.  As noted, employees have many other means of getting such information without receiving a cold call since there was substantial information available about job opportunities at Google.  Thus, even if cold calling might have resulted in some explorations between Google and candidates that would not have occurred otherwise (and thus may have benefited some workers perhaps at the expense of others), for

18

employees that were the most likely candidates for Google (i.e., those that were considering other job options), cold calling would not be necessary for this exploration to occur.[31]

For employees who had no interest in employment at Google, a cold call would normally elicit no response beyond the call and have no effect or in fact could be an annoyance.  In some cases, the call might allow a particular employee to get some information as to market compensation if they pursued the opportunity to some extent even if they had no intention of switching jobs.   Such an impact seems highly unlikely and would likely be limited to a very small number of employees.  Cold calling generally provides little if any information about compensation levels, or at most would reveal relatively broad ranges of compensation.  Rather, obtaining detailed information regarding compensation would require that the employee follow up on the cold call and go through the application/interview process to get an offer.  If the employee were willing to invest such effort to get information about market compensation rates, the employee could readily participate in the same process simply by applying to Google or a host of other firms.  Moreover, even if such interaction would have benefited some partner employees, such an interaction is not by itself an antitrust harm unless one can show that in some relevant labor antitrust market total employment or wages would have been different.  In addition, if as a result of not calling one particular person, Google calls another, then the latter

---

[31] For example, *see* "Google's Do Not Cold Call List" (White paper submitted to US Dept of Justice on January 18, 2010 by Cleary Gottlieb Steen & Hamilton) at 7 ("In short, any indication that an employee might be 'looking' for new employment moved that employee out of the cold call category.  By instituting this narrow approach, Google maintained its ability to hire any employee it wished and its ability to continue engaging in its wide array of recruiting tactics.").  This is also consistent with what we learned during a phone interview with Laszlo Bock, Vice President of People Operations at Google.

19

                                      GOOG-HIGH TECH-00027984

person's wages might rise.  Again, there is no overall effect on total wages as a result of Google's DNCC policy.

From Google's viewpoint the policy was very limited in scope, and a variety of other methods were used to recruit candidates for Google (e.g., recruiting via job fairs, advertisements, and Google's website).[32]  The policy did not prevent recruiters who had information that the employee was considering other jobs from contacting the employee first.  It was hardly a secret that Google was hiring many people.  Google was inundated with applications.  Against that backdrop, cold calling without some indication that the potential candidate is interested in exploring other options is among the least effective ways for a firm to recruit candidates.[33]

Google in fact hired many individuals from collaboration partners on the DNCC list.  This confirms that the DNCC list is indeed a narrow restriction on recruiting practices.  Further, it suggests that the list did not have a measurable impact on Google's employment practices, including the number of actual hires made by Google.  Exhibit 3 shows annual new hires of employees whose former employer was IBM, Intel, Apple or Intuit.  This exhibit shows that Google hired many people from these partners.  For example, Intel was placed on Google's

---

[32] We also confirmed this during a phone interview with Laszlo Bock, Vice President of People Operations at Google.

[33] See, for example, Thomas, J.R., "Reengineering DoD Recruiting," *RAND*, 1997 at 2 ("The preliminary figures for 1995 showed that even greater effort was required [compared to the amount of effort in 1993 and 1994]: 653 phone calls to enlist one recruit, which is 163 more calls than were required in 1993."). Also *see*, in the context of recruiting subjects for clinical trials, Adams, et al., "Recruiting Older Adults for Clinical Trials," *Controlled Clinical Trials*, 1997 at 21 (table showing that cold calling is among the most expensive recruitment methods based on cost per participant). *See* also, in the context of recruiting primary care practices for a study regarding heart disease management, Ellis, et al., *Contemporary Clinical Trials*, 2007 at 258 ("Recruitment approaches based on in-person meetings (41.67%), previous relationships (33.33%), and borrowing an Area Health Education Center's established networks (10.80%), yielded the most recruited practices per effort and were most cost efficient.").

20

CONFIDENTIAL ATTORNEYS EYES ONLY

DNCC list in March 2005.  In 2006, Google hired ███ Intel employees.  The number of Intel employees hired by Google in 2007 █████████████████ in 2008 and ███ in 2009.  Apple was placed on Google's DNCC list in March 2005 as well.  Google hired ███ people from Apple in 2006 and ███ in 2007.  Google hired ███ in 2008 and ███ in 2009.  IBM was initially placed on Google's DNCC list in March 2007.  Google hired ███ IBM employees in 2006; ███ in 2007; ███ in 2008; and ███ in 2009.

