1   Richard M. Heimann (State Bar No. 63607)
    Kelly M. Dermody (State Bar No. 171716)
2   Eric B. Fastiff (State Bar No. 182260)
    Brendan P. Glackin (State Bar No. 199643)
3   Dean M. Harvey (State Bar No. 250298)
    Anne B. Shaver (State Bar No. 255928)
4   Lisa J. Cisneros (State Car No. 251473)
    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
5   275 Battery Street, 29th Floor
    San Francisco, California  94111-3339
6   Telephone:  415.956.1000
    Facsimile:  415.956.1008
7
    Joseph R. Saveri (State Bar No. 130064)
8   James G. Dallal (State Bar No.  277826)
    JOSEPH SAVERI LAW FIRM, INC.
9   505 Montgomery, Suite 625
    San Francisco, California 94111
10  Telephone: 415.500.6800
    Facsimile: 415.395-9940
11
    *Co-Lead Class Counsel*
12

13              UNITED STATES DISTRICT COURT

14            NORTHERN DISTRICT OF CALIFORNIA

15                  SAN JOSE DIVISION

16

| | |
|---|---|
| 17   IN RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION | Master Docket No. 11-CV-2509-LHK |
| 18   THIS DOCUMENT RELATES TO: | **PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' JOINT AND INDIVIDUAL MOTIONS FOR SUMMARY JUDGMENT** |
| 19   All Actions | |
| 20 | Date:         March 20 and 27, 2014 |
| 21 | Time:         1:30 pm |
| 22 | Courtroom:  8, 4th Floor Judge:         Honorable Lucy H. Koh |
| 23 | |

24

25

26              REDACTED/PUBLIC VERSION

27

28

# TABLE OF CONTENTS

**Page**

TABLE OF ABBREVIATIONS .................................................................. VI

I. INTRODUCTION ........................................................................ 1

II. THE RICH EVIDENTIARY RECORD DEMONSTRATES THE ALLEGED CONSPIRACY AND EACH DEFENDANTS' PARTICIPATION IN IT .......................................................... 4

III. THE LAW REGARDING SUMMARY JUDGMENT AND CONSPIRACY SHOW THAT DEFENDANTS' MOTIONS SHOULD BE DENIED ..................................................................... 15

    A. Legal Standards ................................................... 15

        1. Summary Judgment ...................................... 15

        2. Conspiracy ................................................ 18

        3. Defendants' Cases Are Inapposite ............... 22

    B. Defendants Cannot Satisfy Their Initial Burden Under *Matsushita* ........ 24

        1. Defendants Provide No Alternative Plausible Explanation For The Alleged Conspiracy ...................... 24

        2. Defendants Cannot Show That The Alleged Conspiracy Was Otherwise Pro-Competitive .................. 27

    C. Even if Defendants Satisfied Their Initial Burden, Plaintiffs Have Provided Substantial Evidence Tending To Show That Defendants Were Not Engaging in Permissible Competitive Behavior .................. 31

        1. The Anti-Solicitation Agreements Were Not Independent, Pro-Competitive, or Justifiable ...................... 31

        2. Defendants Had A Shared Motive to Conspire ........... 32

        3. Defendants' Identical, Bilateral Agreements Were Not Reached In Isolation ...................... 33

    D. Each Defendant Joined the Conspiracy and Furthered Its Purpose ......... 36

        1. Apple .......................................... 36

        2. Adobe .......................................... 38

        3. Google .......................................... 42

        4. Intel .......................................... 44

IV. DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT BASED ON THEIR MOTION TO EXCLUDE TESTIMONY OF DR. LEAMER FAILS .................................................. 46

V. CONCLUSION .......................................................... 47

# TABLE OF AUTHORITIES

**Page**

### Cases

*AD/SAT v. Associated Press*,
181 F.3d 216 (2d Cir. 1999)..................................................................................................... 36

*American Tobacco Co. v. United States*,
328 U.S. 781 (1946)........................................................................................................ 24, 27

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........................................................................................................ 16, 22

*Apex Oil Co. v. Di Mauro*,
822 F.2d 246 (2d Cir. 1987)........................................................................................... 17, 27

*Balint v. Carson City*,
180 F.3d 1047 (9th Cir. 1999)................................................................................................ 26

*Barry v. Blue Cross of Cal.*,
805 F.2d 866 (9th Cir. 1986)................................................................................................. 35

*Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*,
620 F.2d 1360 (9th Cir. 1980)......................................................................................... 16, 21

*Blumenthal v. United States*,
332 U.S. 539 (1947)............................................................................................................... 18

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)............................................................................................................... 15

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (U.S. 1962).............................................................................................. passim

*Dickson v. Microsoft Corp.*,
309 F.3d 193 (4th Cir. 2002)................................................................................................. 23

*Eastman Kodak Co. v. Image Technical Services, Inc.*,
504 U.S. 451 (1992)............................................................................................................... 17

*Gold v. Wolpert*,
876 F.2d 1327 (7th Cir. 1989).................................................................................................. 3

*Harkins Amusement Enters., Inc. v. Gen. Cinema Corp.*,
850 F.2d 477 (9th Cir. 1988)................................................................................................. 12

*Holmes v. Elec. Document Processing, Inc.*,
No. 12-CV-06193-LHK, 2013 U.S. Dist. LEXIS 116598 (N.D. Cal. Aug. 15, 2013)............... 3

*In re Citric Acid Litig.*,
191 F.3d 1090 (9th Cir. Cal. 1999)................................................................................ passim

*In re Elec. Books Antitrust Litig.*,
859 F. Supp. 2d 671 (S.D.N.Y. 2012).................................................................................... 20

*In re Flat Glass Antitrust Litig.*,
385 F.3d 350 (3d Cir. 2004).......................................................................................... 16, 17

*In re High Fructose Corn Syrup Antitrust Litig.*,
295 F.3d 651 (7th Cir. 2002)................................................................................................. 17

*In re High-Tech Empl. Antitrust Litig. (High-Tech I)*,
856 F. Supp. 2d 1103 (N.D. Cal. 2012).......................................................................... passim

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

*In re High-Tech Empl. Antitrust Litig. (High-Tech II)*,
  289 F.R.D. 555 (N.D. Cal. 2013) ................................................................. passim

4

*In re High-Tech Empl. Antitrust Litig. (High-Tech III)*,
  2013 U.S. Dist. LEXIS 153752  (N.D. Cal. Oct. 24, 2013) ...................................... 1, 12, 33, 47

5

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010) ................................................................. 23

6

*In re Petroleum Prods. Antitrust Litig.*,
  906 F.2d 432 (9th Cir. 1990) ................................................................. 17, 24, 28

7

*In re Publ'n Paper Antitrust Litig.*,
  690 F.3d 51 (2d Cir. 2012) ................................................................. 16, 17, 36

8

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010) ................................................................. 16

9

10

*Indus. Bldg. Materials, Inc. v. Interchemical Corp.*,
  437 F.2d 1336 (9th Cir. 1970) ................................................................. 20

11

*Interstate Circuit Inc. v. United States*,
  306 U.S. 208 (1939) ................................................................. 20, 23

12

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ................................................................. passim

13

*MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.*,
  62 F.3d 967 (7th Cir. 1995) ................................................................. 20

14

15

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984) ................................................................. passim

16

*Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., Inc.*,
  998 F.2d 1224 (3d Cir. 1993) ................................................................. 17

17

*Standard Oil Co. v. United States*,
  337 U.S. 293 (1949) ................................................................. 18

18

*Therasense, Inc. v. Becton Dickinson and Co.*,
  No. 04-02123, 2008 U.S. Dist. LEXIS 107992 (N.D. Cal. May 12, 2008) ............................. 27

19

20

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*,
  530 F.3d 204 (3d Cir. 2008) ................................................................. 19

21

*Toys "R" Us v. FTC*,
  221 F.3d 928 (7th Cir. 2000) ................................................................. 23

22

*Twentieth Century-Fox Film Corp. v. Harkins Amusement Enters., Inc.*,
  No. 90-80190, 1990 U.S. App. LEXIS 21836 (9th Cir. Aug. 20, 1990) ................................. 21

23

*Twin City Sportsservice Inc. v. Charles O. Finley & Co.*,
  676 F.2d 1291 (9th Cir 1982) ................................................................. 18

24

25

*United States ex rel. Miller v. Harbert Int'l Constr., Inc.*,
  608 F.3d 871 (D.C. Cir. 2012) ................................................................. 18

26

*United States v. Apple Inc.*,
  No. 12 Civ. 2826 (DLC),
  2013 U.S. Dist. LEXIS 96424
  (S.D.N.Y. July 10, 2013) ................................................................. 21

27

28

# TABLE OF AUTHORITIES
### (continued)

**Page**

*United States v. Bibbero*,
749 F.2d 581 (9th Cir. 1984) ................................................................. 18

*United States v. Bloch*,
696 F.2d 1213 (9th Cir. 1982) ............................................................... 19

*United States v. Burns*,
No. 98-50771, 2000 U.S. App. LEXIS 15801
(9th Cir. July 6, 2000) ........................................................................... 19

*United States v. Cont'l Group, Inc.*,
603 F.2d 444 (3d Cir. 1979) .................................................................. 20

*United States v. DeVarona*,
872 F.2d 114 (5th Cir. 1989) ................................................................ 19

*United States v. Falstaff Brewing Corp.*,
410 U.S. 526 (1973) .............................................................................. 16

*United States v. General Motors Corp.*,
384 U.S. 127 (1966) .................................................................... passim

*United States v. Hemphill*,
514 F.3d 1350 (D.C. Cir. 2008) ............................................................ 19

*United States v. Kelly*,
892 F.2d 255 (3d Cir. 1989) (same). ..................................................... 19

*United States v. Masonite Corp.*,
316 U.S. 265 (1942) ................................................................. 20, 38, 43

*United States v. Nat'l Lead Co.*,
332 U.S. 319 (1947) .............................................................................. 20

*United States v. Paramount Pictures*,
334 U.S. 131 (1948) .............................................................................. 19

*United States v. Perez*,
491 F.2d 167 (9th Cir. 1974), *cert. denied sub nom. Lombera v. United States*,
419 U.S. 858 (1974) .............................................................................. 16

*United States v. United Gypsum Co.*,
333 U.S. 364 (1948) ................................................................................ 7

*United States v. Zamorano-Leyva*,
220 Fed. Appx. 557 (9th Cir. 2007) ..................................................... 16

*Verizon Communs., Inc. v. Law Offices of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004) .............................................................................. 27

*Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*,
156 F.3d 535 (4th Cir. 1998) ................................................................ 20

*White v. R.M. Packer Co.*,
635 F.3d 571 (1st Cir. 2011) ................................................................ 22

*Wilcox v. First Interstate Bank, N.A.*,
815 F.2d 522 (9th Cir. 1987) ................................................................ 22

*Zamani v. Carnes*,
491 F.3d 990 (9th Cir. 2007) .................................................................. 3

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

**Other Authorities**

4

Federal Rules of Civil Procedure

Rule 56(a)................................................................................................................ 15

5

**Treatises**

6

1 Witkin, Contracts, §§ 419-420 ............................................................................ 30

2 Witkin, Cal. Evidence, Documentary Evidence (5th ed.) § 71 .................................. 30

7

ABA Model Jury Instructions in Civil Antitrust Cases (2005 ed.) ("Jury Instructions") ............. 21

8

**Other Authorities**

9

http://waltdisneystudios.com/corp/unit/6/bio/53................................................................. 6

http://www.adobe.com/aboutadobe/invrelations/adobeandmacromedia.html ............................ 41

10

http://www.irs.princeton.edu/richard-lester-award-outstanding-book-industrial-relations-
and-labor-economics ........................................................................................... 13

11

Matthew Marx, et al., *Mobility, Skills, and the Michigan Non-Compete Experiment*,
55 Mgmt. Sci. 875 (2009) ..................................................................................... 14

12

13

Matthew Marx, *The Firm Strikes Back: Non-Compete Agreements and the Mobility of
Technical Professionals*,
76 Am. Soc. Rev. 695 (2011)................................................................................ 14

14

Walter Isaacson, Steve Jobs (2011) ............................................................................. 8

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Table of Abbreviations[1]**

**I.**    **Defendants' Summary Judgment and *Daubert* Motions**

Defendants' Joint Notice of Motion and Motion for
Summary Judgment Based on Motion to Exclude Testimony
of Dr. Edward E. Leamer, Ph.D.; Memorandum of Points
and Authorities in Support Thereof..............................................................................Joint MSJ __

Defendant Adobe's Motion for Summary Judgment................................................ Adobe MSJ __

Defendant Apple Inc.'s Notice of Motion and Motion for
Summary Judgment; Memorandum of Points and
Authorities in Support Thereof .................................................................................. Apple MSJ __

Defendant Google Inc.'s Notice of Motion and Motion for
Summary Judgment; Memorandum of Points and
Authorities in Support Thereof ................................................................................ Google MSJ __

Notice of Motion and Motion by Intel Corporation for
Summary Judgment Pursuant to Fed.R.Civ.Pro 56 ...................................................Intel MSJ __

**II.**    **Depositions**

    **A.**    **Lay Witnesses**

Deposition of Mark Bentley (August 23, 2012)  ...........................................................Bentley __

Deposition of Sergey Brin (March 19, 2013)  ...................................................................... Brin __

Deposition of Shona Brown (January 30, 2013) ............................................................ Brown __

Deposition Bruce Chizen (March 15, 2013) ...................................................................Chizen __

Deposition Tim Cook (March 21, 2013) ...........................................................................Cook __

Deposition of Brian Croll (March 22, 2013)

Deposition of William Campbell (February 5, 2013)....................................................Campbell __

Deposition of Ed Catmull (January 24, 2013) ............................................................. Catmull __

Deposition of Alan Eustace (February 27, 2013)  ........................................................Eustace __

Deposition of Patrick Flynn (April 3, 2013) .....................................................................Flynn __

Deposition of Arnnon Geshuri (August 17, 2012).........................................................Geshuri __

---

[1] The depositions of witnesses who provided a report and a deposition are abbreviated as "[Last Name] Dep."; the deposition of witnesses who provided a deposition but not a report are abbreviated as "[Last Name]."  Deposition transcripts and exhibits are attached to the accompanying Declaration of Lisa J. Cisneros In Support of Plaintiffs' Opposition Briefs.  All other documents are attached to the accompanying Declaration of Dean M. Harvey In Support of Plaintiffs' Opposition Briefs.

Deposition of Digby Horner (March 1, 2013) ........................................................ Horner __

Deposition of Danielle Lambert (October 2, 2012) ..................................................Lambert __

Deposition of George Lucas (March 28, 2013) ..........................................................Lucas __

Deposition of Omid Kordestani (March 11, 2013) ...............................................Kordestani __

Deposition of Lori McAdams (August 2, 2012) ......................................................McAdams __

Deposition of Donna Morris (August 21, 2012) ........................................................ Morris __

Deposition of James Morris (August 3, 2012) .........................................................J. Morris __

Deposition of Paul Otellini (January 29, 2013) ........................................................ Otellini __

Deposition of Jonathan Rosenberg (March 13, 2013) ............................................ Rosenberg __

Deposition of Ron Okamoto (February 27, 2013) ................................................... Okamoto __

Deposition Shantanu Narayen (April 5, 2013).........................................................Narayen __

Deposition of Eric Schmidt (February 20, 2013).....................................................Schmidt __

Deposition of Frank Wagner (March 7, 2013)..........................................................Wagner __

Deposition of Pamela Zissimos (November 13, 2012) .............................................Zissimos __

**B. Plaintiffs' Expert Witnesses**

Deposition of Matthew Marx (November 15, 2013) ...............................................Marx Dep. __

**C. Defendants' Expert Witnesses**

Deposition of Kevin Murphy (Vol. I., pp. 1-385, December 3, 2012,
Vol. II, pp. 386-568, July 5, 2013 and Vol III. December 7, 2013 pp.569-901) …Murphy Dep. __

Deposition of Edward Snyder (December 7, 2013)............................................... Snyder Dep. __

Deposition of Lauren Stiroh (December 9, 2013)..................................................Stiroh Dep. __

Deposition of Eric Talley (December 8, 2013)...................................................... Talley Dep. __

**III. Lay Witness Declarations**

Declaration of Sheryl Sandberg ..............................................................Sandberg Decl. __

Declaration of Edward T. Colligan ........................................................Colligan Decl. __

**IV. Expert Reports**

**A. Plaintiffs' Experts**

Merits Expert Report of Kevin Hallock (October 28, 2013) .......................................Hallock ¶ __

Merits Expert Report of Edward Leamer (October 28, 2013) ...........................Leamer Merits ¶ __

Merits Rebuttal Expert Report of Edward Leamer (December 11, 2013) ..... Leamer Rebuttal ¶ __

Expert Report of Edward E. Leamer, Ph.D. (October 10, 2012) ...............................Leamer I ¶ __

Reply Expert Report of Edward E. Leamer, Ph.D. (December 12, 2012) ................Leamer II ¶ __

Supplemental Expert Report of Edward E. Leamer, Ph.D. (May 10, 2013) .......... Leamer III ¶ __

Supplemental Reply Expert Report of Edward E. Leamer, Ph.D.
(July 12, 2013) ......................................................................................Leamer IV ¶ __

Merits Expert Report of Alan Manning (October 28, 2013).......................................Manning ¶ __

Merits Expert Report of Matthew Marx (October 28, 2013)............................................Marx ¶ __

Merits Rebuttal Expert Report of Matthew Marx (December 11, 2013)........... Marx Rebuttal ¶ __

B.     **Defendants' Experts**

Merits Expert Report of David Lewin (November 25, 2013)........................................ Lewin ¶ __

Merits Expert Report of Kevin Murphy (November 25, 2013) ...................................Murphy ¶ __

Merits Expert Report of Edward Snyder (December 6, 2013)...................................... Snyder ¶ __

Merits Expert Report of Lauren Stiroh (November 25, 2013).......................................Stiroh ¶ __

Merits Expert Report of Eric Talley (November 25, 2013) ........................................... Talley ¶ __

PLTFS' CONSOLIDATED OPP TO DEFS' JOINT AND
INDIVIDUAL MOTIONS FOR SUMMARY JUDGMENT
Master Docket No. 11-CV-2509-LHK

1    **I.      INTRODUCTION**

2          This is the *fourth* time Defendants have asked the Court to accept the far-fetched premise

3    that their misconduct amounts to "nothing more" than "parallel behavior among pairs of

4    Defendants."  Oct. 13, 2011 Joint Mot. to Dismiss the Consol. Am. Compl. (Dkt. 79), at 13-14.

5    *See also* Nov. 12, 2012 Opp'n to Pls.' Mot. for Class Cert. (Dkt. 209), at 1-8; June 21, 2014

6    Opp'n to Pls.' Supp. Mot. for Class Cert. (Dkt. 439), at 3-4, 19-21.  The Court should reject

7    Defendants' fourth attempt for the same reasons the Court rejected their prior three.[2]

8          Defendants' four individual motions for summary judgment serve a single purpose: to

9    contest the sufficiency of the substantial evidence as to each Defendant's participation in the

10   alleged conspiracy.  Defendants' joint motion for summary judgment is nothing more than a

11   vehicle for Defendants to refer to their separate motions to exclude Dr. Edward E. Leamer's

12   testimony.  Joint MSJ at 1.  Defendants' strategy disregards the Court's clear instructions.  The

13   Court directed Defendants to brief common issues, such as the applicable legal standard (rule of

14   reason versus per se), in a joint brief, and to spend as little time as possible contesting the

15   sufficiency of the evidence, given the "very rich, rich record."  May 15, 2013 Case Mgmt. Conf.

