1   Richard M. Heimann (State Bar No. 63607)
    Kelly M. Dermody (State Bar No. 171716)
2   Brendan P. Glackin (State Bar No. 199643)
    Dean M. Harvey (State Bar No. 250298)
3   Anne B. Shaver (State Bar No. 255928)
    Lisa J. Cisneros (State Car No. 251473)
4   LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
    275 Battery Street, 29th Floor
5   San Francisco, California  94111-3339
    Telephone:  415.956.1000
6   Facsimile:  415.956.1008

7   Joseph R. Saveri (State Bar No. 130064)
    James Dallal (State Bar No.  277826)
8   JOSEPH SAVERI LAW FIRM, INC.
    505 Montgomery St., Suite 625
9   San Francisco, California 94111
    Telephone: 415.500.6800
10  Facsimile: 415.500.6803
    *Co-Lead Class Counsel*

11                          UNITED STATES DISTRICT COURT

12                       NORTHERN DISTRICT OF CALIFORNIA

13                                 SAN JOSE DIVISION

14

15

16  IN RE: HIGH-TECH EMPLOYEE          Master Docket No. 11-CV-2509-LHK
    ANTITRUST LITIGATION
17                                     **PLAINTIFFS' MOTION FOR**
    THIS DOCUMENT RELATES TO:          **APPLICATION OF THE PER SE**
18                                     **STANDARD**
    ALL ACTIONS
19                                     Courtroom:  8, 4th Floor
                                       Judge:        Honorable Lucy H. Koh
20

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3

INTRODUCTION ...................................................................................................... 1

ARGUMENT .............................................................................................................. 2

I.    The Per Se Rule Applies to Agreements Limiting Competition for Employees ....................................................................................................... 2

II.    The Agreements Not to Compete Are Not Reasonably Ancillary to Any Pro-Competitive Integration of Economic Activity That Requires Restrictions on Competition In Order to Succeed ..................................... 4

A.    Defendants Do Not Identify Joint Activity that Requires Competition to be Restrained ............................................................... 4

B.    Defendants Do Not Establish The Necessary Relationship Between The Non-Solicitation Agreements and Any Joint Activity ...................... 5

C.    Defendants' Arguments that the Agreements "Facilitated" Collaborations Are Legally Insufficient and Factually Unsupported ........ 9

D.    Defendants Concede They Cannot Satisfy the Requirements of the Rule of Reason ....................................................................................... 13

III.    If the Court Does Not Apply the Per Se Rule, It Should Apply a Quick Look Analysis .......................................................................................... 13

IV.    Testimony or Other Evidence Regarding Pro-Competitive Justifications or Effects of the DNCC Agreements Are Irrelevant And Should Be Excluded ....... 15

CONCLUSION ......................................................................................................... 15

18

19

20

21

22

23

24

25

26

27

28

1169210.10

1

## TABLE OF AUTHORITIES

2

**Page**

3

**Cases**

4
*American Needle, Inc. v. Nat'l Football League*,
   560 U.S. 183 (2010) ................................................................................................ 4

5
*Arizona v. Maricopa County Med. Soc'y*,
6
   457 U.S. 332 (9th Cir. 1982) .............................................................................. 2, 15

*Bhan v. NME Hospitals, Inc.*,
7
   929 F.2d 1404 (9th Cir.),
   *cert. denied*, 502 U.S. 994 (1991) ...................................................................... 13

8
*Blackburn v. Sweeney*,
9
   53 F.3d 825 (7th Cir. 1995) ............................................................................... 3, 4

*Broadcast Music, Inc. v. Columbia Broad. Sys., Inc.*,
10
   441 U.S. 1 (1979) .................................................................................................. 5

11
*Cal. Dental Ass'n v. FTC*,
   526 U.S. 756 (1999) ............................................................................................. 14

12
*California ex rel. Harris v. Safeway, Inc.*,
   651 F.3d 1118 (9th Cir. 2011) ............................................................................. 14

13
*Chicago Professional Sports Limited Partnership v. National Basketball Assn.*,
14
   961 F.2d 667 (7th Cir. 1992) ............................................................................... 14

*Doe v. Arizona Hosp. and Healthcare Assoc.*,
15
   No. CV 07–1292–PHX–SRB, 2009 WL 1423378 (D. Ariz. Mar. 19, 2009) .................. 3

16
*Eli Lilly and Co. v. Zenith Goldline Pharm., Inc.*,
   172 F. Supp. 2d 1060 (S.D. Ind. 2001) ................................................................. 10

17
*Fleischman v. Albany Med. Ctn.*,
   728 F. Supp. 2d 130 (N.D.N.Y. 2010) ................................................................ 3, 4

18
*Freeman v. San Diego Ass'n of Realtors*,
19
   322 F.3d 1133 (9th Cir. 2003) ...................................................................... 4, 5, 6, 7

*FTC v. Indiana Fed'n of Dentists*,
20
   446 U.S. 447 (7th Cir. 1986) ............................................................................... 14

21
*Gerlinger v. Amazon.com, Inc.*,
   311 F. Supp. 2d 838 (N.D. Cal. 2004) .................................................................. 10

22
*Hairston v. Pac. 10 Conf.*,
   101 F.3d 1315 (9th Cir.1996) .............................................................................. 13

23
*In re Cardizem CD Antitrust Litig,*
24
   332 F.3d 896 (6th Cir. 2003) ............................................................................... 15

*In re High-Tech Emp. Antitrust Litig.*,
25
   856 F. Supp. 2d 1103 (N.D. Cal. 2012) ................................................................. 4

26
*In re Ins. Brokerage Antitrust Litig.*,
   618 F.3d 300 (3d Cir. 2010) ......................................................................... 1, 6, 10

