# Excerpts of Deposition of Kathryn Shaw, Ph.D.

## July 3, 2013

## REDACTED VERSION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE      )

ANTITRUST LITIGATION           )

                               )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:      )

ALL ACTIONS.                   )

_____)


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEO DEPOSITION OF KATHRYN SHAW, PH.D.

JULY 3, 2013


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

Deposition of Kathryn Shaw, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

09:37:14  1          Q.   How about Batts and the service sector customer

09:37:17  2     service study?  AT&T?

09:37:21  3          A.   AT&T, I don't recall that paper.

09:37:24  4          Q.   How about Cockburn in 1999 about

09:37:26  5     pharmaceuticals?

09:37:27  6          A.   Yes, that's an insider paper.

09:37:29  7          Q.   And Landers in 1996 about law firms?

09:37:32  8          A.   That's not an insider paper.

09:37:34  9          Q.   In terms of vending the field, it seems that

09:37:40  10    there have been many people that preceded you in doing

09:37:43  11    this work; isn't that fair?

09:37:45  12              MR. KIERNAN:  Object to form?

09:37:47  13              THE WITNESS:  There have been isolated

09:37:48  14    instances in which people have done work that is of an

09:37:52  15    insider econometric nature.  But to really call it a

09:37:56  16    field and to outline the methodology for doing this type

09:38:01  17    of work had not been done before.  And it was really a

09:38:06  18    nascent field as we developed it.

09:38:09  19              And the paper we wrote on the steel

09:38:12  20    manufacturing plants is really one of the original papers

09:38:16  21    showing how insider econometrics would be done.

09:38:21  22    BY MS. DERMODY:

09:38:21  23          Q.   And that paper was done in what year?

09:38:24  24          A.   The late '90s.

09:38:26  25          Q.   Uh-huh.  Do you know if anyone other than you

09:38:28  1    teaches a course covering insider econometrics as a

09:38:32  2    label?

09:38:34  3         A.   I don't know.

09:38:36  4         Q.   You're not aware of anyone else that does; is

09:38:38  5    that correct?

09:38:39  6         A.   I'm not aware of it.

09:38:42  7         Q.   Okay.  And this field that you claim you

09:38:44  8    invented, insider econometrics, how is insider

09:38:50  9    information used?

09:38:51  10         A.   Insider information is used to understand the

09:38:54  11    nature of the environment and form testable hypotheses.

09:39:05  12         Q.   And is this done through developing a study?

09:39:08  13         A.   What do you mean by "a study"?

09:39:10  14         Q.   Why don't you tell me how this is done.  How do

09:39:13  15    you go about understanding the nature of the environment

09:39:15  16    and forming testable hypotheses?

09:39:19  17         A.   You go to individual firms, and you talk to

09:39:22  18    them about their production function, about their human

09:39:26  19    resource practices, about their environment, and you

09:39:31  20    identify a testable hypothesis that you would like to

09:39:38  21    research.

09:39:40  22         Q.   And does this approach necessarily involve

09:39:43  23    doing interviews?

09:39:45  24         A.   Yes, it does.

09:39:46  25         Q.   Could a survey also be used in place of

09:39:48  1   interviews?

09:39:50  2       A.   Surveys can be part of the insider approach,

09:39:53  3   but interviews are important.

09:39:59  4       Q.   Let me ask you, if you were studying a pay

09:40:02  5   system in a large firm, would you want to speak with the

09:40:06  6   director of compensation to get an overview of how the

09:40:10  7   pay system was designed to work?

09:40:12  8            MR. KIERNAN:  Object to form.

09:40:13  9            THE WITNESS:  You'd want to speak to the --

09:40:16  10  yeah, the director of compensation, but also to -- to

09:40:18  11  others, as well.

09:40:19  12  BY MS. DERMODY:

09:40:20  13      Q.   And if the company you were studying gave you a

09:40:23  14  list of the senior managers most knowledgeable about the

09:40:26  15  practice you were studying, would you want to speak with

09:40:29  16  those individuals?

09:40:31  17           MR. KIERNAN:  Object to form.

09:40:33  18           THE WITNESS:  I'd want to speak with an

09:40:35  19  assortment of people in the company in order to ascertain

09:40:38  20  the, you know, way in which compensation practices are

09:40:43  21  implemented.

09:40:44  22  BY MS. DERMODY:

09:40:45  23      Q.   My question is, if you were given a list of

09:40:48  24  senior managers most knowledgeable about the practice, do

09:40:50  25  you have any reason to ignore that list?

Deposition of Kathryn Shaw, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| 09:40:54 | 1 | MR. KIERNAN:  Object to form? |
| 09:40:55 | 2 | THE WITNESS:  To ignore the list?  In what |
| 09:40:57 | 3 | sense? |
| 09:40:58 | 4 | BY MS. DERMODY: |
| 09:40:58 | 5 | Q.   Ignore it and go pick your own people to |
| 09:41:00 | 6 | interview. |
| 09:41:05 | 7 | A.   I -- you know, I'd want to develop a list. |
| 09:41:08 | 8 | Whether I used their list or whether I have some prior |
| 09:41:11 | 9 | knowledge of people I want to interview, I can't say. |
| 09:41:14 | 10 | Q.   How would you pick a list of people to |
| 09:41:16 | 11 | interview that was different than what the company shared |
| 09:41:18 | 12 | with you as a starting point? |
| 09:41:28 | 13 | MR. TUBACH:  Object to the form of the |
| 09:41:29 | 14 | question. |
| 09:41:31 | 15 | MS. DERMODY:  Excuse me.  There is one person |
| 09:41:32 | 16 | defending.  Thank you. |
| 09:41:35 | 17 | THE WITNESS:  Would you repeat the question? |
| 09:41:36 | 18 | BY MS. DERMODY: |
| 09:41:37 | 19 | Q.   Sure.  I asked you if the company gave you a |
| 09:41:41 | 20 | list of the senior managers most knowledgeable about the |
| 09:41:44 | 21 | practice, would you use that list as a starting point for |
| 09:41:47 | 22 | interviews? |
| 09:41:48 | 23 | MR. KIERNAN:  Object to form. |
| 09:41:49 | 24 | THE WITNESS:  I would use that list.  I would |
| 09:41:50 | 25 | gather my own list.  You know, I -- probably I would |

| | | |
|---|---|---|
| 09:41:56 | 1 | interview people on their list. |
| 09:42:00 | 2 | BY MS. DERMODY: |
| 09:42:00 | 3 | Q.   Is there any reason you wouldn't interview the |
| 09:42:02 | 4 | people on their list as a starting point? |
| 09:42:06 | 5 | MR. KIERNAN:  Same objection. |
| 09:42:07 | 6 | THE WITNESS:  It depends on whether I'm |
| 09:42:09 | 7 | knowledgeable about the company, and I have other people |
| 09:42:11 | 8 | I'd like to identify to interview. |
| 09:42:13 | 9 | BY MS. DERMODY: |
| 09:42:13 | 10 | Q.   Okay.  Let's assume you aren't knowledgeable |
| 09:42:16 | 11 | about the company.  Would you start with a list the |
| 09:42:19 | 12 | company gave you? |
| 09:42:21 | 13 | MR. KIERNAN:  Object to form. |
| 09:42:22 | 14 | THE WITNESS:  I would begin with that list.  I |
| 09:42:23 | 15 | might expand on that list. |
| 09:42:25 | 16 | BY MS. DERMODY: |
| 09:42:25 | 17 | Q.   Okay.  That's fair. |
| 09:42:37 | 18 | Is it true that insider econometrics analysis |
| 09:42:40 | 19 | is ultimately interested in estimating the effects of |
| 09:42:44 | 20 | organizational level practices? |
| 09:42:46 | 21 | A.   Of organizational what? |
| 09:42:49 | 22 | Q.   Level practices. |
| 09:42:50 | 23 | A.   Of organizational practices, yes. |
| 09:42:52 | 24 | Q.   And what does that mean? |
| 09:42:54 | 25 | A.   We want to see whether human resource |

| | | |
|---|---|---|
| 09:42:57 | 1 | management practices have effects on productivity or on |
| 09:43:03 | 2 | profitability or on some measure of performance. |
| 09:43:07 | 3 | Q. And in doing that work, is it true you're |
| 09:43:11 | 4 | looking at company-level policies, company-level |
| 09:43:16 | 5 | incentives? |
| 09:43:17 | 6 | A. Or they may be department level, but we're |
| 09:43:20 | 7 | looking at policies that the company uses, yes. |
| 09:43:22 | 8 | MS. DERMODY: Next in order. |
| 09:43:22 | 9 | THE REPORTER: Exhibit 2847. |
| 09:43:23 | 10 | (Exhibit 2847 was marked for identification.) |
| 09:44:10 | 11 | BY MS. DERMODY: |
| 09:44:11 | 12 | Q. Dr. Shaw, do you recognize what has been marked |
| 09:44:13 | 13 | as Exhibit 2847? |
| 09:44:14 | 14 | A. Yes, I do. |
| 09:44:15 | 15 | Q. And what is this? |
| 09:44:16 | 16 | A. This is a paper I wrote. |
| 09:44:20 | 17 | Q. Okay. And this is a paper that was published |
| 09:44:23 | 18 | in 2009; is that correct? |
| 09:44:25 | 19 | A. That's right. |
| 09:44:26 | 20 | Q. Okay. If you could please turn to what is |
| 09:44:28 | 21 | marked as page -- internally as page 614 of the document. |
| 09:44:33 | 22 | It's a few pages in. |
| 09:44:39 | 23 | A. Okay. |
| 09:44:41 | 24 | Q. And if you'll look in the left column of that |
| 09:44:46 | 25 | page, about four paragraphs down, there is a paragraph |

09:44:50  1   that starts, "Data across establishments or firms as a

09:44:54  2   primary source of the identification of the effect of an

09:44:57  3   organizational innovation on productivity."

09:45:00  4            Do you see that?

09:45:01  5       A.   Yes.

09:45:01  6       Q.   What does that mean?

09:45:03  7       A.   It means that in attempting to identify the

09:45:07  8   effect of a human resource management practice on

09:45:11  9   productivity, one source of data would be to gather data

09:45:15 10   across establishments or firms in order to estimate the

09:45:19 11   regression model.

09:45:21 12       Q.   And then going over to the right column of the

09:45:25 13   same page, close to the top, there is a second header

09:45:30 14   which is not bold, says, "3.1, corollary one, it is

09:45:36 15   always nice to get more data to prove your point."

09:45:39 16            Do you see that?

09:45:40 17       A.   Sure.

09:45:41 18       Q.   What does that mean?

09:45:43 19       A.   It means that when you're working with

09:45:45 20   companies, you want to ask for data to do your

09:45:52 21   econometrics analysis, and it means exactly what it says.

09:45:57 22   More data is better than small amounts of data.

09:46:03 23       Q.   And why is that?

09:46:05 24       A.   Because it increases the power of your

09:46:07 25   econometrics test.

09:46:37  1        Q.   And then staying on that page, in the same

09:46:40  2    column, there is another header below that italicized

09:46:44  3    one, also in italics, "3.1, corollary 2, add descriptive

09:46:48  4    evidence from insiders."

09:46:50  5             Do you see that?

09:46:51  6        A.   Yes.

09:46:52  7        Q.   And what does that involve?

09:46:53  8        A.   It means what it says below in the paragraph

09:46:56  9    below that corollary, which is that it is helpful in

09:47:00  10   doing an econometrics analysis to interview insiders and

09:47:05  11   incorporate some of their views in your -- in your

09:47:08  12   research paper.

09:47:09  13       Q.   If you look in the -- in that paragraph that's

09:47:20  14   underneath that italicized header, the very last sentence

09:47:25  15   says, "A good story can go a long way in reassuring the

09:47:29  16   reader that the estimated model is a good way of

09:47:32  17   interpreting the reality of the firm.  Has the researcher

09:47:36  18   found truth?"

09:47:37  19            Do you see that?

09:47:37  20       A.   Yes, I do.

09:47:39  21       Q.   What does that mean?

09:47:40  22       A.   It means that when you do econometric analysis,

09:47:43  23   and you're looking at data, it's always nice to have

09:47:47  24   additional analysis from the insiders to corroborate the

09:47:52  25   results that you find.

| | | |
|---|---|---|
| 09:47:54 | 1 | Q.   And then on the next page, 615 of the document, |
| 09:48:17 | 2 | in the left column there is a bolded header, "Steps To |
| 09:48:22 | 3 | Take." |
| 09:48:23 | 4 | Do you see that? |
| 09:48:23 | 5 | A.   Sure. |
| 09:48:24 | 6 | Q.   And is that list essentially the key approach |
| 09:48:26 | 7 | that you would take to do an econometric -- insider |
| 09:48:29 | 8 | econometric study? |
| 09:48:31 | 9 | A.   Yes.  It's the list I wrote at the time. |
| 09:48:34 | 10 | Q.   Has that changed since 2009? |
| 09:48:38 | 11 | A.   Well, I've written more papers on this.  We |
| 09:48:40 | 12 | might have altered the list a little bit, but it's |
| 09:48:43 | 13 | basically as it says.  It's steps to take. |
| 09:48:47 | 14 | Q.   In looking at this list right now, is there |
| 09:48:49 | 15 | anything you can see on the list that you now disagree |
| 09:48:52 | 16 | with? |
| 09:48:54 | 17 | MR. KIERNAN:  Object to form. |
| 09:49:09 | 18 | THE WITNESS:  I don't disagree with any of it. |
| 09:49:11 | 19 | I've written other lists that are slightly different, but |
| 09:49:14 | 20 | this is one possible set of practices. |
| 09:49:16 | 21 | BY MS. DERMODY: |
| 09:49:16 | 22 | Q.   Okay.  And then going to the right column of |
| 09:49:23 | 23 | the page on 615, there is a numbered paragraph 4, and it |
| 09:49:28 | 24 | references using census data. |
| 09:49:30 | 25 | Do you see that? |

| | | |
|---|---|---|
| 09:49:32 | 1 | A.    Uh-huh.  Yes. |
| 09:49:34 | 2 | Q.    Thank you.  How can you use census data in your |
| 09:49:36 | 3 | work? |
| 09:49:42 | 4 | MR. KIERNAN:  Object to form. |
| 09:49:42 | 5 | THE WITNESS:  In my work?  In what -- what do |
| 09:49:45 | 6 | you mean in my work? |
| 09:49:46 | 7 | BY MS. DERMODY: |
| 09:49:46 | 8 | Q.    I meant in your insider econometric study. |
| 09:49:50 | 9 | A.    Well, I've never used census data in my |
| 09:49:54 | 10 | econometrics studies, but others are beginning to do so |
| 09:49:57 | 11 | as data is becoming available, and I mention that in the |
| 09:50:00 | 12 | paragraph the below, that there are some industries, such |
| 09:50:02 | 13 | as trucking industry, retail trade, manufacturing |
| 09:50:05 | 14 | industries, where you can get census data, and you look |
| 09:50:09 | 15 | and match it to changes in practices over time, and I try |
| 09:50:15 | 16 | to identify the effect of management practices on |
| 09:50:18 | 17 | performance. |
| 09:50:19 | 18 | Q.    And there is also census data about technology |
| 09:50:23 | 19 | positions; isn't that correct? |
| 09:50:25 | 20 | MR. KIERNAN:  Object to form. |
| 09:50:26 | 21 | THE WITNESS:  It depends.  Census is -- census |
| 09:50:30 | 22 | is a huge institution.  I don't know what census data |
| 09:50:33 | 23 | you're referring to. |
| 09:50:34 | 24 | BY MS. DERMODY: |
| 09:50:35 | 25 | Q.    There is labor statistics about people in |

09:50:37  1   different occupations; isn't that true?

09:50:40  2        A.   Census has CPS data that show employment

09:50:45  3   earnings by occupation.

09:50:46  4        Q.   And that would include certain occupations in

09:50:48  5   technology, too; isn't that correct?

09:50:50  6        A.   It would include those, yes.

09:50:52  7        Q.   Okay.

09:51:04  8        A.   But that's very different census data than what

09:51:07  9   it is I'm writing about.

09:51:08  10       Q.   Okay.  And how is that?

09:51:10  11       A.   What I'm writing about is census data on the

09:51:13  12  firm side, which is on the production and manufacturing

09:51:16  13  side, not on the individual side.

09:51:19  14       Q.   And is it your view that census data on the

09:51:22  15  occupational side is irrelevant to econometric study?

09:51:27  16            MR. KIERNAN:  Object to form.

09:51:30  17            THE WITNESS:  It depends on the study.

09:51:32  18  BY MS. DERMODY:

09:51:32  19       Q.   Okay.  Is census data, in your view, ever

09:51:36  20  useful for econometric study?

09:51:39  21       A.   Well, that's a very broad statement.

09:51:42  22  Certainly, since this data is used in econometric

09:51:48  23  studies.

