# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

CONFIDENTIAL – TO BE FILED UNDER SEAL
SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| IN RE: HIGH-TECH EMPLOYEES ANTITRUST LITIGATION | No.  11-CV-2509-LHK |
| THIS DOCUMENT RELATES TO: | |
| ALL ACTIONS | |

EXPERT REPORT OF MATTHEW MARX

October 28, 2013

## TABLE OF CONTENTS

**Page**

I.  Experience and Qualifications ............................................................................................ 1

II.  Introduction, Assignment, and Summary of Conclusions ................................................. 1

III.  Defendants' Conspiracy, Including Defendants' Express Anti-Solicitation
Agreements .......................................................................................................................... 3

IV.  I Would Expect Agreements of this Sort to Reduce the Compensation of Class
Members ............................................................................................................................. 8

V.  Defendants' Conspiracy Was Not Reasonably Necessary to Achieve the
"Collaborations" and Other Goals they Identify................................................................ 12

VI.  Conclusion ......................................................................................................................... 23

## I.    Experience and Qualifications

1.    I am the Mitsui Career Development Professor of Entrepreneurship and Assistant
Professor of Technological Innovation, Entrepreneurship, and Strategic
Management at the Massachusetts Institute of Technology Sloan School of
Management.  I earned a B.S. degree in Symbolic Systems from Stanford
University in 1993, an S.M. degree in Media Arts and Sciences from MIT in
1995, an MBA degree from Harvard Business School in 2005, and a Doctor of
Business Administration degree from Harvard Business School in 2009.  I have
published work in peer-reviewed journals including Management Science and the
American Sociological Review.  I am an expert on the topic of employee non-
compete agreements.

2.    In addition to my academic experience, I spent approximately a decade working
at startup companies.  During this time I wrote thousands of lines of C++ code,
obtained seven U.S. patents, and led engineering teams of up to 75 workers.

a.    At Speechworks International (Boston, MA), I served as an engineer and
later Director of Customer Solutions and launched one of the first
commercial implementations of speech recognition technology for United
Airlines.  Speechworks completed an IPO in 2000.

b.    At Tellme Networks (Mountain View, CA), I reported to the CEO as Vice
President of Client Services and attended board meetings regularly.
Tellme was acquired by Microsoft Corporation in 2004 for approximately
$770MM.

c.    At Vlingo Corporation (Cambridge, MA), I helped write the initial
business plan and worked as a part-time consultant while completing my
doctoral studies.  Vlingo was acquired by Nuance Communications in
2011 for approximately $250MM.

3.    My curriculum vita is incorporated in this report as Exhibit 1.  My hourly rate for
time spent working on this matter is $500.

4.    I have in this report relied on the best information available to me at the time of
its preparation.  A list of documents on which I relied in the preparation of this
report is provided in Exhibit 2.

## II.   Introduction, Assignment, and Summary of Conclusions

5.    I have been asked to provide an expert opinion regarding the following questions.

- 1 -

a.  Would I expect agreements limiting competition for workers among the Defendants, such as the conspiracy alleged here, to reduce worker compensation?

b.  Was Defendants' conspiracy, including the express Anti-Solicitation agreements, reasonably necessary to achieve the "collaborations" and other goals identified in their interrogatory responses?

6.  Based on the documents I have reviewed, my professional experience, and my research on non-compete agreements, I have a number of conclusions expressed in the report, which I also summarize here.

a.  The Anti-Solicitation agreements evidenced by the exhibits, depositions, and Defendants' interrogatory responses do not simply represent autonomous choices made by individual companies.  Rather, directors, CEOs, advisors, and senior executives conspired to suppress cold-calling. Internal announcements confirm the reciprocal nature of these agreements.

b.  These Anti-Solicitation agreements were not independently arrived at by pairs of firms.  Rather, these illegal arrangements were disseminated through a tight network of co-located, interlocking owners, directors, and advisors.  The original Pixar-Lucasfilm arrangement was known to Pixar CEO Steve Jobs, who then instigated a similar agreement with Adobe and, though board member Eric Schmidt, with Google.  Google replicated the agreement with Intel's CEO, who sat on its board.  Intuit, whose chairman sat on Apple's board and also closely advised Google, requested to be brought into the fold.  All of these directors lived in the San Francisco Bay Area, though employees across the companies were affected.

c.  Although the Defendants claim that Anti-Solicitation agreements are critical to successful technical collaborations, the evidence does not support this contention.  First, Defendants successfully managed technical collaborations without Anti-Solicitation agreements.  Second, some Defendants attempted to establish Anti-Solicitation agreements with companies where no technical collaboration existed.  Third, the people most involved in establishing the collaborations testified they were unaware of the Anti-Solicitation agreements.  The contracts memorializing the collaborations make no reference to the Anti-Solicitation agreements. Fourth, the circumstances of how the Anti-Solicitation agreements were reached and enforced show that they were unrelated to collaborations. Instead, they were reached to eliminate competition for labor, suppress employee mobility, and suppress employee compensation.  Hence, the

challenged Anti-Solicitation agreements at issue were not, and could not have been, reasonably necessary to technical collaborations among them.

These Anti-Solicitation agreements were not limited to individuals involved in collaborations but rather extended to all employees of the firms involved. Moreover, and contrary to employee non-compete agreements, the vast majority of these workers (excepting HR recruiters and some senior executives) had no idea that their opportunities to learn of external job opportunities were being restricted in this way. Further, Defendants provide no justification whatsoever for the Anti-Solicitation conspiracy among them. There is none.

d.    It is clear from the evidence that the Anti-Solicitation agreements were established for the purpose of suppressing compensation. Certain co-conspirators used the pretext of "embarrassment" as justification, while others were clear in their desire to stem the outward flow of talent to competitors who were growing quickly, with no mention of technical collaborations. As Anti-Solicitation agreements limit the flow of job opportunities to workers, as do employee non-compete agreements, Anti-Solicitation agreements would indeed limit compensation in the way that Defendants' chief executives hoped they would. Indeed, it may be that Defendants enacted this secretive conspiracy in order to gain advantages beyond those afforded to companies by non-compete agreements, which are unenforceable in California.

III.    **Defendants' Conspiracy, Including Defendants' Express Anti-Solicitation Agreements**

7.    The Defendants in this case are a group of prominent, California-based technology companies: Adobe, Apple, Google, Intel, Intuit, Lucasfilm, and Pixar.[1]

---

[1] Adobe Systems Inc. ("Adobe") is a Delaware corporation with its principal place of business located at 345 Park Avenue, San Jose, California 95110, Apple Inc. ("Apple") is a California corporation with its principal place of business located at 1 Infinite Loop, Cupertino, California 95014, Google Inc. ("Google") is a Delaware corporation with its principal place of business located at 1600 Amphitheatre Parkway, Mountain View, California 94043, Intel Corp. ("Intel") is a Delaware corporation with its principal place of business located at 2200 Mission College Boulevard, Santa Clara, California 95054, Intuit Inc. ("Intuit") is a Delaware corporation with its principal place of business located at 2632 Marine Way, Mountain View, California 94043, Lucasfilm Ltd. ("Lucasfilm") is a California corporation with its principal place of business located at 1110 Gorgas Ave., in San Francisco, California 94129, and Pixar is a California

*Footnote continued on next page*

Before getting into the details of the individual Anti-Solicitation agreements, it is important to establish that the key issue is not simply that there were some number of Anti-Solicitation agreements to which Defendants were party and which fail the DOJ criteria for legitimate agreements necessary to a collaboration.

8.     First, these were hardly isolated agreements.  Apple, Google, and Pixar were party to at least two Anti-Solicitation agreements with other Defendants.  Apple and Google were party to three such agreements with other Defendants.  We also know that Apple and Google attempted to establish additional Anti-Solicitation agreements (with Palm and Facebook, respectively).

9.     Second, the Defendants' chief executives do not have a random geographic distribution but are concentrated in the San Francisco Bay Area.  All Defendants are headquartered in California, where strict labor laws limit the ability of companies to block their employees from leaving to join another company in a similar industry. The absence of enforceable non-compete agreements in California may help to explain why such a conspiracy would arise here.

10.    Third, the Anti-Solicitation agreements here all included the identical terms and had the identical scope.  They all prohibited solicitation of any employee, regardless of title, job duties, or geographic location.  They all had limitless scope, both in terms of limitless geographic reach and no expiration date.  I agree with the Court that it "strains credulity" that such identical agreements could have been reached in isolation.[2]

11.    Fourth, the Defendants are far from unconnected to each other.  Rather, they are interlinked through a thick network of ownership, governance, and friendship. These ties shed light on the motives behind the Defendants' assembly of a conspiracy to reduce interorganizational mobility of workers and, as a result, lower compensation.  It is important to note that in the absence of employee non-compete agreements, this network of Anti-Solicitation agreements enables the Defendants to (illegally) lower their labor costs as compared to non-Defendant competitors.

12.    Indeed, this desired end state is seen in the very first Anti-Solicitation agreement, between Lucasfilm and Pixar, as the principals of those companies freely admit in

_Footnote continued from previous page_
corporation with its principal place of business located at 1200 Park Avenue, Emeryville, California 94608.

[2] Order Granting In Part and Denying In Part Defendants' Joint Motion to Dismiss; Denying Lucasfilm LTD.'s Motion to Dismiss at 14:7-19

their depositions. Both companies are connected via ownership and governance to Apple CEO Steve Jobs, who personally purchased the Pixar division from Lucasfilm and served as its CEO. Unsurprisingly, these companies struck Anti-Solicitation agreements, as did other companies with ownership or governance connections.

13. The initial nexus of agreements among Jobs' own companies expanded considerably against an interwoven and insular group of leaders. Steve Jobs had mentored Google founders Brin and Page; CEO Schmidt served on the board of Apple; and Schmidt's primary mentor and advisor, Intuit Chairman Bill Campbell, sat with him on Apple's board. Google later entered into an Anti-Solicit agreement with Intuit at Campbell's request. Again, with Intel, there was a connection: Intel CEO Otellini sat on Google's board and learned of the agreement from Google's founders.

14. Perhaps as illuminating are Anti-Solicitation agreements that were sought but not consummated. Jobs, who already had multiple such agreements in place, threatened Palm CEO Ed Colligan with patent litigation if he did not join the network of agreements (he refused). Schmidt, who began to lose employees to Facebook, organized an effort to orchestrate an Anti-Solicitation agreement with Facebook. (Note that Intuit Chairman Bill Campbell was intimately involved in this effort.)

