# Exhibit L

Declaration of Lisa J. Cisneros in Support of Plaintiffs'

Opposition Briefs ("Cisneros"), February 6, 2014,

(Dkt. 605)

(Public - redacted under seal portions)

Mark Bentley

August 23, 2012 Deposition

1                  UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3                        SAN JOSE DIVISION

4

5

6     IN RE:  HIGH-TECH EMPLOYEE      )

7     ANTITRUST LITIGATION            )

8                                     )   No. 11-CV-2509-LHK

9     THIS DOCUMENT RELATES TO:       )

10    ALL ACTIONS.                    )

11    _____)

12

13

14          CONFIDENTIAL - ATTORNEYS' EYES ONLY

15            VIDEO DEPOSITION OF MARK BENTLEY

16                    August 23, 2012

17

18

19

20    REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

21

22

23

24

25

| | | |
|---|---|---|
| 09:07:00 | 1 | in front of the jury in this case? |
| 09:07:01 | 2 | A.  I do. |
| 09:07:02 | 3 | Q.  And do you understand that you have an |
| 09:07:03 | 4 | obligation to tell the truth today? |
| 09:07:05 | 5 | A.  I do. |
| 09:07:06 | 6 | Q.  Now, if you don't understand my questions, |
| 09:07:09 | 7 | would you please let me know and I'll do my best to |
| 09:07:11 | 8 | rephrase them.  Do you understand that? |
| 09:07:13 | 9 | A.  I will do that. |
| 09:07:14 | 10 | Q.  Okay.  And have you had your deposition taken |
| 09:07:17 | 11 | before? |
| 09:07:18 | 12 | A.  Have I had a deposition taken before? |
| 09:07:20 | 13 | Q.  Yes. |
| 09:07:20 | 14 | A.  Yes, I have. |
| 09:07:21 | 15 | Q.  Okay.  So I'm -- if -- I'm going to assume some |
| 09:07:26 | 16 | familiarity with the process.  It's important for the |
| 09:07:29 | 17 | reporter to get clean answers, so will you let me finish |
| 09:07:31 | 18 | my question before you answer it? |
| 09:07:33 | 19 | A.  Okay. |
| 09:07:34 | 20 | Q.  And will you try to do your best to answer my |
| 09:07:37 | 21 | questions audibly? |
| 09:07:38 | 22 | A.  Yes, I will. |
| 09:07:45 | 23 | Q.  With what companies did Apple have |
| 09:07:49 | 24 | no-cold-calling agreements? |
| 09:07:51 | 25 | MR. RILEY:  Objection.  Assumes facts. |

| | | |
|---|---|---|
| 09:07:58 | 1 | THE WITNESS:  Can you please repeat the |
| 09:07:59 | 2 | question. |
| 09:07:59 | 3 | MR. SAVERI:  Read it back, please. |
| 09:08:01 | 4 | (Record read as follows:  With what companies |
| 09:08:01 | 5 | did Apple have no-cold-calling agreements?) |
| 09:08:06 | 6 | MR. SAVERI:  Let me make sure I get this right. |
| 09:08:08 | 7 | Q.  With what companies did Apple have |
| 09:08:13 | 8 | no-cold-calling agreements? |
| 09:08:15 | 9 | MR. RILEY:  Same objection. |
| 09:08:16 | 10 | THE WITNESS:  There is only one company that I |
| 09:08:18 | 11 | know of in which we had a -- an agreement not to cold |
| 09:08:22 | 12 | call. |
| 09:08:23 | 13 | MR. SAVERI:  Q.  And what company is that? |
| 09:08:25 | 14 | A.  That was Google. |
| 09:08:29 | 15 | Q.  Can you describe for me generally what you |
| 09:08:43 | 16 | understood -- strike that. |
| 09:08:46 | 17 | Could you describe for me generally what the |
| 09:08:48 | 18 | terms of that agreement with Google were. |
| 09:08:53 | 19 | A.  I will answer that question to the best of my |
| 09:08:55 | 20 | ability.  It was somewhat dynamic.  There was a period |
| 09:08:58 | 21 | of time, given our business relationship with Google |
| 09:09:02 | 22 | going back a few years ago, in which we did not actively |
| 09:09:07 | 23 | cold call into the company, although we were still |
| 09:09:09 | 24 | recruiting. |
| 09:09:15 | 25 | Q.  And when did that agreement begin? |

09:09:20  1        A.  I don't remember exact dates, but it was prior

09:09:23  2    to Eric Schmidt becoming a board member of Apple.

