# Exhibit M

Declaration of Lisa J. Cisneros in Support of Plaintiffs'
Opposition Briefs ("Cisneros"), February 6, 2014,
(Dkt. 605)

(Public - redacted under seal portions)

Patrick Burke

February 26, 2013 Deposition

1                UNITED STATES DISTRICT COURT

2               NORTHERN DISTRICT OF CALIFORNIA

3                     SAN JOSE DIVISION

4

5

6    IN RE:  HIGH-TECH EMPLOYEE     )

7    ANTITRUST LITIGATION           )

8                                   )   No. 11-CV-2509-LHK

9    THIS DOCUMENT RELATES TO:      )

10   ALL ACTIONS.                   )

11   _____)

12

13

14                   HIGHLY CONFIDENTIAL

15           VIDEO DEPOSITION OF PATRICK BURKE

16                   February 26, 2013

17

18

19   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25

Deposition of Patrick Burke                                      In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:12:16  1   and source candidates for us.

10:12:17  2        Q.  Well, were there -- were there particular types

10:12:20  3   of research they did or data they gathered?

10:12:24  4           MR. TUBACH:  Lacks foundation.

10:12:27  5           THE WITNESS:  No.  I mean, it's a broad

10:12:30  6   description of service that they provided.

10:12:39  7           MR. SAVERI:  Q.  I asked you a few minutes

10:12:41  8   ago about the -- about your role with respect to

10:12:48  9   placing new hires in the salary structure.  Let me

10:12:50 10   ask some more questions about that.

10:12:53 11        A.  Sure.

10:12:55 12        Q.  So as a general matter, when Apple determined

10:12:59 13   that it needed to fill a certain job, who decided what

10:13:06 14   the salary range for that job would be?

10:13:09 15           MR. TUBACH:  Lacks foundation.  Calls for

10:13:09 16   speculation.

10:13:12 17           THE WITNESS:  For a particular candidate that

10:13:14 18   we were hiring?

10:13:15 19           MR. SAVERI:  Q.  Yes.

10:13:16 20        A.  The hiring manager was the ultimate decision,

10:13:19 21   and recruiters and HR representatives would help and

10:13:26 22   influence.

10:13:27 23        Q.  Well, was it generally the practice that a

10:13:32 24   range was established for a particular job that needed

10:13:37 25   to be filled?

10:13:39   1        A.   No.

10:14:01   2        Q.   So during your time, you hired or recruited

10:14:09   3    engineers, correct?

10:14:11   4        A.   That's all I did.  Yes.

10:14:12   5        Q.   Now, for any particular engineering candidate,

10:14:16   6    how was the salary range established for that potential

10:14:21   7    candidate?

10:14:21   8             MR. TUBACH:  Objection.  Asked and answered.

10:14:23   9    Lacks foundation.

10:14:25  10             THE WITNESS:  It wasn't a salary range

10:14:28  11    determined, it was what salary we were going to offer.

10:14:33  12             MR. SAVERI:  Q.  Okay.

10:14:33  13        A.   And how that was determined was mostly asking

10:14:37  14    the hiring manager who they compared to in the team,

10:14:40  15    looking at the candidate's education, experience, and

10:14:44  16    knowledge within that experience, and comparing that to

10:14:48  17    different people on their team.  And those were the

10:14:52  18    biggest deciphering things.

10:14:54  19             Now, each person on their team that they

10:14:57  20    compared to were at particular levels and titles and,

10:15:03  21    you know, levels within the salary ranges.  And that's

10:15:05  22    more what determined it.

10:15:07  23             And then sometimes, depending on where -- the

10:15:09  24    number that we determined for a particular candidate, we

10:15:13  25    would look where it falls in with a particular salary

Deposition of Patrick Burke                          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:15:15  1   range, was that comfortable.  There were certain

10:15:19  2   guidelines that they didn't want to be too high of one

10:15:22  3   particular one, or too low, and that's where kind of

10:15:25  4   sometimes HR would get involved to do it.  But it was

10:15:28  5   generally guided by other people on the team and how

10:15:31  6   they compared to them.

10:15:34  7          MR. SAVERI:  Q.  As part of that process --

10:15:35  8   well, strike that.

10:15:40  9          When was the system title for a particular

10:15:46 10   candidate or new hire established?

10:15:49 11          A.  At that time.

10:15:50 12          Q.  Okay.

10:15:51 13          A.  So it's -- we -- in the recruiting system, when

10:15:56 14   we opened a position, we would open it up at -- there is

10:16:01 15   two levels, say it was a two and a three.  But we had,

10:16:05 16   you know, kind of flexibility to, hey, if we're hiring

10:16:08 17   and we determined that the salary range what we were

10:16:10 18   figuring that would be a four, we could change that in

10:16:14 19   the system and make that happen.

10:16:16 20          Q.  And who had to approve that change, just

10:16:19 21   organizationally?  Was it Tony Fadell?  Was it someone

10:16:23 22   in the HR department?  Was it you?

10:16:25 23          A.  There was no approving of the change, it was

10:16:27 24   approving of the offer.

10:16:28 25          Q.  Okay.

10:16:28 1    A.  So it was once we determined with the hiring

10:16:30 2    manager, we would make that change in the system, but

10:16:33 3    then that would be -- we would make the offer, put

10:16:34 4    that -- those numbers and everything to it, and put that

10:16:37 5    up through the management chain, which included Tony

10:16:41 6    Fadell and the iPod division.

10:16:44 7         But that's how it was for any of the divisions

10:16:47 8    in Apple that I was involved with.

10:16:57 9         Q.  As a general matter, who communicated to the

10:16:59 10   candidates regarding compensation packages?

10:17:03 11        A.  Mostly the recruiter.

10:17:04 12        Q.  So sometimes it was you?

10:17:06 13        A.  Yes.

10:17:07 14        Q.  And then sometimes it was the recruiters that

10:17:09 15   you supervised?

10:17:10 16        A.  Yes.  And then sometimes, you know, every once

10:17:12 17   in a while it was a hiring manager.

10:17:20 18        Q.  So did you ever make recommendations regarding

10:17:22 19   base salary for particular candidates?

10:17:25 20        A.  Yes.

10:17:26 21        Q.  And what were -- what were those

10:17:29 22   recommendations generally based on?  Those same criteria

10:17:32 23   that we've been --

10:17:34 24        A.  What salary they were currently at, what salary

10:17:36 25   they were looking for, what competing offers were.  But

10:17:42   1    it was always determined by how they compared to other

10:17:46   2    people.  And then if that didn't quite match up with

10:17:48   3    their expectations, I'd advise kind of the hiring

10:17:52   4    manager do we want to push that up a little higher.  If

10:17:56   5    their expectations were higher, do we want to push that

10:17:58   6    higher or a hiring bonus to make up the difference.

10:18:02   7    Those were some of the components that we would do.

10:18:08   8              Basically advise.  Advise on what makes sense,

10:18:11   9    what we call internally, versus what will close the

10:18:18  10    deal.

10:18:18  11        Q.  I think you said a few seconds ago that when

10:18:21  12    you did that, one of the things you looked at was -- or

10:18:25  13    what you tried to do was compare the candidate you were

10:18:30  14    talking to to other people?

10:18:34  15        A.  Other engineers at similar levels on the team,

10:18:37  16    yes.

10:18:37  17        Q.  That's what I wanted to get.  When you said

10:18:39  18    other people, were you talking about other people at

10:18:41  19    Apple?

10:18:42  20        A.  Yes.

10:18:43  21        Q.  When you were determining yourself, or making a

10:18:46  22    recommendation on salary, did you also look at

10:18:51  23    information or data regarding compensation outside the

10:18:55  24    company?

