# Exhibit Q

Declaration of Lisa J. Cisneros in Support of Plaintiffs' Opposition Briefs ("Cisneros"), February 6, 2014, (Dkt. 605)

(Public - redacted under seal portions)

Tony Fadell

March 20, 2013 Deposition

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IN RE: HIGH-TECH EMPLOYEE    )
ANTITRUST LITIGATION          )
                              )   No. 11-CV-2509-LHK
THIS DOCUMENT RELATES TO:     )
ALL ACTIONS.                  )
_____)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

VIDEO DEPOSITION OF TONY FADELL

MARCH 20, 2013

Reported by: Rosalie A. Kramm, CSR No. 5469, CRR

| | | |
|---|---|---|
| 10:42:28 | 1 | A. No, I understand.  I'm giving you an example. |
| 10:42:31 | 2 | Q. Okay. |
| 10:42:31 | 3 | A. In my company today when we decide on salary |
| 10:42:34 | 4 | ranges, it is a group of people, that is between finance |
| 10:42:38 | 5 | and HR and recruiting and senior management. |
| 10:42:42 | 6 | Q. Right. |
| 10:42:42 | 7 | A. But I don't know how it was done at Apple |
| 10:42:44 | 8 | specifically. |
| 10:42:45 | 9 | Q. Okay.  That -- and that -- that -- that's fair. |
| 10:42:49 | 10 | Now let's talk for a minute about |
| 10:43:04 | 11 | responsibility for compensation after someone was hired. |
| 10:43:06 | 12 | Did you -- |
| 10:43:06 | 13 | A. After they were hired and they accepted a |
| 10:43:09 | 14 | compensation package, they were already a pre-existing |
| 10:43:12 | 15 | employee? |
| 10:43:12 | 16 | Q. Right.  And they had come to work, and they'd |
| 10:43:13 | 17 | showed up, and they were working for you and they were |
| 10:43:15 | 18 | doing -- doing their job in some fashion or another. |
| 10:43:17 | 19 | Did you have responsibility as head of the -- |
| 10:43:19 | 20 | the group for determining compensation going forward, in |
| 10:43:25 | 21 | any respect? |
| 10:43:27 | 22 | A. Well, it was part of my responsibility to |
| 10:43:31 | 23 | retain the talent to the best of my abilities, and the |
| 10:43:35 | 24 | tools that I was given were various ways of -- various |
| 10:43:42 | 25 | compensation tools which were increasing salary, |

```
10:43:44  1   increasing bonus, or decreasing it, you could always
10:43:48  2   decrease any of those, adding additional equity, or
10:43:51  3   possibly changing benefits in some way.  So it was a span
10:43:55  4   of different tools that we had at our disposal to retain
10:43:59  5   the talent.  And that was given down from on high.
10:44:03  6         Q.   And when you -- okay.
10:44:08  7              With respect to each or any of those for the
10:44:10  8   people that you supervised, did you have input into those
10:44:14  9   on an ongoing basis for particular employees?
10:44:18 10         A.   Well, I was responsible for retaining the
10:44:20 11   employees who reported directly to me, and then my
10:44:23 12   managers were responsible for them.  So I had, you
10:44:27 13   know -- I had some purview into retaining the people who
10:44:33 14   reported to me, and I would then specifically state
10:44:35 15   whether those people merited an increase or a stay or
10:44:39 16   possibly even a decrease, in some cases.
10:44:50 17         Q.   In -- in your thinking about those issues, were
10:44:52 18   you provided information or did you obtain information
10:44:56 19   regarding market conditions regarding compensation?
10:45:03 20              When I say "market conditions," what I mean is,
10:45:05 21   what other technology companies or other potential
10:45:11 22   employers in the Valley or other -- other reference
10:45:15 23   points were -- were doing with respect to those issues.
10:45:17 24         A.   I would generally ask the team, there was a
10:45:23 25   team of people, finance, all these people, are -- are our
```

