# Exhibit T

Declaration of Lisa J. Cisneros in Support of Plaintiffs'
Opposition Briefs ("Cisneros"), February 6, 2014,
(Dkt. 605)

(Public - redacted under seal portions)

Ron Okamoto

February 27, 2013 Deposition

1                   UNITED STATES DISTRICT COURT

2                 NORTHERN DISTRICT OF CALIFORNIA

3                       SAN JOSE DIVISION

4

5

6    IN RE:  HIGH-TECH EMPLOYEE     )

7    ANTITRUST LITIGATION           )

8                                   )   No. 11-CV-2509-LHK

9    THIS DOCUMENT RELATES TO:      )

10   ALL ACTIONS.                   )

11   _____)

12

13

14

15           VIDEO DEPOSITION OF RON OKAMOTO

16                  February 27, 2013

17

18

19   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25

09:32:02  1    their best people, to make that critical transition

09:32:05  2    without having the noise of cold calling as being part

09:32:08  3    of the things that could potentially hold them back from

09:32:11  4    doing that.

09:32:12  5        Q.  Did you speak with Steve Jobs about the issues

09:32:16  6    that you've been discussing prior to talking to the

09:32:18  7    recruiting team?

09:32:20  8        A.  When you say "the issues," can you please

09:32:24  9    explain.

09:32:25 10        Q.  Sure.  The -- you spoke with recruiters at a

09:32:27 11    certain point about ceasing cold calling practices; is

09:32:30 12    that accurate?

09:32:30 13        A.  What I recall is having a conversation with a

09:32:33 14    gentleman named Mark Bentley where I told him that the

09:32:37 15    cold calling practices was getting in the way or at

09:32:39 16    least, you know, creating a -- not a great atmosphere

09:32:41 17    for us to be able to do this sensitive work.

09:32:43 18        Q.  Did you request that he cease cold calling

09:32:46 19    Adobe employees at that time?

09:32:47 20        A.  I told him it wasn't a good idea.

09:32:50 21        Q.  Did you speak with Steve Jobs about your

09:32:52 22    request prior to speaking to Mark Bentley?

09:32:59 23        A.  I don't recall if I did.

09:33:00 24        Q.  Did you ask Mr. Bentley not to recruit any

09:33:05 25    employees from Adobe?

09:33:06  1        A.  No, I didn't.  What I told -- what I told him

09:33:08  2    is, it was the practice of cold calling that was causing

09:33:11  3    the issues.  Which is pretty much our guys grabbing a

09:33:15  4    phone book and just starting to make calls to people.

09:33:18  5    You know, this was not about not hiring people.  This

09:33:21  6    was not about -- this was about cold calling.  And so

09:33:24  7    that was the thing that was -- that was upsetting.

09:33:32  8        Q.  Which engineering teams at Adobe were working

09:33:35  9    with Apple on these transitions?

09:33:40 10        A.  At the time, I don't think there wasn't a

09:33:43 11    product that Adobe was working on that didn't have to go

09:33:46 12    through the transition.  But, of course, as I mentioned,

09:33:49 13    one of the most important was Photoshop.  So one way or

09:33:53 14    the other, all of Adobe's products that run on the Mac

09:33:57 15    ultimately had to get worked on.

09:33:59 16        Q.  How many engineers were working on the -- on the

09:34:00 17    the -- that team at Adobe?

09:34:02 18        A.  I don't know -- I don't know specifically what

09:34:03 19    the number or the count was.

09:34:06 20        Q.  Did you ask Mr. Bentley to limit the practice

09:34:09 21    of cold calling just with respect to the engineers who

09:34:11 22    were working on the Adobe-Apple collaborations?

09:34:14 23        A.  I don't recall if I gave him that specific

09:34:16 24    instruction.

09:34:17 25        Q.  You told him to cease cold calling from Adobe

09:34:21  1    generally; is that accurate?

09:34:22  2        A.  No.  What I recall is that I told him that the

09:34:24  3    practice that he was engaged in, the cold calling, was

09:34:27  4    something that, again, was not creating the right

09:34:31  5    atmosphere for the kind of collaboration that we wanted.

09:34:35  6        Q.  Did you request that Steve Jobs speak with

09:34:38  7    anyone at Adobe about the decision not to cold call?

09:34:40  8        A.  I don't recall.

09:34:41  9        Q.  Are you aware that Steve Jobs had a

09:34:43  10   conversation or email conversation with the CEO of Adobe

09:34:48  11   regarding cold calling?

09:34:53  12       A.  I don't know if he had that.  But, again, you

09:34:55  13   know, what I did was talked to Mark Bentley about the

09:34:58  14   issues that we had with respect to the sensitivity.

09:35:01  15       Q.  My question was whether you were aware that

09:35:03  16   Mr. Jobs had conversations with Adobe's CEO --

09:35:06  17       A.  I don't recall.

09:35:06  18       Q.  -- about the practice of recruiting.

09:35:09  19           You're not aware?

09:35:11  20           Are you aware or you don't know?

09:35:14  21           MR. RILEY:  I believe he answered "I don't

09:35:15  22   recall."  But you two are starting to talk over each

09:35:18  23   other.

09:35:19  24           THE WITNESS:  I don't recall.

09:35:29  25           MS. SCHALMAN-BERGEN:  Q.  Are you aware of

10:35:17  1      Q.  Did you receive more compensation at FirePower

10:35:20  2  when you came on than you had been previously receiving

10:35:24  3  at Canon?

10:35:25  4      A.  I don't remember if I did or I didn't.

10:35:29  5      Q.  Did you receive any ownership, stock options in

10:35:35  6  FirePower?

10:35:35  7      A.  Yes, I believe I did.

10:35:47  8      Q.  Did you ever meet Steve Jobs when you worked at

10:35:50  9  FirePower?

10:35:50 10      A.  No.

10:35:51 11      Q.  When was the first time you met Steve Jobs?

10:35:55 12      A.  When I went to Apple to talk to him about the

10:35:58 13  job opportunity at Apple.

10:36:01 14          Oh, I'm sorry.  Excuse me.  I mentioned before

10:36:05 15  that I did meet him once, which was at a meeting that I

10:36:09 16  had when I was at Adobe.  This is the one I had

10:36:12 17  mentioned prior where I spoke about -- you know, the

10:36:14 18  only thing I can remember is we spoke about the font

10:36:16 19  business.  But that was just that meeting.  And then the

10:36:19 20  next time was when we spoke about the job opportunity at

10:36:22 21  Apple.

10:36:23 22      Q.  Do you recall what year it was that you met him

10:36:25 23  to discuss the font business?

10:36:28 24      A.  No.  It was just sometime during my time at

10:36:30 25  Adobe.

10:36:31  1    Q.  Prior to 2001?

10:36:33  2    A.  Probably.

10:36:38  3    Q.  You came to Apple in 2001; is that correct?

10:36:40  4    A.  Oh, yeah.  So it had to be prior.  What I mean

10:36:43  5   is, you know, was it before, earlier, you know, middle.

10:36:56  6    Q.  Did anyone at FirePower inform anyone at Canon

10:37:01  7   that you were applying for the job?

