# EXHIBIT JJJ TO
# CISNEROS DECLARATION
# REDACTED VERSION

```
 1                 UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF CALIFORNIA

 3                     SAN JOSE DIVISION

 4

 5

 6   IN RE:  HIGH-TECH EMPLOYEE      )

 7   ANTITRUST LITIGATION            )

 8                                   )   No. 11-CV-2509-LHK

 9   THIS DOCUMENT RELATES TO:       )

10   ALL ACTIONS.                    )

11   _____ )

12

13

14                 ATTORNEYS' EYES ONLY

15        VIDEO DEPOSITION OF LAUREN STIROH, Ph.D.

16                  December 9, 2013

17

18

19   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RMR, CCRR

20

21

22

23

24

25
```

09:31:13  1    in The Metropolitan Corporate Counsel.  What is

09:31:16  2    The Metropolitan Corporate Counsel?

09:31:25  3        A.  I don't know much about it, other than --

09:31:27  4    certainly as I sit here today, other than to say it's a

09:31:29  5    publication.  I just don't recall much about that.

09:31:32  6        Q.  So did the Willkie Farr & Gallagher attorneys

09:31:35  7    that you list there invite you to help them with that

09:31:37  8    contribution?

09:31:38  9        A.  Yes.

09:31:38  10       Q.  What did they tell you about the journal or

09:31:40  11   publication, if anything, when they invited you to help

09:31:43  12   them?

09:31:44  13       A.  I don't recall those conversations right now.

09:31:48  14       Q.  Well, do you at least understand that that

09:31:50  15   publication is oriented towards an audience of in-house

09:31:55  16   corporate lawyers?

09:31:57  17       A.  It wouldn't surprise me, based on the name of

09:31:59  18   the publication, but I just don't really recall very

09:32:01  19   much about it.

09:32:04  20       Q.  Who wrote -- well, what was your -- what were

09:32:08  21   the respective roles of the different authors in writing

09:32:10  22   that article?

09:32:14  23           If contributions is a better word, use

09:32:17  24   contributions.

09:32:17  25       A.  I think my contribution was on the economics of

| | | |
|---|---|---|
| 09:32:21 | 1 | standard setting and the things an economist would look |
| 09:32:23 | 2 | at to look at the impact of standard setting on a |
| 09:32:27 | 3 | royalty rate.  And then the lawyers talked more about |
| 09:32:28 | 4 | the legal aspect and the particular case that we were |
| 09:32:31 | 5 | using as a -- as an example in that matter. |
| 09:32:34 | 6 | Q.  Had you worked with any of those attorneys |
| 09:32:36 | 7 | before they invited you to help them with this article? |
| 09:32:41 | 8 | A.  I think so, yes. |
| 09:32:43 | 9 | Q.  So what -- what -- in what capacity had you |
| 09:32:46 | 10 | worked with them? |
| 09:32:47 | 11 | A.  I had worked with Mr. Rooney on a matter, I |
| 09:32:52 | 12 | think it was a damages matter.  I wasn't the testifying |
| 09:32:56 | 13 | economist on that, but I had interaction with him on |
| 09:32:59 | 14 | that matter. |
| 09:33:04 | 15 | Possibly Mr. Chang on a different matter, but I |
| 09:33:07 | 16 | can't remember if that was before or after this article. |
| 09:33:14 | 17 | Q.  Would you agree with me that -- how many pages |
| 09:33:16 | 18 | long was that article? |
| 09:33:22 | 19 | A.  I don't remember.  Certainly it matters how you |
| 09:33:25 | 20 | print it out.  When you print it out in The Metropolitan |
| 09:33:28 | 21 | Corporate Counsel, it may be in several columns and fit |
| 09:33:31 | 22 | onto a single page.  If it's on a computer, it would |
| 09:33:33 | 23 | follow the typical pagination and would be more pages, |
| 09:33:36 | 24 | but it's not very lengthy. |
| 09:33:40 | 25 | Q.  Is it -- is it fair to say -- would you agree |

| | | |
|---|---|---|
| 09:33:43 | 1 | that part of the purpose of writing such articles is to |
| 09:33:47 | 2 | market your services and those of the attorneys to |
| 09:33:50 | 3 | in-house corporate lawyers? |
| 09:33:51 | 4 | MR. KIERNAN:  Object to form. |
| 09:34:03 | 5 | THE WITNESS:  Certainly could be, yes. |
| 09:34:05 | 6 | MR. GLACKIN:  Q.  What about the NERA books |
| 09:34:07 | 7 | that you've contributed to; did those also have a |
| 09:34:10 | 8 | marketing purpose? |
| 09:34:12 | 9 | A.  They have a marketing purpose and I think a |
| 09:34:15 | 10 | part of our goal is to provide an education purpose. |
| 09:34:18 | 11 | Q.  I mean, I only ask because I get these books |
| 09:34:20 | 12 | for free sometimes, NERA just sends them to me.  So I'm |
| 09:34:23 | 13 | wondering, are they sending them to me because they want |
| 09:34:25 | 14 | to advertise their services and the services of |
| 09:34:28 | 15 | economists like yourself? |
| 09:34:29 | 16 | MR. KIERNAN:  Object to form. |
| 09:34:31 | 17 | THE WITNESS:  I don't know what the reason |
| 09:34:32 | 18 | would be that we have sent them to you.  I hope you |
| 09:34:34 | 19 | enjoyed them.  But part of their -- the purpose behind |
| 09:34:40 | 20 | them is what we feel is an education purpose. |
| 09:34:42 | 21 | MR. GLACKIN:  Q.  So part of the purpose is |
| 09:34:43 | 22 | education and part of the purpose is marketing; are |
| 09:34:45 | 23 | you willing to agree with that? |
| 09:34:46 | 24 | A.  I am. |
| 09:34:50 | 25 | Q.  And then "Considerations in Defining the |

| | | |
|---|---|---|
| 09:34:53 | 1 | Relevant Product Market for Antitrust Analysis," that |
| 09:34:55 | 2 | was a presentation you gave at the American Bar |
| 09:34:57 | 3 | Association Spring Meetings, correct? |
| 09:35:00 | 4 | A.  Correct. |
| 09:35:00 | 5 | Q.  And part of the benefit of giving a |
| 09:35:02 | 6 | presentation at those meetings is, again, there is a |
| 09:35:03 | 7 | marketing benefit to it, right? |
| 09:35:06 | 8 | A.  Potentially, there could be, yes.  I was |
| 09:35:08 | 9 | invited to give that presentation, that there was a |
| 09:35:10 | 10 | paper that went along with it. |
| 09:35:12 | 11 | Q.  Who invited you to give the presentation? |
| 09:35:14 | 12 | A.  The organizers of the ABA Spring Meeting. |
| 09:35:19 | 13 | Q.  Well, there is a lot of them.  Which one was it |
| 09:35:21 | 14 | in particular, do you remember? |
| 09:35:22 | 15 | A.  I don't remember. |
| 09:35:23 | 16 | Q.  Was it someone you had worked with before? |
| 09:35:26 | 17 | A.  I don't think so. |
| 09:35:41 | 18 | Q.  In your -- your chapter on, "Proving Causation |
| 09:35:57 | 19 | in Damages Analyses," it's also written for an audience |
| 09:35:59 | 20 | of attorneys, correct? |
| 09:36:03 | 21 | Let me rephrase that.  It is principally |
| 09:36:07 | 22 | written for an audience of attorneys, correct? |
| 09:36:09 | 23 | A.  It is specific to proving causation in the |
| 09:36:12 | 24 | context of a litigation.  In that sense, yes. |
| 09:36:18 | 25 | Q.  Is there anything in there that I would need to |

| | | |
|---|---|---|
| 09:36:20 | 1 | have a degree in statistics to understand as a lawyer? |
| 09:36:23 | 2 | MR. KIERNAN:  Object to form. |
| 09:36:27 | 3 | THE WITNESS:  I don't recall.  It was certainly |
| 09:36:28 | 4 | my goal to write it in such a way that it would be |
| 09:36:31 | 5 | understandable to someone without a degree in |
| 09:36:33 | 6 | statistics. |
| 09:36:34 | 7 | MR. GLACKIN:  Q.  How many pages long is |
| 09:36:35 | 8 | that article? |
| 09:36:36 | 9 | A.  I don't remember. |
| 09:36:37 | 10 | Q.  More than ten or less? |
| 09:36:40 | 11 | A.  I don't remember. |
| 09:36:45 | 12 | Q.  Are you familiar with the concept of Granger |
| 09:36:48 | 13 | causality? |
| 09:36:49 | 14 | A.  Yes. |
| 09:36:49 | 15 | Q.  What is the concept of Granger causality? |
| 09:36:56 | 16 | A.  It is looking at the frequency with which one |
| 09:37:00 | 17 | event follows another event, generally in a time series. |
| 09:37:04 | 18 | And from that, if there is the consistency of one event |
| 09:37:08 | 19 | occurring and then another event occurring within some |
| 09:37:10 | 20 | defined time period, whether that supports an inference |
| 09:37:13 | 21 | of causation that the first event caused the second |
| 09:37:17 | 22 | event to occur. |
| 09:37:18 | 23 | Q.  And you wrote about Granger causality in your |
| 09:37:22 | 24 | chapter in "Proving Causation in Damages Analyses," |
| 09:37:24 | 25 | correct? |

Deposition of Lauren Stiroh, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

09:37:25  1       A.  I refer to it there, yes.

09:37:26  2       Q.  You refer to it as one means of inferring

09:37:28  3  causation, correct?

09:37:31  4       A.  I don't think I refer to it -- well, maybe I

09:37:33  5  do, but to the best of my recollection, the reason I

09:37:37  6  mention Granger causality is to talk about the cases

09:37:39  7  where it does not work.  I think I bring up the

09:37:42  8  Christmas cards do not cause Christmas.

09:37:45  9       Q.  Well, do you agree with Professor Granger that

09:37:49 10  under the circumstances he outlines, causation can

09:37:53 11  sometimes be inferred?

09:37:56 12           MR. KIERNAN:  Object to form.

09:37:57 13           THE WITNESS:  I don't recall the circumstances

09:37:58 14  that he outlines as a statistical matter.  And given the

09:38:01 15  situation, it may be possible to infer causation if an

09:38:04 16  event typically or routinely follows a prior event.  But

09:38:08 17  there may be other things that cause both of those

09:38:10 18  events to occur and cause both of them to occur in a

09:38:14 19  pattern where one happens first and the other happens

09:38:17 20  second without causation being inferred.  So you would

09:38:19 21  need to look at something broader than just the

09:38:21 22  statistical output.

09:38:23 23           MR. GLACKIN:  Q.  So you are aware that

09:38:25 24  Professor Granger won the Nobel Prize, right?

09:38:28 25       A.  I think so, yes.

KRAMM COURT REPORTING            *ATTORNEYS' EYES ONLY*            Page: 35

10:04:36  1    that I have in my report is that the -- that having a

10:04:40  2    conduct variable that turns off at the start time and

10:04:42  3    then turns off at the end time is going to sweep into it

10:04:46  4    anything that's not adequately controlled for elsewhere

10:04:50  5    in the report -- in the analysis.

10:04:52  6          And to the extent that there is an overlap in

10:04:56  7    the periods of the agreement, so even assuming that the

10:04:59  8    agreements have an impact, that the impact could be

10:05:03  9    measurable and the impact is to lead to

10:05:05 10    undercompensation of the class, if all of that is true,

10:05:08 11    and you have two agreements that have an overlap in

10:05:11 12    period, then there is nothing in the analysis that tells

10:05:13 13    you what of that measured undercompensation comes from

10:05:17 14    the one at issue versus one that was concurrent with the

10:05:20 15    one at issue, even if the concurrency was for a part but

10:05:24 16    not all of the time.

10:05:26 17          MR. GLACKIN:   Q.   When you say the

10:05:27 18    agreements have an overlap, are you saying this

10:05:30 19    problem arises if there is any overlap at all

10:05:33 20    between the time periods of the agreements?

10:05:38 21       A.   If the theory is correct, that there is an

10:05:41 22    impact on undercompensation from the nature of the

10:05:45 23    agreement, and there is a period of overlap, then the

10:05:47 24    model has no way to distinguish what part of that

10:05:50 25    undercompensation comes from the agreement that we're

10:05:52  1    trying to measure the effect of, and what comes from the

10:05:54  2    agreement that we are not trying to measure the effect

10:05:56  3    of.

10:05:57  4        Q.  So let's call -- I'm going to refer to those

10:05:59  5    agreements as the agreements were not trying to measure

10:06:03  6    the effect as lawful agreements.

10:06:09  7            (Reporter clarification.)

10:06:09  8            THE WITNESS:  Okay.

10:06:09  9            MR. GLACKIN:  Q.  Suppose you had a lawful

10:06:10 10    agreement that began in 1995 and continued up to the

10:06:13 11    present day; why would the regression analysis, as

10:06:19 12    it is constructed, fail to control for the existence

10:06:22 13    of that agreement?

10:06:24 14            MR. KIERNAN:  Object to form.

10:06:32 15            THE WITNESS:  I think that -- I would want to

10:06:37 16    look a little bit further to see what the nature of the

10:06:39 17    agreement was specifically, and who the two parties were

10:06:44 18    to the agreement.  But just on the hypothetical, an

10:06:47 19    agreement that spans the entirety of the period, then if

10:06:51 20    there is an impact on undercompensation from the

10:06:54 21    agreement, it's not necessarily going to be uniform

10:06:56 22    throughout the entire period.

