# EXHIBIT 5

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IN RE:  HIGH TECH EMPLOYEE      )

ANTITRUST LITIGATION            )

                               )   No. 11 CV 2509 LHK

THIS DOCUMENT RELATES TO:       )

ALL ACTIONS.                    )

_____)

VIDEO DEPOSITION OF ERIC L. TALLEY, J.D., PH.D.

DECEMBER 8, 2013

Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

08:56:28  1        Q.    And in that CV you describe work you have done

08:56:29  2    consulting with boards of directors, correct?

08:56:30  3        A.    Among other things, yes.

08:56:31  4        Q.    And you have    it says here that in 2010, you

08:56:32  5    were retained as an expert consultant to provide

08:56:33  6    corporate governance training to the board of directors

08:56:35  7    of Senestech Incorporated; is that right?

08:56:36  8        A.    That's correct, yes.

08:56:36  9        Q.    And it also says that    let's see.  In 2007,

08:56:38 10    2008, you were retained by Marvell Technology Group to

08:56:39 11    provide corporate governance training to senior

08:56:40 12    executives and board relating to managerial oversight,

08:56:41 13    appropriate delegation, and conflicts of interest; is

08:56:42 14    that right?

08:56:43 15        A.    That's correct.

08:56:43 16        Q.    Can you describe the advice you provided to

08:56:44 17    those two companies.

08:56:45 18            MR. RUBIN:  Well, I would just caution to the

08:56:45 19    extent there is privilege    there is a privilege issue,

08:56:47 20    I would

08:56:47 21            MR. HARVEY:  Sure, let me

08:56:47 22            MR. RUBIN:  I mean I don't represent them,

08:56:47 23    obviously, but I would just    I'm sure Professor Talley

08:56:49 24    knows that, too, but I just want to make sure he doesn't

08:56:50 25    disclose anything.

| | | |
|---|---|---|
| 08:56:51 | 1 | BY MR. HARVEY: |
| 08:56:51 | 2 | Q.    And just so we're not crossing any boundaries |
| 08:56:52 | 3 | here, I'm not asking for anything specific about the |
| 08:56:53 | 4 | substance or anything confidential with respect to those |
| 08:56:54 | 5 | companies.  I'm just asking you generally to describe for |
| 08:56:55 | 6 | the kind of advice or the categories of advice you |
| 08:56:56 | 7 | provided. |
| 08:56:56 | 8 | MR. RUBIN:  If you can do that without |
| 08:56:57 | 9 | breaching confidentiality or privilege. |
| 08:56:58 | 10 | THE WITNESS:  So in both of the instances you |
| 08:56:59 | 11 | mentioned, there    there were sensitive issues that    I |
| 08:57:00 | 12 | believe that the nature of the relationship was one of |
| 08:57:01 | 13 | trust and confidence, and I cannot divulge.  So I can |
| 08:57:02 | 14 | only paint these in broad strokes. |
| 08:57:03 | 15 | BY MR. HARVEY: |
| 08:57:03 | 16 | Q.    You know what, why don't I stop you there and |
| 08:57:04 | 17 | I'll just withdraw the question. |
| 08:57:05 | 18 | A.    Okay. |
| 08:57:05 | 19 | Q.    During the course of your    of the work that |
| 08:57:06 | 20 | you did for Senestech, did you ever advise Senestech to |
| 08:57:08 | 21 | enter into a secret company wide antisolicitation |
| 08:57:09 | 22 | agreement with another company, with no geographic limit, |
| 08:57:10 | 23 | no expiration date, and without regard to the categories |
| 08:57:11 | 24 | of work that the employees did? |
| 08:57:13 | 25 | MR. RUBIN:  Objection.  Form. |

Deposition of Eric L. Talley, J.D., Ph.D.          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 08:57:13 | 1 | THE WITNESS:  I don't believe that that was |
| 08:57:14 | 2 | part of our discussion.  No. |
| 08:57:14 | 3 | BY MR. HARVEY: |
| 08:57:15 | 4 | Q.   Did you ever advise Marvell Technology Group to |
| 08:57:16 | 5 | enter into such agreements? |
| 08:57:16 | 6 | MR. RUBIN:  Same objection. |
| 08:57:17 | 7 | THE WITNESS:  As per the same question you |
| 08:57:18 | 8 | asked earlier? |
| 08:57:18 | 9 | BY MR. HARVEY: |
| 08:57:18 | 10 | Q.   Yes. |
| 08:57:19 | 11 | A.   I don't believe that that was part of our |
| 08:57:19 | 12 | discussion.  However, the discussion did involve issues |
| 08:57:21 | 13 | relating to    let's see.  HR and employment management, |
| 08:57:22 | 14 | generally.  I can't get into more specifics.  Sorry. |
| 08:57:24 | 15 | Q.   And you mentioned    and this is just in your |
| 08:57:25 | 16 | CV    that among the categories was    was appropriate |
| 08:57:26 | 17 | delegation and conflicts of interest. |
| 08:57:27 | 18 | Did you ever advise either of these companies |
| 08:57:28 | 19 | that agreements of that kind would be a good idea in |
| 08:57:29 | 20 | order to solve potential or actual conflicts of interest? |
| 08:57:31 | 21 | MR. RUBIN:  Objection.  Form. |
| 08:57:31 | 22 | THE WITNESS:  Agreements of that kind is    can |
| 08:57:32 | 23 | you |
| 08:57:32 | 24 | BY MR. HARVEY: |
| 08:57:33 | 25 | Q.   Sure.  Agreements such as those at issue in |

| | | |
|---|---|---|
| 08:57:34 | 1 | this case, that is secret company wide antisolicitation |
| 08:57:35 | 2 | agreements with other companies, with no geographic |
| 08:57:36 | 3 | limit, no time limit, and no narrowing in terms of what |
| 08:57:38 | 4 | the employees subject to that agreement were working on |
| 08:57:39 | 5 | or what their titles were. |
| 08:57:40 | 6 | MR. RUBIN:  Same objection. |
| 08:57:40 | 7 | THE WITNESS:  Again, I want to be careful here |
| 08:57:41 | 8 | because of a    of a confidence issue.  The    it is fair |
| 08:57:43 | 9 | to say that our discussions did involve issues that would |
| 08:57:44 | 10 | plausibly be related to confidentiality agreements |
| 08:57:45 | 11 | between companies, and that confidentiality agreements |
| 08:57:46 | 12 | might well have non solicit provisions in them, and those |
| 08:57:48 | 13 | non solicit provisions have many forms of    of |
| 08:57:49 | 14 | application, including without restriction as to type of |
| 08:57:50 | 15 | employee. |
| 08:57:51 | 16 | BY MR. HARVEY: |
| 08:57:51 | 17 | Q.   Which company are you referring to?  Senestech |
| 08:57:52 | 18 | or Marvell Technology Group? |
| 08:57:53 | 19 | A.   So these discussions did come up with the |
| 08:57:54 | 20 | Marvell. |
| 08:57:54 | 21 | Q.   When you say "these discussions," you are |
| 08:57:55 | 22 | referring to discussions about agreements similar to |
| 08:57:56 | 23 | those at issue in this case? |
| 08:57:57 | 24 | MR. RUBIN:  Objection to form. |
| 08:57:58 | 25 | THE WITNESS:  I'm talking about agreements that |

| | | |
|---|---|---|
| 08:57:58 | 1 | include non solicitation provisions from company to |
| 08:58:00 | 2 | company. |
| 08:58:00 | 3 | BY MR. HARVEY: |
| 08:58:00 | 4 | Q.   And while you're listing it in your CV, so I'm |
| 08:58:02 | 5 | going to have to ask you, is it your understanding that |
| 08:58:03 | 6 | Marvell Technology Group entered into such an agreement? |
| 08:58:04 | 7 | MR. RUBIN:  Objection.  Form.  And caution you |
| 08:58:05 | 8 | on the privilege. |
| 08:58:06 | 9 | THE WITNESS:  I    I think at this point you |
| 08:58:06 | 10 | are getting into facts I don't think I can    I don't |
| 08:58:07 | 11 | think I can relate them to you.  I    I believe I am |
| 08:58:09 | 12 | under a    my own confidentiality NDA with respect to the |
| 08:58:10 | 13 | interaction I had with    with Marvell. |
| 08:58:11 | 14 | BY MR. HARVEY: |
| 08:58:12 | 15 | Q.   Well, why don't I put it this way.  To the |
| 08:58:13 | 16 | extent such an agreement existed, since you are being coy |
| 08:58:14 | 17 | about it, I take it it is not publicly known. |
| 08:58:16 | 18 | MR. RUBIN:  Objection.  Form. |
| 08:58:16 | 19 | THE WITNESS:  Can you restate that question, |
| 08:58:17 | 20 | Mr. Harvey? |
| 08:58:17 | 21 | BY MR. HARVEY: |
| 08:58:17 | 22 | Q.   Without    if there were an agreement, such an |
| 08:58:18 | 23 | agreement, between Marvell and another company, is it |
| 08:58:20 | 24 | fair to say that it is not public knowledge? |
| 08:58:21 | 25 | MR. RUBIN:  Objection.  Form. |

Deposition of Eric L. Talley, J.D., Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

08:58:22   1              THE WITNESS:  I don't know whether it is or is

08:58:23   2    not.  Part of my caution is because of the fact that I

08:58:24   3    don't know whether it is or is not public    public

08:58:25   4    knowledge.  These sorts of agreements sometimes are

08:58:26   5    disclosed in securities filings.  Sometimes they're not.

08:58:28   6    BY MR. HARVEY:

08:58:28   7         Q.  And when you say "these kind of agreements,"

08:58:29   8    you mean company wide antisolicitation agreements similar

08:58:30   9    to those at issue in this case are sometimes disclosed in

08:58:31  10    SEC filings?  Is that your testimony?

08:58:32  11         A.  You'll sometimes see them in the context of,

08:58:33  12    you know, maybe an M&A filing where they have a

08:58:35  13    confidentiality provision and a no    or a

08:58:36  14    confidentiality agreement with a no solicit clause.

08:58:37  15    Sometimes you'll see them.  Sometimes they are not

08:58:38  16    disclosed.

08:58:38  17         Q.  Please identify every company that has

08:58:39  18    disclosed an antisolicitation agreement similar to those

08:58:40  19    at issue in this case in an SEC filing.

08:58:42  20              MR. RUBIN:  Objection.  Form.

08:58:42  21              THE WITNESS:  Off the top of my head,

08:58:43  22    Mr. Harvey, I    I can't name the companies.  I have

08:58:44  23    just in unrelated work, because I teach mergers and

08:58:45  24    acquisitions, and one of the parts of mergers and

08:58:47  25    acquisitions is    is non solicits and    and

Deposition of Eric L. Talley, J.D., Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 08:58:48 | 1 | confidentiality agreements.  So I have spent a fair |
| 08:58:49 | 2 | amount of time on EDGAR trying to pull documents related |
| 08:58:51 | 3 | to joint ventures, to joint investment projects to asset |
| 08:58:52 | 4 | sales to acquisitions that    that have confidentiality |
| 08:58:53 | 5 | agreements as    as some of the exhibits, and sometimes |
| 08:58:55 | 6 | you will see them.  I'd say most of the time you do not, |
| 08:58:56 | 7 | but they will sometimes work their way into the filings |
| 08:58:57 | 8 | as an exhibit. |
| 08:58:58 | 9 |         And I can't    I cannot list off the top of my |
| 08:58:59 | 10 | head every company for which I have    have examined |
| 08:59:00 | 11 | the    the NDA and how many of them had    I can give |
| 08:59:02 | 12 | estimates, but I don't have a compilation of quantitative |
| 08:59:03 | 13 | data in front of me. |
| 08:59:04 | 14 | BY MR. HARVEY: |
| 08:59:04 | 15 |     Q.   Can you identify a single one? |
| 08:59:05 | 16 |     A.   Not off the top of my head.  If you give me |
| 08:59:07 | 17 | some    a chance to think about it, I might    I might |
| 08:59:08 | 18 | bring it up later on in the deposition. |
| 08:59:09 | 19 |     Q.   Sure.  If at any point during the deposition |
| 08:59:10 | 20 | you think of one |
| 08:59:11 | 21 |     A.   All right. |
| 08:59:11 | 22 |     Q.      just let me know. |
| 08:59:11 | 23 |     A.   Okay. |
| 08:59:12 | 24 |     Q.   You used the phrase "M&A" frequently in |
| 08:59:13 | 25 | describing this.  Do you recall ever seeing an agreement |

08:59:14  1    in a context outside of the merger context?

08:59:16  2        A.   Yes, I've seen confidentiality agreements with

08:59:17  3    non solicits in joint venture agreements, joint

08:59:18  4    investment agreements.  There is a, you know, categorical

08:59:20  5    question of what constitutes, you know, mergers and

08:59:21  6    acquisition agreements when a lot of these things don't

08:59:22  7    involve change of control or transfer of shares or   or

08:59:24  8    assets from one company to another.  So I've seen them in

08:59:25  9    other contexts as well.

