# Expert Report of
# Eric Talley, Ph.D

# (Nov. 25, 2013)

# *Cisneros Exhibit 8*

# REDACTED VERSION

**Highly Confidential**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

| | |
|---|---|
| IN RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Master Docket No. 11-CV-2509-LHK |

# Expert Report of Eric Talley

# November 25, 2013

**Highly Confidential**

# Table of Contents

I.    Qualifications ................................................................................................ 1

II.   Assignment and Materials Reviewed .......................................................... 2

III.  Summary of Opinions ................................................................................. 4

IV.   Efficiency-Enhancing Benefits of Overlapping Boards, Executive Networking, and DNCCs ................................................................................. 5

    A.   Overview of Potential Benefits Associated with Overlapping Boards and Other Networking among Executives and Directors .................................. 5

        1.   Overlapping Boards Are Not Uncommon .................................. 6

        2.   Overlapping Boards Can Serve Efficiency-Enhancing Purposes .............. 7

    B.   DNCCs Can Serve Efficiency-Enhancing Purposes By Setting Ground Rules for Cooperative Endeavors ............................................................. 8

        1.   DNCC as a Governance Tool to Address Potential Conflicts of Interest ... 9

        2.   DNCCs as Part of a Broader System of Ground Rules to Facilitate an Environment of Collaboration .............................................. 11

        3.   DNCCs as a Tool to Enhance Intellectual Property Protection ............... 12

V.    Google's Use of DNCCs Appears Consistent with Efficiency-Enhancing Purposes ....... 13

        1.   Google-Apple DNCC is Consistent with Efficiency-Enhancing Purposes .. ................................................................................ 13

        2.   Google-Intel DNCC Is Consistent with Efficiency-Enhancing Purposes. 15

        3.   Google-Intuit DNCC is Consistent with Efficiency-Enhancing Purposes 17

VI.   Plaintiffs Ignore Additional Facts Regarding the Nature of the DNCCs at Issue That Are Inconsistent with Their Alleged Anticompetitive Purpose ............................... 18

    A.   DNCCs Covered a Small Subset of Google's Recruiting Targets ........................ 19

    B.   Google Did Not Necessarily Seek No-Calling Reciprocity ................................. 21

    C.   Google's DNCC List Was One of Three Lists Within a Policy Document Addressing Google's Recruiting and Hiring Policies ........................................ 22

    D.   Google's DNCC List Was Varied and Dynamic ................................................. 23

VII.  Analysis of Marx Report ............................................................................ 24

    A.   Professor Marx Ignores Potential Procompetitive Purposes of DNCCs .............. 25

        1.   No One-to-One Correspondence between Technical Collaboration and DNCCs ........................................................................ 25

        2.   Professor Marx's View of "Collaboration" Is Artificially Narrow .......... 26

**Highly Confidential**

B.      Professor Marx Ignores Potential Efficiency-Enhancing Purposes of Overlapping Boards ........................................................................................................................ 27

C.      Professor Marx's Comparison of DNCCs and Non-Compete Agreements is Flawed and Misleading ...................................................................................................... 29

**Highly Confidential**

## I.      Qualifications

1.      I am a Professor of Law at the University of California, Berkeley, School of Law, where I hold the Rosalinde and Arthur Gilbert Endowed Chair in Law, Business, and the Economy.  I have been a professor at UC Berkeley (with tenure) since July 2006.  Prior to July 2006, I was the Ivadelle and Theodore Johnson Professor of Law and Business at the University of Southern California, where I held dual appointments in the Gould School of Law (with tenure) and the Marshall School of Business (Finance and Business Economics group).

2.      Since 2005, I have served as Faculty Co-Director of the Berkeley Center in Law, Business, and the Economy, at UC Berkeley.  From 2001 until 2004, I served as director of the USC Center in Law, Economics, and Organization, a multidisciplinary research group organized across three university departments (law, business, and economics).  Also from 2001 to 2004, I directed the USC/Caltech Olin Center for the Study of Law and Rational Choice, a collaborative research group between USC Law School and the Humanities and Social Sciences department at the California Institute of Technology.  I received a Ph. D. in Economics and a J.D. from Stanford University.

3.      In addition to my permanent academic positions, I have held visiting teaching appointments or lectureships at the California Institute of Technology, Harvard, University of Chicago, UC Berkeley, Georgetown, the University of Miami, the University of Sydney (Australia), the RAND Graduate School, the Interdisciplinary Center (Israel), and Stanford University.

4.      Simultaneous with much of my service at UC Berkeley and USC, I also held the position of Senior Economist (Affiliated Adjunct) at the RAND Corporation, Santa Monica, CA.  At RAND, I conducted research on the effects of various types of corporate and business litigation, including projects related to contract design, securities fraud, securities regulation, the legal and accounting professions, civil justice, business ethics, corporate culture, and private class actions.

5.      I have also previously served as Chair of the American Association of Law Schools (AALS) section on Contracts, as Chair of the AALS section on Law and Economics, and as an elected board member for the American Law and Economics Association (ALEA), the leading academic association in the world of law and economics scholars.  Currently, I serve as an elected board member for the Society of Empirical Legal Studies (SELS), the leading academic

Highly Confidential

association in the world of empirical legal scholars.  I also currently serve as President of SELS, through November 2014.

6.      Over the course of my career, I have taught numerous courses in corporate law, corporate finance, mergers and acquisitions, contracts, corporate governance, economic analysis of law, statistics, business ethics, law and economics, behavioral law and economics, and game theory. Many of these areas focus on questions pertaining to industrial organization, information economics and compensation practices.  I have conducted research and published articles in each of these fields, including numerous published articles in refereed journals, law reviews, and edited volumes.  I also am a referee for a number of journals both in law and economics and economics proper.  My resume is attached in Appendix A.  It includes a list of my publications, speaking engagements, refereeing experience, and previous expert testimony.

7.      With respect to this matter, I am being compensated at my usual rate of $650 per hour. My compensation is not contingent upon my opinions or on the outcome of this matter.  Staff of Cornerstone Research, a consulting firm, performed research and provided other assistance to me in this matter; they were working under my direction.


## II.      Assignment and Materials Reviewed

8.      I understand the Plaintiffs in this case to be a class of approximately 60,000 current or former employees of seven companies (Adobe, Apple, Google, Intel, Intuit, Lucasfilm, and Pixar, collectively "Defendants") who allege that Defendants entered into a conspiracy of anticompetitive conduct with the intent to suppress wages in "high-tech" labor markets by refraining from making recruiting cold calls to each other's employees pursuant to a series of "do not cold call" agreements ("DNCC agreements" or "DNCCs").  The anticompetitive conduct is alleged to have occurred "[b]etween approximately 2005 and 2009."[1]  In support of their assertions, Plaintiffs offer the testimony of Professor Matthew Marx.[2]  Professor Marx repeats Plaintiffs' allegations by asserting that the intent of the DNCCs was to suppress wages in "high-tech" labor markets, that this conspiracy was facilitated by Defendants' overlapping board

---

[1] Order Granting Plaintiffs' Supplemental Motion for Class Certification ("Class Certification Order"), 10/24/13, p. 4.
[2] Expert Report of Matthew Marx ("Marx Report"), 10/28/13.

memberships, and that the conduct in question resulted in an adverse impact upon "high-tech" labor markets.[3]

9.      In response to Plaintiffs' assertions, Counsel for Defendant Google, Inc. ("Google") asked me to address the following issues:

- Whether overlapping boards and other analogous close relationships between senior corporate officers can serve efficiency-enhancing purposes in contexts like those encountered in the pending matter;
- Whether formal or informal DNCCs can serve efficiency-enhancing purposes in contexts like those presented by the pending matter; and
- Whether Google's DNCC agreements,[4] viewed in the light of all the background facts and circumstances as I understand them, appear more consistent with efficiency-enhancing purposes than with anticompetitive purposes.

10.      In addition, I was asked to review the opinions offered by Professor Marx.  Specifically, I was asked to evaluate whether the Marx Report provides a principled economic analysis using commonly accepted methodology of relevant economic issues at issue in this matter, including

- The purported limits and the potential benefits of DNCCs, and
- The analogy Marx draws between DNCCs and non-compete agreements.

11.      In preparation for this report and in forming my opinions, I have reviewed legal pleadings, various internal documents of Defendants provided by counsel, documents cited in the

---

[3] Marx Report, ¶6.

[4] For purposes of this report I am assuming that the alleged DNCC conduct between Google-Apple, Google-Intel and Google-Intuit were the product of "agreements" ("Google's DNCC agreements"), although I understand this may still be a disputed issue.  Further, Plaintiffs appear to be alleging that the Google-Intuit no cold-call agreement was one directional, with only Google agreeing not to cold call Intuit employees, but no agreement prohibiting Intuit from calling into Google.  See Plaintiffs' Motion for Class Certification, 10/1/12, p. 13 (alleging only that Bill Campbell "insisted that Google agree not to recruit Intuit employees");  and Plaintiffs' Motion for Class Certification, 5/10/13, p. 9 (alleging only that "Mr. Campbell 'requested that Intuit be added fully to the Do Not Call list'" and that "Google agreed to Mr. Campbell's request").  This is consistent with my review of the evidence.  See Deposition of William Campbell ("Campbell Deposition"), 10/24/13, p. 32:22-24 ("Q. So as far as you were concerned, Intuit was free to raid Google employees as much as it wanted?  A. Correct. Not likely, but correct.").  See E-mail from B. Campbell, S. Brown, and A. Geshuri, 6/7/07 (GOOG-HIGH TECH-00056885-6).

Highly Confidential

Marx Report, depositions, academic literature, and third-party data. The list of materials I have reviewed and relied upon is attached in Appendix B.

## III.    Summary of Opinions

12.    A summary of my opinions is as follows.

- Overlapping boards and other inter-company relationships between directors and senior executives are not unusual, and they can serve pro-competitive, efficiency-enhancing purposes by (for example) inculcating and diffusing best practices of corporate governance, facilitating efficient collaboration across multiple fronts, and improving overall corporate operations. See Section IV.A.

- In high-tech industries where collaboration (regardless of form) is frequent and dynamic, operating efficiency is enhanced by establishing a facilitating set of clear, easy to follow ground rules to frame collaborative effort. These ground rules might take the form of a wide array of short- and long-term policies and agreements that lay out the basis for exchanging information, sharing intellectual property, giving advice, and investing in human and other forms of capital. A DNCC agreement can be a simple, low-cost tool to foster and facilitate a general environment of broad collaboration between firms in technical, operating, governance, and other arenas. In particular, DNCCs are part of the set of transparent ground rules that can facilitate beneficial networking between the boards and senior executives—which otherwise would be vulnerable to conflicts of interest. See Section IV.B.

- The evidence I reviewed regarding the circumstances of Google's DNCC agreements and its "do not cold-call" list ("DNCC List") generally provides tangible examples of the efficiency-enhancing benefits DNCCs can achieve, and these agreements appear more consistent with an effort to pursue those benefits than with an anticompetitive purpose. See Section V and VI.

Highly Confidential

- Professor Marx is mistaken that DNCCs can have a pro-competitive purpose only when narrowly limited to a specific set of employees involved in a specific technical collaboration.  See Section VI.A.

- Professor Marx artificially limits the context in which DNCCs can arise, and as a consequence, his conclusions are unsupported by logic or evidence.  His analysis, moreover, fails to account for the particular benefits of board and executive overlap that were facilitated by Google's DNCC agreements.  See Section VII.B.

- Professor Marx's attempt to draw an analogy between DNCCs and non-compete agreements is inapposite, flawed and unconvincing.  Although DNCCs and non-competes share some beneficial effects (such as the protection of intellectual property), DNCCs do not constrain employee mobility in the way Professor Marx ascribes to non-competes in his research.  See Section VII.C.

## IV.    Efficiency-Enhancing Benefits of Overlapping Boards, Executive Networking, and DNCCs

### A.    Overview of Potential Benefits Associated with Overlapping Boards and Other Networking among Executives and Directors

13.    Plaintiffs' conspiracy claims appear to focus on the fact that various Defendant companies had board members who also served on boards of other Defendant companies, or alternatively had some analogous fiduciary role in other Defendant companies.  Plaintiffs imply that this sort of interrelatedness between corporate entities is anomalous, and was either deliberately created or directly permitted by Defendants to effectuate DNCCs with the goal of suppressing compensation.  Yet, Plaintiffs either ignore or intentionally avoid the economic reality that overlapping corporate boards and analogous relationships are not uncommon in industry today, and that these relationships can catalyze gains that are consistent with efficiency-enhancing purposes.

14.    As documented below, a growing body of research finds that structural overlaps between fiduciaries of different firms, as well as other interrelated personnel appointments and activities, are not uncommon in today's business landscape, nor is this type of interrelated activity unusual

Highly Confidential

in the Silicon Valley (Section 1 below).  The literature also suggests that this type of interrelated activity can lead to value creation, promote efficiency gains, and foster innovation and greater collaboration for parties involved (Section 2).  Thus, scholarly, scientific research provides evidence that interrelated activity among officers and directors can be consistent with efficiency-enhancing purposes, rather than with anti-competitive purposes.

## 1.    Overlapping Boards Are Not Uncommon

15.    Overlapping board membership is not unusual among large companies.  A study by Larcker, So, and Wang (2013) of a sample of more than 6,000 U.S. firms over an eight-year period found that on average, 72% of the companies in the sample had at least one board member concurrently serving on the board of another firm in the sample; and that the average (median) firm within their sample shares board members with approximately five (three) other companies.[5]  Similarly, Bouwman (2011) reports that the average director of a Forbes 500 firm holds three directorships, and that directors at the largest firms tend to hold the highest number of directorships.[6]

16.    In many cases, outside directors also serve on multiple committees inside the firm.[7]  In those cases, as a result, directors would not only owe fiduciary duties to multiple companies by virtue of their multiple board service, but they would also be actively involved in various internal operations of more than one company.  One study found that directors that serve on multiple boards in public companies participate in 1.7 committees on average.[8]

17.    The phenomenon of board overlap appears to carry over to Silicon Valley firms.  To evaluate frequency of overlapping boards in Silicon Valley, I obtained from Capital IQ a dataset comprising 106 companies in the Bay Area that share at least one business line with any of the Defendants and that have over 1,000 employees (see Exhibit 1).  Capital IQ identified 178

---

[5] Larcker, David F., Eric C. So, and Charles C.Y. Wang, "Boardroom Centrality and Firm Performance," *Journal of Accounting and Economics*, Vol. 55, Nos. 2-3, 2013, pp. 225-50.
[6] Bouwman, Christa H.S. "Overlapping Boards of Directors: Causes and Consequences for Corporate Governance" in *Financial Contagion: The Viral Threat to the Wealth of Nations*, ed. Robert W. Kolb, John Wiley & Sons, February 2011.
[7] Ferris, Stephen P., Murali Jagannathan, and Adam C. Pritchard, "Too Busy to Mind the Business?  Monitoring by Directors with Multiple Board Appointment," *Journal of Finance*, Vol. 58, No. 3, 2003, pp. 1087-112.
[8]  Ferris, Jagannathan and Pritchard (2003).

Highly Confidential

distinct directors within this group of companies.  Of these directors, 78% sit on at least two boards (among and outside the 106 companies), and 25% participate in five or more boards.

## 2.    Overlapping Boards Can Serve Efficiency-Enhancing Purposes

18.    The academic literature strongly supports the conclusion that close working relationships between companies through board member overlap and other executive networking can serve beneficial, efficiency-enhancing purposes.  For example, Larcker, So, and Wang (2013) observe that firms with interconnected boards benefit from increased access to information, trust between companies, business contacts, and knowledge of business innovations.[9]  Bouwman (2011) suggests that board connections facilitate the monitoring of manager activities, support the legitimacy and prestige of a company, and allow multiple firms to access a small set of highly qualified directors.[10]  Perry and Peyer (2005) find that in some cases larger board networks can benefit firms "through signaling of managerial quality, learning, or networking opportunities."[11]

19.    The academic literature also suggests that these board networks can translate into gains in value and efficiency.  For example, Cai and Sevilir (2012) provide evidence that "board connectedness plays important roles in corporate investments and leads to greater value creation."[12]  Larcker, So, and Wang (2013) demonstrate that firms with more connected boards experience a higher future returns on assets.[13] And Horton, Millo, and Serafeim (2012) find that "[board] connectedness is positively associated with .  .  .  the firm's future performance."[14]

20.    Similarly, my own research has demonstrated that public companies with affiliated directors are both less likely to be sued for securities fraud and less frequently exposed to large

---

[9] Larcker, David F., Eric C. So, and Charles C.Y. Wang, "Boardroom Centrality and Firm Performance," *Journal of Accounting and Economics*, Vol. 55, Nos. 2-3, 2013, pp. 225-50.

[10]  Bouwman, Christa H.S. "Overlapping Boards of Directors: Causes and Consequences for Corporate Governance" in *Financial Contagion: The Viral Threat to the Wealth of Nations*, ed. Robert W. Kolb, John Wiley & Sons, February 2011.

[11] Perry, Tod, and Urs Peyer, "Board Seat Accumulation by Executives: A Shareholder's Perspective." *Journal of Finance*, Vol. 60, No. 4, August 2005, pp. 2083-123.

[12] Cai, Ye, and Merih Sevilir, "Board Connections and M&A Transactions," *Journal of Financial Economics*, Vol. 103, No. 2, February 2012, pp. 327-49.  In particular, they examine merger and acquisition transactions between firms with current board connections and their results suggest that "first-degree connections benefit acquirers with lower takeover premiums while second-degree connections benefit acquirers with greater value creation."

