1  Richard M. Heimann (State Bar No. 63607)
   Kelly M. Dermody (State Bar No. 171716)
2  Brendan P. Glackin (State Bar No. 199643)
   Dean M. Harvey (State Bar No. 250298)
3  Anne B. Shaver (State Bar No. 255928)
   Lisa J. Cisneros (State Car No. 251473)
4  LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
   275 Battery Street, 29th Floor
5  San Francisco, California  94111-3339
   Telephone:  415.956.1000
6  Facsimile:  415.956.1008

7  Joseph R. Saveri (State Bar No. 130064)
   James Dallal (State Bar No.  277826)
8  JOSEPH SAVERI LAW FIRM, INC.
   505 Montgomery St., Suite 625
9  San Francisco, California 94111
   Telephone: 415.500.6800
10 Facsimile: 415.500.6803

11 *Co-Lead Class Counsel*

12                 UNITED STATES DISTRICT COURT

13               NORTHERN DISTRICT OF CALIFORNIA

14                       SAN JOSE DIVISION

15

16 IN RE: HIGH-TECH EMPLOYEE          Master Docket No. 11-CV-2509-LHK
   ANTITRUST LITIGATION
17                                    **PLAINTIFFS' OPPOSITION TO
   THIS DOCUMENT RELATES TO:         DEFENDANTS' JOINT MOTIONS *IN
18                                    LIMINE***
   ALL ACTIONS
19

20

21

22

23

24

25

26

27

28

1

## TABLE OF CONTENTS

2

**Page**

3  MIL No. 1:  Opposition to Motion In Limine to Exclude References to DOJ Investigation.......... 1

4  MIL No. 2: Opposition to Motion In Limine to Exclude Evidence of Individual Class
   Members' Possible Damage Awards ................................................................................ 5

5

6  MIL No. 3: Opposition to Motion In Limine to Exclude Evidence Regarding Non-Class
   Members.................................................................................................................................. 6

7  MIL No. 4: Opposition to Motion In Limine to Exclude Argument or Suggestion that
   Bilateral Agreements or Unilateral Conduct Were Unlawful ............................................ 9

8

9  MIL No. 5: Opposition to Motion In Limine to Exclude Argument that Uncharged
   Recruiting Agreements or Policies Were in Furtherance of the Alleged
   Overarching Conspiracy...................................................................................................... 11

10 MIL No. 6: Opposition to Motion In Limine to Exclude Evidence Relating to Steve Jobs'
   Character .............................................................................................................................. 12

11

12 MIL 7:  Opposition to Motion In Limine to Exclude Evidence Relating to Co-Defendant
   Settlements ........................................................................................................................... 15

13

14 MIL No. 8: Opposition to Motion In Limine to Exclude Evidence Relating to Defendants'
   Financial Resources ............................................................................................................ 16

15 MIL No. 9: Opposition to Motion In Limine to Exclude References to Non-Class-
   Members' Wealth or Compensation ................................................................................... 18

16

17 MIL No. 10: Opposition to Motion In Limine to Exclude Pixar and Lucasfilm Statements........ 19

   CONCLUSION....................................................................................................................... 20

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Andrews v. Home Depot U.S.A., Inc.*,
No. 03-5200, 2010 WL 5464303 (D.N.J. Dec. 29, 2010)........................................................... 6

*Arhart v. Micro Switch Mfg. Co.*,
798 F.2d 291 (8th Cir. 1986)..................................................................................................... 15

*Belton v. Fibreboard Corp.*,
724 F.2d 500 (5th Cir. 1984)..................................................................................................... 15

*Blumenthal v. United States*,
332 U.S. 539 (1947).................................................................................................................... 3

*Brocklesby v. United States*,
767 F.2d 1288 (9th Cir. 1985)................................................................................................... 15

*Bryant v. Farmers Insurance Exchange*,
432 F.3d 1114 (10th Cir. 2005)............................................................................................... 6, 7

*Carpenter v. Forest Meadows Owners Ass'n*,
2011 U.S. Dist. LEXIS 82295 (E.D. Cal. July 26, 2011) ......................................................... 17

*Colton Crane Co., LLC v. Terex Cranes Wilmington, Inc.*,
No. CV 08-8525 PSG, 2010 WL 2035800 (C.D. Cal. May 19, 2010) ....................................... 9

*Crowe v. Bolduc*,
334 F.3d 124 (1st Cir. 2003) ..................................................................................................... 18

*Fleischman v. Albany Med. Ctr.*,
728 F. Supp. 2d 130 (N.D.N.Y. 2010) ...................................................................................... 10

*Hayes v. SmithKline Beecham Corp.*,
2009 U.S. Dist. LEXIS 115956 (N.D. Okla. Dec. 14, 2009).................................................... 16

*In re Paoli Railroad Yard PCB Litig.*,
35 F.3d 717 (3d Cir. 1994)......................................................................................................... 6

*In re Seroquel Prods. Liab. Litig.*,
6:06-MD-1769, 2009 WL 223140 (M.D. Fl. Jan. 30, 2009) ...................................................... 8

*In re Shopping Carts Antitrust Litigation*,
95 F.R.D. 299 (S.D.N.Y. 1982) ................................................................................................ 16

*In re Southeastern Milk Antitrust Litig.*,
No. 2:08-MD-1000, 2011 WL 2749579 (E.D. Tenn. Jul. 14, 2011)......................................... 10

*In re Titanium Dioxide Antitrust Litig.*,
No. 10-0318, 2013 WL 1855980 (D. Md. May 1, 2013).......................................................... 10

1

<div align="center">

**TABLE OF AUTHORITIES**
(continued)

</div>

2

Page

3    *In re Urethane Antitrust Litig.,*
        No. 04–1313–JWL, MDL No. 1616, 2012 WL 6681783 (D. Kan. Dec. 21, 2012) ................. 11
4
     *In re Vitamins Antitrust Litig.,*
5        2001 WL 1049433 (D.D.C., June 20, 2001) ................................................................. 8

6    *Johnson v. Pushpin Holdings, LLC,*
        No. 14-8006, 2014 WL 1383027 (7th Cir. Apr. 9, 2014) ......................................... 6
7
     *Kennon v. Slipstreamer, Inc.,*
8        794 F.2d 1067 (5th Cir. 1986) ........................................................................... 15

9    *Kinetic Concepts, Inc. v. Blue Sky Medical Group, Inc.,*
        554 F.3d. 1010 (Fed. Cir. 2009) ......................................................................... 18
10
     *Kunzman v. Enron Corp.,*
11       941 F. Supp. 853 (N.D. Iowa 1996) ............................................................ 17, 18

12   *Lego v. Stratos Intern., Inc.,*
        No. C 02–03743 JW, 2004 WL 5518162 (N.D. Cal. Nov. 4, 2004) ........................ 9
13
     *Maricopa Cty v. Maberry,*
14       555 F.2d 207 (9th Cir. 1977) ............................................................................. 6

15   *Marvin Johnson, P.C. v. Shoen,*
        888 F. Supp. 1009 (D. Ariz. 1995) ..................................................................... 17
16
     *Maryland and Virginia Milk Producers Ass'n v. United States,*
17       362 U.S. 458 (1960) ......................................................................................... 10

18   *Matrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft,*
        555 F. Supp. 824 (D. Md. 1983) ......................................................................... 5
19
     *Packard v. Provident Nat. Bank,*
20       994 F.2d 1039 (3rd Cir. 1993) ........................................................................... 6

21   *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC,*
        2011 U.S. Dist. LEXIS 62969 (S.D. Fla. Jun. 7, 2011) ........................................ 18
22
     *Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co.,*
23       998 F.2d 1224 (3d Cir. 1993) ........................................................................... 11

