1  GREGORY P. STONE (State Bar No. 78329)
   gregory.stone@mto.com
2  BRADLEY S. PHILLIPS (State Bar No. 85263)
   brad.phillips@mto.com
3  STEVEN M. PERRY (State Bar No. 106154)
   steven.perry@mto.com
4  BETHANY W. KRISTOVICH (State Bar No. 241891)
   bethany.kristovich@mto.com
5  MUNGER, TOLLES & OLSON LLP
   355 South Grand Avenue
6  Thirty-Fifth Floor
   Los Angeles, California 90071-1560
7  Telephone:     (213) 683-9100
   Facsimile:     (213) 687-3702
8
   Attorneys for Defendant Intel Corporation
9  [Additional counsel listed on signature page]

10

11              UNITED STATES DISTRICT COURT

12            NORTHERN DISTRICT OF CALIFORNIA

13                   SAN JOSE DIVISION

14

15  IN RE: HIGH-TECH EMPLOYEE          Master Docket No. 11-CV-2509-LHK
    ANTITRUST LITIGATION
16
                                       **DEFENDANTS' JOINT RESPONSE TO
17  THIS DOCUMENT RELATES TO:          PLAINTIFFS' MOTION FOR
                                       APPLICATION OF THE PER SE
18                                     STANDARD**
    ALL ACTIONS
19                                     **ORAL ARGUMENT REQUESTED**

20                                     Judge:    Hon. Lucy H. Koh
                                       Date:     May 8, 2014
21                                     Time:     1:30 p.m.
                                       Crtrm:    8
22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.     INTRODUCTION ................................................................................................. 1

II.    ARGUMENT ....................................................................................................... 2

    A.    The Rule of Reason Is the Presumptive Standard, and Plaintiffs Have the Burden of Justifying a Departure from that Standard ................................. 2

    B.    The Alleged Overarching Conspiracy Is Unusual and Extremely Limited in Scope and Did Not Restrict Hiring or Fix Compensation ........................................ 5

    C.    Neither Judicial Experience Nor Economic Analysis Warrants Departure from the Presumptive Rule-of-Reason Standard ........................................ 6

        1.    There is no judicial experience with the type of conspiracy alleged here ................................................................................................. 6

        2.    Courts apply the rule of reason to more restrictive restraints on employee recruiting and hiring ................................................... 8

        3.    Courts reject per se and "quick look" analysis of restraints, such as restrictions on information, that do not directly and obviously restrict output ....................................................................................... 9

        4.    The Ninth Circuit's en banc decision in *Safeway* requires application of the full rule of reason here ..................................................... 10

        5.    Courts apply the rule of reason to restraints that are, as here, ancillary to collaborative relationships ........................................... 12

    D.    Plaintiffs Are Not Entitled to Either Effective Summary Adjudication Under the Rule of Reason or an Order Excluding Evidence of the Pro-Competitive Reasons for and Effects of the DNCC Agreements ................................. 14

III.    CONCLUSION ................................................................................................ 15

DEFS.' JOINT RESPONSE TO PLFS.' MOT. FOR APPLICATION OF THE PER SE STANDARD

1

## **TABLE OF AUTHORITIES**

2

**FEDERAL CASES**

3

*Am. Needle v. Nat'l Football League*,
  130 S. Ct. 2201 (2010) ...................................................................................... 14

4

5

*Arizona v. Maricopa Cty. Med. Soc'y*,
  457 U.S. 332 (1982) ........................................................................................... 3

6

*Bhan v. NME Hosps., Inc.*,
  929 F.2d 1404 (9th Cir. 1991) ......................................................................... 15

7

8

*Blackburn v. Sweeney*,
  53 F.3d 825 (7th Cir. 1995) ................................................................................ 3

9

*Bogan v. Hodgkins*,
  166 F.3d 509 (2nd Cir. 1999) ............................................................................. 8

10

11

*Broadcast Music, Inc. v. Colum. Broadcasting Sys.*,
  441 U.S. 1 (1979) ............................................................................................ 2, 9

12

13

*Cal. Dental Ass'n v. FTC*,
  526 U.S. 756 (1999) ................................................................................... passim

14

*California ex rel. Harris v. Safeway, Inc.*,
  651 F.3d 1118 (9th Cir. 2011) (en banc) ..................................................... passim

15

16

*Citizen Publ'g Co. v. United States*,
  394 U.S. 131 (1969) .......................................................................................... 11

17

18

*Consultants & Designers, Inc. v. Butler Serv. Grp.*,
  720 F.2d 1553 (11th Cir. 1983) ......................................................................... 8

19

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984) .......................................................................................... 14

20

21

*Doe v. Arizona Hosp. & Healthcare Assoc.*,
  2009 WL 1423378 (D. Ariz. Mar. 19, 2009) ...................................................... 3

22

23

*Eichorn v. AT&T Corp.*,
  248 F.3d 131 (3rd Cir. 2001) .............................................................................. 8

24

*F.T.C. v. Actavis, Inc.*,
  133 S. Ct. 2223 (2013) ................................................................................ 4, 5, 7

25

26

*F.T.C. v. Indiana Fed'n of Dentists*,
  476 U.S. 447 (1986) ............................................................................................ 3

27

28

DEFS.' JOINT RESPONSE TO PLFS.' MOT. FOR APPLICATION OF THE PER SE STANDARD

*Fleischman v. Albany Med. Ctr.*,
   728 F. Supp. 2d 130 (N.D.N.Y. 2010) ................................................................. 3

*Fortner Enters., Inc. v. U.S. Steel Corp.*,
   394 U.S. 495 (1969) .............................................................................................. 3

*Freeman v. San Diego Ass'n of Realtors*,
   322 F.3d 1133 (9th Cir. 2003) .................................................................... 13, 14

*General Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*,
   744 F.2d 588 (7th Cir. 1984) ............................................................................... 3

*Gerlinger v. Amazon.com, Inc.*,
   311 F. Supp. 2d 838 (N.D. Cal. 2004) .............................................................. 13

*Hahn v. Oregon Physicians' Serv.*,
   868 F.2d 1022 (9th Cir. 1989) ............................................................................ 2

*Hairston v. Pacific 10 Conference*,
   101 F.3d 1315 (9th Cir. 1996) .......................................................................... 15

*Illinois Tool Works v. Indep. Ink, Inc.*,
   547 U.S. 28 (2006) ........................................................................................... 3, 4

*In re ATM Fee Antitrust Litig.*,
   554 F. Supp. 2d 1003 (N.D. Cal. 2008) ........................................................... 13

