# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

--oOo--

```
IN RE: HIGH-TECH EMPLOYEE       )
ANTITRUST LITIGATION,           )
                                )
                                ) Master Docket No.
                                ) 11-CV-2509-LHK
                                )
THIS DOCUMENT RELATES TO:       )
                                )
ALL ACTIONS                     )
_____)
```

DEPOSITION OF

MATTHEW MARX

_____

NOVEMBER 15, 2013

REPORTED BY:  SARAH LUCIA BRANN, CSR 3887

```
 1              MR. HARVEY:  Objection as to form.
 2              THE WITNESS:  Okay.  So, if we start on
 3   page 12, I provide a few examples of these.
 4              So, for example, at -- so I will start
 5   with 24B.  Excuse me.  Actually, 24A.
 6              So Google said that it claims that these
 7   policies -- Google claims that it perceived that
 8   engaging in cold calling of these companies'
 9   employees could jeopardize important collaborative
10   and business relationships between Google and these
11   companies.
12              In section B Adobe claimed that the
13   non-solicitation --
14              MR. PHILLIPS:  Q.  I am sorry.  Maybe we
15   could do one at a time, because I have a follow-up
16   question.  I am happy to let you do the others as
17   well.
18              Do you agree or disagree with the notion
19   that engaging in cold calling could jeopardize
20   collaborative business relationships between
21   companies?
22        A.    I could see how it might make those
23   collaboration partners uneasy.  But the -- my charge
24   was not to determine whether they would make
25   partners uneasy.  It was whether they were
```

1   that the anti-solicitation agreements were essential
2   to their technical collaborations?
3        A.   Okay.  So if we look at C, Intuit states
4   that if one or the other company using the
5   collaboration has an opportunity to identify the
6   other company's best employees for the purpose of
7   recruiting them, it will create a lack of trust and
8   a disincentive to assign the best employees for them
9   to be as open with each other.
10       Q.   Do you agree or disagree with the notion
11  expressed there?
12       A.   I don't disagree with their opinion
13  regarding their technical collaboration, why they
14  might be worried about that.  And I think that's why
15  the Department of Justice allows for technical
16  collaborations -- sorry.  I misspoke.
17            That's why the Department of Justice in
18  its consent decree allows for anti-solicitation
19  agreements that are attached to specific
20  collaborations, time bound, naming the people
21  involved on both sides.
22       Q.   Where in 24C does it indicate that Intuit
23  thought that the anti-solicitation agreement was
24  necessary in order for it to collaborate at all with
25  Google?

```
 1            MR. PHILLIPS:  Q.  What's the next one
 2   where you think that they stated that the
 3   anti-solicitation agreement was necessary in order
 4   for them to collaborate at all?
 5        A.   That would be D.  There Apple says that it
 6   wanted competitors to refrain from actively
 7   recruiting each other's employees, to assure Apple's
 8   partners that "Apple will not use the knowledge it
 9   gains through its collaboration to 'cherry pick' its
10   partners' employees, because such solicitations are
11   disruptive to the relationships."
12        Q.   Do you agree or disagree with the notion
13   that cherry picking each other's employees would be
14   likely disruptive to collaborative relationships?
15        A.   It could be disruptive.  I think that's --
16   that's a -- that's a possible fear that Apple would
17   have.  And losing any employee could be disruptive,
18   whether it's to a collaboration partner or just more
19   generally.
20        Q.   And what's the next one that you think
21   indicates that the defendants thought that the
22   anti-solicitation agreements were necessary in order
23   for them to collaborate at all?
24        A.   So in E Lucasfilm says that if the
25   companies were to actively raid one another's best
```

```
 1         Q.   Any other indications the defendants
 2    thought that the anti-solicitation agreements were
 3    necessary in order for them to collaborate at all?
 4         A.   So the last item is in G, where Intel
 5    defended its anti-solicitation agreement because
 6    if -- if another -- if a collaborator --
 7              Excuse me.
 8              Because having a collaborator hire its --
 9    not hire.  Sorry.  But having a collaborator cold
10    call and target its employees would be seen as
11    significantly undermining trust, causing significant
12    ill will, and having significant negative
13    repercussions on the collaboration, which would be
14    indicative that they were -- that they might
15    consider not having the collaboration without it.
16         Q.   That they might consider not having the
17    collaboration, but that they also might consider
18    still having the collaboration; correct?
19         A.   They could still consider it.
20         Q.   Do you agree or disagree with the
21    statement there that cold calling by a collaborator
22    might significantly undermine trust, cause ill will,
23    have negative repercussions on a collaboration?
24         A.   I think my answer to that would be similar
25    to my answer to your questions on the previous
```

 1    statements, that it is possible that that could be
 2    the case.  And for that reason, it was surprising to
 3    me that the defendants entered into technical
 4    collaborations where no anti-solicitation agreement
 5    was included.
 6             MR. PHILLIPS:  Move to strike, starting
 7    with "and for that reason" as non-responsive.
 8             MR. HARVEY:  Objection.
 9             MR. PHILLIPS:  Q.  In paragraph 25 at the
10    top of page 14 you say that "Defendants argue that
11    the Anti-Solicitation agreements are essential for a
12    successful technical collaboration."
13             And you then say, "If one takes this
14    argument at face value, then a rational company
15    should adopt Anti-Solicitation agreements if and
16    only if undertaking a technical collaboration with
17    another firm," and that this implies two actions,
18    that "Every Anti-Solicitation agreement between two
19    companies should be tied to a corresponding
20    technical collaboration," and that "Every technical
21    collaboration should have an Anti-Solicitation
22    agreement in place between the two companies."
23             Do you see that?
24        A.   I do.
25        Q.   Is that your opinion?

