1    Richard M. Heimann (State Bar No. 63607)
     Kelly M. Dermody (State Bar No. 171716)
2    Brendan Glackin (State Bar No. 199643)
     Dean Harvey (State Bar No. 250298)
3    Anne B. Shaver (State Bar No. 255928)
     Lisa J. Cisneros (State Bar No. 251473)
4    LIEFF CABRASER HEIMANN &
     BERNSTEIN, LLP
5    275 Battery Street, 29th Floor
     San Francisco, California  94111-3339
6    Telephone:  415.956.1000
     Facsimile:   415.956.1008
7
     Joseph R. Saveri (State Bar No. 130064)
8    James Dallal (State Bar No. 277826)
     JOSEPH SAVERI LAW FIRM, INC.
9    505 Montgomery, Suite 625
     San Francisco, CA 94111
10   Telephone: 415.500.6800
     Facsimile:   415.395.9940
11
     *Co-Lead Class Counsel*
12

13                    UNITED STATES DISTRICT COURT

14                   NORTHERN DISTRICT OF CALIFORNIA

15                          SAN JOSE DIVISION

16

17   IN RE: HIGH-TECH EMPLOYEE          Master Docket No. 11-CV-2509-LHK
     ANTITRUST LITIGATION
18                                       **CLASS ACTION**
     THIS DOCUMENT RELATES TO:
19                                       **REPLY MEMORANDUM OF POINTS AND
     ALL ACTIONS                         AUTHORITIES IN SUPPORT OF MOTION
20                                       FOR PRELIMINARY APPROVAL OF
                                         CLASS ACTION SETTLEMENT**
21                                       _____
                                         Judge:        Hon. Lucy H. Koh
22                                       Courtroom:  8, 4th Floor
                                         Date:         June 19, 2014
23                                       Time:         1:30 p.m.

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................. 1

II.  THE SETTLEMENT IS PRESUMPTIVELY FAIR ............................................. 3

III. THE SETTLEMENT IS WELL WITHIN THE RANGE OF POSSIBLE JUDICIAL APPROVAL, PARTICULARLY WHEN TAKING INTO ACCOUNT THE UNCERTAINTIES, RISKS, COSTS, AND DELAYS OF LITIGATING THE CASE TO JUDGMENT AND BEYOND ...................... 5

   A.   The Settlement Amount of $324.5 Million Is Well Within the Range of Judicial Approval ........................................................ 5

   B.   Absent the Settlement, the Class Faced A Substantial Risk of Litigating the Case to Trial and Receiving Nothing ................................. 10

IV.  CONCLUSION ................................................................. 14

1

**TABLE OF AUTHORITIES**

2

**Page**

3

4

**CASES**

5

*Acosta v. Trans Union*, LLC,
    243 F.R.D. 377 (C.D. Cal. 2007) ........................................................... 8

6

*Behrens v. Wometco Enters., Inc.*,
    118 F.R.D. 534 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990) ................... 6

7

*City Pshp. Co. v. Atl. Acquisition Ltd. P'shp.*,
8    100 F.3d 1041 (1st Cir. 1996) ............................................................. 3

9

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) ................................................................... 11

10

*Create-A-Card, Inc. v. Intuit, Inc.*,
11    No. CV-07-6452 WHA, 2009 U.S. Dist. LEXIS 93989 (N.D. Cal. Sept. 22,
    2009) .................................................................................... 3

12

*Fraley v. Facebook, Inc.*,
13    No. C 11-1726-RS, 2012 U.S. Dist. LEXIS 116526 (N.D. Cal. Aug. 17, 2012)..................... 9

14

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998)......................................................... 1, 6, 14

15

*Hartman, et al. v. Albright, et al.*,
16    Case No. 77-2019-JR, Dkt. 917 (D.D.C. July 12, 2000) ............................... 2

17

*In re Domestic Air Transp. Antitrust Litig.*,
    148 F.R.D. 297 (N.D. Ga. 1993)......................................................... 8

18

*In re Elec. Carbon Prods. Antitrust Litig.*,
19    447 F. Supp. 2d 389 (D.N.J. 2006) ..................................................... 12

20

*In re LDK Solar Secs. Litig.*,
    No. C 07-5182, 2010 U.S. Dist. LEXIS 73530 (N.D. Cal. June 21, 2010) ............. 6

21

*In re Motor Fuel Temperature Sales Practices Litig.*,
    286 F.R.D. 488 (D. Kan. 2012)......................................................... 9

22

*In re NFL Players' Concussion Injury Litig.*,
23    961 F. Supp. 2d 708 (E.D. Pa. 2014) ................................................... 9

24

*In re Nucoa Real Margarine Litig.*,
    No. CV-10-00927 MMM (AJWx), 2012 U.S. Dist. LEXIS 189901 (C.D. Cal.
    June 12, 2012) ........................................................................... 5

25

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
26    2013 U.S. Dist. LEXIS 179340 (E.D.N.Y. Dec. 13, 2013) ............................ 3, 6

27

*In re Tableware Antitrust Litig.*,
    No. C 04-3514-VRW, 2007 U.S. Dist. LEXIS 89998 (N.D. Cal. Nov. 28,
28    2007) .................................................................................... 6

**TABLE OF AUTHORITIES**
(continued)

Page

*In re Toys "R" Us-Del., Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438 (C.D. Cal. 2014) .................................................................. 6

