1          UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

5

6    IN RE: HIGH-TECH EMPLOYEE        )   C-11-02509 LHK
     ANTITRUST LITIGATION,            )
7                                     )   SAN JOSE, CALIFORNIA
     _____ )
8                                     )   JUNE 19, 2014
     THIS DOCUMENT RELATES TO:        )
9    ALL ACTIONS                      )   PAGES 1-76
     _____ )
10

11              TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE LUCY H. KOH
12            UNITED STATES DISTRICT JUDGE

13   A P P E A R A N C E S:

14   FOR THE PLAINTIFFS:    JOSEPH SAVERI LAW FIRM
                            BY:  JOSEPH SAVERI
15                          255 CALIFORNIA STREET, SUITE 450
                            SAN FRANCISCO, CALIFORNIA  94111
16

17                          LIEFF, CABRASER,
                            HEIMANN & BERNSTEIN
18                          BY:  KELLY M. DERMODY
                                 BRENDAN P. GLACKIN
19                               DEAN M. HARVEY
                            275 BATTERY STREET, 30TH FLOOR
20                          SAN FRANCISCO, CALIFORNIA  94111

21
              <u>APPEARANCES CONTINUED ON NEXT PAGE</u>
22

23   OFFICIAL COURT REPORTER:    LEE-ANNE SHORTRIDGE, CSR, CRR
                                 CERTIFICATE NUMBER 9595
24
          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
25             TRANSCRIPT PRODUCED WITH COMPUTER

APPEARANCES (CONTINUED)

FOR THE PLAINTIFFS:     JOSEPH SAVERI LAW FIRM
                        BY:  JOSEPH R. SAVERI
                        505 MONTGOMERY STREET, SUITE 625
                        SAN FRANCISCO, CALIFORNIA  94111


FOR DEFENDANT           KEKER & VAN NEST
GOOGLE:                 BY:  ROBERT A. VAN NEST
                             JUSTINA K. SESSIONS
                        633 BATTERY STREET
                        SAN FRANCISCO, CALIFORNIA  94111

FOR DEFENDANT           O'MELVENY & MYERS
APPLE:                  BY:  GEORGE A. RILEY
                             CHRISTINA BROWN
                        TWO EMBARCADERO CENTER
                        28TH FLOOR
                        SAN FRANCISCO, CALIFORNIA  94111

FOR DEFENDANTS          JONES DAY
ADOBE:                  BY:  LIN W. KAHN
                        555 CALIFORNIA STREET, 26TH FLOOR
                        SAN FRANCISCO, CALIFORNIA  94104

FOR DEFENDANT           MUNGER, TOLLES & OLSEN
INTEL:                  BY:  STEVEN M. PERRY
                        355 SOUTH GRAND AVENUE, 35TH FLOOR
                        LOS ANGELES, CALIFORNIA  90071


FOR MICHAEL DEVINE:     GIRARD GIBBS
                        BY:  DANIEL C. GIRARD
                        601 CALIFORNIA STREET, 14TH FLOOR
                        SAN FRANCISCO, CALIFORNIA  94108

```
1    SAN JOSE, CALIFORNIA                    JUNE 19, 2014
2                    P R O C E E D I N G S
3        (COURT CONVENED AT 1:50 P.M.)
4            THE CLERK:  CALLING CASE NUMBER C-11-02509 LHK, IN
5    RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION.
6            MS. DERMODY:  GOOD AFTERNOON, YOUR HONOR.
7    KELLY DERMODY FROM LEIFF CABRASER.  WITH ME ARE MY PARTNERS,
8    BRENDAN GLACKIN AND DEAN HARVEY.
9            MR. SAVERI:  GOOD AFTERNOON, YOUR HONOR.
10   JOSEPH SAVERI.
11           MR. GIRARD:  GOOD AFTERNOON.  I'M DAN GIRARD
12   APPEARING FOR CLASS REPRESENTATIVE MICHAEL DEVINE.
13           THE COURT:  OKAY.
14           MR. VAN NEST:  GOOD AFTERNOON, YOUR HONOR.
15   BOB VAN NEST, KEKER & VAN NEST, HERE FOR GOOGLE, AND I'M HERE
16   WITH JUSTINA SESSIONS.
17           THE COURT:  OKAY.
18           MR. RILEY:  GOOD AFTERNOON, YOUR HONOR.  GEORGE RILEY
19   OF O'MELVENY & MYERS.  I REPRESENT APPLE.  I'M HERE WITH MY
20   COLLEAGUE, CHRISTINA BROWN.
21           MS. KAHN:  GOOD AFTERNOON.  LIN KAHN FROM JONES DAY
22   ON BEHALF OF ADOBE.
23           MR. PERRY:  AND STEVE PERRY FROM MUNGER TOLLES FOR
24   INTEL.
25           THE COURT:  OKAY.  GOOD AFTERNOON TO EVERYONE AND
```

1    WELCOME.

2        HOW MANY OPT OUTS TO THE LITIGATION CLASS WERE --

3            MS. DERMODY:  YOUR HONOR, WE CAN GET THAT NUMBER FOR

4    YOU.  IT WAS NOT VERY MANY.

5            THE COURT:  OKAY.  HOW MANY OPT OUTS WERE THERE TO

6    THE LUCASFILM/PIXAR SETTLEMENT?

7            MS. DERMODY:  I THINK IT WAS 160, SOMEWHERE IN THERE,

8    155 OR SOMETHING LIKE THAT, YOUR HONOR.  IT WAS IN YOUR ORDER.

9        AND THERE WERE NOT THAT MANY MORE THAT WERE JUST

10   LITIGATION.  IT WAS DE MINIMIS.

11           THE COURT:  OKAY.  WHAT ABOUT FOR INTUIT CLASS?  ARE

12   THOSE --

13           MS. DERMODY:  I MEAN ALL TOGETHER.

14           THE COURT:  IF I REMEMBER, THOSE WERE THE SAME.

15           MS. DERMODY:  YES.

16           THE COURT:  THEY OPTED OUT OF BOTH.  BUT DID THEY

17   ALSO OPT OUT OF THE LITIGATION CLASS SIMULTANEOUSLY, OR NOT?

18           MS. DERMODY:  THERE WERE SOME THAT DID.  IT WAS KIND

19   OF A MIX, DIFFERENT BUCKETS.  THERE WERE MOSTLY PEOPLE THAT IF

20   THEY OPTED OUT, THEY OPTED OUT OF THE SETTLEMENTS OF THE PIXAR,

21   LUCAS, AND INTUIT, AND THEN THERE WERE SOME ADDITIONAL ONES

22   THAT OPTED OUT OF THE LITIGATION THAT WAS ONGOING.

23           THE COURT:  SO YOU DON'T KNOW THE NUMBER OF THE

24   LITIGATION OPT OUTS AT THIS TIME?

25           MS. DERMODY:  ONLY THAT IT WAS RELATIVELY NOT THAT

1    MANY MORE PEOPLE, YOUR HONOR.  IT WAS A SMALL NUMBER OF PEOPLE.

2         MAYBE YOU ALL REMEMBER IT BETTER THAN I DO, BUT IT WAS

3    TOTAL --

4              THE COURT:  DOES ANYBODY KNOW?

5              MS. DERMODY:  TOTAL OPT OUTS?  IT WAS IN THE LOW

6    HUNDREDS.  WE CAN GET THAT RIGHT NOW.

7              THE COURT:  IS THAT GOING TO COUNT TOWARDS THE 4

8    PERCENT OPT OUTS?

9              MS. DERMODY:  IT'S NOT, YOUR HONOR, NO.  THIS WOULD

10   BE 4 PERCENT ON TOP OF WHAT HAS ALREADY BEEN AN OPT OUT NUMBER.

11        AND GIVEN THE --

12             THE COURT:  I GUESS I DON'T UNDERSTAND.  4 PERCENT ON

13   TOP OF IT --

14             MS. DERMODY:  SO THERE ARE SOME PEOPLE THAT ARE NO

15   LONGER IN THE CLASS BECAUSE THEY'VE OPTED OUT.  AS THE CASE IS

16   CURRENTLY COMPOSED, THOSE PEOPLE DO NOT EXIST IN THE CASE

17   ANYMORE.

18             THE COURT:  UM-HUM.

19             MS. DERMODY:  THE PRO RATA REDUCTION THAT YOU SAW,

20   YOUR HONOR, IN THE SETTLEMENT AGREEMENT WOULD ONLY KICK IN IF

21   THEY KNEW 4 PERCENT, SOMETHING IN EXCESS OF 2500 PEOPLE NOW, IN

22   ADDITION, OPTED OUT.

23        SO IT WOULD BE A SIGNIFICANTLY LARGER, EXPONENTIALLY

24   LARGER NUMBER OF PEOPLE THAN OPTED OUT THE FIRST TIME.

25             THE COURT:  YOU KNOW, THE SETTLEMENT WITH LUCASFILM,

1    PIXAR, AND INTUIT DIDN'T HAVE THIS 4 PERCENT REVERTER.  WHY --

2    IN SOME SENSES, LUCASFILM AND PIXAR, AS WELL AS INTUIT, ARE

3    PAYING MORE OF THEIR -- A HIGHER PROPORTION OF THEIR LIABILITY

4    THAN GOOGLE, APPLE, INTEL, AND ADOBE.  WHY IS THAT?

5         MS. DERMODY:  THERE WAS A PRO RATA REDUCTION THAT

6    WOULD KICK IN THAT WAS SET FORTH IN THOSE OTHER SETTLEMENT

7    AGREEMENTS.  IT WAS A -- I THINK IT WAS 10 PERCENT OR SOMETHING

8    IN PIXAR, LUCAS, AND INTUIT.  SO THE CONCEPT EXISTED IN THE

9    PRIOR SETTLEMENT AGREEMENTS.

10    HERE WE -- IT JUST WAS DIFFERENT DEFENDANTS, DIFFERENT

11    NEGOTIATIONS, DIFFERENT TERMS THAT WERE BEING DISCUSSED.

12    AND SO WE HAD THE SAME CONCEPT, THAT THERE BE SOME NUMBER

13    OF PEOPLE -- THERE WAS SOME PRICE POINT AT WHICH, FOR THE

14    DEFENDANTS TO HAVE TO PAY, FROM THEIR POINT OF VIEW, HAVE TO

15    PAY INTO A CLASS FUND WHILE LEAVING OPEN THE LIABILITY OF

16    THOUSANDS OF PEOPLE SEEMED TO BE, AS THEY EXPRESSED IT,

17    SOMETHING THAT SHOULD BE ACCOUNTED FOR.

18    SO IT WOULDN'T BE LESS CONSIDERATION TO THE CLASS.  IT

19    WOULD BE JUST A PRO RATA REDUCTION THAT WOULD KICK IN.  THE

20    SAME NUMBER OF PEOPLE WOULD HAVE THE SAME NET RESULT OF THE

21    CASE IF YOU HIT A CERTAIN THRESHOLD, AGAIN, ONE THAT I, AS

22    CLASS COUNSEL, DON'T THINK WILL BE REACHED, BUT WHICH IS KIND

23    OF A BACKSTOP FOR THE DEFENDANTS IN THE EVENT THAT IT IS.

24         THE COURT:  OKAY.  I'M UNCLEAR.  YOU'RE SAYING THERE

25    WAS A 10 PERCENT REVERTER IN THE LUCASFILM, PIXAR, AND INTUIT

```
 1    SETTLEMENT?

 2              MS. DERMODY:  THERE WAS A --

 3              THE COURT:  I DON'T HAVE THAT.

 4              MS. DERMODY:  IT'S IN THE SETTLEMENT AGREEMENT, YOUR

 5    HONOR.  WE CAN PULL IT UP.

 6         THE CONCEPT OF THERE BEING A PRO RATA REDUCTION FOR A

 7    CERTAIN NUMBER OF OPT OUTS AND THE CONCEPT OF THERE BEING A

 8    TERMINATION POSSIBILITY WITH A CERTAIN NUMBER OF OPT OUTS WAS

 9    SOMETHING THAT HAPPENED IN THE PRIOR SETTLEMENT AGREEMENTS.

10              THE COURT:  OH, OKAY.  CAN I SEE THAT?  BECAUSE I'M

11    SORRY, I DON'T RECALL THAT.

12              MS. DERMODY:  YES, YOUR HONOR.  WE'LL FIND THAT FOR

13    YOU.  I'M AFRAID I DON'T HAVE IT IN FRONT OF ME.  I DIDN'T

14    BRING THAT WITH ME TODAY.

15              THE COURT:  OKAY.

16              MS. DERMODY:  BUT WE'LL LOCATE IT.

17              THE COURT:  OKAY.

18              MS. DERMODY:  AND IF IT WOULD HELP YOUR HONOR --

19              THE COURT:  IS PARVES SYED MOHAMED OBJECTING?  I KNOW

20    YOU HAD A FOOTNOTE IN YOUR MOTION THAT YOU DIDN'T THINK THAT HE

21    WAS.  WHAT DID YOU BASE THAT ON?

22              MS. DERMODY:  A CONVERSATION WITH HIM, YOUR HONOR.

23    AT THE TIME THAT WE -- AFTER WE REVIEWED THAT LETTER, WE SPOKE

24    WITH HIM.  IT WAS OUR UNDERSTANDING THAT HE HAD AN INTENT TO

25    WITHDRAW THAT OBJECTION.
```

