# Exhibit S to the Cisneros Declaration, Revised Version – Redacted

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3                  SAN JOSE DIVISION

4

5

6    IN RE:  HIGH-TECH EMPLOYEE     )

7    ANTITRUST LITIGATION           )

8                                   )   No. 11-CV-2509-LHK

9    THIS DOCUMENT RELATES TO:      )

10   ALL ACTIONS.                   )

11   _____)

12

13

14

15           VIDEO DEPOSITION OF SHONA BROWN

16                 January 30, 2013

17

18

19   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25

09:23:47 1   would be a very hands-on corporate strategy group.

09:23:55 2       Q.   And could you elaborate what you mean by People

09:23:57 3   Operations.

09:24:02 4       A.   The People Operations group is a name that I

09:24:06 5   chose because it -- primarily because the group was

09:24:13 6   inclusive of human resources but broader than that.

09:24:17 7   The focus was what you might call administrative G&A

09:24:21 8   pieces so, for example, the chefs all used to work for

09:24:24 9   me.  We had quite a few of them.  But it was inclusive

09:24:28 10  of all of the traditional aspects of human resources,

09:24:32 11  some parts that you might include in facilities, some

09:24:36 12  parts you might include in finance.

09:24:39 13      Q.   And you mentioned GMA.  What does that stand

09:24:44 14  for?

09:24:44 15      A.   G&A, sorry.  Functionally G&A, I guess it's

09:24:49 16  general and administrative.

09:24:52 17      Q.   Oh.

09:24:53 18           MR. RUBIN:  G&A.

09:24:56 19           THE WITNESS:  Yeah.  Sorry.  Ampersand.

09:25:00 20           MR. HARVEY:  Q.  Okay.  In your role as vice

09:25:01 21  president of business operations, you oversaw Google's

09:25:06 22  recruiting, correct?

09:25:10 23      A.   Yes.  Recruiting was a -- was part of my

09:25:13 24  group's mandate, and I would have had somebody -- I

09:25:19 25  would have had somebody running recruiting, though I do

09:25:23  1    not recall at that time who it was to be honest.

09:25:25  2         Q.  Is that the role Mr. Geshuri eventually

09:25:28  3    occupied?

09:25:28  4         A.  At one point in time, Mr. Geshuri was running a

09:25:32  5    good chunk of recruiting.

09:25:42  6         Q.  Was compensation part of your purview?

09:25:44  7         A.  Yes.  Compensation was also part of that People

09:25:47  8    Operations group's purview.

09:25:50  9         Q.  And so you had responsibility to design and

09:25:56  10   supervise a -- pardon me, supervise compensation at

09:26:00  11   Google company wide, correct?

09:26:03  12        A.  I would say that that's a fair description,

09:26:04  13   that the purview included design and monitoring and

09:26:09  14   oversight for compensation programs across the company.

09:26:12  15   Yes.

09:26:16  16        Q.  And these responsibilities -- and these

09:26:23  17   responsibilities, as you've described them, did you keep

09:26:30  18   that -- those responsibilities until you moved to head

09:26:37  19   Google.org?

09:26:41  20        A.  No.  I did not keep the responsibilities for

09:26:44  21   that entire period of time.  At a point, I actually

09:26:50  22   transitioned all of the People Operations group under

09:26:55  23   the responsibility of Laszlo Bock who did report to me.

09:27:00  24   And then at a point in time, I moved Laszlo from

09:27:04  25   reporting to me up to reporting to Eric so that I was no

09:27:07  1    longer operationally responsible for that group.  That

09:27:14  2    happened prior to me moving to my responsibilities with

09:27:17  3    Google.org so I continued on in my responsibilities with

09:27:22  4    business operations while not having any direct

09:27:24  5    oversight over People Operations.

09:27:27  6          Q.  What I'm trying to pinpoint is when those moves

09:27:31  7    happened.  So starting in I believe you said August of

09:27:35  8    2003, you had this wider set of responsibilities

09:27:37  9    reporting directly to Eric Schmidt.

09:27:41  10            When did you move what you described as People

09:27:46  11   Operations to Laszlo Bock?

09:27:48  12         A.  I don't actually recall specifically when

09:27:53  13   Laszlo moved from reporting to me to reporting to Eric.

09:27:58  14         Q.  But when did Laszlo Bock enter the picture so

09:28:01  15   that he took over some of those responsibilities but

09:28:03  16   reported to you?

09:28:06  17         A.  I don't recall when we hired Laszlo, but I

09:28:09  18   hired Laszlo to come in and work for me.  And I gave him

09:28:13  19   a set of responsibilities in People Operations.  I don't

09:28:17  20   recall if I gave him all of the pieces when he first

09:28:21  21   joined or not, actually.

09:28:24  22            Ultimately, I gave him all of the pieces of

09:28:26  23   People Operations, rolling up to him, reporting to me

09:28:31  24   and then at some point in time, I transitioned him to

09:28:34  25   report directly to Eric Schmidt.

10:03:18   1          MR. HARVEY:  What kind of break do you want to

10:03:19   2   take?

10:03:20   3          MR. RUBIN:  Ten minutes.

10:03:20   4          MR. HARVEY:  That's fine.

10:03:21   5          THE VIDEOGRAPHER:  The time is 10:03 a.m.

10:03:23   6   We're going off the record.  Sorry.  This is end of

10:03:29   7   video No. 1.

10:03:30   8          Off the record.

10:03:33   9          (Recess taken.)

10:07:30  10          THE VIDEOGRAPHER:  This is the beginning of

10:18:48  11   video No. 2 in the deposition of Shona Brown.  The time

10:18:50  12   is 10:18 a.m.

10:18:52  13          We're back on the record.

10:18:56  14          MR. HARVEY:  Q.  I believe you mentioned

10:18:57  15   earlier that Google recruited people, correct?

10:19:03  16      A.  Yes.  Google recruited people.

10:19:06  17      Q.  And during your time at Google, Google grew at

10:19:10  18   a rapid pace, correct?

10:19:11  19          MR. RUBIN:  Objection.  Vague.

10:19:17  20          THE WITNESS:  Google grew significantly as an

10:19:19  21   organization from the time that I joined through the

10:19:21  22   period in question.  Yes.

10:19:24  23          MR. HARVEY:  Q.  And -- well, why don't I

10:19:28  24   do this with more specificity.  Give me one moment.

10:19:56  25          I'm going to show you what has been marked as

| | | |
|---|---|---|
| 10:19:59 | 1 | Plaintiffs' Exhibit 634.  If you could take a look at |
| 10:20:03 | 2 | that and let me know when you're ready. |
| 10:20:07 | 3 | (Whereupon, Exhibit 634 was marked for |
| 10:20:07 | 4 | identification.) |
| 10:20:44 | 5 | THE WITNESS:  Okay.  I'm ready. |
| 10:20:47 | 6 | MR. HARVEY:  Q.  So I'm just going to |
| 10:20:48 | 7 | represent that this is a summary of data as produced |
| 10:20:52 | 8 | by Google to plaintiffs in this case. |
| 10:20:55 | 9 | And you began work in 2003 when the total |
| 10:21:00 | 10 | number of employees in Google's data was approximately |
| 10:21:04 | 11 | 1309, and for the most recent year, we have data, the |
| 10:21:08 | 12 | total number of employees is 17,890. |
| 10:21:12 | 13 | That represents significant growth, correct? |
| 10:21:16 | 14 | A.  Could I ask you a question about the data? |
| 10:21:18 | 15 | Q.  Please. |
| 10:21:19 | 16 | A.  Is this meant to be global data or U.S. only? |
| 10:21:22 | 17 | Q.  U.S. only. |
| 10:21:24 | 18 | A.  Okay.  That makes sense. |
| 10:21:28 | 19 | When I started, there were, I think, slightly |
| 10:21:31 | 20 | under a thousand people.  It looks consistent with this |
| 10:21:34 | 21 | data.  I have no reason to believe this is wrong. |
| 10:21:37 | 22 | Q.  Okay. |
| 10:21:38 | 23 | A.  And the adjective used is irrelevant, really. |
| 10:21:43 | 24 | I mean, you can just look at the numbers and we were |
| 10:21:45 | 25 | around a thousand, and as you point out, most recently |

10:21:49  1    in the U.S., looks like a little under 18,000.

