# Exhibit V to the Cisneros Declaration, Revised Version

Deposition of Jonathan Rosenberg                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN JOSE DIVISION

 4

 5

 6   IN RE:  HIGH-TECH EMPLOYEE     )

 7   ANTITRUST LITIGATION           )

 8                                  )   No. 11-CV-2509-LHK

 9   THIS DOCUMENT RELATES TO:      )

10   ALL ACTIONS.                   )

11   _____)

12

13

14      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

15      VIDEO DEPOSITION OF JONATHAN ROSENBERG

16                March 13, 2013

17

18

19   REPORTED BY:  GINA V. CARBONE, CSR NO. 8249, RPR, CCRR

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 10:36:44 | 1 | running searches.  And they all know their |
| 10:36:49 | 2 | colleges well.  They all went to big schools. |
| 10:36:51 | 3 | I went to, like, little, rinky-dink Claremont |
| 10:36:53 | 4 | McKenna College in Southern California.  There |
| 10:36:54 | 5 | is, like, 200 graduates a year.  So I type in |
| 10:36:58 | 6 | suma cum laude Claremont McKenna College, and I |
| 10:36:58 | 7 | find two people and, you know, I try to |
| 10:37:00 | 8 | convince them to join Google.  And then I |
| 10:37:03 | 9 | realize I'm not adding any value.  Every week |
| 10:37:05 | 10 | I'm showing up in this room, and they're |
| 10:37:08 | 11 | running searches, finding great people, and |
| 10:37:10 | 12 | giving the great people to the recruiters and |
| 10:37:11 | 13 | saying, just send these -- just tell these |
| 10:37:13 | 14 | people there is a plane ticket to Mountain View |
| 10:37:15 | 15 | and we want to hire them.  So I decided that I |
| 10:37:20 | 16 | needed to add some value because I was busy |
| 10:37:22 | 17 | arguing with Larry about the product lines.  He |
| 10:37:25 | 18 | didn't think I was a useful executive.  So I |
| 10:37:29 | 19 | thought, well, I'll try a different search.  So |
| 10:37:32 | 20 | I discovered there was an award at India |
| 10:37:32 | 21 | Institute of Technology called the Gold Medal |
| 10:37:32 | 22 | Award.  And I ran a search and I found four |
| 10:37:32 | 23 | people, Prashan, Sihndar, Deep, (phonetic) who |
| 10:37:32 | 24 | won the Gold Medal Award at India Institute of |
| 10:37:32 | 25 | Technology.  And I said to the recruiter, call |

10:37:32  1          these people and explain to them why they

10:37:32  2          should work at Google.  And if they don't agree

10:37:53  3          with you, let me explain it to them.  And so --

10:37:56  4          and it worked.  Like, suddenly we hired a few

10:37:59  5          people.  And so the recruiting dynamic is

10:38:04  6          different.  It's not the adverse selection of

10:38:06  7          the people that want you, it's the people that

10:38:07  8          you want.  The next thing, which is really

10:38:10  9          different" --

10:38:13 10          MR. RUBIN:  And I'll just object to form.

10:38:14 11 Rule 106.

10:38:17 12          MR. HARVEY:  Q.  Okay.  There are a couple

10:38:22 13 of statements you made in that segment.  And I'm

10:38:24 14 just going to repeat them to you because it's

10:38:26 15 easier, given the technology, for me just to say it,

10:38:30 16 and then I'll ask you to explain kind of what you

10:38:32 17 meant by that statement.

10:38:33 18      A.  Okay.

10:38:34 19      Q.  The first is, we don't want the people who are

10:38:38 20 applying, we want the best people in the world.

10:38:42 21          MR. RUBIN:  Objection.  Form.

10:38:43 22          MR. HARVEY:  Q.  What did you mean by that

10:38:45 23 statement?

10:38:46 24          MR. RUBIN:  Sorry.  I thought you were done,

10:38:47 25 Dean, I'm sorry.

| | | |
|---|---|---|
| 10:38:49 | 1 | Objection.  Form. |
| 10:38:55 | 2 | THE WITNESS:  I'm not sure how to provide |
| 10:38:58 | 3 | additional clarification beyond what I said. |
| 10:39:03 | 4 | MR. HARVEY:  Q.  Okay.  The second |
| 10:39:07 | 5 | statement that I want to ask you about is, it's not |
| 10:39:10 | 6 | the adverse selection of the people that want you, |
| 10:39:14 | 7 | it's the people that you want.  Could you explain |
| 10:39:17 | 8 | what you meant by that statement. |
| 10:39:19 | 9 | MR. RUBIN:  Objection.  Form. |
| 10:39:32 | 10 | THE WITNESS:  Repeat the statement. |
| 10:39:34 | 11 | MR. HARVEY:  Q.  Sure.  It's not the |
| 10:39:35 | 12 | adverse selection of the people that want you, it's |
| 10:39:39 | 13 | the people that you want. |
| 10:39:42 | 14 | MR. RUBIN:  Objection.  Form. |
| 10:39:45 | 15 | THE WITNESS:  I guess you would have to be more |
| 10:39:46 | 16 | specific about what portion of that statement you want |
| 10:39:48 | 17 | me to clarify. |
| 10:39:50 | 18 | MR. HARVEY:  Q.  Sure.  Why don't we break |
| 10:39:51 | 19 | it up.  When you used the phrase "adverse selection" |
| 10:39:55 | 20 | in the context of individuals applying to Google, |
| 10:39:59 | 21 | what did you mean by that? |
| 10:40:08 | 22 | A.  That there is a bias related to the set of |
| 10:40:13 | 23 | people who apply as opposed to those who don't. |
| 10:40:17 | 24 | Q.  And what is that bias? |
| 10:40:18 | 25 | A.  That the people who apply, on average, aren't |

10:40:21  1    as good.

10:40:24  2         Q.   And Google wanted to hire the best people it

10:40:27  3    could?

10:40:28  4              MR. RUBIN:  Objection.  Form.

10:40:30  5              MR. HARVEY:  Q.  Correct?

10:40:31  6         A.   As a general rule, Google always wanted to hire

10:40:39  7    the best people it could.

10:40:45  8         Q.   Okay.  I think that's it for the video portion

10:40:47  9    of the deposition.

10:40:56 10              MR. RUBIN:  At a break, Dean, can we get a

10:40:57 11    copy?  Do you have another --

10:41:00 12              MR. HARVEY:  I can give it to you right now.

10:41:02 13              MR. RUBIN:  Great.  Thank you.

10:41:45 14              MR. HARVEY:  Q.  In your experience at

10:41:46 15    Google, would you say that the typical employee knew

10:41:51 16    what comparable employees were being paid at Google?

10:41:54 17              MR. RUBIN:  Objection.  Form.

10:41:57 18              THE WITNESS:  I don't know.

10:41:59 19              MR. HARVEY:  Q.  You don't have an opinion

10:42:00 20    one way or another?

10:42:02 21         A.   I don't.

10:42:02 22              MR. RUBIN:  Objection.  Form.

10:42:10 23              MR. HARVEY:  Q.  Did you think it was

10:42:11 24    important not to share compensation ranges,

10:42:19 25    compensation information about employees generally

| | | |
|---|---|---|
| 10:42:20 | 1 | with the wider population at Google? |
| 10:42:23 | 2 | MR. RUBIN:  Objection.  Form. |
| 10:42:28 | 3 | THE WITNESS:  I guess you have to -- can you -- |
| 10:42:30 | 4 | I don't understand exactly what you are asking. |
| 10:42:32 | 5 | MR. HARVEY:  Q.  Sure.  So let me take a |
| 10:42:34 | 6 | step back for a moment. |
| 10:42:36 | 7 | You had information about what various |
| 10:42:39 | 8 | engineers who worked for you were getting paid, correct? |
| 10:42:43 | 9 | A.  I did. |
| 10:42:44 | 10 | Q.  And that information was superior, in many |
| 10:42:47 | 11 | ways, to the information that the engineers themselves |
| 10:42:51 | 12 | had about what their colleagues were getting paid, |
| 10:42:54 | 13 | correct? |
| 10:42:54 | 14 | MR. RUBIN:  Objection.  Form. |
| 10:43:01 | 15 | THE WITNESS:  I had information that other |
| 10:43:02 | 16 | people did not. |
| 10:43:03 | 17 | MR. HARVEY:  Q.  Was it important to you to |
| 10:43:05 | 18 | keep that information from the wider population at |
| 10:43:10 | 19 | Google. |
| 10:43:11 | 20 | MR. RUBIN:  Objection.  Form. |
| 10:43:16 | 21 | THE WITNESS:  As a general rule, salary |
| 10:43:18 | 22 | information is something which is kept confidential, and |
| 10:43:22 | 23 | I -- I generally administered that policy. |
| 10:43:28 | 24 | MR. HARVEY:  Q.  Do you agree with that |
| 10:43:29 | 25 | policy? |

