# Exhibit W to the Cisneros Declaration, Revised Version – Redacted

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

IN RE:  HIGH-TECH EMPLOYEE        )

ANTITRUST LITIGATION             )

                                 )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:        )

ALL ACTIONS.                     )

_____  )

HIGHLY CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY

VIDEO DEPOSITION OF ERIC SCHMIDT

FEBRUARY 20, 2013

Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

10:40:14  1    come to an end?

10:40:16  2         A.   1997.

10:40:16  3         Q.   And then where did you go, sir?

10:40:18  4         A.   Novell as the CEO.

10:40:20  5         Q.   And when were you with Novell?

10:40:22  6         A.   1997 until 2001.

10:40:24  7         Q.   And then where did you go in 2001?

10:40:26  8         A.   Came here to Google.

10:40:28  9         Q.   And what was your initial position with Google?

10:40:32 10         A.   It's complicated.  I came in as chairman for

10:40:36 11    two months, and then I became CEO for ten years.  And I

10:40:43 12    was chairman on and off a bunch of times.

10:40:45 13         Q.   All right.  Were you on the board of directors

10:40:47 14    throughout that time period?

10:40:48 15         A.   Yes, I was.

10:40:49 16         Q.   And what is your current position at Google?

10:40:52 17         A.   I'm now the executive chairman and member of

10:40:54 18    the board of Google.

10:40:56 19         Q.   What is the executive chairman position?

10:40:59 20         A.   Whatever I'd like it to be.

10:41:04 21         Q.   And -- all right, sir.

10:41:06 22              Do you have an understanding as to what the

10:41:08 23    lawsuit that we're here is all about?

10:41:10 24         A.   I do.

10:41:10 25         Q.   What is your understanding of the claims that

10:41:12  1    are being made?

10:41:16  2         A.   Well, I won't represent your claims.  You can

10:41:19  3    represent your claims.  My understanding is that this is

10:41:23  4    an argument over the hiring practices that existed

10:41:27  5    between roughly 2005 and roughly 2009 between the

10:41:31  6    companies whose lawyers are represented here in the room.

10:41:34  7         Q.   And what is it about -- what understanding, if

10:41:37  8    any, do you have about the nature of the hiring practices

10:41:40  9    that are in question?

10:41:43 10         A.   Well, I -- the -- the term that's generally

10:41:46 11    used is the do-not-call rules, if that's what you're

10:41:49 12    referring to.

10:41:50 13         Q.   What does that mean to you, when you use that

10:41:52 14    term?

10:41:57 15         A.   It's easier if I state it as a fact rather than

10:42:00 16    how I -- how it means to me.

10:42:01 17              During this period of time -- and, again, I

10:42:05 18    will represent what Google did, as opposed to what the

10:42:08 19    other companies did; they can speak for themselves.  We

10:42:11 20    had various practices, for better -- best -- best way to

10:42:20 21    describe it is we had various practices where we would

10:42:23 22    choose not to call and recruit people from other

10:42:26 23    companies for various periods of time for various

10:42:29 24    reasons.

10:42:33 25         Q.   And do you have an understanding as to what the

| | | |
|---|---|---|
| 10:42:35 | 1 | claims are that are being made by the Plaintiffs with |
| 10:42:37 | 2 | respect to those practices? |
| 10:42:41 | 3 | MR. RUBIN: And I'm going to instruct |
| 10:42:42 | 4 | Mr. Schmidt, make sure that in any response that he |
| 10:42:47 | 5 | doesn't convey privileged information. So if you can |
| 10:42:49 | 6 | answer the question without conveying what lawyers have |
| 10:42:51 | 7 | told you, then you should answer, but if you can't, then |
| 10:42:55 | 8 | you should not answer the question. |
| 10:42:57 | 9 | THE WITNESS: Unfortunately, in order to answer |
| 10:42:58 | 10 | your question, I have to divulge the contents of a |
| 10:43:01 | 11 | conversation that was legally privileged. |
| 10:43:04 | 12 | BY MR. HEIMANN: |
| 10:43:04 | 13 | Q. All right. Do you have any other understanding |
| 10:43:06 | 14 | outside of what your lawyers have told you about the |
| 10:43:08 | 15 | nature of the claims that are being made? |
| 10:43:11 | 16 | A. No. |
| 10:43:11 | 17 | Q. Have you reviewed any of the pleadings that |
| 10:43:14 | 18 | have been filed in the case? |
| 10:43:17 | 19 | A. I'm sorry. Pleadings are what? |
| 10:43:19 | 20 | Q. Pleadings are documents that are filed by the |
| 10:43:23 | 21 | law -- lawyers representing the parties that are filed |
| 10:43:25 | 22 | with the Court; for example, the Complaint in the case or |
| 10:43:28 | 23 | motions in the case. |
| 10:43:30 | 24 | A. That's what I thought. Okay. The answer is |
| 10:43:31 | 25 | no. |

11:14:56  1          Have you had a chance to look at this?

11:14:58  2      A.   I have.

11:14:59  3      Q.   This is an email exchange in the same time

11:15:01  4  frame, and is part of one we just looked at.

11:15:06  5          Do you see that?

11:15:07  6      A.   I do.

11:15:08  7      Q.   All right.  And focusing on the concluding

11:15:21  8  email, this is from Shona Brown to Mr. Shader with copies

11:15:26  9  to several folks, but I don't believe to you, correct?

11:15:29 10      A.   That is correct.

11:15:30 11      Q.   All right.  And in any event, she, in replying

11:15:34 12  to Mr. Shader's follow-up email about the subject that he

11:15:37 13  had raised initially, says, "Just going through email" --

11:15:41 14  excuse me -- "Just going through mail, and I think this

11:15:44 15  may have gotten buried in the Thanksgiving mail bag.

11:15:48 16  Sorry.  To clarify, I was not comfortable putting Good on

11:15:51 17  a, quote, 'do-not-call,' close quote, list.  We don't

11:15:54 18  have such a list as we find it not practical to create

11:15:57 19  nor to manage."  Let me stop there.

11:16:00 20          Were you familiar with the term, "do-not-call

11:16:02 21  list" at the time?

11:16:04 22      A.   I don't -- I don't -- I have no recollection of

11:16:06 23  this, period, so -- I -- I would know what a do-not-call

11:16:11 24  list in general, but you asked it during this period.  I

11:16:13 25  don't -- I don't remember any of this.

11:16:16  1       Q.    You don't remember the email exchange. I

11:16:19  2   understand.

11:16:19  3       A.    Well, I didn't see it. I did not see this

11:16:22  4   email exchange at all, so --

11:16:23  5       Q.    You did not see the top part.

11:16:25  6       A.    I did not see, to be precise, any of the first

11:16:30  7   page. I did not see the top of the second page. All I

11:16:34  8   saw was the "Danny, we have a new VP of business

11:16:38  9   operations in HR."

11:16:41 10       Q.    Is it correct, as far as you know, that Google

11:16:50 11   did not have a do-not-call list as of this point in time?

11:16:53 12       A.    I do not know.

11:16:54 13       Q.    One way or the other?

11:16:55 14       A.    I don't know.

11:17:01 15       Q.    Do you recall any conversations, either during

11:17:07 16   this time period or going forward in time, at Google

11:17:10 17   about this topic of do-not-call list or no poaching?

11:17:17 18       A.    Well, I'm -- I'm aware that we ultimately had a

11:17:21 19   do-not-call list, and I have vague recollections of

11:17:24 20   conversations in -- verbal conversations about it.

11:17:28 21       Q.    What -- even though your recollections are

11:17:30 22   vague, what do you recall?

11:17:32 23       A.    Well, as I indicated, I remember a big

11:17:35 24   kerfuffle involving Apple.

11:17:37 25       Q.    We'll get to that.

11:17:39 1        A.    Over that.

11:17:40 2              MR. RUBIN:  So you don't want him to share his

11:17:42 3    memory?

11:17:42 4              MR. HEIMANN:  No, I want him to answer the

11:17:45 5    question.  I'm just telling him -- we'll get to it, but I

11:17:46 6    do want to know your best recollections as you sit here.

11:17:49 7              THE WITNESS:  And I remember at some point

11:17:52 8    discussing to have some of the board members not be --

11:17:56 9    you know, their companies not be -- not be targeted, in

11:17:59 10   whatever the correct term is.  And that's sort of all I

11:18:02 11   really remember.

11:18:02 12   BY MR. HEIMANN:

11:18:03 13       Q.    Do you recall who you had those conversations

11:18:05 14   with?

11:18:08 15       A.    Well, again, these are very vague, but they

11:18:10 16   would have been with Shona and/or Bill Campbell.

11:18:17 17       Q.    Why would they have been with Mr. Campbell?  I

11:18:20 18   understand with Shona.

11:18:21 19       A.    Bill Campbell was my coach.

11:18:24 20       Q.    What does that mean?

11:18:26 21       A.    Informal advisor, provide guidance to the

11:18:29 22   manager, a coach.  Understand it as a coach in other

11:18:35 23   areas as well.

11:18:36 24              Someone I could talk to to ask questions and

11:18:38 25   get some advice from; how to handle difficult situations.

| | | |
|---|---|---|
| 11:18:42 | 1 | Q.   To your knowledge, at the time was he serving |
| 11:18:44 | 2 | in that capacity for any other companies? |
| 11:18:46 | 3 | A.   He was certainly playing a similar role for |
| 11:18:50 | 4 | Steve Jobs. |
| 11:18:52 | 5 | Q.   At Apple? |
| 11:18:53 | 6 | A.   That is correct. |
| 11:18:54 | 7 | Q.   Any other companies that you are aware of? |
| 11:18:57 | 8 | A.   I'm sure that he was doing it in others, but he |
| 11:19:00 | 9 | would have to tell you the details. |
| 11:19:17 | 10 | Q.   Let's go to Exhibit 556. |
| 11:20:22 | 11 | Have you had a chance to look at this? |
| 11:20:23 | 12 | A.   I have. |
| 11:20:24 | 13 | Q.   This is an email exchange from August of 2004 |
| 11:20:27 | 14 | involving yourself and others.  Do you see that? |
| 11:20:29 | 15 | A.   I do. |
| 11:20:30 | 16 | Q.   And shortly prior to the email exchange, Google |
| 11:20:35 | 17 | had gone to an IPO; is that right? |
| 11:20:40 | 18 | A.   We went public in August 18th, 2004.  So it |
| 11:20:44 | 19 | would have been two weeks before. |
| 11:20:46 | 20 | Q.   Literally just two weeks before? |
| 11:20:47 | 21 | A.   Literally right then. |
| 11:20:50 | 22 | Q.   And you begin the email exchange by writing to |
| 11:20:52 | 23 | Ms. Brown and to two others.  Who are the two others that |
| 11:20:56 | 24 | you wrote to? |
| 11:20:57 | 25 | A.   Larry Page and Sergey Brin, who were the |

11:21:00 1   co-founders, and my colleagues running the company.

11:21:02 2        Q.   And you wrote, "██████████████████████

11:21:05 3   ████████████████████████████████████████████

11:21:08 4   ███████████████████████████████████████████

11:21:11 5   ████████████████████████████████

11:21:16 6        And then dropping down to the last sentence of

11:21:20 7   your email, "We need to address this.  Apparently MSFT,"

11:21:23 8   that's an abbreviation for Microsoft, correct?

11:21:26 9        A.   That's correct.

11:21:27 10       Q.   -- "and Yahoo have a, quote, 'bidding war,'

11:21:29 11  close quote, approach."

11:21:32 12       Do you recall this email exchange, by the way?

11:21:34 13       A.   I do not.

11:21:34 14       Q.   Nonetheless, can you tell us what you meant by

11:21:38 15  "bidding war approach"?

11:21:44 16       A.   I don't recall the email, but I can tell you

11:21:49 17  what I probably meant.

11:21:50 18       Q.   Fair enough.

11:21:51 19       A.   I probably meant that -- that Yahoo and

11:21:54 20  Microsoft will do whatever it takes to overpay candidates

11:22:02 21  of great talent.  This -- this email appears to be about

11:22:12 22  hiring new hires, and it would appear that I am concerned

11:22:17 23  that ██████████████████████████████████████████

11:22:21 24  ████████████████████████████████████████████████

11:22:25 25  ██████████████████████████████████████

11:22:27 1    candidates into the company.  That's how I would

11:22:33 2    interpret that paragraph.

11:22:34 3        Q.   Okay.  And then Ms. Brown responds to your

11:22:41 4    email, as I -- as I read this, and she says, in part, "In

11:22:45 5    my opinion, we are clearly experiencing an intense battle

11:22:49 6    for top talent, with a win-at-all-costs approach from a

11:22:53 7    number of our key competitors.

11:22:57 8             "Philosophically I believe we should pay to get

11:23:00 9    the talent; even overpay to a certain degree.  It is a

11:23:02 10   bidding war that I believe we cannot afford to lose."

11:23:04 11            Did you agree with that at the time?

11:23:11 12       A.   I don't remember this so -- is there a response

11:23:16 13   from me to this?

11:23:18 14       Q.   Do you mean am I going to show you a response?

11:23:21 15       A.   Yeah.

11:23:21 16       Q.   The answer is, no, I don't have a response.

11:23:24 17       A.   Then I don't -- I don't recall what I

11:23:25 18   thought --

11:23:25 19       Q.   All right.

11:23:26 20       A.   -- at the time.  I mean if there were a

11:23:28 21   response, then maybe that would clarify what I thought at

11:23:30 22   the time.

11:23:31 23       Q.   If there were a response, I would definitely

11:23:33 24   show it to you.

11:23:34 25       A.   Okay.

11:23:34   1        Q.   She goes on to say, in part, "The trick is we

11:23:38   2   don't want to announce 'We will match any other offers' -

11:23:44   3   This would encourage gaming of us by candidates and

11:23:47   4   competitors and would also likely drive inflation in the

11:23:50   5   bidding war.

11:23:51   6             "We also don't want to go out of alignment from

11:23:54   7   an internal equity perspective."

11:23:58   8             Recognizing that you don't recall this email,

11:24:00   9   though, do you have an understanding of what "internal

11:24:03  10   equity perspective" is referring to there?

11:24:06  11        A.   Well, I can tell you what the term means if

11:24:08  12   you're an HR person.

11:24:09  13        Q.   Okay.

11:24:10  14        A.   Okay.  And it's -- the definition of "internal

11:24:13  15   equity" is you don't want to be -- if you are an HR

11:24:16  16   person -- having two people in similar roles and one

11:24:21  17   having massively different compensation than the other.

11:24:23  18        Q.   And in the context of the bidding war, was that

11:24:26  19   a concern?

11:24:28  20        A.   It would appear to be her concern.

11:24:31  21        Q.   Well, would you have shared the concern at the

11:24:33  22   time, do you think?

11:24:34  23        A.   Well, again, you are asking me to think about

11:24:36  24   what I thought in August 2004 on the subject.

11:24:39  25        Q.   Well, or generally what your business

11:24:42  1    philosophy is with respect to the issue, yes.  That is

11:24:46  2    something else that might answer the question.

11:24:47  3        A.   Well, as a general statement, Google paid an

11:24:50  4    enormous amount to our employees by virtue of stock

11:24:55  5    appreciation.  So by virtue of the success of the

11:24:59  6    company, good luck, all those things, ██████████████

11:25:04  7    ███████████████████████████████████████████████████

11:25:09  8    █████████████████████████████████████████

11:25:13  9    ████████████████    And so at this point the company has just

11:25:18  10   gone public, and so it's like every employee has just won

11:25:22  11   the lottery.  It is this huge amount of additional

11:25:26  12   compensation coming in.

11:25:27  13        So I think my -- my reaction to this period,

11:25:31  14   this is two weeks after the IPO, ████████████████████

11:25:34  15   ██████████████████████████████████████████████

11:25:38  16   ████████████████████████    That's how I would have

11:25:42  17   thought about it.

11:25:52  18        Q.   Do you recall any conversations with Ms. Brown

11:25:55  19   circa this time period about the bidding war issue that

11:25:59  20   she raises?

11:26:00  21        A.   As I said, I don't remember.

11:26:08  22        Q.   Let's take a look at Exhibit 557 next.

11:26:16  23        MR. RUBIN:  Let me know when you want to take a

11:26:17  24   break.

11:26:18  25        THE WITNESS:  That's fine.  We'll just keep

11:30:31  1    relevant to this legal -- legal issue, but by this time,

11:30:36  2    Microsoft is busy building a search engine to compete

11:30:40  3    with us or either has -- has announced that they are

11:30:43  4    going to come in and kill us with products that they

11:30:45  5    haven't shipped yet, and so on and so on.  They are

11:30:48  6    highly competitive during this period, and that

11:30:50  7    continues.

11:30:55  8             And I should be clear that Apple was not

11:30:57  9    building a search engine to compete with us, and search

11:31:01 10    was 98 or 99 percent of our revenue.  That would be the

11:31:04 11    definition of a competitor.

