# Exhibit W to the Cisneros Declaration, Revised Version – Redacted

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE      )

ANTITRUST LITIGATION            )

                                )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:       )

ALL ACTIONS.                    )

_____)


HIGHLY CONFIDENTIAL - FOR ATTORNEYS' EYES ONLY


VIDEO DEPOSITION OF ERIC SCHMIDT


FEBRUARY 20, 2013


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

```
10:40:14  1    come to an end?

10:40:16  2        A.    1997.

10:40:16  3        Q.    And then where did you go, sir?

10:40:18  4        A.    Novell as the CEO.

10:40:20  5        Q.    And when were you with Novell?

10:40:22  6        A.    1997 until 2001.

10:40:24  7        Q.    And then where did you go in 2001?

10:40:26  8        A.    Came here to Google.

10:40:28  9        Q.    And what was your initial position with Google?

10:40:32 10        A.    It's complicated.  I came in as chairman for

10:40:36 11    two months, and then I became CEO for ten years.  And I

10:40:43 12    was chairman on and off a bunch of times.

10:40:45 13        Q.    All right.  Were you on the board of directors

10:40:47 14    throughout that time period?

10:40:48 15        A.    Yes, I was.

10:40:49 16        Q.    And what is your current position at Google?

10:40:52 17        A.    I'm now the executive chairman and member of

10:40:54 18    the board of Google.

10:40:56 19        Q.    What is the executive chairman position?

10:40:59 20        A.    Whatever I'd like it to be.

10:41:04 21        Q.    And -- all right, sir.

10:41:06 22              Do you have an understanding as to what the

10:41:08 23    lawsuit that we're here is all about?

10:41:10 24        A.    I do.

10:41:10 25        Q.    What is your understanding of the claims that
```

10:41:12  1    are being made?

10:41:16  2         A.   Well, I won't represent your claims.  You can

10:41:19  3    represent your claims.  My understanding is that this is

10:41:23  4    an argument over the hiring practices that existed

10:41:27  5    between roughly 2005 and roughly 2009 between the

10:41:31  6    companies whose lawyers are represented here in the room.

10:41:34  7         Q.   And what is it about -- what understanding, if

10:41:37  8    any, do you have about the nature of the hiring practices

10:41:40  9    that are in question?

10:41:43  10        A.   Well, I -- the -- the term that's generally

10:41:46  11   used is the do-not-call rules, if that's what you're

10:41:49  12   referring to.

10:41:50  13        Q.   What does that mean to you, when you use that

10:41:52  14   term?

10:41:57  15        A.   It's easier if I state it as a fact rather than

10:42:00  16   how I -- how it means to me.

10:42:01  17             During this period of time -- and, again, I

10:42:05  18   will represent what Google did, as opposed to what the

10:42:08  19   other companies did; they can speak for themselves.  We

10:42:11  20   had various practices, for better -- best -- best way to

10:42:20  21   describe it is we had various practices where we would

10:42:23  22   choose not to call and recruit people from other

10:42:26  23   companies for various periods of time for various

10:42:29  24   reasons.

10:42:33  25        Q.   And do you have an understanding as to what the

10:42:35 1   claims are that are being made by the Plaintiffs with

10:42:37 2   respect to those practices?

10:42:41 3           MR. RUBIN:  And I'm going to instruct

10:42:42 4   Mr. Schmidt, make sure that in any response that he

10:42:47 5   doesn't convey privileged information.  So if you can

10:42:49 6   answer the question without conveying what lawyers have

10:42:51 7   told you, then you should answer, but if you can't, then

10:42:55 8   you should not answer the question.

10:42:57 9           THE WITNESS:  Unfortunately, in order to answer

10:42:58 10  your question, I have to divulge the contents of a

10:43:01 11  conversation that was legally privileged.

10:43:04 12  BY MR. HEIMANN:

10:43:04 13      Q.   All right.  Do you have any other understanding

10:43:06 14  outside of what your lawyers have told you about the

10:43:08 15  nature of the claims that are being made?

10:43:11 16      A.   No.

10:43:11 17      Q.   Have you reviewed any of the pleadings that

10:43:14 18  have been filed in the case?

10:43:17 19      A.   I'm sorry.  Pleadings are what?

10:43:19 20      Q.   Pleadings are documents that are filed by the

10:43:23 21  law -- lawyers representing the parties that are filed

10:43:25 22  with the Court; for example, the Complaint in the case or

10:43:28 23  motions in the case.

10:43:30 24      A.   That's what I thought.  Okay.  The answer is

10:43:31 25  no.

Deposition of Eric Schmidt                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 11:14:56 | 1 | Have you had a chance to look at this? |
| 11:14:58 | 2 | A.   I have. |
| 11:14:59 | 3 | Q.   This is an email exchange in the same time |
| 11:15:01 | 4 | frame, and is part of one we just looked at. |
| 11:15:06 | 5 | Do you see that? |
| 11:15:07 | 6 | A.   I do. |
| 11:15:08 | 7 | Q.   All right.  And focusing on the concluding |
| 11:15:21 | 8 | email, this is from Shona Brown to Mr. Shader with copies |
| 11:15:26 | 9 | to several folks, but I don't believe to you, correct? |
| 11:15:29 | 10 | A.   That is correct. |
| 11:15:30 | 11 | Q.   All right.  And in any event, she, in replying |
| 11:15:34 | 12 | to Mr. Shader's follow-up email about the subject that he |
| 11:15:37 | 13 | had raised initially, says, "Just going through email" -- |
| 11:15:41 | 14 | excuse me -- "Just going through mail, and I think this |
| 11:15:44 | 15 | may have gotten buried in the Thanksgiving mail bag. |
| 11:15:48 | 16 | Sorry.  To clarify, I was not comfortable putting Good on |
| 11:15:51 | 17 | a, quote, 'do-not-call,' close quote, list.  We don't |
| 11:15:54 | 18 | have such a list as we find it not practical to create |
| 11:15:57 | 19 | nor to manage."  Let me stop there. |
| 11:16:00 | 20 | Were you familiar with the term, "do-not-call |
| 11:16:02 | 21 | list" at the time? |
| 11:16:04 | 22 | A.   I don't -- I don't -- I have no recollection of |
| 11:16:06 | 23 | this, period, so -- I -- I would know what a do-not-call |
| 11:16:11 | 24 | list in general, but you asked it during this period.  I |
| 11:16:13 | 25 | don't -- I don't remember any of this. |

11:16:16  1      Q.   You don't remember the email exchange.  I

11:16:19  2   understand.

11:16:19  3      A.   Well, I didn't see it.  I did not see this

11:16:22  4   email exchange at all, so --

11:16:23  5      Q.   You did not see the top part.

11:16:25  6      A.   I did not see, to be precise, any of the first

11:16:30  7   page.  I did not see the top of the second page.  All I

11:16:34  8   saw was the "Danny, we have a new VP of business

11:16:38  9   operations in HR."

11:16:41 10      Q.   Is it correct, as far as you know, that Google

11:16:50 11   did not have a do-not-call list as of this point in time?

11:16:53 12      A.   I do not know.

11:16:54 13      Q.   One way or the other?

11:16:55 14      A.   I don't know.

11:17:01 15      Q.   Do you recall any conversations, either during

11:17:07 16   this time period or going forward in time, at Google

11:17:10 17   about this topic of do-not-call list or no poaching?

11:17:17 18      A.   Well, I'm -- I'm aware that we ultimately had a

11:17:21 19   do-not-call list, and I have vague recollections of

11:17:24 20   conversations in -- verbal conversations about it.

11:17:28 21      Q.   What -- even though your recollections are

11:17:30 22   vague, what do you recall?

11:17:32 23      A.   Well, as I indicated, I remember a big

11:17:35 24   kerfuffle involving Apple.

11:17:37 25      Q.   We'll get to that.

Deposition of Eric Schmidt                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | |
|---|---|
| 11:17:39  1 | A.   Over that. |
| 11:17:40  2 | MR. RUBIN:  So you don't want him to share his |
| 11:17:42  3 | memory? |
| 11:17:42  4 | MR. HEIMANN:  No, I want him to answer the |
| 11:17:45  5 | question.  I'm just telling him -- we'll get to it, but I |
| 11:17:46  6 | do want to know your best recollections as you sit here. |
| 11:17:49  7 | THE WITNESS:  And I remember at some point |
| 11:17:52  8 | discussing to have some of the board members not be -- |
| 11:17:56  9 | you know, their companies not be -- not be targeted, in |
| 11:17:59 10 | whatever the correct term is.  And that's sort of all I |
| 11:18:02 11 | really remember. |
| 11:18:02 12 | BY MR. HEIMANN: |
| 11:18:03 13 | Q.   Do you recall who you had those conversations |
| 11:18:05 14 | with? |
| 11:18:08 15 | A.   Well, again, these are very vague, but they |
| 11:18:10 16 | would have been with Shona and/or Bill Campbell. |
| 11:18:17 17 | Q.   Why would they have been with Mr. Campbell?  I |
| 11:18:20 18 | understand with Shona. |
| 11:18:21 19 | A.   Bill Campbell was my coach. |
| 11:18:24 20 | Q.   What does that mean? |
| 11:18:26 21 | A.   Informal advisor, provide guidance to the |
| 11:18:29 22 | manager, a coach.  Understand it as a coach in other |
| 11:18:35 23 | areas as well. |
| 11:18:36 24 | Someone I could talk to to ask questions and |
| 11:18:38 25 | get some advice from; how to handle difficult situations. |

| | | |
|---|---|---|
| 11:18:42 | 1 | Q.    To your knowledge, at the time was he serving |
| 11:18:44 | 2 | in that capacity for any other companies? |
| 11:18:46 | 3 | A.    He was certainly playing a similar role for |
| 11:18:50 | 4 | Steve Jobs. |
| 11:18:52 | 5 | Q.    At Apple? |
| 11:18:53 | 6 | A.    That is correct. |
| 11:18:54 | 7 | Q.    Any other companies that you are aware of? |
| 11:18:57 | 8 | A.    I'm sure that he was doing it in others, but he |
| 11:19:00 | 9 | would have to tell you the details. |
| 11:19:17 | 10 | Q.    Let's go to Exhibit 556. |
| 11:20:22 | 11 | Have you had a chance to look at this? |
| 11:20:23 | 12 | A.    I have. |
| 11:20:24 | 13 | Q.    This is an email exchange from August of 2004 |
| 11:20:27 | 14 | involving yourself and others.  Do you see that? |
| 11:20:29 | 15 | A.    I do. |
| 11:20:30 | 16 | Q.    And shortly prior to the email exchange, Google |
| 11:20:35 | 17 | had gone to an IPO; is that right? |
| 11:20:40 | 18 | A.    We went public in August 18th, 2004.  So it |
| 11:20:44 | 19 | would have been two weeks before. |
| 11:20:46 | 20 | Q.    Literally just two weeks before? |
| 11:20:47 | 21 | A.    Literally right then. |
| 11:20:50 | 22 | Q.    And you begin the email exchange by writing to |
| 11:20:52 | 23 | Ms. Brown and to two others.  Who are the two others that |
| 11:20:56 | 24 | you wrote to? |
| 11:20:57 | 25 | A.    Larry Page and Sergey Brin, who were the |

Deposition of Eric Schmidt                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| 11:21:00 | 1 | co-founders, and my colleagues running the company. |

11:21:00  1    co-founders, and my colleagues running the company.

11:21:02  2         Q.   And you wrote, " █████████████████████

11:21:05  3    ████████████████████████████████████████████████

11:21:08  4    ████████████████████████████████████████████

11:21:11  5    ██████████████████████████████████████

11:21:16  6         And then dropping down to the last sentence of

11:21:20  7    your email, "We need to address this.  Apparently MSFT,"

11:21:23  8    that's an abbreviation for Microsoft, correct?

11:21:26  9         A.   That's correct.

11:21:27 10         Q.   -- "and Yahoo have a, quote, 'bidding war,'

11:21:29 11    close quote, approach."

11:21:32 12         Do you recall this email exchange, by the way?

11:21:34 13         A.   I do not.

11:21:34 14         Q.   Nonetheless, can you tell us what you meant by

11:21:38 15    "bidding war approach"?

11:21:44 16         A.   I don't recall the email, but I can tell you

11:21:49 17    what I probably meant.

11:21:50 18         Q.   Fair enough.

11:21:51 19         A.   I probably meant that -- that Yahoo and

11:21:54 20    Microsoft will do whatever it takes to overpay candidates

11:22:02 21    of great talent.  This -- this email appears to be about

11:22:12 22    hiring new hires, and it would appear that I am concerned

11:22:17 23    that █████████████████████████████████████████████

11:22:21 24    ████████████████████████████████████████████████████

11:22:25 25    ██████████████████████████████████████

---

KRAMM COURT REPORTING      *HIGHLY CONFIDENTIAL - For Attorneys' Eyes Only*                    Page: 44

| | | |
|---|---|---|
| 11:22:27 | 1 | candidates into the company.  That's how I would |
| 11:22:33 | 2 | interpret that paragraph. |
| 11:22:34 | 3 | Q.   Okay.  And then Ms. Brown responds to your |
| 11:22:41 | 4 | email, as I -- as I read this, and she says, in part, "In |
| 11:22:45 | 5 | my opinion, we are clearly experiencing an intense battle |
| 11:22:49 | 6 | for top talent, with a win-at-all-costs approach from a |
| 11:22:53 | 7 | number of our key competitors. |
| 11:22:57 | 8 | "Philosophically I believe we should pay to get |
| 11:23:00 | 9 | the talent; even overpay to a certain degree.  It is a |
| 11:23:02 | 10 | bidding war that I believe we cannot afford to lose." |
| 11:23:04 | 11 | Did you agree with that at the time? |
| 11:23:11 | 12 | A.   I don't remember this so -- is there a response |
| 11:23:16 | 13 | from me to this? |
| 11:23:18 | 14 | Q.   Do you mean am I going to show you a response? |
| 11:23:21 | 15 | A.   Yeah. |
| 11:23:21 | 16 | Q.   The answer is, no, I don't have a response. |
| 11:23:24 | 17 | A.   Then I don't -- I don't recall what I |
| 11:23:25 | 18 | thought -- |
| 11:23:25 | 19 | Q.   All right. |
| 11:23:26 | 20 | A.   -- at the time.  I mean if there were a |
| 11:23:28 | 21 | response, then maybe that would clarify what I thought at |
| 11:23:30 | 22 | the time. |
| 11:23:31 | 23 | Q.   If there were a response, I would definitely |
| 11:23:33 | 24 | show it to you. |
| 11:23:34 | 25 | A.   Okay. |

11:23:34 1     Q.    She goes on to say, in part, "The trick is we

11:23:38 2  don't want to announce 'We will match any other offers' -

11:23:44 3  This would encourage gaming of us by candidates and

11:23:47 4  competitors and would also likely drive inflation in the

11:23:50 5  bidding war.

11:23:51 6           "We also don't want to go out of alignment from

11:23:54 7  an internal equity perspective."

11:23:58 8           Recognizing that you don't recall this email,

11:24:00 9  though, do you have an understanding of what "internal

11:24:03 10 equity perspective" is referring to there?

11:24:06 11    A.    Well, I can tell you what the term means if

11:24:08 12 you're an HR person.

11:24:09 13    Q.    Okay.

11:24:10 14    A.    Okay.  And it's -- the definition of "internal

11:24:13 15 equity" is you don't want to be -- if you are an HR

11:24:16 16 person -- having two people in similar roles and one

11:24:21 17 having massively different compensation than the other.

11:24:23 18    Q.    And in the context of the bidding war, was that

11:24:26 19 a concern?

11:24:28 20    A.    It would appear to be her concern.

11:24:31 21    Q.    Well, would you have shared the concern at the

11:24:33 22 time, do you think?

11:24:34 23    A.    Well, again, you are asking me to think about

11:24:36 24 what I thought in August 2004 on the subject.

11:24:39 25    Q.    Well, or generally what your business

11:24:42  1    philosophy is with respect to the issue, yes.  That is

11:24:46  2    something else that might answer the question.

11:24:47  3         A.   Well, as a general statement, Google paid an

11:24:50  4    enormous amount to our employees by virtue of stock

11:24:55  5    appreciation.  So by virtue of the success of the

11:24:59  6    company, good luck, all those things, ▬▬▬▬▬▬▬▬

11:25:04  7    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

11:25:09  8    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

11:25:13  9    ▬▬▬▬▬▬▬   And so at this point the company has just

11:25:18 10    gone public, and so it's like every employee has just won

11:25:22 11    the lottery.  It is this huge amount of additional

11:25:26 12    compensation coming in.

11:25:27 13         So I think my -- my reaction to this period,

11:25:31 14    this is two weeks after the IPO, ▬▬▬▬▬▬▬▬▬▬

11:25:34 15    ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

11:25:38 16    ▬▬▬▬▬▬▬▬▬▬   That's how I would have

11:25:42 17    thought about it.

11:25:52 18         Q.   Do you recall any conversations with Ms. Brown

11:25:55 19    circa this time period about the bidding war issue that

11:25:59 20    she raises?

11:26:00 21         A.   As I said, I don't remember.

11:26:08 22         Q.   Let's take a look at Exhibit 557 next.

11:26:16 23              MR. RUBIN:  Let me know when you want to take a

11:26:17 24    break.

11:26:18 25              THE WITNESS:  That's fine.  We'll just keep

11:30:31  1    relevant to this legal -- legal issue, but by this time,

11:30:36  2    Microsoft is busy building a search engine to compete

11:30:40  3    with us or either has -- has announced that they are

11:30:43  4    going to come in and kill us with products that they

11:30:45  5    haven't shipped yet, and so on and so on.  They are

11:30:48  6    highly competitive during this period, and that

11:30:50  7    continues.

11:30:55  8            And I should be clear that Apple was not

11:30:57  9    building a search engine to compete with us, and search

11:31:01 10    was 98 or 99 percent of our revenue.  That would be the

11:31:04 11    definition of a competitor.

