# EXHIBIT 416
to the Declaration of
Lisa J. Cisneros in Support of
Plaintiffs' Opposition Briefs

**REDACTED VERSION**

Robert A. Mittelstaedt (State Bar No. 60359)
ramittelstaedt@jonesday.com
Craig A. Waldman (State Bar No. 229943)
cwaldman@jonesday.com
David C. Kiernan (State Bar No. 215335)
dkiernan@jonesday.com
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: (415) 626-3939
Facsimile: (415) 875-5700

Attorneys for Defendant
Adobe Systems Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

IN RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

THIS DOCUMENT RELATES TO:

ALL ACTIONS

**Master Docket No. 11-CV-2509-LHK**

**DECLARATION OF DONNA MORRIS OF ADOBE SYSTEMS INC. IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Date Consolidated Amended Compl. Filed: September 13, 2011

**ATTORNEYS EYES ONLY**

**EXHIBIT** 416
**Deponent** Murphy
**Date** 12-3-12
Gina V. Carbone, CSR

416.1

I, Donna Morris, declare as follows:

1. I am the Senior Vice President ("SVP") of Global Human Resources at Adobe Systems Inc. ("Adobe"). I have been employed by Adobe in the human resources ("HR") department for more than 10 years. I began working for Adobe in April 2002 as the Senior Director of Global Talent. In December 2005, I became the Vice President of Global Human Resource Operations. In March 2007, I was promoted to my current position.

2. I have personal knowledge of the matters stated in this declaration. I make the statements in this declaration based on information gained during my current and former positions within Adobe's HR department. I have been responsible for all HR operations, including the compensation, benefits, and recruiting teams since March 2007. As part of my duties, I have gained historical knowledge of Adobe's compensation practices before 2007 by reviewing Adobe's past training and presentation materials and by participating in meetings and discussions with other Adobe employees. The compensation policies and practices described herein apply to Adobe's salaried employees between January 1, 2005 and December 31, 2009 (the "Class Period").

3. The information in this declaration and the exhibits attached are confidential to Adobe. It is Adobe's practice to keep compensation policies and strategies confidential, for internal use only, and not to disclose them to the public. The public disclosure of this information would harm Adobe, including potentially impairing its competitive position in recruiting, hiring, and compensating employees. Adobe derives independent economic value from keeping this information confidential. Adobe has designated the information Attorneys Eyes Only under the Protective Order entered in this case.

4. During the Class Period, Adobe employed thousands of employees in more than 400 job categories, including executives, human resource managers, compensation analysts, benefits managers, payroll mangers, recruiters, attorneys, accountants, sales managers, product managers, various types of software developers, quality assurance analysts, IT employees, creative designers, web developers, facility managers, market research analysts, financial analysts, business analysts, internal auditors, and various other jobs. [redacted]

[redacted].

## I. ADOBE'S COMPENSATION GENERALLY

[redacted]

6. Adobe's policy has always been to compensate employees based on their performance and expected future contribution to the company. It does not seek pay equality or parity among employees within the same job code, team, department or business unit or across the company. Adobe believes that differentiating compensation based on performance increases employee satisfaction by sending a clear message that Adobe appreciates and rewards their contributions and a clear message to those who aren't performing that they have to improve their performance. This policy encourages employees to continue to stretch themselves to perform better and to push the company beyond the status quo.

7. Adobe did not determine compensation for individual employees on a company-wide basis. Instead, managers determined the compensation for individual employees within a business unit, and were required to differentiate compensation among employees based on performance levels, performance reviews, and the manager's assessment of the employee's expected future contribution to the company. Each year, the manager was given a budget for merit-based salary increases and bonuses. How the budget was allocated among employees was in the discretion of the manager. Adobe had multiple business units, each with managers at various levels (i.e., manager, senior manager, director, senior director, vice president, etc.) that

provided leadership to departments and teams of employees within the business unit. The number of managers who made compensation determinations varied between approximately 500 to approximately 1000, given the growth in headcount over time.

8. Adobe reinforced its policy of differentiating compensation through training and other practices described below. As examples, attached hereto as Exhibits 1 through 5 are true and correct copies of internal Adobe manager training presentations during the Class Period discussing Adobe's compensation policy:

a. Exhibit 1 (ADOBE_015864), Adobe 2005 Performance, Salary & Stock Focal, February 2005 – "We fairly and regularly assess performance results and differentiate rewards based on performance";

b. Exhibit 2 (ADOBE_023747), 2007 Mini Performance Focal Manager Training, November & December 2006 – same; "salary increase matrices to provide managers with an approach to effectively use budget dollars to differentiate rewards based on performance and recognize and reward results and contributions";

c. Exhibit 3 (ADOBE_015059) FY '07 Incentive Program Updates, February 15, 2007 – "differentiate rewards based on performance";

d. Exhibit 4 (ADOBE_009668) HR All Hands, September 11, 2008 – "Developing total reward programs that are differentiated based on performance"; "increasing focus on differentiation of rewards based on performance"; and

e. Exhibit 5 (ADOBE_009295) HR Strategic Plan 2010 – 2013, "Continue to evolve culture towards pay for performance."