Comparing Exhibit 3 to Exhibit 1 also indicates that as a general matter, the pattern of growth and contraction experienced by Google overall regarding its new hires is similar to the pattern for new hires of former employees of IBM, Intuit, Apple and Intel.  More specifically, the overall pattern of an increase in new hires in 2007 compared to 2006 and then year-over-year declines through 2009 is also reflected in the company-specific chart.   This reinforces the conclusion that the policy did not have a measurable impact on Google's actual employment practices.

**B.  Even if Some Potential Google Candidates from Some Collaboration Partners Were Impacted by the Policy, There is No Likely Anticompetitive Effect in Any Relevant Labor Market**

Conduct is considered anticompetitive if it results in competitive harm in a well defined relevant antitrust market.  In this case, the issue is whether the DNCC policy could facilitate the exercise of monopsony power over employees in a relevant market leading to lower wages and/or reduced supply of labor.  This would only occur if by Google not cold calling employees at collaboration partners, this would significantly limit competition for employees.  As noted above, the policy seems highly unlikely to have impacted Google's hiring generally or from

21

collaboration partners.  However, even if it did, a market impact is inconceivable.  As a starting

point, it is important to reiterate that Google was constantly hiring throughout the time period

covered by the DNCC list.  For example, as illustrated in Exhibit 1, Google hired literally

thousands of people from 2006 to 2009.  The number of new hires reached a peak in 2007, when

Google hired more than ███ people.  Although not completely immune from the deep

recession, Google still hired more than ███ people in 2008 and roughly ███ in 2009.

Additionally, as seen in Exhibit 4, the annual number of new hires as a percentage of total

employment at Google ranged from approximately ███ (2009) to as high as approximately ███

(2006).  These figures further underscore Google's phenomenal growth in hiring in recent years.

Moreover, on average, Google received more than 200 applications per every new hire.  Thus,

there is no indication that Google restricted its hiring or that there were any significant

limitations on the ability of potential employees to participate in the recruiting process.  Without

a restriction on Google's hiring, there can be no market effect.

Moreover, even assuming that Google's DNCC policy involved bilateral agreements with

another firm,[34] a policy that involves the behavior of two firms among numerous competing

firms is unlikely to impact market wages or output.  Monopsony power is the flip side of

monopoly power and occurs when a purchaser (or group of purchasers that are coordinating) of a

good or service in a market represents all or substantially all of the purchases of that good or

service.  Monopsony and corresponding monopsony power are rarely observed for individual

---

[34] As noted above, we are making this assumption for the purposes of this paper.

22

CONFIDENTIAL ATTORNEYS EYES ONLY                                    GOOG-HIGH TECH-00027987

firms in labor markets as employees usually have enough flexibility in their skills or geographically to have a wide range of options for their services. An economics journal notes that: "Textbooks usually interpret monopsony as describing a particular firm with exclusive access to a completely isolated labor market. Such cases are surely rare."[35] Although a "completely isolated labor market" is a fairly stark example, it is commonly believed that most labor markets would not be characterized as monopsonies.[36] Thus, anticompetitive harm from a single firm's recruiting behavior is unlikely in most labor markets.

Since most labor markets are likely relatively broadly defined, recruiting policies by a relatively small group of firms generally would not have a competitive effect. This is particularly true for the types of employees which Google was recruiting. Google was recruiting a very broad set of employees across all major job categories, including business operations, engineering, finance, human resources, legal and public policy, product management, and sales.[37] Google as a general matter did not limit its recruiting to employees in the high technology industry.[38] For many job categories, work experience in the computer industry may

---

[35] Boal, W.M. and M.R. Ransom, "Monopsony in the Labor Market," *Journal of Economic Literature*, Vol. 35, 1997 at 90.

[36] Monopsony has been studied frequently in the context of teacher labor markets mostly because of the availability of data on teachers' salaries. A recent paper concludes: "We detect no evidence of lower average teacher salaries in less competitive labor markets." The paper also notes: "This study [Landon and Baird (1971)] led to a number of similar studies in the 1970s, although there arose no clear consensus on whether monopsony effects even existed, much less on their magnitude." (*see* Medcalfe, S. and R. Thornton, "Monopsony and Teachers' Salaries in Georgia," *Journal of Labor Research*, Vol. 27, No 4, Fall 2006 at 537, 538.).