16   Tr., at 7:19-20.  *See also id.* at 7:15-17 ("I'm quite familiar with the facts in this case after the

17   motion to dismiss and the class cert.  I don't think this is a summary judgment case."), 8:19-21 ("I

18   think there's abundant evidence that there was an overall[,] overarching conspiracy sufficient to

19   go to trial at least."), 13:17-18 ("The rule of reason versus per se, that obviously should be

20   briefed, and we haven't really done that yet."); 15:4-7 (Defendants' joint brief "will be the rule of

21   reason versus per se.  On sufficiency of the evidence, I just think that's going to be hard to win on

22   summary judgment."); Apr. 8, 2013 Case Mgmt. Conf. Tr., at 15:18-23 ("just based upon the

23   fullness of the evidentiary record . . . it may be that we just skip summary judgment completely.

24   The record is too rich.").[3]

25   _____

26   [2] *See In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1115-1123 (N.D. Cal. 2012)
     ("*High-Tech I*"); *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 564-65, 570-73 (N.D.
     Cal. 2013) ("*High-Tech II*"); *In re High-Tech Emp. Antitrust Litig.*, No. 11-2509-LHK, 2013 U.S.

27   Dist. LEXIS 153752, at *56-110 (N.D. Cal. Oct. 24, 2013) ("*High-Tech III*").

     [3] Defendants' three joint motions to exclude expert testimony also violate the Court's

28   instructions.  The December 18, 2013 Case Mgmt. Order restricted Defendants to a total of 25

*Footnote continued on next page*

- 1 -

Setting aside what they fail to address, Defendants' five motions for summary judgment are notable for what they admit.  First, Defendants concede the bilateral anti-solicitation agreements as alleged.  Second, Defendants do not meaningfully contest the existence of the alleged conspiracy.  Instead, each claims not to have joined it.  Third, Defendants concede that their alleged misconduct violated the antitrust laws per se.  Despite the Court's instructions, the phrases "per se" or "rule of reason" appear nowhere in their motions.  Defendants have thus finally confirmed what has long been obvious: the Antitrust Division of the United States Department of Justice understood the facts and properly applied the antitrust laws when it found Defendants' agreements to be "per se unlawful" and "facially anticompetitive because they eliminated a significant form of competition to attract high-tech employees, and, overall, substantially diminished competition to the detriment of the affected employees who were likely deprived of competitively important information and access to better job opportunities."[4] "Defendants' concerted behavior both reduced their ability to compete for employees and disrupted the normal price-setting mechanisms that apply in the labor setting."[5]  With respect to the alleged conspiracy as a whole, Defendants advance no justification whatsoever.  The instructions to the jury at trial will accordingly be limited to the per se standard.[6]

---

*Footnote continued from previous page*

pages (Dkt. 547 at 2), but Defendants filed three motions that total 35 pages.  *See* May 15, 2013 Case Mgmt. Conf. Tr., at 28:13-18 ("I want to strongly encourage you to restrict these [*Daubert* motions] further and—and the reason is that, you know, most likely, things are going to weight and not admissibility.  *Daubert*, you know, the likelihood that somebody would be struck completely, probably not likely."); Apr. 8, 2013 Case Mgmt. Conf. Tr., at 12:22-13:5 ("If the *Daubert* motions are like the *Daubert* motions I saw on the class cert. motion, I'm going to be disappointed because, you know, ultimately that's really weight and not admissibility and the criticisms that each side raised are really more for cross-examination and for closing argument. So I really—I just don't want to have to, you know, spend a ton of resources just having to do a bunch of those because those are not going to be granted.").  Plaintiffs have accordingly moved separately to enforce the Court's Case Management Order regarding page limits.

[4] DOJ Competitive Impact Statement at 3, *United States v. Adobe Systems Inc., et al.*, No. 10-cv-1629-RBW (D.D.C. Sept. 24, 2010) (regarding agreements among all defendants but Lucasfilm), *attached as* Ex. 168 to Cisneros Decl.  *See also* DOJ Competitive Impact Statement at 8, *United States v. Lucasfilm LTD.*, No. 10-cv-2220-RBW (D.D.C. Dec. 21, 2010) (regarding agreement between Lucasfilm and Pixar), attached as Ex. 167 to Cisneros Decl.

[5] DOJ Competitive Impact Statement at 10, *United States v. Adobe Systems Inc., et al.*, *supra. See also* DOJ Competitive Impact Statement at 8, *United States v. Lucasfilm LTD.*, *supra*.

[6] Defendants cannot remedy their failure to address this issue in reply.  "This Court 'need not consider arguments raised for the first time in a reply brief.'"  *Zamani v. Carnes*, 491 F.3d 990,

*Footnote continued on next page*

PLTFS' CONSOLIDATED OPP TO DEFS' JOINT AND
INDIVIDUAL MOTIONS FOR SUMMARY JUDGMENT
Master Docket No. 11-CV-2509-LHK

1      Thus the only contested issue is one the Court has already resolved: whether there is

2   sufficient evidence of "'a unity of purpose[,] a common design and understanding, or a meeting

3   of minds in an unlawful arrangement'" to take the case to trial.  *High-Tech I*, 856 F. Supp. 2d at

4   1117 (quoting *Monsanto Co. v. Spray Rite Svc. Corp.*, 465 U.S. 752, 764 (1984)).  Two years

5   ago, the Court held that "Plaintiffs have alleged facts beyond mere parallel conduct that 'tend[] to

6   exclude the possibility of independent action.'"  *Id.* (quoting *Monsanto*, 465 U.S. at 764).  The

7   Court rightly observed that Plaintiffs will be entitled to relief if they prove the factual allegations

8   in the Consolidated Amended Complaint ("CAC").  Plaintiffs have now presented the Court with

9   voluminous direct and circumstantial evidence verifying these allegations.  Further, after

10  discovery, the "record is so much richer than that."  May 15, 2013 Case Mgmt. Conf. Tr., at 8:16-

11  17.  There can be no question that this evidence is, at the very least, sufficient to create genuine

12  disputes of material fact regarding Defendants' participation in a conspiracy to suppress

13  employee compensation and mobility.  *See* Part II, *infra*.

14      In Part III, Plaintiffs review the applicable legal standards regarding summary judgment

15  and conspiracy.  Defendants' authorities, such as *Matsushita Elec. Indus. Co., Ltd. v. Zenith

16  Radio Corp.*, 475 U.S. 574 (1986) and *In re Citric Acid Litig.*, 191 F.3d 1090 (9th Cir. Cal. 1999),

17  in fact explain why summary judgment would be improper here.  These cases address situations

18  where: (1) Plaintiffs rely exclusively on circumstantial evidence of a violation; and (2) the

19  underlying challenged conduct, but for conspiracy, would be the "very essence of competition,"

20  such as cutting prices to consumers for decades with no evidence of anticompetitive effects.

21  *Matsushita*, 475 U.S. at 594.  In such circumstances, courts should be careful about inferring a

22  conspiracy, based on circumstantial evidence, from otherwise pro-competitive conduct: "mistaken

23  inferences . . . are especially costly, because they chill the very conduct the antitrust laws were

24  designed to protect."  *Id.*  This concern has no place here, where Plaintiffs rely on substantial

25  _____

*Footnote continued from previous page*

26  997 (9th Cir. 2007).  *See also Holmes v. Elec. Document Processing, Inc.*, No. 12-CV-06193-
    LHK, 2013 U.S. Dist. LEXIS 116598, at *22-23 n.4 (N.D. Cal. Aug. 15, 2013) (Koh, J.) ("'It is

27  well settled that new arguments cannot be made for the first time in reply. This goes for new facts
    too.'  Thus, the Court declines to consider these arguments.") (quoting *Gold v. Wolpert*, 876 F.2d

28  1327, 1331 n.6 (7th Cir. 1989)).

1    direct evidence of unlawful agreements, and where the underlying conduct is not the "very

2    essence of competition," but rather a network of collusive, secret agreements to suppress

3    employee compensation and mobility that are themselves per se violations of the antitrust laws

4    (and all of which Defendants concede occurred).

5          Even if the Court applies the burden-shifting framework of *Citric Acid*, summary

6    judgment should be denied because Defendants cannot carry their initial burden of showing: (1) a

7    plausible alternative explanation for their alleged conspiracy; and (2) that their alleged conspiracy

8    was otherwise pro-competitive.  In attempting to construct after-the-fact justifications for their

9    anti-solicitation agreements, Defendants all violate controlling authority: "In antitrust conspiracy

10   cases, 'plaintiffs should be given the full benefit of their proof without tightly compartmentalizing

11   the various factual components and wiping the slate clean after scrutiny of each . . . . [T]he

12   character and effect of a conspiracy are not to be judged by dismembering it and viewing its

13   separate parts, but only by looking at it as a whole . . . ."  *High-Tech I*, 856 F. Supp. 2d at 1118

14   (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)).

15   Defendants fail to provide any plausible alternative explanation for how their network of nearly

16   identical, secret agreements arose and operated concurrently for five years, without any

17   coordination or communication among them.  And, of course, the evidence shows Defendants did

18   in fact communicate and coordinate through the close relationships and overlapping roles of their

19   CEOs and other senior executives.  Each Defendant entered into at least one secret anti-

20   solicitation agreement, and each Defendant gained knowledge of the "essential nature of the

21   plan[7]": to suppress employee compensation and mobility through a network of anti-solicitation

22   agreements that extended beyond their own bilateral agreements.

23         Defendants' motions for summary judgment should be denied.

24   **II.    THE RICH EVIDENTIARY RECORD DEMONSTRATES THE ALLEGED
             CONSPIRACY AND EACH DEFENDANTS' PARTICIPATION IN IT**
25

26         In denying Defendants' Joint Motion to Dismiss, the Court held that "Plaintiffs describe a

27   _____

28   [7] ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 ed.), at
     B-13 ("Jury Instructions").

plausible scenario as to how, in light of basic economic principles, these agreements formed an overarching conspiracy that resulted in artificially lower salaries." *High-Tech I*, 856 F. Supp. 2d at 1117. First, "it is plausible to infer that even a single bilateral agreement would have the ripple effect of depressing the mobility and compensation of employees of companies that are not direct parties to the agreement." *Id.* at 1121. "Plaintiffs' allegations of six parallel bilateral agreements render the inference of an anticompetitive ripple effect that much more plausible." *Id.* Second, the agreements are alleged to have been "negotiated, executed, and, in most cases, enforced by Defendants' senior executives," and all of the express agreements involved Mr. Jobs or another member of Apple's Board of Directors. *Id.* at 1116 (internal quotation omitted). Third, "the identical nature of the six bilateral agreements may support the inference that these individuals played a role in shaping these agreements." *Id.* In fact, it "strains credulity" to argue that the alleged identical, secret agreements could be reached "without some communication or coordination" among Defendants. *Id.* Fourth, Defendants had an "opportunity to conspire" based upon overlapping boards and other frequent contacts among Defendants' senior executives. *Id.* at 1118-20. Fifth, the "plausibility of these inferences increases when the Court considers that Mr. Jobs exerted significant influence over companies involved in four of the bilateral 'Do Not Cold Call' agreements: Pixar-Lucasfilm; Apple-Pixar; Apple-Google; and Apple-Adobe." *Id.* at 1119. The allegations regarding Mr. Jobs's personal involvement, including his communications, show that "it is reasonable to infer that Mr. Jobs had the intent to reduce competition for skilled labor and was aware that 'Do Not Call Agreements' were effective means of doing so." *Id.* "[I]t is also reasonable to infer that the overlapping board memberships provided an opportunity for Mr. Jobs to expand the conspiracy." *Id.*

When viewing these factual allegations as "a whole," *id.* at 1118 (quoting *Cont'l Ore*, 370 U.S. at 699), the Court concluded that "Plaintiffs here have alleged facts plausibly suggesting 'a unity of purpose[,] a common design and understanding, or a meeting of minds in an unlawful arrangement.'" *Id.* at 1120 (quoting *Monsanto*, 465 U.S. at 764). The Court also found that "Plaintiffs have alleged facts beyond mere parallel conduct that 'tend[] to exclude the possibility of independent action.'" *Id.* (quoting *Monsanto*, 465 U.S. at 764).

1    The parties have now completed discovery, and the evidence confirms Plaintiffs'

2    allegations.  The conspiracy indeed "began with an agreement between senior executives of Pixar

3    and Lucasfilm to eliminate competition between them for skilled labor, with the intent and effect

4    of suppressing the competition and mobility of their employees."  CAC ¶ 56.  The "senior

5    executives" were George Lucas (former Chairman and CEO of Lucasfilm), Mr. Jobs (former

6    CEO of Pixar and Apple), and Ed Catmull (who ran Pixar under Mr. Jobs's close supervision, and

7    who is the current President of Walt Disney and Pixar Animation Studios[8]).  On January 30,

8    1986, Mr. Lucas sold Lucasfilm's "computer division," a "tech, research, and development

9    company" to Mr. Jobs, which became "Pixar."  Lucas 16:15-17, 59:9; Catmull 78:22-79:16;

10   PIX00087434 (Purchase Agreement).  Shortly after the sale of Pixar,[9] and continuing until the

11   DOJ investigation in 2009, Lucasfilm and Pixar employees were "hands off to each other in terms

12   of soliciting talent."  Lucas 96:19-25.  *See also* J. Morris 165:13-16 ("we had an agreement for a

13   long period of time that we wouldn't recruit from each other, and we are not doing that anymore.

14   We rescinded that agreement."), 103-19-25 ("reason is there was a consent decree.").  Direct

15   evidence confirms that the illicit agreement between Pixar and Lucasfilm occurred as Plaintiffs

16   allege.[10]

17   Mr. Lucas and Mr. Catmull both admitted that their anti-solicitation agreement had "the

18   intent and effect of suppressing the compensation and mobility of their employees."  CAC ¶ 56.

19   George Lucas "had a sort of unusual view of things," Catmull 32:22-23, specifically that

20   companies should not compete against each other for employees: "It's not a normal industrial

21   competitive situation."  Lucas 52:5-6.  Mr. Lucas explained: "Well, I always—the rule we had, or

22   the rule that I put down for everybody," was that "we cannot get into a bidding war with other

23   companies because we don't have the margins for that sort of thing."  Lucas 44:18-25.  Mr. Lucas

24   agreed with Mr. Catmull that Pixar would reciprocate this "rule."  Anti-solicitation agreements

25

26   [8] *See* http://waltdisneystudios.com/corp/unit/6/bio/53.

27   [9] Mr. Lucas confirmed that the anti-solicitation agreement with Pixar "had nothing to do" with the
     sale of Pixar or with the negotiations regarding the sale.  Lucas 208:14-17.

28   [10] *Compare* CAC ¶¶ 58-64 *with* Exs. 129, 131, 137, 154, 158, 164, 695, 947; Lucas 67:12-15,
     92:12-13, 96:19-25; J. Morris 126:20-127:10, 165:13-16; PIX00004051; LUCAS00013507.

1   matter particularly in the case of new or growing competitors, who would otherwise "go out and

2   raid all the other companies. It's a big problem. And they will pay whatever it takes . . . ." Lucas

3   184:13-16. "[I]n those situations we have a key person who you have to have to keep going who

4   is being wooed away by another company who is going to pay triple what they are getting, or in

5   this case even 30 percent is a lot, and, you know, you want to try to keep that in check." Lucas

6   186:11-15. *See also* Catmull 96:22-24 ("[W]hen the companies start these aggressive moves

7   toward each other, then disasters happen."). Anti-solicitation agreements keep competitive

8   pressure in check. Lucas 187:4-6. *See also* Lucas 67:12-15 ("Q: Did you discuss with Ed

9   Catmull the subject of your interest in avoiding bidding wars between the two companies? A:

10  well, no, but that was implied."), 62:9-11 ("we shouldn't get into a competitive situation where

11  we're trying to put each other out of business."), 92:12-13 ("the part of the agreement is not to

12  solicit each other's employees, is the crux of it."); Catmull 100:20-21 ("we were trying not to get

13  into systematic raiding"), 167:16-22 (anti-solicitation agreements avoid bidding wars).