27
*MLB Props., Inc. v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008) .............................................................................. 6, 8

28

1

2

**TABLE OF AUTHORITIES**
(continued)

**Page**

3

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984) ............................................................................. 4, 5, 6, 14

4

*Nat'l Society of Prof'l Eng'rs v. United States*,
    435 U.S. 679 (1978) ....................................................................................... 14

5

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
    776 F.2d 185 (7th Cir. 1985) ..................................................................... 9, 10

6

*PolyGram Holding, Inc. v. FTC*,
    416 F.3d 29 (D.C. Cir. 2005) ........................................................................ 14

7

*Princo Corp., v. Int'l Trade Comm'n*,
    616 F.3d 1318 (Fed. Cir. 2010) ................................................................. 9, 10

8

9

*Regents of the University of California v. American Broadcasting Cos.*,
    747 F.2d 511 (9th Cir. 1984) ................................................................... 4, 6, 8

10

*United States v. Brown Univ.*,
    5 F.3d 658 (3d Cir.1993) ......................................................................... 13, 14

11

*United States v. Brown*,
    936 F.2d 1042 (9th Cir. 1991) ..................................................................... 3, 4

12

*United States v. Cooperative Theaters of Ohio, Inc.*,
    845 F.2d 1367 (6th Cir. 1988) ..................................................................... 3, 4

13

14

15

**Rules**

16

Fed. R. Civ. P. 402 ............................................................................................ 15

Fed. R. Civ. P. 403 ............................................................................................ 15

17

18

**Treatises**

19

Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (3d ed.) ........................................................... 1, 2, 3, 14

20

21

**Other Authorities**

22

ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 ed.),
    at A-10 ........................................................................................................... 13

23

DOJ Competitive Impact Statement ................................................................ 4, 7

*United States v. Ass'n of Family Practice Residency Doctors*, No. 96-575-CV-W-2, (W.D. Mo.),
    Competitive Impact Statement, filed (W.D. Mo. May 28, 1996), accessible at 61 Fed. Reg.
    28891, 28894 (June 6, 1996) ........................................................................... 7

24

25

26

27

28

## **INTRODUCTION**

This memorandum will address the question of the presumptive legality or illegality of the conduct at issue in this case, a question of law for the Court.  Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (3d ed. 2007), vol. ii, ¶ 305 ("[T]hese presumptions, whether formal or informal, are rules of substantive law.").  Throughout this case, Defendants have steadfastly avoided explaining how anything other than the per se rule could apply to an agreement by horizontal competitors not to compete, despite findings to that effect by the Court and the Department of Justice.  Plaintiffs therefore cannot know with certainty which theory Defendants will pursue on this issue.  This memorandum will demonstrate why the per se rule applies under any theory.

**Part One** will explain that a horizontal agreement to reduce or limit competition for workers falls squarely within the per se rule against "naked" restraints of trade.  The restraints at issue here are comparable to traditionally per se illegal agreements to allocate markets or to not solicit competitors' customers.  Defendants' own expert agrees.  "***I happen to be a big believer in the per se rule*** . . . . ***I understand why the [DOJ] went down that path.***"  Snyder Dep. 100:19-102:9 (emphasis added), attached to the accompanying Declaration of Lisa J. Cisneros, Ex. 4.

**Part Two** will address Defendants' apparent contention that their agreements "facilitated" collaborations among themselves.  While it is true that otherwise per se illegal restraints can occasionally be justified as "ancillary" to legitimate joint ventures, these restraints cannot.  In order for the ancillary restraint doctrine to even come into play, Defendants would have to establish that their collaborations required competition to be restrained in order to exist at all—a position they have expressly disavowed.  They would also have to establish an organic and necessary relationship between the agreements and the supposed joint activity, something else they have failed to even attempt.  Defendants' argument that joint activity excuses any restraint that merely "facilitates" or "promotes" it finds no support in the law.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 346 (3d Cir. 2010) ("A restraint is not automatically deemed ancillary simply because it 'facilitates' a procompetitive arrangement.").  Moreover, even Defendants' claim about "facilitation" is inconsistent with the facts, as Dr. Marx has explained.

- 1 -

The record reveals "facilitation" as an after-the-fact rationalization by Defendants' lawyers and economists, not the actual contemporaneous goal or effect of agreements that were designed to limit talent competition and suppress wages.

**Part Three** explains that even if the Court applies the more flexible "quick look" approach, the conspiracy and its attendant agreements must be condemned because the most rudimentary economic principles show they are anticompetitive, and Defendants have failed to link any of them to a sound procompetitive justification.

**Part Four** requests that evidence of Defendants' limited joint activity with one another be excluded as irrelevant because Defendants have failed to justify the application of anything other than the per se standard.

## ARGUMENT

### I.   The Per Se Rule Applies to Agreements Limiting Competition for Employees

The rule of per se illegality of certain kinds of restraints on trade serves an important purpose:  predictability.  It reflects a judgment that certain kinds of restraints are so obviously "pernicious" that courts and victims should not have to expend resources in every case re-establishing that fact.  Application of the rule cannot be avoided by claiming that a particular factual context is novel.[1]  The per se rule does not condemn specific agreements based on their particular language or details; it condemns entire classes of agreements based on their terms and economic effects.  Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (3d ed. 2010), vol. 7, ¶ 1509a, at 440-41 ("But sometimes the reasonableness judgment can be generalized for a class of behavior or for a class of claimed defenses").  Economic analysis, combined with *stare decisis*, drives the inquiry.  *Id.* ¶ 1509b, at 448 (per se rule applies where "serious pernicious effects are likely to result from

---

[1] *See Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 351 (9th Cir. 1982) ("[T]he argument that the per se rule must be rejustified for every industry that has not been subject to significant antitrust litigation ignores the rationale for per se rules, which in part is to void 'the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable.'").