09:51:49  24       Q.   It's not on its face unreliable in your view;

09:51:52  25  is that correct?

| | | |
|---|---|---|
| 09:51:53 | 1 | MR. KIERNAN:  Object to form. |
| 09:51:54 | 2 | THE WITNESS:  It depends on your testable |
| 09:51:57 | 3 | hypothesis and whether the data is appropriate for |
| 09:52:01 | 4 | testing that hypothesis. |
| 09:52:02 | 5 | BY MS. DERMODY: |
| 09:52:03 | 6 | Q.   Okay.  But the data itself is not something |
| 09:52:06 | 7 | that you shouldn't use merely because you're doing an |
| 09:52:10 | 8 | econometric study; is that correct? |
| 09:52:13 | 9 | MR. KIERNAN:  Object to form. |
| 09:52:13 | 10 | THE WITNESS:  It depends on the econometric |
| 09:52:15 | 11 | study. |
| 09:52:16 | 12 | BY MS. DERMODY: |
| 09:52:19 | 13 | Q.   In page 616, which is the last page of this |
| 09:52:27 | 14 | paper before the references, on the right column, the |
| 09:52:36 | 15 | last paragraph, you write in the start of the paragraph, |
| 09:52:40 | 16 | "Ultimately, implementing insider econometrics is part |
| 09:52:44 | 17 | art and part science." |
| 09:52:46 | 18 | Do you see that? |
| 09:52:47 | 19 | A.   Yes. |
| 09:52:47 | 20 | Q.   What do you mean by that? |
| 09:52:50 | 21 | A.   It means -- the science part is the |
| 09:52:52 | 22 | econometrics.  It's the regressions that you run. |
| 09:52:55 | 23 | And the art is the way in which you sort of put |
| 09:52:57 | 24 | together the evidence so that the preponderance of |
| 09:53:00 | 25 | evidence tests the hypothesis.  And so you have to be |

Deposition of Kathryn Shaw, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 09:53:04 | 1 | somewhat artful in how you do that.  There is not pure |
| 09:53:08 | 2 | scientific rules. |
| 09:53:09 | 3 | Q.   And is there some art to constructing |
| 09:53:12 | 4 | regressions? |
| 09:53:14 | 5 | MR. KIERNAN:  Object to form. |
| 09:53:20 | 6 | THE WITNESS:  There is judgment.  I wouldn't |
| 09:53:21 | 7 | say art applies to the regressions. |
| 09:53:23 | 8 | BY MS. DERMODY: |
| 09:53:24 | 9 | Q.   Okay.  In what sense is there judgment? |
| 09:53:28 | 10 | A.   In estimating regressions you have to judge |
| 09:53:31 | 11 | what the proper functional form is to test your |
| 09:53:34 | 12 | hypothesis. |
| 09:54:37 | 13 | THE REPORTER:  Exhibit 2848. |
| 09:54:38 | 14 | (Exhibit 2848 was marked for identification.) |
| 09:54:38 | 15 | BY MS. DERMODY: |
| 09:54:39 | 16 | Q.   Dr. Shaw, do you recognize what I have placed |
| 09:54:42 | 17 | in front of you? |
| 09:54:42 | 18 | A.   Yes, I do. |
| 09:54:43 | 19 | Q.   Is this your expert report in this case? |
| 09:54:46 | 20 | A.   Yes, it is. |
| 09:54:47 | 21 | Q.   Can you turn to page 27 of the report. |
| 09:55:01 | 22 | A.   Okay. |
| 09:55:02 | 23 | Q.   Is that your signature on page 27? |
| 09:55:03 | 24 | A.   Yes, it is. |
| 09:55:04 | 25 | Q.   Did you sign that on June 21 or on a different |

| | | |
|---|---|---|
| 09:55:08 | 1 | date? |
| 09:55:08 | 2 | A.   On June 21st. |
| 09:55:10 | 3 | Q.   Did you work with anyone else on this report? |
| 09:55:15 | 4 | A.    In this report, I -- I wrote the report myself |
| 09:55:20 | 5 | and went through several versions of the report myself. |
| 09:55:24 | 6 | And I got feedback from counsel on some elements of the |
| 09:55:31 | 7 | report. |
| 09:55:33 | 8 | Q.   Did you have any staff or students to help you? |
| 09:55:35 | 9 | A.   No, I didn't. |
| 09:55:40 | 10 | Q.   Did you do the actual word processing for this |
| 09:55:43 | 11 | report, that is the actual typing? |
| 09:55:45 | 12 | A.   Yes, I did. |
| 09:55:50 | 13 | Q.   If you turn to -- let's see -- Exhibit B, or |
| 09:55:54 | 14 | Appendix B, excuse me -- |
| 09:55:59 | 15 | A.   Okay. |
| 09:56:00 | 16 | Q.   -- there is a list of documents on here; is |
| 09:56:11 | 17 | that correct? |
| 09:56:11 | 18 | A.   That's right. |
| 09:56:12 | 19 | Q.   And how did you select the transcripts and |
| 09:56:15 | 20 | depositions that you reviewed? |
| 09:56:18 | 21 | A.   I reviewed many declarations and depositions, |
| 09:56:24 | 22 | and -- that were provided to me, and I reviewed them |
| 09:56:30 | 23 | based on an assortment of people at each company.  So I |
| 09:56:36 | 24 | looked for people who would be CEOs, presidents, HR |
| 09:56:42 | 25 | professionals, and managers. |

| | | |
|---|---|---|
| 09:56:43 | 1 | Q.    And how did you select which ones you'd review? |
| 09:56:48 | 2 | A.    That's what I thought I just answered. |
| 09:56:57 | 3 | Q.    So did you review all of the declarations and |
| 09:57:00 | 4 | depositions that were given to you? |
| 09:57:01 | 5 | A.    I reviewed -- yes, I reviewed all the |
| 09:57:05 | 6 | declarations.  There are some depositions that I didn't |
| 09:57:07 | 7 | review, but I reviewed the majority. |
| 09:57:12 | 8 | Q.    And is it your understanding these are all the |
| 09:57:14 | 9 | depositions in the case? |
| 09:57:21 | 10 | A.    Listed in this appendix? |
| 09:57:23 | 11 | Q.    Yes. |
| 09:57:24 | 12 | A.    No.  These are not all the depositions in the |
| 09:57:26 | 13 | case. |
| 09:57:26 | 14 | Q.    Do you know how many depositions were taken in |
| 09:57:28 | 15 | this case? |
| 09:57:29 | 16 | A.    No, I don't. |
| 09:57:35 | 17 | Q.    Did you review for the depositions the complete |
| 09:57:38 | 18 | transcripts or only parts of them? |
| 09:57:41 | 19 | A.    For the most part, I reviewed the complete |
| 09:57:43 | 20 | transcripts, but there are places where I skimmed them. |
| 09:57:47 | 21 | Q.    Did you review summaries of transcripts |
| 09:57:53 | 22 | prepared by other people? |
| 09:57:54 | 23 | A.    No, I didn't. |
| 09:57:57 | 24 | Q.    Did you request to get any materials that you |
| 09:57:59 | 25 | did not get? |

09:58:02  1     A.   I requested to get materials that were relevant

09:58:05  2  to the case.  I didn't -- I don't know of any materials I

09:58:07  3  did not get.

09:58:10  4     Q.   I note on this list there is no mention of the

09:58:14  5  reports of Plaintiffs' expert, Dr. Edward Leamer,

09:58:20  6  correct?

09:58:21  7     A.   That's right.

09:58:22  8     Q.   And did you not receive those reports?

09:58:23  9     A.   No, I received them.

09:58:24  10    Q.   And did you not review them?

09:58:26  11    A.   I read them.

09:58:29  12    Q.   You didn't list them here.

09:58:31  13    A.   Well, they're not relevant to my assignment.

09:58:36  14    Q.   And did you review the briefs that Plaintiffs

09:58:39  15  prepared in connection with class certification?

09:58:44  16    A.   I -- I read them.

09:58:45  17    Q.   But you didn't list them here.

09:58:47  18    A.   Again, they're not relevant to my report.

09:58:55  19         MR. KIERNAN:  Kelly, if you look at paragraph

09:58:57  20  15, she lists materials that she reviewed, and I think

09:59:01  21  Appendix B is what she's citing to in her report that

09:59:04  22  she's relying on.

09:59:06  23         THE WITNESS:  Right.  So --

09:59:07  24         MR. KIERNAN:  I just want to -- since you're

09:59:09  25  going -- focusing on Appendix B, some of the materials

09:59:13   1    that you just listed are listed in paragraph 15.

09:59:18   2             MS. DERMODY:  Can you point out to me in

09:59:20   3    paragraph 15, Counsel, where it says Leamer's report

09:59:23   4    or --

09:59:24   5             MR. KIERNAN:  It says "experts reports," fourth

09:59:27   6    line down.

09:59:30   7             MS. DERMODY:  It's not clear from this that

09:59:32   8    we're talking about Leamer as opposed to Hallock.

09:59:35   9             MR. KIERNAN:  That includes all expert reports.

09:59:39  10    BY MS. DERMODY:

09:59:39  11        Q.   Is that true?

09:59:40  12        A.   That's true.

09:59:50  13        Q.   Did you also review the declarations Plaintiffs

09:59:54  14    submitted attaching evidence in connection with the class

09:59:57  15    certification?

09:59:58  16        A.   I read all the declarations that were provided

10:00:01  17    to me.

10:00:02  18        Q.   Okay.  Do you recall if you read declarations

10:00:04  19    of Plaintiffs' counsel?

10:00:10  20        A.   I don't know what that is.

10:00:13  21        Q.   You don't list them in your Appendix B.

10:00:17  22        A.   I don't know what a "declaration of Plaintiffs'

10:00:19  23    counsel" is.

10:00:21  24        Q.   So when you read declarations, did you notice

10:00:25  25    the people wrote who they were and what their titles

10:32:06  1      A.    Again, I haven't been asked to evaluate what

10:32:08  2  percentage of base is paid -- is tied to performance.

10:32:12  3      Q.    Do you know -- do you have empirical evidence

10:32:15  4  that base salary is tied to performance at each of these

10:32:19  5  firms?

10:32:20  6            MR. KIERNAN:  Object to form.

10:32:28  7            THE WITNESS:  There is evidence showing

10:32:29  8  dispersion of pay, which suggests that it is associated

10:32:34  9  with individual performance differences, but the -- but

10:32:38  10  I -- I don't draw upon evidence, and I was not asked to

10:32:44  11  look at evidence to -- to document the connection between

10:32:48  12  performance and pay.

10:32:49  13  BY MS. DERMODY:

10:32:53  14      Q.    So you've not reviewed any data that reflects a

10:32:56  15  connection between performance rating and base salary; is

10:33:00  16  that correct?

10:33:01  17            MR. KIERNAN:  Object to form.

10:33:02  18            THE WITNESS:  Between performance rating and

10:33:05  19  base salary?

10:33:06  20  BY MS. DERMODY:

10:33:07  21      Q.    Yes.

10:33:07  22      A.    That's correct.  I haven't reviewed any data.

10:33:09  23      Q.    And your opinion here that individual

10:33:11  24  performance creates a difference between employees is

10:33:15  25  related solely to dispersion of salaries across the

| | | |
|---|---|---|
| 10:33:20 | 1 | companies; is that correct? |
| 10:33:22 | 2 | MR. KIERNAN:  Object to form. |
| 10:33:24 | 3 | THE WITNESS:  And it's related to the |
| 10:33:25 | 4 | qualitative evidence in the case, talking about the use |
| 10:33:29 | 5 | of the philosophy, pay for performance, and how it was |
| 10:33:32 | 6 | implemented. |
| 10:33:34 | 7 | BY MS. DERMODY: |
| 10:33:36 | 8 | Q.   So your opinion is that because there was a |
| 10:33:39 | 9 | discussion of pay for performance at the companies and |
| 10:33:42 | 10 | there was some variation in employee pay, that |
| 10:33:47 | 11 | therefore -- what? |
| 10:33:50 | 12 | MR. KIERNAN:  Object to form. |
| 10:33:52 | 13 | THE WITNESS:  My view is that the preponderance |
| 10:33:53 | 14 | of evidence, both on the qualitative side and the |
| 10:33:58 | 15 | quantitative side, describes a pay-for-performance |
| 10:34:01 | 16 | environment in each of these firms. |
| 10:34:04 | 17 | BY MS. DERMODY: |
| 10:34:04 | 18 | Q.   And your view is also a pay-for-performance |
| 10:34:07 | 19 | system -- sorry -- that each of these companies also |
| 10:34:09 | 20 | followed principles of internal equity; isn't that true? |
| 10:34:13 | 21 | A.   It depends on how you define "internal equity." |
| 10:34:16 | 22 | Q.   Well, how do you define it? |
| 10:34:17 | 23 | A.   Well, as I stated in my doc -- in my report, |
| 10:34:21 | 24 | the way I define "internal equity" is internal equity is |
| 10:34:25 | 25 | simply a notion that managers should consider the pay of |

| | | |
|---|---|---|
| 10:34:28 | 1 | similarly-performing employees doing similar work when |
| 10:34:32 | 2 | setting an individual's pay. |
| 10:34:33 | 3 | Q.   Okay.  Under that definition, would you agree |
| 10:34:36 | 4 | that all of the Defendants follow principles of internal |
| 10:34:39 | 5 | equity? |
| 10:34:40 | 6 | A.   For the most part -- |
| 10:34:41 | 7 | MR. KIERNAN:  Object to form. |
| 10:34:42 | 8 | THE WITNESS:  -- they follow the concept of |
| 10:34:43 | 9 | internal equity. |
| 10:34:46 | 10 | BY MS. DERMODY: |
| 10:34:46 | 11 | Q.   Are you familiar with the term "pay |
| 10:34:59 | 12 | compression"? |
| 10:34:59 | 13 | A.   Yes. |
| 10:35:00 | 14 | Q.   And what is that? |
| 10:35:01 | 15 | A.   Pay compression means that the pay of the less |
| 10:35:05 | 16 | experienced new hire may be higher than the older |
| 10:35:11 | 17 | experienced employee. |
| 10:36:18 | 18 | Q.   In your view, pay compression is not a |
| 10:36:21 | 19 | flattening of pay so that wages don't get out of line? |
| 10:36:25 | 20 | MR. KIERNAN:  Object to form. |
| 10:36:25 | 21 | THE WITNESS:  I don't know what you mean by |
| 10:36:26 | 22 | "flattening" or "out of line." |
| 10:36:28 | 23 | BY MS. DERMODY: |
| 10:36:29 | 24 | Q.   The example you gave is pay compression means |
| 10:36:31 | 25 | that someone with less experience could have more pay |

| | | |
|---|---|---|
| 10:36:34 | 1 | than an older experienced employee, right?  Isn't that |
| 10:36:38 | 2 | what you said? |
| 10:36:38 | 3 | A.   Yes.  That's what I said. |
| 10:36:41 | 4 | Q.   But isn't pay compression also when there is a |
| 10:36:43 | 5 | flattening of wages to keep wages in line with each |
| 10:36:47 | 6 | other? |
| 10:36:48 | 7 | MR. KIERNAN:  Object to form. |
| 10:36:49 | 8 | THE WITNESS:  I still don't know what you mean |
| 10:36:50 | 9 | by "flattening."  That's not a term I use. |
| 10:36:53 | 10 | BY MS. DERMODY: |
| 10:36:54 | 11 | Q.   Do you understand the idea of related pay? |
| 10:36:58 | 12 | A.   No, I don't. |
| 10:37:10 | 13 | THE VIDEOGRAPHER:  Could you move the paper |
| 10:37:10 | 14 | away from your microphone cord? |
| 10:37:10 | 15 | MS. DERMODY:  Yes. |
| 10:37:12 | 16 | THE VIDEOGRAPHER:  It makes a noise. |
| 10:37:18 | 17 | BY MS. DERMODY: |
| 10:37:18 | 18 | Q.   What do you understand the term "compression" |
| 10:37:19 | 19 | to mean? |
| 10:37:21 | 20 | A.   I just defined it. |
| 10:37:22 | 21 | Q.   You defined "paid compression." |
| 10:37:25 | 22 | A.   Well, I'm not thinking about tire compression. |
| 10:37:28 | 23 | I don't know what -- what -- what kind of compression do |
| 10:37:31 | 24 | you want me to define? |
| 10:37:33 | 25 | Q.   Well, isn't "compression" a term that describes |

| | | |
|---|---|---|
| 10:37:36 | 1 | a flattening of something? |
| 10:37:38 | 2 | MR. KIERNAN:  Object to form. |
| 10:37:41 | 3 | THE WITNESS:  A flattening of what?  I -- I -- |
| 10:37:43 | 4 | I don't know what you mean.  Flattening with respect to |
| 10:37:46 | 5 | what? |
| 10:37:46 | 6 | BY MS. DERMODY: |
| 10:37:47 | 7 | Q.   In the context of pay, a flattening of related |
| 10:37:50 | 8 | salaries. |
| 10:37:51 | 9 | MR. KIERNAN:  Object to form. |
| 10:37:52 | 10 | THE WITNESS:  No, I think you'd have to define |
| 10:37:53 | 11 | "flattening" more carefully for me to evaluate what you |
| 10:38:00 | 12 | mean by "flattening." |
| 10:38:01 | 13 | BY MS. DERMODY: |
| 10:38:02 | 14 | Q.   You understand how the concept internal equity |
| 10:38:04 | 15 | can create comparisons between people doing similar work, |
| 10:38:07 | 16 | correct? |
| 10:38:07 | 17 | A.   As I defined it, it is making comparisons in |
| 10:38:11 | 18 | pay between people who are -- who are similar-performing |
| 10:38:15 | 19 | employees doing similar work. |
| 10:38:17 | 20 | Q.   Okay.  And if there are employees that are |
| 10:38:21 | 21 | doing similar work, and one of those employees was to |
| 10:38:25 | 22 | get -- was to receive a salary increase, if the pay -- |
| 10:38:31 | 23 | the pay compression was a concept, wouldn't there be a |
| 10:38:37 | 24 | downward impact on the pay? |
| 10:38:42 | 25 | MR. KIERNAN:  Object to form. |

| | | |
|---|---|---|
| 10:38:43 | 1 | THE WITNESS:  A downward impact on the pay of |
| 10:38:44 | 2 | what? |
| 10:38:45 | 3 | BY MS. DERMODY: |
| 10:38:45 | 4 | Q.   Of the employee getting a salary increase. |
| 10:38:48 | 5 | MR. KIERNAN:  Object to form. |
| 10:38:49 | 6 | THE WITNESS:  You have to restate your |
| 10:38:50 | 7 | scenario.  I -- I don't understand your scenario. |
| 10:38:53 | 8 | BY MS. DERMODY: |
| 10:38:54 | 9 | Q.   In your field of study, you've looked at the |
| 10:39:35 | 10 | effects of personnel practices on certain objectives, |
| 10:39:39 | 11 | like productivity; is that correct? |
| 10:39:42 | 12 | A.   That's right. |
| 10:39:42 | 13 | Q.   And is it fair to say that you've observed that |
| 10:39:45 | 14 | sometimes the effects of personnel practices aren't felt |
| 10:39:50 | 15 | instantaneously? |
| 10:39:52 | 16 | MR. KIERNAN:  Object to form. |
| 10:39:57 | 17 | THE WITNESS:  The effects of personal practices |
| 10:40:00 | 18 | on productivity would have a lag structure.  Is that what |
| 10:40:02 | 19 | you're referring to? |
| 10:40:03 | 20 | BY MS. DERMODY: |
| 10:40:04 | 21 | Q.   Yes. |
| 10:40:04 | 22 | A.   Yes.  There could be a lag structure. |
| 10:40:09 | 23 | Q.   And are you familiar with the term "rigid wage |
| 10:40:13 | 24 | structure"? |
| 10:40:14 | 25 | A.   I've read the term. |

10:40:15  1      Q.   What is your understanding of what that means?