15. Taken together, what follows will show that the alleged Anti-Solicitation agreements were far from isolated, disconnected occurrences. Rather, they were part of a network of owners and directors who believed in suppressing mobility and compensation and who spread the idea to fellow CEOs and senior executives at similar companies where they were involved. Where their targets appeared weaker (e.g., Apple→Palm), they used threats. Where their targets appeared stronger (e.g., Intuit→Google, and later, Google→Facebook), they leveraged their professional and social connections to achieve their desired outcome.

16. I have reviewed the Plaintiffs' complaint and other court documents describing the company-to-company agreements designed to prevent one company from cold-calling employees of another company. I will refer to these as Anti-Solicitation agreements. My understanding is that the chronology of the alleged Anti-Solicitation agreements is as follows:[3]

---

[3] See ADOBE_001096-097 and 231APPLE002145 (Adobe-Apple); PIX00003419 (Apple-Pixar); 231APPLE002140 and 231APPLE073139 (Apple-Google); GOOG-HIGH TECH-

*Footnote continued on next page*

a.   In the mid-1980s, George Lucas and Ed Catmull established an Anti-Solicitation agreement between Lucasfilm and Pixar, stipulating that each other's employees were "hands off to each other in terms of soliciting talent."[4]  Lucas and Catmull were both explicit that the company-to-company Anti-Solicitation agreement was designed to suppress employee compensation.  Lucas noted "we cannot get into a bidding war with other companies."[5]  Catmull similarly noted that "it messes up the pay structure. It does. It makes it very high."[6]

b.   The next recorded Anti-Solicitation agreement was between Apple and Google in February of 2005.  Jobs expressed frustration with Google's hiring of Apple employees to Google founders Sergey Brin and Larry Page as well as Apple board member Bill Campbell,[7] who was advising Google CEO Eric Schmidt and "regularly attended" the company's executive staff and board meetings.[8]  Jobs threatened to go to "war" with Google unless Google agreed to his demands.[9]  Google CEO Eric Schmidt apparently agreed to stop soliciting Apple's employees, as evidenced by an email from Bill Campbell to Steve Jobs saying that "Eric [Schmidt] told me that he got directly involved and firmly stopped all efforts to recruit anyone from Apple."[10]  Moreover, Schmidt's action was coordinated with Apple, whose head of Human Resources, Danielle Lambert, internally announced the Anti-Solicitation agreement between the two companies: "Please add Google to your 'hands-off' list. We recently agreed not to recruit from one another so if you hear of any recruiting they are doing against us, please be sure to let me know.  Please also be sure to honor our side of the deal."[11]  Lambert also confirmed the existence of an agreement in an email to Steve Jobs: "We are researching Google to see who's there and learn what we can about their backgrounds, but are not directly calling them directly [sic] given the agreement you &

---

*Footnote continued from previous page*
00008281-284 (Google- Intel); GOOG-HIGH TECH-00008342-350 (Google-Intuit); and Deposition of James Morris, August 3, 2012 at p. 93 (Lucasfilm-Pixar).

[4] Deposition of George Lucas (96:19-25)

[5] Deposition of George Lucas (44:16-25)

[6] Deposition of Ed Catmull, (179:17-25)

[7] Exhibits 557, 1868, 1869

[8] Deposition of Shona Brown, (36:25-37:3)

[9] Exhibit 1871

[10] Exhibit 199

[11] Exhibit 563

Sergey struck not to recruit from one another."[12]  Google later terminated a recruiter who cold-called Apple employees in violation of the Anti-Solicitation agreement, with Google Vice President, People Shona Brown emailing Google CEO Schmidt and members of her team to "[p]lease make a public example of this termination with the group."[13]  That Google's practice of not cold-calling Apple's employees was not merely an internal-only policy, but in fact an agreement between the two companies, is underscored by Schmidt's relaying news of the recruiter's termination to Jobs along with his "apologies."[14]

c.   Very shortly thereafter, Google and Intel entered into another Anti-Solicitation agreement.  Google's senior executives told Paul Otellini, Google Director and Intel CEO, about their Anti-Solicitation agreement with Apple.[15]  Moreover, Otellini intended to keep the deal secret: "we have a handshake 'no recruit' between Eric and myself.  I would not like this broadly known."[16]

d.   Apple and Adobe followed suit after Jobs threatened Adobe CEO Bruce Chizen that he would solicit "any Adobe employee who is not a Sr. Director or VP".[17]  This Anti-Solicitation agreement was consummated in May of 2005.  Moreover, Jobs made clear that he expected such arrangements to be company-to-company: "I have a standing policy with our recruiters that we don't recruit from Adobe.  It seems you have a different policy.  One of us must change our policy.  Please let me know who."[18]

e.   In April of 2007, Pixar and Apple formalized an Anti-Solicitation agreement as evidenced by an email to Pixar's recruiting staff that "we won't directly solicit any Apple employee" and that Danielle Lambert of Apple "will ask her Recruiting team to follow the same procedure."[19]

---

[12] Exhibit 861

[13] Exhibit 192

[14] Exhibit 250

[15] Deposition of Sergey Brin (74:15); Deposition of Eric Schmidt (126:10-11)

[16] Exhibit 651

[17] Exhibit 223

[18] Exhibit 223

[19] Exhibit 139

        f.      Intuit Chairman Bill Campbell "requested that Intuit be added fully to the Do Not Call list" at Google;[20] Google agreed not to recruit from Intuit as of June 2007.

17.      These agreements ended no earlier than March 13, 2009, upon receipt of Civil Investigative Demands from the Antitrust Division of the United States Department of Justice.

## IV.    I Would Expect Agreements of this Sort to Reduce the Compensation of Class Members

18.      Aside from federal and state minimum wage laws, companies are under no legal obligation to pay their (non-union) employees any particular amount. Workers discover their market value by exploring potential matches at multiple companies and routinely negotiating compensation at the time of joining. This "price discovery" mechanism is described in extensive detail by Dr. Edward Leamer in his reports,[21] and I shall not repeat his argument here except to emphasize that cold-calling employees of other companies is a means of disseminating information regarding market value.

19.      Even if companies receive many applicants for posted openings, these may not represent the most attractive candidates. Jonathan Rosenberg of Google observed that "the people who apply, on average, aren't as good."[22] Even if such applicants were sufficiently attractive, the speed at which certain companies wish to grow may not be supported sufficiently by inbound applications. In June of 2004, prior to the institution of the Anti-Solicitation agreements with Apple and Intuit, Google VP, People Shona Brown emphasized that "[w]e will need to drain competitors to accomplish this rate of hiring" in an internal email including both founders and the CEO.[23]

20.      The rapid growth targeted by companies such as Google, and hoped for by investors including venture capitalists, is exactly the threat Pixar President Ed Catmull identifies as driving his decision to enter into Anti-Solicitation agreements: "Every time a [competitor] tries to grow rapidly…it seriously messes up the pay structure…by offering higher salaries to grow at the rate they desire, people will hear about it and leave…. We have avoided wars up here in Northern California because all of the companies up here…have conscientiously avoided

---

[20] Exhibit 597

[21] Expert Report of Edward E. Leamer, Ph.D.

[22] Deposition of Jonathan Rosenberg (27:19-32:7)

[23] Exhibit 1753

raiding each other."[24] Catmull explicitly admits that he entered into company-to-company Anti-Solicitation agreements for purposes of suppressing compensation.

21.   The post-employment covenant not to compete agreements (hereafter, "non-competes") I have studied resemble Anti-Solicitation agreements in that they limit workers' ability to explore potential employment opportunities outside of their current employer and thereby suppress compensation. However, they are significantly more limited in scope than what Defendants adopted here. I will give some background on the nature and use of non-competes and then discuss their implications for compensation.

   a.   A non-compete is a written agreement signed by an individual worker and a representative of an organization, with at least two stipulations regarding the types of employment the worker may not accept after separating from the current organization.

      i.   First, the non-compete designates a *field of service* in which the ex-employee will refrain from taking a job. Based on my review of several workers' non-compete agreements in my fieldwork, this is sometimes represented as a list of other organizations but more frequently is described as a type of occupation or industry. For example, a non-compete for an engineer working on database optimization might stipulate that the engineer cannot take a job doing database optimization after leaving the current firm.

      ii.   Second, the non-compete designates a *time period* following separation from the employer during which the ex-employee will refrain from taking a job in the designated field of service. In a survey I conducted of more than 1,000 members of the Institute of Electrical and Electronics Engineers, the duration of non-compete agreements ranged from six months to more than five years.[25]

   b.   These two stipulations combine to restrict the sorts of opportunities the worker may productively explore after separating from the firm. Although the non-compete contract only explicitly bans the worker from accepting an employment offer in the designated field of service for the designated time period following separation from the firm, the disincentive to the worker for exploring certain extraorganizational job opportunities is clear.

---

[24] Exhibit 154

[25] Marx, Matt, "The Firm Strikes Back: Non-compete Agreements and the Mobility of Technical Professionals." American Sociological Review 76(5):695-712.

Moreover, jobs most likely to make use of the worker's skills and thus likely to present the most attractive opportunities are exactly those circumscribed by the non-compete. Accordingly, non-competes impact workers in at least two ways.

i. First, non-competes act as a brake on interorganizational mobility. The causal effect on non-competes has been established in two articles, one where I am an author and the other by Mark Garmaise of the Finance Group at the University of California, Los Angeles Anderson School of Management. In the former, my coauthors and I exploit the inadvertent reversal of non-compete enforcement policy in Michigan during 1985. Prior to the reversal, Michigan had proscribed non-compete agreements. Comparing rates of interorganizational mobility between Michigan and a group of control states, We find that the job mobility of patenting inventors in Michigan dropped by 8.1% compared to inventors in states that continued to proscribe non-competes. Moreover, the effect is twice as strong for inventors with specialized technical skills.[26] Garmaise found similar results regarding the mobility of executives in large public firms.[27]

ii. Second, non-compete agreements reduce compensation. I found preliminary evidence of this effect in my fieldwork, which included 52 in-depth interviews and a survey of more than 1,000 members of the Institute of Electrical and Electronics Engineers. My research showed that employees subject to non-competes who nonetheless left their jobs also left their industry, taking less attractive jobs in fields where they could not use their skills. *"I intentionally looked for general-purpose programming, and I took a substantial pay cut to go there,"* said one scientist with a Ph.D who was blocked from taking another job in her field by a non-compete agreement.[28] Large-sample evidence for the causal effect of non-competes on compensation comes from the aforementioned

[26] Marx, Matt, Deborah Strumsky, and Lee Fleming, "Mobility, Skills, and the Michigan Non-Compete Experiment," Management Science, 55 (2009), 875-889.