09:09:30  3        Q.  Could you give me the approximate year.

09:09:36  4        A.  I'm taking a guess here.

09:09:38  5        Q.  Give me your best recollection of when it

09:09:40  6    began.

09:09:43  7        A.  2005.

09:09:44  8        Q.  Were you working with Apple at the time?

09:09:47  9        A.  Yes, I was working with Apple.

09:09:50  10       Q.  And who told you first about the agreement?

09:09:56  11       A.  I'm not sure -- I didn't necessarily know there

09:09:58  12   was an agreement in place before I understood that we

09:10:00  13   were not actively cold calling out of Google.

09:10:04  14       Q.  Okay.

09:10:04  15       A.  And that understanding came from my boss who

09:10:06  16   was Danielle Lambert who was vice president of HR.

09:10:12  17            (Reporter clarification.)

09:10:12  18            MR. SAVERI:  Q.  Now, Mr. Bentley, you

09:10:15  19   are -- you seem a little soft spoken to me.  It's

09:10:17  20   really important that you keep your voice up,

09:10:19  21   particularly in this room, so at least we have a

09:10:21  22   good record of that.  Okay?

09:10:23  23       A.  Okay.

09:10:23  24       Q.  Thank you.

09:10:25  25       A.  So I'm soft spoken as it is, but I'll do my

09:10:30  1    best.

09:10:30  2        Q.  And I -- I suffer from the same flaw.  So let's

09:10:34  3    do our best to at least fill this part of the room with

09:10:39  4    our voices.  Okay?

09:10:41  5        A.  Understood.

09:10:42  6        Q.  Did Ms. Lambert -- well, strike that.

09:10:50  7            What did Ms. Lambert tell you when she informed

09:10:52  8    you about the -- the policy with respect to no cold

09:10:58  9    calling Google employees?

09:11:02 10        A.  I did not necessarily know there was a policy

09:11:04 11    in place.  It was my understanding that we were not

09:11:08 12    recruiting out of Google at the time -- excuse me -- we

09:11:11 13    were not cold calling into Google because of the

09:11:14 14    strategic relationship with Google.

09:11:17 15        Q.  Did Ms. Lambert tell you that?

09:11:20 16        A.  I believe on occasion we had talked about it.

09:11:22 17        Q.  When you heard about it the first time, did you

09:11:24 18    hear about it from Ms. Lambert?

09:11:28 19        A.  I believe so.

09:11:28 20        Q.  And did she communicate that to you in person

09:11:32 21    or in writing?

09:11:34 22        A.  I don't recall.

09:11:47 23        Q.  And can you describe for me generally what

09:11:50 24    restrictions you understood that -- could you tell me

09:12:00 25    generally what the restrictions that Ms. Lambert was

09:12:05  1   describing put on your job or your responsibilities with

09:12:08  2   respect to recruiting?

09:12:11  3       A.  At the time that -- at the time that this

09:12:14  4   occurred, I was the director of the executive search

09:12:17  5   team, and I managed approximately a 12-person team.  And

09:12:22  6   it was my understanding that we were not to actively

09:12:25  7   cold call into Google.  We were still hiring from

09:12:30  8   Google.

09:12:31  9       Q.  Did you understand at the time that Google had

09:12:34 10   agreed to adopt a similar policy or practice with

09:12:37 11   respect to the recruiting of Apple employees?

09:12:40 12           MR. RILEY:  Objection to the form of the

09:12:41 13   question.

09:12:44 14           THE WITNESS:  I did not.  I did not necessarily

09:12:47 15   know that there was a -- I did not know what Google's

09:12:51 16   understanding was.

09:12:52 17           MR. SAVERI:  Q.  Okay.  At what point in

09:12:54 18   time did you understand that there was an agreement

09:12:56 19   between Google and Apple with respect to no cold

09:13:00 20   calling?

09:13:01 21       A.  I don't remember the approximate dates.

09:13:03 22       Q.  Could you give me, generally, a time or a

09:13:05 23   milestone or a year?

09:13:06 24       A.  I believe it may have been end of 2005, maybe

09:13:11 25   beginning of 2006.

09:13:12  1        Q.  Who told you there was an agreement?

09:13:16  2        A.  Again, it wasn't clear to me that there was

09:13:18  3    actually an agreement in place.  I had -- I had seen an

09:13:23  4    email from my boss.

09:13:25  5        Q.  And when you say your boss, are you talking

09:13:27  6    about Ms. Lambert?

09:13:30  7        A.  Danielle Lambert.