10:18:56  25        A.  No.

Deposition of Patrick Burke                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:18:56  1        Q.  I mean, for example, did you look at what they

10:18:58  2    were making before at their other company?

10:19:03  3             MR. TUBACH:  Vague and ambiguous.

10:19:03  4             You mean what the prospective employee was

10:19:06  5    making --

10:19:06  6             MR. SAVERI:  Yes.

10:19:07  7             MR. TUBACH:  -- at his current job?

10:19:08  8             THE WITNESS:  I would ask the candidate what

10:19:10  9    their current compensation was.  For the most part they

10:19:12 10    shared that, sometimes they did not.

10:19:14 11             MR. SAVERI:  Q.  Did you also consider what

10:19:16 12    the market was for particular skill sets,

10:19:23 13    qualifications, with respect to the people you were

10:19:27 14    recruiting?

10:19:27 15        A.  That's a broad statement.  It was probably more

10:19:30 16    driven by competing offers.

10:19:32 17        Q.  Okay.

10:19:33 18        A.  Either of that particular candidate or similar

10:19:37 19    candidates.

10:19:38 20        Q.  So are you aware that there are companies that,

10:19:40 21    for example, do compensation surveys of the market?

10:19:50 22        A.  Yes.

10:19:51 23        Q.  I mean, for example, have you heard the name

10:19:53 24    Croner?

10:19:55 25        A.  No.

| | | |
|---|---|---|
| 10:19:55 | 1 | Q.  Or Radford? |
| 10:19:56 | 2 | A.  Yes. |
| 10:19:57 | 3 | Q.  Okay.  And have you seen Radford surveys from |
| 10:20:00 | 4 | time to time? |
| 10:20:01 | 5 | A.  No. |
| 10:20:01 | 6 | Q.  Did you ever use Radford Survey data, or other |
| 10:20:06 | 7 | similar data, regarding levels of compensation in the |
| 10:20:11 | 8 | market in doing your job with respect to recommending |
| 10:20:15 | 9 | compensation for particular candidates? |
| 10:20:20 | 10 | A.  Never. |
| 10:20:20 | 11 | Q.  So in terms of comparison, is it fair to say |
| 10:20:22 | 12 | that when you were making recommendations, you tried to |
| 10:20:30 | 13 | make a comparison of the candidate you were talking to |
| 10:20:33 | 14 | to other people at Apple? |
| 10:20:35 | 15 | MR. TUBACH:  Objection.  Asked and answered. |
| 10:20:37 | 16 | THE WITNESS:  Compared the candidate to the |
| 10:20:40 | 17 | people at Apple on the team that we were hiring them in. |
| 10:20:45 | 18 | MR. SAVERI:  Q.  When you made a |
| 10:20:47 | 19 | recommendation, did you consider whether or not this |
| 10:20:57 | 20 | new candidate was going to be getting paid more for |
| 10:21:03 | 21 | a similar job than people who were already at Apple? |
| 10:21:08 | 22 | MR. TUBACH:  Vague and ambiguous. |
| 10:21:08 | 23 | THE WITNESS:  Yes, can you.... |
| 10:21:11 | 24 | MR. SAVERI:  Q.  Well, was one of your |
| 10:21:12 | 25 | concerns that you didn't want -- when you were |

Deposition of Patrick Burke                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 10:21:14 | 1 | hiring a new candidate and you were talking about |
| 10:21:16 | 2 | compensation, when you wanted to get that right, did |
| 10:21:20 | 3 | you think about whether or not you were -- you were |
| 10:21:24 | 4 | going to pay a candidate more than someone else who |
| 10:21:27 | 5 | was already at Apple doing a similar job? |
| 10:21:30 | 6 | MR. TUBACH:  Same objection. |
| 10:21:33 | 7 | THE WITNESS:  That was a determining factor, |
| 10:21:35 | 8 | but it was, again, more about how they compared to those |
| 10:21:39 | 9 | people.  And so the hiring manager would usually not |
| 10:21:43 | 10 | want to pay more than a person with similar or more |
| 10:21:49 | 11 | experience at Apple. |
| 10:21:51 | 12 | So we called it internal equity or fair |
| 10:21:54 | 13 | compensation.  And we would want to kind of keep it fair |
| 10:21:58 | 14 | to the team on board.  Just because this person was |
| 10:22:00 | 15 | asking for more money than someone with similar |
| 10:22:06 | 16 | experience on the team didn't mean we just gave it to |
| 10:22:09 | 17 | him.  We would keep it fair to the people, and ███████ |
| 10:22:13 | 18 | ████████████████████████████████████████████████ |
| 10:22:18 | 19 | ██████ |
| 10:22:21 | 20 | MR. SAVERI:  Q.  Okay.  How important did |
| 10:22:39 | 21 | you think recruiting was to the success of Apple? |
| 10:22:41 | 22 | MR. TUBACH:  Vague and ambiguous.  Lacks |
| 10:22:43 | 23 | foundation. |
| 10:22:45 | 24 | THE WITNESS:  Very important. |
| 10:22:49 | 25 | MR. SAVERI:  Q.  Why was it very important? |

| | | |
|---|---|---|
| 10:22:51 | 1 | MR. TUBACH:  Same objections. |
| 10:22:56 | 2 | THE WITNESS:  Growth of the business.  We |
| 10:22:59 | 3 | needed people to -- more engineers to make their |
| 10:23:04 | 4 | products of the ideas that they came up with.  Steve |
| 10:23:07 | 5 | Jobs thought it was -- you know, he would mention that |
| 10:23:11 | 6 | 40 percent of his time was recruiting, whatever that |
| 10:23:16 | 7 | meant. |
| 10:23:16 | 8 | MR. SAVERI:  Q.  Well, a hundred percent of |
| 10:23:18 | 9 | yours was, right? |
| 10:23:18 | 10 | A.  Yes.  But it was always good to have someone at |
| 10:23:21 | 11 | the -- as a leader that thinks that recruiting, you |
| 10:23:24 | 12 | know, your job, is important. |
| 10:23:27 | 13 | Q.  Well, okay.  Did you understand that Mr. Jobs |
| 10:23:32 | 14 | had a personal commitment to recruiting top talent to |
| 10:23:37 | 15 | Apple? |
| 10:23:39 | 16 | A.  I don't know.  I'm assuming so by saying 40 |
| 10:23:40 | 17 | percent of his time was spent on recruiting. |
| 10:23:43 | 18 | Q.  Well, did you understand, yourself, that your |
| 10:23:45 | 19 | job, with respect to recruiting top talent to Apple, was |
| 10:23:48 | 20 | very important to the company? |
| 10:23:51 | 21 | MR. TUBACH:  Lacks foundation. |
| 10:23:52 | 22 | THE WITNESS:  I personally thought that, yes. |
| 10:24:02 | 23 | MR. SAVERI:  Q.  Did you ever talk with |
| 10:24:03 | 24 | Mr. Jobs about that subject? |
| 10:24:04 | 25 | A.  Never talked to him. |

10:24:06  1        Q.  You never talked to him?

10:24:07  2        A.  No.

10:24:10  3        Q.  Just so I'm clear, you never spoke to Steve

10:24:12  4    Jobs in your life?

10:24:13  5        A.  No.

10:24:14  6        Q.  Okay.  Did you ever communicate to him in

10:24:16  7    writing?

10:24:20  8        A.  No.

10:24:22  9        Q.  Did you ever go to meetings or participate in

10:24:26 10    kind of group circumstances where Steve Jobs addressed

10:24:35 11    people at Apple or communicated his thoughts about the

10:24:37 12    company?

10:24:38 13        A.  Yes.