| | | |
|---|---|---|
| 10:45:29 | 1 | compensation packages competitive with other peer |
| 10:45:33 | 2 | companies or competitors? |
| 10:45:35 | 3 | Q.   In connection with that conversation, were you |
| 10:45:37 | 4 | provided with metrics or data yourself to support the -- |
| 10:45:48 | 5 | any conclusions with respect to those issues? |
| 10:45:51 | 6 | A.   I don't recall any specific data.  I recall |
| 10:45:53 | 7 | Apple ranges in levels, but I don't recall any specific |
| 10:45:57 | 8 | peer group data that I was ever shown. |
| 10:45:59 | 9 | Q.   So are -- are you aware that there are, for |
| 10:46:02 | 10 | example, companies that -- that as part of their business |
| 10:46:07 | 11 | provide employers with market-based compensation data? |
| 10:46:12 | 12 | A.   Through my existing company, in fact, last |
| 10:46:16 | 13 | night, I was made aware of a few different companies that |
| 10:46:21 | 14 | have this data that -- they gather this data to help you |
| 10:46:26 | 15 | do competitive salary and compensation analysis. |
| 10:46:30 | 16 | Q.   Are you aware that there is a company that is, |
| 10:46:33 | 17 | for example, called Radford that -- that does this? |
| 10:46:35 | 18 | A.   I didn't know until yesterday. |
| 10:46:36 | 19 | Q.   Okay.  Or a company called Croner? |
| 10:46:39 | 20 | A.   Never heard that term -- that name. |
| 10:46:41 | 21 | Q.   Okay.  So -- but going back to the time that |
| 10:46:43 | 22 | you were at Apple, were you provided any market survey |
| 10:46:47 | 23 | data -- strike that. |
| 10:46:52 | 24 | Were you provided the market surveys in |
| 10:46:55 | 25 | connection with your input into compensation decisions? |

| | | |
|---|---|---|
| 10:46:58 | 1 | A. Not that I recall, no. |
| 10:47:01 | 2 | Q. And were you told by the people that you were |
| 10:47:05 | 3 | interfacing with at Apple about the subject that they had |
| 10:47:09 | 4 | reviewed that sort of material in -- in developing the |
| 10:47:14 | 5 | tools that they provided to you with respect to |
| 10:47:16 | 6 | compensation decisions? |
| 10:47:19 | 7 | A. When I would ask the question to these -- these |
| 10:47:21 | 8 | teams of people, are we paying -- do we have competitive, |
| 10:47:24 | 9 | you know, compensation packages, then they would say |
| 10:47:28 | 10 | things like, yes, we have researched this thoroughly. We |
| 10:47:30 | 11 | believe we are paying in a competitive manner, and that's |
| 10:47:34 | 12 | how these levels and ranges were created. |
| 10:47:38 | 13 | Q. Were there any general benchmarks or metrics |
| 10:47:43 | 14 | that you understood Apple tried to maintain or meet with |
| 10:47:50 | 15 | respect to market-based measures of compensation? |
| 10:48:04 | 16 | A. We were given ranges for various different |
| 10:48:07 | 17 | types of positions. We were given salary ranges that we |
| 10:48:12 | 18 | had our discretion as to where an employee would fall |
| 10:48:17 | 19 | within those ranges. |
| 10:48:18 | 20 | Q. So, for example, did -- did you or, to your |
| 10:48:22 | 21 | knowledge, anyone at Apple, try to use as a benchmark for |
| 10:48:26 | 22 | compensation something like, Apple as a goal wants to |
| 10:48:34 | 23 | pay, you know, 50 percent of -- of -- of a peer-based |
| 10:48:41 | 24 | analysis of the market, or some other kind of |
| 10:48:44 | 25 | percentage-based metric? |

```
10:48:46  1        A.   I don't recall any such -- any such discussion.
10:48:50  2        Q.   And do you recall any discussion about any sort
10:48:54  3   of market-based metric in setting compensation or
10:49:01  4   compensation ranges at Apple?
10:49:03  5        A.   I don't recall any specific numbers.  I recall
10:49:06  6   a general discussion of, are we paying competitively?
10:49:11  7   And, are you sure we're paying competitively?  I don't
10:49:15  8   want to lose this talent.  Because I'm like, I don't know
10:49:18  9   what you guys do over there, but I want to make sure that
10:49:20 10   we've done our best job possible and you've given me the
10:49:24 11   best tools possible to retain this talent.
10:49:27 12        Q.   And when you were thinking about what
10:49:29 13   competitive means, did you think about it in terms of
10:49:31 14   some kind of objective metric of the market, a percentage
10:49:35 15   or range, or was it a qualitative kind of --
10:49:37 16        A.   It is a qualitative.  When an employee, or a
10:49:40 17   future employee or a current employee, was looking at a
10:49:43 18   package they -- they would say, "Oh, you know, is this --
10:49:46 19   does this seem right?  If I was to go down the street or
10:49:49 20   wherever else, will I get, you know, similar compensation
10:49:53 21   or better compensation?"
10:49:54 22        Q.   So -- okay.  That's fair.  I understand.  Thank
10:49:56 23   you.
10:49:57 24             Now, in terms -- in -- with respect to your
10:49:58 25   input into compensation, did you have input into setting
```

```
10:50:03  1   base salary for the people you supervised?
10:50:08  2        A.   I was -- I would -- I would recommend -- well,
10:50:11  3   what would happen is typically, if it was a new employee
10:50:14  4   who was going to report to me, they -- I forget exactly
10:50:19  5   who I think it was recruiting -- would come to me and
10:50:24  6   say, we believe the right range for this would be in
10:50:26  7   here.  What would you like to do?
10:50:28  8        Q.   Okay.
10:50:29  9        A.   How -- how important is this person to -- to
10:50:32 10   getting?  Would it be to -- you know, how important it is
10:50:35 11   to -- to hire this person over maybe somebody else, how
10:50:40 12   much are you willing to go within your budget to -- to
10:50:43 13   stretch to get this person if they were really great.
10:50:46 14        Q.   And once that person came to work for you, were
10:50:50 15   they reviewed on an annual basis with respect to
10:50:52 16   compensation?
10:50:53 17        A.   Well, they -- so, first, when they were hired,
10:50:57 18   it wasn't just a salary range.  There were all kind --
10:51:01 19   like I said, those four other metrics.
10:51:02 20        Q.   And I'm sorry.  I was just talking about basis
10:51:04 21   and point of entry in the discussion.
10:51:06 22        A.   Okay.  Then on -- then there was a -- a -- a
10:51:10 23   natural review cycle.  Sometimes people if they came too
10:51:13 24   soon to a review cycle, they would miss the review cycle.
10:51:17 25   But if they were there generally for about a year or six
```