10:37:09  8    A.  No, I don't believe -- I don't believe so.

10:37:19  9    Q.  When FirePower made you the offer, did they

10:37:21 10   require that you leave employment with Canon before they

10:37:25 11   would extend an offer to you?

10:37:27 12    A.  No, they did not.

10:37:38 13    Q.  Who did you report to in your last job title at

10:37:44 14   Canon -- at Canon?

10:37:45 15    A.  A gentleman by the name of Peter Bergman.

10:37:49 16    Q.  Was Peter aware that you were applying for the

10:37:52 17   job at FirePower prior to your receiving the offer?

10:37:57 18    A.  Yes.

10:37:58 19    Q.  Did he provide a reference for you?

10:38:01 20    A.  I don't believe he did.

10:38:09 21    Q.  After FirePower, you left to go to Macromedia;

10:38:12 22   is that accurate?

10:38:13 23    A.  Yes.

10:38:14 24    Q.  What year did you join Macromedia?

10:38:24 25    A.  Had to be around 1990 -- 1995, 1996.

| | | |
|---|---|---|
| 10:38:39 | 1 | Q.  Was the job at Macromedia based in Northern |
| 10:38:42 | 2 | California as well? |
| 10:38:50 | 3 | A.  Yes. |
| 10:38:51 | 4 | Q.  What was the job title that you were hired into |
| 10:38:54 | 5 | at Macromedia? |
| 10:38:55 | 6 | A.  Director of product marketing. |
| 10:39:00 | 7 | Q.  As director of product marketing, were your |
| 10:39:02 | 8 | responsibilities different than your responsibilities at |
| 10:39:05 | 9 | FirePower? |
| 10:39:08 | 10 | A.  No, but the transition was between FirePower |
| 10:39:11 | 11 | was a PC hardware company and Macromedia was a software |
| 10:39:15 | 12 | company.  So the basic product management |
| 10:39:17 | 13 | responsibilities were very similar, but the type of |
| 10:39:20 | 14 | products were different. |
| 10:39:23 | 15 | Q.  How did you become aware of the opportunity at |
| 10:39:25 | 16 | Macromedia? |
| 10:39:26 | 17 | A.  A friend had told me. |
| 10:39:31 | 18 | Q.  Who was the friend? |
| 10:39:34 | 19 | A.  Phil Schiller. |
| 10:39:37 | 20 | Q.  Where does Phil Schiller work now? |
| 10:39:40 | 21 | A.  Apple. |
| 10:39:41 | 22 | Q.  What's his job title? |
| 10:39:43 | 23 | A.  I believe he's EVP of marketing. |
| 10:39:53 | 24 | Q.  From where did you become friends with Phil |
| 10:39:57 | 25 | Schiller? |

11:01:34 1      A.  Yes, I did.

11:01:35 2      Q.  How frequently?

11:01:36 3      A.  Again, not that frequently.  It was primarily

11:01:39 4  in those forecasting meetings.

11:01:41 5      Q.  While you were at Adobe, did you have any

11:01:54 6  responsibilities with respect to setting compensation

11:01:55 7  for the people that you managed?

11:02:00 8      A.  Well, similar to what I described at

11:02:04 9  Macromedia, at Adobe, again, we had a recruiting

11:02:07 10  department.  So when we had open requisitions, we would

11:02:10 11  work with the recruiting department on getting resumes

11:02:13 12  of potential candidates.  We would take a look at that.

11:02:17 13  And if we saw somebody we wanted to hire, we would take

11:02:20 14  a look and make sure that we could, you know, offer

11:02:22 15  something that we think they would accept.  And so to

11:02:25 16  that extent, that we were -- you know, we were one of

11:02:28 17  the feedback loops in terms of creating the offer.

11:02:34 18      Q.  While you were at Adobe, did you have any

11:02:36 19  responsibilities with respect to recruiting?

11:02:43 20      A.  Well, there's two things, right, is what I

11:02:45 21  said, which is, you know, there were the open

11:02:47 22  requisitions that would do that.  But if I knew some

11:02:50 23  people that I had known from a prior life, similar to

11:02:53 24  what happened to me through my career, if I felt that

11:02:56 25  they would be interested or, you know, possible good

| | | |
|---|---|---|
| 11:02:58 | 1 | fit, I could just ask them if they were interested in |
| 11:03:01 | 2 | looking at a job at Adobe.  But these were people I knew |
| 11:03:06 | 3 | from my, you know, prior lives. |
| 11:03:10 | 4 | Q.  Do you know whether recruiters at Adobe used |
| 11:03:14 | 5 | cold calling as a means to attract candidates? |
| 11:03:17 | 6 | A.  Not to my knowledge. |
| 11:03:20 | 7 | Q.  No, they didn't, or no, you're not aware of |
| 11:03:22 | 8 | whether they did or not? |
| 11:03:24 | 9 | A.  No, I'm not aware. |
| 11:03:31 | 10 | Q.  While at Adobe, did you ever have occasion to |
| 11:03:35 | 11 | work on any collaborations between Adobe and Apple? |
| 11:03:41 | 12 | A.  Yes. |
| 11:03:41 | 13 | Q.  What were those? |
| 11:03:42 | 14 | A.  It was some performance optimizations that we |
| 11:03:45 | 15 | needed to do with Photoshop.  There was a -- there was |
| 11:03:48 | 16 | some things, there were some plug-ins that we had |
| 11:03:54 | 17 | created that allowed Photoshop to run better on the Mac |
| 11:03:58 | 18 | platform and we worked with Adobe -- I mean, rather with |
| 11:04:00 | 19 | Apple, because it was Adobe at the time.  We worked with |
| 11:04:03 | 20 | Apple to make sure that those things got built, and then |
| 11:04:06 | 21 | we worked with them so that they were released to the |
| 11:04:10 | 22 | public so people could get a better performing version |
| 11:04:13 | 23 | of Photoshop on their Macs. |
| 11:04:16 | 24 | Q.  What was your role in that process? |
| 11:04:18 | 25 | A.  Basically making sure that those plug-ins were |

11:04:21  1    launched and they got out to the customers' hands.

11:04:25  2        Q.  What steps were involved in making sure the

11:04:27  3    plug-ins were launched?

11:04:29  4        A.  Let's see.  Well, obviously we had to confirm

11:04:37  5    that they were done, they were blessed by engineering.

11:04:40  6    And I can't remember if we made it available on the

11:04:47  7    website or how we distributed it, but there was --

11:04:51  8    again, it's a while ago, so I'm -- but we were able,

11:04:55  9    then, to make sure that those plug-ins were made

11:04:58 10    available to you, to existing Photoshop customers so

11:05:01 11    that whenever -- you know, if they had the Mac, they

11:05:03 12    could get the plug-ins, put it in, and then get a better

11:05:07 13    performing version.  The specifics of how they got it, I

11:05:10 14    really can't recall now.

11:05:11 15        Q.  In order for this project to occur, did

11:05:14 16    engineers at Adobe have to work with engineers at Apple?

11:05:17 17        A.  Yes, they did.

11:05:19 18        Q.  Do you know how many engineers at Adobe worked

11:05:21 19    with how many engineers at Apple?