10:06:58 23            And because there are not sufficient controls

10:07:01 24    during what we're calling the damage period, 2005 to

10:07:07 25    2009, and there are events within that damage period,

10:07:11  1   undercompensation that should be connected to the lawful

10:07:14  2   agreement can be wrapped up in undercompensation that is

10:07:17  3   coming from the -- from the recession or other

10:07:21  4   compensation events at the defendants that happened

10:07:23  5   inside the damage period and not under the -- outside

10:07:25  6   the damage period.

10:07:27  7        They're being swept into compensation where it

10:07:29  8   should be that they are really attributed to different

10:07:32  9   causes.  And if one of those causes is a lawful

10:07:35 10   agreement, even if it spans the entirety of the period,

10:07:38 11   could still be swept into damages.

10:07:40 12        MR. GLACKIN:  Q.  Is it your opinion that

10:07:41 13   that actually happened with respect to any of these

10:07:44 14   four lawful agreements that you've identified here?

10:07:48 15        MR. KIERNAN:  Object to form.

10:07:50 16        THE WITNESS:  As I sit here, I don't recall

10:07:52 17   what the dates were and whether they, all or any of

10:07:54 18   them, span 1995 through 2011, but it is my general

10:07:58 19   opinion that what is being picked up by Dr. Leamer's

10:08:01 20   conduct variable includes more events than certainly the

10:08:04 21   conduct that we're trying to measure at issue.  And I've

10:08:06 22   given you an example of how one of those agreements may

10:08:08 23   be infecting the analyses.

10:08:11 24        MR. GLACKIN:  Q.  So what I'm asking is, is

10:08:13 25   it your affirmative opinion that any one of these

Deposition of Lauren Stiroh, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

10:09:32  1           MR. GLACKIN:  Q.  Well, I only ask because

10:09:36  2   you said that it was our theory that the plaintiffs

10:09:38  3   had -- the agreements had this affect regardless of

10:09:41  4   their term, so I was trying to understand what you

10:09:42  5   meant by that.

10:09:44  6           MR. KIERNAN:  There is not a question pending.

10:09:46  7           MR. GLACKIN:  Q.  So what did you mean by

10:09:47  8   that?

10:09:48  9       A.  That I was there referring to the way that

10:09:51 10   Dr. Leamer puts them into his analysis, which is where

10:09:54 11   this conflation can become an issue by not separating

10:09:58 12   them out.

10:09:58 13           So he has a conduct period that turns on

10:10:01 14   whenever the first agreement that a company enters into

10:10:05 15   occurred, and then turns off in March 2009.  And there

10:10:08 16   is no correction, adjustment or control for different

10:10:13 17   terms of the different agreements.

10:10:15 18       Q.  Was there, in fact, a do-not-cold-call

10:10:17 19   agreement between Pixar and Intel that was comparable in

10:10:21 20   terms and scope to the do-not-cold-call agreement

10:10:25 21   between Intel and Google?

10:10:27 22           MR. KIERNAN:  Object to form.

10:10:29 23           THE WITNESS:  I don't recall, as I sit here,

10:10:30 24   what the differences are in those.

10:10:33 25           MR. GLACKIN:  Q.  Well, do you have -- are

10:10:34   1   you expressing an opinion about that one way or the

10:10:36   2   other?  I mean, this is important.  I'm trying to

10:10:37   3   understand it.

10:10:38   4          If your answer is that you don't know because

10:10:41   5   you haven't studied it, then you can tell me that.  Or

10:10:43   6   if your answer is that you have an opinion but you

10:10:45   7   didn't put it in your report, you can tell me that.

10:10:47   8          So my question -- or if it's in your report

10:10:50   9   somewhere and I didn't find it, you can tell me that.

10:10:52  10          My question is, is it your opinion that Pixar

10:10:55  11   and Intel had a do-not-cold-call agreement that was

10:10:58  12   comparable in terms and scope and duration to the

10:11:03  13   do-not-cold-call agreement between Intel and Google?

10:11:06  14          MR. KIERNAN:  Object to form.

10:11:06  15          THE WITNESS:  I am not offering an opinion on

10:11:09  16   that subject.

10:11:10  17          MR. GLACKIN:  Q.  Are you offering an

10:11:11  18   opinion on that subject with respect to any of these

10:11:13  19   other lawful agreements that are listed here in

10:11:15  20   paragraph 10?

10:11:16  21          MR. KIERNAN:  Object to form.

10:11:17  22          THE WITNESS:  I am not.

10:11:18  23          MR. GLACKIN:  Q.  Okay.  So you are

10:11:19  24   identifying -- you are identifying a hypothetical

10:11:22  25   issue, right?