08:59:26  10       Q.   And just so the record is clear, my question is

08:59:27  11   not about confidentiality agreements generally, and it is

08:59:28  12   not about a    non disclosure agreements generally, and

08:59:29  13   it is not about non solicits generally.  It is a very

08:59:31  14   specific question.  And that is, whether agreements such

08:59:32  15   as those at issue in this case, as I've defined them,

08:59:33  16   that is company wide antisolicit    company wide

08:59:34  17   antisolicitation agreements without any restriction in

08:59:36  18   terms of geography, with no time limit, and with no

08:59:37  19   narrowing in terms of categories of employees.

08:59:39  20            MR. RUBIN:  Objection.  Form.

08:59:39  21            THE WITNESS:  Well, one thing to remember,

08:59:40  22   Mr. Harvey, is that    and I'm trying to answer this

08:59:41  23   the question here    is that I'm referring to contracts

08:59:43  24   that have non solicit provisions that have many of the

08:59:44  25   features that you refer to.  The notion of, say, a joint

09:10:11  1    BY MR. HARVEY:

09:10:12  2        Q.    When you are telling your students that

09:10:12  3    agreements like this would be a good idea, do you tell

09:10:13  4    them about the Department of Justice investigation that

09:10:16  5    preceded this action?

09:10:16  6        A.    This   my involvement in this case is a month

09:10:17  7    old.  I last taught a class that   that pertained to

09:10:19  8    this in the spring of 2013.  This case didn't come up in

09:10:20  9    that instance.  But, you know, there is a unit in the

09:10:22  10   class on confidentiality agreements, and we discussed

09:10:23  11   non solicits as part of that.

09:10:24  12       Q.    When was   well, first let me say, are you

09:10:25  13   aware sitting here that the Antitrust Division of the

09:10:26  14   United States Department of Justice conducted an

09:10:27  15   investigation into the conduct at issue in this civil

09:10:28  16   case?

09:10:29  17       A.    Yes, I am aware of that.

09:10:30  18       Q.    When was that investigation first made public?

09:10:31  19            MR. RUBIN:  Objection.  Form.

09:10:31  20            THE WITNESS:  I did not investigate this.

09:10:32  21   I'm   I think it probably was a few years ago.

09:10:33  22   BY MR. HARVEY:

09:10:33  23       Q.    And this advice to your students, did that take

09:10:35  24   place before or after that was made public?

09:10:36  25       A.    The advice that

| 09:10:36 | 1 | Q.   That it would be a good idea to enter into |
| 09:10:37 | 2 | agreements like this? |
| 09:10:38 | 3 | A.   That is not |
| 09:10:38 | 4 | MR. RUBIN:  Objection.  Form. |
| 09:10:39 | 5 | THE WITNESS:  Sorry.  The   what you |
| 09:10:39 | 6 | characterized as advice, I'm going to recharacterize as |
| 09:10:41 | 7 | what I present to my students, which is that non solicit |
| 09:10:42 | 8 | agreements can be   can play a helpful role in |
| 09:10:43 | 9 | facilitating various types of collaborative relationships |
| 09:10:45 | 10 | or negotiations under the appropriate circumstances.  All |
| 09:10:47 | 11 | right?  But this should not be understood as advising |
| 09:10:48 | 12 | them to get into such agreements willy nilly. |
| 09:10:49 | 13 | BY MR. HARVEY: |
| 09:10:49 | 14 | Q.   Are you aware that there was a consent decree |
| 09:10:50 | 15 | entered in the DOJ case that was entered as a final |
| 09:10:52 | 16 | judgment in the district of DC? |
| 09:10:53 | 17 | A.   I'm aware of this, yes. |
| 09:10:54 | 18 | Q.   But you haven't reviewed it, correct? |
| 09:10:55 | 19 | A.   I haven't spent   I may have glanced at it, |
| 09:10:56 | 20 | but I didn't spend any appreciable time with it. |
| 09:10:57 | 21 | Q.   Are you aware that that consent decree lays out |
| 09:10:59 | 22 | the circumstances under which non solicits may or may not |
| 09:11:00 | 23 | be appropriate when formed in conjunction with specific |
| 09:11:01 | 24 | collaborations? |
| 09:11:02 | 25 | MR. RUBIN:  Objection.  Form. |

Deposition of Eric L. Talley, J.D., Ph.D.          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 09:11:02 | 1 | THE WITNESS:  I'm aware that the   the consent |
| 09:11:03 | 2 | decree   who drafted it, I do not know, and I am aware |
| 09:11:05 | 3 | that it lays out some parameters.  I am not aware that it |
| 09:11:07 | 4 | is a set of parameters that speaks generally to when |
| 09:11:08 | 5 | something is appropriate or not.  It   it   my sense is |
| 09:11:09 | 6 | that it's a settlement, and it was brokered by some |
| 09:11:11 | 7 | lawyers who I do not know. |
| 09:11:12 | 8 | BY MR. HARVEY: |
| 09:11:12 | 9 | Q.  Do you understand that all the defendants in |
| 09:11:13 | 10 | this case agreed to that final judgment? |
| 09:11:14 | 11 | A.  I believe I   yes, I believe I've seen |
| 09:11:15 | 12 | reference to that, yeah. |
| 09:11:16 | 13 | Q.  And do you understand that that final judgment |
| 09:11:16 | 14 | was entered by the judge in that action? |
| 09:11:18 | 15 | MR. RUBIN:  Objection.  Form. |
| 09:11:19 | 16 | THE WITNESS:  I haven't seen evidence one way |
| 09:11:19 | 17 | or the other to that, but we can stipulate. |
| 09:11:21 | 18 | BY MR. HARVEY: |
| 09:11:21 | 19 | Q.  Is there a reason why you didn't read that |
| 09:11:22 | 20 | document? |
| 09:11:22 | 21 | MR. RUBIN:  Objection.  Form. |
| 09:11:23 | 22 | THE WITNESS:  I was asked to review the nature |
| 09:11:24 | 23 | of the agreements between around 2005 and 2009.  The |
| 09:11:25 | 24 | consent decree itself is a legal document.  My   my |
| 09:11:26 | 25 | understanding of my engagement in this case was to |

09:42:05   1    agreement ever occurred?

09:42:05   2         A.   I don't believe I have.

09:42:06   3         Q.   Okay.  Okay.  If you can go to page 11 and

09:42:07   4    paragraph 32, please.

09:42:08   5         A.   Got it.

09:42:08   6         Q.   There    again in the penultimate sentence, you

09:42:09   7    list as    as potential negative consequences to the

09:42:11   8    absence of a do not call agreement that the participants

09:42:12   9    might, quote, "develop wasteful incentives to curtail

09:42:14   10   investments in their employees' skills, to ration

09:42:15   11   employees access to proprietary information, or to limit

09:42:16   12   collaborators access to the most valuable employees and

09:42:17   13   other corporate resources."

09:42:18   14        Do you see that?

09:42:19   15        A.   Yes.

09:42:19   16        Q.   Have you seen any evidence to suggest    and I

09:42:20   17   want you to be specific here, about a specific

09:42:21   18   collaboration, that occurred prior to 2005, in which the

09:42:22   19   participants developed wasteful incentives to curtail

09:42:24   20   investment in their employees' skills?

09:42:25   21        MR. RUBIN:  Objection.  Form.

09:42:25   22        THE WITNESS:  So the    I can probably answer

09:42:26   23   that    what would I call it, the contra positive of this

09:42:28   24   question.  The    the pre 2005 is a period before the

09:42:29   25   alleged DNCC agreements came into existence.

| | | |
|---|---|---|
| 09:42:30 | 1 | One potential adverse effect is that it may |
| 09:42:32 | 2 | limit the depth and scope and intensity of a |
| 09:42:33 | 3 | collaboration.  I have not tried to measure the depth or |
| 09:42:34 | 4 | scope, but there is evidence that when the DNCCs are in |
| 09:42:36 | 5 | existence, people complain about, hey, listen, I sent you |
| 09:42:37 | 6 | my best guy, and you just stole him away.  I    it's |
| 09:42:39 | 7 | I'm trying to imagine whether such a document would exist |
| 09:42:40 | 8 | before the alleged DNCCs came into existence. |
| 09:42:42 | 9 | BY MR. HARVEY: |
| 09:42:42 | 10 | Q.   So you have not, as an empirical matter, |
| 09:42:43 | 11 | determined whether any of the collaborations that existed |
| 09:42:45 | 12 | prior to 2005 developed a    wasteful incentives among |
| 09:42:46 | 13 | the collaborators to curtail investments in their |
| 09:42:47 | 14 | employees' skills? |
| 09:42:48 | 15 | A.   I have not.  I believe it also would be a very |
| 09:42:49 | 16 | difficult thing to quantify if    directly.  It's a    it |
| 09:42:50 | 17 | is essentially trying to quantify the dog that doesn't |
| 09:42:52 | 18 | bark. |
| 09:42:52 | 19 | Q.   And the same is true after 2009, correct?  That |
| 09:42:53 | 20 | you have not conducted    or you    you don't know |
| 09:42:54 | 21 | empirically whether the collaborations that occurred |
| 09:42:56 | 22 | after the agreements ended developed wasteful incentives |
| 09:42:57 | 23 | to curtail investments in their employees' skills. |
| 09:42:58 | 24 | A.   I    I curtailed my analysis at 2009 when the |
| 09:42:59 | 25 | DNCCs    alleged DNCCs were to have come to an end.  So I |

09:43:01  1    wasn't    you know, I don't think my report talks about

09:43:02  2    collaborations afterward.

09:43:03  3         I have seen some evidence of some    some

09:43:04  4    collaborations, but I didn't do a detailed analysis of

09:43:05  5    that post 2009.

09:43:05  6         Q.   So you didn't analyze the post conspiracy

09:43:06  7    period, correct?

09:43:07  8         A.   I did not analyze the    the    the period that

09:43:08  9    is after the alleged conspiracy, correct.

09:43:09  10        Q.   Okay.  Is your answer the same for the

09:43:10  11   preconspiracy period?  Did you analyze that?

09:43:11  12        A.   A little bit.  Part of the    part of the

09:43:12  13   reason to analyze a little bit of the preconspiracy

09:43:14  14   period or the alleged conspiracy period is to get a sense

09:43:15  15   about whether the relationship between two parties to one

09:43:16  16   of these alleged agreements was    was growing,

09:43:18  17   whether    where they were becoming more involved with

09:43:19  18   one another on a    on multiple collaborative prospective

09:43:20  19   and realized collaborative venues.

09:43:21  20             So, for instance, I think somewhere in the

09:43:23  21   report I note that collaboration between Apple and Google

09:43:24  22   started as early as 2002, but then, you know, picked up

09:43:26  23   as well.  And    and there were significant numbers of

09:43:27  24   collaborations after the alleged DNCCs were to have

09:43:28  25   alleged to have begun in 2005.

| | | |
|---|---|---|
| 09:43:29 | 1 | Q.   You know, that leads me to another question I |
| 09:43:30 | 2 | have. |
| 09:43:30 | 3 | Are you offering an opinion that the |
| 09:43:31 | 4 | collaborations that Google had with other defendants |
| 09:43:32 | 5 | picked up after 2005? |
| 09:43:33 | 6 | MR. RUBIN:  Objection.  Form. |
| 09:43:33 | 7 | BY MR. HARVEY: |
| 09:43:34 | 8 | Q.   Or increased in some way.  I think you used the |
| 09:43:35 | 9 | phrase "picked up," but however you want to describe it. |
| 09:43:36 | 10 | A.   All I am saying is that DNCCs can facilitate |
| 09:43:38 | 11 | the   the   both the intensity and the extensiveness of |
| 09:43:39 | 12 | collaborations between   between the parties.  It is a |
| 09:43:41 | 13 | perfectly plausible and sensible economic justification, |
| 09:43:42 | 14 | and that is an efficiency enhancing justification for |
| 09:43:43 | 15 | them. |
| 09:43:43 | 16 | Q.   I understand that.  But I think you said that |
| 09:43:44 | 17 | maybe 30 times, and I haven't asked you about that. |
| 09:43:45 | 18 | A.   Thirty four times. |
| 09:43:46 | 19 | Q.   So I understand that you want to get it out |
| 09:43:46 | 20 | there, and you have.  My question is different. |
| 09:43:47 | 21 | My question is whether you have done an |
| 09:43:48 | 22 | empirical assessment to determine whether the |
| 09:43:49 | 23 | collaborative activity that Google had with the other |
| 09:43:51 | 24 | defendants materially increased after 2005 |
| 09:43:51 | 25 | A.   Yes. |

09:43:52  1         Q.     as compared to before 2005.

09:43:53  2         A.   I have not tried to do that empirical

09:43:53  3   quantitative assessment.  The   it would be challenging

09:43:55  4   on a number of different grounds.  It is not just a

09:43:56  5   counting exercise of how many collaborative agreements

09:43:58  6   did they enter into.  There may be informal collaborative

09:43:59  7   relationships that are entered into.