[13] Larcker, David F., Eric C. So, and Charles C.Y. Wang, "Boardroom Centrality and Firm Performance," *Journal of Accounting and Economics*, Vol. 55, Nos. 2-3, 2013, pp. 225-50.

[14] Horton, Joanne, Yuval Millo, and George Serafeim, "Resources or Power? Implications of Social Networks on Compensation and Firm Performance," *Journal of Business Finance & Accounting*, Vol. 39, Nos. 3.4, April/May 2012, pp. 399-426.

Highly Confidential

judgments or settlements conditional on being sued (Talley 2009).[15]  Given the growing attention
that state and federal laws have accorded over the last decade to fostering best practices in
corporate governance and compliance within public companies, such networks appear to
important.

21.     In addition to the shared dissemination of best governance and compliance practices,
board and executive affiliations can facilitate and foster strategic and technical collaborations
among the firms involved.  In Section V below, I provide examples of such collaborations that
involve Google and companies with which it had DNCCs.

22.     Finally, economists have long recognized that firms can increase efficiency and promote
innovation through various forms of cooperation.[16]  Firms can achieve better results when they
agree to cooperate because they can invest more resources, develop technology, and hire and
train highly qualified personnel in smaller but complementary parts of a complex production
process.  For example, there is ample empirical work that confirms that inter-firm investments in
cooperative, relation-specific assets are often correlated with superior performance.[17]

### B.     DNCCs Can Serve Efficiency-Enhancing Purposes By Setting Ground Rules for Cooperative Endeavors

23.     As noted above, there can be significant welfare-enhancing reasons for businesses to
operate in an interrelated way, such as through overlapping boards or interrelated personnel.  At
the same time, conflicts of interest can arise in these relationships that must be managed in order
for such collaborations to realize gains in value, efficiency, or innovation.  DNCCs can be a
mechanism to address conflicts of interest that may arise in this type of environment.  DNCCs
can also assist in the protection of firm- and asset-specific investments, such as human capital—a
particular concern when firms collaborate in technically-oriented or otherwise human-capital

---

[15] Talley, Eric L, "Public Ownership, Firm Governance, and Litigation Risk," University of Chicago Law Review, 2009, pp. 335-366.

[16] Alchian, Armen A., and Harold Demsetz, "Production, Information Costs, and Economic Organization," *American Economic Review*, Vol. 62, No. 5, December 1972, pp. 777-95.

[17] Parkhe, Arvind, "Strategic Alliance Structuring: A Game Theoretic and Transaction Cost Examination of Interfirm Cooperation," *Academy of Management Journal*, Vol. 36, No. 4, August 1993, pp. 794-829; Dyer, Jeffrey H., "Specialized Supplier Networks as a Source of Competitive Advantage: Evidence from the Auto Industry," *Strategic Management Journal*, Vol. 17, No. 4, April 1996, pp. 271-91; Dyer, Jeffrey H., and Nile W. Hatch, "Relation-specific Capabilities and Barriers to Knowledge Transfers: Creating Advantage Through Network Relationships," *Strategic Management Journal*, Vol. 27, No. 8, August 2006, pp. 701-19.

Highly Confidential

specific environments.  By providing such ground rules, DNCCs can help to serve efficiency-enhancing forms of inter-firm collaboration.

### 1. DNCC as a Governance Tool to Address Potential Conflicts of Interest

24.  Notwithstanding their potential for creating value, inter-company cooperation and knowledge sharing can sometimes put a firm's unique resources and capabilities at risk of appropriation by co-venturers.[18]  To deal with these risks, companies frequently find it optimal to adopt a set of ground rules to manage their relationships in a manner that allows for cooperation and competition to coexist.[19]

25.  In areas where numerous collaborative opportunities are likely to recur, it can be very costly and time consuming to negotiate a set of ground rules on a case-by-case basis each time the need arises.  Such tailored case-by-case arrangements would require the parties to bargain repeatedly, each time attempting to predict how their agreement interacts with myriad future contingencies.[20]  Moreover, in the industries where innovation and collaborations are fast-developing and dynamic (like much of Silicon Valley), the prospect of protracted case-by-case negotiations can be especially costly.

26.  To manage such bargaining and transaction costs, it is often beneficial to utilize long-term policies and agreements that lay out the foundations for cooperative ventures prospectively.  As early as 1987, economist Paul Joskow argued that "buyers and sellers make longer commitments to the terms of future trade at the contract execution stage, and rely less on repeated bargaining when relationship-specific investments are more important."[21]

27.  It is not surprising, then, that the academic literature finds that long-term contractual mechanisms facilitate knowledge sharing across organizations and that more cooperative technology transfer and development takes place between companies that have established such

---

[18] Mudambi, Susan M., and Stephen Tallman, "Make, Buy or Ally? Theoretical Perspectives on Knowledge Process Outsourcing Through Alliances, *Journal of Management Studies*, Vol. 47, No. 8, December 2010, pp. 1434-56.
[19] Dyer, Jeffrey H., "Effective Interfirm Collaboration: How Firms Minimize Transaction Costs and Maximize Transaction Value," *Strategic Management Journal*, Vol. 18, No. 7, August 1997, pp. 535-56.
[20] Tirole, Jean, "Cognition and Incomplete Contracts," *American Economic Review*, Vol. 99, No. 1, March 2009, pp. 265-94.
[21] Joskow, Paul L., "Contract duration and relationship-specific investments: Empirical evidence from coal markets," *American Economic Review*, Vol. 77, No. 1, March 1987, pp. 168-85.

Highly Confidential

ground rules.[22]  DNCCs can provide a mechanism to address and manage prospective conflicts. Indeed, Section V provides examples of Google's DNCC agreements that are consistent with this purpose.

28.     Moreover, in cases where fiduciary interests may arise, corporate law and governance principles have long recognized both the benefits of collaboration and the attendant potential for conflicts of interest—and have provided mechanisms for dealing with the latter.  Specifically, a common good-governance recommendation for dealing with potential conflicts is that the overlapping boards should establish clear ground rules by which the vying corporations might compete for the business opportunities.  Where such firms compete for skilled employees, DNCCs can similarly provide an efficient system of ground rules.

29.     The approach in corporate law is not that conflicts of interest should be avoided, but rather that they should be foreseen and proactively addressed.  Every state's corporate code includes express provisions by which potentially conflicted directors, officers, and other fiduciaries address potential conflicts.  For example, Delaware General Corporate Law (DGCL) § 144 states specifically that no corporate action shall be deemed invalid solely because of a conflict of interest involving board members.  Rather, the section specifies procedures for addressing such conflicts, usually some form of disclosure and approval by either disinterested directors or shareholders.  I understand that Plaintiffs have not alleged that Google failed to follow these procedures when placing other companies on its DNCC List in any circumstances where a potential conflict arose.

30.     Similarly, one area where corporate law particularly encourages interlocking corporate boards to anticipate and establish protocols to govern conflicts of interest is in the context of a new "corporate opportunity," in which a new business opportunity may be presented to a director who might direct it to multiple boards on which he or she sits.  Once again, anticipating such situations, DGCL § 122(17) specifically authorizes boards to take action in advance of the arrival of such opportunities to clarify and establish ground rules by which the vying corporations might compete for the business opportunity.

31.     In fact, the recruitment of new key employees is an example of a corporate opportunity, and it would be fully consistent with the mandates of DGCL § 122(17) for a board to seek out

---

[22] Gomes-Casseres, Benjamin, John Hagedoorn, and Adam B. Jaffe, "Do Alliances Promote Knowledge Flows?" *Journal of Financial Economics*, Vol. 80, No. 1, April 2006, pp. 5-33.

Highly Confidential

arrangements that clearly delineate the terms on which such recruiting might ensue, and manage potential conflict between loyalties to two companies by preventing harm to one company from recruitment of its employees by another company.

### 2.    DNCCs as Part of a Broader System of Ground Rules to Facilitate an Environment of Collaboration

32.    When companies collaborate, a set of governing ground rules can also facilitate efficient employer-side investments in employee skills, training, and exposure.  As part of any collaboration (technical, governance, executive, acquisitive, or otherwise), partners may become exposed to a broad array of one another's employees.  Anticipating prospectively that their own employees may become recruitment targets of partners or co-venturers, participants might develop wasteful incentives to curtail investments in their employees' skills, to ration employees' access to proprietary information, or to limit collaborators' access to the most valuable employees and other corporate resources.  Such limitations, while perhaps rational in the absence of governance ground rules, are almost certainly inefficient.

33.    Here again, DNCCs can establish reasonable ground rules for encouraging efficient collaboration among potential competitors.  While not eliminating the possibility of employee departures, DNCCs are helpful for facilitating investments in employees, entrusting them with confidential information, and deploying the most valuable employees to the collaborative effort.  Similarly, executing an employee non-solicitation agreement (a set of ground rules similar to DNCCs) is a standard consideration among co-ventures, licensees, and parties negotiating M&A transactions.  A telling measure of consensus best practices is provided in model agreements.  Prominent model confidentiality / non-disclosure agreements include provisions for either the unilateral or bilateral non-solicitation of the negotiating parties' employees.[23]  In Section V, I provide examples of Google DNCC agreements that appear consistent with serving this purpose.

---

[23] See, e.g.,  "Model Confidentiality Agreement," in *Model Merger Agreement for the Acquisition of a Public Company*, ABA Publishing, 2011, pp. 341-71.

**Highly Confidential**

### 3.      DNCCs as a Tool to Enhance Intellectual Property Protection

34.      DNCCs and similar ground rules can improve the efficiency of intellectual property rights and protections.  This is especially relevant in an industry where intellectual property is the cornerstone of value creation, and where employees are often recruited for their intellectual property value.

35.      Professor Marx in his articles cites a wide array of academic literature that outlines the threat that employee defection poses to the intellectual property of companies where innovation occurs frequently.[24]  For example, he cites papers such as Stolpe (2002) and Rosenkopf and Almeida (2003), which examine knowledge spillovers that occur when employees migrate to a competitor,[25] and Kim and Marschke (2005), which finds that the threat of scientists leaving for the competition reduces a company's investment in research and development.[26]  The need for intellectual property protection clearly applies in this case.  For example, Mr. Otellini certified that Google was very worried (at the board level) that departing employees might take with them Google's "IP and trade secrets" and knowledge of "how the company operated."[27]

36.      DNCCs can enhance the efficiency of protecting employers' intellectual property.  In particular, DNCCs can be a sensible way to articulate ground rules tailored for inter-firm collaboration in trade-secret-sensitive areas in a manner that balances the goals of preserving employee mobility with protecting employers' proprietary information.  Indeed, the targeted proscriptions in a DNCC apply only when a company solicits the employee of a DNCC counterparty, not when the employee reaches out to the co-venturer.  This one-directional proscription makes a good deal of sense.  Because collaboration provides a unique window of insight into the proprietary knowledge held by a co-venturer's employees, it makes the participating companies uniquely vulnerable to targeted and opportunistic recruiting by co-venturers, not solely for the employees' skills *per se*, but for the proprietary knowledge they bring with them.  Moreover, the recruiting company is often in a particularly good position to

---

[24] Marx, Matt, Deborah Strumsky, and Lee Fleming, "Mobility, Skills, and the Michigan Non-compete Experiment," *Management Science*, Vol. 55, No. 6, June 2009, pp. 875-89.

[25] Stolpe, Michael, "Determinants of Knowledge Diffusion as Evidenced in Patent Data: The Case of Liquid Crystal Display Technology," *Research Policy*, Vol. 31, No. 7, September 2002, pp. 1181-98;  Rosenkopf, Lori, and Paul Almeida, "Overcoming Local Search Through Alliances and Mobility," *Management Science*, Vol. 49, No. 6, June 2003, pp. 751-66.

[26] Kim, Jinyoung, and Gerald Marschke, "Labor Mobility of Scientists, Technological Diffusion, and the Firm's Patenting Decision," *RAND Journal of Economics*, Vol. 36, No. 2, Summer 2005, pp. 298-317.

[27] Deposition of Paul Otellini ("Otellini Deposition"), 1/29/13, p. 30:3-21.

Highly Confidential

learn where it has "fallen behind" its co-venturer in a particular area, enhancing the temptation to appropriate proprietary know-how through recruitment.  By restricting such targeted and opportunistic recruiting by co-venturers, DNCCs can help to stabilize the parties' expectations about the protection of intellectual property and trade secrets.

37.     Moreover, DNCCs can provide this stability without restricting employees' option to seek out jobs independently with the co-venturers (or other firms).  When a solicitation comes from the employee, it is less plausibly intermingled with an improper motive to appropriate competitors' proprietary information.  In striking this balance, DNCCs can help stabilize the parties' expectations about the protection of their intellectual property during joint projects, thereby permitting the partners to be more open in sharing valuable resources.

## V.     Google's Use of DNCCs Appears Consistent with Efficiency-Enhancing Purposes

38.     There is no dispute that the Google board included individuals who also served on the boards of companies on Google's DNCC List.  In at least one instance, Google retained a senior advisor who was also a director of a company on the DNCC List.  Moreover, there is no dispute that Google had certain collaborative efforts underway with the Defendants with whom it had DNCCs as well as with other companies on its DNCC List.  Plaintiffs claim that board and advisory overlaps were a conduit for entering into the DNCCs for the purpose of effectuating anticompetitive conduct, namely to suppress wages in the "high-tech" industry.  However, applying the general principles developed above to Google's practices, Google's DNCC agreements appear more consistent with efficiency-enhancing purposes described in Section IV rather than anticompetitive purposes.

### 1.     Google-Apple DNCC is Consistent with Efficiency-Enhancing Purposes

39.     In contrast to the Plaintiffs' claims, my review of the record indicates that this interrelatedness more plausibly contributed to gains in value, efficiency, and/or collaborative innovation.  For example, Google executives emphasized the importance of maintaining strong relations with Apple while Google was a growing company, especially in light of an adversarial relationship between Google and Microsoft (an alternative platform provider for Google's search

**Highly Confidential**

services).[28]   Moreover, consistent with the observation that clear ground rules can facilitate collaboration, the collaborative relationship between Google and Apple (which started as early as 2002[29]) developed further after Apple was added to the DNCC List in 2005.

40.     Indeed, around the same time Apple was added to the DNCC List, Google was also considering several potential partnerships with Apple.[30]   The degree of interest between Google and Apple was such that on February 11, 2005, Google and Apple entered into a Mutual Non-Disclosure agreement to "evaluate whether to enter into a contemplated business transaction."[31]   Also, at or around this time period, Google and Apple were developing a search partnership where Google search was integrated as the default search engine in Apple's Safari web browser.[32]   As noted above, this sort of technical collaboration can give rise to the need to develop protocols to manage potential future conflicts.   Consistent with this pro-competitive purpose, Apple's WebKit technology, the foundation of Google's Chrome browser, was referenced as a major reason for Apple's inclusion under the DNCC policy.[33]

41.     Google and Apple's post-2005 collaborations also included several projects that integrated Google services and Apple products.[34]   In one such project, Google's map application and YouTube were included as the standard experience for the iPhone.[35]   And in January 2007, Google and Apple signed a license agreement that allowed Apple to use Google Maps for Mobile source code in their mobile devices.[36]   Additional collaborative agreements between Google and Apple reached while Apple was on Google's DNCC List, included:  Confidential iTunes Database and Use Agreement (October 2005),[37] Google Mail License Agreement (May 2007),[38] Upload API License Agreement,[39] AdSense API Agreement (2007),[40] Cooperative

---

[28] Deposition of Eric Schmidt ("Schmidt Deposition"), 2/20/13, pp. 48:19-52:4; Deposition of Omid Kordestani ("Kordestani Deposition"), 3/11/13, pp. 87:21–88:2.
[29] Information Services Agreement, 12/20/02 (231APPLE132589-98).
[30] Schmidt Deposition, p. 48:19–23.
[31] Mutual Non-Disclosure Agreement, Google Inc. and Apple Computer, Inc., 2/11/05 (231APPLE123280).
[32] Defendant Apple Inc.'s Amended Responses to Plaintiffs' Second Set of Interrogatories ("Apple's Response to Plaintiffs' Interrogatories"), 3/29/13, p. 9; Schmidt Deposition, p. 48:19–25.
[33] "We put this [DNCC policy] in place because of the relationship that we wanted to build starting with the Webkit." Schmidt Deposition, pp. 68:18–19, 69:20–22.
[34] Apple's Response to Plaintiffs' Interrogatories, p. 10.
[35] Kordestani Deposition, p. 88:3–7; Apple's Response to Plaintiffs' Interrogatories, p. 10.
[36] License Agreement between Google Inc. and Apple Computer, Inc., 2007 (231APPLE124988-5030).
[37] Confidential iTunes Database and Use Agreement, 10/26/05 (GOOG-HIGH-TECH-00625625–30).
[38] Google Mail License Agreement, 5/24/07 (GOOG-HIGH-TECH-00625532–52).
[39] GOOG-HIGH-TECH-00625707.  Amended May 2008, September 2008, and March 2009 (GOOG-HIGH-TECH-00625722; GOOG-HIGH-TECH-00625724; GOOG-HIGH-TECH-00625725).
[40] AdSense API Terms and Conditions, 2007 (GOOG-HIGH-TECH-00625678–706).