24   *Re/Max Int'l, Inc. v. Realty One, Inc.,*
        173 F.3d 995 (6th Cir. 1999) ........................................................................... 11
25
     *Rooney v. Sprague Energy Corp.,*
26       519 F. Supp. 2d 110 (D. Me. 2007) ................................................................... 17

27   *See United States v. Gil,*
        58 F.3d 1414 (9th Cir. 1995) ........................................................................... 20
28

# TABLE OF AUTHORITIES
### (continued)

Page

*Telewizja Polska USA, Inc. v. Echostar Satellite Corp.*,
65 Fed. R. Evid. Serv. (Callaghan) 673 (N.D. Ill. Oct. 14, 2004) .............................................. 17

*United States v. Adobe Sys., et al.*, No. 10-cv-01629 (Mar. 18, 2011), Final Judgment, at V(B) ... 2

*United States v. Apple Inc.*,
952 F. Supp. 2d 638 (S.D.N.Y. 2013)....................................................................................... 13

*United States v. Bibbero*,
749 F.2d 581 (9th Cir. 1984).......................................................................................................... 9

*United States v. Sequra-Gallegos*,
41 F.3d 1266 (9th Cir. 1994)...................................................................................................... 20

*United States v. Umagat*,
998 F.2d 770 (9th Cir. 1993)...................................................................................................... 20

*Weiss v. La Suisse, Societe D'Assurances Sur La Vie*,
293 F. Supp. 2d 397 (S.D.N.Y. 2003)........................................................................................... 9

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
401 U.S. 321 (1971)......................................................................................................................... 4

**Statutes**

15 U.S.C. § 16(a) ................................................................................................................................. 1

15 U.S.C. § 16(h) ................................................................................................................................. 1

**Rules**

Fed. R. Evid. 401 ................................................................................................................................. 9

Fed. R. Evid. 402 ................................................................................................................................. 9

Fed. R. Evid. 403 ................................................................................................................................. 9

Fed. R. Evid. 408(a) ......................................................................................................................... 15

Fed. R. Evid. 408(b) ......................................................................................................................... 15

Fed. R. Evid. 703 ................................................................................................................................. 6

**Other Authorities**

2 Fed. Evidence § 4:59 (4th ed.) ...................................................................................................... 15

Plaintiffs respectfully request that this Court deny Defendants' Joint Motions *In Limine* ("Defs' MIL") for the reasons discussed herein.

**MIL No. 1:  Opposition to Motion In Limine to Exclude References to DOJ Investigation**

Defendants argue that the DOJ Consent Decree and competitive impact statements are inadmissible under the Tunney Act, 15 U.S.C. §16, and that evidence of and references to the fact of the investigation should be precluded as unduly prejudicial pursuant to Rule 403.  Defs' MIL at 1-3.  Plaintiffs do not intend to use the DOJ Consent Decree or the competitive impact statement as *prima facie* evidence against Defendants.  *See* 15 U.S.C. § 16(a) & (h) (consent judgment may not be used as *prima facie* evidence against the defendant).[1]  The underlying facts of the DOJ investigation and entry of the Consent Decree (including its terms), however, are relevant and admissible, at minimum, to show: (a) the end of the conspiracy (which is important to Plaintiffs' proof of causation and damages); (b) the reason these otherwise secret agreements became publicly known (which is relevant to proving Defendants' intent to keep the agreements secret, and thus to their anticompetitive character); and (c) as necessary, to respond to any arguments by Defendants challenging the motivations behind Plaintiffs bringing suit.  The probative value of admitting this evidence for these limited purposes outweighs any potential prejudice, and therefore the evidence should not be excluded pursuant to Rule 403.  Also, Defendants' own experts rely on the DOJ documents and Defendants may "open the door" to this evidence in other ways.  It is therefore inappropriate to rule on this question prior to trial.

First, Defendants admit that the bilateral agreements that form the core of Plaintiffs' conspiracy evidence ended because of the DOJ investigation.[2]  This evidence is relevant and admissible because the end of the conspiracy is the basis for the closing of the Class Period,

---

[1] Defendants also argue that the competitive impact statement and DOJ complaint are inadmissible hearsay. Plaintiffs, however, do not intend to introduce either document for the truth of the matters asserted within it.

[2] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████

1   which distinguishes the conspiracy period from the before and after periods for Dr. Leamer's

2   causation and damages analyses.  As Dr. Leamer explains, his damages model incorporates the

3   fact that the bilateral agreements at issue ceased in March 2009, when the DOJ informed certain

4   Defendants of its investigation.  *See* Leamer Merits Report at ¶ 6, Shaver Decl. Ex. 18; *see also* Defs'

5   Mot. to Exclude Expert Testimony of Dr. Leamer, Dkt. 570 at 12 (acknowledging that Google

6   suspended its "DNCC practices after receiving the DOJ's civil investigative demand in 2009").

7        Pinpointing the end of the conspiracy is particularly relevant to rebutting Defendants'

8   charge that Dr. Leamer's regression is incapable of segregating the compensation effects

9   attributable to the conspiracy from compensation effects due to other factors (such as, *e.g.*, the

10   existence of other similar agreements or unilateral policies not part of the alleged conspiracy).  As

11   the Court found in denying Defendants' motion to exclude Dr. Leamer, Dr. Leamer's model

12   controls for any compensation suppression effects stemming from unchallenged conduct, in part,

13   through its use of the relevant conspiracy period, which terminates only because of the DOJ

14   investigation.  Thus, determining the relevant period for the illegal agreements is critical to

15   Defendants' own attack on Dr. Leamer's model.  Without being able to point to the DOJ

16   investigation as a clear and unmistakable reason why the conduct ended, the jury may be

17   confused or have difficulty accepting the plausibility of Plaintiffs' argument that seven companies

18   engaged in six separate, secret agreements over many years suddenly decided, almost overnight,

19   to end that conduct without any outside prompting.

20        Second, the existence of the Consent Decree, and specifically the fact that Defendants are

21   each abiding by its requirements to narrowly tailor any recruiting restrictions to specific and

22   contemporaneously-negotiated collaborations, is also admissible to refute Defendants' asserted

23   justification that the agreements "facilitated" pro-competitive collaborations.[3]  Defendants'

24

25   [3] The Consent Decree provides that any "no direct solicitation provisions that relate to written
    agreements" by Defendants must "1) identify, with specificity, the agreement to which it is
26   ancillary; 2) be narrowly tailored to affect only employees who are anticipated to be directly
    involved in the agreement; 3) identify with reasonable specificity the employees who are subject
27   to the agreement; 4) contain a specific termination date or event; and 5) be signed by all parties to
    the agreement, including any modifications to the agreement."  *See United States v. Adobe Sys., et*
28   *al.*, No. 10-cv-01629 (Mar. 18, 2011), Final Judgment, at V(B), Shaver Decl. Ex. 166.

experts apparently intend to testify not only that the agreements "facilitated" collaborations, but

also that such agreements could not have been more narrowly tailored without constraining

procompetitive collaborations.[4]  Plaintiffs should be permitted to present evidence that such

collaborations continued unabated after each Defendant committed to abiding by the terms of the

Consent Decree.[5]

        Third, establishing that Plaintiffs became aware of the series of secretive anti-solicitation

agreements—which were kept secret even from the vast majority of their own employees—only

*after* the DOJ Investigation forced this information into the public realm is relevant to Plaintiffs'

proof of the overarching conspiracy.  As the Supreme Court has held, "[s]ecrecy and concealment

are essential features of successful conspiracy." *Blumenthal v. United States*, 332 U.S. 539, 557

(1947).  The fact that Defendants kept the anti-solicitation agreements secret—and were forced to

disclose their existence due to the DOJ investigation—is evidence tending to show both that these

agreements were formed as part of a conspiracy and that they were anticompetitive.[6]  If Plaintiffs

---

[4] Snyder Report at ¶¶ 56-70, Shaver Decl., Ex. 14; Talley Report at ¶¶ 32-33, Shaver Decl., Ex. 15; Murphy Report at ¶¶ 30-34, Shaver Decl., Ex. 13; *see also* Marx ¶¶ 29-32, Shaver Decl., Ex. 16; Marx Rebuttal ¶¶ 1-31, Shaver Decl., Ex. 17.  For example, Intel's expert, Dr. Snyder, intends to testify that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Snyder Report ¶ 72.  Evidence that, since the Consent Decree, Defendants have been required to "identify with reasonable specificity the employees who are subject to the agreement," and yet have continued to collaborate unabated is relevant to refuting Dr. Snyder's opinion and testimony. *See* Marx ¶ 30(b).