*In re Cardizem CD Antitrust Litig.*,
   332 F.3d 896 (6th Cir. 2003) ............................................................................... 4

*In re Sulfuric Acid Antitrust Litig.*,
   703 F.3d 1004 (7th Cir. 2012) ............................................................................ 6

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) ......................................................................... 2, 4, 9, 14

*Lipsky v. Commonwealth United Corp.*,
   551 F.2d 887 (2d Cir. 1976) ................................................................................ 7

*Marion Healthcare LLC v. S. Illinois Healthcare*,
   2013 WL 4510168 (S.D. Ill. Aug. 26, 2013) ..................................................... 7

*Meijer v. Barr Pharm., Inc.*,
   572 F. Supp. 2d 38 (D.D.C. 2008) ............................................................. 12, 15

*Metrix Warehouse, Inc. v. Daimler-Benz Aktiengesellschaft*,
   555 F. Supp. 824 (D. Md. 1983) ......................................................................... 7

*MLB Props., Inc. v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008) ................................................................. 10, 13, 14

*NCAA v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984) ............................................................................. 2, 14

*Nichols v. Spencer Int'l Press, Inc.*,
    371 F.2d 332 (7th Cir. 1967) ............................................................... 8

*Northrop Corp. v. McDonnell Douglas Corp.*,
    705 F.2d 1030 (9th Cir. 1983) ............................................................. 6

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
    472 U.S. 284 (1985) ............................................................................ 4

*O'Bannon v. NCAA*,
    2010 WL 445190 (N.D. Cal. Feb. 8, 2010) ........................................ 3

*Pipe Fitters Local Union No. 120 Pension Fund v. Barclays Capital Inc.*,
    2011 WL 3844196 (N.D. Cal. Aug. 30, 2011) ................................ 2-3

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
    776 F.2d 185 (7th Cir. 1985) ............................................................. 13

*Princo Corp. v. Int'l Trade Comm'n*,
    616 F.3d 1318 (Fed. Cir. 2010) (en banc) ......................................... 13

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997) ................................................................................. 2

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006) ............................................................................. 2, 4

*UARCO Inc. v. Lam*,
    18 F. Supp. 2d 1116 (D. Haw. 1998) ................................................. 8

*Union Circulation Company, Inc. v. F.T.C.*,
    241 F.2d 652 (2nd Cir. 1957) ............................................................. 8

*United States v. Brown*,
    936 F.2d 1042 (9th Cir. 1991) ............................................................ 3

*United States v. Brown Univ.*,
    5 F.3d 658 (3d Cir. 1993) .............................................................. 7, 15

*United States v. Cooperative Theatres of Ohio*,
    845 F.2d 1367 (6th Cir. 1988) ............................................................ 3

*United States v. Microsoft Corp.*,
    215 F. Supp. 2d 1 (D.D.C. 2002) ....................................................... 7

*United States v. Microsoft Corp.*,
    253 F.3d 34 (D.C. Cir. 2001) .............................................................. 7

11-CV-2509-LHK

DEFS.' JOINT RESPONSE TO PLFS.' MOT. FOR APPLICATION OF THE PER SE STANDARD

*United States v. Reality Multi-List, Inc.*,
    629 F.2d 1351 (5th Cir. 1980) ................................................................................7

*United States v. Studiengesellschaft Kohle, m.b.H.*,
    670 F.2d 1122 (D.C. Cir. 1981) ................................................................................7

*Weisfeld v. Sun Chem. Corp.*,
    210 F.R.D. 136 (D.N.J. 2002) ................................................................................8

*White Motor Co. v. United States*,
    372 U.S. 253 (1963) ................................................................................7

**FEDERAL STATUTES**

Clayton Act, 15 U.S.C. §§ 16(a) & (h) ................................................................................7

**OTHER AUTHORITIES**

Herbert Hovenkamp, THE ANTITRUST ENTERPRISE 118 (2005) ................................................................................2

# I.      __INTRODUCTION__

The rule of reason, not the per se rule, is the presumptive standard under Section 1 of the Sherman Act. The per se rule applies to only a few specific types of restraints that substantial judicial experience has shown have obvious anticompetitive effects and lack any redeeming virtue. Over the last twenty years, the Supreme Court has repeatedly narrowed the per se rule's scope and rejected attempts, including by the U.S. Department of Justice and Federal Trade Commission, to extend its application to additional types of restraints or to untested or unusual fact situations.

The conspiracy alleged here is unlike any conspiracy to which courts have applied the per se rule or "quick look" analysis. Plaintiffs allege that Defendants conspired to limit information available to employees through cold calls and that this had the ultimate effect of suppressing the wages of all Defendants' technical employees. But Plaintiffs do not allege that Defendants agreed to restrict jobs or hiring or actually to fix their employees' compensation. In other words, the alleged conspiracy, unlike every category of restraint that is subject to the per se rule or "quick look" analysis, involved neither output reduction nor price fixing. According to Plaintiffs, the seven Defendants conspired to enter into a "network" of six two-party do-not-cold-call ("DNCC") agreements. The DNCC agreements existed only where the two parties had collaborative business relationships and left unrestricted all other means of recruiting and hiring each other's employees. Cold calling, recruiting, and hiring between the other fifteen pairs of Defendants and between them and the remaining 98% of the technical-employee market were entirely unaffected.

Courts have no experience with either DNCC agreements or this type of alleged conspiracy, much less experience that makes clear they have obvious anticompetitive effects. Courts have, however, rejected the per se and quick look rules and applied the rule of reason to: more restrictive restraints on employee recruiting and hiring; agreements that limited information but did not fix prices or restrict output; an agreement of comparably limited scope but including a far larger share of the relevant market; and restraints ancillary to collaborative relationships. While Plaintiffs allege that the purpose of the purported conspiracy was to suppress compensation, the same (or the equivalent, to raise prices) can be said of most cases in which courts have rejected the per se and quick look tests. Moreover, the antitrust economists who have analyzed the DNCC

DEFS.' JOINT RESPONSE TO PLFS.' MOT. FOR APPLICATION OF THE PER SE STANDARD

1  agreements conclude that they likely have procompetitive benefits and would not have

2  anticompetitive effects. For these reasons, Plaintiffs cannot satisfy their burden of justifying a

3  departure from the presumptive rule-of-reason standard.[1]

4  **II.    ARGUMENT**

5  **A.    The Rule of Reason Is the Presumptive Standard, and Plaintiffs Have the**
6         **Burden of Justifying a Departure from that Standard**