1    expectation that it would still be successful?  Do
2    you think they might make that decision?
3           MR. HARVEY:  Object as to form.
4           THE WITNESS:  I would say that a company
5    facing the decision of whether to launch a technical
6    collaboration has a lot of degrees of freedom,
7    including who to include in that collaboration,
8    including what incentives to give to the people in
9    that collaboration to improve their chances of
10   staying.
11          And they can do that with potential
12   rewards.  They can also do that with -- sorry.  They
13   can do that with incentives to retain them, and --
14   otherwise they may do it with mechanisms to -- to
15   block the chances of them being recruited.  So they
16   could have multiple approaches to that scenario.
17          MR. PHILLIPS:  Q.  And one approach might
18   be to assign different employees than they otherwise
19   would to the collaboration; correct?
20      A.   That could be another approach.
21      Q.   And might assigning such employees to the
22   collaboration potentially reduce the success of the
23   collaboration?
24      A.   It could.
25      Q.   And would the reduction in the success of

1  that collaboration potentially have adverse effects
2  for consumers?
3         MR. HARVEY:  Objection as to form.
4         THE WITNESS:  Possibly.
5         MR. PHILLIPS:  Q.  So it's not in fact the
6  case that -- strike that.
7         So one of the results of an
8  anti-solicitation agreement of the type that you
9  talk about in your reports might be to ensure that
10 the collaborators can use their best employees in
11 the collaboration without fear of having them
12 poached; correct?
13        MR. HARVEY:  Objection as to form.
14        THE WITNESS:  That could be one reason.
15        MR. PHILLIPS:  Q.  And that would
16 potentially make the collaboration more successful;
17 correct?
18        MR. HARVEY:  Objection as to form.
19        THE WITNESS:  It could, though there are
20 other means by which they could achieve that end.
21        MR. PHILLIPS:  Q.  And if this
22 collaboration were successful, it might generate
23 more benefits for consumers; correct?
24        MR. HARVEY:  Objection as to form.
25        THE WITNESS:  It might, or it might

Case 5:11-cv-02509-LHK   Document 887-4   Filed 04/18/14   Page 10 of 12

MATTHEW MARX - 11/15/2013

92

```
 1   generate private benefits for the company.
 2              MR. PHILLIPS:  Q.  Or both; correct?
 3              MR. HARVEY:  Objection as to form.
 4              THE WITNESS:  Or both.
 5              MR. PHILLIPS:  Q.  And it might even, for
 6   example, generate additional jobs; correct?
 7              MR. HARVEY:  Objection as to form.
 8              THE WITNESS:  I don't know.  I don't have
 9   a strong opinion on that.
10              MR. PHILLIPS:  Q.  Well, if, for example,
11   the collaboration resulted in creating a product
12   that was particularly appealing to consumers, might
13   not there be more jobs created for people to
14   actually make that product?
15              MR. HARVEY:  Objection as to form.
16              THE WITNESS:  Oh, so you are saying if, in
17   the long run, if the collaboration caused the
18   company to perform better, might that mean -- well,
19   it would mean a lot of -- there could be a lot of
20   outcomes.  The company could potentially do better.
21              MR. PHILLIPS:  Q.  And create more jobs;
22   right?
23        A.    That could be an outcome.
24        Q.    So an anti-solicitation agreement in
25   connection with a technical collaboration, can be --
```

Merrill Corporation - Los Angeles
800-826-0277                                www.merrillcorp.com/law

```
 1   can generate benefits for consumers by improving the
 2   success of that venture, by making it more
 3   successful, even if the collaboration would have
 4   occurred in the absence of the anti-solicitation
 5   agreement; correct?
 6           MR. HARVEY:  Objection as to form.
 7           THE WITNESS:  I am sorry.  Can you ask one
 8   more time?
 9           MR. PHILLIPS:  Q.  An anti-solicitation
10   agreement can, by generating -- by making a
11   collaboration more successful than it otherwise
12   would have been, can generate benefits for consumers
13   even if that collaboration would have occurred in
14   another form without the anti-solicitation
15   agreement; correct?
16           MR. HARVEY:  Same objection.
17           THE WITNESS:  Yeah, I would agree with
18   that.
19           MR. PHILLIPS:  Q.  Going back to page two
20   of your report --
21           I am sorry.  One other question along this
22   line.
23           If in the course of a collaboration one of
24   the companies cold called and stole away key
25   employees of the other company, do you think that
```

```
 1                    CERTIFICATE OF REPORTER
 2              I, SARAH LUCIA BRANN, a Certified
 3   Shorthand Reporter, hereby certify that the witness
 4   in the foregoing deposition was by me duly sworn to
 5   tell the truth, the whole truth, and nothing but the
 6   truth in the within-entitled cause;
 7              That said deposition was taken in
 8   shorthand by me, a disinterested person, at the time
 9   and place therein stated, and that the testimony of
10   the said witness was thereafter reduced to
11   typewriting, by computer, under my direction and
12   supervision;
13              That before completion of the deposition,
14   review of the transcript [X] was [ ] was not
15   requested.  If requested, any changes made by the
16   deponent (and provided to the reporter) during the
17   period allowed are appended hereto.
18              I further certify that I am not of counsel
19   or attorney for either or any of the parties to the
20   said deposition, nor in any way interested in the
21   event of this cause, and that I am not related to
22   any of the parties thereto.
23              DATED:  November 20, 2013
24                     _____
25                     SARAH LUCIA BRANN, CSR No. 3887
```