*In re Zoran Corp. Derivative Litig.*,
No. C 06-05503-WHA, 2008 U.S. Dist. LEXIS 48246 (N.D. Cal. Apr. 7, 2008) ................... 9

*Johnson et al. v. Arizona Hospital and Healthcare Association et al.*,
Case No. 07-cv-01292-SRB, Dkt. 664 (D. Ariz. Mar. 4, 2011) ............................... 7

*Laguna v. Coverall N. Am., Inc.*,
No. 12-55479, 2014 U.S. App. LEXIS 10259 (9th Cir. June 3, 2014) ...................... 4

*Linney v. Cellular Alaska P'shp*,
No. C-96-3008 DLJ, 1997 U.S. Dist. LEXIS 24300 (N.D. Cal. July 18, 1997),
*aff'd*, 151 F.3d 1234 (1998) ......................................................... 1, 3, 5

*Meijer Inc., et al. v. Abbott Laboratories*,
CV07-5985 (N.D. Cal.) ................................................................ 8

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
221 F.R.D. 523 (C.D. Cal. 2004) ..................................................... 3

*Officers for Justice v. Civil Service Comm'n.*,
688 F.2d 615 (9th Cir. 1982) .................................................. 1, 5, 10, 14

*Parker v. Anderson*,
667 F.2d 1204 (5th Cir. 1982) ...................................................... 6

*Reed v. 1-800 Contacts, Inc.*,
No. 12-cv-02359 JM (BGS), 2014 U.S. Dist. LEXIS 255 (S.D. Cal. Jan. 2,
2014) ................................................................................ 6

*SmithKline Beecham Corp. v. Abbott Laboratories*,
CV07-5702 (N. D. Cal.) .............................................................. 8

*State of California v. eBay Inc.*,
Case No. 12-CV-5874-EJD-PSG, Dkt. 55 (N.D. Cal. May 1, 2014) ..................... 7

*Sullivan v. DB Invs., Inc.*,
667 F.3d 273 (3d Cir. 2011), *cert. denied*, 132 S. Ct. 1876 (2012) .................. 6

*Sutton v. Medical Serv. Ass'n*,
No. 92-4787, 1994 U.S. Dist. LEXIS 7512 (E.D. Pa. June 8, 1994) .................... 12

*TBK Partners, Ltd. v. Western Union Corp.*,
675 F.2d 456 (2d Cir. 1982) ......................................................... 5

*Weeks v. Kellogg Co.*,
No. CV 09-08102 (MMM) (RZx), 2011 U.S. Dist. LEXIS 155472 (C.D. Cal.
Nov. 23, 2011) ...................................................................... 3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF AUTHORITIES**
**(continued)**

Page

**TREATISES**

*Manual for Complex Litigation (Fourth)* (2004) ........................................................ 1, 4

*Newberg on Class Actions* (4th ed. 2002).................................................................... 1, 3

**OTHER AUTHORITIES**

Streitfeld and Wollan, "Tech Rides are Focus of Hostility in Bay Area," *The New York Times*, Jan. 31, 2014, *available at* http://www.nytimes.com/2014/02/01/ technology/tech-rides-are-focus-of-hostility-in-bay-area.html (last visited on June 11, 2014) .................................................................................................................... 13

- iv -

1    **I.      INTRODUCTION**

2            Plaintiffs Mark Fichtner, Siddharth Hariharan, and Daniel Stover ("Plaintiffs" or "Class

3    Representatives") submit this response to Michael Devine's Opposition to Plaintiffs' Motion for

4    Preliminary Approval of Class Action Settlement ("Objection"; Dkt. 934).  Mr. Devine opposes

5    the proposed settlement with Adobe, Apple, Google, and Intel (the "Settlement") because he

6    prefers the risks, costs, and delay of trial over cash consideration of $324.5 million that cannot

7    revert back to Defendants.  In other words, he would rather risk getting zero for the Class than a

8    certain, timely payment, and he asks the Court to reject the Settlement at preliminary approval

9    even before the Class has had an opportunity to consider it.  Plaintiffs respectfully disagree.  The

10   Court should preliminarily approve the Settlement because it falls well "within the range of

11   possible judicial approval" such that the Class should receive notice of it and the Court should

12   hold a fairness hearing.  *Newberg on Class Actions* § 11:25 at 38 (4th ed. 2002) ("*Newberg*");

13   *Manual for Complex Litigation (Fourth)* § 21.632 at 320-21 (2004) ("*Manual*").

14           Mr. Devine contends that the Settlement does not adequately reflect the strength of

15   Plaintiffs' case.  But while his Objection repeatedly cites language from the Court's orders

16   establishing the strength of Plaintiffs' evidence, he never notes that this language only identifies

17   open questions of fact that prevented Defendants from obtaining summary judgment.  It does not,

18   as the Objection seems to suggest, establish that Plaintiffs would win on each of these open

19   questions—and it is not in any way binding on the jury that would decide them.