1    TO DATE THAT HASN'T HAPPENED.  I DON'T KNOW WHETHER OR NOT

2    HE CONTINUES TO WANT TO WITHDRAW THAT OBJECTION OR CONTINUES TO

3    WANT TO SAY THAT HE WANTS THERE TO BE MORE MONEY IN THE

4    SETTLEMENT.  I'M NOT SURE EITHER WAY.

5         THE COURT:  OKAY.  AND IS MR. MOHAMMED HERE TODAY?

6         ALL RIGHT.  LET ME GIVE MR. GIRARD AN OPPORTUNITY TO

7    RESPOND TO THE PLAINTIFFS' REPLY.

8         I'D ALSO LIKE TO ASK WHETHER MR. DEVINE ACTUALLY SENT THAT

9    MAY 11, 2014 LETTER TO THE COURT, BECAUSE I NEVER GOT IT.  DO

10   YOU KNOW IF HE ACTUALLY SENT IT?

11        MR. GIRARD:  I DO NOT KNOW THE ANSWER TO THAT

12   QUESTION AS TO WHETHER IT WAS ACTUALLY SENT.  I BELIEVE IT WAS

13   FROM SPEAKING WITH HIM.  AND IF YOU'D LIKE TO SEE IT, WE WILL

14   PRODUCE IT TO THE COURT.

15        WE HAVE TALKED WITH MR. DEVINE AT LENGTH AND COUNSELLED

16   HIM ON THE ISSUES SURROUNDING THE APPROVAL OF CLASS ACTION

17   SETTLEMENTS, AND THE OPPOSITION TO THE MOTION FOR PRELIMINARY

18   APPROVAL THAT WAS FILED ON HIS BEHALF REFLECTS HIS POSITION IN

19   OPPOSITION AND IT SUPERSEDES THE LETTER.

20        SO THESE ARE THE ARGUMENTS THAT HE IS ELECTING TO PUT

21   FORWARD IN OPPOSITION TO THE SETTLEMENT, AND I'M PREPARED TO

22   SPEAK TO THOSE IF THIS IS THE RIGHT TIME FOR THAT.

23        THE COURT:  YES.  I WOULD LIKE TO HEAR YOUR RESPONSE

24   TO THE PLAINTIFFS' REPLY.

25        MR. GIRARD:  SURE.

1          THE COURT:  OKAY.

2          MR. GIRARD:  SO TO START WITH, THE ARGUMENT IS MADE

3    THAT THE SETTLEMENT IS LARGE, PUT IT THAT WAY, $324.5 MILLION,

4    AND IT IS INDISPUTABLY A VERY LARGE AMOUNT OF MONEY.

5          THE PERSPECTIVE THAT MR. DEVINE IS APPROACHING IS HIS

6    PERSPECTIVE AS AN INDIVIDUAL.  IT'S NOT LOOKING BACK AND

7    SAYING, "IS IT OR ISN'T IT A BIG AMOUNT OF MONEY?"

8          HIS PERSPECTIVE IS THAT WHAT THIS REPRESENTS FOR HIM IS

9    AROUND $3500 TO $3600, AND FOR THAT PRICE, IF YOU ASKED HIM,

10   "WOULD YOU BE WILLING TO GIVE THE DEFENDANTS THE RIGHT TO

11   MANIPULATE THE MARKET FOR THE SERVICES HE PROVIDES FOR FOUR

12   YEARS FOR $3600, OR WOULD YOU PREFER TO TAKE YOUR CHANCES,

13   KNOWING THAT YOU MIGHT LOSE THAT MONEY, BUT YOU MIGHT ALSO GET

14   A LOT MORE?"

15         AND SPECIFICALLY HERE WE THINK THAT IF THE PLAINTIFFS WIN

16   UNDER THEIR MODEL, THAT LOT MORE IS $144,000, APPROXIMATELY.

17         I THINK, IF HE'S RATIONAL, HIS ANSWER -- AND HE IS -- AND

18   HIS ANSWER IS, "WHAT ARE MY CHANCES?  ARE MY CHANCES 97 AND A

19   HALF PERCENT THAT I WILL DO WORSE THAN THIS $3600?"

20         AND HE SAYS, "GIVEN THOSE ODDS, I DON'T THINK SO.  I'LL

21   TAKE MY CHANCES ON AN INDIVIDUAL LEVEL."

22         AND HE'S HERE SPEAKING FOR THAT PERSPECTIVE, WHICH IS THAT

23   HE'S PREPARED TO PUT THIS AMOUNT OF MONEY AT RISK BECAUSE THE

24   AMOUNT THAT HE GETS SPECIFICALLY INDIVIDUALLY, NOTWITHSTANDING

25   HOW BIG THE SETTLEMENT IS, IS INSUFFICIENT, IN HIS MIND, IN

1     RELATION TO WHAT HE STANDS TO GAIN IF THIS CASE GOES FORWARD.

2     NOW, IT'S TRUE THAT THE AMOUNT OF MONEY THAT COUNSEL

3     OBTAINED -- AND TO BE CLEAR, THIS IS AN OBJECTION TO THE

4     SUFFICIENCY OF THE RECOVERY.  IT'S NOT AN OBJECTION TO THE

5     ADEQUACY OF REPRESENTATION.  SO WE'RE NOT CLAIMING THAT COUNSEL

6     WAS -- SOLD OUT THE CASE BECAUSE THEY GOT TOGETHER WITH THE

7     DEFENDANTS AND ENTERED INTO A COLLUSIVE SETTLEMENT.  THAT

8     WOULDN'T BE A SERIOUS CLAIM AND THAT'S NOT THE CLAIM BEING

9     MADE.  THE CLAIM GOES SOLELY TO THE SUFFICIENCY OF THE

10    RECOVERY.

11    AND THE ARGUMENT THAT MR. DEVINE MAKES IS THAT IF YOU LOOK

12    AT THIS SETTLEMENT, YES, IT'S TRUE THAT IT'S 325 MILLION, BUT I

13    CAN'T THINK OF ANY OTHER TYPE OF CASE THAT HAD THIS TYPE OF

14    EVIDENCE THAT WAS THIS CLOSE TO TRIAL.

15    SO, YES, IT'S A LOT OF MONEY.  BUT IT'S ALSO A VERY, VERY

16    STRONG CASE, AND WHERE WE ARE HERE IS PRELIMINARY APPROVAL.

17    AND WE KNOW WHAT'S GOING TO HAPPEN HERE.  IF THE COURT

18    ENTERS AN ORDER PRELIMINARILY APPROVING THE SETTLEMENT, NOTICE

19    WILL GO OUT AND SOME NUMBER OF CLASS MEMBERS WILL OBJECT TO THE

20    SETTLEMENT AND CLASS COUNSEL WILL SAY THAT NUMBER, WHATEVER IT

21    IS, IS SMALL IN RELATION TO THE TOTAL NUMBER OF CLASS MEMBERS,

22    AND THEY'LL PROBABLY BE RIGHT AND IT'S A LEGITIMATE ARGUMENT

23    AND I'VE MADE IT MANY TIMES AS CLASS COUNSEL.

24    BUT I THINK THE TREND IS TO TAKE THE HARD LOOK NOW RATHER

25    THAN DEFER TO FINAL APPROVAL, BECAUSE IF YOU ENTER PRELIMINARY

1    APPROVAL NOW, THE WRITING IS ON THE WALL THAT WE'LL GET TO THAT

2    POINT AND THEY'LL SAY IT'S A SMALL AMOUNT AND, THEREFORE, THE

3    MOST -- MOST OF THE CLASS IS HAPPY WITH THE SETTLEMENT AND THE

4    COURT SHOULD APPROVE IT.

5        WHAT'S UNIQUE ABOUT THIS CASE, I THINK -- AND PLAINTIFFS'

6    COUNSEL POINTED OUT THAT MOST OF THE CASES WHERE THE COURTS ARE

7    PUSHING BACK AT PRELIMINARY APPROVAL, A NUMBER OF THOSE CASES

8    INVOLVE FAIRLY QUESTIONABLE SETTLEMENTS AND NOT THE BEST WORK

9    NECESSARILY DONE BY PLAINTIFFS' COUNSEL, AND THAT'S NOT THE

10   ARGUMENT WE'RE MAKING HERE.

11       BUT THIS COURT, IN THIS PARTICULAR CASE, IS UNIQUELY

12   SITUATED TO EXERCISE ITS DISCRETION AT THIS STAGE, AND THIS IS

13   REALLY WHAT PRELIMINARY APPROVAL IS, IS THE COURT ACTING AS A

14   GATEKEEPER.

15       YOU KNOW, WHAT'S INTERESTING ABOUT RULE 23 IS THERE'S

16   NOTHING IN THERE ABOUT PRELIMINARY APPROVAL.  WE COULDN'T FIND

17   A SINGLE CIRCUIT LEVEL DECISION WHERE A COURT SAYS THIS IS THE

18   STANDARD THAT YOU, AS A DISTRICT COURT, ARE REQUIRED TO APPLY.

19       THE DISTRICT COURTS REPEAT THE STANDARD GENERALLY THAT THE

20   COURT IS MAKING AN OVERALL ASSESSMENT OF THE FAIRNESS AND

21   LOOKING FOR SIGNS OF COLLUSION.

22       BUT AT THE SAME TIME, THE INSTRUCTION IS TO THIS COURT TO

23   LOOK HARD AND, IF YOU HAVE CONCERNS, TO EXPRESS THOSE CONCERNS

24   NOW.

25       SO WHAT MR. DEVINE'S POSITION IS IS THAT FROM THE

1    PERSPECTIVE OF ANY INDIVIDUAL MEMBER OF THIS CLASS, IF YOU'RE

2    PRESENTED WITH THE BARGAIN OF CONSENTING TO THIS CONDUCT AND

3    ENTERING INTO A RELEASE, IF YOU LOOK AT IT FROM HIS INDIVIDUAL

4    PERSPECTIVE, LIKE A PERSONAL INJURY CASE, IF HE'S GIVEN THE

5    CHOICE OF TAKING $3600 OR PLAYING IT FORWARD FOR THE

6    POSSIBILITY OF DOING A LOT BETTER, AND WHEN YOU LOOK AT THE

7    CONDUCT INVOLVED AND YOU THINK ABOUT WHAT THE DEFENDANTS DID

8    HERE AND HOW THAT AFFECTED THE MARKET FOR THE SERVICES THAT HE

9    AND THE OTHER MEMBERS OF THE CLASS ARE PROVIDING, THAT THEY

10   WOULD PREFER TO TAKE THEIR CHANCES.

11        AND HE'S NOT SAYING -- HE'S NOT SAYING THAT THERE'S NO

12   SETTLEMENT EVER THAT COULD POSSIBLY BE SATISFACTORY TO HIM.

13   HE'S SAYING THAT HE LOOKS AT THIS AND HE THINKS THIS SETTLEMENT

14   IS SHORT OF THE MARK AND THAT IT WOULD BE WORTH IT --

15             THE COURT:  HOW MUCH SHORT OF THE MARK DOES HE THINK

16    IT IS?

17             MR. GIRARD:  I THINK HE -- HIS CONCERN WAS THAT HE

18    WAS CONCERNED WITH THE PROCESS, TO SOME EXTENT.

19        AND TO ANSWER THAT QUESTION, I GUESS I WOULD -- I WANT TO

20   GIVE A SPECIFIC RESPONSE RATHER THAN AN OVERLY GENERAL ONE.

21        I DON'T THINK WE'RE TALKING ABOUT MULTIPLES OF THIS

22   NUMBER.  ONE THOUGHT THAT WE HAD, IN TERMS OF WHAT THIS COURT

23   MIGHT CONSIDER DOING, IS IF THE COURT SHARES ANY OF THESE

24   CONCERNS ABOUT THE SUFFICIENCY OF THE SETTLEMENT, TO GIVE THE

25   PARTIES AN OPPORTUNITY TO GO BACK TO THE TABLE WITH MR. DEVINE

1    REPRESENTED, ALONG WITH CLASS COUNSEL, AND SEE IF, IN THE

2    CONTEXT OF THE MEDIATION, THE DEFENDANTS ARE WILLING TO PAY ANY

3    MORE IN SETTLEMENT.

4        IF THE ANSWER IS NO, THEN THE COURT CAN RULE ON THIS

5    MOTION AS IT'S BEEN PRESENTED TO THE COURT.

6        IF WE'RE ABLE TO COME BACK WITH A SUBSTANTIALLY IMPROVED,

7    OR EVEN A MODESTLY IMPROVED SETTLEMENT, THE COURT WILL HAVE A

8    DIFFERENT CALCULUS IN FRONT OF IT AND PROBABLY A SETTLEMENT

9    THAT ALL THE CLASS REPRESENTATIVES SUPPORT.

10        THAT'S A PROCESS WE'D BE WILLING TO TAKE ON IF THE COURT

11    IS SO INCLINED.

12        AND --

13            THE COURT:  WHAT ABOUT MR. DEVINE JUST OPTING OUT AND

14    LITIGATING HIS OWN INDIVIDUAL CASE?

15            MR. GIRARD:  WELL, THAT'S A POSSIBILITY AND WE'VE

16    CERTAINLY TALKED WITH HIM ABOUT THAT.

17        THE SITUATION FROM HIS POINT OF VIEW, IT'S THE SAME

18    SITUATION THAT WAS DISCUSSED RECENTLY BY THE SUPREME COURT IN

19    THE ITALIAN COLORS CASE ON ARBITRATION.  HE'S GOING TO BE

20    LOOKING THEN AT A CLAIM THAT'S WORTH, ON AVERAGE, $140,000

21    TREBLED, AND HE'S GOING TO BE LOOKING AT EXPENSES FOR EXPERTS

22    THAT ARE GOING TO BE MANY MULTIPLES OF THAT.

23        SO THE OPT OUT RATE HERE IS A, YOU KNOW, RELATIVELY WEAK

24    EXPEDIENT UNLESS THE VOLUME OF OPT OUTS ARE SUCH THAT IT'S

25    POSSIBLE TO AGGREGATE SOME GROUP OF PEOPLE WHO SHARE THE SAME

1   VIEW HE HAS AND WANT TO PROCEED.

2           THE COURT:  WHAT ABOUT THE -- WHAT ABOUT THE SPECIFIC

3   ARGUMENTS THAT THE PLAINTIFFS MAKE IN THEIR REPLY THAT, YOU

4   KNOW, MR. -- DR. LEAMER ONLY PROVIDED A DAMAGES ANALYSIS FOR

5   THE OVERARCHING CONSPIRACY, AND IF THE JURY WERE TO FIND THAT

6   ONE OF THE SEVEN DEFENDANTS DIDN'T ACTUALLY JOIN IN THAT

7   CONSPIRACY, THERE WOULDN'T BE SORT OF AN ALTERNATIVE DAMAGES

8   CALCULATION FOR THE JURY TO RELY ON.

9           MR. GIRARD:  SO THEY MADE A NUMBER OF ARGUMENTS LIKE

10  THAT.

11          THE COURT:  YEAH.

12          MR. GIRARD:  AND THERE WAS AN ISSUE ABOUT WHETHER THE

13  COURT WOULD ORDER THAT THE STANDARD IS GOING TO BE PER SE

14  VERSUS RULE OF REASON --

15          THE COURT:  UM-HUM.

16          MR. GIRARD:  -- A NUMBER OF EVIDENTIARY MOTIONS THAT

17  WERE BEFORE THE COURT, AND THE NEED FOR A UNANIMOUS JURY, ET

18  CETERA.

19      I MEAN, I PUT ALL OF THOSE UNDER THE UMBRELLA GENERALLY OF

20  TRIAL IS RISKY.

21          THE COURT:  UM-HUM.

22          MR. GIRARD:  BUT THIS IS NOT A SITUATION HERE WHERE

23  THE CASE IS, YOU KNOW, AT THE MOTION TO DISMISS STAGE, OR EVEN

24  AT THE SUMMARY JUDGMENT STAGE.  I MEAN, WE'RE HERE POST CLASS

25  CERTIFICATION, POST RULE 23, VERY CLOSE TO TRIAL, AND THOSE ARE

1      ALL FAIR ARGUMENTS.

2          THE FLIP SIDE IS, WHAT ABOUT THE POSSIBILITY THAT THE

3      DEFENDANTS END UP HAVING TO PAY OVER A BILLION DOLLARS BEFORE

4      TREBLING?

5          THEY'RE EQUALLY LEGITIMATE POINTS TO CONSIDER.

6          SO WE'RE NOT -- I MEAN, THIS ISN'T THE OBJECTION WHERE

7      SOMEBODY COMES AND WAVES OFF ALL THE REALITIES AND RISKS OF

8      TRIAL.  WE HAVE A TREMENDOUS LEVEL OF APPRECIATION FOR THE WORK

9      THAT'S GONE INTO THIS PROCESS AND HOW HARD COUNSEL HAVE WORKED.

10          THIS IS REALLY A CLASS REPRESENTATIVE WHO'S SPEAKING UP,

11     DOING THE RIGHT THING IN TERMS OF COMING FORWARD TO THE COURT

12     WITH THE BENEFIT OF HIS EXPERIENCE AND THE THOUGHT AND, TO SOME

13     EXTENT, THE PERSONAL TRAVAIL ALL FOUR OF THESE CLASS

14     REPRESENTATIVES HAVE SUFFERED PROFESSIONALLY FROM HAVING TO

15     TAKE ON THIS INDUSTRY AND THESE DEFENDANTS, AND I THINK THE

16     COST THAT THEY PERCEIVE IN THAT TO THEM AS FAR AS THE

17     PROFESSIONAL CONSEQUENCES THAT THEY MAY SUFFER FOR HAVING

18     BROUGHT THESE CASES AND SAYING, "SOMEHOW WE FEEL LIKE WE'VE

19     BEEN LEFT SHORT HERE, THAT THIS ISN'T THE KIND OF RESULT THAT

20     WE THOUGHT, WHEN WE GOT INTO THIS, WAS WHAT WE WERE LOOKING

21     FOR."

22          AND, YOU KNOW, YOU THINK ABOUT THIS -- AND I DON'T WANT TO

23     GET TOO PHILOSOPHICAL HERE, SO I'M GOING TO CUT TO THE POINT

24     HERE -- BUT YOU THINK ABOUT THIS COUNTRY AND HOW HARD PEOPLE

25     WORK TO GET THESE TYPES OF JOBS AND HOW IMPORTANT IT IS TO A

1    LOT OF THE, THE GENERATION OF PEOPLE THAT ARE COMING UP,

2    ENTERING THE WORK FORCE, THE SACRIFICES SOMEBODY LIKE

3    MR. DEVINE MADE, THE LOANS THEY TOOK OUT TO BE EDUCATED AND SO

4    FORTH, AND ANYTHING ABOUT THE RHETORIC THAT IS BEING SOLD BY

5    THE PEOPLE WHO ENTERED INTO THESE AGREEMENTS ABOUT FREE

6    ENTERPRISE AND INDIVIDUAL RESPONSIBILITY AND ON AND ON, AND YOU

7    LOOK AT THE FACT THAT THEY WERE GETTING TOGETHER AND FIXING THE

8    PRICE FOR THESE SERVICES.

9         I MEAN, I THINK FROM THEIR POINT OF VIEW, IT'S VERY TOUGH

10   TO GIVE IT UP AT THIS POINT FOR THE TRADE THAT I REFERRED TO,

11   THE $3600 FOR THE RIGHT TO FIX THIS MARKET FOR FOUR YEARS.

12        AND SO THAT'S, THAT'S THE PERSPECTIVE IN WHICH HE IS

13   APPROACHING THE COURT TODAY.

14             THE COURT:  ALL RIGHT.  THANK YOU.

15        LET ME HEAR FROM THE PLAINTIFFS.

16             MS. DERMODY:  YOUR HONOR, DO YOU WANT TO HEAR THE

17   HOUSEKEEPING THINGS FIRST IN RESPONSE TO YOUR QUESTIONS?

18             THE COURT:  SURE.  HOW MANY CLASS --

19             MS. DERMODY:  SO FROM --

20             THE COURT:  -- LITIGATION CLASS OPT OUTS WERE THERE?

21             MS. DERMODY:  SIXTY-ONE.

22             THE COURT:  OKAY.

23             MR. DERMODY:  AND IN BOTH THE PIXAR, LUCAS, AND

24   INTUIT SETTLEMENTS, THERE WAS AN ATTACHMENT 1.  SO IF YOUR

25   HONOR WAS LOOKING IN THE BODY OF THE SETTLEMENT AGREEMENTS, YOU

1    MIGHT NOT HAVE SEEN IT.

2        BUT IF YOU LOOK TO THE FIRST ATTACHMENT, IT'S IN THERE.

3    IT TALKS ABOUT A PRO RATA REDUCTION, AND IN PIXAR/LUCASFILM IT

4    WAS 10 PERCENT WAS THE THRESHOLD, AND ONCE YOU HAD 10 PERCENT

5    OPT OUTS, THEN YOU WOULD START HAVING A PRO RATA REDUCTION OF

6    THE CLASS CONSIDERATION.

7            THE COURT:  WHY IS IT SO MUCH LOWER HERE?

8            MS. DERMODY:  I THINK IT'S A DIFFERENT POINT IN THE

9    CASE, DIFFERENT ISSUES IN THE CASE IN TERMS OF CONCERNS ABOUT

10   OPT OUTS, YOUR HONOR.

11       I THINK THAT WAS REALLY ALL THAT WAS GOING ON.  I MEAN --

12           THE COURT:  OKAY.  THE POINT IN THE CASE WOULD

13   ACTUALLY DICTATE FOR A HIGHER NUMBER, RIGHT?  I MEAN THE --

14           MS. DERMODY:  NOT IF YOU --

15           THE COURT:  -- THE LUCASFILM/PIXAR/INTUIT FOLKS

16   SETTLED WHEN I HAD DENIED THE CLASS CERTIFICATION MOTION.

17       SO THESE DEFENDANTS SETTLED AFTER I HAD CERTIFIED THE

18   CLASS, AFTER THE NINTH CIRCUIT HAD REFUSED TO REVIEW MY CLASS

19   CERTIFICATION ORDER, AFTER I HAD DENIED SUMMARY JUDGMENT, AFTER

20   I HAD DENIED THE DAUBERT EXCLUDING DR. LEAMER'S DAMAGES

21   ANALYSIS.

22           MS. DERMODY:  RIGHT.

23           THE COURT:  SO IF ANYTHING, THAT NUMBER SHOULD BE

24   GOING UP AND NOT GOING DOWN.

25           MS. DERMODY:  YOU WOULD THINK, IN GENERAL, THAT WOULD

1   BE TRUE FOR A LOT OF TERMS, YOUR HONOR.

2           THE COURT:  UM-HUM.

3           MS. DERMODY:  BUT ON THAT PARTICULAR ONE, AT THE TIME

4   OF THE PIXAR/LUCAS SETTLEMENT, AS YOU MIGHT REMEMBER, THERE WAS

5   NO PRIOR PRELIMINARY APPROVAL INFORMATION THAT ANYONE IN THE

6   CLASS MIGHT OBJECT TO THAT SETTLEMENT.

7       WE HAD A DIFFERENT SCENARIO HERE.  SO IT WAS A

8   DIFFERENT -- IT WAS JUST A DIFFERENT -- THE PLACE WAS SET

9   DIFFERENTLY FOR THAT PARTICULAR TERM TO BE NEGOTIATED THAN IT

10  WAS AT THE TIME OF THE PIXAR/LUCAS SETTLEMENT, DIFFERENT FACTS

11  IN THE GROUND.

12          THE COURT:  OKAY.  SO TELL ME THEN WHAT YOU KNEW AT

13  THE TIME YOU SETTLED, BECAUSE MY UNDERSTANDING IS YOU DIDN'T

14  GET THESE OBJECTIONS UNTIL AFTER PEOPLE, SOMEBODY AT "THE

15  NEW YORK TIMES" LEAKED THE 324 MILLION NUMBER.

16          MS. DERMODY:  RIGHT.  I DON'T KNOW HOW THAT --

17          THE COURT:  RIGHT.  SO I GUESS I'M UNCLEAR.  HOW ARE

18  OBJECTIONS THAT POST-DATED THE ANNOUNCEMENT OF THE SETTLEMENT

19  AMOUNT, THE ONES THAT MOTIVATED THE NUMBER DURING THE

20  SETTLEMENT NEGOTIATIONS THAT PRECEDED THAT NUMBER COMING OUT?

21          MS. DERMODY:  WELL, AT THE --

22          THE COURT:  DOES THAT MAKE SENSE TO YOU?

23          MS. DERMODY:  YES, YOUR HONOR.

24          THE COURT:  THAT DOESN'T MAKE SENSE TO ME.

25          MS. DERMODY:  I UNDERSTAND THE QUESTION COMPLETELY.

1          I JUST WANT TO MAKE VERY CLEAR TO THE COURT THAT THE

2     PARTIES AGREED THAT THEY WOULD NOT RELEASE ANY OF THE TERMS

3     UNTIL THEY PRESENTED THEM TO YOUR HONOR.  NO ONE ON THE

4     PLAINTIFFS' SIDE SPOKE TO ANY MEDIA ABOUT ANY OF THE SPECIFIC

5     TERMS OF THE SETTLEMENT.  I DON'T KNOW WHERE "THE NEW YORK

6     TIMES" GOT THEIR INFORMATION.  TO THIS DAY, I'M PERSONALLY VERY

7     UPSET THAT THAT INFORMATION WAS OUT THERE BECAUSE THE PARTIES

8     WERE STILL NEGOTIATING THE TERMS OF THE SETTLEMENT AGREEMENT.

9          SO THAT WAS STILL IN PLAY, THAT PARTICULAR TERM, AND THAT

10    PARTICULAR TERM WAS INFORMED BY FEEDBACK THAT HAPPENED, IN PART

11    FROM "THE NEW YORK TIMES," RIGHT AFTERWARDS.

12         SO YOU HAVE TO DEAL WITH THE FACTS IN THE GROUND THAT

13    HAPPENED AT THE TIME YOU'RE NEGOTIATING THOSE TERMS AND THAT IS

14    THE DIFFERENCE.

15         IF THAT TERM ITSELF IS THE STICKING POINT FOR YOUR HONOR,

16    ABSOLUTELY WE'RE GOING TO HAVE TO SORT OF GO AND ADDRESS THAT.

17         BUT I WANT YOUR HONOR TO UNDERSTAND THAT WE WEREN'T

18    DEALING WITH THE EXACT SAME INFORMATION ABOUT OPT OUTS THAT WE

19    WERE WHEN WE NEGOTIATED THE PIXAR/LUCASFILM --

20              THE COURT:  I GUESS IT STILL DOESN'T MAKE SENSE TO

21    ME.  YOUR JUSTIFICATION FOR THE NUMBER GOING DOWN IS BASED ON

22    OBJECTIONS THAT OCCURRED AFTER YOU HAD ALREADY AGREED TO THE

23    NUMBER.

24              MS. DERMODY:  YOUR HONOR, IT'S A -- IT'S A FUNNY

25    POSITION --

1          THE COURT:  BECAUSE YOU ANNOUNCED -- YOU SENT THE

2     LETTER TO ME THAT YOU HAD REACHED A SETTLEMENT AT ABOUT THE

3     EXACT SAME TIME.

4          MS. DERMODY:  YES, YOUR HONOR.

5          THE COURT:  SO I ASSUME WHEN YOU SENT THAT LETTER TO

6     ME, YOU HAD THIS 4 PERCENT NUMBER.

7          MS. DERMODY:  NO.  WE HAD THE -- I MEAN, YOUR HONOR

8     IS SORT OF ASKING ME TO REVEAL A LOT OF SETTLEMENT PRIVILEGES,

9     SO I'M HAVING A HARD TIME WITH THIS.

10        BUT I WILL TELL YOU THAT --

11         THE COURT:  WELL, YOU'RE THE ONE THAT OPENED THE

12    DOOR.  YOU'RE THE ONE THAT GAVE THAT AS THE JUSTIFICATION FOR

13    WHY THE NUMBER IS LOWER THAN 10 PERCENT TO 4 PERCENT, RIGHT?  I

14    MEAN, IF YOU HADN'T OPENED THE DOOR, I WOULDN'T BE FOLLOWING

15    THIS LINE OF INQUIRY.

16         MS. DERMODY:  I WANT TO MAKE SURE THE COURT

17    UNDERSTANDS, BECAUSE I APPRECIATE THE QUESTION.  IT'S A

18    COMPLETELY FAIR QUESTION.

19         THE COURT:  I GUESS I DON'T UNDERSTAND.

20         MS. DERMODY:  THE 324. --

21         THE COURT:  THE EARLIER DEFENDANTS SETTLED AT A POINT

22    WHEN THEY HAD MUCH MORE LEVERAGE.

23        THESE DEFENDANTS SETTLED AFTER THEIR LEVERAGE WAS LARGELY

24    GONE.  AS SOON AS THE NINTH CIRCUIT SAID, "WE'RE NOT GOING TO

25    REVIEW THIS CLASS CERT ORDER," THEY WERE GOING TO BE FORCED TO

1    GO TO TRIAL, AND I SUSPECT THEY WOULD HAVE WON, IN WHICH CASE

2    THERE WOULD HAVE BEEN AUTOMATIC TREBLING.

3        NOW, GRANTED, I UNDERSTAND THE APPEAL RISKS.

4        BUT IT'S STILL -- FROM A NEGOTIATING STANDPOINT, THESE

5    DEFENDANTS SHOULD HAVE HAD LESS LEVERAGE THAN THE

6    LUCASFILM/PIXAR/INTUIT DEFENDANTS WHO SETTLED WHEN THE ONLY

7    ORDER WAS DENYING THE CLASS CERT MOTION.

8            MS. DERMODY:  SO, YOUR HONOR --

9            THE COURT:  SO WHY ARE THEY PAYING -- WHY ARE THE

10   EARLIER SETTLING DEFENDANTS BEING PENALIZED BY PAYING A HIGHER

11   PROPORTION OF THEIR DAMAGES LIABILITY THAN THESE DEFENDANTS?

12           MS. DERMODY:  WELL, LET ME MAKE IT TOTALLY CLEAR.

13           THE COURT:  YEAH.

14           MS. DERMODY:  THE PRIOR DEFENDANTS PAID A HUNDRED

15   PERCENT, 100 PERCENT OF WHAT WAS IN THE SETTLEMENT AGREEMENT.

16       WE EXPECT THESE DEFENDANTS WILL PAY 100 PERCENT OF WHAT IS

17   PROMISED IN THE SETTLEMENT AGREEMENT.

18       THE ONLY TIME THAT THERE'S ANY POSSIBILITY THAT THERE WILL

19   BE A PRO RATA REDUCTION IS IF YOU HIT A THRESHOLD OF OVER 2500

20   NEW OPT OUTS AFTER WE HAD 61 THE LAST TIME AROUND.

21       SO THIS IS TALK -- THIS IS SORT OF EXPECTING THE WORST

22   POSSIBLE CASE SCENARIO THAT, BASED ON THE PRIOR SETTLEMENTS --

23   WE DIDN'T KNOW, PRIOR TO THOSE SETTLEMENTS, WHO WOULD OPT OUT.

24       NOW WE HAVE BETTER INFORMATION THAT VERY FEW PEOPLE OPTED

25   OUT LAST TIME AND IT WAS A VERY SMALL SETTLEMENT AMOUNT.

1    THIS TIME, IT'S A MUCH GREATER SETTLEMENT AMOUNT.  WE

2    DON'T HAVE ANY EXPECTATION THAT MORE PEOPLE WILL SUDDENLY

3    DECIDE TO EXERCISE THAT OPTION.

4    SO I'M -- I JUST WANT TO MAKE SURE YOUR HONOR UNDERSTANDS

5    THAT THEY'RE NOT GOING TO PAY LESS, NOT UNLESS YOU HAVE A VERY,

6    VERY LARGE NUMBER OF PEOPLE SUDDENLY COMING OUT OF THE WOODWORK

7    TO OPT OUT, WHICH WE HAVE NO REASON TO BELIEVE IS GOING TO BE

8    THE CASE.

9    THE COURT:  OKAY.  SEPARATE FROM THIS REVERTER,

10   SEPARATE FROM THIS REVERTER, IT DOES APPEAR THAT THESE LATER

11   SETTLING DEFENDANTS ARE PAYING A LOWER PROPORTION OF THEIR

12   POTENTIAL DAMAGES LIABILITY THAN THE EARLIER SETTLING

13   DEFENDANTS, AND IT DOESN'T MAKE SENSE TO ME BECAUSE THEY SHOULD

14   HAVE HAD LESS LEVERAGE THAN THE EARLIER SETTLING DEFENDANTS.

15   MS. DERMODY:  I THINK I WOULD DISAGREE WITH THE FIRST

16   ASSUMPTION, YOUR HONOR.

17   THE COURT:  OKAY.

18   MS. DERMODY:  I DO THINK THAT THERE IS A SIMILAR

19   RATIO IN TERMS OF THE EARLIER DEFENDANTS AND THESE DEFENDANTS,

20   AND I CAN APPRECIATE WHY YOUR HONOR WOULD ASK THE QUESTION THAT

21   YOUR HONOR IS ASKING.

22   AND I THINK FROM OUR PERSPECTIVE, I WANT IT TO BE REALLY

23   CLEAR WHAT WE WERE LOOKING AT AND WHY WE THINK IT WOULD BE

24   MALPRACTICE FOR US, AS CLASS COUNSEL, NOT TO GIVE THE CLASS A

25   CHANCE TO HEAR THAT THEY COULD GET $324.5 MILLION.

1            HERE'S HOW WE SAW THE LAY OF THE LAND, YOUR HONOR.  SO

2    WHILE THE NINTH CIRCUIT DID NOT GRANT THE 23(F), AND WE WERE

3    DELIGHTED THAT THAT HAPPENED, THE NINTH CIRCUIT DID NOT GRANT

4    23(F) AND THEN RULE FOR US, AFFIRM ON THE MERITS.