10:21:55  2         Q.  Sure.

10:21:55  3              And Google experienced growth in the different

10:21:58  4    categories of employees described in this document,

10:22:00  5    correct?

10:22:01  6              MR. RUBIN:  Objection.  Vague.

10:22:06  7              THE WITNESS:  We could go through each of the

10:22:08  8    different functions line by line.  And I didn't actually

10:22:14  9    look to look quickly.  But if I take engineering, for

10:22:18 10    example -- well, it's unclear from this data, actually,

10:22:25 11    to be honest, how many employees you're growing and in

10:22:29 12    each of the different, because it's all in percentiles

10:22:34 13    based.  So we would have to debunk that into absolutes

10:22:38 14    to be clear but....

10:22:38 15              MR. HARVEY:  Q.  Sure.

10:22:38 16         A.  I agree with you in the aggregate the

10:22:40 17    organization is getting bigger.  I can't tell you

10:22:42 18    exactly from this precisely which function is growing,

10:22:46 19    quote/unquote, rapidly.

10:22:50 20         Q.  Drawing on your own personal experience, you

10:22:52 21    know --

10:22:53 22         A.  Yes.

10:22:53 23         Q.  -- regardless --

10:22:53 24         A.  Yes.

10:22:53 25         Q.  -- of what this says here --

10:22:55  1      A.   Yes.

10:22:57  2      Q.   -- Google recruited for employees for a variety

10:23:00  3  of different titles and job responsibilities, correct?

10:23:04  4      A.   We had a large -- we were growing a diverse

10:23:09  5  operating company, I would say unlike if you were, for

10:23:12  6  example, hiring into a law firm where you are typically

10:23:16  7  bringing in people in very similar roles and similar

10:23:19  8  levels, so the number of different roles you're

10:23:21  9  recruiting for is quite small.

10:23:22 10          In contrast, in an operating company when

10:23:24 11  you're building it and as you get bigger, that grows.

10:23:28 12  You have a wide variety of roles that you're hiring for.

10:23:32 13  Yes.

10:23:34 14      Q.   Okay.  And why don't we focus on the recruiting

10:23:37 15  part of that hiring for a moment.

10:23:39 16      A.   Sorry, what do you mean by the recruiting part

10:23:40 17  of hiring?  I don't actually know.

10:23:43 18      Q.   Is that because, to you, hiring is part of

10:23:45 19  recruiting?

10:23:47 20          MR. RUBIN:  I think she's just asking you for a

10:23:49 21  clarification.

10:23:50 22          THE WITNESS:  Can you just clarify what you

10:23:51 23  mean by recruiting.

10:23:53 24          MR. RUBIN:  She's just asking you to clarify

10:23:54 25  your question.

10:41:51  1   you have an understanding of whether Google had a

10:41:53  2   philosophy concerning pay?

10:41:56  3       A.  When I started at Google in 2003, we didn't

10:42:01  4   have a stated philosophy.  By that I mean, we didn't

10:42:08  5   have a set of specific do's and don'ts, or rules or

10:42:16  6   points of view on specific ways we would develop or

10:42:22  7   target pay.  None of that existed that needed to be

10:42:28  8   developed.

10:42:29  9       Q.  So in 2003, it was essentially a free-for-all

10:42:32 10   when it came to compensation at Google?

10:42:35 11           MR. RUBIN:  Objection.  Mischaracterizes prior

10:42:37 12   testimony.

10:42:38 13           THE WITNESS:  I wouldn't characterize our pay

10:42:40 14   practice as a free-for-all.  I would -- I would say that

10:42:43 15   we -- in 2003, my recollection is that there were a set

10:42:51 16   of biases that were not expressed very well in clear

10:42:55 17   guidelines that you could take to build out a set of

10:43:01 18   rules.  There were certainly sets of biases on

10:43:06 19   approaches to compensation.

10:43:10 20           MR. HARVEY:  Q.  What were those biases?

10:43:12 21       A.  So, for example, like many small, private

10:43:17 22   companies, you have an understanding that the most

10:43:21 23   valuable thing that you can offer to someone you're

10:43:24 24   trying to hire is an opportunity to participate in a

10:43:28 25   company that might go public.  So you have a point of

10:43:32  1   view that you have some stock options.  At that time

10:43:36  2   options were universally used.

10:43:40  3          And so I would say a bias was, when you're

10:43:42  4   thinking about making an offer, you understood that

10:43:46  5   probably the most attractive thing you could offer was

10:43:51  6   some stock options from a compensation perspective.  So

10:43:56  7   I would -- to me, that doesn't translate into a very

10:44:00  8   concrete philosophy, the way you were using the term,

10:44:02  9   but it's a clear bias in the system.

10:44:05  10       Q.  Okay.  Did -- when you started, did Google try

10:44:11  11  to pay its employees fairly?

10:44:19  12       A.  From my perspective, and in all of the elements

10:44:22  13  where I led development of our pay practices, I was

10:44:27  14  always focused on trying to pay people fairly.  Of

10:44:29  15  course.

10:44:33  16          Your fair and my fair might be different.

10:44:34  17  That's the nature of compensation.  But of course, we

10:44:36  18  were trying to pay people fairly for, you know, for

10:44:40  19  their value.

10:44:43  20       Q.  So you said that our notions of fairness may

10:44:48  21  differ.  What did you understand fairness to mean in

10:44:51  22  that context?

10:44:52  23          MR. RUBIN:  Objection.  Vague.  Ambiguous.

10:44:54  24          THE WITNESS:  I think it's a high-level

10:44:55  25  question, but the way I would respond to your question

| | |
|---|---|
| 10:44:58 | 1 | about what's fair in pay, is very simply, which is that |
| 10:45:03 | 2 | a person's overall pay, which could include many |
| 10:45:08 | 3 | elements, ought to reflect, overall, the value that |
| 10:45:11 | 4 | they're bring to the organization.  It's a sniff test. |
| 10:45:18 | 5 | MR. HARVEY:  Q.  Was a component of |
| 10:45:20 | 6 | fairness, as you saw it, that two -- two equally |
| 10:45:27 | 7 | valuable employees should be paid roughly the same? |
| 10:45:30 | 8 | A.  Unfortunately, in my experience, pay practices |
| 10:45:33 | 9 | are not that simple. |
| 10:45:35 | 10 | Just to take your very simple example, did |
| 10:45:39 | 11 | those two individuals join at the same time?  Have those |
| 10:45:43 | 12 | two individuals progressed at the same rate?  Are they |
| 10:45:47 | 13 | giving the same amount of value to me in this past |
| 10:45:50 | 14 | quarter, this past year, over their entire tenure at |
| 10:45:53 | 15 | Google?  How should I think about all of those?  What's |
| 10:45:55 | 16 | fair?  I don't think that's a very black-and-white |
| 10:45:58 | 17 | question. |
| 10:45:58 | 18 | So pay practices in my experience, you do try |
| 10:46:00 | 19 | to develop some principles.  For example, we believe our |
| 10:46:04 | 20 | options is a big part of value we can offer employees. |
| 10:46:08 | 21 | But then, in reality, it's a case-by-case basis.  It's |
| 10:46:13 | 22 | good management and attention to details and looking at |
| 10:46:15 | 23 | individuals that's going to generate the most fair |
| 10:46:19 | 24 | system, to use your term. |
| 10:46:21 | 25 | Q.  So I want to focus on the first part of your |