| | | |
|---|---|---|
| 11:32:09 | 1 | number of reasons.  One primary reason would be the |
| 11:32:11 | 2 | confidentiality of the candidate. |
| 11:32:14 | 3 | MR. HARVEY:  Q.  And could you elaborate on |
| 11:32:15 | 4 | that a little bit.  What confidentiality concern are |
| 11:32:19 | 5 | you describing? |
| 11:32:21 | 6 | A.  A candidate might not want his employer to know |
| 11:32:24 | 7 | that he's interviewing with another firm. |
| 11:32:26 | 8 | Q.  And why might a candidate not want his or her |
| 11:32:31 | 9 | employer to know that he's interviewing with another |
| 11:32:33 | 10 | firm, or she's interviewing with another firm? |
| 11:32:37 | 11 | A.  I'm sure there are a whole host of relatively |
| 11:32:40 | 12 | obvious reasons that any reasonable person can think of. |
| 11:32:43 | 13 | Q.  And what would those obvious reasons be? |
| 11:32:47 | 14 | MR. RUBIN:  Objection.  Form. |
| 11:32:57 | 15 | THE WITNESS:  Can you be specific and give me |
| 11:32:59 | 16 | some possibilities?  I can tell you whether I agree or |
| 11:33:01 | 17 | disagree with them rather than just guessing. |
| 11:33:03 | 18 | MR. HARVEY:  I don't want you to guess, but you |
| 11:33:04 | 19 | just said that there were some obvious reasons.  And so |
| 11:33:07 | 20 | I'd like to have you list what those obvious reasons |
| 11:33:11 | 21 | are. |
| 11:33:12 | 22 | MR. RUBIN:  Objection.  Form. |
| 11:33:15 | 23 | THE WITNESS:  One would be that they could be |
| 11:33:16 | 24 | perceived as disloyal. |
| 11:33:21 | 25 | MR. HARVEY:  Q.  Are there any others? |

11:33:24 1      A.  Again, I can't make an exhaustive list for you.

11:33:28 2   I think as a general rule, it's obvious why employees

11:33:31 3   who are looking might not want their employers to know

11:33:34 4   that they're looking.

11:33:41 5      Q.  Okay.  Why don't we stick with the first reason

11:33:45 6   you gave, that the employer may be concerned that -- I'm

11:33:49 7   sorry -- that the employee may be concerned that his or

11:33:52 8   her employer would perceive that person as disloyal.

11:34:02 9           In that circumstance, where an employer

11:34:05 10  discovers that an employee is interviewing at another

11:34:09 11  company, why would that employer perceive that as a

11:34:16 12  disloyal act?

11:34:18 13          MR. RUBIN:  Objection.  Form.

11:34:23 14          THE WITNESS:  Again, there's lots of reasons.

11:34:27 15  I don't -- I guess I don't understand exactly what you

11:34:29 16  are asking.

11:34:31 17          MR. HARVEY:  Q.  Well, I'm basically asking

11:34:33 18  you to expand on the point you've already made,

11:34:36 19  which is that an obvious reason why an employee may

11:34:39 20  not want to know -- or may not want their employer

11:34:43 21  to know that they're interviewing is that they could

11:34:46 22  be perceived as disloyal.  So I'm asking why is

11:34:49 23  that?  Why is that an obvious concern?

11:34:56 24          MR. RUBIN:  Objection.  Form.

11:35:00 25          THE WITNESS:  Because employees have

11:35:02  1    confidential information, and firms compete with each

11:35:06  2    other and often don't want confidential information

11:35:10  3    going from one company to another through an employee.

11:35:17  4            MR. HARVEY:  Q.  What about the disloyalty

11:35:20  5    piece?  What would be disloyal about interviewing

11:35:23  6    with other companies?

11:35:25  7            MR. RUBIN:  Objection.  Form.

11:35:27  8            THE WITNESS:  You would have to ask the manager

11:35:28  9    of the employee what their view of disloyalty is, but

11:35:33 10    I'm sure that many employees perceive that their

11:35:35 11    managers might think it disloyal, and it therefore not

11:35:38 12    to be in their self-interest to have their managers be

11:35:41 13    aware of the fact that they're looking for other

11:35:43 14    employment.

11:35:46 15            MR. HARVEY:  Q.  And it's fair to say that

11:35:49 16    when an employer learns that an employee is looking

11:35:54 17    around to work for another employer, that this

11:35:59 18    disloyalty concern could result in negative

11:36:04 19    consequences to the career of that employee should

11:36:07 20    that employee choose to stay at the current

11:36:09 21    employer?

11:36:09 22            MR. RUBIN:  Objection.  Form.

11:36:12 23            THE WITNESS:  It's a pretty complex statement.

11:36:15 24    I'm not sure I can speculate on the generality as to

11:36:21 25    whether or not it's true for different people in

12:04:26  1              THE VIDEOGRAPHER:  We are now on the record at

12:04:28  2   12:04.

12:04:30  3              MR. HARVEY:  Q.  Mr. Rosenberg, if you

12:04:30  4   could please take a look at a document that has been

12:04:33  5   previously introduced as Exhibit 1738.

12:04:53  6        A.  Okay.

12:04:56  7        Q.  Here Mr. Shader responds to Ms. Brown's

12:04:58  8   rejection by e-mailing you and Mr. Kordestani

12:05:03  9   separately, correct?

12:05:04 10        A.  Yes.

12:05:07 11        Q.  And in it, Mr. Shader wrote, "Hey, guys, I

12:05:12 12   think this is a surprising response given the 'small

12:05:16 13   Valley' phenomenon."

12:05:18 14              Do you know what he's referring to here?

12:05:22 15        A.  I do not know.

12:05:24 16        Q.  Have you ever heard the term "small Valley

12:05:26 17   phenomenon" in the context of recruiting and hiring?

12:05:29 18              MR. RUBIN:  Objection.  Form.

12:05:31 19              THE WITNESS:  I have not.

12:05:36 20              MR. HARVEY:  Q.  Okay.  And the next

12:05:39 21   sentence is, "Omid's and my personal experiences at

12:05:45 22   Netscape would suggest that it's sometimes hard to

12:05:48 23   anticipate the long-term consequences of decisions

12:05:52 24   that are made when things are going well."

12:05:57 25              Do you see that?

12:05:58  1        A.  I do.

12:05:59  2        Q.  Do you have an understanding of what he was

12:06:01  3    saying here in terms of what the potential long-term

12:06:04  4    consequences would be?

12:06:07  5        A.  I do think I understand what he's saying.

12:06:11  6        Q.  And what's that?

12:06:12  7        A.  I think he's saying that Google is doing very

12:06:15  8    well, and I'm a partner of yours, and you are choosing

12:06:18  9    not to be helpful to me in this situation.  And when

12:06:23 10    things -- and it's a small world, and I don't appreciate

12:06:29 11    it.

12:06:31 12        Q.  Sort of suggesting that if Google needs

12:06:35 13    something from Good in the future, Google may not get

12:06:38 14    the answer it wants?

12:06:42 15            MR. RUBIN:  Objection.  Form.

12:06:46 16            THE WITNESS:  I don't know that that's what

12:06:47 17    he's saying, but he is clearly saying that -- he's

12:06:52 18    clearly indicating he's not happy with our choice --

12:06:56 19    with our decision.

12:06:59 20            MR. HARVEY:  Q.  Okay.  If we could

12:07:12 21    fast-forward to the next year, 2004.  This was a

12:07:18 22    time of, is it fair to say, explosive growth for

12:07:23 23    Google?

12:07:24 24        A.  We were expanding rapidly.

12:07:26 25        Q.  And that rapid expansion included hiring

| | | |
|---|---|---|
| 12:07:28 | 1 | rapidly, correct? |
| 12:07:29 | 2 | A.  That is correct. |
| 12:07:42 | 3 | MR. HARVEY:  This is a new exhibit.  I believe |
| 12:07:48 | 4 | we're at 1753. |
| 12:08:00 | 5 | (Whereupon, Exhibit 1753 was marked for |
| 12:08:00 | 6 | identification.) |
| 12:08:06 | 7 | MR. HARVEY:  Q.  If you could please take a |
| 12:08:08 | 8 | look at the document and let me know when you are |
| 12:08:09 | 9 | ready. |
| 12:08:52 | 10 | A.  Okay. |
| 12:08:54 | 11 | Q.  Without going through a fairly lengthy email -- |
| 12:09:00 | 12 | well, first let me say, this is an email that |
| 12:09:03 | 13 | Ms. Brown -- pardon me, Ms. Brown sent to you and others |
| 12:09:07 | 14 | at Google on June 7th, 2004, correct? |
| 12:09:12 | 15 | A.  Correct. |
| 12:09:14 | 16 | Q.  Is it fair to say that the topic of this |
| 12:09:16 | 17 | conversation is planning for this rapid growth you just |
| 12:09:20 | 18 | described? |
| 12:09:22 | 19 | MR. RUBIN:  Objection.  Form. |
| 12:09:26 | 20 | THE WITNESS:  The topic of the email relates to |
| 12:09:29 | 21 | headcount planning and engineering hiring. |
| 12:09:33 | 22 | MR. HARVEY:  Q.  Okay.  Is it fair to say |
| 12:09:40 | 23 | that at this time, June 7th, 2004, Google was |
| 12:09:45 | 24 | gearing up to dramatically increase the rate at |
| 12:09:49 | 25 | which it was hiring employees? |

12:09:51 1          MR. RUBIN:  Objection.  Form.