11:31:08 12        Q.   Well, I'm really trying to get an understanding

11:31:12 13    of this notion of friendly, because it is -- I'm sure you

11:31:14 14    appreciate it is somewhat vague.

11:31:17 15             Did you consider any company that you were not

11:31:19 16    a direct competitor with to be a friendly company?

11:31:24 17        A.   No.  That's not what I said.

11:31:27 18        Q.   Okay.  So that's why I want to get at -- what

11:31:29 19    was it about the relationship with Apple, aside from the

11:31:32 20    fact that they weren't a competitor, that made them a

11:31:34 21    friendly company?

11:31:35 22        A.   Well, start with the fact that Apple was trying

11:31:37 23    to build great and beautiful products; that Apple at the

11:31:42 24    time was working on a thing called WebKit, which was the

11:31:45 25    source for Safari, which is part of an open source piece

11:31:51 1    of software which we admired.  As I indicated we were

11:31:54 2    either in conversations or we had already done a search

11:31:57 3    deal with them, that would make them friendly.  We were

11:32:00 4    providing search services to them.  So customer, partner.

11:32:03 5        The word "friendly" here can be -- it's

11:32:06 6    deliberately vague.  All right?  There is no precise

11:32:09 7    definition of friend or foe.  In our industry these days,

11:32:13 8    you have people who are both -- you have both

11:32:17 9    competitive -- competition and partnering within the same

11:32:20 10   firm now.  That's a maturation of the industry.

11:32:24 11       Q.   And when you say the term "friendly" is

11:32:26 12   deliberately vague, why is that?

11:32:28 13       A.   I mean I don't define the word "friendly."  I'm

11:32:31 14   just defining it how I use it.

11:32:32 15       Q.   I know, but you said it was deliberately vague,

11:32:35 16   as if somebody intended it to be a vague term.

11:32:37 17       A.   That is not what I meant.

11:32:38 18       Q.   What did you mean, then?

11:32:40 19       A.   Okay.  Well, then I will not say the word

11:32:43 20   "deliberately."  It doesn't have a precise meaning.

11:32:52 21       Q.   Do you recall what, if anything, happened as a

11:32:55 22   result of this communication between Mr. Jobs and I think

11:33:00 23   it's Sergey Brin?

11:33:05 24       A.   Well, there is -- there is subsequent

11:33:07 25   correspondence about this, but in general -- as a general

11:33:11  1    statement, we began to look very carefully at Apple

11:33:17  2    recruiting, and then I believe we stopped recruiting from

11:33:21  3    that team, and maybe from all of Apple.

11:33:25  4        Q.   And when did that happen, then?

11:33:26  5        A.   It would be after this, during this period.

11:33:29  6        Q.   Shortly after?

11:33:30  7        A.   I don't recall.

11:33:32  8        Q.   Let's focus on the timing, then.  The email

11:33:35  9    from Mr. Brin, assuming the date and time are correct, is

11:33:38 10    on Sunday morning, in the early morning, 1:00 o'clock.

11:33:46 11        A.   I see that, yes.

11:33:47 12        Q.   And he's talking about having received a call

11:33:49 13    from Mr. Jobs that very day.  So either Saturday, during

11:33:54 14    the day, or -- one would guess, rather than early Sunday

11:33:58 15    morning.  But in any event, right about the time that he

11:34:02 16    sends the email.

11:34:03 17        A.   Okay.

11:34:03 18        Q.   All right?  And then Ms. Brown responds even

11:34:08 19    earlier on the day, but this time on Monday at 4:30 in

11:34:12 20    the morning, assuming that that time is correct.

11:34:15 21        A.   Well, it is highly likely that Shona was not in

11:34:18 22    the same time zone to generate these time clocks, but it

11:34:22 23    is perfectly possible she was traveling when she saw it.

11:34:26 24    So those times would be California times.

11:34:27 25        Q.   Okay.  Well, let's go to the next exhibit,

| | | |
|---|---|---|
| 11:34:41 | 1 | Exhibit 561. |
| 11:35:20 | 2 | A. Okay. |
| 11:35:20 | 3 | Q. All right. Let's focus on the email at the |
| 11:35:22 | 4 | top. This is from Ms. Brown to Mr. Geshuri and |
| 11:35:30 | 5 | Ms. Gilbert with a copy to Stacy Sullivan. |
| 11:35:35 | 6 | Do you see that? |
| 11:35:35 | 7 | A. I do. |
| 11:35:36 | 8 | Q. And Mr. Geshuri at the time was what at Google? |
| 11:35:39 | 9 | Do you recall? |
| 11:35:41 | 10 | A. Arnnon and Judy worked for Shona. And they |
| 11:35:45 | 11 | were involved in human resources, recruiting, policy, et |
| 11:35:49 | 12 | cetera. I don't know the specific roles of each. |
| 11:35:53 | 13 | Q. And do you recall who Stacy Sullivan was at the |
| 11:35:56 | 14 | time at Google? |
| 11:35:57 | 15 | A. Stacy Sullivan was the original vice president |
| 11:36:00 | 16 | or director of HR who was I believe at this point more of |
| 11:36:03 | 17 | a consultant helper to Shona. So it would be fair to say |
| 11:36:07 | 18 | that Arnnon, Judy, and Stacy were the brain trust that |
| 11:36:13 | 19 | worked for Shona leading HR issues. |
| 11:36:16 | 20 | Q. And she writes in the email, "We agreed in EMG |
| 11:36:19 | 21 | today that we would treat three companies in a special |
| 11:36:22 | 22 | way going forward." Let me stop there. |
| 11:36:25 | 23 | What is -- what was the EMG at the time? |
| 11:36:28 | 24 | A. EMG is an abbreviation for "Executive |
| 11:36:30 | 25 | Management Group." It is a group that I ran. And it met |

11:43:20  1  me about -- you asked me about Steve -- you asked me

11:43:23  2  about an email from what Steve said, and then you

11:43:25  3  conflated that with Apple.

11:43:27  4      Q.  Right.  I did.  Given Steve Jobs'

11:43:31  5  relationship --

11:43:32  6          MR. RUBIN:  Let him answer.

11:43:33  7          THE WITNESS:  So I would encourage you to

11:43:35  8  ask -- you can ask a Steve question or an Apple question,

11:43:39  9  but they are in fact different.

11:43:40 10  BY MR. HEIMANN:

11:43:41 11      Q.  That is what I'm interested in finding out.

11:43:43 12          So are you saying that despite, for example,

11:43:45 13  the threat that was apparently made here to go to war,

11:43:49 14  that did not impact your view of Apple's relationship to

11:43:53 15  Google as a friendly company.

11:43:55 16          MR. RUBIN:  Objection.  Mischaracterizes the

11:43:57 17  document and testimony.

11:43:58 18          THE WITNESS:  Well, as I indicated, Steve's

11:44:03 19  alleged quote here, which of course I did not actually

11:44:06 20  hear, but Sergey is relaying, did not deter me from

11:44:11 21  ultimately going on the Apple board and being a very

11:44:13 22  close friend of Steve.  So the answer to your question is

11:44:16 23  obviously not.

11:44:18 24  BY MR. HEIMANN:

11:44:19 25      Q.  Well, is it fair to say that one of the reasons

11:44:24  1   that Google entered into the recruiting arrangement, or

11:44:29  2   agreement or practice with Apple, was in response to

11:44:33  3   Mr. Jobs' threats to go to war if you didn't?

11:44:38  4           MR. MITTELSTAEDT:  Objection.  Compound.

11:44:40  5           MR. RUBIN:  Objection.  Mischaracterizes prior

11:44:42  6   testimony.

11:44:44  7           THE WITNESS:  Okay.  So the way you said that,

11:44:46  8   the answer is no.

11:44:47  9   BY MR. HEIMANN:

11:44:49 10       Q.   Is there some way in which it could be better

11:44:54 11   phrased and the answer would be yes?

11:44:56 12           MR. MITTELSTAEDT:  Objection.  Argumentative.

11:44:57 13           THE WITNESS:  I -- I can't tell you how to ask

11:44:59 14   the question.

11:45:00 15   BY MR. HEIMANN:

11:45:00 16       Q.   Let me put it this way.

11:45:02 17           Did Mr. Jobs' threats have anything to do with

11:45:06 18   Google's deciding to treat Apple in the way you've

11:45:10 19   already described that Google decided to treat Apple?

11:45:14 20       A.   I would answer your question by saying that

11:45:17 21   Steve was unhappy, and Steve's unhappiness absolutely

11:45:23 22   influenced the change we made in recruiting practice, as

11:45:28 23   you'll see later in the mail messages.  You're using the

11:45:32 24   word "threats."

11:45:33 25       Q.   I'm using the word "threats" because that

11:45:36  1    appears to be what Mr. Brin characterized it as.

11:45:38  2         A.   I wasn't -- I wasn't there.  So I -- I can't

11:45:39  3    speak as to the word "threats" and so forth.

11:45:42  4              The -- the word "threat" is very sensitive,

11:45:44  5    because if you actually read Walter Isaacson's book about

11:45:49  6    Steve, you'll see there's a lot of words and drama and so

11:45:53  7    forth, using the word "threats" about Google later.  So

11:45:56  8    I'd rather speak about things that I saw and I know.

11:46:00  9              But it's fair to say that the pressure -- the

11:46:04 10    pressure was put on Google by Steve personally to not

11:46:08 11    hire three people in -- in a Safari team, and we

11:46:12 12    responded to that pressure.  That is absolutely true.

11:46:20 13         Q.   And is it true that the ultimate response at

11:46:22 14    least in part was that Google decided not to hire any of

11:46:26 15    the people?

11:46:27 16              MR. RUBIN:  Objection.  Lacks foundation.

11:46:29 17              THE WITNESS:  I don't actually know that.  As I

11:46:34 18    read the mail messages, there was a big give and take on

11:46:38 19    that question.  But I actually don't know personally who

11:46:41 20    we hired and who we didn't out of the three.

11:46:46 21    BY MR. HEIMANN:

11:47:02 22         Q.   In terms of the executive management of Google

11:47:11 23    at this point in time, what was the nature of the

11:47:14 24    relationship between you and the three -- the two

11:47:17 25    cofounders?

11:47:19 1          A.    The general term we used was the triumvirate,

11:47:22 2    and we worked in a partnership as we do today.  So each

11:47:27 3    of us had sort of relatively overlapping roles.  And a

11:47:32 4    simple rule would be that if somebody felt strongly, the

11:47:37 5    others couldn't -- couldn't just go do whatever they

11:47:40 6    want.  You have to kind of check with them.  But because

11:47:43 7    we're colleagues and friends and so forth, it worked

11:47:46 8    pretty well.

11:47:47 9          MR. HEIMANN:  Let me show you Exhibit 871 on

11:47:52 10   this subject.

11:48:12 11          (Exhibit 871 was marked for identification.)

11:48:12 12   BY MR. HEIMANN:

11:48:13 13          Q.    Let me ask you the question before you read

11:48:14 14   this, because it will be easier to have the question in

11:48:16 15   mind.  What I want to know is whether or not this is a

11:48:19 16   fair description of how you all functioned together at

11:48:22 17   Google.

11:48:33 18          A.    I see that I -- I did read -- read this.  I can

11:48:37 19   suggest a more accurate characterization.

11:48:40 20          Q.    Sure.

11:48:41 21          A.    If you go to the founders' letter, you will

11:48:44 22   find a paragraph which is a revision of this, the public

11:48:49 23   founders' letter.  But this is roughly -- this is roughly

11:48:53 24   what we were doing at the time.

11:48:55 25          Q.    And did this relationship continue forward in

11:48:58  1    time?

11:48:59  2        A.   Yes.  It may be easier for me to just describe

11:49:06  3    how I think it actually played out.  There was a set of

11:49:08  4    things which were largely operational which I was largely

11:49:11  5    in charge of.  Things involving product, product

11:49:15  6    strategy, Larry and Sergey tended to work on.  But we

11:49:19  7    were all involved in each other, so there were always

11:49:22  8    situations where we were together reviewing everything.

11:49:28  9    And if you were to ask them, they would say, Eric worked

11:49:33 10    on these areas, because that was his expertise, and they

11:49:37 11    worked on theirs.  That is how they would characterize

11:49:39 12    it.

11:49:39 13        Q.   How significant to Google was the workforce,

11:49:42 14    your employees?

11:49:43 15        A.   Crucial.

11:49:44 16             MR. RUBIN:  Objection.  Vague.

11:49:46 17             THE WITNESS:  Crucial.

11:49:46 18    BY MR. HEIMANN:

11:49:46 19        Q.   And was that something that the three of you

11:49:49 20    collaborated on, would it be fair to say?

11:49:53 21        A.   Of course.

11:49:55 22             MR. HEIMANN:  Why don't we take a break.

11:49:56 23             THE VIDEOGRAPHER:  We're now off the record at

11:49:57 24    11:50.

11:49:58 25             (Recess was taken.)

12:03:05  1          THE VIDEOGRAPHER:  We are now on the record at

12:03:06  2    12:03.

12:03:08  3    BY MR. HEIMANN:

12:03:08  4          Q.   Mr. Schmidt, I asked that Exhibit 199 be put

12:03:12  5    before you.

12:03:17  6          A.   I have that.

12:03:18  7          Q.   Sir, have you had a chance to look it over?

12:03:20  8          A.   I have.

12:03:20  9          Q.   This is an email from the same time period as

12:03:22 10    the other ones we were looking at just before we broke,

12:03:26 11    February 2005.  In this case it is from Mr. Campbell to

12:03:29 12    Mr. Jobs.  I don't see anyone else copied on it.

12:03:33 13          But in the email he wrote in part, "I'm heading

12:03:36 14    out of town in the a.m., off to Montana, and wanted to

12:03:41 15    give you the latest of what I heard from Google after

12:03:44 16    talking to Eric Schmidt.  Eric told me that he got

12:03:51 17    directly involved and firmly stopped all efforts to

12:03:53 18    recruit anyone from Apple."  Let me stop there.

12:03:56 19          Is that consistent with your recollection of

12:03:58 20    what happened?

12:04:00 21          A.   Well, I believe that he is overstating what we

12:04:03 22    did.  I believe he is saying -- he is referring to stop

12:04:09 23    all efforts to recruit the members of that specific team.

12:04:13 24          Q.   Why do you think that?

12:04:14 25          A.   Because as far as I know we never stopped

12:08:29  1    communications between the people, because he has good

12:08:33  2    trust relationships with me and also with Steve.  So I

12:08:36  3    think he's simply trying to be helpful.

12:08:38  4    BY MR. HEIMANN:

12:08:49  5         Q.   Was the agreement with Apple about no cold

12:08:58  6    calling related to any specific corroboration or joint

12:09:01  7    effort at the time?

12:09:03  8              MR. RUBIN:  Collaboration, you mean?

12:09:04  9    BY MR. HEIMANN:

12:09:05 10         Q.   Collaboration, I'm sorry.  Thank you.

12:09:09 11         A.   Well, as I indicated, I believe we had a search

12:09:11 12    deal there, and I believe that we were in -- we were

12:09:15 13    discussing the maps technology there.  Apple is today a

12:09:20 14    very large customer of Google's, and until they did their

12:09:26 15    own maps a very large customer of our maps.  So we also

12:09:29 16    today have an extremely detailed collaboration involving

12:09:33 17    the very team that this names, because the team that this

12:09:37 18    is referring to, which is called WebKit, is the

12:09:39 19    foundation of the Chrome browser.

12:09:43 20              So we would have certainly anticipated some of

12:09:48 21    that, but we would not have foreseen all of it.  Exactly

12:09:52 22    where we were, I couldn't tell you.

12:09:54 23         Q.   So back to the question, was the agreement with

12:09:55 24    Apple regarding recruiting, cold calling, related to any

12:10:00 25    specific collaboration that existed at the time?

12:10:04 1          MR. RUBIN:  Objection.  Asked and answered.

12:10:05 2          THE WITNESS:  As I said, I believe we had a

12:10:07 3  search deal during that period, and I believe these other

12:10:10 4  collaborations were at various levels of conversation.

12:10:13 5  BY MR. HEIMANN:

12:10:13 6      Q.  All right.  And so was the agreement limited to

12:10:15 7  the personnel that would be relevant to those

12:10:17 8  collaborations?

12:10:18 9          MR. RUBIN:  Objection.  Lacks foundation as to

12:10:19 10  "agreement."

12:10:22 11          THE WITNESS:  Okay.  Again, without -- without

12:10:24 12  getting too hung up on like the word "agreement" and so

12:10:27 13  forth, my recollection is it was limited to this WebKit

12:10:33 14  issue initially.

12:10:36 15  BY MR. HEIMANN:

12:10:37 16      Q.  And how do you square that with the exhibit

12:10:40 17  that I just showed you a moment ago, Exhibit 561?

12:10:49 18          MR. MITTELSTAEDT:  Object.  Argumentative.

12:10:51 19          THE WITNESS:  No.  I understand your question.

12:10:55 20          No, we put this in place because of the

12:10:58 21  relationship that we wanted to build starting with the

12:11:00 22  WebKit.