11:31:08 12       Q.   Well, I'm really trying to get an understanding

11:31:12 13    of this notion of friendly, because it is -- I'm sure you

11:31:14 14    appreciate it is somewhat vague.

11:31:17 15            Did you consider any company that you were not

11:31:19 16    a direct competitor with to be a friendly company?

11:31:24 17       A.   No.  That's not what I said.

11:31:27 18       Q.   Okay.  So that's why I want to get at -- what

11:31:29 19    was it about the relationship with Apple, aside from the

11:31:32 20    fact that they weren't a competitor, that made them a

11:31:34 21    friendly company?

11:31:35 22       A.   Well, start with the fact that Apple was trying

11:31:37 23    to build great and beautiful products; that Apple at the

11:31:42 24    time was working on a thing called WebKit, which was the

11:31:45 25    source for Safari, which is part of an open source piece

11:31:51  1    of software which we admired.  As I indicated we were

11:31:54  2    either in conversations or we had already done a search

11:31:57  3    deal with them, that would make them friendly.  We were

11:32:00  4    providing search services to them.  So customer, partner.

11:32:03  5            The word "friendly" here can be -- it's

11:32:06  6    deliberately vague.  All right?  There is no precise

11:32:09  7    definition of friend or foe.  In our industry these days,

11:32:13  8    you have people who are both -- you have both

11:32:17  9    competitive -- competition and partnering within the same

11:32:20 10    firm now.  That's a maturation of the industry.

11:32:24 11        Q.   And when you say the term "friendly" is

11:32:26 12    deliberately vague, why is that?

11:32:28 13        A.   I mean I don't define the word "friendly."  I'm

11:32:31 14    just defining it how I use it.

11:32:32 15        Q.   I know, but you said it was deliberately vague,

11:32:35 16    as if somebody intended it to be a vague term.

11:32:37 17        A.   That is not what I meant.

11:32:38 18        Q.   What did you mean, then?

11:32:40 19        A.   Okay.  Well, then I will not say the word

11:32:43 20    "deliberately."  It doesn't have a precise meaning.

11:32:52 21        Q.   Do you recall what, if anything, happened as a

11:32:55 22    result of this communication between Mr. Jobs and I think

11:33:00 23    it's Sergey Brin?

11:33:05 24        A.   Well, there is -- there is subsequent

11:33:07 25    correspondence about this, but in general -- as a general

11:33:11 1   statement, we began to look very carefully at Apple

11:33:17 2   recruiting, and then I believe we stopped recruiting from

11:33:21 3   that team, and maybe from all of Apple.

11:33:25 4        Q.   And when did that happen, then?

11:33:26 5        A.   It would be after this, during this period.

11:33:29 6        Q.   Shortly after?

11:33:30 7        A.   I don't recall.

11:33:32 8        Q.   Let's focus on the timing, then.  The email

11:33:35 9   from Mr. Brin, assuming the date and time are correct, is

11:33:38 10  on Sunday morning, in the early morning, 1:00 o'clock.

11:33:46 11       A.   I see that, yes.

11:33:47 12       Q.   And he's talking about having received a call

11:33:49 13  from Mr. Jobs that very day.  So either Saturday, during

11:33:54 14  the day, or -- one would guess, rather than early Sunday

11:33:58 15  morning.  But in any event, right about the time that he

11:34:02 16  sends the email.

11:34:03 17       A.   Okay.

11:34:03 18       Q.   All right?  And then Ms. Brown responds even

11:34:08 19  earlier on the day, but this time on Monday at 4:30 in

11:34:12 20  the morning, assuming that that time is correct.

11:34:15 21       A.   Well, it is highly likely that Shona was not in

11:34:18 22  the same time zone to generate these time clocks, but it

11:34:22 23  is perfectly possible she was traveling when she saw it.

11:34:26 24  So those times would be California times.

11:34:27 25       Q.   Okay.  Well, let's go to the next exhibit,

11:34:41  1    Exhibit 561.

11:35:20  2         A.   Okay.

11:35:20  3         Q.   All right.  Let's focus on the email at the

11:35:22  4    top.  This is from Ms. Brown to Mr. Geshuri and

11:35:30  5    Ms. Gilbert with a copy to Stacy Sullivan.

11:35:35  6              Do you see that?

11:35:35  7         A.   I do.

11:35:36  8         Q.   And Mr. Geshuri at the time was what at Google?

11:35:39  9    Do you recall?

11:35:41 10         A.   Arnnon and Judy worked for Shona.  And they

11:35:45 11    were involved in human resources, recruiting, policy, et

11:35:49 12    cetera.  I don't know the specific roles of each.

11:35:53 13         Q.   And do you recall who Stacy Sullivan was at the

11:35:56 14    time at Google?

11:35:57 15         A.   Stacy Sullivan was the original vice president

11:36:00 16    or director of HR who was I believe at this point more of

11:36:03 17    a consultant helper to Shona.  So it would be fair to say

11:36:07 18    that Arnnon, Judy, and Stacy were the brain trust that

11:36:13 19    worked for Shona leading HR issues.

11:36:16 20         Q.   And she writes in the email, "We agreed in EMG

11:36:19 21    today that we would treat three companies in a special

11:36:22 22    way going forward."  Let me stop there.

11:36:25 23              What is -- what was the EMG at the time?

11:36:28 24         A.   EMG is an abbreviation for "Executive

11:36:30 25    Management Group."  It is a group that I ran.  And it met

| | | |
|---|---|---|
| 11:43:20 | 1 | me about -- you asked me about Steve -- you asked me |
| 11:43:23 | 2 | about an email from what Steve said, and then you |
| 11:43:25 | 3 | conflated that with Apple. |
| 11:43:27 | 4 | Q.   Right.  I did.  Given Steve Jobs' |
| 11:43:31 | 5 | relationship -- |
| 11:43:32 | 6 | MR. RUBIN:  Let him answer. |
| 11:43:33 | 7 | THE WITNESS:  So I would encourage you to |
| 11:43:35 | 8 | ask -- you can ask a Steve question or an Apple question, |
| 11:43:39 | 9 | but they are in fact different. |
| 11:43:40 | 10 | BY MR. HEIMANN: |
| 11:43:41 | 11 | Q.   That is what I'm interested in finding out. |
| 11:43:43 | 12 | So are you saying that despite, for example, |
| 11:43:45 | 13 | the threat that was apparently made here to go to war, |
| 11:43:49 | 14 | that did not impact your view of Apple's relationship to |
| 11:43:53 | 15 | Google as a friendly company. |
| 11:43:55 | 16 | MR. RUBIN:  Objection.  Mischaracterizes the |
| 11:43:57 | 17 | document and testimony. |
| 11:43:58 | 18 | THE WITNESS:  Well, as I indicated, Steve's |
| 11:44:03 | 19 | alleged quote here, which of course I did not actually |
| 11:44:06 | 20 | hear, but Sergey is relaying, did not deter me from |
| 11:44:11 | 21 | ultimately going on the Apple board and being a very |
| 11:44:13 | 22 | close friend of Steve.  So the answer to your question is |
| 11:44:16 | 23 | obviously not. |
| 11:44:18 | 24 | BY MR. HEIMANN: |
| 11:44:19 | 25 | Q.   Well, is it fair to say that one of the reasons |

| | | |
|---|---|---|
| 11:44:24 | 1 | that Google entered into the recruiting arrangement, or |
| 11:44:29 | 2 | agreement or practice with Apple, was in response to |
| 11:44:33 | 3 | Mr. Jobs' threats to go to war if you didn't? |
| 11:44:38 | 4 | MR. MITTELSTAEDT:  Objection.  Compound. |
| 11:44:40 | 5 | MR. RUBIN:  Objection.  Mischaracterizes prior |
| 11:44:42 | 6 | testimony. |
| 11:44:44 | 7 | THE WITNESS:  Okay.  So the way you said that, |
| 11:44:46 | 8 | the answer is no. |
| 11:44:47 | 9 | BY MR. HEIMANN: |
| 11:44:49 | 10 | Q.   Is there some way in which it could be better |
| 11:44:54 | 11 | phrased and the answer would be yes? |
| 11:44:56 | 12 | MR. MITTELSTAEDT:  Objection.  Argumentative. |
| 11:44:57 | 13 | THE WITNESS:  I -- I can't tell you how to ask |
| 11:44:59 | 14 | the question. |
| 11:45:00 | 15 | BY MR. HEIMANN: |
| 11:45:00 | 16 | Q.   Let me put it this way. |
| 11:45:02 | 17 | Did Mr. Jobs' threats have anything to do with |
| 11:45:06 | 18 | Google's deciding to treat Apple in the way you've |
| 11:45:10 | 19 | already described that Google decided to treat Apple? |
| 11:45:14 | 20 | A.   I would answer your question by saying that |
| 11:45:17 | 21 | Steve was unhappy, and Steve's unhappiness absolutely |
| 11:45:23 | 22 | influenced the change we made in recruiting practice, as |
| 11:45:28 | 23 | you'll see later in the mail messages.  You're using the |
| 11:45:32 | 24 | word "threats." |
| 11:45:33 | 25 | Q.   I'm using the word "threats" because that |

| | | |
|---|---|---|
| 11:45:36 | 1 | appears to be what Mr. Brin characterized it as. |
| 11:45:38 | 2 | A.  I wasn't -- I wasn't there.  So I -- I can't |
| 11:45:39 | 3 | speak as to the word "threats" and so forth. |
| 11:45:42 | 4 | The -- the word "threat" is very sensitive, |
| 11:45:44 | 5 | because if you actually read Walter Isaacson's book about |
| 11:45:49 | 6 | Steve, you'll see there's a lot of words and drama and so |
| 11:45:53 | 7 | forth, using the word "threats" about Google later.  So |
| 11:45:56 | 8 | I'd rather speak about things that I saw and I know. |
| 11:46:00 | 9 | But it's fair to say that the pressure -- the |
| 11:46:04 | 10 | pressure was put on Google by Steve personally to not |
| 11:46:08 | 11 | hire three people in -- in a Safari team, and we |
| 11:46:12 | 12 | responded to that pressure.  That is absolutely true. |
| 11:46:20 | 13 | Q.  And is it true that the ultimate response at |
| 11:46:22 | 14 | least in part was that Google decided not to hire any of |
| 11:46:26 | 15 | the people? |
| 11:46:27 | 16 | MR. RUBIN:  Objection.  Lacks foundation. |
| 11:46:29 | 17 | THE WITNESS:  I don't actually know that.  As I |
| 11:46:34 | 18 | read the mail messages, there was a big give and take on |
| 11:46:38 | 19 | that question.  But I actually don't know personally who |
| 11:46:41 | 20 | we hired and who we didn't out of the three. |
| 11:46:46 | 21 | BY MR. HEIMANN: |
| 11:47:02 | 22 | Q.  In terms of the executive management of Google |
| 11:47:11 | 23 | at this point in time, what was the nature of the |
| 11:47:14 | 24 | relationship between you and the three -- the two |
| 11:47:17 | 25 | cofounders? |

11:47:19  1        A.    The general term we used was the triumvirate,

11:47:22  2    and we worked in a partnership as we do today.  So each

11:47:27  3    of us had sort of relatively overlapping roles.  And a

11:47:32  4    simple rule would be that if somebody felt strongly, the

11:47:37  5    others couldn't -- couldn't just go do whatever they

11:47:40  6    want.  You have to kind of check with them.  But because

11:47:43  7    we're colleagues and friends and so forth, it worked

11:47:46  8    pretty well.

11:47:47  9             MR. HEIMANN:  Let me show you Exhibit 871 on

11:47:52 10    this subject.

11:48:12 11             (Exhibit 871 was marked for identification.)

11:48:12 12    BY MR. HEIMANN:

11:48:13 13        Q.    Let me ask you the question before you read

11:48:14 14    this, because it will be easier to have the question in

11:48:16 15    mind.  What I want to know is whether or not this is a

11:48:19 16    fair description of how you all functioned together at

11:48:22 17    Google.

11:48:33 18        A.    I see that I -- I did read -- read this.  I can

11:48:37 19    suggest a more accurate characterization.

11:48:40 20        Q.    Sure.

11:48:41 21        A.    If you go to the founders' letter, you will

11:48:44 22    find a paragraph which is a revision of this, the public

11:48:49 23    founders' letter.  But this is roughly -- this is roughly

11:48:53 24    what we were doing at the time.

11:48:55 25        Q.    And did this relationship continue forward in

| | | |
|---|---|---|
| 11:48:58 | 1 | time? |
| 11:48:59 | 2 | A.   Yes.  It may be easier for me to just describe |
| 11:49:06 | 3 | how I think it actually played out.  There was a set of |
| 11:49:08 | 4 | things which were largely operational which I was largely |
| 11:49:11 | 5 | in charge of.  Things involving product, product |
| 11:49:15 | 6 | strategy, Larry and Sergey tended to work on.  But we |
| 11:49:19 | 7 | were all involved in each other, so there were always |
| 11:49:22 | 8 | situations where we were together reviewing everything. |
| 11:49:28 | 9 | And if you were to ask them, they would say, Eric worked |
| 11:49:33 | 10 | on these areas, because that was his expertise, and they |
| 11:49:37 | 11 | worked on theirs.  That is how they would characterize |
| 11:49:39 | 12 | it. |
| 11:49:39 | 13 | Q.   How significant to Google was the workforce, |
| 11:49:42 | 14 | your employees? |
| 11:49:43 | 15 | A.   Crucial. |
| 11:49:44 | 16 | MR. RUBIN:  Objection.  Vague. |
| 11:49:46 | 17 | THE WITNESS:  Crucial. |
| 11:49:46 | 18 | BY MR. HEIMANN: |
| 11:49:46 | 19 | Q.   And was that something that the three of you |
| 11:49:49 | 20 | collaborated on, would it be fair to say? |
| 11:49:53 | 21 | A.   Of course. |
| 11:49:55 | 22 | MR. HEIMANN:  Why don't we take a break. |
| 11:49:56 | 23 | THE VIDEOGRAPHER:  We're now off the record at |
| 11:49:57 | 24 | 11:50. |
| 11:49:58 | 25 | (Recess was taken.) |

12:03:05  1          THE VIDEOGRAPHER:  We are now on the record at

12:03:06  2    12:03.

12:03:08  3    BY MR. HEIMANN:

12:03:08  4       Q.   Mr. Schmidt, I asked that Exhibit 199 be put

12:03:12  5    before you.

12:03:17  6       A.   I have that.

12:03:18  7       Q.   Sir, have you had a chance to look it over?

12:03:20  8       A.   I have.

12:03:20  9       Q.   This is an email from the same time period as

12:03:22 10    the other ones we were looking at just before we broke,

12:03:26 11    February 2005.  In this case it is from Mr. Campbell to

12:03:29 12    Mr. Jobs.  I don't see anyone else copied on it.

12:03:33 13          But in the email he wrote in part, "I'm heading

12:03:36 14    out of town in the a.m., off to Montana, and wanted to

12:03:41 15    give you the latest of what I heard from Google after

12:03:44 16    talking to Eric Schmidt.  Eric told me that he got

12:03:51 17    directly involved and firmly stopped all efforts to

12:03:53 18    recruit anyone from Apple."  Let me stop there.

12:03:56 19          Is that consistent with your recollection of

12:03:58 20    what happened?

12:04:00 21       A.   Well, I believe that he is overstating what we

12:04:03 22    did.  I believe he is saying -- he is referring to stop

12:04:09 23    all efforts to recruit the members of that specific team.

12:04:13 24       Q.   Why do you think that?

12:04:14 25       A.   Because as far as I know we never stopped

12:08:29 1  communications between the people, because he has good

12:08:33 2  trust relationships with me and also with Steve.  So I

12:08:36 3  think he's simply trying to be helpful.

12:08:38 4  BY MR. HEIMANN:

12:08:49 5      Q.   Was the agreement with Apple about no cold

12:08:58 6  calling related to any specific corroboration or joint

12:09:01 7  effort at the time?

12:09:03 8          MR. RUBIN:  Collaboration, you mean?

12:09:04 9  BY MR. HEIMANN:

12:09:05 10     Q.   Collaboration, I'm sorry.  Thank you.

12:09:09 11     A.   Well, as I indicated, I believe we had a search

12:09:11 12 deal there, and I believe that we were in -- we were

12:09:15 13 discussing the maps technology there.  Apple is today a

12:09:20 14 very large customer of Google's, and until they did their

12:09:26 15 own maps a very large customer of our maps.  So we also

12:09:29 16 today have an extremely detailed collaboration involving

12:09:33 17 the very team that this names, because the team that this

12:09:37 18 is referring to, which is called WebKit, is the

12:09:39 19 foundation of the Chrome browser.

12:09:43 20         So we would have certainly anticipated some of

12:09:48 21 that, but we would not have foreseen all of it.  Exactly

12:09:52 22 where we were, I couldn't tell you.

12:09:54 23     Q.   So back to the question, was the agreement with

12:09:55 24 Apple regarding recruiting, cold calling, related to any

12:10:00 25 specific collaboration that existed at the time?

12:10:04 1          MR. RUBIN:  Objection.  Asked and answered.

12:10:05 2          THE WITNESS:  As I said, I believe we had a

12:10:07 3   search deal during that period, and I believe these other

12:10:10 4   collaborations were at various levels of conversation.

12:10:13 5   BY MR. HEIMANN:

12:10:13 6      Q.   All right.  And so was the agreement limited to

12:10:15 7   the personnel that would be relevant to those

12:10:17 8   collaborations?

12:10:18 9          MR. RUBIN:  Objection.  Lacks foundation as to

12:10:19 10  "agreement."

12:10:22 11         THE WITNESS:  Okay.  Again, without -- without

12:10:24 12  getting too hung up on like the word "agreement" and so

12:10:27 13  forth, my recollection is it was limited to this WebKit

12:10:33 14  issue initially.