## II. <u>HOW ADOBE SETS COMPENSATION FOR EXISTING EMPLOYEES</u>

9. Because of Adobe's strong emphasis on tying compensation to performance and differentiating compensation across employees, each employee's compensation was determined by that employee's manager who is in the best position to assess that employee's performance.

### A. BASE SALARY

#### 1. <u>Performance Evaluations</u>

10. Each year, Adobe conducted a "focal review" during which every employee was

evaluated by his/her manager for performance, contribution to the company, and future potential. To help differentiate employees based on these factors, managers ranked their employees as high performers, solid performers, and low performers.

11. [REDACTED]

[redacted]

[redacted] [redacted]

[redacted] [redacted]

17. Movement of the salary range did not automatically lead to adjustments in compensation for all employees. Actual salary adjustments were made by managers on an individual basis within the confines of the budget.

18. [redacted]

[redacted]

20. Based on these surveys, Adobe's compensation team built the salary ranges for each job code for the coming year by setting the mid-point of the salary range at a certain percentile of the survey data, then setting a maximum and a minimum. The target midpoint has changed over the years and varied across job functions. For example, the 2005 target midpoint for various jobs is set forth in Exhibit 1 (ADOBE_015864), which is a true and correct copy of Adobe's 2005 Performance, Salary & Stock Focal. The maximum and minimum of the salary range was then calculated by applying a spread, which also varied over the years and across job levels. The spread varied between 50% to around 70% for different job levels during the Class Period. After the salary ranges were set, they were loaded onto the internal salary website for access by all managers in the company.

[redacted]

//

//

3. **Budget**

22. Each year, Adobe determined a budget for managers to use for merit-based salary increases and promotions. The budget has varied over the years; for example, it was 5% for 2005 and 5.5% for 2008. See, for example, Exhibit 1, which is a true and correct copy of the 2005 Focal Review (ADOBE_015864). [redacted].

B. **BONUS AND EQUITY**

23. The amount of bonus and equity grants were also determined by managers in the managers' discretion based on an employee's performance.

24. [redacted]

[redacted] [redacted]

[redacted] [redacted]

C. **TIMING OF ANNUAL COMPENSATION ADJUSTMENTS**

27. Generally, adjustments to employee compensation occurred during the focal

period described above. Prior to 2007, the annual base salary, bonus, and equity grant adjustments became effective June 1st. In 2007, Adobe shifted its model to align the review period with the end of the fiscal year, making the annual salary, bonus, and equity grant adjustments effective on February 1st.

[redacted]

[redacted]

31. When a manager decided to increase compensation to retain an individual employee, the form of compensation was usually a one-time cash payment referred to as a retention or counter offer bonus. It was not typical to adjust the base salary. And as mentioned above, if compensation for one employee was increased to retain that employee, no adjustments were made to compensation of other employees.

## III. NEW HIRE COMPENSATION

[redacted]

33. I understand that plaintiffs rely on an email from me with the bates numbers ADOBE_008047-008049, for the proposition that Adobe was committed to internal equity in pay and that Adobe was concerned about individuals hired above the salary range. In the past, it's been brought to my attention that a few new hires' base salaries were above the maximum of the salary ranges for their particular job codes. From my experience, this is not common and is caused by incorrect job leveling, meaning the new hire should have been put in the position above the position he/she was offered (which would correspond with a higher salary range). When a new hire's base salary was above the salary range, Adobe did not increase the compensation across the board for other employees in that job group, or any other group of employees.

## IV. INTERNAL EQUITY

34. Adobe did not, and does not, adjust employee compensation, including base salaries, on a company-wide level (or on any group level) based on the concept of internal equity. Indeed, Adobe did not, and does not, seek pay equality, meaning paying employees within the same job code the same amount. Doing so would run counter to the company's philosophy of

differentiating employee compensation based on performance and merit. Adobe believed that internal equity was not a concern so long as salaries were appropriately differentiated in accord with that philosophy. Adobe trained managers to be prepared to articulate the reasons behind salary differentials (based on factors such as performance, years of experience, education, future potential, length of time with the company, etc.).

## V. MERGERS AND ACQUISITIONS

35. In December of 2005, Adobe acquired San Francisco-based Macromedia, a leading software solutions company. The acquisition added approximately 1,200 employees to Adobe's headcount. The new employees had to be integrated into our company. [REDACTED]

36. After Macromedia, Adobe continued to make acquisitions, including the acquisition of Navisware in 2005; TTF, Pixmantec, Interakt, Amicima, Serious Magic, and Antepo in 2006; Scene7 and Virtual Ubiquity in 2007; Meer Meer and Yawah in 2008; and Business Catalyst and Omniture in 2009. The most significant of these acquisitions was the acquisition of Omniture, which added approximately 1,100 employees. [REDACTED]

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 9th day of November 2012 in San Jose, California.

By: [signature]
Donna Morris

SFI-771543

4/16/11