[37] "Google's Do Not Cold Call List" (White paper submitted to US Dept of Justice on January 18, 2010 by Cleary Gottlieb Steen & Hamilton) at 5.

[38] "Google's Do Not Cold Call List" (White paper submitted to US Dept of Justice on January 18, 2010 by Cleary Gottlieb Steen & Hamilton) at 5.

23

CONFIDENTIAL ATTORNEYS EYES ONLY

GOOG-HIGH TECH-00027988

not be particularly important, and Google recruited from a broad range of industries (even for its senior executives).[39]  For other areas, there may be fewer types of firms from which Google was recruiting (in addition to candidates with new degrees), but the geographic scope of its recruiting efforts for such employees was likely very broad.  Consistent with the geographic breadth of Google's recruiting efforts, many employees in a variety of positions do not work at Google's main campus in Mountain View, CA or even in the United States.[40]  According to Google's website, Google has 13 offices in the Asia Pacific; 26 in Europe; 3 in Latin America; and 5 in the Middle East.  Google thus would be competing with hundreds or thousands of other employers going after the same set of potential employees.  Thus Google itself or with a collaboration partner is highly unlikely to have monopsony power.

## V.    Conclusion

Google's DNCC policy should be considered under the rule of reason.  There are plausible procompetitive reasons for a restriction in direct recruiting among collaboration partners, particularly cold calling.  Thus, the advantage of judicial efficiency from the per se approach cannot be justified based on the high likelihood of condemning anticompetitive behavior.  The appropriateness of a rule of reason approach applies not only generally to restrictions on cold calling for collaboration partners, but also in assessing whether a particular restriction is overly broad.  To determine whether a restriction is too broad in essence requires a

---

[39] "Google's Do Not Cold Call List" (White paper submitted to US Dept of Justice on January 18, 2010 by Cleary Gottlieb Steen & Hamilton) at 5.

[40] "Google's Do Not Cold Call List" (White paper submitted to US Dept of Justice on January 18, 2010 by Cleary Gottlieb Steen & Hamilton) at 5-6.

24

CONFIDENTIAL ATTORNEYS EYES ONLY

GOOG-HIGH TECH-00027989

rule of reason assessment as to whether the procompetitive benefits from the restriction offset the potential for anticompetitive harm.  In this case, Google's restriction on cold calling is unlikely to have had a significant impact in the labor market even absent any procompetitive justification of Google's DNCC policy.  In particular, throughout the time period, Google has continuously hired many new employees and on average processed many applications per new hire.  Thus, there is no indication that the policy had any impact on the level of Google's recruiting or hiring activity.  Therefore, under a rule of reason, Google's conduct should raise no antitrust concerns.

CONFIDENTIAL ATTORNEYS EYES ONLY                                          GOOG-HIGH TECH-00027990

Confidential Treatment Requested



**Exhibit 1**

**Annual New Hires by Google: 2006-2009**



*Source*: Information Provided by Google.

CONFIDENTIAL ATTORNEYS EYES ONLY

GOOG-HIGH TECH-00027991



Confidential Treatment Requested



**Exhibit 2**

**Compound Annual Growth Rate of Total Employment from 2005–2009 for Selected Companies**

*Source:* SEC 10-K Filings and Annual Reports.

*Notes:* Growth rate is computed based on fiscal years 2005 and 2009. Unless noted otherwise, fiscal years end in December. Apple's fiscal year ends in September, and Intuit's fiscal year ends in July. The figures used to compute the compound growth rate may include the effects of divestitures, acquisitions, and other events, and no adjustments have been made to the data reported in the companies' 10-K filings and annual reports.

CONFIDENTIAL ATTORNEYS EYES ONLY



**Exhibit 3**
**Annual New Hires by Google of Former**
**Employees of Selected Companies: 2006-2009**

*Source:* Information provided by Google.

Confidential Treatment Requested



COMPASS LEXECON

CONFIDENTIAL ATTORNEYS EYES ONLY



Exhibit 4
Annual Google New Hires as a Percentage
of Total Number of Employees

Source: Information provided by Google, SEC 10-K Filings and Annual Reports.

Confidential Treatment Requested

COMPASS LEXECON