14          Mr. Catmull admitted that anti-solicitation agreements suppress employee compensation

15  systematically, by design. Without them, growing companies "would go out and they would offer

16  much higher salaries to everybody they could[.] . . . I was trying to prevent that from happening."

17  Catmull 172:24-173:8. A single company soliciting employees can result in a "billion dollar

18  disaster." Catmull 174:18. "So I'm sorry but—while I have responsibility for the payroll, I have

19  responsibility for the long-term also. I don't apologize for this. This was bad stuff. Did not

20  belong in this industry." Catmull 174:7-10. "The—for me I just—it means the pay. All right? If

21  the pay goes way up in an industry where the margins are practically non-existent, it will have a

22  negative effect." Catmull 184:25-185:4. "So it messes up the pay structure. It does. It makes it

23  very high. . . . That's just the reality we've got. And I do feel strongly about it." Catmull 179:17-

24  25.[11]

---

25  [11] Though they try, the remaining Defendants cannot distance themselves from these revealing
    admissions. Defense counsel conceded that these admissions are relevant to the non-settling
26  Defendants as alleged co-conspirators. Aug. 8, 2013 Tr. 17:24-18:14. Indeed, it is black letter
    conspiracy law that "the acts and statements of the conspirators are binding on all those whom
27  [the jury] finds were members of the conspiracy." Jury Instructions at B-14 (citing, in part,
    *United States v. United Gypsum Co.*, 333 U.S. 364, 393 (1948) ("the declarations and acts of the
28  various [conspirators], even though made or done prior to the adherence of some to the

*Footnote continued on next page*

PLTFS' CONSOLIDATED OPP TO DEFS' JOINT AND
INDIVIDUAL MOTIONS FOR SUMMARY JUDGMENT
Master Docket No. 11-CV-2509-LHK

1    Mr. Catmull testified that he kept Mr. Jobs fully informed of the existence, intent, and

2  effect of Pixar's anti-solicitation agreement with Lucasfilm.  Catmull 61:13-19 (Mr. Jobs "knew

3  and understood—what we were trying to do with the Northern California Community."), 195:18-

4  21.  When, following Disney's acquisition of Pixar, Apple and Pixar formalized their secret anti-

5  solicitation agreement, they used the Lucasfilm-Pixar agreement as the template.  Ex. 139

6  ("effective now, we'll follow a gentleman's agreement with Apple that is similar to our Lucasfilm

7  agreement.").  Direct evidence shows that this agreement occurred as Plaintiffs allege.[12]

8    Mr. Jobs expanded the conspiracy aggressively, making clear that the anti-solicitation

9  agreements he demanded were not aberrant one-offs, but instead reflected a wider scheme to

10  eliminate competition for technical talent.  Mr. Jobs—renowned as one of the great visionaries of

11  the tech era—"believed that you should not be hiring each others' [sic], you know, technical

12  people[.]"  Schmidt 169:20-23.[13]  Mr. Schmidt admitted that, given his knowledge of Mr. Jobs's

13  "view," it was "*fair to extrapolate*" that "*he would have extended [anti-solicitation agreements]*

14  *to others*."  Schmidt 169:4-170:20 (emphasis added).  "[I]t was inappropriate in his view for us to

15  be calling in and hiring people.  And—and he would express this in unique Steve Jobs style.  Q:

16  Which was?  A: *Loud*."  Schmidt 169:12-17 (emphasis added.).  He "was very adamant about

17  protecting his employee force.  I mean, he was trying to develop tech talent, and he did want to

18  keep—I knew that."  Catmull 195:18-21.  "I think Mr. Jobs' view was that people shouldn't piss

19  him off.  And I think that things that pissed him off were—would be hiring, you know—

20  whatever."  Brin 112:21-24.

21    It is no coincidence that every express agreement at issue in this case involved Mr. Jobs

_Footnote continued from previous page_

22  conspiracy, become admissible against all as declarations or acts of co-conspirators in aid of the

23  conspiracy")).

[12] *Compare* CAC ¶¶ 85-91 with Exs. 139, 162, 369, 420, 424; Zissimos 128:20-23.

24  [13] Mr. Schmidt declined to discuss Mr. Jobs's motivations in detail given his recent death, and

25  chose instead to refer Plaintiffs' counsel to the "books that have profiled his personality,"
specifically the biography by Walter Isaacson.  Schmidt 58:13-22, 60:17-61:12.  In writing the

26  book, Mr. Isaacson interviewed dozens of witnesses, including key figures in this case: Mr.
Campbell, Mr. Catmull, Mr. Cook, Mr. Otellini, and Mr. Schmidt.  Walter Isaacson, *Steve Jobs*

27  575-76 (2011).  Mr. Jobs "kept a tight rein on the hiring process."  *Id.* at 142.  He "acted as if he
were not subject to the strictures around him," and had a "Nietzschean attitude that ordinary rules

28  didn't apply to him."  *Id.* at 119, 313.  Those ordinary rules apparently included the antitrust laws.

1    directly, and/or involved Bill Campbell, a long-time (and current) Apple Director and Mr. Jobs's

2    "[v]ery, very, very good friend." Campbell 20:1-3. Mr. Campbell's relationship with Mr. Jobs

3    dates back to April 1983 when Mr. Jobs interviewed him for a position at Apple. Campbell

4    17:25-18:4. Mr. Jobs and Mr. Campbell were also neighbors in Palo Alto and spoke to each other

5    several times a week. Campbell 20:6-18. This relationship proved critical in expanding the

6    conspiracy to the remaining Defendants.

7         In June 2004, Google determined that it needed to "dramatically increase the engineering

8    hiring rate." Ex. 1753. As Mr. Schmidt explained: "at the time in question Google was growing

9    very, very dramatically, and so we were certainly hiring lots of people from the Valley[.]"

10   Schmidt 126:18-20. *See also* Eustace 24:24 ("we doubled almost every year"); Rosenberg 73:20-

11   74:2 (Google was growing and hiring rapidly). Google concluded that it would "need to drain

12   competitors to accomplish this rate of hiring." Ex. 1753. This led to Mr. Lucas's concern:

13   Google had decided to "go out and raid all the other companies. It's a big problem. And they

14   will pay whatever it takes[.]" Lucas 184:13-16. As Meg Whitman said to Mr. Schmidt on

15   September 7, 2005: "Google is the talk of the Valley because [Google is] driving up salaries

16   across the board." Ex. 872.

17        Instead of retaining Apple employees by increasing their compensation, Mr. Jobs sought

18   to eliminate the competitive threat altogether. On February 13, 2005, Mr. Jobs was so "angry

19   about systematic solicitation" of Apple employees by Google that he placed an "irate call" to

20   Google's Sergey Brin. Ex. 557. Mr. Jobs was "very agitated" and made "various veiled

21   threats[.]" Ex. 557. Later that week, Mr. Jobs also called Mr. Campbell and Larry Page to

22   express his anger. Exs. 1868 and 1869. Mr. Jobs spoke with Mr. Brin again: "Basically, he said

23   'if you hire a single one of these people that means war'." Ex. 1871. The next day,

24   Mr. Campbell emailed Mr. Jobs: "Eric [Schmidt] told me that he got directly involved and firmly

25   stopped all efforts to recruit anyone from Apple." Ex. 199. *See also* Brin 61:8-11 ("But it

26   looks—if I believe this, at least Eric made a—you know, a—you know, at least some kind of—

27   had a conversation with Bill to relate to Steve to calm him down."); Schmidt 60:21-22 ("Steve

28   was unhappy, and Steve's unhappiness absolutely influenced the change we made in recruiting

1    practice[.]").  Apple's head of Human Resources, Danielle Lambert, announced the reciprocal

2    deal to Apple recruiters: "Please add Google to your 'hands-off' list.  We recently agreed not to

3    recruit from one another so if you hear of any recruiting they are doing against us, please be sure

4    to let me know.  Please also be sure to honor our side of the deal."  Ex. 563.  *See also* Flynn 76:6-

5    79:16.  Thereafter, and until the DOJ investigation, Google remained on Apple's "Do Not Call"

6    list, and Apple remained on Google's.  Patrick Flynn, a senior recruiter who worked for both

7    companies during the conspiracy period, confirmed that the two "Do Not Call" lists worked the

8    same way.  Flynn 110:18-112:23.  Additional direct evidence provides support that the agreement

9    between Apple and Google occurred just as Plaintiffs allege.[14]

10          Only three months after Mr. Jobs convinced Google to eliminate "systematic solicitation,"

11   Ex. 557, he persuaded Adobe's CEO, Bruce Chizen, to enter an identical agreement, largely by

12   threatening to have Apple solicit "any Adobe employee who is not a Sr. Director or VP."  Ex.

13   223.  Knowledge of the Adobe/Apple agreement spread to other Defendants as the conspiracy

14   continued.  For example, recruiters at Google were aware that Adobe had an anti-solicitation

15   agreement with Apple.  Ex. 2795 (Google recruiter: Apple has "a serious 'hand-off' policy with

16   Adobe.").  *See also* Flynn 65:8-10 ("I do recall Adobe being on the list"), 73:23-74:5, 138:22-23

17   ("I did reference Adobe being on the do-not-call list there.").  Mr. Flynn attended approximately

18   30 sessions of Google's Executive Management Group as a senior Google recruiter.  Flynn 56:6-

19   25.  Additional direct evidence provides further support that the agreement between Adobe and

20   Apple occurred as Plaintiffs allege.[15]

21          Google's agreement with Intel arose as part of the same common understanding and

22   course of conduct.  Google's senior executives told Paul Otellini, Google Director and Intel CEO,

23   about Mr. Jobs's demand for an anti-solicitation agreement and Google's acceptance.  Brin 74:15

24   ("I'm sure we would have mentioned it[.]"); Schmidt 126:10-11 ("I'm sure I spoke with Paul

25   about this at some point.").  Google's recruiting restrictions were discussed at Google Board

---

[14] *Compare* CAC ¶¶ 79-84 *with* Exs. 179, 180, 181, 187, 192, 199, 250, 276, 277, 563, 653, 1871;
Bentley 13:7-14:7, 36:12-17; Flynn 110:18-112:23; Geshuri 161:2-167:8, 172:6-8; Schmidt
60:21-22, 97:11-102:8; GOOG-HIGH TECH-00007574.

[15] *Compare* CAC ¶¶ 72-78 *with* Exs. 223, 225, 226, 679; Bentley 39:25-40:3.

1    meetings, which Mr. Otellini and Mr. Campbell regularly attended.  Rosenberg 85:15-24.

2    Mr. Jobs's anti-solicitation demand was also a topic at Google Board meetings.  Brin 74:15-17.

3    As a result of these meetings, communications, and agreements, both Intel and Apple were placed

4    on Google's "Do Not Call List" at the same time: March 6, 2005.  Ex. 1741 at 7.  The anti-

5    solicitation agreement was later reinforced and memorialized.  Ex. 202 ("We have a handshake

6    'no recruit' between eric and myself.  I would not like this broadly known."); Ex. 651 ("Can you

7    pls reinforce the no recruiting agreement?  I would appreciate it.").  Additional direct evidence

8    provides further support that the agreement occurred as Plaintiffs allege.[16]

9           Finally, after Mr. Campbell succeeded in bringing Google into the fold, Mr. Campbell

10   "requested that Intuit be added fully to the Do Not Call list."  Ex. 597.  Google agreed to

11   Mr. Campbell's request.  Ex. 597; Campbell 28:23-29:1 ("Shona Brown was the senior VP of

12   business operations, which included human resources, and I asked her not to cold-call Intuit, and

13   she said okay.").  Mr. Campbell admitted that what he cared about was the competitive effect of

14   the *calls*, more so than the actual hiring: "I don't know where they would get their names but, you

15   know, go down a list, you know, if they find a list of employees somewhere, and went A through

16   Z and called everybody that was a mid-level engineer and above, just to see if they would -- if

17   they could entice them to come over for an interview.  And that was what I objected to."

18   Campbell 30:16-22.  Direct evidence provides support that the agreement occurred as Plaintiffs

19   allege.[17]

20          Failed attempts to expand the conspiracy to additional companies provide yet more

21   support.  As the Court explained in denying Defendants' Joint Motion to Dismiss, the alleged

22   communications between Mr. Jobs and the then CEO of Palm, Ed Colligan, create a reasonable

23   inference that "Mr. Jobs had the intent to reduce competition for skilled labor and was aware that

24   'Do Not Cold Call' agreements were effective means of doing so."  *High-Tech I*, 856 F. Supp. 2d

25   at 1119.  Those communications in fact occurred exactly as Plaintiffs allege, and Mr. Colligan

26   ────────────────────
     [16] *Compare* CAC ¶¶ 97-102 *with* Exs. 182, 200, 201, 202, 387, 459, 460, 1869; Otellini 46:9-17;
27   76526DOC000007; GOOG-HIGH TECH-00056879.
     [17] *Compare* CAC ¶¶ 103-107 *with* Exs. 196, 197, 597; Campbell 28:23-29:1, 30:16-22, S. Brown
28   204:13-205:11; GOOG-HIGH TECH-00057458; GOOG-HIGH TECH-00058235.

1  himself provided Plaintiffs with a declaration providing yet further support. *Compare* CAC ¶¶ 92-

2  96 *with* Colligan Decl. ¶¶ 1-8, Exs. A and B.[18]

3      Thus the alleged facts that the Court earlier found "tend[] to exclude the possibility of

4  independent action" and "plausibly suggest[] 'a unity of purpose[,] a common design and

5  understanding, or a meeting of the minds in an unlawful arrangement," have now been

6  established with voluminous direct and circumstantial evidence. *High-Tech I*, 856 F. Supp. 2d at

7  1117 and 1120 (quoting *Monsanto*, 465 U.S. at 764). *See also id.* (quoting *Harkins Amusement*

8  *Enters., Inc. v. Gen. Cinema Corp.*, 850 F.2d 477, 484 (9th Cir. 1988) ("concerted action may be

9  inferred from circumstantial evidence of the defendant's conduct and course of dealings")

10  (internal citation omitted)).

11      Since the Court denied Defendants' joint motion to dismiss, discovery has provided a

12  record that is "so much richer" than the facts alleged in the CAC. May 15, 2013 Case Mgmt.

13  Conf. Tr., at 8:16-17. For brevity, Plaintiffs respectfully refer the Court to its own detailed

14  summaries of this evidence in its two orders regarding Plaintiffs' original and supplemental

15  motions for class certification. *High-Tech II*, 289 F.R.D. at 564-65, 570-573; *High-Tech III*, 2013

16  U.S. Dist. LEXIS 153752, at *55-110.

17      In addition to substantial documentary and testimonial evidence, Plaintiffs also provide

18  extensive expert analysis. First, Dr. Edward E. Leamer estimates the damages caused by

19  Defendants' conspiracy, applying the same methodology the Court examined carefully in

20  connection with class certification. Leamer Merits ¶¶ 16-46. Dr. Leamer is the Chauncery J.

21  Medberry Professor of Management, Professor of Economics, and Professor of Statistics at the

22  University of California at Los Angeles. He finds that Defendants accomplished their objective:

23  as a result of their conspiracy, Defendants suppressed total class compensation by 9.3% during

24  the conspiracy period. Leamer Merits, Figures 6 and 7. In addition, Dr. Leamer attaches and

25  resubmits his prior four expert reports that were prepared earlier in connection with class

26  certification. Leamer Merits ¶ 1, Exs. A-D. In those reports, Dr. Leamer examines the evidence

27

---

28  [18] Mr. Jobs also attempted to conclude a similar illegal agreement with Ed Zander, CEO of Motorola. Exs. 272, 1024, 1026, 2788.

1    and finds that the purpose and effect of Defendants' conspiracy was to suppress Class

2    compensation and mobility.  Leamer I ¶¶ 13-52, 57-62, 81-88, 107-125; Leamer II ¶¶ 10-40, 50-

3    56; Leamer IV ¶¶ 18-25.  Dr. Leamer applies economic theory that explains how the anti-

4    solicitation agreements succeeded in their objective.  Leamer I ¶¶ 66-80; Leamer II ¶¶ 49; Leamer

5    IV ¶¶ 20-25.  Finally, Dr. Leamer provides Class-wide methods of showing anticompetitive

6    impact and estimating damages, and showing that all or nearly all Class members were injured.

7    Leamer I ¶¶ 89-106, 126-148; Leamer II ¶¶ 41-48, 57-109; Leamer III ¶¶ 14-68; Leamer IV

8    ¶¶ 26-67.  Dr. Leamer also provided over 30 hours of deposition testimony, covering these and

9    other related topics.  Defendants move to exclude his damages analysis only, conceding the

10   admissibility of his remaining opinions.[19]

11          Second, Dr. Kevin F. Hallock is the Donald C. Opatrny '74 Chair of the Department of

12   Economics, the Joseph R. Rich '80 Professor, Professor of Economics and Human Resource

13   Studies, and Director of the Institute for Compensation Studies at Cornell University.[20]

14   Dr. Hallock conducts a detailed assessment of Defendants' testimony and contemporaneous

15   business records and finds: (1) all Defendants had formal administrative pay systems, including

16   using market surveys, Hallock ¶¶ 10-97, 196-200; (2) all Defendants worked to preserve internal

17   pay equity among their employees, ¶¶ 98-169; (3) pay moved in Defendant firms in systematic

18   and structured ways, ¶¶ 189-195, 201-216; (4) internal equity is consistent with pay for

19   performance, ¶¶ 170-179; and (5) anti-solicitation agreements had clear impacts on employee

20   compensation, and accordingly he predicts that pay suppression spread to all or nearly all Class

21   members, ¶¶ 180-239.  Defendants have not challenged any aspect of Dr. Hallock's testimony.