1    most of its concrete manifestations, and social benefits are likely to be absent or small or readily

2    achievable in other ways").

3            The per se rule, and its rationale, extend well beyond the most common example of a

4    price-fixing cartel.  *Id.* at ¶ 1509a, p. 444 ("What has been said of price fixing applies almost

5    equally to other forms of naked collusion, such as horizontal market division").  Collusion among

6    horizontal competitors to limit, reduce, or eliminate competition is a quintessential per se

7    violation of the antitrust laws—regardless of whether it involves an agreement about price.  *See*

8    *United States v. Brown*, 936 F.2d 1042, 1045 (9th Cir. 1991).  The per se rule applies where two

9    producers agree not to bid competitively for inputs to their products, including on such things as

10   advertising.  *Id.*  (affirming the conviction of defendants who conspired to refrain from bidding on

11   each other's former billboard leases and holding that "a market allocation agreement between

12   competitors at the same market level is a classic per se antitrust violation").  It applies where

13   sellers agree not to solicit each other's customers, even though they agree to remain free to accept

14   unsolicited business.  *United States v. Cooperative Theaters of Ohio, Inc.*, 845 F.2d 1367, 1373

15   (6th Cir. 1988) (applying the per se standard to an agreement between movie theater booking

16   agents to refrain from soliciting each other's customers, even though the booking agents remained

17   free to accept unsolicited business from these customers).  It applies to agreements to restrict

18   territories in which firms advertise.  *See Blackburn v. Sweeney*, 53 F.3d 825 (7th Cir. 1995) (per

19   se rule applies to former law partners' agreement restricting advertising).  It also applies to

20   agreements among employers that reduce competition for employees.  *See Fleischman v. Albany*

21   *Med. Ctn.*, 728 F. Supp. 2d 130 (N.D.N.Y. 2010) (denying defendants' motion for summary

22   judgment on the per se claim, holding that the information exchange between Defendants

23   constituted a conspiracy that was illegal per se and tantamount to a conspiracy to fix prices).[2]

24

25

---

26   [2] *See also Doe v. Arizona Hosp. and Healthcare Assoc.*, No. CV 07–1292–PHX–SRB, 2009 WL
     1423378 (D. Ariz. Mar. 19, 2009) (holding that employee nurses alleged sufficient facts to
27   establish a claim of per se illegality against hospitals where the hospitals allegedly wrongfully
     suppressed the compensation of temporary nurses by exclusively contracting with a registry
28   program that set standardized, uniform hourly rates for temporary nursing personnel).

1    An agreement between two labor competitors not to solicit *any* of each other's employees

2  violates the Sherman Act per se.  Standing alone—the question of whether a particular agreement

3  may be justified as an ancillary restraint is a separate issue—such an agreement has no

4  conceivable benefits for workers or society at large and serves no purpose other than to restrain

5  competition.  *See Brown*; *Cooperative Theatres of Ohio*; *Blackburn*; *Fleischman*.  The

6  Department of Justice reached this conclusion with respect to these very agreements.  DOJ

7  Competitive Impact Statement at 7 (discussing *Brown* and *Cooperative Theaters*).  This Court

8  reached it before.  *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1123 (N.D. Cal.

9  2012).  It is thus clear that the per se standard applies to Defendants' misconduct, whether viewed

10  as a single conspiracy or a series of individual agreements.

11  **II.    The Agreements Not to Compete Are Not Reasonably Ancillary to Any Pro-
12          Competitive Integration of Economic Activity That Requires Restrictions on
         Competition In Order to Succeed**

13    Defendants have never disputed that the per se rule applies to an agreement between two

14  companies, or among these seven companies, not to solicit each other's employees.  Rather, they

15  have responded to this issue by gesturing in the direction of a line of authority addressing the rare

16  occasion when competition needs to be restrained for two or more firms to undertake joint

17  economic activity—otherwise known as the "reasonably ancillary restraints" doctrine.  *See* Def.

18  Mot. to Exclude Expert Testimony of Dr. Marx, Dkt. No. 559 at 8-9.  The rule of reason applies

19  to such restraints.  However, Defendants have not met, and cannot meet, the requirements for

20  application of this "very narrow" exception to the per se rule, *Freeman v. San Diego Ass'n of*

21  *Realtors*, 322 F.3d 1133, 1150 (9th Cir. 2003), because they have expressly disavowed that

22  competition must be restrained in order for their purported joint activity to occur.

23    **A.    Defendants Do Not Identify Joint Activity that Requires Competition to be
            Restrained**

24

25    The very first requirement for application of the ancillary restraints doctrine is that the

26  case must "involve[] an industry in which horizontal restraints on competition are ***essential*** if the

27  product is to be available at all."  *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of*

28  *Okla.*, 468 U.S. 85, 101 (1984) ("*NCAA*") (emphasis added).  *See also American Needle, Inc. v.*

- 4 -

1    *Nat'l Football League*, 560 U.S. 183, 203 (2010) (reaffirming *NCAA*, and holding that "when

2    restraints on competition are ***essential*** if the product is to be available at all, per se rules of

3    illegality are inapplicable, and instead the restraint must be judged according to the flexible Rule

4    of Reason") (internal citations omitted) (emphasis added); *Broadcast Music, Inc. v. Columbia*

5    *Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979) (cooperative arrangements involving price not unlawful

6    "where the agreement on price is necessary to market the product at all"); *see also Freeman*, 322

7    F.3d 1151 (explaining *NCAA*).  It is no accident that the Supreme Court and appellate decisions

8    articulating this exception to the per se rule involve unusual avenues like sports leagues, group

9    music licensing, and the MLS listing service.  These are industries, products, and ventures that

10   require cooperation among competitors and "essential" restrictions on competition in order to

11   exist.  They reinforce that most economic activity by companies does not require horizontal

12   restrictions on competition.