10:40:18  2      A.   Well, I -- I read the term in Dr. Leamer's

10:40:21  3  report, but I don't have a clear understanding of what

10:40:24  4  that means.

10:40:25  5      Q.   What does a "rigid wage structure" mean to you?

10:40:29  6      A.   There is no common definition of a "rigid wage

10:40:33  7  structure" in my field.

10:40:34  8      Q.   Would you have a hypothetical example of what

10:40:37  9  you would consider a "rigid wage structure"?

10:40:40  10          MR. KIERNAN:  Object to form.

10:40:45  11          THE WITNESS:  I could extrapolate and speculate

10:40:49  12  based upon Dr. Leamer's report what he meant by "rigid

10:40:53  13  wage structure."

10:40:54  14  BY MS. DERMODY:

10:40:54  15     Q.   What do you think it means based on that

10:40:57  16  extrapolation?

10:40:58  17     A.   My speculation on what "rigid wage structure"

10:41:01  18  means is that there are fixed wages between different job

10:41:04  19  categories.

10:41:04  20     Q.   Is that different than salary ranges?

10:41:07  21     A.   Completely different.  Salary ranges are not

10:41:10  22  rigid wage structure.

10:41:12  23     Q.   Okay.  So the -- does the existence of salary

10:41:15  24  range -- excuse me.

10:41:17  25          Is the existence of a salary range incompatible

10:41:22  1    with the rigid wage structure in your view?

10:41:26  2              MR. KIERNAN:  Object to form.

10:41:27  3              THE WITNESS:  A salary range -- again, I

10:41:29  4    haven't defined a rigid wage structure, and I'm not sure

10:41:32  5    it can be defined.  So it would be difficult for me to

10:41:34  6    say whether the existence of a salary range is consistent

10:41:38  7    or inconsistent with it.

10:41:41  8    BY MS. DERMODY:

10:42:02  9        Q.   Is the existence of a salary range consistent

10:42:05 10    with a formal pay structure?

10:42:08 11        A.   Yes.  Formalized pay systems may well have

10:42:10 12    salary ranges as a part of their formalized systems.

10:42:14 13        Q.   Okay.  And are salary ranges consistent with a

10:42:19 14    pay-for-performance system?

10:42:22 15        A.   Salary ranges are consistent with pay for

10:42:24 16    performance when they serve as guidelines for managers

10:42:28 17    when they're making pay decisions.

10:42:32 18        Q.   And if managers pay 100 percent of the time

10:42:40 19    within salary ranges, does that lead to any conclusion

10:42:43 20    for you about whether there is a formal pay system?

10:42:48 21              MR. KIERNAN:  Object to form.

10:42:49 22              THE WITNESS:  I don't know what you mean by pay

10:42:50 23    100 percent of the time in salary ranges.

10:42:54 24              MS. DERMODY:  Let me strike that.

10:43:01 25        Q.   Does it matter to your analysis how frequently

Deposition of Kathryn Shaw, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 10:43:05 | 1 | managers pay within a salary range to determine whether |
| 10:43:08 | 2 | there is manager discretion at work in a |
| 10:43:12 | 3 | pay-for-performance system? |
| 10:43:13 | 4 | A.   No, it does not matter. |
| 10:43:15 | 5 | Q.   So even if it's a hundred percent of the time, |
| 10:43:18 | 6 | it doesn't change your view. |
| 10:43:21 | 7 | A.   It could still -- managers may well pay within |
| 10:43:24 | 8 | the salary range as when the salary range is a guideline, |
| 10:43:28 | 9 | but they could still be using pay for performance. |
| 10:43:31 | 10 | Q.   If one were to consider a series of objective |
| 10:43:57 | 11 | factors, a series of objective characteristics of |
| 10:44:01 | 12 | employees to compare similar employees -- do you follow |
| 10:44:05 | 13 | me so far? |
| 10:44:06 | 14 | A.   Perhaps. |
| 10:44:07 | 15 | Q.   Okay.  And if you were looking at things like |
| 10:44:09 | 16 | title, tenure, age, gender, and location -- |
| 10:44:15 | 17 | A.   Okay. |
| 10:44:16 | 18 | Q.   -- and that accounted for 90 percent of the |
| 10:44:20 | 19 | wages that employees were paid, leaving only 10 percent |
| 10:44:24 | 20 | that was different, would that be an example of a |
| 10:44:29 | 21 | pay-for-performance system or something else? |
| 10:44:32 | 22 | MR. KIERNAN:  Object to form. |
| 10:44:33 | 23 | THE WITNESS:  It can still be completely |
| 10:44:35 | 24 | consistent with a pay-for-performance system. |
| | 25 | // |

| | |
|---|---|
| 10:44:38 | 1 |
| 10:44:44 | 2 |
| 10:44:50 | 3 |
| 10:44:53 | 4 |
| 10:44:58 | 5 |
| 10:44:59 | 6 |
| 10:45:01 | 7 |
| 10:45:02 | 8 |
| 10:45:02 | 9 |
| 10:45:05 | 10 |
| 10:45:07 | 11 |
| 10:45:09 | 12 |
| 10:45:11 | 13 |
| 10:45:12 | 14 |
| 10:45:16 | 15 |
| 10:45:19 | 16 |
| 10:45:26 | 17 |
| 10:45:34 | 18 |
| 10:45:35 | 19 |
| 10:45:38 | 20 |
| 10:45:41 | 21 |
| 10:46:09 | 22 |
| 10:46:11 | 23 |
| 10:46:13 | 24 |
| 10:46:13 | 25 |

BY MS. DERMODY:

Q.   Is there some level of pay that is inconsistent with a pay-for-performance system, some study that you would do, other than having fixed wages?

MR. KIERNAN:  Object to form.

THE WITNESS:  Some study I would do?  I'm not sure I follow.

BY MS. DERMODY:

Q.   Is there -- is there any type of firm you can think of that doesn't have a pay-for-performance system?

A.   Certainly there are firms without a pay-for-performance system.

Q.   Okay.  What are they?

A.   An example would be teachers, education.  They would use a salary schedule which -- in which your tenure and your education would determine quite -- quite closely what it is your pay should be.

Q.   Any others?

A.   Well, perhaps government workers, firefighters. Traditional firms may well have a system that's not a pay-for-performance system.

Q.   You base a lot of your opinion on the fact managers have some discretion around pay; is that correct?

A.   Yes, I believe managers have discretion.

| | | |
|---|---|---|
| 10:46:16 | 1 | Q.   And is there a level of -- is there a |
| 10:46:22 | 2 | limitation on that discretion where you would no longer |
| 10:46:25 | 3 | think that that discretion mattered in this case? |
| 10:46:28 | 4 | MR. KIERNAN:  Object to form. |
| 10:46:34 | 5 | THE WITNESS:  I don't know how -- I -- I can't |
| 10:46:36 | 6 | imagine what you're referring to. |
| 10:46:38 | 7 | BY MS. DERMODY: |
| 10:46:38 | 8 | Q.   Okay.  Is there any empirical study that you |
| 10:46:41 | 9 | would do to test your hypothesis that managers exercise |
| 10:46:44 | 10 | substantial discretion? |
| 10:46:46 | 11 | MR. KIERNAN:  Object to form. |
| 10:47:00 | 12 | THE WITNESS:  It would be a difficult -- it |
| 10:47:02 | 13 | would be a difficult test to take -- to make. |
| 10:47:07 | 14 | BY MS. DERMODY: |
| 10:47:07 | 15 | Q.   Okay.  Can you come up with any idea? |
| 10:47:09 | 16 | A.   I haven't been asked to do that, so I would |
| 10:47:11 | 17 | have to think about it in more depth. |
| 10:47:13 | 18 | Q.   Okay.  As a regular part of your work, you |
| 10:47:17 | 19 | developed those types of tests; isn't that right? |
| 10:47:19 | 20 | A.   I develop tests of the effect of management |
| 10:47:22 | 21 | practices on performance, but I don't develop tests of |
| 10:47:26 | 22 | the effects of management discretion on pay or -- I'm not |
| 10:47:31 | 23 | even sure what you're asking. |
| 10:47:32 | 24 | Q.   Yes.  You expressed that correctly. |
| 10:47:36 | 25 | A.   Okay. |

| | | |
|---|---|---|
| 10:47:37 | 1 | Q.   Is there any type of data that you know you'd |
| 10:47:40 | 2 | want to look at? |
| 10:47:41 | 3 | A.   I'd really have to think about the question in |
| 10:47:44 | 4 | more depth to identify a dataset to really tease out |
| 10:47:47 | 5 | those effects. |
| 10:47:49 | 6 | Q.   Okay.  If you sat here for five minutes, would |
| 10:47:51 | 7 | you be able to come up with an idea, or no? |
| 10:47:54 | 8 | A.   Probably it -- I'd really have to think about |
| 10:47:56 | 9 | the nature of the data that the firm would make available |
| 10:47:59 | 10 | in order to test that, and that would be a difficult |
| 10:48:03 | 11 | task. |
| 10:48:04 | 12 | Q.   Okay.  And you haven't done that here, correct? |
| 10:48:07 | 13 | A.   I haven't tested whether discretion -- I |
| 10:48:10 | 14 | haven't tested the extent of -- I'm losing track of your |
| 10:48:14 | 15 | question.  I haven't tested the extent of the impact of |
| 10:48:17 | 16 | management's discretion. |
| 10:48:19 | 17 | Q.   When you have constructed regressions looking |
| 10:48:34 | 18 | at various employment practices of firms, have you on |
| 10:48:42 | 19 | occasion considered such factors as tenure, age, gender, |
| 10:48:48 | 20 | title, that sort of thing? |
| 10:48:51 | 21 | MR. KIERNAN:  Object to form. |
| 10:48:51 | 22 | THE WITNESS:  In wage regressions?  Is that |
| 10:48:53 | 23 | your question? |
| 10:48:54 | 24 | BY MS. DERMODY: |
| 10:48:54 | 25 | Q.   Sure. |

| 10:48:55 | 1  | A.    You're asking me -- would you repeat it? |
| 10:48:57 | 2  | Q.    Yes. |
| 10:48:57 | 3  | A.    What are you asking? |
| 10:48:58 | 4  | Q.    Yes.  When you have constructed regressions |
| 10:49:01 | 5  | looking at employment practices at firms, have you on |
| 10:49:06 | 6  | occasion considered such factors as tenure, age, gender, |
| 10:49:10 | 7  | title, those sorts of things? |
| 10:49:12 | 8  | A.    You'll have to be more clear about what the |
| 10:49:14 | 9  | regression was doing for me to say whether I put in |
| 10:49:18 | 10 | tenure or age. |
| 10:49:19 | 11 | Q.    So in your "Reaching For The Stars" article, do |
| 10:49:21 | 12 | you recall doing a study that actually looked at tenure |
| 10:49:25 | 13 | and age? |
| 10:49:26 | 14 | A.    We had -- in "Reaching For The Stars," we had |
| 10:49:29 | 15 | data on age.  I don't recall if we had data on tenure. |
| 10:49:33 | 16 | I'd have to look. |
| 10:50:07 | 17 | Q.    We've talked a little bit already about |
| 10:50:09 | 18 | internal equity. |
| 10:50:10 | 19 |        Do you recall that? |
| 10:50:11 | 20 | A.    Yes. |
| 10:50:13 | 21 | Q.    And if you turn to paragraph 43 of your report, |
| 10:50:16 | 22 | it's on page 15 -- |
| 10:50:24 | 23 | A.    Yes. |
| 10:50:24 | 24 | Q.    -- do you see that?  You'll note that in the |
| 10:50:26 | 25 | middle of that paragraph you cite to footnote 16 which is |

| | | |
|---|---|---|
| 10:50:29 | 1 | the Baron and Kreps treatise, "Strategic Human |
| 10:50:34 | 2 | Resources." |
| 10:50:35 | 3 | Do you see that? |
| 10:50:36 | 4 | A.   Right. |
| 10:51:07 | 5 | THE REPORTER:  Exhibit 2850. |
| 10:51:08 | 6 | (Exhibit 2850 was marked for identification.) |
| 10:51:27 | 7 | BY MS. DERMODY: |
| 10:51:28 | 8 | Q.   Do you recognize this document marked as |
| 10:51:29 | 9 | Exhibit 2850? |
| 10:51:30 | 10 | A.   Yes, I do. |
| 10:51:31 | 11 | Q.   What is this? |
| 10:51:32 | 12 | A.   It looks like a chapter from the Baron and |
| 10:51:34 | 13 | Kreps textbook. |
| 10:51:36 | 14 | Q.   And this is a chapter that you cited in |
| 10:51:39 | 15 | footnote 16? |
| 10:51:43 | 16 | A.   I'd have to match the pages as -- I -- I don't |
| 10:51:51 | 17 | know if it's the chapter.  I'd have to look for the part |
| 10:51:53 | 18 | on -- on different measures of justice.  I assume that |
| 10:51:56 | 19 | that's what you found. |
| 10:51:57 | 20 | Q.   Yes. |
| 10:51:58 | 21 | A.   Oh, here it is. |
| 10:51:58 | 22 | Q.   You cite 107. |
| 10:52:00 | 23 | A.   Yeah, here it is.  107.  Here it is.  Yeah. |
| 10:52:04 | 24 | Q.   Now, in paragraph 43, you state there are two |
| 10:52:07 | 25 | types of internal equity, distributed justice, where you |

Deposition of Kathryn Shaw, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:52:11  1   claim is when all employees are paid the same wage; and

10:52:15  2   procedural justice, when pay is perceived to be fair

10:52:18  3   because the procedures for setting pay are fair.

10:52:21  4           Do you see that --

10:52:22  5      A.   Yes.

10:52:22  6      Q.   -- in your report?

10:52:23  7      A.   That's right.

10:52:24  8      Q.   All right.  And you cite Baron and Kreps for

10:52:26  9   that proposition; is that correct?

10:52:28 10      A.   Yes.

10:52:32 11      Q.   And then you quote them on page 16 -- I'm

10:52:37 12   sorry.  And then you in this -- sorry.  In paragraph

10:52:40 13   43 -- strike that.

10:52:42 14           In paragraph 43, your sentence starting in the

10:52:46 15   second definition labeled "Procedural Justice:  Pay is

10:52:49 16   perceived to be fair when the procedures for setting pay

10:52:51 17   are fair."

10:52:52 18           Do you see that?

10:52:53 19      A.   Yes.

10:52:53 20      Q.   And you cite Baron and Kreps, and you have a

10:52:55 21   quote there for that sentence.

10:52:57 22           Do you see that?

10:52:58 23      A.   Okay.

10:52:58 24      Q.   And that's page 107.

10:53:00 25      A.   Right.

10:53:01   1        Q.   If you turn to 107, you'll note that what

10:53:07   2   you've quoted is actually not from "Procedural Justice,"

10:53:10   3   but from "Distributive Justice."

10:53:12   4             Do you see that?

10:53:38   5        A.   Well, it's referring to this -- a third justice

10:53:41   6   principle, according to the equity principle.

10:53:52   7             Okay.  No, I -- I don't see that it refers to

10:53:53   8   distributive justice.

10:53:55   9        Q.   Right, even though it's -- I'm sorry.  It's

10:53:57  10   under --

10:53:58  11        A.   It's under "Distributive Justice."

10:53:59  12        Q.   So there is a heading on 107, "Distributive

10:54:02  13   Justice."

10:54:03  14             Do you see that?

10:54:03  15        A.   Uh-huh.  I see that, yes.

10:54:04  16        Q.   If you turn to 108, do you see there is a

10:54:07  17   heading for "Procedural Justice"?

10:54:09  18        A.   Yes.

10:54:09  19        Q.   So would you agree that the quote you have put

10:54:12  20   in footnote 16 comes from "Distributive Justice," not

10:54:15  21   "Procedural Justice" from Baron/Kreps; is that correct?

10:54:22  22             MR. KIERNAN:  Object to form.

10:54:24  23             THE WITNESS:  Yes.  It looks like it's from the

10:54:27  24   section "Distributive Justice."

          25   //

| | | |
|---|---|---|
| 10:54:29 | 1 | BY MS. DERMODY: |
| 10:54:29 | 2 | Q.   Okay.  So the cite in paragraph 43 to this |
| 10:54:35 | 3 | text, which is a cite about procedural justice, is |
| 10:54:40 | 4 | inaccurate; is that correct? |
| 10:54:43 | 5 | MR. KIERNAN:  Object to form. |
| 10:54:49 | 6 | THE WITNESS:  Well, it's under the setting of |
| 10:54:51 | 7 | distributive justice.  So is it inaccurate?  It looks |
| 10:55:05 | 8 | like it should be referring to distributive justice, but |
| 10:55:08 | 9 | I'd have to read the whole thing. |
| 10:55:40 | 10 | So what's the question? |
| 10:55:40 | 11 | BY MS. DERMODY: |
| 10:55:41 | 12 | Q.   So the question was, this citation at footnote |
| 10:55:43 | 13 | 16 to the sentence about procedural justice is |
| 10:55:45 | 14 | inaccurate; isn't that correct? |
| 10:55:47 | 15 | MR. KIERNAN:  Object to form. |
| 10:55:52 | 16 | THE WITNESS:  It looks like it should be |
| 10:55:53 | 17 | referring to distributive justice. |
| 10:55:55 | 18 | BY MS. DERMODY: |
| 10:55:55 | 19 | Q.   Okay.  And let's go back to paragraph 43. |
| 10:56:02 | 20 | So you relied on Baron and Kreps for this |
| 10:56:04 | 21 | analysis of the difference between distributive justice |
| 10:56:07 | 22 | and procedural justice; is that correct? |
| 10:56:10 | 23 | A.   And my own knowledge of the area. |
| 10:56:12 | 24 | Q.   Okay.  And you say in paragraph 43, "The |
| 10:56:17 | 25 | distributive justice is where pay is perceived fair |

10:56:21   1   because everyone is paid the same, like in a unionized

10:56:24   2   setting"; is that correct?

10:56:29   3          A.   That's correct.  Yes.

10:56:39   4          Q.   And if you go to page 106 of Baron and Kreps,

10:56:49   5   under "Distributive and Procedural Justice," do you see

10:56:52   6   that heading?

10:56:53   7          A.   Uh-huh.

10:56:53   8          Q.   And you'll see at the very end there is a

10:56:58   9   definition that Baron and Kreps gives to distributive

10:57:01   10  versus procedural justice.

10:57:03   11         Do you see that?