[27] Garmaise, Mark, "The Ties That Truly Bind: Noncompetition Agreements, Executive Compensation, and Firm Investment," Journal of Law, Economics, and Organization, 27(2):376-425.

[28] Marx, Matt, "The Firm Strikes Back: Non-compete Agreements and the Mobility of Technical Professionals." American Sociological Review 76(5):695-712.

article by Garmaise, based on three separate alterations of state-level non-compete enforcement policies in Texas, Florida, and Louisiana. He finds that executive compensation varies inversely with increases in the strength of non-compete enforcement.

22. There are of course differences between non-compete agreements and Anti-Solicitation agreements.[29] First, non-compete agreements are between employers and employees—usually in writing—both of which have knowledge of what they are covenanting (not) to do. By comparison, the alleged Anti-Solicitation agreements were struck between executives of different companies, without the knowledge of the vast majority of employees affected by the agreements. Second, non-compete agreements do not bar the employee from approaching or being approached by other companies, or even interviewing with those companies; they only bar the employee from taking the job. Thus an employee subject to non-compete agreements could in theory explore outside options even without the intention of leaving the current employer and thus without breaking their covenant. By contrast, the alleged Anti-Solicitation agreements necessarily curtail the flow of information from external companies to the employee, to the extent that a given employee might otherwise have been cold-called. Third, as noted above, non-compete agreements must be limited as to the field of service and the duration of the restriction. By contrast, the alleged Anti-Solicitation agreements were not constrained as to duration or the types of employees who were covered. As such, they are more akin to the "general" restraints outlawed by the 1711 *Mitchell v. Reynolds* decision, which allowed only for "particular" or limited contractual restraints on the ability of employees to search for and obtain new employment. In addition, the vast majority of workers affected by an Anti-Solicitation clause were wholly unaware of its existence and did not agree to it. While one might make the argument that workers who enter into non-competes "know what they are getting into" the same can hardly be said of the Class here.

---

[29] There is also another type of agreement, often called a "non-solicit" which may sound like the Anti-Solicitation agreements which are the subject of this report. However, a "non-solicit" is, like a non-compete, a contract between an individual and an organization, *not* between two or more organizations. Non-solicits, which I believe are valid in all 50 states including where non-compete agreements are unenforceable, stipulate that for some period of time following the worker's separation from the firm, that worker will not personally recruit (or set in motion, for instance by providing a referral to a recruiter), former co-workers at the ex-employer. Note that such an agreement would not preclude the worker's new employer cold-calling workers at the former firm, as long as they were not referred by the worker who signed the non-solicit agreement. The two types of agreements should not be confused.

V.    **Defendants' Conspiracy Was Not Reasonably Necessary to Achieve the "Collaborations" and Other Goals they Identify**

23.    Prior to this case, I had never heard of companies agreeing not to recruit any of each other's employees, either in my academic or business-world experience. First, I am unaware of any scholarly investigation of company-to-company Anti-Solicitation agreements. Second, during my time in the business world I spent several years working at high-technology companies not unlike the Defendants and where technical collaborations were routine. As Vice President of Client Solutions at Tellme Networks, I led a team of several dozen engineers and managed a multi-year technical collaboration with Nuance Communications, a company also focused on speech recognition. The employees of each company possessed skills valued by the other and might have been at risk of being recruited away via cold calls. Moreover, other parts of the company had technical collaborations with other companies. Although I reported to the CEO and frequently attended board meetings, I am unaware of any discussion of Anti-Solicitation agreements between Tellme and any other company.

24.    I have reviewed Defendants' interrogatory responses in which they claim that the company-to-company Anti-Solicitation agreements were essential to the successful execution of important technical collaborations. I note at the outset that no Defendant attempts any justification of the conspiracy at issue— Defendants deny the existence of the conspiracy and instead address only the express Anti-Solicitation agreements. Defendants' arguments are as follows:

a.    While Google denies reaching any Anti-Solicitation agreement with any other company, it justifies what it asserts are only internal, unilateral policies not to solicit any employee of Apple, Intel, and Intuit because Google claims that it "perceived that engaging in cold-calling of these companies' employees could jeopardize the important collaborative and business relationships between Google and those companies."[30]

b.    Adobe claimed that "the non-solicitation policy between Adobe and Apple fostered a close working relationship over the last thirty years" including "over 200 cooperative agreements."[31]

c.    Intuit denies reaching an Anti-Solicitation agreement with Google, yet it argues that "[i]f one or the other company is using the collaboration as an

---

[30] Google Inc.'s Responses to Plaintiff's Second Set of Interrogatories at 9.

[31] Defendant Adobe Systems Inc.'s Amended Response to Plaintiff's Second Set of Interrogatories Directed to Defendant Adobe Systems Inc. 5, 6.

-12-

opportunity to identify the other company's best employees for the purpose of recruiting them, it will create a lack of trust and a disincentive to assign the best employees for them to be as open with each other."[32]

d.     Apple claimed that it was necessary to reach understandings with its labor competitors to "refrain from actively recruiting each other's employees" to "assure[] Apple's partners that Apple will not use the knowledge it gains through its collaboration to 'cherry pick' its partners' employees…[because] such solicitations are disruptive to the relationships."[33]

e.     Lucasfilm claimed that its collaborations with Pixar, including RenderMan, "would not have been possible without the full commitment of and long-term institutional input from both Pixar and Lucasfilm…if the companies were to actively raid one another's best employees during those collaborations, that could destabilize production teams."[34]

f.     Pixar claimed that the Anti-Solicitation agreement with Lucasfilm avoided "cold-calling activity that could be harmful to that close relationship and disruptive to these beneficial collaborations."[35] Regarding its Anti-Solicitation agreement with Apple, Pixar claimed its relationship with Apple was "assisted by the fact that the companies did not engage in cold-calling activity that could be harmful to that close relationship and disruptive to these beneficial collaborations."[36]

g.     Intel defends its Anti-Solicitation agreement with Google in similar ways. It argues that the hiring of its employees by a technical collaborator was

---

[32] Defendant Intuit Inc.'s Response to Plaintiff's Second Set of Interrogatories Directed to Defendant Intuit Inc.(6:17-20)

[33] Defendant Apple Inc.'s Amended Responses to Plaintiff's Second Set of Interrogatories (7:9-13)

[34] Defendant Lucasfilm Ltd.'s Supplemental Objections and Responses to Plaintiff's Second Set of Interrogatories (9:1-2, 10:13-15)

[35] Defendant Pixar's Supplemental Objections and Responses to Plaintiff's Second Set of Interrogatories (6:27-7:2)

[36] Defendant Pixar's Supplemental Objections and Responses to Plaintiff's Second Set of Interrogatories (8:14-17)

seen as "significantly undermin[ing]" trust; "causing significant ill will"; and "had significant negative repercussions on the collaboration.[37]

25.    Defendants thus argue that the Anti-Solicitation agreements are essential for a successful technical collaboration.  If one takes this argument at face value, then a rational company should adopt Anti-Solicitation agreements if and only if undertaking a technical collaboration with another firm. This implies two actions:

   a.    Every Anti-Solicitation agreement between two companies should be tied to a corresponding technical collaboration.

   b.    Every technical collaboration should have an Anti-Solicitation agreement in place between the two companies.

The evidence, however, shows that the Defendants' adoption of Anti-Solicitation agreements hardly mirrors the behavior of a company whose purpose in using Anti-Solicitation Agreements is to foster the success of technical collaborations.

26.    First, some Defendants entered (or attempted to enter) into Anti-Solicitation agreements without a corresponding technical collaboration.

   a.    In August of 2007, Jobs threatened Palm CEO Ed Colligan that "if Palm did not agree to such an arrangement, Palm could face lawsuits alleging infringement of Apple's many patents." Colligan declined the invitation via email that same month.[38] Nothing in the exchange between Jobs and Colligan addresses any technical collaboration either existing or contemplated.

   b.    In March 2008, Google executives discussed establishing an Anti-Solicitation agreement with Facebook.[39] Bill Campbell pressed Google to seek a "truce" with Facebook.[40] He stated: "there was a sense that if we had a mutual nonrecruiting or, you know, let's say a non-cold-calling arrangement, it would be good."[41] The invitation was extended by Jonathan Rosenberg of Google, who "expressed concerned about what he described as the perceived rate at which Facebook could hire employees

---

[37] Intel's Objections and Amended and Supplemented Responses to Plaintiff's Second Set of Interrogatories (13:3-15:8)

[38]Declaration of Edward T. Colligan (2:7-17)

[39] Exhibit 614

[40] Exhibit 667

[41] Deposition of William Campbell (142:17-20)

from Google." Facebook COO Sheryl Sandberg however "declined at that time to limit Facebook's recruitment or hiring of Google employees."[42] Rosenberg remarked that "I don't feel that I had a satisfactory response from Sheryl [Sandberg] in achieving my objective…to reduce the overall number of employees that [Facebook] was hiring from Google."[43] Neither Campbell nor Rosenberg mentions a technical collaboration as a driver of seeking an Anti-Solicitation agreement with Facebook.