09:13:34  8        Q.  And is the -- was the email from Ms. Lambert

09:13:41  9    the first time you understood there was an agreement

09:13:44 10    between Google and Apple with respect to no cold

09:13:47 11    calling?

09:13:50 12        A.  It was my understanding there was an

09:13:52 13    understanding.  I'm not sure I'd characterize it as an

09:13:54 14    agreement.

09:13:54 15        Q.  Okay.  Fair enough.  Maybe "agreement" is a

09:13:57 16    lawyer's word.  But at least at that point in time, you

09:14:00 17    understood there was an understanding between Google and

09:14:03 18    Apple with respect to no cold calling.  Is that fair?

09:14:06 19        A.  That is fair.  It was my understanding that

09:14:08 20    this was not unilateral.

09:14:27 21        Q.  Did you understand the understanding applied to

09:14:30 22    all employees of Google and Apple?

09:14:34 23            MR. RILEY:  Objection.  Question is vague.

09:14:39 24            THE WITNESS:  It was my understanding that we

09:14:40 25    were not to cold call into Google.

| | | |
|---|---|---|
| 09:14:44 | 1 | MR. SAVERI:  Q.  At all? |
| 09:14:46 | 2 | A.  That was my understanding. |
| 09:14:59 | 3 | Q.  At the time that you learned of this |
| 09:15:01 | 4 | understanding, were there business collaborations |
| 09:15:05 | 5 | between Apple and Google? |
| 09:15:06 | 6 | A.  It was my understanding there was. |
| 09:15:09 | 7 | Q.  Was the understanding, with respect to no cold |
| 09:15:13 | 8 | calling, limited in any way to the persons working on |
| 09:15:16 | 9 | those projects or collaborations? |
| 09:15:21 | 10 | MR. RILEY:  Objection.  No foundation. |
| 09:15:24 | 11 | THE WITNESS:  My understanding that we were |
| 09:15:25 | 12 | working across a large swath of -- both companies were |
| 09:15:30 | 13 | working with each other across a large swath of the |
| 09:15:33 | 14 | company. |
| 09:15:34 | 15 | MR. SAVERI:  Q.  So -- but my question was, |
| 09:15:36 | 16 | was the understanding limited in any way to the |
| 09:15:41 | 17 | persons working on those collaborations or projects |
| 09:15:44 | 18 | between the two companies? |
| 09:15:45 | 19 | MR. RILEY:  Objection.  No foundation. |
| 09:15:54 | 20 | THE WITNESS:  I don't recall. |
| 09:15:57 | 21 | MR. SAVERI:  Q.  And when you say "I don't |
| 09:15:58 | 22 | recall," do you mean no, or do you mean you don't |
| 09:16:00 | 23 | have a recollection? |
| 09:16:03 | 24 | A.  Meaning, as I think back about this now, Google |
| 09:16:06 | 25 | was a much smaller company back then, and they were |

09:16:09  1   viewed as a very key strategic partner, and I would have

09:16:13  2   no reason to think that it would have been directed

09:16:15  3   towards specific groups.  I would -- the assumption

09:16:19  4   would have been from a recruiting standpoint, it applied

09:16:22  5   to the whole company.

09:16:24  6        Q.  So did you also understand, then, that this

09:16:28  7   understanding was not limited with respect to recruiting

09:16:33  8   people of particular job title, job classification, job

09:16:40  9   level?

09:16:40 10           MR. RILEY:  Objection.  No foundation.

09:16:42 11           THE WITNESS:  To clarify, we were continuing to

09:16:44 12   recruit.

09:16:46 13           MR. SAVERI:  Q.  But -- fair enough.  But

09:16:47 14   with respect to this no-cold-calling understanding,

09:16:51 15   did you understand, at the time that you first

09:16:53 16   learned about it, that there was any limitation to

09:16:56 17   the understanding with respect to job

09:17:02 18   classification, job title, or job of potential

09:17:06 19   recruits?

09:17:07 20           MR. RILEY:  Objection.  No foundation.

09:17:13 21           THE WITNESS:  I did not necessarily understand

09:17:14 22   that.

09:17:16 23           MR. SAVERI:  Q.  Well, did you understand

09:17:17 24   that this understanding excluded any employees at

09:17:21 25   either company?

09:40:36  1    Lambert.

09:40:38  2         Q.  And did you understand that she passed that

09:40:40  3    complaint on to Mr. Jobs?

09:40:42  4         A.  I did understand that.

09:40:44  5         Q.  And you understood that Mr. Jobs passed that

09:40:47  6    complaint on to Mr. Schmidt; correct?

09:40:49  7         A.  Yes.