10:24:38 14        Q.  During any of those, did he talk about the

10:24:40 15    importance of recruiting top talent to the company --

10:24:42 16        A.  Yes.

10:24:42 17        Q.  -- that you recall.

10:24:44 18            What did he say about that?

10:24:45 19        A.  I can't recall.  Something along those lines

10:24:47 20    of -- that it's important to recruit top talent.  But I

10:24:51 21    don't remember any specific statements.

10:24:53 22        Q.  But you do remember him, at least on one

10:24:57 23    occasion, talking to people internal at Apple about how

10:25:00 24    important recruiting top talent was to the company?

10:25:03 25        A.  Uh-huh.

10:25:03 1      Q.  Did you ever hear him talk about how concerned

10:25:10 2  or -- how concerned he was or how important it was to

10:25:13 3  Apple that Apple retain top talent?

10:25:15 4      A.  No.

10:25:16 5      Q.  Okay.

10:25:44 6          (Discussion off the record.)

10:25:46 7          (Whereupon, Exhibit 1015 was marked for

10:25:46 8          identification.)

10:25:47 9          MR. SAVERI:  Q.  So Mr. Burke, if you need

10:25:49 10 to take a break at any time, let me know.  Otherwise

10:25:52 11 I'm going to keep going and try to get this done as

10:25:56 12 soon as possible.

10:25:56 13     A.  Go until my water is up.

10:25:59 14     Q.  Let me hand you what's been marked as

10:26:02 15 Exhibit 1015.  And this is a document that has Bates

10:26:14 16 numbers, which are the little numbers in the corner, of

10:26:17 17 231APPLE055897 to 99.

10:26:35 18         And Mr. Burke, if you take a moment to look at

10:26:37 19 it, I'm going to just ask you about the portion of the

10:26:42 20 document that looks like something you wrote.  It's a

10:26:44 21 little bit weird because it looks like this document

10:26:47 22 kind of repeats the same thing in two places.  And maybe

10:26:52 23 the easiest way to do this is just to look at what's on

10:26:55 24 the last page.

10:26:56 25     A.  Uh-huh.

11:53:54  1        Q.   From Bruce Arthur?

11:53:56  2        A.   Uh-huh.

11:53:57  3        Q.   Subject Re:  Microsoft looking for iChat

11:54:04  4   contact.  To Patrick Burke.  Do you see that?

11:54:06  5             (Reporter clarification.)

11:54:06  6             THE WITNESS:  Yes.

11:54:08  7             MR. SAVERI:  Q.  Is this an email that you

11:54:11  8   received from Mr. Arthur on or about this date?

11:54:16  9             MR. TUBACH:  Lacks foundation.

11:54:16 10             THE WITNESS:  I'm assuming.  I'm assuming from

11:54:17 11   this printout, yes.

11:54:20 12             MR. SAVERI:  Q.  Now, next to your name

11:54:21 13   there is an email address.  Do you see that?

11:54:23 14        A.   Yes.

11:54:25 15        Q.   Pburke@apple.com?

11:54:28 16        A.   Yes.

11:54:28 17        Q.   Was that the email address you used?

11:54:30 18        A.   Yes, that is me.

11:54:31 19        Q.   And did you ever have a different email

11:54:33 20   address --

11:54:33 21        A.   No.

11:54:34 22        Q.   -- while you were at Apple?

11:54:35 23        A.   No, I did not.

11:54:36 24        Q.   Now, what was Mr. Arthur's job at this time?

11:54:39 25        A.   He was engineering manager for iChat, which was

11:54:44   1     an application in OS10.

11:54:46   2          Q.   During this period of time, were you supporting

11:54:50   3     Mr. Arthur with respect to recruiting?

11:54:52   4          A.   Yes.

11:54:57   5          Q.   Now, it's a little bit hard to tell from the

11:55:07   6     way this is printed, but it looks like his email to you

11:55:13   7     includes some prior communication from you to him.  Do

11:55:17   8     you see that?

11:55:18   9          A.   Yes.

11:55:19  10          Q.   So I think if you look at the kind of second

11:55:26  11     caret it begins "Bruce."  Do you see that?

11:55:27  12          A.   Yes.

11:55:28  13          Q.   It says, "Bruce, would we want to raid this

11:55:31  14     group."  Do you see that?

11:55:32  15          A.   Yes.

11:55:33  16          Q.   Did you write that to him?

11:55:35  17          A.   I'm assuming so, yes.

11:55:36  18          Q.   What did you mean by "raid this group"?

11:55:38  19               MR. TUBACH:  Lacks foundation.

11:55:39  20               THE WITNESS:  Recruit from them.

11:55:43  21               MR. SAVERI:  Q.  Why did you use the term

11:55:48  22     "raid"?

11:55:49  23               MR. TUBACH:  Lacks foundation.

11:55:52  24               THE WITNESS:  That's a slang word for go

11:55:55  25     infiltrate and recruit from one particular group.

| | | |
|---|---|---|
| 11:55:59 | 1 | MR. SAVERI:  Q.  Now, how -- |
| 11:56:04 | 2 | A.  And to clarify that, I'm not sure what is going |
| 11:56:08 | 3 | on there where they're talking about -- when Bruce is |
| 11:56:12 | 4 | talking about released contractors.  So I'm making an |
| 11:56:14 | 5 | assumption that there was some sort of event that |
| 11:56:16 | 6 | happened in this particular group where they were |
| 11:56:19 | 7 | letting people go or there is some sort of weakness. |
| 11:56:22 | 8 | That they weren't doing well or something. |
| 11:56:25 | 9 | That's usually when I talk about raid.  Is |
| 11:56:27 | 10 | there is some weakness in a group.  And rather than just |
| 11:56:30 | 11 | going after one engineer and hopefully to get them out, |
| 11:56:32 | 12 | if there is weakness in a group, you go after, you start |
| 11:56:36 | 13 | calling everybody, and hopefully everybody is, yeah, I |
| 11:56:38 | 14 | hate this place, let's go.  Right?  So that's usually |
| 11:56:40 | 15 | why I would use that terminology. |
| 11:56:43 | 16 | Q.  So were there occasions when you found or |
| 11:56:46 | 17 | identified particular companies where -- that -- where |
| 11:56:50 | 18 | those -- where there were those circumstances? |
| 11:56:53 | 19 | A.  Yes. |
| 11:56:53 | 20 | Q.  And did you view that as a particular kind of |
| 11:56:57 | 21 | opportunity for you with respect to recruiting? |
| 11:57:00 | 22 | A.  Oh, yeah. |
| 11:57:02 | 23 | Q.  Was it the kind of thing that you tried to |
| 11:57:04 | 24 | identify? |
| 11:57:07 | 25 | A.  Identify.  Yeah, I guess.  As your -- you know, |

```
12:07:15  1    my job.
12:07:20  2          MR. SAVERI:  Q.  So you don't have any
12:07:33  3    disagreement with the idea that this kind of attack
12:07:40  4    on a company was or could be aggressive?
12:07:47  5          A.  Uh-huh.
12:07:51  6          Q.  And it's fair to say that that was part of your
12:07:57  7    job, to do that on behalf of Apple?
12:07:59  8          A.  Yes.
12:08:00  9          Q.  Now, you write to him, "I promise I won't rat
12:08:05 10    you out as we raid their company."
12:08:11 11          What did you mean by, "I promise I won't rat
12:08:13 12    you out"?
12:08:14 13          A.  There is a point when you call a candidate,
12:08:18 14    especially a cold call, how did you hear about my name,
12:08:21 15    they'll ask you.
12:08:22 16          Q.  Right.
12:08:23 17          A.  So, oh, yeah, Floyd Clark gave me your name.
12:08:27 18    That's basically what I'm saying is I'm not going to
12:08:29 19    mention you.
12:08:31 20          Q.  So you -- is it fair to say that you were
12:08:34 21    telling Floyd Clark that you were agreeing to kind of
12:08:37 22    protect the confidentiality of that source?
12:08:41 23          A.  Yes.
12:08:42 24          Q.  When you say, "I'm sure they'll ask me," you
12:08:46 25    are referring to the potential candidates that you
```

12:08:51  1    planned on calling?