| | | |
|---|---|---|
| 10:51:20 | 1 | months, depending on what the dynamics were at the time, |
| 10:51:25 | 2 | we would then go through a review cycle of the entire |
| 10:51:28 | 3 | team, and certain people based on merit and performance |
| 10:51:31 | 4 | were then -- were then given a -- we would change the |
| 10:51:36 | 5 | compensation full package based on that personal, you |
| 10:51:40 | 6 | know, productivity. |
| 10:51:42 | 7 | Q.   So was one of the things that was looked at as |
| 10:51:44 | 8 | part of that cycle base salary? |
| 10:51:52 | 9 | A.   It was base salary, it was bonus, and it was |
| 10:51:57 | 10 | equity compensation, all three of those things combined. |
| 10:52:01 | 11 | Benefits were something that were typically not -- you |
| 10:52:05 | 12 | know, that was a company-wide thing. |
| 10:52:07 | 13 | Q.   And just in terms of your responsibility, did |
| 10:52:10 | 14 | you have input into each of those -- I guess there are |
| 10:52:13 | 15 | three elements of compensation with respect to your |
| 10:52:16 | 16 | reports; that is the base, the bonus, and the equity |
| 10:52:21 | 17 | comp.  Did you have input as part of that process? |
| 10:52:25 | 18 | A.   I had input to the individual, yes. |
| 10:52:29 | 19 | Q.   Okay. |
| 10:52:32 | 20 | A.   Not to the general overarching, you know, what |
| 10:52:35 | 21 | were the guidelines. |
| 10:52:37 | 22 | Q.   Fair enough.  And were the guidelines provided |
| 10:52:39 | 23 | to you by people within the HR function at Apple?  Let me |
| 10:52:46 | 24 | ask a better question. |
| 10:52:46 | 25 | Who provided you the -- the general information |

```
10:52:50  1    regarding the system?  As part of your -- that process,
10:52:55  2    where did you get that information?
10:52:57  3         A.    ███████████████████  ███████████████████
10:53:01  4    ████████████████████████████████████████████████████
10:53:04  5    ████████████████████████████████████████████████
10:53:06  6    ██████████████████████████████████████
10:53:09  7    ██████████████████████████████  ████████████████
10:53:11  8    ████████████████████████████████████████████████████
10:53:14  9    ████████████████████████████████████████████████████
10:53:18 10         Q.    ███████████████████████████████████████
10:53:20 11    ██████████████████████████████████████, can you just tell
10:53:25 12    me generally organizationally who would have to be
10:53:27 13    involved in that discussion.
10:53:28 14         A.    Well, it was different based on the different
10:53:31 15    time frames that I was employed.  Right?  So when I was
10:53:37 16    a -- when I started as a director, it was very different
10:53:40 17    who I would speak to than when I was the senior vice
10:53:45 18    president.
10:53:45 19         Q.    So just generally could you tell me who you --
10:53:47 20    who would have to be involved organizationally when you
10:53:50 21    were a director in -- ██████████████████████████████
10:53:55 22    ██████████████████████████████████████████████████.
10:53:59 23         A.    I don't recall specifically.  I don't recall.
10:54:02 24    I just don't recall specifically.
10:54:04 25         Q.    Were there people from the HR group that were
```