11:05:22 20        A.  No, I don't.

11:05:25 21        Q.  Did you super- -- you didn't supervise any of

11:05:27 22    the engineers at Adobe?

11:05:28 23        A.  No, I did not supervise the engineering work.

11:05:31 24        Q.  Who did supervise the engineers that were

11:05:32 25    working with Apple?

| | | |
|---|---|---|
| 11:17:31 | 1 | MS. SCHALMAN-BERGEN:  We've been going for |
| 11:17:31 | 2 | about another hour.  You want to take a break? |
| 11:17:33 | 3 | MR. RILEY:  All right. |
| 11:17:34 | 4 | MS. SCHALMAN-BERGEN:  Thank you. |
| 11:17:35 | 5 | THE VIDEOGRAHER:  This is the end of video |
| 11:17:36 | 6 | No. 2.  The time is 11:17 a.m.  We're going off the |
| 11:17:38 | 7 | record. |
| 11:17:40 | 8 | (Recess taken.) |
| 11:26:18 | 9 | THE VIDEOGRAHER:  This is the beginning of |
| 11:26:19 | 10 | video No. 3 in the deposition of Ron Okamoto.  The time |
| 11:26:23 | 11 | is 11:26 a.m.  We're back on the record. |
| 11:26:28 | 12 | MS. SCHALMAN-BERGEN:  Q.  Mr. Okamoto, is |
| 11:26:29 | 13 | there any reason why you can't continue to give me |
| 11:26:31 | 14 | your best testimony? |
| 11:26:32 | 15 | A.  No. |
| 11:26:45 | 16 | Q.  How would you describe the relationship between |
| 11:26:47 | 17 | Adobe and Apple during the time when you worked at |
| 11:26:49 | 18 | Adobe? |
| 11:26:53 | 19 | A.  It was a good relationship. |
| 11:27:00 | 20 | Q.  How would you describe the relationship between |
| 11:27:02 | 21 | Adobe and Apple during the time you worked -- have |
| 11:27:06 | 22 | worked at Apple? |
| 11:27:09 | 23 | A.  It's been fundamentally a good relationship, |
| 11:27:11 | 24 | but there's been challenges at times. |
| 11:27:14 | 25 | Q.  What sorts of challenges? |

| | | |
|---|---|---|
| 11:27:16 | 1 | A.  Most specifically in the areas where we |
| 11:27:18 | 2 | compete, where we have similar products going after |
| 11:27:21 | 3 | similar customers. |
| 11:27:21 | 4 | Q.  What areas are those? |
| 11:27:23 | 5 | A.  That would be in the film editing area. |
| 11:27:27 | 6 | Q.  Any other areas? |
| 11:27:28 | 7 | A.  That's -- I believe that's primarily it. |
| 11:27:40 | 8 | Q.  Have there been any sorts of challenges that |
| 11:27:43 | 9 | affected the relationship with -- between Adobe and |
| 11:27:45 | 10 | Apple with respect to Flash? |
| 11:27:50 | 11 | A.  Well, there was -- there was a -- there was a |
| 11:27:57 | 12 | challenge in that Flash is something that Adobe really |
| 11:28:01 | 13 | wanted to see on our mobile platform, and it's something |
| 11:28:04 | 14 | that we didn't put on there. |
| 11:28:09 | 15 | Q.  Did the challenge with Flash cause any tension |
| 11:28:12 | 16 | or disruption between the Apple and Adobe relationship? |
| 11:28:17 | 17 | A.  I wouldn't call it disruption.  Definitely |
| 11:28:20 | 18 | there was a difference of opinion there. |
| 11:28:26 | 19 | Q.  Did the difference of opinion lead Apple and |
| 11:28:29 | 20 | Adobe to cease collaborating with each other? |
| 11:28:34 | 21 | A.  No, not on the important things. |
| 11:28:37 | 22 | Q.  What were the important things? |
| 11:28:38 | 23 | A.  Again, the same things that I've -- I spoke |
| 11:28:41 | 24 | about before:  Making sure that their products were |
| 11:28:44 | 25 | running well on our platform. |

| | | |
|---|---|---|
| 11:28:49 | 1 | Q.  When did the challenge with Flash occur? |
| 11:28:56 | 2 | A.  I believe it happened around the time that we |
| 11:28:59 | 3 | introduced the iPhone. |
| 11:29:01 | 4 | Q.  What year would that be? |
| 11:29:03 | 5 | A.  What's that, about five years ago, so 2007, |
| 11:29:10 | 6 | 2008, in that time frame. |
| 11:29:16 | 7 | Q.  In 2001, you left Adobe to go to Apple; is that |
| 11:29:20 | 8 | accurate? |
| 11:29:21 | 9 | A.  Yes. |
| 11:29:23 | 10 | Q.  What was your position when you began working |
| 11:29:26 | 11 | at Apple? |
| 11:29:27 | 12 | A.  Vice president of developer relations. |
| 11:29:35 | 13 | Q.  How did you learn about the opportunity at |
| 11:29:37 | 14 | Apple? |
| 11:29:39 | 15 | A.  Phil Schiller gave me a phone call. |
| 11:29:42 | 16 | Q.  What did Phil say? |
| 11:29:44 | 17 | A.  That there was an opportunity at Apple and |
| 11:29:46 | 18 | would I be interested in discussing it with him. |
| 11:29:51 | 19 | Q.  Do you recall when he made that phone call? |
| 11:29:55 | 20 | A.  No, not the specifics.  No, not a specific |
| 11:29:59 | 21 | time. |
| 11:30:01 | 22 | Q.  Was it in 2001? |
| 11:30:07 | 23 | A.  Yes, I believe it was. |
| 11:30:10 | 24 | Q.  What month did you begin working at Apple? |
| 11:30:12 | 25 | A.  It was around March or April. |

11:30:16  1        Q.  So in early 2001, Phil called you to tell you

11:30:19  2    that there was an opportunity with Apple?

11:30:21  3        A.  Yes.

11:30:23  4        Q.  At the time, were you satisfied with your job

11:30:27  5    at Adobe?

11:30:28  6        A.  Less so.

11:30:29  7        Q.  Why so?

11:30:32  8        A.  I really enjoyed the company when Chuck and

11:30:35  9    John were running it.  They, you know, approached it

11:30:37 10    from a certain perspective.  And when there was the

11:30:41 11    changeover in the management, it just became, in my

11:30:46 12    opinion, a little bit too rigid.

11:30:50 13        Q.  In what ways was it too rigid?

11:30:53 14        A.  We were definitely following more of the -- you

11:30:55 15    know, what are the numbers saying and everything, so it

11:30:57 16    was more analytical.  And there's nothing wrong with

11:31:01 17    that.  I think that was, given the size of the business

11:31:02 18    and where it was going, is perfectly appropriate, but it

11:31:05 19    wasn't as good of a fit for me.

11:31:07 20        Q.  When you say you were following more of what

11:31:09 21    the numbers were saying, what do you mean by that?