Deposition of Lauren Stiroh, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
10:11:24  1              MR. KIERNAN:  Object to form.
10:11:28  2              THE WITNESS:  To the extent that no agreements
10:11:31  3   exist between these parties that overlaps with the time
10:11:36  4   period that is in the damage period that Dr. Leamer
10:11:41  5   analyzes, then it is a hypothetical issue.
10:11:45  6              My recollection was that there is overlap of
10:11:47  7   the agreements that were no longer being challenged, so
10:11:52  8   it is more than a hypothetical issue.  But as I sit here
10:11:55  9   today, it's not something that I've looked at for some
10:11:57 10   time, so I just don't have the information at my
10:11:59 11   fingertips to be able to give you a more concrete
10:12:01 12   answer.
10:12:03 13              MR. GLACKIN:  Q.  Are you intending to
10:12:03 14   offer an opinion about the terms, scope, or duration
10:12:08 15   of any of these four lawful agreements?
10:12:11 16              MR. KIERNAN:  Object to form.
10:12:12 17              THE WITNESS:  I am not intending to offer an
10:12:15 18   opinion as to facts regarding the agreements.  My
10:12:18 19   opinions would be related to what Dr. Leamer has done
10:12:22 20   with respect to the agreements.  But I don't have -- and
10:12:26 21   take, as fact, information that is in the record about
10:12:29 22   those agreements at issue.  But I'm not the person that
10:12:31 23   would tell you what those facts are.
10:12:36 24              MR. KIERNAN:  If you are about to switch, we've
10:12:38 25   been going over an hour.
```

Deposition of Lauren Stiroh, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 10:12:39 | 1 | MR. GLACKIN:  Sure.  Would you like a break? |
| 10:12:40 | 2 | THE WITNESS:  Sure. |
| 10:12:41 | 3 | MR. GLACKIN:  Okay. |
| 10:12:41 | 4 | THE VIDEOGRAPHER:  This is the end of video |
| 10:12:42 | 5 | No. 1.  The time is 10:12 a.m.  We're going off the |
| 10:12:45 | 6 | record. |
| 10:12:46 | 7 | (Recess taken.) |
| 10:24:04 | 8 | THE VIDEOGRAPHER:  This is the beginning of |
| 10:24:06 | 9 | video No. 2 in the deposition of Dr. Stiroh.  The time |
| 10:24:09 | 10 | is 10:24 a.m.  We're back on the record. |
| 10:24:20 | 11 | MR. GLACKIN:  Q.  In that same paragraph we |
| 10:24:21 | 12 | were talking about you say, "Finally, it is my |
| 10:24:23 | 13 | understanding from counsel that Intel's |
| 10:24:26 | 14 | participation in a DNCC agreement with Google may |
| 10:24:29 | 15 | have begun in spring of 2006, as opposed to spring |
| 10:24:33 | 16 | of 2005," et cetera, et cetera.  I'm not going to |
| 10:24:37 | 17 | keep reading. |
| 10:24:38 | 18 | First question is, what counsel gave you that |
| 10:24:40 | 19 | understanding? |
| 10:24:48 | 20 | A.  I don't remember specifically if it was |
| 10:24:51 | 21 | logically counsel for Intel.  But in discussions in a |
| 10:24:55 | 22 | group phone call, I don't remember who was speaking with |
| 10:24:58 | 23 | respect to that. |
| 10:25:00 | 24 | I reviewed the information that's referenced in |
| 10:25:03 | 25 | footnote 15 as well, where there seemed to be documents |

| | | |
|---|---|---|
| 11:08:52 | 1 | MR. KIERNAN:  Object to form. |
| 11:08:56 | 2 | THE WITNESS:  I don't know that you can say |
| 11:08:58 | 3 | that outside of the litigation context, and then have |
| 11:09:01 | 4 | that be -- have any meaning for what statement is |
| 11:09:04 | 5 | written by an attorney.  That may be, if outside of the |
| 11:09:06 | 6 | litigation context, somebody is talking about 10-Ks, the |
| 11:09:10 | 7 | 10-Ks may have been written by the attorneys for the |
| 11:09:12 | 8 | firm, or some part of it might have been. |
| 11:09:15 | 9 | Contracts.  If somebody is doing an analysis of |
| 11:09:17 | 10 | contracts and looking at publicly available information |
| 11:09:20 | 11 | about contracts, the contracts may have been drafted by |
| 11:09:21 | 12 | attorneys. |
| 11:09:22 | 13 | I think it is not unusual inside a litigation |
| 11:09:25 | 14 | context to have information that may be drafted by |
| 11:09:29 | 15 | attorneys, just given the fact that it is litigation. |
| 11:09:32 | 16 | MR. GLACKIN:  Q.  Can you point me to any |
| 11:09:34 | 17 | authority, scholarly authority, that approves the |
| 11:09:41 | 18 | reliance by economists on witness statements drafted |
| 11:09:45 | 19 | by lawyers? |
| 11:09:47 | 20 | MR. KIERNAN:  Object to form. |
| 11:09:50 | 21 | THE WITNESS:  You are asking me for a scholarly |
| 11:09:53 | 22 | authority? |
| 11:09:54 | 23 | MR. GLACKIN:  Q.  Right. |
| 11:09:58 | 24 | A.  I can't -- I don't know what type of a |
| 11:10:01 | 25 | scholarly authority would even have that type of a |

11:10:04  1    statement.  It is, I think, generally accepted in a

11:10:11  2    litigation context, where economists are offering expert

11:10:15  3    opinions, that they can rely on what you referred to a

11:10:19  4    minute ago as hearsay.  Information that they've heard

11:10:22  5    from other parties to the case.

11:10:24  6         I am not opining as to the fact of that

11:10:27  7    information.  I'm taking it as an input that informs my

11:10:31  8    analysis.  That to the extent that facts are established

11:10:33  9    to be different from how I have understood them, then I

11:10:36  10   will adjust my opinions as necessary and as appropriate.

11:10:43  11        Q.  Okay.  In your background section, there is a

11:10:48  12   number of paragraphs where you discuss the fact that

11:10:52  13   average compensation increases, and average hiring

11:10:55  14   increases during the class period.  Do you -- just in

11:10:59  15   general terms, are you familiar with the opinions that

11:11:01  16   I'm talking about?

11:11:04  17        A.  I'm generally familiar with what's in the

11:11:07  18   background section, yes.

11:11:08  19        Q.  Okay.  Does the fact -- what is the relevance

11:11:14  20   of -- to your opinions of the fact that compensation

11:11:18  21   increased -- average compensation increased during the

11:11:20  22   class period?

11:11:27  23        A.  That there is not an easily observable

11:11:29  24   relationship with the start and stop date of the damage

11:11:31  25   period, as assessed by Dr. Leamer in his report, with

| | | |
|---|---|---|
| 11:11:36 | 1 | compensation patterns at each of the seven companies. |
| 11:11:38 | 2 | We don't see a change in average compensation at the |
| 11:11:43 | 3 | start of the alleged damage period and at the end of the |
| 11:11:47 | 4 | alleged damage period.  That is consistent across the |
| 11:11:50 | 5 | companies. |
| 11:11:51 | 6 |         Generally, compensation continues to increase |
| 11:11:52 | 7 | during the alleged damage period.  And I guess one |
| 11:11:55 | 8 | other -- the pattern does not look to be different in |
| 11:12:01 | 9 | the damage period compared to outside the damage period |
| 11:12:05 | 10 | at either end. |
| 11:12:06 | 11 |     Q.  Is it necessary for there to be such an easily |
| 11:12:09 | 12 | observable relationship with the start and stop date in |
| 11:12:11 | 13 | order for the agreements to have impacted compensation? |
| 11:12:16 | 14 |         MR. KIERNAN:  Object to form. |
| 11:12:16 | 15 |         THE WITNESS:  It is not necessary.  It is |
| 11:12:18 | 16 | something that, my understanding of Dr. Leamer's earlier |
| 11:12:21 | 17 | reports, that he looked for such a relationship, and he |
| 11:12:25 | 18 | seemed to view one, looking at all of the companies |
| 11:12:29 | 19 | averaged together, and took that as -- I can't now |
| 11:12:33 | 20 | remember what word he specifically uses, but motivation |
| 11:12:37 | 21 | I think is maybe -- it's either his word or one that |
| 11:12:40 | 22 | I've said in the report -- for the analysis that he then |
| 11:12:43 | 23 | conducts.  And I observe that same motivation does not |
| 11:12:46 | 24 | seem to appear when you look at each of the companies |
| 11:12:48 | 25 | individually. |

| | | |
|---|---|---|
| 11:12:49 | 1 | MR. GLACKIN:  Q.  So let me ask you a |
| 11:12:50 | 2 | question.  I'd like you to suppose, for example, |
| 11:12:53 | 3 | that you have a conspiracy to fix the prices of some |
| 11:12:56 | 4 | high tech component, like any of the half dozen that |
| 11:12:59 | 5 | have been brought in this district over the last ten |
| 11:13:01 | 6 | years. |
| 11:13:03 | 7 | And then suppose that when you look at the |
| 11:13:05 | 8 | period of the conspiracy prices for the component are |
| 11:13:09 | 9 | going down through the conspiracy; is that evidence that |
| 11:13:12 | 10 | the conspiracy had no effect on price? |
| 11:13:14 | 11 | MR. KIERNAN:  Object to form. |
| 11:13:17 | 12 | THE WITNESS:  On its own it would not be.  You |
| 11:13:19 | 13 | may look at the rates of change of the decline, and you |
| 11:13:22 | 14 | would look to other factors, which is exactly what I do |
| 11:13:27 | 15 | in my report as well.  But the observation that |
| 11:13:29 | 16 | Dr. Leamer made that there seemed to be a difference in |
| 11:13:31 | 17 | the growth rate for compensation in 2004 and 2011 does |
| 11:13:36 | 18 | not bear up when you look at each of the companies |
| 11:13:38 | 19 | individually. |
| 11:13:39 | 20 | And to the extent that that observation is |
| 11:13:41 | 21 | motivation for the analysis that he did, I don't |
| 11:13:43 | 22 | think -- I think the motivation is lacking when we do a |
| 11:13:48 | 23 | further investigation and see that there isn't a |
| 11:13:50 | 24 | consistent pattern across the companies. |
| 11:13:51 | 25 | MR. GLACKIN:  Q.  So the only -- so the |

| | | |
|---|---|---|
| 11:20:09 | 1 | during the period is a reasonable starting place or a |
| 11:20:11 | 2 | relevant factor in concluding that this conduct had an |
| 11:20:16 | 3 | impact on compensation? |
| 11:20:17 | 4 | MR. STONE:  Can I have that question back.  I'm |
| 11:20:21 | 5 | sorry. |
| 11:20:22 | 6 | (Record read as follows:  What's your authority |
| 11:20:22 | 7 | for the proposition that the pattern -- whether |
| 11:20:22 | 8 | or not there is a pattern of change during the |
| 11:20:22 | 9 | period is a reasonable starting place or a |
| 11:20:22 | 10 | relevant factor in concluding that this conduct |
| 11:20:22 | 11 | had an impact on compensation?) |
| 11:20:39 | 12 | MR. KIERNAN:  Object to form. |
| 11:20:44 | 13 | THE WITNESS:  If one were to conclude that -- |
| 11:20:56 | 14 | (Reporter clarification.) |
| 11:20:56 | 15 | THE WITNESS:  If one were to conclude that |
| 11:20:58 | 16 | conduct had an impact on compensation, then you would |
| 11:21:01 | 17 | need to establish that that impact is being driven by |
| 11:21:04 | 18 | the conduct and not other factors. |
| 11:21:07 | 19 | In conducting a regression analysis, you -- a |
| 11:21:11 | 20 | first stage is understanding the data and looking at the |
| 11:21:14 | 21 | data.  And the authority for that, besides my own |
| 11:21:17 | 22 | experience and looking at the specific data that has |
| 11:21:21 | 23 | been produced in this case, as I will tell you just |
| 11:21:25 | 24 | about every econometrics textbook, even those that I |
| 11:21:28 | 25 | have not seen, but I think I reference Peter Kennedy as |

Deposition of Lauren Stiroh, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

11:21:31   1   an example in my -- in my materials.

11:21:34   2           MR. GLACKIN:  Q.  You did.

11:21:34   3       A.  Okay.

11:21:35   4       Q.  So Peter Kennedy says this.

11:21:40   5           Does Peter Kennedy say this?  Is that what you

11:21:42   6   are saying?

11:21:43   7       A.  Peter Kennedy does not say the words that I

11:21:45   8   just said.  He does say look at the data.  I think he's

11:21:49   9   got ten commandments and it is probably in the top

11:21:54   10  three.

11:21:55   11      Q.  So there is a whole literature, I'm sure that

11:21:58   12  you are aware of, about the effect of antitrust

11:22:03   13  conspiracies.  Are you aware of that literature?

11:22:07   14          MR. KIERNAN:  Object to form.

11:22:10   15          THE WITNESS:  I am aware of literature talking

11:22:14   16  about various types of conspiracies and whether there

11:22:20   17  is, in cases, a measurable impact of alleged

11:22:22   18  conspiracies, or even acknowledged conspiracies, or even

11:22:27   19  agreements that are not conspiracies.  But there is

11:22:30   20  academic literature on the subject of what happens when

11:22:32   21  firms agree and act in concert with one another, as

11:22:35   22  opposed to independently of one another.

11:22:38   23          MR. GLACKIN:  Q.  Is there any authority in

11:22:40   24  that literature for the proposition that the absence

11:22:42   25  of a change in pattern during versus before and

| | | |
|---|---|---|
| 11:22:47 | 1 | after the conspiracy is relevant to understanding |
| 11:22:51 | 2 | whether or not the conspiracy had any effect? |
| 11:22:55 | 3 | MR. KIERNAN:  Object to form. |
| 11:22:57 | 4 | THE WITNESS:  Can you ask it again. |
| 11:22:57 | 5 | MR. GLACKIN:  Q.  Is there any authority in |
| 11:22:58 | 6 | that literature for the proposition that the absence |
| 11:23:00 | 7 | of a change in pattern during versus before and |
| 11:23:04 | 8 | after the conspiracy is relevant to understanding |
| 11:23:07 | 9 | whether or not the conspiracy had any effect? |
| 11:23:11 | 10 | MR. KIERNAN:  Object to form. |
| 11:23:11 | 11 | THE WITNESS:  So the literature that looks at a |
| 11:23:13 | 12 | before and after period, that is looking at -- for a |
| 11:23:17 | 13 | change in pattern.  The examples that I can call to |
| 11:23:23 | 14 | mind, and I can't tell you specifically what it is, more |
| 11:23:25 | 15 | than just a recollection of what the page looks like, is |
| 11:23:29 | 16 | looking at a chart and a before and after period and a |
| 11:23:32 | 17 | dotted line that separates before to after, and drawing |
| 11:23:35 | 18 | the reader's attention to, look, this looks different |
| 11:23:38 | 19 | from that. |
| 11:23:38 | 20 | Now, that's not the end point, it's not the |
| 11:23:40 | 21 | final conclusion, it's a starting place.  It is looking |
| 11:23:43 | 22 | at the data, prior to doing an analysis, and noting that |
| 11:23:46 | 23 | there is a difference in the after period than before |
| 11:23:49 | 24 | period.  And quite often, the noting of that difference |
| 11:23:53 | 25 | is the inspiration for lawsuits to say what was it that |

01:32:40  1   pocket that you are going to surprise us with later,

01:32:42  2   correct?

01:32:43  3        MR. KIERNAN:  Object to form.

01:32:46  4        THE WITNESS:  I don't think I can say whether

01:32:47  5   or not you will be surprised.  It is my -- not my

01:32:51  6   intention to surprise you.  But the factors that I think

01:32:55  7   have not been affected are the ones that I've described

01:32:58  8   here, the job title and promotion history, but also the

01:33:01  9   other factors in the background section where I talk

01:33:03  10  about the ways that each of the companies individually

01:33:06  11  responded to the recession and individual compensation

01:33:10  12  events in the, you know, nine-year period that is being

01:33:14  13  studied.

01:33:14  14        MR. GLACKIN:  Q.  So the factors you

01:33:15  15  reference here in paragraph 150 as having been

01:33:18  16  omitted are all factors that you discuss somewhere

01:33:21  17  else in your report, correct?  That's what I'm

01:33:23  18  trying to get to.

01:33:33  19      A.  Yes.  The omitted factors that I am talking

01:33:35  20  about are the ones that I am talking about somewhere in

01:33:38  21  the report, not necessarily just in --

01:33:40  22      Q.  Correct.  Not --

01:33:41  23      A.  -- this section.

01:33:42  24      Q.  I understand.

01:33:43  25      A.  Yes.

01:33:46   1     Q.  I'd like you to turn to paragraph 161, please.

01:33:53   2         Okay.  You say that, "A well-known effect of

01:33:57   3   misspecification and omitted variables in regression

01:34:02   4   analyses is that coefficients can be estimated with the

01:34:05   5   'wrong' sign."  You cite to Dr. Kennedy's book.

01:34:09   6         How did you become familiar with Dr. Kennedy's

01:34:12   7   book?

01:34:20   8     A.  I think it is a textbook that is frequently

01:34:22   9   used in econometrics programs that some of my colleagues

01:34:26  10   and people that I work with used it in their

01:34:29  11   econometrics courses.  I think it is very clearly

01:34:33  12   written, and so it's one that I cite frequently.

01:34:36  13     Q.  Okay.  Are you saying that the fact that the

01:34:47  14   age coefficients, in your opinion, have the wrong sign

01:34:50  15   on them is a basis to conclude the model is

01:34:53  16   misspecified?

01:34:56  17     A.  I am saying it is a basis to question the

01:34:58  18   model.  And so one of the things that I think is needed

01:35:01  19   is a theory to go along with why is it that the age and

01:35:04  20   age-squared variables have the opposite sign to what

01:35:09  21   they would typically have in wage regressions.

01:35:11  22         So it may be the case that there is a reason to

01:35:14  23   think, for these defendant companies, that is the

01:35:17  24   relationship between compensation and age.  It is a

01:35:21  25   different sign than Dr. Leamer obtained when he did his

01:35:26  1    year-by-year company-by-company regression and was able

01:35:30  2    to include job title in those regressions.

01:35:33  3            So there is a different relationship between

01:35:37  4    age of compensation being measured in his conduct

01:35:40  5    regression than he obtained when he was able to control

01:35:42  6    for more of the factors and -- that affect compensation.

01:35:54  7        Q.  In paragraph 165 on the next page you say,

01:35:56  8    "Dr. Leamer has not provided an explanation for why the

01:36:00  9    unusual results are reasonable in this market setting."

01:36:03  10           Is it your position that Dr. Leamer has not

01:36:05  11   provided any explanation for what you describe as the

01:36:10  12   counterintuitive signs on age?

01:36:15  13       A.  I don't recall anything that he said that

01:36:17  14   explains it.  I thought actually more that I -- it

01:36:22  15   seemed that he was dismissive of the wrong signs, and I

01:36:27  16   think inappropriately so, because it is important to

01:36:29  17   look into them and figure out what is going on and

01:36:32  18   what's driving the wrong signs.

01:36:35  19           But I think the more persuasive thing is the

01:36:39  20   fact that he got different signs in one form of a wage

01:36:42  21   regression when he was able to control for things that

01:36:44  22   matter than he got in his conduct regression when he's

01:36:47  23   not able to control for those things.

01:36:51  24       Q.  Did you read Dr. Leamer's most recent

01:36:54  25   deposition?

| | | |
|---|---|---|
| 01:48:08 | 1 | THE WITNESS:  Statistical significance |
| 01:48:09 | 2 | generally depends on what the -- the circumstances is, |
| 01:48:11 | 3 | and why someone is referring to it.  It could be -- |
| 01:48:18 | 4 | certainly pertains to the reliability of results based |
| 01:48:21 | 5 | on a coefficient that is not measured with any |
| 01:48:26 | 6 | statistical significance.  There are other measures of |
| 01:48:28 | 7 | reliability for the -- an overall regression. |
| 01:48:36 | 8 | MR. GLACKIN:  Q.  Is it necessary for a |
| 01:48:37 | 9 | regression result to be statistically significant in |
| 01:48:39 | 10 | order to be evidence of something to an economist? |
| 01:48:43 | 11 | MR. KIERNAN:  Object to form. |
| 01:48:55 | 12 | THE WITNESS:  Again, it depends on what it is |
| 01:48:56 | 13 | you are trying to measure and what conclusion you are |
| 01:48:58 | 14 | trying to draw.  If you are trying to draw a conclusion |
| 01:49:00 | 15 | about a specific coefficient, and that coefficient is |
| 01:49:06 | 16 | not measured with statistical significance, it matters |
| 01:49:08 | 17 | crucially. |
| 01:49:09 | 18 | If you are trying to draw a conclusion about a |
| 01:49:12 | 19 | specific coefficient from a well-specified regression, |
| 01:49:16 | 20 | but not all of the variables in the regression are |
| 01:49:19 | 21 | measured with statistical significance, if the one you |
| 01:49:21 | 22 | care about is, and the regression is properly specified, |
| 01:49:24 | 23 | then the insignificance of other variables may not |
| 01:49:28 | 24 | affect your results. |
| 01:49:28 | 25 | MR. GLACKIN:  Q.  So are you saying that |

01:49:29  1    the -- it is necessary for the coefficient you care

01:49:35  2    about, to use your phrase, are you saying it is

01:49:36  3    necessary for that coefficient to be statistically

01:49:40  4    significant in order for it to be evidence of

01:49:46  5    anything?

01:49:47  6         A.  I think, yes.  To say that there is

01:49:52  7    undercompensation measured by conduct, you need the

01:50:02  8    conduct variable to be negative and significant --

01:50:04  9              (Reporter clarification.)

01:50:04  10             THE WITNESS:  To say that there is

01:50:04  11   undercompensation caused by conduct, you need the

01:50:04  12   conduct variables to be negative and significant, and

01:50:05  13   you also need it not to flip sign and other reasonable

01:50:08  14   specifications.

01:50:08  15             MR. GLACKIN:  Q.  What is your support

01:50:13  16   for -- in the literature for your contention that

01:50:17  17   the variable you care about has to be statistically

01:50:20  18   significant in order to be evidence?

01:50:22  19        A.  Again, econometrics textbooks that talk about

01:50:26  20   inference from regression analyses.  That one of the

01:50:29  21   first tests that you learn as an economist is a test for

01:50:32  22   significance of a variable.  And it allows -- what

01:50:36  23   allows you then to draw an inference that the variable

01:50:38  24   had a specific positive or negative relationship to the

01:50:43  25   left-hand side variable.

Deposition of Lauren Stiroh, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

01:50:46  1        Q.  Which one of those textbooks says that the
01:50:49  2    coefficient you care about has to be statistically
01:50:52  3    significant at the 95 percent level in order to be
01:50:54  4    evidence of anything?
01:51:01  5        A.  The textbooks generally say that the level of
01:51:03  6    significance may be something that is chosen by an
01:51:06  7    economist doing the analysis, but that the generally
01:51:11  8    agreed upon levels are typically 5 percent or 1 percent
01:51:14  9    or .1 percent.  There is nothing in a textbook I think
01:51:18 10    that dictates what that level would be, but 5 percent is
01:51:22 11    certainly generally agreed upon.
01:51:30 12        Q.  What do you mean 5 percent is generally agreed
01:51:32 13    upon?  Where can I find that?
01:51:38 14        A.  It is my recollection from reading various
01:51:40 15    textbooks that talk about statistical inference that
01:51:43 16    essentially say something very similar to what I have
01:51:46 17    just told you.  That to -- that determining a level of
01:51:50 18    statistical significance may vary case to case,
01:51:53 19    depending on the richness of the data.  But generally,
01:51:58 20    5 percent is what is typically used by economists.  And
01:52:01 21    it's consistent with other things that I have read where
01:52:03 22    economists typically use 5 percent, or less.
01:52:15 23        Q.  You said that choosing a level of statistical
01:52:19 24    significance depends on the richness of the data.  How
01:52:21 25    many observations, effectively, does this dataset have?