09:44:01  8         The intensity of those relationships would have

09:44:02  9   to be measured.  So it's a   it is a very difficult

09:44:03  10  empirical puzzle.  I have not tried to do an empirical

09:44:05  11  assessment, but I just flagged that it would be a

09:44:06  12  challenging thing to do.

09:44:07  13        MR. HARVEY:  I think we are five minutes away

09:44:08  14  from lunch, and so rather than plowing through for

09:44:09  15  another half hour, I'm inclined to take a break for lunch

09:44:10  16  now, if that is okay with you guys.

09:44:12  17        MR. RUBIN:  You mean five minutes away from...

09:44:13  18        THE WITNESS:  You are ordering in?

09:44:13  19        MR. RUBIN:  That is fine.

09:44:14  20        THE WITNESS:  Fine by me.

09:44:14  21        THE VIDEOGRAPHER:  We are now off the record at

09:44:15  22  12:23 p.m.

09:44:15  23        (Luncheon recess was take.)

10:17:13  24        THE VIDEOGRAPHER:  This is Tape 4 of the

10:17:14  25  Deposition of Dr. Eric Talley.  We're now on the record

| | | |
|---|---|---|
| 10:17:18 | 1 | at 1:17 p.m. |
| 10:17:22 | 2 | MR. HARVEY:  For the record, during the break |
| 10:17:24 | 3 | counsel for plaintiffs identified that what had been |
| 10:17:26 | 4 | marked as Exhibit 2921, which is Dr. Talley's report, |
| 10:17:30 | 5 | inadvertently included the highlighting.  Counsel for |
| 10:17:35 | 6 | defendants have agreed to swap out that exhibit with a |
| 10:17:42 | 7 | version that does not have that highlighting. |
| 10:17:45 | 8 | Is that correct, Mr. Rubin? |
| 10:17:47 | 9 | MR. RUBIN:  Yes, that's correct. |
| 10:17:49 | 10 | MR. HARVEY:  Thank you. |
| 10:17:51 | 11 | Q.   Dr. Talley, did you review contracts produced |
| 10:17:56 | 12 | by the defendants that memorialized certain |
| 10:17:59 | 13 | collaborations? |
| 10:17:59 | 14 | A.   I believe I did, yes. |
| 10:18:01 | 15 | Q.   Okay.  Did you see in any of the contracts you |
| 10:18:05 | 16 | reviewed a reference to the do not call agreements at |
| 10:18:08 | 17 | issue in this case? |
| 10:18:11 | 18 | A.   I don't believe I did.  They may   it may be |
| 10:18:15 | 19 | in there, but I don't believe I saw it. |
| 10:18:17 | 20 | Q.   Okay.  Could you go to page 11 of your report. |
| 10:18:26 | 21 | A.   Sure. |
| 10:18:27 | 22 | Q.   And specifically paragraph 33. |
| 10:18:37 | 23 | A.   Got it. |
| 10:18:37 | 24 | Q.   Okay.  And I'm going to direct your attention |
| 10:18:46 | 25 | to the penultimate sentence, they are always the |

10:18:48  1   penultimate sentence, in paragraph 33 where you say,

10:18:53  2   quote, "A telling measure of consensus best practices is

10:18:56  3   provided   " oh, scratch that.

10:19:00  4           Beginning with, quote, "Prominent model

10:19:02  5   confidentiality/non disclosure agreements include

10:19:07  6   provisions for either the unilateral or bilateral

10:19:10  7   non solicitation of the negotiating parties' employees."

10:19:16  8           Do you see that?

10:19:17  9       A.   Yes.

10:19:17  10      Q.   And the sentence preceding that which I began

10:19:20  11  to read was, "A telling measure of consensus best

10:19:21  12  practices   "

10:19:22  13      A.   Yes.

10:19:22  14      Q.   "   is provided by such agreements."

10:19:24  15           Do you see that?

10:19:26  16      A.   Yes, I do.

10:19:27  17      Q.   And the support for this assertion is   that

10:19:30  18  you provided in your report here, is footnote 23,

10:19:34  19  correct?

10:19:35  20      A.   Yes.

10:19:42  21           MR. HARVEY:  Please mark Plaintiffs'

10:19:44  22  Exhibit 2923.

10:19:58  23           THE REPORTER:  2923.

10:20:11  24           (Exhibit 2923 was marked for identification.)

          25  //

10:20:11  1   BY MR. HARVEY:

10:20:11  2        Q.   And Exhibit 2923 is the document to which you

10:20:13  3   cite in footnote 23, right?

10:20:16  4        A.   Yes, it appears to be.

10:20:27  5        Q.   And if you go to the first page of the

10:20:30  6   document

10:20:31  7        A.   Yes.

10:20:31  8        Q.     it is the "Model Merger Agreement for the

10:20:33  9   Acquisition of a Public Company."

10:20:36  10            Do you see that?

10:20:36  11       A.   Correct.

10:20:37  12       Q.   Do you have any evidence in this case that any

10:20:39  13  defendant considered merging with any other defendant?

10:20:49  14       A.   It's unclear to me one way or the other.  It's

10:20:52  15  certainly possible that there were negotiations about

10:20:56  16  many times a merger negotiation may start as a joint

10:21:01  17  venture negotiation.  So    but I haven't seen direct

10:21:06  18  statements about potential mergers.

10:21:08  19            This    this model agreement has both the

10:21:13  20  definitive merger agreement in it, and then a series of

10:21:16  21  other attendant agreements that often will long predate a

10:21:20  22  merger agreement.

10:21:28  23       Q.   Okay.  You cite to pages 341 to 371, correct?

10:21:33  24       A.   Yes.

10:21:33  25       Q.   And are those pages contained in    in

| | | |
|---|---|---|
| 10:21:37 | 1 | Exhibit 2923? |
| 10:21:39 | 2 | A.  They    this appears to be a    a version    an |
| 10:21:44 | 3 | abbreviated version of the ABA    of the ABA model |
| 10:21:50 | 4 | agreement or agreements, and the part that is included |
| 10:21:55 | 5 | here after the cover page is the model confidentiality |
| 10:21:58 | 6 | agreement. |
| 10:22:00 | 7 | Q.  And these are the pages you cited in note 23, |
| 10:22:04 | 8 | are they not? |
| 10:22:05 | 9 | A.  It appears that they are, yes. |
| 10:22:07 | 10 | Q.  And if you go to page 341 |
| 10:22:09 | 11 | A.  Yes. |
| 10:22:09 | 12 | Q.    the first sentence in bold is, "The Model |
| 10:22:12 | 13 | Confidentiality Agreement and Commentary is the |
| 10:22:15 | 14 | confidentiality agreement related to the Model Merger |
| 10:22:19 | 15 | Agreement."  Do you see that? |
| 10:22:20 | 16 | A.  Yes. |
| 10:22:21 | 17 | Q.  Okay.  And if you go to page 342 |
| 10:22:32 | 18 | A.  Yes. |
| 10:22:33 | 19 | Q.    of the document, under the heading, "TYPICAL |
| 10:22:36 | 20 | PROVISIONS," there is a subheading    or I should say the |
| 10:22:40 | 21 | text begins, "At a minimum, a confidentiality agreement |
| 10:22:44 | 22 | normally covers the following points:"  And it lists six |
| 10:22:50 | 23 | bullet points, correct? |
| 10:22:54 | 24 | A.  Let me count.  One, two, three, four    yes, |
| 10:22:57 | 25 | six bullet points. |

| | | |
|---|---|---|
| 10:22:58 | 1 | Q.   Is prohibiting the solicitation of employees |
| 10:23:01 | 2 | any of those bullet points? |
| 10:23:03 | 3 | A.   It is not in those six. |
| 10:23:05 | 4 | Q.   Then the next section says, "Other provisions |
| 10:23:09 | 5 | that may be included in a confidentiality agreement |
| 10:23:11 | 6 | depend upon the varying factual circumstances in which |
| 10:23:15 | 7 | the agreement arises and may include:" and then it lists |
| 10:23:19 | 8 | three bullet points, correct? |
| 10:23:20 | 9 | A.   That is correct. |
| 10:23:23 | 10 | Q.   And the provision regarding solicitation of |
| 10:23:25 | 11 | employees is that first bullet point, correct? |
| 10:23:28 | 12 | A.   Yes. |
| 10:23:39 | 13 | Q.   Now, if you could go ahead to page 366 of that |
| 10:23:45 | 14 | same exhibit, where    Section 11, the heading is |
| 10:23:51 | 15 | "Non Solicitation," do you see that? |
| 10:23:53 | 16 | A.   Yes. |
| 10:23:59 | 17 | Q.   And in the model agreement it says that, "Each |
| 10:24:01 | 18 | party to this letter agreement agrees that, for a period |
| 10:24:05 | 19 | of two years from the date hereof," and so forth.  Do you |
| 10:24:10 | 20 | see that? |
| 10:24:11 | 21 | A.   Yes, I do. |
| 10:24:12 | 22 | Q.   Okay.  And then if you go to the commentary, |
| 10:24:20 | 23 | I'd like you to look at the second sentence there, where |
| 10:24:25 | 24 | it says, "This is most often the target's concern, and |
| 10:24:29 | 25 | the concern is most likely to be present in the case of |

| | | |
|---|---|---|
| 10:24:32 | 1 | smaller companies and technology or other companies where |
| 10:24:36 | 2 | there are a few key employees who have valuable knowledge |
| 10:24:39 | 3 | and skills or who are especially important to the |
| 10:24:43 | 4 | company's customer relations." |
| 10:24:45 | 5 | Do you see that? |
| 10:24:45 | 6 | A.   I do see this, yes. |
| 10:24:47 | 7 | Q.   And then the next sentence reads:  "Many buyers |
| 10:24:50 | 8 | will object to non solicitation provisions, particularly |
| 10:24:54 | 9 | ones that purport to apply to employees of the buyer who |
| 10:24:59 | 10 | do not even know about the possible transaction with the |
| 10:25:02 | 11 | target."  Do you see that? |
| 10:25:03 | 12 | A.   I do, yes. |
| 10:25:05 | 13 | Q.   Okay.  And then following that section, the |
| 10:25:10 | 14 | comment lists potential ways to address that concern from |
| 10:25:14 | 15 | the buyer.  Do you see those bullets?  There are one, |
| 10:25:18 | 16 | two, three, four of them. |
| 10:25:20 | 17 | A.   Yes. |
| 10:25:21 | 18 | Q.   And the first one is to "reduce the |
| 10:25:23 | 19 | non solicitation period," correct? |
| 10:25:25 | 20 | A.   Yes. |
| 10:25:26 | 21 | Q.   And that would be reducing it from two years to |
| 10:25:29 | 22 | something shorter, correct? |
| 10:25:30 | 23 | A.   One would assume, correct. |
| 10:25:31 | 24 | Q.   Okay.  And the second bullet is to "limit the |
| 10:25:34 | 25 | provision to the employees or other representatives of |

| | | |
|---|---|---|
| 10:25:37 | 1 | the buyer who are involved in (or possibly aware of) the |
| 10:25:42 | 2 | possible transaction."  Do you see that? |
| 10:25:44 | 3 | A.   Yes. |
| 10:25:45 | 4 | Q.   And then the third bullet is, "limit the |
| 10:25:48 | 5 | provision to a specific subset of the target's employees, |
| 10:25:54 | 6 | with such subset being defined by a specific list or |
| 10:25:58 | 7 | category (for example, officers, employees"    or I |
| 10:26:04 | 8 | should say, "officers, employees at the level of vice |
| 10:26:07 | 9 | president or above, key technical or salespersons, or |
| 10:26:11 | 10 | persons identified in the due diligence and negotiation |
| 10:26:14 | 11 | process)." |
| 10:26:15 | 12 | Do you see that? |
| 10:26:15 | 13 | A.   Yes. |
| 10:26:16 | 14 | Q.   Okay.  Okay.  You can put that aside. |
| 10:26:27 | 15 | A.   Okay. |
| 10:27:00 | 16 | Q.   Moving to a different topic, in conducting your |
| 10:27:02 | 17 | analysis, did you consider whether there were potentially |
| 10:27:07 | 18 | less restrictive versions of the agreements at issue in |
| 10:27:11 | 19 | this case that would still serve the    the other |
| 10:27:17 | 20 | purposes you described in your report? |
| 10:27:20 | 21 | A.   Can you give me an example?  That might help. |
| 10:27:24 | 22 | Q.   Sure.  So, for example, instead of the |
| 10:27:26 | 23 | agreements being with respect to all employees from the |
| 10:27:33 | 24 | chef to the administrative assistant to the software |
| 10:27:35 | 25 | engineer, that the agreements would be tailored to |

10:57:18  1    be something that, you know, you can identify a clear set

10:57:21  2    of employees for.

10:57:23  3            You might    and, in fact, if it is a    if the

10:57:28  4    costs are intense enough you might reduce your investment

10:57:32  5    in the collaboration to the point of being zero.  That

10:57:34  6    would be the extreme case, but it could be sort of a

10:57:37  7    softer form of collaboration, maybe a less diligent form,

10:57:42  8    a less spirited form of collaboration.