Marketing and Services Agreement (December 2007),[41] Contact Sync License Agreement (January 2008),[42] Master iTunes Affiliate Agreement (January 2008),[43] and iPhone Developer Program License Agreement (April 2008).[44] Further, Google and Apple leaders collaborated on governance issues, aided by Google CEO Eric Schmidt's membership on Apple's board of directors from 2006 through 2009.[45]

### 2.  Google-Intel DNCC Is Consistent with Efficiency-Enhancing Purposes

42.  Based on my review of the record, the evidence shows that the Google-Intel DNCC is also consistent with the efficiency-enhancing purposes discussed in Section IV, albeit for different (and broader) reasons than the Google-Apple DNCC. Indeed, collaboration between Intel and Google expanded after Intel was added to Google's DNCC List.[46] Moreover, the collaborative relationship transcended narrow technical collaborations. As a Google director, Paul Otellini frequently interacted with Google executives and directors[47] sharing Intel's experiences and practices to assist Google, a young company in its critical growth years. In particular, Intel provided advice and assistance to Google in areas such as finance, human resources, site selection, and legal issues, and the two companies collaborated on many projects.[48] Mr. Otellini enumerated some of the assistance he provided:

> [Google] wanted to tap into our knowledge on how we scaled our company up, and they wanted information from our finance teams and HR teams, maybe the legal team as well, on just how companies grow. And we made our experts in those areas available to them.[49]

43.  This advice and assistance was important to Google:

---

[41] Cooperative Marketing and Services Agreement, 12/28/07 (GOOG-HIGH-TECH-00625733–46).

[42] Contact Sync License Agreement, 1/14/08 (GOOG-HIGH-TECH-00625631–41).

[43] Master iTunes Affiliate Agreement, 1/30/08 (GOOG-HIGH-TECH-00625727–32).

[44] iPhone Developer Program License Agreement, 4/3/08 (GOOG-HIGH-TECH-00625642).

[45] Apple's Response to Plaintiffs' Interrogatories, p. 10.

[46] "By September 2008, the scope of Intel's and Google's collaborative relationship had grown so large that Intel established a 'Google Program Office' to help manage the wide and continuing array of projects the companies have pursued together." See Intel's Objections and Amended and Supplemented Responses to Plaintiffs' Second Set of Interrogatories ("Intel's Response to Plaintiffs' Interrogatories"), 3/12/13, p. 7.

[47] Otellini Deposition, p. 20:9-24.

[48] Intel's Response to Plaintiffs' Interrogatories, p. 7.

[49] Otellini Deposition, p. 196:13-18

> Genentech and Intel and Apple . . . were being very helpful to us as we're trying to build our little company, and we would have had a lot of contact with all -- with members of all three of those companies. . . . Part of them being on our board, either formally or in Bill Campbell's capacity as an advisor, is that they were helpful in . . . opening up their companies to be places we could go for advice.[50]

44.     The Google-Intel technical collaboration also blossomed in numerous areas after Intel was added to the DNCC List—consistent with the long-term facilitative purposes of such policies and agreements.  In Mr. Otellini's words:

> [T]he collaboration, we had one in the data center, we had one in data center efficiency, we had one in search optimization, we had one around Google TV, we had one around Android, one around Chrome, Chrome OS. All of those -- all of those happened. It's speculative to say I don't know that anything would not have happened in the absence of the agreement. [] But, you know, the companies were working well together and were engaged broadly in a wide array of projects as I delineated.[51]

45.     Additional collaborative projects included Google's licensing Chipset source code from Intel in February 2008,[52] running evaluation of Pixomatix Development Kit in July 2008,[53] and working together to develop the first nationwide WiMax mobile broadband network,[54] while Intel licensed from Google IndexBench source code in September 2005, November 2007, and February 2009,[55] and ran trial evaluations of Google Search Appliance for several years.[56] Google and Intel also collaborated on the development of VIIV to allow video to play seamlessly on Intel hardware.[57]

46.     The Google-Intel DNCC agreement appears to have fulfilled another beneficial purpose discussed in the previous section:  managing conflict of interest Mr. Otellini might have faced in

---

[50] Deposition of Shona Brown ("Brown Deposition"), 1/30/13, pp. 120:1-121-1.

[51] Otellini Deposition, p. 83:14-24.  The collaboration into data center efficiency included the Climate Savers Computing Initiative in 2007.  See Intel's Supplemental Responses to Plaintiffs' Second Set of Interrogatories, p.7.

[52] Chipset Source Code License Agreement, 2/1/2008 (GOOG-HIGH-TECH-00625248-55).

[53] Evaluation License Agreement, 7/25/2008 (GOOG-HIGH-TECH-00625267-9).

[54] Intel's Supplemental Responses to Plaintiffs' Second Set of Interrogatories, p.8.

[55] Google Inc. Source Code Evaluation License, 9/30/2005 (GOOG-HIGH-TECH-00625239-46);  Amendment No. 1 to Source Code Evaluation License Agreement, 11/1/2007 (GOOG-HIGH-TECH-00625247);  Exhibit A to Google Inc. Source Code Evaluation License, 2/17/2009 (GOOG-HIGH-TECH-00625270-2).

[56] Agreement for Evaluation and Trial of Software, 5/8/2002 (GOOG-HIGH-TECH-00625224-6);  Google Inc. Appliance Evaluation Agreements, 1/28/2004 (GOOG-HIGH-TECH-00625227-30), 2/2/2004 (GOOG-HIGH-TECH-00625231-4), and 4/1/2005 (GOOG-HIGH-TECH-00625235-8).

[57] Otellini Deposition, pp. 199:13-200:18.

Highly Confidential

collaborating with Google management.  Mr. Otellini explained that without a no cold-call arrangement, Intel and he personally would not have been motivated to participate in these kinds of collaborations due to such conflicts:

> [T]he more we collaborate and the more [Google] cherry-picks our best people, the less we're going to be inclined to collaborate.[58]

> [Google] asked us to help them, we sent a guy over there who was our best guy, showed them how we're doing it. He's a tenured employee, valued employee, and they hired him away. I didn't think it was the best way to get me to want to help them anymore.[59]

> What would be my incentive to help Google if when I send people over there they recruit our best people.[60]

> [I]f we're going to continue to work together, for our joint companies' good, let's not disrupt the teams that are working together.[61]

### 3.   Google-Intuit DNCC is Consistent with Efficiency-Enhancing Purposes

47.   My review of the evidence suggests that Intuit's addition to Google's DNCC List also facilitated governance, strategic, and technical collaboration between Intuit's chairman and Google executives.  Intuit's inclusion on the DNCC List served to facilitate the relationship with Bill Campbell, Chairman of Intuit's board, who was as an important special advisor to Google's CEO.[62]  The Google-Intuit DNCC allowed Mr. Campbell to continue in his role as Google's advisor during much of the class period, in a fiduciary manner that appears consistent with affiliated board service.  Mr. Campbell, together with other directors, was "helpful in . . . opening up their companies to be places [Google] could go for advice."[63]  Mr. Schmidt relied on Mr. Campbell as "someone [he] could talk to ask questions and get some advice from; how to

---

[58] Otellini Deposition, p. 138:19-21.
[59] Otellini Deposition, p. 137:18-23.
[60] Otellini Deposition, p. 74:5-22; Email from P. Otellini to E. Schmidt, 6/3/07 (76616DOC003892) ("Seems unkind to hire our guy after we helped you out by teaching you how we did site selection.");  Email Exchange between P. Otellini, P. Murray, and E. Schmidt, Subject:  Hiring, June 4 to June 5, 2007 (76616DOC003875) ("They asked me to set up a meeting on how to do site selection. We did. They then went and hired our most senior guy…I was livid.").
[61] Otellini Deposition p. 127:9-11.
[62] E-mail from B. Campbell, S. Brown, and A. Geshuri, 6/7/07 (GOOG-HIGH TECH-00056885-6);  Email from J. Sims to J. Tierney, S. Scheele, J. Butler-Arkow, Subject:  Intuit Paper, 12/24/09(INTUIT_005692-705).
[63] Brown Deposition, p. 120:21-24.

Highly Confidential

handle difficult situations."[64]  Mr. Campbell spent time each week at Google, coaching primarily Mr. Schmidt but also other executives.[65]  He attended board meetings and senior staff meetings.[66]  After Mr. Schmidt stepped down as CEO, Mr. Campbell continued advising Larry Page at Google.[67]

48.     Evidence regarding the Google-Intuit DNCC is consistent with the beneficial purpose described above in Section IV to manage potential conflicts of interest (or the appearance thereof) for Mr. Campbell.[68]  As he testified, "my day job was Intuit, so if I had a conflict, Intuit won the conflict."[69] Mr. Campbell would have felt conflicted "in such an intimate position helping Google" if Google recruiters called Intuit employees.[70]  He testified that both he and Mr. Schmidt considered that board-level and similar business "relationships were important and that [the two companies] should not do anything that would affect those relationships."[71]

49.     Moreover, Intuit and Google continued their technical collaboration.  The Quickbooks cooperative project continued for several years, as evidenced by several joint promotion, software distribution and ad research agreements.[72]

## VI.    Plaintiffs Ignore Additional Facts Regarding the Nature of the DNCCs at Issue That Are Inconsistent with Their Alleged Anticompetitive Purpose

50.     In addition to the above evidence that DNCCs facilitated Google's important strategic partnerships, many facts surrounding Google's DNCC List (and related protocols) also appear inconsistent with anticompetitive purposes.

---

[64] Schmidt Deposition, p. 42:19-25.
[65] Campbell Deposition, p. 65:19-25.
[66] Brown Deposition, pp. 36:21-37:3.
[67] Campbell Deposition, p. 26:1:14.
[68] Defendant Intuit Inc.'s Response to Plaintiffs' Second Set of Interrogatories Directed to Defendant Intuit Inc. ("Intuit's Response to Plaintiffs' Interrogatories"), 4/5/12, pp. 5–6; Email from J. Sims to J. Tierney, S. Scheele, J. Butler-Arkow, Subject:  Intuit Paper, 12/24/09 (INTUIT_005692-705).
[69] Campbell Deposition, p. 24:20-21.
[70] Campbell Deposition, p. 29:4-9.
[71] Campbell Deposition, p. 46:15-23.
[72] Amendment Number One to Google-Intuit Product and Promotion Agreement, 11/1/2006 (GOOG-HIGH-TECH-00625444-5); Amended and Restated Google-Intuit Product and Promotion Agreement, 10/15/200, (GOOG-HIGH-TECH-00625358-443); Google Software Distribution Agreement, 12/5/2007 (GOOG-HIGH-TECH-00625464-73); Google Case Study Release, 10/30/08 (GOOG-HIGH-TECH-00625482); Ad Research Study Agreement, 10/30/08 (GOOG-HIGH-TECH-00625481); Amendment Number Two to Google-Intuit Product and Promotion Agreement, 11/11/2008 (GOOG-HIGH-TECH-00625446-53); Ad Research Study Agreement, 1/26/09 (GOOG-HIGH-TECH-00625480).

**Highly Confidential**

51.     One such fact is that the DNCC List included only a small proportion of Google's hiring sources, and it generally did not include the sources most similar to Google (section A).  Another is that Google did not categorically request reciprocal no-calling from the firms it added on the list (section B).  Third, the DNCC List was part of a broader recruiting policy together with other lists, which are not alleged to be part of the conspiracy (Section C).  Further, the DNCC List continued to change over the class period, with companies added and removed as collaborations changed (section D).

## A.     DNCCs Covered a Small Subset of Google's Recruiting Targets

52.     Google's DNCC agreements covered only a fraction of Google's recruiting sources (evidently not the most valuable ones), and a subset of Google's overall recruiting activities.  These observations suggest that the DNCCs (as actually administered) would be an ineffectual way to affect compensation levels, and are more consistent with efficiency-enhancing purposes of these policies and agreements as described above and herein.

53.     During the class period, Google hired tens of thousands of employees.  In the five-year period spanning December 2004 to December 2009, Google's full-time employee base grew on a net basis from 3,021 to 19,835 employees.[73]  Between 2005 and 2008, Google's employee base grew at a compounded annual rate of 46%—compared to, for example, 3% annual growth for Intuit and net loss of employees for Intel.[74]  New employees arrived at Google from a great variety of locations, including universities, research centers and laboratories, local companies, and institutions located in other geographic areas.[75]  Apple, Intel and Intuit—even when aggregated with other companies on Google's DNCC List—represented only a small fraction of Google's recruiting sources.

54.     In addition to being limited in size, the DNCC List conspicuously omitted Google's closest competitors (who would presumably compete more directly with Google for

---

[73] Capital IQ Data.

[75] Even Google's biggest labor market competitors ▮▮▮▮▮▮▮▮▮▮▮▮ of Google's new hires each from 2006 to 2008.  See e.g. Top 25 New Hire Previous Employers, 2007-2008 (GOOG-HIGH-TECH-00258494); Google Leadership Development and Compensation Committee, 1/30/08 (GOOG-HIGH-TECH-00223682.R-713.R), at 686.R-688.R; Google Presentation Draft - "Sourcing Diagnostic," July 2006 (GOOG-HIGH-TECH-00024150-203).

Highly Confidential

employees).[76]  In order to find commonality among the Defendants, Plaintiffs have to aggregate

them artificially into a "high tech" category.  However, "high tech" is not a single industry, but

rather an agglomeration of dozens of different industry sectors and job functions.  Two

companies can be both "high-tech" and yet have no employees with overlapping technical skills.

In fact, as shown in Table 1, none of the Defendants currently share any of Google's four-digit

Standard Industrial Codes ("SICs") that mark its principal lines of business.

**Table 1.  Standard Industrial Classification Codes of The Seven Alleged Conspirators**

| Company | SIC (per Capital IQ)[77] | SIC (per SEC Filings)[78] |
| --- | --- | --- |
| Google | 7370 – Computer programming, data processing, and other computer related services<br>7375 – Information retrieval services<br>7379 – Computer related services<br>4813 – Telephone communications, except radio | 7370 |
| Apple | 3571 – Electronic Computers<br>3663 – Radio and Television communications equipment | 3571 |
| Intel | 3674 – Semiconductors and related devices | 3674 |
| Intuit | 7372 – Prepackaged Software | 7372 |
| Adobe | 7372 – Prepackaged Software | 7372 |
| Lucasfilm | 7812 – Motion picture and video production | Not Listed |
| Pixar | 7812 – Motion picture and video production | 7812 |

55.    Even if one were to include Defendants' secondary business lines, the Defendants with

which Google had alleged DNCCs (Apple, Intuit, and Intel) constituted but a small fraction of

the universe of firms that operated in the same lines of business as these companies (and thus

would be potential sources of lateral hiring).  Exhibit 1 helps illustrate this point,

---

[76] See, for example, Otellini Deposition, p. 158:6-13 ("The top two companies [that Google recruited from] are other software companies, so that makes sense that Google would hire a lot of other software people into a software company.  We [at Intel] don't have, in the grand scheme of things, that many software people, and Google is not going to hire chip designers or, you know, manufacturing people, which is half our employment base.")

[77] Standard industrial classification ("SIC") code as reported by Capital IQ.  Capital IQ describes its methodology as follows: "To determine a company's primary SIC Code, our collection team decides what the proper code is based on the company's primary line of business.  We do not always take the SIC code the company lists in their filings.  Our team will research the company to determine its primary line of business."

[78] SIC as reported by the SEC on the EDGAR website (http://www.sec.gov/edgar.shtml).

**Highly Confidential**

diagrammatically, depicting Bay Area companies with more than 1,000 employees which share at least one business line with Google, Apple, Intel, or Intuit.[79]  As the Exhibit illustrates, the three Google DNCC agreements at issue in this case cover a fraction of the field of large local companies that compete in the same set of industries.  Moreover, this Exhibit does not address more numerous smaller companies that might solicit Google's or other Defendants' employees, nor does it account for new startups that may be founded by Google's and other Defendants' former employees.  The fact that Google's DNCC agreements constituted only a small fraction of its employee recruitment sources casts doubt on the Plaintiffs' claim of a market-wide conspiracy; in contrast, the targeted nature of the list would be strongly consistent with an interpretation of DNCCs as efficiency-enhancing tools for managing co-venturer relationships.

56.     Moreover, as noted above, the DNCCs limited only one avenue of Google's recruiting activities.  As Mr. Otellini testified, "[I]f someone wanted to go to work at Google, they certainly had every ability to. The jobs were posted. The recruiters were widely available."[80] .  Finally, it bears noting that several of the companies on Google's DNCC List were not even headquartered in Silicon Valley.[81]

### B.     Google Did Not Necessarily Seek No-Calling Reciprocity

57.     Another fact inconsistent with the alleged conspiracy is that Google did not categorically seek reciprocity when adding firms to its DNCC List.  Even where the addition of a company to the DNCC List was pursuant to some form of agreement, some companies were added to Google's DNCC List asymmetrically, without a reciprocal promise not to solicit Google's employees.[82]  Professor Marx is therefore mistaken in asserting that "[i]nternal announcements confirm the reciprocal nature of these agreements."[83]

---

[79] For Google and each defendant who allegedly had an agreement with Google I obtained a list of companies sharing at least one Capital IQ industry classification and limited it to companies with more than 1000 employees located in the San Francisco, San Jose, and Oakland metropolitan areas.  Capital IQ assigns approximately 3-20 industry classifications to each company.  Each line connects a company (or group of companies) to the defendants with whom it (or they) shares at least one industry classification.  Capital IQ lists multiple industry classifications for most companies; Google, for example, has 11 industry primary and secondary classifications.

[80] Otellini Deposition, pp. 99:21-100:6.

[81] For example, Invidi is headquartered in Princeton, New Jersey  (http://www.invidi.com/itc_company_contact.html) and Illumita (now Skytap) is located in Seattle, Washington (http://www.skytap.com/company/location).