[5] As Apple CEO Tim Cook explained: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[6] In denying summary judgment, this Court found persuasive evidence that "Defendants … recognized that these agreements were not designed for circulation, and tried to ensure that the agreements were known only to recruiters and executives who had to enforce them." *In re High-Tech Emp. Antitrust Litig.*, 2014 U.S. Dist. LEXIS 46335, at *10 (N.D. Cal. Mar. 28, 2014). Similarly, evidence of the secrecy of the agreements is critical to the extent Defendants attempt to assert that the anti-solicitation agreements had pro-competitive justifications. *See, e.g.*, *TAG Mfrs. Inst. v. FTC*, 174 F.2d 452, 462 (1st Cir 1949) (explaining that "secrecy more readily suggests the inference that the agreement is inspired by some unlawful purpose and precludes the argument that the information thus secretly exchanged serves a function similar to that of market information made available through the activities of commodity exchanges, trade journals, etc."). Defendants' experts struggled to find a plausible pro-competitive justification for the secrecy of the agreements, or did not have an opinion on the subject at all. *See, e.g.*, Murphy Dep. 620:11-622:15, Shaver Decl., Ex. 7; Lewin Dep. 247:13-16, Shaver Decl., Ex. 4; Snyder Dep. 142:15-143:4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, 150:9-151:12, Shaver Decl., Ex. 9.

1   are precluded from introducing the Consent Decree or the simple fact of the DOJ investigation, the

2   jury may be confused as to how the conspiracy became publicly known, and could be left to

3   speculate that Defendants themselves promoted the agreements or publicized them, and thus that

4   they were not secret after all.  Accordingly, evidence of the fact of the DOJ investigation, and in

5   particular, its role in breaking the conspiratorial secrecy, is relevant to Plaintiffs' proof of the

6   conspiracy itself.

7          Fourth, and finally, the fact of the DOJ investigation is relevant to how the individual

8   Plaintiffs learned of the allegations in their Complaint and why they filed their lawsuit when they

9   did.  At their depositions, multiple Plaintiffs testified that they learned of this lawsuit through

10  reports about the DOJ investigation, and filed this lawsuit as a result of the information from the

11  DOJ investigation.[7]  The jury will want to know why this class action began.  They should be told

12  the truth, rather than rely on their own speculation to the prejudice of Plaintiffs.  Establishing that

13  Plaintiffs filed their Complaint in 2011, after learning about the existence of Defendants' anti-

14  solicitation agreements from the DOJ investigation is also relevant to rebutting Defendants'

15  statute of limitations and laches affirmative defenses because such testimony explains each

16  Plaintiff's discovery of the facts underlying the claim.[8]  *See Zenith Radio Corp. v. Hazeltine*

17  *Research, Inc*., 401 U.S. 321 (1971) (explaining tolling).[9]

18         In the alternative, if the Court is inclined to exclude any references to the Consent Decree

19  or the DOJ investigation, it should nonetheless allow Plaintiffs to tell the jury that it was only due

20  to outside prompting that Defendants ultimately: (a) exposed the bilateral agreements to the

21  public; and (b) terminated them all at or about the same time.  Further, and in the alternative, the

---

[7] *See* Marshall Dep. 22:23-25:6 (testifying that he contacted counsel because he learned of the DOJ investigation and believed he was a class member), Shaver Decl., Ex. 11; Stover Dep. 45:21-48:10 ("So my decision to pursue this case was, as I said, based on the DOJ report which was already published."), Shaver Decl., Ex. 12; Hariharan Dep. 298:21-300:10 (testifying that he read about the DOJ investigation before he contacted an attorney), Shaver Decl., Ex. 10.

[8] *See* Adobe Ans. (Dkt. 127) at Eighth Affirmative Defense; Google Ans. (Dkt. 131) at Second and Sixth Affirmative Defenses; Apple Ans. (Dkt. 132) at Sixth Affirmative Defense; Intel Ans. (Dkt. 126) at Eighth Affirmative Defense.

[9] Moreover, if Defendants intend to address in any way the Class Representatives' motivations for filing suit, Plaintiffs must be able to introduce the fact of their awareness of the DOJ investigation and Consent Decree as the motivation for their lawsuit in rebuttal.

Court should allow Plaintiffs to inform the jury Defendants each began to abide by the terms relating to recruiting and hiring practices that are set out in the Consent Decree (even if the fact that these terms emanate from the Consent Decree is not disclosed). As *Matrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft*, 555 F. Supp. 824, 826 (D. Md. 1983), cited by Defendants, makes clear, "[o]f course, steps taken by defendants to comply with the consent decree" are admissible "to introduce evidence of conduct engaged in since the decree, if relevant to an issue in the current suit." Here, as discussed above, the fact that Defendants are each abiding by the terms of the Consent Decree and yet are continuing unabated to collaborate productively refutes Defendants' purported justifications.

## MIL No. 2: Opposition to Motion In Limine to Exclude Evidence of Individual Class Members' Possible Damage Awards

Defendants next seek to preclude "Plaintiffs from making any statement or otherwise presenting or eliciting any evidence, testimony or argument regarding the amount of damages any individual class member might recover." Defs' MIL at 3. Plaintiffs agree that there has been no evidence generated in this case on class member damages for specific individuals. However, to the extent Defendants are seeking to prevent Plaintiffs from saying what the aggregate class-wide damages figure means—***on average***—on a per class member basis, Defendants' argument has no merit.

Plaintiffs should be able to tell the jury that the $3.05 billion total amount of damages would work out to an ***average*** award of $47,213.44 for each of the 64,613 class members. These figures are the result of simple division, using the values from Dr. Leamer's report.[10] Such evidence of the "average" recovery would help jurors put the total aggregate award in context. Jurors may have trouble understanding or comprehending large numbers,[11] such as, *e.g.*, the aggregate damages figure computed by Dr. Leamer for the class as a whole here, namely $3.05 billion, without proper context. "The 'ultimate touchstone' in evaluating admissibility under Rule

---

[10] Reply Merits Report of Edward E. Leamer, Ph.D., Dec. 11, 2013 at 3, Shaver Decl., Ex. 19.

[11] *See, e.g.*, "How to Understand a Trillion-Dollar Deficit," *Time*, Jan. 11, 2009 ("'There is a sense that when numbers are too big or too small, the brain just shuts off,' says Colin Camerer, a professor of behavioral economics at the California Institute of Technology.") (found at: http://content.time.com/time/business/article/0,8599,1870699,00.html).

702 is 'helpfulness to the trier of fact." *In re Paoli Railroad Yard PCB Litig.*, 35 F.3d 717, 746

(3d Cir. 1994).  Indeed, this is not even the type of evidence that requires expert support under

Fed. R. Evid. 703, as Defendants suggest.  *See Bryant v. Farmers Insurance Exchange*, 432 F.3d

1114, 1124 (10th Cir. 2005) ("Taking a simple average of 103 numbers, though technically a

statistical determination is not so complex a task that litigants need to hire experts in order to

deem the evidence trustworthy. A mathematical calculation well within the ability of anyone with

a grade-school education is, in our opinion, more aptly characterized as a lay opinion under Fed.