7      "*The rule of reason is the presumptive or default standard*, and it requires the antitrust

8  plaintiff to 'demonstrate that a particular contract or combination is in fact unreasonable and

9  anticompetitive.'" *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1133 (9th Cir. 2011)

10 (en banc) (quoting *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006))[2]; *see also State Oil Co. v. Khan*,

11 522 U.S. 3, 10 (1997) ("most antitrust claims are analyzed under a 'rule of reason'"). A departure

12 from the rule of reason is "appropriate only after courts have had considerable experience with the

13 type of restraint at issue" and "can predict with confidence that it would be invalidated in all or

14 almost all instances under the rule of reason." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,

15 551 U.S. 877, 886-87 (2007) (citations omitted). Thus, "courts ordinarily do not apply the per se

16 rule to a practice the first time they encounter it. That judgment can be made only after

17 'considerable judicial experience' showing that anticompetitive effects dominate any alternative

18 explanation." Herbert Hovenkamp, THE ANTITRUST ENTERPRISE 118 (2005) (quoting *Broadcast*

19 *Music, Inc. v. Colum. Broadcasting Sys.*, 441 U.S. 1, 2 (1979)).

20      "To justify a *per se* prohibition, a restraint must have 'manifestly anticompetitive' effects

21 and lack 'any redeeming virtue.'" *Leegin*, 551 U.S. at 886 (citations omitted). Thus, "[r]esort to

22 *per se* rules is confined to restraints … 'that would always or almost always tend to restrict

23 competition *and decrease output*.'" *Id.* (quoting *Bus. Elecs Corp. v. Sharp Elecs Corp.*, 485 U.S.

24 717, 723 (1988)); *see also Hahn v. Oregon Physicians' Serv.*, 868 F.2d 1022, 1026 (9th Cir. 1989)

25 (same) (citing *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100 (1984)); *Pipe Fitters*

26 _____

27 [1] Even were the Court to conclude that the per se rule would apply to the alleged conspiracy, Plaintiffs would still bear the burden of proving that each Defendant entered into that conspiracy, that each member of the class suffered antitrust injury, and the amount of any damages.

28 [2] All emphases and alterations are added unless otherwise indicated.

1  *Local Union No. 120 Pension Fund v. Barclays Capital Inc.*, 2011 WL 3844196, at *4 (N.D. Cal.

2  Aug. 30, 2011) (same); *O'Bannon v. NCAA*, 2010 WL 445190, at *4 (N.D. Cal. Feb. 8, 2010)

3  (same).[3] Horizontal price fixing, market divisions, and certain group boycotts and tying

4  arrangements are the only restraints to which a per se prohibition applies. *Hahn*, 868 F.2d at 1026

5  (9th Cir. 1989). Group boycotts and tying arrangements, however, are deemed per se unlawful

6  only where the defendants possess market power because they (unlike price fixing and market

7  division) do not directly fix prices or restrict output. *See F.T.C. v. Indiana Fed'n of Dentists*, 476

8  U.S. 447, 458 (1986) (group boycotts); *Illinois Tool Works v. Indep. Ink, Inc.*, 547 U.S. 28, 34

9  (2006) (tying arrangements); *General Leaseways*, 744 F.2d at 594 ("[An agreement to limit

10 output] is the equivalent of a division of markets.").

11      Tellingly, all of the per se cases cited in section I of Plaintiffs' brief involved price fixing

12 or market division. *See Arizona v. Maricopa Cty. Med. Soc'y*, 457 U.S. 332, 335-36 (1982)

13 (horizontal agreement that fixed physicians' fees); *United States v. Brown*, 936 F.2d 1042, 1045

14 (9th Cir. 1991) (agreement allocated geographic markets between competing billboard

15 companies); *United States v. Cooperative Theatres of Ohio*, 845 F.2d 1367, 1368, 1370 (6th Cir.

16 1988) (agreement between competing theatre booking agents to allocate customers); *Blackburn v.*

17 *Sweeney*, 53 F.3d 825, 826-27 (7th Cir. 1995) (agreement between competing lawyers to allocate

18 geographic markets); *Fleischman v. Albany Med. Ctr.*, 728 F. Supp. 2d 130, 156-62 (N.D.N.Y.

19 2010) (evidence of horizontal price-fixing conspiracy sufficient to survive summary judgment);

20 *Doe v. Arizona Hosp. & Healthcare Assoc.*, 2009 WL 1423378, at *3 (D. Ariz. Mar. 19, 2009)

---

22 [3] Courts often equate output restrictions with price fixing and use the former to encompass the latter because "reduced output is the almost inevitable result of higher prices [and vice-versa]."
23 *Fortner Enters., Inc. v. U.S. Steel Corp.*, 394 U.S. 495, 503 (1969). *See also Cal. Dental Ass'n v.*
24 *FTC*, 526 U.S. 756, 777 (1999) ("An agreement on output also equates to a price-fixing agreement. If firms raise price, the market's demand for their product will fall, so the amount
25 supplied will fall too—in other words, output will be restricted. If instead the firms restrict output directly, price will as mentioned rise in order to limit demand for to the reduced supply." (quoting
26 *General Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 594-95 (7th Cir. 1984) (Posner, J.)). Here, to lower compensation, Defendants would have needed to reduce the number
27 of jobs (*i.e.*, output). *See* Am. Expert Report of Edward A. Snyder, Ph.D., ¶ 20 (Dec. 6, 2013)
28 ("Snyder Rpt.), attached to Plfs.' Mot., Cisneros Decl., Dkt. 833, Ex. 7 ("Cisneros Decl."). There is no evidence this occurred here.

1  (horizontal agreement to "jointly set … wages and compensation [and adopt] uniform pay rate

2  scale"). None of these restraints is similar to the conspiracy alleged here, which allegedly limited

3  only one means of recruiting while placing no restrictions on either hiring or compensation.