20           Further, he does not take into account the risks (and delay) of trial and appeals, and does

21   not explain how the Settlement could be so deficient in light of these risks that the Class should

22   not receive notice of it.  As the Ninth Circuit has explained, "it is the very uncertainty of outcome

23   in litigation and avoidance of wasteful and expensive litigation that induce consensual

24   settlements.  The proposed settlement is not to be judged against a hypothetical or speculative

25   measure of what *might* have been achieved by the negotiators." *Officers for Justice v. Civil

26   Service Comm'n.*, 688 F.2d 615, 625 (9th Cir. 1982) (emphasis in original).  "Thus, 'the very

27   essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest

28   hopes.'" *Linney v. Cellular Alaska P'shp*, 151 F.3d 1234, 1242 (9th Cir. 1998) (quoting *Officers*

1  *for Justice*, 688 F.2d at 624). "[I]t must not be overlooked that voluntary conciliation and

2  settlement are the preferred means of dispute resolution.  This is especially true in complex class

3  action litigation[.]"  *Officers for Justice*, 688 F.2d at 625.  Review of the Settlement should

4  "reflect[] the proper deference to the private consensual decision of the parties."  *Hanlon v.*

5  *Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

6        The Settlement is presumptively fair because it is the result of years of hard-fought

7  litigation and arm's length negotiations conducted by capable counsel with extensive experience

8  in class action litigation.  The settlement negotiations were facilitated by experienced mediator

9  Honorable Layn R. Phillips (Ret.), and there is no indication of collusion here whatsoever.  There

10  is nothing about the Settlement to upset this presumption.  To the contrary, along with the

11  settlements previously achieved with Intuit, Lucasfilm, and Pixar, the total amount recovered in

12  this action will be $344.5 million.  Plaintiffs believe this to be the second largest settlement of

13  employee class action claims in history.[1]  The Settlement also appears to be (by far) the largest

14  recovery ever achieved in an employee class action bringing claims under the antitrust laws, on

15  either an aggregate or net per class member basis.[2]  After all potential deductions, the net

16  recovery for the Class will be approximately $253 million, or an average Class member cash

17  recovery of $3,915.24.  This amount is ***23 times*** what the average class member stands to recover

18  from the proposed settlement resolving the California Attorney General's suit against eBay

19  regarding conduct that is substantially similar to the conduct at issue in this case.  This Settlement

20  is an excellent result for the Class, particularly in light of the substantial risks, costs, and delay of

21  trial and subsequent appeals.

22        The Court should preliminarily approve the Settlement, direct notice of the Settlement to

23  the Class, and schedule a hearing for final approval.

24

25  [1] The one larger settlement occurred in *Hartman, et al. v. Albright, et al.*, Case No. 77-2019-JR,

26  Dkt. 917 (D.D.C. July 12, 2000), a class action against the United States government that settled
    after ***23 years*** of litigation.

27  [2] Exhibit A attached hereto is a chart of known settlements of employee class actions alleging
    claims under antitrust law.

28

1    II.    **THE SETTLEMENT IS PRESUMPTIVELY FAIR**

2         There is no dispute that the Settlement was negotiated at arm's-length by capable counsel

3    with extensive experience in complex class action litigation.  (*See* Decl. of Kelly M. Dermody in

4    Support of Motion for Preliminary Approval, at ¶¶ 10-13, Dkt. 921.)  The Settlement occurred

5    only after the parties completed thorough fact and expert discovery.  (*Id.* at ¶¶ 3-9.)  The

6    negotiations leading to the Settlement were also directed by experienced and respected mediator

7    Honorable Layn R. Phillips (Ret.).  (*Id.* at ¶ 10.)  Participation by a neutral mediator helps ensure

8    that settlement negotiations are free of collusion and undue pressure.  *See, e.g.*, *In re Payment*

9    *Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 2013 U.S. Dist. LEXIS 179340, at *30-32

10   (E.D.N.Y. Dec. 13, 2013) (participation by experienced mediators helped demonstrate "beyond

11   any reasonable doubt that the negotiations were adversarial and conducted at arm's length").

12        Accordingly, the Court should begin its analysis with a presumption that the Settlement is

13   fair and should be approved.  *See Newberg* § 11:41; *City P'shp. Co. v. Atl. Acquisition Ltd.*

14   *P'shp.*, 100 F.3d 1041, 1043 (1st Cir. 1996) ("When sufficient discovery has been provided and

15   the parties have bargained at arms-length, there is a presumption in favor of the settlement.");

16   *Create-A-Card, Inc. v. Intuit, Inc.*, No. CV-07-6452 WHA, 2009 U.S. Dist. LEXIS 93989, at *8-9

17   (N.D. Cal. Sept. 22, 2009) ("This Court begins its analysis with a presumption that a class

18   settlement is fair and should be approved if it is the product of arm's-length negotiations

19   conducted by capable counsel with extensive experience in complex class action litigation.  Each

20   of these factors is present here: Class Counsel have extensive experience in class action litigation,

21   and they reached the Settlement with Intuit only after ample investigation, extensive arm's-length

22   mediation facilitated by experienced mediator Honorable Edward A. Infante (Ret.), and

23   substantial negotiation about the specific terms of the Settlement.") (internal citation omitted);

24   *Linney v. Cellular Alaska P'shp*, No. C-96-3008 DLJ, 1997 U.S. Dist. LEXIS 24300, at *16

25   (N.D. Cal. July 18, 1997) ("The involvement of experienced class action counsel and the fact that

26   the settlement agreement was reached in arm's length negotiations, after relevant discovery had

27   taken place create a presumption that the agreement is fair."), *aff'd*, 151 F.3d 1234; *Weeks v.*

28   *Kellogg Co.*, No. CV 09-08102 (MMM) (RZx), 2011 U.S. Dist. LEXIS 155472, at *45 (C.D. Cal.