5            SO FROM OUR PERSPECTIVE, THE ISSUE OF CLASS CERTIFICATION

6    IS STILL AN OPEN ISSUE ON APPEAL.  SO THAT ISSUE DOESN'T GET

7    TAKEN OFF THE TABLE BECAUSE OF 23(F) BEING DENIED.  THAT'S

8    STILL OUT THERE.

9            THE COURT:  RIGHT.  BUT WHAT IS YOUR NEGOTIATING

10   POSITION IF YOU HAD GONE TO TRIAL AND YOU HAD WON AND THEN YOU

11   HAD THE APPEAL PROCESS PENDING?  YOUR NEGOTIATION LEVERAGE

12   WOULD HAVE INCREASED.

13           MS. DERMODY:  ABSOLUTELY, YOUR HONOR.

14           THE COURT:  IT WOULD HAVE INCREASED.

15           MS. DERMODY:  SO LET'S TALK ABOUT THE TRIAL.

16           THE COURT:  LET'S TALK ABOUT THE NINTH CIRCUIT.  YOU

17   DON'T THINK, EN BANC, THERE WOULD HAVE BEEN A GOOD -- EN

18   BANC -- THERE WOULD HAVE BEEN A GOOD POSSIBILITY THAT THE CLASS

19   CERT ORDER WOULD HAVE BEEN AFFIRMED?

20           MS. DERMODY:  I THINK IT'S A POSSIBILITY.

21       AND THEN WHAT ARE YOUR ODDS IN THE SUPREME COURT, YOUR

22   HONOR?

23           THE COURT:  WELL, I THINK IF YOU WANT TO DO AN ORDER

24   THAT RESTRICTS CLASS ACTIONS, I DON'T KNOW IF THIS IS THE

25   POSTER CHILD FOR DOING THAT.

1       WHAT DO YOU THINK?  DO YOU THINK THE SUPREME COURT WOULD

2   HAVE WANTED TO DO IT IN THIS CASE?  YOU DON'T THINK PERHAPS

3   THERE MIGHT HAVE BEEN A LEGISLATIVE FIX?  THIS WOULD HAVE BEEN

4   LIKE A LILLY LEDBETTER SITUATION WHERE THERE MAY HAVE BEEN A

5   LEGISLATIVE RESPONSE?

6       I MEAN, I JUST DON'T THINK THAT THIS IS THE -- IF THERE

7   WERE GOING TO BE A GOOD CASE FOR FURTHER RESTRICTING CLASS

8   ACTIONS, I'M NOT SURE THIS IS THE ONE.

9           MS. DERMODY:  IT SOUNDS -- WHAT YOU'RE SAYING, YOUR

10  HONOR, SOUNDS LIKE CONVERSATIONS THAT ME AND MY PARTNERS HAVE

11  AROUND THE CONFERENCE ROOM TABLE ABOUT CASES ALL THE TIME,

12  INCLUDING THIS CASE, AND WHY IT'S SO HARD, WITH A CASE LIKE

13  THIS, TO KNOW WHAT'S THE RIGHT THING TO DO FOR A BUNCH OF

14  ABSENT CLASS MEMBERS WHOSE RIGHTS YOU HOLD IN YOUR HAND BY YOUR

15  NEGOTIATION.

16      AND WHEN YOU HAVE A CASE WHERE YOU CAN RECOGNIZE THAT

17  THERE IS A RISK, YOU HAVE TO TAKE THAT RISK SERIOUSLY.  EVEN IF

18  YOU THINK YOU HAVE A GREAT CASE AND IT'S THE MOST WONDERFUL

19  CASE, YOU HAVE TO AT LEAST ACKNOWLEDGE THAT THE RISK EXISTS.

20      THAT'S ONLY ONE RISK.  IT IS A RISK.  IT MAY NOT BE EVEN

21  THE RISK THAT WE THOUGHT WAS THE GREATEST RISK.

22      I THINK YOUR HONOR MAY HAVE ASSUMED MORE THAN WE DID ABOUT

23  THE LACK OF RISK AT TRIAL, AND WE HAVE DONE JURY TESTING, AS I

24  KNOW THE DEFENDANTS HAVE DONE JURY TESTING -- AS ANYONE I'M

25  SURE THAT COMES BEFORE YOUR HONOR DOES IN A COMPLEX LITIGATION

1    IN THIS COURT -- TO FIND OUT WHAT JURORS THINK ABOUT THIS

2    EVIDENCE, WHAT JURORS THINK ABOUT THESE CLASS MEMBERS, WHAT

3    JURORS THINK ABOUT CERTAIN THEMES THAT ARE IN THIS CASE.

4         AND YOU HAVE TO BE SOBERED WHEN YOU DO THAT KIND OF

5    TESTING TO UNDERSTAND THAT WHILE YOU MIGHT HAVE GREAT EVIDENCE,

6    YOU HAVE TO OVERCOME A NUMBER OF HURDLES.

7         IN THIS CASE, AS THE COURT WELL KNOWS, WE HAD SEVERAL.  WE

8    HAVE JURORS HAVE TO FIND UNANIMOUSLY THERE WAS AN OVERARCHING

9    CONSPIRACY AMONG ALL SEVEN COMPANIES; WE HAVE JURORS HAVE TO

10   FIND THAT THERE WAS IMPACT UNANIMOUSLY; AND JURORS HAVE TO COME

11   UP WITH A DAMAGES FIGURE THAT'S GOING TO RIVAL WHAT WE'VE

12   SECURED HERE, THAT IS, A SUM CERTAIN.

13        AND WHEN WE EXPLORE ALL OF THOSE THINGS, THOSE ARE VERY,

14   VERY REAL RISKS FOR PLAINTIFFS, VERY REAL RISKS.

15        AND THE PROBLEM FOR US, AS WE LOOK AT WHAT'S HAPPENED IN

16   OTHER ANTITRUST TRIALS IN THE LAST DECADE, IS THAT IT'S VERY,

17   VERY TOUGH.

18             THE COURT:  LET ME ASK YOU A QUESTION.  IN YOUR

19   PAPERS, YOU SAY AT LEAST TWICE, OR AT LEAST ONCE, THAT IF ONE

20   OF THE SEVEN DEFENDANTS WAS FOUND NOT TO HAVE PARTICIPATED IN

21   AN OVERARCHING CONSPIRACY, THE DAMAGES WOULD HAVE BEEN ZERO.

22   DO YOU REALLY THINK THAT'S THE CASE?  IT WOULD HAVE BEEN ZERO?

23             MS. DERMODY:  IF THE -- THAT'S NOT OUR POSITION.  I'M

24   SAYING WHAT WE KNOW THE DEFENDANTS WOULD ARGUE, AND WE WOULD

25   HAVE TO PRESENT OUR POSITIONS AGAINST THAT.  WE WOULD DISAGREE

1    WITH THAT.

2         BUT THEY WOULD HAVE ARGUMENTS ABOUT THAT BECAUSE OUR

3    THEORY OF THE CASE IS OVERARCHING CONSPIRACY.  OUR DAMAGES

4    MODEL REFLECTS AN OVERARCHING CONSPIRACY.

5         THE DEFENDANTS WOULD MAKE ARGUMENTS THAT WE HAVE TO

6    CREDIT, YOUR HONOR.

7         I UNDERSTAND THE COURT'S SKEPTICISM BECAUSE THE COURT

8    KNOWS, AS WE KNOW, WHAT WE'VE UNCOVERED IN THIS CASE.

9         THE COURT:  I'VE LOOKED AT -- THROUGH ALL THOSE

10   SEALING REQUESTS, I'VE LOOKED AT MUCH OF THESE DOCUMENTS

11   MYSELF, ALL THE E-MAILS, ALL OF THE REPORTS.

12        SO I'M ASKING YOU, HAVING GONE THROUGH A LOT OF THOSE

13   SEALING REQUESTS, WHICH WAS NOT VERY MUCH FUN, AND KNOWING WHAT

14   A LOT OF THE DOCUMENTS ARE IN THIS CASE, YOU REALLY THINK THE

15   DAMAGES WOULD HAVE BEEN ZERO IF THIS HAD GONE TO TRIAL?

16        I MEAN, I JUST FEEL LIKE THAT IS SUCH A STRETCH.

17        MS. DERMODY:  WHAT I'M SAYING TO YOU, YOUR HONOR --

18        THE COURT:  YEAH.

19        MS. DERMODY:  -- IS THAT THERE IS A RISK.

20        THE COURT:  UM-HUM.

21        MS. DERMODY:  THERE IS A RISK.  THERE'S A RISK THAT A

22   JURY MIGHT FIND THAT THERE WAS NO OVERARCHING CONSPIRACY, AND

23   YET, THEY MIGHT THINK THERE WAS AN IMPACT.

24        A JURY MIGHT FIND THAT THERE WAS AN OVERARCHING CONSPIRACY

25   AND NO IMPACT BECAUSE THE JURY MIGHT CONCLUDE THAT THESE

1    WORKERS ARE AMONG THE MOST DESIRABLE IN THE WORLD AND THEY HAD

2    PLENTY OF OTHER OPPORTUNITY TO GO OTHER PLACES BESIDES THESE

3    SEVEN COMPANIES.  JURORS MIGHT CONCLUDE THAT.

4         JURORS MIGHT SAY THERE WAS AN OVERARCHING CONSPIRACY AND

5    THERE WAS SOME IMPACT, BUT WE DON'T LIKE PLAINTIFFS' DAMAGES

6    MODEL, THAT WE ACTUALLY LISTENED TO WHAT THE DEFENDANTS'

7    EXPERTS, SIX ECONOMISTS, ARE GOING TO SAY, AND WE THINK THAT IT

8    WASN'T $3 BILLION.  WE THINK IT WAS LESS THAN $1 BILLION.  WE

9    THINK IT WAS SOME SMALL FRACTION.

10        THE COURT:  WELL THEN, WHY DIDN'T YOU ALL PROPOSE,

11   THEN, A BETTER, MORE ACCURATE, MORE PERSUASIVE DAMAGES MODEL?

12        I MEAN, YOU'RE ALMOST NOW A VICTIM OF YOUR OWN SUCCESS.

13   YOU'RE THE ONES THAT PUT OUT THE 3 BILLION NUMBER.  THAT'S WHAT

14   HAS GOTTEN EVERYONE'S EXPECTATIONS SO HIGH.  IF YOU ALL HAD NOT

15   BEEN SO AGGRESSIVE WITH YOUR DAMAGES MODEL AND THEORY, PERHAPS

16   WE WOULDN'T BE IN THIS SITUATION, RIGHT?  YOU ARE THE ONES WHO

17   HAVE CREATED THE VERY HIGH EXPECTATIONS OF THIS CLASS.

18        MS. DERMODY:  WELL, I THINK THAT'S INTERESTING

19   FEEDBACK, YOUR HONOR.

20        WE PUT TOGETHER THE MODEL THAT OUR EXPERT, INDEPENDENTLY,

21   DECIDED WAS THE MODEL TO REFLECT WHAT OUR EXPERT BELIEVED TO BE

22   THE BUT FOR WORLD IF THESE AGREEMENTS HAD NOT EXISTED.  THAT

23   WAS OUR EXPERT'S POINT OF VIEW.  FULL STOP.

24        WE HAVE TO ACKNOWLEDGE THE RISK THAT A JURY, HEARING A

25   WHOLE BUNCH OF DIFFERENT EXPERTS, EVEN AS WE THINK WE HAVE THE

1    BEST ONE, MIGHT COME TO A DIFFERENT PERSPECTIVE.

2         AND WHILE I WOULD LOVE IT IF I WAS TRYING THIS CASE TO

3    "THE NEW YORK TIMES" EDITORIAL BOARD, THE FACT OF THE MATTER

4    IS, WE WOULD BE TRYING THIS CASE TO THE JURORS THAT ARE HERE

5    AND WE HAVE TO DEAL WITH THE REALITY THAT THOSE JURORS MIGHT

6    NOT SEE IT THE WAY WE SEE IT, OR EVEN HOW YOUR HONOR HAS SEEN

7    THE EVIDENCE.  THAT IS JUST A REALITY.

8         SO WHEN WE LOOK AT THOSE THINGS AND WE UNDERSTAND THAT

9    THERE IS SOME RISK AT EACH STEP OF THE WAY THAT WE'RE NOT GOING

10   TO EITHER PREVAIL, OR IF WE PREVAIL, NOT GET THAT AMOUNT OF

11   MONEY, AND WE HAVE IN HAND $324 AND A HALF MILLION ON TOP OF 20

12   MILLION WE'VE ALREADY RECOVERED, AND WE CAN LOOK AT OTHER CASES

13   THAT HAVE BEEN TRIED IN THIS DISTRICT RECENTLY WHERE PEOPLE GOT

14   LESS THAN WHAT WE'RE GETTING AS A PERCENTAGE OF EXPOSURE --

15        THE COURT:  OKAY.  BUT THAT -- YOU KNOW, UNLESS YOU

16   SHOW ME THE DOCUMENTS IN THOSE LCD-TFD CASES, I JUST DON'T

17   THINK THAT'S USEFUL.  THAT'S NOT USEFUL.  THAT'S A TOTALLY

18   DIFFERENT CASE.

19        MS. DERMODY:  BUT THERE WERE 14 GUILTY PLEAS IN THAT

20   CASE.

21        WE HAD NO GUILTY PLEAS HERE.  IN SOME WAYS THAT CASE WAS

22   MUCH MORE COMPELLING ON THE EVIDENCE.

23        I MEAN, THEY'RE APPLES AND ORANGES IN SO MANY RESPECTS,

24   YOUR HONOR.

25        BUT I JUST WANT TO SAY THAT --

1        THE COURT:  DO YOU REALLY THINK THAT PRICE FIXING ON

2   TV'S IS MORE COMPELLING THAN THE FACTS OF THIS CASE?

3        MS. DERMODY:  WELL, I WILL USE A DIFFERENT CASE THAT,

4   AT LEAST FOR ME, COMPETES WITH THIS ONE FOR BEING COMPELLING,

5   AND THAT'S THE ABBOTT CASE, THE SMITHKLINE BEECHAM CASE THAT

6   WAS BEFORE JUDGE WILKEN THAT WAS A DRUG PRICE FIXING CASE FOR

7   AN AIDS DRUG, AND IN THAT CASE YOU HAVE A HISTORY OF ALLEGED

8   PRACTICE OF PEOPLE ELEVATING --

9        THE COURT:  WELL, I STILL DON'T THINK --

10        MS. DERMODY:  -- THE PRICE OF AN AIDS DRUG.  THE JURY

11   GOT --

12        THE COURT:  UNLESS YOU'RE GOING TO GIVE ME ALL THE

13   DOCUMENTATION SO I CAN FAMILIARIZE MYSELF WITH THE FACTS OF

14   THOSE CASES, I JUST DON'T THINK RANDOMLY PULLING OUT OTHER

15   VERDICTS OF OTHER CASES IS REALLY USEFUL.

16        MS. DERMODY:  OKAY, YOUR HONOR.  I MEAN, IF THERE'S

17   SOMETHING THAT WE COULD SUBMIT TO YOUR HONOR THAT WOULD BE MORE

18   HELPFUL, I WOULD BE REALLY MORE THAN HAPPY TO DO IT.

19        I THINK WHAT WE'RE STRUGGLING WITH IS THAT THE STANDARD

20   HERE IS NOT, YOU KNOW, WHAT MIGHT BE THE BEST POSSIBLE

21   SCENARIO.

22        THE STANDARD HERE IS SORT OF THE RANGE OF REASONABLENESS

23   BASED ON THE RISK IN THIS CASE.  AND FROM OUR PERSPECTIVE, AS

24   PEOPLE THAT LIVED AND BREATHED AND SWEATED AND SACRIFICED FOR

25   THIS CASE, AND JUST 100 PERCENT DID EVERYTHING WE COULD FOR

1    THESE CLASS MEMBERS -- I MEAN, HONESTLY, YOUR HONOR, WE HAVE

2    DONE EVERYTHING WE COULD TO DO THIS CASE RIGHT -- WE BELIEVE

3    THAT THIS IS THE RIGHT THING TO DO FOR THE CLASS.

4        WE THINK IT WOULD BE ABSOLUTELY UNETHICAL FOR US TO SEE

5    THAT THERE WAS THIS MUCH MONEY AVAILABLE FOR THE CLASS ON THESE

6    CLAIMS AND TO IGNORE THAT AND GO TO TRIAL KNOWING THAT THERE

7    MIGHT BE A VERY STRONG RISK THAT THE CLASS GETS NOTHING.

8        THAT DID NOT SEEM AT ALL TENABLE TO US, YOUR HONOR, AND WE

9    JUST HAVE PROVIDED THE COURT VARIOUS BENCHMARKS WE THOUGHT

10   WOULD BE USEFUL TO SEE THAT THIS RISK IS SOMETHING THAT OTHER

11   GOOD LAWYERS, OTHER EXPERIENCED LAWYERS HAVE COME TO SIMILAR

12   RISK CALCULATIONS.

13       I MEAN, ONE OF THE MOST INTERESTING COMPARISONS, PERHAPS

14   TO US ONLY, IS WHAT WE PUT FORWARD IN THAT --

15           THE COURT:  WASN'T THE LCD-TFT YOUR CASE?  WASN'T

16   THAT LEIFF CABRASER?

17           MS. DERMODY:  IT WAS OUR CASE.