| | | |
|---|---|---|
| 10:46:24 | 1 | answer where you gave me examples of how two employees |
| 10:46:27 | 2 | might be situated differently.  And let's think about |
| 10:46:32 | 3 | that for a moment. |
| 10:46:34 | 4 | Suppose there are two employees at Google who |
| 10:46:37 | 5 | are similarly situated in every way in which you |
| 10:46:42 | 6 | describe.  So for example, they were hired at the same |
| 10:46:45 | 7 | time, they have the same education, they're the same |
| 10:46:51 | 8 | age, and they provide the same value to the company. |
| 10:46:55 | 9 | Should they be paid the same? |
| 10:46:56 | 10 | MR. RUBIN:  Objection.  Calls for a |
| 10:46:58 | 11 | hypothetical response.  Calls for speculation. |
| 10:47:01 | 12 | THE WITNESS:  I'm afraid that it is a |
| 10:47:05 | 13 | hypothetical case.  And I will -- I'll repeat, which is |
| 10:47:08 | 14 | that on a case-by-case basis, you would look at those |
| 10:47:12 | 15 | two individuals, and we would need to sit down and look |
| 10:47:14 | 16 | at those two individuals and decide whether one factor |
| 10:47:19 | 17 | in determining their pay should be each of the other two |
| 10:47:22 | 18 | individuals.  And that would never be the sole factor, |
| 10:47:26 | 19 | of course.  Because you would also be looking at how |
| 10:47:30 | 20 | does the market pay these individuals.  You might also |
| 10:47:34 | 21 | be considering how much were they being paid before they |
| 10:47:37 | 22 | joined.  You might also be considering other parts of |
| 10:47:41 | 23 | the company and how did this role compare to that. |
| 10:47:46 | 24 | So in my experience, again, there are so many |
| 10:47:48 | 25 | factors that fair is a very difficult thing to define, |

10:47:53   1   and you just simply have to use your best judgment as a

10:47:57   2   manager, and you have to have your best possible list of

10:48:01   3   guiding principles.  And diligently work through, you

10:48:04   4   know, lists of people to try to do your best to be as,

10:48:08   5   quote, fair as possible.

10:48:10   6            MR. HARVEY:  Q.  And I acknowledge that

10:48:11   7   there are other relevant concerns.  But one

10:48:13   8   component of fairness is that in examples like that,

10:48:19   9   their compensation should be similar or comparable,

10:48:21   10  correct?

10:48:23   11       A.  I guess I'm not accepting your assertion of a

10:48:26   12  hypothetical that they necessarily need to be similar.

10:48:29   13            It is the case that when you are looking at an

10:48:33   14  individual's pay, one of the things you would consider

10:48:37   15  was the pay of other similar individuals.  One of many

10:48:41   16  factors.  Whether that would lead you to align that

10:48:44   17  person's pay with those other individuals is too

10:48:47   18  difficult to say in a hypothetical.  But you would

10:48:50   19  certainly look at that factor.

10:48:52   20       Q.  Are you familiar with the term internal equity?

10:48:57   21       A.  No.  It's not really a term that I typically

10:48:59   22  use.

10:48:59   23            Can you explain what you mean.

10:49:02   24       Q.  So your testimony is that you've never heard

10:49:04   25  the term?

| | | |
|---|---|---|
| 10:49:05 | 1 | MR. RUBIN:  Objection.  Mischaracterizes her |
| 10:49:07 | 2 | testimony. |
| 10:49:09 | 3 | THE WITNESS:  I said that it's not a term that |
| 10:49:11 | 4 | I typically use.  I don't recall its usage in parlance |
| 10:49:17 | 5 | so I'm not exactly sure what -- it could mean a variety |
| 10:49:20 | 6 | of things. |
| 10:49:21 | 7 | MR. HARVEY:  Okay. |
| 10:49:32 | 8 | (Discussion off the record.) |
| 10:49:41 | 9 | MR. HARVEY:  Q.  I'm going to hand you |
| 10:49:45 | 10 | what's been marked Plaintiffs' Exhibit 564. |
| 10:49:48 | 11 | (Whereupon, Exhibit 564 was marked for |
| 10:49:48 | 12 | identification.) |
| 10:50:01 | 13 | MR. HARVEY:  Q.  Just let me know when |
| 10:50:01 | 14 | you're ready. |
| 10:50:02 | 15 | I'll just say that my questions are going to |
| 10:50:04 | 16 | be focused on Sheryl Sandberg's email of April 3rd on |
| 10:50:09 | 17 | the second page and your response. |
| 10:52:31 | 18 | A.  Okay.  I get the gist of it.  Depending on your |
| 10:52:33 | 19 | question, I may have to read more.  It's fairly lengthy. |
| 10:52:38 | 20 | Q.  Sure.  Sure.  I appreciate that. |
| 10:52:38 | 21 | Why don't we start with the bottom of page 1. |
| 10:52:41 | 22 | A.  Bottom of page 1.  Yes. |
| 10:52:48 | 23 | Q.  First, did you, in fact, send this email to |
| 10:52:52 | 24 | Sheryl Sandberg and others on April 3rd, 2004? |
| 10:52:56 | 25 | A.  I have no recollection of this email, but I |

| | | |
|---|---|---|
| 10:55:51 | 1 | way to think of it in a commonsense way is, if that |
| 10:55:54 | 2 | individual was to up and look for that very same job at |
| 10:55:57 | 3 | a different company, what are the ranges of pay that |
| 10:56:01 | 4 | might be possible if they were hireable in that. |
| 10:56:04 | 5 | Separately, I think of the internal market as |
| 10:56:08 | 6 | inside the company, irrespective of how other companies |
| 10:56:12 | 7 | think about that role, how does our -- how does the |
| 10:56:14 | 8 | internal market value that role relative to other roles |
| 10:56:19 | 9 | at Google. |
| 10:56:21 | 10 | Very simply put, if I looked at the pay range |
| 10:56:23 | 11 | of our service associate, and I looked at the pay range |
| 10:56:28 | 12 | of our engineering directors, let's say, it probably |
| 10:56:32 | 13 | wouldn't make sense if the pay range of the service |
| 10:56:34 | 14 | associate was the same as the pay range of the |
| 10:56:38 | 15 | engineering director, right? |
| 10:56:40 | 16 | Somewhat of a stupid example, but the point is, |
| 10:56:42 | 17 | you would think internally about these pay ranges for |
| 10:56:45 | 18 | these different roles.  And at some level, |
| 10:56:48 | 19 | commonsensically, those pay ranges should make sense for |
| 10:56:52 | 20 | the value internally of that role. |
| 10:56:56 | 21 | Often those two things overlap a lot, however, |
| 10:57:00 | 22 | there are instances in which a specific company -- and |
| 10:57:05 | 23 | I'm not really familiar in other companies that |
| 10:57:07 | 24 | deeply -- but for example, at Google, where there might |
| 10:57:09 | 25 | be a role that we actually value disproportionately |

| | | |
|---|---|---|
| 10:57:14 | 1 | compared to how the outside market values it.  So we |
| 10:57:18 | 2 | might adjust our pay range for that. |
| 10:57:19 | 3 | So when I say internal market and external |
| 10:57:22 | 4 | market, broadly speaking, that's what I mean. |
| 10:57:25 | 5 | Q.  Great.  Thank you for that clarification. |
| 10:57:28 | 6 | In the internal market, I believe you use an |
| 10:57:31 | 7 | example of two employees where one has a title that |
| 10:57:37 | 8 | suggests that the range should be higher than the range |
| 10:57:41 | 9 | for another group of employees. |
| 10:57:44 | 10 | Was it important to maintain a certain |
| 10:57:47 | 11 | relationship in that way?  For example, if there were |
| 10:57:54 | 12 | different levels to a particular category of employee, |
| 10:57:56 | 13 | that employees in a lower level, when their pay went up, |
| 10:58:01 | 14 | then the compensation to employees at a higher level |
| 10:58:05 | 15 | would sometimes need to be adjusted to reflect that |
| 10:58:08 | 16 | shift? |
| 10:58:08 | 17 | MR. RUBIN:  Objection.  Vague.  Ambiguous. |
| 10:58:12 | 18 | Calls for speculation. |
| 10:58:19 | 19 | THE WITNESS:  That was a rather complicated |
| 10:58:20 | 20 | question.  If the question is that when you construct a |
| 10:58:27 | 21 | job ladder, for example, for sales in -- sales |
| 10:58:34 | 22 | associates.  And this is an example of part of a job |
| 10:58:37 | 23 | ladder in this email from Lourdes to Sheryl, I believe. |
| 10:58:45 | 24 | For example, if you looked at these different jobs which |
| 10:58:49 | 25 | are meant to be opportunities for someone to progress up |