12:09:56 2          THE WITNESS:  I'm not sure what "gearing up"

12:09:58 3  means, and I'm not sure -- I don't have a graph of the

12:10:03 4  rate of hiring.  It is clear that we are discussing the

12:10:11 5  hiring of absolute numbers of people that is greater

12:10:14 6  than we had been hired -- than we had hired in previous

12:10:18 7  years.

12:10:19 8          MR. HARVEY:  Q.  Okay.  And I think I'll

12:10:22 9  just ask you about one thing specifically, which is,

12:10:24 10 if you go to No. 2 -- I'm sorry, paragraph that's

12:10:36 11 No. 2 in front of it, towards the end of the first

12:10:39 12 page.

12:10:41 13     A.  Uh-huh.  Yes.

12:10:41 14     Q.  And she describes director hires -- yeah.  So

12:10:48 15 the topic of this paragraph is the hiring of directors,

12:10:51 16 correct?

12:10:55 17     A.  Yes, it is.

12:10:56 18     Q.  Okay.  And she ends the point by saying, "We

12:11:00 19 will need to drain competitors to accomplish this rate

12:11:04 20 of hiring."

12:11:05 21         Do you see that?

12:11:05 22     A.  I do.

12:11:08 23     Q.  Do you agree that that's what Google had to do

12:11:11 24 to accomplish that rate of hiring?

12:11:15 25         MR. RUBIN:  Objection.  Form.

```
12:29:58  1            MR. RUBIN:  Objection.  Form.

12:30:08  2            THE WITNESS:  I didn't -- I don't believe I

12:30:10  3  ever really fully understood it.

12:30:14  4            MR. HARVEY:  Q.  But did you understand

12:30:15  5  that it was for internal purposes only?

12:30:18  6            MR. RUBIN:  Objection.  Form.

12:30:24  7            THE WITNESS:  I don't know whether it was or

12:30:25  8  wasn't an internal confidential list or not.

12:30:30  9            MR. HARVEY:  Q.  So you don't know, sitting

12:30:31 10  here today, whether it was shared with other

12:30:34 11  companies?

12:30:37 12       A.  I don't.

12:30:39 13       Q.  Do you know, sitting here today, whether a

12:30:42 14  company was put on or off the list pursuant to an

12:30:45 15  agreement with that company who made similar commitments

12:30:51 16  to Google?

12:30:51 17       A.  I do not.

12:30:53 18       Q.  You don't know one way or the other?

12:30:55 19       A.  I don't.

12:30:59 20       Q.  Do you recall discussing the do-not-call list

12:31:05 21  at meetings of the executive management group?

12:31:08 22       A.  I vaguely recall discussions around recruiting

12:31:12 23  policies and procedures, companies and process --

12:31:18 24  internal processes related to those companies.

12:31:29 25       Q.  And in those discussions, was Google's
```

12:31:33  1   do-not-call list part of those discussions?

12:31:45  2       A.  I don't remember referring to the list as a

12:31:47  3   do-not-call list.  I remember discussions around the

12:31:51  4   issue of proactively cold calling individuals at other

12:31:57  5   companies or not doing so.

12:32:00  6       Q.  And you recall those discussions taking place

12:32:02  7   at meetings of the executive management group?

12:32:08  8       A.  I don't recall whether or not they were the

12:32:10  9   official Monday executive management group meetings or

12:32:15 10   other meetings with similar sets of individuals present.

12:32:18 11       Q.  Okay.  Do you recall when those discussions

12:32:23 12   began, approximately?

12:32:29 13       A.  Sometime after I started.  So no, I don't

12:32:33 14   recall exactly when they began.

12:32:45 15       Q.  Do you recall an event or communication that

12:32:51 16   prompted Google to discuss whether to create a

12:32:54 17   do-not-call list?

12:32:57 18            MR. RUBIN:  Objection.  Form.

12:33:01 19            THE WITNESS:  I recall events from other

12:33:05 20   individuals that caused us to discuss the policy.  I

12:33:11 21   don't know the direct -- I don't know the timing of the

12:33:14 22   do-not-call list, nor do I specifically recall the

12:33:17 23   do-not-call list.  So I can't link the causality between

12:33:24 24   the two.  But I do recall discussions based on

12:33:27 25   individuals voicing objections.

| | | |
|---|---|---|
| 12:33:30 | 1 | MR. HARVEY:  Q.  And these individuals were |
| 12:33:31 | 2 | typically the chief executives of other companies, |
| 12:33:34 | 3 | correct? |
| 12:33:40 | 4 | A.  I think more often than not, the escalation |
| 12:33:43 | 5 | would come through a chief executive, yes. |
| 12:33:46 | 6 | Q.  And those chief executives included Steve Jobs, |
| 12:33:48 | 7 | correct? |
| 12:33:49 | 8 | A.  Definitely. |
| 12:33:52 | 9 | Q.  And those chief executives included Paul |
| 12:33:55 | 10 | Otellini, correct? |
| 12:33:58 | 11 | A.  I don't recall Paul specifically calling us, |
| 12:34:02 | 12 | but I do recall discussions involving Paul on these |
| 12:34:09 | 13 | issues.  But I don't recall a particular discussion -- I |
| 12:34:12 | 14 | don't recall Paul initiating a discussion. |
| 12:34:15 | 15 | Q.  Do you recall anyone else initiating a |
| 12:34:16 | 16 | discussion with Paul about these issues? |
| 12:34:20 | 17 | A.  No.  I believe I was involved in discussions |
| 12:34:29 | 18 | with Paul, but I don't remember whether I initiated |
| 12:34:32 | 19 | them. |
| 12:34:33 | 20 | Q.  Okay.  Was Mr. Campbell -- well, he wasn't a |
| 12:34:45 | 21 | chief executive at the time.  I guess he was chairman of |
| 12:34:48 | 22 | the board of Intuit. |
| 12:34:49 | 23 | Was he one of those individuals who contacted |
| 12:34:53 | 24 | Google about concerns of Google's recruiting of |
| 12:34:58 | 25 | employees of his company? |

12:35:00  1            MR. RUBIN:  Objection.  Form.

12:35:04  2            THE WITNESS:  I believe Mr. Campbell was

12:35:07  3   present for some of these discussions.  He was usually

12:35:09  4   present during the Monday after -- he was often present

12:35:11  5   during the Monday afternoon meetings.

12:35:22  6            MR. HARVEY:  Q.  Do you recall what the

12:35:23  7   basic terms of Google's do-not-call list were with

12:35:30  8   respect to the limitations it imposed on Google?

12:35:39  9            MR. RUBIN:  Objection.  Form.

12:35:39 10            THE WITNESS:  Well, I don't exactly.  I believe

12:35:41 11   it changed over the course of time, and I was generally

12:35:47 12   ambiguous as to what -- I generally felt the

12:35:53 13   implications of whatever was on the list was ambiguous.

12:35:59 14            MR. HARVEY:  Q.  You thought the list

12:36:03 15   imposed ambiguous restrictions on Google?

12:36:09 16       A.  I never went through the details of what was on

12:36:11 17   the list, or paid super close attention to exactly how

12:36:15 18   the rules were articulated.

12:36:20 19       Q.  Do you have any kind of general understanding

12:36:22 20   of the limitations that were embodied in the do-not-call

12:36:27 21   list?

12:36:27 22            MR. RUBIN:  Objection.  Form.

12:36:32 23            THE WITNESS:  Again, since the -- since my

12:36:34 24   understanding of the policies evolved over time, I can't

12:36:44 25   tell you specifically what was embodied within those

| | | |
|---|---|---|
| 12:36:47 | 1 | policies at any given point in time. |
| 12:36:49 | 2 | MR. HARVEY:  Q.  But generally, if a |
| 12:36:51 | 3 | company was listed on the do-not-call list, then |
| 12:36:56 | 4 | Google could not cold call into that company, |
| 12:36:59 | 5 | correct? |
| 12:37:01 | 6 | MR. RUBIN:  Objection.  Form. |
| 12:37:09 | 7 | THE WITNESS:  If recruiters cold called into a |
| 12:37:11 | 8 | company that was on the list, they could expect that the |
| 12:37:14 | 9 | other company would escalate and be upset about it. |
| 12:37:18 | 10 | MR. HARVEY:  Q.  And that initial act of |
| 12:37:19 | 11 | the recruiter, if it happened, would have been in |
| 12:37:22 | 12 | violation of the do-not-call list, correct? |
| 12:37:26 | 13 | A.  I don't know. |
| 12:37:35 | 14 | Q.  Are you aware of any other companies, aside |
| 12:37:38 | 15 | from Google, that had a similar do-not-call list? |
| 12:37:45 | 16 | A.  No. |
| 12:38:01 | 17 | Q.  In your experience with other companies, did |
| 12:38:04 | 18 | any of those companies have anything similar to the |
| 12:38:09 | 19 | do-not-call list that Google created? |
| 12:38:11 | 20 | MR. RUBIN:  Objection.  Form. |
| 12:38:16 | 21 | THE WITNESS:  Again, I don't know the specifics |
| 12:38:17 | 22 | of what was on our list.  I believe that -- I believe |
| 12:38:24 | 23 | that I have heard of other companies who, in practice, |
| 12:38:26 | 24 | chose or chose not to allow their recruiters to solicit |
| 12:38:31 | 25 | employees of firms that they engaged in business with, |

12:38:35  1   and that that is a generally common practice.  But not

12:38:41  2   familiar with the specifics of it.