12:11:01 23  BY MR. HEIMANN:

12:11:02 24      Q.  Are you -- is it your testimony that this

12:11:05 25  agreement that the EMG reached was limited in some

12:11:11  1    respects to certain components of Apple, rather than

12:11:14  2    Apple generally?

12:11:15  3       A.   No.  I -- as I indicated, this -- my

12:11:18  4    recollection is this is the correct agreement.  So --

12:11:23  5       Q.   So it was company-wide in terms of Apple.

12:11:26  6       A.   Company-wide in terms of do not directly

12:11:28  7    call -- cold call the company.

12:11:31  8       Q.   And it applied to Apple and all of its

12:11:33  9    subsidiaries, correct?

12:11:35 10       A.   I would assume so.

12:11:36 11       Q.   And it was not geographically limited in any

12:11:39 12    respect?

12:11:39 13       A.   As far as I can tell.

12:11:41 14       Q.   Or in terms of timing?

12:11:45 15       MR. MITTELSTAEDT:  Objection.  Vague.

12:11:46 16    BY MR. HEIMANN:

12:11:47 17       Q.   Well, were there any time limits on it?

12:11:49 18       A.   No.  As you know, it is now ended.

12:11:52 19       Q.   I do know that.

12:11:53 20       A.   Yeah.

12:11:53 21       Q.   But there wasn't any time limit at the time it

12:11:55 22    was agreed upon.

12:11:58 23       A.   But, again, you are using the word "agreement."

12:12:01 24    We sat in the equivalent of this room and decided to do

12:12:04 25    this.

| | | |
|---|---|---|
| 12:12:06 | 1 | Q. Well, isn't it true that Google had an |
| 12:12:09 | 2 | agreement with Apple that Google wouldn't cold call Apple |
| 12:12:11 | 3 | employees and Apple wouldn't cold call Google employees; |
| 12:12:16 | 4 | isn't that true? |
| 12:12:18 | 5 | MR. RUBIN: Objection. Lacks foundation. |
| 12:12:19 | 6 | THE WITNESS: Again, you are using the word |
| 12:12:22 | 7 | "agreement" in a specific way. |
| 12:12:23 | 8 | BY MR. HEIMANN: |
| 12:12:24 | 9 | Q. I'm using "agreement" in the common way that |
| 12:12:26 | 10 | agreement is used, just the English usage. |
| 12:12:29 | 11 | A. But I -- |
| 12:12:30 | 12 | MR. RUBIN: Move to strike that. So you should |
| 12:12:33 | 13 | ask questions, not respond. |
| 12:12:34 | 14 | THE WITNESS: Well, I'm actually trying to |
| 12:12:35 | 15 | answer your question as directly as possible. |
| 12:12:37 | 16 | BY MR. HEIMANN: |
| 12:12:38 | 17 | Q. Please. |
| 12:12:39 | 18 | A. We on our own made this agreement. |
| 12:12:43 | 19 | Q. And what is "this agreement"? |
| 12:12:45 | 20 | A. What you see in Exhibit 561. |
| 12:12:46 | 21 | Q. All right. So you agreed -- when you say |
| 12:12:49 | 22 | "agreed," the EMG agreed; is that what you are saying? |
| 12:12:53 | 23 | A. The executives of the company, the policy of |
| 12:12:54 | 24 | the company was to do what is in Exhibit 561. |
| 12:12:58 | 25 | Q. Okay. |

| 12:12:58 | 1 | A.   And I -- and I approved it. |
| 12:12:59 | 2 | Q.   And did Google communicate that fact to Apple? |
| 12:13:06 | 3 | A.   I don't remember myself communicating this to |
| 12:13:11 | 4 | these people. |
| 12:13:12 | 5 | Q.   I didn't say did you do it.  Did Google do it? |
| 12:13:15 | 6 | A.   I was trying to answer your question. |
| 12:13:17 | 7 |      I don't know of any communications aside from |
| 12:13:20 | 8 | the Bill Campbell email, which I didn't know about until |
| 12:13:23 | 9 | you showed it to me. |
| 12:13:24 | 10 | Q.   You hadn't seen that one before? |
| 12:13:26 | 11 | A.   That's a privileged question.  I had not seen |
| 12:13:28 | 12 | it before the privileged review. |
| 12:13:30 | 13 | Q.   I take issue with whether it was privileged. |
| 12:13:33 | 14 | Did you see that document in preparing for the |
| 12:13:35 | 15 | deposition? |
| 12:13:36 | 16 | MR. RUBIN:  Well, it is privileged.  You can |
| 12:13:37 | 17 | ask. |
| 12:13:39 | 18 | MR. HEIMANN:  You can argue it is privileged, |
| 12:13:41 | 19 | it doesn't mean it is privileged. |
| 12:13:42 | 20 | MR. RUBIN:  I am asserting privilege, and I'm |
| 12:13:44 | 21 | directing him not to answer that question. |
| 12:13:45 | 22 | THE WITNESS:  So I'm directed not to answer |
| 12:13:46 | 23 | that question? |
| 12:13:47 | 24 | MR. RUBIN:  Right. |
| 12:13:48 | 25 | MR. HEIMANN:  Only if you saw it.  If you |

12:13:49  1   didn't see it, you are to tell me you didn't see it.

12:13:52  2          MR. RUBIN:  No.

12:13:54  3          THE WITNESS:  Okay.

12:13:54  4          MR. RUBIN:  He has already indicated that there

12:13:56  5   is something related to the preparation about that email,

12:13:58  6   so I'm directing him not to answer the question.

12:14:01  7          MR. HEIMANN:  What's the basis for the

12:14:02  8   direction?

12:14:04  9          MR. RUBIN:  That it was something that -- that

12:14:07 10   he -- that the witness has indicated that he -- the only

12:14:11 11   knowledge he has of it relates to preparation.

12:14:14 12          MR. HEIMANN:  What's the legal basis for the

12:14:15 13   objection?

12:14:17 14          MR. RUBIN:  Because it is work product,

12:14:18 15   attorney-client privilege.

12:14:19 16          MR. HEIMANN:  Okay.  Both, you claim?

12:14:21 17          MR. RUBIN:  Yes.

12:14:21 18   BY MR. HEIMANN:

12:14:22 19      Q.   All right.  Was the understanding reciprocal on

12:14:33 20   Apple's part?

12:14:36 21          MR. RUBIN:  Objection.  Lacks foundation as to

12:14:37 22   "understanding."

12:14:38 23          THE WITNESS:  I don't know what Apple's policy

12:14:39 24   was with respect to us.  But I would have -- I would have

12:14:50 25   assumed that they would have done something similar, but

| 12:14:54 | 1 | you characterized it as a mutual agreement between the |
|---|---|---|
| 12:14:56 | 2 | two companies. |
| 12:14:57 | 3 | BY MR. HEIMANN: |
| 12:14:57 | 4 | Q.   Uh-huh. |
| 12:14:58 | 5 | A.   Which is what I did not like in your question. |
| 12:15:02 | 6 | So I don't know if there was an agreement on the Apple |
| 12:15:05 | 7 | side with this kind of specificity. |
| 12:15:08 | 8 | Q.   Well, now you've qualified it.  Do you know |
| 12:15:10 | 9 | whether or not there was any agreement on Apple's side |
| 12:15:13 | 10 | with respect to cold calling into Google? |
| 12:15:17 | 11 | MR. RUBIN:   Objection.  Lacks foundation as to |
| 12:15:18 | 12 | "agreement." |
| 12:15:21 | 13 | THE WITNESS:  Again, I don't know what Apple -- |
| 12:15:22 | 14 | as a general answer, I don't know what Apple's policy |
| 12:15:25 | 15 | with respect to cold calling into Google was.  I didn't, |
| 12:15:29 | 16 | and I don't now. |
| 12:15:31 | 17 | BY MR. HEIMANN: |
| 12:15:31 | 18 | Q.   So if I put it to you that, in fact, there was |
| 12:15:34 | 19 | an explicit agreement between Google and Apple not to |
| 12:15:37 | 20 | cold call each others' employees, you couldn't tell me |
| 12:15:41 | 21 | whether that was true or not. |
| 12:15:42 | 22 | A.   Are you -- are you informing me that that's |
| 12:15:43 | 23 | true? |
| 12:15:44 | 24 | Q.   I'll show you a document in a minute that says |
| 12:15:46 | 25 | that. |

```
12:15:47  1          A.   Oh, I'd love --
12:15:48  2               MR. RUBIN:  Objection.  Objection.  Lacks
12:15:49  3    foundation.
12:15:49  4               THE WITNESS:  I'm looking forward to seeing
12:15:51  5    your document.
12:15:51  6    BY MR. HEIMANN:
12:15:52  7          Q.   But the answer is, you don't know of any such
12:15:54  8    mutual agreement between Apple and Google.
12:15:56  9          A.   I don't have direct knowledge that I can
12:15:59 10    recall.
12:16:00 11          Q.   Do you have indirect knowledge that you can
12:16:01 12    recall?
12:16:02 13          A.   Okay.  Again, I'm trying to answer your
12:16:04 14    questions precisely.  I don't have -- my guess would
12:16:09 15    be -- I guess I'm not supposed to guess in a deposition.
12:16:12 16          Q.   You can guess.
12:16:13 17          A.   My guess would be that -- that they had a
12:16:15 18    reciprocal arrangement of some kind, but I don't know the
12:16:18 19    details.
12:16:19 20          Q.   Did Mr. Brin ever tell you that he had reached
12:16:22 21    such an agreement with Mr. Jobs?
12:16:24 22               MR. RUBIN:  Objection.  Lacks foundation.
12:16:26 23               THE WITNESS:  I have no memory of such a
12:16:28 24    conversation.
         25    //
```

12:16:28  1    BY MR. HEIMANN:

12:16:41  2        Q.    Again, to Exhibit 561, that's the email from

12:16:47  3    Ms. Brown, Genentech is a company that is identified as

12:16:53  4    one of the three companies for this special arrangement.

12:16:57  5             Why?

12:16:58  6        A.    I have no -- I don't specifically recall the

12:17:00  7    conversation, as I said.  But I would observe that

12:17:04  8    Genentech, Intel, and Apple -- that Genentech and Intel

12:17:10  9    had board members that were board members of Google, and

12:17:13  10   Genentech was -- Art Levinson was the CEO of Genentech.

12:17:18  11   Paul Otellini was the CEO of Intel.  And Apple, of

12:17:22  12   course, I eventually got on their board, and Bill

12:17:23  13   Campbell was a board member of Apple.

12:17:26  14             So, again, my feeling would be -- I don't

12:17:29  15   precisely remember, would be that this was related -- and

12:17:33  16   I vaguely remember saying that we did not want a

12:17:37  17   situation where you had a sitting board member and we

12:17:40  18   were cold calling into their companies.

12:17:43  19       Q.    Now, at what level is that speculation and at

12:17:47  20   what level is that an actual memory of the reason for the

12:17:51  21   agreement with respect to Genentech?

12:17:53  22       A.    It's vague enough I can't give you a precise

12:17:56  23   answer, but I think it's probably true.

12:17:58  24       Q.    Was there any other reason you can think of for

12:18:00  25   Genentech being the subject of this agreement?

| | | |
|---|---|---|
| 12:19:45 | 1 | A.   That is correct. |
| 12:20:03 | 2 | Q.   Let's take a look at Exhibit 563. |
| 12:20:34 | 3 | Have you had a chance to read this? |
| 12:20:35 | 4 | A.   I have. |
| 12:20:36 | 5 | Q.   So this is an email internal to Apple from |
| 12:20:39 | 6 | Danielle Lambert, or Lambert, I'm not sure of the |
| 12:20:43 | 7 | pronunciation.  Do you know who she was at the time? |
| 12:20:47 | 8 | A.   I do not. |
| 12:20:47 | 9 | Q.   And it is to U.S. recruiting, all at group |
| 12:20:51 | 10 | Apple.  Do you see that? |
| 12:20:53 | 11 | A.   I do. |
| 12:20:53 | 12 | Q.   And it is dated February of 2005. |
| 12:20:55 | 13 | A.   I do. |
| 12:20:56 | 14 | Q.   The same time that the emails we were looking |
| 12:20:58 | 15 | at a moment ago were dated, right? |
| 12:21:00 | 16 | A.   Yes. |
| 12:21:01 | 17 | Q.   And she wrote, "All, please add Google to |
| 12:21:04 | 18 | your," quote, "'hands-off,'" close quote, "list.  We |
| 12:21:08 | 19 | recently agreed not to recruit from one another.  So if |
| 12:21:11 | 20 | you hear of any recruiting they are doing against us, |
| 12:21:14 | 21 | please be sure to let me know.  Please also be sure to |
| 12:21:17 | 22 | honor our side of the deal." |
| 12:21:19 | 23 | Do you see that? |
| 12:21:20 | 24 | A.   I do. |
| 12:21:20 | 25 | Q.   How do you square that with your testimony |

12:21:22 1    there was not an agreement between Apple and Google?

12:21:26 2              MR. RUBIN:  Objection.  Lacks foundation;

12:21:27 3    argumentative.

12:21:29 4              THE WITNESS:  This is the first I've ever seen

12:21:30 5    of this email.  So I have no opinion about this email.

12:21:33 6    My testimony stands.

12:21:36 7    BY MR. HEIMANN:

12:21:36 8        Q.   Your testimony is there was no agreement

12:21:38 9    between the two not to recruit from each other, correct?

12:21:41 10             MR. RUBIN:  Objection.  Mischaracterizes his

12:21:42 11   prior testimony; lacks foundation.

12:21:45 12             THE WITNESS:  I tried to be very precise, and I

12:21:47 13   said that we made a decision, which is well characterized

12:21:51 14   in Exhibit 561, to not directly cold call into, among

12:21:57 15   other things, Apple.

12:21:59 16             I also told you that I don't know what Apple

12:22:02 17   did internally.  You've now presented evidence to me of

12:22:06 18   what Apple did internally, which is news to me.

12:22:08 19   BY MR. HEIMANN:

12:22:15 20        Q.   Was the actions with respect to cold calling

12:22:21 21   communicated to Google's board of directors?

12:22:26 22        A.   Well, it was certainly communicated to Bill

12:22:28 23   Campbell, who is an advisor to the Google board of

12:22:31 24   directors.  I don't recall -- I don't recall a discussion

12:22:37 25   at the board about this.

12:22:38  1       Q.    Did the board of directors approve it?

12:22:41  2             MR. RUBIN:  Objection.  Asked and answered.

12:22:44  3             THE WITNESS:  As I indicated, I have no

12:22:45  4   recollection of such a discussion.  However, it would not

12:22:48  5   have been -- it would not have required a board of

12:22:50  6   directors approval.

12:22:51  7   BY MR. HEIMANN:

12:22:53  8       Q.    Do you know whether or not there is any

12:22:56  9   discussion in the minutes of any meeting of the board of

12:22:58 10   directors?

12:23:00 11       A.    I do not.

12:23:08 12       Q.    Is it something of sufficient importance that

12:23:11 13   you think in all likelihood it would have been presented

12:23:13 14   to the board?

12:23:14 15             MR. RUBIN:  Objection.  Asked and answered.

12:23:16 16             THE WITNESS:  I think it's unlikely it would

12:23:18 17   have been presented to the board.

12:23:19 18   BY MR. HEIMANN:

12:23:20 19       Q.    Why do you say that?

12:23:21 20       A.    We were working on more important things.

12:23:32 21       Q.    I'll ask you to take a look at Exhibit 640.

12:23:59 22             This is a somewhat lengthy document.  I have

12:24:01 23   got one page and one section I'm going to focus on, but

12:24:06 24   you should at least take enough time to -- to familiarize

12:24:09 25   yourself with the document generally, and -- because what

12:37:10  1        A.    This was, you know, as I indicated --

12:37:10  2        Q.    It is a long time ago.  I understand that.

12:37:12  3        A.    Eight years ago.  No.  This is the best I can

12:37:15  4   recall.

12:37:15  5        Q.    But I'm trying to find out whether you're

12:37:17  6   actually recalling something now, or whether you are, as

12:37:19  7   is natural, saying, this is what -- is this likely what I

12:37:22  8   would have been thinking about and why I said this.

12:37:25  9             MR. RUBIN:  Objection.  Asked and answered;

12:37:27 10   argumentative and close to badgering.

12:37:30 11             THE WITNESS:  I've answered your question by

12:37:32 12   saying that I don't recall the specific typing of this

12:37:35 13   response, however, that my general view is what I told

12:37:40 14   you, and I'm sure that it was my general view then, too.

12:37:45 15   That's the best answer I can give you.

12:37:48 16             MR. HEIMANN:  Fair enough.  Fair enough.

12:37:59 17             Shall we break for lunch?  Is that all right?

12:38:05 18             MR. RUBIN:  If that's what you want to do.  I

12:38:07 19   think Eric is probably ready to keep going for a little

12:38:09 20   while longer, but --

12:38:10 21             MR. HEIMANN:  We're going to go on to the end,

12:38:12 22   so the question is only whether we eat now or wait.