12:10:36 15  BY MR. HEIMANN:

12:10:37 16     Q.   And how do you square that with the exhibit

12:10:40 17  that I just showed you a moment ago, Exhibit 561?

12:10:49 18         MR. MITTELSTAEDT:  Object.  Argumentative.

12:10:51 19         THE WITNESS:  No.  I understand your question.

12:10:55 20         No, we put this in place because of the

12:10:58 21  relationship that we wanted to build starting with the

12:11:00 22  WebKit.

12:11:01 23  BY MR. HEIMANN:

12:11:02 24     Q.   Are you -- is it your testimony that this

12:11:05 25  agreement that the EMG reached was limited in some

| | | |
|---|---|---|
| 12:11:11 | 1 | respects to certain components of Apple, rather than |
| 12:11:14 | 2 | Apple generally? |
| 12:11:15 | 3 | A.   No.  I -- as I indicated, this -- my |
| 12:11:18 | 4 | recollection is this is the correct agreement.  So -- |
| 12:11:23 | 5 | Q.   So it was company-wide in terms of Apple. |
| 12:11:26 | 6 | A.   Company-wide in terms of do not directly |
| 12:11:28 | 7 | call -- cold call the company. |
| 12:11:31 | 8 | Q.   And it applied to Apple and all of its |
| 12:11:33 | 9 | subsidiaries, correct? |
| 12:11:35 | 10 | A.   I would assume so. |
| 12:11:36 | 11 | Q.   And it was not geographically limited in any |
| 12:11:39 | 12 | respect? |
| 12:11:39 | 13 | A.   As far as I can tell. |
| 12:11:41 | 14 | Q.   Or in terms of timing? |
| 12:11:45 | 15 | MR. MITTELSTAEDT:  Objection.  Vague. |
| 12:11:46 | 16 | BY MR. HEIMANN: |
| 12:11:47 | 17 | Q.   Well, were there any time limits on it? |
| 12:11:49 | 18 | A.   No.  As you know, it is now ended. |
| 12:11:52 | 19 | Q.   I do know that. |
| 12:11:53 | 20 | A.   Yeah. |
| 12:11:53 | 21 | Q.   But there wasn't any time limit at the time it |
| 12:11:55 | 22 | was agreed upon. |
| 12:11:58 | 23 | A.   But, again, you are using the word "agreement." |
| 12:12:01 | 24 | We sat in the equivalent of this room and decided to do |
| 12:12:04 | 25 | this. |

Deposition of Eric Schmidt                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | |
|---|---|
| 12:12:06 1 | Q.   Well, isn't it true that Google had an |
| 12:12:09 2 | agreement with Apple that Google wouldn't cold call Apple |
| 12:12:11 3 | employees and Apple wouldn't cold call Google employees; |
| 12:12:16 4 | isn't that true? |
| 12:12:18 5 | MR. RUBIN:  Objection.  Lacks foundation. |
| 12:12:19 6 | THE WITNESS:  Again, you are using the word |
| 12:12:22 7 | "agreement" in a specific way. |
| 12:12:23 8 | BY MR. HEIMANN: |
| 12:12:24 9 | Q.   I'm using "agreement" in the common way that |
| 12:12:26 10 | agreement is used, just the English usage. |
| 12:12:29 11 | A.   But I -- |
| 12:12:30 12 | MR. RUBIN:  Move to strike that.  So you should |
| 12:12:33 13 | ask questions, not respond. |
| 12:12:34 14 | THE WITNESS:  Well, I'm actually trying to |
| 12:12:35 15 | answer your question as directly as possible. |
| 12:12:37 16 | BY MR. HEIMANN: |
| 12:12:38 17 | Q.   Please. |
| 12:12:39 18 | A.   We on our own made this agreement. |
| 12:12:43 19 | Q.   And what is "this agreement"? |
| 12:12:45 20 | A.   What you see in Exhibit 561. |
| 12:12:46 21 | Q.   All right.  So you agreed -- when you say |
| 12:12:49 22 | "agreed," the EMG agreed; is that what you are saying? |
| 12:12:53 23 | A.   The executives of the company, the policy of |
| 12:12:54 24 | the company was to do what is in Exhibit 561. |
| 12:12:58 25 | Q.   Okay. |

Deposition of Eric Schmidt                                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 12:12:58 | 1 | A.   And I -- and I approved it. |
| 12:12:59 | 2 | Q.   And did Google communicate that fact to Apple? |
| 12:13:06 | 3 | A.   I don't remember myself communicating this to |
| 12:13:11 | 4 | these people. |
| 12:13:12 | 5 | Q.   I didn't say did you do it.  Did Google do it? |
| 12:13:15 | 6 | A.   I was trying to answer your question. |
| 12:13:17 | 7 | I don't know of any communications aside from |
| 12:13:20 | 8 | the Bill Campbell email, which I didn't know about until |
| 12:13:23 | 9 | you showed it to me. |
| 12:13:24 | 10 | Q.   You hadn't seen that one before? |
| 12:13:26 | 11 | A.   That's a privileged question.  I had not seen |
| 12:13:28 | 12 | it before the privileged review. |
| 12:13:30 | 13 | Q.   I take issue with whether it was privileged. |
| 12:13:33 | 14 | Did you see that document in preparing for the |
| 12:13:35 | 15 | deposition? |
| 12:13:36 | 16 | MR. RUBIN:  Well, it is privileged.  You can |
| 12:13:37 | 17 | ask. |
| 12:13:39 | 18 | MR. HEIMANN:  You can argue it is privileged, |
| 12:13:41 | 19 | it doesn't mean it is privileged. |
| 12:13:42 | 20 | MR. RUBIN:  I am asserting privilege, and I'm |
| 12:13:44 | 21 | directing him not to answer that question. |
| 12:13:45 | 22 | THE WITNESS:  So I'm directed not to answer |
| 12:13:46 | 23 | that question? |
| 12:13:47 | 24 | MR. RUBIN:  Right. |
| 12:13:48 | 25 | MR. HEIMANN:  Only if you saw it.  If you |

12:13:49  1    didn't see it, you are to tell me you didn't see it.

12:13:52  2                MR. RUBIN:  No.

12:13:54  3                THE WITNESS:  Okay.

12:13:54  4                MR. RUBIN:  He has already indicated that there

12:13:56  5    is something related to the preparation about that email,

12:13:58  6    so I'm directing him not to answer the question.

12:14:01  7                MR. HEIMANN:  What's the basis for the

12:14:02  8    direction?

12:14:04  9                MR. RUBIN:  That it was something that -- that

12:14:07 10    he -- that the witness has indicated that he -- the only

12:14:11 11    knowledge he has of it relates to preparation.

12:14:14 12                MR. HEIMANN:  What's the legal basis for the

12:14:15 13    objection?

12:14:17 14                MR. RUBIN:  Because it is work product,

12:14:18 15    attorney-client privilege.

12:14:19 16                MR. HEIMANN:  Okay.  Both, you claim?

12:14:21 17                MR. RUBIN:  Yes.

12:14:21 18    BY MR. HEIMANN:

12:14:22 19        Q.   All right.  Was the understanding reciprocal on

12:14:33 20    Apple's part?

12:14:36 21                MR. RUBIN:  Objection.  Lacks foundation as to

12:14:37 22    "understanding."

12:14:38 23                THE WITNESS:  I don't know what Apple's policy

12:14:39 24    was with respect to us.  But I would have -- I would have

12:14:50 25    assumed that they would have done something similar, but

12:14:54  1   you characterized it as a mutual agreement between the

12:14:56  2   two companies.

12:14:57  3   BY MR. HEIMANN:

12:14:57  4        Q.   Uh-huh.

12:14:58  5        A.   Which is what I did not like in your question.

12:15:02  6   So I don't know if there was an agreement on the Apple

12:15:05  7   side with this kind of specificity.

12:15:08  8        Q.   Well, now you've qualified it.  Do you know

12:15:10  9   whether or not there was any agreement on Apple's side

12:15:13 10   with respect to cold calling into Google?

12:15:17 11             MR. RUBIN:  Objection.  Lacks foundation as to

12:15:18 12   "agreement."

12:15:21 13             THE WITNESS:  Again, I don't know what Apple --

12:15:22 14   as a general answer, I don't know what Apple's policy

12:15:25 15   with respect to cold calling into Google was.  I didn't,

12:15:29 16   and I don't now.

12:15:31 17   BY MR. HEIMANN:

12:15:31 18        Q.   So if I put it to you that, in fact, there was

12:15:34 19   an explicit agreement between Google and Apple not to

12:15:37 20   cold call each others' employees, you couldn't tell me

12:15:41 21   whether that was true or not.

12:15:42 22        A.   Are you -- are you informing me that that's

12:15:43 23   true?

12:15:44 24        Q.   I'll show you a document in a minute that says

12:15:46 25   that.

```
12:15:47  1        A.   Oh, I'd love --

12:15:48  2              MR. RUBIN:  Objection.  Objection.  Lacks

12:15:49  3    foundation.

12:15:49  4              THE WITNESS:  I'm looking forward to seeing

12:15:51  5    your document.

12:15:51  6    BY MR. HEIMANN:

12:15:52  7        Q.   But the answer is, you don't know of any such

12:15:54  8    mutual agreement between Apple and Google.

12:15:56  9        A.   I don't have direct knowledge that I can

12:15:59 10    recall.

12:16:00 11        Q.   Do you have indirect knowledge that you can

12:16:01 12    recall?

12:16:02 13        A.   Okay.  Again, I'm trying to answer your

12:16:04 14    questions precisely.  I don't have -- my guess would

12:16:09 15    be -- I guess I'm not supposed to guess in a deposition.

12:16:12 16        Q.   You can guess.

12:16:13 17        A.   My guess would be that -- that they had a

12:16:15 18    reciprocal arrangement of some kind, but I don't know the

12:16:18 19    details.

12:16:19 20        Q.   Did Mr. Brin ever tell you that he had reached

12:16:22 21    such an agreement with Mr. Jobs?

12:16:24 22              MR. RUBIN:  Objection.  Lacks foundation.

12:16:26 23              THE WITNESS:  I have no memory of such a

12:16:28 24    conversation.

         25    //
```

Deposition of Eric Schmidt                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
12:16:28  1    BY MR. HEIMANN:
12:16:41  2        Q.   Again, to Exhibit 561, that's the email from
12:16:47  3    Ms. Brown, Genentech is a company that is identified as
12:16:53  4    one of the three companies for this special arrangement.
12:16:57  5        Why?
12:16:58  6        A.   I have no -- I don't specifically recall the
12:17:00  7    conversation, as I said.  But I would observe that
12:17:04  8    Genentech, Intel, and Apple -- that Genentech and Intel
12:17:10  9    had board members that were board members of Google, and
12:17:13 10    Genentech was -- Art Levinson was the CEO of Genentech.
12:17:18 11    Paul Otellini was the CEO of Intel.  And Apple, of
12:17:22 12    course, I eventually got on their board, and Bill
12:17:23 13    Campbell was a board member of Apple.
12:17:26 14        So, again, my feeling would be -- I don't
12:17:29 15    precisely remember, would be that this was related -- and
12:17:33 16    I vaguely remember saying that we did not want a
12:17:37 17    situation where you had a sitting board member and we
12:17:40 18    were cold calling into their companies.
12:17:43 19        Q.   Now, at what level is that speculation and at
12:17:47 20    what level is that an actual memory of the reason for the
12:17:51 21    agreement with respect to Genentech?
12:17:53 22        A.   It's vague enough I can't give you a precise
12:17:56 23    answer, but I think it's probably true.
12:17:58 24        Q.   Was there any other reason you can think of for
12:18:00 25    Genentech being the subject of this agreement?
```

KRAMM COURT REPORTING       *HIGHLY CONFIDENTIAL - For Attorneys' Eyes Only*              Page: 76

Deposition of Eric Schmidt                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 12:19:45 | 1 | A.   That is correct. |
| 12:20:03 | 2 | Q.   Let's take a look at Exhibit 563. |
| 12:20:34 | 3 |      Have you had a chance to read this? |
| 12:20:35 | 4 | A.   I have. |
| 12:20:36 | 5 | Q.   So this is an email internal to Apple from |
| 12:20:39 | 6 | Danielle Lambert, or Lambert, I'm not sure of the |
| 12:20:43 | 7 | pronunciation.  Do you know who she was at the time? |
| 12:20:47 | 8 | A.   I do not. |
| 12:20:47 | 9 | Q.   And it is to U.S. recruiting, all at group |
| 12:20:51 | 10 | Apple.  Do you see that? |
| 12:20:53 | 11 | A.   I do. |
| 12:20:53 | 12 | Q.   And it is dated February of 2005. |
| 12:20:55 | 13 | A.   I do. |
| 12:20:56 | 14 | Q.   The same time that the emails we were looking |
| 12:20:58 | 15 | at a moment ago were dated, right? |
| 12:21:00 | 16 | A.   Yes. |
| 12:21:01 | 17 | Q.   And she wrote, "All, please add Google to |
| 12:21:04 | 18 | your," quote, "'hands-off,'" close quote, "list.  We |
| 12:21:08 | 19 | recently agreed not to recruit from one another.  So if |
| 12:21:11 | 20 | you hear of any recruiting they are doing against us, |
| 12:21:14 | 21 | please be sure to let me know.  Please also be sure to |
| 12:21:17 | 22 | honor our side of the deal." |
| 12:21:19 | 23 |      Do you see that? |
| 12:21:20 | 24 | A.   I do. |
| 12:21:20 | 25 | Q.   How do you square that with your testimony |

Deposition of Eric Schmidt                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

12:21:22  1    there was not an agreement between Apple and Google?

12:21:26  2              MR. RUBIN:  Objection.  Lacks foundation;

12:21:27  3    argumentative.

12:21:29  4              THE WITNESS:  This is the first I've ever seen

12:21:30  5    of this email.  So I have no opinion about this email.

12:21:33  6    My testimony stands.

12:21:36  7    BY MR. HEIMANN:

12:21:36  8         Q.   Your testimony is there was no agreement

12:21:38  9    between the two not to recruit from each other, correct?

12:21:41 10              MR. RUBIN:  Objection.  Mischaracterizes his

12:21:42 11    prior testimony; lacks foundation.

12:21:45 12              THE WITNESS:  I tried to be very precise, and I

12:21:47 13    said that we made a decision, which is well characterized

12:21:51 14    in Exhibit 561, to not directly cold call into, among

12:21:57 15    other things, Apple.

12:21:59 16              I also told you that I don't know what Apple

12:22:02 17    did internally.  You've now presented evidence to me of

12:22:06 18    what Apple did internally, which is news to me.

12:22:08 19    BY MR. HEIMANN:

12:22:15 20         Q.   Was the actions with respect to cold calling

12:22:21 21    communicated to Google's board of directors?

12:22:26 22         A.   Well, it was certainly communicated to Bill

12:22:28 23    Campbell, who is an advisor to the Google board of

12:22:31 24    directors.  I don't recall -- I don't recall a discussion

12:22:37 25    at the board about this.

Deposition of Eric Schmidt                     In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 12:22:38 | 1 | Q.   Did the board of directors approve it? |
| 12:22:41 | 2 | MR. RUBIN:  Objection.  Asked and answered. |
| 12:22:44 | 3 | THE WITNESS:  As I indicated, I have no |
| 12:22:45 | 4 | recollection of such a discussion.  However, it would not |
| 12:22:48 | 5 | have been -- it would not have required a board of |
| 12:22:50 | 6 | directors approval. |
| 12:22:51 | 7 | BY MR. HEIMANN: |
| 12:22:53 | 8 | Q.   Do you know whether or not there is any |
| 12:22:56 | 9 | discussion in the minutes of any meeting of the board of |
| 12:22:58 | 10 | directors? |
| 12:23:00 | 11 | A.   I do not. |
| 12:23:08 | 12 | Q.   Is it something of sufficient importance that |
| 12:23:11 | 13 | you think in all likelihood it would have been presented |
| 12:23:13 | 14 | to the board? |
| 12:23:14 | 15 | MR. RUBIN:  Objection.  Asked and answered. |
| 12:23:16 | 16 | THE WITNESS:  I think it's unlikely it would |
| 12:23:18 | 17 | have been presented to the board. |
| 12:23:19 | 18 | BY MR. HEIMANN: |
| 12:23:20 | 19 | Q.   Why do you say that? |
| 12:23:21 | 20 | A.   We were working on more important things. |
| 12:23:32 | 21 | Q.   I'll ask you to take a look at Exhibit 640. |
| 12:23:59 | 22 | This is a somewhat lengthy document.  I have |
| 12:24:01 | 23 | got one page and one section I'm going to focus on, but |
| 12:24:06 | 24 | you should at least take enough time to -- to familiarize |
| 12:24:09 | 25 | yourself with the document generally, and -- because what |

12:37:10 1        A.   This was, you know, as I indicated --

12:37:10 2        Q.   It is a long time ago.  I understand that.

12:37:12 3        A.   Eight years ago.  No.  This is the best I can

12:37:15 4   recall.

12:37:15 5        Q.   But I'm trying to find out whether you're

12:37:17 6   actually recalling something now, or whether you are, as

12:37:19 7   is natural, saying, this is what -- is this likely what I

12:37:22 8   would have been thinking about and why I said this.

12:37:25 9             MR. RUBIN:  Objection.  Asked and answered;

12:37:27 10  argumentative and close to badgering.

12:37:30 11            THE WITNESS:  I've answered your question by

12:37:32 12  saying that I don't recall the specific typing of this

12:37:35 13  response, however, that my general view is what I told

12:37:40 14  you, and I'm sure that it was my general view then, too.

12:37:45 15  That's the best answer I can give you.

12:37:48 16            MR. HEIMANN:  Fair enough.  Fair enough.

12:37:59 17            Shall we break for lunch?  Is that all right?

12:38:05 18            MR. RUBIN:  If that's what you want to do.  I

12:38:07 19  think Eric is probably ready to keep going for a little

12:38:09 20  while longer, but --

12:38:10 21            MR. HEIMANN:  We're going to go on to the end,

12:38:12 22  so the question is only whether we eat now or wait.

12:38:15 23            THE WITNESS:  I think you should go on until

12:38:17 24  we're done, and I think we should work as hard as we can

12:38:20 25  to be done.

Deposition of Eric Schmidt                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
12:38:20  1              MR. HEIMANN:  I can't go on without lunch.

12:38:24  2              THE WITNESS:  Okay, then we should have lunch.

12:38:25  3   How long do you need for lunch?

12:38:27  4              MR. HEIMANN:  I don't know what is being

12:38:28  5   offered.

12:38:31  6              MR. RUBIN:  We can go off the record for lunch.

12:38:33  7              THE VIDEOGRAPHER:  This is the end of Video

12:38:34  8   No. 1.  We're now off the record at 12:38.

12:38:38  9              (Recess was taken.)

13:14:20 10              THE VIDEOGRAPHER:  We are now on the record at

13:14:23 11   1:14.  This is the beginning of Video No. 2.

13:14:27 12   BY MR. HEIMANN:

13:14:28 13        Q.   Mr. Schmidt, if we could go back briefly to

13:14:31 14   Exhibit 640, that is the recruiting data and policy.

13:14:35 15        A.   I have it.

13:14:37 16        Q.   I've been informed that according to the

13:14:38 17   metadata the author of that document is Jane Sho, S-h-o.

13:14:44 18   Does that name mean anything to you?

13:14:46 19        A.   It does not.

13:14:47 20        Q.   Okay.  Did you take any steps to enforce the no

13:14:55 21   cold call policy at Google?

13:14:59 22              MR. RUBIN:  Objection.  Vague.

13:15:01 23              THE WITNESS:  What do you mean by "steps"?

13:15:02 24   BY MR. HEIMANN:

13:15:03 25        Q.   Did you do anything to enforce the policy?
```

13:15:06  1        A.   Well, I approved it.