22          Third, Dr. Alan Manning is one of the world's leading authorities on labor markets and

23

---

24   [19] Despite the Court's prior rulings, Defendants spend 25 pages attacking Dr. Leamer's damages methodology.  Plaintiffs respond to these arguments separately.

25   [20] Since submitting an earlier analysis in support of Plaintiffs' Supplemental Motion for Class
26   Certification, Dr. Hallock received Princeton University's Richard A. Lester Award for the Outstanding Book in Industrial Relations, for his book *Pay*, on which much of his analysis in this case is based.  "The award is presented to the book making the most original and important
27   contribution toward understanding the problems of industrial relations, and the evolution of labor markets."  http://www.irs.princeton.edu/richard-lester-award-outstanding-book-industrial-
28   relations-and-labor-economics.

- 13 -

employer market power.  He is a Professor of Economics at the London School of Economics, and served as Chair of its Department of Economics from 2009-2012.  He is the author of a leading book on the subject of employer market power, *Monopsony in Motion: Imperfect Competition in Labor Markets*, published by Princeton University Press, and author of the chapter "Imperfect Competition in Labor Markets" in the Handbook of Labor Economics.  Manning, Ex. A.  Dr. Manning applies his expertise to the facts and finds: (1) knowledge of job opportunities play a central role in determining compensation, ¶¶ 17-26; (2) labor markets are imperfectly competitive and do not behave in the way Defendants' experts presuppose, ¶¶ 27-45, 52-56; (3) Defendants' conspiracy is likely to have had a large effect on Class members' job opportunities and the quality of information available to the Class, ¶¶ 11-16, 46-51, 57-73; and (4) Dr. Leamer's analyses are consistent with Dr. Manning's conclusions and observations, and Dr. Leamer's damages estimate "is an appropriate approach to measuring the impact of the conspiracy on worker compensation," ¶ 74.  Defendants concede the admissibility of Dr. Manning's opinions.

Fourth, Dr. Matthew Marx is Associate Professor of Technological Innovation, Entrepreneurship, and Strategic Management at the Massachusetts Institute of Technology Sloan School of Management.  He is an expert on the topic of employee non-compete agreements, has published empirical studies in prominent peer-reviewed journals investigating the impact of non-compete agreements,[21] and has twice provided testimony on the topic to the Massachusetts Joint Committee on Labor and Workforce Development.  Marx, Ex. 1.  Prior to his academic career, Dr. Marx spent a decade working at technology companies, including in Silicon Valley, where he obtained 7 U.S. Patents, wrote thousands of lines of computer code, led engineering teams of up to 75 technology workers, and oversaw extensive collaborations with other companies.  *Id.* Dr. Marx applies his expertise to the evidentiary record and investigates: (1) the likely impact of Defendants' conspiracy on Class compensation; and (2) Defendants' alternative explanation that their anti-solicitation agreements were created to facilitate technological collaborations and other

---

[21] *See, e.g.*, Matthew Marx, *The Firm Strikes Back: Non-Compete Agreements and the Mobility of Technical Professionals*, 76 Am. Soc. Rev. 695 (2011); Matthew Marx, et al., *Mobility, Skills, and the Michigan Non-Compete Experiment*, 55 Mgmt. Sci. 875 (2009).

1    pro-competitive purposes.  Dr. Marx agrees with Drs. Leamer, Hallock, and Manning and finds

2    that Defendants' conspiracy likely reduced Class compensation.  Marx ¶¶ 18-22; Marx Rebuttal

3    ¶¶ 29-43.  Dr. Marx observes that Defendants have advanced no justification for the alleged

4    conspiracy, and concludes that their purported justifications for their anti-solicitation agreements

5    are inconsistent with the evidence.  He explains that in his decade of experience managing

6    technical collaborations, and in his academic career studying employer/employee non-compete

7    agreements, he never encountered anti-solicitation agreements such as those at issue in this case.

8    Marx ¶ 23.  He finds that Defendants attempted to enter into anti-solicitation agreements with

9    Palm and with Facebook, where no corresponding collaboration existed.  *Id.* ¶ 26.  Defendants

10   did not establish anti-solicitation agreements at the time they undertook important technical

11   collaborations with each other.  *Id.* ¶ 27.  The individuals who managed and negotiated technical

12   collaborations among Defendants deny any knowledge that the anti-solicitation agreements even

13   existed, and the contracts memorializing the collaborations make no mention of the anti-

14   solicitation agreements.  *Id.* ¶¶ 28, 30.a; Marx Rebuttal ¶ 31.  Defendants and their experts ignore

15   that collaborations and other pro-competitive activities occurred before the conspiracy began,

16   continued among companies without anti-solicitation agreements during the conspiracy, and

17   continued apace after the anti-solicitation agreements ended.  Marx ¶¶ 29-32; Marx Rebuttal ¶¶ 1-

18   31.  "Thus, the record shows that the anti-solicitation agreements did not have anything to do with

19   these supposed collaborations."  Marx ¶ 29.

20   **III.    THE LAW REGARDING SUMMARY JUDGMENT AND CONSPIRACY SHOW
         THAT DEFENDANTS' MOTIONS SHOULD BE DENIED**

21

22         **A.    Legal Standards**

23           **1.    Summary Judgment**

24         Summary judgment must be denied unless the evidence plainly demonstrates there is "no

25   genuine dispute of material fact," and Defendants are "entitled to judgment as a matter of law."

26   *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  It is "hornbook

27   law" that "courts are obligated to construe the evidence in the light most favorable to the non-

28   moving party, to give the non-moving party the benefit of all reasonable inferences, and to refrain

from making credibility determinations." *Citric Acid*, 191 F.3d at 1094.  In "complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators. . . .  It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised." *Beltz Travel Serv., Inc. v. Int'l Air Transp. Ass'n*, 620 F.2d 1360, 1365 (9th Cir. 1980) (quotation omitted).  Where, as here, a plaintiff alleges a conspiracy that "is economically sensible for the alleged conspirators to undertake and 'the challenged activities could not reasonably be perceived as procompetitive,'" a court may make broad inferences based on circumstantial evidence.  *In re Publ'n Paper Antitrust Litig.*, 690 F.3d 51, 63 (2d Cir. 2012) (quoting *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 358 (3d Cir. 2004) (discussing inferences permissible under *Matsushita*). *See also In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) ("Direct evidence of conspiracy is not a sine qua non").  "Circumstantial evidence is not 'inherently less probative than direct evidence.'"  *United States v. Zamorano-Leyva*, 220 Fed. Appx. 557, 558 (9th Cir. 2007) (quoting *United States v. Perez*, 491 F.2d 167, 171 (9th Cir. 1974), *cert. denied sub nom. Lombera v. United States*, 419 U.S. 858 (1974)).  Indeed, "circumstantial evidence is the lifeblood of antitrust law."  *United States v. Falstaff Brewing Corp.*, 410 U.S. 526, 536 n.13 (1973).

Plaintiffs here "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.  The direct evidence adduced constitutes more than a "scintilla of evidence"; and the circumstantial evidence is "evidence on which the jury could reasonably find" for Plaintiffs (especially when viewed in the light most favorable to Plaintiffs, with all justifiable inferences in Plaintiffs' favor).  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986).

In *Matsushita*, two American consumer electronics manufacturers alleged a predatory pricing conspiracy whereby their 21 Japanese competitors suppressed the prices of consumer electronics in the United States for decades in the hope of driving the American companies out of business.  475 U.S. at 582-584.  The Supreme Court reviewed the evidence and concluded that the alleged conspiracy was economically irrational and practically infeasible, given that the 21

1    Japanese competitors had cut prices for over twenty years without ever succeeding in their

2    alleged goal of driving the American companies out of business, and that the plaintiffs continued

3    to enjoy the largest share of the American retail market. *Id.* at 591-593. Critically, the behavior

4    complained of—reducing prices—would otherwise be considered pro-competitive: "cutting

5    prices in order to increase business often is the very essence of competition." *Id.* at 594. "Thus,

6    mistaken inferences in cases such as this one are especially costly, because they chill the very

7    conduct the antitrust laws were designed to protect." *Id.*[22]

8            As the Ninth Circuit explained in applying *Matsushita* to reverse a district court's grant of

9    summary judgment: "In short, the trial court must consider whether, on the evidence presented,

10   the protection of innocent independent conduct outweighs the costs associated with the potential

11   decrease in strict antitrust enforcement." *In re Petroleum Prods. Antitrust Litig.*, 906 F.2d 432,

12   439 (9th Cir. 1990).[23] Here, Defendants' conduct was neither "innocent" nor "independent."

13   Defendants are not being accused of lowering prices to consumers. The uncontroverted direct

14   evidence shows that Defendants all entered into secret agreements to eliminate competition for

15   their employees. There is no innocent or independent conduct to protect. However, the costs

16   associated with "the potential decrease in strict antitrust enforcement," *id.*, would be enormous.

17   While Defendants agreed to end their illicit agreements as part of the stipulated Final Judgment

---

[22] *See also Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 468 (1992) ("The Court's requirement in *Matsushita* that the plaintiffs' claims make economic sense did not introduce a special burden on plaintiffs facing summary judgment in antitrust cases. The Court did not hold that if the moving party enunciates *any* economic theory supporting its behavior, regardless of its accuracy in reflecting the actual market, it is entitled to summary judgment. *Matsushita* demands only that the nonmoving party's inferences be reasonable in order to reach the jury, a requirement that was not invented, but merely articulated, in that decision.").

[23] *See also Publ'n Paper*, 690 F.3d at 63 (distinguishing *Matsushita* and reversing summary judgment, explaining that "broader inferences are permitted, and the 'tends to exclude' standard is more easily satisfied, when the conspiracy is economically sensible for the alleged conspirators to undertake and 'the challenged activities could not reasonably be perceived as procompetitive'") (quoting *Flat Glass*, 385 F.3d at 358); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350 (3d Cir. 2004) (distinguishing *Matsushita* and reversing summary judgment in part); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002) (distinguishing *Matsushita* and reversing summary judgment, explaining that it is the province of the jury to weigh conflicting evidence, and it is error to "suppose that if no single item of evidence presented by the plaintiff points unequivocally to conspiracy, the evidence as a whole cannot defeat summary judgment"); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., Inc.*, 998 F.2d 1224 (3d Cir. 1993) (distinguishing *Matsushita* and reversing summary judgment); *Apex Oil Co. v. Di Mauro*, 822 F.2d 246 (2d Cir. 1987) (distinguishing *Matsushita* and reversing summary judgment).

1   with the DOJ, they have not paid any fines and have not compensated the intended targets—their

2   employees—for the harm Defendants inflicted.  "Strict antitrust enforcement" would substantially

3   diminish if these leading corporate titans could brazenly violate the antitrust laws with no

4   consequence.

5               **2.      Conspiracy**

6          It is no defense that Defendants' conspiracy consisted of a network of unlawful bilateral

7   agreements.  It is well established that a single conspiracy may be comprised of—or implemented

8   through—individual agreements, communications or understandings.  *See Blumenthal v. United*

9   *States*, 332 U.S. 539, 559 (1947) (finding several agreements to be "essential and integral steps"

10  in forming a single conspiracy); *United States v. Bibbero*, 749 F.2d 581, 587 (9th Cir. 1984) ("A

11  single conspiracy may involve several subagreements or subgroups of conspirators.").  Because

12  "[s]ecrecy and concealment are essential features of successful conspiracy," the "law rightly gives

13  room for allowing the conviction of those discovered upon showing sufficiently the essential

14  nature of the plan and their connections with it, without requiring evidence of knowledge of all its

15  details or of the participation of others."  *Blumenthal*, 332 U.S. at 557.  The unlawful nature of

16  Defendants' conspiracy and their network of bilateral agreements should be determined together,

17  not piecemeal.  *Cont'l Ore*, 370 U.S. at 699; *Standard Oil Co. v. United States*, 337 U.S. 293

18  (1949); *Twin City Sportservice Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1303 (9th Cir

19  1982) ("[c]reating such a distinction would require courts to enforce arguably innocuous single

20  contracts that belong to a pattern of contractual relations that significantly restrain trade").

21         Resolution of the issue of whether there is a single conspiracy or separate ones is

22  ordinarily an issue for the finder of fact.  Determining whether a "single conspiracy has been

23  proved, rather than multiple conspiracies . . . is essentially a question of the sufficiency of the

24  evidence."  *Bibbero*, 749 F.2d at 586.  At trial, the trier of fact will consider "the nature of the

25  scheme; the identity of the participants; the quality, frequency, and duration of each conspirator's

26  transactions; and the commonality of time and goals."  *Id.* at 587.  Such evidence will sustain a

27  finding of a single conspiracy.[24]  *See also United States v. Bloch*, 696 F.2d 1213, 1215 (9th Cir.

28  [24] *See United States ex rel. Miller v. Harbert Int'l Constr., Inc.*, 608 F.3d 871 (D.C. Cir. 2012)

*Footnote continued on next page*

1    1982) (court upheld jury's finding of a single conspiracy because the "conspiracy involved the

2    same scheme, the same central actors, the same activities, and the same goals."); *United States v.*

3    *Burns*, No. 98-50771, 2000 U.S. App. LEXIS 15801, *3-6 (9th Cir. July 6, 2000) ("Whether there

4    is one conspiracy or many is a question of fact for the jury to decide").

5          For instance, in *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 221,

6    226 (3d Cir. 2008), the Third Circuit reversed summary judgment of antitrust conspiracy claims

7    involving horizontal agreements among Mack truck dealers and a vertical agreement among

8    Mack and its dealers.  Addressing whether the plaintiffs submitted sufficient evidence to

9    overcome summary judgment on the horizontal agreements under *Matsushita*, the court stated:

> [Plaintiff] presented several pieces of direct evidence for the existence of one or
> more agreements among Mack dealers not to compete with each other. Because we
> conclude that [plaintiff]'s direct evidence is sufficient to allow a jury to conclude
> that a conspiracy not to compete existed among Mack dealers, *we need not apply
> the rules restricting inferences drawn from circumstantial evidence*. . . . Mack
> argues that [plaintiff]'s evidence is insufficient to give to a jury because *the record
> does not reveal the exact extent of any such agreements*. . . . It may well be that
> [plaintiff]'s inability to present the details of any agreement among dealers would
> leave a jury unpersuaded that such agreements did in fact exist. That, however, is
> not our inquiry. Instead, we must consider whether the evidence entitles [plaintiff]
> to place that question before the jury at all. We believe it does.  Simply put,
> [plaintiff]'s evidence was sufficient because a jury considering it could believe it
> and reasonably conclude that agreements not to compete did exist among Mack
> dealers.

*Id.* at 220 (emphasis added).  The same outcome is required here.  Plaintiffs have provided direct

evidence of unlawful horizontal agreements among Defendants, which Defendants admit.

Defendants may dispute the *exact extent* of the conspiracy.  But, as in *Mack Trucks*, the question

is clearly one for the jury to decide.

It is also not a defense if one is coerced into violating the antitrust laws.  Acquiescence is

sufficient to establish participation in a conspiracy, and the acquiescing party need only know of

the anticompetitive effect.  *United States v. Paramount Pictures*, 334 U.S. 131, 161 (1948)

("acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and

promotion of one").  *See also Virginia Vermiculite, Ltd. v. W.R. Grace & Co.*, 156 F.3d 535, 541

---

*Footnote continued from previous page*
(upholding jury verdict's finding of an overarching conspiracy); *United States v. Hemphill*,
514 F.3d 1350, 1364 (D.C. Cir. 2008) (same); *United States v. DeVarona*, 872 F.2d 114, 120 (5th
Cir. 1989) (same); *United States v. Kelly*, 892 F.2d 255, 259 (3d Cir. 1989) (same).

1   (4th Cir. 1998) (same); *MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.*, 62 F.3d 967,

2   973 (7th Cir. 1995) ("[T]he 'combination or conspiracy' element of Section 1 violation is not

3   negated by the fact that one or more of the co-conspirators acted unwillingly, reluctantly, or only

4   in response to coercion.").

5          Nor is it necessary, as Defendants contend, for all underlying agreements to begin at the

6   same moment: "It is not clear at what precise point of time each appellee became aware of the

7   fact that its contract was not an isolated transaction but part of a larger arrangement." *United*

8   *States v. Masonite Corp.*, 316 U.S. 265, 274-75 (1942) (reversing post-trial dismissal of antitrust

9   conspiracy).  *See also Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 227 (1939) ("It is

10  elementary that an unlawful conspiracy may be and often is formed without simultaneous action

11  or agreement on the part of the conspirators."); *United States v. Nat'l Lead Co.*, 332 U.S. 319,

12  325-27 (1947) (defendant joined the conspiracy thirteen years after inception); *Indus. Bldg.*

13  *Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1343 (9th Cir. 1970) (defendant joined the

14  conspiracy two years after inception); *United States v. Cont'l Group, Inc.*, 603 F.2d 444, 452-53

15  (3d Cir. 1979) (no need "to prove that [Defendant] participated in the conspiracy from its

16  inception, but only that he knowingly became a member of the ongoing conspiracy"—defendants

17  joined ten and nineteen years after inception) (citation omitted); *In re Elec. Books Antitrust Litig.*,

18  859 F. Supp. 2d 671, 689 (S.D.N.Y. 2012) ("a conspirator may join a conspiracy at any time that

19  it is ongoing; there is no requirement that a conspirator join in a conspiracy from its inception").