13       Defendants utterly fail to meet the first requirement to invoke this doctrine:  they offer not

14   a shred of evidence that any of their supposed joint activity required restraints on competition in

15   order to be successful.  In fact, Defendants have *ridiculed* as a "straw-man proposition" the idea

16   that they needed non-solicitation agreements in order to collaborate.  *See* Def. Mot. to Exclude

17   Dr. Marx, at 6-9 ("Another significant part of Dr. Marx's report is devoted to a lengthy refutation

18   of the straw-man proposition that 'Anti-Solicitation agreements are essential for a successful

19   technical collaboration.'").  Neither Defendants nor their experts have identified any other respect

20   in which restraining competition was "essential" for their joint activity to succeed, much less

21   justification for blanket restrictions covering entire workforces, as existed here.  Indeed, in many

22   cases the parties to the non-solicit agreements do not even claim to have had any joint economic

23   activity to begin with.  Because Defendants fail to meet this first requirement, the Court need go

24   no further in evaluating the application of the ancillary restraints doctrine.

25       **B.    Defendants Do Not Establish The Necessary Relationship Between The Non-**
             **Solicitation Agreements and Any Joint Activity**

26

27       Defendants have also failed the second requirement of the exception:  establishing that

28   non-solicit agreements are "reasonably ancillary to the legitimate cooperative aspects of the

venture." *Freeman*, 322 F.3d 1151.  The existence of a joint venture requiring *some* restrictions on competition does not automatically authorize *every possible* restriction on competition.  In *Regents of the University of California v. American Broadcasting Cos.*, 747 F.2d 511 (9th Cir. 1984), the Ninth Circuit invalidated further broadcasting restraints on the grounds that they had "little, if any, bearing on the operative rules of collegiate football" and appeared "to constitute classic horizontal restraints unadorned by any organic relationship to the character and quality of the 'product.'" *Id.* at 517 (quoting *NCAA*); *see also Freeman*, 322 F.3d 1151 (citing and quoting *Regents*).  Or as then-Judge Sotomayor explained in her *MLB Properties* concurrence, "a restraint that is **unnecessary** to achieve a joint venture's efficiency-enhancing benefits may not be justified based on those benefits. . . . In contrast, where a restraint is reasonably **necessary** to achieve a joint venture's efficiency-enhancing purposes (*i.e.*, ancillary), it will be analyzed under the rule of reason as part of the joint venture because the effects of that restraint are not so plainly anticompetitive as to make a *per se* or quick-look approach appropriate."  *MLB Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 339 (2d Cir. 2008) (Sotomayor, J., concurring in the judgment) (emphasis added).

Defendants fail to meet this requirement for a number of reasons.  First, there is no conceivable way in which the multi-lateral conspiracy Plaintiffs will seek to prove at trial could be "reasonably ancillary" to any of Defendants' joint activity—and Defendants offer no evidence or argument to the contrary.   Unlike Sandicor, the joint operation the multiple defendants formed in *Freeman*, there is no evidence that all seven Defendants were collectively pursuing any joint venture or collaboration.  Indeed, Defendants expressly disavow any coordination or cooperation between all of the Defendants, and their experts limited their opinions to the individual bilateral agreements.[3]  *See also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d at 346 (holding that

---

[3]  *See* Snyder Dep. 256:2-6 (Q: Did you . . . in your report provide any procompetitive justifications for the alleged overarching agreement? A: That was not part of my assignment. I didn't inquire one way or the other."), Cisneros Decl., Ex. 4; *see also* Talley Dep. 274:3-6 (Q: "You didn't study the agreements that did not have Google as a party, correct?" A: "I did not focus on those agreements."), Cisneros Decl., Ex. 5; Lewin Dep. 247:13-16 (Q: "Do you have any opinion regarding why the CEOs wanted to keep these agreements secret?" A: "No."), Cisneros Decl., Ex. 2.

1    horizontal restraints were not ancillary where defendants could not identify "any procompetitive

2    venture to which the insurers' alleged horizontal agreement not to compete for incumbent

3    business could reasonably be deemed integral").  Here, the overarching conspiracy is a classic

4    "naked" restraint, aimed at artificially suppressing compensation.  It cannot plausibly be deemed

5    to fall within the very narrow "ancillary restraints" doctrine.  It should therefore be judged under

6    the per se standard.  *See Freeman*, 322 F.3d 1133 at 1151.

7         Defendants' agreements also fail this standard when considered separately.  In examining

8    the six bilateral agreements at issue, the DOJ concluded that separately the agreements were

9    "naked restraints of trade and not ancillary to achieving legitimate business purposes."  DOJ

10   Competitive Impact Statement at 6.  The DOJ has examined analogous agreements in other cases

11   and has come to the same conclusion.[4]  The DOJ explained with regard to Defendants' conduct

12   here:

> Although Defendants at times engaged in legitimate collaborative projects, the
> agreements to ban cold calling were not, under established antitrust law, properly
> ancillary to those collaborations.  Defendants' agreements were not tied to any
> specific collaboration, nor were they narrowly tailored to the scope of any specific
> collaboration.  The agreements extended to all employees at the firms, including
> those who had little or nothing to do with the collaboration at issue.   The
> agreements were not limited by geography, job function, product group, or time
> period.  This overbreadth and other evidence demonstrated that the no cold calling
> agreements were not reasonably necessary for any collaboration and, hence, not
> ancillary.   The lack of reasonable necessity for these broad agreements is
> demonstrated also by the fact that Defendants successfully collaborated with other
> companies without similar agreements, or with agreements containing more
> narrowly focused hiring restrictions.