10:57:04   12         A.   You mean the -- what's in italics?

10:57:07   13         Q.   Yes.

10:57:07   14         A.   Yes.

10:57:08   15         Q.   And under the Baron and Kreps definition there,

10:57:11   16  where it says, "Distributive justice is how people did

10:57:14   17  relative to others, and procedural is the process by

10:57:17   18  which the outcome was achieved," do you see that?

10:57:20   19         A.   Yes, I do.

10:57:21   20         Q.   And that's inconsistent with the idea that

10:57:24   21  distributive justice only means pay is the same for

10:57:27   22  everyone; is that correct?

10:57:29   23              MR. KIERNAN:  Object to form.

10:57:30   24              THE WITNESS:  Distributive justice means pay is

10:57:31   25  the same for everybody looking at people, comparing

11:08:51  1    ever gotten in trouble because you have misstated your

11:08:54  2    research?

11:08:55  3         A.   No, I haven't.

11:08:57  4         Q.   Okay.  Have you ever been in trouble for

11:08:58  5    exaggerating credentials?

11:09:01  6              MR. KIERNAN:  Object to form.

11:09:02  7              THE WITNESS:  No, I haven't.

11:09:04  8              MS. DERMODY:  Okay.  Let's take a quick break.

11:09:06  9              THE VIDEOGRAPHER:  Okay.  This is the end of

11:09:07 10    Video No. 1.  We're off the record at 11:09.

11:09:09 11              (Recess was taken.)

11:28:20 12              THE VIDEOGRAPHER:  We are now on the record at

11:28:21 13    11:28.  This is the beginning of Video No. 2.

11:28:27 14    BY MS. DERMODY:

11:28:28 15         Q.   So, Dr. Shaw, what did you do to investigate

11:28:30 16    the amount of discretions -- discretion that managers had

11:28:34 17    at Defendant firms here?

11:28:37 18         A.   I read an extensive number of depositions that

11:28:40 19    discussed managerial discretion in setting pay.

11:28:44 20         Q.   Did you review any of the guidelines for

11:28:47 21    discretion?

11:28:48 22         A.   What do you refer to with "guidelines"?

11:28:51 23         Q.   Did you do a systematic study to see if there

11:28:54 24    were guidelines of managerial discretion?

11:28:57 25              MR. KIERNAN:  Object to form.

| | | |
|---|---|---|
| 11:28:58 | 1 | THE WITNESS:  Guidelines given by whom. |
| 11:28:59 | 2 | BY MS. DERMODY: |
| 11:29:00 | 3 | Q.   To firms, managers. |
| 11:29:01 | 4 | A.   Managers do -- yes.  Firms do provide |
| 11:29:04 | 5 | guidelines in determining pay. |
| 11:29:05 | 6 | Q.   Did you do any systematic study for any of the |
| 11:29:09 | 7 | firms as to what guidelines had existed in the time |
| 11:29:13 | 8 | periods studied in this case? |
| 11:29:14 | 9 | A.   What do you mean by a -- |
| 11:29:15 | 10 | MR. KIERNAN:  Object to form. |
| 11:29:16 | 11 | THE WITNESS:  -- "systematic study"? |
| 11:29:18 | 12 | BY MS. DERMODY: |
| 11:29:18 | 13 | Q.   Did you request to see all guidelines limiting |
| 11:29:20 | 14 | discretion or governing discretion of managers? |
| 11:29:24 | 15 | A.   From the firms? |
| 11:29:25 | 16 | Q.   Yes. |
| 11:29:25 | 17 | A.   No, I did not request to see guidelines from |
| 11:29:27 | 18 | the firms. |
| 11:29:29 | 19 | Q.   Did you do any systematic review of any of the |
| 11:29:32 | 20 | oversight mechanisms for manager discretion? |
| 11:29:35 | 21 | MR. KIERNAN:  Object to form. |
| 11:29:37 | 22 | THE WITNESS:  I read many depositions that |
| 11:29:40 | 23 | described managerial discretion and the guidelines that |
| 11:29:44 | 24 | were given to managers in making pay determinations. |
| | 25 | // |

| | | |
|---|---|---|
| 11:29:48 | 1 | BY MS. DERMODY: |
| 11:29:49 | 2 | Q.   Did you request to see whether there were |
| 11:29:52 | 3 | oversight mechanisms that existed at any of the firms? |
| 11:29:55 | 4 | A.   "Oversight mechanisms" meaning whether managers |
| 11:29:59 | 5 | were doing what? |
| 11:30:00 | 6 | Q.   Whether there was sign-off on manager |
| 11:30:04 | 7 | decisions. |
| 11:30:05 | 8 | MR. KIERNAN:  Object to form. |
| 11:30:06 | 9 | THE WITNESS:  Sign-off by human resources? |
| 11:30:09 | 10 | What do you mean by "sign-off"? |
| 11:30:10 | 11 | BY MS. DERMODY: |
| 11:30:10 | 12 | Q.   Yes, anyone outside the manager himself or |
| 11:30:14 | 13 | herself. |
| 11:30:15 | 14 | A.   I'm not sure I'm following your line of |
| 11:30:17 | 15 | questioning. |
| 11:30:17 | 16 | Q.   Did you request to see whether there were |
| 11:30:20 | 17 | oversight mechanisms at any of the firms to govern the |
| 11:30:24 | 18 | discretion exercised by managers, by people above them in |
| 11:30:28 | 19 | the line of command? |
| 11:30:29 | 20 | A.   No, I didn't -- |
| 11:30:30 | 21 | MR. KIERNAN:  Object to form. |
| 11:30:31 | 22 | THE WITNESS:  -- request to see any documents. |
| 11:30:33 | 23 | BY MS. DERMODY: |
| 11:30:33 | 24 | Q.   Okay.  Did you study at what level managers at |
| 11:30:38 | 25 | any of the companies had authority to make pay decisions |

| | | |
|---|---|---|
| 11:30:41 | 1 | without review by others in the company? |
| 11:30:45 | 2 | A.   The company depositions discussed managerial |
| 11:30:48 | 3 | authority in making decisions, and in some there were |
| 11:30:51 | 4 | references to compensation committees that would check |
| 11:30:56 | 5 | management decisions.  But I couldn't describe that for |
| 11:31:00 | 6 | every Defendant. |
| 11:31:01 | 7 | Q.   Did you make an attempt to study whether |
| 11:31:04 | 8 | oversight existed to check manager discretion at each |
| 11:31:09 | 9 | company? |
| 11:31:09 | 10 | MR. KIERNAN:  Object to form. |
| 11:31:10 | 11 | THE WITNESS:  I was just following the analysis |
| 11:31:11 | 12 | that Kevin Hallock did and -- and -- and ascertaining |
| 11:31:17 | 13 | whether there was a -- whether there was spillover from |
| 11:31:24 | 14 | impacting -- potentially allegedly impacted employees to |
| 11:31:28 | 15 | all or all others, and in my assessment after reading |
| 11:31:32 | 16 | depositions I found that there was extensive managerial |
| 11:31:35 | 17 | discretion in setting pay that would limit that |
| 11:31:37 | 18 | spillover. |
| 11:31:40 | 19 | MS. DERMODY:  Move to strike the answer as |
| 11:31:42 | 20 | non-responsive. |
| 11:31:43 | 21 | Q.   If you could please answer the question I just |
| 11:31:45 | 22 | asked, which is, did you make an attempt to study whether |
| 11:31:48 | 23 | company oversight -- whether at any company there was |
| 11:31:50 | 24 | oversight at the manager's discretion on pay decisions. |
| 11:31:54 | 25 | A.   What do you mean by "study"? |

| | | |
|---|---|---|
| 11:31:56 | 1 | MR. KIERNAN:  Object to form. |
| 11:31:56 | 2 | BY MS. DERMODY: |
| 11:31:56 | 3 | Q.  Did you systematically try to review all the |
| 11:31:59 | 4 | information that existed at the companies about what |
| 11:32:02 | 5 | oversight exists to govern manager discretion? |
| 11:32:07 | 6 | A.  I reviewed the information I had.  I didn't |
| 11:32:09 | 7 | return to the companies and ask them for more |
| 11:32:12 | 8 | information. |
| 11:32:13 | 9 | Q.  And Dr. Hallock did not study manager |
| 11:32:16 | 10 | discretion, did he? |
| 11:32:19 | 11 | MR. KIERNAN:  Object to form. |
| 11:32:22 | 12 | THE WITNESS:  Dr. Hallock described performance |
| 11:32:25 | 13 | pay briefly, but he didn't discuss or describe the study |
| 11:32:30 | 14 | of managerial discretion. |
| 11:32:36 | 15 | MS. DERMODY:  Okay.  Let me see that. |
| 11:32:51 | 16 | Q.  If you could turn to Exhibit 2848, which is |
| 11:32:55 | 17 | your report in this case, Dr. Shaw, and go to Appendix |
| 11:32:58 | 18 | E1. |
| 11:32:59 | 19 | A.  Sure. |
| 11:33:06 | 20 | Q.  You'll see on E1 there aren't actually page |
| 11:33:09 | 21 | numbers that follow, but if you look in the left column |
| 11:33:11 | 22 | that says "Employer." |
| 11:33:14 | 23 | A.  Right. |
| 11:33:14 | 24 | Q.  And if you can do me a favor and turn to |
| 11:33:16 | 25 | "Intel" as the employer. |

Deposition of Kathryn Shaw, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 11:33:19 | 1 | A.   Yes. |
| 11:33:20 | 2 | Q.   As an example. |
| 11:33:21 | 3 | First, can you help me understand this to be |
| 11:33:23 | 4 | reflecting.  We'll take the very first line, "Intel - |
| 11:33:26 | 5 | Analog Engineer 10." |
| 11:33:30 | 6 | A.   Okay.  So this is a -- this "Analog Engineer |
| 11:33:33 | 7 | 10" is a job title of a group of people at Intel. |
| 11:33:40 | 8 | Q.   And under the column for "Manager" -- |
| 11:33:42 | 9 | "Managers," it says, "8." |
| 11:33:45 | 10 | Do you see that? |
| 11:33:45 | 11 | A.   Yes, that's right. |
| 11:33:47 | 12 | Q.   Does that indicate there are eight managers |
| 11:33:49 | 13 | that held that title? |
| 11:33:51 | 14 | A.   No.  That indicates eight managers supervised |
| 11:33:54 | 15 | people who held that title. |
| 11:33:56 | 16 | Q.   And do you know what managers supervised that |
| 11:33:58 | 17 | title? |
| 11:33:59 | 18 | A.   I don't know per se. |
| 11:34:02 | 19 | Q.   Okay.  Do you know what authority the managers |
| 11:34:05 | 20 | who supervised that title had to make pay decisions |
| 11:34:08 | 21 | without supervision? |
| 11:34:09 | 22 | A.   I know that firms like Intel gave their |
| 11:34:12 | 23 | manage -- in depositions stated their managers had the |
| 11:34:16 | 24 | authority to make pay decisions. |
| 11:34:17 | 25 | Q.   Do you have a specific reference to evidence |

Deposition of Kathryn Shaw, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 11:34:21 | 1 | that the managers for "Analog Engineer 10" had the |
| 11:34:25 | 2 | authority to make pay decisions without review? |
| 11:34:28 | 3 | MR. KIERNAN:  Object to form. |
| 11:34:29 | 4 | THE WITNESS:  I don't have that information. |
| 11:34:30 | 5 | BY MS. DERMODY: |
| 11:34:30 | 6 | Q.   Okay.  Let's go to the next page of Intel.  And |
| 11:34:36 | 7 | let's go to the title "Construction Project Manager." |
| 11:34:44 | 8 | Do you see that? |
| 11:34:45 | 9 | A.   Yes. |
| 11:34:47 | 10 | Q.   And it indicates in the next column under |
| 11:34:49 | 11 | "Manager" that there are four. |
| 11:34:51 | 12 | Do you see that? |
| 11:34:52 | 13 | A.   Yes. |
| 11:34:52 | 14 | Q.   Does that indicate there were four managers of |
| 11:34:55 | 15 | those employees or that there were four in that title? |
| 11:34:59 | 16 | A.   Four managers of those employees. |
| 11:35:01 | 17 | Q.   Okay. |
| 11:35:01 | 18 | A.   Well, the -- the employees themselves are |
| 11:35:04 | 19 | managers.  But, yes, there are four managers of those |
| 11:35:07 | 20 | employees. |
| 11:35:07 | 21 | Q.   Okay.  So for this title, which you indicate |
| 11:35:11 | 22 | these employees are managers, do you have any authority |
| 11:35:15 | 23 | showing that these managers were able to make pay |
| 11:35:18 | 24 | decisions without review? |
| 11:35:20 | 25 | MR. KIERNAN:  Hang on.  Object to form. |

Deposition of Kathryn Shaw, Ph.D.          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 11:35:21 | 1 | THE WITNESS:  I would have to look up the Intel |
| 11:35:23 | 2 | information specifically.  There are seven Defendants |
| 11:35:26 | 3 | here, and I can't tell you exactly what sort of review |
| 11:35:29 | 4 | system Intel has for these particular managers. |
| 11:35:31 | 5 | BY MS. DERMODY: |
| 11:35:32 | 6 | Q.   Do you have anything in your report that |
| 11:35:33 | 7 | indicates that "Intel Construction Project Manager 10" |
| 11:35:37 | 8 | had the authority to make pay decisions without review? |
| 11:35:40 | 9 | A.   What I do have is an overall analysis that |
| 11:35:45 | 10 | managers were given discretion in making pay decisions. |
| 11:35:47 | 11 | Q.   And you don't -- you didn't do any study to see |
| 11:35:50 | 12 | how that discretion was limited; is that correct? |
| 11:35:57 | 13 | MR. KIERNAN:  Object to form. |
| 11:35:57 | 14 | THE WITNESS:  I don't know whether there were |
| 11:35:58 | 15 | limitations on managers' discretion here, but managers -- |
| 11:36:00 | 16 | this is a pay-for-performance environment where managers |
| 11:36:04 | 17 | are told they are supposed to pay for performance, and |
| 11:36:06 | 18 | therefore they would be analyzing on a subjective basis |
| 11:36:11 | 19 | the work of "Construction Project Manager 10" and |
| 11:36:15 | 20 | assigning pay based upon the capabilities of that person. |
| 11:36:18 | 21 | BY MS. DERMODY: |
| 11:36:19 | 22 | Q.   And you don't know whether when they made those |
| 11:36:21 | 23 | decisions they were reviewed by anyone, one person, a |
| 11:36:24 | 24 | hundred people, a thousand people; is that correct? |
| 11:36:27 | 25 | MR. KIERNAN:  Object to form. |

| | | |
|---|---|---|
| 11:36:28 | 1 | THE WITNESS:  I don't know whether they were |
| 11:36:29 | 2 | reviewed.  I didn't check to see whether they were |
| 11:36:31 | 3 | reviewed, but I do know that in a pay-for-performance |
| 11:36:34 | 4 | system there could be some reviews, but often they state |
| 11:36:37 | 5 | that managers have complete discretion. |
| 11:36:42 | 6 | BY MS. DERMODY: |
| 11:36:50 | 7 | Q.   Do you recall seeing any evidence in this case |
| 11:36:52 | 8 | in writing in a document to managers advising them they |
| 11:37:01 | 9 | had complete discretion to make all decisions without |
| 11:37:03 | 10 | review? |
| 11:37:04 | 11 | A.   I don't recall the word "complete discretion," |
| 11:37:06 | 12 | but certainly I heard -- I saw reference repeatedly to |
| 11:37:11 | 13 | managers having discretion in making their assessments of |
| 11:37:15 | 14 | performance in pay. |
| 11:37:16 | 15 | Q.   And that was references made in deposition |
| 11:37:19 | 16 | testimony; is that correct, Ms. Shaw? |
| 11:37:21 | 17 | A.   That's right. |
| 11:37:36 | 18 | Q.   You have written a bit about talent sorting; is |
| 11:37:40 | 19 | that correct? |
| 11:37:40 | 20 | A.   Talent sorting? |
| 11:37:41 | 21 | Q.   Yes. |
| 11:37:43 | 22 | A.   It depends on what you mean.  For the -- which |
| 11:37:48 | 23 | paper do you have in mind? |
| 11:37:50 | 24 | Q.   Talent sorting and skill complementarity among |
| 11:37:54 | 25 | software engineers. |

| | | |
|---|---|---|
| 11:37:56 | 1 | A.    I'd have to look at that. |
| 11:37:58 | 2 | Q.    Okay.  I'm just going to pass you this so you |
| 11:38:00 | 3 | can see what I'm referencing.  I wasn't intending to add |
| 11:38:03 | 4 | to the paper for the court reporter. |
| 11:38:07 | 5 | A.    Oh, yes. |
| 11:38:13 | 6 | MR. TUBACH:  Kelly, sorry, can you read into |
| 11:38:15 | 7 | the record what the document is. |
| 11:38:17 | 8 | MS. DERMODY:  Sure.  It's "Talent Sorting and |
| 11:38:18 | 9 | Skill Complementarity Among Software Engineers, December |
| 11:38:20 | 10 | 2006."  Kathryn Shaw is one of the authors. |
| 11:38:26 | 11 | Q.    Is that correct? |
| 11:38:27 | 12 | A.    That's right. |
| 11:38:28 | 13 | Q.    Okay.  And would you consider the seven |
| 11:38:31 | 14 | Defendant firms in this case to be in a top-tier of |
| 11:38:35 | 15 | technology firms in terms of their talent? |
| 11:38:38 | 16 | MR. KIERNAN:  Object to form. |
| 11:38:40 | 17 | THE WITNESS:  I'd have to define "top-tier," |
| 11:38:42 | 18 | and I don't know if I -- in this paper I define |
| 11:38:44 | 19 | "top-tier."  Perhaps I did, but I don't remember.  This |
| 11:38:47 | 20 | is a paper that was never published. |
| 11:38:49 | 21 | BY MS. DERMODY: |
| 11:39:12 | 22 | Q.    Do you understand the concept of higher quality |
| 11:39:14 | 23 | firms? |
| 11:39:15 | 24 | A.    No, I don't. |
| 11:39:18 | 25 | Q.    If you turn to page 3 -- |