27.    Second, some Defendants failed to establish Anti-Solicitation agreements at the time they undertook important technical collaborations. This is evident both in technical collaborations that long pre-date the establishment of an Anti-Solicitation agreement as well as collaborations with non-Defendant companies.

    a.    In its interrogatory response, Adobe claims to have executed more than 200 technical collaborations with Defendant Apple over a nearly thirty-year period. As described above, however, the Anti-Solicitation agreement between Adobe and Apple was not consummated until May of 2005. The email exchange between the CEOs of the two companies indicates the prior absence of an Anti-Solicitation agreement. Chizen initially responds by saying "I thought we agreed not to recruit any senior level employees…I would propose we keep it this way" but then backs down when Jobs threatens to recruit "any Adobe employee who is not a Sr. Director of VP."[44] Acquiesces Chizen, "I'd rather agree NOT to actively solicit any employee from either company…if you are in agreement I will let my folks know."[45] Adobe's vice president of Human Resources announces the next day to her team of recruiters that "Bruce and Steve Jobs have an agreement that we are not to solicit ANY Apple employees, and vice versa."[46] The CEO exchange coupled with the communication to HR makes clear two aspects of the May 2005 Anti-Solicitation agreement.

        i.    First, it represented a clear change in practice within Adobe. Prior to Bruce Chizen, Adobe co-founder John Warnock served as CEO since the inception of the company and covering the period of during which Apple and Adobe claim to have had many

---

[42] Declaration of Non-Party Sheryl Sandberg (2:2-8)

[43] Deposition of Jonathan Rosenberg (132:2-9)

[44] Exhibit 223

[45] Exhibit 223

[46] Exhibit 225

collaborations. In his deposition, Warnock said "There was a contract written in late 1983 between Apple and Adobe."[47] When asked whether that contract contained an agreement not to recruit each other's employees, Warnock responded, "I don't believe so."[48]

ii. Second, the timing of this Anti-Solicitation agreement indicates that many of the technical collaborations between Apple and Adobe occurred without Anti-Solicitation agreements, including a period when "essentially all of Adobe's revenue came from Apple, and all of its resources were devoted to the companies' shared vision."[49] Both Defendants' interrogatory responses suggest that these were very successful collaborations, even though the 2005 Anti-Solicitation agreement had not yet been entered into.

b. There are likewise many technical collaborations with non-Defendants that are nonetheless unsupported by Anti-Solicitation agreements. While it is impossible to inventory all such collaborations, non-Defendant Microsoft may serve as a suitable counterexample. At least two of the Defendants have had multiple and/or long-term technical collaborations with Microsoft, but these are not mentioned in any of the Defendants' interrogatory responses. If Anti-Solicitation agreements were so critical to the successful of technical collaborations, one might have expected such between Microsoft and either of Intel and Apple.

i. Intel has been the dominant supplier of microprocessors for PCs with the Microsoft Windows operating system (hence the "wintel" nickname), requiring a long-term technical collaboration to ensure the success of the platform. As recently as 2009, the two companies held a joint press conference to explain that the two companies kicked off their collaboration on Windows 7 "the day after Vista shipped" (January 30, 2007, i.e., more than two years

---

[47] Deposition of John Warnock (24:24-25)

[48] Deposition of John Warnock (24:19-25:17)

[49] Defendant Adobe Systems Inc.'s Amended Response to Plaintiff's Second Set of Interrogatories Directed to Defendant Adobe Systems Inc. at 5

before the DOJ ruling) including a "timer coalescing" API that keeps the CPU in a low-power state as long as possible.[50]

ii.    Apple might seem a less obvious collaborator of Microsoft than Intel, but the competitors have found multiple occasions to collaborate starting in 1997, when Apple took a $150MM investment from Microsoft. Steve Jobs announced at MacWorld that the two companies would "work together on Java" and that Microsoft's Internet Explorer would become the default browser for its Macintosh line of computers, not unlike the collaboration Apple described as necessary to make Google the default search engine in its Safari browser or Google Maps the default mapping application on the iPhone. In 2003, Apple released its iTunes music application for Windows,[51] which required an iPod to be detected via a USB connection whereas Macintosh computers used FireWire ports. Moreover, just as Apple collaborated with Adobe to ensure that its software ran properly on Macintosh, Microsoft Office required substantial adaptation since its original 4.2 release in 1994 as customers complained it was not "Mac-like" enough.[52]

28.    Third, the individuals who managed and negotiated the collaborations deny any knowledge that the Anti-Solicitation agreements existed, and deny that the issue of Anti-Solicitation agreements ever came up during negotiations over collaborations. For example, Google engineering executive Alan Eustace reported no knowledge of Anti-Solicitation agreements associated with the multiple collaborations he managed with Apple. In 2007, Eustace took over primary responsibility for the relationship with Apple,[53] including the placement of Google Maps on the iPhone and Google as the primary search engine in the Safari browser. Eustace said that neither contract contained an Anti-Solicitation

---

[50] Poeter, D. "Microsoft, Intel Tout Their Collaboration on Windows 7." *CRN*. September 1, 2009. Available at http://www.crn.com/blogs-op-ed/the-channel-wire/219500867/microsoft-intel-tout-their-collaboration-on-windows-7.htm, accessed 18 October 2013.

[51] McLaughlin, K. "Microsoft and Apple Actually Don't Loathe Each Other, and Here Are Examples of Them Working Together." *Business Insider, 28 June 2013. Available at* http://www.businessinsider.com/how-microsoft-and-apple-work-together-2013-6, accessed 18 October 2013

[52] "Office Macintosh Edition: a History of "Mac-First"". Microsoft press release, April 26. 1999. Available at http://www.microsoft.com/en-us/news/features/1999/04-26macoffice.aspx, accessed 18 October 2013

[53] Deposition of Alan Eustace (55:15-19)

agreement.[54] When asked whether even the negotiation surrounding these contracts raised the issue of Anti-Solicitation, Eustace replied "I do not recall any provision that had anything to do with cold calling in that agreement."[55] With respect to Apple, then-COO Tim Cook also denied knowledge of any Anti-Solicitation agreements: "I'm not aware of an agreement that Apple had with Google"[56] regarding cold calling. This seems plausible, given that by Cook's account "I believe the entire time I was COO, was that HR reported in to the CEO, who was Steve [Jobs]."[57] If so, then Cook might well not have been aware of email communications between CEO Jobs and HR head Danielle Lambert regarding the Anti-Solicitation agreements[58] even though he as COO was responsible for the success of the collaboration. The fact that the COO of Apple apparently had no knowledge of these illicit agreements that Apple now asserts were somehow key to successful collaborations speaks volumes.

29.    Thus the record shows that the Anti-Solicitation agreements did not have anything to do with these supposed collaborations. They were established for other reasons including to exert market power over a competitor, as in the case of Apple threatening Palm with patent-infringement lawsuits if they did not agree, or in order to avoid losing employees to another company, such as Google's entreaty to Facebook or Intuit's request of Google. Moreover, it is apparent that social factors having nothing to do with technical collaborations played a significant role in the adoption of the Anti-Solicitation agreements.

a.    All but one of the Anti-Solicitation agreements existed between two companies sharing an owner, CEO, board member, or key advisor. Apple CEO Steve Jobs was also CEO of Pixar (with whom it had an Anti-Solicitation agreement), which he had purchased from Lucasfilm (with which Pixar had a long-standing Anti-Solicitation agreement). Intel CEO Paul Otellini served on Google's board (with which it had an Anti-Solicitation agreement), and whose CEO Eric Schmidt served on Apple's board (with which it had an Anti-Solicitation agreement).

---

[54] Deposition of Alan Eustace (116:6-19; 119:12-120:4)

[55] Deposition of Alan Eustace (120:11-18) (regarding Search contract negotiations); (118:6-22) (regarding Maps contract negotiations)

[56] Deposition of Tim Cook (17:2-18:1)

[57] Deposition of Tim Cook (39:4-5)

[58] Exhibits 139, 563, and 861

b.   Intuit Chairman Bill Campbell served as an advisor to Google CEO Eric
Schmidt, attending weekly meetings held by Google executive
management.[5960]

c.   Moreover, the personal relationships and frequency of contact between
certain Defendants extends beyond occasional board meetings.  Intuit
Chairman Bill Campbell describes Apple CEO Steve Jobs as a "[v]ery,
very, very good friend."[61]

d.   In his deposition, upon stating that he asked Google VP People Shona
Brown to add Intuit to its do-not-call list, Chairman Bill Campbell
explained the circumstances surrounding his request: "I was quite
*embarrassed* by that with my own company, that I was there in such an
intimate position helping Google and Google was recruiting—cold-calling
our employees. So I asked them if they would stop doing that" (emphasis
added).[62]  In a similar vein, Apple argued that Anti-Solicitation
agreements "avoid creating an actual or apparent conflict of interest or any
appearance of impropriety arising from a Board member's dual roles at
different companies."[63]  Helping a board member or key advisor avoid the
appearance of impropriety—or personal embarrassment—is far different
from ensuring the success of a technical collaboration.

30.   The requirements of the DOJ consent decree offer multiple provisions for
distinguishing Anti-Solicitation agreements ancillary to legitimate
collaborations:[64]

a.   *identify, with specificity, the agreement to which it is ancillary.*

Defendants have produced no ex ante evidence of Anti-Solicitation
agreements (i.e., written contracts or emails) stating that such agreement
was tied to a specific technical collaboration.  Rather, the emails
documenting such agreements are general and do not refer to a specific
project or subset of employees affected.  Moreover, Defendants
memorialized their collaborations in written contracts, many of which I

---

[59] Deposition of William Campbell (21:3-22:10)

[60] Deposition of Shona Brown (166:21-23)

[61] Deposition of William Campbell (20:23)

[62] Deposition of William Campbell (28:23-29:10)

[63] Defendant Apple Inc.'s Amended Responses to Plaintiff's Second Set of Interrogatories
(10:16-21)

[64] Stipulation to Enter Final Judgment (5)

have reviewed. I understand that these contracts do not include any reference to the Anti-Solicitation Agreements at issue. For example, the licensing agreement for Google Mail to Apple (signed by Kent Walker and Phil Schiller of Google and Apple, respectively) says nothing regarding recruiting restrictions.[65] The only mention of employee governance I could find in the contracts I reviewed is a section describing the lack of collective bargaining agreements among the Lucasfilm employees who would join Pixar, and a list of said employees.[66] Instead, the evidence demonstrates that the Defendants' senior executives entered into the Anti-Solicitation Agreements separately, in order to eliminate competition for their employees, not to facilitate collaborations.

b.  *be narrowly tailored to affect only employees who are anticipated to be directly involved in the agreement, and identify with reasonable specificity the employees who are subject to the agreement*

The Anti-Solicitation agreements applied to all employees of both companies. As an example, the Apple-Google agreement had "stopped all efforts to recruit anyone from Apple"[67] and Apple notified its recruiters that they should "honor our side of the deal."[68] The 2005 email from Adobe HR activating the Anti-Solicitation agreement with Apple states that "Bruce and Steve Jobs have an agreement that we are not to solicit ANY Apple employees, and vice versa."[69] Workers at those companies during the period of the agreement include a wide variety of employees whom could not reasonably be anticipated to be directly involved in the agreement. Moreover, Apple recruiter Patrick Flynn confirmed that when a company was added to the do-not-call list, all of its subsidiaries were also added to the list.[70]

The aberrant nature of the Anti-Solicitation agreements is further demonstrated by contrasting them with no-solicit agreements that were discussed as part of an actual potential collaboration. For example, Sheryl Sandberg (while at Google) attempted a collaboration between Google and Intuit, as a precursor to which in April 2006 the former agreed not to

---

[65] GOOG-HIGH-TECH-00625532

[66] PIX00087389

[67] Exhibit 199

[68] Exhibit 563

[69] Exhibit 225

[70] Deposition of Patrick Flynn (112:4-23)

solicit "8 named individuals for a specific period of time – duration of partnership or 12 months if partnership does not get consummated."[71] Independent of whether this collaboration was realized, the two companies later entered into a broad Anti-Solicitation agreement detailed above in which Google agreed not to cold-call any Intuit employees. Sandberg makes explicit that the later decision to add all of Intuit's employees to Google's do-not-call list had nothing to do with this earlier agreement and thus was not ancillary to a collaboration as per DOJ requirements.[72]

c.   *contain a specific termination date or event*

None of the Anti-Solicitation agreements contained a termination date but rather appeared to be perpetually effective. Indeed, none of them was terminated prior to the DOJ investigation, as might have been the case if any of them had been time-bound. The lack of any set expiration date further confirms that the purpose was not to facilitate collaboration, but rather to eliminate competition.

d.   *be signed by all parties to the agreement, including any modifications to the agreement*

None of the Anti-Solicitation agreements were signed as part of a formal contract but rather were entered into in secret among Defendants' chief executives and other top-level senior executives, who then actively concealed their existence.