09:40:51  8         Q.  And did you understand that, for example,

09:40:54  9    Mr. Schmidt terminated people at Google as a result of

09:40:58 10    this?

09:40:59 11              MR. RILEY:  Objection.  No foundation.

09:41:02 12              THE WITNESS:  That's not my understanding.

09:41:04 13              MR. SAVERI:  Q.  Okay.

09:41:05 14         A.  I don't know if Mr. Schmidt terminated someone

09:41:09 15    at Google specifically because of this.  I'm not sure if

09:41:13 16    there were other variables involved or not.

09:41:19 17         Q.  Okay.  Did Apple ever receive complaints from

09:41:23 18    Google about -- strike that.

09:41:26 19              Did Apple ever receive complaints from Google

09:41:31 20    to the effect that Apple had violated its understanding

09:41:34 21    with Google?

09:41:41 22         A.  I don't recall.

09:41:44 23         Q.  Is it your testimony that Apple never received,

09:41:48 24    to the best of your recollection, any complaints from

09:41:50 25    Google to that effect?

09:41:53  1        A.  It is the best of my recollection that we never

09:41:57  2   received any complaints about cold calling into Google.

09:42:02  3   I don't know if there was any complaints received about

09:42:06  4   recruiting out of Google.

09:42:08  5        Q.  Did you, from time to time, check with the

09:42:11  6   people that you supervised to ensure that they were

09:42:15  7   complying with the understanding with Google?

09:42:24  8        A.  There was -- there were times in which there

09:42:28  9   was communication between me and some of the folks on my

09:42:32 10   team about clarifying one's candidacy at Apple from

09:42:42 11   Google.

09:42:43 12        Q.  Isn't it true that after you complained about

09:42:46 13   Google violating the understanding, that you checked

09:42:52 14   with the people that worked for you at Apple to make

09:42:56 15   sure that no one at Apple had violated that

09:42:59 16   understanding?

09:43:00 17        A.  I believe I may have done so.

09:43:05 18        Q.  Did Apple have a no-cold-calling agreement with

09:43:07 19   Adobe?

09:43:16 20        A.  That's not my understanding.  It's my

09:43:19 21   understanding that we had -- there was sensitivity

09:43:23 22   involved, in periods of time, with Apple cold calling

09:43:27 23   into Adobe because of our business relationship.  I

09:43:32 24   don't know if -- there was no agreement in my mind.

09:43:45 25        Q.  Okay.  I -- I don't understand your last

09:43:49  1    answer.  Let me ask the question again.  Is it your

09:43:51  2    testimony that there was or was not an agreement between

09:43:54  3    Apple and Adobe with respect to cold calling?

09:43:57  4        A.  It's my understanding that we had -- Adobe was

09:44:01  5    on our sensitive list for periods of time because of our

09:44:05  6    business relationship.  I don't know -- I have no idea

09:44:08  7    if there was an agreement between Apple and Adobe as it

09:44:10  8    relates to cold calling into each other's companies.

09:44:15  9        Q.  And when you say you "have no idea," what do

09:44:18  10   you mean?

09:44:21  11       A.  Meaning, I don't know what was discussed.

09:44:22  12       Q.  Okay.

09:44:23  13       A.  I don't know what was discussed, if things were

09:44:25  14   discussed, how it was discussed.

09:44:28  15       Q.  Were you told, by Ms. Lambert or someone else

09:44:31  16   at Apple, that there was an agreement between Apple and

09:44:34  17   Adobe with respect to cold calling?

09:44:38  18            And maybe I should use a better -- let me

09:44:41  19   withdraw that question.

09:44:42  20            Were you told by Ms. Lambert, or someone else

09:44:44  21   at Apple, that there was an understanding between Apple

09:44:47  22   and Adobe with respect to cold calling?