12:08:51  2        A.  Yes.

12:09:00  3        Q.  Now, when you were at Apple, do you recall

12:09:03  4    ever -- a situation where you felt Apple was being

12:09:11  5    raided or attacked by other companies with respect to

12:09:14  6    recruiting?

12:09:16  7        A.  Just when I heard from engineers that they were

12:09:21  8    getting called by recruiters, I remember Google at one

12:09:27  9    point calling in to a hardware team, which I always

12:09:31 10    thought was strange for a software company.

12:09:33 11        Q.  Right.

12:09:33 12        A.  And kind of tipped our hand of what they were

12:09:36 13    getting into.  And then those two people rusing into the

12:09:44 14    iPod engineering team.  Those were the instances that I

12:09:46 15    remember.

12:09:47 16            And just to -- and engineering management would

12:09:55 17    say, can you do something about it.  And my response

12:09:58 18    would be, like, no.  That's what recruiters are supposed

12:10:01 19    to do, is you need to make sure your employees are happy

12:10:05 20    and, you know, and challenged and, you know, can resist

12:10:12 21    a recruiting phone call.

12:10:13 22        Q.  So were you asked, time to time, to do

12:10:16 23    something about these -- about particular situations

12:10:18 24    where other companies attacked Apple?

12:10:20 25        A.  Uh-huh.  Yes.

12:10:23   1       Q.   And -- but you were a recruiter.  It wasn't

12:10:26   2   part of your job to deal with that, right?

12:10:29   3       A.   They just thought I could -- I would know

12:10:32   4   somebody over there and tell them to stop.  And it was

12:10:35   5   just kind of naive for them to ask the question, so I'd

12:10:39   6   just go, "No."

12:10:41   7       Q.   They thought you were the sheriff and you could

12:10:43   8   call over there, make them stop or something like that?

12:10:45   9       A.   Yes.

12:10:45   10       Q.   But you couldn't do that?

12:10:47   11       A.   No one could.

12:10:48   12       Q.   It wasn't part of your job?

12:10:49   13       A.   No.  But no one can.  That's -- no one could

12:10:52   14   ask me to stop recruiting.

12:10:53   15       Q.   And they couldn't ask you to stop?

12:10:55   16       A.   No.

12:10:58   17       Q.   Now, do you recall when Palm hired a couple of

12:11:15   18   prominent engineers at Apple?

12:11:16   19       A.   Uh-huh.

12:11:25   20       Q.   What was the -- do you recall the reaction at

12:11:27   21   Apple to that?

12:11:28   22          MR. TUBACH:  Vague and ambiguous.

12:11:30   23          THE WITNESS:  I do.

12:11:31   24          MR. SAVERI:  Q.  And what was it?

12:11:33   25       A.   I can't believe they're doing it.  Because Jon

01:59:29  1      A.  Achim.

01:59:29  2      Q.  How do you pronounce Achim's last name?

01:59:33  3      A.  Pantofoerder.

01:59:34  4      Q.  Pantofoerder.  Did he work in that group as

01:59:36  5  well?

01:59:36  6      A.  Yes.

01:59:37  7      Q.  And Cong worked for you, right?

01:59:38  8      A.  Yes.

01:59:39  9      Q.  As a recruiter?

01:59:39 10      A.  Yes.

01:59:40 11      Q.  Now, he wrote, "Moto is either going to walk

01:59:46 12  him out or come down strong with a counter."  Do you see

01:59:49 13  that?

01:59:49 14      A.  Yes.

01:59:50 15      Q.  And when Mr. Cong wrote, "walk him out," did

01:59:53 16  you understand him to mean -- well, let me just ask you,

01:59:58 17  what did you understand Mr. Cong to mean when he wrote

02:00:02 18  "walk him out"?

02:00:04 19      A.  Well, so when candidates give their two weeks'

02:00:06 20  notice, sometimes, depending on where they're going, as

02:00:09 21  we discussed earlier, that it's not a place they feel

02:00:13 22  comfortable them sticking around for two weeks when

02:00:16 23  they're going to a competitor, so they will escort them

02:00:19 24  out of employment with the company right then and there.

02:00:24 25      Q.  When you say "escort," that means that they

02:00:29  1    didn't leave unattended, right?

02:00:32  2        A.  Correct.  That's an assumption.  That's a term,

02:00:34  3    "walking out," is grab your stuff, let's go.

02:00:39  4        Q.  So it was more of an order than a request,

02:00:42  5    correct?

02:00:43  6        A.  Uh-huh.

02:00:44  7            MR. TUBACH:  Are you talking about generally or

02:00:45  8    are you talking about this Motorola HR --

02:00:47  9            MR. SAVERI:  Q.  When you read this, what

02:00:49 10    you understand him to mean by walking someone out.

02:00:53 11        A.  That's what the term means, is your employment

02:00:55 12    is done, we don't want you to stick around for the two

02:00:58 13    weeks' notice that you gave, or whatever notice that you

02:01:00 14    gave.

02:01:01 15        Q.  And sometimes people who are walked out are

02:01:04 16    escorted by security, right?

02:01:06 17            MR. TUBACH:  Lacks foundation.

02:01:06 18            THE WITNESS:  I don't know.

02:01:07 19            MR. SAVERI:  Q.  Well, did -- when Mr. Cong

02:01:11 20    wrote, "come down strong with a counter," what did

02:01:14 21    you understand him to mean there?

02:01:16 22        A.  A counteroffer to stay.

02:01:18 23        Q.  So did you understand that Mr. Cong was saying

02:01:26 24    that Motorola might walk this candidate out or respond

02:01:34 25    to Apple's offer with a counteroffer?

02:01:38  1      A.  Correct.  Not necessarily in that order.

02:01:42  2  ████████████████████████████████████████████████

02:01:46  3  ██████████████████████████████████████████

02:01:49  4  ████████████████████████████  ██████████████████████

02:01:55  5  ████████████████████████████████████

02:01:59  6  ████████████████████████████████████████████

02:02:02  7      Q.  Usually makes sense to do them in that order,

02:02:04  8  right?

02:02:05  9      A.  Yes.

02:02:20 10      Q.  Did it happen from time to time that candidates

02:02:26 11  that Apple recruited through cold calls, to whom Apple

02:02:33 12  eventually made a job offer, sometimes stayed with their

02:02:36 13  current employers because the current employer made a

02:02:39 14  counteroffer?

02:02:41 15      A.  I can't -- I don't know if as far as from that

02:02:44 16  exact source of cold calling, but over my employment at

02:02:48 17  Apple, that happened several times at different stages

02:02:53 18  where from acceptance to giving notice to, you know,

02:02:57 19  that they would go back with their employer or stay with

02:03:01 20  their employer.

02:03:04 21      Q.  And from time to time, did the counteroffers

02:03:10 22  that candidates that Apple recruited receive from their

02:03:19 23  current employers include increased compensation?