| Time | # | |
|---|---|---|
| 10:54:06 | 1 | involved? |
| 10:54:09 | 2 | A. Each was a case-by-case basis. |
| 10:54:11 | 3 | Q. Was the CFO involved? |
| 10:54:13 | 4 | A. I don't remember ever getting the CFO involved |
| 10:54:15 | 5 | in any of my -- |
| 10:54:17 | 6 | Q. Was Steve Jobs involved? |
| 10:54:19 | 7 | A. No, he was not. |
| 10:54:20 | 8 | Q. Okay. When -- so I think you said that there |
| 10:54:23 | 9 | was a point in time where things changed when you became |
| 10:54:27 | 10 | a director? |
| 10:54:27 | 11 | A. Well, I -- I started as a director. |
| 10:54:29 | 12 | Q. I'm sorry. And then in the next phase, were |
| 10:54:35 | 13 | there other people that -- or less people that were |
| 10:54:39 | 14 | involved in approving exceptions that you advocated for |
| 10:54:44 | 15 | with respect to the people you supervised? |
| 10:54:46 | 16 | A. There were all -- exceptions, there are always |
| 10:54:49 | 17 | other people involved. There was never, you know -- I |
| 10:54:51 | 18 | was never -- I could never just accrete something. |
| 10:54:55 | 19 | Q. You didn't have carte blanche? |
| 10:54:57 | 20 | A. I didn't have carte blanche, even as a senior |
| 10:55:00 | 21 | vice president. |
| 10:55:00 | 22 | Q. But when you were a senior vice president, when |
| 10:55:02 | 23 | you wanted to have exceptions approved, were there people |
| 10:55:05 | 24 | from the HR organization that were involved in that |
| 10:55:07 | 25 | discussion? |

```
13:20:34  1              Do you see that?
13:20:35  2         A.   Yes, I do.
13:20:36  3         Q.   And then there are a couple -- there are a
13:20:38  4   number of columns.  Do you see that?
13:20:40  5         A.   I do.
13:20:40  6         Q.   And there is a hiring manager listed a couple
13:20:43  7   of times on the first page.  Do you see that?
13:20:45  8         A.   Yes, I do.
13:20:46  9         Q.   It says, "Tony Fadell," right?
13:20:49 10         A.   Yes, it does.
13:20:50 11         Q.   That is you, right?
13:20:51 12         A.   Yes.
13:20:52 13         Q.   There aren't any other Tony Fadells at the
13:20:55 14   company, right?
13:20:55 15         A.   Not that I'm aware, no.
13:20:57 16         Q.   In the left-hand column there is -- there is --
13:21:00 17   well, the column is labeled req number, do you see that?
13:21:05 18   R-e-q number?
13:21:06 19         A.   Yes.
13:21:06 20         Q.   What -- what -- what information or data does
13:21:08 21   that column have?
13:21:16 22         A.   Well, it has -- in that column it says "TBD"
13:21:18 23   and it has a couple other ones filled in with numbers.
13:21:21 24         Q.   And what -- what are -- what are the numbers?
13:21:22 25   What do they refer to?
```

```
13:21:24  1         A.    I don't know.
13:21:24  2         Q.    Well, are there -- for each job req at Apple
13:21:31  3   and Apple system, was there a discrete number assigned to
13:21:35  4   it?
13:21:37  5         A.    I don't know.
13:21:41  6         Q.    There is a "Grade" column, do you see that?
13:21:43  7         A.    Gray column?
13:21:44  8         Q.    "Grade."
13:21:45  9         A.    Oh, "Grade," yes.
13:21:46 10         Q.    I'm working left to right.  Do you know what
13:21:48 11   the Grade -- what information is in the "Grade" column?
13:21:51 12         A.    Well, generally that referred to the grade, the
13:21:59 13   hiring range and the hiring level that you -- for a
13:22:02 14   compensation package that you would bring somebody in at.
13:22:06 15         Q.    Is the grade that's listed here job grade?
13:22:10 16               MR. RILEY:  Object to the form.
13:22:14 17               THE WITNESS:  Could you be more specific,
13:22:15 18   please?
13:22:16 19   BY MR. SAVERI:
13:22:17 20         Q.    No, I'll withdraw and move on.
13:22:19 21               The next column moving left to right is
13:22:21 22   something called, "Title."  Do you see that?
13:22:24 23         A.    Yes.
13:22:24 24         Q.    What is in that column?
13:22:27 25         A.    That's a proposed title that we would give an
```

```
13:22:31  1   engineer if they were to join the company.  It is a
13:22:34  2   proposed one of the type of person we're kind of looking
13:22:38  3   for.
13:22:46  4       Q.   Who created the job titles?
13:22:47  5       A.   On this document?
13:22:48  6       Q.   Or generally.  Put it this way, for the people
13:22:51  7   that you were hiring or had responsibility for hiring
13:22:54  8   into your -- into your group, who established the job
13:22:56  9   titles for -- for new hires?
13:23:03 10       A.   Job titles were -- were responsibility of the
13:23:07 11   hiring manager to assign to people, and if they were
13:23:12 12   falling within certain guidelines, you know, it was to
13:23:15 13   managers' discretion, you know, to what is the right
13:23:20 14   thing to do to attract the talent.
13:23:22 15       Q.   Now, if you look at this first page, there are
13:23:25 16   ███████████████████████████████  Do you see that?
13:23:36 17       A.   Yes.
13:23:37 18       Q.   And they have different titles.  Do you see
13:23:39 19   that?
13:23:40 20       A.   Yes.
13:23:48 21       Q.   Were there -- strike that.
13:23:50 22                              ████████████████████████████
13:23:53 23   ██████
13:23:56 24       A.   ████████████████████████████████████████████
13:24:02 25   ████████████████████████████████████████████████████
```