11:31:12 22        A.  Well, just very good -- you know, a very strong

11:31:15 23    focus on the financials, making sure that, you know,

11:31:17 24    accurate forecasts were being made, accurate sales --

11:31:20 25    you know, good sales were being made, and really

| | | |
|---|---|---|
| 01:36:51 | 1 | Q.  Do you recognize this document? |
| 01:36:53 | 2 | A.  Yes, I do. |
| 01:36:55 | 3 | Q.  Is this a document that you reviewed in |
| 01:36:56 | 4 | preparation for your deposition? |
| 01:36:58 | 5 | A.  No, I didn't -- oh, that I reviewed?  I'm |
| 01:37:01 | 6 | sorry.  Yes. |
| 01:37:03 | 7 | Q.  Yes, you did review this document -- |
| 01:37:04 | 8 | A.  Yes. |
| 01:37:04 | 9 | Q.  -- to prepare for your deposition? |
| 01:37:06 | 10 | A.  I've seen this, yes. |
| 01:37:09 | 11 | Q.  When was the last time you saw this document? |
| 01:37:14 | 12 | A.  Probably when I wrote it back in 2010. |
| 01:37:18 | 13 | Q.  You have not seen this document since learning |
| 01:37:21 | 14 | that you would have your deposition taken; is that |
| 01:37:23 | 15 | correct? |
| 01:37:24 | 16 | A.  No. |
| 01:37:27 | 17 | Q.  Can you tell me what this document is. |
| 01:37:30 | 18 | A.  Yeah.  This document is somewhat describing |
| 01:37:33 | 19 | what I've spoken about before, which is we have a group |
| 01:37:39 | 20 | of folks that we wanted to make sure they were able to |
| 01:37:43 | 21 | get their raises within the total corporate budget |
| 01:37:46 | 22 | allocation that we had of ▮ percent.  And I had told you |
| 01:37:50 | 23 | before that some of these scales, there's like a medium, |
| 01:37:52 | 24 | high, and a low.  So there were some situations where |
| 01:37:55 | 25 | people were bumping into the top of that; and, |

01:37:57  1   therefore, you know, how do we handle that?  Because

01:37:59  2   sometimes it's promotion, and you want to make sure that

01:38:02  3   all the people who are performing well get rewarded.

01:38:05  4   And those that aren't, you know, performing well, you

01:38:08  5   know, they get a message as well.

01:38:10  6        Q.  So you're working within the corporate

01:38:12  7   guidelines to achieve those goals?

01:38:14  8        A.  No.  What I'm working with is a budget of

01:38:16  9   ▮percent against our total budget of compensation.

01:38:21  10       Q.  What do you mean by "a budget of ▮percent"?

01:38:23  11       A.  The way that we look at it is if you have your

01:38:26  12   total payroll to your organization, that for this

01:38:30  13   budgeting cycle, you could allocate ▮percent of -- you

01:38:33  14   know, ▮percent of that to raises and, basically, you

01:38:37  15   know, adjustments in compensation based on performance

01:38:39  16   of the employees.

01:38:42  17       Q.  Let me back up.

01:38:43  18           You recognize that this is an email from you to

01:38:47  19   Philip Shoemaker; is that correct?

01:38:49  20       A.  It's not Philip Shoemaker.

01:38:51  21       Q.  Oh.

01:38:53  22       A.  Oh, yes, I'm sorry, at the very top.  Yes.

01:38:56  23       Q.  Okay.  So there are two emails, one is

01:38:58  24   forwarded, and the top email you recognize to be an

01:39:00  25   email from you to Phillip Shoemaker; is that correct?

01:39:03  1        A.   Yes.

01:39:04  2        Q.   And the second email in the chain is from Phil

01:39:09  3   Schiller to you with Paige Riveron --

01:39:15  4             Is that how you pronounce her name?

01:39:17  5        A.   Riveron.

01:39:18  6        Q.   -- Riveron, excuse me, copied on it; is that

01:39:21  7   accurate?

01:39:21  8        A.   Yes.

01:39:22  9        Q.   And at the top of the document, do you see your

01:39:23 10   name in the to line -- in the from line, excuse me?

01:39:25 11        A.   Yes.

01:39:26 12        Q.   And following your name is an email address.

01:39:28 13   Do you see that?

01:39:30 14        A.   Yes.

01:39:30 15        Q.   And is that the email address that you use at

01:39:33 16   Apple?

01:39:34 17        A.   Yes.   That's my corporate email address.

01:39:38 18        Q.   That's the email address that you use to send

01:39:41 19   and receive emails?

01:39:42 20        A.   Yes.

01:39:42 21        Q.   And do you send and receive emails in the

01:39:45 22   ordinary course of business?

01:39:46 23        A.   Yes.

01:39:49 24        Q.   Has your email address changed since you've

01:39:52 25   been at Apple?

01:39:53   1          A.   No.

01:39:59   2          Q.   Who's Phillip Shoemaker?

01:40:01   3          A.   Phillip Shoemaker is one of my direct reports

01:40:03   4    who handles part of the team.

01:40:05   5          Q.   What's his job title?

01:40:07   6          A.   Director of app review.

01:40:11   7          Q.   And do you recognize that to be his email

01:40:13   8    address?

01:40:13   9          A.   Yes.

01:40:16   10         Q.   In the to line, excuse me.

01:40:18   11         A.   Yes.

01:40:20   12         Q.   Who is Paige Riveron?

01:40:24   13         A.   Paige Riveron is one of the folks in our HR

01:40:28   14   team.

01:40:29   15         Q.   And then there is a third email in the chain

01:40:37   16   that it looks like you sent on September 14th, 2010, at

01:40:41   17   3:06 p.m., and it looks like it's from you to Phil

01:40:44   18   Schiller; is that accurate?

01:40:50   19         A.   Yes, that's what it appears to be.

01:41:00   20         Q.   And in the email, the bottom email on this

01:41:03   21   page, you say, "All teams are using the corporate

01:41:07   22   guidelines of ██ percent for their teams based on

01:41:10   23   performance and salary range."

01:41:11   24              Do you see that?

01:41:12   25         A.   Yes.

01:41:13  1          Q.  And does that accurately describe the process

01:41:15  2  you were just telling me?

01:41:18  3          MR. RILEY:  Objection to the form of the

01:41:19  4  question.

01:41:19  5          THE WITNESS:  Yes.  What -- what it means is,

01:41:22  6  is that again, I told you that it was a budget -- that

01:41:25  7  there was a budget allocation.  That budget allocation

01:41:28  8  is ██ percent.

01:41:30  9          MS. SCHALMAN-BERGEN:  Q.  And -- strike

01:41:35 10  that.

01:41:36 11          When you say "all teams," who were you

01:41:38 12  referring to?

01:41:45 13          A.  This far back, I can't recall what I -- who I

01:41:48 14  was referring to in the all teams.

01:41:54 15          Q.  When you say, "All teams are using the

01:41:57 16  corporate guidelines of ██ percent based on performance

01:41:59 17  and salary range," for the salary range, you're

01:42:02 18  discussing the min and max that Apple guidelines

01:42:06 19  prescribe for job titles; is that accurate?

01:42:08 20          MR. RILEY:  Objection to the form.