```
01:52:26  1        A.   For certain variables it has either nine or ten
01:52:30  2   observations.  And it is that restriction that limits
01:52:32  3   the amount of information that is in the regression.
01:52:35  4        Q.   In your experience, as an econometrician, what
01:52:42  5   effect does the limited number of observations have on
01:52:47  6   the likelihood of producing a regression that achieves
01:52:50  7   statistical significance at the 95 percent level?
01:52:53  8             MR. KIERNAN:  Object to form.
01:52:55  9             MR. GLACKIN:  Q.  In case it was unclear, I
01:52:57 10   meant in this case.
01:53:01 11        A.   So there are --
01:53:02 12             MR. KIERNAN:  Objection.
01:53:02 13             THE WITNESS:  -- two things that matter for
01:53:03 14   statistical significance.  How -- the distance between
01:53:06 15   your observation -- the observed result and zero, and
01:53:10 16   the number of experiments that you have that give you
01:53:12 17   faith that you've done enough experiments that what you
01:53:14 18   are seeing is a meaningful difference from zero, as
01:53:18 19   opposed to just an outcome that could happen because
01:53:22 20   we've just done a few experiments.
01:53:24 21             It's the two things together, both the number
01:53:26 22   of experiments and the magnitude of the results.
01:53:30 23   Ultimately in this case, we don't have a statistically
01:53:32 24   significant result for the conduct variable.
01:53:34 25             MR. GLACKIN:  Q.  I guess my question is,
```

02:04:19  1    interval around every coefficient, and generally we're

02:04:24  2    interested in whether zero is inside the confidence

02:04:27  3    interval.

02:04:28  4        Q.  So you are agreeing with me, correct?

02:04:31  5        A.  Yes.  I'm agreeing with you that a coefficient

02:04:34  6    can move in either direction, but statistical

02:04:37  7    significance says we can't conclude that it is different

02:04:40  8    from zero.

02:04:41  9        Q.  Right.

02:04:41  10            MR. KIERNAN:  If you are going to switch gears,

02:04:43  11   I'd like to take a break.  Whenever you are going to

02:04:45  12   switch gears.  We've been going about an hour and seven

02:04:48  13   minutes.

02:04:50  14            MR. GLACKIN:  Okay.  Let me wrap up.  Unless --

02:04:52  15   if we really.

02:04:53  16            MR. KIERNAN:  No, no, no.  Go ahead.  If you

02:04:54  17   are going to wrap up.

02:05:07  18            MR. GLACKIN:  Actually, let's take a break.

02:05:08  19   Off the record.

02:05:09  20            MR. KIERNAN:  Okay.

02:05:09  21            THE VIDEOGRAPHER:  This is the end of video

02:05:10  22   No. 3.  The time is 2:05 p.m.  We're going off the

02:05:13  23   record.

02:05:17  24            (Recess taken.)

02:17:15  25            THE VIDEOGRAPHER:  This is the beginning of

02:17:17  1   video No. 4 in the deposition of Dr. Stiroh.  The time

02:17:20  2   is 2:17 p.m.  We're back on the record.

02:17:24  3              MR. GLACKIN:  Q.  Dr. Stiroh, are you

02:17:25  4   familiar with the difference between type I and

02:17:27  5   type II error as it relates to statistics?

02:17:31  6        A.  Yes.

02:17:31  7        Q.  Okay.  What is the difference between a type I

02:17:33  8   and type II error?

02:17:38  9        A.  Accepting a hypothesis when it is -- sorry.

02:17:42 10   Rejecting a hypothesis when it is true is type I and

02:17:46 11   accepting it when it is false is type II.

02:17:48 12        Q.  Okay.  So a type II error in this case would be

02:17:52 13   to accept the hypothesis of zero effect when it is, in

02:17:59 14   fact, false, correct?

02:18:01 15              MR. KIERNAN:  Object to form.

02:18:09 16              THE WITNESS:  Yes.  If your hypothesis is zero

02:18:11 17   effect and you accept that, yes.

02:18:15 18              MR. GLACKIN:  Q.  Do you agree that there

02:18:18 19   is a relationship between -- the inverse

02:18:23 20   relationship, in fact, between type I and type II

02:18:25 21   error depending on the threshold of statistical

02:18:29 22   significance that is chosen?

02:18:32 23        A.  I do.

02:18:33 24        Q.  Maybe you could explain that, in layperson's

02:18:35 25   terms.

02:18:39 1     A.  I think you've done a good job.  There is an

02:18:42 2  inverse relationship between the level of significance

02:18:44 3  and -- which is the probability of making a type I error

02:18:47 4  and the probability of making a type II error.  And so,

02:18:52 5  yes, they go in different directions.  If you are

02:18:54 6  looking for significance at 1 percent, then there is a

02:18:58 7  bigger chance of making a type II error.

02:19:00 8     Q.  So in other words, the higher a threshold for

02:19:04 9  statistical significance you set with respect to type I

02:19:07 10  error, the greater a chance that you are going to

02:19:11 11  wrongly accept the hypothesis of zero effect, right?

02:19:19 12          MR. KIERNAN:  Object to form.

02:19:23 13          THE WITNESS:  The greater the threshold for

02:19:25 14  statistical significance, then the greater the

02:19:27 15  probability of a type II error, which would be to reject

02:19:34 16  the null hypothesis when it is true, where the null

02:19:41 17  hypothesis is of some significant effect.

02:19:43 18          MR. GLACKIN:  Q.  The type II error would

02:19:44 19  be to accept the null hypothesis when it is false,

02:19:48 20  right?

02:19:50 21          MR. KIERNAN:  Object to form.

02:19:50 22          THE WITNESS:  I think we're thinking two

02:19:51 23  different null hypotheses.  That you fail to find

02:20:00 24  evidence of a significant effect where the effect may be

02:20:04 25  different from zero.  I think we are saying the same

Deposition of Lauren Stiroh, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:20:06   1    thing there, just choosing to say it in different words.

02:20:09   2            MR. GLACKIN:  Q.  Let me read you something

02:20:11   3    and maybe this will clear things up.  Do you agree

02:20:13   4    with the following statement:  By increasing the

02:20:15   5    type I error rate, the type II error rate, the

02:20:17   6    probability of accepting the null when it is false,

02:20:20   7    is lowered.  Do you agree with that statement?

02:20:25   8        A.  By increasing the type I error rate, yes.  I

02:20:28   9    do.

02:20:30  10        Q.  In other words, lower the threshold for

02:20:32  11    statistical significance.

02:20:33  12        A.  I agree with that statement.

02:20:34  13        Q.  Okay.  In selecting a 95 percent threshold

02:20:41  14    here, did you consider the type II error rate?

02:20:46  15        A.  Yes.

02:20:46  16        Q.  How did you consider the type II error rate?

02:20:48  17        A.  In a couple of different ways.  First, when

02:20:50  18    looking at significance at a 5 percent level, it's

02:20:53  19    fairly standard in economics, and it's fairly standard

02:20:56  20    in even litigation economics to use that, which means

02:20:58  21    that also the attendant type II error rate is also an

02:21:02  22    acceptable error rate in the majority of economic

02:21:06  23    analyses.

02:21:06  24            The other way to evaluate whether it is a type

02:21:08  25    II error rate is to look at other specifications.  And

02:21:11  1    the fact that the conduct -- alleged impact flip sign,

02:21:18  2    positive to negative, and in the specifications that I

02:21:20  3    do that we talked about earlier where you interpreted as

02:21:24  4    overcompensation, those are just showing the other sign

02:21:27  5    on the conduct variables.

02:21:29  6          The fact that you could get what looks like

02:21:31  7    either overcompensation or undercompensation with minor

02:21:33  8    changes to the specification is consistent with there,

02:21:38  9    in fact, being no measurable impact.  It's not a type II

02:21:40 10    error.  Where really there is undercompensation

02:21:45 11    associated with conduct, and it's just not measured with

02:21:47 12    precision, in fact, we really don't have evidence that

02:21:51 13    there is any, because sometimes it's positive and

02:21:52 14    sometimes it's negative.

02:21:57 15       Q.  Did you do anything to evaluate the relative

02:22:00 16    costs, in the statistical sense, of the two kinds of

02:22:03 17    error here?

02:22:05 18             MR. KIERNAN:  Object to form.

02:22:14 19             THE WITNESS:  I'm not sure really what you mean

02:22:15 20    by that.  I think in a textbook, you might say you

02:22:18 21    consider the costs of being wrong.  Here, the cost that

02:22:23 22    Dr. Leamer has alleged is about $3 billion associated

02:22:26 23    with him finding undercompensation, that certainly would

02:22:30 24    be the cost to the defendant, I don't know if it is

02:22:32 25    subject to tripling, but of him being wrong in this

02:22:36  1   case.  And I have shown that small changes in

02:22:38  2   specification lead to the opposite result, which is

02:22:42  3   consistent with, in fact, there being no impact.

02:22:44  4            MR. GLACKIN:  Q.  How, as a matter of

02:22:46  5   statistics, does one consider the relative costs of

02:22:49  6   the two different kinds of error?  And if you could

02:22:52  7   point me to something -- I'm asking you in a general

02:22:55  8   sense, and then if you can point me to some

02:22:57  9   authority that would explain that, that you agree

02:22:59  10  with, I'd appreciate it.

02:23:01  11           MR. KIERNAN:  Object to form.

02:23:02  12           THE WITNESS:  I don't know that there is

02:23:03  13  something in a general sense that you evaluate the cost.

02:23:07  14  It is in my view what is the cost of being wrong.  And

02:23:11  15  here it is measured, because it's a dollar value that is

02:23:14  16  being attributed to the conduct at issue.  And if, in

02:23:17  17  fact, there is no impact, that dollar value is measured

02:23:21  18  at $3 billion.

02:23:23  19           MR. GLACKIN:  Q.  So that would -- the cost

02:23:27  20  of accepting the null when it is false, which is

02:23:32  21  type II error, would be $3 billion to the class,

02:23:36  22  correct?

02:23:39  23           MR. KIERNAN:  Object to form.

02:23:44  24           THE WITNESS:  I think that is wrong because

02:23:48  25  of -- got various other specifications that show that

02:23:51   1    the -- there is not always undercompensation.

02:23:54   2          If every specification showed some sort of

02:23:56   3    undercompensation, then maybe we could put a bound on

02:23:59   4    what the -- the cost of the null being wrong in one

02:24:03   5    direction.  But it could go in either direction.  The

02:24:06   6    conduct, if it is, in fact, no impact, then you would

02:24:10   7    expect to see what we do see, where sometimes it looks

02:24:13   8    positive and sometimes it looks negative.

02:24:15   9          But I don't think it wrong to measure the

02:24:17  10    impact on the class of being wrong at the $3 billion.

02:24:19  11    Because what the lack of statistical significance is

02:24:23  12    telling us is that we don't have confidence in that

02:24:25  13    being the correct number.

02:24:27  14          MR. GLACKIN:  Q.  So I'm trying -- you

02:24:31  15    know, let's -- I'm trying to isolate this discussion

02:24:33  16    so I can have an understanding of what you

02:24:36  17    understand type II error to be.  And I'm -- what I'm

02:24:40  18    asking is, would the type II error here be

02:24:45  19    $3 billion to the class?

02:24:47  20          If type II error is committed, if the null is

02:24:51  21    accepted when it should be rejected, is the cost of that

02:24:55  22    $3 billion to the class, just as the cost is $3 billion

02:24:58  23    to the companies if the null is accepted when it ought

02:25:02  24    to be rejected?  It works both ways, doesn't it?

02:25:05  25          MR. KIERNAN:  Object to form.

Deposition of Lauren Stiroh, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:25:06  1          THE WITNESS:  I don't think it does to the

02:25:07  2   identical magnitude.  Because we've got a dollar value

02:25:11  3   being put forward as damages if, in fact, there are no

02:25:15  4   damages, we know what that is.  If, in fact, the

02:25:17  5   outcome, the impact is just different from what is being

02:25:19  6   measured, then you are saying if there is a type II

02:25:20  7   error, we don't actually know what the value is supposed

02:25:23  8   to be.  We know one measured value.

02:25:25  9          But what I've got in my report, with a

02:25:28  10   different specification, is sometimes a positive,

02:25:30  11   sometimes a negative value.  So it is not right to say

02:25:32  12   that the cost to the class is $3 billion.  There is no

02:25:36  13   evidence that there is any cost to the class because it

02:25:38  14   does that flip-flopping of values.

02:25:40  15          MR. GLACKIN:  Q.  Do you mention type II

02:25:41  16   error anywhere in your report?

02:25:43  17      A.  I don't think I mention either type I error or

02:25:45  18   type II error, but I may just be misremembering.

02:25:51  19      Q.  What does it mean, in a statistical sense, to

02:25:53  20   consider the relative costs of type I and type II error?

02:25:56  21      A.  You asked me that already.  I'd need to see the

02:26:00  22   source that talks about considering the statistical

02:26:02  23   cost, and I think the answer would be as I said a moment

02:26:06  24   ago.  I think it depends on the context and what the

02:26:09  25   analyst has in mind.

02:26:10  1          I think in this case, it's the dollar value

02:26:13  2  that is being put on the table that is not supported by

02:26:15  3  statistical significance.

02:26:17  4      Q.  Is there a procedure that one -- statistical

02:26:20  5  procedure that one undertakes to measure the relative

02:26:23  6  costs of type I and type II error?

02:26:27  7          MR. KIERNAN:  Object to form.

02:26:27  8          THE WITNESS:  There may be.  I think that it

02:26:30  9  would be specific to the situation at hand.  And where

02:26:34 10  it may matter is in policy prescription.  And you would

02:26:37 11  consider, you know, what if we make a policy based on

02:26:40 12  the outcome, and it turns out that the outcome is wrong.

02:26:44 13  What would be the cost to the economy?  Would we grow

02:26:47 14  more slowly?  Would we be thrown into a recession or

02:26:50 15  would nothing bad happen?

02:26:51 16          And if nothing bad happens because you are

02:26:53 17  wrong, there is a low cost of being wrong.  If something

02:26:55 18  really bad would happen, if we're going to cause a

02:26:58 19  depression, cause a worldwide recession, that's a pretty

02:27:01 20  high cost of being wrong.  That's how I would interpret

02:27:03 21  the sentence that you've been reading to me, but I don't

02:27:05 22  know what the author had in mind for that.

02:27:12 23          MR. GLACKIN:  Q.  It's Dr. Kennedy.  And I

02:27:14 24  thought you said before he was a clear writer,

02:27:17 25  so....

Deposition of Lauren Stiroh, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 02:27:18 | 1 | MR. KIERNAN:  No question. |
| 02:27:24 | 2 | MR. GLACKIN:  Q.  Can you explain, in |
| 02:27:25 | 3 | layperson's terms, what the 5 percent confidence |
| 02:27:32 | 4 | level -- excuse me.  That's the wrong -- I'm mixing |
| 02:27:35 | 5 | up terms -- what the 5 percent threshold for |
| 02:27:38 | 6 | statistical significance means in terms of the |
| 02:27:39 | 7 | likelihood that the null hypothesis will be |
| 02:27:46 | 8 | rejected? |
| 02:27:48 | 9 | A.  Okay.  Five percent significance level means |
| 02:27:52 | 10 | that you would reject the null hypothesis -- you asked |
| 02:28:00 | 11 | me to say it in layperson's terms, and I'm not doing a |
| 02:28:03 | 12 | good job of that.  I'm using all the same terms. |
| 02:28:08 | 13 | If in a repeated random draws of an experiment, |
| 02:28:13 | 14 | so that you could do the same type of experiment many, |
| 02:28:15 | 15 | many times, 5 percent of the time you may get a result |