10:57:45  9            Similarly, with    with time limitations, you

10:57:50 10    might sort of say, okay, let's try to figure out what

10:57:55 11    when this collaboration is going to end, how long is it

10:57:58 12    going to take us to develop this thing, and suppose it is

10:58:01 13    going to take us    you know, we think it is going to

10:58:03 14    take us 14 months, so let's tack on another 18 months

10:58:08 15    after that, so you get 32 months; and then someone else

10:58:11 16    tells you, well, it could take 14 months, but it's kind

10:58:14 17    of like, you know, building the Bay Bridge, which could

10:58:17 18    take longer than    than 14 months, so maybe we should

10:58:20 19    toll that time until the end of the collaboration.

10:58:25 20            Another possibility is, well, okay, what

10:58:27 21    happens if during this collaboration there is an obvious

10:58:31 22    add on, and then we have to worry a little bit about

10:58:35 23    saying, you know, do we call it part of the collaboration

10:58:38 24    or not; and if we do, then does that tolling period go

10:58:43 25    even longer?  And that may be a very difficult thing to

| | | |
|---|---|---|
| 10:58:47 | 1 | compute. |
| 10:58:47 | 2 | And so my sense is that    that one of the |
| 10:58:52 | 3 | costs, or the    the responsive costs, then, would be to |
| 10:58:56 | 4 | say, well, maybe we don't dip our toes in the water as |
| 10:59:00 | 5 | deeply as we otherwise would have. |
| 10:59:02 | 6 | Q.   So the conversation    or I should say your |
| 10:59:05 | 7 | answer as you just provided, that was, you know, |
| 10:59:08 | 8 | hypothetically, if Google were to hire    Google hasn't |
| 10:59:12 | 9 | in fact hired you to do this, correct? |
| 10:59:14 | 10 | A.   Not to my knowledge. |
| 10:59:18 | 11 | Q.   And moving back to the conspiracy period, 2005 |
| 10:59:29 | 12 | to 2009, have you identified a specific collaboration |
| 10:59:35 | 13 | that would not have happened in the absence of the |
| 10:59:38 | 14 | do not call agreements that the defendants engaged in? |
| 10:59:43 | 15 | MR. RUBIN:  Objection.  Form. |
| 10:59:44 | 16 | THE WITNESS:  Yeah, so I would say that |
| 10:59:46 | 17 | that    remember, I think there are two different issues, |
| 10:59:49 | 18 | and I'll do econo head speak again, about the extensive |
| 10:59:54 | 19 | margin, right, does something happen or not; and the |
| 10:59:57 | 20 | intensive margin, right, if something happens, how much |
| 11:00:01 | 21 | do you invest in it?  How deep do you go?  How deep do |
| 11:00:04 | 22 | you    you know, do you dip your toe, your leg, your |
| 11:00:07 | 23 | ankle, your knee into the water. |
| 11:00:10 | 24 | And so    so my sense from the documents I've |
| 11:00:12 | 25 | read is that at the very least there are some |

11:00:15  1   collaborations that would not have been as   as intense

11:00:21  2   as   or as   as   I don't know how to   as close as

11:00:28  3   they would otherwise have been, but for the existence of

11:00:34  4   some of the security provided by the DNCCs or the DNCC

11:00:41  5   guidelines.

11:00:42  6            Whether that   you know, remember the   the

11:00:44  7   complete absence of a collaboration is in some ways the

11:00:49  8   limiting case, the extreme case, right?  The   the

11:00:51  9   disincentive is so strong that the   you know, your

11:00:54  10  intensive margin goes to zero.  You just don't want to do

11:00:58  11  the thing at all.

11:00:59  12           So it's hard for me to say, oh, this, you know,

11:01:01  13  absolutely wouldn't have taken place but for the DNCCs,

11:01:06  14  but it is plausible that a variety of these

11:01:08  15  collaborations would have been dialed significantly down,

11:01:11  16  or at least measurably down, without the assurances or

11:01:16  17  without at least the   the possible security provided by

11:01:22  18  the DNCC guidelines.

11:01:24  19  BY MR. HARVEY:

11:01:25  20       Q.   Okay.  I think I asked you if you identified in

11:01:29  21  your report any collaborations that would not have

11:01:34  22  happened.  I understand your opinion about the intensity.

11:01:36  23  Now I'm just focused on what you characterize as an

11:01:41  24  extreme case, that is collaborations that would not have

11:01:43  25  happened.  Do you identify collaborations that would not

11:01:46  1  have happened?

11:01:47  2      A.   I can't say for sure whether they would have

11:01:48  3  happened or not.  But, for instance, I think we talked a

11:01:51  4  little bit earlier about Mr. Otellini's complaints about

11:01:57  5  his site person being   being hired away, and it's

11:02:00  6  plausible that he would not have given access to that

11:02:06  7  site selection person but for his belief that the person

11:02:10  8  was not going to get   was not going to get poached.

11:02:16  9      Q.   Do you have an opinion one way or the other

11:02:18 10  about whether that site selection collaboration, let's

11:02:21 11  call it that

11:02:22 12      A.   Yeah.

11:02:23 13      Q.     would have or would not have happened in the

11:02:26 14  absence of a do not call agreement?

11:02:28 15          MR. RUBIN:  Objection.  Form.

11:02:29 16          THE WITNESS:  I don't have a sense for sure

11:02:31 17  whether it would not have happened.  It is possible it

11:02:33 18  might not have, or even if it did happen, pretty

11:02:36 19  plausible that it would have been dialed down.  But I

11:02:39 20  can't sit here and say for sure, oh, no, this never would

11:02:42 21  have happened, but it may have happened in a different

11:02:45 22  flavor or a different intensity than it did.

11:02:48 23  BY MR. HARVEY:

11:02:48 24      Q.   So aside from the possibility of that one, are

11:02:51 25  there any others   I should say, because I don't think

| | | |
|---|---|---|
| 11:02:53 | 1 | that one qualifies, are there any others that you have |
| 11:02:58 | 2 | identified that would not have happened but for these |
| 11:03:00 | 3 | agreements? |
| 11:03:01 | 4 | MR. RUBIN:  Objection to form. |
| 11:03:03 | 5 | THE WITNESS:  I think my answer will be |
| 11:03:04 | 6 | similar.  It's hard to    to say, oh, the    the lack of |
| 11:03:07 | 7 | a DNCC set of protocols would have dialed down the |
| 11:03:11 | 8 | interaction to zero, but it's possible that it would have |
| 11:03:14 | 9 | for other ones as well. |
| 11:03:16 | 10 | BY MR. HARVEY: |
| 11:03:16 | 11 | Q.   Okay.  And that's not my question.  I'm not |
| 11:03:19 | 12 | asking you to assess the difficulty or whether it may |
| 11:03:22 | 13 | have happened somewhere or speculate.  I am asking you if |
| 11:03:26 | 14 | you can point to one, one collaboration, one specific |
| 11:03:30 | 15 | collaboration that you've seen in this case, where you |
| 11:03:33 | 16 | have an opinion that this collaboration would not have |
| 11:03:35 | 17 | happened but for the do not call agreements? |
| 11:03:39 | 18 | MR. RUBIN:  Objection.  Form. |
| 11:03:41 | 19 | THE WITNESS:  I have not    I can't sit here |
| 11:03:44 | 20 | and say, "Oh, this clearly would not have happened," but |
| 11:03:47 | 21 | I also    I'd fight you a little bit on the nature of the |
| 11:03:50 | 22 | question.  It's    it's sort of like saying, well, if we |
| 11:03:55 | 23 | impose a tax on a good, will the    will the price of the |
| 11:04:00 | 24 | good rise?  Will consumption fall?  I think the answer is |
| 11:04:04 | 25 | probably it would. |

| | |
|---|---|
| 11:04:05 | 1 |

BY MR. HARVEY:

11:04:05   2     Q.   I'm not going to fight you on that.

11:04:07   3     A.   Would the price be zero?   Would the market

11:04:10   4   disappear completely?   Probably not.   But it would be a

11:04:14   5   shadow of its former self.

11:04:15   6     Q.   I decline to get into a debate about my

11:04:18   7   question.

11:04:18   8     A.   Okay.

11:04:18   9     Q.   So now going back to the other side of it,

11:04:21   10   where you say that there may be some collaborations that

11:04:23   11   were not as intense or, that but for the agreements the

11:04:31   12   agreements would have been less    I'm sorry, the

11:04:34   13   collaborations would have been less intense, have you

11:04:37   14   identified any specific collaborations where you have an

11:04:42   15   opinion that this collaboration would have been less

11:04:45   16   intense?

11:04:46   17     A.   Oh, I think we talked about one, the Otellini

11:04:50   18   site selection.   There are a few others I cited with

11:04:55   19   Intel.   I think in Bill Campbell's advisory role with

11:04:59   20   in particular pertaining to executive coaching, corporate

11:05:02   21   governance at Google as a shareholder of Intuit, that may

11:05:06   22   well have also been one of these situations where the

11:05:09   23   the nature, the extent, the depth, the intensity of

11:05:14   24   those    of those advisory    those pieces of advice

11:05:24   25   would have gotten less specific and less helpful.

| | | |
|---|---|---|
| 11:05:28 | 1 | Q.   So aside from those two categories, do you have |
| 11:05:30 | 2 | any others? |
| 11:05:31 | 3 | A.   I think it's quite plausible that   that some |
| 11:05:36 | 4 | of the various collaborations with Apple that we've been |
| 11:05:39 | 5 | discussing may have become dialed down, less   less |
| 11:05:45 | 6 | focused, less deep. |
| 11:05:47 | 7 | Q.   And I'm not asking you whether it's a |
| 11:05:50 | 8 | possibility.  I'm saying sitting here, have you formed an |
| 11:05:52 | 9 | opinion that but for the agreements specific |
| 11:05:56 | 10 | collaborations would have been less intense? |
| 11:06:00 | 11 | MR. RUBIN:  Objection.  Form. |
| 11:06:02 | 12 | BY MR. HARVEY: |
| 11:06:03 | 13 | Q.   Do you hold that opinion as to the Apple |
| 11:06:05 | 14 | collaboration? |
| 11:06:05 | 15 | A.   So I don't think you can exclude, absolutely |
| 11:06:08 | 16 | exclude anything, but I think there's a   there's a good |
| 11:06:11 | 17 | likelihood that they would have been less intense, yes. |
| 11:06:15 | 18 | Q.   Good likelihood.  Okay. |
| 11:06:20 | 19 | And you said that the   the intensity would |
| 11:06:23 | 20 | have measurably decreased.  How would you go about |
| 11:06:28 | 21 | measuring the intensity of a collaboration? |
| 11:06:32 | 22 | A.   Well, let's pick a type of collaboration.  Do |
| 11:06:35 | 23 | you want to think about, you know, Intel? |
| 11:06:41 | 24 | Q.   Let's pick one so we can kind of make it |
| 11:06:43 | 25 | concrete.  The Bill Campbell advice to Google. |

| | | |
|---|---|---|
| 11:06:47 | 1 | A.   All right.  So Campbell is sort of a, you know, |
| 11:06:51 | 2 | an informal advisor to    to    to Mr. Schmidt during a |
| 11:06:57 | 3 | fair amount of this time, and    and this is all    this |
| 11:07:02 | 4 | is in part because Google is still a growing company, |
| 11:07:05 | 5 | from what I understand, trying to give Schmidt a sense |
| 11:07:09 | 6 | of, you know, how to    how to scale, how to grow, what |
| 11:07:13 | 7 | sorts of    of, you know, strategic maybe human resources |
| 11:07:18 | 8 | issues are likely to be confronted as    as one is |
| 11:07:22 | 9 | growing, regulatory clearance issues and so forth. |
| 11:07:27 | 10 | One possibility, and it seems quite plausible |
| 11:07:32 | 11 | in this    in this situation, is that Campbell might say, |
| 11:07:35 | 12 | hey, listen, if you've got an, you know, issue related |
| 11:07:38 | 13 | to, I don't know, OSHA compliance or some other |
| 11:07:42 | 14 | regulatory issue, we've got a    we've got a pretty good |
| 11:07:46 | 15 | regulatory person, I think we found the right way to do |
| 11:07:49 | 16 | it.  Let me put your people in touch with that person so |
| 11:07:53 | 17 | you can    they can give you a sense of how we did it. |
| 11:07:55 | 18 | Or maybe a Sarbanes |
| 11:07:59 | 19 | Q.   We'll stop there |
| 11:08:01 | 20 | A.   Yeah. |
| 11:07:59 | 21 | Q.    just so I can    you got to stop at some |
| 11:07:59 | 22 | point. |
| 11:08:02 | 23 | MR. RUBIN:  Can we take a very short break, |
| 11:08:04 | 24 | actually? |
| 11:08:05 | 25 | THE WITNESS:  I'd be happy to. |

| | | |
|---|---|---|
| 11:08:06 | 1 | MR. HARVEY:  Let's just finish this little |
| 11:08:07 | 2 | segment. |
| 11:08:09 | 3 | MR. RUBIN:  Okay. |
| 11:08:10 | 4 | MR. HARVEY:  I'll be quick, though, if I can. |
| 11:08:12 | 5 | MR. RUBIN:  All right. |
| 11:08:12 | 6 | BY MR. HARVEY: |
| 11:08:13 | 7 | Q.  So you gave an example of Campbell pointing to |
| 11:08:18 | 8 | someone at Intuit who might have some expertise on OSHA |
| 11:08:23 | 9 | compliance. |
| 11:08:24 | 10 | A.  Or Sarbanes Oxley compliance. |
| 11:08:26 | 11 | Q.  Sure.  And so the measurement comes in terms of |
| 11:08:29 | 12 | he would   he might not do that, and so you would tally |
| 11:08:32 | 13 | up |
| 11:08:34 | 14 | MR. RUBIN:  No pun intended. |
| 11:08:35 | 15 | BY MR. HARVEY: |
| 11:08:35 | 16 | Q.   the times when he would   the times when he |
| 11:08:36 | 17 | would give advice versus when he wouldn't, and but for |
| 11:08:40 | 18 | the agreements we have some number? |
| 11:08:42 | 19 | A.  Yeah, you might try to get a sense of, okay, |
| 11:08:43 | 20 | when that happened, at what level of   of direct contact |
| 11:08:47 | 21 | did   you know, would he put them in touch with this |
| 11:08:51 | 22 | person or say, I'm going to   I'm going to go try and |
| 11:08:52 | 23 | find out and I'll give you a few   a few hints what I |
| 11:08:55 | 24 | can find out.  Or maybe not do it as frequently as he |
| 11:08:59 | 25 | would have otherwise with knowing that   that Google |