[82] Email from S. Brown, A. Geshuri, C. Fitz-roy, and A. Haslam, 3/27/07 (GOOG-HIGH TECH-00023164–6).

[83] Marx Report, ¶6.a.

Highly Confidential

58.     As noted above (fn. 4) Plaintiffs' allegations appear to acknowledge that the Google-Intuit DNCC agreement was one directional, with only Google agreeing not to cold call Intuit employees, but no agreement regarding calling into Google.[84]  I understand Genentech was also added to Google's DNCC List without a reciprocal promise not to call.[85]  Genentech's CEO (along with Intel's CEO) was a Google director; both Genentech and Intel's CEOs were Google compensation committee members;[86] and the two firms were added to the DNCC List contemporaneously (along with Apple and other companies not involved in this case).[87]  These facts suggest similar efficiency-enhancing purposes of the DNCC policies with respect to these and other firms.

### C.     Google's DNCC List Was One of Three Lists Within a Policy Document Addressing Google's Recruiting and Hiring Policies

59.     Another fact inconsistent with Plaintiffs' conspiracy allegations is that the DNCC List was but one of three different lists included in Google's internal recruiting protocol.[88]

60.     In addition to the DNCC List, Google maintained—within the same document—a separately-designated "Sensitive" list and a "Restricted Companies" list.  The companies on the "Sensitive" list remained subject to cold calling and solicitation of employees (with milder protocols in place for the recruitment of executive-level personnel).[89]  The "Sensitive" list appears to occupy another place on the continuum with the DNCC List—both functioned as part of Google's effort to facilitate broad value-creating collaborations with the firms on the list.

---

[84] See Plaintiffs' Motion for Class Certification, 10/1/12, p. 13 (alleging only that Bill Campbell "insisted that Google agree not to recruit Intuit employees");  and Plaintiffs' Motion for Class Certification, 5/10/13, p. 9 (alleging only that "Mr. Campbell 'requested that Intuit be added fully to the Do Not Call list'" and that "Google agreed to Mr. Campbell's request").  This is consistent with my review of the evidence.  See Campbell Deposition, pp. 32:8-12, 32:22-24 ("Q. …Was it part of the understanding that Intuit would not cold-call into Google the way you described cold-calling? A. No, we never had a -- you know, what you called a reciprocal agreement, no.... Q. So as far as you were concerned, Intuit was free to raid Google employees as much as it wanted? A. Correct. Not likely, but correct.").

[85] "[Genentech's inclusion  to DNCC List] [d]oesn't work both ways.  It is a one-way do not call list," Email from A. Geshuri, 3/30/07 (GOOG-HIGH-TECH-00008614-5); Email from S. Brown, 3/27/07 (GOOG-HIGH-TECH-00023164-6).

[86] Deposition of Eric Schmidt, 2/20/13, pp. 183:25–184:5; 184:15–185:2; Otellini Deposition, pp. 15:18-20, 17:3-5.

[87] Google Special Agreement Hiring Policy:  Protocol for 'Do Not Cold Call' and 'Sensitive' Companies (GOOG-HIGH TECH-00008283–4).

[88] Special Agreement Hiring Policy - Protocol for "Restricted Hiring," "Do Not Cold Call," and "Sensitive" Companies. 5/10/07.  GOOG-HIGH TECH-00009376-82;  Special Agreement Hiring Policy - Protocol for "Restricted Hiring," "Do Not Cold Call," and "Sensitive" Companies. 1/7/08.  GOOG-HIGH TECH-00008342-50;  Special Agreement Hiring Policy - Protocol for "Restricted Hiring," "Do Not Cold Call," and "Sensitive" Companies.  11/18/08.  GOOG-HIGH TECH-00052337-44.

[89] Google Special Agreement Hiring Policy:  Protocol for 'Do Not Cold Call' and 'Sensitive' Companies (GOOG-HIGH TECH-00008283–4).

**Highly Confidential**

61.     The "Restricted Companies" were companies from whom Google did not wish to recruit for certain positions because of perceived incompatibility between the corporate cultures.[90]  The "Restricted Companies" list was unambiguously a product of unilateral decision-making.  It is notable that all three lists were part of the same internal policy Google used to guide and limit its recruiting, and Google repeatedly issued internal guidance about all three lists simultaneously.[91]  This strongly suggests that Google internally conceived of all lists as serving complementary roles of managing relationships with other companies in the context of seeking talent and collaborative opportunities, as opposed to a wage-restricting conspiracy with the small subset of Silicon Valley companies on the DNCC List.

### D.     Google's DNCC List Was Varied and Dynamic

62.     From the evidence I have reviewed, the fact that the DNCC List was changing throughout the period also appears more consistent with the purpose of facilitating collaboration than with a wage restricting conspiracy.  DNCC List adjustments appear to match changes in Google's collaborative activities as opposed to changes in Google's other recruiting goals.

63.     Specifically, Google's use of a DNCC List is replete with examples of companies being added and removed.  Google started to keep an internal no cold-call list of companies no later than 2005.[92]  At different times, the list included IBM, Apple, Genentech, Intel, Comcast, OpenTV, and other companies.[93]  An oft-cited reason for the additions to the list was complaints from Google's collaboration partners (such as companies that had click-through or other

---

[90] E-mail from A. Geshuri, 5/9/07 (GOOG-HIGH-TECH-00230684); Special Agreement Hiring Policy - Protocol for "Restricted Hiring," "Do Not Cold Call," and "Sensitive" Companies (GOOG-HIGH TECH-00008342-50).

[91] Special Agreement Hiring Policy - Protocol for "Restricted Hiring," "Do Not Cold Call," and "Sensitive" Companies. 5/10/07 (GOOG-HIGH TECH-00009376-82);  Special Agreement Hiring Policy - Protocol for "Restricted Hiring," "Do Not Cold Call," and "Sensitive" Companies.  1/7/08 (GOOG-HIGH TECH-00008342-50);  Special Agreement Hiring Policy - Protocol for "Restricted Hiring," "Do Not Cold Call," and "Sensitive" Companies.  11/18/08 (GOOG-HIGH TECH-00052337-44).

[92] Google Special Agreement Hiring Policy:  Protocol for 'Do Not Cold Call' and 'Sensitive' Companies (GOOG-HIGH TECH-00008283-4).

[93] Google Special Agreement Hiring Policy - Protocol for "Do Not Cold Call" and "Sensitive" Companies, 4/10/06 (GOOG-HIGH TECH-00000076-7); Google Special Agreement Hiring Policy - Protocol for "Do Not Cold Call" and "Sensitive" Companies, 11/6/06 (GOOG-HIGH TECH-00008283-4); Google Special Agreement Hiring Policy - Protocol for "Do Not Cold Call" and "Sensitive" Companies, 12/1/06 (GOOG-HIGH TECH-00000019-26); Google Special Agreement Hiring Policy - Protocol for "Do Not Cold Call" and "Sensitive" Companies, 4/24/07 (GOOG-HIGH TECH-00009200-4); Google Special Agreement Hiring Policy - Protocol for "Restricted Hiring," "Do Not Cold Call," and "Sensitive" Companies, 5/10/07 (GOOG-HIGH TECH-00009376-82); Google Special Agreement Hiring Policy - Protocol for "Restricted Hiring," "Do Not Cold Call," and "Sensitive" Companies, 1/7/08 (GOOG-HIGH TECH-00008342-50); Google Special Agreement Hiring Policy - Protocol for "Restricted Hiring," "Do Not Cold Call," and "Sensitive" Companies, 11/18/08 (GOOG-HIGH TECH-00052337-44).

Highly Confidential

sales/marketing agreements with Google) regarding Google's recruiting of their key employees.[94] In including a limited number of companies on its DNCC List, Google appears to have been engaging in an efficiency-enhancing effort to manage these collaborative relationships.

64.　　Moreover, multiple firms were *taken off* Google's DNCC List when the importance of ongoing collaborative relationships waned.  For example, Dell was only included on the DNCC List for two months to facilitate a partnership between the two companies that had been disrupted by Google's recruiting of a Dell sales employee.[95]  Invidi Technologies was similarly removed from the DNCC List in December 2006 because "the relationship ha[d] since changed" and "the partnership no longer exists."[96]  I have not seen an alternative explanation (plausible or otherwise) for these changes that would be consistent with furthering the alleged conspiracy.

## VII.　Analysis of Marx Report

65.　　 My analysis and critique of Plaintiffs' claims above also applies to the Marx Report. First, Professor Marx fails to consider properly academic research and substantial evidence in this matter that suggest that Google's use of DNCCs was consistent with efficiency-enhancing purposes.  Instead of weighing these economic arguments and evidence, Marx largely ignores them, categorically concluding that the DNCCs at issue were for the purpose of suppressing wages in the "high-tech" labor market (see Section A below).  Similarly, Professor Marx erroneously presumes that the existence of a board overlap constitutes ineluctable evidence of a conspiracy, ignoring the evidence of potential procompetitive purposes of overlapping boards and interrelated personnel (Section B).  Finally, Professor Marx provides a flawed and misleading comparison between DNCCs and non-competes (Section C).

---

[94] OpenTV and Invidi were added to the DNCC List because Google was "engaging in partnership negotiation with those two firms" (E-mail from A. Geshuri, 2/10/06 (GOOG-HIGH-TECH-00007566-7). Eric Schmidt asked to put WPP on the DNCC List because "[t]hey are important partners and upset" (E-mail from E. Schmidt, 9/13/07 (GOOG-HIGH-TECH-00059757-8)). More generally, Google "created a do-not-call policy as a course of action in working with our strategic partners… [and] were concerned with being a good partner to other companies in the community that [they] considered strategic partners" (Brown Deposition, pp. 109:23–25, 110:3-6.)

[95] Schmidt Deposition, pp. 134:17-135:5;  Email from A. Geshuri, L. Bock, E. Schmidt, P. Shore, and Michael@dell.com, 4/19/07 (GOOG-HIGH TECH-00023106—7).

[96] Email from A. Geshuri, J. Byr, and S. Ryan, 12/1/06 (GOOG-REC-100030555–6).

Highly Confidential

### A.     Professor Marx Ignores Potential Procompetitive Purposes of DNCCs

66.     The Marx Report endeavors to limit the universe of procompetitive DNCCs to situations where a specific set of employees are involved in a narrow form of technical collaboration.  In particular, in paragraph 25 of his report, Professor Marx asserts (without substantiation) a type of "one-to-one" correspondence between efficiency-enhancing DNCCs and technical collaboration.  That is, he asserts (a) that an efficient DNCC can only exist when there is a specific, ongoing technical collaboration between the parties; and (b) that technical collaboration can only exist when there is a DNCC between the parties.  This assertion leads him to conclude that the efficiency-enhancing role of a DNCC is not present unless one regularly (or perhaps even universally) observes this one-to-one correspondence.

67.     The limitation Professor Marx asserts on DNCCs and technical collaboration is both artificial and inappropriate, and it is not supported by theory, practice, or the evidence presented in this case.  I therefore disagree with it in several respects, and consequently I disagree with the ultimate implications that Professor Marx draws from this limitation in reviewing the evidence.

### 1.     No One-to-One Correspondence between Technical Collaboration and DNCCs

68.     DNCCs are not a necessary condition for facilitating collaboration.  By their very nature, different companies have different and constantly changing objectives, collaboration plans, and circumstances.  Companies' decisions whether a DNCC would be helpful depend on a variety of factors, including the current or anticipated depth and volume of cooperation, the nature of cooperation, the extent of proprietary knowledge at risk, potential for conflicts of interests, the extent to which information is shared, and other factors.  Depending on the circumstances, companies may find it optimal to embrace a variety of contracts, policies, standards, governance norms, and the like.  Sometimes companies may pursue a technical collaboration through information exchange, high-level standard setting accords, or other means, and do not need a DNCC to proceed.  In other cases, co-venturers might execute a separate confidentiality agreement that includes an employee non-solicitation provision, so that a DNCC would be duplicative and unnecessary, and might even run the risk of introducing inconsistencies.  It simply does not follow that the existence of a technical collaboration mandates that a DNCC be the means to foster it.

**Highly Confidential**

69.     Professor Marx is also incorrect in asserting that an existing technical collaboration is a necessary precursor to an efficient DNCC.  As I have described above in Sections IIV and V, in industries where technical collaboration is frequent and ever-changing, DNCCs can be used more efficiently as part of a long-term, transaction-cost-minimizing framework of ground rules, rather than as narrow agreements covering a specific set of people in a specific collaboration. For example, although the Google-Intuit DNCC was first introduced in connection with the Quickbooks collaboration, it was expanded to all Intuit employees not because of a technical project, but because of a corporate governance collaboration with Mr. Campbell.[97]

70.     As noted in Section IV above, a significant body of academic literature teaches that companies rarely can anticipate each area where collaboration will be beneficial, and thus when collaborative opportunities seem likely on many unforeseeable fronts, it can be more efficient to have a set of basic ground rules established in advance.  The DNCCs provide a set of protocols consistent with the need for such ground rules.  Given the frequency and heterogeneity of Google's collaborations with Intel and Apple (described above), a standing set of ground rules as reflected in a DNCC agreement would be a sensible and efficient way to manage transaction costs.

### 2.     Professor Marx's View of "Collaboration" Is Artificially Narrow

71.     In his expert report, Professor Marx inexplicably focuses his discussion on collaboration over "technical" issues, which he does not define, but based on the examples he provides mean things such as software and platform compatibility issues.[98] While technical collaboration is certainly one important way that firms, including Defendants, can work together, this is far from the sole legitimate dimension on which firms may collaborate in an efficiency-enhancing way. For example, many firms can benefit from collaboration on different levels, such as in adopting governance and compliance practices, executive coaching, marketing, and managerial

---

[97]  Email from J. Sims to J. Tierney, S. Scheele, J. Butler-Arkow, Subject:  Intuit Paper (INTUIT_005692–705 at 698).

[98] These examples include Apple's making Google the default search engine in its Safari browser and Google Maps the default mapping application on the iPhone, the technical collaborations between Apple and Adobe when "essentially all of Adobe's revenue came from Apple, and all of its resources were devoted to the companies' shared vision." See Marx Report ¶¶ 27.a.ii and 27.b.ii.

Highly Confidential

consulting.  Professor Marx admitted that he failed to review all of the evidence available to him regarding Google's various collaborations.[99]

72.     As I have shown in Section V above, Google's DNCC agreements occurred in the context of different types of collaborative venturing—not only technical, but also in strategic, governance, advising, marketing and other areas.

73.     In each of these non-"technical" forms of collaboration, there may also be a reason to establish ground rules for the recruitment of collaborators' employees—whether to address their reasonable fear that key employees may be solicited, to protect trade secrets, to address potential conflicts of interests for directors, executives and advisers, or other legitimate business reasons discussed in Sections IV and V.

74.     Moreover, many of the firms that at one time or another appeared on Google's DNCC List evidently engaged in some of these other "non-technical" avenues of collaboration.  For example, although Genentech was "in a completely different business" from Google, it provided Google advice on "how you scale an R&D organization, how you think about moving projects through phases of R&D."[100]  Dell "was a very large customer for search" and Google was "trying to get them to distribute Chrome" among other things during the period of the Google-Dell DNCC.[101]  Consequently, by artificially limiting his inquiry to "technical" forms of collaboration, Professor Marx misses the ways that DNCCs provide a platform from which to facilitate efficiency-enhancing inter-company collaboration.

## B.     Professor Marx Ignores Potential Efficiency-Enhancing Purposes of Overlapping Boards

75.     Professor Marx paints an overly broad and simplistic picture of the overlapping boards and executive relationships between the Defendants, arguing that their chief (or perhaps sole)

---

[99] Deposition of Mathew Marx ("Marx Deposition"), Vol. 1, 11/15/13, p. 200: 22 – 24 ("I did not do an exhaustive search of the [do-not-call] list and understand all the reasons for their collaborations…");  p. 212: 5 - 10 (excluding the Defendants, he "did not consider  any of the circumstances or background about any of the other companies on Google's do-not-call list in forming [his] opinions";  p. 170:1-4 ("I did not focus on the necessity of anti-solicitation agreements to facilitate board memberships, although some Defendants, including Apple, raised that as a justification");  p. 170:13-18 ("I did not consider Otellini's membership on Google's board of directors as a justification for implementing an anti-solicitation agreement, notwithstanding the fact that there were many different technical collaborations listed here, including some I mentioned earlier….").

[100] Brown Deposition, pp. 121:21-122:5.

[101] Schmidt Deposition, p. 135:3-5.

Highly Confidential

role was to serve as a platform for a conspiracy to suppress wages.[102]  In so doing, he fails to acknowledge the potential efficiency advantages of overlapping director and officer relationships, which are well documented in the academic literature, and which Professor Marx himself recognized in his testimony.[103]

76.     Marx's report appears to suggest that the existence of board members who serve on multiple boards plays no beneficial role worthy of recognition—and consequently that the existence of board overlap provides a *prima facie* case for collusive behavior.[104]  My review of the relevant literature on affiliated board membership, however, is that it is much more nuanced than Professor Marx's portrayal.  Academic literature provides a strong indication that there is nothing unusual about these patterns in the Defendant companies who were allegedly engaged in the conspiracy (see Section IV above).

77.     It is therefore important to remain mindful of three points, all of which are inconsistent with (or conspicuously absent from) Professor Marx's discussion.

78.     First, within the broader social science literature on board affiliations, there does not appear to be anything close to academic consensus on the proposition that the mere existence of such board overlap implies anticompetitive practices or inefficient allocations.