R. Evid. 701.").[12]  This is in accord with the model jury instructions, which provide that the jury

will be permitted to estimate "average" class member damages, "as long as the average or

estimate is based on evidence and reasonable inferences."  Model Jury Instructions in Civil

Antitrust Cases, at F-26 (2005).

Defendants identify absolutely no prejudice from this simple calculation.  To the extent

Defendants seek to block Plaintiffs' ability to do simple math, such as, *e.g.*, by dividing the total

aggregate damages number by the total number of class members simply to show what the

average per class member damages award is, Defendants' motion should be denied.

## MIL No. 3: Opposition to Motion In Limine to Exclude Evidence Regarding Non-Class Members

Defendants also ask the Court to preclude Plaintiffs from "presenting or eliciting any

evidence, testimony or argument regarding the recruiting, hiring, or compensation of non-class

---

[12] Federal courts routinely make arithmetic calculations of the per plaintiff benefits of a damage award without expert assistance. Judge Posner recently did so in *Johnson v. Pushpin Holdings, LLC,* No. 14-8006, 2014 WL 1383027, *2 (7th Cir. Apr. 9, 2014) ("spread over more than 1000 class members, an additional $1.5 million in damages . . . would yield an average of less than $1500 in additional damages per class member"); *see also Packard v. Provident Nat. Bank*, 994 F.2d 1039, 1046 n.10 (3rd Cir. 1993) ("[w]hen this figure is divided by the 5,000 class members . . . it nets out to approximately $11,000 per member"); *Andrews v. Home Depot U.S.A., Inc.*, No. 03-5200, 2010 WL 5464303, *2 (D.N.J. Dec. 29, 2010) ("[w]hen this amount is divided amongst the 500 purported class members, the baseline average for damages becomes $50,000 per plaintiff, which is a reasonable recovery.").  The only case Defendants cite, *Maricopa Cty v. Maberry*, 555 F.2d 207, 217 n. 14 (9th Cir. 1977), Defs' MIL at 3, does not support barring the kind of contextual evidence or argument Plaintiffs seek to present.  In that case, counsel for plaintiffs improperly asked defendants' expert witness on cross-examination, over objection, whether the expert had said "off the record" at his deposition that plaintiffs' counsel had "a damned good case and you know it."  *Id.* That has nothing to do with proffering evidence, or making argument, to put the aggregate damages number in context for the jury.

1    members." Defs' MIL at 4.  Defendants claim, without relevant citation, that "the class definition

2    expressly delineates the boundaries" of the "claims" and "issues" in this case.  *Id.* Because the

3    Court's class definition includes only U.S. workers, Defendants say, Plaintiffs should not be

4    permitted to present any "evidence, testimony or argument" concerning a variety of topics that

5    impact foreign or non-class employees, including, among others, Defendants' compensation,

6    recruiting, and hiring policies and practices outside the U.S. *Id.*

7          This argument confuses two concepts that have nothing to do with one another:  the

8    criteria for being a member of the Class and the evidence relevant to proving the conspiracy.  The

9    class definition does not establish what ***evidence*** of a conspiracy or any other aspect of Plaintiffs'

10   claims are admissible; it establishes only which individuals are before the Court and will be

11   bound by the class determination. The fact that in this case the class definition limits the certified

12   class to Defendants' U.S. employees does not somehow, by itself, limit the ***evidence*** in the case

13   only to Defendants' misconduct that occurred on U.S. soil, involving U.S. employees.

14   Defendants' improper recruiting, hiring, and compensation policies and practices outside of the

15   U.S., or Defendants' practices involving employees who are not covered by the class definition in

16   this case, could certainly be relevant to this case and admissible at trial.  Indeed, evidence of

17   conduct overseas is routinely used to prove the existence of an antitrust conspiracy that injured a

18   class of United States plaintiffs.  For instance, in cases involving foreign price-fixing cartels it is

19   common for virtually all of the evidence to be of conduct taking place overseas, while all the

20   plaintiffs are located in the United States.  This is true of all of the major cartel cases pending or

21   that have recently resolved in this District, including *TFT-LCD*, *CRT*, *DRAM*, *SRAM* and *ODD*, to

22   name but some of them.[13]  As the district court put it in the now-seminal *Vitamins* litigation,

23              Although [foreign] actions may not be admissible to establish
              damages . . . the information would be relevant to show the breadth
24            of the conspiracy, the role that each defendants' executives played
              in implementing, expanding, enforcing and concealing the
25            conspiracy, and how the conspiracy was maintained for the length
              of time alleged.
26
     _____
27   [13] *In re TFT-LCD Antitrust Litig.*, MDL No. 1827; *In re Cathode Ray Tube (CRT) Antitrust Litig.*,
     MDL No. 1917; *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, MDL No.
28   1486; *In re Static Random Access Memory (SRAM) Antitrust Litig.*, MDL No.1819; *In re Optical
     Disk Drive Antitrust Litig.*, Case No. M:10-cv-2143 RS.

*In re Vitamins Antitrust Litig.*, 2001 WL 1049433, *11 (D.D.C., June 20, 2001).

Similar evidence exists in this case, including ████████████████████████████

████████████████████████████████████████████████████  *See* Shaver

Decl., Exs.  278, 648, 279, 650, and 653.  ████████████████████████  *Id.* Ex.

278. ██████████████████████████████████████████████████  *Id.*

Ex. 653.  Other evidence concerning U.S. employees who are not class members is also relevant

and admissible.  ██████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████  Shaver Decl., Ex. 281A.

Although Defendants never mention it, this is the relevant and otherwise admissible evidence

they seek to exclude via their motion.[14]

Finally, Defendants argue that "it would be unfair and prejudicial to allow Plaintiffs to

present evidence on an incomplete discovery record to the jury."  Defs' MILs at 5.  But this

---

[14] The three cases Defendants cite are inapposite. *In re Seroquel Prods. Liab. Litig.,* 6:06-MD-1769, 2009 WL 223140, *2-5 (M.D. Fl. Jan. 30, 2009), the court deemed inadmissible, among other things, evidence regarding the risks of the drug in question for persons not in the injured class. In the present case, unlike *Seroquel*, Plaintiffs are not seeking to introduce evidence relating to injuries non-class members suffered to prove those non-class members suffered harm, but rather may ask the jury to consider evidence, for instance, of Defendants' conduct with regard to recruitment of foreign workers to show that these bilateral agreements existed, were being enforced, and that the defendant companies were broadly abiding by them.

Likewise, *In re Southeastern Milk Antitrust Litig.*, 2:08-MD-1000, 2011 WL 2749579, *3 (E.D. Tenn. July 14, 2011), held that to the extent plaintiffs sought to introduce **evidence of damages** (not conduct evidence, as here) from dairy farmers who were not members of the certified class, such evidence is irrelevant.  In *Southeastern Milk,* the danger was that if damages incurred by non-class members were introduced, there was a risk that plaintiffs would collect an improper double-recovery for both their damages and (improperly) the damages of non-class members. *Id.*  In this case, by contrast, admitting the evidence in question contains no such risk because Plaintiffs do not intend to seek damages for non-class member harms.

Finally, Defendants misquote *Negrete v. Allianz Life Ins. Co.*, 05-cv-6838, 2013 WL 6535164, *1 (C.D. Cal. Dec. 9, 2013). There, the court excluded evidence of actions taken or not taken by state insurance regulators not evidence of "products outside the class definition," as Defendants claim.  In fact, *Negrete* **rejected** defense arguments that marketing materials that mentioned both products covered by the class definition and products that were not covered were inadmissible.  Although the court excluded contracts, sales materials and pricing documentation for sales transactions outside the class period, it did so only because those documents were marginally relevant and invited jury confusion. *Id.* at *16. Moreover, the court noted that defendants in that case did not move to exclude evidence relating to "the pre-Class development of [defendant's] marketing organization" that addressed plaintiffs' claimed rationale for needing pre-class information.  *Id.*

1    argument too lacks a logical foundation.  It is *Plaintiffs*, *not Defendants*, who would suffer

2    prejudice of any incomplete discovery, for it is Defendants who control information about the

3    non-Class member employees.  Defendants do not explain any prejudice they might suffer,

4    beyond their conclusory assertion.  The motion should be denied.