4        The Supreme Court has "'expressed reluctance to adopt *per se* rules where the economic

5  impact of certain practices is not immediately obvious.'" *Safeway*, 651 F.3d at 1133 (quoting

6  *Dagher*, 547 U.S. at 5). Indeed, in the last two decades, the Court has repeatedly *narrowed* the

7  categories of restraints that are subject to the per se rule and *rejected* efforts to extend that rule to

8  new restraints. *See, e.g.*, *F.T.C. v. Actavis, Inc.*, 133 S. Ct. 2223, 2237 (2013) (holding rule of

9  reason applies to "reverse-payment" patent settlements); *Leegin*, 551 U.S. at 887-907 (overruling

10  *Dr. Miles Medical Co. v. John D. Park & Sons Co.*, 220 U.S. 373 (1911) and holding all vertical

11  price restraints are judged under the rule of reason); *Dagher*, 547 U.S. at 8 (rejecting per se rule

12  for price-setting agreement between joint-venture participants); *Illinois Tool Works*, 547 U.S. at 34

13  (applying rule of reason proof requirement to tying claim). Plaintiffs do not even mention *Actavis*,

14  *Leegin*, *Dagher*, or *Illinois Tool Works*—the most recent Supreme Court decisions on application

15  of the per se and rule of reason standards.[4]

16        As this Court indicated (CMC Hr'g Tr. at 21:23-22:8, Mar. 27, 2014) (Ex. 1),[5] Plaintiffs

17  have the burden of persuading the Court that it should depart from the presumptive rule-of-reason

18  standard here. *See Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284,

19  298 (1985) ("A plaintiff seeking application of the *per se* rule must present a threshold case that

20  the challenged activity falls into a category likely to have predominantly anticompetitive

21  effects."). Plaintiffs must demonstrate that the courts have sufficient experience with the

22  conspiracy and restraint alleged here "to predict with confidence that the rule of reason will

23  condemn it." *Safeway*, 651 F.3d at 1133. That prediction must be "based upon demonstrable

24  economic effect," not "formalistic line drawing," and plaintiffs must establish that the type of

---

26  [4] Plaintiffs cite *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896 (6th Cir. 2003) (Mot. at 15), but,

27  notably, the Sixth Circuit's holding there that the per se rule applies to reverse- payment patent
settlements was overruled in *Actavis*. 133 S. Ct. at 2237.

28  [5] The evidence cited herein, unless otherwise indicated, is attached to the accompanying
Declaration of Gregory M. Sergi and cited as "Ex. __".

restraint at issue "would always or almost always tend to … decrease output," that its "immediately obvious" economic effect would be "manifestly anticompetitive," and that it lacks "any redeeming virtue." *Id.*

To the extent Plaintiffs seek application of a "truncated rule of reason" or "quick look" analysis, *see id.* at 1134, their burden is similarly heavy. Such analysis "is appropriate only where 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets.'" *Actavis*, 133 S. Ct. at 2237 (quoting *Cal. Dental*, 526 U.S. at 770). "[I]f an arrangement 'might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition,' then a 'quick look' form of analysis is inappropriate." *Safeway*, 651 F.3d at 1134 (quoting *Cal. Dental*, 526 U.S. at 771).

**B.    The Alleged Overarching Conspiracy Is Unusual and Extremely Limited in Scope and Did Not Restrict Hiring or Fix Compensation**

Plaintiffs allege that the seven Defendants entered into a single "overarching conspiracy" to create "a network of unlawful bilateral [DNCC] agreements." Plfs.' MSJ Opp., Dkt. 603, at 18 (Feb. 6, 2014); *see also* Order Granting Plfs.' Supp'l Mot. for Class Cert., Dkt. 531, at 4 (Oct. 24, 2013) ("The [alleged] conspiracy consisted of an interconnected web of express bilateral agreements among Defendants to abstain from actively soliciting each other's employees.")

The alleged conspiracy is highly unusual and extremely limited in at least six crucial respects. *First*, it placed no restrictions whatsoever on hiring or jobs, either at the Defendant companies or in any relevant market. As Plaintiffs' counsel explained, "this is not a case about suppression of hiring," but only a case about "suppression of information flow." Ex. 1, CMC Hr'g Tr. at 46:14-17. *Second*, the alleged conspiracy involved no agreement about employees' compensation. *Third*, it comprised only six two-party agreements between six pairs of Defendants, leaving the other fifteen Defendant-pairs unaffected—for example, the conspiracy did not restrict Adobe's cold calling Google, Intel, Intuit, Lucasfilm, or Pixar employees, and vice-versa. *Fourth*, the alleged conspiracy affected only one of many recruiting methods. For example, Apple was free to recruit Adobe employees by every means other than cold calling—online and print job postings,

DEFS.' JOINT RESPONSE TO PLFS.' MOT. FOR APPLICATION OF THE PER SE STANDARD

job fairs, word-of-mouth, interviewing applicants, employee referrals, and others—and to hire unlimited numbers of Adobe employees. *Fifth*, the alleged conspiracy affected cold calling between only Defendant-pairs that had some type of collaborative or advisory relationship. *Sixth*, the alleged conspiracy left totally unaffected cold calling, other forms of recruiting, and hiring between the seven Defendants and the entire rest of the labor market for technical employees. That market includes such giants as Microsoft, Oracle, Amazon, Electronic Arts, Cisco, HP, IBM, Dell, IBM, Samsung, Yahoo, AMD, and scores of other technology companies, as well as universities and governmental entities. Plaintiffs offer no evidence to dispute that the seven Defendants accounted for roughly 2 percent of the "technical" employees in the United States. *See* Snyder Rpt. ¶ 38 & Ex. 2a ("Defendants represented approximately 2 percent of all high technology jobs").

### C.   Neither Judicial Experience Nor Economic Analysis Warrants Departure from the Presumptive Rule-of-Reason Standard

#### 1.   There is no judicial experience with the type of conspiracy alleged here

No judicial experience justifies treating the alleged conspiracy as per se illegal. Defendants are not aware of, and Plaintiffs have not cited, any judicial decision that addresses (a) the legality under the antitrust laws of an agreement between two or more companies not to cold call each other's employees; or (b) an alleged conspiracy in which multiple competitors, who make up a tiny percentage of the market, do not agree to restrict price or output but instead agree only to restrict one means of competition between a few pairs of defendants, while leaving that same competitive tool unrestricted between most defendant pairs and the vast majority of the market. Simply put, there is *no judicial experience* with a conspiracy remotely similar to the one alleged here. For that reason alone, per se or "quick look" treatment is inappropriate. *See In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1011-12 (7th Cir. 2012) (Posner, J.) ("It is relevant that we have never seen or heard of an antitrust case quite like this. . . . The per se rule is designed for cases in which experience has convinced the judiciary that a particular type of business practice has no (or trivial) redeeming benefits ever."); *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1052 (9th Cir. 1983) ("We find no significant judicial rule-of-reason experience with

DEFS.' JOINT RESPONSE TO PLFS.' MOT. FOR APPLICATION OF THE PER SE STANDARD

1  either the particular practice or industry at issue here and therefore conclude that imposing a new

2  *per se* rule would be premature.").