1    Nov. 23, 2011) ("The court agrees that the agreement was reached in good faith after a well-

2    informed arms-length negotiation and is entitled to a presumption of fairness."); *Nat'l Rural*

3    *Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("A settlement

4    following sufficient discovery and genuine arms-length negotiation is presumed fair."); *Hemphill*

5    *v. San Diego Ass'n of Realtors,* 225 F.R.D. 616, 622 (S.D. Cal. 2004) ("If the terms themselves

6    are fair, reasonable, and adequate, the district court may fairly assume they were negotiated by

7    competent and adequate counsel; in such cases, whether another team of negotiators might have

8    accomplished a better settlement is a matter equally comprised of conjecture and irrelevance.")

9    (citing *In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 212 (5th Cir. 1981)).

10        In addition, there is no indication of collusion here.  To the contrary: (1) Class Counsel do

11   not seek a disproportionate distribution of the Settlement, and the Class receives a monetary

12   distribution; (2) there is no "clear sailing" agreement providing for attorneys' fees separate and

13   apart from Class funds; and (3) there is no reversion of Settlement funds back to Defendants.

14   *Laguna v. Coverall N. Am., Inc.*, No. 12-55479, 2014 U.S. App. LEXIS 10259, at *15 (9th Cir.

15   June 3, 2014) (affirming approval of class action settlement and summarizing the primary

16   indicators of collusion).

17        Similarly, the Manual for Complex Litigation describes nine additional "recurring

18   potential abuses," none of which is to be found here.  *Manual* § 21.61 at 310-312.  Specifically:

19   (1) the Settlement was not the result of a reverse auction, whereby Defendants select among

20   competing class counsel for the lowest Class recovery; (2) the Settlement provides for monetary

21   relief to Class Members, as opposed to "illusory nonmonetary benefits," such as discount coupons

22   for more of Defendants' products; (3) there was no filing or voluntary dismissal of class

23   allegations for strategic purposes; (4) the Settlement does not impose cumbersome claims

24   procedures that will make it unlikely that Class Members will file claims (to the contrary, Class

25   Members may recover here without even filing a claim) and there will be no reversion of

26   unclaimed funds to the Defendants; (5) the Settlement treats similar Class Members similarly,

27   with an allocation plan based upon salary received during the alleged conspiracy period; (6) the

28   Settlement does not release claims against parties who do not contribute to the Settlement; (7) the

- 4 -

1   Settlement does not release claims of parties who receive no compensation; (8) Class Counsel do

2   not seek attorney fees based on a valuation of nonmonetary relief; and (9) the Settlement does not

3   assess Class Members for attorneys' fees in excess of the amount of damages awarded to each

4   Class Member. *Id.*

5       The Settlement is an exemplary resolution of class action claims and is entitled to a strong

6   presumption of fairness.

7   **III.   THE SETTLEMENT IS WELL WITHIN THE RANGE OF POSSIBLE JUDICIAL
        APPROVAL, PARTICULARLY WHEN TAKING INTO ACCOUNT THE**

8   **UNCERTAINTIES, RISKS, COSTS, AND DELAYS OF LITIGATING THE CASE
        TO JUDGMENT AND BEYOND**

9

10      **A.     The Settlement Amount of $324.5 Million Is Well Within the Range of
                  Judicial Approval**

11      Even at final approval, "the court's intrusion upon what is otherwise a private consensual

12  agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to

13  reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or

14  collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair,

15  reasonable and adequate to all concerned." *Officers for Justice*, 688 F.2d at 625. "Therefore, the

16  settlement or fairness hearing is not to be turned into a trial or rehearsal for trial on the merits."

17  *Id.*

18      Plaintiffs and Defendants both compromised in order to achieve a "voluntary

19  conciliation," *Officers for Justice*, 688 F.2d at 625, that avoided the risks and costs of trial and

20  subsequent litigation. Defendants agreed to exchange substantial consideration—$324.5

21  million—to avoid the risks that they might lose at trial and lose subsequent appeals, and Plaintiffs

22  accepted that consideration to avoid the costs, risks, and delay of trial and later appeals.

23  "Estimates of what constitutes a fair settlement figure are tempered by factors such as the risk of

24  losing at trial, the expense of litigating the case, and the expected delay in recovery (often

25  measured in years)." *In re Nucoa Real Margarine Litig.*, No. CV-10-00927 MMM (AJWx), 2012

26  U.S. Dist. LEXIS 189901, at *46 (C.D. Cal. June 12, 2012). Thus, "[t]he fact that a proposed

27  settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean

28

that the proposed settlement is grossly inadequate and should be disapproved." *Cellular Alaska P'ship*, 151 F.3d at 1242 (internal quotation omitted).[3] "Settlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion." *Hanlon*, 150 F.3d at 1027.