18           THE COURT:  OKAY.  WHICH ONE, THE TOSHIBA OR BEST BUY

19   VERSUS HANNSTAR --

20           MS. DERMODY:  TOSHIBA.  WE TRIED THAT CASE, YOUR

21   HONOR.

22           THE COURT:  UM-HUM.

23           MS. DERMODY:  AND IN EXHIBIT A TO OUR REPLY BRIEF, WE

24   PUT FORWARD ALL OF THE ANTITRUST EMPLOYEE CLASS ACTIONS THAT WE

25   COULD FIND, AND WE PUT FORWARD WHAT WE UNDERSTAND TO BE THE

1      RESULTS IN THOSE CASES SO YOUR HONOR CAN SEE THEM.

2          AND I THINK WHAT IS INTERESTING IS TO LOOK AT EVEN THE

3      EBAY CASE, WHICH THE CALIFORNIA ATTORNEY GENERAL'S OFFICE

4      PROSECUTED, SOME OF THE BEST LAWYERS IN THE STATE ARE IN THAT

5      OFFICE, REALLY SMART, TALENTED PEOPLE, AND THE RECOVERY IN THAT

6      CASE WAS 1/23RD OF WHAT WE GOT HERE, AND THIS IS 20 -- I SHOULD

7      SAY THIS IS 23 TIMES WHAT THEY GOT THERE.

8          THESE --

9          THE COURT:  WELL, UNLESS YOU'RE GOING TO SHOW ME THE

10     DOCUMENTS IN THAT CASE -- I DON'T BELIEVE THERE WAS CLASS CERT

11     IN THAT CASE.  I DON'T BELIEVE THERE WAS SUMMARY JUDGMENT IN

12     THAT CASE.  I DON'T THINK IT HAD GONE THROUGH THE DAUBERT

13     MOTIONS IN THAT CASE.

14         BUT REGARDLESS, I DON'T FIND IT VERY HELPFUL, UNLESS

15     YOU'RE REALLY GOING TO GIVE ME DEEP INFORMATION ABOUT THOSE

16     CASES, TO SAY, "ALL OF THESE OTHER CASES, BECAUSE I'VE SLAPPED

17     ANTITRUST LABELS ON THEM, ARE COMPARABLE TO THIS."

18         BECAUSE IF WE'RE JUST GOING TO TALK ABOUT RANDOM TRIALS, I

19     CAN DO THAT, TOO.  I JUST DON'T THINK -- UNLESS WE GO DEEPLY

20     INTO WHAT THE FACTS ARE TO REALLY SEE IF IT'S COMPARABLE OR

21     NOT, IT'S TOO GENERAL, I THINK.

22         MS. DERMODY:  OKAY, YOUR HONOR.  WHAT WOULD BE

23     HELPFUL TO THE COURT?

24         THE COURT:  SO EXPLAIN TO ME -- I MEAN, YOUR POSITION

25     APPEARS TO BE THAT IF ONE DEFENDANT WAS NOT FOUND TO HAVE

1    PARTICIPATED IN THE OVERARCHING CONSPIRACY, THEN DAMAGES WOULD

2    HAVE BEEN ZERO AND THE CLASS WOULD HAVE GOTTEN NOTHING.

3         BUT I DON'T THINK THAT'S TRUE.  YOU ALSO WOULD HAVE THE

4    LEVERAGE TO APPEAL OR, YOU KNOW, THERE WOULD HAVE BEEN ANOTHER

5    SETTLEMENT.  IT JUST WOULD HAVE BEEN LATER IN THE PROCESS.

6         MS. DERMODY:  SO --

7         THE COURT:  AND YOUR LEVERAGE -- ANYWAY, I JUST HAVE

8    CONCERNS ABOUT WHETHER THIS IS REALLY FAIR TO THE CLASS, AND I

9    HAVEN'T MADE A DECISION YET ABOUT WHAT I'M GOING TO DO.  I'D

10   LIKE TO THINK ABOUT IT FURTHER.

11        BUT I DO HAVE A CONCERN ABOUT WHETHER THIS IS A SUFFICIENT

12   RECOVERY FOR THE CLASS.  I -- YOU KNOW, I AM NOT AT ALL SAYING

13   THAT THE PLAINTIFFS HAVEN'T BEEN ZEALOUS ADVOCATES IN DOING

14   EVERYTHING POSSIBLE FOR THE CLASS, BUT I JUST DO HAVE A

15   QUESTION AND I NEED TO THINK ABOUT IT FURTHER.

16        MS. DERMODY:  OKAY, YOUR HONOR.

17        THE COURT:  SO IF THERE'S NOTHING MORE THAT YOU WANT

18   TO SAY?

19        NOW, YOU'RE GOING FOR $81 MILLION.  WHAT'S YOUR LODESTAR,

20   AND WHY SHOULD THAT GO TO YOU INSTEAD OF THE CLASS?

21        MS. DERMODY:  YOUR HONOR, ALL WE'VE SAID IS TO NOTICE

22   THE CLASS THAT WE MIGHT REQUEST UP TO THAT.  LAST TIME WE

23   NOTICED THE CLASS AND WE REQUESTED LESS THAN WHAT WE NOTICED.

24        IT'S THE BENCHMARK IN THE NINTH CIRCUIT.  WE WOULD THINK

25   IT WOULD BE WARRANTED HERE GIVEN THE WORK IN THIS CASE.

```
 1          THE COURT:  WHAT'S YOUR LODESTAR?  BECAUSE FROM THE

 2    FIRST SETTLEMENT, IT LOOKED LIKE LEIFF CABRASER'S WAS, WHAT,

 3    ABOUT 8 MILLION THROUGH OCTOBER OF, YOU KNOW, OCTOBER 30TH OF

 4    2013, 8.4 MILLION.

 5         SO WHAT'S THE LODESTAR IF YOU ADD UP ALL THE DIFFERENT LAW

 6    FIRMS THAT ARE INVOLVED IN THIS LITIGATION?

 7          MS. DERMODY:  I DON'T HAVE THAT INFORMATION FOR YOUR

 8    HONOR.  I'M SORRY.

 9          THE COURT:  ALL RIGHT.  SO FOR THE FIRST SETTLEMENT,

10    NOBODY LOOKED AT THAT FOR THE SETTLEMENT WITH LUCAS FILM,

11    PIXAR, AND INTUIT?

12          MS. DERMODY:  I JUST DON'T HAVE THE NUMBERS HANDY FOR

13    YOUR HONOR.  I'M SORRY.  I DON'T WANT TO MISLEAD THE COURT.

14          THE COURT:  OKAY.  WELL, YOU KNOW, MR. SAVERI SAID

15    THAT HE WOULD FILE HIS FEES DOCUMENTS FOR THE FIRST SETTLEMENT.

16    I DON'T BELIEVE I GOT THAT.

17         WHAT ARE YOUR LAW FIRM'S -- WHAT'S YOUR LAW FIRM'S --

18          MR. SAVERI:  AS OF THE TIME OF THAT, OF THE PRIOR

19    SETTLEMENT, MY FIRM'S LODESTAR WAS APPROXIMATELY $4 MILLION.

20          THE COURT:  OKAY.  SO -- AND I BELIEVE THAT

21    SETTLEMENT WAS REACHED IN, WHAT, APRIL OF 2013?  IS THAT

22    SOMEWHERE AROUND THERE?  OR, NO, WHEN WAS THAT?  SEPTEMBER?

23          MS. DERMODY:  IT WAS APPROVED IN OCTOBER, YOUR HONOR.

24          THE COURT:  RIGHT.  BUT I -- I GUESS I'M TRYING TO

25    FIGURE OUT, YOU'RE SAYING UP TO THE POINT OF SETTLEMENT, SO
```

1        WHAT LINE ARE YOU DRAWING HERE?  WHAT'S THE DATE,

2        APPROXIMATELY?

3                    MR. SAVERI:  I BELIEVE IT WAS OCTOBER OF LAST YEAR.

4                    THE COURT:  OKAY.  SO THROUGH -- ALSO THROUGH SOME

5        POINT IN OCTOBER?

6                    MR. SAVERI:  YEAH.

7                    THE COURT:  OKAY.

8                    MR. SAVERI:  AND, YOUR HONOR, SINCE THAT POINT IN

9        TIME, I MEAN, WE DID A LOT OF ADDITIONAL WORK IN THE CASE.

10                   THE COURT:  SURE.

11                   MR. SAVERI:  THE LIEFF CABRASER FOLKS DID A LOT OF

12       WORK.

13                   THE COURT:  SURE.

14                   MR. SAVERI:  MY OFFICE DID.  SO THERE'S ADDITIONAL

15       LODESTAR.  I JUST WANT TO BE --

16                   THE COURT:  YES, I COMPLETELY UNDERSTAND THAT.

17            BUT YOU HAVE NO IDEA WITH REGARD TO -- I BELIEVE THERE

18       ARE, WHAT, AT LEAST THREE OTHER LAW FIRMS?

19                   MS. DERMODY:  TWO OTHER FIRMS, YOUR HONOR.

20                   THE COURT:  TWO OTHER FIRMS.

21                   MR. SAVERI:  I THINK IT'S FAIR TO SAY THAT BETWEEN

22       THE TWO OF US, WE HAVE THE GREAT MAJORITY OF THE TIME IN THIS

23       CASE.

24                   THE COURT:  SURE, SURE.

25                   MR. SAVERI:  I MEAN, AND THAT'S CONSISTENT WITH WHAT

1    YOU'VE SEEN IN THE CASE.

2            MS. DERMODY:  YEAH.  WE CAN GET THE ACTUAL NUMBER.

3    WE HAVE THEIRS.

4            THE COURT:  OKAY.  THE SETTLEMENT AGREEMENT SAYS THE

5    DEFENDANTS TAKE NO POSITION ON THE SERVICE AWARDS IF THE AWARDS

6    ARE $25,000 OR LESS.

7        NOW, THE PROPOSED SERVICE AWARDS ARE 80,000.  DOES THAT

8    MEAN THE DEFENDANTS ARE GOING TO TAKE A POSITION?  OR YOU'RE

9    GOING TO REMAIN SILENT?

10           MR. VAN NEST:  WE'RE GOING TO REMAIN SILENT, YOUR

11   HONOR.

12           THE COURT:  OKAY.

13           MR. VAN NEST:  THAT'S UP TO YOUR HONOR'S DISCRETION.

14           THE COURT:  OKAY.

15           MR. VAN NEST:  I WOULD LIKE TO COMMENT ON THE

16   SETTLEMENT OVERALL WHEN YOUR HONOR GETS TO US THOUGH.

17           THE COURT:  ACTUALLY, WHY DON'T WE GO AHEAD AND DO

18   THAT NOW?  I HAVE SOME OTHER MORE MECHANICAL QUESTIONS ABOUT

19   THE SETTLEMENT.  THOSE CAN WAIT.

20           MR. VAN NEST:  SURE.

21           THE COURT:  SO -- YEAH.

22           MR. VAN NEST:  JUST A COUPLE OF QUICK POINTS.

23           THE COURT:  YES.

24           MR. VAN NEST:  I THINK YOUR HONOR STARTED WITH THE

25   PREMISE SOMEHOW THAT THE SETTLING DEFENDANTS HERE ARE PAYING A

1    HIGHER PERCENTAGE THAN THE EARLIER -- A LOWER PERCENTAGE.

2         WE DON'T LOOK AT IT THAT WAY AT ALL.

3              THE COURT:  OKAY.

4              MR. VAN NEST:  AS A MATTER OF FACT, WE THINK WE'RE

5    PAYING A PREMIUM IN THAT IF YOU LOOK AT THE SETTLEMENTS THAT

6    YOU'VE ALREADY APPROVED, YOU APPROVED $20 MILLION SETTLEMENTS.

7    THAT'S ABOUT 8 PERCENT OF THE CLASS.

8         I MEAN, IF YOU DO THE MATH, OUR SETTLEMENT SHOULD HAVE

9    BEEN BELOW $300 MILLION.  I MEAN, IF IT'S JUST COMPARABLE, IF

10   WE'RE JUST PAYING WHAT, THE SAME BASIS THAT THAT 20 MILLION

11   PAID, WE WOULD HAVE BEEN IN THE 250 TO 270 TO 280 RANGE.

12        AND BELIEVE ME, AS I THINK YOU KNOW --

13             THE COURT:  HOW ARE YOU CALCULATING THAT?

14             MR. VAN NEST:  OH, IF YOU JUST -- IF 8 PERCENT OF THE

15   CLASS IS WORTH 20 MILLION, WHAT'S THE OTHER 92 PERCENT WORTH?

16        IT'S NOT 324 MILLION.  IT'S A NUMBER SOUTH OF 300.

17        SO OUR POINT IS, AND WE MADE IT REPEATEDLY IN DISCUSSIONS

18   WITH PLAINTIFFS, THAT, YOU KNOW, WE'RE PAYING MORE -- AT THE

19   NUMBERS WE'RE NEGOTIATING NOW, WE'RE PAYING MORE THAN THE FOLKS

20   THAT SETTLED OUT EARLIER, AND IN OUR SITUATION, WE FELT THAT

21   THE BIGGEST RISK IN THIS CASE WAS THE TRIAL ITSELF.

22        AND IF I COULD MAKE JUST A COUPLE OF POINTS ABOUT THIS

23   TRIAL, YOUR HONOR, THAT I THINK ARE SIGNIFICANT?

24             THE COURT:  OKAY.

25             MR. VAN NEST:  IT IS TRUE THAT DR. LEAMER BASED HIS

1    DAMAGE MODEL ON AN ALL-IN APPROACH.  IT WAS ALL SEVEN

2    DEFENDANTS PARTICIPATING.  IF YOU TOOK OUT ONE OR MORE

3    DEFENDANTS, HIS MODEL FELL APART AND IN SOME CASES SHOWED THAT

4    SOME DEFENDANTS HAD OVERCOMPENSATED PEOPLE.

5         IN OTHER WORDS, HIS MODEL ONLY WORKED -- AND HE CONCEDED

6    THIS, WE'D BE HAPPY TO SUBMIT A SHORT BRIEF ON IT -- HE

7    CONCEDED THAT HIS MODEL WOULDN'T WORK IF NOT ALL DEFENDANTS

8    WERE FOUND TO BE PARTICIPANTS.

9         NOW, YOUR HONOR RECOGNIZES, AND COUNSEL SAID IT IN HER

10   BRIEF, THAT OBVIOUSLY THESE BILATERAL AGREEMENTS WERE ENTERED

11   INTO OVER A WIDE PERIOD OF TIME, SOME IN DIFFERENT INDUSTRIES,

12   AND SO ONE OF THE BIG RISKS IN THE TRIAL WAS THAT ONE DEFENDANT

13   WOULD BE OUT.

14             THE COURT:  YES.

15             MR. VAN NEST:  THE OTHER BIG RISK --

16             THE COURT:  OKAY.  BUT LET'S PLAY THAT OUT.  SO WHAT

17   WOULD HAVE HAPPENED?  YOU DON'T THINK THE JURORS, ONE

18   POSSIBILITY COULD HAVE BEEN TO TAKE OUT OF DR. LEAMER'S DAMAGES

19   MODEL, OR SOME PERCENTAGE OF THAT MODEL, TAKE OUT THAT

20   PERCENTAGE OF THAT DEFENDANT'S EMPLOYEES?  OR YOU'RE SAYING

21   THAT -- YOU'RE SAYING THE JURY COULD HAVE COME UP WITH NOTHING?

22             MR. VAN NEST:  YEAH.

23             THE COURT:  IF THEY DIDN'T ACCEPT IT WHOLE HOG, THEY

24   WOULD COME UP WITH ZERO?

25             MR. VAN NEST:  TWO THINGS.

1    THE COURT:  IS THAT -- I JUST WANT TO KNOW --

2    MR. VAN NEST:  YEAH.

3    THE COURT:  -- WHAT ARE YOU SAYING?

4    MR. VAN NEST:  ABSOLUTELY.

5    THE COURT:  IF THE JURY FOUND THAT ONE, THEY WOULD GO

6    WITH ZERO?  BECAUSE I -- I FIND THAT A LITTLE BIT DIFFICULT TO

7    BELIEVE.

8    MR. VAN NEST:  I DON'T.

9    THE COURT:  YOU THINK THAT THE JURY WOULD COME UP

10   WITH ZERO?

11   MR. VAN NEST:  BUT HERE'S THE POINT.  THEY HAD AN

12   EXPERT REPORT THAT WAS ONE FLAVOR.

13   THE COURT:  UM-HUM.

14   MR. VAN NEST:  ALL SEVEN IN, HERE'S THE NUMBER.

15   THE COURT:  UM-HUM.

16   MR. VAN NEST:  DR. LEAMER CONCEDED, IN DEPOSITION,

17   "IF YOU TAKE ONE DEFENDANT OUT, MY MODEL DOESN'T WORK."