| | | |
|---|---|---|
| 10:58:53 | 1 | their job ladder, when you constructed the pay scales, |
| 10:58:56 | 2 | you would be having a pay range that increased with |
| 10:59:02 | 3 | increased responsibility as you were promoted up that |
| 10:59:05 | 4 | job ladder. |
| 10:59:07 | 5 | It's -- I don't remember the specifics of any |
| 10:59:10 | 6 | of the job ladders.  I can tell you that it's not all -- |
| 10:59:15 | 7 | it's certainly not always clean in the sense that you |
| 10:59:18 | 8 | don't have some line, if you're in this job, you're paid |
| 10:59:22 | 9 | below X.  There's overlap.  But generally speaking, as |
| 10:59:25 | 10 | you went up a job ladder, as your responsibilities grew, |
| 10:59:28 | 11 | as your value grew, your pay range would also increase. |
| 10:59:33 | 12 | But there would be overlaps.  And also to our earlier |
| 10:59:38 | 13 | conversation, there would be exceptions.  Because pay is |
| 10:59:42 | 14 | individual.  Back to my earlier point. |
| 10:59:45 | 15 | MR. HARVEY:  Q.  It's individual, but it's part |
| 10:59:47 | 16 | of this company-wide system where you're trying to |
| 10:59:50 | 17 | maintain fairness in light of what you were discussing, |
| 10:59:53 | 18 | the external market facts, the internal market facts, |
| 10:59:56 | 19 | correct? |
| 10:59:56 | 20 | MR. RUBIN:  Objection.  Mischaracterizes |
| 10:59:58 | 21 | prior -- |
| 10:59:59 | 22 | THE WITNESS:  Sorry. |
| 10:59:59 | 23 | MR. RUBIN:  -- lengthy description. |
| 11:00:01 | 24 | THE WITNESS:  Could you just clarify your |
| 11:00:02 | 25 | question in there. |

| | | |
|---|---|---|
| 11:00:03 | 1 | MR. HARVEY: Q. Well, sure. |
| 11:00:04 | 2 | So I'm -- you stated that pay is individual, |
| 11:00:07 | 3 | but I want to go back to what we've been talking about |
| 11:00:12 | 4 | where Google and you, in trying to create this |
| 11:00:16 | 5 | compensation system, fairness was a principle that you |
| 11:00:19 | 6 | used in that system, correct? |
| 11:00:22 | 7 | MR. RUBIN: Objection. Vague. Ambiguous. |
| 11:00:24 | 8 | Mischaracterizes prior testimony. |
| 11:00:27 | 9 | THE WITNESS: I think when we talked about |
| 11:00:29 | 10 | fairness, we actually agreed or at least I asserted that |
| 11:00:32 | 11 | it was hard to define, so I'm not going to agree with |
| 11:00:35 | 12 | your statement. |
| 11:00:35 | 13 | If your question is whether or not when you |
| 11:00:38 | 14 | design pay structures for companies you think about |
| 11:00:40 | 15 | bands of pay and you think about different bands of pay |
| 11:00:44 | 16 | at different levels, then yes, we did that, and we tried |
| 11:00:47 | 17 | to create bands of pay that reflected the role the |
| 11:00:50 | 18 | individual was playing and -- and the value that they -- |
| 11:00:54 | 19 | that role implied. |
| 11:00:58 | 20 | MR. HARVEY: Q. Okay. Thanks. |
| 11:01:00 | 21 | Could you explain how those bands of pay, say |
| 11:01:02 | 22 | for any given job ladder, what was their relationship to |
| 11:01:07 | 23 | each other? So for example, you know, comparing the |
| 11:01:11 | 24 | lower rungs, if I can put it that way, on the job ladder |
| 11:01:14 | 25 | to the higher rungs. |

11:01:17  1        MR. RUBIN:  Objection.  Ambiguous.

11:01:22  2        THE WITNESS:  If your question is about the

11:01:24  3  size of the, you know, percent changes between the rungs

11:01:30  4  on a ladder or the ratios, I actually -- I'm the wrong

11:01:33  5  person to ask.  I don't remember those level of detail.

11:01:35  6        MR. HARVEY:  Q.  Who would be the right person

11:01:36  7  to ask?

11:01:39  8     A.  I'd have to speculate to decide at which level

11:01:46  9  of the organization individuals would remember that.  So

11:01:52 10  I -- I mean....

11:01:54 11     Q.  Well --

11:01:56 12     A.  Of course I was exposed to it over time, but

11:01:58 13  this is some time ago and I don't remember the

11:01:59 14  specifics.

11:02:01 15     Q.  Okay.  Can you explain how Google evaluated the

11:02:35 16  performance of its employees.

11:02:47 17     A.  I'm not sure that I can actually explain in an

11:02:52 18  oral statement how we evaluated our employees.

11:02:57 19        Can you break that down for me as well?  That's

11:03:00 20  like your previous, you know, initial question, very

11:03:05 21  broad.

11:03:06 22     Q.  Did Google, throughout your time there, make an

11:03:09 23  effort to have a systematic way of evaluating its

11:03:13 24  employees?

11:03:13 25     A.  Yes.  We attempted to systematically evaluate

| | | |
|---|---|---|
| 11:03:17 | 1 | our employees. |
| 11:03:18 | 2 | Q. Did those methods change during your time at |
| 11:03:23 | 3 | Google? |
| 11:03:24 | 4 | A. Yes. Over the period of time in question, the |
| 11:03:28 | 5 | methods changed in terms of how we attempted to evaluate |
| 11:03:31 | 6 | our employees. |
| 11:03:32 | 7 | Q. Why don't we go through it. |
| 11:03:34 | 8 | So starting in 2003, what was Google's method |
| 11:03:40 | 9 | for evaluating performance of its employees? |
| 11:03:43 | 10 | MR. RUBIN: Objection. Vague. |
| 11:03:47 | 11 | THE WITNESS: Is it possible for you to ask me |
| 11:03:49 | 12 | a more specific aspect of evaluation that you're |
| 11:03:53 | 13 | interested in? |
| 11:03:54 | 14 | MR. HARVEY: Q. Well, as it relates to |
| 11:03:55 | 15 | making decisions about compensation. |
| 11:04:00 | 16 | MR. RUBIN: Same objection. |
| 11:04:09 | 17 | THE WITNESS: I'm struggling to answer your |
| 11:04:10 | 18 | question when we had, you know, such a vast array of |
| 11:04:16 | 19 | relevant elements, it seems to me. |
| 11:04:18 | 20 | Is there some particular part of how we |
| 11:04:21 | 21 | evaluated people that you're interested in that I could |
| 11:04:24 | 22 | address? |
| 11:04:25 | 23 | MR. HARVEY: Q. Yeah, why don't we get |
| 11:04:27 | 24 | more specific. |
| 11:04:29 | 25 | Google used a point system on a one-to-five |

11:04:32  1    scale, true?

11:04:36  2        A.  Google had a mechanism of rating employees.  I

11:04:43  3    don't recall exactly when we put it into place, but very

11:04:49  4    early on.  And we continue to use a version of that

11:04:54  5    system -- let's say up through the period in question.

11:04:58  6    I'm less familiar with exactly what we're doing right

11:05:01  7    now.

11:05:04  8        Q.  Did Google use a pay system -- I'm sorry -- a

11:05:07  9    point system for evaluation from 2003 through 2010?