12:38:50  3              MR. HARVEY:  Q.  What other companies do

12:38:51  4   you know of that had a list of companies that the

12:39:02  5   company could not cold call into?

12:39:15  6        A.  Again, I don't know of such a literal list or

12:39:21  7   what might be on the list.  I do remember when I was at

12:39:24  8   Dialog, which was a Knight Ridder subsidiary, that it

12:39:28  9   would not have been considered great form to

12:39:34 10   aggressively pursue the attorneys who were sent by a law

12:39:39 11   firm to help us with a particular project.

12:39:47 12        Q.  Do you know whether Dialog maintained a list of

12:39:51 13   companies that Dialog could not cold call into?

12:39:55 14        A.  No.  But I distinctly remember a conversation

12:39:58 15   about recruiting an attorney that we worked with.

12:40:03 16        Q.  When did that conversation occur, basically?

12:40:06 17        A.  I don't know.  Between 1990 and 1993.

12:40:18 18        Q.  Okay.  Aside from Dialog, are there any other

12:40:21 19   companies you know of that had a policy of not cold

12:40:28 20   calling into specific companies?

12:40:35 21        A.  Not that I know of.

12:40:38 22        Q.  Do you know whether Intel had such a policy?

12:40:40 23              MR. RUBIN:  Objection.  Form.

12:40:46 24              THE WITNESS:  No, I don't.

12:40:51 25              MR. HARVEY:  Q.  Did you ever discuss

| | | |
|---|---|---|
| 12:40:52 | 1 | Intel's recruiting activities with anyone at Intel? |
| 12:41:03 | 2 | A.  I believe I may have. |
| 12:41:07 | 3 | Q.  And what conversations are you thinking of? |
| 12:41:12 | 4 | A.  The only person at Intel who I had any regular |
| 12:41:14 | 5 | interaction with would have been Paul Otellini. |
| 12:41:18 | 6 | Q.  Do you recall anything that Paul Otellini said |
| 12:41:21 | 7 | to you about Intel's recruiting? |
| 12:41:23 | 8 | A.  No. |
| 12:41:29 | 9 | Q.  Do you know whether Intuit had a list of |
| 12:41:31 | 10 | companies that Intuit could not cold call into? |
| 12:41:36 | 11 | A.  I do not. |
| 12:41:38 | 12 | Q.  Do you know whether Apple had a list of |
| 12:41:40 | 13 | companies that Apple could not cold call into? |
| 12:41:44 | 14 | A.  I do not. |
| 12:42:07 | 15 | Q.  Was Google's do-not-call list ever discussed at |
| 12:42:11 | 16 | a meeting of Google's board of directors? |
| 12:42:15 | 17 | A.  It may have been. |
| 12:42:16 | 18 | Q.  And what makes you think that it may have been? |
| 12:42:26 | 19 | A.  Various parties who we've discussed here were |
| 12:42:28 | 20 | generally at those meetings.  And our hiring and |
| 12:42:38 | 21 | recruiting practices were reported on in those meetings. |
| 12:42:57 | 22 | Q.  And Mr. Campbell would often attend meetings of |
| 12:43:02 | 23 | Google's board of directors, correct? |
| 12:43:03 | 24 | A.  Yes. |
| 12:43:17 | 25 | Q.  Do you recall an irate call from Steve Jobs to |

12:43:24 1    Sergey Brin in February 2005?

12:43:27 2        A.  I recall the reporting of Steve being irate.

12:43:32 3        Q.  And what do you recall about that?

12:43:44 4        A.  That Steve was upset about -- I don't know

12:43:49 5    which particular conversation you are referring to.  I

12:43:51 6    recall a number of instances in which it was reported

12:43:56 7    that Steve was irate.  And I recall that the general

12:44:02 8    issues around which he was irate were the hiring of

12:44:09 9    Apple employees into Google.

12:44:15 10       Q.  Do you know who at Google Steve called to

12:44:19 11   discuss -- to discuss that issue?

12:44:25 12       A.  I believe at different times he called

12:44:27 13   different people.  I'm pretty confident that he called

12:44:29 14   both Eric -- I believe I remember Eric saying he had

12:44:32 15   received calls, and I believe I remember Sergey saying

12:44:37 16   he received calls.

12:44:38 17       Q.  Aside from Eric Schmidt, I take it, and Sergey

12:44:41 18   Brin, do you recall any other individuals at Google who

12:44:46 19   received these calls from Mr. Jobs?

12:44:50 20       A.  The only thing I recall specifically is that

12:44:53 21   Alan Eustace also had a lot of direct discussions with

12:44:57 22   Steve, but those were the three primary people who Steve

12:45:00 23   spoke to over the years.  I suppose in addition to

12:45:03 24   Larry.  I don't recall a discussion with Larry on this

12:45:06 25   issue.

| | | |
|---|---|---|
| 12:45:09 | 1 | Q.  Was it -- well, how common, if at all, was it |
| 12:45:19 | 2 | for Steve Jobs to call someone at Google in an irate |
| 12:45:25 | 3 | fashion? |
| 12:45:27 | 4 | MR. RUBIN:  Objection.  Form. |
| 12:45:30 | 5 | THE WITNESS:  In my experience, our |
| 12:45:32 | 6 | interactions with Steve -- in our interactions with |
| 12:45:37 | 7 | Steve, he generally exhibited an irate, difficult, |
| 12:45:43 | 8 | ornery, and petulant behavior regarding his feelings |
| 12:45:47 | 9 | about our business dealings. |
| 12:45:52 | 10 | MR. HARVEY:  Q.  Did you have any -- that |
| 12:45:54 | 11 | will do. |
| 12:45:55 | 12 | Did you have any direct communications with |
| 12:45:58 | 13 | Steve Jobs? |
| 12:46:01 | 14 | A.  No.  Not beyond socially acknowledging his |
| 12:46:08 | 15 | existence in the context of events. |
| 12:46:14 | 16 | Q.  Did you ever attend meetings or conference |
| 12:46:17 | 17 | calls where Mr. Jobs participated? |
| 12:46:25 | 18 | A.  Not that I can recall. |
| 12:46:40 | 19 | Q.  Do you recall whether Google first created its |
| 12:46:48 | 20 | do-not-call list in response to one of these irate calls |
| 12:46:50 | 21 | from Steve Jobs? |
| 12:46:53 | 22 | A.  I recall substantive discussion in the time |
| 12:46:57 | 23 | frame -- occurring in the time frame of the call from |
| 12:47:01 | 24 | Steve.  I don't know the exact time lines around such a |
| 12:47:06 | 25 | list or changes to such a list. |

| | | |
|---|---|---|
| 12:47:10 | 1 | Q.  Why don't we go through some documents -- |
| 12:47:12 | 2 | A.  Okay. |
| 12:47:13 | 3 | Q.  -- that I think can help you. |
| 12:47:16 | 4 |     This first one, I don't believe has been |
| 12:47:19 | 5 | introduced before. |
| 12:47:28 | 6 |     (Whereupon, Exhibit 1754 was marked for |
| 12:47:28 | 7 |     identification.) |
| 12:47:41 | 8 |     MR. HARVEY:  Q.  Please let me know once |
| 12:47:42 | 9 | you've had a chance to examine the document. |
| 12:48:27 | 10 | A.  Okay. |
| 12:48:31 | 11 | Q.  You know, I should have mentioned this earlier, |
| 12:48:33 | 12 | but you were on the emg@google.com email list during |
| 12:48:38 | 13 | this time, correct? |
| 12:48:40 | 14 | A.  Absolutely. |
| 12:48:40 | 15 | Q.  And you were throughout the time that you were |
| 12:48:44 | 16 | a member of the EMG, correct? |
| 12:48:47 | 17 | A.  Correct. |
| 12:48:50 | 18 | Q.  Did you receive this email from Mr. Brin, looks |
| 12:48:54 | 19 | like on February 13th, 2005? |
| 12:48:57 | 20 | A.  I'm sure I did. |
| 12:48:57 | 21 | Q.  And this email describes one of the irate calls |
| 12:49:00 | 22 | we were just talking about, correct? |
| 12:49:01 | 23 | A.  Yes, it does. |
| 12:49:06 | 24 | Q.  At the bottom of that first paragraph, Mr. Brin |
| 12:49:10 | 25 | wrote, "He made various veiled threats too, though I am |

12:49:15  1   not inclined to hold them against him too much, as he

12:49:19  2   seemed beside himself, (as Eric would say)."

12:49:25  3         Do you know what various veiled threats

12:49:31  4   Mr. Jobs made to Mr. Brin?

12:49:32  5         A.  No, I don't.

12:49:33  6         Q.  Did you ever discuss those veiled threats with

12:49:36  7   Mr. Brin?

12:49:36  8             MR. RUBIN:  Objection.  Form.

12:49:41  9             THE WITNESS:  It's possible.