12:38:15 23             THE WITNESS:  I think you should go on until

12:38:17 24   we're done, and I think we should work as hard as we can

12:38:20 25   to be done.

12:38:20  1            MR. HEIMANN: I can't go on without lunch.

12:38:24  2            THE WITNESS: Okay, then we should have lunch.

12:38:25  3   How long do you need for lunch?

12:38:27  4            MR. HEIMANN: I don't know what is being

12:38:28  5   offered.

12:38:31  6            MR. RUBIN: We can go off the record for lunch.

12:38:33  7            THE VIDEOGRAPHER: This is the end of Video

12:38:34  8   No. 1. We're now off the record at 12:38.

12:38:38  9            (Recess was taken.)

13:14:20 10            THE VIDEOGRAPHER: We are now on the record at

13:14:23 11   1:14. This is the beginning of Video No. 2.

13:14:27 12   BY MR. HEIMANN:

13:14:28 13       Q.   Mr. Schmidt, if we could go back briefly to

13:14:31 14   Exhibit 640, that is the recruiting data and policy.

13:14:35 15       A.   I have it.

13:14:37 16       Q.   I've been informed that according to the

13:14:38 17   metadata the author of that document is Jane Sho, S-h-o.

13:14:44 18   Does that name mean anything to you?

13:14:46 19       A.   It does not.

13:14:47 20       Q.   Okay. Did you take any steps to enforce the no

13:14:55 21   cold call policy at Google?

13:14:59 22            MR. RUBIN: Objection. Vague.

13:15:01 23            THE WITNESS: What do you mean by "steps"?

13:15:02 24   BY MR. HEIMANN:

13:15:03 25       Q.   Did you do anything to enforce the policy?

13:15:06  1      A.   Well, I approved it.

13:15:08  2      Q.   Right.  And after approving it, did you become

13:15:10  3  involved in any way in enforcing the policy and seeing to

13:15:13  4  it that it was carried out?

13:15:15  5      A.   Not that I'm aware -- nothing beyond approval.

13:15:20  6      Q.   Let's take a look at Exhibit 187, please.

13:16:02  7           Have you had a chance to look at that?

13:16:04  8      A.   I have.

13:16:04  9      Q.   Does it -- strike that.

13:16:05 10           Do you recall it at all?

13:16:06 11      A.   No.

13:16:07 12      Q.   Do you recall from time to time after the

13:16:10 13  policy respecting Apple was put into effect receiving

13:16:14 14  communications from Steve Jobs complaining about Google's

13:16:18 15  recruiting into Apple?

13:16:20 16      A.   I have a general recollection, but I don't

13:16:22 17  recall the specifics.

13:16:23 18      Q.   What's the extent of your general recollection?

13:16:26 19      A.   That whenever there was any recruiting

13:16:28 20  activity, we would hear from Steve one way or the other.

13:16:31 21      Q.   And did he typically communicate directly to

13:16:35 22  you about those matters?

13:16:37 23           MR. RUBIN:  Objection.  Lacks foundation.

13:16:41 24           THE WITNESS:  He would talk to whoever he had

13:16:43 25  spoken to the previous time on something else.  So he

| | | |
|---|---|---|
| 13:16:47 | 1 | would speak to myself. He would speak to Bill Campbell. |
| 13:16:50 | 2 | For a while Alan Eustace was assigned to speak to Steve. |
| 13:16:59 | 3 | So it would depend. |
| 13:17:02 | 4 | BY MR. HEIMANN: |
| 13:17:03 | 5 | Q. Forgive me, I'm just not clear on your answer. |
| 13:17:05 | 6 | When you said "he would speak to whomever he |
| 13:17:08 | 7 | had last spoken to," are you talking about Mr. Jobs would |
| 13:17:10 | 8 | speak to whomever he had last spoken? |
| 13:17:13 | 9 | A. That's correct. |
| 13:17:13 | 10 | Q. What is -- can you explain what you mean by |
| 13:17:14 | 11 | that? |
| 13:17:15 | 12 | A. Well, the company had interactions with Steve, |
| 13:17:18 | 13 | and Steve would call whoever he had most recently spoken |
| 13:17:21 | 14 | with on another subject to let them know of his |
| 13:17:24 | 15 | displeasure. |
| 13:17:25 | 16 | Q. And that was just his idiosyncratic practice? |
| 13:17:31 | 17 | A. I -- I'm not going to judge it. So -- |
| 13:17:33 | 18 | Q. All right. That was -- setting aside the |
| 13:17:36 | 19 | idiosyncratic, that was Mr. Jobs' apparent practice from |
| 13:17:41 | 20 | what you saw and observed? |
| 13:17:43 | 21 | MR. RUBIN: Objection. Lacks foundation. |
| 13:17:44 | 22 | THE WITNESS: It is only my observation of what |
| 13:17:45 | 23 | happened. I can't speculate on Steve's motivations. |
| 13:17:51 | 24 | Again, let me remind you that I joined the |
| 13:17:53 | 25 | board about -- the board of Apple about -- at a time |

13:17:56  1    in -- coincident with this era, this period of time.

13:17:59  2    BY MR. HEIMANN:

13:18:00  3        Q.    I have it down that you joined in August of

13:18:02  4    2006.  Does that sound right?

13:18:04  5        A.    That sounds good.

13:18:05  6        Q.    And you were on the board up until or through

13:18:08  7    August 2009?

13:18:09  8        A.    That sounds about right.

13:18:10  9        Q.    And then you went off the board of Apple?

13:18:12  10        A.    That is correct.

13:18:13  11        Q.    Why?

13:18:14  12        A.    The conflicts between the company while I was

13:18:20  13    on the board -- it started with almost no conflict, and

13:18:24  14    then during the time I was on the board the iPhone was

13:18:28  15    announced, and then the android product line, which is

13:18:31  16    the primary competitor for the iPhone now, was announced,

13:18:36  17    and I had to recuse myself under the rules, which is the

13:18:39  18    right thing.  And it got to the point where I had to

13:18:41  19    recuse myself from too much, that I could not effectively

13:18:45  20    contribute as an Apple board member, and it was the right

13:18:48  21    decision to get off.

13:18:51  22        Q.    All right.  Sir, in this instance we're look at

13:18:53  23    Exhibit 187, apparently Mr. Jobs brought to your

13:18:56  24    attention his complaint about Google's recruiting into

13:18:59  25    his iPod group.

13:19:02  1         A.    I see that.

13:19:02  2         Q.    All right.  And I'm sorry.  Maybe I already

13:19:05  3    asked you that.  Do you recall this?

13:19:07  4         A.    I do not, although as I read this, it's

13:19:10  5    probably the case that new cell phone software group is

13:19:14  6    referring to android.

13:19:18  7         Q.    All right.  And then you responded to him

13:19:23  8    fairly promptly, saying you would look into it and

13:19:27  9    affirming or reaffirming the policy of no recruiting?

13:19:30 10         A.    That is correct.

13:19:32 11         Q.    If we could go next to Exhibit 250.

13:20:14 12         A.    Okay.

13:20:15 13         Q.    All right.  Do you have any recollection of

13:20:16 14    this email exchange?

13:20:17 15         A.    No.

13:20:34 16         Q.    In any event, what you've done -- strike that.

13:20:36 17               The email appears to be you're forwarding to

13:20:38 18    Mr. Jobs the information you had been provided about the

13:20:42 19    matter that he had asked about or complained about?

13:20:44 20         A.    That is correct.

13:20:50 21               MR. RUBIN:  Are you referring back to the prior

13:20:52 22    exhibit, or are you linking the two exhibits?

13:20:54 23               MR. HEIMANN:  I think I did, yeah.  Aren't they

13:20:59 24    linked?

13:21:13 25               THE WITNESS:  I'm going to presume that these

13:21:15  1   are two linked, but there is not a guarantee that they

13:21:18  2   are.

13:21:19  3           MS. BROWN:  I'll note for the record that the

13:21:20  4   date on the prior exhibit, Exhibit 187, appears to be in

13:21:24  5   February 2006, whereas the date on the Exhibit 250 is

13:21:27  6   '07.

13:21:29  7           THE WITNESS:  You are right.

13:21:30  8   BY MR. HEIMANN:

13:21:30  9       Q.  So that would suggest they are not.  My

13:21:32 10   apologies.

13:21:33 11       A.  Let's assume they are not.  This is referring

13:21:35 12   to some other incident, then.

13:21:37 13       Q.  So in this email, I'm talking about

13:22:11 14   Exhibit 250, and it is not clear to me who the author of

13:22:17 15   the email is that you forwarded to Mr. Jobs, but whoever

13:22:21 16   the author is, they reported that on this specific case

13:22:24 17   the source or who contacted this Apple employee should

13:22:30 18   not have and will be terminated within the hour.  Do you

13:22:32 19   see that?

13:22:33 20       A.  I do.

13:22:33 21       Q.  And then skipping down a bit it says, "In

13:22:35 22   general we have a very clear," quote, "'do not call,'"

13:22:39 23   close quote, "policy that is given to every staffing

13:22:44 24   professional," et cetera.

13:22:45 25           Do you see that?

| 13:22:46 | 1 | A.   I do. |
| 13:22:46 | 2 | Q.   Was this a matter of such importance that it |
| 13:22:48 | 3 | justified termination of the person who offended the |
| 13:22:52 | 4 | policy as is indicated here? |
| 13:22:54 | 5 | MR. RUBIN:  Objection.  Argumentative. |
| 13:22:57 | 6 | THE WITNESS:  Well, as a general rule, Google |
| 13:23:00 | 7 | has a set of rules that the recruiters and everyone else |
| 13:23:05 | 8 | has to follow, and so I would assume reading this that |
| 13:23:09 | 9 | the manager observed that the recruiter had violated the |
| 13:23:14 | 10 | rules and was terminated.  It was relatively -- it's how |
| 13:23:20 | 11 | you deal with -- with errors in a company. |
| 13:23:22 | 12 | BY MR. HEIMANN: |
| 13:23:22 | 13 | Q.   Are you suggesting that every error committed |
| 13:23:25 | 14 | at Google resulted in termination? |
| 13:23:28 | 15 | MR. RUBIN:  Objection.  Mischaracterizes prior |
| 13:23:29 | 16 | testimony; argumentive. |
| 13:23:32 | 17 | THE WITNESS:  If it is a rule that you've been |
| 13:23:33 | 18 | told you have to follow or you'll lose your job, sure. |
| 13:23:36 | 19 | BY MR. HEIMANN: |
| 13:23:37 | 20 | Q.   And this was such a rule? |
| 13:23:38 | 21 | A.   I don't know, but I would infer it was. |
| 13:23:46 | 22 | Q.   Let's take a look at Exhibit 192. |
| 13:24:08 | 23 | A.   This explains to you the origin. |
| 13:24:22 | 24 | Q.   Right. |
| 13:24:22 | 25 | A.   Okay.  So what was your question? |

13:24:25  1        Q.    So you've had a chance to look at this?  That's

13:24:27  2    the first question.

13:24:28  3        A.    Uh-huh.

13:24:29  4        Q.    This email string appears to begin with an

13:24:31  5    email from a Google recruiter to someone at Apple.

13:24:36  6        A.    That's -- I see that.

13:24:37  7        Q.    All right.  And then Steve Jobs forwards that

13:24:41  8    email to you with the statement, "I would be very pleased

13:24:46  9    if your recruiting department would stop doing this."  Do

13:24:49 10    you see that?

13:24:50 11        A.    That is correct.

13:24:53 12        Q.    And you responded to -- let me make sure I get

13:25:01 13    this right.

13:25:02 14        A.    I'll try to help you.

13:25:03 15        Q.    Sure.

13:25:03 16        A.    This is a forward where I'm forwarding Steve's

13:25:06 17    mail almost certainly to Shona.

13:25:08 18        Q.    Okay.

13:25:10 19        A.    Where I say to Shona, "I believe that we have a

13:25:12 20    no policy of recruiting from Apple."  Or perhaps it is

13:25:16 21    Arnnon.  I'm sending it to either Shona or Arnnon, or

13:25:20 22    whatever his name is, and then you can see the response

13:25:24 23    from Arnnon to me, and then you can see the response from

13:25:27 24    Shona to Arnnon in order.

13:25:30 25        Q.    Right.  So this would be -- so it is clear on

13:25:33  1  the record, so Arnnon's response to you is the one on

13:25:36  2  March 8 which he writes, "on this specific case," et

13:25:40  3  cetera.

13:25:40  4       A.   That is correct.  You can see he has addressed

13:25:45  5  it to me.

13:25:45  6       Q.   Yes, sir.  And that is the email in which he

13:25:48  7  says the person will be terminated within the hour?

13:25:50  8       A.   Right.  And you'll also see above that Shona's

13:25:54  9  direction to Arnnon that we have a zero tolerance policy

13:25:58 10  for violating our policies, which should answer your

13:26:01 11  earlier question.

13:26:02 12       Q.   Right.  So this policy regarding recruiting

13:26:04 13  was, as she puts it here, "a zero tolerance policy" that

13:26:09 14  warranted immediate termination if violated.

13:26:12 15         MR. RUBIN:  Objection.  Mischaracterized the

13:26:15 16  document.

13:26:15 17         THE WITNESS:  Again, I'll let the document

13:26:17 18  speak for itself.  So --

13:26:18 19  BY MR. HEIMANN:

13:26:19 20       Q.   That's what the document says, right?

13:26:20 21         MR. RUBIN:  Objection.  Same objection.

13:26:22 22         THE WITNESS:  "I want it clear we have a zero

13:26:24 23  tolerance policy for violating our policies."  So I think

13:26:28 24  that's how I'd interpret it.

         25  //

| | | |
|---|---|---|
| 13:26:31 | 1 | BY MR. HEIMANN: |
| 13:26:32 | 2 | Q.   Right.  Now, focusing again on the policy with |
| 13:26:40 | 3 | respect to Apple, you've indicated in your prior |
| 13:26:45 | 4 | testimony that the policy was a no cold call policy.  I |
| 13:26:49 | 5 | think that's the fairest way to summarize it, right? |
| 13:26:51 | 6 | A.   Yeah, we call it a do-not-call policy. |
| 13:26:53 | 7 | Q.   Do-not-call policy, thank you. |
| 13:26:55 | 8 | A.   DNC. |
| 13:26:56 | 9 | Q.   But with respect to Apple, wasn't it more than |
| 13:26:59 | 10 | that, wasn't it also a do-not-hire unless Steve Jobs |
| 13:27:02 | 11 | okays the hire? |
| 13:27:03 | 12 | MR. RUBIN:  Objection.  Argumentative; lacks |
| 13:27:04 | 13 | foundation. |
| 13:27:06 | 14 | THE WITNESS:  That is not true. |
| 13:27:07 | 15 | BY MR. HEIMANN: |
| 13:27:08 | 16 | Q.   Let's take a look at Exhibit 278.  Have you had |
| 13:27:55 | 17 | a chance to take a look at this? |
| 13:27:57 | 18 | A.   I do. |
| 13:27:57 | 19 | Q.   This is an email from Mr. Eustace, Alan |
| 13:27:59 | 20 | Eustace, to Steve Jobs, correct? |
| 13:28:01 | 21 | A.   Uh-huh.  Yes. |
| 13:28:03 | 22 | Q.   And who is Mr. Eustace at Google at the time? |
| 13:28:06 | 23 | A.   Senior vice president of engineering. |
| 13:28:08 | 24 | Q.   That is a senior position, is it not? |
| 13:28:10 | 25 | A.   That is correct. |

13:28:11  1      Q.    And he copies Mr. Campbell and the two founders

13:28:14  2   of the company as well, correct?

13:28:16  3      A.    That's correct.

13:28:17  4      Q.    And he says in part, "Google would like to make

13:28:21  5   an offer to ███████████████" Is that how you

13:28:26  6   pronounce it?  Do you know?

13:28:28  7      A.    I don't know.

13:28:28  8      Q.    "-- to run a small engineering center in Paris.

13:28:31  9   Bill, Larry, Sergey" -- Sergey, sorry, "and ██████████

13:28:35 10   believe it is important to get your blessing before

13:28:38 11   moving forward with this offer."

13:28:39 12           Skipping down to the last paragraph, "Google's

13:28:41 13   relationship with Apple is extremely important to us.  If

13:28:44 14   that relationship is any way threatened by this hire,

13:28:47 15   please let me know, and we will pass on this

13:28:50 16   opportunity."

13:28:50 17           Do you see that?

13:28:51 18      A.    I do.

13:28:52 19      Q.    Did you know anything about this at the time?

13:28:55 20      A.    I did not.  Or I should say, I don't have any

13:29:02 21   memory of it.

13:29:06 22      Q.    If we can go to Exhibit 648.

13:29:09 23           Have you had a chance to look at that?

13:29:55 24      A.    I have.

13:29:55 25      Q.    So this is an email chain, I'll try to

13:29:57  1    summarize it rather than read through it, in which it

13:30:01  2    appears that Mr. Jobs had not responded to the email that

13:30:04  3    we saw just a moment ago.  I'm looking at page 2, halfway

13:30:08  4    down it says, "Steve didn't respond to my email, but Bill

13:30:12  5    Campbell promised to call," et cetera.