13:15:08  2        Q.   Right.  And after approving it, did you become

13:15:10  3   involved in any way in enforcing the policy and seeing to

13:15:13  4   it that it was carried out?

13:15:15  5        A.   Not that I'm aware -- nothing beyond approval.

13:15:20  6        Q.   Let's take a look at Exhibit 187, please.

13:16:02  7             Have you had a chance to look at that?

13:16:04  8        A.   I have.

13:16:04  9        Q.   Does it -- strike that.

13:16:05 10             Do you recall it at all?

13:16:06 11        A.   No.

13:16:07 12        Q.   Do you recall from time to time after the

13:16:10 13   policy respecting Apple was put into effect receiving

13:16:14 14   communications from Steve Jobs complaining about Google's

13:16:18 15   recruiting into Apple?

13:16:20 16        A.   I have a general recollection, but I don't

13:16:22 17   recall the specifics.

13:16:23 18        Q.   What's the extent of your general recollection?

13:16:26 19        A.   That whenever there was any recruiting

13:16:28 20   activity, we would hear from Steve one way or the other.

13:16:31 21        Q.   And did he typically communicate directly to

13:16:35 22   you about those matters?

13:16:37 23             MR. RUBIN:  Objection.  Lacks foundation.

13:16:41 24             THE WITNESS:  He would talk to whoever he had

13:16:43 25   spoken to the previous time on something else.  So he

13:16:47  1   would speak to myself.  He would speak to Bill Campbell.

13:16:50  2   For a while Alan Eustace was assigned to speak to Steve.

13:16:59  3   So it would depend.

13:17:02  4   BY MR. HEIMANN:

13:17:03  5       Q.   Forgive me, I'm just not clear on your answer.

13:17:05  6            When you said "he would speak to whomever he

13:17:08  7   had last spoken to," are you talking about Mr. Jobs would

13:17:10  8   speak to whomever he had last spoken?

13:17:13  9       A.   That's correct.

13:17:13 10       Q.   What is -- can you explain what you mean by

13:17:14 11   that?

13:17:15 12       A.   Well, the company had interactions with Steve,

13:17:18 13   and Steve would call whoever he had most recently spoken

13:17:21 14   with on another subject to let them know of his

13:17:24 15   displeasure.

13:17:25 16       Q.   And that was just his idiosyncratic practice?

13:17:31 17       A.   I -- I'm not going to judge it.  So --

13:17:33 18       Q.   All right.  That was -- setting aside the

13:17:36 19   idiosyncratic, that was Mr. Jobs' apparent practice from

13:17:41 20   what you saw and observed?

13:17:43 21            MR. RUBIN:  Objection.  Lacks foundation.

13:17:44 22            THE WITNESS:  It is only my observation of what

13:17:45 23   happened.  I can't speculate on Steve's motivations.

13:17:51 24            Again, let me remind you that I joined the

13:17:53 25   board about -- the board of Apple about -- at a time

| | | |
|---|---|---|
| 13:17:56 | 1 | in -- coincident with this era, this period of time. |
| 13:17:59 | 2 | BY MR. HEIMANN: |
| 13:18:00 | 3 | Q.   I have it down that you joined in August of |
| 13:18:02 | 4 | 2006.  Does that sound right? |
| 13:18:04 | 5 | A.   That sounds good. |
| 13:18:05 | 6 | Q.   And you were on the board up until or through |
| 13:18:08 | 7 | August 2009? |
| 13:18:09 | 8 | A.   That sounds about right. |
| 13:18:10 | 9 | Q.   And then you went off the board of Apple? |
| 13:18:12 | 10 | A.   That is correct. |
| 13:18:13 | 11 | Q.   Why? |
| 13:18:14 | 12 | A.   The conflicts between the company while I was |
| 13:18:20 | 13 | on the board -- it started with almost no conflict, and |
| 13:18:24 | 14 | then during the time I was on the board the iPhone was |
| 13:18:28 | 15 | announced, and then the android product line, which is |
| 13:18:31 | 16 | the primary competitor for the iPhone now, was announced, |
| 13:18:36 | 17 | and I had to recuse myself under the rules, which is the |
| 13:18:39 | 18 | right thing.  And it got to the point where I had to |
| 13:18:41 | 19 | recuse myself from too much, that I could not effectively |
| 13:18:45 | 20 | contribute as an Apple board member, and it was the right |
| 13:18:48 | 21 | decision to get off. |
| 13:18:51 | 22 | Q.   All right.  Sir, in this instance we're look at |
| 13:18:53 | 23 | Exhibit 187, apparently Mr. Jobs brought to your |
| 13:18:56 | 24 | attention his complaint about Google's recruiting into |
| 13:18:59 | 25 | his iPod group. |

Deposition of Eric Schmidt                                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

13:19:02  1          A.    I see that.

13:19:02  2          Q.    All right.  And I'm sorry.  Maybe I already

13:19:05  3     asked you that.  Do you recall this?

13:19:07  4          A.    I do not, although as I read this, it's

13:19:10  5     probably the case that new cell phone software group is

13:19:14  6     referring to android.

13:19:18  7          Q.    All right.  And then you responded to him

13:19:23  8     fairly promptly, saying you would look into it and

13:19:27  9     affirming or reaffirming the policy of no recruiting?

13:19:30 10          A.    That is correct.

13:19:32 11          Q.    If we could go next to Exhibit 250.

13:20:14 12          A.    Okay.

13:20:15 13          Q.    All right.  Do you have any recollection of

13:20:16 14     this email exchange?

13:20:17 15          A.    No.

13:20:34 16          Q.    In any event, what you've done -- strike that.

13:20:36 17                The email appears to be you're forwarding to

13:20:38 18     Mr. Jobs the information you had been provided about the

13:20:42 19     matter that he had asked about or complained about?

13:20:44 20          A.    That is correct.

13:20:50 21                MR. RUBIN:  Are you referring back to the prior

13:20:52 22     exhibit, or are you linking the two exhibits?

13:20:54 23                MR. HEIMANN:  I think I did, yeah.  Aren't they

13:20:59 24     linked?

13:21:13 25                THE WITNESS:  I'm going to presume that these

KRAMM COURT REPORTING        *HIGHLY CONFIDENTIAL - For Attorneys' Eyes Only*                    Page: 97

| | |
|---|---|
| 13:21:15 1 | are two linked, but there is not a guarantee that they |
| 13:21:18 2 | are. |
| 13:21:19 3 | MS. BROWN:  I'll note for the record that the |
| 13:21:20 4 | date on the prior exhibit, Exhibit 187, appears to be in |
| 13:21:24 5 | February 2006, whereas the date on the Exhibit 250 is |
| 13:21:27 6 | '07. |
| 13:21:29 7 | THE WITNESS:  You are right. |
| 13:21:30 8 | BY MR. HEIMANN: |
| 13:21:30 9 | Q.  So that would suggest they are not.  My |
| 13:21:32 10 | apologies. |
| 13:21:33 11 | A.  Let's assume they are not.  This is referring |
| 13:21:35 12 | to some other incident, then. |
| 13:21:37 13 | Q.  So in this email, I'm talking about |
| 13:22:11 14 | Exhibit 250, and it is not clear to me who the author of |
| 13:22:17 15 | the email is that you forwarded to Mr. Jobs, but whoever |
| 13:22:21 16 | the author is, they reported that on this specific case |
| 13:22:24 17 | the source or who contacted this Apple employee should |
| 13:22:30 18 | not have and will be terminated within the hour.  Do you |
| 13:22:32 19 | see that? |
| 13:22:33 20 | A.  I do. |
| 13:22:33 21 | Q.  And then skipping down a bit it says, "In |
| 13:22:35 22 | general we have a very clear," quote, "'do not call,'" |
| 13:22:39 23 | close quote, "policy that is given to every staffing |
| 13:22:44 24 | professional," et cetera. |
| 13:22:45 25 | Do you see that? |

13:22:46  1      A.    I do.

13:22:46  2      Q.    Was this a matter of such importance that it

13:22:48  3  justified termination of the person who offended the

13:22:52  4  policy as is indicated here?

13:22:54  5            MR. RUBIN:  Objection.  Argumentative.

13:22:57  6            THE WITNESS:  Well, as a general rule, Google

13:23:00  7  has a set of rules that the recruiters and everyone else

13:23:05  8  has to follow, and so I would assume reading this that

13:23:09  9  the manager observed that the recruiter had violated the

13:23:14 10  rules and was terminated.  It was relatively -- it's how

13:23:20 11  you deal with -- with errors in a company.

13:23:22 12  BY MR. HEIMANN:

13:23:22 13      Q.    Are you suggesting that every error committed

13:23:25 14  at Google resulted in termination?

13:23:28 15            MR. RUBIN:  Objection.  Mischaracterizes prior

13:23:29 16  testimony; argumentative.

13:23:32 17            THE WITNESS:  If it is a rule that you've been

13:23:33 18  told you have to follow or you'll lose your job, sure.

13:23:36 19  BY MR. HEIMANN:

13:23:37 20      Q.    And this was such a rule?

13:23:38 21      A.    I don't know, but I would infer it was.

13:23:46 22      Q.    Let's take a look at Exhibit 192.

13:24:08 23      A.    This explains to you the origin.

13:24:22 24      Q.    Right.

13:24:22 25      A.    Okay.  So what was your question?

| | | |
|---|---|---|
| 13:24:25 | 1 | Q.   So you've had a chance to look at this?  That's |
| 13:24:27 | 2 | the first question. |
| 13:24:28 | 3 | A.   Uh-huh. |
| 13:24:29 | 4 | Q.   This email string appears to begin with an |
| 13:24:31 | 5 | email from a Google recruiter to someone at Apple. |
| 13:24:36 | 6 | A.   That's -- I see that. |
| 13:24:37 | 7 | Q.   All right.  And then Steve Jobs forwards that |
| 13:24:41 | 8 | email to you with the statement, "I would be very pleased |
| 13:24:46 | 9 | if your recruiting department would stop doing this."  Do |
| 13:24:49 | 10 | you see that? |
| 13:24:50 | 11 | A.   That is correct. |
| 13:24:53 | 12 | Q.   And you responded to -- let me make sure I get |
| 13:25:01 | 13 | this right. |
| 13:25:02 | 14 | A.   I'll try to help you. |
| 13:25:03 | 15 | Q.   Sure. |
| 13:25:03 | 16 | A.   This is a forward where I'm forwarding Steve's |
| 13:25:06 | 17 | mail almost certainly to Shona. |
| 13:25:08 | 18 | Q.   Okay. |
| 13:25:10 | 19 | A.   Where I say to Shona, "I believe that we have a |
| 13:25:12 | 20 | no policy of recruiting from Apple."  Or perhaps it is |
| 13:25:16 | 21 | Arnnon.  I'm sending it to either Shona or Arnnon, or |
| 13:25:20 | 22 | whatever his name is, and then you can see the response |
| 13:25:24 | 23 | from Arnnon to me, and then you can see the response from |
| 13:25:27 | 24 | Shona to Arnnon in order. |
| 13:25:30 | 25 | Q.   Right.  So this would be -- so it is clear on |

13:25:33  1   the record, so Arnnon's response to you is the one on

13:25:36  2   March 8 which he writes, "on this specific case," et

13:25:40  3   cetera.

13:25:40  4        A.   That is correct.  You can see he has addressed

13:25:45  5   it to me.

13:25:45  6        Q.   Yes, sir.  And that is the email in which he

13:25:48  7   says the person will be terminated within the hour?

13:25:50  8        A.   Right.  And you'll also see above that Shona's

13:25:54  9   direction to Arnnon that we have a zero tolerance policy

13:25:58 10   for violating our policies, which should answer your

13:26:01 11   earlier question.

13:26:02 12        Q.   Right.  So this policy regarding recruiting

13:26:04 13   was, as she puts it here, "a zero tolerance policy" that

13:26:09 14   warranted immediate termination if violated.

13:26:12 15             MR. RUBIN:  Objection.  Mischaracterized the

13:26:15 16   document.

13:26:15 17             THE WITNESS:  Again, I'll let the document

13:26:17 18   speak for itself.  So --

13:26:18 19   BY MR. HEIMANN:

13:26:19 20        Q.   That's what the document says, right?

13:26:20 21             MR. RUBIN:  Objection.  Same objection.

13:26:22 22             THE WITNESS:  "I want it clear we have a zero

13:26:24 23   tolerance policy for violating our policies."  So I think

13:26:28 24   that's how I'd interpret it.

         25   //

Deposition of Eric Schmidt                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

13:26:31  1    BY MR. HEIMANN:

13:26:32  2        Q.    Right.   Now, focusing again on the policy with

13:26:40  3    respect to Apple, you've indicated in your prior

13:26:45  4    testimony that the policy was a no cold call policy.   I

13:26:49  5    think that's the fairest way to summarize it, right?

13:26:51  6        A.    Yeah, we call it a do-not-call policy.

13:26:53  7        Q.    Do-not-call policy, thank you.

13:26:55  8        A.    DNC.

13:26:56  9        Q.    But with respect to Apple, wasn't it more than

13:26:59 10    that, wasn't it also a do-not-hire unless Steve Jobs

13:27:02 11    okays the hire?

13:27:03 12            MR. RUBIN:   Objection.   Argumentative; lacks

13:27:04 13    foundation.

13:27:06 14            THE WITNESS:   That is not true.

13:27:07 15    BY MR. HEIMANN:

13:27:08 16        Q.    Let's take a look at Exhibit 278.   Have you had

13:27:55 17    a chance to take a look at this?

13:27:57 18        A.    I do.

13:27:57 19        Q.    This is an email from Mr. Eustace, Alan

13:27:59 20    Eustace, to Steve Jobs, correct?

13:28:01 21        A.    Uh-huh.   Yes.

13:28:03 22        Q.    And who is Mr. Eustace at Google at the time?

13:28:06 23        A.    Senior vice president of engineering.

13:28:08 24        Q.    That is a senior position, is it not?

13:28:10 25        A.    That is correct.

| | | |
|---|---|---|
| 13:28:11 | 1 | Q.   And he copies Mr. Campbell and the two founders |
| 13:28:14 | 2 | of the company as well, correct? |
| 13:28:16 | 3 | A.   That's correct. |
| 13:28:17 | 4 | Q.   And he says in part, "Google would like to make |
| 13:28:21 | 5 | an offer to ████████████████" Is that how you |
| 13:28:26 | 6 | pronounce it?  Do you know? |
| 13:28:28 | 7 | A.   I don't know. |
| 13:28:28 | 8 | Q.   "-- to run a small engineering center in Paris. |
| 13:28:31 | 9 | Bill, Larry, Sergey" -- Sergey, sorry, "and ████████ |
| 13:28:35 | 10 | believe it is important to get your blessing before |
| 13:28:38 | 11 | moving forward with this offer." |
| 13:28:39 | 12 | Skipping down to the last paragraph, "Google's |
| 13:28:41 | 13 | relationship with Apple is extremely important to us.  If |
| 13:28:44 | 14 | that relationship is any way threatened by this hire, |
| 13:28:47 | 15 | please let me know, and we will pass on this |
| 13:28:50 | 16 | opportunity." |
| 13:28:50 | 17 | Do you see that? |
| 13:28:51 | 18 | A.   I do. |
| 13:28:52 | 19 | Q.   Did you know anything about this at the time? |
| 13:28:55 | 20 | A.   I did not.  Or I should say, I don't have any |
| 13:29:02 | 21 | memory of it. |
| 13:29:06 | 22 | Q.   If we can go to Exhibit 648. |
| 13:29:09 | 23 | Have you had a chance to look at that? |
| 13:29:55 | 24 | A.   I have. |
| 13:29:55 | 25 | Q.   So this is an email chain, I'll try to |

| | | |
|---|---|---|
| 13:29:57 | 1 | summarize it rather than read through it, in which it |
| 13:30:01 | 2 | appears that Mr. Jobs had not responded to the email that |
| 13:30:04 | 3 | we saw just a moment ago.  I'm looking at page 2, halfway |
| 13:30:08 | 4 | down it says, "Steve didn't respond to my email, but Bill |
| 13:30:12 | 5 | Campbell promised to call," et cetera. |
| 13:30:14 | 6 | A.    That's what it says. |
| 13:30:16 | 7 | Q.    And then looking at the first page there is an |
| 13:30:21 | 8 | email exchange involving whether or not Mr. Campbell had |
| 13:30:24 | 9 | had a chance to talk with Mr. Jobs yet about the subject. |
| 13:30:27 | 10 | Do you see that? |
| 13:30:27 | 11 | A.    I do. |
| 13:30:28 | 12 | Q.    And the last email is Mr. Campbell saying he is |
| 13:30:31 | 13 | going to be meeting with Mr. Jobs on Sunday. |
| 13:30:34 | 14 | A.    I see that. |
| 13:30:35 | 15 | Q.    Okay.  Refresh your memory at all about this |
| 13:30:38 | 16 | incident at this point? |
| 13:30:40 | 17 | A.    No. |
| 13:30:41 | 18 | Q.    If we can go next, then, to Exhibit 650 -- no, |
| 13:30:48 | 19 | I'm sorry, Exhibit 279. |
| 13:31:14 | 20 | A.    Okay. |
| 13:31:15 | 21 | Q.    So now what I'm showing you is the response |
| 13:31:16 | 22 | that Mr. Jobs sent on the 9th of April the day after -- |
| 13:31:20 | 23 | or maybe the very day he spoke with Mr. Campbell, |
| 13:31:22 | 24 | according to Exhibit 648, in which Mr. Jobs wrote, "What |
| 13:31:28 | 25 | would ███████ be working on?  We would have a problem |

13:31:28   1   if it is related to cell phone handsets, et cetera."