20         Defendants also assert that because each of their bilateral agreements were in their

21  individual self-interest, those agreements cannot be used to infer the alleged conspiracy.

22  Defendants are incorrect, regardless of whether their bilateral agreements were lawful (and they

23  were not).  "It is of no consequence, for purposes of determining whether there has been a

24  combination or conspiracy under § 1 of the Sherman Act, that each party acted in its own lawful

25  interest." *United States v. General Motors Corp.*, 384 U.S. 127, 142 (1966).  *See also Masonite*,

26  316 U.S. at 276 ("the fact that there were business reasons which made the arrangements

27  desirable to the appellees . . . would be no more a legal justification for price-fixing than were the

28  'competitive evils' in the *Socony-Vacuum* case."); *United States v. Apple Inc.*, No. 12 Civ. 2826

1    (DLC), 2013 U.S. Dist. LEXIS 96424, at *152 (S.D.N.Y. July 10, 2013) ("It is not surprising that

2    Apple chose to further its own independent, economic interests.  Such a motivation, however,

3    does not insulate a defendant from liability for illegal conduct.") (citing *General Motors*,

4    384 U.S. at 142).

5         At trial, the jury will be instructed that, to create a conspiracy, "two or more persons must

6    enter into an agreement that they will act together for some unlawful purpose," and that "the

7    evidence need not show that its members entered into any formal or written agreement; that they

8    met together; or that they directly stated what their object or purpose was, or the details of it, or

9    the means by which they would accomplish their purpose.  The agreement itself may have been

10   entirely unspoken."  ABA Model Jury Instructions in Civil Antitrust Cases (2005 ed.) ("Jury

11   Instructions") at B-2 to B-3.  The jury will be asked whether the evidence shows that each

12   defendant "knowingly joined in the unlawful plan at its inception or some later time with the

13   intent to advance or further some object or purpose of the conspiracy."  Jury Instructions, at B-13.

14   "A person may become a member of a conspiracy without full knowledge of all the details of the

15   conspiracy, the identity of all its members, or the parts they played."  *Id*. at B-13.  "If you find

16   that the alleged conspiracy existed, then the acts and statements of the conspirators are binding on

17   all those whom you find were members of the conspiracy."  *Id*. at B-14.  Moreover, it is not

18   necessary that each member of the conspiracy participate in "every detail in the execution of the

19   conspiracy . . . to establish liability, for each conspirator may be performing different tasks to

20   bring about the desired result."  *Beltz*, 620 F.2d at 1367 ("If Beltz can establish the existence of a

21   conspiracy in violation of the antitrust laws and that appellees were a part of such a conspiracy,

22   appellees will be liable for the acts of all members of the conspiracy in furtherance of the

23   conspiracy, regardless of the nature of appellees' own actions.").  *See also Twentieth Century-Fox*

24   *Film Corp. v. Harkins Amusement Enters., Inc.*, No. 90-80190, 1990 U.S. App. LEXIS 21836, at

25   *2-3 (9th Cir. Aug. 20, 1990) (citing *Beltz*, holding that Plaintiffs may establish "liability of a

26   distributor for participating in an overall conspiracy against [plaintiff] that, unknown to it,

27   involved other distributors," and "each of those distributors would be jointly and severally liable

28   for all damages flowing from the conspiracy . . . .").

The voluminous record provides ample basis for the jury to reasonably find for Plaintiffs, particularly when that record is viewed in the light most favorable to Plaintiffs and all justifiable inferences are drawn in their favor. *Liberty Lobby*, 477 U.S. at 252, 255.

### 3.       Defendants' Cases Are Inapposite

This is not a case where a jury will be asked to infer a concerted violation from mere parallel conduct. *White v. R.M. Packer Co.* concerned price fixing in a "geographically constrained gasoline market with *publicly* posted prices," in contrast to the secret pacts at issue here. 635 F.3d 571, 577 (1st Cir. 2011) (emphasis added). The court distinguished this phenomenon from a tacit agreement, which is sufficient to sustain a section 1 claim, explaining that while tacit agreements may also involve "uniform behavior among competitors," it is "preceded by conversations implying that later uniformity might prove desirable or accompanied by other conduct that in context suggests that each competitor failed to make an independent decision." *Id.* at 576 (internal quotation marks and citation omitted). The context here provides ample evidence suggesting that Defendants were not making independent decisions.

*Wilcox v. First Interstate Bank, N.A.*, 815 F.2d 522 (9th Cir. 1987), also concerned publicly-available prices and is distinguishable on the same basis. There, the defendant bank was accused of price-fixing based on its interest rates paralleling those of other banks. *Id.* at 524. Similar to *White*, those rates were publicly available. *Id.* at 526 (noting "publication by the wire services"). The court affirmed summary judgment because nothing the plaintiffs presented suggested that the bank was engaging in more than conscious parallelism. *Id.* at 527 (requiring conscious parallelism to be accompanied by additional evidence). As already explained, here, Defendants are not just independently "following the [publicly-disclosed actions] of an industry leader." *Id.* Plaintiffs present more than just evidence of Defendants mimicking each other's publicly-known conduct.

Also distinguishable are Defendants' cases addressing motions to dismiss, finding that plaintiffs' pleadings failed to state claims based on independent bilateral agreements between defendants. For instance, separate from being distinguishable because the agreements there were "strictly vertical in nature," the conspiracy alleged in *In re Ins. Brokerage Antitrust Litig.* rested

1   simply on defendants' engaging in similar conduct between insurance brokers and their partner-

2   insurers.  618 F.3d 300, 335-36 (3d Cir. 2010).  The court found nothing to suggest a "plausible

3   inference of horizontal conspiracy," noting that "the complaints themselves provide obvious

4   reasons to conclude that the brokers were able to steer clients to preferred insurers without the

5   need for any agreement among the insurers."  *Id.* at 335.  This Court has already come to the

6   opposite conclusion based upon allegations that have since been supported by direct and

7   circumstances evidence.  *High-Tech I*, 856 F. Supp. 2d at 1120.  Defendants also rely on *Dickson*

8   *v. Microsoft Corp.*, another case where the plaintiffs failed to state a claim based on their

9   challenge of vertical agreements.  309 F.3d 193 (4th Cir. 2002).  There, the plaintiffs alleged a

10  single conspiracy involving Microsoft and various computer manufacturers, claiming that

11  Microsoft entered into "licensing agreements" with the manufacturers that contained identical

12  anticompetitive provisions.  *Id.* at 199.  Plaintiffs failed to allege "an overlap of key actors,

13  methods, and goals," which the court noted was sufficient to support an inference of conspiracy in

14  the criminal context.  *Id.* at 203 n.12 (internal quotation marks and citation omitted).  The case

15  bears no relationship to the rich evidence here.

16          Finally, attempting to reinforce its unavailing reliance on *Insurance Brokerage* and

17  *Dickson*, Google cites *Toys "R" Us v. FTC*, 221 F.3d 928 (7th Cir. 2000), asserting that this case

18  teaches that "vertical agreements with multiple manufacturers" constitute rimless conspiracies

19  insufficient to support allegations of a single conspiracy.  Google MSJ at 12.  Google misstates

20  the case, citing to the court's recitation of the ***defendant's*** characterization of the conspiracy,

21  which the court ***rejected***.  *Id.* at 935 ("We need only decide whether the inference the

22  Commission drew of horizontal agreement was a permissible one from that evidence, not if it was

23  the only possible one. . . . The commission is right.").  The Seventh Circuit applied *Interstate*

24  *Circuit*, 306 U.S. at 223-34, and found that a "horizontal agreement" among the toy

25  manufacturers was supported by "direct evidence of communications" among the competitors and

26  knowledge of the overall goals of the conspiracy.  *Id.* at 936 (rejecting defendant's attempt to

27  "avoid this result by hypothesizing independent motives.").  Plaintiffs present such evidence here.

28

**B.**     **Defendants Cannot Satisfy Their Initial Burden Under *Matsushita***

Even if the Court determines that Plaintiffs rely "entirely upon circumstantial evidence," Defendants bear the initial burden of showing: (1) that their conduct "is consistent with other plausible explanations, and (2) permitting an inference of conspiracy would pose a significant deterrent to beneficial procompetitive behavior." *Petroleum Prods.*, 906 F.2d at 440. *See also Citric Acid*, 191 F.3d at 1094 (when a "plaintiff rests its case entirely on circumstantial evidence" a defendant can rebut an allegation of conspiracy "by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice.") (internal quotation marks and citation omitted). Defendants cannot satisfy their initial burden because they have failed to provide a plausible alternative explanation, and they cannot show that their anti-solicitation agreements were procompetitive, justifiable, or consistent with proper business practice.

**1.**     **Defendants Provide No Alternative Plausible Explanation For The Alleged Conspiracy**

Defendants cannot show that the alleged conspiracy is consistent with other plausible explanations for the simple reason that Defendants have not provided any. Defendants have not made any attempt to explain how six identical, secret anti-solicitation agreements could have arisen at the same time, operating continuously and concurrently for five years, among such a small, close-knit group of senior executives without "a unity of purpose, a common design and understanding, or a meeting of minds in an unlawful arrangement." *High-Tech I*, 856 F. Supp. 2d at 1120 (quoting *Monsanto*, 465 U.S. at 764). *See also Am. Tobacco Co. v. United States*, 328 U.S. 781, 805 (1946) (evidence showed improbable common conduct for which the defendants offered no legitimate justification). Defendants ignore the relevant inquiry under controlling authority. A conspiracy must be viewed as the sum of its parts, not each part separately. *High-Tech I*, 856 F. Supp. 2d at 1118 (quoting *Cont'l Ore*, 370 U.S. at 699).

Defendants' Joint Motion for Summary Judgment is a single page and says nothing about the alleged conspiracy "as a whole." Instead, each Defendant filed an individual motion, selectively addressing only certain issues as to that Defendant. "The crucial question, however, is whether the evidence *considered as a whole* can support an inference of conspiracy[.]" *Citric*

1    *Acid*, 191 F.3d at 1105-06 (emphasis in original); *see also Cont'l Ore*, 370 U.S. at 699.

2    Defendants ignore the "'larger picture' of senior executives from closely connected high-tech

3    companies in Northern California contemporaneously negotiating and enforcing six bilateral 'Do

4    Not Cold Call' agreements." *High-Tech I*, 856 F. Supp. 2d at 1120.

5            For instance, Apple begins its argument with the remarkable assertion that there is "not a

6    shred of evidence" suggesting that "Apple entered into any agreement with the intent or purpose

7    to suppress the compensation of its own employees, let alone the compensation of [other

8    Defendants]." Apple MSJ at 1. Apple ignores the alleged statements by Mr. Jobs in the CAC

9    that the Court already found do exactly that, *High-Tech I*, 856 F. Supp. 2d at 1119, or the direct

10    evidence produced by Plaintiffs establishing that those communications in fact occurred.

11    *Compare* CAC ¶¶ 94 and 95 *with* Colligan Decl., Exs. A and B. Apple ignores admissions from

12    other Defendants, such as the testimony of Mr. Lucas and Mr. Catmull, and Mr. Catmull's

13    admission that Mr. Jobs "knew and understood—what we were trying to do with the Northern

14    California Community." Catmull 61:13-19. Apple compounds the misrepresentation by asserting

15    that Plaintiffs' expert Dr. Marx "concedes" the lack of evidence from which to infer

16    anticompetitive intent. Apple MSJ at 1. In fact, as Dr. Marx explained at length in his reports

17    and at his deposition: "It is clear from the evidence that the anti-solicitation agreements were

18    established for the purpose of suppressing compensation." Marx ¶ 6.d. *See also id.* ¶¶ 7-17

19    (assessing evidence of common anticompetitive purpose); 18-22 (explaining how Defendants'

20    anti-solicitation agreements likely suppressed Class compensation); 23-32 (opining that the

21    record demonstrates that Defendants' anti-solicitation agreements had "nothing to do" with their

22    proffered justification of facilitating technical collaborations); Marx Rebuttal ¶¶ 8-43 (explaining

23    why Defendants' experts fail to establish any legitimate justification for Defendants'

24    misconduct); Marx Dep. 280:19-288:1 (explaining his bases for inferring anticompetitive

25    purpose).

26            Each Defendant likewise retained its own expert who ignored the alleged conspiracy "as a

27    whole" and instead only examined the "separate part" (relying on only a very selective subset of

28    evidence) as to that Defendant. While Defendants all concede that they entered into the alleged

1   bilateral agreements, they provide after-the-fact rationales for them.  These explanations are

2   pretextual, do not comport with the plain language of contemporaneous documents, and

3   improperly invite the Court to resolve credibility issues or weigh evidence, as prohibited by such

4   cases as *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999) (*en banc*).

5          Adobe retained Dr. David Lewin, who reviewed only Adobe fact witness depositions and

6   virtually no business records produced by other Defendants.  Lewin, Ex. 2.  Dr. Lewin offers no

7   opinion on the plausibility or justification for the alleged conspiracy, or even the Adobe / Apple

8   anti-solicitation agreement.  Intel retained Dr. Edward Snyder, who reviewed a total of nine

9   business records (six produced by Intel and three produced by Google) and only two fact witness

10  depositions, both Intel.  Snyder, App. C.  Dr. Snyder accordingly limited his task to whether the

11  Google / Intel agreement, standing alone, had pro-competitive justifications.  Snyder ¶ 10.

12  Google retained Dr. Talley, who reviewed only fact witness depositions of Google witnesses (and

13  the deposition of Mr. Campbell).  Talley, App. B.  Dr. Talley limited his task to examining only

14  the individual agreements to which Google entered, but ignored all other evidence, including even

15  the attempted recruiting "truce" Google sought with Facebook that his proffered justifications

16  cannot possibly explain (Google had no technical collaboration with Facebook and no

17  overlapping board member).[25]  Dr. Talley also admitted he does not advance an alternative

18  explanation for how Defendants' anti-solicitation agreements could have arisen without

19  coordination or common understanding; he has no opinion regarding whether the alleged

20  conspiracy actually occurred; and he did not examine evidence regarding agreements to which

21  Google was not an express party.  Talley Dep. 239:17-241:10.  Apple retained Dr. Kevin Murphy

22  to evaluate documentary evidence regarding Apple, despite his earlier admission that he is

23  unqualified to perform the task: "I got no particular advantage of reading documents.  I'm

24  probably worse at reading documents than most people."  July 5, 2013 Murphy Dep. at 443:12-

25  15.  Like Defendants' other experts, Dr. Murphy only evaluated anti-solicitation agreements to

26  which Apple is a direct party, and he provided no explanation for how the full set of anti-

27  solicitation agreements could have arisen without coordination or communication.  Murphy

28  [25] Ex. 667; Rosenberg Dep. 122:20-127:9; Sandberg Decl. ¶¶ 1-7.

1  Report.[26]

2        Defendants cannot show a plausible, alternative explanation for the alleged conspiracy as

3  a whole.  They have not even tried.

4              **2.     Defendants Cannot Show That The Alleged Conspiracy Was
                       Otherwise Pro-Competitive**

5

6        The inference of conspiracy here is not based upon otherwise pro-competitive behavior,

7  but from a network of secret, company-wide anti-solicitation agreements, misconduct that

   Defendants now concede occurred.[27]  Such secret collusion among horizontal competitors to
8
   eliminate competition among them is not "the very essence of competition," *Matsushita*, 475 U.S.
9
   at 594, it is the "supreme evil of antitrust," *Verizon Communs., Inc. v. Law Offices of Curtis V.*
10
   *Trinko, LLP*, 540 U.S. 398, 408 (2004).
11
        The unlawful nature of Defendants' misconduct is further confirmed by the DOJ
12
   investigation.  The DOJ concluded that Defendants' anti-solicitation agreements, with or without
13
   a common understanding or shared purpose among them, were all per se violations of the
14
   Sherman act because "the agreements were naked restraints and not ancillary to achieving
15
   legitimate business purposes."  DOJ Competitive Impact Statement at 6 (formatted).  Defendants
16
   stipulated to a Final Judgment in which they agreed that their anti-solicitation agreements would
17
   thereafter be prohibited, and agreed to a variety of compliance measures to ensure that such
18
   agreements would never reoccur.  Final Judgment.  These measures include furnishing the Final
19

20
   _____

21  [26] All six of Defendants' experts improperly reply upon, and uncritically accept as true,
   Defendants' interrogatory responses and attorney-drafted declarations.  Plaintiffs have moved to
22  exclude any expert opinions premised upon these documents. Dkt. 565.  *See Therasense, Inc. v.*
   *Becton Dickinson and Co.*, No. 04-02123 WHA, Omnibus Order on Motion for Final Pretrial
   Conference Submitted With Oral Argument, Dkt. 1024 at 2 (May 22, 2008) ("One of the worst
23  abuses in civil litigation is the attempted spoon-feeding of client-prepared and lawyer-
   orchestrated 'facts' to a hired expert who then 'relies' on the information to express an opinion."),
24  *attached to* Harvey Decl, Ex. 206.

25  [27] Perversely, Defendants seek to use the strength of this unambiguous evidence of explicit
   agreements to undermine the legitimate plausible inference of a broader conspiracy which this
   evidence, together with other strong circumstantial evidence, permits.  It is settled law that "no
26  formal agreement is necessary to constitute an unlawful conspiracy." *Am. Tobacco Co.*, 328 U.S.
   at 809; *United States v. Gen. Motors Corp.*, 342 U.S. at 142-143 ("explicit agreement is not a
27  necessary part of a Sherman Act conspiracy").  Even "[s]eemingly innocent or ambiguous
   behavior can give rise to a reasonable inference of conspiracy in light of the background against
28  which the behavior takes place." *Apex*, 822 F.2d at 255.