20   *Id.* at 9.  As the DOJ found, the anticompetitive effects of these agreements are plain, and subject

21   to per se condemnation.

22        Nothing that has been developed in the record remotely challenges this conclusion.  First,

23   while some of the Defendants engaged in collaborations with each other, none of the contracts

24   between the collaborating entities even mentions their secret anti-solicitation agreements, let

25

26   _____
     [4] For example, the DOJ earlier applied the per se standard to similar agreements among members
27   of the Association of Family Practice Residency Directors not to directly solicit residents from
     each other.  *See United States v. Ass'n of Family Practice Residency Doctors*, No. 96-575-CV-W-
28   2, (W.D. Mo.), Competitive Impact Statement, filed (W.D. Mo. May 28, 1996), accessible at
     61 Fed. Reg. 28891, 28894 (June 6, 1996).

- 7 -

1    alone indicates their essential importance to the joint project.  *See, e.g.*, Cisneros Decl., Exs.

2    2924-2928 (contracts).  As Dr. Talley admitted, the written contracts reflecting the collaborations

3    by their own terms constitute the entire agreements between the parties concerning the

4    collaborations, and *none* of the collaboration contracts even mentions an anti-solicitation

5    agreement.  Talley Dep. 215:3-220:7, Cisneros Decl., Ex. 5.  While being included in the

6    collaboration agreement might not be *sufficient* to make a restraint reasonably ancillary it is

7    certainly *necessary*.  *See Regents*, 747 F.2d at 517.  Further, the individuals who negotiated and

8    supervised the collaborations were not even aware that the secret anti-solicitation agreements

9    even existed.  Marx ¶¶ 28, 30.a; Marx Rebuttal ¶ 31.  *See also* Pls' Opp'n to Summ. J. at nn.33-41

10   (Dkt. 603).  The lack of any record connection between the agreements and the collaborations

11   shows that link for what it is: a post-hoc pretext for eliminating competition for their workers.

12          Second, the scope of the anti-solicitation agreements bears no relation to the asserted pro-

13   competitive justifications of the agreement, *i.e.* that the agreements facilitated collaborations by

14   preventing the companies from poaching each other's employees directly involved in the

15   collaboration.  Instead, the agreements prohibited recruitment of all employees, regardless of title,

16   job function, connection to collaboration (such as visibility to the collaborator), location, or time

17   period.  The Final Judgment sets out a list of conditions under which the Defendants can engage

18   in narrowly-tailored agreements if they are specifically tied to collaborations, requirements that

19   the company-wide agreements at issue obviously failed to meet.  Defendants' experts also do not,

20   and could not when questioned, point to a single collaboration that would not have occurred, or a

21   single product that would not have been created, but for the anti-solicitation agreements.[5]  See

22   *MLB Props.*, 542 F.3d  at 339 (Sotomayor, J., concurring in the judgment).

23

24

25

26   [5] *See* Murphy Dep. 749:1-17 ("there is not a … necessary and sufficient relationship between
     agreements and collaborations"), 751:14-752:6, 760:10-763:5, Cisneros Decl., Ex. 3; Snyder Dep.
27   46:9-20 ("[O]ne would not expect to be able to say with certainty that with or without a particular
     cold call agreement that you would have or not have a particular collaboration."), Cisneros Decl.,
28   Ex. 4; Tally Dep. 169:11-177:18, Cisneros Decl., Ex. 5.

1    Thus, Defendants' anti-solicitation agreements were not tied to any specific collaboration,

2    and far exceeded any possible appropriate restriction.  On those bases alone, Defendants'

3    agreements cannot be deemed to be ancillary to any collaboration or joint venture.

### C.    Defendants' Arguments that the Agreements "Facilitated" Collaborations Are Legally Insufficient and Factually Unsupported

4    In their Motion to Exclude Dr. Marx's testimony, Defendants argue that a restraint may be

6    ancillary and therefore legal if it merely "facilitates" collaborations, or "contribute[s] to the

7    success of a cooperative venture that promises greater productivity and output."  *See* Mot. to

8    Exclude Dr. Marx at 8 (citing *Princo Corp., v. Int'l Trade Comm'n*, 616 F.3d 1318, 1336 (Fed.

9    Cir. 2010) (*en banc*); *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 189 (7th Cir.

10   1985)).  Their experts similarly attempt to justify the agreements.  *See, e.g.*, Snyder Report at

11   ¶¶ 56-70, Cisneros Decl., Ex. 7; Talley Report at ¶¶ 32-33, Cisneros Decl., Ex. 8; Murphy Report

12   at ¶¶ 30-34, Cisneros Decl., Ex. 6.  Defendants appear to be reaching for a body of out-of-Circuit

13   authority addressing the lawfulness of "reasonably ancillary restraints" in the context of an

14   integrated joint venture.  However, that body of caselaw does not change the analysis in any

15   material way—it does not support Defendants' attempt to rely on a lower standard than

16   "necessity" in defending their otherwise unlawful arrangements.

17   First, not every joint activity of competitors can be used to justify restraints on

18   competition.  Defendants' own cases demonstrate that this body of law relates to true joint

19   ventures where the venturers pool assets and share both the chance of profit and the risk of loss.