| | | |
|---|---|---|
| 12:04:35 | 1 | THE WITNESS:  In this particular study, we were |
| 12:04:38 | 2 | studying a particular measure of productivity and a |
| 12:04:40 | 3 | particular measure of HR practices that was relevant to |
| 12:04:43 | 4 | the study. |
| 12:04:44 | 5 | BY MS. DERMODY: |
| 12:04:44 | 6 | Q.   And you weren't -- |
| 12:04:45 | 7 | A.   But that is not relevant to this study here |
| 12:04:48 | 8 | which is studying a very different set of firms. |
| 12:04:50 | 9 | Q.   And going back to those studies, you weren't |
| 12:04:52 | 10 | studying just individuals, you were studying what was |
| 12:04:57 | 11 | happening on a company level; is that correct? |
| 12:04:58 | 12 | A.   No, not a company level, a mill level. |
| 12:05:02 | 13 | Q.   Okay.  A mill level. |
| 12:05:03 | 14 | So many employees; is that correct? |
| 12:05:05 | 15 | A.   Yes, many employees. |
| 12:05:22 | 16 | Q.   When you drew the conclusions that certain |
| 12:05:23 | 17 | practices resulted in negative productivity, did you do a |
| 12:05:28 | 18 | study of performance rating verses productivity? |
| 12:05:35 | 19 | MR. KIERNAN:  Object to form. |
| 12:05:36 | 20 | THE WITNESS:  I -- I didn't -- you |
| 12:05:37 | 21 | mischaracterized the study.  I didn't state that certain |
| 12:05:39 | 22 | practices had negative productivity. |
| 12:05:41 | 23 | BY MS. DERMODY: |
| 12:05:42 | 24 | Q.   I'm sorry.  Certain practices resulted in |
| 12:05:45 | 25 | negative productivity. |

| | | |
|---|---|---|
| 12:05:46 | 1 | A.   I didn't state that.  Certain practices have |
| 12:05:49 | 2 | lower productivity than other practices. |
| 12:05:51 | 3 | Q.   Okay.  And when you were reviewing the |
| 12:05:55 | 4 | different results in terms of productivity, some have |
| 12:05:58 | 5 | lower productivity, some have higher productivity, did |
| 12:06:02 | 6 | you look at performance ratings by individual managers as |
| 12:06:05 | 7 | a feature of whether or not the HR system had higher or |
| 12:06:11 | 8 | lower productivity? |
| 12:06:14 | 9 | A.   Did I look at what? |
| 12:06:15 | 10 | Q.   Performance ratings. |
| 12:06:17 | 11 | A.   Of managers? |
| 12:06:18 | 12 | Q.   Yes. |
| 12:06:20 | 13 | A.   Performance ratings -- |
| 12:06:21 | 14 | Q.   That managers made of employees. |
| 12:06:23 | 15 | A.   Made of employees. |
| 12:06:24 | 16 | MR. KIERNAN:  Object to form. |
| 12:06:25 | 17 | THE WITNESS:  No.  This data was no specific |
| 12:06:27 | 18 | data for the steel industry.  Management ratings of |
| 12:06:32 | 19 | individual employees was not relevant to performance. |
| 12:06:35 | 20 | (Exhibit 2854 was marked for identification.) |
| 12:06:35 | 21 | BY MS. DERMODY: |
| 12:06:35 | 22 | Q.   Okay.  Dr. Shaw, the exhibit marked as |
| 12:07:30 | 23 | Exhibit 2854 appears to be another article. |
| 12:07:34 | 24 | Do you recognize this? |
| 12:07:35 | 25 | A.   Yes. |

Deposition of Kathryn Shaw, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 12:07:35 | 1 | Q.   What is this? |
| 12:07:36 | 2 | A.   An article entitled, "Reaching For The Stars." |
| 12:07:39 | 3 | Q.   And this is an article that you wrote in August |
| 12:07:42 | 4 | of 2006; is that correct? |
| 12:07:45 | 5 | A.   Yes, that's right. |
| 12:07:59 | 6 | Q.   And if you could turn to page 6 of the |
| 12:08:07 | 7 | document, towards the bottom there is a paragraph that |
| 12:08:17 | 8 | starts "Second." |
| 12:08:18 | 9 | Do you see that? |
| 12:08:18 | 10 | A.   Uh-huh. |
| 12:08:19 | 11 | Q.   And indicates the pay of software workers rises |
| 12:08:22 | 12 | markedly with tenure. |
| 12:08:24 | 13 | Do you see that? |
| 12:08:25 | 14 | A.   Yes. |
| 12:08:33 | 15 | Q.   And if you look at those documents, does this |
| 12:08:36 | 16 | refresh your recollection about a subject we talked about |
| 12:08:38 | 17 | earlier, which is whether you had ever used tenure -- |
| 12:08:41 | 18 | A.   It does. |
| 12:08:42 | 19 | Q.   -- as a study?  And having had your memory |
| 12:08:45 | 20 | refreshed, is it your testimony that you have used tenure |
| 12:08:48 | 21 | in the software industry? |
| 12:08:49 | 22 | A.   Yes, tenure is used in this dataset. |
| 12:08:52 | 23 | Q.   Okay.  And if you could go to page 13 of the |
| 12:09:00 | 24 | document -- |
| 12:09:01 | 25 | A.   Okay. |

| | | |
|---|---|---|
| 12:09:01 | 1 | Q.   -- at the top it says, "We test the hypotheses |
| 12:09:17 | 2 | of our model by focusing on the prepackaged software |
| 12:09:20 | 3 | industry, which corresponds to the four digit SIC," and |
| 12:09:23 | 4 | it has some numbers there. |
| 12:09:25 | 5 | Do you see that? |
| 12:09:26 | 6 | A.   Yes. |
| 12:09:26 | 7 | Q.   What is the "SIC"? |
| 12:09:28 | 8 | A.   The SIC Code is the Standard Industrial |
| 12:09:30 | 9 | Classification Code, and this refers to prepackaged |
| 12:09:34 | 10 | software. |
| 12:09:34 | 11 | Q.   And where does that classification code come |
| 12:09:36 | 12 | from? |
| 12:09:38 | 13 | A.   I guess it's a census code.  I've used it so |
| 12:09:42 | 14 | much, I don't recall. |
| 12:09:43 | 15 | Q.   So this is census data you're using; is that |
| 12:09:46 | 16 | correct? |
| 12:09:46 | 17 | A.   No, that's not correct.  It is not census data. |
| 12:09:50 | 18 | Q.   Okay.  Tell me the way in which you use this |
| 12:09:52 | 19 | code in this study. |
| 12:09:53 | 20 | A.   We looked for people in -- who work in the |
| 12:09:57 | 21 | prepackaged software industry, and we used the code as |
| 12:10:00 | 22 | the industry to designate how we found those people. |
| 12:10:03 | 23 | Q.   And you found those people by looking at the |
| 12:10:05 | 24 | data that was collected; is that correct? |
| 12:10:10 | 25 | MR. KIERNAN:  Object to form. |

| | | |
|---|---|---|
| 12:10:11 | 1 | THE WITNESS:  I don't know what you mean by |
| 12:10:13 | 2 | looking at the data that was collected.  We had a |
| 12:10:16 | 3 | dataset, and we looked for people who worked in the |
| 12:10:18 | 4 | software industry. |
| 12:10:19 | 5 | BY MS. DERMODY: |
| 12:10:19 | 6 | Q.   Where did the dataset come from? |
| 12:10:21 | 7 | A.   The dataset was data that we obtained by |
| 12:10:24 | 8 | working for -- with unemployment compensation datasets |
| 12:10:29 | 9 | from various states.  It was housed at the census center, |
| 12:10:33 | 10 | but it's not census data. |
| 12:10:35 | 11 | Q.   Okay.  So it was housed there.  You just don't |
| 12:10:37 | 12 | call it census data; is that correct? |
| 12:10:40 | 13 | A.   It's not census data. |
| 12:10:43 | 14 | Q.   So in the middle is paragraph at page 13, where |
| 12:10:46 | 15 | it references the census bureau -- |
| 12:10:49 | 16 | A.   That's a different dataset. |
| 12:10:50 | 17 | Q.   And what is that dataset? |
| 12:10:52 | 18 | A.   That's a dataset on the information, as it says |
| 12:10:55 | 19 | there, on firms that produce software.  The dataset that |
| 12:10:58 | 20 | I'm referring to above and in the majority of the paper |
| 12:11:03 | 21 | is a different dataset.  There are two different datasets |
| 12:11:07 | 22 | that are merged here. |
| 12:11:08 | 23 | Q.   Okay.  And you use both types of datasets in |
| 12:11:11 | 24 | the study; is that correct? |
| 12:11:12 | 25 | A.   Yes.  And you can see that on the paper where |

12:11:15  1    one says dataset on software workers and establishments.

12:11:19  2    And so we're talking about one dataset called LEHD and

12:11:23  3    another dataset, which is the census dataset.

12:11:26  4          Q.   Okay.  And using the census bureau dataset, how

12:11:30  5    did you identify the software employees that you were

12:11:34  6    looking for?

12:11:35  7          A.   We don't identify software employees in the

12:11:38  8    census data.  The census data is the data on firms, not

12:11:41  9    employees.

12:11:42 10          Q.   Okay.  And as stated below, on that same page,

12:11:48 11    the LEHD data --

12:11:51 12          A.   Right.

12:11:51 13          Q.   -- that's data you say comes -- that is

12:11:54 14    collected by the States and is stored at the census

12:11:58 15    bureau?

12:11:59 16          A.   That's right.

12:12:01 17          Q.   And that data, as indicated, has information on

12:12:05 18    worker date of birth; is that correct?

12:12:07 19          A.   Yes, apparently.

12:12:09 20          Q.   Which is age, race, and sex; is that correct?

12:12:13 21          A.   I'd have to refresh my memory.  This is an old

12:12:16 22    paper now.  So if that's what it says, that's correct.

12:12:19 23          Q.   Sure, on the bottom of 13, if that helps.

12:12:22 24          A.   Okay.

12:12:22 25          Q.   The very last words of 13.

12:12:27   1        A.    Okay.  Yeah.  Okay.

12:12:28   2              Date of birth, race and sex.  Okay.

12:12:30   3        Q.    And then on page 14, at the bottom of that

12:12:32   4   page, the paragraph that starts, "Our basic universe of

12:12:36   5   data workers," do you see that?

12:12:37   6        A.    Yes, I do.

12:12:38   7        Q.    It talks about studying 83,497 employment

12:12:45   8   spells.  Do you see that?

12:12:47   9        A.    Right.

12:12:48  10        Q.    What does that mean?

12:12:49  11        A.    An employment spell is the time you enter

12:12:52  12   employment with a firm until the time you end employment,

12:12:54  13   or also it could be from the time we start -- start

12:12:58  14   observing the person until the time we stop observing

12:13:02  15   them, even though their employment spell hasn't ended or

12:13:06  16   begun.

12:13:06  17        Q.    Would that be different than unique workers?

12:13:12  18              MR. KIERNAN:  Object to form.

12:13:13  19              THE WITNESS:  Yes.  This is employment -- you

12:13:14  20   know, again, I haven't reviewed this paper since 2006, so

12:13:19  21   I don't recall exactly what's in this paper.  But I would

12:13:22  22   imagine this refers to employment spells of workers and

12:13:26  23   not unique workers, would be my recollection, but I'd

12:13:28  24   have to look at it closely.  I'd have to read the rest of

12:13:31  25   the paper to remind myself.

Deposition of Kathryn Shaw, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 12:13:33 | 1 | BY MS. DERMODY: |
| 12:13:33 | 2 | Q.   Okay.  So it's essentially tracking 83,000 |
| 12:13:39 | 3 | employment records; is that correct? |
| 12:13:41 | 4 | A.   Employment spells. |
| 12:13:42 | 5 | MR. KIERNAN:  Object to form. |
| 12:13:43 | 6 | BY MS. DERMODY: |
| 12:13:44 | 7 | Q.   Can you help me, being someone not in your |
| 12:13:47 | 8 | industry, understand what a spell is.  I'm not sure I got |
| 12:13:49 | 9 | it. |
| 12:13:50 | 10 | A.   A spell is -- is two things in this dataset. |
| 12:13:53 | 11 | It is the beginning of employment, the day you arrive on |
| 12:13:56 | 12 | the job, until the day you end the job.  That's one |
| 12:13:58 | 13 | definition of an "employment spell." |
| 12:14:00 | 14 | It could also be, since the data doesn't start |
| 12:14:04 | 15 | until 1992, and goes through 2001, it -- a spell could |
| 12:14:09 | 16 | also be the day we start to observe a person at that |
| 12:14:13 | 17 | employer or the time that we stop observing them, even |
| 12:14:17 | 18 | though they didn't terminate employment. |
| 12:14:19 | 19 | Q.   Okay.  And in this study, based on what it says |
| 12:14:22 | 20 | in this paragraph that we're looking at, were you |
| 12:14:25 | 21 | starting from a universe of data that had 83,497 |
| 12:14:30 | 22 | employment spells for workers employed in the software |
| 12:14:35 | 23 | industry in 10 states from 1992 to 2001? |
| 12:14:40 | 24 | A.   That's what it says here. |
| 12:14:41 | 25 | Q.   Okay.  And if you turn to the next page, as |

| | | |
|---|---|---|
| 12:14:51 | 1 | indicated, did you limit the study to workers of a |
| 12:14:57 | 2 | certain age and a certain salary? |
| 12:15:00 | 3 | MR. KIERNAN:  Object to form. |
| 12:15:05 | 4 | THE WITNESS:  Yes, as it states here we did. |
| 12:15:07 | 5 | BY MS. DERMODY: |
| 12:15:08 | 6 | Q.   And did you also limit it to a certain type of |
| 12:15:11 | 7 | company? |
| 12:15:15 | 8 | A.   I don't know what you mean by "type of |
| 12:15:16 | 9 | company." |
| 12:15:17 | 10 | Q.   Sorry.  At the very end of the paragraph -- of |
| 12:15:19 | 11 | the first paragraph in that page, it talks about |
| 12:15:28 | 12 | businesses that could be matched, including the size, |
| 12:15:31 | 13 | age, sales, and product line information. |
| 12:15:33 | 14 | A.   That's right. |
| 12:15:33 | 15 | Q.   So were you trying to limit your study to |
| 12:15:35 | 16 | companies that were similar? |
| 12:15:37 | 17 | A.   No. |
| 12:15:37 | 18 | MR. KIERNAN:  Object to form. |
| 12:15:38 | 19 | THE WITNESS:  We were not.  We were just trying |
| 12:15:40 | 20 | to match datasets where we match the economic census data |
| 12:15:44 | 21 | for software firms to the LEHD data.  We weren't limiting |
| 12:15:49 | 22 | it to any type of firm. |
| 12:15:50 | 23 | BY MS. DERMODY: |
| 12:15:51 | 24 | Q.   So you were trying to match the workers to |
| 12:15:53 | 25 | firms? |

12:15:53   1       A.    Right.

12:15:54   2       Q.    Okay.  And then in the next paragraph you were

12:15:59   3   limiting the study to employees within the firm -- types

12:16:05   4   of employees within the firms, so software engineers,

12:16:08   5   developers, managers; is that correct?

12:16:10   6       A.    For a different set of analysis.  As you say

12:16:13   7   here, for this sample, we limit -- we limit our data --

12:16:18   8   well, that should say "our data" to those individuals in

12:16:21   9   the software industry, who are software engineers,

12:16:25  10   developers, or managers.  That's in that particular set

12:16:28  11   of analysis.

12:16:41  12       Q.    And do you recall doing regressions that

12:16:43  13   included factors such as age or sex or tenure?

12:16:50  14           MR. KIERNAN:  Object to form.

12:16:50  15   BY MS. DERMODY:

12:16:51  16       Q.    As part of this study?

12:16:52  17       A.    I don't recall the exact functional form of the

12:16:55  18   regressions, but I -- if I look through the paper, I

12:16:58  19   would probably find that age and tenure were in the

12:17:03  20   regressions.

12:17:51  21       Q.    Did you have a chance to confirm that in

12:17:54  22   looking at the regressions?

12:17:56  23       A.    I can look at the tables --

12:17:58  24           MR. KIERNAN:  Object to form.

          25   //

| | | |
|---|---|---|
| 12:17:59 | 1 | BY MS. DERMODY: |
| 12:17:59 | 2 | Q.   I'm sorry.  I thought that's what you were |
| 12:18:02 | 3 | doing.  I apologize. |
| 12:18:03 | 4 | A.   So do you have a table in mind? |
| 12:18:11 | 5 | Q.   I think you said if I looked through the paper, |
| 12:18:15 | 6 | that age and tenure were in the regressions.  I assumed |
| 12:18:18 | 7 | when you were looking at the paper, that is what you were |
| 12:18:21 | 8 | looking for. |
| 12:18:21 | 9 | A.   Okay.  I'm looking now. |
| 12:18:23 | 10 | Again, I haven't read this paper in many years, |
| 12:18:25 | 11 | so I'd be speculating as to what it is, you know, some of |
| 12:18:28 | 12 | the details of the paper, but what you see here is that |
| 12:18:30 | 13 | in Table 7 it says, we can -- we have wage residuals for |
| 12:18:38 | 14 | regression controlling for age and tenure.  So in that |
| 12:18:39 | 15 | sense we put age and tenure in one of the wage |
| 12:18:43 | 16 | regressions. |
| 12:18:44 | 17 | MS. DERMODY:  Okay.  So it's about 12:20.  Is |
| 12:18:48 | 18 | this a good time for us to break for lunch?  Thumbs up |
| 12:18:52 | 19 | from Mr. Tubach.  All right. |
| 12:18:56 | 20 | How much time would you all like? |
| 12:18:59 | 21 | MR. KIERNAN:  20, 30 minutes. |
| 12:19:03 | 22 | MS. DERMODY:  I think we'll need at least 30 |
| 12:19:04 | 23 | minutes to eat.  So -- |
| 12:19:06 | 24 | THE VIDEOGRAPHER:  We're off the record at |
| 12:19:07 | 25 | 12:19. |

Deposition of Kathryn Shaw, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 12:19:08 | 1 | (Luncheon recess was taken.) |
| 13:02:29 | 2 | THE VIDEOGRAPHER:  We are now on the record at |
| 13:02:30 | 3 | 1:02. |
| 13:02:33 | 4 | BY MS. DERMODY: |
| 13:02:34 | 5 | Q.   Dr. Shaw, if we can keep on going with your |
| 13:02:37 | 6 | report, I think you have that in front of you. |
| 13:02:39 | 7 | A.   Yes. |
| 13:02:39 | 8 | Q.   And that's Exhibit 2848.  If you could please |
| 13:02:43 | 9 | turn to paragraph 18, which is on page 7 -- |
| 13:02:51 | 10 | A.   Okay. |
| 13:02:51 | 11 | Q.   -- and in this paragraph you state that the |
| 13:02:55 | 12 | concept of internal equity was used at the manager level |
| 13:02:59 | 13 | to make individual employee compensation decisions not on |
| 13:03:02 | 14 | a company-wide level to make automatic adjustments to |
| 13:03:07 | 15 | groups of people. |
| 13:03:08 | 16 | Do you see that? |
| 13:03:09 | 17 | A.   Yes. |
| 13:03:22 | 18 | Q.   And did you do anything to study whether there |
| 13:03:25 | 19 | were employee compensation decisions that happened -- |
| 13:03:30 | 20 | sorry -- that there were adjustments made to groups of |
| 13:03:32 | 21 | people on a gradual level rather than on an automatic |
| 13:03:36 | 22 | level? |
| 13:03:37 | 23 | MR. KIERNAN:  Object to form. |
| 13:03:41 | 24 | THE WITNESS:  I don't know.  "Gradual level" |
| 13:03:45 | 25 | meaning what? |

13:21:46   1            MR. KIERNAN:  Object to form.