In their interrogatory responses, Defendants listed employees who knew about the Anti-Solicitation agreements or knew about discussions regarding the agreements. None of these responses contain a full list of employees who would be affected, from which it is reasonable to conclude that they were not involved in the negotiations. Rather, only certain senior executives were mentioned. At Adobe, only CEO Bruce Chizen and COO Shantanu Narayen.[73] At Intuit, only Chairman Bill Campbell, CEO Brad Smith, and President of Global Business Division Alex Lintner.[74] Pixar

---

[71] Exhibit 575

[72] Declaration of Sheryl Sandberg (1:24-2:1)

[73] Defendant Adobe Systems Inc.'s Response to Plaintiffs' First Set of Interrogatories Re: Identification of Witnesses (March 12, 2012) at 6.

[74] Defendant Intuit Inc.'s Response to Plaintiffs' First Set of Interrogatories Re: Identification of Witnesses (March 12, 2012) at 5.

lists Ed Catmull and Steve Jobs.[75]  Google lists seven executives including CEO Schmidt, engineering executive Alan Eustace, Senior Advisor Jonathan Rosenberg, and four Director/SVP-level members of the People Operations team.[76]  Apple lists several people, but each of them has "HR" or "staffing" or "recruiting" in their title; no engineers or other types of employees are mentioned as having been aware of the illicit agreements.[77]  For example, Intel CEO Otellini intended to keep his Anti-Solicitation agreement with Google secret: "We have a handshake 'no recruit' between eric and myself. I would not like this broadly known. paul"[78]  Similarly, Google CEO Schmidt expressed a preference that the "Do Not Call" list be described to others "verbally, since I don't want to create a paper trail over which we can be sued later?"[79]

31.  In some cases, Defendants' own executives admit that their Anti-Solicitation Agreements failed to satisfy the DOJ's provisions and were halted as a result.  For example, James Morris (General Manager of Pixar) said of Lucasfilm, "we had an agreement for a long period of time that we wouldn't recruit from each other, and we are not doing that anymore. We rescinded that agreement."[80]  When asked why the agreement was rescinded, Morris stated, "reason is there was a consent decree."[81]  Likewise, in September 2009 after the DOJ began its investigation, Google "remove[d] the Do Not Call list anywhere that it appears."[82]

32.  Since entering into the consent decree with the DOJ, these Defendants appear to have eliminated the Anti-Solicitation agreements and have abided by the terms of the consent decree.  I understand that certain of Defendants' senior executives confirmed in their depositions that, following the DOJ investigation in 2009, they attended antitrust compliance training and have since not violated the terms of the consent decree.[83]  Defendants—among the leading and most successful technology

---

[75] Defendant Pixar's Objections and Responses to Plaintiffs' First Set of Interrogatories Re: Identification of Witnesses (March 2, 2012) at 5.

[76] Google Inc.'s Responses to Plaintiffs' First Set of Interrogatories Re: Identification of Witnesses (March 2, 2012) at 9.

[77] Defendant Apple Inc.'s Responses to Plaintiffs' First Set of Interrogatories Re: Identification of Witnesses (March 2, 2012) at 8-9.

[78] Exhibit 202

[79] Exhibit 181

[80] Deposition of James Morris (165:13-16)

[81] Deposition of James Morris (103:19-25)

[82] Exhibit 209; also confirmed in deposition of Shona Brown (239:10-240:16) and Exhibit 635.

[83] For example, Exhibit 169 and deposition of James Morris (188:1-189:25), and deposition of Tim Cook (54:4-58:7)

companies in the world—do not appear to have suffered as a result of abiding by the antitrust laws. Apple was the most valuable company in the world for the space of a year, with Google not far behind.[84] Intuit's stock price has more than doubled since the DOJ consent decree. Moreover, since 2009 these companies have continued to collaborate with each other and with other companies, without company-wide Anti-Solicitation agreements restricting the mobility and compensation of their employees. In September of 2011, Intel announced a technical collaboration with Google to optimize its Atom processor for the Android mobile platform.[85] Google moreover, despite later competing against Apple's iPhone with Android, in 2012 integrated into its iOS Maps application previously-unavailable features including spoken turn-by-turn driving directions.[86] Tim Cook, Apple's current CEO, perhaps put it best: "Are we in deep collaboration with anyone? Of course. Yes. And we abide by the consent decree with those."[87] "The consent decree doesn't prevent people from working together."[88]

## VI.   Conclusion

33.   Based on the documents I have reviewed, my professional experience, and my research on non-compete agreements, I have a number of conclusions expressed in the report, which I also summarize here.

34.   The Anti-Solicitation agreements evidenced by the exhibits, depositions, and Defendants' interrogatory responses do not simply represent autonomous choices made by individual companies. Rather, directors, CEOs, advisors, and senior

---

[84] Apple's market capitalization exceeded Exxon for a 365-day period starting January 24, 2012. Source: http://money.cnn.com/2013/01/25/investing/apple-exxon/index.html. When deducting cash in the bank from market capitalization, Google was more valuable than Apple as of June 2013: http://money.cnn.com/2013/01/25/investing/apple-exxon/index.html.

[85] http://newsroom.intel.com/community/intel_newsroom/blog/2011/09/13/intel-and-google-to-optimize-android-platform-for-intel-architecture

[86] One might argue that Google's decision to compete against Apple in the mobile phone space was driven by the inability to continue its broad Anti-Solicitation agreement. However, Google launched the first commercially-available Android handset in 2008, well before the consent decree (http://www.gsmarena.com/t_mobile_g1-2533.php). If anything, this episode reconfirms the importance of technical collaborations, as Apple struggled to deliver its own Maps application of quality comparable to what it could obtain by collaborating with Google.

[87] Deposition of Tim Cook (58:5-7)

[88] Deposition of Tim Cook (75:1-2)

executives conspired to suppress cold-calling.  Internal announcements confirm the reciprocal nature of these agreements.

35.   These Anti-Solicitation agreements were not independently arrived at by pairs of firms.  Rather, these illegal arrangements were disseminated through a tight network of co-located, interlocking owners, directors, and advisors.  The original Pixar-Lucasfilm arrangement was known to Pixar CEO Steve Jobs, who then instigated a similar agreement with Adobe and, though board member Eric Schmidt, with Google.  Google then replicated the agreement with the Intel CEO, who sat on its board.  Intuit, whose chairman sat on Apple's board and also closely advised Google, requested to be brought into the fold.  All of these directors lived in the San Francisco Bay Area, though employees across the companies were affected.

36.   Although the Defendants claim that Anti-Solicitation agreements are critical to successful technical collaborations, the evidence does not support this contention.  First, Defendants successfully managed essential technical collaborations without Anti-Solicitation agreements.  Second, some Defendants attempted to establish Anti-Solicitation agreements with companies where no technical collaboration existed.  Third, the people most involved in establishing the collaborations testified they were unaware of the Anti-Solicitation agreements.  Hence, Anti-Solicitation agreements cannot be reasonably necessary to technical collaborations.  Further, Defendants provide no justification whatsoever for the Anti-Solicitation conspiracy among them.  There is none.

37.   These Anti-Solicitation agreements were not limited to individuals involved in collaborations but rather extended to all employees of the firms involved.  Moreover, and contrary to employee non-compete agreements, the vast majority of these workers (excepting HR recruiters and some senior executives) had no idea that their opportunities to learn of external job opportunities were being restricted in this way.

38. It is clear from the evidence that the Anti-Solicitation agreements were established for the purpose of suppressing compensation. Certain co-conspirators used the pretext of "embarrassment" as justification, while others were clear in their desire to stem the upward pressure on wages or the outward flow of talent to competitors who were growing quickly, with no mention of technical collaborations. As Anti-Solicitation agreements limit the flow of job opportunities to workers, Anti-Solicitation agreements would indeed limit compensation in the way that Defendants' chief executives hoped they would.

Matthew Marx
October 28, 2013

**Exhibit 1: Matthew Marx CV**

## Matthew Marx

Office Address
Massachusetts Institute of Technology
Sloan School of Management
100 Main Street, E62-478
Cambridge, MA 02142
(617) 253-5539
mmarx@mit.edu, http://mmarx.scripts.mit.edu

Home Address
158 Phillips Brooks Road
Westwood, MA 02090
(781) 686-9055

## EMPLOYMENT

**MIT Sloan School of Management**                                      Cambridge, MA
Mitsui Career Development Professor of Entrepreneurship                  2010-present
Assistant Professor of Technological Innovation, Entrepreneurship, and Strategic Management
                                                                        2009-present

**Tellme Networks** (acquired by Microsoft)
Mountain View, CA
Vice President, Solutions Delivery
1999-2004

- Hired and led 75-person team that launched speech recognition services handling 1 billion calls per year.
- Grew annualized revenue from $5M to $100M. Reported to CEO and presented regularly to board.

**SpeechWorks International** (completed IPO)
Boston, MA
User Interface Engineer
1994-1999

- Designed and implemented applications for Fortune 500 clients.
- Catalyzed decision to switch company's commercialization strategy from technology licensing to services.

## EDUCATION

**Harvard University**                                                          Boston, MA
Doctor of Business Administration                                               June 2009
Dissertation Title: Essays on Employee Non-compete Agreements.
Committee: Lee Fleming (chair), Rakesh Khurana, Josh Lerner

**Harvard University**                                                          Boston, MA
Master of Business Administration (with Distinction)                           2005

**Massachusetts Institute of Technology**                                      Cambridge, MA
S.M., Media Arts and Sciences (Motorola Fellow)                                1995
Master's Thesis Title: Toward Effective Conversational Messaging
Committee: Christopher Schmandt (chair), Pattie Maes, Nicole Yankelovich

**Stanford University**                                                         Stanford, CA
B.S., Symbolic Systems (with Distinction, Phi Beta Kappa, degree completed in three years)
                                                                                1993

## PUBLICATIONS

J. Singh and M. Marx. "Geographic Constraints on Knowledge Diffusion: Political Borders vs. Spatial Proximity." *Management Science* (forthcoming).