09:44:53  23       A.  I don't recall.  Specifically I recall there

09:44:58  24   being sensitivity about cold calling in Adobe because of

09:45:00  25   our business relationship; and frankly, that was very

| | | |
|---|---|---|
| 09:45:04 | 1 | dynamic. |
| 09:45:25 | 2 | Q.  Are you aware that in the Department of |
| 09:45:30 | 3 | Justice's Competitive Impact Statement, in the case |
| 09:45:36 | 4 | against Apple and others with respect to these |
| 09:45:40 | 5 | cold-calling agreements, that the Government stated that |
| 09:45:43 | 6 | beginning no later than May 2005, Apple requested an |
| 09:45:47 | 7 | agreement from Adobe to refrain from cold calling each |
| 09:45:50 | 8 | other's employees? |
| 09:45:53 | 9 | MR. RILEY:  Objection.  No foundation. |
| 09:45:58 | 10 | THE WITNESS:  I'm not aware of that.  The |
| 09:45:59 | 11 | reason I'm having trouble with this one is I was |
| 09:46:05 | 12 | specifically involved in recruiting an executive out of |
| 09:46:11 | 13 | Adobe.  Actively recruiting somebody out of Adobe.  I'm |
| 09:46:14 | 14 | not sure what time frame that was and if it's within |
| 09:46:16 | 15 | these time zones. |
| 09:46:18 | 16 | MR. SAVERI:  Q.  You said "an executive." |
| 09:46:20 | 17 | Does that mean one person? |
| 09:46:23 | 18 | A.  In that period of time, yes. |
| 09:46:24 | 19 | Q.  And who was that person? |
| 09:46:26 | 20 | A.  A gentleman by the name of Ben Dillon who was |
| 09:46:29 | 21 | at Macromedia. |
| 09:46:30 | 22 | Q.  And was that -- was he at Macromedia before -- |
| 09:46:33 | 23 | I'm sorry, was he at Macromedia after Adobe bought |
| 09:46:37 | 24 | Macromedia? |
| 09:46:38 | 25 | A.  I believe so, yes. |

09:46:39  1        Q.  But my question is, do you deny that beginning

09:46:50  2    no later than May 2005, Apple requested an agreement

09:46:53  3    from Adobe to refrain from cold calling each other's

09:46:56  4    employees?

09:46:58  5            MR. RILEY:  Objection to the form of the

09:46:59  6    question.

09:47:02  7            THE WITNESS:  I don't know about that.  I just

09:47:05  8    don't know about that.

09:47:15  9            MR. SAVERI:  Q.  Did you ever discuss that

09:47:17  10   subject with Ms. Lambert?

09:47:18  11           MR. RILEY:  Objection.  The question is vague.

09:47:23  12           THE WITNESS:  I believe we may have discussed

09:47:24  13   it on occasion.  Adobe -- it was a porous -- during a

09:47:34  14   period of time, there was sensitivity about cold calling

09:47:37  15   into Adobe because of our strategic relationship.  That

09:47:41  16   was ambiguous to me and to some recruiters, and I did

09:47:47  17   not want to go out of my way to spend a lot of time

09:47:53  18   clarifying that because we were -- we were successfully

09:47:58  19   recruiting out of Adobe.

09:48:00  20           MR. SAVERI:  Q.  Did you discuss that

09:48:02  21   subject with Ms. Lambert?

09:48:05  22           And when I say "that subject," I mean the --

09:48:09  23   let me -- let me withdraw the question.

09:48:12  24           Was Apple -- excuse me.

09:48:13  25           Was Adobe on the no-cold-calling list that

| | | |
|---|---|---|
| 09:48:16 | 1 | you've maintained? |
| 09:48:18 | 2 | A.  There was a period of time that I believe Adobe |
| 09:48:19 | 3 | was on that list. |
| 09:48:21 | 4 | Q.  Who told you to put Adobe on the list? |
| 09:48:25 | 5 | A.  I don't recall. |
| 09:48:26 | 6 | Q.  Was it Ms. Lambert? |
| 09:48:30 | 7 | A.  Don't recall if it was Ms. Lambert or |
| 09:48:34 | 8 | Mr. Okamoto. |
| 09:48:37 | 9 | Q.  Was there a point in time when Adobe was taken |
| 09:48:40 | 10 | off that list? |
| 09:48:49 | 11 | A.  I believe there was a time that Adobe was taken |
| 09:48:50 | 12 | off the list. |
| 09:48:52 | 13 | Q.  When? |
| 09:48:52 | 14 | A.  I don't recall. |
| 09:48:53 | 15 | Q.  Did you take Adobe off the list? |
| 09:49:02 | 16 | A.  If Adobe was taken off the list, it would have |
| 09:49:04 | 17 | come by my direction. |
| 09:49:05 | 18 | Q.  Who gave you direction to take Adobe off the |
| 09:49:08 | 19 | list?  Did you decide yourself? |
| 09:49:11 | 20 | A.  The -- this is porous.  So this -- |
| 09:49:17 | 21 | Q.  I'm sorry, I don't mean to interrupt you.  When |
| 09:49:20 | 22 | you say "porous," I want to make sure I understand what |
| 09:49:22 | 23 | you mean by that. |
| 09:49:24 | 24 | A.  What I mean by that is I think there may be a |
| 09:49:27 | 25 | sense that this was very black and white, or there is a |

09:49:30  1  specific date in which this just gets cut off, a light

09:49:34  2  switch gets turned on or turned off, and that's just not

09:49:36  3  how it worked.