02:03:22 24          MR. TUBACH:  Lacks foundation.  Calls for

02:03:22 25  speculation.

| | | |
|---|---|---|
| 02:03:25 | 1 | THE WITNESS:  I'm not sure.  I mean, it was -- |
| 02:03:28 | 2 | there were -- there was several -- in general, there are |
| 02:03:32 | 3 | several aspects to it.  Increased compensation, title, |
| 02:03:38 | 4 | different projects, whatever is not making them happy, |
| 02:03:42 | 5 | hopefully they could fix to stay, and that might be one |
| 02:03:46 | 6 | of those factors. |
| 02:03:47 | 7 | MR. SAVERI:  Q.  So is it fair to say that |
| 02:03:54 | 8 | sometimes Apple was unsuccessful in recruiting a |
| 02:03:58 | 9 | candidate because the candidate's current employer |
| 02:04:01 | 10 | made a counteroffer that the candidate preferred? |
| 02:04:08 | 11 | MR. TUBACH:  Lacks foundation. |
| 02:04:09 | 12 | THE WITNESS:  Yes. |
| 02:04:10 | 13 | MR. SAVERI:  Q.  And did the candidates who |
| 02:04:14 | 14 | stayed tell you at Apple, from time to time, what |
| 02:04:20 | 15 | the counteroffer was and why they stayed? |
| 02:04:24 | 16 | A.  We would probe into that, yes. |
| 02:04:27 | 17 | Q.  And from time to time, did, in response to |
| 02:04:31 | 18 | those questions, did the candidate tell you, for |
| 02:04:35 | 19 | example, well, they gave me a promotion? |
| 02:04:40 | 20 | A.  Uh-huh. |
| 02:04:41 | 21 | Q.  Or they changed my job duties in a way that I |
| 02:04:44 | 22 | liked? |
| 02:04:46 | 23 | A.  Those were some of the reasons, yes. |
| 02:04:48 | 24 | Q.  And sometimes they would raise their |
| 02:04:51 | 25 | compensation? |

02:04:52 1       A.  Yes.

02:04:53 2       Q.  And sometimes it would be a combination of

02:04:55 3   those things?

02:04:56 4       A.  Yes.

02:04:56 5       Q.  And sometimes a combination of those things and

02:05:01 6   other improvements to their job situation?

02:05:04 7       A.  Correct.

02:05:20 8          (Whereupon, Exhibit 1026 was marked for

02:05:20 9          identification.)

02:05:20 10         MR. SAVERI:  Q.  Exhibit 1026.  Do you have

02:05:35 11  that in front of you?

02:05:36 12      A.  Yes.

02:05:38 13      Q.  This document is an email, looks like it's all

02:05:46 14  an email, with the Bates No. 231APPLE061813 through 817.

02:05:53 15  Do you have that in front of you?

02:05:54 16      A.  Yes.

02:05:55 17      Q.  Would you take a moment to review it, please.

02:06:00 18      A.  Yes.

02:06:04 19      Q.  Some of it you'll recognize as part of -- some

02:06:06 20  of this you will recognize as the previous document.

02:06:09 21      A.  Yep.

02:06:48 22          Okay.

02:06:51 23      Q.  Do you recognize this document?

02:06:52 24      A.  Yes.

02:06:53 25      Q.  Could you tell me what it is, please.

| | | |
|---|---|---|
| 02:06:55 | 1 | A.  It's the same document from Jose Cong, passing |
| 02:06:59 | 2 | along to Dani Lambert and my direct boss, Ed Sermone, |
| 02:07:07 | 3 | about this candidate, about the situation that after |
| 02:07:13 | 4 | giving notice, what heat, as they said, what -- from the |
| 02:07:20 | 5 | candidate -- the Motorola candidate is getting from |
| 02:07:23 | 6 | Motorola for, you know, giving notice, saying that he's |
| 02:07:26 | 7 | going to Apple, and them really probing him further than |
| 02:07:30 | 8 | the normal candidate giving notice.  So.... |
| 02:07:34 | 9 | Q.  Now, did you write the email to Ed Sermone on |
| 02:07:39 | 10 | the 28th of October 2005 as indicated here? |
| 02:07:43 | 11 | A.  To Dani Lambert, cc'ing Ed, yes. |
| 02:07:47 | 12 | Q.  Okay.  Now -- and at this time, was Ed Sermone |
| 02:07:51 | 13 | your direct boss? |
| 02:07:52 | 14 | A.  Correct. |
| 02:07:53 | 15 | Q.  And was Dani Lambert Ed Sermone's boss? |
| 02:07:57 | 16 | A.  Yes. |
| 02:07:58 | 17 | Q.  Why did you write this to Dani Lambert? |
| 02:08:01 | 18 | A.  Because Dani was the one that told me about the |
| 02:08:03 | 19 | agreement.  And as referenced in this, when Dani told me |
| 02:08:11 | 20 | about this agreement, that we told Dani about this |
| 02:08:18 | 21 | candidate we were already in discussions with before the |
| 02:08:21 | 22 | agreement, and for her to ask Steve Jobs if it was okay |
| 02:08:24 | 23 | for us to pursue and he gave that blessing.  Now this is |
| 02:08:27 | 24 | the aftermath of it.  Of the person accepting, giving |
| 02:08:31 | 25 | notice. |

02:10:17   1          Q.   Now, you also write that Jose -- that's Jose

02:10:19   2   Cong, right?

02:10:21   3          A.   Yes.

02:10:21   4          Q.   -- also got a call back from a -- looks like

02:10:25   5   senior Moto engineer -- is that what that means?

02:10:30   6          A.   Yes.

02:10:30   7          Q.   -- a day after the hands off.  Do you see that?

02:10:32   8          A.   Yes.

02:10:34   9          Q.   Does that mean that, in sequence, Steve Jobs

02:10:37  10   and Motorola made the agreement?

02:10:39  11          A.   Yes.

02:10:40  12          Q.   And then the next day, Jose Cong got a call

02:10:46  13   back from someone at Motorola; is that correct?

02:10:47  14          A.   From calling efforts previous to the agreement,

02:10:50  15   he got a call back after the agreement.

02:10:52  16          Q.   So this was a candidate that had -- that Apple

02:10:55  17   had contacted at Motorola before the Jobs-Motorola

02:11:00  18   agreement?

02:11:00  19          A.   Yes.

02:11:00  20          Q.   And this is a different guy than the one that

02:11:03  21   Jobs had specifically approved?

02:11:07  22          A.   Correct.

02:11:11  23          Q.   And then did Jose Cong tell you this?

02:11:22  24          A.   Yes.

02:11:24  25               MR. TUBACH:  When you say "this," you mean

02:11:32  1    what's reflected in the email?

02:11:33  2            MR. SAVERI:  Q.  Let me ask you, did Jose

02:11:35  3    Cong tell you that the senior Motorola engineer told

02:11:38  4    him that Apple couldn't recruit him?

02:11:41  5        A.  He told me everything listed in this email,

02:11:43  6    yes.

02:11:46  7        Q.  And did Jose Cong tell you that this senior

02:11:51  8    Motorola engineer said "I know"?

02:11:55  9        A.  Yes.

02:11:56 10        Q.  And did that -- did Jose Cong tell you that the

02:12:00 11    Motorola engineer told him that the Motorola management

02:12:05 12    was telling their key folks about the hands-off rule?

02:12:09 13        A.  Well, he asked how did he know.  And he said,

02:12:13 14    well, Motorola manager told us about the agreement.

02:12:17 15        Q.  And were you surprised when Mr. Cong told you

02:12:20 16    that?

02:12:20 17        A.  Yes.

02:12:21 18        Q.  Why?

02:12:27 19        A.  When these agreements happen, they'll tell

02:12:29 20    recruiting, but they won't tell the masses of Apple

02:12:33 21    employees that they have these agreements because it's

02:12:37 22    more about recruiting, you know, cold calling in.