| | | |
|---|---|---|
| 15:51:49 1 | A. | Sure.  So in regards to any of the -- you're |
| 15:52:03 2 | asking about any of the email addresses -- | |
| 15:52:05 3 | Q. | Yes. |
| 15:52:04 4 | A. | -- names I see at top?  These people did not |
| 15:52:09 5 | report in to my organization. | |
| 15:52:11 6 | | MR. SAVERI:  Okay.  You can put that aside. |
| 15:52:13 7 | | (Exhibit 1995 was marked for identification.) |
| 15:52:37 8 | BY MR. SAVERI: | |
| 15:52:38 9 | Q. | Let me hand you what has been marked as |
| 15:52:39 10 | Exhibit 1995.  Do you have that in front of you? | |
| 15:52:50 11 | A. | Yes, I do. |
| 15:52:50 12 | Q. | Would you take a moment to look at it, please. |
| 15:52:53 13 | A. | Sure.  All right. |
| 15:53:15 14 | Q. | Have you had a chance to look at that? |
| 15:53:17 15 | A. | Yes. |
| 15:53:17 16 | Q. | Do you recognize the document? |
| 15:53:18 17 | A. | I don't recall this document. |
| 15:53:20 18 | Q. | Did you send this email to Cheryl Smith on or |
| 15:53:26 19 | about August 23rd, 2006, the date indicated on the email? | |
| 15:53:29 20 | A. | I replied to Cheryl's email, yes, I did. |
| 15:53:32 21 | Q. | And did Cheryl Smith work for you at this time? |
| 15:53:36 22 | A. | Cheryl Smith was not -- she didn't report to |
| 15:53:39 23 | me, no. | |
| 15:53:39 24 | Q. | What part of the company did she work in? |
| 15:53:41 25 | A. | I don't know specifically at that time who she |