01:42:10 21          THE WITNESS:  What I'm describing in salary

01:42:12 22  range is what is the appropriate range based on job

01:42:14 23  title.

01:42:17 24          MS. SCHALMAN-BERGEN:  Q.  The next sentence

01:42:18 25  you say, "An important consideration is that folks

01:42:20  1    who are at the top of their salary range wouldn't

01:42:23  2    get merit raises."

01:42:25  3         Do you see that?

01:42:26  4         A.  Yes.

01:42:26  5         Q.  What did you mean by that?

01:42:28  6         A.  There are some people who may have come in and

01:42:30  7    who may have ultimately have gotten to the top of their

01:42:33  8    salary range.  And for them to be able to, you know --

01:42:37  9    these are the case of only the top performers.  If our

01:42:40  10   top performers came in and they're near the top of their

01:42:43  11   range, in order for them to be able to get a merit

01:42:47  12   raise, they would actually be outside of that range.

01:42:50  13         And so the question is, when that happens, what

01:42:54  14   do you do?  Sometimes you promote the people because in

01:42:57  15   some cases because of their performance we've shown that

01:43:00  16   they're people who need to get promoted to the next

01:43:03  17   level.  And in some cases, it's a little bit more

01:43:05  18   difficult when that promotion takes them into a range,

01:43:08  19   for example, of directly managing people and these may

01:43:11  20   be individual contributor jobs.

01:43:15  21        Q.  So you would -- in this email, are you saying

01:43:17  22   that they wouldn't be able to get merit ranges

01:43:19  23   [verbatim] without making one of those exceptions you

01:43:21  24   discussed because they're already at the top of their

01:43:24  25   salary range?

| | | |
|---|---|---|
| 01:43:25 | 1 | MR. RILEY:  Object to the form. |
| 01:43:29 | 2 | THE WITNESS:  What I'm describing here is that |
| 01:43:30 | 3 | we had some performers who were doing really well.  And |
| 01:43:32 | 4 | if they're near or at the top of their range, we wanted |
| 01:43:35 | 5 | to make sure, as I said before, that in this process of |
| 01:43:38 | 6 | the merit increases that they got the message that |
| 01:43:41 | 7 | they're being appreciated and that, you know, we -- we |
| 01:43:44 | 8 | value their work.  And so, again, as I said here, is |
| 01:43:47 | 9 | that there would be some people near the top, and then |
| 01:43:50 | 10 | given the description of that range that we have, you |
| 01:43:53 | 11 | know, it would become difficult. |
| 01:43:55 | 12 | MS. SCHALMAN-BERGEN:  Q.  Because that's a |
| 01:43:57 | 13 | rigid range that Apple sets; is that accurate? |
| 01:44:00 | 14 | MR. RILEY:  Object to the form of the question. |
| 01:44:01 | 15 | THE WITNESS:  Again, you know, how rigid it is, |
| 01:44:03 | 16 | I don't know, but it's basically the guide -- not the |
| 01:44:07 | 17 | guidelines, but it's the ranges that we work with. |
| 01:44:10 | 18 | MS. SCHALMAN-BERGEN:  Q.  Down -- if you go |
| 01:44:12 | 19 | down to the two paragraphs, at the end of the second |
| 01:44:17 | 20 | paragraph up, you say, "Award bonuses on an |
| 01:44:21 | 21 | individual basis as well depending on performance." |
| 01:44:23 | 22 | And then you say, "Bonuses at amounts equitable to |
| 01:44:27 | 23 | the rest of the DR team." |
| 01:44:29 | 24 | Do you see that? |
| 01:44:30 | 25 | A.  Uh-huh. |

| | | |
|---|---|---|
| 01:52:30 | 1 | THE WITNESS:  Yes.  I wouldn't -- I wouldn't |
| 01:52:31 | 2 | know based on what somebody would think. |
| 01:52:35 | 3 | MS. SCHALMAN-BERGEN:  Q.  Well, you're a |
| 01:52:36 | 4 | manager -- |
| 01:52:36 | 5 | A.  Uh-huh. |
| 01:52:36 | 6 | Q.  -- so you're -- in this email, you're -- |
| 01:52:39 | 7 | A.  Uh-huh. |
| 01:52:39 | 8 | Q.  -- you're here saying bonuses should be at |
| 01:52:42 | 9 | amounts equitable to the rest of the team.  So I'm just |
| 01:52:45 | 10 | trying to get at what you mean by that.  You know, in |
| 01:52:47 | 11 | your experience, is it important that people are |
| 01:52:50 | 12 | receiving compensation at the level that is appropriate? |
| 01:52:53 | 13 | And if compensation is off, does that affect |
| 01:52:58 | 14 | productivity? |
| 01:52:59 | 15 | MR. RILEY:  Objection.  It's a multiple |
| 01:53:00 | 16 | compound question, misstates the document and prior |
| 01:53:04 | 17 | testimony. |
| 01:53:04 | 18 | THE WITNESS:  Okay.  First question.  Instead |
| 01:53:05 | 19 | of many questions, can you start with the first question |
| 01:53:08 | 20 | in that chain? |
| 01:53:10 | 21 | MS. SCHALMAN-BERGEN:  Q.  Sure. |
| 01:53:12 | 22 | If compensation is inequitable between a |
| 01:53:16 | 23 | range -- |
| 01:53:16 | 24 | A.  Uh-huh. |
| 01:53:16 | 25 | Q.  -- in your experience as a manager, would that |

01:53:18  1    impact the productivity of employees?

01:53:21  2              MR. RILEY:  Object to the form of the question.

01:53:23  3              THE WITNESS:  Again, it's speculative whether

01:53:25  4    it would impact the productivity or not.  I mean, people

01:53:28  5    are different.

01:53:28  6              MS. SCHALMAN-BERGEN:  Q.  Is equitable

01:53:31  7    compensation something that you consider when making

01:53:34  8    management decisions about salaries?

01:53:37  9              MR. RILEY:  Object to the form of the question.

01:53:39  10             THE WITNESS:  Well, again, what we take a look

01:53:41  11   at, going back to what we've been discussing, is we make

01:53:44  12   sure that the compensation that we provide people at

01:53:46  13   positions is within the ranges that we discuss.  And,

01:53:50  14   again, there's variability in that range based on

01:53:53  15   performance.

01:53:59  16             MS. SCHALMAN-BERGEN:  Q.  And would you

01:53:59  17   agree that it's important, generally, to hire within

01:54:02  18   a salary range to preserve equity between employees

01:54:06  19   performing similar jobs?

01:54:08  20             MR. RILEY:  Objection to the form of the

01:54:08  21   question.

01:54:10  22             THE WITNESS:  I believe that you take a look at

01:54:12  23   the job opening that we have, the position that we hire

01:54:15  24   for, and, again, you look for people who are best fit

01:54:18  25   for the job.  And that is defined -- the pay scale is

01:54:24  1   going to be defined on what that job is.

01:54:29  2       MS. SCHALMAN-BERGEN:  Q.  I'm not sure you

01:54:29  3   answered my question.  Can we try one more time?

01:54:31  4       A.  Sure.

01:54:32  5       MS. SCHALMAN-BERGEN:  Can you read that back.