| 02:28:18 | 16 | that is very different from the expected result.  And I |
| 02:28:21 | 17 | could do one better just by giving an example. |
| 02:28:24 | 18 | If you roll two dice and add up the amount, the |
| 02:28:28 | 19 | expected value is seven.  If you roll two dice and you |
| 02:28:32 | 20 | add it up and you get four, you don't conclude from that |
| 02:28:34 | 21 | that the dice might be loaded because you got something |
| 02:28:38 | 22 | different from seven.  You've run one experiment and you |
| 02:28:41 | 23 | got something lower.  It's not so unusual. |
| 02:28:43 | 24 | If you ran this experiment many, many, many |
| 02:28:45 | 25 | times, and you always got a number lower than seven, |

| | | |
|---|---|---|
| 02:52:20 | 1 | MR. STONE:  Object to the form. |
| 02:52:21 | 2 | MR. GLACKIN:  Q.  Are you familiar with the |
| 02:52:22 | 3 | statement that a competitive labor market sets wages |
| 02:52:25 | 4 | equal to the value of the marginal product? |
| 02:52:29 | 5 | MR. KIERNAN:  Same objection. |
| 02:52:35 | 6 | THE WITNESS:  I'm not familiar with it written |
| 02:52:37 | 7 | that way.  I think I would want to see what else is |
| 02:52:40 | 8 | written around it.  Maybe it's the same as if -- or the |
| 02:52:42 | 9 | intention is the same as if it were marginal revenue |
| 02:52:45 | 10 | product. |
| 02:52:46 | 11 | MR. GLACKIN:  Q.  So if I inserted the word |
| 02:52:47 | 12 | revenue in there, then you would -- it would be |
| 02:52:50 | 13 | something that you were familiar with? |
| 02:52:51 | 14 | A.  In that case it's more aligned with my |
| 02:52:53 | 15 | recollections. |
| 02:52:54 | 16 | Q.  Okay.  This is a way of defining real wages, |
| 02:52:58 | 17 | right? |
| 02:52:59 | 18 | MR. KIERNAN:  Object to form. |
| 02:53:00 | 19 | THE WITNESS:  No. |
| 02:53:02 | 20 | MR. GLACKIN:  Q.  It's not? |
| 02:53:04 | 21 | A.  Correct. |
| 02:53:04 | 22 | MR. KIERNAN:  Object to form. |
| 02:53:05 | 23 | MR. GLACKIN:  Q.  What do you think it is? |
| 02:53:07 | 24 | A.  It is a theoretical statement that in a |
| 02:53:10 | 25 | competitive labor market, the wages would be aligned |

Deposition of Lauren Stiroh, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:53:12  1   with the marginal revenue product if, in fact, that is

02:53:15  2   the right way to interpret that, of the workers.  Real

02:53:18  3   wages are defined by the -- the buying power of the wage

02:53:24  4   that an employee receives.

02:53:28  5       Q.  It's completely normal for economists to talk

02:53:31  6   about real wages being determined by the labor markets,

02:53:35  7   isn't it?

02:53:36  8              MR. KIERNAN:  Object to form.

02:53:40  9              THE WITNESS:  Economists may talk about real

02:53:42  10  wages being defined by a labor market.  That is not the

02:53:46  11  same thing to -- as opining that each worker is paid

02:53:51  12  their marginal revenue product.  But it's also a

02:53:55  13  theoretic construct, a way of thinking about markets.

02:53:58  14  It's not necessarily what firms actually do, since firms

02:54:03  15  set nominal wages, not real wages.

02:54:06  16             MR. GLACKIN:  Q.  Can you refer us to any

02:54:07  17  studies of the labor market that have intentionally

02:54:10  18  focused on nominal wages, not real wages, either

02:54:14  19  theoretical or empirical?

02:54:17  20      A.  As I sit here, I can't call one specifically to

02:54:19  21  mind.  But there are, and I have a footnote -- I don't

02:54:21  22  think I cite anything specifically -- but certainly

02:54:25  23  there are studies of wages where there would be wage

02:54:27  24  regressions run on nominal wages rather than real wages.

02:54:31  25  Which you choose depends on what you are trying to

02:54:33  1    answer.

02:54:34  2          In this particular case, we're looking at

02:54:36  3    whether firms have undercompensated their employees by

02:54:40  4    the wage that they set.  And I think, quite

02:54:43  5    specifically, we're not looking at market wages.  And I

02:54:47  6    take that because I think that Dr. Leamer has stated

02:54:51  7    specifically he's looking at wages paid to the specific

02:54:55  8    employees in these firms, and he is not opining that

02:54:57  9    these are meant to be market wages, or what he's

02:55:00  10   measuring is undercompensation relative to a market

02:55:03  11   value.

02:55:03  12         So I think we're -- it's two different things.

02:55:05  13   But to the -- for the specific question that we're

02:55:07  14   trying to answer in this case, which is whether or not

02:55:09  15   the firms set wages in a way that undercompensated

02:55:13  16   employees, what they set is nominal wages.

02:55:17  17      Q.  So is it your opinion, as an economist, that if

02:55:22  18   employers do not have perfect information about future

02:55:25  19   inflation, then the labor market determines nominal

02:55:29  20   wages not real wages?

02:55:34  21         MR. KIERNAN:  Object to form.

02:55:34  22         THE WITNESS:  That is not an accurate statement

02:55:35  23   of my opinion as an economist.

02:55:39  24         MR. GLACKIN:  Q.  Why not?

02:55:42  25      A.  For a variety of reasons.  One, in connection

02:55:45  1   with this case I haven't done an analysis of how the

02:55:47  2   market determines wages.  We've looked at how these

02:55:51  3   seven firms have set wages to their employees.

02:55:53  4        To the best of my recollection, there is not a

02:55:56  5   claim that the wages are different from a market level

02:55:59  6   outcome.  A market level of wage.  And there has been

02:56:02  7   no, as far as I can tell, discussion of what the market

02:56:05  8   wage is or should have been.

02:56:07  9        Instead, there is a discussion of whether these

02:56:10  10  specific employees, or the employees of these seven

02:56:13  11  firms, are undercompensated in a four-and-a-half year

02:56:18  12  time frame relative to benchmarks outside that time

02:56:21  13  frame.

02:56:31  14      Q.  So are you saying that the defendants did not

02:56:35  15  consider inflation in setting compensation at their

02:56:39  16  companies?

02:56:39  17      A.  I'm not saying that, no.

02:56:41  18      Q.  So you agree with me, they did consider

02:56:43  19  inflation in setting compensation at their companies?

02:56:45  20          MR. KIERNAN:  Object to form.

02:56:46  21          THE WITNESS:  To the best of my recollection,

02:56:48  22  there is information, or a thought, that there is

02:56:50  23  certainly the possibility that the defendants considered

02:56:56  24  inflation and expected inflation when setting

02:56:59  25  compensation.  It is my opinion that they don't have

| | | |
|---|---|---|
| 02:57:02 | 1 | clarity into what inflation will be, and that the |
| 02:57:04 | 2 | outcomes that Dr. Leamer is measuring that are on the |
| 02:57:08 | 3 | left-hand side of his regression include an impact on |
| 02:57:10 | 4 | compensation that is outside of the defendants' control. |
| 02:57:12 | 5 | And instead, if we restrict the regression |
| 02:57:16 | 6 | analysis to be just those variables inside the |
| 02:57:18 | 7 | defendants' control, the nominal compensation, that has |
| 02:57:21 | 8 | a significant impact on his results.  Changing nothing |
| 02:57:23 | 9 | else, but instead of saying that he's going to measure |
| 02:57:28 | 10 | real wage or real compensation on the left-hand side, if |
| 02:57:31 | 11 | he were to do nominal compensation, which is what the |
| 02:57:33 | 12 | defendants actually set, then damages, I think, come |
| 02:57:36 | 13 | down by about half in the way that he's modeling it.  In |
| 02:57:40 | 14 | the model that he's set forth. |
| 02:57:42 | 15 | And that means -- maybe I have the number |
| 02:57:44 | 16 | wrong -- but roughly half of the $3 billion is coming |
| 02:57:47 | 17 | from a variable that is completely outside of the |
| 02:57:50 | 18 | defendants' control.  And if even if there were a |
| 02:57:54 | 19 | conspiracy, there isn't something put forward to say how |
| 02:57:56 | 20 | are the defendants able to control inflation in a way |
| 02:57:59 | 21 | that causes half of the damages in this case. |
| 02:58:06 | 22 | MR. GLACKIN:  Q.  So in other words, your |
| 02:58:07 | 23 | argument is that if the defendants cannot predict |
| 02:58:12 | 24 | with certainty, as you use that word in |
| 02:58:15 | 25 | paragraph 175, what inflation was going to be in the |

Deposition of Lauren Stiroh, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

02:58:19   1   coming year, then inflation should be taken out of

02:58:22   2   the regression analysis, even if the defendants

02:58:24   3   actually did consider inflation when setting

02:58:27   4   compensation?  That's your argument?

02:58:29   5        MR. KIERNAN:  Object to form.

02:58:29   6        THE WITNESS:  No.  Not necessarily.  My

02:58:32   7   argument is that half of the damages that Dr. Leamer

02:58:36   8   calculates come from the impact of including real

02:58:39   9   compensation on the left-hand side, which means that

02:58:42  10   half of his damages are coming from a variable that the

02:58:46  11   defendants can control.

02:58:49  12        Moreover, it's coming from a variable that was

02:58:52  13   different from expectations within the damage period.

02:58:55  14   It's not to say there wouldn't be some other way of

02:58:59  15   accounting for that, but Dr. Leamer hasn't proposed a

02:59:01  16   way of accounting for expected inflation or to try to

02:59:04  17   differentiate what was the compensation that the firms

02:59:06  18   tried to set, subject to the alleged conspiracy.  And

02:59:10  19   what was the compensation that was the result, separate

02:59:12  20   from the alleged conspiracy, that just happened because

02:59:15  21   the inflation was different from expectations.

02:59:19  22        (Discussion off the record.)

02:59:52  23        MR. GLACKIN:  Q.  Can you point us to a

02:59:53  24   single authority for the proposition -- let me

02:59:56  25   strike that.  I'll make it broader.

| | | |
|---|---|---|
| 02:59:58 | 1 | Can you give us a single example of one of the |
| 03:00:00 | 2 | studies you mention that studied nominal wages so we can |
| 03:00:03 | 3 | understand the circumstances when it's appropriate to do |
| 03:00:05 | 4 | that and when it's not appropriate to do it? |
| 03:00:08 | 5 | MR. KIERNAN:  Object to form. |
| 03:00:08 | 6 | THE WITNESS:  So I don't know that reading a |
| 03:00:09 | 7 | single study is going to tell you when it is appropriate |
| 03:00:11 | 8 | to do it and when it is appropriate not to do it.  What |
| 03:00:14 | 9 | makes it appropriate is your theory, and whether you are |
| 03:00:18 | 10 | accurately testing the theory. |
| 03:00:19 | 11 | And in this case you are not testing the theory |
| 03:00:21 | 12 | of whether defendants suppressed wages when what you are |
| 03:00:25 | 13 | measuring -- when half of what you are measuring comes |
| 03:00:27 | 14 | from the impact of a variable that is not within the |
| 03:00:30 | 15 | defendants' control. |
| 03:00:31 | 16 | MR. GLACKIN:  Q.  So the answer is, you |
| 03:00:33 | 17 | can't give us any authority for the approach you've |
| 03:00:36 | 18 | taken, correct? |
| 03:00:37 | 19 | A.  That is incorrect.  The answer was that a |
| 03:00:40 | 20 | single authority will not tell you when it is |
| 03:00:42 | 21 | appropriate and when it is not appropriate in a way that |
| 03:00:44 | 22 | may be meaningful for this case. |
| 03:00:46 | 23 | What is meaningful for this case is what is the |
| 03:00:48 | 24 | alleged mechanism by which this -- the alleged |
| 03:00:51 | 25 | conspiracy was supposed to suppress wages.  And that is |

03:00:55  1    not what is being measured in Dr. Leamer's analysis.

03:00:57  2        Q.   Okay.  Give me any authority of any kind, if

03:01:00  3    you have one, that supports the approach you take in

03:01:03  4    paragraph 175.

03:01:06  5            MR. KIERNAN:  Object to form.

03:01:09  6            MR. GLACKIN:  Q.  If you've got more than

03:01:10  7    one, give me your favorites.

03:01:12  8        A.   I don't know that I can tell you off the top of

03:01:13  9    my head a title of an authority that is going to talk

03:01:18  10   about nominal versus real wages.

03:01:21  11           Certainly from what I can recall, the

03:01:24  12   discussion of nominal versus real wages depends on the

03:01:27  13   context.  And then it is my opinion in this case that

03:01:31  14   the way that the conspiracy has been alleged is not a

03:01:37  15   conspiracy to suppress compensation.  The allegation is

03:01:41  16   that there has been a suppression of compensation, and

03:01:43  17   if it is things within the power of the alleged

03:01:46  18   conspirators, that has to be nominal compensation.

03:01:49  19           There may be other ways to account for

03:01:50  20   expectations of inflation, or whatever individual firms

03:01:54  21   may have taken into account when they set wages that may

03:01:57  22   be different from the way other firms took information

03:02:01  23   into account.  But what I am pointing out in this

03:02:03  24   section is that half of Dr. Leamer's damages come from

03:02:07  25   his assumption that what was being suppressed was --

03:02:09  1   what was deliberately being suppressed was real

03:02:12  2   compensation, and I don't think there is support for

03:02:14  3   that.

03:02:14  4       Q.  Are you arguing that information about the

03:02:20  5   consumer price index is subject to a lag?

03:02:28  6           MR. KIERNAN:  Object to the form.

03:02:31  7           THE WITNESS:  I don't think I'm arguing that.

03:02:32  8   I think that inflation happens on a regular basis, and

03:02:39  9   information is published on that.  If the CPI is

03:02:43  10  published, backward looking, so looking at what

03:02:45  11  inflation has been over a period of time, it is not

03:02:48  12  forward looking.

03:02:49  13          And so to the extent that it is then

03:02:52  14  incorporated into analysis, it takes into account first

03:02:56  15  of all, information that may not have been available at

03:02:58  16  the time the compensation was set, and second,

03:03:02  17  information that is not within the control of the

03:03:04  18  defendants.

03:03:06  19          MR. GLACKIN:  How long have we been going, do

03:03:08  20  we know?

03:03:09  21          THE VIDEOGRAPHER:  Total or just this tape?

03:03:12  22          MR. GLACKIN:  This tape.

03:03:13  23          THE VIDEOGRAPHER:  Forty-six minutes.

03:03:14  24          MR. GLACKIN:  Do you want a break or should we

03:03:15  25  keep going?

Deposition of Lauren Stiroh, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
03:03:16   1              THE WITNESS:  Well, we've stopped.  Let's take
03:03:17   2    a break for five minutes and then come back.
03:03:19   3              MR. GLACKIN:  Sure.
03:03:20   4              THE VIDEOGRAPHER:  This is the end of video
03:03:21   5    No. 4.  The time is 3:03 p.m.  We're going off the
03:03:24   6    record.
03:03:25   7              (Recess taken.)
03:13:07   8              THE VIDEOGRAPHER:  This is the beginning of
03:13:08   9    video No. 5 in the deposition of Lauren Stiroh.  The
03:13:14  10    time is 3:13 p.m.  We're back on the record.
03:13:19  11              MR. GLACKIN:  Q.  Dr. Stiroh, is it
03:13:20  12    possible to include too few variables in a
03:13:23  13    regression model?
03:13:25  14              MR. KIERNAN:  Object to form.
03:13:27  15              THE WITNESS:  I would think so, yes.
03:13:29  16              MR. GLACKIN:  Q.  Why is that?
03:13:32  17        A.  If you have omitted a variable that is
03:13:35  18    necessary for a regression, and then you have included
03:13:39  19    too few.  That there should be another variable there.
03:13:43  20        Q.  Is it possible to include too many variables in
03:13:46  21    a regression?
03:13:51  22        A.  Well, at some point the regression will break
03:13:54  23    down and the computer won't run it if you've got too
03:13:57  24    many variables.  So yes, that is also possible.
03:14:01  25        Q.  Why does the computer break down and you can't
```