11:09:03  1   wasn't going to turn around and    and cold call that

11:09:06  2   person in to recruit them in.

11:09:07  3          And so I think it's both kind of the level of

11:09:11  4   access, the degree of specificity, and the frequency of

11:09:15  5   that kind of an access, are the dimensions that I guess

11:09:18  6   I'd be interested in.

11:09:19  7      Q.   And you    you'd be interested in it.  Have

11:09:22  8   you, in fact, done that analysis?

11:09:24  9      A.   I have not.

11:09:25  10     Q.   Okay.  And in this case, in the case of Bill

11:09:30  11  Campbell, Intuit was a party to an agreement with Google

11:09:34  12  for about two years, correct, 2007, 2009?

11:09:40  13     A.   Something like that.

11:09:40  14     Q.   Did you try to measure the difference between

11:09:42  15  the amount or the intensity of his advice before the

11:09:45  16  conspiracy period, during and after?

11:09:47  17     A.   I did not try to do a quantitative measurement

11:09:51  18  in the way that you're speaking.

11:09:53  19          MR. HARVEY:  Okay.  Why don't we take a break.

11:09:56  20          THE VIDEOGRAPHER:  We are now off the record at

11:09:57  21  2:09 p.m.

11:09:58  22          (Recess was taken.)

11:27:34  23          THE VIDEOGRAPHER:  This is Tape 5 of the

11:27:35  24  Deposition of Dr. Eric Talley.  We are now on the record

11:27:39  25  at 2:27 p.m.

| | | |
|---|---|---|
| 11:27:42 | 1 | BY MR. HARVEY: |
| 11:27:43 | 2 | Q.    Switching topics to board memberships and so |
| 11:27:45 | 3 | forth |
| 11:27:46 | 4 | A.    Yes. |
| 11:27:46 | 5 | Q.     is it your understanding that the Plaintiffs |
| 11:27:48 | 6 | in this case are attacking the fact of the overlapping |
| 11:27:52 | 7 | boards as themselves being a violation of the law? |
| 11:27:58 | 8 | A.    Not quite that directly, but something akin to |
| 11:28:04 | 9 | that, I guess. |
| 11:28:05 | 10 | Q.    What do you have in mind in terms of being akin |
| 11:28:08 | 11 | to that? |
| 11:28:09 | 12 | A.    You know, I think it's in my report, and   and |
| 11:28:18 | 13 | so on page 5, "Plaintiffs' conspiracy claims appear to |
| 11:28:24 | 14 | focus on the fact that various Defendant companies had |
| 11:28:27 | 15 | board members who also served on boards of other |
| 11:28:29 | 16 | Defendant companies, or alternatively had some analogous |
| 11:28:30 | 17 | fiduciary duty role in other Defendant companies. |
| 11:28:30 | 18 | Plaintiffs imply that this sort of interrelatedness |
| 11:28:30 | 19 | between corporate entities is anomalous, and was either |
| 11:28:38 | 20 | deliberately created or directly permitted by defendants |
| 11:28:40 | 21 | to effectuate the DNCCs with the goal of suppressing |
| 11:28:45 | 22 | compensation." |
| 11:28:46 | 23 | Q.    So that's your understanding |
| 11:28:46 | 24 | A.    Compensation, yes. |
| 11:28:46 | 25 | Q.    So that accurately describes your |

11:28:48  1   understanding?

11:28:49  2       A.   That is my understanding of the nature of the

11:28:51  3   plaintiffs' claims insofar as they relate to board    to

11:28:55  4   overlapping boards.

11:29:00  5       Q.   But isn't plaintiffs' claim different, I mean

11:29:03  6   not that    that the fact of overlapping boards is itself

11:29:06  7   unusual, but the nature of the overlapping boards among

11:29:11  8   these companies permitted the spread of the agreements

11:29:15  9   from one company to another and facilitated the common

11:29:18  10  understanding?  Isn't that what plaintiffs' allege?

11:29:21  11      A.   I'm just trying to figure out the    it may

11:29:25  12  well be what the Plaintiffs allege, but I'm trying to

11:29:28  13  figure out if that is a distinction without a difference

11:29:31  14  between these statements and what the plaintiffs are

11:29:32  15  alleging, that the existence of the board overlap created

11:29:39  16  or directly permitted defendants to effectuate the DNCC.

11:29:43  17  It sounds similar.  They may not use the same words, but

11:29:46  18  I think it's

11:29:48  19      Q.   It might help to use an analogy.

11:29:51  20      A.   Okay.

11:29:51  21      Q.   Are you familiar with price fixing cases?

11:29:53  22      A.   Yes.

11:29:54  23      Q.   Often in a price fixing case there is a trade

11:29:57  24  association that facilitates the cartel, where the cartel

11:30:00  25  members attend the trade association and they enter into

| | | |
|---|---|---|
| 11:30:03 | 1 | an agreement at the trade association.  Are you familiar |
| 11:30:05 | 2 | with this concept? |
| 11:30:07 | 3 |     A.   I am, yes. |
| 11:30:08 | 4 |     Q.   And in those cases, challenging the |
| 11:30:10 | 5 | price fixing cartel, do you understand those cases to be |
| 11:30:16 | 6 | challenging the trade association as a violation or the |
| 11:30:19 | 7 | agreement to form a cartel as the violation? |
| 11:30:22 | 8 |     A.   It's the latter, yes. |
| 11:30:23 | 9 |     Q.   And so in this case, do you understand |
| 11:30:24 | 10 | plaintiffs to not be challenging the fact of overlapping |
| 11:30:28 | 11 | boards is a violation, but rather that the overlapping |
| 11:30:32 | 12 | boards facilitated anticompetitive agreements and a |
| 11:30:36 | 13 | common understanding? |
| 11:30:37 | 14 |          MR. RUBIN:  Objection.  Form. |
| 11:30:38 | 15 |          THE WITNESS:  Yes, so my understanding     I |
| 11:30:39 | 16 | mean it's going to come close to what I said here, but my |
| 11:30:42 | 17 | understanding is that the Plaintiffs are alleging that |
| 11:30:44 | 18 | the existence of the board overlaps are a key ingredient |
| 11:30:46 | 19 | to facilitating what they allege to be a conspiracy to |
| 11:30:50 | 20 | suppress compensation. |
| 11:30:52 | 21 | BY MR. HARVEY: |
| 11:30:53 | 22 |     Q.   You don't understand plaintiffs to be seeking |
| 11:30:57 | 23 | an injunction preventing board overlaps, do you? |
| 11:31:03 | 24 |     A.   Not that I've seen. |
| 11:31:11 | 25 |     Q.   Is it your opinion that but for these |

11:31:13  1  agreements, the individuals serving on the other

11:31:17  2  defendants' boards would have decided not to self serve?

11:31:21  3  And so for instance, when we start with Paul Otellini

11:31:25  4  serving on the Google board.

11:31:26  5       A.   I didn't make an assessment of his willingness

11:31:29  6  to serve on the board or not as a function of the DNCCs

11:31:37  7  or the DNCC guidelines.   To the extent that board overlap

11:31:42  8  creates the opportunity for all kinds of

11:31:46  9  efficiency enhancing collaborations, and those

11:31:48 10  collaborations can be further facilitated by the

11:31:51 11  existence of some set of ground rules on attracting or

11:31:55 12  recruiting one another's   one another's employees, it

11:31:59 13  seems conceivable to me that Mr. Otellini would have been

11:32:03 14  less excited about being on Google's board or would have

11:32:06 15  been less helpful as a board member.   It is not clear

11:32:09 16  that he would have refused an appointment on the board.

11:32:13 17       Q.   So why don't we just start with this first

11:32:17 18  point before I get into that.   And that is, have you

11:32:20 19  identified any individuals who served on a board or

11:32:23 20  provided board like advice, and I think one example of

11:32:27 21  that is Bill Campbell

11:32:28 22       A.   Yes.

11:32:28 23       Q.      for any of these individuals, would any of

11:32:31 24  them have decided not    and this is just    they

11:32:35 25  wouldn't have done it at all, but for the agreements?

11:32:38  1      A.   Yeah.  So this is kind of a version from a

11:32:40  2  different direction of the conversation we were having

11:32:42  3  earlier about the intensive versus extensive margin.

11:32:46  4           I think my answer is going to be similar, that

11:32:47  5  I can't rule out that but for these agreements the person

11:32:51  6  would have stayed on the board or in the advisory like

11:32:54  7  capacity, but it seems quite   quite plausible, and I

11:32:58  8  would    my   my opinion is probably likely or that

11:33:02  9  that it's likely that   that their degree of engagement

11:33:07 10  in interaction and helpfulness as board members or

11:33:11 11  advisors, fiduciary advisors, would have been dampened in

11:33:16 12  the absence of DNCC guidelines at Google.

11:33:21 13      Q.   Let me start with the first one, the first part

11:33:23 14  of this, which is whether it would have happened at all.

11:33:27 15           Paul Otellini's membership of the Google board

11:33:31 16  precedes the do not call agreement, correct?

11:33:34 17      A.   I believe it does, yes.

11:33:36 18      Q.   And does Paul Otellini continue to sit on the

11:33:40 19  Google board today?

11:33:41 20      A.   I don't know for sure.  I think he does, but I

11:33:44 21  don't know for sure.

11:33:45 22      Q.   He certainly sat after the agreements ended in

11:33:47 23  2009, correct?

11:33:48 24      A.   Yes.

11:33:48 25      Q.   Have you seen any evidence to suggest that he

11:33:50  1   became a less effective board member?  And this is

11:33:53  2   specific   specific evidence that Paul Otellini's

11:33:57  3   service on the Google board became less valuable to

11:34:02  4   Google after 2009.

11:34:04  5           MR. RUBIN:  Objection.  Form.

11:34:05  6           THE WITNESS:  I haven't seen evidence one way

11:34:07  7   or the other on this.  It is certainly conceivable,

11:34:11  8   because you've got to remember that the type of advice

11:34:14  9   that board members are going to be giving at any given

11:34:18  10  time is in part going to be predicated against

11:34:20  11  prospectively how will my advice be used?

11:34:24  12          So   so it seems quite plausible to me, though

11:34:28  13  I haven't seen a document to evidence   post 2009

11:34:32  14  evidence one way or the other that he has become more or

11:34:35  15  less effective on the Google board.

11:34:37  16  BY MR. HARVEY:

11:34:37  17      Q.   Okay.  And in Bill Campbell's case, he

11:34:40  18  continues to give advice to Google today, does he not?

11:34:43  19      A.   I believe he does.

11:34:44  20          MR. RUBIN:  Objection to form.

11:34:45  21          THE WITNESS:  Excuse me.  I believe he does.

11:34:47  22  BY MR. HARVEY:

11:34:47  23      Q.   And I believe in your report you say that when

11:34:49  24  Larry Page replaced Eric Schmidt as a CEO, he started

11:34:55  25  coaching, or continued in maybe a different way, coaching

11:34:59  1    Larry Page, correct?

11:34:59  2         A.   Yeah, I've seen documents consistent with that,

11:35:01  3    and it's reflected in my report.