79.     Second, the literature discussed above suggests that board overlaps can enhance (and not impede) economic efficiency by catalyzing the spontaneous, inter-firm diffusion of information, governance practices, and strategic advice.  One should be careful not to confuse emergent patterns and practices—even that may partially spread among overlapping directors—with conspiratorial organization.  For the reasons discussed above, the development of the DNCCs appears more consistent with independent paths of diffusion—often for different reasons—than a broad anticompetitive conspiracy.

80.     Third, where conflicts of interest might arise (for example, in the context of board overlaps) the conventional response in such contexts is not to prohibit conflicts of interest *writ large*, but rather to develop mechanisms to address them looking forward, while still maintaining

---

[102] Marx Report, ¶¶6, 8, 9, 10, 11 and 15.

[103] Marx Deposition, p. 190:7-9 ("So I don't think anyone would disagree that receiving good advice from advisers or board members can be helpful to a company.").

[104] Paragraph 11 of the Marx Report states: "[T]he Defendants are far from unconnected to each other. Rather, they are interlinked through a thick network of ownership, governance, and friendship. These ties shed light on the motives behind the Defendants' assembly of a conspiracy to reduce inter-organizational mobility of workers and, as a result, lower compensation."

the benefits of board and senior advisor overlap.  As noted above, Google's DNCC agreements played a role consistent with such purposes.

### C.    Professor Marx's Comparison of DNCCs and Non-Compete Agreements is Flawed and Misleading

81.    In his expert report, Professor Marx draws an analogy between DNCCs and express non-compete agreements executed between employers and employees.[105]  In doing so, he cites to his own research that critiques non-compete agreements for attenuating employee mobility.[106]  He attempts to draw conclusions about the economic effects of DNCCs based on what he asserts to be their similarity with non-competes.  However, Professor Marx's analogy is seriously flawed.  He fails to consider that there are fundamental differences between DNCCs and non-competes; and that these differences have important economic consequences.

82.    Professor Marx's analogy fails to acknowledge that DNCCs share many of the intellectual property protection benefits of non-competes, but without the same flaws.  He ignores that, unlike non-competes, DNCCs do not interfere with the employees' ability to explore opportunities outside of their current employers.  This failure to consider the fundamental differences between the two types of agreements makes Professor Marx's analogy erroneous and inapposite.

83.    In support of this point, I note that the DNCCs at issue in this case have little in common with Professor Marx's definition of non-competes.  According to his writing,

> (1) "Non-competes typically either list a set of companies at which the employee may not work or defines a 'field of service' in which the ex-employee may not perform";

> (2) "Regarding geography, non-competes in fields where competition is circumscribed by distance typically specify the spatial range beyond which competitive activity is sanctioned"; [and]

---

[105] Paragraph 21 of the Marx Report states: "[The non-competes] I have studied resemble Anti-Solicitation agreements in that they limit workers' ability to explore potential employment opportunities outside of their current employer and thereby suppress compensation."
[106] Marx, Matt, Deborah Strumsky, and Lee Fleming, "Mobility, Skills, and the Michigan Non-compete Experiment," *Management Science*, Vol. 55, No. 6, June 2009, pp. 875-89.

(3) "A non-compete must spell out the length of time for which the ex-employee is bound after leaving the firm."[107]

84.    According to the evidence that I have reviewed, the DNCCs at issue here do not present any of these features.[108]  Importantly, non-competes restrict *employees'* job-searching activities and future employment, while DNCCs more narrowly guide *employers'* recruiting activities.

85.    These differences imply that even while DNCCs and non-competes sometimes share certain goals, DNCCs come with significantly less inefficient baggage.  Indeed, Professor Marx recognizes the role that non-competes play in employers' protecting intellectual property— which, as I described in Section IV, is also an advantage shared with DNCCs.  Yet Professor Marx fails to consider this benefit in the DNCC context in his expert report:

> Firms use non-competes to protect their interests: to prevent the disclosure of trade secrets, to honor customer confidentiality, and to guard against competitors appropriating the specialized skills and knowledge of its employees…
>
> One might argue that trade secrets are already protected by the nondisclosure agreement (NDA) employees are generally required to sign, but violations of an NDA can be difficult to detect or prove […].  Preventing an ex-employee from joining a competitor reduces the likelihood that an employee will violate the corresponding NDA via so-called "inevitable disclosure" of confidential information at a new job.[109]

86.    On the other hand, DNCCs do not share the disadvantages of non-competes that Professor Marx identifies.  He objects to non-compete agreements because they "limit the worker's ability to explore potential opportunities outside of their current employer."[110]  Unlike non-competes, DNCCs do not deter employees from exploring external opportunities on their own.  Evidence from the DNCCs at issue shows that incumbent employees were able to solicit jobs with other employers, and many of them appear to have done so.[111]

---

[107] Marx, Matt, and Lee Fleming, "Non-compete Agreements: Barriers to Entry...and Exit?" in J. Lerner and S. Stern, eds., *Innovation Policy and the Economy*, Vol. 12, pp. 39-64, The University of Chicago Press, 2012.

[108] Invidi Technologies and Illumita are two examples of companies in the DNCC List that were not even located in the Silicon Valley

[109] Marx, Matt, Deborah Strumsky, and Lee Fleming, "Mobility, Skills, and the Michigan Non-compete Experiment," *Management Science*, Vol. 55, No. 6, June 2009, pp. 875-89

[110] Marx Report ¶21.

[111] See e.g. E-mail from Laszlo Bock, 11/4/06 (GOOG-HIGH TECH-00008242-3); Schmidt Deposition, pp. 66:24–67:4; E-mail from Arnon Geshuri, 10/1/07 (GOOG-HIGH TECH-00024458–9).

Highly Confidential

87.     Because DNCCs allow employees affirmatively to seek opportunities outside of their current employers, DNCCs also do not compel employees who "[leave] their jobs [also to leave] the industry, taking less attractive jobs in fields where they could not use their skills."[112]  That is, non-competes impose a barrier to employees who would otherwise actively seek out alternative jobs in their employer's industry.  In contrast, the DNCCs at issue here simply do not impair or impinge upon such activities, and it would be difficult to argue any sort of disincentive to seek better employment opportunities as a result.  Consequently, it is inapposite and logically inconsistent to ascribe these same alleged downsides of non-competes to DNCCs.

88.     Moreover, Professor Marx extrapolates his research findings into a very different context. His papers are written about patents in Michigan in the 1980s,[113] with a strong connection to the phenomena occurring in the automotive industry of that time.[114]  Applying the findings to the fast paced innovation and rapidly evolving collaboration of the Silicon Valley in the 21st century appears to be a stretch, and Marx presents no convincing reason to accept the analogy.

89.     There are further inconsistencies and logical flaws in Professor Marx's argument.  In his report, he admits that in contrast to DNCCs, "non-compete agreements are between employers and employees—usually in writing—both of which have knowledge of what they are covenanting (not) to do."[115]  However, his study found that 70% of interviewees were informed of the requirement to sign a non-compete only after they accepted a job offer;[116]  and were "blindsided" by them.[117]  Similarly, he argues that:

> [N]on-compete agreements do not bar the employee from approaching or being approached by other companies, or even interviewing with those companies; they only bar the employee from taking the job. Thus an employee subject to non-compete agreements could in theory explore outside options even without the intention of leaving the current employer and thus without breaking their covenant.[118]

---

[112] Marx Report ¶21bii.

[113] Marx Report ¶21bi.

[114] Marx, Matt, Deborah Strumsky, and Lee Fleming, "Mobility, Skills, and the Michigan Non-compete Experiment," *Management Science*, Vol. 55, No. 6, June 2009, pp. 875-89.

[115] Marx Report ¶22.

[116] Marx, Matt. "The Firm Strikes Back Non-compete Agreements and the Mobility of Technical Professionals." *American Sociological Review*, Vol. 76, No. 5, 2011, pp. 695-712.

[117] See report by Dizikes, Peter, "Non-compete Agreements Create 'Career Detours'" *MIT News*, 10/4/11, http://web.mit.edu/newsoffice/2011/non-compete-agreements-1005.html, retrieved on 11/24/13.

[118] Marx Report ¶22

90.    What Marx clearly fails to recognize is that (1) the ability to "in theory explore outside options" is effectively useless if the employee is barred from taking the job; and (2) that DNCCs provide a real—not theoretical—ability to explore outside options without breaking any agreement.

Eric Talley
November 25, 2013

# Exhibit 1

# Board Overlap Among Defendants and Comparable Companies

|  | Bay Area | United States |
|---|---|---|
| Average Number of Boards per Boardmember | 3.5 | 3.3 |
| Median Number of Boards per Boardmember | 3 | 2 |
| Percent of Boardmembers on 2+ Boards | 78% | 66% |
| Percent of Boardmembers on 5+ Boards | 25% | 22% |
| Sample Size | 178 | 1,745 |

Source:  S&P Capital IQ.

Note:  The sample was selected by looking for current board members of companies that (1) shared a Capital IQ business line with at least one of the seven defendants and (2) currently have more than 1000 employees.  The Bay Area includes only board members of companies primarily located in the Oakland Area, San Francisco Area, or San Jose Area.  The United States includes only board members of companies primarily located in the United States

# Exhibit 2
# Companies in Each of Google's, Apple's, Intel's, and Intuit's Respective Business Lines



Note:  For Google and each defendant who allegedly had an agreement with Google we obtained a list of companies sharing at least one Capital IQ industry classification and limited it to companies with more than 1000 employees located in the San Francisco, San Jose, and Oakland metropolitan areas.  Capital IQ assigns approximately 3-20 industry classifications to each company.  Each line connects a company (or group of companies) to the defendants with whom it (or they) shares at least one industry classification.

# Appendix A

## Eric L. Talley

**Professor of Law**
**Arthur and Rosalinde Gilbert Foundation Chair in Law, Business and the Economy**
**Faculty Co-Director, Berkeley Center for Law, Business and the Economy**
**University of California, Berkeley (Boalt Hall) School of Law**
Berkeley, CA  94720-7200
(510) 642-7875 (office – UC Berkeley)
Email: *etalley@law.berkeley.edu*

## Professional/Employment

| | |
|---|---|
| *2009-Pres.* | **Arthur and Rosalinde Gilbert Foundation Chair in Law, Business and the Economy,** UC Berkeley School of Law, Berkeley CA. |
| *2006-Pres.* | **Professor of Law,** University of California, Berkeley (Boalt Hall) School of Law. Co-Director, Berkeley Center for Law, Business and the Economy. |
| *2004-2013.* | **Senior Economist**, RAND Corporation, Santa Monica, CA, Institute for Civil Justice (Affiliated adjunct staff). |
| *2011* | **Visiting Professor of Law**, University of Chicago Law School, Chicago IL. |
| *2008-2009* | **Robert B. and Candice J. Haas Visiting Professor in Corporate Finance and Law,** Harvard Law School, Cambridge, MA. |
| *2006* | **Guest Commentator**, *Marketplace* Radio; American Public Media. Weekly slot on *Marketplace* national public radio program. |
| *2005-2006* | **Visiting Professor of Law,** UC Berkeley School of Law. Co-Director, Berkeley Center for Law, Business and the Economy. |
| *2005-2006* | **Ivadelle & Theodore Johnson Chair in Law and Business,** University of Southern California, Gould School of Law. |
| *2005-2006* | **Professor of Finance and Business Economics (Secondary Appointment),** University of Southern California, Marshall School of Business. |
| *2000-2005.* | **Professor of Law,** Univ. of Southern California Law School. (Director, USC Center in Law Economics & Organization, 2002-2004; Director, USC/Caltech Olin Center for Study of Law & Rational Choice, 2002-2004). |
| *2003 (Spr.)* | **Visiting Research Fellow,** Institute for Civil Justice, RAND Corporation, Santa Monica, CA. |

1

| | |
|---|---|
| *2001 (Spr/Aut.)* | **Visiting Professor of Law,** California Institute of Technology, Department of Humanities and Social Sciences. (Courses: Law and Economics; Regulation of Securities Markets). |
| *2000 (Aut.)* | **Visiting Professor of Law and Alfred P. Sloan Research Fellow,** Georgetown University Law Center. |
| *1997-2000* | **Associate Professor of Law,** University of Southern California Law School. |
| *1995-1997* | **Assistant Professor of Law,** University of Southern California Law School. |
| *1993-94* | **Contract Specialist,** Brown & Bain, Palo Alto, CA (non-practicing consultant). |
| *1993* | **Summer Associate,** Brown & Bain, Palo Alto, CA. |
| *1993* | **Lecturer,** Stanford Economics Department. Intermediate microeconomics. |
| *1990, 1992* | **Instructor,** Stanford Law School. Taught two seminars for law faculty on the fundamentals of economic analysis and game theory. |

**Education**

| | |
|---|---|
| Ph.D./J.D. | **Stanford University Department of Economics & Stanford Law School.** 1989-95, 1999. Dissertation Committee: Paul R. Milgrom. (Principal); Ian Ayres; A. Mitchell Polinsky. |
| B.A. | **University of California, San Diego.** 1984-88. Magna Cum Laude. Majors: economics and political science; minor: mathematics. |
| High School | **Los Alamos High School,** Los Alamos, NM. 1981-84. |

**Courses Taught**

| | |
|---|---|
| I. | Corporate Law / Business Associations |
| II. | Corporate Finance |
| III. | Corporate Finance and Law Topics (seminar) |
| IV. | Contract Law |
| V. | Mergers and Acquisitions |
| VI. | Securities Regulation |
| VII. | Law and Economics |
| VIII. | Law and Game Theory Seminar |
| IX. | Quantitative Methods in the Law |

**Books**

· EXPERIMENTAL LAW AND ECONOMICS (Edward Elgar Publishing Ltd.,2008) (co-edited with Jennifer Arlen).

**Articles / Chapters**

· *Legislation with Endogenous Preferences*, in HANDBOOK OF MARKET DESIGN (Roth, Vulkan & Neeman, eds.) (with A. Heifetz & E. Segev) (forthcoming 2013).

·

· *The World's Most Important Number:  How a Web of Skewed Incentives, Broken Hierarchies and Compliance Cultures Conspired to Undermine LIBOR,* JASSA, 2 FINSIA JOURNAL OF APPLIED FINANCE 50  (with Samantha Strimling) (forthcoming 2013).

· *Law, Economics, and the Burden(s) of Proof*, in RESEARCH HANDBOOK ON THE ECONOMICS OF TORTS (J. Arlen, ed) (forthcoming 2013).

· *Left, Right and Center: Strategic Information Acquisition and Diversity in Judicial Panels* (with Matthew Spitzer), 29 LAW ECON. & ORG. 638 (2013).

· *The Measure of a MAC: A Machine-Learning Protocol for Tokenizing Force Majeure Clauses in M&A Agreements* (with D. O'Kane)*, 168* J. INST. & THEOR. ECON. 181 (2012)*.*

· *On Uncertainty, Ambiguity, and Contractual Conditions,* 34 DEL. J. CORP. LAW 755 (2009).

· *The Supervisory Capital Assessment Program: An Appraisal* (with  Johan Walden) (June 2009), *TARP Congressional Oversight Panel, June 2009 Report to Congress, Elizabeth Warren Chair.*

· *Public Ownership, Firm Governance, and Litigation Risk,* 76 U. CHI. L. REV. 335 (2009*)*

· *Going Private Decisions and the Sarbanes Oxley Act of 2002: A Cross-Country Analysis* (with Ehud Kamar and Pinar Karaca-Mandic), 25:1 J. LAW ECON. & ORG. 107-33 (2009). *Corporate Practice Commentator* designation as author of one of the "Ten Best Corporate and Securities Articles written in 2009."

· *Introduction to Experimental Law and Economics, in* EXPERIMENTAL LAW AND ECONOMICS (Edward Elgar Publishing Ltd., 2008) (with Jennifer Arlen).

· *Hope and Despair in the Magic Kingdom, In Re. Disney Shareholders Litigation,* ICONIC CASES IN CORPORATE LAW (Jonathan Macey, ed.) (2008) (with James D. Cox)

· *Investor and Industry Perspectives on Investment Advisers and Broker-Dealers,* RAND Technical Report TR-556-SEC (2008) (with Angela A. Hung, Noreen Clancy, Jeff Dominitz, Claude Berrebi, and Farrukh Suvankulov).

- *Design of the Qatar National Research Fund,* RAND Technical Report TR-209-QF (2008) (with Debra Knopman, Victoria A. Greenfield, Gabrielle Bloom, Edward Balkovich, D. J. Peterson, James T. Bartis, Stephen Rattien, Richard Rettig, Mark Y.D. Wang, Michael Mattock, Jihane Najjar, & Martin C. Libicki).

- *Experimental Law and Economics, in* HANDBOOK OF LAW AND ECONOMICS (A. Mitchell Polinsky & Steven Shavell, eds.) (2007) (with Colin Camerer).

- *Market Design with Endogenous Preferences* (with Aviad Heifetz & Ella Segev), 58 GAMES & ECON. BEHAVIOR 121-153 (2007).

- *Cataclysmic Liability Risk Among Big-Four Auditors,* 106 COLUM. L. REV. 1641 (2006).

- *On the Private Provision of Corporate Law* (with Gillian Hadfield), 22 J. LAW, ECON. & ORG 414 (2006).

- *Expectations and Legal Doctrine, in* PARADOXES AND INCONSISTENCIES IN THE LAW 183-204 (O. Perez & G. Taubner, eds. 2006).