5    <u>**MIL No. 4: Opposition to Motion In Limine to Exclude Argument or Suggestion that
     Bilateral Agreements or Unilateral Conduct Were Unlawful**</u>

6

7           Defendants next contend that Plaintiffs' counsel and their experts should be precluded

8    from arguing that the six bilateral agreements that comprise the overarching conspiracy in the

9    case, or conduct that Plaintiffs have not challenged in this case as being part of an overarching

10   conspiracy,[15] are unlawful as irrelevant and unduly prejudicial, pursuant to Fed. R. Evid. 401, 402

11   and 403.  *See* Defs' MIL at 5-6.

12          Evidence and argument that the six bilateral agreements are unlawful bear upon the jury's

13   ultimate determination of whether the overarching conspiracy is unlawful.  It is well settled that a

14   conspiracy is "an agreement to accomplish an illegal objective, coupled with one or more overt

15   acts in furtherance of the illegal purpose and the requisite intent necessary to commit the

16   underlying substantive offense."  *United States v. Bibbero*, 749 F.2d 581, 587 (9th Cir. 1984).

17   Here, Plaintiffs contend that Defendants' unlawful conduct "consisted of a network of *unlawful*

18   bilateral agreements," which were executed in furtherance of the single conspiracy.  Pl. Cons.

19   Opp. To Def. Joint Motions for Summ. J at 18 (citing *Bibbero*, 749 F.2d at 587) ("A single

20   conspiracy may involve several subagreements or subgroups of conspirators.")).  Contrary to

21   Defendants' assertions, throughout this case, Plaintiffs have alleged that both the underlying

22   ―――――――――――――――――
     [15] Defendants do not clearly identify the "unilateral conduct" and "uncharged conduct" to which

23   their request would apply.  While Plaintiffs do not challenge any unilateral conduct and do not
     intend to argue that any such conduct is unlawful, Defendants' request should be denied for lack

24   of specificity.  *See Weiss v. La Suisse, Societe D'Assurances Sur La Vie*, 293 F. Supp. 2d 397,
     407–08 (S.D.N.Y. 2003) (denying motion to exclude evidence for a "lack[ ] of specificity[,]"

25   stating "[n]o particular documents or testimony have been identified in the motion"); *see also
     Lego v. Stratos Intern., Inc*., No. C 02–03743 JW, 2004 WL 5518162, at *1 (N.D. Cal. Nov. 4,

26   2004) (denying *in limine* motion "because the requested relief is too vague"); *Colton Crane Co.,
     LLC v. Terex Cranes Wilmington, Inc.*, No. CV 08-8525 PSG, 2010 WL 2035800, *1 (C.D. Cal.

27   May 19, 2010) (motions *in limine* should rarely seek to exclude broad categories of evidence, as
     the court is almost always better situated to rule on evidentiary issues in their factual context

28   during trial).

agreements and the conspiracy itself are *per se* unlawful.[16]  While, as Defendants' citations

provide, it is *not necessary* for an underlying act to be unlawful to further an unlawful antitrust

conspiracy,[17] it does not follow that evidence of the underlying act's illegality is irrelevant.  To

the contrary, the fact that the underlying acts (as they are here) are in and of themselves unlawful

is directly relevant to Plaintiffs' claims.  The unlawfulness of the six agreements themselves is

also relevant to understanding why Defendants sought to keep each one of them secret.

Defendants further request an order excluding witness testimony that characterizes any

conduct as "unlawful," "illegal," or "conspiratorial."  *See* Defs' MIL at 6-7.  Defendants' request

is overbroad and would improperly restrict lay and expert testimony.  As to lay witnesses the fact

that a witness knew or even suspected (or was told) he or she might be breaking the law is

certainly a relevant fact.  As to experts, none of Plaintiffs' expert witnesses will testify to purely

legal issues regarding the lawfulness of the conspiracy or the underlying anti-solicitation

agreements.  However, Dr. Marx does intend to testify as to how Defendants' conduct is

consistent with collusion and conspiracy, and inconsistent with competition.  *See In re Titanium*

*Dioxide Antitrust Litig.*, No. 10-0318, 2013 WL 1855980, *4-5 (D. Md. May 1, 2013) ("Rule 704

permits the Plaintiffs' proposed experts to testify that the Defendants' behavior is consistent with

collusion and inconsistent with competition"); *Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d

130,152-54 (N.D.N.Y. 2010) (An expert may "opine that the nature, frequency and scope with

which Defendants share information would make it easier for Defendants to establish and

---

[16] *See* CAC ¶ 32(b) ("questions of law or fact common to the Class include … whether Defendants' conspiracy and associated agreements, or any one of them, constitute a *per se* violation of the Sherman Act or Cartwright Act"), ¶ 110 ("Plaintiffs and each member of the Class were harmed by each and every agreement herein alleged."), ¶¶ 119-126 (claim for relief pursuant to Section 1 of the Sherman Act regarding the "unlawful agreements" alleged in the complaint); Pls.' Opp. To Defs.' Mot. to Dismiss (Dkt. 92) at 8 ("Plaintiffs have adequately alleged all Defendants' participation in at least one explicit unlawful agreement."); Pls.' Cons. Opp. To Defs' Mot. for Summ. J. (Dkt. 603) at 27-31 (addressing the illegality of Defendants' bilateral agreements); Pls.' Mot. for Application of the *Per Se* Standard (Dkt. 830) at 7-8 (arguing that both the conspiracy as well as the underlying agreements should be judged under *per se* standard).

[17] *See In re Southeastern Milk Antitrust Litig.*, No. 2:08-MD-1000, 2011 WL 2749579, *8 (E.D. Tenn. Jul. 14, 2011) (citing *Maryland and Virginia Milk Producers Ass'n v. United States*, 362 U.S. 458, 472 (1960) ("But even lawful contracts and business activities may help to make up a pattern of conduct unlawful under the Sherman Act.")).

- 10 -

maintain an agreement to reduce RN competition.").  Testimony in the form of an opinion or

inference otherwise admissible is "not objectionable just because it embraces an ultimate issue."

Fed. R. Evid. 704(a).  Courts regularly admit expert testimony regarding the likelihood of

collusion,[18] and to the extent Defendants seek an order to the contrary, it should be denied.

### MIL No. 5: Opposition to Motion In Limine to Exclude Argument that Uncharged Recruiting Agreements or Policies Were in Furtherance of the Alleged Overarching Conspiracy

Defendants seek an order "barring Plaintiffs and their witnesses from stating in the

presence of the jury that any recruiting-related agreements other than the six identified in

Plaintiffs' [CAC] were in furtherance of the alleged overarching conspiracy."  *See* Defs' MIL at

7-9.  The Court should not enter a broad order that would restrict how Plaintiffs address evidence

Defendants themselves introduce regarding other such agreements or policies.

Although they do not specify the testimony or evidence to which this order would apply,[19]

in challenging Dr. Leamer's damages analysis, Defendants have previously argued that

Defendants had other "lawful agreements or unilateral policies during the class period," including

Intel-Apple and Intel-Pixar no-recruiting agreements, and Google DNCC policies with respect to

two non-defendant companies, which required exclusion of Dr. Leamer's regression.  *See* Defs.'