3      The DOJ's allegation that the individual DNCC agreements were per se violations is

4  entitled to no weight.[6] *See, e.g.*, *Marion Healthcare LLC v. S. Illinois Healthcare*, 2013 WL

5  4510168, at *10 n.3 (S.D. Ill. Aug. 26, 2013) (holding that DOJ Complaint, Competitive Impact

6  Statement, and Final Judgment "are not authoritative or controlling."). Federal courts have

7  consistently interpreted sections 5(a) and (h) of the Clayton Act, 15 U.S.C. §§ 16(a) & (h), as

8  prohibiting any reliance on a consent decree or competitive impact statement in private antitrust

9  litigation. *See*, *e.g.*, *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976);

10  *United States v. Microsoft Corp.*, 215 F. Supp. 2d 1, 9 n.7 (D.D.C. 2002); *Metrix Warehouse, Inc.*

11  *v. Daimler-Benz Aktiengesellschaft*, 555 F. Supp. 824, 826 (D. Md. 1983).[7]

12      Moreover, the Supreme Court and many other courts have repeatedly *rejected* arguments

13  by the DOJ and FTC that certain practices should be judged under the per se or "quick look" rule.

14  *See, e.g.*, *Actavis*, 133 S. Ct. at 2237-38 (rejecting the FTC's arguments that "quick look" analysis

15  should apply to reverse-payment settlements); *Cal. Dental*, 526 U.S. at 762-63 (rejecting FTC's

16  argument for per se or "quick look" analysis of advertising restrictions); *White Motor Co. v.*

17  *United States*, 372 U.S. 253 (1963) (rejecting DOJ's argument that the per se rule applied to

18  vertical territorial limitations); *United States v. Microsoft Corp.*, 253 F.3d 34, 94 (D.C. Cir. 2001)

19  (rejecting DOJ's argument that per se rule should be applied to tying arrangement); *United States*

20  *v. Brown Univ.*, 5 F.3d 658, 672, 678 (3d Cir. 1993) (rejecting DOJ's argument for per se rule and

21  district court's application of an "abbreviated rule of reason" analysis); *United States v.*

22  *Studiengesellschaft Kohle, m.b.H.*, 670 F.2d 1122, 1130 (D.C. Cir. 1981) (rejecting DOJ's

23  argument for per se rule regarding restrictions on sale of products by patent licensees); *United*

24

25  _____

26  [6] The DOJ did not allege the existence of any overarching conspiracy among the Defendants.

27  [7] Plaintiffs' citation to Dr. Snyder's testimony about the per se rule, *see* Mot. at 1, is misleading.
    Dr. Snyder never testified that he *agreed* with the DOJ's allegation that the DNCC agreements

28  were per se illegal. To the contrary, as noted elsewhere, he testified that the agreements both could
    have no meaningful anticompetitive effect and could be procompetitive.

1   *States v. Reality Multi-List, Inc.*, 629 F.2d 1351, 1362 (5th Cir. 1980) (rejecting DOJ's argument

2   for per se rule against restrictions on membership in real estate listing group).

3          **2.     Courts apply the rule of reason to more restrictive restraints on**
4                  **employee recruiting and hiring**

5          Courts have consistently refused to apply the per se rule to both two-party and multilateral

6   restraints on employee recruiting that were significantly more restrictive than the DNCC

7   agreements at issue here. In *Union Circulation Company, Inc. v. F.T.C.*, 241 F.2d 652 (2nd Cir.

8   1957), the Second Circuit applied the rule of reason to an agreement among several magazine

9   subscription sales agencies not to hire each other's agents and, in some instances, not to hire

10  agents of *any* other company. *Id.* at 655-57. This multilateral agreement was a flat ban on hiring,

11  not merely a restriction on one recruiting method, and there were no related business

12  collaborations among the defendants. *Id.* In rejecting per se treatment, the Second Circuit

13  emphasized that "a harmful effect upon competition is not clearly apparent from the terms of these

14  agreements." *Id.* at 657. The court reaffirmed this decision forty years later in refusing to apply the

15  per se rule to a multilateral "no-switching" agreement that prevented hiring of insurance agents.

16  *Bogan v. Hodgkins*, 166 F.3d 509, 515 (2nd Cir. 1999) ("the Agreement's anticompetitive effect

17  on the market for insurance sales agents is not obvious").

18         Many other courts have refused to apply the per se rule and instead applied the rule of

19  reason to no-hiring and no-recruiting agreements. *See*, *e.g.*, *Eichorn v. AT&T Corp.*, 248 F.3d 131,

20  138-44 (3rd Cir. 2001) ("we can find no support within the relevant case law for [the per se]

21  label"); *Consultants & Designers, Inc. v. Butler Serv. Grp.*, 720 F.2d 1553, 1555-56, 1562-64

22  (11th Cir. 1983) (upholding no-hiring agreements under rule of reason); *Nichols v. Spencer Int'l*

23  *Press, Inc.*, 371 F.2d 332, 335-37 (7th Cir. 1967) (applying rule of reason to no-hiring agreement);

24  *Weisfeld v. Sun Chem. Corp.*, 210 F.R.D. 136, 141-43 (D.N.J. 2002) (applying rule of reason to

25  "[c]ontracts among employers to not hire the employees of other parties to the agreement");

26  *UARCO Inc. v. Lam*, 18 F. Supp. 2d 1116, 1124 (D. Haw. 1998) (applying rule of reason to "no-

27  hire agreements among competitors"). While Plaintiffs *assert* that "[a]n agreement between two

28  labor competitors not to solicit *any* of each other's employees violates the Sherman Act per se,"

DEFS.' JOINT RESPONSE TO PLFS.' MOT. FOR APPLICATION OF THE PER SE STANDARD

1  Mot. at 4:1-2 (emphasis in original), they cite *no authority* for that proposition, while ignoring the

2  cases, cited here, that analyze restrictions on employee recruiting under the rule or reason.

3           **3.       Courts reject per se and "quick look" analysis of restraints, such as
                        restrictions on information, that do not directly and obviously restrict
4                       output**

5           As explained above, *supra* pp. 2-5, for a category of restraint to qualify for per se

6  treatment, the restraint must "facially appear[] to be one that would always or almost always tend

7  to restrict competition *and decrease output.*" *BMI*, 441 U.S. at 19-20; *see also Leegin*, 551 U.S. at

8  886-87. Similarly, "quick look" analysis applies only to "naked restraints on price and output."