The cash Settlement here exceeds 10% of estimated single damages (and, with the settlements previously approved, exceeds 11% of estimated single damages). District courts in the Ninth Circuit routinely approve settlements with much larger differences between the settlement amount and possible recoveries. *See*, *e.g.*, *In re Toys "R" Us-Del., Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438 (C.D. Cal. 2014) (granting final approval of a settlement providing for vouchers to class members, the total value of which was 3% of possible recovery (vouchers worth up to $391.5 million, released claims worth up to $13.05 billion)); *Reed v. 1-800 Contacts, Inc.*, No. 12-cv-02359 JM (BGS), 2014 U.S. Dist. LEXIS 255 (S.D. Cal. Jan. 2, 2014) (granting final approval where settlement represented 1.7% of possible recovery (net settlement fund of $8,288,719.16, resolving claims worth potentially $499,420,000)); *In re LDK Solar Secs. Litig.*, No. C 07-5182, 2010 U.S. Dist. LEXIS 73530, at *6 (N.D. Cal. June 21, 2010) (granting final approval where settlement was 5% of estimated damages). Antitrust cases, with the possibility of treble damages, are no different. "[C]ourts generally determine fairness of an antitrust class action settlement based on how it compensates the class for past injuries, without giving much, if any, consideration to treble damages." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 333 n.65 (3d Cir. 2011) (en banc) (quotation omitted), *cert.*

---

[3] *See also Officers for Justice*, 688 F.2d at 628 ("It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery will not *per se* render the settlement inadequate or unfair."); *TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 463-464 (2d Cir. 1982) ("As to the adequacy of the amount to be recovered for business assets under the settlement, we note that the fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is inadequate; there is no reason why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery.") (internal quotation omitted); *Parker v. Anderson*, 667 F.2d 1204, 1210 n.6 (5th Cir. 1982) (same); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 05-MD-1720-JG-JO, 2013 U.S. Dist. LEXIS 179340, at *55 n.4 (E.D.N.Y. Dec. 13, 2013) (same); *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988) (same), *aff'd*, 899 F.2d 21 (11th Cir. 1990).

1   *denied*, 132 S. Ct. 1876 (2012).  *See*, *e.g.*, *In re Tableware Antitrust Litig.*, No. C 04-3514-VRW,

2   2007 U.S. Dist. LEXIS 89998, at *7 (N.D. Cal. Nov. 28, 2007) (granting final approval where

3   settlement represented 4% of estimated single damages (settlement of $500,000 and estimated

4   single damages of about $12.5 million)).

5         Plaintiffs are aware of only one other proposed class settlement resolving claims that are

6   nearly identical to those at issue here: the settlement reached between the California Attorney

7   General and eBay Inc., resolving claims of approximately 13,990 class members.  *State of*

8   *California v. eBay Inc.*, Case No. 12-CV-5874-EJD-PSG, Dkt. 55, at 6 (N.D. Cal. May 1, 2014).

9   With its motion for preliminary approval, the California Attorney General filed an expert report

10  estimating total damages of $56.9 million.  *Id.*, Dkt. 55-1 at 26.  Thus, the total proposed

11  settlement fund of $3.75 million in that analogous case is 6.6% of estimated single damages.  Of

12  the $3.75 million, the proposed settlement sets aside $2.375 million for restitution to class

13  members, which is 4.2% of estimated single damages and an average recovery of $169.76 per

14  class member.  The Settlement here compares favorably.  As a result of years of litigation, hard-

15  fought settlement negotiations, and the settlements previously achieved with Intuit, Lucasfilm,

16  and Pixar, the Class here will receive a net average of $3,915.24 each (or 8.3% of their estimated

17  single damages).  Thus, on an individual class member basis, the proposed Settlement here is

18  more than 23 times what was achieved in the proposed *eBay* settlement.

19        The next most analogous class settlement occurred in *Johnson, et al. v. Arizona Hospital*

20  *and Healthcare Association, et al.*, Case No. 07-cv-01292-SRB, Dkt. 664 (D. Ariz. Mar. 4, 2011)

21  ("*Arizona Nurses*").  *Arizona Nurses* is the only other class action in the Ninth Circuit of which

22  Plaintiffs are aware in which employees filed suit against employers alleging a conspiracy to

23  suppress compensation in violation of the antitrust laws.  As in this action, *Arizona Nurses*

24  followed an investigation by the United States Department of Justice that ended with a consent

25  decree but no civil fines or compensation to the employees allegedly impacted.  *Id.* at 4-5.  After

26  over three years of litigation (including partial class certification), a year of settlement

27  discussions, and two rounds of mediation, the parties in that case agreed to a total cash settlement

28  of $22.4 million, or 9.4% of plaintiffs' estimated single damages of $239 million (compared to

REPLY MPA IN SUPPORT OF PRELIMINARY
SETTLEMENT APPROVAL; 11-CV-2509-LHK

1   over 11% here).  *Id.*, Dkt. 639 at 15.  The net amount recovered in *Arizona Nurses* after

2   deductions for approved costs, attorneys' fees, and service awards was $15,848,430.38, reflecting

3   6.6% of their estimated single damages and an average recovery of $633.94 per class member.

4   *Id.*, Dkt. 664 at 9-10.  On a net average class member basis, the proposed Settlement here is more

5   than 6 times what was achieved in the *Arizona Nurses* settlement.

6           In fact, this Settlement appears to set a record for the largest settlement ever achieved in

7   an employee class action alleging claims under the antitrust laws, on both an aggregate and per

8   class member basis.  (Ex. A, attached.)