18   THEY THEN -- WE THEN WOULD BE ARGUING TO YOUR HONOR, UNDER

19   COMCAST AND ALL THE RECENT SUPREME COURT CASES, THAT THEY DON'T

20   HAVE A DAMAGE MODEL TO GIVE TO THE JURY TO PRODUCE ANYTHING

21   OTHER THAN SPECULATION.

22   THE COURT:  UM-HUM.

23   MR. VAN NEST:  SO DO I THINK I HAD A CHANCE TO

24   PERSUADE THE JURY, GIVEN THAT, THAT THEY SHOULDN'T AWARD

25   DAMAGES BECAUSE THERE WASN'T A BASIS?  YOU BET I DO.

1          BUT I THINK EVEN IF I HADN'T --

2              THE COURT:  YOU WOULD HAVE A JMOL MOTION?

3              MR. VAN NEST:  I WOULD HAVE A GOOD MOTION UNDER

4     COMCAST.

5          NOW, I DON'T, FRANKLY, THINK THAT THAT'S THE BIGGEST RISK.

6              THE COURT:  YEAH.

7              MR. VAN NEST:  I'LL TELL YOU, I THINK THE BIGGEST

8     RISK IN THIS CASE --

9              THE COURT:  YEAH.

10             MR. VAN NEST:  -- IS THAT THEY HAD A HUGE NUMBER,

11    $3 BILLION, AND THE FACTS ON THE GROUND WERE THAT TECH

12    EMPLOYEES IN THE CLASS WERE PAID WAY ABOVE BOTH THE NATIONAL

13    AND THE REGIONAL AVERAGE, AND THEIR PAY WENT UP, NOT BY A

14    LITTLE, BUT EVERY YEAR IT WENT UP BY MORE THAN IT HAD EITHER

15    BEFORE OR AFTER THE CLASS PERIOD.

16         SO THERE'S A VERY STRONG ARGUMENT THAT THAT $3 BILLION

17    NUMBER EVERYBODY IS TALKING ABOUT WAS ABSOLUTELY INCONSISTENT

18    WITH THE FACTS ON THE GROUND.

19         AND WHY DO YOU THINK THAT HE COULD HAVE --

20             THE COURT:  BUT YOU'RE COMPARING THEM, WHAT, LIKE THE

21    PLAINTIFFS JUST TO THE AVERAGE INCOME IN SANTA CLARA COUNTY?

22             MR. VAN NEST:  NO, NO, NO, NO.

23             THE COURT:  BECAUSE THAT'S WHAT THEY DO IN THEIR

24    REPLY BRIEF.

25             MR. VAN NEST:  THEY DO.

```
 1              THE COURT:  THEY JUST SAY, WELL, SANTA CLARA COUNTY,
 2      AVERAGE INCOME IS THIS; THEREFORE, THERE WOULD HAVE BEEN A LOT
 3      OF RESENTMENT THAT THESE ARE TECH WORK WORKERS THAT ARE MAKING
 4      MORE THAN THE AVERAGE INCOME.
 5              MR. VAN NEST:  WHAT WE SAID IN OUR DAUBERT --
 6              THE COURT:  YEAH.
 7              MR. VAN NEST:  -- WAS THAT THEY ARE ABOVE THE
 8      NATIONAL AND THE REGIONAL AVERAGE FOR TECH WORKERS.  IF YOU
 9      LOOK AT TECH WORKERS ON AVERAGE, IN THE NATION OR REGIONALLY
10      HERE, THESE CLASS MEMBERS WERE PAID WAY -- I'M NOT TALKING 1 OR
11      2 PERCENT -- BUT WAY ABOVE THAT AVERAGE AND THEIR PAY WENT UP.
12              THE COURT:  BUT ISN'T THIS WHERE YOU COME IF YOU ARE
13      A TOP TECH WORKER?
14              MR. VAN NEST:  SURE.
15              THE COURT:  WOULDN'T YOU BE IN SILICON VALLEY --
16              MR. VAN NEST:  ABSOLUTELY.
17              THE COURT:  -- VERSUS IN BROKEN ARROW, OKLAHOMA?
18              MR. VAN NEST:  SURE.  MY POINT IS THAT THEIR WHOLE
19      CASE WAS PREMISED ON SOMEHOW PAY BEING SUPPRESSED; AND, YET, IN
20      THE CLASS PERIOD, PAY WENT UP MORE EVERY YEAR THAN IT HAD GONE
21      UP BEFORE OR AFTER.
22              THE COURT:  BUT THE THEORY IS IT COULD HAVE GONE UP
23      EVEN MORE.
24              MR. VAN NEST:  SURE.
25              THE COURT:  AND I DON'T THINK THAT'S INCONSISTENT
```