11:05:15 10        A.  It's my recollection that we had a point system

11:05:23 11    in place as one part of our evaluation process

11:05:28 12    throughout that period.  Yes.

11:05:35 13        Q.  And were there -- well, first, are you familiar

11:05:39 14    with the term compensable factor.

11:05:46 15        A.  No, I'm not familiar with the term compensable

11:05:49 16    factor.

11:05:50 17        Q.  The point system, was it on a one-to-five

11:05:53 18    scale?

11:05:54 19        A.  My recollection is that we had a

11:05:58 20    one-through-five scale.  I don't recall if that's still

11:06:04 21    the case.  But that's my recollection in the period in

11:06:07 22    question.

11:06:08 23        Q.  And was there -- well, I should say, who were

11:06:14 24    the individuals who typically assigned points to

11:06:17 25    particular employees?

| | | |
|---|---|---|
| 11:06:20 | 1 | MR. RUBIN:  Objection.  Vague. |
| 11:06:26 | 2 | THE WITNESS:  I can't answer your question in |
| 11:06:27 | 3 | terms of which named individual assigned points to which |
| 11:06:33 | 4 | named Googler.  What I'll do is explain that we |
| 11:06:37 | 5 | attempted to have the right level of manager, so in a |
| 11:06:41 | 6 | management chain, be responsible for the point assigned |
| 11:06:49 | 7 | to the individuals in their chain.  And that that -- who |
| 11:06:54 | 8 | that correct level of individual was changed over time. |
| 11:07:01 | 9 | MR. HARVEY:  Q.  And was there a single |
| 11:07:02 | 10 | point assigned to a particular employee or were |
| 11:07:06 | 11 | there several factors each of which had its own |
| 11:07:09 | 12 | score? |
| 11:07:10 | 13 | A.  I'm sorry, I don't understand that last part of |
| 11:07:12 | 14 | your question. |
| 11:07:14 | 15 | Q.  So for a particular employee working for |
| 11:07:18 | 16 | Google, say in 2005 -- |
| 11:07:20 | 17 | A.  Yes. |
| 11:07:22 | 18 | Q.  -- would that employee be evaluated on this |
| 11:07:24 | 19 | one-to-five scale once a year? |
| 11:07:31 | 20 | A.  I don't recall specifically 2005, but the most |
| 11:07:35 | 21 | common pattern throughout this period was that each |
| 11:07:39 | 22 | individual -- most individuals would receive a rating on |
| 11:07:48 | 23 | a quarterly basis.  And at different times, the method |
| 11:07:53 | 24 | for an annual rating was calculated either -- as an |
| 11:07:59 | 25 | additional fifth rating or simply as a sum of the four |

11:08:04 1    from the year.

11:08:07 2            The mechanism of determining a rating for most

11:08:10 3    of this period was done on a quarterly basis.

11:08:15 4        Q.  Okay.  And typically, whenever the evaluations

11:08:21 5    occurred, was there a single score assigned to a

11:08:23 6    particular employee, say, you know, three or four, or

11:08:27 7    were there several scores for a particular employee,

11:08:32 8    each of which had its own one-to-five value?

11:08:42 9        A.  I'm not sure on the mechanics in every group

11:08:46 10   exactly, you know, what different pieces of evaluation

11:08:51 11   went on.  Generally speaking, the end result was that

11:08:58 12   for each individual Googler for which this mechanism was

11:09:04 13   being applied -- I say that because my recollection is

11:09:08 14   that in some of the sales roles, the mechanism was

11:09:12 15   different.

11:09:14 16           But generally speaking, for most individual

11:09:16 17   Googlers, on a quarterly basis, the net result of the

11:09:21 18   evaluation process is that they would have a single

11:09:24 19   rating, for example, 3.2, that would reflect their --

11:09:30 20   meant to reflect their performance in that quarter.  And

11:09:32 21   that would be one input into the performance evaluation

11:09:38 22   system that is very complicated but we're in a specific

11:09:42 23   piece of it at the moment.

11:09:45 24       Q.  Okay.  Did Google have a single company-wide

11:10:00 25   budget for salary increases?

11:10:03 1          MR. RUBIN:  Ambiguous as to time.

11:10:07 2          MR. HARVEY:  Q.  From when you started

11:10:09 3   until the present time, to your knowledge.

11:10:18 4          A.  I don't remember the details of how we managed

11:10:23 5   budget relative to compensation changes, and it changed

11:10:30 6   over time.  We clearly understood that -- we definitely

11:10:38 7   were, if you will, calculating the end result of the

11:10:42 8   proposed compensation changes and the budget

11:10:46 9   implications of that.  I don't recall whether that was

11:10:50 10  done constrained by a budget or as an aftereffect of,

11:10:57 11  well, that's now in the budget.  And it also was managed

11:11:01 12  differently at different points in time.

11:11:18 13         Q.  But for any given year, there was a budget for

11:11:22 14  compensation, correct?

11:11:24 15         A.  No, I don't think that that's what I'm saying.

11:11:28 16  My point is that ultimately, after you've made the pay

11:11:33 17  changes, of course that has implications for budget, and

11:11:39 18  we would understand those implications.  At different

11:11:48 19  times -- the timing of whether that was determined

11:11:55 20  apriori, or whether that was an outcome of the

11:12:00 21  performance evaluation process varies over the time

11:12:03 22  period in question.

11:12:08 23         Q.  Maybe I'm not being clear.  I'm not asking

11:12:10 24  about the relationship between budgets and compensation

11:12:14 25  decisions or timing or any of that.  I'm just asking a

11:24:31 1       Q.   Okay.  Have you ever discussed or thought about

11:24:42 2   whether, you know, Googlers choose to work for Google

11:24:46 3   for reasons other than money or benefits?

11:24:50 4            MR. RUBIN:  Objection.  Overly broad.  Calls

11:24:53 5   for speculation.

11:25:05 6            THE WITNESS:  The way I would answer your

11:25:06 7   question is rather than talk about why people join, I

11:25:08 8   would answer your question and explain why people stay.

11:25:13 9            On a routine basis, we conduct surveys of our

11:25:17 10  existing employees, and one of the questions we ask is,

11:25:22 11  why are you staying at Google.  And the answer, in my

11:25:27 12  time line of exposure to that, which overlaps with the

11:25:33 13  period in question, is relatively consistent.  People

11:25:37 14  choose to stay at Google because of the cohort they get

11:25:40 15  to work with.  In other words, they enjoy their

11:25:43 16  colleagues.  Because of the quality of the -- and nature

11:25:47 17  of the problems they get to work on.  In other words,

11:25:49 18  they get to do interesting work.  And those were

11:25:55 19  consistently the first and second factors that explained

11:25:59 20  why they chose to stay at Google.

11:26:02 21           And then the third was broadly described as the

11:26:05 22  work environment, which is different things to different

11:26:08 23  people.  For some people that's because they have -- we

11:26:12 24  have mother's rooms and mother's parking.  For other

11:26:18 25  people, it's because there was laundry rooms and free

11:26:20  1    food.  It depends on the individual.  But in general,

11:26:22  2    the work environment was always the third.

11:26:26  3           So that's a fact-based answer to your question

11:26:28  4    of why people at least were choosing to stay at Google.

11:26:32  5           MR. HARVEY:  Thank you.

11:27:06  6       Q.  Please take a look at what's been marked

11:27:08  7    Plaintiffs' Exhibit 551.

11:27:09  8           (Whereupon, Exhibit 551 was marked for

11:27:09  9           identification.)

11:28:17 10           THE WITNESS:  Okay.

11:28:18 11           MR. HARVEY:  Q.  I just want to get into

11:28:19 12    some of the vocabulary here and just walk through

11:28:22 13    the email.

11:28:23 14           Well, first I want to ask, who is Jeffrey

11:28:27 15    Donovan?

11:28:31 16       A.  My recollection is that Jeffrey was one of

11:28:38 17    the -- was in our law group somewhere.  I don't recall

11:28:42 18    that he was part of the people ops organization.