12:49:44  10            MR. HARVEY:  Q.  But you don't remember if

12:49:45  11  they happened, what the substance of those

12:49:48  12  conversations were?

12:49:50  13        A.  I do not.

12:49:53  14        Q.  And here, in what I just read, Mr. Brin says

12:49:57  15  that Mr. Jobs seemed beside himself, as Eric would say.

12:50:02  16        Do you know what he's talking about there in

12:50:03  17  terms of sounds like a phrase that Eric Schmidt used to

12:50:12  18  describe Mr. Jobs?

12:50:13  19        A.  I think he's referring to the odd and

12:50:18  20  idiosyncratic manner of Steve's behavior when he engaged

12:50:24  21  with other companies and projected a great deal of anger

12:50:29  22  on an issue in a way that was unlike what many of us are

12:50:32  23  accustomed to with other executives.

12:50:54  24        Q.  Okay.  If you could look at Exhibit 561, which

12:50:57  25  appears to be written that Monday by Ms. Brown.

| | | |
|---|---|---|
| 12:51:08 | 1 | A.  The following Monday. |
| 12:51:12 | 2 | Q.  Yes.  Thank you. |
| 12:51:32 | 3 | A.  Okay. |
| 12:51:34 | 4 | Q.  Do you recall the meeting of the EMG described |
| 12:51:38 | 5 | in this document that took place on February 14th, 2005? |
| 12:51:45 | 6 | A.  I believe I was there, but I don't recall the |
| 12:51:47 | 7 | specifics of the meeting. |
| 12:51:50 | 8 | Q.  Do you recall, generally, that the senior |
| 12:51:53 | 9 | executives of Google at that meeting discussed Steve |
| 12:51:58 | 10 | Jobs' call and what to do about it? |
| 12:52:04 | 11 | A.  I don't recall the discussion occurred at that |
| 12:52:07 | 12 | management meeting, but it seems likely, given the dates |
| 12:52:10 | 13 | and times on these emails. |
| 12:52:14 | 14 | Q.  And Ms. Brown wrote in this email, "We agreed |
| 12:52:20 | 15 | in EMG today that we would treat three companies in a |
| 12:52:25 | 16 | special way going forward, Genentech, Intel, and Apple." |
| 12:52:31 | 17 | Do you know why Genentech and Intel were |
| 12:52:33 | 18 | included with Apple here? |
| 12:52:35 | 19 | MR. RUBIN:  Objection.  Form. |
| 12:52:36 | 20 | THE WITNESS:  I don't. |
| 12:52:39 | 21 | MR. HARVEY:  Q.  Do you know whether Paul |
| 12:52:42 | 22 | at Intel or Mr. Levinson at Genentech made similar |
| 12:52:47 | 23 | calls to Google at the time? |
| 12:52:51 | 24 | A.  I do not. |
| 12:52:57 | 25 | Q.  Do you recall anything about the discussion |

| | | |
|---|---|---|
| 02:32:52 | 1 | Bill and felt that a scenario could evolve in which I |
| 02:32:57 | 2 | want to give a courtesy call to Paul Otellini.  But Mike |
| 02:33:00 | 3 | was coming tomorrow, and I'll find out how Mike wants to |
| 02:33:05 | 4 | handle the communication with his own management.  And |
| 02:33:08 | 5 | we haven't even gotten to the stage of specifically |
| 02:33:10 | 6 | discussing an offer yet.  So my next step is to speak to |
| 02:33:14 | 7 | Mike and then determine what I need to do next. |
| 02:33:28 | 8 | Q.  Do you recall what Mike's -- well, sorry.  Did |
| 02:33:33 | 9 | you, in fact, meet with Mike the next day? |
| 02:33:35 | 10 | A.  I don't remember. |
| 02:33:39 | 11 | Q.  Do you recall speaking with Mike about this |
| 02:33:43 | 12 | issue? |
| 02:33:44 | 13 | A.  I do not. |
| 02:33:47 | 14 | Q.  Did Mike come to work for Google? |
| 02:33:49 | 15 | A.  I don't know. |
| 02:33:51 | 16 | Q.  Okay.  That's something presumably we can |
| 02:33:56 | 17 | check. |
| 02:34:11 | 18 | Actually, this is the end of a segment.  Why |
| 02:34:14 | 19 | don't we take a break. |
| 02:34:16 | 20 | THE VIDEOGRAPHER:  We are now off the record at |
| 02:34:17 | 21 | 2:34. |
| 02:34:22 | 22 | (Recess taken.) |
| 02:48:36 | 23 | THE VIDEOGRAPHER:  We are now on the record at |
| 02:48:37 | 24 | 2:48. |
| 02:48:38 | 25 | MR. HARVEY:  Q.  I'm going to change topics |

02:48:42  1    and go forward in time a bit --

02:48:45  2         A.  Okay.

02:48:45  3         Q.  -- to about 2007.

02:48:49  4         A.  Okay.

02:48:51  5         Q.  Do you recall that at about that time and in

02:48:53  6    that year, Google began to get particularly concerned

02:48:58  7    with Facebook's recruiting of Google employees?

02:49:03  8         A.  I don't recall that it was that time or year,

02:49:05  9    but it sounds roughly correct, and I do recall Google

02:49:09 10    being concerned about Facebook's recruiting.

02:49:14 11         Q.  And why did Facebook present a concern for

02:49:19 12    Google in that regard?

02:49:25 13         A.  Because they were the next hot, young, pre-IPO

02:49:30 14    startup company.

02:49:32 15         Q.  They were sort of like where Google was several

02:49:34 16    years prior?

02:49:35 17         A.  Relative to large, established companies in the

02:49:38 18    Valley, yes, in many ways, that analogy is correct.

02:49:44 19         Q.  And here, the roles were switched a bit where

02:49:48 20    Google had become something of an established company

02:49:51 21    trying to fend off the young upstart; is that fair?

02:50:06 22              MR. RUBIN:  Objection.  Form.

02:50:06 23              THE WITNESS:  I think as I said before, Google

02:50:08 24    was the -- at this stage, Facebook was the young, hot,

02:50:12 25    pre-IPO startup and Google was a larger, more

| | | |
|---|---|---|
| 02:50:15 | 1 | established firm. |
| 02:50:17 | 2 | MR. HARVEY:  Q.  Okay.  If you could please |
| 02:50:34 | 3 | take a look at Exhibit 660. |
| 02:51:16 | 4 | A.  Okay. |
| 02:51:17 | 5 | Q.  Okay.  Did you receive Mr. Brin's email here on |
| 02:51:22 | 6 | the 13th of October, 2007? |
| 02:51:24 | 7 | A.  Yes. |
| 02:51:26 | 8 | Q.  Okay.  And this is an example of the kinds of |
| 02:51:28 | 9 | discussions that Google was having about the retention |
| 02:51:36 | 10 | risk for Google employees presented by Facebook; is that |
| 02:51:40 | 11 | correct? |
| 02:51:45 | 12 | A.  That is -- the subject of discussion does |
| 02:51:48 | 13 | relate to Facebook and retention of Google employees. |
| 02:51:54 | 14 | Q.  And then you forwarded that email to Bill |
| 02:51:56 | 15 | Campbell the same day, correct? |
| 02:51:58 | 16 | A.  Yes. |
| 02:52:02 | 17 | Q.  Is there a reason why you would forward an |
| 02:52:03 | 18 | email like this to Mr. Campbell? |
| 02:52:07 | 19 | A.  Again, as my closest management advisor, with |
| 02:52:11 | 20 | whom I discussed many of the important issues on Eric's |
| 02:52:17 | 21 | staff, it was customary from time to time for me to send |
| 02:52:22 | 22 | messages to Eric's staff that he might not have received |
| 02:52:26 | 23 | to him. |
| 02:52:30 | 24 | Q.  And this threat that Facebook posed, this was |
| 02:52:32 | 25 | one of the topics you discussed with Mr. Campbell? |

02:52:36   1          MR. RUBIN:  Objection.  Form.

02:52:41   2          THE WITNESS:  I did discuss the threat from

02:52:43   3   Facebook from time to time with Mr. Campbell.

02:52:52   4          MR. HARVEY:  Q.  What, to your knowledge,

02:52:54   5   was Mr. Campbell's view of how Google should respond

02:52:58   6   to the threat from Facebook?

02:53:03   7      A.  I don't remember his specific broad view, or

02:53:11   8   how it changed over time.

02:53:15   9      Q.  Do you recall discussing with him alternative

02:53:21  10   strategies in terms of how to retain Google employees in

02:53:29  11   light of the Facebook threat?

02:53:35  12      A.  I recall him being helpful as we attempted to

02:53:39  13   implement policies that would allow us to respond

02:53:45  14   expeditiously to Facebook's threats.

02:53:51  15      Q.  And what type of expeditious responses are you

02:54:01  16   referring to?

02:54:02  17      A.  Changes in job function for employees who were

02:54:04  18   considering leaving, counteroffers, speaking to

02:54:15  19   employees himself, if he could -- because he was a

02:54:18  20   management coach and mentor for them.  Any number of

02:54:22  21   measures.

02:54:26  22      Q.  Was Mr. Campbell helpful in getting the

02:54:30  23   relevant players at Google to agree that Google should

02:54:35  24   very quickly make counteroffers in certain situations to

02:54:39  25   keep employees who were being recruited by Facebook?