13:30:14  6         A.    That's what it says.

13:30:16  7         Q.    And then looking at the first page there is an

13:30:21  8    email exchange involving whether or not Mr. Campbell had

13:30:24  9    had a chance to talk with Mr. Jobs yet about the subject.

13:30:27  10   Do you see that?

13:30:27  11        A.    I do.

13:30:28  12        Q.    And the last email is Mr. Campbell saying he is

13:30:31  13   going to be meeting with Mr. Jobs on Sunday.

13:30:34  14        A.    I see that.

13:30:35  15        Q.    Okay.  Refresh your memory at all about this

13:30:38  16   incident at this point?

13:30:40  17        A.    No.

13:30:41  18        Q.    If we can go next, then, to Exhibit 650 -- no,

13:30:48  19   I'm sorry, Exhibit 279.

13:31:14  20        A.    Okay.

13:31:15  21        Q.    So now what I'm showing you is the response

13:31:16  22   that Mr. Jobs sent on the 9th of April the day after --

13:31:20  23   or maybe the very day he spoke with Mr. Campbell,

13:31:22  24   according to Exhibit 648, in which Mr. Jobs wrote, "What

13:31:28  25   would ███████ be working on?  We would have a problem

13:31:28   1    if it is related to cell phone handsets, et cetera."

13:31:31   2         Do you see that?

13:31:31   3       A.    I do.

13:31:32   4       Q.    And then Mr. Eustace responded to that email as

13:31:36   5    is indicated here, "Thank you very much for responding,"

13:31:38   6    et cetera. Do you see that?

13:31:39   7       A.    I do.

13:31:40   8       Q.    And if we can go next then to Exhibit 650.

13:32:19   9       A.    I see that.

13:32:19 10       Q.    So this begins with an email from Mr. Eustace

13:32:21 11    to Mr. Jobs on the 25th of April, describing the desire

13:32:23 12    to hire  ██████████ and four people who used to work for

13:32:27 13    him at Apple in Paris. Do you see that?

13:32:30 14       A.    Uh-huh.

13:32:30 15       Q.    And then Mr. Jobs wrote back, "We strongly

13:32:33 16    prefer that you not hire these guys."

13:32:34 17         Do you see that?

13:32:35 18       A.    Yes.

13:32:36 19       Q.    And then Mr. Eustace -- I'm sorry -- yes,

13:32:45 20    Mr. Eustace writes to  ████████ relating that to him and

13:32:48 21    indicating that "We can't risk our relationship with

13:32:50 22    Apple to make this happen over his objection."

13:32:52 23         Do you see that?

13:32:53 24       A.    I see.

13:32:54 25       Q.    All right. And finally, if we go to

13:32:57  1    Exhibit 653.

13:33:29  2         A.    Okay.

13:33:29  3         Q.    So this is what appears to me to be the

13:33:32  4    concluding email on the subject in which Mr. Eustace

13:33:35  5    wrote to Mr. Jobs on May 23 of 2006, saying, among other

13:33:38  6    things, that "Based on your strong preference that we not

13:33:42  7    hire the ex-Apple engineer, ██████, and I decided not

13:33:46  8    to open a Paris engineering center."

13:33:48  9              Do you see that?

13:33:53 10         A.    I do.

13:33:53 11         Q.    Once again, do you have any recollection of

13:33:55 12    knowing about this exchange?

13:33:56 13         A.    No, but I should note that we have an

13:33:59 14    engineering center now in Paris.

13:34:02 15         Q.    Glad to hear it, but the question is, how do

13:34:04 16    you square this with the notion that the agreement with

13:34:07 17    Apple did not involve requiring Mr. Jobs' permission for

13:34:11 18    hiring Apple people?

13:34:12 19              MR. RUBIN:  Objection.  Lacks foundation.

13:34:17 20              THE WITNESS:  Well, you -- as you can see, I

13:34:19 21    was not copied on any of this correspondence.

13:34:21 22    BY MR. HEIMANN:

13:34:21 23         Q.    I do.

13:34:22 24         A.    So I was not involved in this whole

13:34:24 25    transaction.  But I stated what I -- what I understood

13:34:28  1    the agreement between -- or whatever you want to

13:34:30  2    characterize them, that Google had about hiring Apple

13:34:34  3    people, which is do not call, but if people approached

13:34:36  4    us, we would pursue.  In this particular case, Alan seems

13:34:40  5    to have gone one step further for reasons that he would

13:34:43  6    have to tell you.

13:34:44  7            (Exhibit 861 was marked for identification.)

13:34:44  8    BY MR. HEIMANN:

13:34:44  9        Q.    All right.  Let me ask you to take a look at

13:34:47 10    Exhibit 861.  Have you had a chance to look at that?

13:35:19 11        A.    I have.

13:35:19 12        Q.    This is an email internal to Apple, as I

13:35:21 13    understand it, and the point I want to focus on is the

13:35:25 14    originating email from Daniel -- Danielle, excuse me,

13:35:28 15    Lambert to Mr. Jobs, June of 2006.  And in particular,

13:35:34 16    the second paragraph of that email, in which she said,

13:35:38 17    "We have been diving into the search for someone to lead

13:35:42 18    an ad sales team and surfacing some good folks.  We're

13:35:47 19    researching Google to see who's there and learn what we

13:35:49 20    can about their backgrounds, but are not directly calling

13:35:52 21    them directly given the agreement you and Sergey" -- I

13:35:57 22    hope I'm pronouncing it correctly -- "struck not to

13:36:00 23    recruit from one another."  Let me stop there.

13:36:07 24            Were you aware that such an agreement had been

13:36:09 25    reached between Mr. Jobs and Sergey Brin at Google?

```
13:36:13  1      A.   Well, I've already indicated that there was no

13:36:15  2   such agreement, in your terms.  I don't know what Sergey

13:36:21  3   may have said separately to Steve or what impressions he

13:36:24  4   may have given.  We -- I already showed you what we did.

13:36:30  5   You showed me an email from this Danielle Lambert woman,

13:36:33  6   who I don't know, which indicates that they were doing

13:36:36  7   something similar for us.

13:36:39  8      Q.   Well, to be fair, both that email and this

13:36:41  9   email speak in terms of an actual agreement between the

13:36:43  10  two companies not to recruit from each other, right?

13:36:48  11          MR. RUBIN:  Objection.  Argumentative; lacks

13:36:49  12  foundation.

13:36:49  13          THE WITNESS:  Well, I -- all I can see are the

13:36:51  14  words on the page.  So I -- it's very hard to interpret

13:36:55  15  an email in the context of a different company.  So --

13:36:59  16  you'd have to ask them.

13:37:18  17  BY MR. HEIMANN:

13:37:18  18     Q.   Well, let's look at a Google document on this

13:37:21  19  subject.  Let's look at Exhibit 661.

13:38:01  20          My focus is on the first page of the document.

13:38:19  21     A.   Okay.

13:38:19  22     Q.   First of all, do you recognize the document?

13:38:21  23     A.   I do not.

13:38:22  24     Q.   It's a Google document, correct?  It is from

13:38:28  25  Google's business records, right?
```

13:38:36  1        A.    I'm sorry.  Are you asking me?

13:38:37  2        Q.    Yes.

13:38:38  3        A.    I didn't produce the document, so I don't know.

13:38:40  4        Q.    When you say you, you mean you personally

13:38:42  5   didn't produce it, right?

13:38:44  6        A.    I -- I don't know where these documents come

13:38:46  7   from.

13:38:47  8        Q.    I'll tell you this document came from Google's

13:38:49  9   business records.

13:38:50 10        A.    And as I asked you previously, I don't know who

13:38:53 11   wrote these documents.  You told me the name of somebody

13:38:54 12   I didn't know.

13:38:54 13        Q.    Right.

13:38:54 14        A.    So if you could let me know who wrote it, that

13:38:56 15   would be helpful.

13:38:57 16        Q.    Well, I think this document was written by

13:38:59 17   Mr. Geshuri, is it not?

13:39:02 18             MR. HARVEY:  I have to double-check this

13:39:03 19   document specifically.

13:39:05 20             THE WITNESS:  Okay.

13:39:05 21   BY MR. HEIMANN:

13:39:06 22        Q.    In any event, there is no doubt it is a Google

13:39:08 23   document, in your mind, is there?

13:39:09 24        A.    Well, I would assume so, yeah.

13:39:11 25        Q.    And the title of the document at the part -- at

13:39:13  1   the very beginning says, "Google" in big letters,

13:39:16  2   "Special Agreement Hiring Policy," right?

13:39:18  3        A.   I see that.

13:39:19  4        Q.   Lower left-hand corner says it was a revision

13:39:22  5   from January of 2008, correct?

13:39:26  6        A.   Yes, it says that.

13:39:27  7        Q.   All right.  If you'll take a look at the text

13:39:29  8   about halfway down on the first page, just below the line

13:39:33  9   that goes across the page, it says, "The following

13:39:36 10   companies (and by association, their subsidiaries listed

13:39:40 11   in Appendix A) have a special agreement with Google and

13:39:44 12   are part of the 'Do Not Cold Call' list."

13:39:46 13             And then there is a list of parent companies

13:39:49 14   provided there.  Do you see that?

13:39:50 15        A.   I do.

13:39:51 16        Q.   And then it goes on to say, "For each of these

13:39:53 17   'Do Not Cold Call' companies, Google has agreed to the

13:39:57 18   following protocol."

13:39:58 19             Now, can you square that with -- strike that.

13:40:01 20             Doesn't that indicate to you that there were

13:40:02 21   actual agreements between Google and these companies

13:40:04 22   respecting the subject matter here?

13:40:09 23             MR. RUBIN:  Objection.  Lacks foundation.

13:40:12 24             THE WITNESS:  I didn't write these, and I

13:40:15 25   didn't write the word "agreement."  So I'm not aware of

13:40:18  1    agreements in the sense of written documents, if that's

13:40:21  2    what your question is.

13:40:21  3    BY MR. HEIMANN:

13:40:22  4         Q.   I said nothing about writing, sir.

13:40:24  5         A.   Well --

13:40:24  6         Q.   You understand agreements don't have to be in

13:40:26  7    writing to be agreements, right?

13:40:27  8         A.   Well, again --

13:40:29  9              MR. RUBIN:   Objection.   That's -- if you -- do

13:40:31 10    you have another question?

13:40:32 11    BY MR. HEIMANN:

13:40:32 12         Q.   That's a question.

13:40:34 13         A.   What is the question?

13:40:35 14         Q.   You understand, sir, that in business an

13:40:37 15    agreement doesn't have to be in writing in order for it

13:40:41 16    to be an agreement.

13:40:42 17         A.   As a -- that's true.   I can assure you that at

13:40:45 18    Google everything is in writing.

13:40:46 19         Q.   You don't have any gentleman's agreements at

13:40:49 20    Google, huh?

13:40:50 21         A.   They are generally a problem.

13:40:52 22         Q.   So back to the question here, were you aware of

13:40:56 23    the agreements that are specifically described here

13:41:01 24    between Google and these companies?

13:41:03 25              MR. RUBIN:   Objection.   Lacks foundation.

13:41:06  1          THE WITNESS:  Well, again, I'm not aware of

13:41:07  2     agreements, period.  I have previously testified that I

13:41:12  3     was aware of do-not-call decisions, if you want to call

13:41:18  4     them, with Apple, Genentech, IBM, Intel, and some of

13:41:25  5     these I was not aware of even now.

13:41:29  6     BY MR. HEIMANN:

13:41:54  7          Q.  Did the executive management group periodically

13:41:57  8     review the no cold call policy or agreements, whatever?

13:42:04  9          MR. RUBIN:  Objection.  Lacks foundation to the

13:42:08 10     extent there were agreements or whatever.  I mean it

13:42:10 11     would be easier just to call it a DNC list for clarity.

13:42:13 12          MR. HEIMANN:  I choose not to call it that,

13:42:15 13     because the documents refer to it as an agreement and as

13:42:18 14     a list, so I think I can use them in the alternative.

13:42:20 15     And the notion that there is no foundation for the use of

13:42:22 16     the word "agreements" in the face of these documents is

13:42:25 17     absurd.

13:42:26 18          MR. RUBIN:  You can call it whatever you want.

13:42:27 19     You'll be able to argue whatever you want.  I'm saying

13:42:30 20     for purposes of the deposition, I think you'll get fewer

13:42:33 21     objections if you just call it a DNC list.

13:42:37 22          MR. HEIMANN:  I'm sorry.  I lost my train of

13:42:39 23     thought there.  What was the question?

13:42:51 24          (Record was read as follows:  "Question:  Did

13:42:51 25     the executive management group periodically review the no

14:01:45  1                    MR. RUBIN:  Objection.  Vague.

14:01:46  2                    THE WITNESS:  I don't know what Intel's policy

14:01:48  3    with respect to recruiting Google was.

14:01:50  4    BY MR. HEIMANN:

14:01:50  5         Q.   Don't you think it's likely that you did know

14:01:52  6    at the time?

14:01:53  7                    MR. RUBIN:  Objection.  Argumentative; calls

14:01:55  8    for speculation.

14:01:58  9                    THE WITNESS:  No.  I actually don't.

14:01:59 10    BY MR. HEIMANN:

14:02:01 11         Q.   And why is that?

14:02:02 12         A.   The relationship was unique because Paul was on

14:02:07 13    the Google board, whereas I was not on the Intel board.

14:02:12 14    So it is perfectly possible you could have different

14:02:15 15    policies in two different companies.  It is not

14:02:17 16    symmetric.

14:02:18 17         Q.   And the "Paul" in your answer is who?

14:02:20 18         A.   Otellini.

14:02:22 19         Q.   He was the CEO --

14:02:24 20         A.   CEO of Intel.

14:02:25 21         Q.   Don't you think it likely that if there was an

14:02:27 22    actual agreement, whether in writing or not, between

14:02:31 23    Google and Intel about not recruiting from each others'

14:02:35 24    employees, that you would have been aware of that?

14:02:37 25                    MR. RUBIN:  Objection.  Argumentative; calls

14:02:39   1    for speculation; lacks foundation based on prior

14:02:42   2    testimony.

14:02:48   3          THE WITNESS:  As I previously said, we set the

14:02:50   4    policy based on what we thought was the right way to

14:02:53   5    treat these partners.  I have no memory of ever

14:02:58   6    discussing Intel's policy.

14:03:00   7    BY MR. HEIMANN:

14:03:01   8         Q.   Did Google tell these companies what Google's

14:03:05   9    policy was?

14:03:06  10         A.   I'm sure I spoke with Paul about this at some

14:03:09  11    point.

14:03:10  12         Q.   And you don't have any recollection of him

14:03:12  13    assuring you that Intel's practices and policies with

14:03:15  14    Google was the same as Google's was to Intel; is that

14:03:20  15    right?

14:03:20  16         A.   That's correct.  It's also -- it's important to

14:03:22  17    understand that it's at -- these situations are

14:03:24  18    asymmetric because at the time in question Google was

14:03:28  19    growing very, very dramatically, and so we were certainly

14:03:34  20    hiring lots of people from the Valley; whereas the other

14:03:36  21    companies might not have been in such a growth phase.  So

14:03:40  22    they're not -- they're not symmetric relationships.

14:03:43  23         Q.   And how does that relate to the question about

14:03:44  24    whether or not the agreements were reciprocal?

14:03:46  25         A.   Well, they don't have to be reciprocal to be

14:03:48  1    the right thing.  We could decide unilaterally to do the

14:03:52  2    right thing.

14:03:52  3        Q.   And not at all be troubled that the other

14:03:54  4    companies might be recruiting your best people right out

14:03:57  5    from under your nose?

14:03:58  6        A.   I think it's highly unlikely that Intel would

14:04:02  7    have recruited any of our best people at the current and

14:04:04  8    periods of time you are discussing.

14:04:06  9        Q.   How about not some of your best people, then?

14:04:08 10        MR. RUBIN:  I'm sorry?

14:04:09 11    BY MR. HEIMANN:

14:04:10 12        Q.   Some of your other people.

14:04:11 13        A.   We would argue that all of our people are our

14:04:13 14    best people.

14:04:14 15        Q.   That's right.  So you think it is likely that

14:04:16 16    they would have been recruiting at all from Google?

14:04:18 17        A.   Well, Google during this period was -- I don't

14:04:21 18    know how to describe it without sounding arrogant, but we

14:04:24 19    were the hottest company in the Valley to work for during

14:04:27 20    this period.  We were winning best places to work for,

14:04:30 21    you know, many, many other aspects.

14:04:32 22            So I think it is a fair characterization that

14:04:36 23    we -- that we would generally win such a competition.