13:31:31   2        Do you see that?

13:31:31   3      A.   I do.

13:31:32   4      Q.   And then Mr. Eustace responded to that email as

13:31:36   5   is indicated here, "Thank you very much for responding,"

13:31:38   6   et cetera.  Do you see that?

13:31:39   7      A.   I do.

13:31:40   8      Q.   And if we can go next then to Exhibit 650.

13:32:19   9      A.   I see that.

13:32:19   10      Q.   So this begins with an email from Mr. Eustace

13:32:21   11   to Mr. Jobs on the 25th of April, describing the desire

13:32:23   12   to hire ███████████ and four people who used to work for

13:32:27   13   him at Apple in Paris.  Do you see that?

13:32:30   14      A.   Uh-huh.

13:32:30   15      Q.   And then Mr. Jobs wrote back, "We strongly

13:32:33   16   prefer that you not hire these guys."

13:32:34   17        Do you see that?

13:32:35   18      A.   Yes.

13:32:36   19      Q.   And then Mr. Eustace -- I'm sorry -- yes,

13:32:45   20   Mr. Eustace writes to ████████████ relating that to him and

13:32:48   21   indicating that "We can't risk our relationship with

13:32:50   22   Apple to make this happen over his objection."

13:32:52   23        Do you see that?

13:32:53   24      A.   I see.

13:32:54   25      Q.   All right.  And finally, if we go to

13:32:57 1  Exhibit 653.

13:33:29 2    A. Okay.

13:33:29 3    Q. So this is what appears to me to be the

13:33:32 4  concluding email on the subject in which Mr. Eustace

13:33:35 5  wrote to Mr. Jobs on May 23 of 2006, saying, among other

13:33:38 6  things, that "Based on your strong preference that we not

13:33:42 7  hire the ex-Apple engineer, ███████, and I decided not

13:33:46 8  to open a Paris engineering center."

13:33:48 9    Do you see that?

13:33:53 10    A. I do.

13:33:53 11    Q. Once again, do you have any recollection of

13:33:55 12  knowing about this exchange?

13:33:56 13    A. No, but I should note that we have an

13:33:59 14  engineering center now in Paris.

13:34:02 15    Q. Glad to hear it, but the question is, how do

13:34:04 16  you square this with the notion that the agreement with

13:34:07 17  Apple did not involve requiring Mr. Jobs' permission for

13:34:11 18  hiring Apple people?

13:34:12 19    MR. RUBIN:  Objection.  Lacks foundation.

13:34:17 20    THE WITNESS:  Well, you -- as you can see, I

13:34:19 21  was not copied on any of this correspondence.

13:34:21 22  BY MR. HEIMANN:

13:34:21 23    Q. I do.

13:34:22 24    A. So I was not involved in this whole

13:34:24 25  transaction.  But I stated what I -- what I understood

13:34:28  1   the agreement between -- or whatever you want to

13:34:30  2   characterize them, that Google had about hiring Apple

13:34:34  3   people, which is do not call, but if people approached

13:34:36  4   us, we would pursue.  In this particular case, Alan seems

13:34:40  5   to have gone one step further for reasons that he would

13:34:43  6   have to tell you.

13:34:44  7          (Exhibit 861 was marked for identification.)

13:34:44  8   BY MR. HEIMANN:

13:34:44  9       Q.   All right.  Let me ask you to take a look at

13:34:47 10   Exhibit 861.  Have you had a chance to look at that?

13:35:19 11       A.   I have.

13:35:19 12       Q.   This is an email internal to Apple, as I

13:35:21 13   understand it, and the point I want to focus on is the

13:35:25 14   originating email from Daniel -- Danielle, excuse me,

13:35:28 15   Lambert to Mr. Jobs, June of 2006.  And in particular,

13:35:34 16   the second paragraph of that email, in which she said,

13:35:38 17   "We have been diving into the search for someone to lead

13:35:42 18   an ad sales team and surfacing some good folks.  We're

13:35:47 19   researching Google to see who's there and learn what we

13:35:49 20   can about their backgrounds, but are not directly calling

13:35:52 21   them directly given the agreement you and Sergey" -- I

13:35:57 22   hope I'm pronouncing it correctly -- "struck not to

13:36:00 23   recruit from one another."  Let me stop there.

13:36:07 24          Were you aware that such an agreement had been

13:36:09 25   reached between Mr. Jobs and Sergey Brin at Google?

13:36:13  1      A.   Well, I've already indicated that there was no

13:36:15  2  such agreement, in your terms.  I don't know what Sergey

13:36:21  3  may have said separately to Steve or what impressions he

13:36:24  4  may have given.  We -- I already showed you what we did.

13:36:30  5  You showed me an email from this Danielle Lambert woman,

13:36:33  6  who I don't know, which indicates that they were doing

13:36:36  7  something similar for us.

13:36:39  8      Q.   Well, to be fair, both that email and this

13:36:41  9  email speak in terms of an actual agreement between the

13:36:43 10  two companies not to recruit from each other, right?

13:36:48 11           MR. RUBIN:   Objection.  Argumentative; lacks

13:36:49 12  foundation.

13:36:49 13           THE WITNESS:  Well, I -- all I can see are the

13:36:51 14  words on the page.  So I -- it's very hard to interpret

13:36:55 15  an email in the context of a different company.  So --

13:36:59 16  you'd have to ask them.

13:37:18 17  BY MR. HEIMANN:

13:37:18 18      Q.   Well, let's look at a Google document on this

13:37:21 19  subject.  Let's look at Exhibit 661.

13:38:01 20           My focus is on the first page of the document.

13:38:19 21      A.   Okay.

13:38:19 22      Q.   First of all, do you recognize the document?

13:38:21 23      A.   I do not.

13:38:22 24      Q.   It's a Google document, correct?  It is from

13:38:28 25  Google's business records, right?

13:38:36  1          A.    I'm sorry.  Are you asking me?

13:38:37  2          Q.    Yes.

13:38:38  3          A.    I didn't produce the document, so I don't know.

13:38:40  4          Q.    When you say you, you mean you personally

13:38:42  5    didn't produce it, right?

13:38:44  6          A.    I -- I don't know where these documents come

13:38:46  7    from.

13:38:47  8          Q.    I'll tell you this document came from Google's

13:38:49  9    business records.

13:38:50 10          A.    And as I asked you previously, I don't know who

13:38:53 11    wrote these documents.  You told me the name of somebody

13:38:54 12    I didn't know.

13:38:54 13          Q.    Right.

13:38:54 14          A.    So if you could let me know who wrote it, that

13:38:56 15    would be helpful.

13:38:57 16          Q.    Well, I think this document was written by

13:38:59 17    Mr. Geshuri, is it not?

13:39:02 18                MR. HARVEY:  I have to double-check this

13:39:03 19    document specifically.

13:39:05 20                THE WITNESS:  Okay.

13:39:05 21    BY MR. HEIMANN:

13:39:06 22          Q.    In any event, there is no doubt it is a Google

13:39:08 23    document, in your mind, is there?

13:39:09 24          A.    Well, I would assume so, yeah.

13:39:11 25          Q.    And the title of the document at the part -- at

13:39:13  1    the very beginning says, "Google" in big letters,

13:39:16  2    "Special Agreement Hiring Policy," right?

13:39:18  3         A.   I see that.

13:39:19  4         Q.   Lower left-hand corner says it was a revision

13:39:22  5    from January of 2008, correct?

13:39:26  6         A.   Yes, it says that.

13:39:27  7         Q.   All right.  If you'll take a look at the text

13:39:29  8    about halfway down on the first page, just below the line

13:39:33  9    that goes across the page, it says, "The following

13:39:36 10    companies (and by association, their subsidiaries listed

13:39:40 11    in Appendix A) have a special agreement with Google and

13:39:44 12    are part of the 'Do Not Cold Call' list."

13:39:46 13         And then there is a list of parent companies

13:39:49 14    provided there.  Do you see that?

13:39:50 15         A.   I do.

13:39:51 16         Q.   And then it goes on to say, "For each of these

13:39:53 17    'Do Not Cold Call' companies, Google has agreed to the

13:39:57 18    following protocol."

13:39:58 19         Now, can you square that with -- strike that.

13:40:01 20         Doesn't that indicate to you that there were

13:40:02 21    actual agreements between Google and these companies

13:40:04 22    respecting the subject matter here?

13:40:09 23         MR. RUBIN:  Objection.  Lacks foundation.

13:40:12 24         THE WITNESS:  I didn't write these, and I

13:40:15 25    didn't write the word "agreement."  So I'm not aware of

13:40:18  1    agreements in the sense of written documents, if that's

13:40:21  2    what your question is.

13:40:21  3    BY MR. HEIMANN:

13:40:22  4        Q.   I said nothing about writing, sir.

13:40:24  5        A.   Well --

13:40:24  6        Q.   You understand agreements don't have to be in

13:40:26  7    writing to be agreements, right?

13:40:27  8        A.   Well, again --

13:40:29  9             MR. RUBIN:  Objection.  That's -- if you -- do

13:40:31 10    you have another question?

13:40:32 11    BY MR. HEIMANN:

13:40:32 12        Q.   That's a question.

13:40:34 13        A.   What is the question?

13:40:35 14        Q.   You understand, sir, that in business an

13:40:37 15    agreement doesn't have to be in writing in order for it

13:40:41 16    to be an agreement.

13:40:42 17        A.   As a -- that's true.  I can assure you that at

13:40:45 18    Google everything is in writing.

13:40:46 19        Q.   You don't have any gentleman's agreements at

13:40:49 20    Google, huh?

13:40:50 21        A.   They are generally a problem.

13:40:52 22        Q.   So back to the question here, were you aware of

13:40:56 23    the agreements that are specifically described here

13:41:01 24    between Google and these companies?

13:41:03 25             MR. RUBIN:  Objection.  Lacks foundation.

| | |
|---|---|
| 13:41:06 | 1 |

THE WITNESS:  Well, again, I'm not aware of

agreements, period.  I have previously testified that I

was aware of do-not-call decisions, if you want to call

them, with Apple, Genentech, IBM, Intel, and some of

these I was not aware of even now.

BY MR. HEIMANN:

Q.   Did the executive management group periodically

review the no cold call policy or agreements, whatever?

MR. RUBIN:  Objection.  Lacks foundation to the

extent there were agreements or whatever.  I mean it

would be easier just to call it a DNC list for clarity.

MR. HEIMANN:  I choose not to call it that,

because the documents refer to it as an agreement and as

a list, so I think I can use them in the alternative.

And the notion that there is no foundation for the use of

the word "agreements" in the face of these documents is

absurd.

MR. RUBIN:  You can call it whatever you want.

You'll be able to argue whatever you want.  I'm saying

for purposes of the deposition, I think you'll get fewer

objections if you just call it a DNC list.

MR. HEIMANN:  I'm sorry.  I lost my train of

thought there.  What was the question?

(Record was read as follows:  "Question:  Did

the executive management group periodically review the no

Deposition of Eric Schmidt                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

14:01:45   1              MR. RUBIN:  Objection.  Vague.

14:01:46   2              THE WITNESS:  I don't know what Intel's policy

14:01:48   3    with respect to recruiting Google was.

14:01:50   4    BY MR. HEIMANN:

14:01:50   5         Q.   Don't you think it's likely that you did know

14:01:52   6    at the time?

14:01:53   7              MR. RUBIN:  Objection.  Argumentative; calls

14:01:55   8    for speculation.

14:01:58   9              THE WITNESS:  No.  I actually don't.

14:01:59  10    BY MR. HEIMANN:

14:02:01  11         Q.   And why is that?

14:02:02  12         A.   The relationship was unique because Paul was on

14:02:07  13    the Google board, whereas I was not on the Intel board.

14:02:12  14    So it is perfectly possible you could have different

14:02:15  15    policies in two different companies.  It is not

14:02:17  16    symmetric.

14:02:18  17         Q.   And the "Paul" in your answer is who?

14:02:20  18         A.   Otellini.

14:02:22  19         Q.   He was the CEO --

14:02:24  20         A.   CEO of Intel.

14:02:25  21         Q.   Don't you think it likely that if there was an

14:02:27  22    actual agreement, whether in writing or not, between

14:02:31  23    Google and Intel about not recruiting from each others'

14:02:35  24    employees, that you would have been aware of that?

14:02:37  25              MR. RUBIN:  Objection.  Argumentative; calls

14:02:39  1    for speculation; lacks foundation based on prior

14:02:42  2    testimony.

14:02:48  3              THE WITNESS:  As I previously said, we set the

14:02:50  4    policy based on what we thought was the right way to

14:02:53  5    treat these partners.  I have no memory of ever

14:02:58  6    discussing Intel's policy.

14:03:00  7    BY MR. HEIMANN:

14:03:01  8         Q.   Did Google tell these companies what Google's

14:03:05  9    policy was?

14:03:06 10         A.   I'm sure I spoke with Paul about this at some

14:03:09 11    point.

14:03:10 12         Q.   And you don't have any recollection of him

14:03:12 13    assuring you that Intel's practices and policies with

14:03:15 14    Google was the same as Google's was to Intel; is that

14:03:20 15    right?

14:03:20 16         A.   That's correct.  It's also -- it's important to

14:03:22 17    understand that it's at -- these situations are

14:03:24 18    asymmetric because at the time in question Google was

14:03:28 19    growing very, very dramatically, and so we were certainly

14:03:34 20    hiring lots of people from the Valley; whereas the other

14:03:36 21    companies might not have been in such a growth phase.  So

14:03:40 22    they're not -- they're not symmetric relationships.

14:03:43 23         Q.   And how does that relate to the question about

14:03:44 24    whether or not the agreements were reciprocal?

14:03:46 25         A.   Well, they don't have to be reciprocal to be

| | | |
|---|---|---|
| 14:03:48 | 1 | the right thing.  We could decide unilaterally to do the |
| 14:03:52 | 2 | right thing. |
| 14:03:52 | 3 | Q.  And not at all be troubled that the other |
| 14:03:54 | 4 | companies might be recruiting your best people right out |
| 14:03:57 | 5 | from under your nose? |
| 14:03:58 | 6 | A.  I think it's highly unlikely that Intel would |
| 14:04:02 | 7 | have recruited any of our best people at the current and |
| 14:04:04 | 8 | periods of time you are discussing. |
| 14:04:06 | 9 | Q.  How about not some of your best people, then? |
| 14:04:08 | 10 | MR. RUBIN:  I'm sorry? |
| 14:04:09 | 11 | BY MR. HEIMANN: |
| 14:04:10 | 12 | Q.  Some of your other people. |
| 14:04:11 | 13 | A.  We would argue that all of our people are our |
| 14:04:13 | 14 | best people. |
| 14:04:14 | 15 | Q.  That's right.  So you think it is likely that |
| 14:04:16 | 16 | they would have been recruiting at all from Google? |
| 14:04:18 | 17 | A.  Well, Google during this period was -- I don't |
| 14:04:21 | 18 | know how to describe it without sounding arrogant, but we |
| 14:04:24 | 19 | were the hottest company in the Valley to work for during |
| 14:04:27 | 20 | this period.  We were winning best places to work for, |
| 14:04:30 | 21 | you know, many, many other aspects. |
| 14:04:32 | 22 | So I think it is a fair characterization that |
| 14:04:36 | 23 | we -- that we would generally win such a competition. |
| 14:04:45 | 24 | Q.  So you are suggesting you didn't need it to be |
| 14:04:47 | 25 | reciprocal because you were such an attractive place to |

14:04:52  1   work; is that fair?

14:04:54  2        A.   Well --

14:04:54  3             MR. RUBIN:  Objection.  Argumentative;

14:04:56  4   mischaracterizes prior testimony.

14:04:57  5             THE WITNESS:  Again, these are your -- your

14:04:58  6   words.  What I would say is that we pride ourselves as

14:05:01  7   being the best place to work and we believe the best

14:05:03  8   people want to work at the best place, and we believe

14:05:06  9   that they should work at Google.  Our position is quite

14:05:09 10   clear.

14:05:10 11   BY MR. HEIMANN:

14:05:10 12        Q.   What is your relationship with Mr. Otellini?

14:05:12 13        A.   I think it's good as personal friends, and

14:05:15 14   she -- and he remains a board member.