1   Judgment and the DOJ's Competitive Impact Statement to "each Defendant's officers, directors,

2   human resource managers, and senior managers who supervise employee recruiting, solicitation,

3   or hiring efforts"; training those individuals annually "on the meaning and requirements" of the

4   "Final Judgment and the antitrust laws"; and requiring a certification from each of those

5   individuals that he or she understands and has abided by the Final Judgment, is not aware of any

6   violations that have not been reported, and understands that "failure to comply with [the] Final

7   Judgment may result in an enforcement action for *civil or criminal contempt* of court against

8   each Defendant and/or any person who violates this Final Judgment[.]"  Final Judgment at 7-9

9   (emphasis added).  Defendants ended their anti-solicitation agreements and appear to have abided

10   by the Final Judgment.  *See*, *e.g.*, J. Morris 165:13-16 ("we had an agreement for a long period of

11   time that we wouldn't recruit from each other, and we are not doing that anymore. We rescinded

12   that agreement."), 103-19-25 ("reason is there was a consent decree."); T. Cook 54:10-15 ("we

13   abide by the consent decree that we signed . . . that's how we run the company.").  Thus, an

14   inference of conspiracy here cannot "have the effect of deterring significant procompetitive

15   conduct."  *Petroleum Prods.*, 906 F.2d at 439.

16        Defendants' attempt to construct after-the-fact justifications for these secret agreements is

17   unavailing.  The limited analyses of defense experts Drs. Lewin, Murphy, Talley, and Snyder

18   only further demonstrate Defendants' failure to show "a plausible and justifiable reason for [their]

19   conduct that is consistent with proper business practice."  *Citric Acid*, 191 F.3d at 1094 (internal

20   quotation marks omitted).  First, Defendants' experts could not provide a single example of such

21   secret anti-solicitation agreements outside of the facts of this case.  Defendants' experts also

22   could not point to a single collaboration that would not have occurred but for the anti-solicitation

23   agreements.  The best these experts could do is assert that such agreements are "consistent" with

24   "consensus best practices" regarding "collaboration among potential competitors."  Talley Report

25   at 11.  However, as Dr. Talley admitted at his deposition, his only support for this assertion is the

26   "Model Merger Agreement for the Acquisition of a Public Company," an ABA publication that is

27   irrelevant to the conduct at issue in this case.  Talley Dep. 140:20-146:13; Ex. 2923.  The

28   document concerns an acquisition of one company by another, and Dr. Talley confirmed there

1    was no evidence that this occurred, or was even contemplated among the Defendants.  Talley

2    Dep. 142:12-18.  Moreover, the ABA publication does not even suggest that anti-solicitation

3    agreements such as those at issue in this case are appropriate to facilitate mergers; to the contrary,

4    the treatise suggests limiting any anti-solicitation agreements in just the way the Final Judgment

5    requires.  *Compare* Ex. 2923 at 366-367 *with* Ex. 166 at 5-6.  *See also* Talley Dep. 142:2-

6    146:23.[28]

7         Second, their opinion that the anti-solicitation agreements were important to facilitate pro-

8    competitive technical collaborations finds no support in the record.  Aside from uncritically

9    adopting attorney-drafted interrogatory responses and declarations, Defendants' experts rely on

10    the fact that these Defendants collaborated with each other while their anti-solicitation

11    agreements were in place.  By contrast, Dr. Marx examines Defendants' claim by looking at the

12    evidence as a whole and determines whether: (1) the anti-solicitation agreements were tied to

13    technical collaborations; and (2) whether technical collaborations among Defendants were tied to

14    anti-solicitation agreements.  Marx ¶ 5.  Dr. Marx finds that the evidence is inconsistent with

15    Defendants' claimed justifications.  *See* Part II, *supra*.  Dr. Talley admitted that none of the

16    collaboration contracts mention the anti-solicitation agreements, and that the written contracts by

17    their own terms constitute the entire agreements between the parties concerning the

18    collaborations.[29]  Talley Dep. 116:23-117:12; 217:16-22.

19

20    [28] Like Defendants' other experts, Dr. Talley could not provide a single example of any other
anti-solicitation agreement such as those at issue in this case.  Talley Dep. 35:15-23.  Dr. Talley

21    insisted he has never advised his students to enter into such agreements, *id.* 62:1-12 ("[T]his
should not be understood as advising them to get into such agreements willy-nilly"); and

22    Dr. Talley testified that, after his work on this case, he may use the DOJ consent decree as a
teaching tool for his students, *id.* 64:24-65:13. In his own work advising boards of directors, he

23    has never advised them to enter into such anti-solicitation agreements.  *Id.* 30:19-31:12.

24    [29] At his deposition, Dr. Talley retreated to the untenable position that Defendants did not
describe their anti-solicitation agreements in their collaboration contracts because they relied on

25    California's liberal interpretation of the parol evidence rule.  Talley Dep. 217:16-224:1.  In
addition to being absurd, the argument is also incorrect as a matter of law.  *See generally*

26    2 Witkin, Cal. Evidence,  Documentary Evidence § 71 (5th ed.) ("Merger clauses have been held
conclusive on the issue of integration, so that parol evidence to show that the parties did not

27    intend the writing to constitute the sole agreement will be excluded.") (collecting cases).  The
term would also be unenforceable given that it would constitute illegal consideration to

28    accomplish an illegal objective, in violation of state and federal antitrust law.  *See generally*
1 Witkin, Contracts, §§ 419-420 (collecting cases re illegal consideration and illegal object).

      - 29 -      

1        Defendants' experts responded to Dr. Marx's analysis by ignoring the evidence on which

2   he relied.  As explained above, none of Defendants' experts examined the evidence as a whole, as

3   Dr. Marx did.  Defendants confined their analyses still further by looking exclusively to the

4   conspiracy period, ignoring that the same technical collaborations existed before the anti-

5   solicitation agreements began, and that technical collaborations continued apace after the anti-

6   solicitation agreements ended.  *See*, *e.g.*, Talley Dep. 136:19-137:9.  That Defendants'

7   collaborations continued uninterrupted after Defendants eliminated the anti-solicitation

8   agreements demonstrates the lack of connection.  As Apple CEO Tim Cook explained: "Are we

9   [now] in deep collaboration with anyone?  Of course. Yes. And we abide by the consent decree

10  with those."  Cook 58:5-7.  "The consent decree doesn't prevent people from working together."

11  *Id.* at 75:1-2.  Defendants and their experts ignore this inconvenient fact.

12       Third, their opinions that the anti-solicitation agreements were important to maintaining

13  good board relations or were otherwise critical for developing a relationship of "mutual trust,"

14  Murphy November 25, 2013 Report ¶ 45, are also inconsistent with the evidence.  Apple had no

15  overlapping board member with Palm; Apple had no overlapping board member with Google

16  when Mr. Jobs and Mr. Brin agreed to a secret anti-solicitation pact (Mr. Schmidt joined Apple's

17  Board later); Mr. Campbell's "advice" to Google long predated his request that Intuit be brought

18  into the fold, and his work with Google continued after the anti-solicitation agreements ended;

19  Mr. Otellini served on the Google board well before he and Mr. Schmidt struck a secret

20  "handshake" anti-solicitation deal, and Mr. Otellini continues to sit on Google's Board today,

21  years after the DOJ consent decree; and Google had no overlapping board member with

22  Facebook, with which it also tried to secure a non-recruit agreement.  In addition, Defendants'

23  experts ignore deposition testimony confirming that conflicts of interest were never discussed in

24  the context of the anti-solicitation agreements.  For instance, Shona Brown, Google's head of HR

25  and member of the Executive Management Group, explained: "I don't recall any conversations on

26  the topic of conflicts of interests and Bill Campbell . . . . I'm not aware of any specific steps that

27  we took to identify conflicts of interest."  Brown 39:16-21.

28       Finally, it is uncontested that the scope of the anti-solicitation agreements went far beyond

PLTFS' CONSOLIDATED OPP TO DEFS' JOINT AND
INDIVIDUAL MOTIONS FOR SUMMARY JUDGMENT
Master Docket No. 11-CV-2509-LHK

any possible legitimate collaborations.  Defendants concede that their anti-solicitation agreements were entirely inconsistent with the requirements of the Final Judgment.[30]  They were secret, unwritten, and not connected to any specific collaboration.  They prohibited recruitment of *all* employees, regardless of title, job function, connection to collaboration (such as visibility to the collaborator), location, or time period.  Thus, Defendants' anti-solicitation agreements far exceeded any possible appropriate restriction.

Accordingly, Defendants cannot satisfy their initial burden of showing that their anti-solicitation agreements were "justifiable" and "consistent with proper business practice." *Citric Acid*, 191 F.3d at 1094 (internal quotation marks omitted).

### C. Even if Defendants Satisfied Their Initial Burden, Plaintiffs Have Provided Substantial Evidence Tending To Show That Defendants Were Not Engaging in Permissible Competitive Behavior

Even if the Court concludes that Defendants rebut Plaintiffs' allegation of conspiracy "by showing a plausible and justifiable reason for [their] conduct that is consistent with proper business practice," summary judgment is nonetheless improper because of the evidence "tending to show" that Defendants were "not engaging in permissible competitive behavior." *Citric Acid*, 191 F.3d at 1094 (internal quotation marks and citation omitted).  Regardless of whether Defendants carry their initial burden, the contrary evidence at the very least creates genuine disputes of material fact.  As explained above in Part II, *supra*, the evidence confirms the alleged facts that the Court earlier found "tend[] to exclude the possibility of independent action," creating a "jury issue." *High-Tech I*, 856 F. Supp. 2d at 1117 (quoting *Monsanto*, 465 U.S. at 764).

### 1. The Anti-Solicitation Agreements Were Not Independent, Pro-Competitive, or Justifiable

First, as explained above, the underlying conduct at issue—the express anti-solicitation

---

[30] Defendants' anti-solicitation agreements did not identify the specific legitimate agreement to which they are ancillary; they were not narrowly tailored to affect only employees who are anticipated to be directly involved in the agreement; they did not identify with reasonable specificity the employees who are subject to the agreement; they did not contain a specific termination date or event; and they were not signed by all parties to the agreement. *See* Final Judgment at 5-7. *See also* Marx ¶¶ 30-32.

1   agreements—were inherently collusive, anti-competitive, and unjustified.  Parts II, III.B, *supra*.

2   Every Defendant concedes that it entered into at least one secret anti-solicitation agreement with

3   another Defendant that was just as overbroad and impermissible as the DOJ and Plaintiffs alleged.

4   Every Defendant stipulated to a Final Judgment in which their senior executives are subject to

5   civil or criminal contempt for failing to report any potential recurrence.  This is not a case

6   challenging the "very essence of competition."  *Matsushita*, 475 U.S. at 594.

7                    **2.    Defendants Had A Shared Motive to Conspire**

8           Second, Defendants had a motive to conspire to suppress employee compensation and

9   mobility.  "Plaintiffs describe a plausible scenario as to how, in light of basic economic

10  principles, these agreements formed an overarching conspiracy that resulted in artificially lowere

11  salaries."  *High-Tech I*, 856 F. Supp. 2d at 1117.  The Court has already examined this evidence

12  in detail.  "First, Plaintiffs set forth contemporaneous documents from Defendants' internal files

13  which show that Defendants viewed competition for workers—including against other

14  Defendants in this lawsuit—as a significant problem."  *High-Tech II*, 289 F.R.D. at 570.

15  "Second, the evidence indicates that Defendants viewed recruitment, including cold calling, as

16  crucial to their growth and development."  *Id.*  "Third, the evidence indicates that, but for anti-

17  solicitation agreements, high-tech companies would solicit one another's employees."  *Id.* at 571.

18  "Fourth, Plaintiffs have offered evidence indicating that Defendants believed that increased

19  competition for workers could lead to higher wages for employees."  *Id.*  "Fifth, Plaintiffs have

20  set forth evidence showing that cold-calling and solicitation could transmit salary information that

21  spread well beyond any single individual who received a job offer, which supports Dr. Leamer's

22  price discovery theory."  *Id.*  "In addition, documentary evidence indicates that Defendants

23  recognized that challenges posed by increased competition for employees often required

24  systematic rather than isolated compensation increases."  *Id.*  "Plaintiffs' evidence also supports

25  Dr. Leamer's theory that Defendants' anti-solicitation agreements were intended to avoid

26  'bidding wars' for personnel that could drive up wages."  *Id.*  "The evidence also indicates that, to

27  avoid bidding wars that could drive up wages, Defendants structured the agreements to apply to

28  *all* employees, regardless of job type, department, or geography."  *Id.*  "Indeed, the sustained

1   personal efforts by the corporations' own chief executives, including but not limited to Apple

2   CEO Steve Jobs, Google CEO Eric Schmidt, Pixar President Ed Catmull, Intuit Chairman Bill

3   Campbell, and Intel CEO Paul Otellini, to monitor and enforce these agreements indicate that the

4   agreements may have had broad effects on Defendants' employees." *Id.* at 572. "Finally, based

5   on the evidence, it appears that Defendants recognized that eliminating the anti-solicitation

6   agreements would lead to greater competition for employees and require enhanced incentives for

7   retaining employees." *Id. See also High-Tech III*, 2013 U.S. Dist. LEXIS 153752, at *55-110

8   (reviewing evidence). "The evidence therefore indicates that Defendants sought to enter into

9   anti-solicitation agreements in an effort to stifle increased competition for labor and rising wages.

10  To the extent that they were successful, Defendants did not need to increase compensation as

11  much as they otherwise would have to attract and retain employees." *Id.* at *109.

12  ### 3.   Defendants' Identical, Bilateral Agreements Were Not Reached In Isolation

13

14         Third, Defendants' anti-solicitation agreements were not reached in isolation. Plaintiffs

15  have provided direct evidence regarding a "'larger picture' of senior executives from closely

16  connected high-tech companies in Northern California contemporaneously negotiating and

17  enforcing six bilateral 'Do Not Cold Call' agreements." *High-Tech I*, 856 F. Supp. 2d at 1120.

18  "The fact that all six identical bilateral agreements were reached in secrecy among seven

19  Defendants in a span of two years suggests that these agreements resulted from collusion, and not

20  from coincidence." *Id.* Plaintiffs' allegations, now backed by substantial direct and

21  circumstantial evidence, show "'a unity of purpose[,] a common design and understanding, or a

22  meeting of minds in an unlawful arrangement.'" *Id.* (quoting *Monsanto*, 465 U.S. at 764).

23         Direct evidence demonstrates that a single person, Mr. Jobs: (i) was aware of the Pixar /

24  Lucasfilm agreement and understood its anticompetitive purpose and effect, Catmull 61:13-19;

25  195:18-21; (ii) was the CEO of both Apple and Pixar when their heads of HR confirmed a

26  "gentleman's agreement" that is "similar to our Lucasfilm agreement," Ex. 139; (iii) personally

27  struck an identical anti-solicitation agreement with Mr. Brin of Google, enlisting Apple Co-Lead

28  Director Mr. Campbell to provide substantial assistance, Exs. 199, 557, 1871; (iv) three months

1158677.2

1    later, personally struck another identical anti-solicitation agreement with Mr. Chizen, CEO of

2    Adobe, Ex. 223; (v) sought to enter another such agreement with Mr. Colligan, the CEO of Palm,

3    Colligan Decl., Exs. A and B; and (vi) personally implemented and enforced these anti-

4    solicitation agreements, Exs. 192, 277.

5         Additional direct evidence shows that another individual, Mr. Campbell: (i) was

6    extraordinarily close to Mr. Jobs and communicated with him several times a week, was

7    Mr. Jobs's "coach" and "[v]ery, very, very good friend," and was his neighbor in Palo Alto;

8    (ii) was a Co-Lead Director of Apple's Board; (iii) was an intimate "advisor" to Google senior

9    executives, "coach" to Mr. Jobs, Mr. Schmidt, and Mr. Page, and regular attendee of Google's

10   weekly Executive Management Group meetings and Board meetings, during which Google's "Do

11   Not Call" list was discussed; (iv) was never asked to leave a Google EMG or Board meeting

12   because of actual or potential conflicts of interest; (v) was Chairman of Intuit's Board; (vi) had a

13   "very friendly" relationship with Adobe's Mr. Chizen; (vii) had a "very friendly" relationship

14   with Intel's Mr. Otellini, Campbell 111:6-13; (viii) assisted Mr. Jobs in securing an anti-

15   solicitation agreement between Apple and Google, Ex. 199; (ix) requested and entered into an

16   anti-solicitation agreement with Google on behalf of Intuit, Ex. 597; Campbell 28:23-29:1; and

17   (x) advised Google executives to enter into another anti-solicitation agreement with Facebook.

18   Ex. 667.

19        Thus, these two "[v]ery, very, very good friends" either personally entered into, or were

20   involved with, all actual and attempted anti-solicitation agreements at issue in this case.  This

21   evidence alone would be more than sufficient to "tend[] to exclude the possibility that

22   [Defendants] acted independently." *Citric Acid*, 191 F.3d at 1093 (quoting *Matsushita*, 475 U.S.

23   at 588).  *See also High-Tech I*, 856 F. Supp. 2d at 1117 (same, collecting cases).