20   For instance, *Princo* concerned a specific category of joint venture—"research joint ventures,"

21   616 F.3d at 1335—as to which "it is now well settled" that the rule of reason presumptively

22   applies.  That is because research joint ventures hold the promise of bringing into being a product

23   that might not otherwise exist.  Similarly, *Polk Bros.* involved a joint venture to co-develop a new

24   retail location that would not otherwise have existed, increasing retail space and benefiting

25   consumers.  776 F.2d at 190.  The stores appear to have invested well over a million dollars (in

26   the 1970s) in the property.  *Id.* at 187 ("In 1978, Forest City exercised its option to buy, and Polk

27   took back a mortgage for some $1.4 million.").  None of Defendants' supposed "collaborations"

28

- 9 -

1    rise to the level of integration in *Princo* or *Polk Bros.*  At most, Defendants identify

2    customer/vendor relationships, or efforts to make their products inter-operable.  But there is no

3    case law holding that these kinds of relationships among firms can justify mutual agreements not

4    to compete.

5         Second, even as to true joint ventures a defendant must show more than that the restraint

6    proved helpful or "facilitated" the venture:  the restraint must be essential or necessary.  As the

7    Third Circuit has explained, "a restraint is not automatically deemed ancillary simply because it

8    'facilitates' a procompetitive arrangement."  *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300,

9    346 (3d Cir. 2010).   Defendants' cases once again do not support a contrary view.  In *Princo*, the

10   court distinguished ancillary restraints that are "important" to collaborative ventures such as those

11   integrated into a contract, and naked restraints which are "not **reasonably necessary** to achieve

12   the efficiency-enhancing benefits of the joint venture."  *Princo*, 616 F. 3d at 1339 (emphasis

13   added).  Or, as the Seventh Circuit explained in *Polk Bros.*:

14               The covenant allocating items between the retailers played an
             important role in inducing the two retailers to cooperate. The
15             district court found that Polk "would not have entered into this
             arrangement, however, unless it had received assurances that
16             [Forest City] would not compete with it in the sale of products that
             are the 'foundation of [Polk's] business'.["] . . . [T]he restrictive
17             covenant **made the cooperation possible**.  The Rule of Reason
             therefore applies.

18

19   776 F.2d at 190 (emphasis added).[6]

20         Moreover, even if it were relevant, this "facilitation" argument is refuted by the record. To

21   begin with, this Court has now painstakingly addressed—twice—the actual evidence of *why* the

22   Defendants entered into the non-solicitation agreements.  Oct. 24, 2013 Order Granting Pls'

23   Suppl. Mot. for Class Cert., Dkt. 531 at 25-31; April 4, 2014 Order Re: Defs.' Mots. Regarding

24   _____

   [6] Defendants' citation to *Gerlinger v. Amazon.com, Inc.*, 311 F. Supp. 2d 838 (N.D. Cal. 2004), is
25   similarly unpersuasive.  *Gerlinger* simply applied *Polk Bros.* in a straightforward way to very
   comparable arrangement:  a virtual on-line marketplace jointly created by Borders and
26   Amazon.com. *See also Eli Lilly and Co. v. Zenith Goldline Pharm., Inc.*, 172 F. Supp. 2d 1060,
   1072 n.14 (S.D. Ind. 2001) (distinguishing *Polk* and denying defendant's summary judgment
27   argument that the restraint was ancillary, holding "[b]y limiting *all* cefaclor sales by Dobfar, the
   Lilly–Dobfar contract goes one step too far, thereby defeating Lilly's argument that the
28   agreement was ancillary").

1    Dr. Leamer and Defs.' Joint Mot. For Summ. J. Based on Mot. to Exclude Testimony of Dr.

2    Leamer, Dkt. 788 at 6-13.  Pixar and Lucas did not agree not to solicit each other's employees

3    because of any collaborations—they didn't have any—they did it in order to avoid bidding wars

4    that would affect their margins.  Pixar and Apple didn't have any "collaborations" either.  And to

5    the extent the Defendants did have any ongoing joint activity at the time they reached their non-

6    solicitation agreements, reference to such is conspicuously absent from the documents that the

7    Court has already reviewed and discussed at length.  Steve Jobs didn't threaten to end joint

8    activity with Google; he threatened "war."  Cisneros Decl., Ex. 1871.  Bruce Chizen didn't

9    suggest a company-wide ban on recruiting because of fear of losing "collaborations"—he

10   suggested it because Jobs threatened to "tell our [Apple's] recruiters that they are free to approach

11   any Adobe employee who is not a Sr. Director or VP."  Cisneros Decl., Ex. 223.  Furthermore, as

12   discussed above, the agreements also manifestly lacked any of the objective limitations from

13   which a connection to a "collaboration" could be inferred.  In fact, Intuit provides the perfect

14   example of this contradiction.  Prior to being "added fully" to Google's DNCC list, Cisneros

15   Decl., Ex. 597, Intuit did have a brief collaboration with Google.  The companies agreed not to

16   solicit top executives specifically associated with the project:  18 individuals identified by name.

17   Cisneros Decl., Ex. 182.  However, sometime after the collaboration ended, in June 2007, Bill

18   Campbell asked for a company-wide ban on active solicitation.  Cisneros Decl., Ex. 597.  The

19   request had nothing to do with any joint activity of the companies.

20        Furthermore, as explained in his report previously submitted, Dr. Matthew Marx of the

21   Massachusetts Institute of Technology business school has combed through the record and

22   concluded it contradicts Defendants' claims.  Cisneros Decl., Ex. 9.  For example, no

23   collaborations existed between Google and Facebook when Google sought a no-cold-calling

24   agreement with that company.  *Id.* at ¶ 26.  The Defendants did not establish their no-cold-calling

25   arrangements in conjunction with, or at the same time as, or even through the same personnel, as

26   their supposed collaborations.  *Id.* at ¶¶ 27, 28, 30.a; Marx Rebuttal ¶ 31, Cisneros Decl., Ex. 10.