13:21:48   2            THE WITNESS:  I see that there are groups of

13:21:49   3    employees.  I don't know what these designations mean,

13:21:53   4    and I don't know what it means to keep them in lock step.

13:21:57   5    I don't know if that refers to keeping them in

13:22:00   6    relationship to one another.

13:22:10   7    BY MS. DERMODY:

13:22:16   8        Q.   What does "lock step" mean to you outside the

13:22:19   9    context of this email?

13:22:20  10        A.   I have no definition of "lock step" outside the

13:22:24  11    context of this.

13:22:25  12        Q.   You've never used the word before?

13:22:26  13        A.   I've never used it.  Not with respect to

13:22:37  14    personnel practices.

13:22:38  15        Q.   Have you ever used the word in any context in

13:22:40  16    your life before?

13:22:42  17        A.   Well, certainly I probably used it in some

13:22:44  18    point in my life, but not with respect to personnel

13:22:47  19    practices.

13:22:48  20        Q.   If you have ever used it before, what was your

13:22:50  21    way of using it?

13:22:53  22        A.   The way I would use "lock step" is to mean that

13:22:56  23    things move in a formal sequence.

13:23:00  24        Q.   Related to each other, correct?

13:23:03  25        A.   They move together.

13:23:22  1      Q.   And when you developed your opinion that all

13:23:28  2   the compensation decisions are based on individual

13:23:30  3   manager decisions, you weren't -- you hadn't reviewed

13:23:33  4   this document, had you, Dr. Shaw?

13:23:35  5            MR. KIERNAN:  Object to form.

13:23:39  6            THE WITNESS:  This document doesn't state

13:23:41  7   otherwise.  This document is referring to MRPs, and not

13:23:44  8   to managers' -- managers' decisions, and managers are

13:23:48  9   only supposed to take MRPs as recommended guidelines, not

13:23:53 10   as actual pay decisions.

13:23:55 11   BY MS. DERMODY:

13:23:55 12      Q.   This document is inconsistent with your theory

13:23:57 13   that there are no company-level reviews for compensation

13:24:00 14   for groups; isn't that true?

13:24:02 15      A.   I never --

13:24:02 16            MR. KIERNAN:  Object to form.

13:24:04 17            THE WITNESS:  I never stated there were no

13:24:05 18   company-level reviews of compensation.

13:24:08 19   BY MS. DERMODY:

13:24:08 20      Q.   Okay.  Is it your opinion there were

13:24:10 21   company-level reviews of compensation for groups of

13:24:13 22   employees in the company?

13:24:15 23      A.   In evaluating the policies of these companies,

13:24:17 24   I'm sure that there are some companies within the

13:24:20 25   Defendant set that did review the compensation decisions

13:24:24  1   with their managers.  That doesn't mean they overturned

13:24:26  2   the decisions.  It means they reviewed the decisions.

13:24:29  3        Q.   And which of those companies, do you recall,

13:24:31  4   that being the case?

13:24:32  5        A.   I couldn't tell you out of the seven companies.

13:24:35  6        Q.   And you didn't -- you didn't study that; is

13:24:37  7   that correct?

13:24:38  8        A.   No.

13:24:38  9             MR. KIERNAN:  Object to form.

13:24:42  10            THE WITNESS:  I -- I -- I did read about it in

13:24:45  11  reviewing the compensation and employment practices of

13:24:49  12  these companies.

13:24:51  13  BY MS. DERMODY:

13:24:52  14       Q.   Can you identify any Defendant that didn't

13:24:53  15  review the decision -- the pay decisions of managers in

13:24:56  16  some fashion?

13:24:57  17       A.   I can recall many depositions in which the

13:25:02  18  person being deposed was asked whether managers had

13:25:05  19  complete discretion, and the implication was the managers

13:25:10  20  did, indeed, have complete discretion in determining what

13:25:13  21  salaries should be and what equity and bonus should be.

13:25:17  22       Q.   Tell me right now a full list of the deponents

13:25:20  23  who said managers had complete discretion with no review

13:25:22  24  of pay decisions of employees.

13:25:27  25       A.   That would be impossible for me to do.

13:25:28  1          MR. KIERNAN:  Vague.

13:25:28  2   BY MS. DERMODY:

13:25:28  3        Q.   How come?

13:25:29  4        A.   There are 50 different depositions.

13:25:29  5        Q.   This is the crux of your opinion, Dr. Shaw.

13:25:31  6   Name one deposition you looked at that said that.

13:25:34  7          MR. KIERNAN:  Hang on.  Object to form.

13:25:35  8          THE WITNESS:  I couldn't look.  I couldn't name

13:25:37  9   one deposition out of the 50 I read that would make that

13:25:40 10   statement, but I -- I believe that there were a number

13:25:45 11   that made that statement, and I can recall them.

13:25:49 12   BY MS. DERMODY:

13:25:49 13        Q.   Tell me the number you think it was.  Two?

13:25:52 14   Three, five?

13:25:53 15        A.   Two, three, five Defendants or depositions?

13:25:57 16        Q.   Depositions, that said managers had complete

13:25:58 17   discretion to make pay decisions without any review.

13:26:01 18          MR. KIERNAN:  Object to form.

13:26:03 19   BY MS. DERMODY:

13:26:03 20        Q.   At any company, at any time.

13:26:05 21          MR. KIERNAN:  Object to form.

13:26:06 22          THE WITNESS:  What the deposition said

13:26:08 23   repeatedly is that managers are given salary ranges,

13:26:13 24   market reference points, and that the ultimate salary

13:26:17 25   decision for the annual review is made by the manager.

13:26:19  1   BY MS. DERMODY:

13:26:20  2        Q.   And tell me even a single deposition that said

13:26:22  3   managers had complete discretion without any oversight to

13:26:26  4   make pay decisions at the company.

13:26:28  5             MR. KIERNAN:  Object to form.

13:26:30  6             THE WITNESS:  I can't tell you that, but I'm

13:26:32  7   quite certain that I read many depositions in which they

13:26:35  8   said that it was ultimately up to the manager to make the

13:26:38  9   decision.

13:26:39 10   BY MS. DERMODY:

13:26:40 11        Q.   But did you see any that said the managers

13:26:42 12   could make the decision without any oversight?

13:26:44 13        A.   Well, I can't say whether it was in those

13:26:46 14   words, but the implication is that managers had

13:26:49 15   discretion in making pay decisions.

13:26:52 16        Q.   Isn't it true, Dr. Shaw, that there isn't a

13:26:54 17   single deposition you read that said managers had

13:26:57 18   complete discretion to make pay decisions without any

13:27:00 19   oversight?

13:27:01 20             MR. KIERNAN:  Object to form.

13:27:02 21             THE WITNESS:  I couldn't say that.  You know, I

13:27:03 22   read many depositions, and I don't -- doubt they used

13:27:07 23   exactly those words.

13:27:11 24   BY MS. DERMODY:

13:27:20 25        Q.   Let's turn to paragraph 19 of your report.  You

| | | |
|---|---|---|
| 13:27:37 | 1 | state in paragraph 19 that, quote, "Given the large size |
| 13:27:41 | 2 | of the labor market surveyed by consulting firms, it is |
| 13:27:46 | 3 | hard to imagine the suppression of pay in a few jobs |
| 13:27:50 | 4 | could lead to suppression of pay in benchmark data." |
| 13:27:54 | 5 | Do you see that in paragraph 19? |
| 13:27:55 | 6 | A.   Yes. |
| 13:27:55 | 7 | Q.   And how many firms are you assuming were in the |
| 13:27:58 | 8 | survey data that the Defendants reviewed? |
| 13:28:02 | 9 | MR. KIERNAN:  Object to form. |
| 13:28:04 | 10 | THE WITNESS:  It depends on the Defendant. |
| 13:28:06 | 11 | Some in the benchmarking studies had the entire labor |
| 13:28:09 | 12 | market, and some had a subset of firms, such as 20 or 30 |
| 13:28:14 | 13 | firms. |
| 13:28:14 | 14 | BY MS. DERMODY: |
| 13:28:15 | 15 | Q.   Tell me which had what. |
| 13:28:17 | 16 | A.   I can't cite that off the top of my head for |
| 13:28:20 | 17 | all Defendants, but my recollection is that Apple had a |
| 13:28:23 | 18 | subset and other firms had the universe, but I couldn't |
| 13:28:26 | 19 | tell you off the top of my head without reviewing the |
| 13:28:28 | 20 | literature and the depositions to find that out. |
| 13:28:31 | 21 | Q.   So you think Apple had a subset, and all the |
| 13:28:34 | 22 | rest had a complete universe? |
| 13:28:36 | 23 | A.   No. |
| 13:28:37 | 24 | MR. KIERNAN:  Wait.  Wait.  Object to form. |
| 13:28:38 | 25 | THE WITNESS:  No.  I didn't say that. |

13:47:27 1      A.   Because Radford is -- is surveying some very

13:47:30 2  large firms and obtaining data for positions within those

13:47:34 3  firms, and they're going to have a minimum sample size in

13:47:40 4  order to make the data public.

13:47:46 5      Q.   So because there are some companies whose

13:47:48 6  headcount is large, therefore it must be that every

13:47:50 7  position has a large headcount; is that what your

13:47:53 8  assumption is?

13:47:55 9          MR. KIERNAN:  Object to form.

13:47:56 10         THE WITNESS:  I'm stating that Radford wouldn't

13:47:57 11 make the data public for a particular position if they

13:48:01 12 didn't have a large enough sample size to create a mean

13:48:04 13 value that can be reported back.

13:48:07 14 BY MS. DERMODY:

13:48:07 15     Q.   And what is the Radford criteria for size of

13:48:14 16 position?

13:48:15 17     A.   I don't know that criteria.

13:48:18 18     Q.   Do you know they have an absolute population

13:48:21 19 headcount that must exist before Radford reports it?

13:48:26 20     A.   No, I don't know.

13:48:27 21         MR. KIERNAN:  Object to form.

13:48:28 22 BY MS. DERMODY:

13:48:28 23     Q.   Okay.  So you're just making that up; is that

13:48:30 24 correct?

13:48:30 25     A.   They're surveying large firms and reporting

13:48:33  1    back confidential data.  Therefore, they'd want to report

13:48:36  2    it back only if they had a reasonable sample size for

13:48:39  3    that reporting.

13:48:40  4         Q.   But you don't know if that is actually a rule

13:48:42  5    at all for Radford; isn't that right?

13:48:44  6         A.   I haven't studied how Radford reports data.

13:49:01  7         Q.   And you said the survey companies report back a

13:49:04  8    mean value, is that what you said?

13:49:07  9              MR. KIERNAN:  Object to form.

13:49:08  10   BY MS. DERMODY:

13:49:09  11        Q.   Per title?

13:49:10  12             MR. KIERNAN:  Object to form.

13:49:11  13             THE WITNESS:  Well, they would report mean in

13:49:14  14   characteristics of the distribution.

13:49:16  15   BY MS. DERMODY:

13:49:17  16        Q.   What is your understanding of what the mean

13:49:18  17   value is?

13:49:20  18        A.   They report back the midpoint and the range so

13:49:24  19   that companies can form their benchmarking ranges.

13:49:31  20        Q.   So this is just saying the average salary that

13:49:33  21   is reported back; is that what you are saying?

13:49:36  22             MR. KIERNAN:  Object to form.

13:49:36  23   BY MS. DERMODY:

13:49:37  24        Q.   I want to understand what the term is.  That's

13:49:40  25   all.

| | | |
|---|---|---|
| 13:49:40 | 1 | MR. KIERNAN:  Object to form. |
| 13:49:41 | 2 | THE WITNESS:  Yeah.  Mean -- mean is average. |
| 13:49:43 | 3 | BY MS. DERMODY: |
| 13:49:49 | 4 | Q.   And why is it important to keep the survey |
| 13:49:52 | 5 | results confidential? |
| 13:49:55 | 6 | MR. KIERNAN:  Object to form. |
| 13:49:57 | 7 | THE WITNESS:  What do you mean by "keep the |
| 13:49:58 | 8 | survey results confidential"? |
| 13:50:21 | 9 | BY MS. DERMODY: |
| 13:50:21 | 10 | Q.   I'm trying to find it in the testimony.  I |
| 13:50:23 | 11 | don't want to misstate you.  I want to find out what you |
| 13:50:25 | 12 | meant when you said something. |
| 13:50:26 | 13 | I asked you a question -- it went away. |
| 13:50:38 | 14 | THE REPORTER:  Hit enter when you find it. |
| 13:50:38 | 15 | MS. DERMODY:  Okay. |
| 13:51:16 | 16 | Q.   You said about the survey companies in an |
| 13:51:17 | 17 | answer, "They are surveying large firms and reporting |
| 13:51:17 | 18 | back confidential data.  Therefore, they'd want to report |
| 13:51:17 | 19 | it back only if they had a reasonable sample size for |
| 13:51:17 | 20 | that reporting." |
| 13:51:17 | 21 | And my question is about the confidentiality |
| 13:51:19 | 22 | that you're describing. |
| 13:51:21 | 23 | A.   Certainly.  So what I have in mind is if it was |
| 13:51:25 | 24 | the job title that was only held at one job at Apple, and |
| 13:51:30 | 25 | they reported that to Radford, that Radford would not |

13:51:34   1    report that back to companies, because that would violate

13:51:37   2    the confidentiality of the data, because everyone could

13:51:39   3    identify it as an Apple job.

13:51:44   4        Q.   Is that something you know from talking to

13:51:46   5    Radford, or are you just speculating that might be the

13:51:51   6    confidentiality concern?

13:51:52   7        A.   I'm speculating when you use surveys of this

13:51:54   8    nature, and I've worked on other surveys of this nature,

13:51:56   9    that that's how they're conducted.

13:52:59  10        Q.   All right.  We've placed in front of you a

13:53:01  11    document previously marked as Exhibit 1606.  Do you see

13:53:04  12    that on the first page?

13:53:06  13        A.   Yes.

13:53:08  14        Q.   And have you seen this document before?

13:53:14  15        A.   This looks familiar.

13:53:21  16        Q.   And if you turn to the page marked 1606.12, do

13:53:25  17    you see that?

13:53:36  18        A.   Yes.

13:53:36  19        Q.   Where it says, "Benchmarking Overview"?

13:53:38  20        A.   Right.

13:53:38  21        Q.   Do you see that?

13:53:39  22        A.   Right.

13:53:40  23        Q.   And it indicates, "How do we measure the

13:53:43  24    market?"  Do you see that in the middle of the page?

13:53:45  25        A.   Yes.

Deposition of Kathryn Shaw, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

13:53:46  1        Q.   And you see there is a list of peer comparative

13:53:51  2   companies.  Do you see that?

13:53:52  3        A.   Yes.

13:53:53  4        Q.   And on this Google document, Google lists four

13:53:56  5   of the co-Defendants, Apple, Intel, Intuit, and Adobe.

13:54:01  6             Do you see that?

13:54:02  7             MR. KIERNAN:  Object to form.

13:54:03  8             THE WITNESS:  Yes.

13:54:04  9   BY MS. DERMODY:

13:54:05  10       Q.   And would it make a difference to your analysis

13:54:07  11  if Google was collecting information where 20 percent of

13:54:12  12  the survey material was tainted?

13:54:16  13            MR. KIERNAN:  Object to form.

13:54:26  14            THE WITNESS:  If Google would present 20

13:54:27  15  percent that was tainted.  Of what survey data?

13:54:31  16  BY MS. DERMODY:

13:54:31  17       Q.   Of data collected from peer companies.

13:54:38  18       A.   There is only -- in this -- there are ▮▮

13:54:40  19  companies here of which ▮▮▮ are peer companies.  So what

13:54:43  20  makes you say 20 percent would be tainted?

13:54:46  21       Q.   There is one, two, three, four of --

13:54:49  22       A.   Oh, four.  Wait.  Apple, Intel --

13:54:52  23       Q.   Intuit, Adobe.

13:54:58  24       A.   Okay.  There are four that are Defendants, yes.

13:55:00  25       Q.   Plus Google is a Defendant.

Deposition of Kathryn Shaw, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

13:55:02  1      A.   So out of █ --

13:55:04  2      Q.   Five are defendants.

13:55:05  3      A.   Of █, five are defendants.  Okay.  So where do

13:55:09  4   you get the number that 20 percent would be tainted?

13:55:13  5      Q.   So if in that survey data, you've got five of

13:55:23  6   █ companies with tainted data, wouldn't you have a

13:55:26  7   concern about your analysis about using market data?

13:55:29  8      A.   I disagree with your assumption that tainted

13:55:32  9   data is going to be widespread within five of these

13:55:35 10   companies.

13:55:37 11      Q.   If you assume that the data of the five

13:55:40 12   companies was tainted, and that they were looking at only

13:55:43 13   the subset of companies in comparing themselves, wouldn't

13:55:47 14   you be concerned that there would be tainted data

13:55:49 15   reported back that would influence compensation

13:55:51 16   decisions?

13:55:52 17           MR. KIERNAN:  Object to form.