M. Marx and L. Fleming. "Non-compete Agreements: Barriers to Entry…and Exit?" in J. Lerner and S. Stern, eds., *Innovation Policy and the Economy* 12. (2012)

M. Marx, "The Firm Strikes Back: Non-Compete Agreements and the Mobility of Technical Professionals." *American Sociological Review* 76(5):695-712. (2011)

M. Marx, D. Strumsky, and L. Fleming, "Mobility, Skills, and the Michigan Non-compete Experiment." *Management Science* 55(6):875-889 (lead article). (2009)

L. Fleming and M. Marx, "Managing Inventive Creativity in Small Worlds." *California Management Review* 48(4):6-27. Winner of the Accenture Award for Contribution to Management Practice. (2007)

C. Christensen, M. Marx, and H. Stevenson. "The Tools of Cooperation and Change." *Harvard Business Review* 84(10). (2006)

## WORKING PAPERS

M. Marx and D. Hsu. "Technology Commercialization Strategy Dynamics and Entrepreneurial Performance: Evidence from the Speech Recognition Industry." (Second-round revise & resubmit at *Management Science*)

M. Marx, J. Singh, and L. Fleming, "Does Non-compete Enforcement Create a 'Brain Drain'?" (under review at *Journal of Law, Economics, and Organization*)

K. Younge and M. Marx, "The Value of Employee Retention: Evidence from a Natural Experiment." (under review at *Journal of Economics and Management Strategy*)

M. Marx and A. Kacperczyk, 2013. "Revisiting the Small-Firm Effect on Entrepreneurship: Evidence from Dissolutions." (under review at *Management Science*)

M. Marx, 2013. "Good work if you can get it…again: Non-compete agreements, technical expertise, and staffing small firms."

M. Marx, 2013. "On a Tight Leash? Venture Capital Staging and Strategic Flexibility."

M. Marx, 2013. "Co-mobility."

M. Marx and D. Hsu, 2013. "Strategic "switchbacks": dynamic commercialization strategies for technology entrepreneurs."

M. Ewens and M. Marx, 2013. "After the Thrill Is Gone: Investor Intervention in Imperiled Portfolio Companies."

A. Kacpercyzk and M. Marx, 2013. "Firm Failure, Stigma, and Entrepreneurship."


## FELLOWSHIPS AND AWARDS

2013 Ewing Marion Kauffman Foundation Junior Faculty Fellowship in Entrepreneurship ($40,000)
2011 MIT Sloan Junior Faculty Research Assistance Program Grant ($33,000)
2011 Edward B. Roberts (1957) Fund, MIT Entrepreneurship Center Fund Grant ($16,500)
2010-2012 Alvin J. Siteman (1948) Career Development Chair
2010 DRUID Best Dissertation Award
2010 Academy of Management Technology Innovation Management Division Best Dissertation Finalist

2009 Academy of Management Technology Innovation Management Division Best Student
Paper Award
2009 Wyss Award from Harvard Business School for Excellence in Doctoral Research
2008 Academy of Management Business Policy and Strategy Division Distinguished Student
Paper Award
2007 California Management Review Accenture Award for Contribution to Management
Practice
2007-2008 Ewing Marion Kauffman Dissertation Fellowship

## TECHNICAL PUBLICATIONS AND PATENTS

U.S. Patent #7,321,856  "Handling of speech recognition in a declarative markup language."
(2008)

U.S. Patent #7,143,039 "Providing menu and other services for an information processing system
using a telephone or other audio interface." (2006)

U.S. Patent #7,140,004 "Method and apparatus for zero-footprint phone application
development." (2006)

U.S. Patent #6,107,696 "System and method for handling a voice prompted conversation."
(2005)

U.S. Patent  #6,606,598 "Statistical computing and reporting for interactive speech applications."
(2003)

U.S. Patent #6,173,266 "System and method for developing interactive speech applications."
(2001)

U.S. Patent #6,747,026 "Transcription and reporting system." (2000)

U.S. Patent #5,995,928 "Method and apparatus for continuous spelling speech recognition with
early identification."  (1999)

M. Marx and C. Schmandt. "CLUES: Dynamic Personalized Message Filtering." *Proceedings of
the ACM Conference on Computer Supported Cooperative Work* (1996)

M. Marx and C. Schmandt. "MailCall: Message presentation and navigation in a non-visual
environment." *Proceedings of the SIGCHI conference on Human Factors in Computing Systems*
(1996)

N. Yankelovich, G.A. Levow, and M. Marx. "Designing SpeechActs: Issues in Speech User Interfaces." *Proceedings of the SIGCHI Conference on Human Factors in Computing Systems* (1995)

M. Marx and C. Schmandt. "Putting People First: Specifying Proper Names in Speech Interfaces." *Proceedings of the 7th annual ACM symposium of User Interface Software and Technology* (1994)

M. Marx and C. Schmandt. "Reliable Spelling Despite Unreliable Letter Recognition." *Proceedings of the American Voice Input/Output Society* (1994)


## GOVERNMENT TESTIMONY

M. Marx. "Testimony regarding MA house Bill H1794, An Act Regarding Noncompetition Agreements." Massachusetts Joint Committee on Labor and Workforce Development, Boston MA, 15 September 2011.

M. Marx. "Testimony regarding MA House Bills H1794 and H1799, Acts Regarding Noncompetition Agreements." Massachusetts Joint Committee on Labor and Workforce Development, Boston MA, 7 October 2009.


## TEACHING EXPERIENCE AND MATERIALS

15.394, Dilemmas in Founding New Ventures. Ratings were 4.9/5.0 and 4.7/5.0 for two sections taught Spring 2011. Overhauled prior syllabus and introduced simulation on firing employees, since adopted at Wharton and Harvard.

Frequent lecturer in executive education and the Trust Center for MIT Entrepreneurship.

Lee Fleming and Matt Marx. "Barry Riceman at NetD (A), (B), and (TN)." Harvard Business School Case 606-090.


## OTHER ACADEMIC EXPERIENCE AND SERVICE

Guest Associate Editor for Management Science. Ad-hoc reviewer for Management Science, American Sociological Review, Review of Economics and Statistics, Journal of Law and Economics, Organization Science, Review of Industrial Organization, Research Policy, California Management Review, Journal of Business Venturing.

Organizing Committee, 2011 Harvard/MIT Strategy Research Conference.

MIT Sloan Undergraduate Program Committee, 2010-2013.

Organized MIT Sloan Behavioral and Policy Sciences Junior Faculty Retreat, 2010 and 2011.

## PRESENTATIONS

Discussant/panelist
- OECD Symposium on "A Policy Framework for Knowledge-Based Capital." December 2012.
- Georgia Tech Roundtable on Engineering Entrepreneurship Research (REER) conference, November 2012.
- NBER Summer Institute Intellectual Property Policy and Innovation Workshop, July 2012
- Boston Bar Association Symposium on Employee Non-Compete Agreements, July 2012
- CCC Doctoral Student Conference, April 2012
- NBER Productivity, Innovation, and Entrepreneurship Working Group, March 2012
- Labor and Employment Relations Association Annual Meeting, January 2012
- Georgia Tech Roundtable on Engineering Entrepreneurship Research (REER) conference, September 2011
- Boston Bar Association Symposium on Employee Non-compete Agreements, July 2011
- NBER conference on Innovation Policy and the Economy. National Press Club, April 2011.
- Boston University Law School, March 2011
- Boston Bar Association Symposium on Employee Non-compete Agreements, July 2010

"Co-mobility"
- University of Chicago Junior Faculty Organization Theory Conference, October 2013.

"Technology Commercialization Strategy Dynamics and Entrepreneurial Performance: Evidence from the Speech Recognition Industry"
- University of Toronto Rotman School of Management Strategy Department Seminar, October 2013
- Industry Studies Association Annual Meeting, May 2013.
- Darden/Cambridge Entrepreneurship Conference, May 2013
- Duke Fuqua School of Business Strategy Conference, October 2012
- Carnegie Mellon University, SETChange department seminar series, October 2012
- West Coast Research Symposium, September 2012
- Academy of Management Annual Meeting, August 2012

- Queen's University Conference on the Economics of Innovation and Entrepreneurship, June 2012
- Atlanta Competitive Advantage Conference, May 2012
- London Business School Sumantra Ghoshal Conference, May 2012
- University of Chicago Organizations and Markets Department Seminar, April 2012
- The Wharton School Management Department Seminar, University of Pennsylvania, March 2012
- BYU-University of Utah Winter Strategy Conference, March 2012
- INFORMS annual meeting, November 2011
- Harvard Business School Strategy Conference, November 2011

"Patent Citations and the Geography of Knowledge Spillovers: Disentangling the Role of State Borders, Metropolitan Boundaries and Distance."
- London Business School, Strategy & Entrepreneurship Department, November 2012
- Georgia Tech Roundtable on Engineering Entrepreneurship Research (REER) conference, November 2012.
- Boston University Strategy & Innovation Department, August 2012
- Academy of Management Annual Meeting, August 2012
- Sloan Economic Sociology Working Group, July 2011

"The market valuation of strategic human capital: evidence from a natural experiment."
- Stanford Organizational Behavior Department Seminar, October  2012
- Berkeley Innovation Seminar, April 2012

"Regional Disadvantage? Non-compete Enforcement and Brain Drain"
- UCLA Anderson Policy Group seminar, October 2011.
- Stanford Institute for Economic Policy Research seminar, October 2011
- The Wharton School, University of Pennsylvania Management Department seminar, October 2011
- Olin School, Washington University in St. Louis, Organizations Department seminar, October 2011
- Harvard Business School, Entrepreneurial Management Department seminar, September 2011
- European School of Management & Technology Department seminar, September 2011
- Mobility and Competition Clause Workshop, Ludwigs-Maximilian-Universitaet, August 2011
- Academy of Management Annual Meeting, August 2011
- University of Virginia Darden Entrepreneurship Conference, May 2011
- NBER Summer Institute, Technology Policy and the Economy, July 2010.