09:49:38  4        If, when Adobe was on that no-cold-call list,

09:49:42  5  it may have been on there for some time, but the reality

09:49:47  6  is recruiting had never stopped, and it was very

09:49:50  7  difficult to keep track of when cold calls were actually

09:49:57  8  made.  And it is my understanding that Adobe, at some

09:50:02  9  points in time, was viewed as not as an important

09:50:07 10  strategic as it once was.  And it fell off the list at

09:50:11 11  some point in time.

09:50:13 12     Q.  When you say "fell off," I mean, you maintain

09:50:14 13  the list; right?

09:50:17 14        MR. RILEY:  Objection.  Misstates his

09:50:22 15  testimony.

09:50:22 16        MR. SAVERI:  Q.  Did you maintain the

09:50:24 17  no-cold-calling list?

09:50:26 18     A.  It was organic.  I -- as the head of

09:50:28 19  recruiting, that list was under my jurisdiction.

09:50:31 20     Q.  And who instructed you to remove Adobe from

09:50:35 21  that list?

09:50:37 22     A.  I don't recall.

09:50:38 23     Q.  And do you recall when you were instructed to

09:50:40 24  take Adobe off the list?

09:50:42 25     A.  I don't recall.

| | |
|---|---|
| 05:36:48 1 | purposes of determining or setting employee |
| 05:36:50 2 | compensation? |
| 05:36:51 3 | MR. RILEY:  Objection.  Question is overbroad. |
| 05:36:53 4 | No foundation. |
| 05:37:01 5 | THE WITNESS:  Do we set job levels for the |
| 05:37:04 6 | purposes of setting compensation? |
| 05:37:07 7 | MR. SAVERI:  Q.  Yes. |
| 05:37:15 8 | A.  I believe it is -- it's one vehicle that we use |
| 05:37:19 9 | to ultimately determine that. |
| 05:37:24 10 | Q.  Now, as a general matter, were changes made for |
| 05:37:31 11 | employee compensation through changes in job categories |
| 05:37:35 12 | or job classifications? |
| 05:37:40 13 | A.  Can you please repeat that question. |
| 05:37:41 14 | Q.  As a general matter, were changes made to |
| 05:37:44 15 | compensation for Apple employees through changes to job |
| 05:37:47 16 | categories or job classifications? |
| 05:37:50 17 | MR. RILEY:  Objection.  The question is vague. |
| 05:37:52 18 | No foundation. |
| 05:37:55 19 | THE WITNESS:  I believe there may be |
| 05:37:56 20 | circumstances when that was the case.  But I don't know |
| 05:37:58 21 | if that was a general practice. |
| 05:38:01 22 | MR. SAVERI:  Q.  Well, is it fair to say |
| 05:38:04 23 | that from time to time, persons move from one job |
| 05:38:09 24 | classification to another at Apple? |
| 05:38:17 25 | A.  I'm not sure I follow your question. |

05:38:18  1      Q.  Well, when an employee came to Apple, were they

05:38:22  2  put in -- were they assigned a job classification or job

05:38:27  3  category?

05:38:29  4      A.  I believe that would be the case.

05:38:31  5      Q.  And was one way their salary was increased, or

05:38:34  6  the compensation was increased, to be moved from one job

05:38:38  7  level or job classification to another job level or job

05:38:41  8  classification?

05:38:45  9      A.  I would -- my understanding is that one

05:38:48 10  would -- my interpretation of that is it's done through

05:38:54 11  promotions and taking on more responsibility.

05:38:58 12      Q.  And when someone was promoted, would they be

05:39:01 13  promoted to a higher job classification or job category?

05:39:06 14      A.  I believe so.

05:39:08 15      Q.  And as a consequence of that, or in connection

05:39:10 16  with that, if they were promoted, they would generally

05:39:14 17  receive more compensation.  Is that fair?

05:39:18 18      A.  I believe that would be the case.

05:39:22 19      Q.  From time to time, did Apple raise the

05:39:25 20  compensation for a particular job category or job level?

05:39:33 21          MR. RILEY:  Objection.  Question is overbroad

05:39:35 22  and there is no foundation.

05:39:43 23          THE WITNESS:  I believe that that would be

05:39:45 24  taken -- I believe if and when that was done, it was

05:39:48 25  done on an annual basis during compensation planning.