02:12:41 23    And -- but for Motorola to go to their engineering staff

02:12:44 24    and tell them they have this agreement is a sign of

02:12:47 25    weakness that they are scared that they're going to get

02:12:52  1    recruited away by Apple people or Apple recruiters.

02:12:56  2            So it's almost warning them in a way, but it's

02:13:00  3    a -- I thought it was a sign of being scared.

02:13:04  4        Q.  Well, if these companies had these -- if a

02:13:10  5    company had this kind of agreement with Apple, why

02:13:13  6    wouldn't it tell its employees that they had this

02:13:16  7    agreement?

02:13:17  8            MR. TUBACH:  Asked and answered.

02:13:21  9            THE WITNESS:  As I mentioned before.

02:13:24 10            MR. SAVERI:  Q.  Well, isn't the best way

02:13:26 11    to make sure that the agreement is in force to tell

02:13:30 12    their employees that the agreement exists?

02:13:33 13            MR. TUBACH:  Calls for speculation.

02:13:35 14            THE WITNESS:  If somebody told me that, I

02:13:37 15    would -- if they told me that and I wasn't in

02:13:41 16    recruiting -- management told me that and I wasn't in

02:13:43 17    recruiting, I would think they're scared that we're all

02:13:47 18    going to leave and go to that other company.

02:14:48 19            MR. SAVERI:  Q.  Did Apple ever tell its

02:14:55 20    employees, outside the group of recruiters, that it

02:15:01 21    had reached agreements with other companies that

02:15:05 22    those companies wouldn't cold call Apple?

02:15:08 23        A.  Not to my knowledge.

02:15:10 24        Q.  And it's your -- it's your belief that if Apple

02:15:18 25    had done so, that would have indicated that Apple was

Deposition of Patrick Burke                          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:15:22  1    scared that people might, in fact, leave?

02:15:25  2         MR. TUBACH:  Calls for speculation.  Lacks

02:15:25  3    foundation.

02:15:26  4         THE WITNESS:  That's my opinion.

02:15:28  5         MR. SAVERI:  Q.  Okay.  Did the -- at this

02:15:34  6    time, did you have any concern about whether the

02:15:44  7    agreement between Apple and Motorola was ethical?

02:15:49  8         A.  No.

02:15:50  9         Q.  Did you have any concern about whether or not

02:15:53 10    the agreement between Apple and Motorola was legal?

02:15:58 11         A.  No.

02:16:00 12         Q.  Did you ever discuss the subject of whether or

02:16:03 13    not these agreements were legal with anybody at Apple?

02:16:07 14         A.  No.

02:16:50 15         Q.  Did Dani Lambert ever tell you to keep the

02:16:52 16    agreement between Jobs and Motorola a secret?

02:16:55 17         A.  No.

02:17:01 18         Q.  Did Mark Bentley ever tell you to keep the

02:17:06 19    identity of companies on the hands-off list a secret?

02:17:09 20         A.  No.

02:17:13 21         MR. TUBACH:  We've been going a little over an

02:17:15 22    hour.  You want to take a break?

02:17:16 23         MR. SAVERI:  Whenever you want.  Sure.

02:17:17 24         MR. TUBACH:  Let's do that.

02:17:19 25         THE VIDEOGRAHER:  This is the end of video

| | | |
|---|---|---|
| 02:34:37 | 1 | A.  Not in this email, no. |
| 02:34:39 | 2 | Q.  Well, down at the bottom you say -- |
| 02:34:41 | 3 | A.  Oh, I'm sorry. |
| 02:34:41 | 4 | Q.  -- "We have LOTS of people from Moto" -- |
| 02:34:43 | 5 | A.  Oh, yes.  Yeah. |
| 02:34:43 | 6 | Q.  -- "so let me know if the agreement can be |
| 02:34:45 | 7 | called off, or if you need more info before asking SJ." |
| 02:34:50 | 8 | A.  Yes. |
| 02:34:50 | 9 | Q.  And when you wrote SJ, you meant Steve Jobs? |
| 02:34:50 | 10 | A.  Yes. |
| 02:34:50 | 11 | Q.  So you understood at the time -- |
| 02:34:50 | 12 | (Reporter clarification.) |
| 02:34:58 | 13 | MR. SAVERI:  Q.  So when you wrote this, |
| 02:34:59 | 14 | when you referred to SJ, you referred to Steve Jobs, |
| 02:35:02 | 15 | correct? |
| 02:35:03 | 16 | A.  Yes. |
| 02:35:04 | 17 | Q.  And when you wrote this to Dani Lambert, did |
| 02:35:06 | 18 | you understand that she needed to go to Steve Jobs to |
| 02:35:09 | 19 | discuss what to do next? |
| 02:35:11 | 20 | A.  Yes. |
| 02:35:13 | 21 | Q.  And then subsequently you heard back from Dani |
| 02:35:15 | 22 | Lambert, correct? |
| 02:35:16 | 23 | A.  Correct. |
| 02:35:17 | 24 | Q.  And she told you, "You have clearance to take |
| 02:35:20 | 25 | the handcuffs off and recruit from Motorola"? |

| | | |
|---|---|---|
| 02:35:24 | 1 | A.  Correct. |
| 02:35:26 | 2 | Q.  Did you understand, when you received that, |
| 02:35:27 | 3 | that she, in fact, had spoken to Steve Jobs about that? |
| 02:35:31 | 4 | A.  It was an assumption. |
| 02:35:35 | 5 | Q.  You assumed that? |
| 02:35:36 | 6 | A.  Yes. |
| 02:35:37 | 7 | Q.  And then she says, "Don't rape and pillage." |
| 02:35:41 | 8 | Do you see that? |
| 02:35:42 | 9 | A.  Yes. |
| 02:35:42 | 10 | Q.  What did understand her to mean by that? |
| 02:35:45 | 11 | MR. TUBACH:  Calls for speculation. |
| 02:35:46 | 12 | THE WITNESS:  That that was a term that several |
| 02:35:48 | 13 | of us had used, which was don't go in there guns |
| 02:35:53 | 14 | blazing, rape and pillage, which is, again, just calling |
| 02:35:58 | 15 | through groups, you know, immediately, and causing alarm |
| 02:36:00 | 16 | to Motorola management.  Go in there strategically, go |
| 02:36:06 | 17 | after the right people, you know, spread it out.  That |
| 02:36:08 | 18 | sort of thing. |
| 02:36:09 | 19 | MR. SAVERI:  Q.  Be sensitive? |
| 02:36:11 | 20 | A.  Yes. |
| 02:36:13 | 21 | Q.  Okay. |
| 02:36:18 | 22 | (Whereupon, Exhibit 1028 was marked for |
| 02:36:18 | 23 | identification.) |
| 02:36:29 | 24 | MR. SAVERI:  Q.  Do you know if Dani |
| 02:36:31 | 25 | Lambert spoke with Steve Jobs or communicated to him |