15:53:46  1  reported to, what have you, but she was typically in the
15:53:48  2  HR organization.
15:54:02  3      Q.   Now, she begins this communication with you by
15:54:05  4  writing, "Hi, What companies do you think we should
15:54:07  5  benchmark against for compensation purposes?"  Do you see
15:54:10  6  that?
15:54:10  7      A.   Yes.
15:54:11  8      Q.   What did you understand her to mean when she
15:54:14  9  said, "benchmark against for compensation purposes"?
15:54:18 10      A.   Again, I don't know exactly what was going on
15:54:20 11  at this time, but the term "benchmark" as we discussed
15:54:25 12  previously, was about going out to other companies who
15:54:28 13  were peer organizations who could attract and retain the
15:54:33 14  same types of talent that we were trying to do
15:54:35 15  competitively, and I wanted to -- and you would make sure
15:54:39 16  that your salary ranges and your compensation packages
15:54:44 17  and your benefits packages would be comparable or highly
15:54:50 18  competitive with people in this peer -- peer group or
15:54:55 19  companies in this peer group.
15:54:56 20      Q.   And so when you received this email, did you
15:54:59 21  understand that she was looking to identify peers from
15:55:03 22  whom she could or would obtain information which would be
15:55:08 23  used for helping you and others at Apple to make
15:55:14 24  decisions regarding compensation of -- of Apple
15:55:18 25  personnel?

```
15:55:19  1              MR. RILEY:  Object to the form.
15:55:21  2              THE WITNESS:  Could you please be more specific
15:55:23  3     with your question?
15:55:23  4     BY MR. SAVERI:
15:55:24  5         Q.   Well, I think so.
15:55:31  6              When she wrote this email to you, and she
15:55:34  7     referred to -- used the terminology "benchmark against
15:55:40  8     for compensation purposes," did you understand that what
15:55:43  9     she -- that she was interested in identifying peer
15:55:48 10     companies with respect to which she would obtain
15:56:07 11     information regarding their compensation levels or
15:56:12 12     practices?
15:56:15 13              MR. RILEY:  Object to the form.
15:56:19 14              THE WITNESS:  In her email she said, "What
15:56:21 15     companies do you think we should benchmark against?"  I
15:56:23 16     didn't know what she was going to do with the
15:56:25 17     information, so what I did was I gave her a list of
15:56:29 18     companies that I thought would be possible places where
15:56:34 19     engineers could go or could come from.
15:56:37 20     BY MR. SAVERI:
15:56:37 21         Q.   Well --
15:56:38 22         A.   For building a team.
15:56:43 23         Q.   Well, and did you understand when she was
15:56:45 24     talking about benchmarking that the information to be
15:56:47 25     obtained regarding those companies that you identified as
```

1    I, Rosalie A. Kramm, Certified Shorthand

2    Reporter licensed in the State of California, License No.

3    5469, hereby certify that the deponent was by me first

4    duly sworn and the foregoing testimony was reported by me

5    and was thereafter transcribed with computer-aided

6    transcription; that the foregoing is a full, complete,

7    and true record of said proceedings.

8         I further certify that I am not of counsel or

9    attorney for either of any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12        The dismantling, unsealing, or unbinding of the

13   original transcript will render the reporter's

14   certificates null and void.

15        In witness whereof, I have hereunto set my hand

16   this day:   April 2, 2013.

17        ___X___   Reading and Signing was requested.

18        _____   Reading and Signing was waived.

19        _____   Reading and signing was not requested.

20

21                            _____

22                            ROSALIE A. KRAMM

23                            CSR 5469, RPR, CRR

24

25