01:54:45  6       (Record read as follows:  And would you agree

01:54:45  7       that it's important, generally, to hire within

01:54:45  8       a salary range to preserve equity between

01:54:45  9       employees performing similar jobs?)

01:54:47 10       MR. RILEY:  Object to the form of the question.

01:54:51 11       THE WITNESS:  I think I did answer it, is that

01:54:53 12   we have position descriptions, and within that position

01:54:57 13   description, there is a salary range.  And we bring in

01:55:01 14   the person against that position based on the best

01:55:04 15   qualified candidate, and it should fit within that

01:55:08 16   range; otherwise, we haven't scoped the job right.

01:55:11 17       MS. SCHALMAN-BERGEN:  Q.  And is one of the

01:55:12 18   reasons for the range to make sure there is equity

01:55:14 19   between employees' salaries performing similar jobs?

01:55:17 20       MR. RILEY:  Object to the form of the question.

01:55:19 21       THE WITNESS:  I don't know if it's equity or

01:55:21 22   not.  What I really know is, though, that when we do

01:55:23 23   this, it's really to make sure that we have competitive

01:55:26 24   salaries, because that's one of the things we want to

01:55:28 25   make sure is that when people do look at jobs at other

01:55:32  1   places, again, those type of things are okay so we can

01:55:37  2   hire the candidates we want.

01:55:38  3        MS. SCHALMAN-BERGEN:  Q.  Describe to me

01:55:39  4   what you mean by "competitive salaries."

01:55:41  5        A.  That if somebody is doing a type of job at one

01:55:43  6   company, say, again, you know, it's a director job of

01:55:46  7   product marketing, and then they go to another director

01:55:48  8   job of product marketing, that there is enough range in

01:55:53  9   there so that you can attract one person from one

01:55:56  10  company to the other.

01:55:57  11       Q.  So it's important for Apple to be pricing the

01:56:01  12  job ranges at rates that are competitive with other

01:56:04  13  companies that Apple may compete with for employees?

01:56:08  14       MR. RILEY:  Object to the form.

01:56:09  15       THE WITNESS:  I would just say that's one of

01:56:11  16  the things.  There may be other things that could factor

01:56:13  17  into that in terms of how people -- how people in job

01:56:16  18  classifications are priced.

01:56:19  19       MS. SCHALMAN-BERGEN:  Q.  But that is one

01:56:20  20  of the things, yes?

01:56:22  21       MR. RILEY:  Object to the form.

01:56:23  22       THE WITNESS:  It could be one of them.

01:56:29  23       MS. SCHALMAN-BERGEN:  Q.  What other

01:56:30  24  companies does Apple compete with for employees?

01:56:35  25       MR. RILEY:  Object to the form.

01:56:40  1          THE WITNESS:  We look -- we look for the best

01:56:43  2   candidates we can find.  And so I wouldn't necessarily

01:56:47  3   say that we're competing with people.  I think we're all

01:56:49  4   there trying to get the best candidates.  And so, again,

01:56:53  5   it depends upon if we have something that's attractive

01:56:56  6   that people want to sign up for and join, versus them

01:56:59  7   thinking something else is more attractive.

01:57:02  8          MS. SCHALMAN-BERGEN:  Q.  When you said

01:57:03  9   "competitive salaries," are there specific companies

01:57:06 10   that Apple uses as a benchmark of what a competitive

01:57:09 11   salary would be?

01:57:10 12          A.  I wouldn't know that.

01:57:23 13          Q.  If Apple doesn't use -- doesn't take into

01:57:27 14   consideration competitive salaries, do you risk losing

01:57:30 15   employees?  Do you have a problem with retention?

01:57:33 16          MR. RILEY:  Objection.  It's a multiple-part

01:57:35 17   question.  Object to the form.

01:57:37 18          THE WITNESS:  Yes.  Can you break that down to

01:57:39 19   one question first, please.

01:57:41 20          MS. SCHALMAN-BERGEN:  Q.  If Apple doesn't

01:57:42 21   take into consideration competitive salaries, do you

01:57:44 22   risk losing employees?

01:57:47 23          MR. RILEY:  Object to the form.

01:57:51 24          THE WITNESS:  Again, when we take a look at --

01:57:53 25   when we have an open position and we were looking for

01:57:55  1    people we'd like to hire, we want to make sure that we

01:57:58  2    can make an offer that we can hire them.

01:58:03  3              MR. RILEY:  Q.  If Apple does not have

01:58:05  4    competitive salaries, would you risk having a

01:58:09  5    problem with retention?

01:58:11  6              MR. RILEY:  Object to the form of the question.

01:58:13  7    Hypothetical.

01:58:19  8              THE WITNESS:  No.  I think it depends -- it's a

01:58:21  9    case-by-case basis dependent upon the employee.  I think

01:58:25 10    everybody has -- you know, let's take my case in point.

01:58:30 11    You asked me several times about whether or not I asked

01:58:34 12    for compensation increases based on potential job offers

01:58:37 13    and things like that.  And it's just one of the things I

01:58:40 14    think people put to consideration.  That's just one of

01:58:42 15    the -- that's one of the factors in retention.

01:58:46 16    Retention is very, you know, it's complex because I

01:58:48 17    think it's based on a lot of the individual.

01:58:50 18              MS. SCHALMAN-BERGEN:  Q.  Well, as a

01:58:51 19    manager, you're kind of looking big picture at

01:58:53 20    things.  And so if, for example, Apple was paying

01:58:58 21    well below market rate, would you be concerned that

01:59:02 22    you might lose employees?

01:59:04 23              MR. RILEY:  Object to the form of the question.

01:59:17 24              THE WITNESS:  You know, it would just, again,

01:59:18 25    be one of the factors.  I think, again, retention is a

01:59:21  1   very complex thing.  Again, just using myself as an

01:59:26  2   example, I took a reduction in my title from a VP title

01:59:29  3   to director title because I saw an opportunity.  And I

01:59:33  4   believe that with respect to retention, again, every

01:59:36  5   individual, I think, has their factors of what makes

01:59:39  6   them happy in their job.

01:59:41  7           MS. SCHALMAN-BERGEN:  Q.  But retention

01:59:42  8   would be something that would be considered if -- in

01:59:44  9   that scenario where Apple was compensating its

01:59:47 10   employees at well below market?

01:59:49 11           MR. RILEY:  Object to the form of the question.

01:59:50 12           THE WITNESS:  No.  What I said was is that, you

01:59:51 13   know, you -- that -- what I said was is that when you

01:59:54 14   take a look at this notion of retention, retention is a

01:59:57 15   very -- is a very interesting thing, because every

01:59:59 16   single person has their own motivations and their own

02:00:02 17   factors for why they choose a job, for one instance, and

02:00:05 18   why they stay in the job.  And so when you talk about

02:00:10 19   the reasons for it, you know, it's a multi-factored

02:00:14 20   decision, I believe.

02:01:05 21           MS. SCHALMAN-BERGEN:  Q.  During the time

02:01:07 22   you worked -- you've been working at Apple, we

02:01:11 23   talked a little bit about the collaborations between

02:01:13 24   Apple and Adobe.