Deposition of Lauren Stiroh, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

03:24:06  1    at the coefficients as they are measured.

03:24:23  2            MR. GLACKIN:  Q.  Are you aware of the

03:24:24  3    following rule of statistics:  If you omit a

03:24:27  4    variable, no variable with a T value less than the

03:24:31  5    omitted variable can change sign.  Are you aware of

03:24:33  6    that rule?

03:24:38  7            MR. KIERNAN:  Object to form.

03:24:40  8            MR. GLACKIN:  Q.  Axiom might be a better

03:24:43  9    word than rule.

03:24:46 10        A.  No variable with a T statistic less than the

03:24:48 11    what?

03:24:49 12        Q.  Omitted variable can change sign.

03:24:52 13        A.  Less than the T statistic of the omitted

03:24:54 14    variable or less than the omitted variable itself?

03:24:58 15        Q.  If you omit a variable -- so if you take a

03:24:59 16    variable out.

03:24:59 17        A.  Okay.

03:25:00 18        Q.  Any -- let me put it a different way.

03:25:02 19            Any variable with a T value that is less than

03:25:04 20    the T value of the omitted variable cannot change sign.

03:25:07 21    Do you understand that?

03:25:10 22            MR. KIERNAN:  Object to form.

03:25:18 23            THE WITNESS:  I don't understand that.

03:25:20 24            MR. GLACKIN:  Q.  Okay.  Are you aware that

03:25:21 25    as a matter of statistics, choosing to omit a

Deposition of Lauren Stiroh, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 03:25:24 | 1 | variable with a high T value is likely to have the |
| 03:25:27 | 2 | most disruptive effect on a regression analyses? |
| 03:25:53 | 3 | MR. KIERNAN:  Object to form. |
| 03:25:53 | 4 | THE WITNESS:  So if a variable has a high T |
| 03:25:55 | 5 | value and is explaining a lot of the variation, and if |
| 03:25:59 | 6 | you omit it, then if there is nothing now explaining |
| 03:26:02 | 7 | that variation, it may be disruptive. |
| 03:26:06 | 8 | What I have done, though, is not just taken -- |
| 03:26:08 | 9 | I haven't taken out his variable and omitted it, I've |
| 03:26:12 | 10 | replaced it with other variables that are conveying the |
| 03:26:15 | 11 | same information, just instead of putting in a number |
| 03:26:18 | 12 | four, I put in the numbers one plus one plus two. |
| 03:26:22 | 13 | So I haven't -- my specification is not |
| 03:26:27 | 14 | omitting any of Dr. Leamer's variables.  It's replacing |
| 03:26:32 | 15 | them with the same information broken out so that the |
| 03:26:35 | 16 | component parts can have individual effects. |
| 03:26:38 | 17 | MR. GLACKIN:  Q.  Well, how does the |
| 03:26:40 | 18 | statistical significance or P value of the variables |
| 03:26:43 | 19 | that you added compare to the  P value of the |
| 03:26:46 | 20 | variable you took out? |
| 03:26:50 | 21 | A.  So let me -- I need to have both of them in |
| 03:26:56 | 22 | front of me.  So I need to find where it is that I have |
| 03:27:00 | 23 | Dr. Leamer's regression. |
| 03:27:03 | 24 | Q.  That's at Roman V.2. |
| 03:27:05 | 25 | A.  Thank you. |

03:27:41  1      Q.  So for the record, it might be helpful to walk

03:27:42  2   through this, since we're referring back to it anyway.

03:27:45  3   So if we're looking at Roman V.2, which is the variable

03:27:51  4   of Dr. Leamer's that you have removed?

03:27:54  5      A.  So I think, again, not removing it, replacing

03:27:57  6   it with the component parts.  And it is the log of the

03:28:04  7   total number of new hires.

03:28:09  8      Q.  And that has a P value of .00001, right?

03:28:17  9      A.  Yes.

03:28:18 10      Q.  And is that 1 a function of rounding by the

03:28:21 11   computer program?  Is it possible there is actually some

03:28:23 12   more leading zeros there that have been omitted?

03:28:26 13      A.  No.  Look up above, you see some that are --

03:28:31 14   have four zeros in a row.

03:28:32 15      Q.  So this is statistically significant to the

03:28:37 16   99.999 percent level?

03:28:42 17      A.  As an explanatory variable, that that is

03:28:45 18   what -- showing that it is statistically significant and

03:28:49 19   negative on compensation, which is also unusual.