11:35:04  4         Q.   Have you seen any evidence   this is the same

11:35:05  5    question, have you seen any evidence that Bill Campbell's

11:35:07  6    advice to Google has become less effective since 2009?

11:35:11  7              MR. RUBIN:  Objection to form.

11:35:11  8              THE WITNESS:  Again, I've not seen that

11:35:12  9    evidence.  It is a difficult thing to measure.  But given

11:35:17 10    that Campbell himself had   had been worried about the

11:35:22 11    migration out of Intuit, that would reasonably factor in

11:35:28 12    to the type of advice or the depth of advice or the

11:35:31 13    sensitivity of advice he might give to   to Mr. Schmidt

11:35:35 14    or Mr. Schmidt's successors.

11:35:37 15    BY MR. HARVEY:

11:35:37 16         Q.   But you haven't actually assessed that one way

11:35:39 17    or the other, have you?

11:35:40 18         A.   I have not tried to assess it quantitatively.

11:35:45 19         Q.   And you are aware, are you not, that Bill

11:35:48 20    Campbell is also on the board of Apple?

11:35:52 21         A.   Yes.

11:35:53 22         Q.   The same question.  Do you have any reason to

11:35:56 23    believe that Bill Campbell's advice or value on the Apple

11:36:02 24    board diminished after 2009 because the do not call

11:36:07 25    agreements were eliminated?

11:36:09  1      A.    And I think it would be the same answer.   I

11:36:11  2  would see reason why they    they might well, but I have

11:36:14  3  not done a quantitative assessment of that.

11:36:17  4      Q.    Okay.  And this    the argument you make about

11:36:23  5  the procompetitive benefits of kind of overlapping

11:36:26  6  boards, and I think in other places you refer to it as

11:36:29  7  corporate governance collaboration, is that relevant to

11:36:34  8  the agreement between Pixar and Lucasfilm?

11:36:37  9      A.    You know, I haven't studied the agreement

11:36:39  10  between Pixar and Lucasfilm in much depth, so I don't

11:36:45  11  haven't really rendered an opinion about that.  It is

11:36:48  12  relevant, I think, between the Intuit Google diad.

11:36:53  13      Q.    And there is no such overlapping board

11:36:56  14  relationship between Apple and Adobe, is there?

11:37:00  15      A.    I don't know one way or the other.

11:37:02  16      Q.    Okay.  In that section of your report,

11:37:48  17  beginning on page 5, I think it's part IV, you also

11:37:51  18  identify resolving conflicts of interest as a potential

11:37:55  19  benefit of do not call agreements, correct?

11:37:58  20      A.    Can you point me to where you are

11:38:01  21      Q.    And I'm discussing your    your argument

11:38:03  22  generally, I'm not trying to tie you to a specific

11:38:05  23  paragraph or anything.

11:38:06  24      A.    Okay.  I'm just trying to    yeah, I think you

11:38:17  25  are probably referring to the discussion that begins

11:38:19  1  around page 9.

11:38:29  2       Q.   So the question was, is it part of your opinion

11:38:34  3  that the do not call agreements resolved    excuse me

11:38:39  4  conflicts of interest between these    these individuals

11:38:45  5  who sat on another company's board and that company?

11:38:50  6       A.   So my    my opinion is that the DNCC guidelines

11:38:56  7  can be viewed as playing a role of helping to mediate

11:39:00  8  potential conflicts of interest in    in accordance with

11:39:03  9  good governance, principles, and applicable legal rules.

11:39:08  10      Q.   What are the conflicts of interest you had in

11:39:09  11  mind here?

11:39:10  12      A.   Well, one that we talked about a little earlier

11:39:13  13  is    is the so called corporate opportunity doctrine,

11:39:19  14  which concerns the obligations of a director who    who

11:39:27  15  has learned of or knows about a specific type of business

11:39:30  16  opportunity, that maybe    maybe is a fiduciary of    of

11:39:37  17  two firms, and is trying to figure out, do I alert both

11:39:42  18  firms to this business opportunity?  Do I allow both of

11:39:46  19  them to    to pursue the business opportunity?  Can I

11:39:54  20  have a set of ground rules which is pretty clear how this

11:39:58  21  category of situations is going to be handled?

11:40:01  22      Q.   Are there any other conflicts of interest you

11:40:03  23  have in mind here?

11:40:06  24      A.   Well, there    the    the    excuse me.

11:40:10  25           The corporate opportunity doctrine is a subset

11:46:05  1  paragraph 29, you cite to Delaware general corporate law,

11:46:10  2  Section 144, correct?

11:46:14  3       A.   Yes.

11:46:15  4       Q.   Okay.  And that section, to your understanding,

11:46:20  5  provides a guide in terms of how companies should resolve

11:46:24  6  such conflicts of interest?

11:46:25  7       A.   Uh huh.

11:46:26  8       Q.   And what   if these companies were to follow

11:46:31  9  Section 144, what would that process have been?

11:46:35  10      A.   So if there were a   a new business

11:46:38  11  opportunity that had arisen that   that   I'm going to

11:46:44  12  caveat this by the next section we're going to talk

11:46:48  13  about, because those two are related   that I think

11:46:51  14  we're going to talk about, a new   new business

11:46:53  15  opportunities is written.

11:46:56  16           Section 144 gives   gives rise to a process by

11:47:00  17  which a board can either authorize or approve, or the

11:47:03  18  board's delegee can authorize or approve, a   a   a

11:47:11  19  party to make a decision that has a conflict of interest

11:47:15  20  associated with it.

11:47:17  21      Q.   And so the   the member of the board with the

11:47:20  22  conflict presents the conflict to the board?

11:47:23  23      A.   That's typically the way it happens, though not

11:47:26  24  always.  There are devices by which   particularly in

11:47:30  25  the corporate opportunity sense, where the board or some

11:47:36  1   other delegee of the board may be able to reach a    an

11:47:42  2   advanced authorization.

11:47:45  3      Q.    Okay.   So either you make the presentation to

11:47:48  4   the board or you do something which is the functional

11:47:51  5   equivalent?

11:47:54  6      A.    Yeah, making a presentation to the board is

11:47:55  7   sort of dealing with the problem as it occurs.   Another

11:47:58  8   way to try to do that is to set ground rules that would

11:48:02  9   deal with the problem ahead of time.

11:48:06 10      Q.    And either way it is approved by the board,

11:48:08 11   correct?

11:48:08 12      A.    Typically it doesn't    the    there will be a

11:48:12 13   question about what sorts    whether the board has

11:48:15 14   delegated some of its powers to, you know, other board

11:48:18 15   members or corporate fiduciaries.

11:48:22 16      Q.    And if you're a board member and you have such

11:48:26 17   a conflict, do you also have a duty to inform the board

11:48:29 18   or some designated representative, of the conflict?

11:48:33 19      A.    It depends on whether one of these advanced

11:48:36 20   designations has been put into place.   If it has, then

11:48:41 21   then it would presumably identify a class or category of

11:48:46 22   business opportunities for which there is no obligation

11:48:48 23   to inform the board about the conflict.   And    and then

11:48:55 24   it would not be necessary to go forward with the    with,

11:48:59 25   you know    because it is essentially being

| | | |
|---|---|---|
| 11:49:02 | 1 | pre authorized. |
| 11:49:03 | 2 | Q.   Have you seen any evidence in this case that |
| 11:49:05 | 3 | the Google board made such an advanced designation to |
| 11:49:08 | 4 | deal with the conflicts of interest we have been talking |
| 11:49:11 | 5 | about? |
| 11:49:11 | 6 | A.   I haven't seen evidence that the board as a |
| 11:49:13 | 7 | whole made that   that designation one way or the other. |
| 11:49:16 | 8 | Q.   Have you seen any evidence that some authorized |
| 11:49:20 | 9 | or, you know, some smaller group of people authorized by |
| 11:49:24 | 10 | the board made such a decision? |
| 11:49:26 | 11 | A.   I haven't. The   the report says it would be |
| 11:49:28 | 12 | fully consistent with this sort of, but I haven't seen |
| 11:49:33 | 13 | evidence one way or the other on this. |
| 11:49:35 | 14 | Q.   Have you seen any evidence that the Intel board |
| 11:49:37 | 15 | made such a decision? |
| 11:49:38 | 16 | A.   I do no the believe I have. |
| 11:49:40 | 17 | Q.   Okay.  And I'm presuming, because you didn't |
| 11:49:42 | 18 | look at it, the same is true for the other companies. |
| 11:49:45 | 19 | A.   Correct. |
| 11:49:45 | 20 | Q.   Have you seen any evidence in this case that |
| 11:49:50 | 21 | Paul Otellini informed the board of Google that he had |
| 11:49:53 | 22 | the conflict of interest you identified? |
| 11:49:56 | 23 | A.   Well, in   in some ways, yes.  I think the |
| 11:49:58 | 24 | you know, the   the site person that he was complaining |
| 11:50:03 | 25 | about is almost saying, "Listen, you are putting me   by |

| | | |
|---|---|---|
| 11:50:09 | 1 | recruiting this person, you are putting me into a |
| 11:50:12 | 2 | conflict of interest." |
| 11:50:13 | 3 | Q.   That is Paul Otellini informing the board of |
| 11:50:16 | 4 | Google? |
| 11:50:17 | 5 | A.   Well, it is an email.  It is not directed |
| 11:50:19 | 6 | towards the board as a whole.  But    but there is a |
| 11:50:21 | 7 | complaint that is lodged by    by Otellini along these |
| 11:50:24 | 8 | very lines. |
| 11:50:25 | 9 | Q.   Have you seen any evidence to suggest that the |
| 11:50:27 | 10 | board of Google was aware of Paul Otellini's conflict and |
| 11:50:32 | 11 | then authorized some resolution of that conflict? |
| 11:50:35 | 12 | A.   Not one way or the other, no. |
| 11:50:39 | 13 | Q.   Are you aware that Bill Campbell informed the |
| 11:50:43 | 14 | board of Google that he was conflicted on this issue? |
| 11:50:47 | 15 | A.   I've not seen evidence one way or the other on |
| 11:50:49 | 16 | that. |
| 11:50:50 | 17 | Q.   Okay.  You cite to the Shona Brown deposition |
| 11:50:53 | 18 | in your materials considered, correct? |
| 11:50:55 | 19 | A.   I believe so, yes. |
| 11:50:57 | 20 | Q.   Do you recall reading her deposition where she |
| 11:50:59 | 21 | says that she can't recall a single example of conflicts |
| 11:51:03 | 22 | of interest with Bill Campbell ever coming up? |
| 11:51:09 | 23 | A.   It depends what one terms as a "conflict of |
| 11:51:12 | 24 | interest."  So the    it may be that was going through |
| 11:51:15 | 25 | I think I vaguely remember seeing this, but I'd have to |

11:51:19  1    see the text to be sure about the context.

11:51:22  2        Q.    Okay.  So let's move on to the next paragraph.

11:51:26  3    I think you want to get to it.

11:51:29  4            Let's see.  That is in reference to Delaware

11:51:34  5    general corporate law, Section 122 subsection 17.  Do you

11:51:41  6    see that?

11:51:42  7        A.    Yes.

11:51:42  8        Q.    And tell me if I have this right.  That section

11:51:46  9    reads:  "Renounce, in its certificate of incorporation or

11:51:52 10    by action of its board of directors, any interest or

11:51:56 11    expectancy of the corporation in, or in being offered an

11:52:01 12    opportunity to participate in, specified business

11:52:04 13    opportunities or a specified classes or categories of

11:52:07 14    business opportunities that are presented to the

11:52:08 15    corporation or one or more of its officers, directors, or

11:52:13 16    stockholders."  Is that the section you are citing to?

11:52:16 17        A.    I believe so, yes.  I'm not looking at it

11:52:18 18    myself, but

11:52:19 19        Q.    Sure.  Is there anything in that section I read

11:52:23 20    that, as you say here, quote, "particularly encourages

11:52:27 21    interlocking corporate boards to anticipate and establish

11:52:32 22    protocols to govern conflicts of interest"?