- Bargaining in the Shadow of Different Regimes (with Ian Ayres), *in* Ian Ayres, OPTIONAL LAW (2005).

- *Unregulable Defenses and the Perils of Shareholder Choice* (with Jennifer Arlen)*, 152 U. PENN. L. REV. 577 (2003). *Corporate Practice Commentator* designation as author of one of the "Ten Best Corporate and Securities Articles written in 2004."

- *Endowment Effects and Corporate Agency Relationships,* 31 J. LEGAL. STUD. 1 (2002) (with Jennifer Arlen and Matt Spitzer).

- *On the Demise of Shareholder Primacy (or, Murder on the James Trains Express),* 75 SO. CAL. L. REV. 1211 (2002).

- *Securities Fraud Class Actions: 70 Years Young, in* RAND Review (Summer 2004), at 42.

- *Playing Favorites with Shareholders,* 75 SO. CALIF. L. REV. 276 (2002) (with Stephen Choi) (*reprinted with permission in* 44 CORPORATE PRACTICE COMMENTATOR 235 (2002)).

- *Law and Economics (Theory of), in* THE OXFORD COMPANION TO AMERICAN LAW (David S. Clark, ed.) (2002).

- *Your (Increasingly) Legal Options,* USC LAW 45 (Fall 2001).

- *The Corporate Opportunity Doctrine, in* 2001 USC INSTITUTE FOR CORPORATE COUNSEL: READING MATERIALS (2001) (with Mira Hashmall).

- *Disclosure Norms,* 149 U. PENN. L. REV. 1955 (2001).

· *A Theory of Legal Presumptions* 16 J. L. ECON. & ORG. 1 (2000) (with Antonio Bernardo & Ivo Welch).

· *Judicial Auditing,* 29 J. LEGAL STUD. 649 (2000) (with Matthew Spitzer).

· *Taking the "I" Out of "Team": Intra-Firm Monitoring and the Content of Fiduciary Duties,* 24 J. CORP. LAW 1001 (1999).

· *Precedential Cascades: An Appraisal,* 73 SO. CAL. L. REV. 87 (1999).

· *Turning Servile Opportunities to Gold: A Strategic Analysis of the Corporate Opportunities Doctrine,* 108 YALE L. J. 277 (1998). *Corporate Practice Commentator* designation as author of one of the "Ten Best Corporate and Securities Articles written in 1999."

· *Interdisciplinary Gap-Filling: Game Theory and the Law,* 22 J. LAW & SOC. INQ. 1055 (1997) (review essay).

· *Investment Policy and Exit-Exchange Offers within Financially Distressed Firms*, 51 J. FINANCE 871 (1996) (with Antonio Bernardo).

· *Liability-Based Fee Shifting Rules and Settlement Mechanisms Under Incomplete Information,* 71 CHI.-KENT L. REV. 461 (1995).

· *Distinguishing Between Consensual and Non-consensual Advantages of Liability Rules*, 105 YALE L. J. 235 (1995) (with Ian Ayres).

· *Solomonic Bargaining: Dividing a Legal Entitlement to Facilitate Coasean Trade*, 104 YALE L.J. 1027 (1995) (with Ian Ayres).

· *Contract Renegotiation, Mechanism Design and the Liquidated Damages Doctrine,* 46 STAN. L. REV. 1195 (1994).

· BARGAINING UNDER INCOMPLETE INFORMATION AND THE DESIGN OF LEGAL RULES, Doctoral Dissertation, Stanford University (1999).

## Submitted Papers, Working Papers and Works-in-Progress

· *A Model of Optimal Government Bailouts* (with Antonio Bernardo and Ivo Welch) (available for download at SSRN: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1830583).

· *Optimal Liability for Terrorism* (with Darius Lakdawalla) (2005)

· *Uncorporated Professionals* (with John Romley) (2004) (available for download at SSRN: http://papers.ssrn.com/sol3/papers.cfm?abstract_id=587982).

· *Equilibrium Expectations and Legal Doctrine* (2005).

· *The Impact of Regulation and Litigation on Small Business and Entrepreneurship: An Overview*, RAND Working Paper WR-317-ICJ (2006) (with Lloyd Dixon, Susan M. Gates, Kanika Kapur, and Seth A. Seabury).

· *Criteria Used to Define a Small Business in Determining Thresholds for the Application of Federal Statutes,* RAND Working Paper WR-292-ICJ (2005) (with Ryan Keefe and Susan M. Gates).

· *A Defense of Shareholder Favoritism* (with Stephen Choi 2002).

· *Incentives, Investment, and the Legal Protection of Trade Secrets* (with Gillian Lester, 2001).

· *Corporate Governance, Executive Compensation and Securities Litigation* (May 2004) (with Gudrun Johnsen).

· *Private Information, Self-Serving Biases, and Optimal Settlement Mechanisms: Theory and Evidence* (November 2003) (with Seth Seabury).

· *Trade Secrets and Mutual Investments* (with Gillian Lester) USC Law School Working Paper # 00-15; Georgetown Law and Economics Research Paper No. 246406 (Oct. 2000).

· *A Note on Presumptions with Sequential Litigation,* USC Olin Working Paper # 99-9 (with Antonio Bernardo) (1999).

· *Property Rights, Liability Rules, and Coasean Bargaining Mechanisms under Incomplete Information,* Stanford Olin Working Paper # 108 (1994).

· *Incentive Theory Falls Into Diablo Canyon: Optimal Regulation Under Political Constraints* (September, 1993).

## Funding/Grants

· Securities and Exchange Commission Grant to study investment advisors and broker dealers, RAND Corporation, 1/2007-3/2008; $280,000 (research staff, task director).

· Ewing Marion Kauffman Foundation, 3-year support grant to fund RAND Center for the Study of Small Business Regulation and Litigation; 11/03-10/06; $1,500,000 (co-PI).

· John Olin Foundation, 3-year support grant to fund USC/Caltech Program in Law and Rational Choice, 6/02-6/05; $300,000 (PI).

· University of Southern California, 3-year Seed Money Grant to Implement USC Center in Law, Economics and Organization, 7/00-6/03; $800,000 (co-PI).

· University of Southern California Zumberge Junior Faculty Award, 8/97-6/98; $30,000 (PI).

6

**Endowed Presentations and Addresses**

·      Twenty-Fifth Annual Francis G. Pileggi Distinguished Lecture in Law, Delaware Journal of Corporate Law, Widener University, October 2008.

·      Ninth Annual Distinguished Speaker Series, McGeorge Law School, University of the Pacific, November 2001 (*Common Agency in Fiduciary Law*).

**Consulting/Testimony**

·      <u>Kane v. Ho et al</u> (2013). Retained as an expert to opine on alter ego liability and business judgment related to corporate dividend policies of Emerson Radio Corporation.

·      <u>Innkeepers v. Cerberus</u> (2011). Retained as an expert to opine on contractual language in a material adverse event provision in a corporate acquisition.

·      <u>In Re Flex Fuels et al</u> (2010). Retained as expert in corporate governance regarding authority of board and officer nominations.

·      <u>SenesTech, Inc.</u> (2010). Retained as expert consultant to provide corporate governance training to board of directors.

·      <u>Klass v. Vestin Mortgage et al.</u> (2010). Retained as expert in corporate governance and compensation in dispute concerning effects of merger transactions.

·      <u>Bates et al. v. Skilled Healthcare Inc. et al.</u> (2009).  Retained as expert on corporate structure, limited liability, agency, the purposes of the corporate form, and piercing the corporate veil.

·      <u>Ammari Electronics et al. v. SBC Yellow Pages</u> (2008-09, 2011-12).  Retained as expert on economic valuation of contract rights and damages calculation in breach of contract class action alleging delivery shortfalls of advertiser-sponsored directories.

·      <u>Marvell Technology Group</u> (2007-08). Retained as expert consultant to provide corporate governance training to senior executive and board relating to managerial oversight, appropriate delegation, and conflicts of interest.

·      <u>Recipco v. Citigroup (Smith Barney) and Rothstein</u> (2007).  Retained as expert on corporate governance matters pertaining to the formation of, conduct of, and reaction to an internal investigation performed by a special litigation committee formed by a board of a privately-held company.

·      <u>Fitzhugh v. Granada Healthcare</u> (2007). Retained as expert on corporate structure, limited liability, agency, the purposes of the corporate form, and piercing the corporate veil.

·   <u>Inamed LLC v. Newcomb et al.</u> (2006).  Retained as expert on the economic incentives regarding fiduciary and professional conduct obligations that an in-house attorneys owe to former employers in civil lawsuit involving a concentrated industry.

·   <u>Islamic Republic of Iran v. The United States of America</u> (2006).  Retained as expert for U.S. State Department on the nature and economic valuation of loss in context of property and contractual rights allegedly belonging to Iran but never repatriated.  Iran-United States Claims Tribunal, The Hague, Netherlands.

·   <u>John Garamendi, California Insurance Commissioner v. Credit Lyonnais et al.</u> (2004-05). Retained as expert on nature of optimal deterrence and damages in context of purchase/sale of financial assets.

·   <u>Doe v. Unocal Corp.</u> (2003).  Retained as expert on organizational structure, limited liability, agency, the purposes of the corporate form, and piercing the corporate veil.

·   <u>Deutsche Bank, North America Equities Research</u> (2002).  Retained to acquaint stock analysts of factors relevant to prospective injunctive relief order in breach of contract action between Boston Scientific Corporation & Cook, Inc.

·   <u>Robert J. Wagner vs. Aaron Spelling Productions et al.</u> (2002). Retained as expert on bargaining dynamics and nature of economic loss in contractual settlement concerning cancelled network television series.

·   <u>Gonzales v. Michael Angelo's Foods</u> (1999). Designated as expert on corporate opportunity appropriation.

·   <u>ARI Property Management Corp. v. Van Zoebrook et al</u> (2001-02). Retained as expert on corporate opportunity appropriation.

·   <u>In re Tata Consultancy</u> (1993). Retained as expert on reasonableness of liquidated damages provision in employment contract.

**Media Appearances (Selected)**

·   *"Marketplace" American Public Radio: <u>Corporate Trials and Retrials</u> (January 2005) (interview with <u>Tess Vigeland</u> regarding ongoing white collar crime trials).*

·   *"Marketplace" American Public Radio: <u>Merger Mania</u> (February 2005) (interview with <u>Kai Ryssdal</u>).*

·   *"Marketplace Report on Day-to-Day" National Public Radio: <u>The Marketplace Report: SEC May Relax Regulations</u> (February 2005) (interview with <u>Tess Vigeland</u> regarding possible decline of corporate oversight and compliance regulations in the post-Enron era).*

- *"Marketplace"* American Public Radio: <u>*So Long and Farewell to the SEC*</u> *(June 2005) (interview with* <u>*Kai Ryssdal*</u> *regarding the departure of William Donaldson from the SEC).*

- *"Morning Edition," National Public Radio:* <u>*Pension Fund Sues Morgan Stanley*</u> *(July 2005) (interview with Wendy Kaufman discussing Morgan Stanley compensation litigation by pension fund).*

- *"Marketplace"* American Public Radio: <u>*Cornering the Corner Office*</u> *(January 2006) (interview with* <u>*Tess Vigeland*</u> *regarding the SEC's proposed executive compensation reforms).*

- *"Marketplace"* American Public Radio: <u>*Ben Bernanke Preview*</u> *(January 2006) (interview with* <u>*Lisa Napoli*</u> *about the Federal Reserve's new chair).*

- *"Marketplace"* American Public Radio: <u>*Corporate Pension Plan Changes*</u> *(February 2006) (interview with* <u>*Lisa Napoli*</u> *regarding the recent trend in pension cutbacks and freezes at major U.S. Companies).*

- *"Marketplace"* American Public Radio: <u>*Betting on home prices*</u> *(February 2006) (interview with* <u>*Tess Vigeland*</u> *regarding real estate derivative markets) -- RealAudio Format.*

- *"Marketplace"* American Public Radio: <u>*The Supreme Court's Impact on Business*</u> *(March 2006) (interview with* <u>*Mark Austin Thomas*</u> *providing an update of business-related cases before the Court during the current term).*

- *"Marketplace"* American Public Radio: <u>*Regulating the NYSE*</u> *(March 2006) (interview with* <u>*Chery Glaser*</u> *regarding the challenges that confront the NYSE as it moves from a non-profit to a for-profit corporation.*

- *"Marketplace"* American Public Radio: <u>*Talley on Fastow*</u> *(March 2006) (interview with* <u>*Chery Glaser*</u> *regarding the Enron trial, Andrew Fastow's testimony and Sarbanes-Oxley)*

- *"Marketplace"* American Public Radio: <u>*Enron Trial Continues*</u> *(April 2006) (interview with* <u>*Mark Austin Thomas*</u> *discussing the much-anticipated testimony of Ken Lay, and personality differences between himself and Jeffrey Skilling).*

- *"Marketplace"* American Public Radio: <u>*Accounting standards for small business*</u> *(April 2006) (interview with* <u>*Mark Austin Thomas*</u> *discussing the SEC's Advisory Committee on Small Business' recommendation that the internal controls section of the Sarbanes-Oxley act be relaxed for small-cap and micro-cap issuers)*

- *"Marketplace"* American Public Radio: <u>*Demand Is High for Lawyers*</u> *(April 2006) (interview with* <u>*Mark Austin Thomas*</u> *discussing the recent increases in large law firm salaries for first year associates) -- RealAudio Format.*

9

·   *"Marketplace" American Public Radio: Going Bankrupt Isn't Cheap (April 2006) (interview with Mark Austin Thomas discussing legal and professional fees being paid in high-profile bankruptcies).*

·   *"Marketplace" American Public Radio: Shareholder Activism (May 2006) (interview with Mark Austin Thomas discussing shareholder activism).*

·   *"Marketplace Money" American Public Radio: Secrets and Stocks (May 2006) (interview with Kai Ryssdal regarding the secrecy policies of companies like Google and how much that should matter for investors).*

·   *"Marketplace" American Public Radio: White House Economic Forecast (June 2006) (interview with Stacey Vanek-Smith discussing inferences from mid-year report on the economy).*

·   *"Marketplace" American Public Radio: HP Drama Unfolds on Capitol Hill (September 2006) (interview with Kai Ryssdal regarding the 'pretexting' scandal at Hewlett-Packard Co.).*

·   *"Mornings on 2" KTVU Television (September 2006) (interview with Ross McGowan discussing the 'pretexting' scandal at Hewlett-Packard Co.).*

·   *"Morning Edition," National Public Radio: Merck Cleared in Vioxx Death Case (March 2007) (interview with Wendy Kaufman discussing litigation strategy and settlement in multi-district tort litigation).*

·   *"Marketplace Money" American Public Radio: The changing face of investor lawsuits (June 2007) (interview with Tess Vigeland regarding recent Supreme Court business and securities cases).*

·   *"Forum" (with Michael Krasny); KQED Radio, San Francisco: Stock option backdating scandal (August 2007) (panel interview and discussion with Dave Iverson).*

·   *"Marketplace" American Public Radio: Is there subprime in your portfolio? (August 2007) (interview with Ashley Milne-Tyte regarding contagion effects from the subprime market crisis).*

·   *"Marketplace" American Public Radio: SEC looks into Goldman Sachs-Facebook Deal (January 2011) (interview with Stacey Vanek-Smith on legal permissibility of Facebook private offering).*

·   *"Forum" KQED Public Radio San Francisco: Financial Reform, One Year Later (July 2011) (interview with Larry Mantle discussing implementation of the Dodd-Frank Act)*

·   *"Marketplace" American Public Radio: HP Gets Activist on Board (November 2011) (interview with Jennifer Collins, discussing addition of activist hedge fund manager on Hewlett Packard's board of directors).*

10

- *"Airtalk" KPPC Radio Los Angeles: Activist Shareholders try New Tactics (February 2013) (interview with Larry Mantle in role of publicly-minded institutional investors in corporate governance debates).*

- *"Take Two" KPPC Radio Los Angeles: What do new US patent laws mean for inventors? (March 2013) (interview with A. Martinez on effect of recent changes to patent law)*

## Awards and Service

- BARBRI, Inc., Legal Education Advisory Board, August 203-Pres.

- UC Berkeley Campus Budget and Interdepartmental Relations Committee (Budget Committee) (2011- Present; Chair, 2013-14).

- UC Berkeley Academic Senate Divisional Council (DIVCO) (2013-14).

- UC Berkeley Academic Planning and Resource Allocation Committee (CAPRA) (2013-14).

- Elected Member, Dean's Faculty Advisory Committee, UC Berkeley School of Law (2010 – 2013).

- Board of Directors, Society for Empirical Legal Scholars (SELS) (2009 - Present) (Vice President 2012-13; President 2013-14).

- Board of Directors, American Law and Economics Association (Three-year term: June 2005-May 2008).

- Program Committee, American Law and Economics Association Annual 2006 Conference.

- Chair, Dean Search Committee, Haas Business School, UC Berkeley (2007-2008).

- Member, National Science Foundation Law and Social Science Grant Evaluation Panel (2008 - 2010).

- Program Committee, American Law and Economics Association Annual 2006 Conference (with D. Rubinfeld, and K. Pastor) (November 2005 – May 2006).

- Chair, Administration and Finance Committee (Elected), USC Law School 2004-05.

- Finance Committee, University of Southern California Board of Trustees (faculty representative), 2004-05.

- Representative, Faculty Senate, University of Southern California 2004-05.

- Board Treasurer, The Growing Place Early Childhood Education Center Board of Directors

(non-profit) 2004-05.