Mot. to Exclude Expert Testimony of Dr. Leamer at 11-12.  While Plaintiffs argued (and the

Court agreed) that such evidence does not require exclusion of Dr. Leamer's analysis, Plaintiffs

do not concede any such conduct would be lawful or necessarily unilateral.[20]  Indeed, therein lies

---

[18] *See*, *e.g.*, *Re/Max Int'l, Inc. v. Realty One, Inc*., 173 F.3d 995, 1010-11 (6th Cir. 1999) (finding expert testimony that "without coordinated conduct, parallel imposition of adverse splits is implausible" was admissible and created a genuine issue of material fact); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co*., 998 F.2d 1224, 1236 (3d Cir. 1993) (expert testimony that "concluded that there was collusive activity" admissible); *In re Urethane Antitrust Litig*., No. 04–1313–JWL, MDL No. 1616, 2012 WL 6681783, *3 (D. Kan. Dec. 21, 2012) (allowing expert testimony that "certain events are consistent with collusion").

[19] For this reason alone, their motion should be denied.  *See supra* n.15.

[20] *See* Pls.' Opp to Defs' Mot. to Exclude Testimony of Dr. Leamer at 12-13, 13 n.4 (noting that the "unilateral" policies identified by Google are found on a document that begins with the caption ███████████████████████████████████████████████████; *see also* Order re: Defs.' Mot. Regarding Dr. Leamer (Dkt. 788) at 29-31 (holding that Defendants' challenge presents a "purely hypothetical problem.").  Without quoting them, Defendants claim that Plaintiffs' interrogatory responses limited their case in this way.  They do not.

1   the basic flaw in Defendants' strategy.  If they prove the existence of other company-wide

2   agreements among themselves that suppressed compensation, then they have self-evidently

3   proved a Sherman Act violation that a jury would be entitled to conclude formed part of the

4   overall conspiracy in this case.  If, however, they prove something less than that—such as a

5   limited agreement or "unilateral policy" that had no effect on class-member compensation—then

6   whatever they establish is, by definition, irrelevant to the effect of the six agreements at the core

7   of this case.  This is a box from which this strategy has no logical escape.

8            That is why, in their Motions *in limine*, Defendants explicitly seek to carve out the ability

9   to introduce evidence such as these agreements and/or supposed "unilateral" policies, *see* Defs'

10  MIL at 8 n.3, while simultaneously attempting to preclude Plaintiffs from responding with proof

11  that these additional agreements were unlawful or furthered the conspiracy.  This is improper.  If

12  Defendants intend to introduce evidence of these or any other non-recruiting practices or

13  agreements and then argue that they suppressed compensation of class members, Plaintiffs are

14  entitled to introduce evidence (and then argue) that the policies were in fact agreements and the

15  agreements and policies were in fact unlawful and in furtherance of the conspiracy.  By invoking

16  supposedly non-charged agreements or conduct as a sword to attack Dr. Leamer's analysis,

17  Defendants cannot then shield themselves from Plaintiffs' ability to argue or present evidence that

18  these same Defendants engaged in other illegal activity designed to harm the Class.  Defendants

19  should not be able simultaneously to raise their own other arguably illicit conduct to attack Dr.

20  Leamer's model as improperly measuring the effects of legal conduct, and yet block Plaintiffs

21  from arguing and presenting evidence that Defendants' other agreements and conduct are illegal

22  and anticompetitive.  The basic purpose of this motion is to distort the evidence in a one-sided

23  way, as opposed to giving the jury the truth.  It should be denied.

24  **MIL No. 6: Opposition to Motion In Limine to Exclude Evidence Relating to Steve Jobs'**
    **Character**

25

26          Defendants' motion seeking exclusion of so-called "hearsay statements about Steve Jobs

27  and opinion evidence concerning his character," (Defs' MIL at 9), mischaracterizes the evidence

28  and improperly speculates on Plaintiffs' motives.  Although Defendants concede that they "do not

seek to exclude evidence of Mr. Jobs's interactions with other witnesses regarding no-cold-call agreements," (*id.* at 10), their overbroad request asks the Court for a ruling *in limine* that broad swaths of evidence pertaining to Mr. Jobs is all impermissible "character assassination." Defendants cite precious few examples of what they believe constitutes "assassination" evidence, and for those their objections are directed toward the hearsay rule and not on character evidence grounds.  This leaves Plaintiffs, and the Court, to speculate at what evidence Defendants truly seek to exclude. At best, this shows that Defendants' motion is premature.  At worst, the motion signals an intention to interfere with the presentation of admissible evidence, merely because such evidence may also reflect poorly on Mr. Jobs.  However, that the jury might draw conclusions about Mr. Jobs' character based on evidence showing the manner in which he pursued the conspiracy at the heart of this case is not grounds to exclude such evidence.

As to the specific evidence Defendants' cite in their motion, Defendants' unsupported contention that Mr. Jobs's statements drawn from the Isaacson biography and elsewhere are inadmissible is at least overbroad.  The biography includes numerous admissions that are not hearsay under Rule 801(d)(2).  In this regard, Defendants (including, most notably, Apple) fail to advise the Court that in the *E-Books* antitrust case Judge Cote cited, quoted, and relied on Mr. Jobs's statements from the Isaacson biography and statements to reporters as direct evidence of Apple's violation of Section 1 of the Sherman Act.  *See, e.g.*, *United States v. Apple Inc.*, 952 F. Supp. 2d 638, 693 (S.D.N.Y. 2013) ("evidence of this conspiracy can be found in Jobs's admissions to a reporter, to James Murdoch, and to his biographer").[21]  Defendants similarly omit to mention ████████████████████████████████████████████████████ ████████████████████████████████████████████████, and that the offending blog post concerned Jobs's attempt to obtain a no-recruit agreement with Palm (*id.*, Ex. 449).

---

[21] *See also id*. at 687 ("Jobs himself was frank in explaining how this scheme worked when he spoke to biographer Walter Isaacson the day after the Launch. Jobs described it as an 'a[i]kido move' to move all retailers to agency and eliminate price competition with Amazon.  In Jobs's own words: "'Amazon screwed it up. . . . So we told the publishers, 'We'll go to the agency model, where you set the price, and we get our 30%, and yes, the customer pays a little more, but that's what you want anyway.''").

1    Defendants also ignore the fact that the force of Mr. Jobs's personality and reputation

2    have been put squarely at issue by their own witnesses and is interwoven with the facts of the

3    case.  Adobe's former CEO, Bruce Chizen, testified that ██████████████████████

4    ████████████████████████████████████████████████████████████

5    ████████████████.[22]  Through testimony and documents produced in this case,

6    Plaintiffs have compiled voluminous evidence of Mr. Jobs's active role in crafting, enforcing, and

7    seeking to expand the conspiracy.  Mr. Jobs—renowned as one of the great visionaries of the tech

8    era—███████████████████████████████████████████████████████

9    ██████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████

12   ██████████████████████████████████████████████████████████

13   ██████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████

15   ██████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████████████

17   █████████████████████████████████████████████████ █[23]

18   As for statements by others in the Isaacson book, blogs, or other publications, numerous

19   exceptions to the hearsay rule may come into play on a case-by-case basis, making a *ruling in*

20   *limine* inappropriate now.  One can imagine that such evidence might not be offered for the truth

21   of the matter asserted or might be used for purposes of impeachment.  Defendants will have a full

---

[22] Of course, the evidence demonstrates that Mr. Chizen's justification is incorrect, as Mr. Chizen later enforced the secret agreement ***against*** Mr. Jobs to ensure that Apple was honoring its side of the deal.  *See In re High-Tech Emple. Antitrust Litig.*, 2014 U.S. Dist. LEXIS 46335, at *17 (N.D. Cal. Mar. 28, 2014) ("Mr. Chizen of Adobe, in response to discovering that Apple was recruiting employees of Macromedia (a separate entity that Adobe would later acquire), helped ensure, through an email to Mr. Jobs, that Apple would honor Apple's pre-existing anti-solicitation agreements with both Adobe and Macromedia after Adobe's acquisition of Macromedia.").