9  *Cal. Dental*, 526 U.S. at 769. For that reason, the Supreme Court has made clear that where, as

10 here, an alleged agreement restricts *information*, not *output*, application of either the per se or

11 "quick look" rule is inappropriate. In *Cal. Dental*, the Supreme Court addressed an agreement

12 among dentists, through their trade association, not to engage in certain forms of price and quality

13 advertising. *Id*. at 760-64. The Ninth Circuit, in support of its "quick look" analysis, had

14 concluded that "restrictions on the ability to advertise prices normally make it more difficult for

15 consumers to find a lower price and for dentists to compete on the basis of price," *id*. at 773, and

16 that "'[t]hese restrictions are in effect a form of output limitation, as they restrict the supply of

17 information about individual dentists' services,'" *id*. at 776. Here, similarly, Plaintiffs' theory is

18 that the DNCC agreements, by suppressing information, made it more difficult for employees to

19 learn about opportunities for higher pay. *See* Order Granting Plfs.' Supp'l Mot. for Class Cert.,

20 Dkt. 531, at 38 ("Plaintiffs allege that the elimination of cold calling deprived all employees of

21 information regarding pay packages …."); Order re Defs.' Mots. Regarding Dr. Leamer, Dkt. 788,

22 at 8 (Apr. 4, 2014) ("Dr. Leamer hypothesized that … Defendants' anti-solicitation agreements

23 impaired information flow about compensation and job offers.").

24          The Supreme Court rejected the Ninth Circuit's application of "quick look" analysis,

25 explaining that "the relevant output for antitrust purposes . . . is presumably not information or

26 advertising, but dental services themselves." *Id*. Thus, "[t]he question is not whether the universe

27 of possible advertisements has been limited (as assuredly it has), but whether the limitation on

28 advertisements obviously tends to limit the total delivery of dental services." *Id*. Concluding that it

DEFS.' JOINT RESPONSE TO PLFS.' MOT. FOR APPLICATION OF THE PER SE STANDARD

was not obvious that the ban on certain forms of advertising—a restriction on the information

available to consumers—would harm competition and suppress output, the Court held that "[t]he

obvious anticompetitive effect that triggers abbreviated analysis has not been shown." *Id*. at 776-

79. *See also MLB Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 317-18 (2d Cir. 2008) (explaining

*Cal. Dental*).

Like the conspiracy in *Cal. Dental*, the alleged conspiracy here had no obvious effect on

output (*i.e.*, hiring or jobs). Under *Cal. Dental*, the relevant question is not whether the universe of

information available to employees has been limited, but whether any such limitation on

information "obviously" tends to limit the number of jobs or the amount of hiring. Here, Plaintiffs

do not even claim—far less attempt to prove—that the alleged conspiracy suppressed hiring or

jobs. Indeed, Plaintiffs' counsel expressly *disclaimed* any suppression of hiring: "this is not a case

about suppression of hiring," but only about "suppression of information flow." Ex. 1, CMC Hr'g

Tr. at 46:14-17. Plaintiffs' expert, Dr. Leamer, concedes he has no evidence that Defendants'

DNCC agreements caused a reduction in the number of jobs. Ex. 2, 11/18/13 Leamer Depo. 895:7-

896:1. *See also* Expert Report of Prof. Kevin M. Murphy, ¶ 15 (Nov. 25, 2013), attached to

Cisneros Decl., Ex. 6 ("11/2013 Murphy Rpt.") ("The bilateral agreements would not have

changed the supply of or demand for labor overall or the number of open jobs that the defendants

desired to and did fill."); Snyder Rpt. ¶ 31 ("[T]he [DNCC] agreements did not reduce

employment or hiring.").

Given Plaintiffs' own contention that this case is about suppression of information, not

output, and the undisputed lack of evidence of any effect on output, the challenged conspiracy

"might plausibly be thought to have … possibly no effect at all on competition." *Cal. Dental*, 526

U.S. at 771. The law therefore prohibits use of either per se or quick look analysis. *Id*.; *Safeway*,

651 F.3d at 1138; *MLB Props.*, 542 F.3d at 318.

> **4.**     **The Ninth Circuit's en banc decision in *Safeway* requires application of the full rule of reason here**

The Ninth Circuit's en banc decision in *Safeway* requires rejection of the per se and "quick

look" rules here. In *Safeway*, the court held that an agreement among four competing grocery store

chains to share their revenues during the term of a labor dispute was not subject to summary

condemnation under per se or "quick look" analysis. 651 F.3d at 1222-23. The Ninth Circuit

emphasized two significant features of the revenue-sharing agreement that distinguished it from

the profit-pooling arrangement that was condemned as per se illegal in *Citizen Publishing Co. v.*

*United States*, 394 U.S. 131 (1969). First, the "indefinite but temporary duration" of the agreement

meant that "the grocers retained incentives to compete during the labor dispute period." *Id*. at

1135. Thus, "[u]nlike the *Citizen Publishing* arrangement, which insulated the newspapers entirely

from competition," the arrangement in *Safeway* left the grocers with "a continued interest in

maintaining and growing their customer bases." *Id*. Here, similarly, the very limited scope of the

alleged conspiracy means that the Defendants retained substantial incentives to compete, even

among themselves, for employees.

      Second, the Ninth Circuit emphasized that the revenue-sharing agreement "did not include

all of the grocers operating in the region." *Id*. at 1136. While the combined sales of the four

grocers that were party to the agreement accounted for between 54.4% and 76% of the relevant

geographic markets, they "still faced competition from other retailers." *Id*. The Ninth Circuit

therefore found that "there is a significant probability that the grocers retained incentives to

continue—or even to increase—discounting and advertising …, to gain new customers if possible,

and to maximize profitability and market share after the strike." *Id*. Here, it is undisputed that

Defendants account for a *tiny* percentage of the relevant labor market. *See*, *e.g.*, Snyder Rpt. ¶ 38;

Murphy Rpt. ¶ 34 (Nov. 12, 2012), attached to Defs.' Joint Renewed Mot. To Seal, at Dkt. 848

(Apr. 10, 2014). *See also* Ex. 2, 11/18/2013 Leamer Depo. 1099:2-14; 1149:11-18. If grocers

representing 2/3 of the market had incentives to continue to compete notwithstanding their

revenue-sharing agreement, so too did these Defendants, who faced entirely unrestricted

competition from 98% of the market.