9           The Objection does not address these analogous cases, or the two most recent antitrust

10  class actions to go to verdict in the Northern District of California (one resulting in the jury

11  awarding 10% of Plaintiffs' estimated damages in a case involving 14 guilty pleas, and the other

12  resulting in a defense verdict and the class receiving nothing).[4]  Instead, the Objection relies on

13  cases in different districts, challenging classic product price-fixing cartels that were clearly

14  subject to *per se* scrutiny, in which Plaintiffs took the risks of trial and prevailed.  (Objection at

15  6.)  While there is certainly a chance that Plaintiffs theoretically may obtain a larger (albeit

16  substantially delayed) recovery after trial and appeals, there is also a strong risk that the Class

17  might receive nothing.  It is the judgment of Co-Lead Class Counsel and the other Named

18  Plaintiffs that this risk is not in the best interests of the Class.  "The Court should consider the

19  vagaries of litigation and compare the significance of immediate recovery by way of the

20  compromise to the mere probability of relief in the future, after protracted and expensive

21  litigation.  In this respect, it has been held proper to take the bird in the hand instead of a

22

23  [4] The case of *Meijer Inc., et al. v. Abbott Laboratories*, CV07-5985 (N.D. Cal.), although not a
    cartel case, is nevertheless also instructive about the risks of trial in antitrust cases in this District.

24  There, the direct purchaser class plaintiffs settled on the third day of trial for $52 million, a
    fraction of their calculated damages.  A co-plaintiff continued to verdict and lost the antitrust

25  claims altogether, recovering only $3.5 million on a different breach of contract claim.  *See*

26  *SmithKline Beecham Corp. v. Abbott Labs*, CV07-5702 (N. D. Cal.), *rev'd on other grounds*, 740
    F.3d. 471 (9th Cir. 2014).  The alleged wrongful conduct was arguably more horrific, and

27  therefore more compelling to a jury, than that alleged here, involving quintupling the price of life-
    prolonging medication for patients suffering from AIDS.

28

REPLY MPA IN SUPPORT OF PRELIMINARY
SETTLEMENT APPROVAL; 11-CV-2509-LHK

1   prospective flock in the bush." *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 326

2   (N.D. Ga. 1993) (internal quotation omitted).

3        The Objection also cites to cases in which courts have rejected proposed settlements.

4   These cases bear no relationship to the Settlement before this Court. For instance, in *Acosta v.*

5   *Trans Union*, LLC, 243 F.R.D. 377, 386 (C.D. Cal. 2007) (Objection at 5), the court held that

6   "the unacceptable volume and degree of deficiencies in this settlement compel the Court to

7   conclude that it neither is nor retains the potential to be fair." These concerns were: (1) the

8   named plaintiffs were inadequate, *id.* at 385; (2) the boundaries of an "economic relief subclass"

9   were arbitrarily drawn, excluding potentially ***millions*** of proposed class members from any relief

10   whatsoever while releasing their claims, *id.* at 389-391; (3) the settlement's cash value was "less

11   than $1 million, or ***not even one-fifth of one percent of the litigation value of these claims***," *id.*

12   at 391 (emphasis added); (4) the parties conducted either no discovery prior to the settlement, or

13   did so in other actions deficiently, *id.* at 396; (5) plaintiffs' counsel negotiated their fees at the

14   same time as the settlement for the class, in a "damning" and highly suspicious fashion, *id.* at

15   397-98; and (6) the process by which the settlement was reached was suspicious and "strikingly

16   similar" to a "reverse auction," *id.* at 399. None of these concerns apply here.

17        The Objection's other authorities are similarly inapposite. In *Fraley v. Facebook, Inc.*,

18   No. C 11-1726-RS, 2012 U.S. Dist. LEXIS 116526, at *4-15 (N.D. Cal. Aug. 17, 2012)

19   (Objection at 8), the Court denied a motion for preliminary approval without prejudice to give the

20   parties another opportunity to explain the propriety of a proposed settlement that provided zero

21   monetary relief to a class that may have included over 70 million individuals (the monetary relief

22   was purely *cy pres*), in addition to other issues such as reversion of funds back to the defendant,

23   and a "clear sailing" agreement for attorneys' fees that equaled the full amount of the *cy pres*

24   funds (and justified only the basis of an inadequate valuation of injunctive relief). *In re Zoran*

25   *Corp. Derivative Litig.*, No. C 06-05503-WHA, 2008 U.S. Dist. LEXIS 48246, at *16-17 (N.D.

26   Cal. Apr. 7, 2008) (Objection at 9) was a settlement of a securities derivative case that provided

27   no cash whatever for the corporation: "the only cash involved in the settlement would go to

28   counsel." The settlement at issue in *In re NFL Players' Concussion Injury Litig.*, 961 F. Supp. 2d

708, 715-16 (E.D. Pa. 2014) (Objection at 9) created a fund to pay medical expenses over a 65-year lifespan, but was structured so that the fund would likely run out of money and fail to provide any compensation to class members who received qualifying diagnoses.  Finally, *In re Motor Fuel Temperature Sales Practices Litig.*, 286 F.R.D. 488, 503-09 (D. Kan. 2012), denied approval to certain proposed settlements but approved others; for those not approved, the court was concerned with valuing *cy pres* awards (or failing to identify the *cy pres* recipients), valuing injunctive relief, and payment schedules that staged and delayed payments unnecessarily.  Again, none of these concerns have any application to the Settlement at issue here.  To the contrary, these cases demonstrate why the Settlement is well within the range of possible judicial approval and should be preliminarily approved.