1    WITH SAYING TECH WORKERS HERE MAKE MORE THAN TECH WORKERS IN

2    ALABAMA, MAINE, WHEREVER YOU WANT TO TALK ABOUT IT, AND THAT

3    THEIR SALARIES COULD HAVE BEEN EVEN HIGHER.

4            MR. VAN NEST:  BUT YOU AND I --

5            THE COURT:  I JUST DON'T THINK THAT'S INCONSISTENT.

6            MR. VAN NEST:  BUT HOW MUCH DO YOU WANT TO GAMBLE ON

7    THAT?  I MEAN, THERE HAVE BEEN A LOT OF BILLION DOLLAR CLAIMS

8    MADE IN OUR DISTRICT --

9            THE COURT:  WELL, HOW MUCH DID YOU ALL WANT TO GAMBLE

10   WITH ALL OF THAT INFORMATION COMING OUT?  HOW MUCH DID YOU ALL

11   WANT TO GO TO TRIAL ON THIS?

12           MR. VAN NEST:  WE BELIEVE --

13           THE COURT:  I MEAN, YOU'VE SEEN HOW OUR JURY POOLS

14   ARE HERE IN SAN JOSE.  I THINK THEY WOULD HAVE FOUND THESE

15   DOCUMENTS VERY SIGNIFICANT AND PRETTY COMPELLING.

16           MR. VAN NEST:  I'M NOT DISAGREEING WITH THAT.

17           THE COURT:  THEY WOULD HAVE FOUND A LOT OF THE

18   TESTIMONY VERY COMPELLING.  THEY WOULD HAVE FOUND A LOT OF THE

19   E-MAILS VERY COMPELLING.

20       HOW MUCH -- YOU KNOW, I UNDERSTAND WE'RE ALL FOCUSED ON

21   HOW MUCH THE PLAINTIFFS DIDN'T WANT TO GO TO TRIAL.

22       LET'S TALK ABOUT HOW MUCH THE DEFENDANTS DIDN'T WANT TO GO

23   TO TRIAL.  HOW MUCH WAS THAT WORTH?

24           MR. VAN NEST:  YOU CAN PRICE IT.

25           THE COURT:  HOW COME YOU'RE NOT REALLY FOCUSSING ON

1    THAT?

2              MR. VAN NEST:  WE PRICED IT.  IT'S $324.5 MILLION.

3         IN OTHER WORDS, GIVEN ALL THE RISKS AND GIVEN MONTHS OF

4    WORK WITH JUDGE PHILLIPS, THAT'S WHAT WE -- THAT'S WHAT WE

5    CONCLUDED.

6              THE COURT:  IT'S NOT JUST FINANCIAL RISKS.  IT'S

7    OTHER DAMAGE THAT YOUR COMPANIES WOULD GET IN TRYING TO RECRUIT

8    OTHER EMPLOYEES AND WHAT THAT WOULD DO TO YOUR IMAGE, TO YOUR

9    GOOD WILL.  I MEAN, IT WOULD HAVE HAD A LOT OF COST OTHER THAN

10   JUST STRICTLY MONETARY.

11             MR. VAN NEST:  I'M NOT DENYING THAT ONE BIT.

12        BUT YOUR HONOR'S QUESTION, WHAT'S IT WORTH TO US, WE PUT

13   OUR MONEY WHERE OUR MOUTH IS, RIGHT?  WE NEGOTIATED FOR A

14   SETTLEMENT AND ACHIEVED A SETTLEMENT THAT IS FAIR AND

15   REASONABLE TO THE CLASS IN LIGHT OF ALL THE RISKS.

16        I'M JUST POINTING OUT THAT THERE ARE LOTS OF RISKS ON THE

17   PLAINTIFFS' SIDE THAT MEAN THERE'S A REAL POSSIBILITY OF EITHER

18   A LOW VERDICT OR NO VERDICT OR A VERDICT THAT DOESN'T REACH THE

19   SETTLEMENT THAT WE'VE ACHIEVED.

20        FOR EXAMPLE, FOR EXAMPLE, WE ALL KNOW THAT YOU CAN COME

21   INTO COURT WITH A BILLION DOLLAR CLAIM AND END UP WITH A LOT

22   LESS MONEY, RIGHT?  I MEAN, THAT HAPPENS ALL THE TIME.

23        AND IN THIS PARTICULAR CASE, THE FOCUS THAT YOUR HONOR

24   HAD, BECAUSE THAT'S WHAT WAS PRESENTED, WAS ON THE LIABILITY

25   SIDE, WE HAD SUMMARY JUDGMENT MOTIONS AND ALL THAT, AND A

1    LITTLE BIT ON THE DAMAGES SIDE IN THE DAUBERTS.

2        BUT THE REAL RISK IN THE CASE WAS --

3            THE COURT:  WELL, THE DAMAGES ALSO CAME UP A LOT IN

4    THE TWO CLASS CERT ISSUES -- MOTIONS, EXCUSE ME.

5            MR. VAN NEST:  TO SOME DEGREE, THEY DID.

6            THE COURT:  YEAH.

7            MR. VAN NEST:  BUT THAT'S WHERE THERE'S A HUGE RANGE

8    OF RISK, WHICH IS WHY I SAY THE NUMBER THAT WE ACHIEVED IS

9    ABSOLUTELY IN LINE, AND A LITTLE BETTER FOR THE PLAINTIFFS,

10   THAN THE NUMBER THAT WAS ACHIEVED IN THE FIRST SETTLEMENT.

11       SO GIVEN -- GIVEN THAT THAT'S 8 TO 10 PERCENT OF THE CLASS

12   THAT PAID $20 MILLION, IT IS ABSOLUTELY FAIR AND REASONABLE FOR

13   THE REST OF THE -- FOR THE DEFENDANTS EMPLOYING THE REST OF THE

14   CLASS TO PAY THE 324.5 MILLION.  IT'S IN LINE WITH IT, IT'S A

15   PREMIUM OVER IT, AND MAYBE THAT'S CONSISTENT WITH THE FACT THAT

16   THE CASE WAS A LITTLE MORE WELL DEVELOPED BY THE TIME IT GOT

17   THERE.

18       BUT I DO THINK THAT WHAT COUNSEL HAS SAID ABOUT THE RISK

19   OF A NO OR LOW VERDICT IS -- CANNOT BE IGNORED OR OVERLOOKED IN

20   THIS CASE GIVEN THE ECONOMIC FACTS ON THE GROUND, AND GIVEN

21   THAT EVEN YOUR HONOR RECOGNIZED THAT DR. LEAMER'S RESULTS AT

22   THAT T-SCORE WEREN'T STATISTICALLY SIGNIFICANT BY ANY MEASURE

23   THAT ANY ECONOMIST, MATHEMATICIAN, OR SCIENTIST HAS EVER

24   APPROVED.

25       AND ALTHOUGH THAT PASSED DAUBERT, IT MIGHT NOT PASS A JURY

1    TO HEAR THAT THIS GUY'S REPORT -- WHICH IS THE ONLY THING THAT

2    GIVES THEM A NUMBER -- WAS NOT STATISTICALLY SIGNIFICANT BY ANY

3    TRADITIONAL MEASURE OF SIGNIFICANCE IN ANY SORT OF SCIENTIFIC,

4    ACADEMIC, MATHEMATIC, OR EVEN INDUSTRIAL COMMUNITY.

5        AND THAT WAS A HUGE, SIGNIFICANT FACT FOR US FOR

6    PRESENTATION TO THE JURY AND, FRANKLY, THE ONLY -- THE ONLY

7    EVIDENCE, IF YOU WANT TO CALL IT THAT, THEY HAD OF THAT NUMBER

8    WAS DR. LEAMER'S OPINION.

9        THERE WASN'T ANY OTHER INTRINSIC EVIDENCE THAT LEADS TO

10   THAT NUMBER.  THE INTRINSIC EVIDENCE LEADS TO A SHOWING THAT I

11   MENTIONED OF PAY GOING UP AND BEING ABOVE AVERAGE.

12       SO IF HE DOESN'T HAVE A SIGNIFICANTLY SIGNIFICANT RESULT,

13   WOULD YOU HANG YOUR HAT ON A JURY TRIAL IN THAT SITUATION WHEN

14   YOU HAVE ONE EXPERT PRESENTING DAMAGES WHOSE T-SCORE IS HIGHER

15   THAN ANY OTHER COURT OR VERDICT THAT WE WERE ABLE TO FIND HAS

16   EVER SUPPORTED?

17       I MEAN, THAT'S ANOTHER FACTOR, I THINK, THAT CAUSED, YOU

18   KNOW, THE PARTIES TO COME WHERE THEY DID.

19       NOW, I WILL SAY THAT THIS SETTLEMENT WAS ACHIEVED OVER A

20   QUITE LONG PERIOD OF TIME.  IT STARTED WITH MEETINGS, BUT IT

21   CONTINUED FOR MONTHS WITH JUDGE PHILLIPS ACTIVELY INVOLVED AND

22   JUDGE PHILLIPS GUIDING THE PARTIES TO WHERE WE ULTIMATELY ENDED

23   UP.

24       AND WHILE, OF COURSE, THE SETTLEMENT DISCUSSIONS ARE

25   CONFIDENTIAL, I DON'T THINK THERE'S ANY QUESTION THAT YOU HAD

1    KNOWLEDGEABLE, EXPERIENCED COUNSEL ON BOTH SIDES, AND A VERY

2    KNOWLEDGEABLE, EXPERIENCED MEDIATOR WHO WAS WELL AWARE OF ALL

3    OF THESE RISKS AND WHAT'S BEEN HAPPENING AT TRIALS HERE AND

4    AROUND THE COUNTRY.

5          AND, YOU KNOW, TO COME UP WITH THIS NUMBER, WHICH IS, I

6    GUESS, THE SECOND BIGGEST NUMBER IN HISTORY FOR A SETTLEMENT OF

7    THIS KIND, I THINK THAT'S A PRETTY SIGNIFICANT ACHIEVEMENT AND

8    I THINK THAT THE PARTIES DIDN'T COME TO IT OVERNIGHT.  IT TOOK

9    A WHOLE LOT OF WORK AND A WHOLE LOT OF TIME AND EFFORT BY A LOT

10   OF PEOPLE TO GET THAT NUMBER DONE.

11         THE ONLY OTHER COMMENT I'LL MAKE IS THAT I THINK YOUR

12   HONOR'S COMMENTS ON THE SO-CALLED PRO RATA, IT -- THIS

13   SETTLEMENT IS A LITTLE BIT DIFFERENT IN THAT THERE'S NO CLAIMS

14   PROCESS.  WE'RE JUST GOING TO WRITE CHECKS.  WE HAVE THE

15   ADDRESSES.  WE HAVE THE IDENTITIES.  THERE'S NO CLAIMS PROCESS.

16         SO IT'S NOT A REVERTER IN THE SENSE THAT WE THINK OF

17   REVERSIONS.  IT'S A SAFETY VALVE, IF A REALLY HIGH NUMBER OF

18   PEOPLE OPT OUT, TO GIVE THE DEFENDANTS THE FUNDS TO DEAL WITH

19   THOSE OPT OUTS.

20         NOW, I DON'T THINK ANY OF US EXPECT OPT OUTS AT THIS

21   LEVEL.  THERE WERE 61 OPT OUTS FROM THE LITIGATION CLASS AND

22   NOT VERY MANY FROM THE SETTLEMENT CLASS.

23         AND SO I THINK THAT THIS REALLY IS A SAFETY VALVE, AND I

24   DON'T THINK IT'S FAIR TO THE PLAINTIFFS, OR US, TO SAY, "WELL,

25   THESE OTHER GUYS, THEIR PRO RATA STARTED AT THIS NUMBER."

1    YOU HAVE TO TAKE THE SETTLEMENT IN ITS ENTIRETY.  IN OTHER

2    WORDS, WE DIDN'T NEGOTIATE ONE LITTLE PIECE AT A TIME.  THIS

3    WAS ONE SETTLEMENT WITH A LOT OF MOVING PARTS AND A LOT OF

4    ELEMENTS, AND SO MAYBE WE GOT A LITTLE BETTER BLOW PROVISION,

5    YOU KNOW, IN TERMS OF A PRO RATA.

6    BUT WHEN YOU'RE PAYING 324 MILLION, MAYBE YOU'RE ENTITLED

7    TO IT.  THOSE GUYS PAID 20 MILLION, AND SO THEIR RISK OF OPT

8    OUTS, WHATEVER IT WAS, YOU KNOW, THEY DIDN'T -- THAT AMOUNT OF

9    MONEY IS SO VASTLY DIFFERENT FROM THE MONEY THAT THESE

10   DEFENDANTS PAID THAT IT'S QUITE NATURAL TO SAY, AND TO EXPECT,

11   THAT A PRO RATA TYPE SAFETY VALVE MIGHT BE DIFFERENT.

12   AND WE DIDN'T NEGOTIATE THIS DEAL FROM THE EARLIER DEAL.

13   THIS SETTLEMENT WAS ACHIEVED BY THESE DEFENDANTS WITH THE

14   PLAINTIFFS BASED ON THE FACTS THAT WE HAD FROM OUR CASE.

15   AND SO WE -- I, FRANKLY, WASN'T EVEN AWARE OF WHAT THEIR

16   PERCENTAGE PRO RATA IN THE LUCASFILM DEAL WAS UNTIL IT CAME UP

17   THIS MORNING.  I JUST KNEW THAT, GIVEN THE AMOUNT OF MONEY WE

18   WERE SPENDING TO RESOLVE THIS, AND THE POSSIBILITY THAT I WOULD

19   BE LEFT IN AN EXTREME CASE -- AND IT IS EXTREME -- WITH A LARGE

20   NUMBER OF OPT OUTS, I WANTED, ASKED FOR, AND NEGOTIATED HARD

21   FOR THE RIGHT TO GET SOME SMALL AMOUNT OF MONEY BACK TO DEAL

22   WITH THOSE SO THAT I COULD EITHER TRY OR RESOLVE THOSE CASES.

23   AND THAT'S ALL IT IS.  IT'S -- IT'S ONE SMALL PIECE OF A

24   BIGGER RESOLUTION, AND I DON'T THINK IT'S FAIR TO COMPARE, YOU

25   KNOW, THAT PRO RATA TO ANY OTHER BECAUSE OUR SETTLEMENT WAS SO

1   MUCH BIGGER AND MORE SIGNIFICANT THAN THE ONE THAT YOUR HONOR

2   APPROVED A COUPLE OF MONTHS AGO.  IT TOOK CARE OF 90-PLUS

3   PERCENT OF THE CLASS, SO IT'S A MUCH BIGGER DEAL FROM THAT

4   PERSPECTIVE.

5         SO I JUST THINK YOU HAVE TO TAKE ALL OF THESE ELEMENTS IN

6   CONTEXT OF THE OVERALL GLOBAL DEAL.

7             THE COURT:  WHAT WAS THE NUMBER OF OPT OUTS IN THE

8   LUCASFILM/PIXAR/INTUIT?  DO YOU HAVE THAT NUMBER NOW?

9             MR. VAN NEST:  SIXTY-ONE --

10            THE COURT:  WAS FOR THE LITIGATION CLASS.

11            MR. VAN NEST:  -- OPTED OUT OF THE LITIGATION CLASS.

12            THE COURT:  YEAH.  SO THAT WOULD HAVE BEEN --

13            MR. VAN NEST:  IT'S MORE FOR THE SETTLEMENT CLASS,

14   BUT IT'S LESS THAN 200, I THINK.

15            MS. DERMODY:  IT'S 147, YOUR HONOR.

16            THE COURT:  OKAY.  AND THEY ARE THE ONES WHO OPTED

17   OUT OF BOTH THE LUCASFILM, PIXAR, AND INTUIT CLASSES, RIGHT?

18            MS. DERMODY:  IT'S THE SETTLEMENT CLASS.

19            THE COURT:  THE SETTLEMENT CLASSES.

20            MS. DERMODY:  RIGHT.  AND THEN 61 JUST OPTED OUT OF

21   THE LITIGATION --

22            THE COURT:  OF THE LITIGATION CLASS.  OKAY.

23        ALL RIGHT.  AND THERE WAS A CLAIM FORM IN THAT SETTLEMENT?

24            MS. DERMODY:  THAT'S RIGHT, YOUR HONOR.

25            THE COURT:  OKAY.  WELL, I WAS HAPPY TO SEE THAT

1    THERE'S NO CLAIM FORM HERE.

2            MR. VAN NEST:  WE THINK IT'S BETTER FOR OUR MEMBERS.

3            MS. DERMODY:  YEAH.  AND WE'VE NOW TESTED THE

4    ADDRESSES, SO WE KNOW WE HAVE VERY GOOD ADDRESSES.  WE'VE

5    UPDATED ALL OF THEM ONE TIME ALREADY, SO WE HAVE A GREAT DEAL

6    OF CONFIDENCE WE'LL REACH EVERYONE.

7            THE COURT:  SO LET ME -- I HAVE SOME MECHANICAL

8    QUESTIONS.

9        YOU STOOD UP -- MR. GIRARD, LET ME DO MY MECHANICAL

10   QUESTIONS AND THEN I'LL GIVE EVERYBODY AN OPPORTUNITY.

11           MR. GIRARD:  OKAY.

12           THE COURT:  OKAY.  THERE'S A PROVISION IN THE

13   SETTLEMENT AGREEMENT THAT SAYS THE NON-CASHED CHECKS GO TO

14   EITHER A CY PRES RECIPIENT OR FOR FURTHER CLASS DISTRIBUTION,

15   AND I WANTED TO GET A SENSE OF HOW THAT WAS LIKELY TO PROCEED.

16   WOULD THERE BE A CERTAIN AMOUNT -- I MEAN, CERTAINLY IF IT'S A

17   REALLY LARGE NUMBER, AT SOME POINT IT SHOULD GO TO THE CLASS

18   FOR FURTHER DISTRIBUTION --

19           MS. DERMODY:  RIGHT.

20           THE COURT:  -- VERSUS GOING TO A CY PRES RECIPIENT.

21       BUT HOW WERE YOU PLANNING TO APPROACH THAT QUESTION?

22           MS. DERMODY:  YOUR HONOR, CAN YOU DIRECT ME TO WHERE

23   YOU ARE IN THE SETTLEMENT?

24           THE COURT:  YEAH, SURE.

25           MS. DERMODY:  I'D BE HAPPY TO TAKE A LOOK AT THAT

1    CLAUSE.

2              THE COURT:  NO PROBLEM.

3              MS. DERMODY:  OKAY.

4              THE COURT:  I'M LOOKING AT -- ON PAGE 18 --

5              MS. DERMODY:  THANK YOU.

6              THE COURT:  -- IT'S PARAGRAPH 8 OF 4A IS THE SECTION.

7              MS. DERMODY:  OH.  YES, YOUR HONOR.

8         WE INTENDED TO COME BACK TO THE COURT SO THAT THE COURT

9    WOULD EITHER BLESS THE APPROACH OF CY PRES, OR WE COULD HAVE A

10   CONVERSATION WITH THE COURT TO DETERMINE WHETHER IT MADE SENSE

11   FROM AN ECONOMIC STANDPOINT TO PAY FOR THE MAIL TO

12   REDISTRIBUTE.

13        IT'S NOT EXPECTED, WITH THIS TYPE OF PROCESS, THAT WE

14   WOULD HAVE THAT MUCH MONEY AT THE END OF THE DAY BECAUSE IT

15   WOULD ONLY BE PEOPLE WHO RECEIVED CHECKS THAT THEY DIDN'T CASH,

16   AND IN A TYPICAL CASE, THAT MIGHT BE $10,000 OR SOMETHING LIKE

17   THAT, MAYBE EVEN $20,000.

18        BUT YOU DON'T TEND TO SEE A MILLION DOLLARS OF UNCASHED

19   CHECKS.  THAT WOULD BE VERY RARE.

20              THE COURT:  SO IS YOUR THINKING ABOUT THIS QUESTION

21    THAT IF IT TURNS OUT THAT THE AMOUNT IS EFFECTIVELY DE MINIMIS

22    AND WOULDN'T ACTUALLY PAY FOR ITSELF IN TERMS OF THE

23    ADMINISTRATIONS COSTS, TO THEN GIVE IT TO A CY PRES RECIPIENT?

24              MS. DERMODY:  THAT'S RIGHT, YOUR HONOR.

25              THE COURT:  BUT IF IT EXCEEDS THE COST OF

1       DISTRIBUTION AND ADMINISTRATION, THEN TO SEND IT TO THE CLASS?

2           MS. DERMODY:  ABSOLUTELY, YES.

3           THE COURT:  OKAY.  ALL RIGHT.  THAT'S FINE.

4       THIS DISPUTE FUND ISN'T DEFINED ANYWHERE AND IT'S NOT IN

5     THE NOTICE.  THIS IS PARAGRAPH 6 ON THE SAME PAGE.

6           MS. DERMODY:  YES, YOUR HONOR.

7           THE COURT:  I WAS UNCLEAR ON IS THIS FUND MONEY THAT

8     GOES TO THE CLAIMS ADMINISTRATOR TO RESOLVE DISPUTES AND PAY

9     FOR ADMINISTRATION COSTS?  OR IS THIS SORT OF A FUND THAT WILL

10    BE PAID TO ANY CLASS MEMBER WHO SUCCESSFULLY DISPUTES THEIR

11    PAYMENT AMOUNT?

12          MS. DERMODY:  THE LATTER, YOUR HONOR, YES.  IT'S --

13    WITH THE -- IT'S JUST TO MAKE SURE THAT THERE'S MONEY LEFT OVER

14    IN CASE THERE'S A CLASS MEMBER WHO EITHER HAS A RECORD KEEPING

15    ISSUE WITH THE DATA AND BELIEVES, AND CORRECTLY BELIEVES, THAT

16    HE OR SHE SHOULD HAVE HAD A HIGHER FORMULA PAY OUT, OR IF THERE

17    IS A PERSON WHO, FOR SOME REASON, DOESN'T RECEIVE A CHECK AND

18    THEY'RE IN THE CLASS DATA AND IT'S JUST A MISTAKE, EITHER ON

19    THE ADMINISTRATOR'S STANDPOINT OR IN THE DEFENDANTS' DATA

20    KEEPING OF PEOPLE IN THIS CLASS, THAT WE HAVE MONEY TO PAY

21    THOSE FOLKS WHO MIGHT SHOW UP JUST AFTER CHECKS ARE ISSUED.

22          THE COURT:  AND NEITHER THIS DISPUTE FUND NOR THE

23    REVERTER OR THE CY PRES ISSUE ARE ACTUALLY IN THE NOTICE.  WAS

24    THERE A REASON WHY THOSE WEREN'T INCLUDED IN THERE?

25          MS. DERMODY:  NO, YOUR HONOR.  BUT WE CAN CERTAINLY

1    ADD THEM.

2              THE COURT:  OKAY.  IF I APPROVE THIS SETTLEMENT, I

3    WOULD WANT IT TO BE ON A PRETTY TIGHT TIMEFRAME.

4              MS. DERMODY:  YES.

5              THE COURT:  AND THIS IS THE SCHEDULE I WOULD

6    RECOMMEND AND I WANTED TO SEE IF THAT WOULD BE FEASIBLE FOR THE

7    PARTIES AND FOR THE CLAIMS ADMINISTRATOR.

8         SO SUBMISSION OF REVISED NOTICE AND PROPOSED ORDER --

9    ACTUALLY, MOST LIKELY -- WE MAY JUST MAKE THE CHANGES OURSELVES

10   TO THE NOTICE.

11        BUT -- I GUESS THE TRANSFERRING OF THE MATERIALS FROM THE

12   PRIOR SETTLEMENT ADMINISTRATOR TO THE NEW ONE BY JUNE 30TH;

13   NOTICE MAILED AND POSTED TO THE INTERNET, JULY 14TH.

14             MS. DERMODY:  YOUR HONOR, I'M SORRY.  CAN I STOP YOU

15    ON THE VERY FIRST ONE?

16             THE COURT:  YES.  IS THAT TOO TIGHT?

17             MS. DERMODY:  YES, I'M SORRY.  HEFFLER AND GILARDI I

18   THINK HAVE TALKED ABOUT 20 DAYS FROM THE ORDER.  IF THE ORDER

19   WAS TODAY, 20 DAYS WOULD BE JULY 9.

20             THE COURT:  FOR, WHAT, THE TRANSFERRING OF MATERIALS?

21             MS. DERMODY:  THE TRANSFER, YES.

22             THE COURT:  OH.  THEY NEED 20 DAYS?

23             MS. DERMODY:  BECAUSE THERE'S SOME SECURITY ISSUES

24   AROUND THE DATA.  IT'S NOT SOMETHING THAT CAN BE DONE SIMPLY.

25   I JUST WANT TO MAKE SURE THEY HAVE ENOUGH TIME TO DO IT

1    SECURELY AND THE RIGHT WAY.

2              THE COURT:  ALL RIGHT.  WELL, THEN, I ASSUME THAT

3    THAT WOULD PUSH EVERYTHING ELSE BACK.

4              MS. DERMODY:  THAT'S WHY I STOPPED YOUR HONOR.  I'M

5    SORRY.

6              THE COURT:  OKAY.  SO --

7              MS. DERMODY:  IF IT WOULD HELP YOUR HONOR, I COULD

8    GIVE YOU A LIST I WROTE OUT IF WE USED JULY 9.

9              THE COURT:  WELL, WHAT IF THAT WOULD BE JULY 14TH?

10   THAT WOULD BE THE DATE OF THE TRANSFER, ROUGHLY 20 DAYS FROM

11   MONDAY, JUNE 23RD.

12         THEN HOW MUCH TIME WOULD YOU NEED TO MAIL THE NOTICE AND

13   POST IT TO THE INTERNET?

14             MS. DERMODY:  TWO WEEKS, YOUR HONOR.  SO THAT WOULD

15   BE JULY 28, AND THAT'S A MONDAY.

16             THE COURT:  OKAY.  AND THEN THE MOTION FOR ATTORNEYS'

17   FEES AND COSTS, YOU'RE SAYING 31 DAYS FROM THE NOTICE DATE, SO

18   THAT WOULD BE ROUGHLY --

19             MS. DERMODY:  AUGUST 28.

20             THE COURT:  THAT WOULD BE AUGUST 28 OF 2014.

21         OKAY.  AND THEN I GUESS I'M UNCLEAR.  SOME OF THE DATES

22   ARE OFF THE -- THEY KIND OF SWITCH FROM THE NOTICE DATE BEING

23   THE ANCHOR DATE TO THE FINAL APPROVAL HEARING BEING THE ANCHOR

24   DATE.

25             MS. DERMODY:  YES.  I'M SORRY, YOUR HONOR.

```
1              THE COURT:  WHAT -- I GUESS FOR THE MOTION FOR FINAL

2     APPROVAL, THAT WOULD BE 70 DAYS FROM THE NOTICE DATE, WHICH

3     WOULD HAVE BEEN JULY 28.

4              MS. DERMODY:  SO IT MIGHT BE EASIER TO SET THE OPT

5     OUT OBJECTION DEADLINE, WHICH I THINK UNDER THIS WOULD BE

6     SEPTEMBER 11TH.

7              AND THEN WE MIGHT WANT TO HAVE TWO WEEKS FOR THE OPENING

8     BRIEF FOR FINAL APPROVAL, AND THAT WOULD THEN BE THREE WEEKS

9     BEFORE THE HEARING DATE.

10             THE COURT:  YOU MEAN TWO WEEKS AFTER SEPTEMBER 11TH?

11             MS. DERMODY:  CORRECT.  THANK YOU.

12        (PAUSE IN PROCEEDINGS.)

13             THE COURT:  HOW MUCH TIME AFTER THE MOTION FOR FINAL

14    APPROVAL IS NEEDED FOR THE CLAIMS ADMINISTER AFFIDAVIT OF

15    COMPLIANCE WITH THE NOTICE REQUIREMENTS?

16             MS. DERMODY:  I THINK THAT THAT CAN BE 30 DAYS BEFORE

17    THE FINAL APPROVAL HEARING, YOUR HONOR.  SO IF THAT HEARING WAS

18    ON OCTOBER 16, IT WOULD BE THE 30 DAYS BEFORE THAT.  I THINK

19    THAT WOULD BE SEPTEMBER 16.

20             THE COURT:  AND THE REPLIES WOULD BE?

21             MS. DERMODY:  A WEEK BEFORE THE HEARING IF THAT WORKS

22    FOR YOUR HONOR.

23             THE COURT:  I NEED TO CHECK -- MS. PARKER BROWN, CAN

24    YOU TAKE A LOOK AT OCTOBER 16?

25             OR WE COULD DO IT EVEN SOONER, OCTOBER -- HOW -- WHAT IS
```

1    THE EARLIEST DATE WE COULD DO IT THAT WOULD GIVE YOU ENOUGH

2    TIME TO GET EVERYTHING DONE?

3            MS. DERMODY:  WELL, IF WE ARE FILING OUR OPENING

4    FINAL APPROVAL BRIEF ON SEPTEMBER 25, AND IF THERE'S GOING TO

5    BE ANY OBJECTOR BRIEFING THAT'S GOING TO FOLLOW THAT, THEN WE

6    MIGHT ACTUALLY KIND OF HAVE TO HAVE A BRIEFING SCHEDULE OF

7    SEPTEMBER 25, WITH THE EXPECTATION THAT SOMETHING GETS FILED BY

8    OBJECTORS A WEEK LATER, AND WE REPLY TO THAT BY THE 9TH.

9        SO THAT'S THE TROUBLE OF TRYING TO MOVE SOMETHING EARLIER

10    THAN THE 16TH I THINK, YOUR HONOR.

11            THE COURT:  OKAY.  SO THIS WOULD SAY THE REPLIES THEN

12    WOULD BE DUE OCTOBER 9, AND THE HEARING DATE WILL THEN BE

13    OCTOBER 16TH.

14            THE CLERK:  ON OCTOBER 16TH, WE CURRENTLY HAVE --

15    YESTERDAY YOU SET DISPOSITIVE MOTIONS ON BRAZIL V. DOLE FOR THE

16    16TH.

17            THE COURT:  UM-HUM.

18        (DISCUSSION OFF THE RECORD BETWEEN THE COURT AND THE

19    CLERK.)

20            MR. VAN NEST:  YOUR HONOR, IN LIGHT OF THE PROBLEMS

21    WE'VE HAD ON THESE EARLIER ONES JUST WITH PAPERWORK AND

22    WHATNOT, I WOULD JUST SUGGEST MOVING IT BACK A WEEK OR TWO SO

23    WE DON'T HAVE TO COME BACK AND MOVE IT AGAIN.

24            THE COURT:  YOU MEAN MOVE THE 16TH A WEEK?

25            MR. VAN NEST:  MOVE IT BACK A WEEK.  THE NOTICES

1    SLIP, THE NOTICES DON'T GET OUT, THE DATE IS NOT QUITE RIGHT.

2    WE'VE HAD THIS HAPPEN.  WE THINK WE'VE GOT IT CLEARED UP, BUT

3    WE DON'T KNOW.

4         WHY NOT GIVE OURSELVES AN EXTRA WEEK AND THEN WE HAVE SOME

5    FLEXIBILITY?

6              THE COURT:  LET'S SEE WHAT WE HAVE ON THE 23RD AND

7    THE 30TH.

8              MR. VAN NEST:  YEAH.

9         (DISCUSSION OFF THE RECORD BETWEEN THE COURT AND THE

10   CLERK.)

11             THE COURT:  WELL, NEITHER OF THOSE DATES ARE GREAT

12   FOR US, BUT I'M HAPPY TO --

13             THE CLERK:  NOVEMBER 6TH MIGHT WORK.

14             THE COURT:  WHAT'S ON NOVEMBER 6TH?

15        (DISCUSSION OFF THE RECORD BETWEEN THE COURT AND THE

16   CLERK.)

17             THE COURT:  I -- YOU KNOW, IF I'M GOING TO APPROVE

18   THIS, I DON'T WANT TO DELAY PAYMENT FURTHER THAN NECESSARY.

19        YOU KNOW, I GUESS NOVEMBER 6TH IS PROBABLY SLIGHTLY

20   BETTER, BUT I'M FINE WITH ALSO HAVING THIS ON THE 23RD OR THE

21   30TH.