11:28:58 19       Q.  Okay.  Did he, in fact, send you this email --

11:29:00 20    I guess you were cc'd -- on January 19th, 2004?

11:29:05 21       A.  I don't have any recollection of this email,

11:29:07 22    but I have no reason to believe that I wasn't cc'd on it

11:29:11 23    as this exhibit suggests.

11:29:15 24       Q.  If you go to point one in his email where he

11:29:18 25    says, "Confirm the levels for each person."  Are levels

| | | |
|---|---|---|
| 11:29:22 | 1 | for employees a concept with which you're familiar? |
| 11:29:30 | 2 | A.  Yes.  The idea that we had employees at |
| 11:29:33 | 3 | different levels is a concept I'm familiar with.  I |
| 11:29:38 | 4 | don't know what he's specifically referring to here. |
| 11:29:41 | 5 | It's unclear.  But generally speaking, we'd had |
| 11:29:46 | 6 | different levels for employees.  Yes. |
| 11:29:49 | 7 | Q.  And just for clarity, I won't ask you to get |
| 11:29:52 | 8 | into Mr. Donovan's mind.  I'm just using this as a way |
| 11:29:55 | 9 | to get your understanding of what different terms mean. |
| 11:30:00 | 10 | So what did -- well, how did Google level its |
| 11:30:07 | 11 | employees? |
| 11:30:07 | 12 | MR. RUBIN:  How did Google -- I'm sorry? |
| 11:30:09 | 13 | MR. HARVEY:  It's not put very artfully. |
| 11:30:10 | 14 | Q.  But how did Google use leveling in the sense of |
| 11:30:13 | 15 | why was it relevant to compensation at Google? |
| 11:30:20 | 16 | A.  I'll try to answer your question. |
| 11:30:22 | 17 | We spoke earlier about the fact that you would |
| 11:30:26 | 18 | have what I refer to as a job ladder, and that |
| 11:30:30 | 19 | terminology may have changed over time.  But within a |
| 11:30:36 | 20 | job ladder, we would typically refer to, for example, |
| 11:30:39 | 21 | the lowest level position -- we would refer to those as |
| 11:30:44 | 22 | levels on a ladder.  So perhaps you were hired into an |
| 11:30:50 | 23 | entry level position.  It doesn't necessarily mean your |
| 11:30:54 | 24 | first job was the bottom of the ladder. |
| 11:30:56 | 25 | But there would be some position at the bottom |

11:30:57  1   of a ladder which reflected a level, and then I think

11:31:02  2   sometimes it was called zero and sometimes one.  I don't

11:31:05  3   recall, and I think it changed over time.  But, you

11:31:07  4   know -- and then it was numbered for ease of

11:31:11  5   understanding that if you discussed a specific role, you

11:31:16  6   could understand that that role was at a specific level

11:31:19  7   on a certain job ladder.

11:31:25  8       Q.   Okay.  And the concept of -- well, scratch

11:31:29  9   that.

11:31:34  10       In the second point, he says, "Place unmatched

11:31:37  11   people into a level and give them a salary range."

11:31:42  12       Did -- or were there occasionally employees at

11:31:46  13   Google who weren't put into a level that Google

11:31:49  14   identified and then figured out where to put them?

11:31:52  15       A.   Again, I don't remember January of 2004 very

11:31:56  16   well.  What I do remember is that we needed to create

11:32:05  17   sets of these -- as we created new roles in the company,

11:32:11  18   we needed to create job ladders and we typically had

11:32:14  19   levels of them.  And it would certainly be the case in

11:32:19  20   January 2004 that on a regular basis, we would be

11:32:23  21   creating new group -- entire new groups for the company

11:32:28  22   which would imply new roles and would imply new ladders

11:32:34  23   and new levels, and it would certainly be the case that

11:32:37  24   those might be pre-populated, if you will.

11:32:40  25       So there would be employees who were performing

| | | |
|---|---|---|
| 11:32:43 | 1 | those roles ahead of us actually figuring out that we -- |
| 11:32:47 | 2 | what the new job ladder would be and where the role sat |
| 11:32:52 | 3 | on it and levels and so on. |
| 11:32:53 | 4 | So the question of whether or not an individual |
| 11:32:56 | 5 | employee at some time may have existed in this period |
| 11:33:00 | 6 | and not have had a clear level or role for some period |
| 11:33:05 | 7 | of time, I think that's certainly the case, yes. |
| 11:33:19 | 8 | Q.  In point 2b, he says, "Include" -- I'm sorry. |
| 11:33:23 | 9 | He says, "Move people to new levels where they |
| 11:33:28 | 10 | wrongfully skew the data for that level." |
| 11:33:33 | 11 | In your experience at Google, were there |
| 11:33:35 | 12 | individuals who were leveled improperly such that they |
| 11:33:37 | 13 | skewed the data? |
| 11:33:41 | 14 | A.  I don't know what he means by "skew the data" |
| 11:33:44 | 15 | so I'm not going to try to interpret.  Let me answer |
| 11:33:47 | 16 | your question about whether or not we ever had |
| 11:33:50 | 17 | individuals who were misleveled. |
| 11:33:53 | 18 | The answer to that question is, yes.  Which is |
| 11:33:57 | 19 | that you would hire individuals, and you would hire them |
| 11:34:01 | 20 | into a certain role.  And based on the interview process |
| 11:34:06 | 21 | and our anticipation of the value that they would add to |
| 11:34:11 | 22 | the company, we would slot them into a specific level. |
| 11:34:15 | 23 | It's -- it did happen on occasion where we |
| 11:34:18 | 24 | simply guessed wrong, right?  The interview process is |
| 11:34:22 | 25 | well understood to be an imperfect process.  And the |

| | | |
|---|---|---|
| 11:34:33 | 1 | topic would come up when in a matter of the standard |
| 11:34:37 | 2 | review process you would look at an individual and the |
| 11:34:41 | 3 | comment would be that we hired this person and we |
| 11:34:45 | 4 | misleveled them, which implied that the person should |
| 11:34:49 | 5 | get moved up or down a level because now that we |
| 11:34:54 | 6 | understand the value that they bring and the work that |
| 11:34:56 | 7 | they can really do, we've placed them in the wrong -- |
| 11:35:00 | 8 | essentially we put them in the wrong job category and we |
| 11:35:03 | 9 | need to change that.  That's my memory of where the term |
| 11:35:06 | 10 | would come up. |
| 11:35:13 | 11 | MR. RUBIN:  Dean -- |
| 11:35:13 | 12 | MR. HARVEY:  Yep. |
| 11:35:13 | 13 | MR. RUBIN:  -- I think it's a good time for a |
| 11:35:15 | 14 | break and I actually have to go to the restroom. |
| 11:35:17 | 15 | MR. HARVEY:  Well, I have no objection to that, |
| 11:35:18 | 16 | so.... |
| 11:35:19 | 17 | MR. RUBIN:  Okay.  Good. |
| 11:35:19 | 18 | MR. HARVEY:  All right. |
| 11:35:20 | 19 | THE VIDEOGRAPHER:  The time is 11:35 a.m. |
| 11:35:25 | 20 | We're going off the record.  This is the end of video |
| 11:35:29 | 21 | No. 2. |
| 11:35:35 | 22 | (Recess taken.) |
| 11:50:12 | 23 | THE VIDEOGRAPHER:  This is the beginning of |
| 11:50:14 | 24 | video No. 3 in the deposition of Shona Brown.  The time |
| 11:50:17 | 25 | is 11:50 a.m. |

05:11:20  1      Q.  When did Facebook [sic] begin entertaining the

05:11:34  2  idea of doing a company-wide raise that was referred to

05:11:39  3  internally as the big bang?

05:11:43  4      A.  Did you mean to say Google?

05:11:45  5      Q.  Yes, I did.  Thank you.  Sorry, it's getting

05:11:47  6  late.