02:54:49  1       A.  I recall reaching decisions to turn around

02:54:51  2   counteroffers expeditiously, and I recall often leaning

02:54:56  3   on Bill to get his assistance to help the management

02:54:58  4   team reach closure on important decisions.  I don't

02:55:02  5   specifically recall him assisting in that particular

02:55:08  6   way.

02:55:14  7       Q.  And would Bill's assistance include convincing

02:55:18  8   other senior members of Google's executive team, such as

02:55:22  9   Eric Schmidt?

02:55:24 10            MR. RUBIN:  Objection.  Form.

02:55:29 11            THE WITNESS:  Bill operated across the entire

02:55:30 12   management team, and he and I often discussed goals that

02:55:34 13   we collectively had and how to get to a decision or

02:55:41 14   action as quickly as possible.

02:56:01 15            MR. HARVEY:  Q.  If you could please take a

02:56:02 16   look at Exhibit 608.

02:56:39 17       A.  Okay.

02:56:48 18       Q.  Is this an example of the expeditious response

02:56:52 19   you were just describing?

02:56:53 20       A.  Yes, it appears to be.

02:56:56 21       Q.  And this is describing a policy Google had at

02:56:59 22   the point in time of trying to provide a candidate with

02:57:04 23   a counteroffer within an hour of receiving a Facebook

02:57:08 24   offer?

02:57:08 25       A.  Yes.

02:57:18   1        Q.  And did you receive this top email from

02:57:20   2   Mr. Schmidt on the 14th of November, 2007?

02:57:22   3        A.  I'm sure I did.

02:57:23   4        Q.  Okay.  Do you have an understanding of why

02:57:28   5   Mr. Schmidt was concerned that this policy was leaked to

02:57:33   6   other employees of Google?

02:57:38   7        A.  As a general rule, it was understood that

02:57:43   8   discussions that occurred at the senior management team

02:57:48   9   were not to be shared widely with employees unless it

02:57:54  10   was agreed that the information would be shared with

02:57:56  11   employees.

02:58:16  12        Q.  Did Google monitor how effective these

02:58:18  13   strategies were at retaining Google employees?

02:58:22  14        A.  Yes.

02:58:24  15        Q.  Do you recall what the view was about whether

02:58:30  16   efforts such as making quick counteroffers was effective

02:58:33  17   in retaining people?

02:58:36  18        A.  I believe we thought it was effective.  I don't

02:58:38  19   recall what the data showed, but I certainly believe

02:58:42  20   that the management team thought it was important and

02:58:44  21   strongly encouraged each other to do it.

02:59:00  22        Q.  Do you recall whether any members of the senior

02:59:07  23   executive team were concerned that once it became known

02:59:11  24   that Google would make counteroffers to key people, that

02:59:15  25   it would encourage people to go and shop for an offer

| | | |
|---|---|---|
| 02:59:17 | 1 | from Facebook? |
| 02:59:19 | 2 | A.  Yeah. |
| 02:59:26 | 3 | Q.  And Sergey Brin held that opinion; is that |
| 02:59:30 | 4 | correct? |
| 02:59:32 | 5 | A.  I'm confident he articulated that opinion at |
| 02:59:34 | 6 | some points in time.  I don't know that he always held |
| 02:59:37 | 7 | that opinion, but I do recall hearing him say that. |
| 02:59:58 | 8 | Q.  If you would please look at Exhibit 613. |
| 03:00:25 | 9 | A.  Okay. |
| 03:00:28 | 10 | Q.  Did you receive this email from Ms. Mayer on |
| 03:00:33 | 11 | March 14th, 2008? |
| 03:00:35 | 12 | A.  Yes. |
| 03:00:36 | 13 | Q.  And this describes the concern we were just |
| 03:00:40 | 14 | talking about in terms of worrying that word would get |
| 03:00:43 | 15 | out to other Google employees that Google was making |
| 03:00:47 | 16 | counteroffers to certain employees; is that right? |
| 03:00:57 | 17 | A.  Yes.  It says that rumors and reports, that if |
| 03:01:01 | 18 | you want something, you should go out and get a |
| 03:01:05 | 19 | competitive offer. |
| 03:01:19 | 20 | Q.  Do you recall -- see, I guess summer of 2008 or |
| 03:01:29 | 21 | so, whether there was a discussion at Google to try an |
| 03:01:35 | 22 | alternative strategy, that is, to contact Facebook |
| 03:01:41 | 23 | directly and try to discourage Facebook from recruiting |
| 03:01:45 | 24 | Google people? |
| 03:01:48 | 25 | MR. RUBIN:  Objection.  Form. |

03:01:49  1          THE WITNESS:  I don't recall the specific time,

03:01:51  2   but I do recall talking to Sheryl at Facebook about

03:01:57  3   minimizing the degree to which they recruited Google

03:02:00  4   employees.

03:02:02  5          MR. HARVEY:  Q.  And you know what, we'll

03:02:08  6   get to that in just a minute.  Before we -- I'll

03:02:11  7   show you those emails, we'll talk about it.

03:02:15  8          But for now, before you actually contacted

03:02:19  9   Sheryl Sandberg, do you recall discussions at Google

03:02:24 10   about trying to convince Facebook to enter into a truce

03:02:29 11   with Google with respect to recruiting?

03:02:32 12          MR. RUBIN:  Objection.  Form.

03:02:35 13          THE WITNESS:  I certainly don't recall the

03:02:37 14   timing of these things.  I recall many -- I'm aware of

03:02:43 15   the fact that there were many discussions regarding what

03:02:46 16   to do about the problem of Facebook recruiting Google

03:02:50 17   employees.

03:02:51 18          MR. HARVEY:  Q.  And was one potential

03:02:52 19   response seeking a truce with Facebook.

03:02:55 20          MR. RUBIN:  Objection.  Form.

03:02:58 21          THE WITNESS:  Well, as we talked about before

03:03:00 22   when we were talking about Apple, we weren't doing any

03:03:04 23   recruiting from them at the time.

03:03:08 24          MR. HARVEY:  Q.  Uh-huh.

03:03:09 25      A.  So the only thing I remember is trying to

| | | |
|---|---|---|
| 03:03:11 | 1 | minimize the degree to which they were recruiting from |
| 03:03:14 | 2 | us. |
| 03:03:22 | 3 |     Q.  Google didn't try to recruit back employees |
| 03:03:24 | 4 | that it lost to Facebook? |
| 03:03:27 | 5 |     A.  We did.  And, in fact, we recruited -- there is |
| 03:03:31 | 6 | an employee that we recruited back from Facebook, but it |
| 03:03:34 | 7 | had not -- the scope of our recruiting from Facebook had |
| 03:03:37 | 8 | not risen to a level that they seemed concerned about |
| 03:03:40 | 9 | it.  So I don't ever recall them bringing it up with us. |
| 03:03:58 | 10 |     Q.  If you could please look at Exhibit 616. |
| 03:04:33 | 11 |     I'm going to start by asking you about the last |
| 03:04:36 | 12 | email on the back. |
| 03:04:37 | 13 |     A.  All right. |
| 03:05:04 | 14 |     Okay. |
| 03:05:06 | 15 |     Q.  Did you receive this email from Ms. Brown on |
| 03:05:09 | 16 | June 23rd, 2008? |
| 03:05:11 | 17 |     A.  Yes. |
| 03:05:12 | 18 |     Q.  Okay.  And in it she says that Bill Campbell, |
| 03:05:16 | 19 | you, and her spoke on that day about, "really doubling |
| 03:05:22 | 20 | down on our efforts to recruit back a couple of people, |
| 03:05:25 | 21 | I'd assume at a high cost, just to stem the tide and |
| 03:05:30 | 22 | give us a better negotiating position on a recruiting |
| 03:05:34 | 23 | 'truce'."  Do you see that? |
| 03:05:38 | 24 |     A.  I do. |
| 03:05:39 | 25 |     Q.  Do you recall the conversation she's |

03:05:41   1   describing?

03:05:42   2        A.   I don't.

03:05:44   3        Q.   Okay.   And then she continues, "Our intent

03:05:49   4   would be to only do this for 2 or 3 people (and then

03:05:53   5   stop, so we don't send a message that we will pay that

03:05:56   6   sort of price across the board) just enough to get a

03:06:00   7   truce."

03:06:03   8             Do you understand that that was a strategy that

03:06:11   9   Google attempted?

03:06:12  10             MR. RUBIN:   Objection.   Form.

03:06:14  11             THE WITNESS:   I understand that it's a sentence

03:06:16  12   that she wrote in this email.   I don't know that it was

03:06:21  13   a strategy that we attempted.   I know of an individual

03:06:25  14   we attempted to hire back.   But with respect to whether

03:06:31  15   or not that was an agreed-to company strategy, I don't

03:06:34  16   know.

03:06:48  17             MR. HARVEY:   Q.   And here's Exhibit 666,

03:06:51  18   which I believe is one of the emails you are

03:06:53  19   referring to between you and Sheryl Sandberg.

03:07:09  20        A.   Okay.   What portion do you want to talk about?