14:04:45 24        Q.   So you are suggesting you didn't need it to be

14:04:47 25    reciprocal because you were such an attractive place to

```
14:04:52  1    work; is that fair?

14:04:54  2         A.   Well --

14:04:54  3              MR. RUBIN:  Objection.  Argumentative;

14:04:56  4    mischaracterizes prior testimony.

14:04:57  5              THE WITNESS:  Again, these are your -- your

14:04:58  6    words.  What I would say is that we pride ourselves as

14:05:01  7    being the best place to work and we believe the best

14:05:03  8    people want to work at the best place, and we believe

14:05:06  9    that they should work at Google.  Our position is quite

14:05:09 10    clear.

14:05:10 11    BY MR. HEIMANN:

14:05:10 12         Q.   What is your relationship with Mr. Otellini?

14:05:12 13         A.   I think it's good as personal friends, and

14:05:15 14    she -- and he remains a board member.

14:05:21 15              MR. MITTELSTAEDT:  Remains a what?

14:05:25 16              MS. BROWN:  Board member.

14:05:25 17    BY MR. HEIMANN:

14:05:26 18         Q.   Let's take a look at some documents.  Start

14:05:28 19    with Exhibit 651.

14:06:03 20         A.   Okay.

14:06:03 21         Q.   All right.  Do you recognize this email?

14:06:06 22         A.   No.

14:06:07 23         Q.   All right.  It is an email exchange in May of

14:06:11 24    2006 between yourself and Mr. Otellini at Intel, right?

14:06:15 25         A.   That's correct.
```

14:06:15  1          Q.   And it begins with an email from Mr. Otellini

14:06:19  2     to you, subject, recruiting, which reads in part, "Sorry

14:06:24  3     to bother you again on this topic, but my guys are very

14:06:28  4     troubled by Google continuing to recruit our key

14:06:32  5     players."

14:06:33  6               And then he -- dropping down to the last

14:06:38  7     sentence in the email, he says, "Can you please reinforce

14:06:41  8     the no-recruiting agreement.  I would appreciate it.

14:06:45  9     Thanks, Paul."

14:06:46 10               Do you see that?

14:06:47 11          A.   I do.

14:06:47 12          Q.   And then you wrote to people at Google,

14:06:53 13     Ms. Brown and Mr. Geshuri, saying, "Can you review?  I

14:06:57 14     thought Intel was on our no-hire list."  Right?

14:07:01 15          A.   I see that.

14:07:02 16          Q.   And then Mr. Geshuri says, "I will investigate

14:07:04 17     and provide a report on this situation."  Right?

14:07:10 18          A.   Yes.

14:07:11 19          Q.   All right.  And you don't recall any of this, I

14:07:13 20     gather.

14:07:13 21          A.   That's correct.

14:07:14 22          Q.   And did you know what agreement Mr. Otellini

14:07:24 23     was talking about at the time?

14:07:25 24          A.   Well, as I said, I don't remember the -- the

14:07:27 25     email, but this would be the do-not-call policy that we

14:07:31  1    had in place.

14:07:33  2        Q.    Which he referred to as an agreement, correct?

14:07:37  3            MR. RUBIN:  Objection.  Calls for speculation;

14:07:41  4    foundation.

14:07:41  5            THE WITNESS:  I didn't write his words.

14:07:42  6    BY MR. HEIMANN:

14:07:43  7        Q.    You need to answer my question.  He called it

14:07:45  8    an agreement in this email, did he not?

14:07:47  9        A.    I observed --

14:07:48  10            MR. RUBIN:  Objection.  Lacks foundation; calls

14:07:48  11   for speculation.

14:07:49  12            THE WITNESS:  I observe he says the words

14:07:50  13   "no-recruiting agreement" in his email.

14:07:53  14            MR. RUBIN:  Just to clarify, an objection by

14:07:56  15   one, I think we have a standing understanding,

14:07:59  16   Mr. Heimann, that an -- an objection by one defendant is

14:08:02  17   incorporated for all defendants.

14:08:05  18            MR. HEIMANN:  I think that has been understood

14:08:07  19   from the beginning.

14:08:08  20            MR. RUBIN:  We hadn't said it on the record

14:08:10  21   today.

14:08:11  22            MR. HEIMANN:  I don't think it's necessary.

14:08:13  23            MR. RUBIN:  I'll take it back.

14:08:31  24   BY MR. HEIMANN:

14:08:32  25        Q.    Let's take a look at Exhibit 458.

14:09:07  1        A.    Okay.

14:09:08  2        Q.    All right.  Sir, this is an internal Intel

14:09:10  3    record.  As far as I know, nobody outside of Intel was

14:09:17  4    involved.  Certainly nobody from Google.

14:09:22  5              But if you'll focus on the email from Gabriel

14:09:26  6    Thompson to Patty Murray and to Paul Otellini at the top

14:09:29  7    of the first page, do you see that?

14:09:31  8        A.    I do.

14:09:32  9        Q.    Do you recognize any of the names, other than

14:09:33 10    Mr. Otellini, by any chance?

14:09:35 11        A.    I do not.

14:09:35 12        Q.    And the subject of that email is, "Global

14:09:40 13    gentleman agreement with Google."  Do you see that?

14:09:43 14        A.    I see it.

14:09:44 15        Q.    And the question that Ms. Thompson posed was,

14:09:48 16    "Are either of you aware of any agreement with Google

14:09:51 17    that prohibits us from recruiting Google's senior

14:09:54 18    talent?"  Do you see that?

14:09:55 19        A.    Uh-huh.

14:09:56 20        Q.    Mr. Otellini responded promptly, saying, "Yes."

14:10:02 21              Do you see that?

14:10:03 22        A.    I do.

14:10:05 23        Q.    And if you'll next go to Exhibit 202, 202

14:10:31 24    reproduces part of the email that I just showed you,

14:10:34 25    including the question being posed by Ms. Thompson, "Are

14:19:19  1   dealing with, did you personally review the public, or

14:19:19  2   did somebody screen those for you?

14:19:26  3       A.   My assistant screened it, and they do that

14:19:28  4   today.  So it is perfectly possible that mail sent to my

14:19:32  5   public address I did not see because my assistants missed

14:19:35  6   it, but I was quite thorough at reading my private

14:19:38  7   emails.  So my presumption is if it's a private email, I

14:19:41  8   did, in fact, read it.

14:19:43  9       Q.   All right.  So -- withdraw that.

14:20:02 10           Now, in his -- I know you're going to be

14:20:05 11   thinking as your counsel, I'm beating a dead horse, but

14:20:08 12   I'm going to have to beat it to death and then some.  In

14:20:11 13   his email to you he talks about a reciprocal

14:20:14 14   understanding.  Do you see that?

14:20:15 15       A.   I see he says, "I think we should have a

14:20:17 16   general understanding that we are not actively recruiting

14:20:20 17   from each other."

14:20:21 18       Q.   All right.  Did you reach such a general

14:20:22 19   understanding with him?

14:20:24 20           MR. RUBIN:  Objection.  Asked and answered.

14:20:25 21           THE WITNESS:  As I've previously said, I have

14:20:27 22   no memory of such an agreement, but it is obvious that

14:20:30 23   we -- we put them on the do-not-call list for a while,

14:20:33 24   from this email.

         25   //

14:20:38 1    BY MR. HEIMANN:

14:20:44 2        Q.   Do you know how long they remained on the list?

14:20:46 3        A.   Well, as I read it, it says they were on for

14:20:49 4    two months.  I don't think that they were on very long,

14:20:52 5    because eventually our partnerships and plans did not

14:20:56 6    come together with Dell.  So it was probably not very

14:21:01 7    long.

14:21:38 8        Q.   So I know that you're speculating to some

14:21:40 9    extent.  You think in all likelihood they came out within

14:21:44 10   a reasonably short -- they came off the list within a

14:21:46 11   reasonably short period of time?

14:21:49 12       A.   Compared to some of the other companies, they

14:21:51 13   would have been on the list for a shorter period of time,

14:21:54 14   but I could not characterize to you what "shorter" is.

14:22:33 15            MR. HEIMANN:  Let me have you take a look next

14:22:36 16   at Exhibit 872.

14:22:37 17            (Exhibit 872 was marked for identification.)

14:22:37 18   BY MR. HEIMANN:

14:23:25 19       Q.   Have you had a chance to look at that?

14:23:27 20       A.   I have.

14:23:27 21       Q.   Do you recall the email at all?

14:23:29 22       A.   I don't recall the email, but I recall speaking

14:23:32 23   with Meg.

14:23:33 24       Q.   So you recall the conversation that is referred

14:23:36 25   to in the email; is that fair?

14:23:38  1        A.    I -- I recall that we had a conversation.  I'm

14:23:40  2    sure this is what I wrote after the conversation.

14:23:43  3        Q.    Okay.  Tell me as best you recall what was said

14:23:46  4    in the conversation with Ms. Whitman.

14:23:48  5        A.    I think the email summarizes the conversations.

14:23:54  6    So that's -- I don't remember the specific subjects.

14:23:58  7    This is as good a memory as we're going to get eight

14:24:00  8    years ago, as I said.

14:24:02  9        Q.    Well, there is a reason for me doing this that

14:24:04 10    may not be clear to you.

14:24:06 11        A.    Okay.

14:24:06 12        Q.    The first question is, can you tell me of your

14:24:08 13    own recollection what was said, and if you can't, you

14:24:10 14    should say, "I don't know what" --

14:24:13 15        A.    I understand.  Again, I'm trying to be helpful

14:24:15 16    here.

14:24:16 17              I recall Meg calling me and complaining about

14:24:19 18    hiring.  I don't recall the specifics of what she said at

14:24:23 19    all.

14:24:24 20        Q.    All right.  Do you -- do you know or do you

14:24:26 21    recall whether eBay -- strike that.

14:24:29 22              Was she calling about eBay as opposed to

14:24:32 23    PayPal?

14:24:37 24              MR. MITTELSTAEDT:  Objection.  Lacks

14:24:37 25    foundation.

14:24:37  1            THE WITNESS:  Because I have had the benefit of

14:24:39  2   reading this email, I now recall that she was

14:24:41  3   particularly incensed that a Google recruiter had called

14:24:45  4   █████████, who was her Number Two at the time.

14:24:48  5   BY MR. HEIMANN:

14:24:49  6       Q.    Okay.  Let me tell you something that I know

14:24:51  7   you know already, but just to be clear.

14:24:53  8            When -- when you -- when your memory gets

14:24:55  9   refreshed from documents, you did the right thing there,

14:25:00 10   tell me what your memory is.

14:25:02 11       A.    All right.

14:25:02 12       Q.    I'm not trying to confine you in unreasonable

14:25:05 13   ways as to how you go about answering these questions.

14:25:08 14            All right.  So the answer is, she was calling

14:25:11 15   in particular about one person who was an eBay employee,

14:25:14 16   if I understood you correctly.

14:25:16 17       A.    Yes.  Again, it is -- there is a couple of

14:25:20 18   things now.  I went to college with Meg.  Our children

14:25:23 19   went to school together.  I have socialized with Meg and

14:25:27 20   her husband.  After we went public, Meg invited me over

14:25:31 21   for a chat to advise me how to become a better public

14:25:36 22   company CEO.  Meg has been very gracious and very helpful

14:25:40 23   to me for many years.  I'm a very big supporter of Meg.

14:25:44 24   So if Meg calls me and she has got a problem, I'm going

14:25:48 25   to pay attention.

14:25:49  1          I don't recall the specifics aside from what

14:25:51  2  has been refreshed by my -- by this, but as I am trying

14:25:55  3  to be helpful and say, I'm sure this is accurately

14:25:57  4  what -- what was said.

14:25:59  5          Q.    So the first point of -- that you recorded of

14:26:03  6  the conversation was, "Google is the talk of the Valley

14:26:07  7  because we are driving salaries up across the board.

14:26:10  8  People are just waiting for us to fail -- or to fall,"

14:26:14  9  sorry, "and get back at us for our," quote, "'unfair,'"

14:26:18 10  close quote, "practices now."

14:26:19 11          Does that refresh your memory to any further

14:26:22 12  extent of what she said in regards to that aspect of

14:26:25 13  the --

14:26:26 14          A.    Same answer.

14:26:28 15          Q.    "Our recruiting practices" -- continuing on in

14:26:36 16  the email, "Our recruiting practices are," quote, "'zero

14:26:39 17  sum,' and it appears that somewhere in Google we are

14:26:41 18  targeting eBay to," quote, "'hurt them,'" close quote,

14:26:45 19  "and it's the reputation that we are doing this against

14:26:48 20  Yahoo, eBay, and MSFT," meaning Microsoft, and then in

14:26:55 21  paren, "(I denied this)."

14:26:58 22          I gather the parenthetical is your response to

14:27:00 23  her statement?

14:27:00 24          A.    Again, I'm writing down -- I'm very good about

14:27:04 25  these things.  She calls with a complaint, I write down

14:27:07  1    what she said, and then I give direction at what to do.

14:27:11  2                In this case, because number two, I was quite

14:27:14  3    sure was not true, I would have said to her, "I denied

14:27:18  4    this," and I noted this for the record, within Google.

14:27:21  5        Q.   All right.  What did you understand, if you

14:27:24  6    did, the reference to "zero sum" to mean?

14:27:28  7        A.   I don't recall the context in which she -- she

14:27:32  8    mentioned it.  That -- these are Meg's thoughts, not

14:27:36  9    mine.  I'm trying to channel them accurately in the

14:27:39 10    email, so -- again, it is helpful to remember that Google

14:27:47 11    has been public for a year.  Google is growing very

14:27:50 12    rapidly.  Google is the best place to work in the Valley.

14:27:55 13    There is all this press about Google taking over the

14:27:58 14    world, and it is clearly having an impact on partners,

14:28:01 15    competitors, and what have you, and that is the context

14:28:03 16    in which she probably had this feeling.

14:28:08 17        Q.   Was part of the reason -- well, let me withdraw

14:28:11 18    that.

14:28:11 19                Was the assertion that Google's recruiting

14:28:16 20    activities or hiring activities were having an impact on

14:28:20 21    salaries in the Valley an accurate one, from your point

14:28:23 22    of view?

14:28:25 23                MR. RUBIN:  Objection.  Lacks foundation; calls

14:28:26 24    for speculation.

14:28:29 25                THE WITNESS:  I don't know.  Because our

14:28:33  1  ████████████████████████████████████

14:28:39  2  ████████████████████████████████████████

14:28:43  3  ████████████████████████████████

14:28:47  4  ████████████████████████████████████

14:28:51  5  BY MR. HEIMANN:

14:28:51  6      Q.   Well, it depends on the point in time, right?

14:28:54  7      A.   I can assure you during this period of time it

14:28:56  8  was the correct behavior.  As to whether people did it, I

14:28:59  9  don't know.  ████████████████████████████████

14:29:02 10  ████████

14:29:02 11      Q.   I wish I had.

14:29:06 12           But let me come back to the point.  She

14:29:09 13  apparently is making the point to you that at least from

14:29:12 14  her perspective, salaries across the board in the Valley,

14:29:17 15  and I assume that's referring to the Silicon Valley, are

14:29:20 16  being driven up.

14:29:21 17      A.   Yes.  That would be -- that would have been her

14:29:22 18  point.

14:29:23 19      Q.   And did you have a view on that at the time?

14:29:25 20           MR. RUBIN:  Objection.  Asked and answered.

14:29:26 21           THE WITNESS:  As I said, I don't recall my

14:29:27 22  response on this.

14:29:28 23  BY MR. HEIMANN:

14:29:30 24      Q.   Well, when you say "response," I'm not really

14:29:32 25  asking --

```
14:29:33  1        A.   Response to her.

14:29:34  2        Q.   Yes, I understand.  But I'm asking a different

14:29:35  3   question.

14:29:36  4             Did you have a view as to whether or not that

14:29:37  5   was an accurate assessment as to what was going on?

14:29:40  6             MR. RUBIN:  Same objection.  Asked and

14:29:41  7   answered.

14:29:42  8             THE WITNESS:  So as best I can recall in 2005,

14:29:47  9   I would say that we were driving compensation up, but not

14:29:51 10   salaries.

14:29:52 11             (Exhibit 873 was marked for identification.)

14:29:53 12   BY MR. HEIMANN:

14:30:16 13        Q.   Let's take a look next at Exhibit 873.

14:30:36 14        A.   Okay.

14:30:36 15        Q.   This is an email a few days later from yourself

14:30:38 16   to Mr. Campbell and Arnnon, again about -- in this case,

14:30:47 17   eBay, PayPal, and Meg.

14:30:53 18        A.   I see.

14:30:54 19        Q.   Do you recall the circumstances surrounding

14:30:56 20   your creation of this email?

14:30:57 21        A.   I do not.

14:31:00 22        Q.   Okay.

14:31:01 23        A.   Let me observe that this is four days after

14:31:03 24   the -- the previous email.

14:31:04 25        Q.   Yes.  You begin this email by saying, "My
```

14:31:11  1    summary on eBay is that the situation is bad and we can

14:31:13  2    improve it with some simple steps.  Nevertheless, we need

14:31:17  3    to be very, very careful with the statements we make and

14:31:20  4    the actions of our recruiters."