14:05:21 15             MR. MITTELSTAEDT:  Remains a what?

14:05:25 16             MS. BROWN:  Board member.

14:05:25 17   BY MR. HEIMANN:

14:05:26 18        Q.   Let's take a look at some documents.  Start

14:05:28 19   with Exhibit 651.

14:06:03 20        A.   Okay.

14:06:03 21        Q.   All right.  Do you recognize this email?

14:06:06 22        A.   No.

14:06:07 23        Q.   All right.  It is an email exchange in May of

14:06:11 24   2006 between yourself and Mr. Otellini at Intel, right?

14:06:15 25        A.   That's correct.

14:06:15   1        Q.    And it begins with an email from Mr. Otellini

14:06:19   2   to you, subject, recruiting, which reads in part, "Sorry

14:06:24   3   to bother you again on this topic, but my guys are very

14:06:28   4   troubled by Google continuing to recruit our key

14:06:32   5   players."

14:06:33   6           And then he -- dropping down to the last

14:06:38   7   sentence in the email, he says, "Can you please reinforce

14:06:41   8   the no-recruiting agreement.  I would appreciate it.

14:06:45   9   Thanks, Paul."

14:06:46  10           Do you see that?

14:06:47  11        A.    I do.

14:06:47  12        Q.    And then you wrote to people at Google,

14:06:53  13   Ms. Brown and Mr. Geshuri, saying, "Can you review?  I

14:06:57  14   thought Intel was on our no-hire list."  Right?

14:07:01  15        A.    I see that.

14:07:02  16        Q.    And then Mr. Geshuri says, "I will investigate

14:07:04  17   and provide a report on this situation."  Right?

14:07:10  18        A.    Yes.

14:07:11  19        Q.    All right.  And you don't recall any of this, I

14:07:13  20   gather.

14:07:13  21        A.    That's correct.

14:07:14  22        Q.    And did you know what agreement Mr. Otellini

14:07:24  23   was talking about at the time?

14:07:25  24        A.    Well, as I said, I don't remember the -- the

14:07:27  25   email, but this would be the do-not-call policy that we

14:07:31 1   had in place.

14:07:33 2         Q.   Which he referred to as an agreement, correct?

14:07:37 3         MR. RUBIN:  Objection.  Calls for speculation;

14:07:41 4   foundation.

14:07:41 5         THE WITNESS:  I didn't write his words.

14:07:42 6   BY MR. HEIMANN:

14:07:43 7         Q.   You need to answer my question.  He called it

14:07:45 8   an agreement in this email, did he not?

14:07:47 9         A.   I observed --

14:07:48 10        MR. RUBIN:  Objection.  Lacks foundation; calls

14:07:48 11  for speculation.

14:07:49 12        THE WITNESS:  I observe he says the words

14:07:50 13  "no-recruiting agreement" in his email.

14:07:53 14        MR. RUBIN:  Just to clarify, an objection by

14:07:56 15  one, I think we have a standing understanding,

14:07:59 16  Mr. Heimann, that an -- an objection by one defendant is

14:08:02 17  incorporated for all defendants.

14:08:05 18        MR. HEIMANN:  I think that has been understood

14:08:07 19  from the beginning.

14:08:08 20        MR. RUBIN:  We hadn't said it on the record

14:08:10 21  today.

14:08:11 22        MR. HEIMANN:  I don't think it's necessary.

14:08:13 23        MR. RUBIN:  I'll take it back.

14:08:31 24  BY MR. HEIMANN:

14:08:32 25        Q.   Let's take a look at Exhibit 458.

14:09:07 1      A.    Okay.

14:09:08 2      Q.    All right.  Sir, this is an internal Intel

14:09:10 3   record.  As far as I know, nobody outside of Intel was

14:09:17 4   involved.  Certainly nobody from Google.

14:09:22 5           But if you'll focus on the email from Gabriel

14:09:26 6   Thompson to Patty Murray and to Paul Otellini at the top

14:09:29 7   of the first page, do you see that?

14:09:31 8      A.    I do.

14:09:32 9      Q.    Do you recognize any of the names, other than

14:09:33 10  Mr. Otellini, by any chance?

14:09:35 11     A.    I do not.

14:09:35 12     Q.    And the subject of that email is, "Global

14:09:40 13  gentleman agreement with Google."  Do you see that?

14:09:43 14     A.    I see it.

14:09:44 15     Q.    And the question that Ms. Thompson posed was,

14:09:48 16  "Are either of you aware of any agreement with Google

14:09:51 17  that prohibits us from recruiting Google's senior

14:09:54 18  talent?"  Do you see that?

14:09:55 19     A.    Uh-huh.

14:09:56 20     Q.    Mr. Otellini responded promptly, saying, "Yes."

14:10:02 21           Do you see that?

14:10:03 22     A.    I do.

14:10:05 23     Q.    And if you'll next go to Exhibit 202, 202

14:10:31 24  reproduces part of the email that I just showed you,

14:10:34 25  including the question being posed by Ms. Thompson, "Are

14:19:19  1   dealing with, did you personally review the public, or

14:19:19  2   did somebody screen those for you?

14:19:26  3        A.   My assistant screened it, and they do that

14:19:28  4   today.  So it is perfectly possible that mail sent to my

14:19:32  5   public address I did not see because my assistants missed

14:19:35  6   it, but I was quite thorough at reading my private

14:19:38  7   emails.  So my presumption is if it's a private email, I

14:19:41  8   did, in fact, read it.

14:19:43  9        Q.   All right.  So -- withdraw that.

14:20:02  10            Now, in his -- I know you're going to be

14:20:05  11   thinking as your counsel, I'm beating a dead horse, but

14:20:08  12   I'm going to have to beat it to death and then some.  In

14:20:11  13   his email to you he talks about a reciprocal

14:20:14  14   understanding.  Do you see that?

14:20:15  15        A.   I see he says, "I think we should have a

14:20:17  16   general understanding that we are not actively recruiting

14:20:20  17   from each other."

14:20:21  18        Q.   All right.  Did you reach such a general

14:20:22  19   understanding with him?

14:20:24  20            MR. RUBIN:  Objection.  Asked and answered.

14:20:25  21            THE WITNESS:  As I've previously said, I have

14:20:27  22   no memory of such an agreement, but it is obvious that

14:20:30  23   we -- we put them on the do-not-call list for a while,

14:20:33  24   from this email.

          25   //

| | |
|---|---|
| 14:20:38 | 1   BY MR. HEIMANN: |
| 14:20:44 | 2        Q.   Do you know how long they remained on the list? |
| 14:20:46 | 3        A.   Well, as I read it, it says they were on for |
| 14:20:49 | 4   two months.  I don't think that they were on very long, |
| 14:20:52 | 5   because eventually our partnerships and plans did not |
| 14:20:56 | 6   come together with Dell.  So it was probably not very |
| 14:21:01 | 7   long. |
| 14:21:38 | 8        Q.   So I know that you're speculating to some |
| 14:21:40 | 9   extent.  You think in all likelihood they came out within |
| 14:21:44 | 10  a reasonably short -- they came off the list within a |
| 14:21:46 | 11  reasonably short period of time? |
| 14:21:49 | 12       A.   Compared to some of the other companies, they |
| 14:21:51 | 13  would have been on the list for a shorter period of time, |
| 14:21:54 | 14  but I could not characterize to you what "shorter" is. |
| 14:22:33 | 15            MR. HEIMANN:  Let me have you take a look next |
| 14:22:36 | 16  at Exhibit 872. |
| 14:22:37 | 17            (Exhibit 872 was marked for identification.) |
| 14:22:37 | 18  BY MR. HEIMANN: |
| 14:23:25 | 19       Q.   Have you had a chance to look at that? |
| 14:23:27 | 20       A.   I have. |
| 14:23:27 | 21       Q.   Do you recall the email at all? |
| 14:23:29 | 22       A.   I don't recall the email, but I recall speaking |
| 14:23:32 | 23  with Meg. |
| 14:23:33 | 24       Q.   So you recall the conversation that is referred |
| 14:23:36 | 25  to in the email; is that fair? |

14:23:38   1        A.   I -- I recall that we had a conversation.  I'm

14:23:40   2   sure this is what I wrote after the conversation.

14:23:43   3        Q.   Okay.  Tell me as best you recall what was said

14:23:46   4   in the conversation with Ms. Whitman.

14:23:48   5        A.   I think the email summarizes the conversations.

14:23:54   6   So that's -- I don't remember the specific subjects.

14:23:58   7   This is as good a memory as we're going to get eight

14:24:00   8   years ago, as I said.

14:24:02   9        Q.   Well, there is a reason for me doing this that

14:24:04  10   may not be clear to you.

14:24:06  11        A.   Okay.

14:24:06  12        Q.   The first question is, can you tell me of your

14:24:08  13   own recollection what was said, and if you can't, you

14:24:10  14   should say, "I don't know what" --

14:24:13  15        A.   I understand.  Again, I'm trying to be helpful

14:24:15  16   here.

14:24:16  17             I recall Meg calling me and complaining about

14:24:19  18   hiring.  I don't recall the specifics of what she said at

14:24:23  19   all.

14:24:24  20        Q.   All right.  Do you -- do you know or do you

14:24:26  21   recall whether eBay -- strike that.

14:24:29  22             Was she calling about eBay as opposed to

14:24:32  23   PayPal?

14:24:37  24             MR. MITTELSTAEDT:  Objection.  Lacks

14:24:37  25   foundation.

Case 5:11-cv-02509-LHK   Document 960-5   Filed 07/11/14   Page 67 of 96


Deposition of Eric Schmidt

In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 14:24:37 | 1 | THE WITNESS:  Because I have had the benefit of |
| 14:24:39 | 2 | reading this email, I now recall that she was |
| 14:24:41 | 3 | particularly incensed that a Google recruiter had called |
| 14:24:45 | 4 | ████████, who was her Number Two at the time. |
| 14:24:48 | 5 | BY MR. HEIMANN: |
| 14:24:49 | 6 | Q.   Okay.  Let me tell you something that I know |
| 14:24:51 | 7 | you know already, but just to be clear. |
| 14:24:53 | 8 | When -- when you -- when your memory gets |
| 14:24:55 | 9 | refreshed from documents, you did the right thing there, |
| 14:25:00 | 10 | tell me what your memory is. |
| 14:25:02 | 11 | A.   All right. |
| 14:25:02 | 12 | Q.   I'm not trying to confine you in unreasonable |
| 14:25:05 | 13 | ways as to how you go about answering these questions. |
| 14:25:08 | 14 | All right.  So the answer is, she was calling |
| 14:25:11 | 15 | in particular about one person who was an eBay employee, |
| 14:25:14 | 16 | if I understood you correctly. |
| 14:25:16 | 17 | A.   Yes.  Again, it is -- there is a couple of |
| 14:25:20 | 18 | things now.  I went to college with Meg.  Our children |
| 14:25:23 | 19 | went to school together.  I have socialized with Meg and |
| 14:25:27 | 20 | her husband.  After we went public, Meg invited me over |
| 14:25:31 | 21 | for a chat to advise me how to become a better public |
| 14:25:36 | 22 | company CEO.  Meg has been very gracious and very helpful |
| 14:25:40 | 23 | to me for many years.  I'm a very big supporter of Meg. |
| 14:25:44 | 24 | So if Meg calls me and she has got a problem, I'm going |
| 14:25:48 | 25 | to pay attention. |

KRAMM COURT REPORTING        *HIGHLY CONFIDENTIAL - For Attorneys' Eyes Only*        Page: 140

14:25:49  1        I don't recall the specifics aside from what

14:25:51  2   has been refreshed by my -- by this, but as I am trying

14:25:55  3   to be helpful and say, I'm sure this is accurately

14:25:57  4   what -- what was said.

14:25:59  5        Q.   So the first point of -- that you recorded of

14:26:03  6   the conversation was, "Google is the talk of the Valley

14:26:07  7   because we are driving salaries up across the board.

14:26:10  8   People are just waiting for us to fail -- or to fall,"

14:26:14  9   sorry, "and get back at us for our," quote, "'unfair,'"

14:26:18 10   close quote, "practices now."

14:26:19 11        Does that refresh your memory to any further

14:26:22 12   extent of what she said in regards to that aspect of

14:26:25 13   the --

14:26:26 14        A.   Same answer.

14:26:28 15        Q.   "Our recruiting practices" -- continuing on in

14:26:36 16   the email, "Our recruiting practices are," quote, "'zero

14:26:39 17   sum,' and it appears that somewhere in Google we are

14:26:41 18   targeting eBay to," quote, "'hurt them,'" close quote,

14:26:45 19   "and it's the reputation that we are doing this against

14:26:48 20   Yahoo, eBay, and MSFT," meaning Microsoft, and then in

14:26:55 21   paren, "(I denied this)."

14:26:58 22        I gather the parenthetical is your response to

14:27:00 23   her statement?

14:27:00 24        A.   Again, I'm writing down -- I'm very good about

14:27:04 25   these things.  She calls with a complaint, I write down

14:27:07 1    what she said, and then I give direction at what to do.

14:27:11 2            In this case, because number two, I was quite

14:27:14 3    sure was not true, I would have said to her, "I denied

14:27:18 4    this," and I noted this for the record, within Google.

14:27:21 5        Q.    All right.  What did you understand, if you

14:27:24 6    did, the reference to "zero sum" to mean?

14:27:28 7        A.    I don't recall the context in which she -- she

14:27:32 8    mentioned it.  That -- these are Meg's thoughts, not

14:27:36 9    mine.  I'm trying to channel them accurately in the

14:27:39 10   email, so -- again, it is helpful to remember that Google

14:27:47 11   has been public for a year.  Google is growing very

14:27:50 12   rapidly.  Google is the best place to work in the Valley.

14:27:55 13   There is all this press about Google taking over the

14:27:58 14   world, and it is clearly having an impact on partners,

14:28:01 15   competitors, and what have you, and that is the context

14:28:03 16   in which she probably had this feeling.

14:28:08 17       Q.    Was part of the reason -- well, let me withdraw

14:28:11 18   that.

14:28:11 19           Was the assertion that Google's recruiting

14:28:16 20   activities or hiring activities were having an impact on

14:28:20 21   salaries in the Valley an accurate one, from your point

14:28:23 22   of view?

14:28:25 23           MR. RUBIN:  Objection.  Lacks foundation; calls

14:28:26 24   for speculation.

14:28:29 25           THE WITNESS:  I don't know.  Because our

| | |
|---|---|
| 14:28:33 1 | ██████████████████████████████ |
| 14:28:39 2 | ██████████████████████████████ |
| 14:28:43 3 | ██████████████████████████ |
| 14:28:47 4 | ██████████████████████████████ |
| 14:28:51 5 | BY MR. HEIMANN: |
| 14:28:51 6 | Q.   Well, it depends on the point in time, right? |
| 14:28:54 7 | A.   I can assure you during this period of time it |
| 14:28:56 8 | was the correct behavior.  As to whether people did it, I |
| 14:28:59 9 | don't know.  ██████████████████████████ |
| 14:29:02 10 | ██████ |
| 14:29:02 11 | Q.   I wish I had. |
| 14:29:06 12 | But let me come back to the point.  She |
| 14:29:09 13 | apparently is making the point to you that at least from |
| 14:29:12 14 | her perspective, salaries across the board in the Valley, |
| 14:29:17 15 | and I assume that's referring to the Silicon Valley, are |
| 14:29:20 16 | being driven up. |
| 14:29:21 17 | A.   Yes.  That would be -- that would have been her |
| 14:29:22 18 | point. |
| 14:29:23 19 | Q.   And did you have a view on that at the time? |
| 14:29:25 20 | MR. RUBIN:  Objection.  Asked and answered. |
| 14:29:26 21 | THE WITNESS:  As I said, I don't recall my |
| 14:29:27 22 | response on this. |
| 14:29:28 23 | BY MR. HEIMANN: |
| 14:29:30 24 | Q.   Well, when you say "response," I'm not really |
| 14:29:32 25 | asking -- |

14:29:33  1        A.   Response to her.

14:29:34  2        Q.   Yes, I understand.  But I'm asking a different

14:29:35  3   question.

14:29:36  4             Did you have a view as to whether or not that

14:29:37  5   was an accurate assessment as to what was going on?

14:29:40  6             MR. RUBIN:  Same objection.  Asked and

14:29:41  7   answered.

14:29:42  8             THE WITNESS:  So as best I can recall in 2005,

14:29:47  9   I would say that we were driving compensation up, but not

14:29:51 10   salaries.

14:29:52 11             (Exhibit 873 was marked for identification.)

14:29:53 12   BY MR. HEIMANN:

14:30:16 13        Q.   Let's take a look next at Exhibit 873.

14:30:36 14        A.   Okay.

14:30:36 15        Q.   This is an email a few days later from yourself

14:30:38 16   to Mr. Campbell and Arnnon, again about -- in this case,

14:30:47 17   eBay, PayPal, and Meg.

14:30:53 18        A.   I see.

14:30:54 19        Q.   Do you recall the circumstances surrounding

14:30:56 20   your creation of this email?

14:30:57 21        A.   I do not.

14:31:00 22        Q.   Okay.

14:31:01 23        A.   Let me observe that this is four days after

14:31:03 24   the -- the previous email.