24        But the evidence of coordination and collusion goes much further.  Given that Defendants

25   all entered into their anti-solicitation agreements secretly, it would be a remarkable (indeed,

26   impossible) coincidence if these agreements arose together and operated in parallel for years,

27   among such a tight-knit group of Northern California technology companies and senior

28   executives, all with identical terms, without coordination and common purpose.  *High-Tech I*,

1   856 F. Supp. at 1116 (it "strains credulity" that Defendants' secret bilateral agreements could

2   arise together without "some communication or coordination").  But this is exactly what

3   Defendants ask the Court to accept, and to further conclude that it would be unreasonable for a

4   jury to determine otherwise.  Defendants make this request against the backdrop of their failure to

5   provide any alternative explanation for how such a coincidence could have occurred, and

6   admissions by their own experts that they are unaware of any similar anti-solicitation agreements,

7   aside from those involving Defendants, ever occurring anywhere at any time.  *See Barry v. Blue*

8   *Cross of Cal.*, 805 F.2d 866 (9th Cir. 1986) (the finder of fact may infer a conspiracy from the

9   relationship of the defendants, based on "common sense.").

10       Opportunities for Defendants to conspire, and to learn of each other's agreements and

11   common purpose, were legion.  Every Defendant is headquartered within 45 miles of each other.

12   Among the non-settling Defendants, none are located more than 17 miles from each other.[31]  The

13   individuals who entered into the secret anti-solicitation agreements interacted and communicated

14   with each other regularly throughout the conspiracy period.  Mr. Schmidt served on Apple's

15   Board with Mr. Jobs and Mr. Campbell.  Mr. Otellini served on Google's Board, which Mr.

16   Campbell attended regularly.  Mr. Chizen was friendly with Mr. Campbell, and Adobe

17   communicated continuously with Apple on a range of issues, from the 1980s to the present.

18   Chizen Dep. 23:1-15; 79:11-20.  Mr. Jobs and Mr. Otellini also communicated frequently.

19   Otellini 81:4-82:9.  Further, their anti-solicitation agreements not only had identical terms, but

20   internal confidential emails even referred to them using the same illicit shorthand: "gentleman's

21   agreements."  *See*, *e.g.*, Ex. 137 (Pixar document referring to Pixar / Lucasfilm); Ex. 139 (Pixar

22   document referring to Apple / Pixar); Ex. 202 (Intel document referring to Google / Intel);

23   ADOBE_4979 (Adobe document referring to Apple / Adobe); GOOG-HIGH-TECH-58471

24   (Google document referring to Google / Apple); 231APPLE098782 (Apple document referring to

25   Apple's anti-solicitation agreements generally).

26       The evidence, viewed as a whole, at the very least tends to exclude the possibility that

---

27   [31] In fact, one may reach the headquarters of all four remaining Defendants within a single 32-minute car ride.  *See* http://www.google.com/maps (last visited February 4, 2014) (map of 24.7
28   mile drive to the corporate headquarters of Adobe, Apple, Google, and Intel).

1    Defendants acted independently.  *Matsushita*, 475 U.S. at 597.  Further, given that the express

2    agreements were themselves unlawful and anticompetitive, "broader inference are permitted" to

3    infer conspiracy.  *In re Publ'n Paper*, 690 F.3d at 63.

4        **D.      Each Defendant Joined the Conspiracy and Furthered Its Purpose**

5            Defendants' individual motions all rest upon the same improper premise: that the Court

6    should deny Plaintiffs "the full benefit of their proof," and instead "tightly compartmentaliz[e] the

7    various factual components and wip[e] the slate clean after scrutiny of each."  *Cont'l Ore*, 370

8    U.S. at 699.  For the reasons explained above, the Court should reject this invitation to legal error

9    and instead examine "the character and effect" of the alleged conspiracy "only by looking at it as

10   a whole."  *Id.* (internal quotation marks and citations omitted).[32]

11           **1.      Apple**

12           Apple begins by conceding that it entered into the anti-solicitation agreements Plaintiffs

13   allege.  Apple MSJ at 1 ("Apple entered into each of the three DNCC agreements").  Apple

14   claims, however, that its anti-solicitation agreements had "nothing to do" with suppressing the

15   compensation and mobility of Class members.  Apple MSJ at 2.

16           Using its own interrogatory answers as its only support, Apple asserts that its anti-

17   solicitation agreement with Adobe actually began much earlier than Plaintiffs allege: "in the

18   1980s," and arose out of technical collaborations.  Apple MSJ at 2, 6-7.  The agreement was

19   "reaffirmed" in emails between Mr. Jobs and Mr. Chizen in 2005.  *Id.* (citing to Ex. 223).  But

20   Apple ignores that the only business record to which it cites is to the contrary.  As Mr. Chizen

21   explained: "I thought we agreed not to recruit any senior level employees (at Adobe this is Sr.

22   Director/VP and represents about 2% of the population)."  Ex. 223.  The status quo was

23   intolerable to Mr. Jobs, who convinced Mr. Chizen to expand the understanding from 2% of each

24   other's employees to 100%, in a manner identical to the deal he struck with Google's Mr. Brin

---

[32] Defendants cite *AD/SAT v. Associated Press*, 181 F.3d 216 (2d Cir. 1999), which is not
contrary to *Cont'l Ore*.  There, the court rejected the plaintiff's novel argument that a trade
association's conduct should be considered the "joint action of the association's members,"
thereby obviating "the need to inquire into the conspiratorial agreement" among its members.  *Id.*
at 233-34.  Here, Plaintiffs rely on no such assumption of joint action and supply ample evidence
showing each Defendant's participation.

1    three months earlier.  *Id.*  Apple also ignores testimony, examined by Dr. Marx, that contradicts

2    the idea that the Apple / Adobe anti-solicitation agreement began in the 1980s, or arose out of

3    technical collaborations.  Marx I ¶ 27 (citing Warnock 24:19-25:17).[33]

4           While Apple begins its argument admitting that its anti-solicitation agreements were in

5    fact agreements, Apple then attempts to inconsistently characterize the Apple / Pixar agreement

6    as a "unilateral practice," Apple MSJ at 3 and 8,  ignoring direct evidence to the contrary.  *See*,

7    *e.g.*, Ex. 139.  Also, the pretext Apple provides for the agreement—that it existed to address

8    conflicts of interest with Mr. Jobs as CEO of both companies—is without basis.  As defense

9    expert Dr. Talley explained, any such conflict of interest would have been with the individual

10   (Mr. Jobs) and not with the entire company (Apple or Pixar).  Talley Dep. 198:21-200:2.  Thus,

11   the companies could have easily addressed the conflict simply by screening Mr. Jobs off from

12   attempts to recruit Pixar employees or vice-versa.  There is no evidence that this ever happened

13   (regarding Mr. Jobs or any other similarly-situated individual, such as Mr. Campbell,

14   Mr. Schmidt, or Mr. Otellini).  In fact, Mr. Jobs did the opposite: he required Pixar to request and

15   receive his personal permission before recruiting or hiring Apple employees.  Ex. 420; McAdams

16   Dep. 158:20-159:19.

17          Apple claims that its anti-solicitation agreement with Google was "a result of the

18   companies' close technical collaborations."  Apple MSJ at 9.  But Apple ignores Dr. Marx's

19   analysis and Dr. Talley's admissions that the contracts memorializing the collaborations make no

20   mention of the anti-solicitation agreement, and the individuals at each company most involved in

21   the collaborations had no idea that the anti-solicitation agreement even existed.  Talley Dep.

22   116:23-117:12; 217:16-22; Marx I ¶ 6(c).  Apple also claims that the Apple / Google agreement

---

23   [33] Apple collaborated with Adobe before the Apple-Adobe anti-solicitation agreement.  Okamoto
24   57:3-5, 75:10-23, 200:22-25, 206:13-20; Narayen 46:10-16; Horner 37:18-20, 39:7-10, 160:20-
     23.  The Apple official who verified the statements in Apple's interrogatory responses regarding
25   Adobe did not recall ever requesting that restrictions on Adobe be limited to people working on
     collaborative projects, Okamoto 20:20-24, and Ms. Lambert would not say whether the agreement
26   was tied to collaborations. Lambert 65:9-67:9. This "relationship of trust" fell apart during the
     pendency of the Apple-Adobe agreement, but the agreement continued. Cook 51:9-52:11;
     Okamoto 88:15-89:6; Chizen 42:16-17, 90:20-23, 248:20-250:22; Horner 130:5-131:6.  And the
27   DOJ's putting an end to the anti-solicitation agreement did not prevent Apple from collaborating
     with Adobe afterward. Okamoto 151:7-152:5 ("The collaboration . . . between Apple and Adobe
28   is pretty much ongoing."); *see also* Horner 248:16-250:14.

1   arose out of Mr. Schmidt's overlapping Board membership.  But the agreement was struck

2   between Mr. Jobs and Mr. Brin over a year before Mr. Schmidt joined Apple's Board in August

3   2006.  *Compare* Ex. 563 *with* Apple MSJ at 3.[34]

4         Apple also argues that it should not be held liable for the damage caused by the

5   conspiracy because its anti-solicitation agreements were in its self-interest.  Apple MSJ at 7.  But

6   it is not a defense to conspiracy that the conspiracy was in a defendant's individual self-interest.

7   *General Motors*, 384 U.S. at 142; *Masonite*, 316 U.S. at 276.  A member of a price-fixing cartel

8   does not seek to increase the profits of its competitors; it seeks to use the cartel to increase its own

9   profits.  The same is true here.  Defendants used their network of anti-solicitation agreements to

10  suppress the compensation and mobility of their own employees.  Further suppressing the

11  compensation and mobility of each other's employees was also in each Defendant's individual

12  self-interest, since each Defendant knew that it could suppress compensation further if its

13  competitors also suppressed compensation and mobility of their employees.

14        Apple fails to provide a rationale for its misconduct that is not clearly contradicted by the

15  voluminous record.  Apple also ignores additional contrary evidence, such as Mr. Jobs's attempt

16  to strike another illegal agreement with Palm's Ed Colligan, a company that had no technical

17  collaborations with Apple or overlapping board member.  *See also* Parts II, III.B, III.C, *supra*,

18  and Parts III.D.2-4, *infra*.  Apple's motion should be denied.

19              **2.    Adobe**

20        Adobe starts by contradicting Apple's version of events: the Apple / Adobe agreement,

21  according to Adobe, occurred exactly as Plaintiffs allege.  In May of 2005 (three months after the

22  Apple / Google agreement), not in the mid-1980s.  Adobe MSJ at 1 ("It is correct that Adobe

---

23  [34] The Apple official primarily responsible for Apple's relationship with Google, and who
    verified the statements in Apple's interrogatory responses pertaining to Google, professed
24  ignorance of the anti-solicitation agreements and could not identify any portion of any written
    agreement between Apple and Google concerning recruiting or identifying individuals not to be
25  recruited based on their assignment to collaborative projects. Croll 13:22-24, 69:10-70:2, 125:3-8.
    Apple's head of executive recruiting was similarly unaware of any such limitations, Bentley
26  18:15-19:5, and Ms. Lambert would not say whether agreement was tied to collaborations.
    Lambert 78:6-22. Apple collaborated with Google before the agreement. Ex. 2249; Cook 60:13-
27  15.  Moreover, the cooperative spirit between Apple and Google such as it was fell apart during
    the pendency of the agreement, but the agreement continued.  Cook 67:12-68:8; Lambert 79:14-
28  80:21; Croll 136:3-137:21; Schmidt 95:24-96:21; Brin 40:22-41:2; Eustace 52:12-53:14.

1   entered into a bilateral DNCC agreement with Apple in May 2005.").

2          Adobe's individual motion boils down to the following argument: while Adobe entered

3   into the precise unlawful agreement with Apple that Plaintiffs allege, and while there may have

4   been a conspiracy to suppress employee compensation and mobility among other Defendants, that

5   larger conspiracy did not include Adobe. As a result, Adobe argues it should have no liability to

6   the Class. Adobe asserts that "the existence or not of other bilateral agreements was irrelevant to

7   Adobe." Adobe MSJ at 4. But Adobe ignores evidence that it exchanged confidential

8   compensation information with Defendants other than Apple,[35] that it considered the other

9   Defendants to be horizontal competitors for employees, Ex. 211, and that it participated in salary

10  surveys in which other Defendant companies beyond itself and Apple participated, Ex. 308, D.

11  Morris Dep. 177:15-178:10. Adobe also ignores that its internal documents show that individuals

12  within Adobe, a year after the agreement began, used the same shorthand for the anti-solicitation

13  agreements as the other Defendants: "gentleman's agreement." ADOBE_4979. Adobe says

14  nothing about Mr. Chizen's position within the tight network of co-conspirators, including his

15  "friendly" relationship with Mr. Campbell and his frequent communications with Mr. Jobs.

16  Chizen Dep. 23:1-15; 79:12-20. Adobe is silent regarding the fact that other Defendants aside

17  from Apple learned of its agreement with Apple. Ex. 2795; Flynn Dep 65:8-10; 73:23-74:5;

18  138:22-23.

19         While Adobe contends that Plaintiffs have failed to support the "who, what, to whom,

20  where, and when" of the alleged conspiracy, Adobe MSJ at 7, Adobe ignores that Plaintiffs have

21  provided direct evidence of the allegations the Court has already held do exactly that. *High-*

22  *Tech I*, 856 F. Supp. 2d at 1117 ("Plaintiffs here have 'answered the basic questions: who, did

23  what, to whom (or with whom), where, and when?'") (internal quotation omitted). Adobe also

24  tries to spin the fact that it had no board overlap with Apple as an inference against conspiracy.

25  [35] Ex. 299 (email exchange re Adobe-Intuit benchmarking); Ex. 308 (2008 Radford Benchmark
    Survey); Ex. 621 at 3, Ex. 2305 (Adobe recruiter email stating "I've reached out to" companies
26  including Google and Intuit regarding HR practices); Ex. 2306 (Adobe recruiter email to Mr.
    Vijungco stating "Would you mind finding out from your friend at Apple (HR Head) where
27  they're focusing their hiring efforts on?"); Ex. 2812 (Adobe email to Intuit re equity award
    policies); Ex. 2817 (Streeter email discussing Google's "Big Bang" and internal compensation
28  policies at companies including Intel).

1    Adobe MSJ at 7-8.  But Adobe ignores that this is a purported *justification* put forward by its co-

2    Defendants (all of whom ignore this contrary fact in their selective and improper dismembering

3    of the conspiracy).  The undisputed fact that the individuals involved—Mr. Chizen and Mr.

4    Jobs—regularly held confidential communications (including those at the heart of the illegal

5    agreement) and in-person meetings, Chizen Dep. 79:11-20; 151:11-13, provides the same

6    opportunity for conspiracy that overlapping Board membership creates, and also puts the lie to the

7    other Defendants' pretext of avoiding Board conflicts of interest.  *High-Tech I*, 856 F. Supp. 2d at

8    1118 ("This is precisely the reason for which Plaintiffs allege overlapping board membership

9    here: to indicate an opportunity to conspire.").[36]

10           Mr. Chizen did not simply strike a parallel deal with another senior executive.  He struck

11   it directly with Mr. Jobs himself, the architect of the conspiracy.  Mr. Jobs made his views

12   regarding anti-solicitation agreements known, and he made those views known loudly, clearly,

13   and repeatedly.  Schmidt Dep. 169:12-17; Brin Dep. 112:21-24; Catmull 195:18-21.  Viewing the

14   evidence "as a whole," it is certainly a reasonable inference that Mr. Jobs made this same view

15   known to Mr. Chizen, if not immediately, then certainly during the five years during which the

16   illicit pact was in place.

17           In fact, direct evidence demonstrates that Mr. Chizen knew his pact with Mr. Jobs was not

18   an isolated event.  One month before striking the anti-solicit deal with Mr. Jobs, Ex. 223, Adobe

19   announced that it would attempt to acquire Macromedia, a rival technology company

20   headquartered in San Francisco, California (among other products, Macromedia created Flash

21   _____

22   [36] The anti-solicitation agreement had nothing to do with collaborations.  Mr. Chizen himself
     acknowledged the agreement was "not limited to any particular projects on which Apple and
23   Adobe were collaborating," Chizen 142:16-25, nor was he was aware of any written agreement
     regarding collaborations to which the recruiting restrictions might have been attached, Chizen
24   237:9-23.  And he admits that "for as long as I was CEO [beginning in 2000], there was always
     friction between Apple and Adobe," Chizen 42:16-17, and that during his time as CEO, the
25   relationship "got worse." Chizen 90:20-23.  The record shows something quite different from "a
     relationship of trust"; in fact, it shows that Adobe and Apple were clear rivals and openly feuded
26   during the period when the anti-solicitation agreement was in effect. Chizen 248:20-250:22
     (acknowledging Apple/Adobe conflict over Adobe's Flash product began in 2005-07 period);
27   Horner 130:5-131:6 (describing Apple/Adobe dispute over Flash as a "low point"); Cook 51:9-
     52:11; Okamoto 88:15-89:6.  There is no evidence that Adobe-Apple collaborations were
28   enhanced post-2005 or changed in any way, and there is no logical connection between their
     collaborations and their anti-solicitation agreement.

player).[37]  Well before the acquisition was finalized on December 5, 2005, Mr. Chizen told

Stephen Elop, then CEO of Macromedia, about the anti-solicitation deal Mr. Chizen struck with

Mr. Jobs.  Ex. 1811 (Mr. Elop to Mr. Chizen on October 19, 2005: "I thought you said that you

and SteveJ [sic] had an anti-poaching agreement?").  No later than October 5, 2005, Mr. Chizen

learned from the "Macromedia guys" that Mr. Jobs entered into an identical deal with Rob

Burgess, long-time Chairman and CEO of Macromedia (Mr. Burgess was CEO of Macromedia

until January 2005).  Ex. 1808 (Mr. Chizen to Mr. Jobs: "I was told that you and Rob Burgess had

an agreement not to recruit from one another.").  Mr. Elop also told Mr. Chizen that Apple was

recruiting Macromedia employees.  Ex. 1811.  Mr. Chizen's reaction?  He ensured that the

conspiracy included Macromedia, too (at the time a distinct third company), emailing Mr. Jobs:

"given that we are about to become one entity, I am assuming that we will continue our hands off

agreement."  Ex. 1808.  Mr. Jobs responded: "I've made sure our recruiters are not initiating calls

with folks at Macromedia . . . ."  Ex. 1809.  Later that month, Mr. Chizen enforced the agreement

by forwarding Apple recruiting attempts to Mr. Jobs.  Ex. 1812.  Mr. Jobs responded: "we have

never pursued [the Macromedia employee], so I have no idea where that is coming from….