27   And the collaborations happened before the conspiracy and have continued despite the Final

28   Judgment.   Marx ¶¶ 29-32; Marx Rebuttal ¶¶ 1-31. Defendants' experts ignore this.  *See, e.g.*,

1    Talley Dep. 136:19-137:9, Cisneros Decl., Ex. 5.   As Apple CEO Tim Cook explained: "Are we

2    [now] in deep collaboration with anyone? Of course. Yes. And we abide by the consent decree

3    with those." Cook 58:5-7, Cisneros Decl., Ex. 1.  "The consent decree doesn't prevent people

4    from working together." *Id.* at 75:1-2.

5         The best Defendants' experts can do is assert that such agreements are "consistent" with

6    "consensus best practices" regarding "collaboration among potential competitors." Talley ¶ 33.

7    However, as Dr. Talley admitted at his deposition, his only support for this assertion is the

8    "Model Merger Agreement for the Acquisition of a Public Company," an ABA publication that is

9    irrelevant to the conduct at issue in this case.  Talley Dep. 140:20-146:13, Cisneros Decl., Exs. 5

10   and 2923.  The ABA document concerns the much different scenario of an acquisition of one

11   company by another.  Moreover, the ABA publication does not even suggest that anti-solicitation

12   agreements such as those at issue in this case are appropriate to facilitate mergers; to the contrary,

13   the treatise suggests limiting any anti-solicitation agreements in just the way the Final Judgment

14   requires. *Compare* Cisneros Decl., Ex. 2923 at 366-367 with Ex. 166 at 5-6.  *See also* Talley Dep.

15   140:20-146:13, Cisneros Decl., Ex. 5.[7]

16        Defendants also argue that the anti-solicitation agreements were important to maintaining

17   good board relations or were otherwise critical for developing a relationship of "mutual trust,"

18   Murphy November 25, 2013 Report ¶ 45, Cisneros Decl., Ex. 6.  Pixar and Lucas did not have

19   overlapping boards—they were privately owned by Mr. Jobs and Mr. Lucas.  At the time it

20   sought an anti-solicitation agreement, Apple had no overlapping board member with Palm.

21   Likewise, Google had no overlapping board member with Facebook, with which it also tried to

22   secure a non-recruit agreement.  Apple had no overlapping board member with Google when Mr.

23   Jobs and Mr. Brin agreed to a secret anti-solicitation pact (Mr. Schmidt joined Apple's Board

24   later).  Mr. Campbell's role as "coach" to Google long predated his request that Intuit be brought

---

25   [7] Like Defendants' other experts, Dr. Talley could not provide a single example of any other anti-
26   solicitation agreement outside of this case. Talley Dep. 35:15-23, Cisneros Decl., Ex. 5.  Dr.
     Talley insisted he has never advised his students to enter into such agreements, *id.* 62:1-12 ("this
27   should not be understood as advising them to get into such agreements willy-nilly"), and in his
     own work advising boards of directors, he has never advised them to enter into such anti-
28   solicitation agreements, *id.* at 30:19-31:12.

into the fold, and his work with Google continued after the anti-solicitation agreements ended. Mr. Otellini served on the Google board well before he and Mr. Schmidt struck a secret "handshake" anti-solicitation deal, and Mr. Otellini continues to sit on Google's Board today, years after the DOJ consent decree (he served as CEO of Intel until 2013). Defendants' vague facilitation arguments are not supported by the record, and are certainly not sufficient to qualify the agreements as ancillary restraints under controlling law.

### D.      Defendants Concede They Cannot Satisfy the Requirements of the Rule of Reason

Even if the Defendants had met these many criteria for application of the rule of reason the analysis would still be the same. That is because the rule of reason itself requires that the defendant establish a relationship of necessity between the restraint and a supposed pro-competitive benefit. In order to defend the case under the rule of reason, Defendants would have to prove that the anti-solicitation agreements resulted in "competitive benefits," and the jury would be instructed that "you *must* also consider whether the restraint was *reasonably necessary* to achieve the benefits." ABA Section of Antitrust Law, Model Jury Instructions in Civil Antitrust Cases (2005 ed.), at A-10. If the restraints were not "reasonably necessary," then they "*cannot* be used to justify the restraint." *Id.*; *see also United States v. Brown Univ.*, 5 F.3d 658, 668 (3d Cir.1993); *Hairston v. Pac. 10 Conf.*, 101 F.3d 1315, 1319 (9th Cir.1996); *Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404, 1413 (9th Cir.), *cert. denied*, 502 U.S. 994 (1991). The Defendants do not take the position that the agreements were "reasonably necessary"—to the contrary, they ridicule this as a "straw-man proposition." So even if Defendants successfully argued for rule of reason here, the Court would wind up instructing the jury in accordance with the per se standard—without reference to the balancing of pro-competitive benefits and anti-competitive harms required by full-blown rule of reason analysis—because Defendants are manifestly unable to clear this hurdle.

### III.      If the Court Does Not Apply the Per Se Rule, It Should Apply a Quick Look Analysis

If the Court declines to apply the per se rule, it should use a "quick look" rule of reason analysis. Conduct may be condemned after a "quick look" if "an observer with even a

- 13 -

1   rudimentary understanding of economics could conclude that the arrangements in question would

2   have an anticompetitive effect on customers and markets." *California ex rel. Harris v. Safeway,*

3   *Inc.*, 651 F.3d 1118, 1146 (9th Cir. 2011) (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770

4   (1999)); *see also* 11 Areeda, ¶ 1911(a) at 326 ("quick look" is "intended to connote that a certain

5   class of restraints, while not unambiguously in the *per se* category, may require a less elaborate

6   examination to establish that their principal or only effect is anticompetitive").  Such

7   condemnation can be accomplished "'in the twinkling on an eye.'"  *Safeway*, 651 F.3d at 1134

8   (quoting *NCAA*, 468 U.S. at 109, n.39 (1984)).