13:55:54 18           THE WITNESS:  I'm not concerned because you

13:55:56 19   haven't given me a number of taint -- a percent of the

13:56:00 20   workforce that has tainted data, and I'm going to suggest

13:56:05 21   it is going to be small, and you have no evidence

13:56:07 22   otherwise.

13:56:08 23   BY MS. DERMODY:

13:56:08 24      Q.   Well, Dr. Shaw, did you consider the reports of

13:56:10 25   Dr. Leamer when you were coming to your conclusions?

13:56:14   1        A.   I read Dr. Leamer's report, but it wasn't

13:56:17   2   relevant to assessing Kevin Hallock's work.

13:56:22   3        Q.   So you didn't consider Dr. Leamer's report to

13:56:26   4   have any relevance to the question of impact; is that

13:56:30   5   correct?

13:56:31   6             MR. KIERNAN:  Object to form.

13:56:32   7             THE WITNESS:  I was not asked to assess overall

13:56:35   8   impact.

13:56:36   9   BY MS. DERMODY:

13:56:44  10        Q.   And, therefore, you didn't review Dr. Leamer's

13:56:47  11   reports for that purpose; is that correct?

13:56:49  12             MR. KIERNAN:  Object to form.

13:56:50  13             THE WITNESS:  I was reviewing Kevin Hallock

13:56:53  14   and -- and I stated my assignment earlier.  I did read

13:56:57  15   Dr. Leamer's report.

13:56:58  16   BY MS. DERMODY:

13:56:58  17        Q.   But you didn't consider it relevant for the

13:57:00  18   issue of impact; is that correct?

13:57:02  19             MR. KIERNAN:  Object to form.

13:57:03  20             THE WITNESS:  I was not asked to assess impact.

13:57:05  21   BY MS. DERMODY:

13:57:06  22        Q.   Okay.  And you didn't consider Dr. Leamer's

13:57:08  23   report as evidence of impact; is that correct?

13:57:13  24        A.   I just stated I wasn't asked to assess impact.

13:57:17  25        Q.   I think you actually just stated that there

| | | |
|---|---|---|
| 13:57:19 | 1 | what no evidence of impact.  Isn't that what you just |
| 13:57:24 | 2 | stated, Dr. Shaw? |
| 13:57:25 | 3 | MR. KIERNAN:  Object to form. |
| 13:57:26 | 4 | THE WITNESS:  I don't recall.  Are you reading |
| 13:57:28 | 5 | it to me? |
| 13:57:29 | 6 | BY MS. DERMODY: |
| 13:57:30 | 7 | Q.   We can read it to you.  This is back here where |
| 13:57:54 | 8 | you were testifying, if you recall, about whether there |
| 13:57:56 | 9 | was tainted data, right? |
| 13:58:00 | 10 | A.   Okay. |
| 13:58:01 | 11 | Q.   You said there is no evidence to suggest that |
| 13:58:04 | 12 | it is not small.  Is that correct?  That's what you said. |
| 13:58:10 | 13 | Is that correct? |
| 13:58:24 | 14 | MR. KIERNAN:  Object to form. |
| 13:58:25 | 15 | THE WITNESS:  Yes.  That's what I said. |
| 13:58:26 | 16 | BY MS. DERMODY: |
| 13:58:27 | 17 | Q.   Okay.  And you didn't consider Dr. Leamer's |
| 13:58:32 | 18 | analyses as evidence of impact; is that correct? |
| 13:58:36 | 19 | MR. KIERNAN:  Object to form. |
| 13:58:40 | 20 | THE WITNESS:  In the -- in the documents that I |
| 13:58:42 | 21 | reviewed, I saw no evidence of impact that would be |
| 13:58:45 | 22 | significant that would cause tainted data to be reported |
| 13:58:49 | 23 | back to these benchmarking firms. |
| 13:58:52 | 24 | BY MS. DERMODY: |
| 13:58:52 | 25 | Q.   Okay.  And do you recall what Dr. Leamer said |

14:02:25   1   BY MS. DERMODY:

14:02:25   2        Q.   Isn't that the point of regression, to test a

14:02:27   3   theory, as you said earlier, Dr. Shaw?

14:02:31   4        A.   Dr. Leamer's analysis looks for correlations in

14:02:36   5   the data, but need not establish causal relationships.

14:02:42   6        Q.   And did you actually run the data analyses

14:02:46   7   yourself?

14:02:47   8        A.   No, I did not.

14:02:47   9        Q.   So that's -- you're basing that on what

14:02:49  10   Dr. Murphy said about Dr. Leamer; is that correct?

14:02:53  11             MR. KIERNAN:  Object to form.

14:02:55  12             THE WITNESS:  I read all the reports, and it's

14:02:58  13   my assessment that he tested for impact, but that that

14:03:01  14   impact has not been verified.

14:03:04  15   BY MS. DERMODY:

14:03:09  16        Q.   Have you read Dr. Leamer's -- all three of

14:03:12  17   Dr. Leamer's reports?

14:03:13  18        A.   Yes, I have.

14:03:15  19        Q.   Including the one that was submitted last

14:03:17  20   December?

14:03:18  21        A.   Yes.

14:03:20  22        Q.   But you didn't cite those in your report.

14:03:23  23             MR. KIERNAN:  Object to form.

14:03:25  24             THE WITNESS:  Those weren't relevant to my

14:03:26  25   assignment to evaluate Kevin Hallock's work.

14:03:33   1                MR. KIERNAN:  Could we take a convenience

14:03:35   2    break?

14:03:36   3                MS. DERMODY:  Sure.

14:03:37   4                THE VIDEOGRAPHER:  This is the end of Video

14:03:38   5    No. 2.  We are now off the record at 2:03.

14:09:31   6                (Recess was taken.)

14:18:54   7                THE VIDEOGRAPHER:  We are now on the record at

14:18:55   8    2:18.  This is the beginning of Video No. 3.

14:18:59   9    BY MS. DERMODY:

14:19:00  10        Q.   Dr. Shaw, going back to your report, paragraph

14:19:04  11    20, it's on page 8, if you would.  In --

14:19:06  12                I'm sorry.  Are you okay?  The most important

14:19:06  13    part of the depo, whether you can be heard.

14:19:06  14                THE REPORTER:  I have to hear every word.

14:19:06  15    Okay.

14:19:06  16    BY MS. DERMODY:

14:19:30  17        Q.   In paragraph 20, you state that you are not

14:19:32  18    aware of any evidence that market data on base salary

14:19:37  19    increased percentages was suppressed."

14:19:41  20                Do you see that?

14:19:42  21        A.   Yes, I do.

14:19:43  22        Q.   And did you review any evidence that the

14:19:44  23    Defendants communicated with each other about their plans

14:19:49  24    for salary budget increases?

14:19:56  25        A.   I don't know what you're referring to.  The

| | | |
|---|---|---|
| 14:19:58 | 1 | Defendants communicated among who? |
| 14:20:00 | 2 | Q.   Each other about that topic. |
| 14:20:03 | 3 | MR. KIERNAN:  Object to form. |
| 14:20:15 | 4 | THE WITNESS:  Yes, I read some depositions |
| 14:20:16 | 5 | where they communicated about salary. |
| 14:20:21 | 6 | BY MS. DERMODY: |
| 14:20:22 | 7 | Q.   About salary budget increases; is that correct? |
| 14:20:25 | 8 | A.   About -- I don't recall salary budget |
| 14:20:27 | 9 | increases, no.  That's not correct. |
| 14:21:02 | 10 | Q.   Dr. Shaw, the document I placed in front of you |
| 14:21:05 | 11 | was previously marked as Exhibit 122. |
| 14:21:07 | 12 | Do you see that? |
| 14:21:13 | 13 | A.   Yes. |
| 14:21:13 | 14 | Q.   Do you recognize that document? |
| 14:21:20 | 15 | A.   It looks like it comes out of the McAdams |
| 14:21:23 | 16 | deposition. |
| 14:21:24 | 17 | Q.   And do you recognize reading that one? |
| 14:21:25 | 18 | A.   I can't recall. |
| 14:21:29 | 19 | Q.   And as indicated on the top of the document, it |
| 14:21:31 | 20 | is from Lori McAdams, and Ms. McAdams has a Pixar dot-com |
| 14:21:36 | 21 | email address.  Do you see that? |
| 14:21:39 | 22 | A.   Yes, I do. |
| 14:21:40 | 23 | Q.   And Ms. McAdams is writing a number of people, |
| 14:21:42 | 24 | including Sharon Coker.  Do you see that? |
| 14:21:45 | 25 | A.   Yes, I do. |

Deposition of Kathryn Shaw, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

14:21:45   1        Q.   And your report indicates that you reviewed

14:21:48   2    Ms. Coker's deposition.  Do you recall that?

14:21:52   3        A.   Yes, that's right.

14:21:54   4        Q.   And do you recall that Ms. Coker is a senior

14:21:56   5    director of human resources at Lucasfilm?

14:22:00   6        A.   Yes, that's right.

14:22:01   7        Q.   And in looking at this email, is it your

14:22:04   8    understanding that this is a communication from

14:22:07   9    Ms. McAdams at Pixar to Ms. Coker and others at Lucas

14:22:12   10   sharing Pixar's expected budget increase numbers in

14:22:16   11   asking for Lucasfilms?

14:22:22   12            MS. SESSIONS:  Object to form.

14:22:24   13            MR. KIERNAN:  Object to form.

14:22:25   14            THE WITNESS:  I see that Ms. McAdams is writing

14:22:29   15   to these people and -- and sharing her budget

14:22:34   16   information, or at least what she thinks it will be.  I

14:22:39   17   don't -- I don't know whether this is her actual budget,

14:22:42   18   but this is her view of the budget, 4 percent.

14:22:47   19   BY MS. DERMODY:

14:22:47   20       Q.   She is also asking for the salary increase

14:22:50   21   budget from Ms. Coker and others; is that correct?

14:22:54   22            MR. KIERNAN:  Object to form.

14:22:59   23            THE WITNESS:  She's asking again if they're

14:23:01   24   doing anything close more or less.  She's not asking

14:23:05   25   for -- she doesn't ask for exact budget numbers.

Deposition of Kathryn Shaw, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 14:23:11 | 1 | BY MS. DERMODY: |
| 14:23:11 | 2 |     Q.   Well, if you see the sentence -- the second |
| 14:23:14 | 3 | sentence of the email says, "What is your salary increase |
| 14:23:17 | 4 | for the budget FY07."  Do you see that? |
| 14:23:20 | 5 |     A.   Yes.  But she follows it up by saying anything |
| 14:23:22 | 6 | close more or less. |
| 14:23:24 | 7 |     Q.   In looking at this document, does this refresh |
| 14:23:26 | 8 | your view that Ms. McAdams at Pixar and Ms. Coker were at |
| 14:23:32 | 9 | least in communication about what Pixar's salary increase |
| 14:23:35 | 10 | budget was? |
| 14:23:37 | 11 |         MR. KIERNAN:  Object to form. |
| 14:23:45 | 12 |         THE WITNESS:  Well, this shows that McAdams is |
| 14:23:48 | 13 | writing Coker with her budget information.  I don't know |
| 14:23:50 | 14 | how common it is for these Defendants to share budget |
| 14:23:54 | 15 | information. |
| 14:23:55 | 16 | BY MS. DERMODY: |
| 14:23:56 | 17 |     Q.   Okay.  Sorry, Dr. Shaw.  I put a new document |
| 14:24:38 | 18 | down for you.  The document placed in front of you was |
| 14:24:43 | 19 | previously marked as Exhibit 621.  Do you see that stamp |
| 14:24:47 | 20 | on this document? |
| 14:24:48 | 21 |     A.   Yes. |
| 14:24:49 | 22 |     Q.   And do you see this as an email attaching other |
| 14:24:53 | 23 | emails from Shona Brown at Google.com? |
| 14:24:57 | 24 |     A.   Yes. |
| 14:24:57 | 25 |     Q.   To other people? |

14:24:58  1        A.    Yes.

14:24:59  2        Q.    Okay.  And if you recall your report, I think

14:25:07  3    you list having read Shona Brown's deposition; is that

14:25:09  4    correct?

14:25:10  5        A.    That's right.

14:25:11  6        Q.    And do you recall she was a senior vice

14:25:13  7    president of People Operations, the HR arm of Google?

14:25:17  8        A.    That's right.

14:25:19  9        Q.    On the second page of the document, there is an

14:25:25 10    email that starts at the bottom from Mr. Bock, which is

14:25:30 11    directed to OC folks.  Do you see that email?

14:25:41 12        A.    Yes.

14:25:42 13        Q.    Okay.  And the email continues on to page 3.

14:25:46 14              Do you see that?

14:25:48 15        A.    Yes.

14:25:49 16        Q.    And on page 3 it indicates as the third point

14:25:54 17    on that page, "Our budget is comparable to other tech

14:25:58 18    companies."  Do you see that?

14:26:00 19        A.    Yes.

14:26:01 20        Q.    And do you see under (A) where it says, "We

14:26:03 21    called tech companies this week to check merit budgets to

14:26:07 22    compare to our --" I believe it says 3.9 percent.

14:26:11 23              Do you see that?

14:26:12 24        A.    Yes.

14:26:13 25        Q.    And do you see where it says, "They told us

| | | |
|---|---|---|
| 14:26:15 | 1 | their merit budgets are," and it lists five different |
| 14:26:19 | 2 | companies.  Do you see that? |
| 14:26:20 | 3 | A.   Yes. |
| 14:26:20 | 4 | Q.   And among those five companies are three |
| 14:26:22 | 5 | Defendants, Adobe, Apple, and Intel.  Do you see that? |
| 14:26:29 | 6 | A.   Yes, I do. |
| 14:26:30 | 7 | Q.   Does that refresh your understanding that |
| 14:26:35 | 8 | Google and these other Defendants were discussing merit |
| 14:26:39 | 9 | budget increases that they were each planning? |
| 14:26:43 | 10 | MR. KIERNAN:  Object to form. |
| 14:27:03 | 11 | THE WITNESS:  So this is an email from Mr. Bock |
| 14:27:04 | 12 | to OC folks?  Is that what we're looking at? |
| 14:27:07 | 13 | BY MS. DERMODY: |
| 14:27:08 | 14 | Q.   Yes, starting on page 2 and going down to page |
| 14:27:14 | 15 | 3. |
| 14:27:27 | 16 | A.   They appear to be shared budget information. |
| 14:27:39 | 17 | Q.   If the Defendants were sharing data, and if |
| 14:27:42 | 18 | hypothetically it was tainted by wage suppression, |
| 14:27:45 | 19 | wouldn't this necessarily have some effect on the overall |
| 14:27:48 | 20 | salary budgets? |
| 14:27:50 | 21 | MR. KIERNAN:  Object to form. |
| 14:27:51 | 22 | THE WITNESS:  That's not what I'm writing about |
| 14:27:53 | 23 | here.  You drew my attention to point number -- point 20, |
| 14:27:56 | 24 | and in that I state that, I'm not aware of any evidence |
| 14:27:59 | 25 | that market data on base salary increased percentages was |

14:28:03  1    suppressed or that the suppressed data resulted in an

14:28:08  2    impact on all or nearly all class members.

14:28:10  3            That's not the same as sharing budget

14:28:13  4    information.

14:28:13  5    BY MS. DERMODY:

14:28:14  6        Q.   I'm exploring that with you, Dr. Shaw.

14:28:16  7            So I'm asking you if the Defendants were

14:28:19  8    sharing this data as they were, and if you assume

14:28:21  9    hypothetically that the data was tainted by wage

14:28:24  10   suppression, wouldn't that necessarily have some effect

14:28:28  11   on overall salary budgets?

14:28:31  12           MR. KIERNAN:  Object to form.

14:28:33  13           THE WITNESS:  As I said, I disagree with the

14:28:37  14   assumption that it was tainted, and it would have an

14:28:40  15   impact on salary budgets, but it wouldn't have an impact

14:28:44  16   on all or nearly all class members because salaries are

14:28:48  17   actually chosen by individual managers as a function of

14:28:53  18   performance pay.  So it wouldn't -- you wouldn't reach

14:28:56  19   the conclusion that it would impact all or nearly all

14:28:58  20   class members.

14:28:59  21   BY MS. DERMODY:

14:29:00  22       Q.   Well, if there was a difference in a salary

14:29:02  23   budget, let's say it was .5 percent, okay?

14:29:10  24       A.   Different, you mean.

14:29:11  25       Q.   Let's say it was .5 percent, hypothetically.

14:30:25  1      Q.   So you have no empirical evidence that mid-tier

14:30:29  2   performers would see no benefit if the salary budget was

14:30:33  3   increased; is that correct?

14:30:34  4            MR. KIERNAN:  Object to form.

14:30:36  5            THE WITNESS:  There is -- the evidence is that

14:30:38  6   there is high variability in this and that low performers

14:30:42  7   need not benefit.  Mid-performers -- it could be that

14:30:45  8   when there is a salary reduction, that it goes all to

14:30:48  9   star performers.  It was up to the individual managers to

14:30:51  10  decide how to allocate that budget, and when there is a

14:30:54  11  change in the budget, that need not impact all or nearly

14:30:58  12  all class members.

14:30:59  13  BY MS. DERMODY:

14:31:00  14     Q.   Please tell me what is the empirical evidence

14:31:03  15  that if a salary budget was raised, that a mid-tier

14:31:07  16  performer would stay the same in terms of how much money

14:31:09  17  they made.

14:31:10  18     A.   We don't have that evidence, because we don't

14:31:11  19  have budget data, but we do have the evidence that there

14:31:14  20  is high variability in wages across all individuals so

14:31:19  21  that it need not be the case that all or nearly all class

14:31:22  22  members are affected.

14:31:23  23     Q.   So the only empirical evidence that an increase

14:31:26  24  in salary budget would only impact a few people is that

14:31:30  25  there is high variability in wage; is that correct?

14:31:33  1          MR. KIERNAN:  Object to form.

14:31:41  2          THE WITNESS:  The evidence is that from one

14:31:42  3   year to the next, pay increases vary tremendously across

14:31:46  4   individuals, so that when the salary budget changes, it

14:31:50  5   need not be the case that it would effect all or nearly

14:31:53  6   all class members.

14:31:54  7   BY MS. DERMODY:

14:32:06  8      Q.   And what is your understanding of the

14:32:09  9   percentage of employees that were low performers that

14:32:12 10   would get no salary increase no matter what at any given

14:32:16 11   firm in any given year?

14:32:18 12          MR. KIERNAN:  Object to form.