- University of Maryland Entrepreneurship Conference, April 2010
- Georgia Tech Roundtable for Engineering Entrepreneurship Research Conference, November 2009
- Technology Transfer Society Annual Meeting, October 2009
- HEC Workshop on Entrepreneurial Entry, September 2009
- Wharton Operations and Information Management Department seminar, September 2009
- Association of American Geographers Annual Meeting, April 2008
- NBER Productivity Lunch, September 2009.

"The Firm Strikes Back: Non-compete Agreements and the Mobility of Technical Professionals"
- American Sociological Association Annual Meeting, August 2010
- University of Oregon West Coast Research Symposium, August 2010
- Eastern Sociological Society annual meeting, March 2010
- NBER Entrepreneurship Working Group Summer Institute, July 2009
- Wharton People & Organizations Conference, June 2009
- Carnegie Mellon / Catholic University of Portugal Entrepreneurship Research conference, January 2009

"On a Short Leash: New Organizations, New Strategies, and Venture Capital"
- Academy of Management Meeting, August 2008

"Good Work If You Can Get It: Non-competes and Ex-employees.
- NBER Summer Institute Entrepreneurship working group, July 2009

"Mobility, Skills, and the Michigan Non-compete Experiment"
- CCC Doctoral Student Consortium, April 2008
- George Washington University Law School Department seminar, September 2007
- Academy of Management Annual Meeting, August 2007
- Wharton Technology Mini-Conference, April 2007
- NBER Productivity Lunch, November 2006

## MEDIA COVERAGE
"Mental Borders." *Slate*, October 2013.
"In bid to keep entrepreneurs, Massachusetts moves to ban non-competes." Gigaom, September 2013.
"Companies Loosen the Handcuffs on Non-competes." *Wall Street Journal*, August 2013.
"Tide turning against use of non-compete agreements in Mass." *Boston Business Journal*, August 2013.
"Set the Creators Free." Wired Magazine, December 2012.

-8-

"Marblehead state rep eyes non-compete agreements." Marblehead Reporter, 14 December 2011.

"Non-compete Laws Stifling Mass. High Tech Industry." RadioBoston, WBUR, 29 November 2011.

"[Governor] Patrick Threatens Enforcement Ban on Non-competes." *Boston Business Journal*, 16 September 2011.

"Non-compete agreements carry high costs for engineers." IEEE Spectrum, 18 October 2011.

"Non-compete agreements create 'career detours'" MIT News, 5 October 2011.

"Want Your Innovators to Leave? Make Them Sign a Non-compete" CBS Bnet, 21 July 2011.

"Non-compete Clauses Stifling to Innovation in Mass." *Boston Globe*, 3 July 2011.

"Stop Enforcing Non-Competes." *Inc. Magazine*, 1 July 2010.

"Industry veterans share their dealings with non-compete agreements." *Mass High Tech*, 7 October 2009.

"Non-compete agreements hinder job switchers." *Wall Street Journal / FINS*, 10 August 2009.

"Non-compete clause changes are in the air again." *Mass High Tech,* 31 July 2009.

"Clause for Concern." *Boston Globe*, 10 July 2009.

"Start-ups stifled by non-competes." *Boston Globe*, 21 June 2009.

"I signed a non-compete, but now I want a new job." *CNNMoney*, 8 April 2009.

"'Til lawsuits do us part." *IEEE Spectrum,* April 2009.

"Non-compete pact called bad for innovation." *PC World*, 20 June 2008.

"The noncompete conundrum: Holding back Bay State tech, or preserving IP?" *Mass High Tech,* 11 February 2008.

"Why non-compete means don't-thrive." Boston Globe, 30 December 2007.

**Exhibit 2: Documents relied upon in the preparation of this report**

Academic Articles

Garmaise, Mark, "The Ties That Truly Bind: Noncompetition Agreements, Executive
   Compensation, and Firm Investment," Journal of Law, Economics, and Organization,
   27(2):376-425.

Marx, Matt, Deborah Strumsky, and Lee Fleming, "Mobility, Skills, and the Michigan Non-
   Compete Experiment," Management Science, 55 (2009), 875-889.

Marx, Matt, "The Firm Strikes Back: Non-compete Agreements and the Mobility of Technical
   Professionals." American Sociological Review 76(5):695-712.

McLaughlin, K.  "Microsoft and Apple Actually Don't Loathe Each Other, and Here Are
   Examples of Them Working Together." Business Insider, 28 June 2013. Available at
   http://www.businessinsider.com/how-microsoft-and-apple-work-together-2013, accessed 18
   October 2013.

Office Macintosh Edition: a History of "Mac-First". Microsoft press release, April 26. 1999.
   Available at http://www.microsoft.com/en-us/news/features/1999/04-26macoffice.aspx,
   accessed 18 October 2013.

Poeter, D. "Microsoft, Intel Tout Their Collaboration on Windows 7." CRN. September 1, 2009.
   Available at http://www.crn.com/blogs-op-ed/the-channel-wire/219500867/microsoft-intel-
   tout-their-collaboration-on-windows-7.htm, accessed 18 October 2013.

Court Orders and Pleadings[1]

Amended Answer to Consolidated Amended Complaint, Lucasfilm (July 5, 2012), Docket No.
   168.

Amended Answer to Consolidated Plaintiffs' Amended Complaint, Adobe (July 5, 2012),
   Docket No. 170.

Amended Answer to Consolidated Amended Complaint, Intel (July 5, 2012), Docket No. 169.

Amended Answer to Plaintiffs' Consolidated Amended Complaint, Intuit (July 5, 2012), Docket
   No. 171.

---

[1] Unless otherwise specified, all documents are from *In re High-Tech Employees Antitrust Litigation*, 11-cv-2509
(N.D. Cal.)

Amended Answer to Plaintiffs' Consolidated Amended Complaint, Pixar (July 5, 2012), Docket No. 172.

Amended Answer to Plaintiffs' Consolidated Amended Complaint, Google (July 5, 2012), Docket No. 173.

Amended Answer to Plaintiffs' Consolidated Amended Complaint, Apple (July 5, 2012), Docket No. 174.

Competitive Impact Statement, *United States v. Adobe, et al.*, Case No. 10-cv-01629 (D.C. Dist. September 24, 2010), Docket No. 2.

Consolidated Amended Complaint, Docket No. 65.

Order Granting in Part, Denying in Part Motion for Class Certification, Docket No. 382.

Order Granting Plaintiffs' Supplemental Motion for Class Certification, Docket No. 531.

Order Granting in Part and Denying In Part Defendants' Joint Motion to Dismiss; Denying LucasFilm LTD.'s Motion to Dismiss, Docket No. 119.

Stipulation to Enter Final Judgment, *United States v. Adobe, et al.*, Case No. 10-cv-01629 (D.C. Dist. September 24, 2010), Docket No. 3.

Plaintiffs' Notice of Motion and Motion for Class Certification, And Memorandum of Law in Support, Docket No. 187.

Plaintiffs' Consolidated Reply In Support of Motion for Class Certification, Docket No. 247.

Plaintiffs' Supplemental Motion and Brief In Support of Class Certification, Docket No. 418.

Plaintiffs' Reply In Support of Supplemental Class Certification Motion, Docket No. 455.


Declarations

Declaration of Edward T. Colligan (August 7, 2012)

Declaration of Non-Party Sheryl Sandberg (May 17, 2013)


Depositions

Deposition of Mark Bentley, August 23, 2012

Deposition of Sergey Brin, March 19, 2013

Deposition of Shona Brown, January 30, 2013

Deposition of William Campbell, February 5, 2013

Deposition of Ed Catmull, January 24, 2013

1137776.4

Deposition of Bruce Chizen, March 15, 2013

Deposition of Tim Cook, March 21, 2013

Deposition of Alan Eustace, February 27, 2013

Deposition of Patrick Flynn, April 3, 2013

Deposition of Arnnon Geshuri, August 17, 2012

Deposition of Danielle Lambert, October 2, 2012

Deposition of Edward Leamer, October 26, 2012

Deposition of George Lucas, March 28, 2013

Deposition of Donna Morris, August 21, 2012

Deposition of James Morris, August 3, 2012

Deposition of Jonathan Rosenberg, March 13, 2013

Deposition of Eric Schmidt, February 20, 2013

Deposition of Deborah Streeter, April 5, 2013

Deposition of Jan Van Der Voort, February 5, 2013

Deposition of John Warnock, March 29, 2013

Deposition of Pamela Zissimos, November 13, 2012

Deposition Exhibits

| Exh. Number | Bates Number |
| --- | --- |
| 129 | [PIX00002262] |
| 139 | [PIX00004883] |
| 161 | [PIX00003419] |
| 163 | [PIX00015306] |
| 169 | [no Bates Stamp, from Deposition of James Morris] |
| 173 | [GOOG-HIGH-TECH-00193034] |
| 176 | [GOOG-HIGH TECH-00000004] |
| 177 | [GOOG-HIGH-TECH-00058573] |
| 178 | [GOOG-H IGH-TECH-00058626] |
| 181 | [GOOG-HIGH-TECH-00058410] |
| 182 | [GOOG-HIGH-TECH-00008283] |
| 183 | [GOOG-HIGH-TECH-00008342] |

1137776.4

| Exh. Number | Bates Number |
|---|---|
| 187 | [231APPLE002149] |
| 192 | [GOOG-HIGH-TECH-00000107] |
| 199 | [231APPLE002140] |
| 202 | [40026DOC000011] |
| 209 | [GOOG-HIGH-TECH-00057353] |
| 223 | [231APPLE002143] |
| 225 | [231APPLE002145] |
| 250 | [231APPLE006876] |
| 278 | [231APPLE002150] |
| 279 | [231APPLE002151] |
| 303 | [Adobe_052404] |
| 369 | [PIX00003599] |
| 389 | [76616DOC005974] |
| 410 | [ADOBE_001096] |
| 420 | [PIX00006025] |
| 421 | [PIX00006023] |
| 424 | [PIX00009182] |
| 472 | [GOOG-HIGH-TECH-00195005] |
| 557 | [GOOG-HIGH-TECH-00293087] |
| 563 | [231APPLE073139] |
| 575 | [GOOG-HIGH-TECH-00058850] |
| 597 | [GOOG-HIGH-TECH-0056882] |
| 608 | [GOOGLE-HIGH-TECH-00255349] |
| 614 | [GOOG-HIGH-TECH-00379327] |
| 616 | [GOOG-HIGH-TECH-00210242] |
| 625 | [GOOG-HIGH-TECH-00194721] |
| 635 | [GOOG-HIGH-TECH-00252681] |
| 648 | [GOOG-HIGH· TECH-00265514] |
| 650 | [GOOG-HIGH-TECH-00265638] |
| 651 | [GOOG-HIGH-TECH-00058868] |