Deposition of Mark Bentley                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

05:39:53   1        MR. SAVERI:  Q.  So, for example, were

05:39:54   2   there employees at Apple who received increases in

05:39:58   3   salary, although they didn't receive a promotion to

05:40:01   4   a different job category or job classification?

05:40:06   5        MR. RILEY:  Objection.  The question is

05:40:08   6   overbroad and there is no foundation.

05:40:20   7        THE WITNESS:  So I believe that that would

05:40:22   8   occur with what we would call merit -- the merit time,

05:40:28   9   or what other companies call focal period, which is done

05:40:33  10   on an annual basis to keep up with inflationary

05:40:37  11   conditions in the market.  And that's not to say that

05:40:40  12   all employees saw adjustments to their compensation.

05:40:46  13        MR. SAVERI:  Q.  Fair enough.

05:40:53  14        Do you know if the market survey information

05:40:55  15   was used in considering whether or not Apple should make

05:40:58  16   those changes to salary levels for particular job levels

05:41:03  17   or job classifications?

05:41:06  18        MR. RILEY:  Question is overbroad and there is

05:41:08  19   no foundation.  It's vague as to time.

05:41:13  20        THE WITNESS:  Again, I believe it's a vehicle

05:41:15  21   that was considered.  How it was weighted, I can't tell

05:41:21  22   you.

05:41:25  23        MR. SAVERI:  Q.  Going back to Exhibit 268,

05:41:32  24   you, in your email to yourself, attach an email from

05:41:39  25   Gilda Montesino to staffing.  Do you see that?

| | | |
|---|---|---|
| 05:57:59 | 1 | MR. SAVERI:  Q.  Did Apple review the |
| 05:58:04 | 2 | compensation levels or the amount of compensation |
| 05:58:07 | 3 | for particular job titles or classifications on a |
| 05:58:10 | 4 | regular basis? |
| 05:58:13 | 5 | MR. RILEY:  Objection.  The question is vague |
| 05:58:14 | 6 | as to compensation. |
| 05:58:22 | 7 | THE WITNESS:  So as the interim HR head, my |
| 05:58:25 | 8 | specialty was recruiting.  It was never my experience |
| 05:58:28 | 9 | that we had issues with competing in the market with |
| 05:58:35 | 10 | getting great talent because of compensation. |
| 05:58:39 | 11 | MR. SAVERI:  Q.  Well, was there ever a |
| 05:58:41 | 12 | situation that you were aware of where Apple |
| 05:58:44 | 13 | believed it had to increase salaries for particular |
| 05:58:47 | 14 | job categories in order to stop or prevent attrition |
| 05:58:50 | 15 | or departure from Apple? |
| 05:58:54 | 16 | MR. RILEY:  Objection.  The question is |
| 05:58:55 | 17 | overbroad and there is no foundation. |
| 05:59:00 | 18 | THE WITNESS:  There may have been situations |
| 05:59:02 | 19 | where there were key employees that may have wanted to |
| 05:59:05 | 20 | leave.  And if -- depending on how important they were, |
| 05:59:12 | 21 | that might have been considered. |
| 05:59:18 | 22 | MR. SAVERI:  Q.  Did Apple employees |
| 05:59:21 | 23 | receive merit bonuses? |
| 05:59:27 | 24 | MR. RILEY:  Objection.  The question is vague. |
| 05:59:30 | 25 | THE WITNESS:  I don't understand your question. |

| | | |
|---|---|---|
| 05:59:31 | 1 | MR. SAVERI:  Q.  Well, did -- were Apple |
| 05:59:37 | 2 | employees eligible to receive increased compensation |
| 05:59:41 | 3 | based on merit or performance? |
| 05:59:45 | 4 | MR. RILEY:  Same objection. |
| 05:59:46 | 5 | THE WITNESS:  Again, I think it depended on the |
| 05:59:51 | 6 | organization and the executive that was managing the |
| 05:59:56 | 7 | organization as it related to how he or she used their |
| 06:00:01 | 8 | discretion. |
| 06:00:02 | 9 | MR. SAVERI:  Q.  So is it fair to say that |
| 06:00:03 | 10 | those managers or persons that you identified had |
| 06:00:05 | 11 | discretion to award or provide bonuses or increased |
| 06:00:11 | 12 | compensation for merit or performance? |
| 06:00:13 | 13 | MR. RILEY:  Objection.  The question is overly |
| 06:00:14 | 14 | broad with regard to employee categories. |
| 06:00:21 | 15 | THE WITNESS:  So from my vantage point, as the |
| 06:00:26 | 16 | interim HR, merit -- annual merit eligibility and bonus |
| 06:00:31 | 17 | were two different -- two different conversations, if |
| 06:00:35 | 18 | you will.  And it depended on the executive -- the |
| 06:00:40 | 19 | executive's discretion. |
| 06:00:42 | 20 | MR. SAVERI:  Q.  Okay.  Let's break them |
| 06:00:44 | 21 | into pieces.  With respect to merit, who |
| 06:00:48 | 22 | determine -- well, can you describe the merit |
| 06:00:51 | 23 | process. |
| 06:00:56 | 24 | A.  The merit process is, I think, similar to many |
| 06:01:01 | 25 | companies. ███████████████████████████████ |