Deposition of Patrick Burke               In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 02:36:34 | 1 | in writing? |
| 02:36:35 | 2 | A.  I don't know either. |
| 02:36:36 | 3 | Q.  And other than that communication from her, the |
| 02:36:41 | 4 | email, did you receive any other permission -- |
| 02:36:44 | 5 | A.  No. |
| 02:36:44 | 6 | Q.  -- from her description of her conversations |
| 02:36:46 | 7 | with Jobs? |
| 02:36:47 | 8 | A.  No.  Not that I remember. |
| 02:36:50 | 9 | Q.  Let me just hand you briefly what's marked as |
| 02:36:53 | 10 | Exhibit 1028.  And this is -- Exhibit 1028 has the Bates |
| 02:37:10 | 11 | Nos. 231APPLE095728 to 730. |
| 02:37:19 | 12 | And you can take what time you need to look at |
| 02:37:22 | 13 | it, but the only question I have for you is, did you -- |
| 02:37:27 | 14 | did you see any of this communication before Dani |
| 02:37:33 | 15 | Lambert wrote the top of the email to you which was in |
| 02:37:38 | 16 | Exhibit 1027? |
| 02:37:39 | 17 | A.  No. |
| 02:37:40 | 18 | Q.  Okay.  You could put that aside. |
| 02:37:54 | 19 | (Whereupon, Exhibit 1029 was marked for |
| 02:37:54 | 20 | identification.) |
| 02:38:02 | 21 | MR. SAVERI:  Q.  Exhibit 1029 is another |
| 02:38:41 | 22 | email, 231APPLE095728 to 730.  Again, you can |
| 02:38:48 | 23 | take -- wait.  I'm sorry.  I mislabeled that. |
| 02:38:58 | 24 | THE WITNESS:  I have Exhibit 1029. |
| 02:39:00 | 25 | MR. TUBACH:  Exhibit 1029 is Exhibit 1028, but |

| | | |
|---|---|---|
| 05:28:46 | 1 | Q.  And then there are a couple of attachments that |
| 05:28:48 | 2 | I want to ask you about.  Okay? |
| 05:29:09 | 3 | A.  Okay. |
| 05:29:16 | 4 | Q.  First, just for foundational purposes, you were |
| 05:29:21 | 5 | a -- were you a recipient of emails to the staffing |
| 05:29:25 | 6 | department email group that's listed here? |
| 05:29:30 | 7 | A.  Yes. |
| 05:29:31 | 8 | Q.  Okay.  And Ms. Montesino, in her email, refers |
| 05:29:35 | 9 | to something called the Staffing Wiki.  Do you see that? |
| 05:29:39 | 10 | A.  Yes. |
| 05:29:40 | 11 | Q.  What was the Staffing Wiki? |
| 05:29:44 | 12 | A.  It is a centralized website for information |
| 05:29:49 | 13 | with password protected for certain people to have |
| 05:29:52 | 14 | access to it and this was the staffing management. |
| 05:29:57 | 15 | Q.  Did you have access to it? |
| 05:29:58 | 16 | A.  Yes. |
| 05:29:58 | 17 | Q.  And from time to time, did you use the |
| 05:29:59 | 18 | information on the wiki for purposes of doing your job? |
| 05:30:04 | 19 | A.  Very rarely. |
| 05:30:05 | 20 | Q.  Okay.  What information on that did you use? |
| 05:30:09 | 21 | A.  I rarely used it. |
| 05:30:11 | 22 | Q.  Okay.  There is something -- she also refers to |
| 05:30:13 | 23 | something called a Functional Job Matrix and leveling |
| 05:30:15 | 24 | guides.  Do you see that? |
| 05:30:18 | 25 | A.  Uh-huh. |

05:30:18  1     Q.  Are those two things or one thing?

05:30:27  2     A.  I'm not familiar with those terms.

05:30:30  3     Q.  Okay.

05:30:32  4     A.  Job matrix.  Yeah, I'm not familiar with those

05:30:45  5  terms.

05:30:45  6     Q.  So you don't know what a -- what she meant when

05:30:47  7  she referred to a Functional Job Matrix?

05:30:54  8          MR. TUBACH:  Asked and answered.

05:30:54  9          THE WITNESS:  Not directly, no.

05:30:55 10          MR. SAVERI:  Q.  And do you know what a

05:30:56 11  leveling guide is?

05:30:58 12     A.  No.

05:30:59 13     Q.  Did -- are you familiar with the term or the

05:31:09 14  concept of job leveling with respect to salary

05:31:11 15  structures?

05:31:18 16     A.  Job leveling.  Job leveling -- job levels are

05:31:21 17  the particular engineer, one, two, three, four, five,

05:31:25 18  six, sort of thing, for example, and then each one of

05:31:28 19  those has a salary range.  So from that perspective,

05:31:31 20  yes.

05:31:33 21     Q.  Now, Mr. Bentley, in his email, looks like he's

05:31:45 22  attaching two documents, one called a US

05:31:49 23  BaseSalary_Structure and one that has to do with RSUs

05:31:55 24  for fiscal year '09 new hire stock.  Do you see that?

05:32:02 25     A.  Uh-huh.

05:32:02  1        Q.  Let's look at the attachments.  Let me ask you

05:32:04  2    a couple questions about them.

05:32:05  3            First, let's focus on the Base Salary

05:32:08  4    Structures.

05:32:12  5        A.  Which one is that?

05:32:13  6        Q.  It looks like it's -- begins on APPLE009282.

05:32:18  7        A.  Yep.

05:32:19  8        Q.  First of all, do you know what these charts

05:32:21  9    are?

05:32:22 10        A.  Yes.

05:32:22 11        Q.  What are they?

05:32:23 12        A.  They are -- the job codes or these job

05:32:28 13    numbers --

05:32:28 14        Q.  Right.

05:32:28 15        A.  -- those relate to particular job codes.  And

05:32:38 16    in Merlin, which is our internal HRS, there was a

05:32:43 17    correlating job title that went along with job codes in

05:32:46 18    particular groups.

05:32:47 19        Q.  Did you use these Base Salary Structures for

05:32:52 20    when you were doing your recruiting or sourcing?

05:32:54 21            MR. TUBACH:  At this time you mean?

05:32:55 22            MR. SAVERI:  Yeah.

05:32:56 23            THE WITNESS:  I'm sorry, what?

05:32:57 24            MR. TUBACH:  Sorry.

05:32:58 25            Go ahead.

05:32:59  1            THE WITNESS:  Not in recruiting or sourcing,

05:33:00  2    no.

05:33:01  3            MR. SAVERI:  Q.  Well, did you use these,

05:33:04  4    either these Base Salary Structures tables or

05:33:08  5    previous versions of these in your job?

05:33:12  6        A.  Yes.  To make offers.

05:33:14  7        Q.  Okay.  And how would you use them to make

05:33:16  8    offers?  Or how did you use them to make offers?

05:33:20  9        A.  Mostly, there is kind of two steps.  You would

05:33:25 10    compare the candidate you were looking to to other

05:33:29 11    people on the team to figure out what level they would

05:33:34 12    be coming in at.  And that was mostly to figure out what

05:33:38 13    level stock.  But who we compared it to was the biggest

05:33:42 14    determining factor on what salary we gave.  And then see

05:33:46 15    if it -- what -- what salary was matching up with the

05:33:52 16    levels and the position in the level.

05:33:54 17        Q.  So is it fair to say when you made offers to

05:33:59 18    particular candidates, you used these -- you used

05:34:03 19    information like this regarding base salary structures

05:34:07 20    in order to determine what job title a person would be

05:34:12 21    offered and the range of salary that would apply to that

05:34:16 22    person?

05:34:18 23        A.  Say that again.  I'm sorry.

05:34:20 24            MR. TUBACH:  Misstates prior testimony.  Vague

05:34:21 25    and ambiguous.

05:34:23  1          MR. SAVERI:  Q.  Let me break it up into

05:34:23  2    pieces.  I think you said you used either this table

05:34:26  3    or other versions of this table when you were making

05:34:30  4    offers to candidates, correct?

05:34:32  5          MR. TUBACH:  Misstates prior testimony.

05:34:34  6          THE WITNESS:  It was a portion of it, yes.

05:34:37  7          MR. SAVERI:  Q.  Okay.  And --

05:34:39  8       A.  Or this information that was in the HRS system.

05:34:42  9    I didn't always have to pull out these tables.  Yes.