02:01:15 25           A.  Uh-huh.

02:01:16 1      Q.  And I want to ask you some questions about what

02:01:18 2   sorts of work has been going on, what kind of

02:01:22 3   collaborations were going on between Apple and Adobe

02:01:24 4   during the time you've worked there.

02:01:26 5      A.  Uh-huh.

02:01:26 6      Q.  Okay?

02:01:27 7          You mentioned two types of events that you'd

02:01:30 8   consider to be major collaborations.  Those were

02:01:33 9   platform changes and integration of operating system.

02:01:37 10  So since you've joined Apple, have Apple and Adobe

02:01:41 11  worked on a platform change together?

02:01:44 12         MR. RILEY:  Objection.  Misstates his prior

02:01:46 13  testimony.

02:01:48 14         THE WITNESS:  The collaboration that we have

02:01:50 15  going on between Apple and Adobe is pretty much ongoing,

02:01:53 16  because they're constantly updating their software,

02:01:57 17  we're constantly updating our operating system and our

02:02:01 18  hardware.  And, therefore, there is multiple instances.

02:02:04 19  It's not just necessarily a platform change.  It could

02:02:06 20  be a software upgrade, it could be going to a different

02:02:10 21  speed range of a CPU inside of a computer.

02:02:12 22         Any one of those events would have the need for

02:02:14 23  collaboration for, you know, what we talked about

02:02:17 24  earlier, which is the -- the products working well,

02:02:21 25  being compatible, and that's an ongoing thing.

02:02:25  1          So in the case of what we did with the two big

02:02:29  2    ones that affected most developers, one, of course, was

02:02:32  3    the switch from OS -- from System 9 over to OS X, and

02:02:35  4    the second, which was the switch from the powered PC CPU

02:02:39  5    architecture to the Intel architecture.

02:02:42  6          MS. SCHALMAN-BERGEN:  Q.  So the answer to

02:02:43  7    my question is yes, there has been collaboration

02:02:48  8    with Adobe that involved a platform change?

02:02:50  9      A.  Yes, there has been collaboration of Adobe

02:02:52 10    involving platform change, but there's also been

02:02:55 11    constant collaboration even between those periods,

02:02:58 12    because, again, as I said, with respect to OS updates,

02:03:02 13    CPU updates, regardless, but that's a change in the -- a

02:03:04 14    major change of the platform, that's an ongoing

02:03:07 15    exercise.

02:03:07 16          MS. SCHALMAN-BERGEN:  I'm going to move to

02:03:09 17    strike that as not responsive.  That's -- was not my

02:03:11 18    question.

02:03:11 19      Q.  Between 2001 --

02:03:12 20          MR. RILEY:  I believe it was responsive to your

02:03:14 21    question.

02:03:14 22          MS. SCHALMAN-BERGEN:  Q.  Between 2001 and

02:03:16 23    2009, there have been platform changes with Apple

02:03:22 24    that involved collaborations with Adobe; is that

02:03:24 25    fair to say?

02:03:27 1        A.   Yes.

02:03:28 2        Q.   Okay.  And with respect to integration of

02:03:30 3   operating systems, is that a collaboration that Apple

02:03:33 4   and Adobe have worked on together since 2001?

02:03:36 5        A.   Well, let me -- let me point out two things.

02:03:42 6             The first, is as far as the platform changes,

02:03:44 7   the platform changes, there are major things that we do,

02:03:49 8   but then there's also the ongoing stuff that we always

02:03:52 9   do.  And with respect to that work, there's always the

02:03:54 10  need for collaboration because the two companies have to

02:03:57 11  work together to make that stuff work.

02:03:59 12            Then with respect to integration, integration

02:04:03 13  could be something that Adobe could do potentially, but

02:04:06 14  it's also things that we do with other partners.  For

02:04:08 15  example, one can say that when we went from the power PC

02:04:12 16  architecture to the Intel architecture, that

02:04:15 17  architecture was basically integrating that new CPU onto

02:04:24 18  our -- onto our machines.

02:04:25 19            So -- I'm sorry, your question again?

02:04:26 20       Q.   Right.

02:04:27 21       A.   Make sure I --

02:04:26 22       Q.   I understand that maybe you may have talked

02:04:28 23  about other collaborations --

02:04:30 24       A.   Yeah.

02:04:30 25       Q.   -- during the break with counsel, but that's

| | | |
|---|---|---|
| 03:29:02 | 1 | THE WITNESS:  I can't remember it was before or |
| 03:29:03 | 2 | after.  I believe it was -- actually, you know what, I |
| 03:29:08 | 3 | just can't remember what the time frame was for both of |
| 03:29:10 | 4 | those. |
| 03:29:11 | 5 | MS. SCHALMAN-BERGEN:  Q.  I just want to |
| 03:29:12 | 6 | make sure that the testimony is clear.  Before, I |
| 03:29:14 | 7 | thought you were saying that the issue came to your |
| 03:29:16 | 8 | attention because of an incident with Garmin. |
| 03:29:19 | 9 | A.  Uh-huh. |
| 03:29:20 | 10 | Q.  And then you spoke with Mark about Adobe.  Is |
| 03:29:22 | 11 | that not your testimony? |
| 03:29:25 | 12 | MR. RILEY:  Objection.  Misstates his |
| 03:29:26 | 13 | testimony. |
| 03:29:29 | 14 | THE WITNESS:  What I used is Garmin as an |
| 03:29:31 | 15 | example of where cold calling was done -- it could have |
| 03:29:37 | 16 | done harm to the work that we were trying to get done. |
| 03:29:39 | 17 | You know, we were trying to get the port completed.  And |
| 03:29:43 | 18 | Garmin had expressed concern over what they had done.  I |
| 03:29:47 | 19 | had also had concerns that other companies that we would |
| 03:29:51 | 20 | work with that if these things occurred, it could also |
| 03:29:54 | 21 | get in the way of the work that we were trying to get |
| 03:29:57 | 22 | done. |
| 03:29:59 | 23 | MS. SCHALMAN-BERGEN:  Q.  So what led you |
| 03:30:00 | 24 | to be concerned that cold calling might get in the |
| 03:30:04 | 25 | way of work to be done with Adobe? |

03:30:08  1        A.  Because I explained to you, in this situation,

03:30:10  2   we're working very closely with these guys, you know,

03:30:14  3   these are complex things we're working on.  We're in a

03:30:17  4   face-to-face situation.  Our guys would -- you know, we

03:30:21  5   would have meetings, we would get together, and then

03:30:22  6   we'd, you know, get together again just a few days

03:30:25  7   later.

03:30:27  8            And one of the things that we wanted to do is

03:30:29  9   really establish this collaboration, you know, this

03:30:32 10   spirit of collaboration that we have, that their best

03:30:36 11   efforts and our best efforts would go forward to making

03:30:39 12   sure that the products came out in a really good way.