03:28:55 20        And so what happens is that if you actually

03:28:58 21   split that into its component parts, and you get parts

03:29:01 22   that aren't measured with statistical significance, that

03:29:04 23   causes you to question whether that statistical result

03:29:09 24   is meaningful in any way when it's not associated with

03:29:15 25   the -- it's not broken up into the various individual

| | | |
|---|---|---|
| 03:29:20 | 1 | component parts. |
| 03:29:21 | 2 | Q. So thank you for that information. But my very |
| 03:29:24 | 3 | simple question is, so this variable, the one you have |
| 03:29:28 | 4 | replaced is statistically significant to the 99.999 |
| 03:29:31 | 5 | percent level, correct? |
| 03:29:34 | 6 | A. Correct. |
| 03:29:35 | 7 | MR. KIERNAN: Object to form. |
| 03:29:35 | 8 | MR. GLACKIN: Q. Okay. So let's go now to |
| 03:29:39 | 9 | your Roman VI.7, which is where you show the |
| 03:29:45 | 10 | variables that have replaced this variable, and |
| 03:29:49 | 11 | let's identify those variables. |
| 03:29:52 | 12 | A. So the ones that replace it are first -- the |
| 03:29:56 | 13 | fifth one down, where I interact conduct with the log of |
| 03:30:00 | 14 | the total number of DNCC new hires. And that means that |
| 03:30:05 | 15 | the new hires that were at the firms with which any -- |
| 03:30:08 | 16 | the employee of a firm that had a DNCC agreement. |
| 03:30:12 | 17 | And then further down, there is just the log, |
| 03:30:19 | 18 | total number of DNCC new hires, the log total number of |
| 03:30:23 | 19 | non-DNCC new hires, and that is -- those are the |
| 03:30:29 | 20 | replacement variables. |
| 03:30:31 | 21 | Q. So just those three variables? |
| 03:30:33 | 22 | A. That replaced the one that Dr. Leamer had, yes. |
| 03:30:37 | 23 | Q. Okay. And so let's start with the first one, |
| 03:30:41 | 24 | which is Conduct, star, Log (Total Number of DNCC New |
| 03:30:47 | 25 | Hires). |

03:30:48  1          So that is statistically significant only at a

03:30:51  2   92 percent level, right?

03:30:53  3       A.  Yes.

03:30:54  4       Q.  Ninety-one and change, actually, right?

03:30:57  5       A.  Yes.

03:30:58  6       Q.  And then Log (Total Number of DNCC New Hires),

03:31:03  7   that is only statistically significant to the level of

03:31:07  8   82 percent and change, correct?

03:31:08  9       A.  Yes.

03:31:09 10       Q.  And the next one is only -- which is Log (Total

03:31:12 11   Number of non-DNCC New Hires) is statistically

03:31:17 12   significant to 94 percent and change, correct?

03:31:21 13       A.  Yes.

03:31:22 14       Q.  So none of those three variables is

03:31:24 15   statistically significant at your conventional level of

03:31:29 16   95 percent, correct?

03:31:29 17       A.  Correct.

03:31:38 18       Q.  Now, in another one of your regressions, you

03:31:41 19   selected -- you replaced the new hire variable with

03:31:46 20   median income of the tech sector.  Do you recall -- you

03:31:48 21   know what I'm talking about?

03:31:50 22       A.  Yes.

03:31:51 23       Q.  Okay.  I don't know if you need to look at the

03:31:56 24   outputs, but you discuss this in footnote 282.

03:32:04 25       A.  Uh-huh.

03:32:09  1      Q.  Why is the median -- so what is median income

03:32:13  2  from the tech sector?  What is that variable measuring?

03:32:18  3      A.  Let me just get the footnote in front of me.

03:32:28  4          MR. KIERNAN:  I'll object to form.

03:32:36  5          MR. GLACKIN:  Q.  And Dr. Stiroh, any time

03:32:38  6  you don't understand any of my questions, just let

03:32:39  7  me know and I'll try to rephrase it.  Okay?

03:32:42  8      A.  Okay.  So again, to the best of my

03:32:51  9  recollection, the reason Dr. Leamer gave for including

03:32:55 10  the new hires variable in the form that he included it

03:33:00 11  was to, I think, account for industry effects.  And I

03:33:03 12  may be misremembering that.

03:33:05 13          So what I'm noting is that when you include the

03:33:09 14  new hire variable on the right-hand side, you've got a

03:33:14 15  variable that has mixed up in it the impact of conduct,

03:33:17 16  if any, and hires that should be completely separate

03:33:21 17  from conduct.  And if the point of including it was to

03:33:25 18  control for some sort of industry level effects, then

03:33:28 19  I'm looking at are there other ways to do that?

03:33:30 20          I think sort of consistent with what something

03:33:33 21  Dr. Leamer proposed of -- that he would be open to other

03:33:37 22  specifications, so long as his various categories of

03:33:41 23  things he wanted to control for were controlled for.

03:33:45 24  And so the point of median income would be to look at an

03:33:52 25  exogenous measure of a factor that has not gotten a

Deposition of Lauren Stiroh, Ph.D.                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

03:33:57  1   variable that's endogenous to the conduct at issue.

03:34:01  2        Q.   Which one do you think is more economically

03:34:04  3   relevant to the regression, new hires variable or median

03:34:10  4   income from the tech sector?

03:34:13  5             MR. KIERNAN:   Object to form.

03:34:14  6             THE WITNESS:   So it depends what it is that you

03:34:15  7   are trying to conclude.  Dr. Leamer's results are highly

03:34:19  8   dependent on including his new hires variable in the

03:34:22  9   form that he has it.  And to me, that doesn't make

03:34:26 10   sense.

03:34:27 11        If what he is trying to measure is the impact

03:34:30 12   of alleged suppression of do not cold calls, then it's

03:34:35 13   got to matter the magnitude of the hiring that the

03:34:40 14   agreement firms were doing.  And that has to have a

03:34:43 15   different effect from the magnitude of hiring that firms

03:34:48 16   without -- that don't have an agreement has.

03:34:49 17        So the purpose of splitting it apart is to

03:34:53 18   allow there to be an estimated effect, if, in fact,

03:34:55 19   there is one, of the conduct at issue.

03:34:58 20        And the fact that it shows up with less

03:35:01 21   significance when it's split apart actually is what

03:35:04 22   casts doubt on the validity of his results.  This is

03:35:07 23   another specification that has that same impact.  That

03:35:13 24   if you replace what -- as I recall, he said that he

03:35:17 25   included it because it was an industry effect he wanted

Deposition of Lauren Stiroh, Ph.D.                                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

03:35:20  1   to control for, replace it with a different variable

03:35:22  2   that could also control for the industry effects, and

03:35:26  3   the damages that he is measuring completely switch sign,

03:35:31  4   then there is -- again, it shows that the results that

03:35:34  5   he has are unreliable, and that they are not connected

03:35:37  6   with the alleged conduct.

03:35:41  7           So the fact when I split apart the variables,

03:35:43  8   and as we just went through, it looks like those

03:35:46  9   variables are either less significant or not

03:35:48  10  significant, that's an indication that what he is

03:35:51  11  calculating isn't an impact on -- of conduct -- on

03:35:56  12  compensation related to conduct, it's something else.

03:35:59  13  Whatever was driving it was a mixture of hiring from

03:36:02  14  firms that allegedly couldn't call defendant firms and

03:36:05  15  hiring from other firms where there is no such

03:36:07  16  agreement.

03:36:42  17          MR. GLACKIN:  We'll mark this next in order,

03:37:24  18  please.

03:37:34  19          Actually, I don't have copies for you, Counsel.

03:37:37  20          MR. KIERNAN:  Tell me what it is.

03:37:38  21          MR. GLACKIN:  October report.  Can we go ahead?

03:37:40  22  And I don't have an extra copy.

03:38:01  23          Thanks, David, I didn't think I'd need it.

03:38:18  24          (Whereupon, Exhibit 2931 was marked for

03:38:18  25          identification.)

Deposition of Lauren Stiroh, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| 03:38:19 | 1 | MR. GLACKIN:  I'm handing you 2931, which is a |
| 03:38:21 | 2 | copy of Dr. Leamer's October 1st, 2012 report which he |
| 03:38:25 | 3 | outlines his regression methodology. |
| 03:38:30 | 4 | You'll see at paragraph 142 he lists the |
| 03:38:35 | 5 | categories of variables he believes ought to be included |
| 03:38:38 | 6 | in the regression.  And it follows over onto the next |
| 03:38:40 | 7 | page. |
| 03:38:40 | 8 | So could you just read -- since I don't have a |
| 03:38:43 | 9 | copy, I gave you my only copy, could you read the titles |
| 03:38:45 | 10 | of the categories of the variables that ought to be |
| 03:38:48 | 11 | included. |
| 03:38:49 | 12 | MR. STONE:  Can I get the exhibit number again. |
| 03:38:54 | 13 | I'm sorry. |
| 03:38:55 | 14 | THE REPORTER:  2931. |
| 03:38:56 | 15 | MR. GLACKIN:  Can you read them out loud, |
| 03:38:57 | 16 | please. |
| 03:38:58 | 17 | THE WITNESS:  Okay.  Dr. Leamer says that the |
| 03:38:59 | 18 | variables in his regression Figure 20, from his October |
| 03:39:03 | 19 | 1st, 2012 report, can be divided into five categories |
| 03:39:08 | 20 | that he names Conduct Effects, Persistence, Worker |
| 03:39:13 | 21 | Effects, Industry Effects, and Employer Effects. |
| 03:39:19 | 22 | MR. GLACKIN:  Q.  Can you now please read |
| 03:39:20 | 23 | out loud the last sentence of paragraph 143. |
| 03:39:26 | 24 | A.  Yes.  The last sentence of Dr. Leamer's |
| 03:39:30 | 25 | paragraph 143 reads, "The effects that vary across |

03:39:34   1   employers are global revenue, relative to the global

03:39:37   2   workforce and the rate of growth thereof, the number of

03:39:40   3   new workers hired relative to the previous year's

03:39:45   4   workforce, and indicators that allow for distinct

03:39:48   5   differences in compensation for each employer."

03:39:50   6        Q.  So Dr. Leamer is using the new hire variable as

03:39:53   7   an employer effect and not an industry effect, correct?

03:39:56   8             MR. KIERNAN:  Object to form.

03:40:19   9             THE WITNESS:  I'm not sure.  It may be that

03:40:21  10   that is how he is intending it, to be an employer

03:40:24  11   effect.  I had thought in deposition testimony he said

03:40:26  12   that it was an industry effect.

03:40:29  13             I don't see that he's got a list of what ones

03:40:31  14   he meant to be the industry effect, but it, in my view,

03:40:37  15   seems that it could be an industry effect.  If he wants

03:40:40  16   to opine that it is irrelevant as an industry effect,

03:40:44  17   then I'll take that under consideration.

03:40:46  18             MR. GLACKIN:  Q.  Well, he says there that

03:40:47  19   it's an employer effect, right?  In the last

03:40:49  20   sentence in paragraph 143.  Will you not agree with

03:40:53  21   that?

03:40:53  22             MR. KIERNAN:  Object to form.

03:40:54  23             THE WITNESS:  I don't know that he does.  He

03:40:56  24   says the effects that vary across employers -- so maybe

03:41:00  25   that is what he intends by that to be -- that to be an

Deposition of Lauren Stiroh, Ph.D.                     In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 03:41:04 | 1 | employer -- |
| 03:41:06 | 2 | MR. GLACKIN:  Q.  Right.  Effects that vary |
| 03:41:09 | 3 | across employers.  So in other words, the whole |
| 03:41:10 | 4 | answer you just gave us about median tech sector |
| 03:41:16 | 5 | wage being replacement variable is wrong, right? |
| 03:41:20 | 6 | Because you are taking out a variable that measures |
| 03:41:22 | 7 | employer effects, and you were replacing it with a |
| 03:41:24 | 8 | variable that you think measures industry effect, |
| 03:41:26 | 9 | right? |
| 03:41:27 | 10 | MR. KIERNAN:  Object to form. |
| 03:41:30 | 11 | I don't know why you are raising your voice, by |
| 03:41:32 | 12 | the way, so if you can just settle down. |
| 03:41:34 | 13 | MR. GLACKIN:  Let the record reflect I'm not |
| 03:41:36 | 14 | raising my voice. |
| 03:41:38 | 15 | MR. KIERNAN:  You were raising your voice, |
| 03:41:39 | 16 | Brendan. |
| 03:41:40 | 17 | MR. GLACKIN:  No, I'm not. |
| 03:41:41 | 18 | MR. KIERNAN:  You have been, just now. |
| 03:41:43 | 19 | MR. GLACKIN:  Stop trying to interrupt the |
| 03:41:44 | 20 | questioning, David. |
| 03:41:44 | 21 | MR. KIERNAN:  I'm not.  I'm not. |
| 03:41:47 | 22 | THE WITNESS:  To the best of my recollection, |
| 03:41:49 | 23 | Dr. Leamer had testimony that indicated to me that he |
| 03:41:51 | 24 | had thought his new -- total new hires variables for the |
| 03:41:55 | 25 | defendants was meant to capture some sort of an industry |

03:41:58  1    effect.

03:41:58  2            And to the extent that that is how he

03:42:02  3    interpreted it, an alternative would be median wage.  If

03:42:06  4    he interpreted it as some other -- to be some other

03:42:11  5    effect, then -- specific to the employers, then I think

03:42:16  6    the breaking of it apart into the component parts so

03:42:19  7    that you can isolate hiring that is being done by firms

03:42:23  8    with which each defendant has a do-not-cold-call

03:42:25  9    agreement, and firms with which it has no such

03:42:29 10    agreement, is relevant to the analysis to show that what

03:42:33 11    is being measured as conduct is not coming from the

03:42:36 12    conduct at issue, it's coming from some other effect in

03:42:39 13    the model.

03:42:40 14            MR. GLACKIN:  Q.  So you are saying you

03:42:41 15    stand by your previous explanation for why you

03:42:44 16    included tech sector income to replace -- I should

03:42:49 17    say you stand by your prior explanation for why you

03:42:53 18    replaced the new hire variable with tech sector

03:42:56 19    income?

03:42:56 20        A.  As I sit here today, that is the best of my

03:42:58 21    recollection, that Dr. Leamer had given testimony that

03:43:03 22    indicated he had thought that to be an industry effect.