11:52:35 23        A.    So this was a    this was a section that is

11:52:37 24    relatively new.  It was, I think, promulgated in 2000, as

11:52:44 25    I recall, and it followed on the heels of a number of

| | | |
|---|---|---|
| 12:18:21 | 1 | of how many of these employees would have been required |
| 12:18:24 | 2 | in each one of these.  But one of the   one of the |
| 12:18:29 | 3 | issues here is that the nature of the repetitiveness of |
| 12:18:34 | 4 | these interactions is such that it might have been very |
| 12:18:37 | 5 | difficult to tell at all, other than there might be quite |
| 12:18:40 | 6 | a lot of them. |
| 12:18:42 | 7 | Q.  Okay.  And the same question as to all of |
| 12:18:47 | 8 | these, have you seen any evidence that expressly links |
| 12:18:50 | 9 | any of these individual collaborations to the   the |
| 12:18:56 | 10 | antisolicitation agreement between Google and Apple? |
| 12:18:59 | 11 | A.  So do you mean expressly links in terms of |
| 12:19:03 | 12 | inside a written instrument that might be called a |
| 12:19:06 | 13 | contract? |
| 12:19:07 | 14 | Q.  Yes. |
| 12:19:08 | 15 | A.  I have not seen that kind of express link. |
| 12:19:11 | 16 | Q.  Have you seen any other express link, such as |
| 12:19:14 | 17 | in deposition testimony? |
| 12:19:15 | 18 | A.  I believe that I have seen deposition testimony |
| 12:19:19 | 19 | that   by numerous parties saying that we were working |
| 12:19:24 | 20 | closely with them.  We wouldn't have worked as closely |
| 12:19:27 | 21 | if   if we thought that they were going to be poaching |
| 12:19:31 | 22 | our employees. |
| 12:19:34 | 23 | Q.  We certainly don't have time to go through all |
| 12:19:36 | 24 | of these, but I think |
| 12:19:38 | 25 | A.  I was getting excited. |

| | | |
|---|---|---|
| 12:19:40 | 1 | Q.   We will go through some of them. |
| 12:19:42 | 2 | A.   Okay. |
| 12:19:43 | 3 | MR. HARVEY:  All right.  I'm going to introduce |
| 12:19:46 | 4 | plaintiffs' Exhibit 2925, which for the record is Bates |
| 12:19:52 | 5 | stamped 231APPLE124988.  And I believe this is the one |
| 12:20:18 | 6 | you cite in footnote 36. |
| 12:20:21 | 7 | (Exhibit 2925 was marked for identification.) |
| 12:20:31 | 8 | THE WITNESS:  Let me just triangulate in here. |
| 12:21:06 | 9 | I think this is it, yeah. |
| 12:21:07 | 10 | BY MR. HARVEY: |
| 12:21:08 | 11 | Q.   If you could turn to page 2 of the document |
| 12:21:10 | 12 | A.   All right. |
| 12:21:13 | 13 | Q.   Well, first, I'm sorry.  Let me just for the |
| 12:21:15 | 14 | record describe it.  This document is entitled, "License |
| 12:21:18 | 15 | Agreement Between Google, Incorporated, and Apple |
| 12:21:22 | 16 | Computer, Incorporated," correct? |
| 12:21:24 | 17 | A.   Sorry.  Yes. |
| 12:21:29 | 18 | Q.   And in the recital section in the first page |
| 12:21:34 | 19 | I'm sorry, the first page I'm still there    it describes |
| 12:21:37 | 20 | that the purpose of this contract is at the parties' |
| 12:21:42 | 21 | desire to enter into an agreement to license certain |
| 12:21:45 | 22 | software from Google to Apple, correct? |
| 12:21:47 | 23 | A.   And where are you reading this? |
| 12:21:49 | 24 | Q.   Under the "Recitals" heading on the first page. |
| 12:21:52 | 25 | A.   Yes, "It is the Parties' desire to enter into |

| | | |
|---|---|---|
| 12:21:55 | 1 | an agreement to license their software, Google to Apple, |
| 12:21:57 | 2 | from source code form pursuant to the terms and |
| 12:22:00 | 3 | conditions set forth below." |
| 12:22:02 | 4 | Q.   Now, if you could turn to page 2 |
| 12:22:04 | 5 | A.   Yes. |
| 12:22:05 | 6 | Q.      there Section 1.9 |
| 12:22:08 | 7 | A.   Yes. |
| 12:22:09 | 8 | Q.      defines what the agreement takes |
| 12:22:11 | 9 | "confidential information" to mean, correct? |
| 12:22:14 | 10 | A.   Yes.  It looks like it is a definition of |
| 12:22:15 | 11 | "confidential information." |
| 12:22:17 | 12 | Q.   And this describes different forms of |
| 12:22:19 | 13 | intellectual property, correct? |
| 12:22:25 | 14 | A.   It may be broader than that, actually. |
| 12:22:27 | 15 | Q.   Sure.  But it includes it, correct? |
| 12:22:35 | 16 | A.   It probably includes it, yes. |
| 12:22:37 | 17 | Q.   And it also includes other forms of |
| 12:22:40 | 18 | confidential business information, such as in little |
| 12:22:44 | 19 | Roman ii, ██████████████████ correct? |
| 12:22:47 | 20 | A.   Yes. |
| 12:22:49 | 21 | Q.   Okay.  And if you could turn to page 14, there |
| 12:23:03 | 22 | in   all right.  There section 9 of the agreement is |
| 12:23:10 | 23 | entitled, "Confidentiality," correct? |
| 12:23:13 | 24 | A.   Yes. |
| 12:23:13 | 25 | Q.   And without getting into the details, |

Deposition of Eric L. Talley, J.D., Ph.D.          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
12:23:19   1    subsections 9.1 and 9.2 ████████████████████████
12:23:23   2    ████████████████████████████████████████████
12:23:27   3    ████████████████████████████
12:23:28   4         A.   So let's see.  ███████████████████████████████████
12:23:34   5    ██████████████████████████████████████████████
12:23:37   6    ████████████████
12:23:45   7         Q.   So is that a yes?
12:23:46   8         A.   Yes.  I just    I restated your question to be
12:23:48   9    accurate with the paragraph.
12:23:49  10         Q.   Okay.  And if you could turn to page 18
12:23:54  11         A.   Yes.
12:23:55  12         Q.      and Section 13.12, there is that ████████████
12:24:00  13    ████████████████████████ isn't there?
12:24:05  14         A.   Yes.  There is another ████████████████ on    in
12:24:09  15    13.12.
12:24:11  16         Q.   Okay.  And you've    presumably you've reviewed
12:24:19  17    this document before citing to it, if you need to read
12:24:24  18    through the whole thing, let me know, but anywhere in
12:24:27  19    this contract does it mention the antisolicitation
12:24:30  20    agreements at issue in this case?
12:24:35  21         A.   So this is a very long document.  I    as I sit
12:24:38  22    here, I don't believe that it mentions them.  But once
12:24:41  23    again, this may be similar to our Apple Google
12:24:45  24    non disclosure agreement that we discussed in
12:24:48  25    Exhibit 2924, that    that there is a question about what
```

Deposition of Eric L. Talley, J.D., Ph.D.          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 12:24:56 | 1 | would be naturally included in this document, and if a |
| 12:25:01 | 2 | an agreement that was already a background understanding |
| 12:25:05 | 3 | or agreement was there, it may not be naturally included |
| 12:25:10 | 4 | in this document. |
| 12:25:11 | 5 | Q.   And, in fact, it is prohibited by section |
| 12:25:14 | 6 | 13.12, isn't it? |
| 12:25:17 | 7 | A.   What is prohibited? |
| 12:25:18 | 8 | Q.   That some    some understanding    some oral |
| 12:25:24 | 9 | prior or contemporaneous understanding is incorporated as |
| 12:25:28 | 10 | part of this agreement. |
| 12:25:29 | 11 | A.   Well, there    there are two caveats to that. |
| 12:25:34 | 12 | One is    is that under usual rules of interpretation in |
| 12:25:42 | 13 | contracts, if something would not be naturally included, |
| 12:25:45 | 14 | then this    this may not be deemed a fully integrated |
| 12:25:48 | 15 | agreement, even with a merger clause within it. |
| 12:25:53 | 16 | Second, the    the interpretation of use or |
| 12:25:59 | 17 | prohibitions may be informed by the existence of other |
| 12:26:05 | 18 | agreements as well, including prior or contemporaneous |
| 12:26:11 | 19 | written or oral agreements. |
| 12:26:13 | 20 | This is, I believe, I can't be sure, I believe |
| 12:26:19 | 21 | this is a contract that is at least executed in |
| 12:26:22 | 22 | California, and it may have a choice of law provision, |
| 12:26:27 | 23 | but I have to read through it to find it. |
| 12:26:31 | 24 | And    yes, there it is, 13.4, ███████████ |
| 12:26:42 | 25 | ███████████████████████████████████ |

Deposition of Eric L. Talley, J.D., Ph.D.                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
12:26:47  1  ████████████████████████████████████████
12:26:49  2  ███████████████████  et cetera, et cetera.
12:26:52  3          So    so there is a choice of law provision
12:26:55  4  that puts it in██████████ as well.  ████████████ has been
12:26:58  5  particularly open to the inclusion of extraneous or parol
12:27:07  6  evidence for purposes of interpretation since 1969 in a
12:27:13  7  case that you might remember, PG&E vs. Thomas Drayage, a
12:27:19  8  lovely case.
12:27:28  9      Q.   Is it your opinion that the two individuals who
12:27:30 10  signed this contract, Phil Schiller at Apple and Marissa
12:27:35 11  Mayer at Google, didn't know what they were doing when
12:27:38 12  they signed the agreement?
12:27:40 13          MR. RUBIN:  Objection.  Form.
12:27:42 14          THE WITNESS:  I have no basis to know whether
12:27:44 15  they knew what they were doing or did not know what they
12:27:47 16  were doing.  They are both fairly well known people.
12:27:51 17  BY MR. HARVEY:
12:28:00 18      Q.   I'm happy to go through some of the other
12:28:02 19  examples, unless we can short circuit it.
12:28:05 20      A.   Okay.
12:28:06 21      Q.   Do you have any reason, sitting here today, why
12:28:08 22  your answers would be different for any of the other
12:28:11 23  contracts you cite to in this section, in terms of the
12:28:14 24  you know, the substantive sections I pointed to you in
12:28:17 25  this contract?
```

12:28:17   1         A.    Yeah.   I think I understand the nature of the

12:28:19   2    question.   I    I think we may be able to short circuit.

12:28:22   3    I believe my answers would be consistent with this.   They

12:28:25   4    may be varied in nuance ways, but as I sit here today, I

12:28:30   5    suspect they would be consistent.   There's obviously some

12:28:33   6    inexactitude to that expectation, but I believe they

12:28:37   7    would be.

12:28:39   8         Q.    Okay.   I think I will skip it.

12:28:48   9              For these contracts, Google and Apple thought

12:28:51  10    it worthwhile to sit down and hash out the language in

12:28:54  11    those contracts, correct?

12:28:55  12         A.    Probably

12:28:58  13              MR. RUBIN:   Objection.   Form.

12:28:59  14              THE WITNESS:   Excuse me.   Someone hashed these

12:29:01  15    out.   They may be drawn from earlier examples, but there

12:29:05  16    clearly seems to be some indication people thought these

12:29:08  17    collaborations were worthwhile proceeding and

12:29:12  18    memorializing.

12:29:13  19    BY MR. HARVEY:

12:29:13  20         Q.    And someone considered the issue of

12:29:15  21    confidentiality and creative provisions to address that

12:29:18  22    concern, correct?

12:29:19  23         A.    There are some provisions in here that reflect

12:29:22  24    issues of confidentiality.

12:29:25  25         Q.    Is it your opinion that these collaborations

| | | |
|---|---|---|
| 12:29:28 | 1 | were so worthless that they would not have been worth |
| 12:29:31 | 2 | doing if they needed a lawyer to spend another two |
| 12:29:35 | 3 | minutes inserting language regarding the antisolicitation |
| 12:29:38 | 4 | agreements? |
| 12:29:39 | 5 | MR. RUBIN:  Objection.  Form. |
| 12:29:40 | 6 | THE WITNESS:  So once again this will go back |
| 12:29:43 | 7 | to an earlier discussion that   that you and I were |
| 12:29:45 | 8 | having, Mr. Harvey, that I don't have an opinion about |
| 12:29:48 | 9 | whether they would be worthless.  There may still be some |
| 12:29:51 | 10 | worth to these collaborations.  The depth, intensity, and |
| 12:29:57 | 11 | value created by them may well, and I   I believe |
| 12:30:01 | 12 | probably would be lower, or it's at least a plausible |
| 12:30:06 | 13 | business judgment that they would be lower if the fear in |
| 12:30:09 | 14 | sharing confidential information were accompanied by a |
| 12:30:12 | 15 | fear that your co venturer, your counter party is going |
| 12:30:18 | 16 | to solicit the very employees that you make available to |
| 12:30:21 | 17 | them. |
| 12:30:22 | 18 | BY MR. HARVEY: |
| 12:30:23 | 19 | Q.   In drafting those contracts, why, in your view, |
| 12:30:25 | 20 | didn't they have a paragraph talking about a |
| 12:30:28 | 21 | non solicitation? |
| 12:30:32 | 22 | MR. RUBIN:  Objection to form. |
| 12:30:33 | 23 | THE WITNESS:  Well, one of the reasons, as I |
| 12:30:35 | 24 | mentioned earlier and I think we discussed, that in sort |
| 12:30:37 | 25 | of a relational contracting scenario, the   the |

| | | |
|---|---|---|
| 13:26:59 | 1 | narrowly tailored, I    it seems plausible to me that you |
| 13:27:03 | 2 | could identify them.  If the scope is larger, and in |
| 13:27:07 | 3 | Mr. Campbell's case, one of the difficult issues is that |
| 13:27:10 | 4 | Mr. Campbell was acting as a very senior advisor to the |
| 13:27:15 | 5 | CEO of Google, then that would be a different objective |
| 13:27:20 | 6 | of the collaboration. |
| 13:27:23 | 7 | Q.   But Google's    I'm sorry. |
| 13:27:25 | 8 | But Mr. Campbell's advice to Google began long |
| 13:27:28 | 9 | before the conspiracy in this case, correct, and that's |
| 13:27:32 | 10 | long before 2005? |
| 13:27:35 | 11 | MR. RUBIN:  Objection.  Form. |
| 13:27:36 | 12 | THE WITNESS:  I believe that Mr. Campbell's |
| 13:27:37 | 13 | relationship to Google and its CEO predated when it is |
| 13:27:43 | 14 | alleged that    that Intuit became    appeared    began |
| 13:27:48 | 15 | to appear on the DNCC list at Google as a general matter. |
| 13:27:54 | 16 | BY MR. HARVEY: |
| 13:27:54 | 17 | Q.   So when Google and Intuit were identifying the |
| 13:27:58 | 18 | individuals that they listed, this occurred during Bill |
| 13:28:03 | 19 | Campbell's advice to Google, but before Intuit was added |
| 13:28:09 | 20 | to Google's do not call list, correct? |
| 13:28:12 | 21 | MR. RUBIN:  Objection.  Form. |
| 13:28:13 | 22 | THE WITNESS:  Can you repeat the question? |
| 13:28:30 | 23 | (Record was read as follows:  "QUESTION:  So |
| 13:28:30 | 24 | when Google and Intuit were identifying the individuals |
| 13:28:30 | 25 | that they listed, this occurred during Bill Campbell's |

13:28:30   1   advice to Google, but before Intuit was added to Google's

13:28:30   2   do not call list, correct?")