·   Director, The Growing Place Early Childhood Education Center Board of Directors (non-profit), 2002-2004.

·   *Corporate Practice Commentator* designation as author of one of the "Ten Best Corporate and Securities Articles written in 2004 (for *Unregulable Defenses and the Perils of Shareholder Choice)*. 4/05.

·   Chair, Faculty Appointments Committee, USC Law School 2003.

·   Chair, AALS Section in Law and Economics, 2004-05.

·   Chair, AALS Section in Contracts, 2007-08.

·   Chair, Faculty Handbook Committee, University of Southern California, 2002-03. Oversaw complete reorganization of faculty handbook (approved by USC Faculty Senate, 2004).

·   Alfred P. Sloan Foundation Research Fellowship, Georgetown Law Center.  9/00-12/00.

·   *Corporate Practice Commentator* designation as author of one of the "Ten Best Corporate and Securities Articles written in 1999" (for *Turning Servile Opportunities to Gold: A Strategic Analysis of the Corporate Opportunities Doctrine)*. 3/00.

·   Zumberge Junior Faculty Research Award, USC. 7/97 - 7/99.

·   Centennial Teaching Award, Stanford University.  6/95.

·   Articles Editor, *Stanford Law Review* 1993-94 (Volume 46).

·   Outstanding Teaching Assistant Award in Economics. 3/94; 6/94; 12/94.

·   Hellman Prize for Outstanding Law-Review Note, *Stanford Law Review.*  5/94

·   Fellow, Stanford Center for Conflict and Negotiation.  11/92-10/93

·   Goldsmith Award for Outstanding Paper in Dispute Resolution.  4/93

·   Hilmer Oehlmann, Jr. Prize for excellence in legal research and writing.  5/92

·   John Olin Foundation Fellowship in law and economics.  4/94; 6/94; 6/92

·   Phi Beta Kappa

·   Departmental Honors in both economics and political science, University of California, San Diego. Graduated Magna Cum Laude from Revelle College.  12/88

**Professional Affiliations**

·       Referee, *American Economic Review; Rand Journal of Economics; Journal of Law, Economics & Organization; Journal of Legal Studies; Review of Economic Studies; International Review of Law and Economics; International Economic Review; Journal of Law and Economics.*

·       Member, American Law and Economics Association; Society for Empirical Legal Studies.

**PhD Students/Advisees**

·       Surajeet Chakravarty, USC Economics Department (PhD), Lecturer, University of Exeter Business School.

·       Svetlana Pevnitskaya, USC Economics Department (PhD), Assistant Professor of Economics, North Carolina State University.

·       Kathy Zeiler, Caltech, Social Science (PhD) / USC Law (JD), Professor of Law, Georgetown University

·       Jingfeng Lu, USC Economics Department (PhD), Assistant Professor, National University of Singapore Department of Economics.

·       Brian Broughman, UC Berkeley JSP Program (PhD), Assistant Professor of Law, University of Indiana.

·       Michael Gilbert, UC Berkeley JSP Program (PhD), Assistant Professor of Law, University of Virginia.

**Personal**

·       Date of Birth: 26 March, 1966.
·       Married (since 1998) to Gillian Lester, Professor of Law and Interim Dean, UC Berkeley Law School.
·       Two children.
·       Hobbies include cycling, hiking, classical/jazz guitar, and skiing.

13

# Appendix B

## Documents Considered by Eric Talley

| Document Title, Bates Numbers | Document Date |
|---|---|
| **Legal Pleadings** | |
| Plaintiffs' Notice of Motion and Motion for Class Certification, and Memorandum of Law in Support | October 1, 2012 |
| Defendant Intuit Inc.'s Response to Plaintiffs' Second Set of Interrogatories Directed to Defendant Intuit Inc. | April 5, 2012 |
| Intel's Objections and Amended and Supplemented Responses to Plaintiffs' Second Set of Interrogatories | March 12, 2013 |
| Defendant Pixar's Supplemental Objections and Responses to Plaintiffs' Second Set of Interrogatories | March 18, 2013 |
| Defendant Adobe Systems Inc.'s Amended Response to Plaintiffs' Second Set of Interrogatories Directed to Defendant Adobe Systems Inc. | March 20, 2013 |
| Defendant Lucasfilm Ltd.'s Supplemental Objections and Responses to Plaintiffs' Second Set of Interrogatories | March 25, 2013 |
| Defendant Apple Inc.'s Amended Responses to Plaintiffs' Second Set of Interrogatories | March 29, 2013 |
| Google Inc.'s Supplemental Responses to Plaintiffs' Second Set of Interrogatories | March 29, 2013 |
| Plaintiffs' Supplemental Motion and Brief in Support of Class Certification | May 10, 2013 |
| Order Granting Plaintiffs' Supplemental Motion for Class Certification | October 24, 2013 |
| **Depositions** | |
| Deposition of Annon Geshuri | August 17, 2012 |
| Deposition of Shona Brown | January 30, 2013 |
| Deposition of William Campbell | February 5, 2013 |
| Deposition of Eric Schmidt | February 20, 2013 |
| Deposition of Alan Eustace | February 27, 2013 |
| Deposition of Omid Kordestani, with Exhibit 1744 GOOG-HIGH-TECH-00244211-6 | March 11, 2013 |
| Deposition of Sergey Brin | March 19, 2013 |
| Deposition of Larry Page | March 22, 2013 |
| Deposition of Paul Otellini | January 29, 2013 |
| Deposition of Matthew Marx, Vol. 1 | November 15, 2013 |
| **Documents Produced In This Case** | |
| Email Exchange between J. Rosenberg, O. Kordestani, E. Schmidt, S. Brown, and D. Shader, Subject: Proposal, November 4 to November 5, 2003 GOOG-HIGH TECH-00000013-5 | |
| Email Exchange between S. Brown, D. Shader, and J. Rosenberg, Subject: Help? November 5, 2003 to January 3, 2004 GOOG-HIGH-TECH-00061040-2 | |
| Email Exchange between J. Braddi, S. Brown, P. Jene, S. Sullivan, K. Manning, and S. Sanberg, Subject: Recruiting in India, July 6 to July 7, 2004 GOOG-HIGH TECH-00007635-8 | |

| **Document Title, Bates Numbers** | **Document Date** |
|---|---|
| Email Exchange between Arnnon and S. Brown, Subject:  Targeting Competitors, November 1 to November 2, 2004<br>GOOG-HIGH TECH-00007729 | |
| Email Exchange between S. Brown and S. Brin, Subject:  Irate Call From Steve Jobs, February 13 to February 14, 2005<br>GOOG-HIGH-TECH-00293087 | |
| Email Exchange between A. Geshuri, S. Brown, and S. Brin, Subject:  Urgent - Monday AM - Irate Call From Steve Jobs, February 13 to February 14, 2005<br>GOOG-HIGH-TECH-00058392-3 | |
| Email from E. Schmidt, Subject:  Phone Call From Meg Whitman, September 7, 2005<br>GOOG-HIGH-TECH-00264994 | |
| Recruiting Data and Policy Clarifications - Special Agreement, Protocols, and Proposed Amendments<br>GOOG-HIGH-TECH-00194850 | September 8, 2005 |
| Email from E. Schmidt, Subject:  eBay Paypal and Meg, September 11, 2005<br>GOOG-HIGH-TECH-00265013 | |
| Email from O. Kordestani, Subject:  Msg to Jeff Jordan, September 13, 2005<br>GOOG-HIGH-TECH-00265033-4 | |
| Email from A. Geshuri, Subject:  Protocol for Do Not Cold Call and Sensitive Companies, September 15, 2005<br>GOOG-HIGH-TECH-00007713-4 | |
| Email from S. Brown and E. Schmidt, Subject:  Cisco - "Sensitive" Companies, October 11, 2005<br>GOOG-HIGH TECH-00007745 | |
| Email from A. Geshuri, Subject:  Reminder:  Do Not Call List, February 7, 2006<br>GOOG-HIGH-TECH-00235948 | |
| Email from A. Geshuri, S. Brown, J. Ho, and J. Wuttke, Subject:  Google's Do Not Touch List, November 28, 2005 to February 10, 2006<br>GOOG-HIGH-TECH-00007566-7 | |
| Email from S. Rao, S. Brown, A. Geshuri, J. Ho, and J. Wuttke, Subject:  Intuit / Google's Do Not Touch List, November 28, 2005 to April 3, 2006<br>GOOG-HIGH-TECH-00007671-3 | |
| Email from S. Brown, J. Shields, and E. Schmidt, Subject:  Lycos Question, June 22, 2006<br>GOOG-HIGH-TECH-00008036-7 | |
| Email from L. Bock, A. Geshuri, E. Schmidt, M. Whitman, and S. Tilenius, Subject:  Google Targeting Our Sales Folks, November 2 to November 4, 2006<br>GOOG-HIGH-TECH-00008242-3 | |
| Email from A. Geshuri, Subject:  [All Staffing] Please Read:  Reminder – Sensitive Companies and Do Not Call List<br>GOOG-HIGH TECH-00008244 | November 4, 2006 |
| Special Agreement Hiring Policy - Protocol for "Do Not Cold Call" and "Sensitive" Companies<br>GOOG-HIGH-TECH-00008283-4 | November 6, 2006 |
| Email from A. Geshuri, J. Byr, and S. Ryan, Subject:  Do Not Call List, December 1, 2006<br>GOOG-REC-100030555-6 | |
| Special Agreement Hiring Policy - Protocol for "Do Not Cold Call" and "Sensitive" Companies<br>GOOG-HIGH TECH-00000019-26 | December 1, 2006 |
| Email from A. Geshuri, Subject:  Intel Lab Closure at Cambridge University - Request from Alan Eustace, December 4, 2006<br>GOOG-HIGH TECH-00010131-3 | |

| Document Title, Bates Numbers | Document Date |
|---|---|
| Email from S. Brown, C. Fitz-roy, and A. Haslam, Subject:  Genentech Recruiting / Genentech Opportunity, March 26 to March 27, 2007<br>GOOG-HIGH TECH-00023164-6 | |
| Email from A. Geshuri, L. Bock, E. Schmidt, P. Shore, and Michael@dell.com, Subject:  Hiring Our Guys, April 19, 2007<br>GOOG-HIGH TECH-00023106-7 | |
| Email from A. Geshuri and L. Bock, Subject:  MS/Oracle/Sun Hiring, April 30, 2007 to May 9, 2007<br>GOOG-HIGH-TECH-00230684 | |
| Special Agreement Hiring Policy - Protocol for "Restricted Hiring," "Do Not Cold Call," and "Sensitive" Companies<br>GOOG-HIGH TECH-00009376-82 | May 10, 2007 |
| Email from E. Schmidt and A. Geshuri, Subject:  Recruiting from eBay/PayPal, May 14, 2007<br>GOOG-HIGH TECH-00023132 | |
| Email from P. Otellini, Subject:  Nuts!!! Google hired away one of my good guys...after we helped him with Site Selection info, June 3, 2007<br>76616DOC003892 | |
| Email from P. Otellini, P. Murray, and E. Schmidt, Subject:  Hiring, June 4 to June 5, 2007<br>76616DOC003875 | |
| Email from S. Brown, S. Whiteley, and J. Locke, Subject:  Google Targeting Intuit / Vantage Partners Follow Up, June 4 to June 5, 2007<br>GOOG-HIGH TECH-00007704 | |
| Email from B. Campbell, S. Brown, and A. Geshuri, Subject:  Changing Intuit's Status on the Do Not Call List, June 6 to June 7, 2007<br>GOOG-HIGH-TECH-00056885-6 | |
| Email from A. Geshuri, Subject:  Arnnon's Weekly Top Ten – Week of June 11, 2007<br>GOOG-HIGH TECH-00007715-8 | June 12, 2007 |
| Email from A. Geshuri, and F. Wagner, Subject:  Compensation Candidate from Genentech - Any Sensitivity?  August 31, 2007<br>GOOG-HIGH TECH-00010070 | |
| Email from A. Geshuri, E. Schmidt, and M. Sorrell, Subject:  WPP and Ogilvy / FAO Eric Schmidt, Google, September 10 to September 13, 2007<br>GOOG-HIGH-TECH-00059757-8 | |
| Email from P. Otellini and E. Schmidt, Subject:  Recruiting, September 27, 2007<br>40026DOC000016 | |
| Special Agreement Hiring Policy - Protocol for "Restricted Hiring," "Do Not Cold Call," and "Sensitive" Companies<br>GOOG-HIGH TECH-00008342-50 | January 7, 2008 |
| Email from A. Geshuri and C. Fitz-roy, Subject:  Help Connect Great People to Genentech, March 26 - 30, 2007<br>GOOG-HIGH TECH-00008614-5 | |
| Email from S. Sandberg, J. Rosenberg, and S. Gardner, Subject:  Thanks + A Request re Google, August 4 to August 10, 2008<br>GOOG-HIGH-TECH-00248307-11 | |
| Special Agreement Hiring Policy - Protocol for "Do Not Cold Call" and "Sensitive" Companies<br>GOOG-HIGH TECH-00009200-4 | April 24, 2007 |
| Special Agreement Hiring Policy - Protocol for "Restricted Hiring," "Do Not Cold Call," and "Sensitive" Companies<br>GOOG-HIGH TECH-00052337-44; Second Set of Bates GOOG-REC-000000100-7 | November 18, 2008 |

| **Document Title, Bates Numbers** | **Document Date** |
|---|---|
| Email from B. Campbell to S. Jobs, Subject:  Google<br>176APPLE002140; Also 231APPLE002140 | February 18, 2005 |
| Email from D. Lambert, Subject:  Google<br>231APPLE073139 | February 26, 2005 |
| Email from E. Schmidt to S. Jobs, Subject:  Recruiting<br>176APPLE002149; Also 231APPLE002149 | February 13, 2006 |
| Email from A. Eustace to S. Jobs, B. Campbell, & L. Page, Subject:  Jean-Marie Hullot<br>176APPLE002150; Also 231APPLE002150 | March 28, 2006 |
| Email from A. Eustace to S. Jobs, Subject:  Jean-Marie Hullot<br>176APPLE002151-2; Also 231APPLE002151-2 | April 10, 2006 |
| Email from A. Eustace to L. Page, Subject:  Jean-Marie Hullot<br>GOOG-HIGH-TECH-00058495-6 | March 26, 2006 |
| Email from D. Lambert, Subject:  Google Recruiters Calling into Apple - Isolated Incident<br>231APPLE006876-7 | March 9, 2007 |
| Email from P. Otellini to G. Thompson, Subject:  Global Gentleman Agreement with Google - Privileged & Confidential<br>40026DOC000011-4; Also 76526DOC000011-4 | September 6, 2007 |
| Information Services Agreement by and between Apple Computer, Inc. and Google Technology Inc.<br>231APPLE132589-98 | December 20, 2002 |
| Mutual Non-Disclosure Agreement between Google, Inc. and its Subsidiaries and Affiliates<br>231APPLE123280 | February 11, 2005 |
| Confidentiality Agreement between Intuit Inc. and Google Inc.<br>INTUIT_056620-3 | April 12, 2006 |
| Google-Intuit  Product and Promotion Agreement<br>INTUIT_056426-58 | July 10, 2006 |
| License Agreement between Google Inc. and Apple Computer, Inc., 2007<br>231APPLE130883-925 | |
| License Agreement between Google Inc. and Apple Computer, Inc.<br>231APPLE124988-5030 | January 3, 2007 |
| Agreement for Evaluation and Trial of Software between Google, Inc. and Intel Corporation<br>GOOG-HIGH-TECH-00625224-6 | May 8, 2002 |
| Information Services Agreement between Apple Computer, Inc. and Google Technology Inc.<br>GOOG-HIGH-TECH-00625486-95 | December 20, 2002 |
| Amendment One to Information Services Agreement between Google Inc. and Apple Computer, Inc. ("Amendment 1")<br>GOOG-HIGH-TECH-00625496-500 | January 14, 2005 |
| Amendment Two to Information Services Agreement between Google Inc. and Apple Inc. ("Amendment 2")<br>GOOG-HIGH-TECH-00625501-4 | September 12, 2007 |
| Amendment Three to Information Services Agreement between Google Inc. and Apple Inc. ("Amendment 3")<br>GOOG-HIGH-TECH-00625505 | July 14, 2008 |
| Amendment Four to Information Services Agreement between Google Inc. and Apple Inc. ("Amendment 4")<br>GOOG-HIGH-TECH-00625506 | January 15, 2009 |