[23] Defendants' invocation of this Court's and Judge Posner's respective rulings in the Samsung and Motorola patent case are inapposite.  Those rulings were not based on character or hearsay grounds, but rather on relevance to the patent claims in those cases.  (*See* Mot. at Ex. D. at 134 ("I really don't think this is a trial about Steve Jobs"); *see also id.* at Ex. B, at 55.).

1   and fair opportunity to object to Plaintiffs' presentation of evidence, including evidence

2   concerning Mr. Jobs, at trial.

3   **MIL 7:  Opposition to Motion In Limine to Exclude Evidence Relating to Co-Defendant
    Settlements**

4

5        Defendants' motion to exclude "***any*** evidence or argument at trial concerning their

6   individual settlements with Pixar, Lucasfilm, and Intuit (or any subsequent settlements)," should

7   be denied.  Defs' MIL at 10.  Defendants' request is overbroad and should be rejected.  Here, the

8   jury should not be left to speculate about why conspiracy participants Pixar, Lucasfilm, and Intuit

9   are not also at trial.  *See* 2 Fed. Evidence § 4:59 (4th ed.) ("It seems that proof of settlement

10  (although not the terms and exact amount) can properly [be admitted], either to explain to the jury

11  the absence of potentially responsible parties or to explain to the jury the disappearance of

12  someone who had been in the suit as a party but has disappeared from the courtroom.").

13       Rule 408 does not exclude evidence of a settlement if the evidence is offered "for another

14  purpose" other than proving the "validity or amount of the disputed claim." *See* Fed. R. Evid.

15  408(a) & (b).  In particular, the fact of a settlement is admissible if offered to explain the

16  conspicuous absence of a party at trial.[24]  Therefore, federal courts regularly admit evidence of

17  the **fact of settlement** to explain why wrongdoers who settled claims are not before the jury.  *See*,

18  *e.g.*, *Belton v. Fibreboard Corp.*, 724 F.2d 500, 515 (5th Cir. 1984) (affirming admission of the

19  existence (but not amounts) of settlements with 15 defendants "for the purpose of explaining why

20  [the settling defendants] were not in court");[25] *Brocklesby v. United States*, 767 F.2d 1288, 1292-

21  93 & n.2 (9th Cir. 1985) (admitting evidence of indemnity agreement offered to show that two

22

23  ---
    [24] *See Kennon v. Slipstreamer, Inc.,* 794 F.2d 1067, 1070 (5th Cir. 1986) ("While revealing the
    fact of settlement explains the absence of the settling defendants and thus tends to reduce jury
    confusion, disclosing the amount of settlement serves no such purpose."); *Arhart v. Micro Switch*

24  *Mfg. Co.*, 798 F.2d 291, 295 (8th Cir. 1986) (when some defendants settle during trial, it becomes
    obvious that they are gone; there is "no other alternative than to advise the jury of the obvious—

25  that there had been a settlement").

26  [25] Defendants' anticipatory argument concerning *Belton* (Def. Joint MIL at 11 n.5) both
    mischaracterizes that case and is otherwise contradicted by their arguments on MIL No. 10

27  seeking to exclude references to the Pixar-Lucasfilm agreement as outside the conspiracy.  All the
    other cases cited by Defendants involve the disclosure of settlement amounts, which Plaintiffs do

28  not seek to present.

- 15 -

1   parties in multi-party action had settled with each other).  Defendants provide no reason for the

2   Court to depart from well-settled law here.

3   **MIL No. 8: Opposition to Motion In Limine to Exclude Evidence Relating to Defendants'**
    **Financial Resources**

4

5          Defendants' motion to exclude evidence concerning Defendants' "overall financial

6   resources, valuations or profitability" should be denied.  Defs' MIL at 12.  Plaintiffs neither

7   intend, nor need, to make any "David v. Goliath" arguments.  However, Defendants already have

8   acknowledged the relevance of their own financial information, and placed it at issue themselves.

9   As an initial matter, Defendants readily concede that numerous revenue and profit related facts

10  are relevant and probative to issues in this case.  *See* Defs' MIL at 12 (admitting relevance of

11  "evidence relating to Defendants' revenue per employee, compensation budgets, or other similar

12  data relied upon by the parties' experts").  The reports of Plaintiffs' damages expert readily bear

13  this out—Dr. Leamer relies on variables including Defendants' revenue per employee, profit per

14  employee, and stock prices to test the robustness of Plaintiffs' damages model (a model that has

15  already passed multiple challenges by Defendants).[26]

16         Where, as here, financial information is relevant to impact and the calculation of damages,

17  it is admissible under FRE 401.  *See In re Shopping Carts Antitrust Litig.*, 95 F.R.D. 299, 309

18  (S.D.N.Y. 1982) (finding evidence of defendants' sales and profits relevant to plaintiffs' antitrust

19  claims).  Nevertheless, Defendants ask the court to bar vague and sweeping categories of

20  evidence related to their financial condition.  This demand places the Court in an untenable

21  position, forced to determine, *a priori*, which unspecified financial evidence is relevant and

22  probative, and which is not.  This demand is unreasonable, and should be denied.  *See*, *e.g.*, *Hayes*

23  *v. SmithKline Beecham Corp.*, 2009 U.S. Dist. LEXIS 115956, *11-12 (N.D. Okla. Dec. 14,

24  2009) (denying motion *in limine* to exclude evidence of party's "net worth, wealth or financial

25

26  [26] The analytical frameworks Dr. Leamer has employed since his first report include █████████

27  ████████████████████████████████████████████████████████████████████████

28  ████████████████████.

1   condition" because "the Court is unable to rule on the admissibility of general categories of

2   hypothetical evidence").

3        Moreover, Defendants' finances during the conspiracy are directly relevant, and have been

4   placed at issue by Defendants themselves.  For example, George Lucas testified that ██████

5   ████████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████

9   ████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████.  Where, as here,

11  a party has put its own economic circumstances at issue, references to that party's "size and

12  wealth"— the very backdrop against which economic decisions are made—are relevant.

13  *Kunzman v. Enron Corp.*, 941 F. Supp. 853, 867 (N.D. Iowa 1996).  *See also Telewizja Polska*

14  *USA, Inc. v. Echostar Satellite Corp.*, 65 Fed. R. Evid. Serv. (Callaghan) 673 (N.D. Ill. Oct. 14,

15  2004) ("To the extent that Defendant places its wealth and/or power at issue, it may open the door

16  to evidence on the issue.").

17       Furthermore, where, as here, evidence of a party's financial condition is relevant to the

18  case, the potential for prejudicial impact may be limited, and will not support exclusion.  *See, e.g.*,

19  *Enron*, 941 F. Supp. at 867; *Carpenter v. Forest Meadows Owners Ass'n*, 2011 U.S. Dist. LEXIS

20  82295 (E.D. Cal. July 26, 2011) (relevant evidence of a party's financial condition need not be

21  excluded due to vague concerns that jury may develop bias regarding non-movant's wealth);

22  *Marvin Johnson, P.C. v. Shoen*, 888 F. Supp. 1009, 1013-14 (D. Ariz. 1995) (evidence of

23  defendant's wealth is admissible where it relates to substantive issues at trial); *Rooney v. Sprague*

24  *Energy Corp.*, 519 F. Supp. 2d 110, 130 (D. Me. 2007) (same).  Thus, Plaintiffs should be

25  permitted to test Defendants' claims that the non-solicitation agreements were necessary in light

26  of the financial condition of the conspirators, and to rebut any potential argument that Defendants

27  could not afford to increase compensation as Dr. Leamer's model estimates.

28

1

### MIL No. 9: Opposition to Motion In Limine to Exclude References to Non-Class-Members' Wealth or Compensation

2

3    Defendants' request to exclude evidence concerning the wealth and compensation of certain

4    unnamed and unspecified "non-class-members" should also be denied. Defs' MIL at 14.