      The Ninth Circuit also emphasized that "[a] restraint of this nature has not undergone the

kind of careful judicial scrutiny that would support the application of the per se rule." *Id*. The

court held that "[n]one of [the State's] cases, alone or in combination, establishes sufficient

judicial experience with a revenue sharing agreement of limited duration, among some

DEFS.' JOINT RESPONSE TO PLFS.' MOT. FOR APPLICATION OF THE PER SE STANDARD

competitors in a market, so as to permit per se treatment of [that agreement]." *Id*. n.15. Here, the cases also do not establish any, let alone sufficient, judicial experience with this unusual and narrow alleged conspiracy. As the Ninth Circuit held in rejecting per se and "quick look" analysis in *Safeway*, "[t]he unique features of the arrangement … and the uncertain effect these features had on the [defendants'] competitive behavior and incentives … render any anticompetitive effects of the [alleged conspiracy] not obvious." *Id*. at 1137. So too here.

Furthermore, two distinguished Ph.D. economists with extensive antitrust experience have concluded, based on fundamental economic principles, that the alleged conspiracy and the DNCC agreements at issue could not have had anticompetitive effects.[8] *See* 11/2013 Murphy Rpt. ¶ 11(a) ("Economic theory and empirical evidence show that the challenged DNCC agreements *were not anticompetitive* and did not reduce the compensation of the broad group of employees in the Class certified by the Court."); *id*. ¶¶ 13-38 (explaining conclusions); Snyder Rpt. ¶¶ 20, 24 ("the [six do-not-cold call agreements] *could not have had meaningful anticompetitive effects*," and "the Google-Intel Agreement had a legitimate procompetitive justification"); *see also id*. ¶¶ 31-74 (explaining conclusions). Plaintiffs have proffered no expert testimony to the effect that a conspiracy of this type would always have an anticompetitive effect. The Court therefore cannot conclude the alleged conspiracy would have an "immediately obvious" anticompetitive effect or that "an observer with even a rudimentary understanding of economics could conclude that [it] would have an anticompetitive effect." *Safeway*, 651 F.3d at 1133-34.

### 5. Courts apply the rule of reason to restraints that are, as here, ancillary to collaborative relationships

If Plaintiffs had challenged the individual two-party DNCC agreements, they would be subject to rule of reason analysis, not the per se rule. Courts consistently hold that a horizontal restraint on competition is ancillary to collaboration and therefore subject to the rule of reason "when it may contribute to the success of a cooperative venture that promises greater productivity

---

[8] *See Safeway*, 651 F.3d at 1137 ("To reach a confident conclusion on the anticompetitive effects of the [revenue-sharing agreement] … [o]ne might want to permit expert testimony …."); *Meijer v. Barr Pharm., Inc.*, 572 F. Supp. 2d 38, 51 & n.15 (D.D.C. 2008) (expert testimony about economic effects is relevant to court's decision whether to apply the per se rule).

and output." *E.g.*, *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1336 (Fed. Cir. 2010) (en banc); *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 189 (7th Cir. 1985). Here, Plaintiff's own expert, Dr. Marx, testified that "[a]n anti-solicitation [DNCC] agreement . . . by making a collaboration more successful than it otherwise would have been, can generate benefits for consumers even if that collaboration would have occurred in another form without the anti-solicitation agreement . . . ." Ex. 3, Marx Depo. 93:9-18; *see also id.* 76:18-23, 81:3-14, 83:5-15, 86:20-87:2 (cold calling could undermine collaboration's success); *id.* 90:25-92:23 (collaboration's increased success could benefit consumers and create more jobs). Intel's expert, Dr. Snyder concluded that "the Google-Intel Agreement had a legitimate *pro-competitive* justification given their ongoing collaborations." Snyder Rpt. ¶¶ 24, 57-64. Thus, it is undisputed that DNCC agreements can be reasonably ancillary to collaborative activity and procompetitive. They are therefore subject to the rule of reason. *See MLB Props.,* 542 F.3d at 340 (where "[plaintiff's expert] conceded that the challenged provisions could have a procompetitive impact …, [they] must be … reviewed under the rule of reason ….") (Sotomayor, J., concurring); *Polk Bros.*, 776 F.2d at 189 ("If [an agreement] *arguably* [promoted enterprise and productivity], then the court must apply the Rule of Reason to make a more discriminating assessment.").

Contrary to Plaintiffs' repeated assertions, *see, e.g.*, Mot. at 4, 5, 6, 10, for a restraint to be "ancillary," it need *not* be essential to the collaboration; it need only "appear[] capable of enhancing the [collaboration's] efficiency"—be "part of a larger endeavor whose success [it] promote[s]." *Princo*, 616 F.3d at 1336 (quoting *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 229 (D.C. Cir. 1986)); *Polk Bros.*, 776 F.2d at 188-89; *see also In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1015 (N.D. Cal. 2008) (rule of reason applies to restraint that is "reasonably ancillary to the legitimate cooperative aspects of the venture"); *Gerlinger v. Amazon.com, Inc.*, 311 F. Supp. 2d 838, 849 (N.D. Cal. 2004) (restraint ancillary if "it may promote the success of a more extensive cooperation").

The very cases Plaintiffs cite, including *Princo*, *Polk Bros.*, and *Gerlinger*, squarely contradict their position. In *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003), the Ninth Circuit stated that "[t]o fall within [the ancillary restraints doctrine], the price

DEFS.' JOINT RESPONSE TO PLFS.' MOT. FOR APPLICATION OF THE PER SE STANDARD

fixing *need not itself be essential* …." *Id*. at 1151 (citing *NCAA*, 468 U.S. at 101). Instead, defendants need show only "that the efficiencies of the [venture] would be impaired [without the restraint]." *Id*. As Justice (then Judge) Sotomayor stated, "[u]nder the ancillary restraints doctrine, a challenged restraint *need not be essential*, but rather only 'reasonably ancillary to the legitimate cooperative aspects of the venture." *MLB Props.*, 542 F.3d at 340 n.11. In *NCAA v. Bd. of Regents*, the Supreme Court, far from requiring that a restraint be "essential," applied the rule of reason to the NCAA's television plan even though "NCAA football could be marketed just as effectively without the [plan]." 468 U.S. at 96, 114. *See also Am. Needle v. Nat'l Football League*, 130 S. Ct. 2201, 2216 (2010) (discussing *NCAA*).