### B.     Absent the Settlement, the Class Faced A Substantial Risk of Litigating the Case to Trial and Receiving Nothing

Plaintiffs faced substantial risks and delays had they rejected the Settlement and took the case to trial and beyond.  Just as in *Officers for Justice*, the Court's pre-trial orders here did not "suggest that liability should be a certainty," 688 F.2d at 628 (internal quotation omitted), and acceptance of Plaintiffs' damages calculation was similarly not assured.  Indeed, Plaintiffs faced substantial obstacles on both counts.

First, with respect to liability, Defendants would have focused their presentation at trial to defeat a finding of a single conspiracy, the predicate of joint and several liability.  In this regard, the Defendants have previously raised arguments reflecting an attack at many different points; each one, they would have argued, undermines the inference of a single conspiracy that could otherwise be drawn from the circumstantial evidence.  For instance, Defendants have indicated that they would have highlighted the long passage of time separating the Pixar and Lucasfilm agreement from the other agreements, as well as the conceptual distance separating the digital animation industry from the software and hardware businesses of the other Defendants.  They have made clear that they would have shown the jury charts demonstrating that the majority of hiring channels among the Defendants remained unrestricted (e.g., while Adobe and Apple agreed

1   not to recruit from one another, Adobe remained free to recruit from, and be recruited against,

2   every other Defendant, and so forth).  Defendants' executives would have testified that they made

3   the individual agreements to facilitate collaboration and membership on one another's boards of

4   directors, and not to suppress compensation.  Each would have denied knowing about agreements

5   that did not involve his or her own company.

6        Hence, this was not a traditional cartel where the common plan could be proven by written

7   records of a group meeting attended by multiple producers; Plaintiffs faced a far more

8   challenging task.  And Defendants would have argued in a motion for judgment and in closing

9   argument that if Plaintiffs failed to demonstrate joinder in a common plan to suppress

10   compensation by ***any*** of the companies, Plaintiffs would be entitled to ***no*** recovery because

11   Dr. Leamer's damages model only estimates the effect of all six bilateral agreements together.

12   (*See, e.g.*, Google's Mot. for Summ. J. at 18, Dkt. 564: "Because Plaintiffs' impact and damages

13   evidence must 'measure damages resulting from the particular antitrust injury on which . . .

14   liability in this action is premised,' *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013), a

15   finding that any defendant did not join the alleged overarching conspiracy with the other

16   defendants requires judgment in favor of all defendants.").  Thus, Defendants would argue that

17   even if the jury found that 6 of the 7 Defendants all joined in a conspiracy to suppress employee

18   compensation, if even one juror remained unconvinced as to a single Defendant, there was a risk

19   that the Class would receive nothing—notwithstanding that there may have been "'smoking gun'

20   evidence" (Objection at 7) with respect to the bilateral agreements.  While Plaintiffs would have

21   opposed this position, the risk nevertheless must be considered.

22        Second, unlike all of the successful trials on which the Objection relies (at 6), the

23   applicable legal standard for Defendants' misconduct here (*per se* versus the rule of reason) was

24   unresolved.  Defendants sought application of the rule of reason.  (Defs.' Joint Resp. to Pls.' Mot.

25   for Application of the Per Se Standard, Dkt. 887.)  If the Court were to agree, Defendants may

26   have been permitted to introduce even more evidence regarding their purported pro-competitive

27   justifications and market conditions, and Plaintiffs would have had to counter with additional

28   evidence regarding markets and market power.  Defendants intended to argue that their bilateral

1  agreements had nothing to do with employee compensation, but rather were created to facilitate

2  beneficial technical and corporate governance collaborations among them.  For instance, Adobe

3  would likely argue that its only bilateral agreement was created to facilitate the close technical

4  relationship between Adobe and Apple, not to suppress the compensation of its employees, and

5  not to join a larger effort to suppress compensation across the Defendants.  Defendants also

6  sought to argue that any negative impact on the Class (which Defendants also vigorously

7  disputed) was outweighed by the competitive benefits of these collaborations.  They also would

8  have argued that they lacked market power as to their employees, because they each competed for

9  workers against countless other businesses.  Thus, Defendants would argue that even if a single

10  juror agreed, the Class should receive nothing.

11       Third, a host of other evidentiary issues were also pending, some briefed in Defendants'

12  motions *in limine*, with others awaiting resolution during pretrial proceedings or trial.  For

13  example, Defendants sought to exclude any mention of the U.S. Department of Justice

14  investigation.  (Defs' Mot. in Limine No. 1, Dkt. 855.)  If successful, the jury would be left to

15  speculate as to the source for the allegations and the Plaintiffs' motivations for filing suit, thus

16  prejudicing the Class at trial.  Defendants also sought to exclude any reference to:  individual

17  damages awards (leaving the jury with only an aggregate damages figure); whether their bilateral

18  agreements were unlawful; evidence relating to Co-Defendant settlements (leaving the jury to

19  speculate as to the absence of settling Defendants); and statements by Lucasfilm and Pixar

20  employees (whose admissions were among the most powerful in the case).  (*Id.*)

21       Fourth, even if Plaintiffs prevailed on all liability issues, the Class would receive nothing

22  unless the jury unanimously agreed on a reasonable estimate of damages.  While Plaintiffs sought

23  a total damages amount of $3.05 billion, Defendants were prepared to vigorously contest that

24  estimate. With the aide of six expert economists, Defendants would argue that there were no

25  damages arising from the alleged conspiracy, or that a revised damages model would result in a

26  fraction of what has been presented.  The result of this clash of expert testimony is difficult to

27  predict.  *See*, *e.g.*, *In re Elec. Carbon Prods. Antitrust Litig.*, 447 F. Supp. 2d 389, 401 (D.N.J.