22             MR. VAN NEST:  EITHER ONE IS FINE WITH US.  ANY ONE

23   OF THOSE THREE DATES IS FINE, YOUR HONOR.

24             MS. DERMODY:  SAME FOR US, YOUR HONOR.

25             THE COURT:  OKAY.

1          (DISCUSSION OFF THE RECORD BETWEEN THE COURT AND THE

2     CLERK.)

3          THE COURT:  I'LL GO AHEAD AND SET THIS ON

4     NOVEMBER 6TH IF I'M GOING TO APPROVE IT, AND THAT WAY WE CAN

5     EVEN BUILD IN A LITTLE TIME THROUGHOUT -- I ASSUME EVERYONE IS

6     AVAILABLE ON THE 6TH?  IS THAT DATE OKAY?

7          MS. DERMODY:  YES, YOUR HONOR.

8          MR. VAN NEST:  YES, YOUR HONOR.

9          THE COURT:  OKAY.  I THINK THAT WAS IT.  I MEAN,

10    THERE ARE SOME NITS ON THE NOTICE, BUT I DON'T THINK THEY'RE

11    IMPORTANT ENOUGH TO TAKE UP YOUR TIME.

12        I'LL GIVE EVERYONE A LAST OPPORTUNITY TO BE HEARD, AND

13    THEN WE'RE GOING TO TAKE A BREAK BEFORE I CALL MY LAST CASE.

14         MR. GIRARD:  FINAL COMMENTS, YOUR HONOR.

15         THE COURT:  OKAY.

16         MR. GIRARD:  ON THE AMOUNT THAT THE DEFENDANTS ARE

17    PAYING, THE COURT REFERRED SEVERAL TIMES TO THE IMPLICIT, I

18    THINK I'LL CALL IT MARKET SHARE, IMPLIED BY THE EARLIER

19    SETTLEMENT, THE 20 MILLION, AND MR. VAN NEST POINTED TO 8

20    PERCENT.

21        THE COLLOQUY THAT OCCURRED BETWEEN THE COURT AND COUNSEL

22    AT PRELIMINARY APPROVAL ON THE EARLIER SETTLEMENTS --

23         THE COURT:  UM-HUM.

24         MR. GIRARD:  -- WAS THAT THE AMOUNT BEING PAID,

25    WHAT -- WHAT THE DISCUSSION WAS, WAS THAT THEY HAD 8 PERCENT OF

1    THE WORK FORCE, BUT THE AMOUNT THEY PAID AMOUNTED TO 5 PERCENT

2    OF THE TOTAL AMOUNT PAID.

3         SO THE IMPLICIT NUMBER, IF YOU USE 20 PERCENT AS A

4    BENCHMARK FOR THESE REMAINING DEFENDANTS, I COME UP WITH IS 400

5    MILLION, SO WE WOULD BE 75 MILLION SHORT IF WE WERE USING THAT

6    AS A BENCHMARK.

7         AND THE REFERENCE IS THE TRANSCRIPT OF THE PRELIMINARY --

8    PRELIMINARY APPROVAL HEARING AT PAGE 16, AND AT LINE 18,

9    THERE'S A DISCUSSION BETWEEN MS. DERMODY AND YOUR HONOR IN

10   WHICH THESE NUMBERS ARE BEING DISCUSSED AND THE 20 PERCENT --

11   OR 20 MILLION AND HOW THAT REPRESENTS 8 PERCENT OF THE WORK

12   FORCE NUMERICALLY, BUT 5 PERCENT FROM THE POINT OF VIEW OF THE

13   AMOUNT THEY PAID IN RELATION TO THE TOTAL AMOUNT OF SALARIES

14   PAID.

15        SO TO THE EXTENT I HEARD THE COURT TO BE SAYING THIS

16   NUMBER SEEMED LIGHT, I THINK THAT'S THE ANSWER.

17        SECOND, THE DISTRICT COURT -- THE COURT MADE A NUMBER OF

18   COMMENTS THAT, IN MY EXPERIENCE, THE COMMENTS HAVE BEEN PRETTY

19   EFFECTIVE IN FOCUSSING THE MIND OF DECISION MAKERS ABOUT

20   SETTLEMENT, AND IF THE COURT DECIDED NOT TO APPROVE THIS AT

21   THIS STAGE AND SENT THE PARTIES BACK TO TRY AGAIN, I THINK

22   YOU'VE MADE IT PRETTY CLEAR, AND I HAVE A SENSE FROM THE

23   DISCUSSION WHERE THAT BENCHMARK IS, AND I HAVE A FEELING THAT

24   THAT -- THAT THE COURT'S COMMENTS ARE GOING TO ELICIT A

25   FAVORABLE RESPONSE.  BUT THE ONLY WAY TO FIND THAT OUT IS TO

1    TRY.

2         A COMMENT ABOUT THE ROLE OF JUDGE PHILLIPS.  I AGREE HE'S

3    A HIGHLY RESPECTED MEDIATOR AND VERY WELL EXPERIENCED.

4         HE WAS ALSO THE MEDIATOR IN THAT NFL CONCUSSION SETTLEMENT

5    WE CITED TO THE COURT THAT JUDGE BRODY DECLINED TO

6    PRELIMINARILY APPROVE AND HE, LIKE THIS CASE, HAD CONCLUDED

7    THAT SETTLEMENT WAS FAIR.

8         THE JUDGE DID NOT GRANT PRELIMINARY APPROVAL BECAUSE OF

9    HER CONCERNS WITH THE AMOUNT OF THE RECOVERY, AND IT'S NOT

10   BECAUSE JUDGE PHILLIPS WASN'T DOING HIS JOB.  HIS JOB IS TO

11   BRING THE PARTIES TOGETHER TO AGREE ON THE NUMBER.

12        IT'S NOW THE JOB THIS COURT HAS TO DECIDE WHETHER THE

13   SETTLEMENT IS FAIR OR NOT.

14        SO I DON'T THINK IT'S ANY DETRACTION ON THE PERFORMANCE OF

15   JUDGE PHILLIPS TO POINT OUT THAT THE FACT THAT A MEDIATOR

16   BRINGS THE PARTIES TOGETHER DOESN'T MEAN THAT THE RESULTING

17   SETTLEMENT WAS FAIR, AND THE COURTS HAVE NOT TREATED THE ROLE

18   OF A MEDIATOR AS DISPOSITIVE ON THAT QUESTION.

19        LAST POINT.  IF YOU DO DECIDE TO GO FORWARD AND GRANT

20   PRELIMINARY APPROVAL, OUR SUGGESTION WOULD BE THAT THE NOTICE

21   INCLUDE THE NUMBERS THAT WE'VE BEEN DISCUSSING IN THE SENSE

22   SPECIFICALLY OF THE POTENTIAL RECOVERY, THE RECOVERY PER

23   PERSON, AND WHAT THE RECOVERY WOULD BE ON THE THEORY OF DAMAGE

24   IF THE CASE WERE TO BE WON AT TRIAL SO THAT FROM THE

25   PERSPECTIVE OF A CLASS MEMBER -- AND FINALLY, THE AMOUNT OF

1  PERSONS IN THE CLASS -- SO THAT THE NUMBERS ARE RIGHT THERE AND

2  SOMEBODY DOESN'T HAVE TO GO DO THE MATH, BECAUSE I THINK THE

3  AVERAGE PERSON IS NOT GOING TO JUMP TO THE CONCLUSION THAT THEY

4  CAN DO THAT MATH AND THAT THAT'S GOING TO BE HOW THEY KNOW.

5      SO IT'S EASY ENOUGH TO DO THAT LANGUAGE.  IF YOU APPROVE,

6  I WOULD PROPOSE LANGUAGE TO CLASS COUNSEL.  I'M SURE WE COULD

7  AGREE ON AN INSERTION TO THE NOTICE THAT WOULD ADD THAT

8  INFORMATION.

9      AND SO IF YOU'RE GOING FORWARD, IT'S, I THINK, CONSISTENT

10  WITH THE NORTHERN DISTRICT'S RECENT GUIDELINES.  THOSE CALL FOR

11  THIS INFORMATION IN THE MOVING PAPERS, AND A NUMBER OF COURTS

12  HAVE REQUIRED THAT INFORMATION IN THE NOTICE.  IT'S REQUIRED

13  UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT, AND IT'S

14  EASY ENOUGH TO DO FROM A PRACTICAL PERSPECTIVE.

15      AND IF YOU WANT TO PROCEED WITH THIS SETTLEMENT, IT'S ONE

16  WAY OF GIVING THE CLASS MEMBERS THE INFORMATION THAT MR. DEVINE

17  WAS CONCERNED ABOUT.

18      THE COURT:  YOU MEAN PUTTING IN THE $141,331?

19      MR. GIRARD:  YEAH.  AND TO THE EXTENT THE CONCERN IS

20  THAT'S A TREBLED NUMBER, IT CAN BE CLARIFIED THAT THAT WOULD BE

21  AFTER TREBLING.

22      BUT I THINK, YEAH, THE SHORT ANSWER IS YES.

23      THE COURT:  WHY DON'T I HAVE MR. VAN NEST, WHY DON'T

24  YOU RESPOND?  I MEAN, IT IS TRUE THAT THE FIRST SETTLEMENT, THE

25  PERCENTAGE OF THE CLASS COMPENSATION WAS 5 PERCENT, AND THE

1     PERCENTAGE OF CLASS MEMBERSHIP WAS 8 PERCENT, AND IF WE DID

2     THAT STRAIGHT CALCULATION, IT WOULD HAVE BEEN HIGHER.

3           MR. VAN NEST:  NO.  THE NUMBER -- IT CONFIRMS

4     ABSOLUTELY THAT THE SETTLEMENT IS RIGHT IN THE SWEET SPOT.

5         IF 8 PERCENT IS THE BENCHMARK, AND THAT'S WHAT WE THOUGHT

6     WAS FAIR AND WHAT WE ARGUED IN THE MEDIATION, THEN OUR SHARE OF

7     THE SETTLEMENT WOULD HAVE BEEN 230 MILLION, BECAUSE IF 8

8     PERCENT OF THE CLASS -- IF THOSE DEFENDANTS, EMPLOYING 8

9     PERCENT, PAID 20 MILLION, THEN THE FULL VALUE OF THAT

10    SETTLEMENT IS 250 MILLION, ABSOLUTELY.

11          THE COURT:  NO, NO, NO.  THE PERCENTAGE -- OKAY, 8

12    PERCENT.  BUT WHY SHOULD YOU GET THE SAME DEAL --

13          MR. VAN NEST:  WE DIDN'T.

14          THE COURT:  -- AS THOSE --

15          MR. VAN NEST:  WE DIDN'T.  WE GOT A DEAL THAT WAS 50

16    PERCENT MORE EXPENSIVE.

17          THE COURT:  OKAY.  LET ME HAVE MR. GIRARD -- OKAY.

18    TELL ME AGAIN -- AND I'M SORRY I DIDN'T WORK OUT THE NUMBERS IN

19    ADVANCE.  I AGREE WITH YOU THE PERCENTAGE OF CLASS COMPENSATION

20    WAS 5 PERCENT.  THE PERCENTAGE OF CLASS MEMBERSHIP WAS 8

21    PERCENT FOR THE INTUIT, LUCASFILM, PIXAR FILM.

22        WHAT WOULD THE NUMBER HAVE BEEN?  I'M SORRY I DIDN'T

23    CALCULATE THIS IN ADVANCE.

24          MR. GIRARD:  SO I'M DOING THE SAME DIVISION THAT

25    MR. VAN NEST IS DOING, BUT WITH 5 PERCENT INSTEAD OF 8 PERCENT,

1          WHICH GIVES YOU 400 MILLION.  SO WE'RE --

2                    THE COURT:  OKAY.  SO TELL ME WHAT YOU'RE DOING AND

3          WHY YOU ALL ARE COMING OUT WITH DIFFERENT NUMBERS.  GO AHEAD.

4                    MR. VAN NEST:  NO, NO.  WE'RE COMING OUT WITH THE

5          SAME NUMBERS, YOUR HONOR.

6               IF YOU LOOK AT IT AS 5 PERCENT OF THE COMPENSATION PAID --

7                    THE COURT:  UM-HUM.

8                    MR. VAN NEST:  -- IF THAT GROUP PAID 20, THEN THE

9           TOTAL VALUE OF THAT IS 400.

10              IF, HOWEVER, YOU LOOK AT IT AS 8 PERCENT OF THE CLASS THAT

11         YOU EMPLOYED, THEN THE TOTAL SETTLEMENT IS 250.

12              THIS NUMBER IS RIGHT IN THE MIDDLE OF THAT, WHICH IS WHY I

13         SAY IT'S AN ABSOLUTELY FAIR NUMBER.  IT'S -- YOU COULD LOOK AT

14         IT ONE WAY OR THE OTHER.  I THINK, AND I THINK THE DEFENDANTS

15         BELIEVE, THE FAIR WAY TO LOOK AT IT IS, WHAT PERCENTAGE OF THE

16         CLASS DID YOU FOLKS EMPLOY THAT PAID?  AND WHO -- IF THAT'S --

17         THAT'S A WAY TO DIVIDE IT UP.

18              YOU COULD ALSO DIVIDE IT UP BASED ON THE PERCENTAGE OF

19         PAY.

20              BUT EITHER WAY YOU DO IT, THIS NUMBER IS RIGHT IN THE

21         SWEET SPOT OF WHAT IS NOT ONLY FAIR, BUT IN MANY WAYS A PREMIUM

22         OVER THE SETTLEMENT THAT YOUR HONOR APPROVED A COUPLE OF MONTHS

23         AGO.  THAT'S ALL.

24                    THE COURT:  ALL RIGHT.  LET ME HEAR FROM MR. GIRARD.

25         WHY SHOULD IT BE A PERCENTAGE OF THE CLASS COMPENSATION VERSUS

1     THE PERCENTAGE OF THE CLASS MEMBERSHIP?

2          MR. GIRARD:  BECAUSE DAMAGES ARE AWARDED BASED ON

3     COMPENSATION, ONE.

4          TWO, BECAUSE THE EARLIER SETTLEMENTS TYPICALLY ARE FIRST

5     OUT SETTLEMENTS THAT ARE USED TO FUND THE LATER LITIGATION WITH

6     THE UNDERSTANDING THAT LATER SETTLING DEFENDANTS ARE GOING TO

7     PAY MORE.

8          AS YOUR HONOR ACKNOWLEDGED, THESE DEFENDANTS WERE FACING A

9     TRIAL.  THE EARLIER DEFENDANTS SETTLED AT A TIME WHEN THERE WAS

10    LESS RISK IN THE CASE.

11         BUT EVEN IF IT'S A PURE APPLES TO APPLES COMPARISON, SINCE

12    DAMAGES ARE AWARDED BASED ON COMPENSATION, THE BENCHMARK NUMBER

13    IS 400, NOT THE NUMBER MR. VAN NEST SUGGESTED.

14         THE COURT:  BUT DO YOU AGREE WITH HIM, IF THE

15    BENCHMARK WAS 8 PERCENT, THE NUMBER WOULD BE 250?  DO YOU AGREE

16    WITH HIM ON THAT?

17         MR. GIRARD:  WHATEVER THE MATH IS.  I AGREE WITH HIM

18    ON THE MATHEMATICAL CALCULATION, SO IF YOU USE THAT, YES.

19         THE COURT:  OKAY.

20         MR. GIRARD:  IT DOESN'T ADDRESS THE ARGUMENTS ABOUT

21    THE HEIGHTENED RISK TO THE DEFENDANTS BECAUSE OF THE STAGE AT

22    WHICH THEY'RE SETTLING AND THE FACT THAT THEY CHOSE TO PLAY ON

23    THE HOPES THAT THEY WOULD GET OUT, THAT THEY WOULD GET THE

24    CLASS CERTIFICATION ORDER REVERSED, DIDN'T GET THAT, AND

25    TYPICALLY THEY PAY A PRICE FOR THAT BY HAVING TO PAY A HIGHER

1    PERCENTAGE.

2         MS. DERMODY:  AND, YOUR HONOR, I JUST WANTED TO SAY

3    THAT CLASS COUNSEL, AT THE START OF THIS HEARING, ACKNOWLEDGED

4    THAT WHERE WE ARE RIGHT NOW IS PRICED IN A RATIO THAT'S VERY

5    SIMILAR TO THE FIRST TIME AROUND AND THAT WE BASED OUR DECISION

6    NOT ON THIS IDEA OF HAVING, YOU KNOW, EVEN MORE MONEY AND THIS

7    IS WHY WE'RE TRYING TO SELL THIS TO THE COURT, BUT ON THIS RISK

8    THAT WE THINK IS VERY REAL.

9         YOU KNOW, WHEN WE HAD THE FIRST SETTLEMENT, AS THE COURT

10   MAY RECALL, THE ONLY CORPORATE ADMISSIONS IN THIS CASE WERE

11   FROM THE PIXAR/LUCAS CORPORATE EXECUTIVES.  THOSE ARE THE -- IN

12   SOME WAYS, THOSE WERE THE STRONGEST PIECES OF EVIDENCE IN THE

13   CASE, AND THEY CASHED OUT.

14        THERE WAS DIFFERENT EVIDENCE, SOME VERY GOOD EVIDENCE, BUT

15   DIFFERENT TYPES OF EVIDENCE PUTTING TOGETHER THE PIECES WITH

16   THE OTHER DEFENDANTS.  SO YOU HAVE TO WEIGH SOME OF THOSE

17   ISSUES AS WELL.

18        AND I THINK, YOUR HONOR, THAT IF YOU WOULD TALK TO OUR

19   TEAM ABOUT WHO HAS BEEN DRINKING THE KOOL-AID ON THIS CASE THE

20   MOST, THEY PROBABLY WOULD NAME ME AS THAT PERSON WHO HAS BEEN

21   ZEALOUS ABOUT TAKING THIS CASE TO TRIAL.

22        BUT WHEN YOU GO THROUGH JURY TESTING AND YOU ACTUALLY SHOW

23   JURORS IN THIS DISTRICT THIS EVIDENCE AND TEST WITH THEM THEIR

24   ATTITUDES ABOUT THESE CLAIMS AND THESE CLASS MEMBERS, YOU HAVE

25   TO BE SOBERED ABOUT WHAT THE RISKS ARE WITH THIS JURY POOL,

1    WITH THIS EVIDENCE.

2         IT IS NOT WITHOUT, YOU KNOW, GREAT CONCERN THAT WE WOULD

3    EVER TAKE THIS CASE TO TRIAL, AND THAT'S WHY WE THINK THIS IS

4    AN EXCELLENT DEAL AND IT WOULD BE WRONG FOR US NOT TO PRESENT

5    IT TO THE CLASS.

6         THE COURT:  OKAY.  BUT WHY -- I MEAN, I WAS THINKING

7    OF THE 5 PERCENT, NOT THE 8 PERCENT.  WHY SHOULDN'T YOU HAVE AT

8    LEAST GOTTEN THE SAME COMPENSATION AS THE EARLIER CASE?

9         YOU'RE SAYING BECAUSE YOUR CASE AGAINST THESE DEFENDANTS

10   WAS WEAKER THAN YOUR CASE AGAINST LUCASFILM AND PIXAR?  I FIND

11   THAT KIND OF HARD CONSIDERING WHO THE KEY PEOPLE WERE, LIKE

12   STEVE JOBS.  YOU HAVE THE -- YOU HAVE MR. CAMPBELL WITH GOOGLE,

13   YOU HAVE THE WHOLE FACEBOOK SOLICITATION, YOU HAVE THE

14   SOLICITATION WITH EBAY.  I MEAN, BOTH MR. CAMPBELL AND

15   MR. SCHMIDT WERE INVOLVED IN THAT.

16        I MEAN, I SEE WHAT YOU'RE SAYING.  CERTAINLY THE QUOTES OF

17   THE CEOS FOR LUCASFILM AND PIXAR WERE VERY GOOD FOR YOU.

18        MS. DERMODY:  ESPECIALLY ABOUT THEIR MOTIVATION FOR

19   WHY THEY ENTERED INTO THE AGREEMENTS.  THERE'S NO ONE ELSE WHO

20   HAS SAID THE THINGS THAT THEY SAID.

21        THE COURT:  BUT I WOULD -- WELL, ANYWAY, YOU TELL ME.

22   SO WHY DO THESE DEFENDANTS GET A DISCOUNT?  BECAUSE YOU THINK

23   YOUR CASE WAS WEAKER AGAINST STEVE JOBS?

24        MS. DERMODY:  I DON'T THINK THAT THEY GOT A DISCOUNT.

25        THE COURT:  YOU THINK YOUR CASE WAS WEAKER AGAINST

1    ERIC SCHMIDT?

2         MS. DERMODY:  I THINK THE RATIO IS VERY SIMILAR IN

3    TERMS OF WHAT HAPPENED BEFORE AND WHAT HAPPENED NOW.  AND I

4    UNDERSTAND.  IT'S WHAT WE WRESTLED WITH OURSELVES ABOUT THIS

5    SETTLEMENT, YOUR HONOR.

6         IT'S BECAUSE, AT THE END OF THE DAY, THE RISK OF LOSING AT

7    TRIAL NEVER CHANGED.

8         AT THE END OF THE DAY, THE RISK OF LOSING CERTAIN PRETRIAL

9    ORDERS ON APPEAL NEVER CHANGED.

10         THE COURT:  YOU KNOW, I WISH YOU HAD TOLD ME HOW WEAK

11    YOUR CASE WAS FOR CLASS CERT AND ON ALL THOSE DAUBERT MOTIONS.

12    I MEAN, THAT WOULD HAVE BEEN HELPFUL INFORMATION.

13         I WAS CERTAINLY HEARING A DIFFERENT TUNE --

14         MS. DERMODY:  I DON'T THINK YOU --

15         THE COURT:  -- FROM YOUR SIDE OF THE COURTROOM DURING

16    ALL THE PREVIOUS MOTIONS IN THIS CASE.

17         IF I HAD KNOWN WHAT A LOSER THIS WAS, PERHAPS, YOU KNOW --

18    THE COURT, YOU KNOW, DID 90-PAGE ORDERS.

19         MS. DERMODY:  YOUR HONOR, I THINK WE'RE --

20         THE COURT:  AND IF I HAD KNOWN WHAT A WEAK CASE THIS

21    WAS, PERHAPS THIS SHOULDN'T HAVE GOTTEN AS MUCH OF THE COURT'S

22    RESOURCES AS IT DID.

23         MS. DERMODY:  BUT, YOUR HONOR, I THINK THAT --

24         THE COURT:  YEAH.

25         MS. DERMODY:  -- HOW THE COURT FEELS ABOUT IT IS

1    MAYBE, I THINK, IN FAIRNESS, NOT LOOKING AT THE FULL PICTURE.

2          THE COURT:  OKAY.

3          MS. DERMODY:  THIS HONESTLY IS ONE OF THE BIGGEST

4    SETTLEMENTS, ONE OF THE BIGGEST RESULTS EVER IN A CASE LIKE

5    THIS.  IT IS THE SINGLE BIGGEST RESULT EVER IN AN ANTITRUST

6    EMPLOYMENT CASE, EVER, BY FAR, ON AN AGGREGATE BASIS OR ON A

7    PER CAPITA CLASS MEMBER BASIS.

8          IT IS A HUGE RESULT BY EXPONENTIALLY MORE THAN OTHER

9    RESULTS THAT HAVE BEEN ACHIEVED, INCLUDING THE EBAY/INTUIT

10   AGREEMENT, AND YOUR HONOR DOES KNOW A LOT ABOUT THAT ONE, IN

11   THIS DISTRICT.

12         ALSO, IN THE EMPLOYMENT CLASS ACTION WORLD, THERE HAVE

13   BEEN TONS OF EMPLOYMENT CLASS ACTIONS.  THERE IS ONLY ONE THAT

14   HAD A GREATER RESULT THAN THIS.  IT TOOK 23 YEARS AGAINST THE

15   U.S. GOVERNMENT.

16         THIS IS A HUGE ACHIEVEMENT.  IT'S VERY SUBSTANTIAL.  IT

17   MAY FEEL LIKE IT'S NOT THE WHOLE THING, THAT WE COULD HAVE

18   GOTTEN MORE.

19         AND, YES, I THINK IN EVERY SETTLEMENT, IT'S THE VIRTUE OF

20   SETTLING IS YOU'RE COMPROMISING WHAT WAS POSSIBLE.

21         THE COURT:  BUT ANSWER MY QUESTION.  DO YOU BELIEVE

22   YOUR CASE WAS WEAKER AGAINST GOOGLE, APPLE, ADOBE, AND INTEL

23   THAN AGAINST LUCASFILM, PIXAR, AND INTUIT?

24         MS. DERMODY:  NO.

25         THE COURT:  BECAUSE THEY PAID A HIGHER PROPORTION OF

```
1          THEIR LIABILITY --

2                    MS. DERMODY:  THIS IS --

3                    THE COURT:  -- AND THEY SETTLED EARLY.

4                    MS. DERMODY:  RIGHT.  THIS IS THE MARKET TESTING,

5          YOUR HONOR.

6                    THE COURT:  OKAY.

7                    MS. DERMODY:  WHEN YOU HAVE JURORS LOOKING AT

8          EVIDENCE, JURORS THINK VERY HIGHLY OF WHAT PEOPLE SAY AS

9          ADMISSIONS.  THEY DON'T NEED TO CONNECT ANY DOTS.  THEY CAN

10         TAKE IT AT FACE VALUE BECAUSE A PERSON SAID IT.

11                   AND SO FROM A JUROR PERSPECTIVE, THERE ARE CERTAIN TYPES

12         OF EVIDENCE THAT ARE, THAT ARE VERY HOT.  THEY'RE TOXIC, YOU

13         KNOW?  THEY'RE -- THEY'RE ATOMIC.

14                   AND THERE ARE OTHER TYPES OF EVIDENCE THAT REQUIRE LEAPS

15         OF LOGIC AND CONNECTING DOTS AND YOU HAVE TO HAVE JURORS THAT

16         ARE WILLING TO ROLL UP THEIR SLEEVES AND REALLY PUT THOSE DOTS

17         TOGETHER IN ORDER TO UNDERSTAND.

18                   AND YOU MIGHT NOT GET THE JURORS THAT DO THE LATTER, BUT

19         YOU MIGHT GET JURORS THAT DO THE FORMER ALL DAY LONG BECAUSE

20         IT'S QUITE SIMPLE TO DO.

21                   AND SO FROM A JUROR PERSPECTIVE, I DON'T KNOW IF I COULD

22         SAY THAT IT WAS STRONGER WITH THE LUCASFILM AND PIXAR -- I

23         DON'T KNOW THAT I WOULD SAY THAT.

24                   BUT I WOULD SAY THAT SOME OF THE EVIDENCE WAS MUCH EASIER

25         FOR THEM, MUCH MORE ACCESSIBLE FOR THEM, AND IN THAT WAY, WE
```