05:11:53  7      A.  What we typically -- or what we have referred

05:11:54  8  to as big bang is when we announce a series of actions,

05:12:03  9  most notably the 10 percent salary increase.  And that

05:12:07 10  is -- I forget the exact date, to be honest, but it is

05:12:12 11  really an end point in an evolution.  It's best

05:12:16 12  understood if you look at our compensation over time.

05:12:18 13  We start as a very small company offering, some might

05:12:22 14  say, too small salaries.  We're always meritocratic.

05:12:30 15  There's some cash bonus in there, but our biggest

05:12:34 16  offering from a compensation perspective is our options

05:12:37 17  at that time.

05:12:38 18          As we become a public company, as the relative

05:12:41 19  rate of growth of our stock price, right, is -- is less

05:12:44 20  for newer employees coming in, we, like many other

05:12:48 21  companies, the nature of our compensation package, in

05:12:51 22  terms of what's attractive, starts to change.

05:12:54 23          We're also serving our employees throughout

05:12:56 24  this period.  And as you go from a small com -- startup

05:13:01 25  where everyone joining you has -- well, most people



05:13:33  12        So the outcome of that was a decision to

05:13:37  13   actually look at that and for -- the only incident I can

05:13:43  14   recall when we unilaterally, in other words, without a

05:13:46  15   performance orientation to it, we looked across the

05:13:49  16   whole company, and we said we're going to give a

05:13:51  17   10 percent -- it doesn't -- it was a percentile but

05:13:53  18   still, we gave it to everybody.  A 10 -- at least I

05:13:55  19   recall it being everybody.  A 10 percent raise and --

05:14:00  20

05:14:03  21       . So from a responsibility perspective of thinking

05:14:06  22   about our -- you know, as a management team, it wasn't a

05:14:11  23   silly thing to do.

05:14:12  24        And what's interesting is the value that you

05:14:15  25   would get in terms of employees appreciating that, we

| | | |
|---|---|---|
| 05:14:18 | 1 | |
| 05:14:21 | 2 | |
| 05:14:25 | 3 | |
| 05:14:28 | 4 | |



05:14:30  5   That's the orientation behind it, and that leads up to

05:14:34  6   what's commonly called big bang or the announcement of

05:14:37  7   our -- our wage increase across the company.

05:14:39  8         To my knowledge, it's the only time we did

05:14:41  9   anything, you know, across everybody that wasn't

05:14:45  10  performance oriented and case by case and so on.

05:14:51  11        MR. HARVEY:  Q.  If you could please take a

05:14:53  12  look at Exhibit 625.

05:15:00  13        (Whereupon, Exhibit 625 was marked for

05:15:00  14        identification.)

05:15:14  15        MR. HARVEY:  Q.  And I'm only going to ask

05:15:15  16  you about Jonathan Rosenberg's email towards the top

05:15:20  17  and your response.

05:15:24  18     A.  Jonathan Rosenberg's -- oh, wait.  Sorry.  I

05:15:26  19  just want to see what's up.

05:15:34  20     Q.  Sure.

05:16:25  21     A.  Okay.

05:16:27  22     Q.  Did you write this email to the OC -- I'm

05:16:29  23  sorry -- to Jonathan Rosenberg copying the OC and Bill

05:16:33  24  Campbell on October 9th, 2010?

05:16:37  25     A.  Yes.  I don't recall the email, but it looks to

05:16:39  1    be an email from me to Jonathan in October 2010.  Yes.

05:16:44  2        Q.  Okay.  Starting with your email, what were you

05:16:49  3    referring to when you wrote, "The well-known downside of

05:16:52  4    what we have chosen to do"?

05:17:01  5        A.  I -- I don't remember what I'm referring to,

05:17:03  6    but in the context of Jonathan's email below, I'm

05:17:07  7    speaking to this point that we discussed earlier, which

05:17:10  8    is that when you are choosing to counteroffer at times,

05:17:16  9    even if you're thoughtful about it, if it starts to be

05:17:20  10   understood, you know, in pockets of the company or just

05:17:22  11   people start to feel like that's happening, you're going

05:17:25  12   to create some concerns about, well, if I'm not somebody

05:17:30  13   who's sought to leave the company and I haven't,

05:17:32  14   therefore, gotten a counteroffer, am I being treated

05:17:35  15   fairly in terms of the compensation that I get relative.

05:17:39  16        Now, they may not know the details, but their

05:17:43  17   gossip is usually worse than reality, right?  So that's

05:17:46  18   the point that I'm -- I -- I expect I'm alluding to

05:17:48  19   there.

05:17:49  20       Q.  Okay.  And -- well, could you explain what you

05:17:56  21   meant by the sentence, "And hope that big bang and other

05:18:02  22   efforts we take short circuits the whole loop

05:18:05  23   dramatically causing less people to seek other offers in

05:18:10  24   the first place"?

05:18:11  25       A.  Yes.  I would -- I mean, this is consistent

05:57:24  1   that we actually used outside compensation consultants,

05:57:27  2   but what he's suggesting is that this is reliable

05:57:32  3   information about the planned budget.  It's not clear to

05:57:34  4   me at all that a Googler actually called up, you know,

05:57:36  5   an Amazon person to accomplish this.  It's unclear from

05:57:40  6   the way he's expressed it.

05:57:42  7        MR. HARVEY:  Q.  When he says we called tech

05:57:44  8   companies, is there anything unclear about that?

05:57:46  9        A.  I --

05:57:46  10        MR. RUBIN:  I think that's what she's telling

05:57:47  11   you.  So objection.  Argumentative.  Not listening to

05:57:51  12   the answer.

05:57:55  13        THE WITNESS:  I'll just repeat that my

05:57:57  14   interpretation in an email like this at a summary level

05:58:00  15   when he says, we called tech companies, he's simply

05:58:03  16   trying to say that we have access to information that we

05:58:06  17   believe reliably comes from those companies directly

05:58:09  18   that this is their planned budgets.  I don't know how he

05:58:12  19   went about getting the information.

05:58:13  20        The context for this is the economy -- the

05:58:16  21   state of the economy in the fall of 2008 and trying to

05:58:19  22   understand whether or not other companies are thinking

05:58:22  23   it's appropriate when you have increasing portions of

05:58:26  24   the U.S. getting laid off, et cetera, to have the

05:58:30  25   technology sector giving increases and what is

05:58:32  1    appropriate.

05:58:33  2           It's -- it's -- it is common practice, across

05:58:36  3    compensation consultant firms to understand, you know,

05:58:39  4    what the sort of average salary increases -- the

05:58:44  5    information is usually dated but what the average salary

05:58:47  6    increases are to keep up with the increased cost of

05:58:50  7    living, et cetera.  So that's the context in which this

05:58:51  8    is being presented.

05:58:53  9           MR. HARVEY:  Q.  Can you identify a single

05:58:56  10   survey or a single consulting company that would provide

05:59:00  11   company-specific merit budgets that are --

05:59:07  12       A.  I don't --

05:59:07  13       Q.  -- yet to be finalized in one case?

05:59:11  14       A.  No, I don't know the de -- as I say, I don't

05:59:12  15   know the details of how he put together this

05:59:14  16   information.

05:59:14  17       Q.  Well, I'm just asking you, apart from the

05:59:16  18   document, can you identify a single survey company or

05:59:20  19   consultancy that would provide this kind of information

05:59:24  20   to Google?

05:59:25  21       A.  I don't have a good memory of exactly -- it's

05:59:25  22   been a while since I've actually looked at specific

05:59:29  23   survey data by survey companies and what they're able to

05:59:32  24   provide at what level.  So I can't tell you that.