03:07:11  21        Q.   Sure.   I'm going to start by talking about, it

03:07:16  22   looks like, the beginning of your first email to her on

03:07:21  23   August 9th, 2008 that begins on page 3.

03:07:26  24        A.   Okay.

03:07:30  25        Q.   In the second paragraph you -- well first, let

| | |
|---|---|
| 03:07:34 1 | me ask, did you send this email to Ms. Sandberg on |
| 03:07:39 2 | August 9th, 2008? |
| 03:07:45 3 | A. Yes. |
| 03:07:46 4 | Q. In the second paragraph you wrote, "I am sorry |
| 03:07:48 5 | that broader relations seem to be at Defcon 2 at the |
| 03:07:53 6 | corporate level with us right now. Maybe there is a |
| 03:07:55 7 | path to navigate where we agree to stay out of each |
| 03:07:58 8 | other's way and do no harm." Do you see that? |
| 03:08:02 9 | A. Yes. |
| 03:08:02 10 | Q. What were you referring to by Defcon 2? |
| 03:08:10 11 | A. I assume it's an allusion to the Department of |
| 03:08:14 12 | Defense nuclear status levels, and I'm simply pointing |
| 03:08:20 13 | out in a colorful way that the companies are not happy |
| 03:08:24 14 | with each other at the moment. |
| 03:08:26 15 | Q. And why weren't the companies happy with each |
| 03:08:29 16 | other? |
| 03:08:30 17 | A. Primarily because of the number of people that |
| 03:08:32 18 | she was recruiting from Google, I believe. |
| 03:08:35 19 | Q. Okay. And then next sentence in that |
| 03:08:42 20 | paragraph is, "Maybe there is a path to navigate where |
| 03:08:47 21 | we agree to stay out of each other's way and do no |
| 03:08:50 22 | harm." Do you see that? |
| 03:08:51 23 | A. Uh-huh. |
| 03:08:52 24 | Q. What path were you referring to here? |
| 03:08:55 25 | A. Doesn't say. |

03:08:55  1      Q.  Well, but I have the fortune of having you in

03:08:59  2    front of me so I can ask you.

03:09:01  3          What did you mean by saying there is a path to

03:09:03  4    navigate where -- where the two of you would agree to

03:09:08  5    stay out of each other's way?

03:09:14  6      A.  Presumably that I could find out what we at

03:09:19  7    Google were upset about and try to convince her to stop.

03:09:23  8      Q.  To stop hiring Google people, correct?

03:09:27  9      A.  Or reduce it.

03:09:31  10      Q.  And then if you go up to Sandberg's response to

03:09:35  11    that, she asked the same question I asked about

03:09:38  12    Defcon 2.  And she says, you know, essentially that she

03:09:43  13    doesn't know what you are talking about.

03:09:45  14          And then in your response to her you wrote, "I

03:09:50  15    was referring to the broad relations between us,

03:09:54  16    primarily related to employees leaving from one company

03:09:56  17    and going to the other which have severely strained

03:09:59  18    relations."  Is that correct?

03:10:00  19      A.  Yeah.

03:10:02  20          MR. RUBIN:  Objection.  Form.

03:10:02  21          MR. HARVEY:  Q.  And that's essentially

03:10:04  22    what you were just talking about, correct?

03:10:06  23      A.  It's referring to the fact that she's hiring

03:10:08  24    Google employees at an inordinately fast rate.

03:10:15  25      Q.  And then in her reply to that she says, "On

03:10:23   1    that, I will say the same thing I keep saying.  We have

03:10:26   2    many applicants from all over -- including Google.  I

03:10:29   3    would say that our applicant pool is fairly broad and

03:10:33   4    Google does not represent an inordinate amount, but

03:10:36   5    there are a steady stream of people applying."  And then

03:10:40   6    she says, "We are being very strict on the Google

03:10:43   7    non-solicit."

03:10:44   8          Do you have an understanding what she means by

03:10:45   9    the "Google non-solicit"?

03:10:47  10          A.  I believe she's talking about the

03:10:49  11    nonsolicitation in a standard Google hiring agreement.

03:10:53  12          Q.  And that is that Google employees agreed in

03:11:02  13    some respect that if they left Google, they wouldn't try

03:11:05  14    to recruit their former coworkers or something to that

03:11:06  15    effect; is that what you mean?

03:11:08  16          A.  I believe it says they wouldn't solicit their

03:11:11  17    coworkers for a period of 12 months.

03:11:14  18          Q.  And then you responded to her in part by

03:11:29  19    saying, "My personal opinion is that I think you are

03:11:33  20    putting too much weight in your view of the notion of

03:11:35  21    'not soliciting' as though soliciting in itself is the

03:11:39  22    only thing that upsets people.  Rather, it is the

03:11:42  23    outcome of people going from one company to the other

03:11:44  24    which is problematic."

03:11:46  25          Do you see that?

03:11:47 1     A.  I do.

03:11:47 2        Q.  Okay.  I'll try to short-circuit some of this

03:11:55 3     so we can save some time.  She asks you of your view of

03:11:58 4     Google's hiring.  And then you responded to her, "My

03:12:01 5     view is we would be better off if neither of us did it.

03:12:04 6     If you all are, I sure as hell will try likewise."

03:12:08 7        Do you see that?

03:12:09 8        A.  Uh-huh.

03:12:11 9        Q.  Here you're offering to her a mutual commitment

03:12:15 10    that both companies would try to reduce the hiring from

03:12:17 11    the other; is that right?

03:12:22 12       A.  I'm not offer -- I don't see that I'm offering

03:12:24 13    any mutual commitment or establishing any agreement, I'm

03:12:28 14    just trying to get a dialogue moving in a direction

03:12:32 15    where she will reduce the scope of her hiring at Google.

03:12:41 16       Q.  But you are offering -- and I understand that

03:12:43 17    you are not entering into an agreement with this email.

03:12:46 18    But it seems to me that you're outlining the terms of a

03:12:51 19    truce with Facebook.  Is that a fair assessment?

03:12:58 20       MR. RUBIN:  Objection.  Form.

03:13:03 21       THE WITNESS:  I think I'm saying that I -- my

03:13:06 22    view is that it would be better off if neither of us did

03:13:11 23    it.

03:13:12 24       MR. HARVEY:  Q.  And by "it," you mean

03:13:15 25    hiring?

| | | |
|---|---|---|
| 03:13:16 | 1 | MR. RUBIN:  Objection.  Form. |
| 03:13:22 | 2 | THE WITNESS:  It would seem to me that hiring |
| 03:13:24 | 3 | in large -- hiring large numbers of employees from each |
| 03:13:26 | 4 | other, which seems to be the thing that I objected to at |
| 03:13:30 | 5 | the outset. |
| 03:13:35 | 6 | MR. HARVEY:  Q.  Okay.  If you could go to |
| 03:14:01 | 7 | the bottom of page 1 to Ms. Sandberg's response she |
| 03:14:07 | 8 | says, "That is not what I meant at all.  What I |
| 03:14:10 | 9 | meant is that Google grew by hiring from other firms |
| 03:14:13 | 10 | in our industry even when they minded and people |
| 03:14:16 | 11 | like Meg called Eric as we believed in a free labor |
| 03:14:20 | 12 | market." |
| 03:14:23 | 13 | Is it correct that Google grew by hiring from |
| 03:14:25 | 14 | other firms in the industry? |
| 03:14:31 | 15 | A.  In addition to hiring people straight out of |
| 03:14:34 | 16 | school, yes. |
| 03:14:39 | 17 | Q.  And then I'm just going to jump up to her email |
| 03:14:43 | 18 | to you on August 10th, 2008 at the very top where she |
| 03:14:50 | 19 | says, "I think what really happens is that companies who |
| 03:14:53 | 20 | have relationships agree in limited ways not solicit |
| 03:14:57 | 21 | from each other.  To my knowledge, Google has never |
| 03:15:01 | 22 | agreed not to hire from any company." |
| 03:15:02 | 23 | And then she says, "Google did agree not to |
| 03:15:05 | 24 | solicit from Intel, Apple, and maybe a few others due to |
| 03:15:09 | 25 | board relationships, but never not to hire." |

| | | |
|---|---|---|
| 03:15:15 | 1 | Is this a true statement of fact, as far as you |
| 03:15:18 | 2 | know, that Google agreed with Intel, Apple, and maybe a |
| 03:15:23 | 3 | few others not to solicit due to board relationships? |
| 03:15:27 | 4 | MR. RUBIN:  Objection.  Form. |
| 03:15:27 | 5 | THE WITNESS:  I don't know the causality of |
| 03:15:30 | 6 | agreements. |
| 03:15:36 | 7 | MR. HARVEY:  Q.  Okay.  Putting causality |
| 03:15:38 | 8 | aside, do you agree that Google, in fact, made these |
| 03:15:42 | 9 | agreements not to solicit with Intel, Apple and |
| 03:15:43 | 10 | maybe a few others. |
| 03:15:45 | 11 | MR. RUBIN:  Objection.  Form. |
| 03:15:47 | 12 | THE WITNESS:  I believe we had a do-not-call |
| 03:15:49 | 13 | list and a policy as articulated by Mr. Geshuri in the |
| 03:15:54 | 14 | note that we looked at earlier. |
| 03:15:57 | 15 | MR. HARVEY:  Q.  As far as you know, those |
| 03:15:59 | 16 | weren't pursuant to agreements? |
| 03:16:01 | 17 | MR. RUBIN:  Objection.  Form. |
| 03:16:02 | 18 | THE WITNESS:  I'm not aware of any agreements. |
| 03:16:05 | 19 | MR. HARVEY:  Q.  So you don't know one way |
| 03:16:06 | 20 | or the other? |
| 03:16:09 | 21 | MR. RUBIN:  Objection.  Form. |
| 03:16:09 | 22 | THE WITNESS:  I'm not aware of any agreements. |
| 03:16:12 | 23 | MR. HARVEY:  Q.  Okay.  Would you say that |
| 03:16:29 | 24 | your attempt to negotiate with Sheryl Sandberg was |
| 03:16:34 | 25 | unsuccessful? |

03:16:43  1            MR. RUBIN:  Objection.  Form.