14:31:27  5              Was the -- the situation with eBay that you

14:31:29  6    described as "bad" the result of Google's recruiting

14:31:34  7    employees out of eBay?

14:31:36  8              MR. RUBIN:  Objection.  Lacks foundation.

14:31:39  9              THE WITNESS:  I'm going to -- again, I don't

14:31:42 10    recall the specifics.  I'm going to assume that this

14:31:44 11    is the -- this mail is simply a follow-up to the first

14:31:47 12    one, and it refers to the set of issues that are relayed

14:31:53 13    in the first email.

14:31:53 14    BY MR. HEIMANN:

14:32:01 15        Q.   Okay.

14:32:02 16        A.   So when I say the situation is bad, it doesn't

14:32:03 17    necessarily mean that it is factually bad on our side.

14:32:06 18    It's perceptions drive behavior.  We have a very

14:32:10 19    important partner who is very upset.  As I said, we had a

14:32:14 20    rough call from a good friend.  So --

14:32:24 21        Q.   Down under paragraph (3) in this Exhibit 873

14:32:29 22    you refer to an "internal complaint about us within

14:32:31 23    PayPal."

14:32:35 24        A.   I see this.

14:32:36 25        Q.   That appears to be distinct from the eBay

15:22:07  1    would have lists similar to Google's list?

15:22:12  2         A.    I never thought about it.

15:22:14  3         Q.    Never crossed your mind?

15:22:15  4         A.    No.  It is not my problem.  They're -- we try

15:22:22  5    to run our own company, not somebody else's.  So --

15:22:27  6         Q.    Well --

15:22:36  7         A.    It is just the back division.

15:22:39  8         Q.    Did you think that Google was unique in the

15:22:42  9    Valley having a list of this sort?

15:22:47 10         A.    As I said, I didn't really think about it.

15:22:51 11    Because of the unique situation that was -- Google was

15:22:53 12    in, it would be perfectly reasonable from my perspective

15:22:59 13    that such lists did not exist or they had fell -- that

15:23:02 14    they had fallen off to the wayside, or what have you.

15:23:05 15         Q.    And why is that?

15:23:06 16         A.    Because as I indicated, during this period

15:23:09 17    Google was unusually favorable in terms of recruiting

15:23:11 18    talent, growth, press, great place to work.  We were in

15:23:15 19    our golden period, if you will.

15:23:26 20         Q.    And how does that relate to the notion of

15:23:29 21    thinking that Google was unique in having this list and

15:23:32 22    not knowing about any other companies similarly situated,

15:23:35 23    or being similarly situated?

15:23:40 24         A.    Again, your question implies that I should have

15:23:43 25    been thinking about other companies.

15:23:44  1       Q.    No.  No.  No.  My question doesn't imply

15:23:47  2   anything.

15:23:47  3       A.    No, no, but the -- the reasoning in the

15:23:49  4   question implies that.  But I -- I made a point of not

15:23:51  5   thinking about other companies.  I made a point of

15:23:53  6   thinking about Google.

15:24:04  7       Q.    How would you describe your relationship with

15:24:06  8   Mr. Jobs?

15:24:07  9       A.    Complicated.  And -- and again, as I said, his

15:24:13 10   death was very tragic for all of us, and I considered him

15:24:16 11   a good friend.

15:24:18 12       Q.    And how often did you, in the time period we're

15:24:22 13   talking about, interact with him, either face-to-face or

15:24:26 14   otherwise?

15:24:27 15       A.    Well, in the -- while I was on the board it was

15:24:30 16   relatively frequently, for a board member.  But it was

15:24:34 17   also not more frequently, because I would recuse myself

15:24:38 18   from Google Apple issues.  So for example, if there was a

15:24:42 19   Google problem, Steve would be forced to call Alan and

15:24:45 20   not me, because I had a two-hat problem.  And obviously I

15:24:49 21   knew him socially and a little bit before, and I also saw

15:24:52 22   him after I left the board as he became more ill.

15:24:55 23             So some -- you know, once a month kind of

15:24:58 24   frequencies.  Not weekly, but not yearly, if that's

15:25:03 25   helpful.

15:25:04  1          Q.    Did you ever have occasion to talk with him

15:25:06  2     about his views regarding companies recruiting from each

15:25:14  3     other in the Valley?

15:25:15  4          A.    Well, I knew his view.

15:25:17  5          Q.    Which was?

15:25:17  6          A.    Which was that when you're in a partnership,

15:25:19  7     you shouldn't do it.

15:25:21  8          Q.    What do you mean by "partnership" now in that?

15:25:23  9          MR. RUBIN:  Well, objection.  Lacks foundation.

15:25:27 10          THE WITNESS:  Again, I was trying -- I was

15:25:28 11     trying to give you the context that because we were

15:25:30 12     working together, it was inappropriate in his view for us

15:25:34 13     to be calling in and hiring people.  And -- and he would

15:25:40 14     express this in unique Steve Jobs style.

15:25:44 15     BY MR. HEIMANN:

15:25:45 16          Q.    Which was?

15:25:45 17          A.    Loud.  But a -- but a fair reading of Steve is

15:25:49 18     he believed, for better or worse, that the world was a

15:25:55 19     better place when you had a partnership, a collaboration,

15:25:58 20     working together, whatever words you want to use, he

15:26:01 21     believed that you should not be hiring each others', you

15:26:05 22     know, technical people, and then cross-fertilizing all

15:26:08 23     that knowledge.

15:26:09 24          And I always believed, and I'll -- rather than

15:26:13 25     explaining I'll say what I believe -- because -- because

15:26:15  1    Apple is so focused on unique intellectual property, it

15:26:19  2    was -- it was my belief and is my belief, that Apple

15:26:22  3    believed that if employees left, they would take some of

15:26:27  4    that unique intellectual property in their heads with

15:26:29  5    them.  That is my opinion.

15:26:31  6            That's -- that may or may not be what he

15:26:33  7    thought, but that's what I thought he thought.

15:26:36  8        Q.   Now, I know we've covered some of this before,

15:26:38  9    but I want to make sure I understand.

15:26:40  10           Was your understanding of Jobs' position that

15:26:43  11   any company that Apple was friendly with in the way that

15:26:46  12   you described it earlier would have fallen into this

15:26:49  13   category of companies you shouldn't be recruiting from?

15:26:52  14           MR. RUBIN:  Objection.  Misstates prior

15:26:53  15   testimony.

15:26:55  16           THE WITNESS:  I -- I never asked myself the

15:26:58  17   question of Steve's general view.  But it's fair to

15:27:02  18   extrapolate that if you had partnerships working together

15:27:06  19   in different kinds of relationships, he would have

15:27:09  20   extended that to others.  I notice with some humor that

15:27:12  21   we have such a list, from the words of their company,

15:27:15  22   which they list as Adobe, Garmin, Google, Intuit,

15:27:19  23   Microsoft Mac Division, and Nvidia, all of whom Apple had

15:27:24  24   effective partnerships with of one kind or another.

          25   //

15:27:27  1    BY MR. HEIMANN:

15:27:28  2        Q.   But those are not the only companies on the

15:27:30  3    list, right?

15:27:30  4        A.   I'm just -- I'm just -- this is their list.  I

15:27:32  5    can't -- I didn't write this list.  This is their

15:27:34  6    opinion.

15:27:34  7        Q.   I know, but since you're expressing an opinion

15:27:36  8    on part of it, I'm asking you about the others as well.

15:27:40  9             There are others that don't have any such

15:27:41 10    explanation for them, right?

15:27:43 11        A.   Which ones?

15:27:45 12        Q.   Tech Data.

15:27:47 13        A.   Oh, there is a second list.

15:27:53 14        Q.   Longer than the first list, right?

15:27:56 15        A.   Well, again, reading the email without judging

15:28:00 16    whether they should be on the list or not, Best Buy is

15:28:02 17    their largest distributor, Fry's is their large

15:28:06 18    distributor.  Art is on the board of Genentech.

15:28:09 19    Imagination, Ingram Micro, that is a distributor.  JCrew,

15:28:14 20    board member.  Mac Zone, distributor; Microsoft - Mac

15:28:18 21    Division, major partner; Nvidia, partner; PC connection,

15:28:22 22    PC Mall, distributors; Pixar, Steve's on the board of

15:28:25 23    Pixar; Tech Data, distributor; Zones, I assume that is a

15:28:30 24    distributor.

15:28:30 25             That is how I would read that message, if I

15:28:33 1    were internal to Apple.

15:28:43 2         Q.    What would be the reason for Lucasfilm to be on

15:28:46 3    their no-call list?

15:28:48 4         A.    As I indicated, I believe Steve was on the

15:28:51 5    board of Lucasfilm and I --

15:28:53 6         Q.    You said Pixar a moment ago.  You may be right.

15:28:56 7    I don't know.

15:28:57 8         A.    Well, you have Lucas -- I'm sorry.  Did I

15:29:01 9    misspeak?

15:29:03 10        Q.    No.  Pixar is on the list.

15:29:05 11        A.    Pixar is on the list.  Okay.  Lucasfilm, no, I

15:29:09 12   don't know.  I don't know that Steve was involved with

15:29:13 13   Lucasfilm.  Maybe he was.

15:29:14 14             MR. HEIMANN:  I'm told we are almost out of

15:29:16 15   tape, so why don't we take a short break.

15:29:18 16             THE VIDEOGRAPHER:  This is the end of Video

15:29:20 17   No. 2.  We're now off the record at 3:29.

15:29:22 18             (Recess was taken.)

15:31:04 19             THE VIDEOGRAPHER:  We are now on the record at

15:31:05 20   3:31.  This is the beginning of Video No. 3.

15:31:08 21   BY MR. HEIMANN:

15:31:09 22        Q.    Is it fair to say that Mr. Jobs made his views

15:31:11 23   that we've been talking about widely known within the

15:31:14 24   Valley?

15:31:15 25             MR. RUBIN:  Objection.  Vague.

```
15:31:18  1              THE WITNESS:  I don't know that.

15:31:20  2   BY MR. HEIMANN:

15:31:21  3       Q.   Well, surely you weren't the only person that

15:31:23  4   was familiar with his views in that regard, were you?

15:31:27  5              MR. RUBIN:  Objection.  Calls for speculation.

15:31:28  6              THE WITNESS:  As I said, I don't have any -- I

15:31:30  7   don't have any independent knowledge of that.  I think it

15:31:32  8   is a reasonable presumption, given Steve's propensity for

15:31:36  9   making his point known, but I don't have any independent

15:31:40 10   knowledge of that.

15:31:40 11   BY MR. HEIMANN:

15:31:41 12       Q.   Do you recall discussing his views with others

15:31:42 13   in the Valley?

15:31:44 14       A.   I certainly discussed it with Google people and

15:31:46 15   Bill Campbell, but not others.

15:31:53 16       Q.   When you communicated with Mr. Jobs by email,

15:31:55 17   did he have more than one email that you used for him?

15:32:00 18       A.   I believe only one, sjobs@apple.com.

15:32:05 19       Q.   Let me ask you to look at Exhibit 448.

15:32:26 20              So this exhibit consists of a declaration from

15:32:29 21   Mr. Edward Colligan, and then an attachment which is in

15:32:33 22   the form of an email exchange.  Actually two emails.

15:33:14 23       A.   Okay.

15:33:14 24       Q.   Have you seen this material before?

15:33:16 25       A.   I have not.
```

15:33:18  1        Q.   Do you know who Mr. Korrigan (sic) is?

15:33:20  2        A.   Colligan.

15:33:23  3        Q.   Colligan, I'm sorry.

15:33:24  4        A.   I know who he is.

15:33:27  5        Q.   Are you acquainted with him personally?

15:33:29  6        A.   I don't believe I've ever met him.  I may have

15:33:30  7   met him, but I don't remember what he looks like.

15:33:31  8        Q.   Did you have any knowledge of the exchange that

15:33:33  9   he describes in his declaration at the time, or at or

15:33:36 10   about the time it took place?

15:33:40 11        A.   No.

15:33:45 12        Q.   Were you aware that Mr. Jobs had approached

15:33:48 13   companies in the Valley seeking agreements that each

15:33:53 14   company not recruit from the other?

15:33:55 15             MR. RUBIN:  Objection.  Lacks foundation; asked

15:33:59 16   and answered.

15:33:59 17             THE WITNESS:  As I indicated, I was not

15:34:01 18   aware -- I was not aware of Steve's activities outside of

15:34:04 19   Google in this regard.

15:34:05 20   BY MR. HEIMANN:

15:34:19 21        Q.   Let me ask you to take a look at Exhibit 449.

15:34:28 22        A.   Is this something that would have gone to -- is

15:34:30 23   this part of the current trial?

15:34:32 24             MR. RUBIN:  This is a declaration he made in

15:34:33 25   the current trial.

15:37:45 1   what he was upset about, but it must have been this.

15:37:48 2   BY MR. HEIMANN:

15:37:48 3       Q.   How did you know he was upset about Rubinstein?

15:37:51 4       A.   I recall Steve mentioning it in one of his

15:37:54 5   discussions, but I don't remember discussing Palm.  So --

15:38:00 6       Q.   All right.

15:38:04 7       A.   Ah, okay.  Dan Lyons was the creator of "The

15:38:08 8   Secret Diary of Steve Jobs."  Now we know who he is.

15:38:12 9   Yes.  He wrote a satire of Steve, Dan Lyons, the author

15:38:19 10  of this document.  It is quite entertaining.  I have a

15:38:22 11  code name in "The Secret Diary of Steve Jobs."  So --

15:38:26 12      Q.   You have a code name?

15:38:27 13      A.   Yes.  I don't remember what it was.  But I

15:38:28 14  remember --

15:38:29 15      Q.   I was going to ask you for it.

15:38:30 16      A.   It is quite entertaining, so you should -- you

15:38:34 17  should take a look at it when you get a chance.

15:38:36 18      Q.   All right.  Okay.  I'm going to switch topics

15:38:39 19  again.

15:38:42 20           At some point did Facebook become a problem or

15:38:47 21  a concern for Google in connection with retaining

15:38:50 22  employees at Google?

15:38:52 23      A.   It did.

15:38:53 24      Q.   And can you tell us when that happened or when

15:38:55 25  it began?

15:39:00  1        A.   I won't get the dates right.  But somewhere

15:39:03  2   around 2008 or 2009 Facebook began -- Facebook hired

15:39:11  3   Sheryl Sandberg, who -- in perhaps 2006 or 2007, maybe

15:39:17  4   2007, and Sheryl had built our recruiting organization,

15:39:22  5   was an excellent recruiter, and as she went over to

15:39:25  6   Facebook, many people left Google to work for her in jobs

15:39:30  7   which they perceived as promotions.

15:39:33  8             There were also a number of engineering leaders

15:39:36  9   who also went to Facebook, and it became -- and it was

15:39:40 10   pretty clear that Facebook's management structure was

15:39:44 11   being built out of executives coming out of Google, which

15:39:47 12   is now a public company, Facebook was a private company.

15:40:02 13        Q.   So how did Google respond?

15:40:04 14        A.   Well, we had a series of internal discussions

15:40:06 15   or arguments about what to do, and we -- I remember

15:40:10 16   distinctly having the conversation about -- given that

15:40:16 17   they were playing by a different set of rules, because

15:40:19 18   they were offering equivalent salaries, but stock that in

15:40:26 19   theory would be worth a great deal of money, they could

15:40:29 20   make an offer to somebody and tell them it's going to be

15:40:32 21   worth X million dollars.

15:40:34 22             And so I remember a series of conversations,

15:40:37 23   which went something like this, what are we willing to do

15:40:42 24   to counter these offers?  And we concluded that we should

15:40:45 25   ████████████████████████████████████████████████

15:40:51  1  

15:40:53  2

15:40:56  3

15:41:01  4

15:41:03  5       Q.   And who all was involved in the conversations

15:41:07  6  about the strategy or tactics to deal.

15:41:09  7                    With the problem?

15:41:11  8       A.

15:41:13  9

15:41:18 10

15:41:21 11

15:41:26 12

15:41:29 13

15:41:32 14

15:41:36 15

15:41:42 16

15:41:45 17

15:41:48 18

15:41:52 19       Q.   Was Bill Campbell involved in the discussions?

15:41:56 20       A.

15:41:58 21

15:42:02 22

15:42:09 23       Q.   Let me ask you to take a look at Exhibit 660.

15:42:48 24       A.   Okay.