14:31:04 25        Q.   Yes.  You begin this email by saying, "My

| | | |
|---|---|---|
| 14:31:11 | 1 | summary on eBay is that the situation is bad and we can |
| 14:31:13 | 2 | improve it with some simple steps.  Nevertheless, we need |
| 14:31:17 | 3 | to be very, very careful with the statements we make and |
| 14:31:20 | 4 | the actions of our recruiters." |
| 14:31:27 | 5 | Was the -- the situation with eBay that you |
| 14:31:29 | 6 | described as "bad" the result of Google's recruiting |
| 14:31:34 | 7 | employees out of eBay? |
| 14:31:36 | 8 | MR. RUBIN:  Objection.  Lacks foundation. |
| 14:31:39 | 9 | THE WITNESS:  I'm going to -- again, I don't |
| 14:31:42 | 10 | recall the specifics.  I'm going to assume that this |
| 14:31:44 | 11 | is the -- this mail is simply a follow-up to the first |
| 14:31:47 | 12 | one, and it refers to the set of issues that are relayed |
| 14:31:53 | 13 | in the first email. |
| 14:31:53 | 14 | BY MR. HEIMANN: |
| 14:32:01 | 15 | Q.  Okay. |
| 14:32:02 | 16 | A.  So when I say the situation is bad, it doesn't |
| 14:32:03 | 17 | necessarily mean that it is factually bad on our side. |
| 14:32:06 | 18 | It's perceptions drive behavior.  We have a very |
| 14:32:10 | 19 | important partner who is very upset.  As I said, we had a |
| 14:32:14 | 20 | rough call from a good friend.  So -- |
| 14:32:24 | 21 | Q.  Down under paragraph (3) in this Exhibit 873 |
| 14:32:29 | 22 | you refer to an "internal complaint about us within |
| 14:32:31 | 23 | PayPal." |
| 14:32:35 | 24 | A.  I see this. |
| 14:32:36 | 25 | Q.  That appears to be distinct from the eBay |

15:22:07  1    would have lists similar to Google's list?

15:22:12  2         A.   I never thought about it.

15:22:14  3         Q.   Never crossed your mind?

15:22:15  4         A.   No.  It is not my problem.  They're -- we try

15:22:22  5    to run our own company, not somebody else's.  So --

15:22:27  6         Q.   Well --

15:22:36  7         A.   It is just the back division.

15:22:39  8         Q.   Did you think that Google was unique in the

15:22:42  9    Valley having a list of this sort?

15:22:47 10         A.   As I said, I didn't really think about it.

15:22:51 11    Because of the unique situation that was -- Google was

15:22:53 12    in, it would be perfectly reasonable from my perspective

15:22:59 13    that such lists did not exist or they had fell -- that

15:23:02 14    they had fallen off to the wayside, or what have you.

15:23:05 15         Q.   And why is that?

15:23:06 16         A.   Because as I indicated, during this period

15:23:09 17    Google was unusually favorable in terms of recruiting

15:23:11 18    talent, growth, press, great place to work.  We were in

15:23:15 19    our golden period, if you will.

15:23:26 20         Q.   And how does that relate to the notion of

15:23:29 21    thinking that Google was unique in having this list and

15:23:32 22    not knowing about any other companies similarly situated,

15:23:35 23    or being similarly situated?

15:23:40 24         A.   Again, your question implies that I should have

15:23:43 25    been thinking about other companies.

15:23:44  1      Q.   No.  No.  No.  My question doesn't imply

15:23:47  2   anything.

15:23:47  3      A.   No, no, but the -- the reasoning in the

15:23:49  4   question implies that.  But I -- I made a point of not

15:23:51  5   thinking about other companies.  I made a point of

15:23:53  6   thinking about Google.

15:24:04  7      Q.   How would you describe your relationship with

15:24:06  8   Mr. Jobs?

15:24:07  9      A.   Complicated.  And -- and again, as I said, his

15:24:13 10   death was very tragic for all of us, and I considered him

15:24:16 11   a good friend.

15:24:18 12      Q.   And how often did you, in the time period we're

15:24:22 13   talking about, interact with him, either face-to-face or

15:24:26 14   otherwise?

15:24:27 15      A.   Well, in the -- while I was on the board it was

15:24:30 16   relatively frequently, for a board member.  But it was

15:24:34 17   also not more frequently, because I would recuse myself

15:24:38 18   from Google Apple issues.  So for example, if there was a

15:24:42 19   Google problem, Steve would be forced to call Alan and

15:24:45 20   not me, because I had a two-hat problem.  And obviously I

15:24:49 21   knew him socially and a little bit before, and I also saw

15:24:52 22   him after I left the board as he became more ill.

15:24:55 23           So some -- you know, once a month kind of

15:24:58 24   frequencies.  Not weekly, but not yearly, if that's

15:25:03 25   helpful.

15:25:04   1        Q.    Did you ever have occasion to talk with him

15:25:06   2   about his views regarding companies recruiting from each

15:25:14   3   other in the Valley?

15:25:15   4        A.    Well, I knew his view.

15:25:17   5        Q.    Which was?

15:25:17   6        A.    Which was that when you're in a partnership,

15:25:19   7   you shouldn't do it.

15:25:21   8        Q.    What do you mean by "partnership" now in that?

15:25:23   9             MR. RUBIN:  Well, objection.  Lacks foundation.

15:25:27  10             THE WITNESS:  Again, I was trying -- I was

15:25:28  11   trying to give you the context that because we were

15:25:30  12   working together, it was inappropriate in his view for us

15:25:34  13   to be calling in and hiring people.  And -- and he would

15:25:40  14   express this in unique Steve Jobs style.

15:25:44  15   BY MR. HEIMANN:

15:25:45  16        Q.    Which was?

15:25:45  17        A.    Loud.  But a -- but a fair reading of Steve is

15:25:49  18   he believed, for better or worse, that the world was a

15:25:55  19   better place when you had a partnership, a collaboration,

15:25:58  20   working together, whatever words you want to use, he

15:26:01  21   believed that you should not be hiring each others', you

15:26:05  22   know, technical people, and then cross-fertilizing all

15:26:08  23   that knowledge.

15:26:09  24             And I always believed, and I'll -- rather than

15:26:13  25   explaining I'll say what I believe -- because -- because

| | | |
|---|---|---|
| 15:26:15 | 1 | Apple is so focused on unique intellectual property, it |
| 15:26:19 | 2 | was -- it was my belief and is my belief, that Apple |
| 15:26:22 | 3 | believed that if employees left, they would take some of |
| 15:26:27 | 4 | that unique intellectual property in their heads with |
| 15:26:29 | 5 | them.  That is my opinion. |
| 15:26:31 | 6 | That's -- that may or may not be what he |
| 15:26:33 | 7 | thought, but that's what I thought he thought. |
| 15:26:36 | 8 | Q.   Now, I know we've covered some of this before, |
| 15:26:38 | 9 | but I want to make sure I understand. |
| 15:26:40 | 10 | Was your understanding of Jobs' position that |
| 15:26:43 | 11 | any company that Apple was friendly with in the way that |
| 15:26:46 | 12 | you described it earlier would have fallen into this |
| 15:26:49 | 13 | category of companies you shouldn't be recruiting from? |
| 15:26:52 | 14 | MR. RUBIN:  Objection.  Misstates prior |
| 15:26:53 | 15 | testimony. |
| 15:26:55 | 16 | THE WITNESS:  I -- I never asked myself the |
| 15:26:58 | 17 | question of Steve's general view.  But it's fair to |
| 15:27:02 | 18 | extrapolate that if you had partnerships working together |
| 15:27:06 | 19 | in different kinds of relationships, he would have |
| 15:27:09 | 20 | extended that to others.  I notice with some humor that |
| 15:27:12 | 21 | we have such a list, from the words of their company, |
| 15:27:15 | 22 | which they list as Adobe, Garmin, Google, Intuit, |
| 15:27:19 | 23 | Microsoft Mac Division, and Nvidia, all of whom Apple had |
| 15:27:24 | 24 | effective partnerships with of one kind or another. |
| | 25 | // |

Deposition of Eric Schmidt                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
15:27:27  1   BY MR. HEIMANN:
15:27:28  2        Q.   But those are not the only companies on the
15:27:30  3   list, right?
15:27:30  4        A.   I'm just -- I'm just -- this is their list.  I
15:27:32  5   can't -- I didn't write this list.  This is their
15:27:34  6   opinion.
15:27:34  7        Q.   I know, but since you're expressing an opinion
15:27:36  8   on part of it, I'm asking you about the others as well.
15:27:40  9             There are others that don't have any such
15:27:41 10   explanation for them, right?
15:27:43 11        A.   Which ones?
15:27:45 12        Q.   Tech Data.
15:27:47 13        A.   Oh, there is a second list.
15:27:53 14        Q.   Longer than the first list, right?
15:27:56 15        A.   Well, again, reading the email without judging
15:28:00 16   whether they should be on the list or not, Best Buy is
15:28:02 17   their largest distributor, Fry's is their large
15:28:06 18   distributor.  Art is on the board of Genentech.
15:28:09 19   Imagination, Ingram Micro, that is a distributor.  JCrew,
15:28:14 20   board member.  Mac Zone, distributor; Microsoft - Mac
15:28:18 21   Division, major partner; Nvidia, partner; PC connection,
15:28:22 22   PC Mall, distributors; Pixar, Steve's on the board of
15:28:25 23   Pixar; Tech Data, distributor; Zones, I assume that is a
15:28:30 24   distributor.
15:28:30 25             That is how I would read that message, if I
```

Deposition of Eric Schmidt                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

15:28:33  1    were internal to Apple.

15:28:43  2         Q.   What would be the reason for Lucasfilm to be on

15:28:46  3    their no-call list?

15:28:48  4         A.   As I indicated, I believe Steve was on the

15:28:51  5    board of Lucasfilm and I --

15:28:53  6         Q.   You said Pixar a moment ago.  You may be right.

15:28:56  7    I don't know.

15:28:57  8         A.   Well, you have Lucas -- I'm sorry.  Did I

15:29:01  9    misspeak?

15:29:03 10         Q.   No.  Pixar is on the list.

15:29:05 11         A.   Pixar is on the list.  Okay.  Lucasfilm, no, I

15:29:09 12    don't know.  I don't know that Steve was involved with

15:29:13 13    Lucasfilm.  Maybe he was.

15:29:14 14              MR. HEIMANN:  I'm told we are almost out of

15:29:16 15    tape, so why don't we take a short break.

15:29:18 16              THE VIDEOGRAPHER:  This is the end of Video

15:29:20 17    No. 2.  We're now off the record at 3:29.

15:29:22 18              (Recess was taken.)

15:31:04 19              THE VIDEOGRAPHER:  We are now on the record at

15:31:05 20    3:31.  This is the beginning of Video No. 3.

15:31:08 21    BY MR. HEIMANN:

15:31:09 22         Q.   Is it fair to say that Mr. Jobs made his views

15:31:11 23    that we've been talking about widely known within the

15:31:14 24    Valley?

15:31:15 25              MR. RUBIN:  Objection.  Vague.

| | | |
|---|---|---|
| 15:31:18 | 1 | THE WITNESS:  I don't know that. |
| 15:31:20 | 2 | BY MR. HEIMANN: |
| 15:31:21 | 3 | Q.   Well, surely you weren't the only person that |
| 15:31:23 | 4 | was familiar with his views in that regard, were you? |
| 15:31:27 | 5 | MR. RUBIN:  Objection.  Calls for speculation. |
| 15:31:28 | 6 | THE WITNESS:  As I said, I don't have any -- I |
| 15:31:30 | 7 | don't have any independent knowledge of that.  I think it |
| 15:31:32 | 8 | is a reasonable presumption, given Steve's propensity for |
| 15:31:36 | 9 | making his point known, but I don't have any independent |
| 15:31:40 | 10 | knowledge of that. |
| 15:31:40 | 11 | BY MR. HEIMANN: |
| 15:31:41 | 12 | Q.   Do you recall discussing his views with others |
| 15:31:42 | 13 | in the Valley? |
| 15:31:44 | 14 | A.   I certainly discussed it with Google people and |
| 15:31:46 | 15 | Bill Campbell, but not others. |
| 15:31:53 | 16 | Q.   When you communicated with Mr. Jobs by email, |
| 15:31:55 | 17 | did he have more than one email that you used for him? |
| 15:32:00 | 18 | A.   I believe only one, sjobs@apple.com. |
| 15:32:05 | 19 | Q.   Let me ask you to look at Exhibit 448. |
| 15:32:26 | 20 | So this exhibit consists of a declaration from |
| 15:32:29 | 21 | Mr. Edward Colligan, and then an attachment which is in |
| 15:32:33 | 22 | the form of an email exchange.  Actually two emails. |
| 15:33:14 | 23 | A.   Okay. |
| 15:33:14 | 24 | Q.   Have you seen this material before? |
| 15:33:16 | 25 | A.   I have not. |

15:33:18  1      Q.   Do you know who Mr. Korrigan (sic) is?

15:33:20  2      A.   Colligan.

15:33:23  3      Q.   Colligan, I'm sorry.

15:33:24  4      A.   I know who he is.

15:33:27  5      Q.   Are you acquainted with him personally?

15:33:29  6      A.   I don't believe I've ever met him.  I may have

15:33:30  7  met him, but I don't remember what he looks like.

15:33:31  8      Q.   Did you have any knowledge of the exchange that

15:33:33  9  he describes in his declaration at the time, or at or

15:33:36 10  about the time it took place?

15:33:40 11      A.   No.

15:33:45 12      Q.   Were you aware that Mr. Jobs had approached

15:33:48 13  companies in the Valley seeking agreements that each

15:33:53 14  company not recruit from the other?

15:33:55 15           MR. RUBIN:  Objection.  Lacks foundation; asked

15:33:59 16  and answered.

15:33:59 17           THE WITNESS:  As I indicated, I was not

15:34:01 18  aware -- I was not aware of Steve's activities outside of

15:34:04 19  Google in this regard.

15:34:05 20  BY MR. HEIMANN:

15:34:19 21      Q.   Let me ask you to take a look at Exhibit 449.

15:34:28 22      A.   Is this something that would have gone to -- is

15:34:30 23  this part of the current trial?

15:34:32 24           MR. RUBIN:  This is a declaration he made in

15:34:33 25  the current trial.

15:37:45  1    what he was upset about, but it must have been this.

15:37:48  2    BY MR. HEIMANN:

15:37:48  3        Q.   How did you know he was upset about Rubinstein?

15:37:51  4        A.   I recall Steve mentioning it in one of his

15:37:54  5    discussions, but I don't remember discussing Palm.  So --

15:38:00  6        Q.   All right.

15:38:04  7        A.   Ah, okay.  Dan Lyons was the creator of "The

15:38:08  8    Secret Diary of Steve Jobs."  Now we know who he is.

15:38:12  9    Yes.  He wrote a satire of Steve, Dan Lyons, the author

15:38:19 10    of this document.  It is quite entertaining.  I have a

15:38:22 11    code name in "The Secret Diary of Steve Jobs."  So --

15:38:26 12        Q.   You have a code name?

15:38:27 13        A.   Yes.  I don't remember what it was.  But I

15:38:28 14    remember --

15:38:29 15        Q.   I was going to ask you for it.

15:38:30 16        A.   It is quite entertaining, so you should -- you

15:38:34 17    should take a look at it when you get a chance.

15:38:36 18        Q.   All right.  Okay.  I'm going to switch topics

15:38:39 19    again.

15:38:42 20             At some point did Facebook become a problem or

15:38:47 21    a concern for Google in connection with retaining

15:38:50 22    employees at Google?

15:38:52 23        A.   It did.

15:38:53 24        Q.   And can you tell us when that happened or when

15:38:55 25    it began?

15:39:00  1      A.   I won't get the dates right.  But somewhere

15:39:03  2    around 2008 or 2009 Facebook began -- Facebook hired

15:39:11  3    Sheryl Sandberg, who -- in perhaps 2006 or 2007, maybe

15:39:17  4    2007, and Sheryl had built our recruiting organization,

15:39:22  5    was an excellent recruiter, and as she went over to

15:39:25  6    Facebook, many people left Google to work for her in jobs

15:39:30  7    which they perceived as promotions.

15:39:33  8           There were also a number of engineering leaders

15:39:36  9    who also went to Facebook, and it became -- and it was

15:39:40 10    pretty clear that Facebook's management structure was

15:39:44 11    being built out of executives coming out of Google, which

15:39:47 12    is now a public company, Facebook was a private company.

15:40:02 13      Q.   So how did Google respond?

15:40:04 14      A.   Well, we had a series of internal discussions

15:40:06 15    or arguments about what to do, and we -- I remember

15:40:10 16    distinctly having the conversation about -- given that

15:40:16 17    they were playing by a different set of rules, because

15:40:19 18    they were offering equivalent salaries, but stock that in

15:40:26 19    theory would be worth a great deal of money, they could

15:40:29 20    make an offer to somebody and tell them it's going to be

15:40:32 21    worth X million dollars.

15:40:34 22           And so I remember a series of conversations,

15:40:37 23    which went something like this, what are we willing to do

15:40:42 24    to counter these offers?  And we concluded that we should

15:40:45 25    ████████████████████████████████████████████████

Deposition of Eric Schmidt                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
15:40:51  1  ███████████████████████
15:40:53  2       ███████████████████████████████████
15:40:56  3  █████████████████████████████████████
15:41:01  4  ████████████████████████████
15:41:03  5       Q.   And who all was involved in the conversations
15:41:07  6  about the strategy or tactics to deal.
15:41:09  7                 With the problem?
15:41:11  8       A.   █████████████████████████
15:41:13  9  ██████████████████████████████████████
15:41:18 10  ██████████████████████████████████████
15:41:21 11  ████████████████████████████████
15:41:26 12  █████████████████████████████████
15:41:29 13  ███████████████████
15:41:32 14       ██████████████████████████████████████
15:41:36 15  ██████████████████████████████
15:41:42 16  ███████████████████████████████████████
15:41:45 17  ███████████████████████████████
15:41:48 18  █████████████████████████████
15:41:52 19       Q.   Was Bill Campbell involved in the discussions?
15:41:56 20       A.   ██████████████████████████████████████
15:41:58 21  █████████████    ████████████████████████
15:42:02 22  █████████
15:42:09 23       Q.   Let me ask you to take a look at Exhibit 660.
15:42:48 24       A.   Okay.
15:42:49 25       Q.   First of all, do you recognize this email
```

15:42:51  1    exchange?

15:42:53  2         A.    Not really.