*Maybe [he] wants a raise*."  *Id.* (emphasis added).  Adobe's argument that it was an unwitting

accomplice, bullied into a single isolated agreement, is not credible.  Mr. Chizen understood he

was joining a larger collusive effort to eliminate competition for technical talent and that is

exactly what the law prohibits.  Jury Instructions at B-13.

          Adobe attempts to distance itself from the other nearly identical agreements at issue in this

case by pointing to the fact that the Pixar / Lucasfilm agreement included additional unlawful

terms.  Adobe MSJ at 8-9.  But Mr. Lucas himself explained that what mattered was what all

agreements at issue in this case have in common: "the part of the agreement is not to solicit each

other's employees, is the crux of it."  Lucas 92:12-13.  Adobe also dismisses the fact that its

agreement was identical to all of the other anti-solicitation agreements by remarking that the

terms of these agreements "are not so complicated, detailed or unusual as to suggest a

---

[37] http://www.adobe.com/aboutadobe/invrelations/adobeandmacromedia.html (last visited
January 31, 2014).

1   conspiracy," Adobe MSJ at 9, despite the fact that none of Defendants' four experts could provide

2   a single example of another such agreement that did not involve a Defendant.[38] *See also* Parts II,

3   III.B, III.C, III.D.1, *supra*.

4          Adobe's motion should be denied.

5               **3.**     **<u>Google</u>**

6          Like the others, Google readily concedes the three unlawful bilateral agreements to which

7   it was a direct party (despite its own senior executives denying, incredulously, that any of these

8   agreements occurred).  Google MSJ at 1.  Google also admits that it grew rapidly in the lead-up to

9   the conspiracy, and that just as it joined the conspiracy, Google was expanding its recruiters from

10   "about 130 in 2005 to over 800 by mid-2007."  *Id.* at 3.  This competitive threat is exactly what

11   prompted the expansion of the conspiracy to include Google.

12          Google asserts a variety of facts it claims are "undisputed," *id.*, when the evidence is to

13   the contrary.  Google claims there is no evidence it knew that its three bilateral agreements were

14   part of a larger effort to suppress compensation and employee mobility.  *Id.* at 1-2.  Google

15   ignores that these agreements alone (along with its attempted agreement with Facebook)

16   systematically suppressed employee compensation and mobility across four companies: Apple,

17   Intel, Intuit, and Google.  The evidence demonstrates that none of these agreements were one-offs

18   or isolated, but instead spread through the tight network of senior executives who all knew about

19   each other's agreements: Bill Campbell (Chairman of Intuit, Co-Lead Director of Apple,

20   "advisor" and "coach" to Steve Jobs and Eric Schmidt; Eric Schmidt and other members of

---

21   [38] Adobe's examples prove the point.  Adobe cites to a 1994 addendum to a 1990 Adobe / Apple
     Master Services Agreement, suggesting that this agreement is like those Plaintiffs challenge.

22   Adobe MSJ at 10 n.3 (citing to ADOBE_110308, at '48).  In fact, that agreement is nothing like
     the anti-solicitation agreements at issue in this case, and instead appears to comply with the

23   requirements of the DOJ Final Judgment.  Unlike the agreements at issue, this addendum: (i) is
     related to a specific joint project (the "████████████"); (ii) is narrowly tailored to concern

24   only "█████████████████████████████████";
     (iii) identifies with reasonable specificity the employees who are subject to the agreement: Apple

25   agrees to provide a list of the individuals which it will update as necessary; (iv) contains a
     specific termination date: one year following each affected employees' last participation in the

26   "██████████████████████";
     and (v) was signed by all parties to the agreement.  *Compare* ADOBE_110308, at '48 and '51

27   *with* Ex. 166 at 5 (DOJ Final Judgment).  Adobe's other examples, Adobe MSJ at 10 n.4, are
     similarly narrow and specific, and are nothing like the anti-solicitation agreements at issue in this

28   case.

1    Google's Executives Management Group, including Sergey Brin and Larry Page; and Paul

2    Otellini, Intel CEO and Google Director).  The evidence also shows that Mr. Campbell worked

3    with Google executives to expand the effort to include Facebook.  Ex. 667; Campbell 142:17-20.

4    Thus Google, Intel, and Intuit all understood they were part of a concerted effort to suppress

5    compensation and mobility beyond their own companies.

6           Further, the evidence certainly provides a reasonable inference that these companies

7    understood that the Google / Apple agreement was not the only anti-solicit agreement Apple had.

8    As Mr. Schmidt himself explained: given his personal knowledge of Mr. Jobs's views on

9    employee recruiting, it is "fair to extrapolate" that Mr. Jobs "would have extended [anti-

10   solicitation agreements] to others."  Schmidt 169:4-170:20.  Indeed, Google's own recruiters

11   knew about additional agreements, such as Apple's agreement with Adobe, and at least one of

12   those recruiters attended approximately thirty meetings of Google's Executive Management

13   Group, a team including Mr. Schmidt, Mr. Page, Mr. Brin, and Mr. Campbell.  Flynn Dep. at

14   56:6-25.  Google "may become a member of a conspiracy without full knowledge of all the

15   details of the conspiracy, the identity of all its members, or the parts they played."  Jury

16   Instructions at B-13.  "Knowledge of the essential nature of the plan is enough," *id.*, and Google

17   understood the essential nature of the network of "gentleman's agreements" to which it agreed

18   and promulgated.

19          Google also claims it had "no reason to believe" that it had anything to gain from anti-

20   solicitation agreements among other companies that suppressed the compensation and mobility of

21   non-Google employees.  Google MSJ at 2, 9.  But as Google's own contemporaneous business

22   records show, in October 2008, Google exchanged confidential compensation information with its

23   labor competitors, including Apple, Intel, and Adobe.  Ex. 621 at 2-3.  This and other business

24   records confirm the common sense conclusion of Plaintiffs' experts: that all members of the

25   conspiracy stood to benefit (and in fact benefited) from a reduction in competition among

26   horizontal competitors.  *See also* Parts II, III.C.2, *supra*.  That Google also benefited from its own

27   bilateral agreements, independent from and in addition to the others, Google MSJ at 9, is no

28   defense to conspiracy.  *General Motors*, 384 U.S. at 142; *Masonite*, 316 U.S. at 276.

1     Google contends that its decision to create a "do not call" list was an internal one, and that

2    it "was not difficult" to add Apple to that list because of collaborations with Apple.  Google MSJ

3    at 3-4.  In fact, Google's "do not call" list—which, through no coincidence, happened to operate

4    identically to Apple's own "do not call" list, Flynn Dep. 110:18-112:23—was created to codify

5    its agreement with Mr. Jobs, after Mr. Jobs had discussions with Mr. Brin and used Mr. Campbell

6    to apply additional pressure to Mr. Schmidt.  Ex. 199; *see also* Schmidt 60:21-22 ("Steve was

7    unhappy, and Steve's unhappiness absolutely influenced the change we made in recruiting

8    practice[.]").  Google also attempts to play off its anti-solicitation agreements as simply a

9    reasonable part of its technical collaborations.  Google MSJ at 3-5.  But, as Dr. Marx explains,

10    and as Google's own Dr. Talley admits, the contracts memorializing these collaborations make no

11    mention of the anti-solicitation agreements, and the individuals directly responsible for the

12    collaborations had no idea the unlawful arrangements even existed.[39]  *Id.* ¶¶ 28, 30.a; Marx

13    Rebuttal ¶ 31; Talley Dep. 116:23-117:12; 217:16-22.  *See also* Parts II, III.B, III.C, III.D.1-2,

14    *supra*, and Part III.D.4, *infra*.

15     Google's motion should be denied.

16           **4.**     **Intel**

17     Intel follows the same strategy as Adobe: while Intel concedes it entered into the

18    agreement with Google as Plaintiffs allege, and while a larger understanding to suppress

19    employee compensation and mobility may have existed among other Defendants, Intel did not

20    join it.

21     According to Intel, "Neither the existence of [its agreement with Google] nor the

22    circumstances surrounding it do anything to establish that Intel joined" a common understanding

23    to suppress Class compensation and mobility.  Intel MSJ at 2.  But Intel ignores that "the

24    circumstances surrounding" its anti-solicitation agreement with Google was Google's response to

25    Mr. Jobs's and Mr. Campbell's successful efforts to persuade Google to enter into an identical

26    agreement with Apple.  Mr. Otellini, a member of Google's Board, was included in these

27    discussions.  Brin 74:15 ("I'm sure we would have mentioned it."); Schmidt 126:10-11 ("I'm sure

28    [39] *See also* Kordestani Dep. 88:20-89:10; Eustace Dep. 46:4-19.

- 44 -

1   I spoke with Paul about this at some point."); Rosenberg 85:15-24.  Thus, Mr. Otellini knew what

2   Google's senior executives and Mr. Campbell knew, which was that they were all joining an

3   effort to eliminate competition with Mr. Jobs, an individual who "loud[ly]" expressed his view

4   that "you should not be hiring each others'[sic], you know, technical people . . . ."  Schmidt

5   169:12-22.  *See also* Brin 112:21-24; Catmull 195:18-21.  Mr. Otellini also participated in

6   discussions with Mr. Campbell and others at Google about the threat that Facebook posed,

7   discussions that led to Mr. Campbell instructing Google executives to extend the conspiracy to

8   Facebook.  Exs. 471, 667; Campbell 142:17-20.

9          Mr. Otellini's testimony to the contrary is not credible.  He disputed the authenticity of his

10  own emails that Intel produced, including an email he sent confirming his anti-solicitation

11  agreement with Mr. Schmidt (Ex. 458).  Otellini 168:13-14 ("it's not the font I use, so it just

12  doesn't look familiar"), 169:11-12 ("So what this is, and where it came from, I can't help you

13  with."); 175:14-15 ("someone has altered the header and the answer, so I think it's very

14  suspicious.").  In this regard, he is similar to other senior executives in this action who resorted to

15  obfuscation, lack of memory, and absurdity when faced with direct evidence of their wrongdoing.

16  *See*, *e.g.*, Brin 113:20-115:1 (disputing the plain meaning of an Apple document memorializing

17  his agreement with Mr. Jobs by questioning whether the author, Apple head of HR Ms. Lambert,

18  spoke English as a second language), *compare with* T. Cook 76:18-21 (confirming that, in fact,

19  Ms. Lambert speaks English fluently).  Intel could not even persuade its own retained expert,

20  Dr. Snyder, that Mr. Otellini was unaware of anti-solicitation agreements beyond his "handshake"

21  deal with Mr. Schmidt.  Snyder 258:17-20 ("Q. Do you have an opinion about whether the CEO

22  of Intel, Mr. Otellini, was aware of Google's -- I'm sorry, aware of Google's other bilateral

23  agreements?  *A. I believe he was.  He was on the board.*") (emphasis added).

24         Intel also ignores evidence that it considered other Defendants to be horizontal

25  competitors for employees and shared confidential compensation information with them,[40] used

---

[40] Ex. 621 at 2; Ex. 463 (Otellini email circulating at Intel a summary he "lifted from Google" of
bonus programs at companies including Apple and Intel); Ex. 2037 (internal Intel email re
"benchmarking meeting" that included Adobe and Intuit); Ex. 2038 (internal Intel email from
Matthew Pera to compensation specialist Danny McKell re option grants at companies including
Adobe); Ex. 2040 (internal Intel email re Google transferable stock options proposal); Otellini

*Footnote continued on next page*

1   the same shorthand for the agreements as all the other Defendants, e.g., Ex. 388 ("global

2   gentleman agreement with Google"); and that Mr. Otellini spoke and met regularly with Mr. Jobs,

3   Otellini 81:4-82:9, and was "very friendly" with Mr. Campbell, Campbell 111:6-13.

4        Intel also asserts that "the principal if not only purpose" of its secret agreement with

5   Google was to "facilitate" technical collaborations.  Intel MSJ at 4 n.4.  However, both Intel and

6   Google's experts admitted that the contracts memorializing these collaborations make no mention

7   of the anti-solicitation agreement.  Talley Dep. 116:23-117:12; 217:16-22.  Further, the

8   contemporaneous business records show that the individuals involved in the collaborations were

9   not made aware of the "global gentleman agreement with Google."  Ex. 388 ("We have nothing

10  signed.  We have a handshake 'no recruit' between eric and myself.  I would not like this broadly

11  known.  paul."); Ex. 387 (Mr. Otellini forwarding confirmation of the anti-solicit deal with

12  Mr. Schmidt to Intel's head of HR: "FYI...Do not fwd.").[41]  *See also* Parts II, III.B, III.C, III.D.1-

13  3, *supra*.

14       Intel's motion should be denied.

15  **IV.    DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT BASED ON
         THEIR MOTION TO EXCLUDE TESTIMONY OF DR. LEAMER FAILS**

16

17       Defendants' Joint Motion for Summary Judgment Based on their Motion to Exclude

18  Testimony of Dr. Leamer fails for the reasons explained in Plaintiffs' Opposition to Defendants'

19  Motion to Strike Reply Report of Edward Leamer, Ph.D. and Plaintiffs' Opposition to Defendants'

20  Motion to Exclude Expert Testimony of Edward E. Leamer, Ph.D., filed herewith.

21       Defendants also assert that, apart from Dr. Leamer's damages estimate, "plaintiffs have no

22  evidence of class-wide impact or damages . . . ."  Joint MSJ at 1.  Defendants ignore the Court's

23  prior orders summarizing the substantial documentary and testimonial evidence regarding impact

24  *Footnote continued from previous page*
    25:4-16.

25  [41] Intel and Google collaborated before the conspiracy. Otellini 84:3-20, 195:24-196:24. During
    the conspiracy, the Intel executive responsible for the Google relationship did not know an anti-
26  solicitation agreement existed. James 32:10-21, 47:16-48:6, 55:20-56:12, 61:25-62:16, 106:12-
    19.  After the DOJ investigations, Intel and Google continued to collaborate.  Otellini 85:20-86:1.
27  Intel collaborated with many companies before, during, and after the conspiracy without
    establishing a no-cold calling agreement.  Otellini 98:25-99:13 ("number of companies"); James
28  71:12-72:11, 99:1-19; Snyder Report, Ex. 5.

- 46 -

1    and damages.  *High-Tech II*, 289 F.R.D. at 565-574; *High-Tech III*, 2013 U.S. Dist. LEXIS

2    153752, at *68-110, 139-167.  "Plaintiffs' documentary evidence provides substantial further

3    support for Plaintiffs' method of proving [common] impact.  Indeed, at trial, the Court predicts

4    that this evidence is likely to be among the most persuasive to a jury as it illustrates and confirms

5    many of the actual dynamics at play within Defendants' firms."  *High-Tech III*, 2013 U.S. Dist.

6    LEXIS 153752, at *141.  Defendants also ignore Dr. Leamer's analyses apart from his damages

7    estimate, and the additional expert work provided by Drs. Hallock, Manning, and Marx.  *See*

8    Part II, *supra*.  Defendants' joint motion should be denied.

9    **V.      CONCLUSION**

10           For the aforementioned reasons, the Court should deny Defendants' joint and individual

11   motions for summary judgment.

12
13    Dated:  February 6, 2014              LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

14
                                           By:    */s/ Kelly M. Dermody*
15
                                           Richard M. Heimann (State Bar No. 63607)
16                                         Kelly M. Dermody (State Bar No. 171716)
                                           Eric B. Fastiff (State Bar No. 182260)
17                                         Brendan P. Glackin (State Bar No. 199643)
                                           Dean M. Harvey (State Bar No. 250298)
18                                         Anne B. Shaver (State Bar No. 255928)
                                           Lisa J. Cisneros (State Bar No. 251473)
19                                         LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                           275 Battery Street, 29th Floor
20                                         San Francisco, California  94111-3339
                                           Telephone:  (415) 956-1000
21                                         Facsimile:  (415) 956-1008

22

23

24

25

26

27

28

1

JOSEPH SAVERI LAW FIRM, INC.

2

3

By:   _/s/ Joseph R. Saveri_

4

Joseph R. Saveri (State Bar No. 130064)
James G. Dallal (State Bar No. 277826)

5

JOSEPH SAVERI LAW FIRM, INC.
505 Montgomery, Suite 625

6

San Francisco, California 94111
Telephone: 415.500.6800

7

Facsimile: 415.395-9940

8

*Co-Lead Class Counsel*

9

Eric L. Cramer
Sarah Schalman-Bergen

10

BERGER & MONTAGUE, P.C.
1622 Locust Street

11

Philadelphia, PA  19103
Telephone:  (800) 424-6690

12

Facsimile:  (215) 875-4604

13

Linda P. Nussbaum
Peter A. Barile III

14

GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor

15

New York, NY  10017
Telephone:  (646) 722-8500

16

Facsimile:  (646) 722-8501

17

*Class Counsel*

18

19

20

21

22

23

24

25

26

27

28

- 48 -