9         The difference from a per se approach is that, under a "quick look," a defendant may try to

10  proffer "sound procompetitive justifications," and the court will examine them.  *United States v.*

11  *Brown Univ.*, 5 F.3d at 669 (citation omitted).  If (but only if) the court concludes that defendants

12  have met their burden, the analysis may shift to a rule of reason.  *Id.*  "Quick-look analysis in

13  effect" shifts to "a defendant the burden to show empirical evidence of procompetitive effects."

14  *Cal. Dental*, 526 U.S., at 775, n.12; *see also PolyGram Holding, Inc. v. FTC*, 416 F.3d 29 (D.C.

15  Cir. 2005) (discussing framework); *Chicago Professional Sports Limited Partnership v. National*

16  *Basketball Assn.*, 961 F.2d 667, 674-676 (7th Cir. 1992) (finding quick-look analysis adequate

17  after assessing and rejecting logic of proffered procompetitive justifications).  No further inquiry

18  into market power or actual harm to competition is necessary if there is no procompetitive

19  justification for the restraint.  *See FTC v. Indiana Fed'n of Dentists*, 446 U.S. 447 (7th Cir. 1986)

20  at 460; *Nat'l Society of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978); *NCAA*, 468 U.S.

21  at 110.

22        Here, Plaintiffs have alleged that Defendants' conspiracy and the individual bilateral

23  agreements that comprise it are naked restraints with readily apparent anticompetitive effects and

24  no plausible procompetitive justifications.  If the Court is disinclined to apply a per se analysis,

25  the Court can readily determine whether such justification is plausible under a "quick look"

26  analysis.  As Defendants have failed to produce any evidence of a procompetitive justification for

27  the overarching conspiracy or of an effort to tailor their bilateral agreements in any way to their

28  efforts at collaboration, under a "quick look" analysis the restraint should be condemned.

1

**IV.     Testimony or Other Evidence Regarding Pro-Competitive Justifications or Effects of the DNCC Agreements Are Irrelevant And Should Be Excluded**

2

3        Because per se analysis is appropriate, evidence or other testimony about purported

4   procompetitive justifications for the conspiracy or the individual agreements is irrelevant and

5   inadmissible.  *See In re Cardizem CD Antitrust Litig,* 332 F.3d 896, 909 (6th Cir. 2003).  "[T]he

6   law is clear that once it is decided that a restraint is subject to *per se* analysis, the claimed lack of

7   any actual anticompetitive effects or presence of procompetitive effects is irrelevant." *Id.* (citing

8   *Arizona v. Maricopa Cty.*, 457 U.S. 332, 351 (1982)).  As such, whether the agreements are "pro-

9   competitive" or were established for "pro-competitive reasons" is irrelevant and should be

10  excluded under Rule 402. Additionally, introduction of such evidence would be unfairly

11  prejudicial.  Not only would the admission of such irrelevant testimony and evidence waste

12  substantial time and judicial resources, but evidence regarding disconnected and irrelevant

13  collaborations, products, and technology could lead the jury to incorrectly conclude that these

14  activities excuse or justify the restraints at issue.  Accordingly, such testimony and evidence

15  should be excluded under Rule 403.

**CONCLUSION**

16

17       For the foregoing reasons, Plaintiffs respectfully request that the Court enter an order that

18  the alleged conspiracy, and the underlying anti-solicitation agreements, should be considered

19  under per se analysis, and the Court should exclude any references to Defendants' procompetitive

20  justifications at trial.

21

22

23

24

25

26

27

28

1

2     Dated:  April 10, 2014          LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

3

4                                    By:_____*/s/ Brendan P. Glackin*_____

5                                    Richard M. Heimann (State Bar No. 63607)
                                     Kelly M. Dermody (State Bar No. 171716)
6                                    Brendan P. Glackin (State Bar No. 199643)
                                     Dean M. Harvey (State Bar No. 250298)
7                                    Anne B. Shaver (State Bar No. 255928)
                                     Lisa J. Cisneros (State Car No. 251473)
8                                    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                                     275 Battery Street, 29th Floor
9                                    San Francisco, California  94111-3339
                                     Telephone:  415.956.1000
10                                   Facsimile:  415.956.1008

11                                   Joseph R. Saveri (State Bar No. 130064)
                                     James G. Dallal (State Bar No.  277826)
12                                   JOSEPH SAVERI LAW FIRM, INC.
                                     255 California, Suite 450
13                                   San Francisco, California 94111
                                     Telephone: 415.500.6800
14                                   Facsimile: 415.500.6803

15                                   *Co-Lead Class Counsel*

16                                   Eric L. Cramer
                                     Sarah R. Schalman-Bergen
17                                   BERGER & MONTAGUE, P.C.
                                     1622 Locust Street
18                                   Philadelphia, PA  19103
                                     Telephone:  (215) 875-3000
19                                   Facsimile:  (215) 875-4604

20                                   Linda P. Nussbaum
                                     Peter Barile
21                                   GRANT & EISENHOFER P.A.
                                     485 Lexington Avenue, 29th Floor
22                                   New York, NY  10017
                                     Telephone:  (646) 722-8500
23                                   Facsimile:  (646) 722-8501

24                                   *Class Counsel*

25

26

27

28

PL. MOT FOR THE APPLICATION
OF PER SE ANALYSIS
MASTER DOCKET NO. 11-CV-2509-LHK