14:32:21 13          THE WITNESS:  I don't have the numbers for low

14:32:24 14   performers across years.  Those aren't in the datasets

14:32:27 15   that were provided to Kevin, and they're not available.

14:32:32 16   BY MS. DERMODY:

14:32:33 17      Q.   Do you have any informed guess as to what those

14:32:37 18   numbers would be?  I mean would you expect that 25

14:32:40 19   percent of these companies are low performers that won't

14:32:44 20   get any raise?

14:32:53 21      A.   There is no way of knowing because raises are

14:32:55 22   given out on a highly individual level so that even

14:32:59 23   though -- even if we had the performance evaluation data,

14:33:04 24   we'd have to link it up to the pay data in order to tell

14:33:07 25   what those percentages are.

14:33:08  1        Q.   Well, Dr. Shaw, you studied different companies

14:33:10  2    in Silicon Valley; is that right?

14:33:13  3        A.   That's correct.

14:33:13  4        Q.   And have you ever seen a company where 25

14:33:15  5    percent of the company was performing so poorly that

14:33:17  6    thing didn't deserve a raise?

14:33:20  7             MR. KIERNAN:  Object to form.

14:33:21  8             THE WITNESS:  The companies have never revealed

14:33:23  9    their wage information as correlated with their

14:33:26 10    performance evaluation information.

14:33:28 11    BY MS. DERMODY:

14:33:29 12        Q.   So you've never studied performance evaluation

14:33:31 13    related to pay; is that correct?

14:33:33 14             MR. KIERNAN:  Object to form.

14:33:36 15             THE WITNESS:  I've discussed performance

14:33:37 16    evaluation pay, and it's quite apparent that in these

14:33:41 17    tech companies when they have low performers, they do not

14:33:44 18    give them pay increases, and that was clear on all the

14:33:47 19    depositions and -- that I read, where it was strongly

14:33:51 20    advised that managers were given guidelines to give zero

14:33:55 21    increases to low performers.

14:33:57 22             MS. DERMODY:  I'm going to move to strike that

14:33:59 23    last answer as non-responsive.

14:34:01 24        Q.   Dr. Shaw, in your history of decades of

14:34:06 25    studying companies, have you ever studied the

14:34:10   1   relationship between performance rating and pay?

14:34:15   2       A.   I've studied it only in talking to companies,

14:34:18   3   and I haven't studied it with data, because that data is

14:34:27   4   confidential, but I've studied it in conversations with

14:34:30   5   companies and conversations with executives.

14:34:32   6       Q.   And what published peer-reviewed articles do

14:34:35   7   you have on the relationship between performance rating

14:34:37   8   and pay?

14:34:42   9       A.   There are no published peer-reviewed articles

14:34:45   10  on it.

14:34:46   11      Q.   Going back to your report, paragraph 24, you

14:35:16   12  state that a formalized compensation system,

14:35:19   13  quote/unquote, "can be carried out and implemented in a

14:35:23   14  way that some workers' wages can be adjusted without

14:35:26   15  widespread effect on other workers."

14:35:29   16          Do you see that?

14:35:30   17      A.   Yes.

14:35:30   18      Q.   Have you done an empirical study of that here?

14:35:47   19      A.   No, Dr. Hallock did not present an empirical

14:35:52   20  study, and I do not have an empirical study of how

14:35:55   21  workers wages -- not in this manner.

14:35:58   22      Q.   Have you ever studied that quantitatively in

14:36:01   23  any other organization?

14:36:12   24      A.   These datasets are not typically made available

14:36:14   25  to researchers.

14:36:15  1        Q.    So the answer is no?

14:36:17  2        A.    So I haven't studied the quantitative impact.

14:36:39  3        Q.    Paragraph 25, you indicate in this paragraph

14:36:43  4    that, one should examine the data to determine whether

14:36:46  5    there was impact to all or nearly all class members.  Do

14:36:50  6    you see that?  I'm not quoting, I'm paraphrasing.

14:36:58  7        A.    Right.

14:37:00  8        Q.    And it's fair to say that you didn't do that

14:37:03  9    study here; is that correct?

14:37:04 10        A.    Well, when you paraphrase, you say, one should

14:37:07 11    examine the evidence regarding how actual pay decisions

14:37:09 12    were made and the compensation data.  I have examined the

14:37:13 13    evidence on how actual pay decisions were made.

14:37:16 14        Q.    But you didn't study the data; is that correct?

14:37:18 15        A.    The data is -- I didn't study the data.

14:37:21 16        Q.    Okay.

14:37:22 17        A.    But I did study the evidence on how they were

14:37:24 18    made.

14:37:24 19        Q.    But you didn't study the limitations on

14:37:27 20    discretion or anything else like that as we talked about

14:37:29 21    earlier; is that correct?

14:37:31 22              MR. KIERNAN:  Object to form.

14:37:33 23              THE WITNESS:  There is no data on -- there is

14:37:38 24    no dataset provided that would show limitations on

14:37:40 25    discretion.

14:45:01  1   wouldn't that be your conclusion, it was a rule, not a

14:45:05  2   guideline?

14:45:06  3          MR. KIERNAN:  Object to form.

14:45:10  4          THE WITNESS:  No.  It could well be that annual

14:45:13  5   pay increases still kept people within the salary range

14:45:17  6   even though they were targeting pay for performance as a

14:45:20  7   function so that the annual increase was a function of

14:45:23  8   performance.

14:45:25  9   BY MS. DERMODY:

14:45:59  10         Q.   Okay.  Going to paragraph 38, as indicated in

14:46:16  11  38, you would agree, wouldn't you, that there are

14:46:18  12  occasions when pay is adjusted for employees who get

14:46:23  13  outside offers; is that right?

14:46:26  14         A.   As I say here, in relative rare instances, pay

14:46:30  15  may be adjusted to retain an employee when he or she

14:46:34  16  receives an outside offer.

14:46:39  17         Q.   And on what evidence do you say that this is a

14:46:41  18  rare occasion?

14:46:44  19         A.   I say it based on the evidence from the

14:46:46  20  depositions where people are often asked how often they

14:46:50  21  counteroffer, and they say it's very rare, and it's

14:46:54  22  only -- counteroffers are only made to those individuals

14:46:57  23  who are star performers.

14:46:58  24         Q.   Did you also see deposition evidence that

14:47:01  25  showed companies acting proactively preemptively to

14:47:05  1   adjust salaries to avoid retention or attrition risks?

14:47:12  2       A.   There is a way in which companies react

14:47:14  3   proactively, and react -- I mean how -- there is a way in

14:47:17  4   which companies attempt to preempt people leaving, and

14:47:22  5   the way they do that is by gathering market data so that

14:47:25  6   they target the market wage to what is the alternative

14:47:30  7   wage would be for the employee.

14:47:39  8       Q.   And isn't one of the ways to ascertain what the

14:47:42  9   market rate is for employees by finding out what

14:47:45 10   competitors are offering for those jobs?

14:47:48 11            MR. KIERNAN:  Object to form.

14:47:49 12            THE WITNESS:  The way in which they act

14:47:51 13   preemptively is by gathering data from firms like Radford

14:47:54 14   to find out what the ongoing salaries are and also using

14:47:58 15   data on equity and bonus to try and pay people what their

14:48:02 16   alternative wage would be.

14:48:03 17   BY MS. DERMODY:

14:48:04 18       Q.   Is it your testimony that companies did not use

14:48:06 19   competitive offers to ascertain what the market is paying

14:48:09 20   for salaries?

14:48:11 21            MR. KIERNAN:  Object to form.

14:48:12 22            THE WITNESS:  What -- what companies do is they

14:48:14 23   use the Radford data and like Radford data to figure out

14:48:19 24   what the alternative wage is at companies.

         25   //

| | | |
|---|---|---|
| 14:48:21 | 1 | BY MS. DERMODY: |
| 14:48:22 | 2 | Q.   May I ask again since you didn't answer the |
| 14:48:24 | 3 | question. |
| 14:48:24 | 4 | Is it your testimony that companies did not use |
| 14:48:26 | 5 | competitive offers to ascertain what the market is paying |
| 14:48:29 | 6 | for salaries?  "Yes" or "no"? |
| 14:48:31 | 7 | MR. KIERNAN:  Object to form. |
| 14:48:31 | 8 | THE WITNESS:  I don't know that I testified to |
| 14:48:33 | 9 | that earlier.  Do you have those words? |
| 14:48:35 | 10 | BY MS. DERMODY: |
| 14:48:35 | 11 | Q.   I'm trying to understand what your testimony |
| 14:48:37 | 12 | is.  You said the companies use Radford data.  Is that |
| 14:48:40 | 13 | the only thing they use, but do they also use competitive |
| 14:48:44 | 14 | offers? |
| 14:48:44 | 15 | MR. KIERNAN:  Object to form. |
| 14:48:46 | 16 | THE WITNESS:  They will on occasion match a |
| 14:48:47 | 17 | competitive offer in rare instances where people -- where |
| 14:48:52 | 18 | a person is a star performer. |
| 14:48:54 | 19 | BY MS. DERMODY: |
| 14:48:54 | 20 | Q.   And we're talking now about preemptive |
| 14:48:58 | 21 | strategies to prevent attrition, correct? |
| 14:49:02 | 22 | A.   Okay. |
| 14:49:03 | 23 | Q.   And one of the ways that you testified they |
| 14:49:08 | 24 | use -- they ascertain they should -- they should use a |
| 14:49:15 | 25 | preemptive strategy is by using market data; is that |

14:54:01  1   And certainly during the recession that was less so.

14:54:04  2   BY MS. DERMODY:

14:54:05  3       Q.   Are you aware that in the Valley, in general,

14:54:07  4   in the last eight years, there has been a very high

14:54:11  5   demand for engineering talent?

14:54:13  6       A.   Again, you'd have to state what it means to be

14:54:16  7   a very high demand.

14:54:18  8       Q.   Would you admit that there has been a demand

14:54:20  9   for engineering talent, Dr. Shaw?

14:54:22  10      A.   The demand was higher prior to the recession, I

14:54:25  11  would admit that.

14:54:26  12      Q.   And prior to 2009?

14:54:28  13      A.   Prior to -- right, prior to the recession in

14:54:31  14  2009.

14:54:31  15      Q.   And did you make any attempt to determine

14:54:38  16  whether there was more resistance to technical people

14:54:46  17  leaving firms when there was such a high demand in that

14:54:49  18  time period?

14:54:51  19          MR. KIERNAN:  Object to form.

14:55:07  20          THE WITNESS:  I don't -- I don't know what

14:55:08  21  you're referring to.  Did I do a study to see what

14:55:11  22  turnover changed with the business cycle?  Is that what

14:55:14  23  you're asking?

14:55:14  24  BY MS. DERMODY:

14:55:15  25      Q.   Or whether there was fewer people considered

| | | |
|---|---|---|
| 14:55:22 | 1 | lower achievers in that cycle. |
| 14:55:25 | 2 | MR. KIERNAN:  Object to form. |
| 14:55:33 | 3 | THE WITNESS:  There are lower achievers every |
| 14:55:35 | 4 | year.  I'm not sure what -- what study you want me to do. |
| 14:55:38 | 5 | BY MS. DERMODY: |
| 14:55:39 | 6 | Q.    You didn't do anything with performance ratings |
| 14:55:42 | 7 | in this case; is that right? |
| 14:55:43 | 8 | A.    That's correct. |
| 14:56:38 | 9 | Q.    In the course of your investigation in this |
| 14:56:41 | 10 | case, did you come across information about the Google |
| 14:56:44 | 11 | Big Bang? |
| 14:56:46 | 12 | A.    Yes, I did. |
| 14:56:47 | 13 | Q.    And what's your understanding what that was? |
| 14:56:50 | 14 | A.    My understanding is that over time Google has |
| 14:56:59 | 15 | evolved from a company that paid out a significant |
| 14:57:02 | 16 | portion of their pay in equity and shifted during the Big |
| 14:57:06 | 17 | Bang to a significant portion of their pay in base |
| 14:57:09 | 18 | salary, because their employees had aged over time, and |
| 14:57:12 | 19 | because stock was worth less.  So they decided to shift |
| 14:57:17 | 20 | more towards base and away from stock. |
| 14:57:19 | 21 | Q.    And aren't you aware that as a result of the |
| 14:57:22 | 22 | change, every employee's base salary went up 10 percent? |
| 14:57:25 | 23 | A.    Yes, I am. |
| 14:57:26 | 24 | MR. KIERNAN:  Object to form. |
| | 25 | // |

| | | |
|---|---|---|
| 14:57:27 | 1 | BY MS. DERMODY: |
| 14:57:27 | 2 | Q.   And are you aware that that happened after the |
| 14:57:29 | 3 | Department of Justice investigated Google and others for |
| 14:57:32 | 4 | the no cold calling agreements and stopped them from |
| 14:57:35 | 5 | doing that? |
| 14:57:36 | 6 | A.   Stopped them from doing what? |
| 14:57:38 | 7 | Q.   Having no cold call agreements. |
| 14:57:40 | 8 | MR. KIERNAN:  Object to form. |
| 14:57:44 | 9 | THE WITNESS:  Yes.  It occurred after the |
| 14:57:46 | 10 | Department of Justice investigation.  I'm -- that's true. |
| 14:57:49 | 11 | BY MS. DERMODY: |
| 14:58:09 | 12 | Q.   And isn't the Google Big Bang an example of a |
| 14:58:13 | 13 | company making a corporate-wide change to salary that |
| 14:58:16 | 14 | affected every employee at the company? |
| 14:58:19 | 15 | MR. KIERNAN:  Object to form. |
| 14:58:20 | 16 | THE WITNESS:  They were making an adjustment in |
| 14:58:22 | 17 | how they paid people during one instance, but that |
| 14:58:26 | 18 | doesn't mean that they -- that -- that that was one pay |
| 14:58:30 | 19 | adjustment across all employees, but that doesn't mean |
| 14:58:33 | 20 | that they were -- that this is a common, you know, |
| 14:58:37 | 21 | change.  No other companies made such a change. |
| 14:58:40 | 22 | BY MS. DERMODY: |
| 14:58:41 | 23 | Q.   But you didn't study their compensation to |
| 14:58:43 | 24 | confirm that, did you? |
| 14:58:45 | 25 | MR. KIERNAN:  Object to form. |

14:58:47  1          THE WITNESS:  I didn't study their compensation

14:58:48  2   to confirm what?

14:58:49  3   BY MS. DERMODY:

14:58:49  4      Q.    That the other companies didn't make a global

14:58:52  5   change to compensation.  That's not an empirical

14:58:59  6   statement, is what I'm asking you.

14:59:01  7      A.    That's not an empirical statement.

14:59:04  8      Q.    Dr. Shaw, other than what you've stated in your

14:59:18  9   report and testified to today, is there anything else in

14:59:22 10   the Hallock report that you disagree with?

14:59:34 11      A.    I've stated that I felt there were no avenues

14:59:37 12   whatsoever by which he has shown that there was an impact

14:59:41 13   from pay suppression to all or nearly all employees.  I

14:59:47 14   can't say that there isn't anything else in his entire

14:59:49 15   report I wouldn't disagree with.  I didn't look at it

14:59:52 16   with that in mind.

14:59:54 17      Q.    Other than what's in your report and what

14:59:56 18   you've said here today, do you have any other opinions

14:59:59 19   about what you just said about Dr. Hallock's conclusions?

15:00:05 20      A.    I believe he hasn't shown any evidence

15:00:08 21   whatsoever that there -- that pay suppression was -- was

15:00:14 22   propagated to all or nearly all employees.

15:00:17 23      Q.    So your primary criticism of him is that he

15:00:20 24   hasn't shown the actual pay decisions and the impact that

15:00:24 25   resulted from the no cold calling; is that correct?

15:00:27 1          MR. KIERNAN:  Object to form.

15:00:31 2          THE WITNESS:  I believe he hasn't looked

15:00:33 3  carefully at the pay practices that are actually utilized

15:00:37 4  by these companies and that this is a pay performance

15:00:39 5  environment and that as a result of that, the -- that

15:00:43 6  there would not be propagation from a few employees to

15:00:47 7  many or all employees.

15:00:49 8  BY MS. DERMODY:

15:00:49 9      Q.   Okay.  And other than what you've just said, is

15:00:52 10 there anything else you would say that's not already

15:00:54 11 covered in your report or that you've testified to that's

15:00:57 12 an opinion that you would express in this case about

15:01:00 13 Dr. Hallock's work?

15:01:08 14     A.   About his report.

15:01:09 15     Q.   Yes.

15:01:12 16     A.   I don't have any line-by-line commentary on his

15:01:16 17 report.

15:01:17 18     Q.   Okay.  So there is nothing else to add.  I just

15:01:19 19 want to make sure.

15:01:21 20     A.   Correct.

15:01:22 21     Q.   Okay.  I'm just going to ask you, in terms of

15:01:27 22 today's deposition, did you meet with counsel to prepare

15:01:30 23 for it?

15:01:32 24     A.   Yes.

15:01:33 25     Q.   And when was that?

16:41:16  1           I, Rosalie A. Kramm, Certified Shorthand

16:41:16  2   Reporter licensed in the State of California, License No.

16:41:16  3   5469, hereby certify that the deponent was by me first

16:41:16  4   duly sworn and the foregoing testimony was reported by me

16:41:16  5   and was thereafter transcribed with computer-aided

16:41:16  6   transcription; that the foregoing is a full, complete,

16:41:16  7   and true record of said proceedings.

16:41:16  8           I further certify that I am not of counsel or

16:41:16  9   attorney for either of any of the parties in the

16:41:16 10   foregoing proceeding and caption named or in any way

16:41:16 11   interested in the outcome of the cause in said caption.

16:41:16 12           The dismantling, unsealing, or unbinding of the

16:41:16 13   original transcript will render the reporter's

16:41:16 14   certificates null and void.

16:41:16 15           In witness whereof, I have hereunto set my hand

16:41:16 16   this day:   July 6, 2013.

16:41:16 17              ___X____  Reading and Signing was requested.

16:41:16 18              _____  Reading and Signing was waived.

16:41:16 19              _____  Reading and signing was not requested.

16:41:16 20

16:41:16 21                        _____

16:41:16 22                        ROSALIE A. KRAMM

16:41:16 23                        CSR 5469, RPR, CRR

16:41:16 24

15:12:19 25

Deposition of Kathryn Shaw, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

15:12:19    1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25