1137776.4

| Exh. Number | Bates Number |
|---|---|
| 653 | [231APPLE073139] |
| 661 | [GOOG-HIGH-TECH-00059839] |
| 666 | [GOOG-HIGH-TECH-00210242] |
| 667 | [GOOG-HIGH-TECH-00296236] |
| 668 | [GOOG-HIGH-TECH-00248336] |
| 669 | [231APPLE065002] |
| 690 | [LFL00016640] |
| 861 | [231APPLE095700] |
| 872 | [GOOG-HIGH-TECH-00264994] |
| 916 | [INTUIT_016652] |
| 1306 | [PIX0012996] |
| 1309 | [PIX00049648] |
| 1753 | [GOOG-HIGH-TECH-00325500] |
| 1868 | [GOOG-HIGH-TECH-00550729] |
| 1869 | [GOOG-HIGH-TECH-00550725] |
| 1870 | [GOOG-HIGH-TECH-00550726] |
| 1871 | [GOOG-HIGH-TECH-00061052] |
| 2800 | [ADOBE_068264] |
| 2823 | [Adobe_025894] |

Declaration Exhibits

| Exh. Number | Description |
|---|---|
| 23 | Harvey Decl. [GOOG-HIGH-TECH-00248336] |
| 27 | Harvey Decl. [76592DOC015613] |
| 17 | Shaver Decl. [231APPLE002140] |
| 27 | Shaver Decl. [GOOG-HIGH TECH-00007725] |
| 29 | Shaver Decl. [GOOG-HIGH TECH-00008283] |
| 37 | Shaver Decl. [GOOG-HIGH TECH-00056790] |
| 45 | Shaver Decl.[GOOG-HIGH-TECH-00193360] |
| 46 | Shaver Decl. [GOOG-HIGH-TECH-00193377] |

1137776.4

| Exh. Number | Description |
|---|---|
| 48 | Shaver Decl. [ GOOG-HIGH-TECH-00194984] |
| 49 | Shaver Decl. [GOOG-HIGH TECH-00196286] |
| 58 | Shaver Decl. [INTUIT_000013] |
| 59 | Shaver Decl. [INTUIT_039098] |
| 61 | Shaver Decl. [PIX00000229] |
| 67 | Shaver Decl. [PIX00006023] |

Expert Reports

Expert Witness Report of Kevin F. Hallock, May 10, 2013.

Expert Report of Edward E. Leamer, Ph.D., October 1, 2012.

Reply Expert Report of Edward E. Leamer, Ph.D., December 10, 2012.

Supplemental Expert Report of Edward E. Leamer, Ph.D., May 10, 2013.

Rebuttal Supplemental Expert Report of Edward E. Leamer, Ph.D., July 12, 2013.

Expert Report of Professor Kevin M. Murphy, November 12, 2012.

Supplemental Expert Report of Professor Kevin M. Murphy, June 21, 2013.

Expert Report of Kathryn Shaw, Ph.D. June 21, 2013.

Job Lists

Job Titles List (technical class positions)

Responses to Interrogatories

Defendant Adobe Systems Inc.'s Response to Plaintiffs' First Set of Interrogatories Re:
   Identification of Witnesses (March 12, 2012).

Defendant Adobe Systems Inc.'s Amended Response to Plaintiff's Second Set of Interrogatories
   Directed to Defendant Adobe Systems Inc. (March 19, 2012).

Defendant Apple Inc.'s Responses to Plaintiffs' First Set of Interrogatories Re: Identification of
   Witnesses (March 2, 2012).

Defendant Apple Inc.'s Amended Responses to Plaintiff's Second Set of Interrogatories (March
   29, 2013).

Google Inc.'s Responses to Plaintiffs' First Set of Interrogatories Re: Identification of Witnesses

(March 2, 2012).

Google Inc.'s Responses to Plaintiff's Second Set of Interrogatories (April 6, 2012).

Intel's Objections and Responses to Plaintiffs' First Set of Interrogatories Re: Identification of
   Witnesses (March 2, 2012).

Intel's Objections and Amended and Supplemented Responses to Plaintiff's Second Set of
   Interrogatories (March 12, 2013).

Defendant Intuit Inc.'s Response to Plaintiffs' First Set of Interrogatories Re: Identification of
   Witnesses (March 12, 2012).

Defendant Intuit Inc.'s Response to Plaintiff's Second Set of Interrogatories Directed to
   Defendant Intuit Inc. (April 4, 2012).

Defendant Lucasfilm LTD's Objections and Responses to Plaintiffs' First Set of Interrogatories
   Re: Identification of Witnesses (March 2, 2012).

Defendant Lucasfilm Ltd.'s Supplemental Objections and Responses to Plaintiff's Second Set of
   Interrogatories (March 25, 2013).

Defendant Pixar's Objections and Responses to Plaintiffs' First Set of Interrogatories Re:
   Identification of Witnesses (March 2, 2012).

Defendant Pixar's Supplemental Objections and Responses to Plaintiff's Second Set of
   Interrogatories (March 18, 2013).

Plaintiffs' Supplemental Interrogatory Response (June 7, 2013).

Plaintiffs' Supplemental Interrogatory Response (May 24, 2013).

Plaintiffs' Responses to Defendants' 2nd Interrogatories (April 12, 2013).

Plaintiff Mark Fichtner's Supplemental Answers to Interrogatories 13 & 14 (October 12, 2012).

Plaintiff Michael Devine's Supplemental Answers to Interrogatories 13 & 14 (October 12, 2012).

Plaintiff Brandon Marshall's Supp. Ans. and Obj. to ROGS 13 and 14 (October 12, 2012).

Plaintiff Daniel Stover's Supp. Answers and Obj. to Def. ROGS 13 and 14 (October 12, 2012).

Plaintiffs Michael Devine's Signed 1st set of Rogs 13+14 (October 12, 2012).

Plaintiff's Siddharth Hariharan Supplemental Answers and Objections (October 10, 2012).

Plaintiff Brandon Marshall Supplementary Interrogatory Responses (June 4, 2012).

Plaintiffs Daniel Stover's Supplementary Interrogatory Responses (June 4, 2012).

Plaintiff Siddharth Hariharan Supplemental Interrogatory Responses (June 5, 2012).

Plaintiff Michael Devine's Supplemental Interrogatory Responses (June 6, 2012).

-7-

Plaintiff Mark Fichtner's Supplemental Interrogatory Responses (June 7, 2012).

Plaintiff Michael Devine's Interrogatory Responses (March 28, 2012).

Plaintiff Mark Fichtner's Interrogatory Responses (March 28, 2012).

Plaintiff Siddharth Hariharan's Interrogatory Responses (March 28, 2012).

Plaintiff Brandon Marshall's Interrogatory Responses (March 28, 2012).

Plaintiff Daniel Stover's Interrogatory Responses (March 28, 2012).

Interrogatory Requests

Plaintiffs' Second Interrogatories Directed to Adobe (February 10, 2012).

Plaintiffs' Second Interrogatories Directed to Apple (February 10, 2012).

Plaintiffs' Second Interrogatories Directed to Google (February 10, 2012).

Plaintiffs' Second Interrrogatories Directed to Intel (February 10, 2012).

Plaintiffs' Second Interrogatories Directed to Intuit (February 10, 2012).

Plaintiffs' Second Interrogatories Directed to Lucasfilm (February 10, 2012).

Plaintiffs' Second Interrogatories Directed to Pixar (February 10, 2012).

White Papers Submitted to the U.S. Department of Justice

Joint Submission Regarding the Application of *Per Se* Treatment to Employee Non-Solicitation
Arrangements (November 25, 2009)

Adobe Systems' Memorandum on Adobe-Apple partnership and Ancillary Non-Solicitation
Policy (January 13, 2010)

Apple's White Paper Submission to the Department of Justice (January 19, 2010)

Google's Do Not Cold Call List – Submission to U.S. Department of Justice (January 18, 2010)

Economic Analysis of Google's Do Not Call Policy (April 1, 2010)

Submission of Intel Corp. Regarding Department of Justice CID (January 25, 2010)

Intuit's Memorandum to Antitrust Division (December 24, 2009)

Intuit's Second Memorandum to the Antitrust Division (March 2, 2010)

Intuit's Second Memorandum to the Antitrust Division (March 3, 2010)

Pixar's Memorandum 1 (January 13, 2010)

Pixar's Memorandum 2 (January 25, 2010)

Pixar's Memorandum 3 (April 2, 2010)

Other Documents

231APPLE003854

231APPLE108086

231APPLE116655

231APPLE123280

231APPLE124988

231APPLE130883

231APPLE131137

231APPLE132410

231APPLE132410

231APPLE132589

231APPLE132589

231APPLE133899

76633DOC000369

ADOBE_007249

ADOBE_007481

Adobe_109674

Adobe_110060

Adobe_110292

Adobe_110302

Adobe_110368

Adobe_110398

Adobe_110454

Adobe_110479

Adobe_110504

Adobe_112028

CID No. 25507 to Intel Corporation and Intel's Response

GOOG-HIGH TECH-00024150

GOOG-HIGH TECH-00027913

GOOG-HIGH TECH-00027965

-9-

GOOG-HIGH TECH-00042588
GOOG-HIGH-TECH-00008281
GOOG-HIGH-TECH-00008282
GOOG-HIGH-TECH-00054804
GOOG-HIGH-TECH-00193217
GOOG-HIGH-TECH-00193406
GOOG-HIGH-TECH-00193435
GOOG-HIGH-TECH-00194945
GOOG-HIGH-TECH-00196108
GOOG-HIGH-TECH-00196687
GOOG-HIGH-TECH-00196689
GOOG-HIGH-TECH-00625224
GOOG-HIGH-TECH-00625227
GOOG-HIGH-TECH-00625235
GOOG-HIGH-TECH-00625239
GOOG-HIGH-TECH-00625264
GOOG-HIGH-TECH-00625475
GOOG-HIGH-TECH-00625480
GOOG-HIGH-TECH-00625486
GOOG-HIGH-TECH-00625509
GOOG-HIGH-TECH-00625532
GOOG-HIGH-TECH-00625631
GOOG-HIGH-TECH-00625733
INTUIT_005692
INTUIT_005711
INTUIT_005772
INTUIT_056426
INTUIT_056620
INTUIT_056624
PIX0000027
PIX00002094

PIX00002193
PIX00002219
PIX00087389

11377764