| 06:01:07 | 1 | ████████████████████████████ |
| 06:01:14 | 2 | ████████████████████████████████ |
| 06:01:22 | 3 | ████  ████████████████████████████ |
| 06:01:28 | 4 | █████████████████████████████. |

06:01:34  5        MR. SAVERI:  Q.  How did the bonus portion

06:01:35  6   of compensation work?  What was the process,

06:01:37  7   generally, for determining that?

06:01:39  8        MR. RILEY:  Objection.  The question is overly

06:01:41  9   broad and vague.

06:01:42 10        THE WITNESS:  It's -- it varies greatly.

06:01:45 11        MR. SAVERI:  Q.  Okay.  Who had -- were the

06:01:47 12   particular persons or -- strike that.

06:01:50 13        Was the compensation committee responsible for

06:01:54 14   determining bonuses?

06:01:56 15        MR. RILEY:  Objection.  The question is overly

06:01:57 16   broad and vague.

06:02:01 17        THE WITNESS:  The compensation committee, I

06:02:03 18   believe, was responsible or had discretion over the

06:02:07 19   executive team bonuses.  But I do not know -- I don't

06:02:12 20   think they had -- they weren't -- they were involved in

06:02:16 21   approving a general framework, and that would then --

06:02:19 22   for the lower levels it was up to the actual individual

06:02:22 23   managers.

06:02:31 24        MR. SAVERI:  Q.  When a new employee is

06:02:33 25   hired by Apple, how is the job title and the level

06:02:38   1   of compensation for that individual generally

06:02:41   2   determined?

06:02:43   3        MR. RILEY:  Objection.  The question is overly

06:02:45   4   broad and there is no foundation.

06:02:47   5        THE WITNESS:  It depends on -- it depends on

06:02:49   6   the functional discipline.  Depends on the leveling, you

06:02:54   7   know, if we're talking about the -- if we're talking

06:02:57   8   about high volume recruiting, say, in retail or in our

06:03:01   9   call centers versus the exec search team.  It varied

06:03:03  10   greatly.

06:03:05  11        MR. SAVERI:  Q.  Was the assignment of

06:03:07  12   particular employees to job categories or job titles

06:03:12  13   something that the HR department did, or the

06:03:16  14   recruiting department?

06:03:17  15        Let me ask a better question.  What --

06:03:20  16   institutionally, who was responsible for assigning

06:03:24  17   particular employees to particular job classifications

06:03:29  18   or job categories?

06:03:31  19        MR. RILEY:  Objection.  The question is vague.

06:03:32  20        THE WITNESS:  I'm not sure I understand your

06:03:34  21   question specifically.  I would answer that question by

06:03:38  22   telling you that in many cases a requisition is created

06:03:46  23   by a hiring manager.  And it is at that time that that

06:03:52  24   goes through a process, and then that requisition is

06:03:55  25   then recruited against.

1        I, Gina V. Carbone, Certified Shorthand

2   Reporter licensed in the State of California, License

3   No. 8249, hereby certify that the deponent was by me

4   first duly sworn and the foregoing testimony was

5   reported by me and was thereafter transcribed with

6   computer-aided transcription; that the foregoing is a

7   full, complete, and true record of said proceedings.

8        I further certify that I am not of counsel or

9   attorney for either of any of the parties in the

10  foregoing proceeding and caption named or in any way

11  interested in the outcome of the cause in said caption.

12        The dismantling, unsealing, or unbinding of

13  the original transcript will render the reporter's

14  certificates null and void.

15        In witness whereof, I have hereunto set my

16  hand this day:  July 6, 2012.

17        ___X___ Reading and Signing was requested.

18        _____ Reading and Signing was waived.

19        _____ Reading and signing was not requested.

20

21

22        _____

23        GINA  V. CARBONE

24        CSR 8249, RPR, CCRR

25