05:34:45 10       Q.  Okay.  But is it fair to say that there was

05:34:49 11    information like this available in paper form or in

05:34:53 12    electronic form that you had access to?

05:34:56 13       A.  They're embedded within the HRS system, yes.

05:34:59 14       Q.  When you say the HRS system, what's that?

05:35:02 15       A.  It's our human resources information system.

05:35:07 16    So we had our homegrown kind of a PeopleSoft or SAP or

05:35:10 17    Oracle sort of thing.  We had our homegrown, so when we

05:35:13 18    opened a position within the Merlin, we would open it

05:35:16 19    up, say, at a level two and a level three, and each one

05:35:19 20    of those had a salary range that went with that.

05:35:22 21          So when we were doing that, I didn't

05:35:24 22    necessarily -- that's a system that we dealt with daily,

05:35:27 23    so I didn't necessarily need to bring out a paper

05:35:30 24    version.

05:35:31 25       Q.  Fair enough.

05:35:32  1        A.   And these don't relate to any recruiting I did.

05:35:35  2    I don't know what these were for.

05:35:37  3        Q.   Okay.  We talked earlier today about something

05:35:40  4    called a system title?

05:35:42  5        A.   Yes.

05:35:43  6        Q.   Are these codes or these job codes equivalent

05:35:47  7    to system titles or is this something else?

05:35:49  8        A.   They -- they equate.  There is -- each system

05:35:53  9    title has a job code that matches to one of these, yes.

05:35:56 10        Q.   When you say job code, do you mean these codes

05:35:59 11    that are in the job column --

05:36:00 12        A.   Yes.

05:36:00 13        Q.   -- of these tables?

05:36:02 14        A.   Yes.

05:36:03 15        Q.   And is it fair to say that everybody who worked

05:36:04 16    for Apple was assigned to one of these job codes or job

05:36:08 17    titles?

05:36:09 18        A.   Some sort of job code and title, yes.

05:36:12 19        Q.   And for each of those, was there a salary range

05:36:16 20    established in the HRS system?

05:36:19 21        A.   Yes.

05:36:21 22        Q.   And was the base compensation for each person

05:36:30 23    within a particular job code somewhere between the

05:36:36 24    minimum and maximum of that range?

05:36:38 25        A.   For the most part, there were exceptions where

Deposition of Patrick Burke                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

05:36:42  1    somebody would be not, you know, because it wasn't just

05:36:46  2    salary, it was some definitions of skill set and

05:36:51  3    different things that maybe -- that would be required or

05:36:57  4    define you to get to the next level.

05:36:59  5          And if they -- yes, their salary was bucking

05:37:01  6    up, you know, maybe over the range of the current one,

05:37:04  7    but they just weren't skill-wise or personality-wise or

05:37:09  8    different things ready for that next level, they would

05:37:13  9    keep them in there.  And sometimes they would be outside

05:37:14  10   of that range.

05:37:16  11         Q.  So would you agree with me that it was

05:37:18  12   generally true that each person was assigned to a job

05:37:21  13   title or job code and their base salary was within the

05:37:26  14   range established for that code or title?

05:37:29  15         A.  Yes.

05:37:29  16         Q.  And at the margins there were some exceptions?

05:37:33  17         A.  Correct.

05:37:34  18         Q.  Was there someone who organizationally had

05:37:37  19   authority to approve those exceptions?

05:37:41  20         A.  There was a multitude of people.  Basically,

05:37:44  21   the business head, someone like Tony Fadell, and then

05:37:48  22   the human resources person for that division usually had

05:37:50  23   a good say in it.

05:37:52  24         Q.  Well, I mean, for example, if you found a

05:37:54  25   candidate that fit within a job -- a particular job

05:37:56  1    title and you thought the salary, because of some

05:38:03  2    discrepancy between that person's skill set and that of

05:38:06  3    the job needed to be outside the range that was

05:38:10  4    established, could you decide that or did you need

05:38:14  5    someone to approve an exception to the ranges?

05:38:16  6        A.  All offers were approved by a number of people

05:38:19  7    in the approval chain, including Tony Fadell.  So it was

05:38:23  8    not my approval.  And it was really rare to bring

05:38:28  9    someone in off the street above a range.  It was -- that

05:38:33 10    was more of an anomaly that happened internally.

05:38:38 11        Q.  Did Apple, from time to time, acquire

05:38:39 12    companies?

05:38:40 13        A.  Very rare.

05:38:43 14        Q.  Do you -- do you know, or can you describe for

05:38:51 15    me, the process of how people who were working for

05:38:55 16    companies that were acquired -- let me ask you a better

05:39:06 17    question.

05:39:07 18            Do you know how employees of acquired companies

05:39:11 19    were incorporated into this salary structure?

05:39:15 20            MR. TUBACH:  Lacks foundation.

05:39:17 21            THE WITNESS:  I don't know, just because I was

05:39:18 22    never involved in it.

05:39:19 23            MR. SAVERI:  Q.  And it wasn't something

05:39:20 24    that you were responsible for?

05:39:22 25        A.  It was -- if an acquisition happened in your

| | | |
|---|---|---|
| 05:39:25 | 1 | line of business, then you would run with it and be |
| 05:39:28 | 2 | involved with it.  Just my groups never did it. |
| 05:39:48 | 3 | (Whereupon, Exhibit 1047 was marked for |
| 05:39:48 | 4 | identification.) |
| 05:39:52 | 5 | THE WITNESS:  Are we done with this one? |
| 05:39:54 | 6 | MR. SAVERI:  Yeah, I am.  Thank you. |
| 05:39:58 | 7 | I didn't make any copies of this. |
| 05:40:03 | 8 | I've handed -- |
| 05:40:04 | 9 | MR. TUBACH:  This is the document we produced |
| 05:40:06 | 10 | today? |
| 05:40:06 | 11 | MR. SAVERI:  Yeah.  Let me do this and try to |
| 05:40:08 | 12 | finish it up. |
| 05:40:09 | 13 | Q.  I've handed you Exhibit 1047. |
| 05:40:10 | 14 | A.  Yes. |
| 05:40:11 | 15 | Q.  Can you tell me what that is. |
| 05:40:12 | 16 | A.  My offer letter of employment to join Apple. |
| 05:40:17 | 17 | Q.  And that's a true and correct copy of your |
| 05:40:19 | 18 | employment letter? |
| 05:40:19 | 19 | A.  Yes. |
| 05:40:20 | 20 | Q.  When you left the company, did you sign any |
| 05:40:22 | 21 | agreement with the company? |
| 05:40:23 | 22 | A.  No. |
| 05:40:25 | 23 | Q.  Are you -- do you have any ongoing business |
| 05:40:31 | 24 | relationship with Apple? |
| 05:40:33 | 25 | A.  Define business relationship. |

1           I, Gina V. Carbone, Certified Shorthand

2    Reporter licensed in the State of California, License

3    No. 8249, hereby certify that the deponent was by me

4    first duly sworn and the foregoing testimony was

5    reported by me and was thereafter transcribed with

6    computer-aided transcription; that the foregoing is a

7    full, complete, and true record of said proceedings.

8           I further certify that I am not of counsel or

9    attorney for either of any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12          The dismantling, unsealing, or unbinding of

13   the original transcript will render the reporter's

14   certificates null and void.

15          In witness whereof, I have hereunto set my

16   hand this day:  March 11, 2013.

17          _____ Reading and Signing was requested.

18          _____ Reading and Signing was waived.

19          ___X___ Reading and signing was not requested.

20

21

22                   _____

23                   GINA  V. CARBONE

24                   CSR 8249, CRR, CCRR

25