03:30:43 13            And what cold calling would do is it would

03:30:46 14   make -- it could make managers and others wonder, why

03:30:52 15   are the -- you know, are those meetings -- are -- is the

03:30:56 16   frequency and the extent of those meetings going to be

03:30:59 17   something that's going to lead to Apple people just, you

03:31:04 18   know, again divebombing with phone calls to a bunch of

03:31:08 19   people, or can we really do that and make sure that the

03:31:11 20   people can stay focused on the work and get that work

03:31:14 21   done?

03:31:16 22            MS. SCHALMAN-BERGEN:  Q.  Well, Apple and

03:31:17 23   Adobe have had a partnership since before you

03:31:19 24   started working at Apple; is that accurate?

03:31:21 25        A.  Yes.

03:31:23  1        Q.  When would you say the partnership began?

03:31:29  2        A.  I'd have to say it was probably back in the

03:31:33  3    time when John Warnock created the first PDF desktop

03:31:39  4    publishing system for the Apple.

03:31:41  5        Q.  In the early '80s; does that sound right?

03:31:45  6        A.  Sounds right, yes.

03:31:47  7        Q.  And in 1990, Photoshop was introduced on Mac

03:31:52  8    only; is that right?

03:31:54  9        A.  I can't recall if that was the case or not.

03:31:56 10        Q.  And did Apple collaborate with Adobe on

03:31:59 11    QuickTime?

03:32:05 12        A.  Yes, I believe they did.

03:32:07 13        Q.  What is QuickTime?

03:32:09 14        A.  QuickTime is basically a software piece that

03:32:13 15    allows you to view movies and things inside of a

03:32:16 16    computer.

03:32:22 17        Q.  When was QuickTime released?

03:32:24 18        A.  I don't know.

03:32:26 19        Q.  Prior to the time that you joined Adobe?

03:32:30 20        A.  Yes, I believe so.

03:32:35 21        Q.  And in 1994, Adobe released After Effects for

03:32:40 22    the Mac; is that right?

03:32:43 23        A.  Again, I don't know.

03:32:46 24        Q.  What's After Effects?

03:32:48 25        A.  After Effects is a video -- actually, it's a

03:37:33  1   being a party -- to running developer relations.  And in

03:37:36  2   the product management vein, you know, we were kind of

03:37:39  3   pretty much downward focused in terms of making this

03:37:41  4   stuff work.  And what we cared about was making sure

03:37:44  5   that we got the right support from Apple so that these

03:37:47  6   things did work.

03:37:48  7        And that changed when I went from Adobe to

03:37:51  8   Apple and I became the vice president of developer

03:37:54  9   relations.  So in that respect, you know, my perspective

03:37:59 10   changed because my perspective now is making sure that

03:38:02 11   we have the right environment for both of our teams to

03:38:05 12   be able to go and, you know, create, again, a great

03:38:08 13   product.

03:38:08 14        Because I think it bears in mind that at the

03:38:15 15   time, the Mac platform was going through the changes

03:38:17 16   because it really needed to get up to speed.  And so it

03:38:20 17   was very critical that certain applications get moved

03:38:22 18   over.  And, you know, again, this is coming from my new

03:38:27 19   job as VP of product -- of, rather, developer relations.

03:38:31 20   And Adobe then became a very important product -- or

03:38:34 21   rather, it had always been a very important partner.

03:38:37 22   But getting things like Photoshop and some of the

03:38:39 23   products that you just described was very, very

03:38:43 24   important.

03:38:43 25        And so with the job that I had as being the VP

03:38:48  1    of developer relations, I wanted to make sure that those

03:38:52  2    conditions, to making sure that that goal got achieved,

03:38:55  3    were in the best shape possible.

03:39:02  4        Q.  While you were at Adobe, did you ever become

03:39:04  5    aware that cold calling -- Apple's cold calling into

03:39:09  6    Adobe disrupted the making stuff work between Apple and

03:39:13  7    Adobe?

03:39:18  8            MR. RILEY:  Objection to the form of the

03:39:19  9    question.

03:39:20 10            THE WITNESS:  Can you say -- can we go over

03:39:20 11    that question again, please.

03:39:22 12            MS. SCHALMAN-BERGEN:  Q.  Sure.

03:39:24 13            While you were at Adobe working on the InDesign

03:39:28 14    collaboration between Adobe and Apple, were you ever

03:39:31 15    made aware that cold calling from Apple into Adobe or

03:39:35 16    Adobe into Apple disrupted the collaborations between

03:39:39 17    the two companies?

03:39:42 18        A.  For the job that I was doing at the time, I had

03:39:45 19    no direct -- I had no direct feedback or heard anything

03:39:49 20    of that nature.

03:39:53 21        Q.  Do you know whether Apple was making cold calls

03:39:55 22    into Adobe during that time period?

03:39:57 23        A.  No, I don't know.

03:40:01 24        Q.  Do you know whether Adobe was making cold calls

03:40:04 25    into Apple during that time period?

```
03:40:05   1        A.   No, I don't know.

03:40:06   2             And to be clear, this is while I was at Adobe?

03:40:09   3        Q.   While you were at Adobe, yes.

03:40:10   4        A.   Okay.

03:40:22   5        Q.   While you were at Adobe, did you ever become

03:40:24   6   aware that collaborations between any company were being

03:40:28   7   impacted because the companies were cold calling into

03:40:30   8   each other?

03:40:37   9        A.   While I was at Adobe?

03:40:40  10        Q.   Yes.

03:40:41  11        A.   I don't believe so.

03:40:48  12             MR. RILEY:  We've been going about an hour.

03:40:49  13             MS. SCHALMAN-BERGEN:  Okay.  We can take a

03:40:51  14   break.

03:40:51  15             THE VIDEOGRAHER:  This is the end of video

03:40:52  16   No. 5.  The time is 3:40 p.m.  We're going off the

03:40:56  17   record.

03:40:57  18             (Recess taken.)

03:52:02  19             THE VIDEOGRAHER:  This is the beginning of

03:58:06  20   video No. 6 in the deposition of Ron Okamoto.  The time

03:58:10  21   is 3:58 p.m.  We're back on the record.

03:58:14  22             MS. SCHALMAN-BERGEN:  Q.  Mr. Okamoto, is

03:58:15  23   there any reason why you can't continue to give me

03:58:17  24   your best testimony?

03:58:18  25        A.   No.
```

```
 1              I, Gina V. Carbone, Certified Shorthand

 2    Reporter licensed in the State of California, License

 3    No. 8249, hereby certify that the deponent was by me

 4    first duly sworn and the foregoing testimony was

 5    reported by me and was thereafter transcribed with

 6    computer-aided transcription; that the foregoing is a

 7    full, complete, and true record of said proceedings.

 8              I further certify that I am not of counsel or

 9    attorney for either of any of the parties in the

10    foregoing proceeding and caption named or in any way

11    interested in the outcome of the cause in said caption.

12              The dismantling, unsealing, or unbinding of

13    the original transcript will render the reporter's

14    certificates null and void.

15              In witness whereof, I have hereunto set my

16    hand this day:  March 11, 2013.

17              _____ Reading and Signing was requested.

18              _____ Reading and Signing was waived.

19              ___X___  Reading and signing was not requested.

20

21

22              _____

23              GINA  V. CARBONE

24              CSR 8249, CRR, CCRR

25
```