03:43:06 23    But I, you know, obviously don't have the full record in

03:43:09 24    front of me here.

03:43:10 25        Q.  So you stand by the answer?

03:43:11  1       A.  I do, yes.

03:43:12  2       Q.  Where is that testimony?

03:43:14  3       A.  I believe it was in deposition testimony, but

03:43:16  4   it's not something that I can now recall to mind.

03:43:19  5       Q.  Well, you discussed this issue in footnote 282

03:43:22  6   of your report, right?

03:43:25  7       A.  I do.

03:43:27  8       Q.  Why don't you cite to that testimony?

03:43:32  9       A.  I think that the analysis and the specification

03:43:37 10   testing stands on its own without being connected to a

03:43:41 11   specific part of Dr. Leamer's testimony.

03:43:44 12           It is a showing that the -- it still shows a

03:43:48 13   sensitivity of Dr. Leamer's results.  The way that I had

03:43:54 14   described it, to me, I thought there was a reason that

03:43:58 15   Dr. Leamer might agree with this change if he views his

03:44:03 16   new hires variable as an industry effect.

03:44:05 17           If it is not intended as an industry effect,

03:44:07 18   and is meant instead to be a firm effect or employer

03:44:11 19   effect, I think that there are still better ways to do

03:44:14 20   it, not then by using the median wage, but by doing the

03:44:18 21   breaking apart.

03:44:19 22           So footnote 282 is still -- is in this section

03:44:23 23   looking at breaking apart the new hires variable, if I

03:44:25 24   have misattributed the reason to do that to something

03:44:28 25   that Dr. Leamer has said that he did not intend to say,

| | | |
|---|---|---|
| 03:44:31 | 1 | then the analysis of breaking apart the variable, I |
| 03:44:34 | 2 | think, is -- doesn't take out anything from his |
| 03:44:38 | 3 | regression, it replaces it just with the component |
| 03:44:42 | 4 | parts.  If he had intended it as an industry effect, |
| 03:44:45 | 5 | then it's still very sensitive to that industry effect. |
| 03:44:50 | 6 |     Q.  Okay.  You can put 2931 aside, whatever it is. |
| 03:44:53 | 7 | We're done with it. |
| 03:44:57 | 8 |         How do you calculate P value from the standard |
| 03:45:00 | 9 | errors? |
| 03:45:07 | 10 |     A.  I don't remember the formula as I sit here.  We |
| 03:45:09 | 11 | can look it up in a book.  Let's let the book testify as |
| 03:45:12 | 12 | to what that formula is.  I don't have it in my head. |
| 03:45:19 | 13 |     Q.  Can you tell what the standard error is on a |
| 03:45:22 | 14 | coefficient by looking at the P value? |
| 03:45:31 | 15 |     A.  I don't remember if you can -- I think you |
| 03:45:33 | 16 | would need -- I think you need another piece of |
| 03:45:39 | 17 | information.  But I just now, as I sit here, can't |
| 03:45:41 | 18 | remember what the formulas are to go from one to the |
| 03:45:44 | 19 | other. |
| 03:45:46 | 20 |     Q.  Can you refer to any textbook in econometrics |
| 03:45:49 | 21 | that recommends reporting P values without standard |
| 03:45:51 | 22 | errors? |
| 03:45:52 | 23 |     A.  I think you've asked me this this morning.  I |
| 03:45:55 | 24 | don't intend to be hiding something by the fact that I |
| 03:45:57 | 25 | put them on the page and not all of the other regression |

03:46:01  1    output.  As far as I know, that the regressions were

03:46:03  2    produced and I've given you the form.  Certainly

03:46:06  3    Dr. Leamer can run my regressions and see what the

03:46:09  4    standard errors are to the extent that he feels that

03:46:11  5    those are more meaningful, or you feel or anybody feels

03:46:14  6    that they are more meaningful.  For the conclusions that

03:46:17  7    I drew, the P values were sufficient for me.  They are

03:46:20  8    giving the same general type of information.

03:46:23  9        Q.  My question was, can you refer to any textbook

03:46:26 10    in econometrics that recommends reporting P values

03:46:28 11    without standard errors?  Can you refer to any such

03:46:31 12    textbook?

03:46:35 13            MR. KIERNAN:  Object to form.

03:46:37 14            THE WITNESS:  I don't know.  I haven't looked

03:46:38 15    for that specific phrase and whether there is a

03:46:42 16    recommendation of always reporting both, when it seems

03:46:45 17    to me they give the same information.  But I haven't

03:46:47 18    looked for that.

03:46:57 19            MR. GLACKIN:  Q.  The P values for testing

03:46:59 20    of coefficients are zero, right?  Testing for the

03:47:02 21    probability.  They might be zero, right?

03:47:05 22        A.  It is relevant -- relevant for that null

03:47:09 23    hypothesis, correct.

03:47:11 24        Q.  Does the P value tell you anything about

03:47:13 25    testing the hypothesis that two or more coefficients are

05:27:21  1    the firm would be compelled to raise compensation

05:27:25  2    everywhere.

05:27:25  3         An outcome that would be consistent with the

05:27:27  4    theory, but not allowed for in the damages, is that some

05:27:31  5    individuals do have information about their market

05:27:34  6    worth, and do negotiate wages, regardless of whether

05:27:37  7    that should or does propagate through.  And so I'm

05:27:42  8    pointing out that there are -- there is a group of

05:27:45  9    employees who did receive a bump in compensation, that I

05:27:50 10    think based on the information that I've read was

05:27:53 11    specifically designed to keep them at Google.

05:28:00 12         To the extent that that is their market worth,

05:28:02 13    there isn't a basis, then, to say they should have been

05:28:05 14    paid even higher than that to keep them at Google.  If

05:28:09 15    the bump in salary or the bump in compensation was

05:28:12 16    the -- a retention bump, then there isn't a basis, I

05:28:15 17    think, to say, oh, it would have been even higher if

05:28:18 18    instead of just the threat of going to Facebook or a

05:28:21 19    startup, there is also a threat that they might have

05:28:23 20    gone to Intuit or Intel.

05:28:28 21         Q.  Have you done anything to calculate their

05:28:30 22    market worth?

05:28:36 23         A.  I looked at the amount that they receive.  I

05:28:39 24    understand it's not a claim being made by Dr. Leamer

05:28:43 25    that they are being paid differently from their market

05:28:45  1    worth or there is some sort of market suppression of

05:28:48  2    wages.  And so all the information we have would be what

05:28:52  3    are each -- what is each individual currently earning,

05:28:55  4    and could they be worth more to another company.

05:28:58  5              And there isn't a basis to assume that having

05:29:03  6    information where they are being paid something

05:29:05  7    specifically to retain them, in the face of recruiting

05:29:08  8    from some companies, that they should have been paid

05:29:11  9    even more if we layer on that cold calling, not just

05:29:16  10   recruiting, but just cold calling from a few more

05:29:18  11   companies.

05:29:19  12        Q.  So you say that there is no basis to assume

05:29:21  13   that.  What have you done to establish that they would

05:29:25  14   not have been paid more if there had been cold-calling

05:29:30  15   from more companies?  What have you done to establish

05:29:32  16   that?

05:29:34  17             MR. KIERNAN:  Object to form.

05:29:34  18             THE WITNESS:  So I have done, essentially, my

05:29:35  19   report, where I look at the model that is put forth by

05:29:39  20   Dr. Leamer where he gets a negative coefficient on

05:29:44  21   conduct, and from that says that there is

05:29:46  22   undercompensation to the class.  And I do a variety of

05:29:49  23   specification changes and say that that variable, what

05:29:52  24   he is measuring, cannot properly be attributed to the

05:29:55  25   conduct at issue.

Deposition of Lauren Stiroh, Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 05:29:58 | 1 | The same model can show very widely differing |
| 05:30:01 | 2 | results.  And so it is my opinion that he has not |
| 05:30:04 | 3 | established that there is either impact or an amount of |
| 05:30:07 | 4 | damages associated with the conduct.  And I think that |
| 05:30:10 | 5 | is relevant to this paragraph here. |
| 05:30:14 | 6 | MR. GLACKIN:  Q.  So I think we're actually |
| 05:30:16 | 7 | back to my first question.  And now I think I have |
| 05:30:19 | 8 | the answer to my first question, which is, your |
| 05:30:21 | 9 | critique as to these particular employees is the |
| 05:30:23 | 10 | critique that you've made throughout the report as |
| 05:30:26 | 11 | to Dr. Leamer's overall methodologies.  And there is |
| 05:30:28 | 12 | not something special that you've done to establish |
| 05:30:31 | 13 | that he's wrong as to these ███ employees? |
| 05:30:34 | 14 | MR. KIERNAN:  Object to form. |
| 05:30:35 | 15 | THE WITNESS:  So certainly as I said, the |
| 05:30:36 | 16 | critique in the rest of my report applies to these |
| 05:30:39 | 17 | employees.  I think there is something special about |
| 05:30:41 | 18 | them in that we do have additional information.  Where |
| 05:30:45 | 19 | there are cases in the rest of the case where we don't |
| 05:30:48 | 20 | have the information we might want about what |
| 05:30:50 | 21 | information is conveyed, why did -- why it is conveyed, |
| 05:30:54 | 22 | why compensation changes are being made. |
| 05:30:56 | 23 | With these ███ employees, we do have that |
| 05:31:01 | 24 | information, and so it is a special consideration of |
| 05:31:04 | 25 | those employees where we see fairly large changes in |

05:31:08  1   their compensation.  We don't see other people that were

05:31:10  2   in the same -- I forget what the name that Google gives

05:31:15  3   them, but the same degree in 2007, matching up with

05:31:20  4   those compensation changes.

05:31:21  5         So we don't see a ripple effect, we don't see a

05:31:24  6   propagation, and we don't have a reason to think that

05:31:27  7   another layer of threats from -- or just potential

05:31:31  8   threats from companies that have never been real threats

05:31:33  9   in the past would have caused a different outcome when

05:31:37 10   we do see Google responding to a specific threat from

05:31:40 11   specific types of companies.

05:31:42 12         MR. GLACKIN:  Q.  So you say we have no

05:31:43 13   reason to believe it.  Have you done something to

05:31:45 14   determine that it's not true, other than the

05:31:47 15   critique that is contained in the rest of your

05:31:49 16   report?

05:31:50 17      A.  No, it is the critique that I have done in the

05:31:52 18   rest of my report that says that.  That tells me that

05:31:56 19   the lack of belief is actually a reasonable belief.

05:32:02 20         Let me clarify.  That's not going to make sense

05:32:05 21   when you read it.

05:32:07 22         MR. GLACKIN:  Stop.  Stop.  Stop.

05:32:08 23         No further questions.

05:32:09 24         THE VIDEOGRAPHER:  This is --

05:32:10 25         MR. KIERNAN:  Before we go off the record, why

05:32:12  1   don't we just have one short meeting.  Break.

05:32:16  2          MR. GLACKIN:  If -- no.  I'm not going to agree

05:32:19  3   to go off the record.  We're just going to stay on the

05:32:21  4   record.

05:32:22  5          MR. KIERNAN:  Stay on the record.

05:32:28  6          MR. GLACKIN:  I mean, if this is about, like --

05:32:29  7   let me just say I'm going to object to you guys

05:32:32  8   conferring with the witness and then coming back and

05:32:34  9   examining her in the middle of the deposition, I object

05:32:36 10   to you doing that.  It's improper.

05:32:38 11          MR. STONE:  I thought we were at the end of the

05:32:40 12   depo.

05:32:40 13          MR. GLACKIN:  Well, if we're at the end of the

05:32:42 14   depo, then we can go off the record and --

05:32:42 15          MR. STONE:  You just told me you were done.

05:32:44 16          MR. KIERNAN:  You just passed the witness.

05:32:45 17          MR. GLACKIN:  What I'm going to object to is

05:32:47 18   you conferring with her.  If you guys want to go confer

05:32:51 19   and come back and ask questions, that's fine.

05:32:53 20          MR. STONE:  Where does that come from, Brendan?

05:32:55 21          MR. GLACKIN:  It's tampering -- it's conferring

05:32:56 22   with the witness in the middle of their testimony.

05:32:57 23   Where does that come from?  Really?

05:33:01 24          MR. STONE:  Where does our ability to take a

05:33:02 25   break and go off the record after you finished your

1        I, Gina V. Carbone, Certified Shorthand

2   Reporter licensed in the State of California, License

3   No. 8249, hereby certify that the deponent was by me

4   first duly sworn and the foregoing testimony was

5   reported by me and was thereafter transcribed with

6   computer-aided transcription; that the foregoing is a

7   full, complete, and true record of said proceedings.

8        I further certify that I am not of counsel or

9   attorney for either of any of the parties in the

10  foregoing proceeding and caption named or in any way

11  interested in the outcome of the cause in said caption.

12       The dismantling, unsealing, or unbinding of the

13  original transcript will render the reporter's

14  certificates null and void.

15       In witness whereof, I have hereunto set my hand

16  this day:  December 16, 2013.

17       ___X___ Reading and Signing was requested.

18       _____ Reading and Signing was waived.

19       _____ Reading and signing was not requested.

20

21

22       _____

23       GINA  V. CARBONE

24       CSR 8249, RMR, CRR, CCRR

25