13:28:30   3          THE WITNESS:  So I understand that    that they

13:28:33   4   may have the identification of this group 15, 18, 20

13:28:38   5   people before the    the general addition on    on

13:28:42   6   Google's do not call list; that Mr. Campbell was engaged

13:28:48   7   in this advice contemporaneously.  I don't have the exact

13:28:52   8   dates of the    of those two, but I think they are both

13:29:01   9   going on before Intuit was added to the general

13:29:06  10   do not call list.

13:29:07  11   BY MR. HARVEY:

13:29:07  12      Q.   Did you study Google's attempt to enter into an

13:29:10  13   agreement with Facebook?

13:29:12  14      A.   I did see some emails along those    those

13:29:15  15   lines, yes.  I don't know if it was an attempt to enter

13:29:23  16   an agreement.  I saw emails between Google and Facebook.

13:29:27  17      Q.   Did you see the email in which Bill Campbell

13:29:29  18   tells people at Google to go seek a truce with Facebook

13:29:33  19   with respect to recruiting and hiring?

13:29:41  20      A.   I think I may have seen that, yes.

13:29:43  21      Q.   At that time, had you identified any actual or

13:29:47  22   potential collaborations that existed between Google and

13:29:51  23   Facebook?

13:29:52  24      A.   I did not identify any.  I don't believe that

13:29:57  25   Facebook ever ended up on Google's do not call list.

| | | |
|---|---|---|
| 13:30:03 | 1 | Q.   And that's because Facebook declined Google's |
| 13:30:05 | 2 | request, correct? |
| 13:30:08 | 3 | MR. RUBIN:  Objection.  Form. |
| 13:30:09 | 4 | THE WITNESS:  I did see some email exchanges, I |
| 13:30:13 | 5 | believe, involving Sheryl Sandberg once she had arrived |
| 13:30:18 | 6 | at Google   excuse me   at Facebook, and   and they |
| 13:30:24 | 7 | were related to   to the recruitment of employees. |
| 13:30:32 | 8 | There were some references to possible collaborations, |
| 13:30:36 | 9 | but I don't believe I saw evidence that any of them came |
| 13:30:39 | 10 | to fruition. |
| 13:30:42 | 11 | BY MR. HARVEY: |
| 13:30:43 | 12 | Q.   Sitting here today, do you recall any possible |
| 13:30:46 | 13 | collaborations |
| 13:30:47 | 14 | MR. RUBIN:  Objection |
| 13:30:47 | 15 | MR. HARVEY:   that they were discussing at |
| 13:30:48 | 16 | the time? |
| 13:30:49 | 17 | MR. RUBIN:  Sorry.  Objection.  Form. |
| 13:30:50 | 18 | THE WITNESS:  I   I can't recall specifically, |
| 13:30:52 | 19 | but I believe there was some general discussion in the |
| 13:30:55 | 20 | email.  I'd have to look at the email to be |
| 13:30:59 | 21 | BY MR. HARVEY: |
| 13:31:12 | 22 | Q.   You did not review the Deposition of Jonathan |
| 13:31:14 | 23 | Rosenberg, correct? |
| 13:31:16 | 24 | A.   I don't believe so.  The depositions I reviewed |
| 13:31:18 | 25 | are on the |

13:31:19   1        Q.   Yeah, I'm looking at them, too.

13:31:21   2        A.   Yeah.

13:31:22   3        Q.   Did you review the declaration of Sheryl

13:31:24   4   Sandberg?  It is not listed in the declaration category.

13:31:31   5        A.   I don't believe I did review that, yes.

13:31:34   6        Q.   Was there an overlapping board member between

13:31:36   7   Google and Facebook at the time?

13:31:40   8        A.   I am not certain.  I don't know.

13:31:42   9        Q.   You don't know either way?

13:31:43  10        A.   I don't know either way.

13:31:44  11        Q.   Was there an individual like Bill Campbell who

13:31:47  12   operated as sort of a    kind of a de facto board member?

13:31:50  13        A.   I don't believe so, but I'm not sure.

13:31:55  14             MR. HARVEY:  Why don't we go off the record.

13:31:58  15             THE VIDEOGRAPHER:  We are now off the record at

13:31:59  16   4:31 p.m.

13:32:00  17             (Recess was taken.)

13:41:53  18             THE VIDEOGRAPHER:  This is Tape 7 of the

13:41:54  19   Deposition of Dr. Eric Talley.  We are now on the record

13:41:57  20   at 4:41 p.m.

13:41:59  21   BY MR. HARVEY:

13:42:00  22        Q.   Dr. Talley, could you please turn to page 26

13:42:06  23   and look to paragraph 69.

13:42:10  24        A.   Yes.

13:42:11  25        Q.   There you say in the last sentence, "For

13:42:15   1   example, although the Google Intuit DNCC was first

13:42:20   2   introduced in connection with the QuickBooks

13:42:23   3   collaboration, it was expanded to all Intuit employees

13:42:27   4   not because of a technical project, but because of a

13:42:29   5   corporate governance collaboration with Mr. Campbell."

13:42:32   6           Do you see that?

13:42:33   7       A.   Yes, I do see that.

13:42:35   8       Q.   And the support you cite for that proposition

13:42:38   9   is footnote 97, correct?

13:42:40   10      A.   Yes, it appears so.

13:42:42   11      Q.   And that's an email from a Jay Sims to others,

13:42:46   12   correct?

13:42:46   13      A.   Yes, it appears so, yes.

13:42:48   14      Q.   Do you know who these individuals are in the

13:42:50   15   email?

13:42:51   16      A.   I can't recall offhand.  I think I did a little

13:42:56   17   bit of diligence in who they were at the time, but I

13:42:58   18   can't recall who they were right now.

13:43:00   19      Q.   Do you recall roughly?  I mean were these

13:43:02   20   employees of Intuit or were they someone else?

13:43:05   21      A.   You know, I can't remember, I'm sorry.

13:43:08   22      Q.   Would it surprise you to learn that J. Sims was

13:43:10   23   an attorney for Intuit, and this is a document drafted by

13:43:13   24   Intuit's lawyers sent to attorneys at the Antitrust

13:43:16   25   Division of the Department of Justice?

14:16:59   1   BY MR. HARVEY:

14:17:00   2       Q.   These defendants entered into agreements not to

14:17:02   3   recruit each other's employees, correct?

14:17:05   4            MR. RUBIN:  Objection.  Form.

14:17:06   5            THE WITNESS:  As I said earlier, the report

14:17:08   6   stipulates arguendo that these were agreements, but once

14:17:13   7   again, understand that to be in dispute.

14:17:16   8   BY MR. HARVEY:

14:17:17   9       Q.   So aggregating the defendants in this case,

14:17:21  10   what's artificial about that?

14:17:25  11       A.   A couple of things.  First of all, the

14:17:27  12   directionality of the   of the alleged do not cold call

14:17:29  13   agreements seem not to be   not to be the same across

14:17:34  14   defendants.  As we discussed earlier, the Intuit   the

14:17:37  15   alleged Intuit Google do not call   cold call agreement

14:17:42  16   appears to be one way.

14:17:43  17            Second, if one were to place the seven

14:17:47  18   defendants, you know, in a   in a circle and try

14:17:50  19   and   and get a sense of, you know, where the alleged

14:17:54  20   agreements were, you would not fill out every possible

14:17:59  21   line of that circle.  They   they   not everyone is

14:18:02  22   connected to everyone else.  Indeed, Google itself

14:18:06  23   appears only connected to three of the remaining six

14:18:10  24   six companies by the allegations of the Plaintiffs.

14:18:14  25            So   so I guess that's the sense in which I

14:18:18  1  was, you know, thinking, well, these are not necessarily

14:18:22  2  the same sets of agreements.

14:18:25  3       Q.   Okay.  But you didn't study the agreements that

14:18:29  4  did not have Google as a party, correct?

14:18:31  5       A.   I did not focus on those agreements.

14:18:33  6       Q.   Okay.  In the third full sentence on page 20,

14:18:40  7  you say, "Two companies can be both," quote, "high tech,"

14:18:45  8  unquote, "and yet have no employees with overlapping

14:18:49  9  technical skills."  Do you see that?

14:18:51  10      A.   Yes.

14:18:52  11      Q.   Is it your testimony that any two companies in

14:18:56  12  this case that are party to a no cold calling agreement

14:19:00  13  had no employees with overlapping technical skills?

14:19:04  14           MR. RUBIN:  Objection.  Form.

14:19:05  15           THE WITNESS:  No, I don't think that's my

14:19:06  16  testimony.  No.  It's   is this a statement of

14:19:09  17  possibility.

14:19:10  18  BY MR. HARVEY:

14:19:10  19      Q.   Okay.  And what you do in Table 1, these are

14:19:15  20  codes for products, correct?  These are codes concerning

14:19:20  21  what these companies are selling.

14:19:23  22      A.   The way that industrial sectors are    are

14:19:27  23  usually organized is through what sort of products are

14:19:31  24  they   are they selling?

14:19:34  25           So that may not be all of what goes into it,

14:19:37  1    but that is the predominant determination.

14:19:41  2          The companies self report that in their SEC

14:19:47  3    findings, and so one measure that   that I examined is

14:19:51  4    what the companies say in their SEC filings; and the

14:19:53  5    other one is the data provider that I used for some of

14:19:57  6    the data I used in the report rolls up a little bit more

14:20:01  7    fulsomely these   these industrial codes, and tries to

14:20:06  8    get at larger scope.  You sort of   when you fill out an

14:20:11  9    SEC filing, you just have to fill out one of these SIC

14:20:15  10   forms.  So I took two measures of it.

14:20:35  11       Q.   So you didn't attempt to look at documents

14:20:37  12   produced in the case to determine whether the defendants

14:20:40  13   consider themselves to be competitors for employees,

14:20:43  14   correct, such as evidence concerning salary budgets, you

14:20:51  15   know, comparing their own salary budgets against the

14:20:54  16   salary budgets of the codefendants.

14:20:57  17            MR. RUBIN:  Objection.  Form.

14:20:58  18            THE WITNESS:  Well, one thing that I did do in

14:20:59  19   the report, I don't know if this will answer your

14:21:02  20   question, is to   to get a sense of if we were to

14:21:06  21   include   if we were to assume these were all

14:21:09  22   competitors for the same employees, then it would be

14:21:12  23   reasonable to assume that   that all other companies,

14:21:17  24   and I think I limit it to Bay Area companies with more

14:21:21  25   than a thousand employees, also would be within the

1          I, Rosalie A. Kramm, Certified Shorthand

2    Reporter licensed in the State of California, License No.

3    5469, hereby certify that the deponent was by me first

4    duly sworn and the foregoing testimony was reported by me

5    and was thereafter transcribed with computer aided

6    transcription; that the foregoing is a full, complete,

7    and true record of said proceedings.

8          I further certify that I am not of counsel or

9    attorney for either of any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12         The dismantling, unsealing, or unbinding of the

13   original transcript will render the reporter's

14   certificates null and void.

15         In witness whereof, I have hereunto set my hand

16   this day:   December 19, 2013.

17         ___X____ Reading and Signing was requested.

18         _____ Reading and Signing was waived.

19         _____ Reading and signing was not requested.

20

21                       _____

22                       ROSALIE A. KRAMM

23                       CSR 5469, RPR, CRR

24

25