| **Document Title, Bates Numbers** | **Document Date** |
|---|---|
| Amendment Five to Information Services Agreement between Google Inc. and Apple Inc. ("Amendment 5")<br>GOOG-HIGH-TECH-00625507-8 | August 20, 2009 |
| License Agreement between Google Inc. and Apple Computer, Inc.<br>GOOG-HIGH-TECH-00625553-95 | January 3, 2007 |
| Amendment One to License Agreement between Google Inc. and Apple Computer, Inc. ("Amendment 1")<br>GOOG-HIGH-TECH-00625596-7 | January 14, 2008 |
| Amendment Two to License Agreement between Google Inc. and Apple Inc. ("Amendment 2")<br>GOOG-HIGH-TECH-00625598-622 | March 10, 2009 |
| Amendment Three to License Agreement between Google Inc. and Apple Inc. ("Amendment 3")<br>GOOG-HIGH-TECH-00625623-4 | October 29, 2009 |
| Confidential iTunes Database and Use Agreement between Apple Computer, Inc. and Google Inc.<br>GOOG-HIGH-TECH-00625625-30 | October 26, 2005 |
| Appliance Evaluation Agreement between Google, Inc. and Intel<br>GOOG-HIGH-TECH-00625227-30 | January 28, 2004 |
| Appliance Evaluation Agreement between Google, Inc. and Intel Corporation<br>GOOG-HIGH-TECH-00625235-8 | April 1, 2005 |
| Source Code Evaluation License between Google, Inc. and Intel Corporation<br>GOOG-HIGH-TECH-00625239-46 | September 30, 2005 |
| Google Presentation – "Sourcing Diagnostic," July 2006 (Draft)<br>GOOG-HIGH TECH-00024150-203 | |
| Email from K. Karpati to A. Geshuri, Subject: Update to the Do Not Call List<br>GOOG-HIGH TECH-00008281 | November 7, 2006 |
| Product Integration Agreement between Apple Inc. and YouTube, LLC<br>GOOG-HIGH-TECH-00625509-31 | |
| Google Mail License Agreement between Google Inc. and Apple Inc.<br>GOOG-HIGH-TECH-00625532-52 | May 24, 2007 |
| YouTube, LLC Upload API License Agreement between YouTube, LLC and Apple Inc.<br>GOOG-HIGH-TECH-00625707-21 | August 8, 2007 |
| Amendment One Upload API License Agreement between Apple Inc. and YouTube, LLC<br>GOOG-HIGH-TECH-00625722-3 | May 15, 2008 |
| Second Amendment to Upload API License Agreement between Apple Inc. and YouTube, LLC<br>GOOG-HIGH-TECH-00625724 | September 30, 2008 |
| Third Amendment to Upload API License Agreement between Apple Inc. and YouTube, LLC<br>GOOG-HIGH-TECH-00625725-6 | March 26, 2009 |
| Master iTunes Affiliate Agreement between Apple Inc. and YouTube, LLC<br>GOOG-HIGH-TECH-00625727-32 | January 30, 2008 |
| Cooperative Marketing and Services Agreement between Apple Inc. and Google Inc.<br>GOOG-HIGH-TECH-00625733-46 | December 28, 2007 |
| Google Inc. Appliance Evaluation Agreement for the Google Search Appliance between Google Inc. and Apple<br>GOOG-HIGH-TECH-00625747-50 | January 10, 2005 |
| Google Mutual Non-Disclosure Agreement between Google Inc. and Apple Computer, Inc.<br>GOOG-HIGH-TECH-00625751 | February 11, 2005 |

| **Document Title, Bates Numbers** | **Document Date** |
|---|---|
| Non-Disclosure Agreement<br>GOOG-HIGH-TECH-00625752 | May 21, 2008 |
| Apple Computer, Inc. Prototype License and Confidentiality Agreement between Apple Computer, Inc. and Google Inc.<br>GOOG-HIGH-TECH-00625753-6 | October 19, 2006 |
| Contact Sync License Agreement between Google, Inc. and Apple Inc.<br>GOOG-HIGH-TECH-00625631-41 | January 14, 2008 |
| Letter from P. Schiller, to A. Young, Re:  iPhone Developer Program License Agreement between Apple and Google (the "iPhone SDK Agreement")<br>GOOG-HIGH-TECH-00625642-73 | April 3, 2008 |
| Letter from P. Schiller, to A. Young, Re:  iPhone Developer Program License Agreement and the iPhone Developer Program Enterprise License Agreement between Apple and Google (the "iPhone SDK Agreement")<br>GOOG-HIGH-TECH-00625674 | April 7, 2009 |
| Apple Inc. Registered iPhone Developer Agreement<br>GOOG-HIGH-TECH-00625675-7 | October 20, 2008 |
| Adsense API Terms and Conditions<br>GOOG-HIGH-TECH-00625678-706 | June 23, 2006 |
| Appliance Evaluation Agreement for the Google Search Appliance between Google, Inc. and Intel<br>GOOG-HIGH-TECH-00625231-4 | February 2, 2004 |
| Amendment No. 1 to Source Code Evaluation License Agreement between Google, Inc. and Intel Corporation<br>GOOG-HIGH-TECH-00625247 | November 1, 2007 |
| Chipset Source Code License Agreement between Google, Inc. and Intel Corporation<br>GOOG-HIGH-TECH-00625248-55 | February 1, 2008 |
| History - Exhibit A<br>GOOG-HIGH-TECH-00625256-9 | |
| History - Exhibit A<br>GOOG-HIGH-TECH-00625260-3 | |
| Beta Evaluation Agreement for the Google Search Appliance Pre-release Version between Google, Inc. and Intel Corporation<br>GOOG-HIGH-TECH-00625264-6 | May 10, 2009 |
| Evaluation License Agreement between Google, Inc. and Intel Corporation<br>GOOG-HIGH-TECH-00625267-9 | July 25, 2008 |
| Exhibit A to Google Inc. Source Code Evaluation License for IndexBench Software Release No. 0.0<br>GOOG-HIGH-TECH-00625270-2 | February 17, 2009 |
| Intel Corporation Restricted Use License Agreement<br>GOOG-HIGH-TECH-00625273-6 | June 30, 2009 |
| Email from S. Brown, Subject:  Urgent --- Apple Etc.<br>GOOG-HIGH-TECH-00235168 | February 14, 2005 |
| Google Recruiting Data and Policy Clarifications - Special Agreements, Protocols, and Amendments<br>GOOG-HIGH-TECH-00194850 | September 8, 2005 |
| Email from A. Geshuri, Subject:  Shona - for Your Review - Protocol for Do Not Cold Call and Sensitive Companies<br>GOOG-HIGH-TECH-00007713-4 | September 15, 2005 |
| Email from S. Brown, Subject:  Shona - for Your Review - Protocol for Do Not Cold Call and Sensitive Companies<br>GOOG-HIGH-TECH-00007725-6 | September 25, 2005 |

| **Document Title, Bates Numbers** | **Document Date** |
|---|---|
| Email from E. Schmidt, Subject:  Protocol For "Do Not Cold Call" and "Sensitive" Companies - Please Comment to Arnnon ASAP if You Have Any Changes<br>GOOG-HIGH-TECH-00007731-2 | October 4, 2005 |
| Email from A. Geshuri, Subject:  Reminder:  Do Not Call List<br>GOOG-HIGH-TECH-00235948 | February 7, 2006 |
| Google Special Agreement Hiring Policy - Protocol for "Do Not Cold Call" and "Sensitive" Companies<br>GOOG-HIGH-TECH-00000076-7 | April 10, 2006 |
| Email Exchange between A. Geshuri, E. Schmidt, and P. Otellini, Subject:  Recruiting, May 4 to May 5, 2006<br>GOOG-HIGH-TECH-00058868 | |
| Email Exchange between B. Strader, A. Geshuri, and E. Schmidt, Subject:  Recruiting (Intel), May 4 to May 10, 2006<br>GOOG-HIGH-TECH-00058869-70 | |
| Email Exchange between J. Rosenberg and L. Bock, Subject:  Mike Hoefflinger, August 22 to August 23, 2006<br>GOOG-HIGH-TECH-00056790 | |
| Email Exchange between A. Geshuri and T. Vanlandingham, Subject:  Intel Lab Closure at Cambridge University-Request from Alan Eustace<br>GOOG-HIGH-TECH-00010131-3 | December 4, 2006 |
| Email from A. Geshuri, Subject:  [Please Read] Important Reminder:  Do Not Call Protocol<br>GOOG-HIGH-TECH-00009449 | March 8, 2007 |
| Email Exchange between D. Harbert, C. Cunningham, L. Stepp, A. Swift, T. Evangelista, P. Anderson, and S. Manthe, Subject:  Intel Lab Closure at Cambridge University-Request from Alan Eustace, April 11 to April 12, 2007<br>40007DOC000274-9, also 76507DOC000274-9 | |
| Email Exchange between D. Tratos, G. Ong, D. Harbert, F. Thigpen, L. Stepp, A. Swift, T. Evangelista, P. Anderson, and S. Manthe, Subject:  Intel Lab Closure at Cambridge University-Request from Alan Eustace, April 11 to April 13, 2007<br>40024DOC000026-30, also 76524DOC000026-30 | |
| Email Exchange between P. Otellini, and A. Bryant, Subject:  FYI<br>40026DOC000007, also 76526DOC000007 | April 16, 2007 |
| Google Special Agreement Hiring Policy - Protocol for "Do Not Cold Call" and "Sensitive" Companies<br>GOOG-HIGH-TECH-00009202-4 | April 24, 2007 |
| Email Exchange between A. Geshuri, L. Bock, and E. Schmidt, Subject:  Rules About Hiring Intel Employees<br>GOOG-HIGH TECH-00009243 | June 3, 2007 |
| Email Exchange between E. Schmidt, L. Bock, P. Otellini, and R. James, Subject:  Google Recruiting, September 26 to September 27, 2007<br>GOOG-REC-100029992-*3* | |
| Email from Otellini, Subject:  Google Recruiting<br>76616DOC002617 | September 27, 2007 |
| Email from P. Otellini, Subject:  Recruiting<br>40026DOC000016; also 76526DOC000016 | September 27, 2007 |
| Email Exchange between A. Geshuri, E. Schmidt, L. Bock, P. Otellini, and R. James, Subject:  Google Recruiting, September 26 to October 1, 2007<br>GOOG-HIGH TECH-00024458-9 | |

| **Document Title, Bates Numbers** | **Document Date** |
|---|---|
| Email Exchange between A. Geshuri, E. Schmidt, L. Bock, P. Otellini, and R. James, Subject:  Google Recruiting, September 26 to October 1, 2007<br>GOOG-REC-100029956-8 | |
| Email Exchange between L. Page, E. Schmidt, L. Bock, P. Otellini, and S. Brown, Subject:  Talked to Paul O, November 29 to November 30, 2007<br>GOOG-HIGH-TECH-00471776-87 | |
| Email Exchange between S. Sandberg, J. Rosenberg, and S. Gardner, Subject:  Thanks + A Request re Google, August 4 to August 10, 2008<br>GOOG-HIGH-TECH-00248307-11 | |
| Google-Intuit Product and Promotion Agreement<br>GOOG-HIGH-TECH-00625277-357 | July 10, 2006 |
| Amended and Restated Google-Intuit Product and Promotion Agreement<br>GOOG-HIGH-TECH-00625358-443 | October 15, 2007 |
| Amendment Number One to Google-Intuit Product and Promotion Agreement<br>GOOG-HIGH-TECH-00625444-5 | November 1, 2006 |
| Amendment Number Two to Amended and Restated Google-Intuit Product and Promotion Agreement<br>GOOG-HIGH-TECH-00625446-53 | November 11, 2008 |
| Google Software Distribution Agreement<br>GOOG-HIGH-TECH-00625454-63 | August 14, 2007 |
| Google Software Distribution Agreement<br>GOOG-HIGH-TECH-00625464-73 | December 5, 2007 |
| Urchin Test Case Study Agreement<br>GOOG-HIGH-TECH-00625474 | October 3, 2005 |
| Mutual Non-Disclosure Agreement<br>GOOG-HIGH-TECH-00625475-7 | August 13, 2009 |
| Google Mutual Non-Disclosure Agreement<br>GOOG-HIGH-TECH-00625478-9 | October 29, 2007 |
| Ad Research Study Agreement<br>GOOG-HIGH-TECH-00625480 | January 26, 2009 |
| Ad Research Study Agreement<br>GOOG-HIGH-TECH-00625481 | October 30, 2008 |
| Google Case Study Release<br>GOOG-HIGH-TECH-00625482 | October 30, 2008 |
| Google Mutual Non-Disclosure Agreement<br>GOOG-HIGH-TECH-00625483 | April 29, 2003 |
| Google Leadership Development and Compensation Committee [Draft for Discussion]<br>GOOG-HIGH-TECH-00223682.R-713.R | January 30, 2008 |
| Top 25 New Hire Previous Employers (2007-2008)<br>GOOG-HIGH-TECH-00258494 | |

**Expert Reports**

| | |
|---|---|
| Expert Report of Matthew Marx | October 28, 2013 |
| Expert Report of Alan Manning, Ph.D | October 28, 2013 |

**Declarations**

| | |
|---|---|
| Declaration of Alan Eustace in Support of Administrative Motion to Seal | October 9, 2012 |

| Document Title, Bates Numbers | Document Date |
|---|---|
| Declaration of William Campbell in Support of Defendant Google's Response to Plaintiffs' Motion to Compel, with Exhibits A-B | January 25, 2013 |

**Academic Articles**

Larcker, David F., Eric C. So, and Charles C.Y. Wang, "Boardroom Centrality and Firm Performance," *Journal of Accounting and Economics*, Vol. 55, Nos. 2-3, 2013, pp. 225-50

Bouwman, Christa H.S. "Overlapping Boards of Directors: Causes and Consequences for Corporate Governance" in *Financial Contagion: The Viral Threat to the Wealth of Nations*, ed. Robert W. Kolb, John Wiley & Sons, February 2011.

Ferris, Stephen P., Murali Jagannathan, and Adam C. Pritchard, "Too Busy to Mind the Business? Monitoring by Directors with Multiple Board Appointment," *Journal of Finance*, Vol. 58, No. 3, 2003, pp. 1087-112

Perry, Tod, and Urs Peyer, "Board Seat Accumulation by Executives: A Shareholder's Perspective." *Journal of Finance*, Vol. 60, No. 4, August 2005, pp. 2083-123

Cai, Ye, and Merih Sevilir, "Board Connections and M&A Transactions," *Journal of Financial Economics*, Vol. 103, No. 2, February 2012, pp. 327-49

Horton, Joanne, Yuval Millo, and George Serafeim, "Resources or Power? Implications of Social Networks on Compensation and Firm Performance," *Journal of Business Finance & Accounting*, Vol. 39, Nos. 3.4, April/May 2012, pp. 399-426

Talley, Eric L, "Public Ownership, Firm Governance, and Litigation Risk," University of Chicago Law Review, 2009, pp. 335-366

Alchian, Armen A., and Harold Demsetz, "Production, Information Costs, and Economic Organization," *American Economic Review*, Vol. 62, No. 5, December 1972, pp. 777-95

Parkhe, Arvind, "Strategic Alliance Structuring: A Game Theoretic and Transaction Cost Examination of Interfirm Cooperation," *Academy of Management Journal*, Vol. 36, No. 4, August 1993, pp. 794-829

Dyer, Jeffrey H., "Specialized Supplier Networks as a Source of Competitive Advantage: Evidence from the Auto Industry," *Strategic Management Journal*, Vol. 17, No. 4, April 1996, pp. 271-91

Dyer, Jeffrey H., and Nile W. Hatch, "Relation-specific Capabilities and Barriers to Knowledge Transfers: Creating Advantage Through Network Relationships," *Strategic Management Journal*, Vol. 27, No. 8, August 2006, pp. 701-19

Mudambi, Susan M., and Stephen Tallman, "Make, Buy or Ally? Theoretical Perspectives on Knowledge Process Outsourcing Through Alliances," *Journal of Management Studies*, Vol. 47, No. 8, December 2010, pp. 1434-56

Dyer, Jeffrey H., "Effective Interfirm Collaboration: How Firms Minimize Transaction Costs and Maximize Transaction Value," *Strategic Management Journal*, Vol. 18, No. 7, August 1997, pp. 535-56

Tirole, Jean, "Cognition and Incomplete Contracts," *American Economic Review*, Vol. 99, No. 1, March 2009, pp. 265-94

Gomes-Casseres, Benjamin, John Hagedoorn, and Adam B. Jaffe, "Do Alliances Promote Knowledge Flows?" *Journal of Financial Economics*, Vol. 80, No. 1, April 2006, pp. 5-33

Marx, Matt, Deborah Strumsky, and Lee Fleming, "Mobility, Skills, and the Michigan Non-compete Experiment," *Management Science*, Vol. 55, No. 6, June 2009, pp. 875-89

Stolpe, Michael, "Determinants of Knowledge Diffusion as Evidenced in Patent Data: The Case of Liquid Crystal Display Technology," *Research Policy*, Vol. 31, No. 7, September 2002, pp. 1181-98

Rosenkopf, Lori, and Paul Almeida, "Overcoming Local Search Through Alliances and Mobility," *Management Science*, Vol. 49, No. 6, June 2003, pp. 751-66

Kim, Jinyoung, and Gerald Marschke, "Labor Mobility of Scientists, Technological Diffusion, and the Firm's Patenting Decision," *RAND Journal of Economics*, Vol. 36, No. 2, Summer 2005, pp. 298-317

**Document Title, Bates Numbers**                                    **Document Date**

Marx, Matt, and Lee Fleming, "Non-compete Agreements: Barriers to Entry...and Exit?" in J. Lerner and S. Stern, eds., *Innovation Policy and the Economy*, Vol. 12, pp. 39-64, The University of Chicago Press, 2012

Joskow, Paul L., "Contract duration and relationship-specific investments: Empirical evidence from coal markets," *American Economic Review*, Vol. 77, No. 1, March 1987, pp. 168-85

"Model Confidentiality Agreement," in *Model Merger Agreement for the Acquisition of a Public Company*, ABA Publishing, 2011, pp. 341-71

Marx, Matt. "The Firm Strikes Back Non-compete Agreements and the Mobility of Technical Professionals," *American Sociological Review*, Vol. 76, No. 5, 2011, pp. 695-712

Dizikes, Peter, "Non-compete Agreements Create 'Career Detours'" *MIT News*, October 4, 2011

**Data**

S&P Capital IQ

**Websites**

http://www.sec.gov/edgar.shtml