5    Presumably, Defendants refer to the individual co-conspirators themselves: their own senior

6    executives. Plaintiffs have no intention to "parade [Defendants'] net worth in front of the jury,"

7    *Kunzman*, 941 F. Supp. at 867, or evoke the "class prejudices" these executives evidently fear.

8    Defendants' executives testified that avoiding "bidding wars" was necessary to protect

9    supposedly narrow profit margins in the industry. Jurors should be permitted to consider the

10   interest such executives had in the success of the conspiracy to suppress their cost of labor

11   running to their bottom line. *See*, *e.g.*, *Pandora Jewelers 1995, Inc. v. Pandora Jewelry, LLC*,

12   2011 U.S. Dist. LEXIS 62969, at *35 (S.D. Fla. Jun. 7, 2011) ("evidence concerning a financial

13   incentive in the outcome of trial may be permitted on cross-examination to show witness bias")

14   (citing *Crowe v. Bolduc*, 334 F.3d 124, 131-32 (1st Cir. 2003)); *Kinetic Concepts, Inc. v. Blue Sky*

15   *Medical Group, Inc.*, 554 F.3d 1010, 1025 (Fed. Cir. 2009) (references to wealth were admissible

16   to show bias). To the extent Defendants are legitimately concerned that the jury will be shocked

17   and react negatively to the value of certain non-class-members' assets, the jury can be instructed

18   that it must not treat any unfairly on the basis of personal wealth. *See Kinetic Concepts*, 554 F.3d

19   at 1025 (jury instruction given).

20       Such evidence is particularly probative here, where the wealth of the individual co-

21   conspirators is such a direct function of their companies' stock prices. A mere five percent

22   change in the stock value of their companies could result in changes of tens or hundreds of

23   millions of dollars in the net worth of the senior executives central to the conspiracy at issue,

24   including Steve Jobs, Eric Schmidt, Sergey Brin, and Bill Campbell. For example, Plaintiffs

25   should be permitted to probe what Sergey Brin personally stood to gain or lose from either: (1)

26   entering into a secret agreement with Steve Jobs to eliminate competition for employees; or (2)

27   ███████████████████████████████. Plaintiffs should also be permitted to

28   explain that the role of Intuit Chairman and Apple Co-Lead Director Bill Campbell as simply an

1    altruistic "coach" to Google CEO Eric Schmidt is readily contradicted by evidence that, ▮▮▮▮

2    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Plaintiffs should be permitted to

4    introduce such evidence, which goes directly and materially to the executives' personal motive to

5    conspire to depress the salaries of their respective company's employees, as well as to their biases

6    at trial.

7    **MIL No. 10: Opposition to Motion In Limine to Exclude Pixar and Lucasfilm Statements**

8          Finally, Defendants seek to exclude ***unspecified*** statements made by Pixar and Lucasfilm

9    representatives relating to the "purpose or effect" of the employee restriction agreement

10    defendants concede "was established 20 years before the other Defendants allegedly entered into

11    an overarching conspiracy" because (i) Pixar and Lucasfilm, unlike any of the other Defendants,

12    were film industry participants and (ii) the terms of the Pixar-Lucasfilm restriction contained

13    "different" and "more restrictive" terms than the conspiracy's current *modus operendi*.  Defs'

14    MIL at 15 (emphasis added).  In making their argument, Defendants appear to intentionally

15    confuse the co-conspirator exception to the hearsay rule with the much different question of

16    relevance and probativeness of statements by another conspirator.  The motion should be denied.

17          Defendants first invoke Rule 801(d)(2)(E), the co-conspirator exception to the hearsay

18    rule, claiming Plaintiffs cannot meet its requirements as to statements by Pixar and Lucas

19    employees.  However, Defendants have failed—critically—to identify the hearsay as to which

20    Plaintiffs cannot meet this burden.  Defendants seem to be alluding to deposition testimony of

21    George Lucas and Ed Catmull about the purpose of the conspiracy (to protect profit margins): but

22    the admissibility of sworn witness testimony has nothing to do with Rule 801(d)(2)(E).  Live

23    testimony in court is not hearsay, and deposition testimony of an unavailable witness is

24    admissible under Rule 32.  To the extent Defendants aim this motion at pre-litigation documents,

25    such as emails, which might be subject to Rule 801(d)(2)(E), it is simply impossible to rule on

26    this question or on any other hearsay exception without knowing what the emails are.

27    Defendants' own cited case makes clear a ruling on this question cannot be made categorically,

28    because a statement made in furtherance of a conspiracy can be used against any co-conspirator,

including a co-conspirator who joined the conspiracy after the statement was made.  *See United States v. Sequra-Gallegos*, 41 F.3d 1266, 1272 (9th Cir. 1994) ("Statements of his co-conspirators are not hearsay even if they were made before Segura-Gallegos entered the conspiracy.").[27]

Defendants then switch mid-stream to a completely different argument:  "[s]tatements relating to the purported purpose or effect of the Pixar-Lucasfilm agreement have little or no probative value…".  Defs' MIL at 17.  But it is black-letter law that one "may join a conspiracy already formed and in existence, and be bound by all that has gone before in the conspiracy, even if unknown to him."  *United States v. Umagat*, 998 F.2d 770, 772 (9th Cir. 1993) (internal quotations omitted).  While it is unclear what precise statements Defendants seek to exclude (itself an independent grounds to deny the motion), as a starting point, there is substantial direct evidence linking Steve Jobs to the Pixar-Lucasfilm agreement and his intent to further the conspiracy by adding Apple, Google, Adobe, and Palm into the conspiracy fold on substantially similar bi-lateral terms to achieve the same objectives.  As another of Defendants' cases makes clear, there is "no real mystery as to the participants" in the alleged conspiracy or to "the meaning" or purpose of the restrictive covenants at-issue here,[28] Defendants' motion should be denied.  *See United States v. Gil*, 58 F.3d 1414, 1419-20 (9th Cir. 1995).

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motions *In Limine*.

---

[27] The numerous cases Defendants cite in support of this particular motion *in limine* are generally cited for non-controversial propositions of law (*i.e.*, applicable legal standards) but otherwise either are clearly inapplicable or, as noted in the text, actually demonstrate why Defendants' motion should be denied.  Defendants mischaracterize their only other cited case, *City of Long Beach*.  In that case, the Court of Appeals affirmed the exclusion of voluminous evidence concerning an Alaska pricing scheme because it "would have gone to a collateral issue, was complicated and would be a waste of time" for the jury's consideration of the at-issue and already-complicated-enough California pricing scheme for which they had already considered voluminous evidence.  46 F.3d 929, 938 (9th Cir. 1995).

[28] As Mr. Lucas explained: ███████████████████████████████████████ ███████████████████████████████████.

Dated:  April 17, 2014

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP


By: _____ /s/ Kelly M. Dermody _____


Richard M. Heimann (State Bar No. 63607)
Kelly M. Dermody (State Bar No. 171716)
Brendan P. Glackin (State Bar No. 199643)
Dean M. Harvey (State Bar No. 250298)
Anne B. Shaver (State Bar No. 255928)
Lisa J. Cisneros (State Car No. 251473)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

Joseph R. Saveri (State Bar No. 130064)
James Dallal (State Bar No.  277826)
JOSEPH SAVERI LAW FIRM, INC.
505 Montgomery St., Suite 625
San Francisco, California 94111
Telephone: 415.500.6800
Facsimile: 415.500.6803

*Co-Lead Class Counsel*

Eric L. Cramer
Sarah R. Schalman-Bergen
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103
Telephone:  (215) 875-3000
Facsimile:  (215) 875-4604

Linda P. Nussbaum
Peter Barile
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY  10017
Telephone:  (646) 722-8500
Facsimile:  (646) 722-8501

*Class Counsel*