        Plaintiffs' argument that the alleged overarching conspiracy should be judged under a different standard than the DNCC agreements, *see* Mot. at 6-7, is based on "formalistic line drawing," not "demonstrable economic effect." *See Leegin*, 551 U.S. at 887. Each agreement restrained the two parties to it from cold calling one another's (but no one else's) employees. The competitive effects of the six agreements, whether linked as part of an overarching conspiracy or not, would be the same: if the effect of each was potentially procompetitive or neutral, so too would be the effect of all six.[9] Thus, regardless of whether the alleged conspiracy (as opposed to the individual DNCC agreements) could be considered ancillary to Defendants' collaborative activities, there is no basis to conclude that it is "immediately obvious" the alleged conspiracy, any more than the individual DNCC agreements, "would always or almost always tend to restrict competition and decrease output." *See Leegin*, 551 U.S. at 886.

        **D.      Plaintiffs Are Not Entitled to Either Effective Summary Adjudication Under the Rule of Reason or an Order Excluding Evidence of the Pro-Competitive Reasons for and Effects of the DNCC Agreements**

        Plaintiffs, in effect, belatedly seek summary adjudication under the rule of reason, arguing that the rule "requires that the defendant establish a relationship of necessity between the restraint

---

[9] The agreements theoretically might have different combined effects if the seven companies together had market power in a relevant economic market, while any two of them did not. That question, however, would necessarily be the subject of a full rule of reason analysis. *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984) (equating the rule of reason with "an inquiry into market power and market structure designed to assess [a restraint's] actual effect").

and a supposed pro-competitive benefit" and that Defendants have supposedly conceded they cannot do so. Mot. at 13. Plaintiffs are wrong on both the law and the facts. As Plaintiffs' cases make clear, under the rule of reason, "[t]he *plaintiff* bears the initial burden of showing that the restraint produces *significant anticompetitive effects* within the relevant product and geographic markets"; "[*if*] *the plaintiff meets this burden*, the defendant must come forward with evidence of the restraint's procompetitive effects"; and "[t]he *plaintiff* must then show that 'any legitimate objectives can be achieved in a substantially less restrictive manner." *Hairston v. Pacific 10 Conference*, 101 F.3d 1315, 1319 (9th Cir. 1996); *see also Brown Univ.*, 5 F.3d at 679; *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1413 (9th Cir. 1991). Moreover, Defendants have decidedly not conceded that they cannot show any procompetitive effects from the DNCC agreements.

Plaintiffs, having ostensibly filed no motions in limine, seek in this motion an order excluding "evidence or other testimony about purported procompetitive justifications for the conspiracy or the individual agreements ...." Mot. at 15. The request is meritless for several reasons. First, its premise—that the per se rule applies—should be rejected for the reasons stated above. Second, the evidence Plaintiffs seek to exclude—such as evidence that a Defendant entered into a DNCC agreement to further a collaborative relationship or for another independent purpose—is directly relevant to the jurors' determination of whether each Defendant entered into the alleged overarching conspiracy. Third, if the Court is not prepared to rule now that the full rule of reason applies, it should hear the evidence concerning alleged anticompetitive and procompetitive effects before deciding to depart from that presumptive rule. *See Meijer,* 572 F. Supp. 2d at 51 & n.15. Lastly, evidence of procompetitive justifications would be directly relevant even under "quick look" analysis. *Safeway*, 651 F.3d at 1138.

## III.   **CONCLUSION**

Defendants respectfully submit that the full rule of reason is the appropriate standard for evaluating the legality of Defendants' alleged conduct.

| | |
|---|---|
| 1 | Dated: April 18, 2014 |
| 2 | |

By: */s/ Bradley S. Phillips*
    Bradley S. Phillips

GREGORY P. STONE (Bar No. 78329)
gregory.stone@mto.com
BRADLEY S. PHILLIPS (Bar No. 85263)
brad.phillips@mto.com
STEVEN M. PERRY (Bar No. 106154)
steven.perry@mto.com
BETHANY W. KRISTOVICH (Bar No. 241891)
bethany.kristovich@mto.com
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue. 35th Floor
Los Angeles, California 90071-1560
Telephone:      (213) 683-9100
Facsimile:      (213) 687-3702

Attorneys for Defendant Intel Corporation


By: */s/ George A. Riley*
    George A. Riley

GEORGE A. RILEY (Bar No. 118304)
griley@omm.com
MICHAEL F. TUBACH (Bar No. 145955)
mtubach@omm.com
CHRISTINA J. BROWN (Bar No. 242130)
cjbrown@omm.com
O'MELVENY & MYERS LLP
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111-3823
Telephone:      (415) 984-8700
Facsimile:      (415) 984-8701

Attorneys for Defendant Apple Inc.


By: */s/ David C. Kiernan*
    David C. Kiernan

ROBERT A. MITTELSTAEDT (Bar No. 60359)
ramittelstaedt@jonesday.com
CRAIG A. WALDMAN (Bar No. 229943)
cwaldman@jonesday.com
DAVID C. KIERNAN (Bar No. 215335)
dkiernan@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone:      (415) 626-3939
Facsimile:      (415) 875-5700

Attorneys for Defendant Adobe Systems, Inc.

DEFS.' JOINT RESPONSE TO PLFS.' MOT. FOR APPLICATION OF THE PER SE STANDARD

By: /s/ Robert A. Van Nest
Robert A. Van Nest

ROBERT A. VAN NEST (Bar No. 84065)
rvannest@kvn.com
DANIEL PURCELL (Bar No. 191424)
dpurcell@kvn.com
EUGENE M. PAIGE (Bar No. 202849)
epaige@kvn.com
JUSTINA SESSIONS (Bar No. 270914)
jsessions@kvn.com
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111-1809
Telephone:        (415) 391-5400
Facsimile:        (415) 397-7188


By: /s/ Lee H. Rubin
Lee H. Rubin

EDWARD D. JOHNSON (Bar No. 189475)
wjohnson@mayerbrown.com
LEE H. RUBIN (Bar No. 141331)
lrubin@mayerbrown.com
DONALD M. FALK (Bar No. 150256)
dfalk@mayerbrown.com
MAYER BROWN LLP
Two Palo Alto Square, Suite 300
Palo Alto, CA 94306-2112
Telephone:        (650) 331-2000
Facsimile:        (650) 331-2060

Attorneys for Defendant Google Inc.

**ATTESTATION**: Pursuant to Civil Local Rule 5-1(i)(3), the filer attests that concurrence in the filing of this document has been obtained from all signatories.

DEFS.' JOINT RESPONSE TO PLFS.' MOT. FOR APPLICATION OF THE PER SE STANDARD