28  2006) (noting risks in proving antitrust damages at trial, which depends on "a battle of experts

addressing the measurement of [damages], which can become an esoteric exercise with

unpredictable results"); *Sutton v. Medical Serv. Ass'n*, No. 92-4787, 1994 U.S. Dist. LEXIS 7512,

at *18 (E.D. Pa. June 8, 1994) (granting final approval, noting that "even assuming that plaintiffs

ultimately would have prevailed on liability, they faced the risk that they could not establish

damages . . . that is achieved by this Settlement Agreement").  Defendants also would have

argued that the conspiracy as alleged had no impact on total recruiting activity, and thus no

impact on competition.  They would argue that any recruiters who were prevented from cold

calling one or more of the other Defendants would have cold called other companies, including

Defendants with which their employer did not have an express agreement.  Defendants would

further contend that the relevant market for the Class extended well beyond Defendants here, and

thus the bilateral agreements at issue could not have had any discernable impact on compensation.

These arguments and many others are described at length in the Defendants' expert reports.

Plaintiffs opposed these positions, but nevertheless must recognize the risks they pose to securing

a recovery for the Class.

Finally, Plaintiffs faced additional challenges in persuading a unanimous jury to award

$3.05 billion in damages.  In 2009 (the end of the alleged conspiracy period), the median

household income in Santa Clara County was $85,215.[5]  Meanwhile, the average compensation of

individual Class members in 2009 was more than double: $195,528.  (Dkt. 856-10 at 17.)  While

many prospective jurors suffered job losses or stagnant wages, particularly after the economic

crisis of 2008, average total compensation of the Class increased every year of available data,

from $128,879.59 in 2001 to $217,298.70 in 2011.  (*Id.*)  Defendants, including their expert Dr.

Stiroh, likely intended to rely on this evidence to attack Dr. Leamer's damages estimate.  If

admitted over Plaintiffs' objection pursuant to Rule 403, that evidence would have also had the

likely effect of prejudicing the jury against the Class, leading them to conclude improperly that

---

[5] United States Census Bureau, 2009 American Community Survey, Table DP03 (Sept. 28, 2010), *available at* http://tinyurl.com/p4ol3kh (last visited on June 12, 2014).

1  Class members were not harmed because their compensation was higher than the average juror's,

2  and also increased over time.[6]

3        The Settlement is a fair, reasonable, and adequate resolution that avoids these risks and

4  other delays and uncertainties of trial and subsequent appeals.  *Hanlon*, 150 F.3d at 1027;

5  *Cellular Alaska P'ship*, 151 F.3d at 1242; *Officers for Justice*, 688 F.2d at 625.

6  **IV.    CONCLUSION**

7        For the aforementioned reasons, the Court should preliminarily approve the Settlement,

8  direct notice to the Class, and schedule a final approval hearing.

9

10 Dated:  June 12, 2014          LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

11                               By:      */s/ Kelly M. Dermody*
12                                        Kelly M. Dermody

13                               Richard M. Heimann (State Bar No. 63607)
                                 Kelly M. Dermody (State Bar No. 171716)
14                               Brendan Glackin (State Bar No. 199643)
                                 Dean Harvey (State Bar No. 250298)
15                               Anne B. Shaver (State Bar No. 255928)
                                 Lisa J. Cisneros (State Bar No. 251473)
16                               275 Battery Street, 29th Floor
                                 San Francisco, California  94111-3339
17                               Telephone:  415.956.1000
                                 Facsimile:  415.956.1008

18

19

20

21

22

23

24  [6] Potential jurors may not have been predisposed to be sympathetic toward the Class in any case,
    particularly given recent hostility toward tech workers in Silicon Valley.  These feelings are
25  described in the same publication on which the Objection seeks to rely.  *See*, *e.g.*, David Streitfeld
    and Malia Wollan, "Tech Rides are Focus of Hostility in Bay Area," *The New York Times*, Jan.
26  31, 2014 ("Even as the tech companies extend their global reach and jostle to own the future, their
    hometown is turning from admiration to anger."), *available at*
27  http://www.nytimes.com/2014/02/01/technology/tech-rides-are-focus-of-hostility-in-bay-
    area.html (last visited on June 11, 2014).
28

REPLY MPA IN SUPPORT OF PRELIMINARY
SETTLEMENT APPROVAL; 11-CV-2509-LHK

1      JOSEPH SAVERI LAW FIRM, INC.

2      By:        */s/ Joseph R. Saveri*
3                      Joseph R. Saveri

4      Joseph R. Saveri (State Bar No. 130064)
       James Dallal (State Bar No. 277826)
5      505 Montgomery, Suite 625
       San Francisco, CA 94111
6      Telephone:  415. 500.6800
       Facsimile:   415. 395.9940
7
8      *Co-Lead Class Counsel*

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28