1    HAD TO FIGURE OUT WHAT WOULD BE THE REACTION IN COMPARISON TO

2    THAT EVIDENCE WITH SOME OF THE OTHER DEFENDANTS.

3            IT IS A RISK, YOUR HONOR.  IT'S A RISK WE HAD TO

4    ACKNOWLEDGE.

5            THE COURT:  BECAUSE THE DOCUMENTARY EVIDENCE IN TERMS

6    OF E-MAILS I THINK WAS STRONGER AGAINST THESE DEFENDANTS THAN

7    AGAINST LUCASFILM AND PIXAR, EVEN IF THEIR CEO STATEMENTS WERE

8    MORE INFLAMMATORY.

9            MS. DERMODY:  THERE WAS A TREMENDOUS RECORD IN THIS

10   CASE, YOUR HONOR, ABSOLUTELY.

11           AND IF I PERSONALLY BELIEVED THAT I COULD GO TO TRIAL

12   RIGHT NOW AND DO BETTER THAN WHAT WE'RE GIVING TO YOUR HONOR

13   TODAY, I WOULD DO IT.  I WOULD DO IT A HUNDRED TIMES IN A ROW.

14           THE REASON WE'RE COMING HERE TODAY, YOUR HONOR, IS

15   BECAUSE, IN OUR BEST JUDGMENT, THIS IS THE RIGHT THING TO DO

16   FOR THIS CLASS.  IF WE DIDN'T THINK THAT, WE WOULD NOT BE HERE

17   BEFORE YOU.

18           MR. VAN NEST:  YOUR HONOR, COULD I MAKE ONE OTHER

19   COMMENT?

20           THE COURT:  YEAH.  I MEAN, YOU KNOW, THE RATIONALE

21   GIVEN IN THE BRIEFS IS, OH, THIS SAVES COURT RESOURCES.  WELL,

22   YOU'VE ALREADY SPENT THIS COURT'S RESOURCES.  THAT IS NOT A

23   RATIONALE.

24           THIS NEEDS TO BE THE FAIREST COMPENSATION, YOU KNOW, A

25   FAIR RESOLUTION FOR THE CLASS.  THIS COURT WAS COMPLETELY

1    PREPARED TO GO TO TRIAL ON THIS CASE.

2         SO WHEN I HEAR, "OH, BUT WE SAVED YOU TIME," I'M SORRY,

3    THAT'S NOT COMPELLING TO ME.  THAT'S NOT A GOOD REASON TO ADOPT

4    THIS.  IT'S IN THE MOTION, IT'S IN THE REPLY, AND IT'S NOT

5    PERSUASIVE.

6         BUT GO AHEAD.

7              MR. VAN NEST:  TWO OTHER POINTS.

8         YOUR HONOR, YOU TALK ABOUT WEIGHING EVIDENCE.

9              THE COURT:  YEAH.

10             MR. VAN NEST:  TWO THINGS.  REMEMBER THAT THE EARLIER

11   PARTIES THAT SETTLED WERE PAYING GENERALLY LOWER SALARIES.  THE

12   PARTIES THAT ARE SETTLING HERE, PARTICULARLY GOOGLE AND APPLE,

13   WERE AT THE VERY TOP OF THE MARKET.

14        ALSO, LIKE I SAY --

15             THE COURT:  BUT WHICH WAY DOES THAT CUT?

16             MR. VAN NEST:  IT CUTS --

17             THE COURT:  WHICH WAY DOES THAT CUT?

18             MR. VAN NEST:  FOR JURORS --

19             THE COURT:  I MEAN, THAT MEANS THAT THE EMPLOYEES

20   COULD POTENTIALLY HAVE EARNED EVEN MORE AND YOU SHOULDN'T BE

21   PAYING LESS THAN YOUR PROPORTION THAN LUCASFILM AND PIXAR.

22             MR. VAN NEST:  IT CUTS IN THIS WAY:  PEOPLE DO NOT

23   FEEL AS THOUGH THOSE EMPLOYEES WERE TREATED UNFAIRLY WHEN THEIR

24   PAY WAS 50 OR MORE PERCENT HIGHER THAN THE AVERAGE TECH WORKER.

25        IT'S HARD TO GET A JUROR TO AGREE THAT THAT'S

1   UNDERCOMPENSATION WHEN THOSE FOLKS ARE MAKING SUCH A PREMIUM

2   OVER EVERYBODY ELSE IN THE BUSINESS.  THAT'S ONE THING.

3        THE OTHER KEY FACT IS THAT INTEL EMPLOYED 60 PERCENT OF

4   THE CLASS.  SO 60 PERCENT OF THE CLASS -- YOUR HONOR KNOWS THIS

5   FROM THE EARLIER BRIEFING.  THE EVIDENCE AGAINST INTEL WAS

6   RELATIVELY THIN, RIGHT?  ONE BILATERAL AGREEMENT, VERY LITTLE

7   E-MAIL TRAFFIC.  THAT WASN'T THE BARN BURNER OF THE CASE.

8        THE CASE THAT YOUR HONOR SAW EARLIER WITH COMMENTS BY

9   MR. CATMULL AND MR. LUCAS AND OTHERS WHERE THEY WERE INDICATING

10  THEY WANTED TO SUPPRESS PAY, THERE WAS NONE OF THAT IN THIS

11  GROUP OF FOUR.

12       AND IN PARTICULAR WITH RESPECT TO INTEL WHERE THERE WAS

13  ONLY A SINGLE AGREEMENT WITH A COMPANY THAT IT WAS DOING A LOT

14  OF BUSINESS WITH, I DO THINK THERE'S A REAL QUESTION --

15            THE COURT:  RIGHT, OKAY.  BUT THERE WAS MR. SCHMIDT'S

16  TESTIMONY AND SERGEY BRIN'S TESTIMONY THAT MR. OTELLINI OF

17  INTEL KNEW ABOUT THE APPLE/GOOGLE AGREEMENT, RIGHT?

18            MR. VAN NEST:  BUT --

19            THE COURT:  I MEAN, THERE WAS CERTAINLY EVIDENCE.

20  INTEL'S OWN EXPERT TESTIFIED THAT MR. OTELLINI WAS LIKELY AWARE

21  OF GOOGLE'S OTHER BILATERAL AGREEMENTS BY VIRTUE OF

22  MR. OTELLINI'S MEMBERSHIP ON GOOGLE'S BOARD.

23       I MEAN, I THINK THERE WAS -- INTEL CONCEDES THAT

24  MR. OTELLINI KNEW THE CONTENTS OF GOOGLE'S DO NOT COLD CALL

25  LIST, WHICH INCLUDED APPLE AND INTEL.

1        I MEAN, I --

2              MR. VAN NEST:  BUT, AGAIN --

3              THE COURT:  I THINK THERE WAS CERTAINLY EVIDENCE THAT

4    THE PLAINTIFFS COULD POINT TO THAT INTEL WAS AWARE OF OTHER

5    DEFENDANTS' AGREEMENTS AND THE COLD CALL AGREEMENTS OF OTHER

6    COMPANIES THAT INCLUDED OTHER COMPANIES, EVEN IF THEY DIDN'T

7    HAVE A DIRECT BILATERAL AGREEMENT WITH INTEL.

8              MR. VAN NEST:  BUT, YOUR HONOR, THE ARGUMENT IS, IS

9    IT A FAIR SETTLEMENT?  WE'RE TALKING ABOUT $324 MILLION.

10   THAT'S ALL PRICED INTO THAT.

11             AND YOU HAVE MR. DEVINE SAYING, "WELL, IT SHOULD HAVE BEEN

12   A LITTLE BIT MORE."  BALONEY.  THAT'S ALL WITHIN THE RANGE OF

13   JUDGMENT AND THE RANGE OF EXPERIENCE AND THE RANGE OF RISK.

14             IT'S NOT AS THOUGH WE'RE LOOKING AT A 15 OR $20 MILLION

15   SETTLEMENT.  WE'RE LOOKING AT A $324 MILLION SETTLEMENT WHICH,

16   NO MATTER HOW YOU CALCULATE IS, IS MANY, MANY FACTORS HIGHER

17   THAN WHAT THE EARLIER GUYS SETTLED FOR.

18             SO THIS IS ALL WITHIN THE RANGE OF DISCRETION AND

19   JUDGMENT.  THAT'S WHY I THINK THIS IS NOT A CLOSE CALL MYSELF

20   GIVEN THE RISKS ON BOTH SIDES, GIVEN THE AMOUNT OF MONEY THAT

21   WAS ACHIEVED, GIVEN THE --

22             THE COURT:  OKAY.  BUT LET ME ASK YOU, IF YOU USE THE

23   5 PERCENT, THEN THIS IS ABOUT 76,000 -- 76 MILLION SHORT.  WHAT

24   IS THAT?

25             MR. VAN NEST:  WHY WOULD --

1          THE COURT:  DO YOU AGREE WITH THE PLAINTIFFS THAT

2     THEIR CASE AGAINST YOU WAS WEAKER THAN THE CASE AGAINST

3     LUCASFILM AND PIXAR?  OR WHAT'S YOUR VIEW?

4          MR. VAN NEST:  I DON'T THINK IT'S --

5          THE COURT:  NO, I'M JUST SAYING -- I UNDERSTAND YOUR

6     POINT THAT IF YOU USE THE PERCENTAGE OF CLASS MEMBERSHIP, THIS

7     LOOKS LIKE IT'S A NEGOTIATED AMOUNT.

8          MR. VAN NEST:  EVEN --

9          THE COURT:  BUT JUST --

10         MR. VAN NEST:  LET'S USE YOUR NUMBER.

11         THE COURT:  -- LOOKING AT THE 5 PERCENT.

12         MR. VAN NEST:  LET'S USE YOUR NUMBER.  IT'S A

13    QUESTION OF JUDGMENT.  YOU CAN'T JUST MULTIPLY THE NUMBER OUT.

14    IT'S A QUESTION -- YOU'VE GOT A LOT MORE MONEY AT STAKE.  THEY

15    HAS A SETTLEMENT OF $20 MILLION.

16         THE COURT:  OKAY.  THAT'S WHY I WANTED TO KNOW, WHAT

17    IS IT THAT MAKES A DIFFERENCE?

18         MR. VAN NEST:  WHAT MAKES IT --

19         THE COURT:  IS IT BECAUSE WE'RE TALKING ABOUT LARGER

20    AMOUNTS OF MONEY?  IS THAT SORT OF THE LOWER PERCENTAGE OR WHAT

21    IS IT?

22         MR. VAN NEST:  IT'S ONE THING TO RISK 20 MILLION.

23         THE COURT:  OKAY.

24         MR. VAN NEST:  IT'S ANOTHER TO RISK 324 MILLION.

25    THAT'S A MUCH BIGGER RISK, RIGHT?  I MEAN, JUST FROM THEIR

1      STANDPOINT OF COMPENSATING THE CLASS --

2            THE COURT:  OKAY.

3            MR. VAN NEST:  -- IT'S ONE THING TO SAY, "OKAY, I'M

4      GOING TO FORGO 20 MILLION AND TAKE MY SHOT."

5            IT'S QUITE ANOTHER THING TO SAY, "I'LL FORGO 324 MILLION

6      AND TAKE MY SHOT."  I MEAN, THAT IS A VASTLY DIFFERENT

7      QUESTION.

8            AND, YES, THE EVIDENCE IS DIFFERENT IN THE TWO CASES AND,

9      YES, WE CAN ALL DISAGREE ABOUT WHAT IT MEANS.

10           BUT ULTIMATELY NONE OF THAT MATTERS BECAUSE IT'S A HUGE

11     RISK, ONE WAY OR THE OTHER, THAT THE JURY SEES IT YOUR WAY, AND

12     IF THEY DON'T, YOU HAVE SQUANDERED $324 MILLION, WHICH IS NOW A

13     SURE THING, YOU KNOW, IF THE SETTLEMENT WERE TO BE APPROVED.

14           SO I DON'T -- I DON'T, FOR ONE MINUTE, THINK THE

15     DIFFERENCE BETWEEN 400 AND 324 IS MEANINGFUL, I DON'T, BECAUSE

16     THIS IS ALL WITHIN THE RANGE OF JUDGMENT.

17           YOU CAN'T JUST TAKE A RULER AND MULTIPLY IT OUT AND SAY

18     YOU'RE FALLING SHORT.

19           AND EVEN IF YOU DID THAT, IF YOU USE MY RULER, WE'RE

20     PAYING A PREMIUM.  IF YOU USE THEIR RULER, WE'RE PAYING LESS.

21           BUT IT'S ALL WITHIN THE RANGE OF A REASONABLE RECOVERY FOR

22     THE CLASS IN LIGHT OF ALL OF THE VARIOUS RISKS.  THAT'S WHAT IT

23     IS.

24           SO I DON'T THINK YOU WOULD REACH A DIFFERENT RESULT EVEN

25     IF YOU SAID, "I THINK THE FAIR WAY TO LOOK AT IT IS BASED ON

1    PAY, 5 PERCENT."

2        I STILL THINK THIS IS EASILY WITHIN THE RANGE OF A

3    REASONABLE RESULT GIVEN EVERYTHING WE'VE TALKED ABOUT.

4        YOUR HONOR AND I COULD DEBATE ALL DAY HOW THE EVIDENCE

5    COMES OUT, BUT YOU AND I BOTH KNOW, IT'S THE JURY THAT DECIDES,

6    AND THAT'S VERY HARD TO PREDICT, VERY HARD TO PREDICT.

7        AND I WOULDN'T, IN A MILLION YEARS, IF I WERE IN THEIR

8    SHOES, RISK $324 MILLION ON WHAT I THOUGHT A JURY OF EIGHT

9    PEOPLE WAS GOING TO DO IN A CASE LIKE THIS WITH SO MUCH

10   DISPARATE EVIDENCE AND SO MANY DIFFERENT FACETS.

11       THAT'S, I THINK, THE KEY TAKE AWAY.  IT'S A MUCH, MUCH

12   BIGGER RISK FOR THE CLASS.

13       MY ONLY OTHER COMMENT IS I DON'T THINK WE SHOULD BE

14   GETTING INTO PUTTING NUMBERS INTO THE NOTICE OF WHAT THE CLASS

15   COULD HAVE WON, I MEAN, BECAUSE THAT IS SO SPECULATIVE.

16           THE COURT:  I'M NOT GOING TO DO THAT.

17           MR. VAN NEST:  YEAH.  THANK YOU.

18           THE COURT:  ALL RIGHT.

19       OKAY.  DO YOU WANT TO HAVE THE LAST WORD?

20           MS. DERMODY:  I JUST WANT TO MAKE IT CLEAR ON THE

21   RECORD, YOUR HONOR, THAT EVERYTHING I'VE BEEN TALKING ABOUT

22   TODAY IS ABOUT RISK ASSESSMENT AND IT'S NOT ABOUT THE

23   PLAINTIFFS' FEELING ABOUT THE CASE BEING A WEAK CASE OR TRYING

24   TO TELL YOUR HONOR THIS WAS A DOG AND ALL OF THAT.

25           THE COURT:  AND WHY WE WASTED YEARS ON THIS CASE.

1          MS. DERMODY:  NO.  IT'S US SAYING TO YOUR HONOR, WE

2     HAVE BEEN DRIVING THIS TRAIN AND WE RAN INTO JURY WORK, AND WE

3     HAVE BEEN SOBERED BY DOING THAT WORK AND BY LEARNING HOW

4     DIFFICULT IT IS TO CONVINCE A UNANIMOUS ROOM OF PEOPLE, EVEN

5     WITH THIS EVIDENCE, TO MEET THE STANDARD IN THIS CASE.

6          AND SO WHAT -- COULD WE HAVE DONE IT?  IS IT POSSIBLE?

7          THE COURT:  WERE YOU DOING RULE OF REASON OR WERE YOU

8     DOING PER SE IN YOUR JURY STUDIES?

9          MS. DERMODY:  WE WERE DOING EVERYTHING IN THE MOST

10    FAVORABLE WAY TO US, INCLUDING THINGS LIKE TELLING THE JURY

11    ABOUT THE D.O.J. INVESTIGATION.

12         I MEAN, YOUR HONOR, I JUST -- YOU KNOW, THE RISK THAT --

13         THE COURT:  I WOULD HAVE ALLOWED THAT PROBABLY.

14    PROBABLY.

15         MS. DERMODY:  WELL, AT THE RISK OF EXPOSING A LOT OF

16    WORK PRODUCT THAT WE WOULD NOT WANT THE DEFENDANTS TO HAVE IF

17    THE COURT WAS TO DENY OUR REQUEST TO APPROVE THE SETTLEMENT, I

18    DO WANT THE COURT TO UNDERSTAND THE AMOUNT OF CONCERN AND

19    EFFORT AND THE EMPIRICAL WORK WE DID TO GET TO A PLACE WHERE WE

20    RECOGNIZE THAT THAT RISK WAS NOT THEORETICAL, THAT IT WAS REAL,

21    AND WE HAD TO AT LEAST ACKNOWLEDGE IT.

22         THE COURT:  OKAY.  ALL RIGHT.  THANK YOU ALL VERY

23    MUCH.

24         MR. VAN NEST:  THANK YOU, YOUR HONOR.

25         THE COURT:  LET'S TAKE A BREAK BEFORE THE LAST CASE.

1          THANK YOU FOR YOUR PATIENCE FOR THE LAST CASE.

2               MS. DERMODY:  THANK YOU, YOUR HONOR.

3          (THE PROCEEDINGS WERE CONCLUDED AT 3:22 P.M.)

1

2

3                    <u>CERTIFICATE OF REPORTER</u>

4

5

6

7          I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

8    STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

9    280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY

10   CERTIFY:

11         THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

12   A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

13   ABOVE-ENTITLED MATTER.

14

15

16   _____

17   LEE-ANNE SHORTRIDGE, CSR, CRR
     CERTIFICATE NUMBER 9595

18   DATED:  JUNE 24, 2014

19

20

21

22

23

24

25