05:59:34  25       Q.  Okay.  How did Google determine the pay ranges

| | | |
|---|---|---|
| 05:59:55 | 1 | that we described earlier -- I'm sorry, that you |
| 05:59:58 | 2 | testified about earlier? |
| 06:00:04 | 3 | A.  I'll answer the question of how pay ranges were |
| 06:00:07 | 4 | created at a very high level because I think the details |
| 06:00:10 | 5 | of how that's done probably changes over the time period |
| 06:00:13 | 6 | in question. |
| 06:00:16 | 7 | But these components are probably a part of it |
| 06:00:19 | 8 | and, again, I'm -- I'm probably a bit too far above it |
| 06:00:22 | 9 | to give you the specifics.  But one is that you would |
| 06:00:25 | 10 | attempt to understand, for all of the roles in your |
| 06:00:29 | 11 | company, how they matched to roles in the -- outside in |
| 06:00:33 | 12 | the market.  So usually third parties are involved to |
| 06:00:37 | 13 | help companies with this process, but what you're trying |
| 06:00:40 | 14 | to understand is, if you will, a role match. |
| 06:00:43 | 15 | Sometimes you have roles inside your company |
| 06:00:45 | 16 | where that's very difficult to do.  You just don't hire |
| 06:00:48 | 17 | the same type of people to do the same type of job.  But |
| 06:00:52 | 18 | generally speaking, what you're trying to understand is, |
| 06:00:53 | 19 | for somebody who is in this role, what are other |
| 06:00:57 | 20 | companies paying people who do this kind of work.  So |
| 06:01:00 | 21 | that's one data point that you would use. |
| 06:01:05 | 22 | The term that's often used in reference to |
| 06:01:07 | 23 | that, and I don't know if we still use it, is a market |
| 06:01:10 | 24 | reference point.  And that's -- that's meant to be |
| 06:01:13 | 25 | describing a -- and it's different for different |

06:01:17  1    types -- different parts of pay, but it's meant to be

06:01:20  2    describing either a mean or median associated with that

06:01:23  3    external market and that role.

06:01:26  4         The second part of your pay structure is,

06:01:29  5    though, then looking internally, right?  And you're

06:01:33  6    trying to understand, okay, the outside world thinks of

06:01:37  7    this role in the following way.  Terrific.  Is that

06:01:39  8    entirely consistent with how we think about that role?

06:01:43  9    Would we hire the very same types of people?  Would we

06:01:46  10   have them do really the very same types of work?  Would

06:01:49  11   we value them in the very same way?  If that's the case,

06:01:52  12   your pays -- your pay range might actually match

06:01:54  13   perfectly that pay range that is reflected in the

06:01:57  14   aggregate external market data.  If it's not, it will

06:02:01  15   differ.

06:02:03  16        And in Google's case, you know, there were some

06:02:05  17   areas where it would be more consistent with external

06:02:07  18   and some areas where it wasn't.  So you'd use that

06:02:11  19   information as well.

06:02:12  20        And then another input would be, okay, great.

06:02:17  21   We understand pay ranges.  We've just compared ourself

06:02:19  22   to some companies who give no stock, say.  Or maybe they

06:02:23  23   have defined benefit plans and we don't, right?  So you

06:02:26  24   have to take into account the other elements of pay as

06:02:29  25   well and factor that into whether or not it's an apples

06:02:31  1   to apples as you think about your pay structure that

06:02:34  2   you're creating.

06:02:38  3          So at a high level -- now, exactly, you know,

06:02:41  4   how we did all of those steps, I think it changes a lot,

06:02:45  5   you know, over time.  It changes as we get bigger, more

06:02:48  6   complex, et cetera.  But generally speaking, those would

06:02:50  7   be inputs into -- it's my understanding of how you would

06:02:53  8   think about creating pay bands.

06:02:56  9       Q.  And would your answer stay the same for how

06:03:00 10   Google would determine range minimums and maximums?

06:03:07 11       A.  I think my answer is consistent with the

06:03:10 12   creation of pay bands, which for me, that includes mins

06:03:15 13   and maxes, as well as probably some sense of either a

06:03:19 14   median or a mean, whichever approach you're using.

06:03:22 15   People use different ways of doing it.

06:03:43 16          MR. HARVEY:  I think that's the end of my

06:03:48 17   questions on the current documentary record.

06:03:50 18          Unless you have any questions?

06:03:52 19          MR. RUBIN:  We don't have any questions.

06:03:53 20          So as I said in my letter to you on I think the

06:03:57 21   25th, either when your questions end or when seven hours

06:04:01 22   end, the deposition's closed, we know that there's a

06:04:03 23   pending motion to compel.  And as we said, although the

06:04:07 24   deposition is closed, if you are successful in that

06:04:09 25   motion and you come to us with particular documents that

| | | |
|---|---|---|
| 06:04:11 | 1 | you think it's imperative for you to be able to ask |
| 06:04:17 | 2 | Ms. Brown additional questions, we'll take that under |
| 06:04:19 | 3 | advisement.  But we reserve the right to take the |
| 06:04:23 | 4 | position that the deposition continues to be closed. |
| 06:04:24 | 5 | MR. HARVEY:  Well, I disagree that the |
| 06:04:26 | 6 | deposition is closed.  From plaintiffs' perspective, the |
| 06:04:29 | 7 | deposition will remain open pending the result of our |
| 06:04:31 | 8 | motion to compel. |
| 06:04:32 | 9 | I understand you're reserving all your |
| 06:04:34 | 10 | objections, but I want to make that clear for the |
| 06:04:34 | 11 | record. |
| 06:04:35 | 12 | MR. RUBIN:  Right.  And we just are invoking |
| 06:04:37 | 13 | the Federal Rules of Civil Procedure that says seven |
| 06:04:39 | 14 | hours.  You're ending, I think, at 6.54, so.... |
| 06:04:41 | 15 | You do have six more minutes, but, otherwise, |
| 06:04:43 | 16 | the deposition is closed if you have no more questions. |
| 06:04:47 | 17 | MR. HARVEY:  Again, I'll just reiterate that |
| 06:04:51 | 18 | our position is that the deposition is not closed.  I |
| 06:04:53 | 19 | disagree with your characterization that a fixed seven |
| 06:04:58 | 20 | hours would be the extent of what we would be entitled |
| 06:05:02 | 21 | to on these facts and on these documents. |
| 06:05:04 | 22 | MR. RUBIN:  Okay.  Well, I think our letter |
| 06:05:06 | 23 | exchanges speak to our respective positions, so.... |
| 06:05:09 | 24 | With that, the deposition is closed from |
| 06:05:11 | 25 | Google's perspective and thank you. |

1          I, Gina V. Carbone, Certified Shorthand

2    Reporter licensed in the State of California, License

3    No. 8249, hereby certify that the deponent was by me

4    first duly sworn and the foregoing testimony was

5    reported by me and was thereafter transcribed with

6    computer-aided transcription; that the foregoing is a

7    full, complete, and true record of said proceedings.

8          I further certify that I am not of counsel or

9    attorney for either of any of the parties in the

10   foregoing proceeding and caption named or in any way

11   interested in the outcome of the cause in said caption.

12         The dismantling, unsealing, or unbinding of

13   the original transcript will render the reporter's

14   certificates null and void.

15         In witness whereof, I have hereunto set my

16   hand this day:  February 1, 2013.

17         _____ Reading and Signing was requested.

18         _____ Reading and Signing was waived.

19         ___X___ Reading and signing was not requested.

20

21

22         _____

23         GINA  V. CARBONE

24         CSR 8249, RPR, CCRR

25

Page  Line

58  16    Change: from "also was running." to "also was running staffing."

          Reason: last word of sentence accidentally omitted from transcript

205  19   Change: from "adjustin" to "gesture"

          Reason: incorrect word in transcript

207  21   Change: from "do-not policy" to "do-not call policy"

          Reason: word policy accidentally omitted from transcript

___  ___  Change:_____

          Reason:_____

___  ___  Change:_____

          Reason:_____

___  ___  Change:_____

          Reason:_____

___  ___  Change:_____

          Reason:_____


_____ Subject to the above changes, I certify that the transcript is true and correct.


_____ No changes have been made. I certify that the transcript is true and correct.


_____          March 26/2013
(signature)                           (date)