03:16:48  2            THE WITNESS:  I didn't get -- I don't feel that

03:16:49  3    I had a satisfactory response from Sheryl in achieving

03:16:55  4    my objective.

03:16:57  5            MR. HARVEY:  Q.  And your objective was to

03:16:59  6    try to convince her to substantially decrease the

03:17:04  7    hiring Facebook was doing at Google, correct?

03:17:07  8        A.  My objective was to reduce the overall number

03:17:10  9    of employees that she was hiring from Google.

03:17:17  10       Q.  And then shortly following your attempt, which

03:17:19  11   I believe -- let me just look back at it -- was August

03:17:30  12   9th, a few days later, Omid Kordestani gave it a shot;

03:17:34  13   is that correct?

03:17:36  14           MR. RUBIN:  Objection.  Form.

03:17:38  15           THE WITNESS:  I don't know what "gave it a

03:17:40  16   shot" means, or when Omid spoke to Sheryl, but I'm sure

03:17:46  17   that from time to time Omid had calls with her as well.

03:17:53  18           MR. HARVEY:  Q.  Why don't we make it a bit

03:17:55  19   more concrete.  If you could please look at

03:17:57  20   Exhibit 619.

03:19:10  21       A.  Okay.

03:19:14  22       Q.  If you go to the last email Mr. Kordestani

03:19:18  23   wrote, did you receive this on August 13th, 2008?

03:19:24  24       A.  Yes.

03:19:24  25       Q.  And among other things, Mr. Kordestani

03:19:26 1  describes a meeting with Sheryl Sandberg in which he

03:19:32 2  complained about Facebook's rate of recruiting.  Do you

03:19:35 3  see that?

03:19:35 4      A.  Yeah.  It may have been a phone conversation.

03:19:37 5  Doesn't say there was a meeting.

03:19:39 6      Q.  I'll just point you to the subject of the

03:19:42 7  email.

03:19:42 8      A.  All right.  There was a meeting.

03:19:45 9      Q.  And as far as you understand it, Mr. Kordestani

03:19:48 10 was unsuccessful in convincing Sheryl Sandberg to reduce

03:19:54 11 the rate of hiring from Google?

03:19:59 12     A.  From reading that email, that would appear to

03:20:01 13 be the case.

03:20:04 14     Q.  And then if you turn to the first page, it's an

03:20:07 15 email you wrote in which you describe your discussion

03:20:14 16 with Sheryl; is that right?

03:20:17 17     A.  Yes.  It appears to be my summary of the

03:20:20 18 previous document.

03:20:22 19     Q.  Uh-huh.  If you could look to the text that

03:20:28 20 starts after the second big redacted box.

03:20:33 21     A.  Okay.

03:20:33 22     Q.  That begins, "I did have a brief side dialogue"

03:20:36 23 and then ends with a parenthetical?

03:20:39 24     A.  Yes.

03:20:39 25     Q.  In the parenthetical you wrote that she, Sheryl

03:20:42 1    Sandberg, also saw Shona later that day at a dinner.  Do

03:20:47 2    you see that?

03:20:48 3        A.  Yes.

03:20:49 4        Q.  Do you know whether Shona also had a

03:20:55 5    conversation with Sheryl Sandberg on this topic?

03:21:01 6        A.  Seems odd that I would put that in a

03:21:03 7    parenthetical if I hadn't -- if I were not aware of some

03:21:08 8    discussion, but I don't recall.

03:21:12 9        Q.  Okay.  And at this time or shortly thereafter,

03:21:27 10   did Mr. Campbell support these efforts to seek a truce

03:21:32 11   with Facebook?

03:21:37 12            MR. RUBIN:  Objection.  Form.

03:21:37 13            THE WITNESS:  I don't know.

03:21:49 14            MR. HARVEY:  Q.  If you could please look

03:21:50 15   at Exhibit 668.

03:22:05 16       A.  Okay.

03:22:06 17       Q.  And I'll note that this document -- just give

03:22:13 18   me one moment -- was written a few days after the prior

03:22:19 19   one.

03:22:24 20            If you go to the second email, did you write

03:22:26 21   that email to Bill Campbell, Rachel Whetstone and Omid

03:22:30 22   Kordestani?

03:22:31 23       A.  Yes.

03:22:33 24       Q.  And this is in response to Bill Campbell's

03:22:36 25   email in which he says, "Jonathan, who should contact

03:22:40 1    Sheryl (or Mark) and get a cease fire.  We have to get a

03:22:44 2    truce."  Correct?

03:22:45 3        A.  Correct.

03:22:46 4        Q.  Okay.  And your response is, "Anybody BUT me!!!

03:22:50 5    That's a good job for brother Omid!"

03:22:52 6        A.  Yes.

03:22:55 7        Q.  And why did you suggest that brother Omid

03:22:58 8    should do it?

03:22:59 9        A.  Because clearly I was not enjoying the

03:23:05 10   interactions with Sheryl on this subject, and I was

03:23:10 11   hoping that somebody else on the management team would

03:23:13 12   take the next steps.

03:23:16 13       Q.  And then Bill Campbell responds, in all caps,

03:23:18 14   "YOU!"

03:23:21 15           Did you take any further steps after this to

03:23:26 16   seek a truce with Facebook?

03:23:30 17           MR. RUBIN:  Objection.  Form.

03:23:32 18           THE WITNESS:  I don't know what transpired

03:23:34 19   after this.  But if a threat existed where an action

03:23:38 20   needed to be taken and Bill Campbell indicated that I

03:23:40 21   was the next person to take the action, unless there is

03:23:44 22   some thread indicating to the contrary, I'm sure my next

03:23:51 23   step would be to follow up and do as Mr. Campbell

03:23:54 24   suggested.

03:23:56 25           MR. HARVEY:  Q.  Sitting here today, were

03:23:57  1    you ever successful in seeking a truce with

03:24:03  2    Facebook?

03:24:06  3              MR. RUBIN:  Objection.  Form.

03:24:11  4              THE WITNESS:  I don't believe I was ever

03:24:11  5    successful in getting Sheryl to modify the behavior, if

03:24:15  6    we define modifying the behavior as -- as changing the

03:24:22  7    practices in which they were engaged in previously

03:24:24  8    related to hiring Google employees.

03:24:33  9              MR. HARVEY:  Q.  Okay.  This may be a good

03:24:40 10    time for a short break.

03:24:41 11              MR. RUBIN:  Okay.

03:24:42 12              THE VIDEOGRAPHER:  We are now off the record at

03:24:43 13    3:24.

03:24:48 14              (Recess taken.)

03:26:18 15              THE VIDEOGRAPHER:  We are now on the record at

03:26:20 16    3:26.  This is the end of video No. 2.

03:26:23 17              We are now off the record at 3:26.

03:27:41 18              (Recess taken.)

03:33:40 19              THE VIDEOGRAPHER:  We are now on the record at

03:33:41 20    3:33.  This is the beginning of video No. 3.

03:33:50 21              MR. HARVEY:  Q.  Did you ever discuss

03:33:52 22    potential agreements regarding restricting hiring

03:33:57 23    with anyone at Apple from 2004 through 2010?

03:34:05 24        A.  Not that I recall.

03:34:10 25        Q.  Did the topic of Google restricting recruiting

Deposition of Jonathan Rosenberg                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
 1              I, Gina V. Carbone, Certified Shorthand

 2    Reporter licensed in the State of California, License

 3    No. 8249, hereby certify that the deponent was by me

 4    first duly sworn and the foregoing testimony was

 5    reported by me and was thereafter transcribed with

 6    computer-aided transcription; that the foregoing is a

 7    full, complete, and true record of said proceedings.

 8              I further certify that I am not of counsel or

 9    attorney for either of any of the parties in the

10    foregoing proceeding and caption named or in any way

11    interested in the outcome of the cause in said caption.

12              The dismantling, unsealing, or unbinding of

13    the original transcript will render the reporter's

14    certificates null and void.

15              In witness whereof, I have hereunto set my

16    hand this day:  March 25, 2013.

17              _____ Reading and Signing was requested.

18              _____ Reading and Signing was waived.

19              ___X___ Reading and signing was not requested.

20

21

22              _____

23              GINA  V. CARBONE

24              CSR 8249, CRR, CCRR

25
```