15:42:49 25       Q.   First of all, do you recognize this email

```
15:42:51  1   exchange?

15:42:53  2        A.   Not really.

15:42:54  3        Q.   But is it part of the conversation that you

15:42:58  4   just described in general terms?

15:42:59  5        A.   Yes.  This would be an example of this

15:43:02  6   conversation.

15:43:15  7        Q.   And the principal email here is from Mr. Brin

15:43:18  8   to the management committee and to Marissa Mayer, it

15:43:23  9   appears to be, correct?

15:43:24 10        A.   That's correct.

15:43:25 11        Q.   And who was Ms. Mayer at the time?

15:43:27 12        A.   So Marissa, who is now the CEO of Yahoo, was an

15:43:31 13   important early executive and worked for Jonathan running

15:43:34 14   many of the client groups.  Sergey and Marissa had a very

15:43:39 15   good working relationship, and I'm sure that he copied

15:43:42 16   her because she was involved in the conversation with

15:43:43 17   him.

15:43:44 18        Q.   And as this email indicates, at least in part,

15:43:47 19   this was a time by which Facebook was posing a concern

15:43:53 20   for Google in terms of recruiting Google employees into

15:43:58 21   Facebook; is that right?

15:44:00 22        A.   That's correct.

15:44:00 23        Q.   And if we go to Exhibit 608 --

15:44:36 24        A.   Okay.

15:44:36 25        Q.   -- is this more of the same in terms of the
```

16:15:05  1    amount, but there are a steady stream of people applying.

16:15:08  2    We are being very strict on the Google non-solicit.  If

16:15:12  3    you hear of any violation of the non-solicit agreement,

16:15:16  4    please let me know, and we will look into it

16:15:19  5    immediately."

16:15:20  6              Now, I'll ask you again, did Google and

16:15:23  7    Facebook reach a non-solicit agreement between

16:15:26  8    themselves?

16:15:28  9              MR. RUBIN:  Objection.  Lacks foundation.

16:15:29 10              THE WITNESS:  As I've indicated before, to my

16:15:31 11    knowledge, there -- there was not, is not, and was never

16:15:36 12    a non-solicit agreement.  I do not know what she is

16:15:39 13    referring to there.

16:15:39 14    BY MR. HEIMANN:

16:15:41 15        Q.   Well, Mr. Rosenberg seemed to know.  He

16:15:44 16    responded, "My personal opinion is that I think you are

16:15:46 17    putting too much weight in your view of the notion of

16:15:49 18    non-soliciting, as though soliciting in itself is the

16:15:53 19    only thing that upsets people.  Rather, it is the outcome

16:15:56 20    of people going from one company to the other which is

16:15:59 21    problematic."

16:16:00 22              Do you see that?

16:16:03 23              MR. MITTELSTAEDT:  Object.  Argumentative.

16:16:04 24              THE WITNESS:  Again --

16:16:05 25              MR. RUBIN:  Same objection as before.  Lacks

16:16:07 1    foundation; asked and answered.

16:16:08 2              THE WITNESS:  You know, you are asking me to --

16:16:10 3    to parse a private conversation between Jonathan and

16:16:12 4    Sheryl.  I think you should just ask them.

16:16:17 5    BY MR. HEIMANN:

16:16:17 6         Q.   Well, we'll get to that, but I'm trying to find

16:16:20 7    out what your understanding and knowledge is of the

16:16:22 8    topic.

16:16:23 9              MR. RUBIN:  But he's not on the email.  So this

16:16:25 10   is really --

16:16:26 11             THE WITNESS:  But I have --

16:16:28 12             MR. RUBIN:  Beyond the witness' knowledge.

16:16:29 13             THE WITNESS:  I have answered your question

16:16:30 14   clearly.

16:16:31 15   BY MR. HEIMANN:

16:16:32 16        Q.   Okay.

16:16:32 17        A.   This is Jonathan complaining to Sheryl, and

16:16:35 18   there is no non-solicit agreement between the two

16:16:40 19   companies, to my knowledge.

16:16:45 20        Q.   Okay.  Let me ask you to take a look next at

16:18:04 21   Exhibit 674.

16:18:20 22             So we have now moved well forward in time.

16:18:23 23   This is in 2010.

16:18:28 24        A.   Okay.

16:18:29 25        Q.   I want to focus your attention, if I can, on

16:18:31 1    the email that is from Patrick Pichette to Shona Brown

16:18:40 2    and yourself, with a copy to Mr. Campbell.

16:18:42 3        A.   Yes.

16:18:42 4        Q.   And who was Mr. Pichette at the time?

16:18:46 5        A.   He was and is the chief financial officer of

16:18:48 6    the company.

16:18:49 7        Q.   All right.  And he is -- addresses a number of

16:18:53 8    topics in this email.  By the way, do you remember this

16:18:57 9    email, by any chance?  It is a little more current than

16:19:00 10   the stuff I've been showing you up to now.

16:19:04 11       A.   No.  I do not.

16:19:05 12       Q.   All right.  Paragraph 3 over on the second

16:19:07 13   page, involves, as he says it, "I wish to comment on the

16:19:14 14   VP/director issue.  Shona -- and we have discussed this

16:19:20 15   and she knows I have a somewhat different approach on

16:19:23 16   this topic."

16:19:24 17            Do you recall that issue at the time?

16:19:26 18       A.   I'm sorry.  Can you tell me which paragraph I'm

16:19:28 19   looking at?

16:19:29 20       Q.   Yes, it is in the second page of the email

16:19:30 21   exchange.

16:19:30 22       A.   Oh, I see it.  Okay.  I'm sorry.  Ask your

16:19:32 23   question again.  Sorry.

16:19:33 24       Q.   Yes.  Well, first of all, you'll see the topic

16:19:34 25   he is addressing in this portion of the email is the

16:19:37   1    VP/director issue, as he puts it.  Why don't you take a

16:19:42   2    moment to read through the substance there before I ask

16:19:45   3    you any more.

16:19:51   4         A.   Okay.

16:19:52   5         Q.   Do you recall what the VP/director issue was at

16:19:54   6    the time?

16:19:57   7         A.   I don't, but I can infer -- infer what it is

16:20:03   8    from the -- okay.  Anyway --

16:20:14   9         Q.   All right.

16:20:14   10        A.   I don't specifically know what he meant by

16:20:17   11    VP/director issue.

16:20:18   12        Q.   I think it will become apparent when we focus

16:20:20   13    on some of the text here.  The second bullet point reads,

16:20:23   14    ███████████████████████████████████████████████████

16:20:27   15    ██████████   ████████████████████████

16:20:29   16    ████████████████████████████████████████████████

16:20:34   17    ████████████████████████████████████████████████

16:20:37   18    ████████████

16:20:39   19         First of all, do you understand what he's

16:20:40   20    talking about there when he █████████████████████

16:20:44   21    ████████████

16:20:45   22        A.   I do.

16:20:46   23        Q.   What is that?

16:20:47   24        A.   ███████████████████████████████████████████

16:20:49   25    ███████████████████████████████████████████████████████

16:20:53  1    so I enforce that.

16:20:55  2    ████████████████████████████████

16:20:58  3    ██████████████████████████████

16:21:02  4    ██████████████████████████████

16:21:04  5    ████████████████    ████████████████

16:21:08  6    ████████████████████████████████████

16:21:11  7    ██████████

16:21:12  8    ████████████████████████████████

16:21:15  9    ██████████████████████████████

16:21:18 10    ██████████████████████████████

16:21:22 11    ██████████████████████████████

16:21:26 12    ████████████████████

16:21:29 13         Q.    Have you changed your mind?

16:21:30 14         A.    No.

16:21:31 15         Q.    He goes on to say, skipping some of this, "What

16:21:34 16    matters is internal equity, not titles."  What is your

16:21:38 17    understanding of that?  Meaning, what is your

16:21:43 18    understanding of what he is saying there?

16:21:54 19         A.    I -- I can tell you how I would interpret that

16:21:56 20    paragraph.  I would interpret that that as long as the

16:21:59 21    people are correctly understood -- sorry.

16:22:01 22    ████████████████████████████████████

16:22:03 23    ██████████████████████████

16:22:05 24    ████████████████████████████

16:22:09 25    ████████████████    ████████████

16:22:11 1 ████████████████████████████████

16:22:14 2 ██████████████████████████████

16:22:18 3 ████████

16:22:19 4        So the way you solve this problem is you have

16:22:21 5 them have internal equity, that is they are in the same

16:22:25 6 salary range, ██████████████████

16:22:28 7 ████████████████████████████████

16:22:30 8 ██████ ████  ███████████████

16:22:34 9 ████████████████████████

16:22:36 10 ██████████████████████████

16:22:39 11 ████████████████████  ████████

16:22:43 12 ██████████████████

16:22:44 13        Q.   Okay.  And do you -- what is the reference to

16:22:47 14 internal equity, or did you already --

16:22:49 15        A.   I read that as internal equity between

16:22:52 16 different -- dissimilar functions.

16:22:54 17        Q.   Okay.

16:22:54 18        A.   So internal equity meaning an engineering

16:22:57 19 executive needs to be ranked against a sales executive.

16:23:01 20 So how do you rank them?  Which one is more important?

16:23:04 21 How do you deal with their comp?  It is a classic HR

16:23:15 22 ranking problem.

16:23:34 23        Q.   What was the big bang?

16:23:42 24        A.   I believe --

16:23:42 25        Q.   Not the universal big bang.

16:23:44  1      A.    I believe the big bang refers to a combination

16:23:48  2   of salary increases and -- and stock increases that were

16:23:51  3   coincident after the stock market crash of 2008.

16:23:59  4      Q.    I'm sorry.   The last part of the question --

16:24:01  5      A.    So the stock market crashed in 2008.   Our stock

16:24:04  6   fell to $260.   We, and in particular I, drove a process

16:24:11  7   to do a stock repricing and compensation look during that

16:24:14  8   period, which I believe is what you're referring to by

16:24:16  9   the big bang.

16:24:17 10      Q.    What was the period, then, that the big bang

16:24:20 11   was put into effect?

16:24:21 12      A.    You'd have to show me the emails to get the

16:24:23 13   dates, but it is after the stock market crashed.

16:24:26 14      Q.    Well --

16:24:29 15      A.    My recollection is roughly the fall of 2008 and

16:24:32 16   past that.

16:24:52 17      Q.    Let me see if I have documents to deal with

16:24:54 18   this.   If I told you I think it is 2010, would I be way

16:25:01 19   off the mark?

16:25:07 20      A.    I may be confusing the stock market repricing

16:25:10 21   and then a subsequent salary increase, which is why

16:25:11 22   wanted to get the precise dates.   I could summarize in

16:25:15 23   general, if that would be helpful.

16:25:17 24      Q.    I'm thinking about, to try and shorten this up

16:25:19 25   a little bit -- what I recall was something like a 10

16:28:53  1    needed to increase our cash compensation, this has

16:28:57  2    ███████████████████████████████████████

16:29:00  3    ████████████████████████████████████████████

16:29:03  4    ██████████████████████████████████

16:29:07  5    Q.   So I'm fascinated by that.  You have some of

16:29:10  6    the smartest people on the planet.  In fact you've made

16:29:13  7    every effort to hire --

16:29:13  8    A.   Yes.

16:29:13  9    Q.   -- very smart people.  How do they not get it?

16:29:16 10    A.   Because it involves financial judgment which

16:29:19 11    they are not trained for.  They don't understand

16:29:21 12    Black-Scholes algorithm.  They didn't do MBA and finance.

16:29:26 13    They don't have Ph.D.s in financial accounting.  They are

16:29:29 14    engineers.  They're very, very intelligent people.  But

16:29:32 15    in any case, I'm simply representing Laszlo's position.

16:29:36 16    Laszlo showed up with this analysis, which you can see

16:29:40 17    summarized here, and based on his detailed analysis, the

16:29:43 18    summary as we eventually did it.

16:29:46 19    Q.   Was the stock repricing in part intended to

16:29:49 20    meet the Facebook concern, for example?

16:29:52 21    A.   Not really.  ████████████████████

16:29:57 22    ██████████████████████████████████████████

16:30:02 23    ████████████████  ████████████████████

16:30:08 24    ████████████████████████████████████████████

16:30:12 25    ████████████████  ████████████████  ████████

16:30:15  1    ███████████████████████   ████████████

16:30:18  2    ██████████████████████   ██████████████

16:30:23  3    ████████████████████████

16:30:28  4        Q.    So, now focusing briefly on this email from

16:30:36  5    Prasad Setty to yourself --

16:30:38  6        A.    Yes.

16:30:38  7        Q.    -- and others; who was Mr. Setty at the time?

16:30:40  8        A.    Prasad is the analyst who worked for Laszlo,

16:30:44  9    who did all the financial modeling around compensation.

16:30:48 10    So he would be a true financial expert over compensation.

16:30:52 11        Q.    And focusing on paragraph 5 at page 2, "What

16:30:57 12    impact will this have on the Valley," are you with me?

16:31:01 13        A.    I see it.

16:31:02 14        Q.    The first point that he makes there is, "May

16:31:04 15    put pressure on pay for coveted technical jobs and

16:31:07 16    increased pay systematically for these jobs." Do you see

16:31:11 17    that?

16:31:11 18        A.    I do.

16:31:12 19        Q.    Was that a subject of discussion that you

16:31:14 20    recalled at the time?

16:31:14 21        A.    I'm sure we talked about it.

16:31:16 22        Q.    In any event did it have that effect?

16:31:22 23        A.    I'm sure it did.

16:31:34 24        Q.    Let me ask you to take a look at Exhibit 621.

16:31:39 25    We are in the home stretch, for anybody who cares.

16:31:42  1            MR. RUBIN:  Like ten minutes?

16:31:50  2            MR. HEIMANN:  No.  You'll need a restroom break

16:31:52  3   to be sure.  Let's do it now.

16:31:57  4            THE VIDEOGRAPHER:  We are now off the record at

16:31:58  5   4:32.

16:39:19  6            (Recess was taken.)

16:39:21  7            THE VIDEOGRAPHER:  We are now on the record at

16:39:23  8   4:39.

16:39:26  9   BY MR. HEIMANN:

16:39:27 10       Q.   I'm not going to bother with that one,

16:39:29 11   Mr. Schmidt.

16:39:30 12       A.   Okay.

16:39:32 13       Q.   During the time period we've been talking about

16:39:37 14   when Google had in place the do-not-call list and so

16:39:40 15   forth, did anyone ever question the legality of that

16:39:43 16   policy?

16:39:48 17       A.   I don't believe -- I don't -- I don't recall.

16:39:51 18   I have no recollection of any such discussion.

16:39:53 19       Q.   Did you ever seek legal advice from Google's

16:39:56 20   general counsel about it?

16:39:59 21            MR. RUBIN:  Objection.  I think even the answer

16:40:01 22   to that question, if it were -- it would be privileged.

16:40:05 23            MR. HEIMANN:  Not if it's no.

16:40:07 24            MR. RUBIN:  All right.  Then let's just take a

16:40:08 25   second.

16:40:09  1           MR. HEIMANN:  Sure.

16:40:09  2               (Discussion off the record.)

16:40:17  3  BY MR. HEIMANN:

16:40:17  4       Q.   Back on the record.

16:40:18  5       A.   The answer to your question is, no.

16:40:23  6           MR. HEIMANN:  Is that on the record?

16:40:25  7           THE REPORTER:  Thank you.

16:40:25  8  BY MR. HEIMANN:

16:40:25  9       Q.   Do you know whether or not Google's general

16:40:27 10  counsel was aware of the policy?

16:40:36 11           MR. RUBIN:  Objection.  Lacks foundation.

16:40:37 12           THE WITNESS:  Do I know?  I have no knowledge

16:40:38 13  one way or the other.

16:40:39 14  BY MR. HEIMANN:

16:40:41 15       Q.   During the time period involved, did you ever

16:40:44 16  consider that the policy or practice might have an

16:40:49 17  adverse impact on employees in the Valley?

16:41:00 18       A.   Well, I certainly thought about the general

16:41:01 19  question of impact, yes.

16:41:04 20       Q.   And did you ever consider that it might have an

16:41:06 21  adverse impact on compensation for employees in the tech

16:41:10 22  sector in the Silicon Valley?

16:41:12 23       A.   I don't believe it did, so -- so the answer is,

16:41:16 24  I -- I thought about it and decided it didn't, in my

16:41:20 25  opinion.

16:41:10  1          I, Rosalie A. Kramm, Certified Shorthand

16:41:10  2  Reporter licensed in the State of California, License No.

16:41:10  3  5469, hereby certify that the deponent was by me first

16:41:10  4  duly sworn and the foregoing testimony was reported by me

16:41:10  5  and was thereafter transcribed with computer-aided

16:41:10  6  transcription; that the foregoing is a full, complete,

16:41:10  7  and true record of said proceedings.

16:41:10  8          I further certify that I am not of counsel or

16:41:10  9  attorney for either of any of the parties in the

16:41:10 10  foregoing proceeding and caption named or in any way

16:41:10 11  interested in the outcome of the cause in said caption.

16:41:10 12          The dismantling, unsealing, or unbinding of the

16:41:10 13  original transcript will render the reporter's

16:41:10 14  certificates null and void.

16:41:10 15          In witness whereof, I have hereunto set my hand

16:41:10 16  this day:   February 23, 2013.

16:41:10 17              ___X____  Reading and Signing was requested.

16:41:10 18              _____  Reading and Signing was waived.

16:41:10 19              _____  Reading and signing was not requested.

16:41:10 20

16:41:10 21                         _____

16:41:10 22                         ROSALIE A. KRAMM

16:41:10 23                         CSR 5469, RPR, CRR

16:41:10 24

         25