15:42:54  3         Q.    But is it part of the conversation that you

15:42:58  4    just described in general terms?

15:42:59  5         A.    Yes.  This would be an example of this

15:43:02  6    conversation.

15:43:15  7         Q.    And the principal email here is from Mr. Brin

15:43:18  8    to the management committee and to Marissa Mayer, it

15:43:23  9    appears to be, correct?

15:43:24 10         A.    That's correct.

15:43:25 11         Q.    And who was Ms. Mayer at the time?

15:43:27 12         A.    So Marissa, who is now the CEO of Yahoo, was an

15:43:31 13    important early executive and worked for Jonathan running

15:43:34 14    many of the client groups.  Sergey and Marissa had a very

15:43:39 15    good working relationship, and I'm sure that he copied

15:43:42 16    her because she was involved in the conversation with

15:43:43 17    him.

15:43:44 18         Q.    And as this email indicates, at least in part,

15:43:47 19    this was a time by which Facebook was posing a concern

15:43:53 20    for Google in terms of recruiting Google employees into

15:43:58 21    Facebook; is that right?

15:44:00 22         A.    That's correct.

15:44:00 23         Q.    And if we go to Exhibit 608 --

15:44:36 24         A.    Okay.

15:44:36 25         Q.    -- is this more of the same in terms of the

16:15:05  1   amount, but there are a steady stream of people applying.

16:15:08  2   We are being very strict on the Google non-solicit.  If

16:15:12  3   you hear of any violation of the non-solicit agreement,

16:15:16  4   please let me know, and we will look into it

16:15:19  5   immediately."

16:15:20  6          Now, I'll ask you again, did Google and

16:15:23  7   Facebook reach a non-solicit agreement between

16:15:26  8   themselves?

16:15:28  9          MR. RUBIN:  Objection.  Lacks foundation.

16:15:29 10          THE WITNESS:  As I've indicated before, to my

16:15:31 11   knowledge, there -- there was not, is not, and was never

16:15:36 12   a non-solicit agreement.  I do not know what she is

16:15:39 13   referring to there.

16:15:39 14   BY MR. HEIMANN:

16:15:41 15      Q.   Well, Mr. Rosenberg seemed to know.  He

16:15:44 16   responded, "My personal opinion is that I think you are

16:15:46 17   putting too much weight in your view of the notion of

16:15:49 18   non-soliciting, as though soliciting in itself is the

16:15:53 19   only thing that upsets people.  Rather, it is the outcome

16:15:56 20   of people going from one company to the other which is

16:15:59 21   problematic."

16:16:00 22          Do you see that?

16:16:03 23          MR. MITTELSTAEDT:  Object.  Argumentative.

16:16:04 24          THE WITNESS:  Again --

16:16:05 25          MR. RUBIN:  Same objection as before.  Lacks

16:16:07  1   foundation; asked and answered.

16:16:08  2              THE WITNESS:  You know, you are asking me to --

16:16:10  3   to parse a private conversation between Jonathan and

16:16:12  4   Sheryl.  I think you should just ask them.

16:16:17  5   BY MR. HEIMANN:

16:16:17  6      Q.   Well, we'll get to that, but I'm trying to find

16:16:20  7   out what your understanding and knowledge is of the

16:16:22  8   topic.

16:16:23  9              MR. RUBIN:  But he's not on the email.  So this

16:16:25 10   is really --

16:16:26 11              THE WITNESS:  But I have --

16:16:28 12              MR. RUBIN:  Beyond the witness' knowledge.

16:16:29 13              THE WITNESS:  I have answered your question

16:16:30 14   clearly.

16:16:31 15   BY MR. HEIMANN:

16:16:32 16      Q.   Okay.

16:16:32 17      A.   This is Jonathan complaining to Sheryl, and

16:16:35 18   there is no non-solicit agreement between the two

16:16:40 19   companies, to my knowledge.

16:16:45 20      Q.   Okay.  Let me ask you to take a look next at

16:18:04 21   Exhibit 674.

16:18:20 22              So we have now moved well forward in time.

16:18:23 23   This is in 2010.

16:18:28 24      A.   Okay.

16:18:29 25      Q.   I want to focus your attention, if I can, on

Deposition of Eric Schmidt                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

16:18:31  1    the email that is from Patrick Pichette to Shona Brown

16:18:40  2    and yourself, with a copy to Mr. Campbell.

16:18:42  3        A.   Yes.

16:18:42  4        Q.   And who was Mr. Pichette at the time?

16:18:46  5        A.   He was and is the chief financial officer of

16:18:48  6    the company.

16:18:49  7        Q.   All right.  And he is -- addresses a number of

16:18:53  8    topics in this email.  By the way, do you remember this

16:18:57  9    email, by any chance?  It is a little more current than

16:19:00 10    the stuff I've been showing you up to now.

16:19:04 11        A.   No.  I do not.

16:19:05 12        Q.   All right.  Paragraph 3 over on the second

16:19:07 13    page, involves, as he says it, "I wish to comment on the

16:19:14 14    VP/director issue.  Shona -- and we have discussed this

16:19:20 15    and she knows I have a somewhat different approach on

16:19:23 16    this topic."

16:19:24 17             Do you recall that issue at the time?

16:19:26 18        A.   I'm sorry.  Can you tell me which paragraph I'm

16:19:28 19    looking at?

16:19:29 20        Q.   Yes, it is in the second page of the email

16:19:30 21    exchange.

16:19:30 22        A.   Oh, I see it.  Okay.  I'm sorry.  Ask your

16:19:32 23    question again.  Sorry.

16:19:33 24        Q.   Yes.  Well, first of all, you'll see the topic

16:19:34 25    he is addressing in this portion of the email is the

16:19:37  1    VP/director issue, as he puts it.  Why don't you take a

16:19:42  2    moment to read through the substance there before I ask

16:19:45  3    you any more.

16:19:51  4         A.   Okay.

16:19:52  5         Q.   Do you recall what the VP/director issue was at

16:19:54  6    the time?

16:19:57  7         A.   I don't, but I can infer -- infer what it is

16:20:03  8    from the -- okay.  Anyway --

16:20:14  9         Q.   All right.

16:20:14 10         A.   I don't specifically know what he meant by

16:20:17 11    VP/director issue.

16:20:18 12         Q.   I think it will become apparent when we focus

16:20:20 13    on some of the text here.  The second bullet point reads,

16:20:23 14    ███████████████████████████████████████████████████████

16:20:27 15    █████████████    ████████████████████████████████████

16:20:29 16    ████████████████████████████████████████████████████

16:20:34 17    ████████████████████████████████████████████████████

16:20:37 18    ██████████████████

16:20:39 19              First of all, do you understand what he's

16:20:40 20    talking about there when he █████████████████████████████

16:20:44 21    ██████████████████

16:20:45 22         A.   I do.

16:20:46 23         Q.   What is that?

16:20:47 24         A.   ████████████████████████████████████████████

16:20:49 25    ██████████████████████████████████████████████████████

16:20:53   1    so I enforce that.

16:20:55   2    

16:20:58   3

16:21:02   4

16:21:04   5

16:21:08   6

16:21:11   7

16:21:12   8

16:21:15   9

16:21:18  10

16:21:22  11

16:21:26  12

16:21:29  13          Q.   Have you changed your mind?

16:21:30  14          A.   No.

16:21:31  15          Q.   He goes on to say, skipping some of this, "What

16:21:34  16    matters is internal equity, not titles."  What is your

16:21:38  17    understanding of that?  Meaning, what is your

16:21:43  18    understanding of what he is saying there?

16:21:54  19          A.   I -- I can tell you how I would interpret that

16:21:56  20    paragraph.  I would interpret that that as long as the

16:21:59  21    people are correctly understood -- sorry.

16:22:01  22

16:22:03  23

16:22:05  24

16:22:09  25

Deposition of Eric Schmidt                                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
16:22:11  1  ████████████████████████████████████████████
16:22:14  2  ██████████████████████████████████████
16:22:18  3  ██████████████
16:22:19  4          So the way you solve this problem is you have
16:22:21  5  them have internal equity, that is they are in the same
16:22:25  6  salary range, ████████████████████████
16:22:28  7  █████████████████████████████████████████████
16:22:30  8  ███████████  ██████   ████████████████████████
16:22:34  9  ██████████████████████████████████████
16:22:36 10  ███████████████████████████████████████████
16:22:39 11  ████████████████████████████████   █████████████
16:22:43 12  ████████████████████████████
16:22:44 13          Q.   Okay.  And do you -- what is the reference to
16:22:47 14  internal equity, or did you already --
16:22:49 15          A.   I read that as internal equity between
16:22:52 16  different -- dissimilar functions.
16:22:54 17          Q.   Okay.
16:22:54 18          A.   So internal equity meaning an engineering
16:22:57 19  executive needs to be ranked against a sales executive.
16:23:01 20  So how do you rank them?  Which one is more important?
16:23:04 21  How do you deal with their comp?  It is a classic HR
16:23:15 22  ranking problem.
16:23:34 23          Q.   What was the big bang?
16:23:42 24          A.   I believe --
16:23:42 25          Q.   Not the universal big bang.
```

16:23:44  1        A.   I believe the big bang refers to a combination

16:23:48  2    of salary increases and -- and stock increases that were

16:23:51  3    coincident after the stock market crash of 2008.

16:23:59  4        Q.   I'm sorry.  The last part of the question --

16:24:01  5        A.   So the stock market crashed in 2008.  Our stock

16:24:04  6    fell to $260.  We, and in particular I, drove a process

16:24:11  7    to do a stock repricing and compensation look during that

16:24:14  8    period, which I believe is what you're referring to by

16:24:16  9    the big bang.

16:24:17 10        Q.   What was the period, then, that the big bang

16:24:20 11    was put into effect?

16:24:21 12        A.   You'd have to show me the emails to get the

16:24:23 13    dates, but it is after the stock market crashed.

16:24:26 14        Q.   Well --

16:24:29 15        A.   My recollection is roughly the fall of 2008 and

16:24:32 16    past that.

16:24:52 17        Q.   Let me see if I have documents to deal with

16:24:54 18    this.  If I told you I think it is 2010, would I be way

16:25:01 19    off the mark?

16:25:07 20        A.   I may be confusing the stock market repricing

16:25:10 21    and then a subsequent salary increase, which is why

16:25:11 22    wanted to get the precise dates.  I could summarize in

16:25:15 23    general, if that would be helpful.

16:25:17 24        Q.   I'm thinking about, to try and shorten this up

16:25:19 25    a little bit -- what I recall was something like a 10

Deposition of Eric Schmidt                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

16:28:53  1    needed to increase our cash compensation, this has

16:28:57  2    ███████████████████████████████████████

16:29:00  3    ████████████████████████████████████████████

16:29:03  4    ██████████████████████████████████████

16:29:07  5         Q.   So I'm fascinated by that.  You have some of

16:29:10  6    the smartest people on the planet.  In fact you've made

16:29:13  7    every effort to hire --

16:29:13  8         A.   Yes.

16:29:13  9         Q.   -- very smart people.  How do they not get it?

16:29:16 10         A.   Because it involves financial judgment which

16:29:19 11    they are not trained for.  They don't understand

16:29:21 12    Black-Scholes algorithm.  They didn't do MBA and finance.

16:29:26 13    They don't have Ph.D.s in financial accounting.  They are

16:29:29 14    engineers.  They're very, very intelligent people.  But

16:29:32 15    in any case, I'm simply representing Laszlo's position.

16:29:36 16    Laszlo showed up with this analysis, which you can see

16:29:40 17    summarized here, and based on his detailed analysis, the

16:29:43 18    summary as we eventually did it.

16:29:46 19         Q.   Was the stock repricing in part intended to

16:29:49 20    meet the Facebook concern, for example?

16:29:52 21         A.   Not really.  ████████████████████████

16:29:57 22    ██████████████████████████████████████████████

16:30:02 23    █████████████    ████████████████████

16:30:08 24    ██████████████████████████████████████████████

16:30:12 25    ███████████████    █████████████████    ██████████

Deposition of Eric Schmidt                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

16:30:15   1   ███████████████████████████   ████████████

16:30:18   2   ██████████████████████   ███████████████

16:30:23   3   ██████████████████████████

16:30:28   4        Q.   So, now focusing briefly on this email from

16:30:36   5   Prasad Setty to yourself --

16:30:38   6        A.   Yes.

16:30:38   7        Q.   -- and others; who was Mr. Setty at the time?

16:30:40   8        A.   Prasad is the analyst who worked for Laszlo,

16:30:44   9   who did all the financial modeling around compensation.

16:30:48  10   So he would be a true financial expert over compensation.

16:30:52  11        Q.   And focusing on paragraph 5 at page 2, "What

16:30:57  12   impact will this have on the Valley," are you with me?

16:31:01  13        A.   I see it.

16:31:02  14        Q.   The first point that he makes there is, "May

16:31:04  15   put pressure on pay for coveted technical jobs and

16:31:07  16   increased pay systematically for these jobs."  Do you see

16:31:11  17   that?

16:31:11  18        A.   I do.

16:31:12  19        Q.   Was that a subject of discussion that you

16:31:14  20   recalled at the time?

16:31:14  21        A.   I'm sure we talked about it.

16:31:16  22        Q.   In any event did it have that effect?

16:31:22  23        A.   I'm sure it did.

16:31:34  24        Q.   Let me ask you to take a look at Exhibit 621.

16:31:39  25   We are in the home stretch, for anybody who cares.

| | | |
|---|---|---|
| 16:31:42 | 1 | MR. RUBIN:  Like ten minutes? |
| 16:31:50 | 2 | MR. HEIMANN:  No.  You'll need a restroom break |
| 16:31:52 | 3 | to be sure.  Let's do it now. |
| 16:31:57 | 4 | THE VIDEOGRAPHER:  We are now off the record at |
| 16:31:58 | 5 | 4:32. |
| 16:39:19 | 6 | (Recess was taken.) |
| 16:39:21 | 7 | THE VIDEOGRAPHER:  We are now on the record at |
| 16:39:23 | 8 | 4:39. |
| 16:39:26 | 9 | BY MR. HEIMANN: |
| 16:39:27 | 10 | Q.  I'm not going to bother with that one, |
| 16:39:29 | 11 | Mr. Schmidt. |
| 16:39:30 | 12 | A.  Okay. |
| 16:39:32 | 13 | Q.  During the time period we've been talking about |
| 16:39:37 | 14 | when Google had in place the do-not-call list and so |
| 16:39:40 | 15 | forth, did anyone ever question the legality of that |
| 16:39:43 | 16 | policy? |
| 16:39:48 | 17 | A.  I don't believe -- I don't -- I don't recall. |
| 16:39:51 | 18 | I have no recollection of any such discussion. |
| 16:39:53 | 19 | Q.  Did you ever seek legal advice from Google's |
| 16:39:56 | 20 | general counsel about it? |
| 16:39:59 | 21 | MR. RUBIN:  Objection.  I think even the answer |
| 16:40:01 | 22 | to that question, if it were -- it would be privileged. |
| 16:40:05 | 23 | MR. HEIMANN:  Not if it's no. |
| 16:40:07 | 24 | MR. RUBIN:  All right.  Then let's just take a |
| 16:40:08 | 25 | second. |

16:40:09  1               MR. HEIMANN:  Sure.

16:40:09  2               (Discussion off the record.)

16:40:17  3   BY MR. HEIMANN:

16:40:17  4        Q.   Back on the record.

16:40:18  5        A.   The answer to your question is, no.

16:40:23  6               MR. HEIMANN:  Is that on the record?

16:40:25  7               THE REPORTER:  Thank you.

16:40:25  8   BY MR. HEIMANN:

16:40:25  9        Q.   Do you know whether or not Google's general

16:40:27 10   counsel was aware of the policy?

16:40:36 11               MR. RUBIN:  Objection.  Lacks foundation.

16:40:37 12               THE WITNESS:  Do I know?  I have no knowledge

16:40:38 13   one way or the other.

16:40:39 14   BY MR. HEIMANN:

16:40:41 15        Q.   During the time period involved, did you ever

16:40:44 16   consider that the policy or practice might have an

16:40:49 17   adverse impact on employees in the Valley?

16:41:00 18        A.   Well, I certainly thought about the general

16:41:01 19   question of impact, yes.

16:41:04 20        Q.   And did you ever consider that it might have an

16:41:06 21   adverse impact on compensation for employees in the tech

16:41:10 22   sector in the Silicon Valley?

16:41:12 23        A.   I don't believe it did, so -- so the answer is,

16:41:16 24   I -- I thought about it and decided it didn't, in my

16:41:20 25   opinion.

Deposition of Eric Schmidt                    In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
16:41:10  1              I, Rosalie A. Kramm, Certified Shorthand

16:41:10  2    Reporter licensed in the State of California, License No.

16:41:10  3    5469, hereby certify that the deponent was by me first

16:41:10  4    duly sworn and the foregoing testimony was reported by me

16:41:10  5    and was thereafter transcribed with computer-aided

16:41:10  6    transcription; that the foregoing is a full, complete,

16:41:10  7    and true record of said proceedings.

16:41:10  8              I further certify that I am not of counsel or

16:41:10  9    attorney for either of any of the parties in the

16:41:10 10    foregoing proceeding and caption named or in any way

16:41:10 11    interested in the outcome of the cause in said caption.

16:41:10 12              The dismantling, unsealing, or unbinding of the

16:41:10 13    original transcript will render the reporter's

16:41:10 14    certificates null and void.

16:41:10 15              In witness whereof, I have hereunto set my hand

16:41:10 16    this day:   February 23, 2013.

16:41:10 17              ___X____ Reading and Signing was requested.

16:41:10 18              _____ Reading and Signing was waived.

16:41:10 19              _____ Reading and signing was not requested.

16:41:10 20

16:41:10 21              _____

16:41:10 22              ROSALIE A. KRAMM

16:41:10 23              CSR 5469, RPR, CRR

16:41:10 24

         25
```