# Exhibit DD to the Cisneros Declaration, Revised Version – Redacted

1          UNITED STATES DISTRICT COURT

2       NORTHERN DISTRICT OF CALIFORNIA

3           SAN JOSE DIVISION

4

5  IN RE:  HIGH-TECH EMPLOYEE    )

6  ANTITRUST LITIGATION       )

7                      )  No. 11-CV-2509-LHK

8  THIS DOCUMENT RELATES TO:    )

9  ALL ACTIONS.              )

10  _____

11

12        VIDEO DEPOSITION OF FRANK WAGNER

13     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14            March 7, 2013

15

16     Reported by:  Anne Torreano, CSR No. 10520

17

18

19

20

21

22

23

24

25

1    Q.   Okay.  And so sitting here today in 2013, your

2    responsibility really is director of the comp team with

3    the duty for employee compensation programs.

4         Is that the current --

10:26:37  5    A.   I think that --

6    Q.   -- scope?

7    A.   -- that would be an accurate representation,

8    yes.

9    Q.   Okay.  Starting in the 2007 time period when

10:26:54  10    you joined, in terms of your -- please describe what

11    you did in terms of running or having responsibility

12    for the employee compensation programs.

13              MR. RUBIN:  Objection.  Vague.

14              THE WITNESS:  So I can continue to answer

10:27:11  15    that?

16              MS. DERMODY:  Yeah.

17              THE WITNESS:  Okay.

18              MR. RUBIN:  Always, unless I tell you not to.

19              THE WITNESS:  Okay.  Good.  Thank you.  Thank

10:27:17  20    you.

21              So I can give you a brief summary.  So it

22    would include running our regular compensation

23    programs.  So we have a -- an annual merit cycle and a

24    bonus-planning cycle, an equity refresh or annual grant

10:27:37  25    cycle.  It included any competitive analysis that the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    team did.  So what we call benchmarking in the

2    compensation field.

3           It call -- it also included the approval of

4    all offers that were to external candidates.  At the

10:28:02  5    time it also included running our quarterly performance

6    management program in that -- in terms of opening up a

7    tool into which performance ratings were placed and

8    then summarizing and doing analysis that resulted.

9           It would include running our sales

10:28:20 10    compensation design efforts.  So the sales bonus

11    program that applies to folks on our quarterly sales

12    plan.

13           And it would -- it included at the time the

14    preparation of materials for our leadership development

10:28:40 15    and compensation committee, which we refer to as --

16    "LDCC" is the acronym, and producing those materials

17    and participating or sitting in the meetings as it was

18    presented to the committee.

19    BY MS. DERMODY:

10:28:56 20        Q.   Anything else?

21        A.   It would have included things related to

22    compensation policies, for example, like, for example,

23    how is compensation treated when somebody transfers

24    from Country A to Country B or Job A to Job B.

10:29:17 25           There were -- there's a -- there are probably

1    a variety of things on a day-to-day basis that would

2    come up that I'm probably not remembering off the top

3    of my head, but there's a variety of things that relate

4    to that.

10:29:34  5        Q.   Okay.  In terms of the major responsibilities,

6    does that pretty much cover it?

7        A.   To the best of my recollection, yes.

8        Q.   Okay.  And have those responsibilities changed

9    since that time, or are you covering the same ground

10:29:51  10   that you just described?

11       A.   With the exception of running the performance

12   management process and running the executive

13   compensation activities, pretty much the same.  And

14   then since that time, since I started, we have a

10:30:11  15   process set up in place for counteroffers, and that

16   would be included in my current remit.

17       Q.   And if you could place in time a day when the

18   counteroffer initiative was added to your scope of

19   duties or responsibility, when would that be?

10:30:33  20       A.   Well, I think that it was arguably -- I don't

21   recall the first specific time of a counteroffer that

22   came up and then -- but it was probably sometime during

23   2007.

24            And then at some time thereafter, and I can't

10:30:50  25   recall the specific date, it might have been in 2007,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    it could have been early 2008, we actually set up a

2    regular process so -- in order to ensure that we were

3    doing things in a rapid fashion.

4         Q.    Let me ask you about a couple of these areas

10:31:11  5    that you just described to make sure I understand what

6    would be involved in them.

7              You mentioned having some responsibility over

8    equity refresh?

9         A.    Yes.

10:31:19  10    Q.    Did I get that correct?

11        A.    Yes.

12        Q.    What is that?

13        A.    Equity refresh at Google is our annual

14    employee stock grant.

10:31:31  15    Q.    And what was your responsibility with respect

16    to that?

17        A.    Broadly it would be that my team developed the

18    guidelines that managers will use to make judgments, or

19    planners.  Usually it was very senior managers and

10:31:56  20    executives that made those decisions.  And then we

21    would run the process.

22              So going out to the planners, issuing them the

23    tool, doing the analysis when things came back, and

24    ensuring, once we got the final judgments of the

10:32:09  25    leaders who made decisions about equity grants, that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    they were forwarded and granted.

2         So we ran the granting process or compiled the

3    list and analysis related to the granting process.

4         Q.   Okay.  And you mentioned the annual grant

10:32:26  5    cycle.  Is that all part of the equity refresh?

6         A.   We had -- yes.

7         Q.   Okay.  What was the competitive analysis that

8    you were doing?

9         A.   Related to equity?

10:32:41 10         Q.   Related to compensation.

11         A.   So my team looks at -- did and continues to

12    look at jobs for Google.  We benchmark all jobs, or as

13    many jobs as possible, to the competitive marketplace.

14    We benchmark over 10,000 individual combinations of job

10:33:09 15    families and levels to surveys, and we produce -- we

16    look at obtaining a competitive target based off our

17    compensation philosophy for our salaries, for total

18    cash and also for equity.

19         Q.   And is that work connected to developing

10:33:33 20    salary bands for different positions?

21         MR. RUBIN:  Objection.  Lacks foundation.

22         THE WITNESS:  That work is related to

23    developing our market targets, and we have approximate

24    ranges for salaries around that.  And those ranges are

10:33:56 25    guideposts or guidelines.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1            But planners, when they make decisions about

2      compensation, could actually go above the top of the

3      band, or when we bring folks in as new hires for

4      various circumstances, they could actually go below the

10:34:13  5      bottom of the band, or the range, if you would, the

6      minimum.

7      BY MS. DERMODY:

8            Q.    And what is the process if a planner wants to

9      bring in someone outside the range?

10:34:23  10           A.    So you mean we have a job offer for a new

11     candidate or new external candidate?

12           Q.    Sure.  We'll start with that.

13           A.    Generally what we would attempt to do is --

14     and you're speaking of salaries?

10:34:39  15           Q.    Yes.

16           A.    Right.

17                 Well, it's important to recognize that we look

18     at it on a total compensation picture and not just on

19     salaries.  So we try to ensure our total compensation

10:34:50  20     package exceeds what that individual has at their prior

21     employer.

22                 It is our preference and our guideline that we

23     try, in the mix of compensation, to ensure that

24     salaries come in toward the bottom of the range

10:35:04  25     because -- or our market target, which we refer to as

1    the market reference point.  If you don't mind, I'll

2    use the "MRP" terminology because it's fewer words to

3    have to say the acronym.

4         Q.   I'm sorry.  That's market --

10:35:17  5         A.   Reference point.

6         Q.   Okay.

7         A.   And what we try to do is bring in new

8    candidates or new employees toward the bottom of the

9    range, because we have a pay-for-performance

10:35:26 10  philosophy, and we'd like their salaries to progress

11   and be aligned with their demonstrated performance

12   after the fact as opposed to bringing folks in higher

13   in the range.

14         It is rare that we bring in people high in the

10:35:38 15  range, but we do sometimes, depending on their current

16   rates of salaries at their current employer.

17         Q.   Okay.  And circling -- I appreciate that

18   description, by the way.

19         Circling back to what happens if someone's

10:35:51 20  going to be slotted outside the range, is there a

21   process for the planner to get approval for that, or

22   does that just happen in the planner's discretion?

23         A.   So let me clarify a couple things.

24         So I would distinguish between our annual

10:36:07 25  merit cycle, where planners are actually planning for a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    team of people and we -- for which we have budgets, and

2    that should be distinguished from new-hire, new-hire

3    rates of pay.

4            So planners or managers have less input,

10:36:25  5    except at the executive level, but they have input, of

6    course, for new-hire offers.

7            Because of our ranges being highly competitive

8    and well above market, it is a rarity that folks would

9    be outside the top of the range.

10:36:40 10    Q.   Okay.  And then switching to an incumbent

11    employee who a manager might think deserves more pay

12    than the range would allow, what is the process for --

13    for that salary to be approved?

14            MR. RUBIN:  Objection.  Vague.

10:36:59 15            THE WITNESS:  Well, if you mean what happens

16    if someone is highly paid relative to our market

17    target, if they are a stellar performer, then it's

18    likely that a proposed increase would be approved, but

19    it would be their judgment.

10:37:16 20            And then if it was a poor performer, then we

21    may not approve that rate of salary increase.

22    BY MS. DERMODY:

23    Q.   And what is the approval process for that

24    position?

10:37:29 25    A.   It goes from the compensation team and me up

1    to Laszlo Bock, and Laszlo Bock is the final

2    determiner --

3        Q.   Okay.

4        A.   -- as the head of HR.  Or People Operations we

10:37:41  5    call it.

6        Q.   Okay.  And is that for all employees in the

7    company?

8        A.   That is the process for nonexecutives, or

9    exclusive of vice presidents, yes.

10:37:51  10       Q.   Okay.  And was that the process in 2007 when

11   you started?

12       A.   Yes.

13            May I clarify?

14       Q.   Of course, yes.

10:38:06  15       A.   So when I started in 2007, the final decider

16   was Shona Brown for, I believe, the first year, and

17   then the responsibility fell to Laszlo Bock

18   subsequently.

19       Q.   Okay.  And in your experience, have most of

10:38:23  20   the employees been paid within the salary ranges for

21   the position they're assigned to?

22            MR. RUBIN:  Objection.  Lacks foundation.

23            THE WITNESS:  What do you mean by "most"?

24   BY MS. DERMODY:

10:38:31  25       Q.   Is it more the exception than the rule that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    employees are paid within their salary range?

2            MR. RUBIN:  Same objection.

3            THE WITNESS:  Most employees are paid within

4    the salary range.

10:38:45  5    BY MS. DERMODY:

6        Q.   You describe, as one of the various

7    responsibilities that you've had, offers to external

8    candidates.

9            Can you tell me what that involves?

10:39:06 10        A.   Offers involves how much we pay a particular

11    candidate, and that would be comprised of their ████

12    ████████████████████████████████████████████████

13    ████████

14        Q.   And what is your role with respect to those

10:39:30 15    issues?

16        A.   My -- well, may I clarify?  My team per --

17    works with another group in People Operations which

18    does the basic offers, and things that are outside of

19    guideline of certain ranges get escalated to them.

10:39:53 20    They review, and things outside of their purview are

21    escalated to me.

22        Q.   Which types of things would fall within

23    another group in People Operations and which things

24    would fall to you?

10:40:20 25        A.   So the other group in People Operations is

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    part of what we called People Technology Operations at

2    the time.   We now refer to it as Google People

3    Services.   And they do the rote or standard offers.

4    ████████████████████████████████████████████

10:40:43  5    ████████████████████████████████████████

6    ████████████████████████████████████████████

7    ██████████████████████████████████████

8    ████████████   ████████████████████████████████

9    ████████████████████████████████

10:40:57  10        Q.   Okay.   And then what goes to you?   All the

11    rest?

12        A.   Oh, you mean to our team?

13        Q.   Yes.

14        A.   They -- they ████████████████████████████

10:41:07  15    ████████████████████████████████████████████

16    ████████████████████████████████████████████████

17    ████████████████████   ████████████████████████████

18    ████████████████████████████████████████████

19    ████████████████████

10:41:26  20        Q.   Okay.   And just so I can be sure I'm

21    following, you used the term ██████████████████████

22    ████████████

23              ████████████████████████████████████████

24    ████████████████████████████████████████████████

10:41:47  25    ████████████████████████████████████████████████



1 ████████████████████

2 A. ████████████████

3 Q. And has that system been in place since you

4 started in 2007?

10:42:02 5 A. No.

6 Q. When did that start?

7 A. 2011.

8 Q. Okay.  So that's more recent?

9 A. Correct.

10:42:09 10 Q. Back in the 2007 era, was there a different

11 approach to offers that involved your team?

12 A. ████████████████████████

13 ████████████████████ ████████

14 ████████████ ██████████████

10:42:35 15 ██████████████████████████

16 Q. Okay. ██████████████████

17 ████████████████████████

18 ██████████████████████████

19 ████████████████████████

10:43:01 20 ████████████

21 A. I'm not sure I know how to interpret that.  Do

22 you mean like similar candidates like new college

23 grads?

24 Q. Sure.

10:43:15 25 A. ████████████████ ████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    similar candidates like software engineers, probably

2    not, given their variation in current compensation.

3         Q.   Okay.  So in part, their offer relied on what

4    their existing compensation was at a different

10:43:32  5    employer?

6         A.   Yes.

7         Q.   Going back to when you started in 2007, you

8    described also having some responsibility for the

9    materials that went to the LDCC.

10:44:03 10          What was that responsibility?

11        A.   Each quarter we had a compensation committee

12   meeting, and there is a variety of updates or special

13   requests that we provided to the LDCC, and it was

14   preparing those materials.

10:44:22 15        Q.   And has that quarterly meeting continued from

16   2007 to the present?

17        A.   Correct.

18        Q.   Okay.  And the LDCC is a committee of the

19   board of directors?

10:44:43 20        A.   It is.

21        Q.   Okay.  And do you recall, when you first

22   started, who was on the LDCC?

23        A.   My recollection was that it was Paul Otellini

24   and Art Levinson.

10:45:02 25        Q.   Were there standard data reports or metrics

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   that the LDCC requested from you?  We'll go back to

2   sort of the 2007 era.  If you recall.

3       A.   You mean as part of the regular materials?

4       Q.   Yes.

10:45:31  5       A.   We had a standard set of reports that we

6   provided, yes.

7       Q.   And what was -- I'm sorry.

8       A.   I don't know if we -- they requested it

9   specifically or we provided them, but we continued

10:45:44 10   providing, from April onwards, when I joined, what --

11   similar to what had been provided before.

12       Q.   Okay.  And what was included in the standard

13   reports?

14       A.   Best of my recollection, ██████████████████

10:46:01 15   ████████████████████████████████████████████████████

16   ████████████████████████████████████████████

17   ██████████

18       Q.   Did you do reporting on total salary as a line

19   item for the company?

10:46:31 20       A.   I'm not sure I know what you mean.

21       Q.   ███████████

22       A.   ███████████████████████████████████████

23   ██████████

24       Q.   Okay.  And again, just so I understand what

10:46:50 25   this means, what would be ████████████████████████████

1    ███████    What does that involve?

2    A.    ██████████████████████

3    ████████████████████████

4    ██████████████████████████████

5    ██████████████████████████████

6    ███████████████

7    Q.    █████████████████████████████

8    ████████████████████████████

9    ████████████████████

10    A.    The former.

11    Q.    Okay.  In terms of the standard reporting that

12    happened starting in 2007, have there been new or

13    additional items that you didn't mention previously

14    that have been reviewed?

15    A.    Yes.

16    Q.    Okay.  And what have those been?

17    A.    ████████████████████████████

18    █████████

19    Q.    And when did those summaries begin to be

20    reported?

21    A.    I don't recall the specific dates.  Perhaps in

22    late 2007 or early 2008, but I would be speculating.

23    Q.    Okay.  You think it was before 2009, at some

24    point?

25    A.    If -- speculating, I would say yes.

1      Q.    Is there a date you're sure you were doing

2  it?  2009?

3      A.    I'm sure we were doing it in 2009.

4      Q.    Okay.  So 2009 or earlier?

10:48:55  5    A.    Correct.

6      Q.    Okay.  ███████████████████████████

7  ██████

8      A.    The summaries ████████████████████

9  ████████████████████████████████

10:49:14 10  ███████████████████████████████████████████

11  ████████████████████████████████

12      Q.    And for what purpose were you tracking all of

13  that information?

14      A.    ██████████████████████████████████

10:49:40 15  ████████████████████████

16      Q.    And why was that?

17      A.    ██████████████████████████████████

18  ████████████████████

19      Q.    Okay.  Let me ask you, in addition to the

10:50:07 20  different categories of information that you have

21  described being part of the standard reports to the

22  LDCC, are there any other categories that you can

23  recall that were standard in the reports?

24      A.    There were periodic reports.  That means not

10:50:21 25  every quarter.  But there are other topics that were

1    covered such as █████████████████████

2    ████████████████████████

3         Q.    Anything else?

4         A.    If there was a special type of programs.

10:50:45  5    Q.    What would be an example?

6         A.    ███████████████████████████████

7    ████████████████████████████████

8         Q.    Anything else?

9         A.    That's what I recall.

10:51:07 10    Q.    Okay. ██████████████████

11         A.    █████████████████████████████

12    █████████████████   ██████████████████

13    ███████████████████████████

14         Q.    Okay.  Did any of the special programs you

10:51:33 15  recall reporting on to the LDCC involve recruiting or

16  compensation for all employees?

17         A.    For all employees?

18         Q.    Yes.

19         A.    No.

10:51:45 20    Q.    Were any of the special programs programs

21  involving certain large sets of employees?

22         A.    No.

23         Q.    Okay.

24         MR. RUBIN:  Let me just go ahead at this

10:51:59 25  point -- I usually wait for documents -- since we are

          1    getting into confidential business discussions,

          2    designate the transcript under the protective order as

          3    highly confidential, attorneys' eyes only.

          4         MS. DERMODY:  Okay.

10:52:10  5    BY MS. DERMODY:

          6         Q.   In terms of the periodic reporting, what do

          7    you recall being reported about the compensation

          8    philosophy of the company?

          9         MR. RUBIN:  Objection.  Vague.

10:52:26 10         THE WITNESS:  Do you mean in 2007 or 2008

         11    or ...

         12    BY MS. DERMODY:

         13         Q.   Let's start with 2007, sure.  And this is what

         14    you had described as a periodic report to the LDCC.

10:52:36 15         A.   Right.

         16         So in 2007 we changed our compensation

         17    philosophy to increase our market targeting for our

         18    cash compensation.

         19         Q.   And what did that involve?

10:53:00 20         A.   That involved moving our salary target from

         21    ████████████████████████████████████████████████

         22    ████████████████████████████████████████████

         23    ███████████████████

         24         Q.   And was that for all employees at Google?

10:53:18 25         A.   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    Did that compensation philosophy change in

2    2008?

3         A.    No.

4         Q.    Okay.  How about in 2009?

10:53:30   5    A.    No.

6         Q.    Okay.  In 2010?

7         A.    It was decided in 2010 we would change the

8    compensation philosophy for implementation at the

9    beginning of 2011.

10:53:45  10    Q.    And was that the initiative called "Big Bang"?

11        A.    Big Bang was a result of that change in

12   compensation philosophy.

13        Q.    Okay.  And how would you characterize that

14   change?

10:54:00  15    A.    ████████████████████████████████████████

16   ████████████████████████████████████████████

17   ████████████████████████████████████

18        Q.    Okay.  In terms of the periodic reporting to

19   the LDCC, was there anything else you recall about

10:54:21  20   compensation philosophy that was reported in that 2007

21   to 2010 time period other than what you've just

22   described?

23        A.    For the broad-based employee population?

24        Q.    Yes.

10:54:34  25    A.    Those are the major -- in terms of major

1    compensation philosophy or targeting, pay targeting,

2    no, that would cover it.

3         Q.    Okay.  Were there changes in the compensation

4    philosophy that were reported out to the LDC [sic]

10:54:54 5    involving certain groups of employees in 2007?

6         A.    Separate from --

7         Q.    All employees.

8         A.    -- the employee population?

9         Q.    Yes.

10:55:05 10        A.    Or separate from special projects?

11        Q.    Yes.

12        A.    I don't believe so.

13        Q.    Okay.  Were there certain special projects

14    that were focused on groups of employees in the 2007

10:55:21 15   time period?

16        A.    There may have been specific other types of

17   projects for single employees or small groups of

18   employees.

19        Q.    Okay.  Not large groups of employees?

10:55:42 20        A.    Correct.

21        Q.    And would that be true for 2008?

22        A.    The same would apply.

23        Q.    Okay.  And how about 2009?

24        A.    To the best of my recollection, yeah, the same

10:55:56 25   would apply.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    came, and that person in that role varied during that

2    period.

3        Q.    Who was the person when you started in '07?

4        A.    David Rolefson, R-o-l-e-f-s-o-n.

11:02:02  5        Q.    And who took over for Mr. Rolefson when he was

6    no longer in that position?

7        A.    Eric Schaffer, I believe.

8        Q.    Okay.  And when did Mr. Schaffer take over

9    that role?

11:02:22  10       A.    I believe it was at the end of 2007.

11       Q.    Okay.  And has Mr. Schaffer had that role ever

12    since, or has it been someone else?

13       A.    Mr. Schaffer has had that role ever since.

14       Q.    Okay.  And then going all the way back to when

11:02:45  15   you testified that one of your areas of

16    responsibilities was compensation policy, can you

17    elaborate on what that involves?

18       A.    I would say that compensation policy would be

19    things where there were special cases related to

11:03:05  20   compensation.  For example, the treatment, as I

21    mentioned, of movement between jobs or locations, if

22    there was an on-call policy, a thing like a shift

23    premium policy.

24       Q.    Anything else?

11:03:29  25       A.    I think -- well, there are probably other

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    things I'm not recalling.  Most of the other things,

2    you can call them policy, are just sort of assumed in

3    the base pay program, sales bonus design, equity

4    design, and the benchmarking process.  All those things

11:04:01  5    had a policy-related activity, but as a separate -- as

6    a separate concept outside of our norm, that's probably

7    a fair statement, or those are things I'm remembering.

8        Q.   Okay.  Going to base pay, did your group have

9    responsibility for evaluating whether the salary ranges

11:04:27  10   were appropriate for the titles or job families in the

11   company?

12           MR. RUBIN:  Objection.  Vague.

13           THE WITNESS:  Yeah, could you repeat the

14   question?

11:04:43  15   BY MS. DERMODY:

16       Q.   Sure.

17           Let me go back to 2007.  When you started in

18   2007, were there salary ranges then?

19       A.   There was a notion of a salary range.  There

11:05:03  20   were -- there was a -- the existing ██████████████

21   ████████████████████████████████████    ████████████

22   ████████████████████████████████████████

23   █████████████████████████████████████████████████

24   █████████████████████████████████████████████████

11:05:32  25   █████████████



1      Q.   █████████████████████████████

2   ████████████████████████████████████████

3   ████

4      A.   Yeah.   ████████████

11:05:48  5      Q.   ███████████   █████████████████

6   █████████████████   Make sure I understand it.

7      A.   That's correct.

8      Q.   Okay.

9      A.   When I joined, yes.

11:05:55 10      Q.   Okay.  And what would the guidelines cover?

11      A.   █████████████████   ████████████

12   ███████████████████████████████████████

13   ███████████████   ██████████████████

14   █████████████████████████████████

15   ████████████████████████████████████████

16   ██

17           When I joined, to be clear, we changed the

18   methodology, ███████████████████████████

19   ███████████████████████████████████████

11:06:39 20   ████████████████████████████████████

21   ████████████████████████████████████

22   ███████████████████████████████████████

23   ████████████████████████████████████████████

24   ███████████████████████████

11:07:28 25           (DEPOSITION EXHIBIT 1600 MARKED.)

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

BY MS. DERMODY:

   Q.   So the document that's been placed in front of you was produced to us without a Bates number, we call it Bates number, a number on the front, but on the second page, you should see up at the top right corner a number that says "395420."

      Do you see that?

   A.   I see that.

   Q.   Great.

      This document we've marked as Exhibit 1600 has the title on the first page "Google 2004 Salary Ranges." And by this title it seems clear you were not at Google in 2004.

   A.   That's correct.

   Q.   But looking at the way this is laid out, does this document appear to correspond to what you just described was the system in 2007 for salary ranges?

   A.   Yes, it generally corresponds. I see that this is █████████████████████████ ███████████████████████████ █████████████████████ ████████████ ███████████████████ ████████████ but otherwise it looks like, in general, the same structure, although the numbers differ from what they were when I joined in 2007.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   Great.

2           And when you joined in 2007, were you able to

3      observe on your computer or did you have passed out to

4      you a document that would have had the Google 2007

11:09:30  5   salary ranges of this structure on Exhibit 1600?

6      A.   I -- it's -- yes, I would have -- I believe or

7      I strongly believe that I would have seen something

8      generally similar to this.  Not in the same format,

9      because this is not what I recall.  But something

11:09:50 10  similar to this.

11     Q.   Okay.  And again, just so I can understand

12     what the document means, if you can start with region

13     1, is this identifying a geographic region for these

14     salaries?

11:10:14 15  A.   Region 1 would be -- yes, the lists in the

16     parentheses, to clarify, are acronyms or abbreviations

17     for Google locations.  So it would apply -- if this is

18     consistent with how it was in 2007, it would apply to

19     the cities that are listed.

11:10:38 20  Q.   Is "MV" Mountain View?

21     A.   Yes.

22     Q.   And New York City.

23          What's "SMOLA"?

24     A.   Santa Monica Los Angeles.

11:10:50 25  Q.   And then is the next Boston and Seattle?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.   Yes.

2      Q.   Is that Virginia?

3      A.   I don't know, since we don't have that

4   nomenclature anymore.

11:11:02  5      Q.   Okay.  And then it looks like something in

6   Australia?

7      A.   No, Austin, Texas.

8      Q.   Oh, Austin.  Excuse me.

9           And is that Chicago?

11:11:09 10      A.   Correct.

11      Q.   Okay.  And just looking again at this box on

12   the top left, it says "Tech Salary Structure"; is that

13   correct?

14      A.   That is correct.

11:11:19 15      Q.   And would that include software engineers and

16   people in the engineering side of the company?

17      A.   That would be primarily software developers,

18   yes, software engineers.

19      Q.   And then the grades go from ████████████; is

11:11:38 20   that correct?

21      A.   Well, I would say the grades for the tech

22   salary structure go from ████████  ████████████

23   ████████  ████████████████████  It really isn't part

24   of the tech structure.

11:11:53 25      Q.   Okay.  And what is your understanding of how

1    to read what the different columns mean?

2         A.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3               I'll just go across the top.

4         Q.    That's perfect.  Thank you.

11:12:11  5    A.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

7               ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

8    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11:12:27 10         ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  I also would

11   infer that was based on our philosophy at the time.

12              ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11:12:48 15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16        Q.    And then going down to the next -- the middle

17   boxes,  ▮▮▮▮▮▮▮▮▮▮▮

18        A.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

11:13:16 20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21   ▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22   ▮▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24   ▮▮▮▮

11:13:29 25       Q.    Okay.  And that group has the  ▮▮▮▮▮▮▮▮▮

1    four guidelines, does this document we've marked as

2    Exhibit 1600 reflect the four guidelines, or would

3    there have been something else you would be talking

4    about in the 2007 era?

11:18:00  5        A.   Well, we had this general topical structure

6    for the first six or eight months of 2007, and then we

7    moved to something more granular.

8        Q.   Okay.  And can you describe for me what

9    changed?

11:18:19 10       A.   What changed in terms of the salaries?

11       Q.   Yes, the salary ranges.

12            MR. RUBIN:  You're not asking about specific

13    numbers.  You're just asking about the --

14            MS. DERMODY:  Philosophy.

11:18:43 15            MR. RUBIN:  -- concepts?

16            THE WITNESS:  Oh, okay.

17    ████████████████████████████████████████████

18    ████████████████████████████████

19    ████████████████████████████████████████

11:18:55 20    ███████  ████████████████████████████

21    █████████████████  █████████████████████

22    ███████████████████████████████████████

23    ████████████████████████████████████████████

24    ████████████████  ██████████████████████

11:19:19 25    ████████████████████

 1    ████████████████████████████████

 2    ████████████████████████████████████

 3    ████████████████████████████████████████

 4    ████████████████████████████████████████

11:19:40  5    ██████████████████████████████████████

 6    ███████████

 7    ██████████████████████████████████████████

 8    ████   █████████████████████████

 9    BY MS. DERMODY:

11:19:54 10        Q.   ████████████████████████████████

11    ███████████████████████

12        A.   ████████████████████████████████████

13    █████████████████████

14        Q.   And since that change happened, have there

11:20:17 15    been other conceptual changes to the salary range

16    approach?

17        A.   No, we've maintained that general approach

18    that we benchmark and compare jobs, ███████████

19    ████████████████████████████████████████

11:20:35 20    ███████████████████

21        Q.   And if you wanted to identify what the target

22    salary would be for a certain job within a certain

23    grade, could you go online or go to some place in your

24    office and pull up what that was for that job family

11:21:00 25    and that grade?

1     A.   Could I do it?

2     Q.   Yes.

3     A.   Yes.

4     Q.   And could you have done that since this change

11:21:08  5   in philosophy happened?

6     A.   Since -- since we implemented the more

7   granular approach?

8     Q.   Yes.

9     A.   Yes.

11:21:14 10   Q.   And where would you locate that information in

11  terms of your computer system or your files?  Is there

12  a manual, or is it a certain database?

13     A.   We keep data on market reference points in a

14  Excel file.

11:21:32 15   Q.   And that's for every job family?

16     A.   Yes.

17     Q.   And if you were to physically have to identify

18  on the computer where to look for that Excel file, is

19  it contained within a certain employee's documents, or

11:22:04 20  is it something that has a certain title within your

21  team?

22     A.   It's a secure area of the Google servers

23  somewhere.

24     Q.   So if you were instructing another person who

11:22:20 25  wasn't familiar with how to locate that document and

1   you needed to find it, what would you tell them to look

2   for?  Is there a certain search you would do?

3        A.   If I was talking to someone on my team, they

4   would know where to find it.  I would say, "Get me the

11:22:34 5   MRP file."  But it is on a secure area of the Google

6   server that's set aside for the compensation team.

7             I have not had the occasion to actually do --

8   go and look at myself, since my team does that as

9   opposed to me personally.

11:22:54 10       Q.   Okay.  But the common name would be the "MRP

11  file"?  Is that fair?

12       A.   The list of our MRPs is in the MRP file, yes.

13       Q.   Okay.  Thank you.

14            MS. DERMODY:  Should we take a short break?

11:23:06 15       MR. RUBIN:  Sure.

16            MS. DERMODY:  We've been going for a bit.

17            MR. RUBIN:  Sure.

18            MS. DERMODY:  Thanks.

19            THE VIDEOGRAPHER:  This is the end of video

11:23:12 20  No. 1.  The time is 11:23 a.m.  We're going off the

21  record.

22            (RECESS TAKEN.)

23            THE VIDEOGRAPHER:  This is the beginning of

24  video No. 2 in the deposition of Frank Wagner.  The

11:39:36 25  time is 11:39 a.m.  We're back on the record.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   BY MS. DERMODY:

2       Q.   Okay, Mr. Wagner.  Going back to when you were

3   describing some of your areas of responsibility as a

4   director, you mentioned that at some point you added to

11:39:54  5   your regular responsibilities an initiative involving

6   counteroffers.

7            Do you recall that?

8       A.   Yes.

9       Q.   And can you describe what that was involving?

11:40:03  10      A.   The counteroffer initiative, I'm not -- could

11  you be a little clearer as to the specifics there, what

12  you're looking for?

13      Q.   Sure.  Maybe I was confused.  So you tell me

14  if I didn't get this correctly.

11:40:20  15           Initially you described a whole list of areas

16  of responsibility that were part of what you were

17  handling when you first started in 2007, and then there

18  was some changes over time, and one of the changes that

19  added a responsibility, I thought, was the counteroffer

11:40:39  20  area.

21           Was that a misunderstanding on my part?

22      A.   No.  I think what happened is that the

23  counteroffer used was infrequent and ad hoc when I

24  first joined, with a very small end count.  But then I

11:40:57  25  recall, whether it was toward the end of '07 or so, the

1    counteroffer request became more frequent.  And so,

2    working with Laszlo, we determined that we should

3    implement a more formal process where we designated

4    people on the team to be available to assist with the

11:41:16  5    counteroffer process.

6            Is that enough information for you?

7    Q.   Yes.

8    A.   I'm sorry.  I'm sure that -- yeah.  I'm sure

9    you'll -- well --

11:41:25 10    Q.   Yes.  I appreciate that.  I'll probably

11    trouble you with follow-up questions when I'm confused.

12    A.   Got it.

13    Q.   But thank you.

14    A.   Got it.

11:41:32 15    Q.   And I do have some follow-up questions.

16    A.   Okay.

17    Q.   So in terms of the counteroffer, the

18    formalization of the process for counteroffers, did

19    that involve all jobs at Google or was that targeted to

11:41:44 20    certain types of jobs?

21    A.   The counteroffer process ███████████████

22    ████████████████████████████████████████████

23    ████████████████████████████████████

24    ████████████████████████  ███████████████

11:42:02 25    ████████████████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



```
          1     ████████████████████████████████████████

          2     ████████████████████████████████████████████

          3     ███████████████████████████████████████

          4     ████████████████

11:42:18  5          Q.   And using the different categories of types of

          6     jobs that are represented on Exhibit 1600, ███████████

          7     ████████████████████████████████████████████████

          8     ███████████████████   -- be possible in all of those areas

          9     or only in some of them?

11:42:44 10          A.   When -- at what -- initially, you mean?

         11          Q.   Yes, initially.

         12          A.   ████████████████████████████████

         13     ████████████████████████████████████████████

         14     ██████████████████████████████████

11:43:00 15          Q.   And when you say "initially," did you mean

         16     when you started in 2007?

         17          A.   Correct.

         18          Q.   Okay.  And did that --

         19          A.   And -- sorry.

11:43:07 20               And then also when we implemented the more

         21     formal process for -- established on my team to help

         22     with the counteroffer process.

         23          Q.   Okay.  So that continued.  █████████████████

         24     ██████████████████████████████████████████████; is

11:43:20 25     that --
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    A.   Correct.  That's correct.

2    Q.   Okay.  As you recall, when you started to

3    formalize a counteroffer process, did you develop

4    guidelines for how to counteroffer?

11:43:42  5    A.   Yes.

6    Q.   And what were those?

7         MR. RUBIN:  Objection.  Vague.

8         THE WITNESS:  Well, if you mean that --

9    there's two aspects, I think.  One is whether we should

11:43:57  10    counteroffer, and secondly would be the magnitude, is

11    how I think about it.

12         So again, we just had general principles that

13    I mentioned earlier about the type of jobs that will be

14    eligible for a counteroffer.

11:44:10  15         The magnitude tended to be, initially, that we

16    would match the amount of compensation that someone

17    would have had in their external offer with a focus on

18    providing it in equity rather than other components of

19    compensation.

11:44:37  20    BY MS. DERMODY:

21    Q.   And over time, did the guidelines on magnitude

22    change?

23    A.   So do you mean like in 2008 or 2009?

24    Q.   Sure.

11:44:46  25    A.   So initially, yes, relative to the initial,

1    for select companies, we became more aggressive with

2    the magnitude.

3        Q.    Did your philosophy about magnitude stay the

4    same for the companies that weren't the select

11:45:13  5    companies?

6        A.    Yes.

7        Q.    Okay.  And what were the select companies

8    where you changed your philosophy around the magnitude

9    of the counteroffer?

11:45:24  10        A.    The select companies initially, when we first

11    initially did it, did the process, it was focused

12    primarily, if not -- not exclusively but primarily on

13    Facebook.

14        Q.    Okay.

11:45:38  15        A.    And then your other question was did -- did

16    you say -- did you ask for other companies?  Is that

17    what you said?

18        Q.    Sure.  Were there other companies as well in

19    the select companies that you were counteroffering to?

11:45:51  20        A.    Yes, eventually that list expanded from just

21    Facebook to other organizations.

22        Q.    And what were those?

23        A.    Various companies were included or not

24    included on the list.  The primary one that was added

11:46:12  25    after Facebook was Twitter, and Square was also added,

1    and I believe, my recollection is Groupon was on the

2    list for a time but dropped off.

3         Q.   And were there any other of those companies

4    that you can recall?

11:46:29 5         A.   There were companies that we would consider

6    for a counteroffer, most of which -- I believe all of

7    which exclusively were start-up-type organizations.  I

8    don't recall the counteroffers being employed for

9    larger, established organizations, but my recollection

11:46:53 10   is that it was exclusively within the start-up space,

11   and each situation was looked at on its merits and the

12   characteristics or principles about the type of folks

13   that we like to retain.

14        Q.   And in terms of the distinction between the

11:47:11 15   select companies where you, I believe, characterized

16   counteroffers as being more aggressive, versus the

17   nonselect companies which follow the usual approach,

18   what was the difference in philosophy to the select

19   companies?

11:47:27 20        A.   Well, I was implementing that, so I didn't

21   make those decisions.  That was made by our executive

22   team.  But generally they were the types of

23   organizations that were -- we worried about in our

24   competitive space.  That was my understanding.

11:47:44 25        Q.   Okay.  And just in terms of -- going back to

1    the magnitude description, I think you said that

2    initially there had been an approach that was to match

3    compensation and focus on equity offers for candidates

4    for counteroffer.

11:48:04  5          Is that correct?

6          A.    That is correct.

7          Q.    And then you changed that for select companies

8    over time; is that correct?

9          A.    That is correct.

11:48:10 10        Q.    And how did you make -- how did you change

11   that approach?

12         A.    We still almost exclusively used equity, but

13   instead of matching the amount offered by the external

14   organization, we went to a larger multiple.

11:48:28 15        Q.    So a larger multiple on the base salary?

16         A.    No.

17         Q.    Larger -- explain.

18         A.    Sorry.  A larger multiple of the equity.

19         Q.    Okay.

11:48:38 20        A.    For example, if person -- a person got

21   $100,000 in equity from start-up X, from Facebook, we

22   would offer something more than $100,000.

23         Q.    Okay.  So the approach would be to match

24   compensation and have a larger multiple on equity; is

11:48:56 25   that correct?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    you started in the company?

2         A.    For the compensation team?

3         Q.    Yes.

4         A.    We -- we have -- by various names, whether

11:58:03  5    it's the direct report or the managers in

6    compensation.  We've called it different things over

7    time.  But there are weekly meetings of the managers or

8    leaders in the compensation team, and there are monthly

9    to bimonthly all-hands meetings.

11:58:17 10         Q.    And has that been since you started in 2007,

11    those two types of meetings for your team?

12         A.    Yes.

13         Q.    Okay.  And is there a difference of attendees

14    in the weekly meetings versus the monthly or bimonthly

11:58:42 15    all-hands?

16         A.    Right.

17              So the monthly all-hands would be everybody,

18    and the weekly meeting was generally managers.  So that

19    population has varied from five to eight people on

11:58:55 20    average.

21         Q.    And how about the monthly or bimonthly

22    all-hands meeting?  How big is that group?

23         A.    Well, when I joined it was about ten people,

24    and now it's about 42 or 43.

11:59:07 25         Q.    Okay.

1      A.   So we've grown with the company.  You know,

2   we've quadrupled, and I think the company is about 4X

3   the time -- the size of what it was when I first

4   started.

11:59:19  5      Q.   And in terms of subject matter that's covered

6   in these two different meetings, can you tell me about

7   the weekly meeting?  And if it's changed over time,

8   feel free to say it was different in '07 versus

9   present.

11:59:34 10      A.   No, it would be -- it would be very similar.

11   ███████████████████████████████████████████

12   ███████████████████████████   ███████████████████

13   █████████████████████████████████████████████

14   ██████████████████████████████

11:59:59 15      ████████████████████████████████████████

16   ████████████████████   █████████████████████████████

17   █████████████████████████████████████████████████

18   ███████████████████████████████████████████

19   ████

12:00:12 20      ████████████████████████████████████████████

21   ████████████████████████████████████

22      Q.   Okay.  And who -- are there certain titles

23   under the compensation -- under your title, director of

24   compensation, that are -- let me strike that.

12:00:32 25           The people who attend the weekly meeting are

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    all the managers who report to you on the compensation

2    team; is that correct?

3        A.    As -- yes, as well as those who report to Eric

4    Schaffer.

12:00:41  5      Q.    Okay.  And then what are the types of topics

6    covered at the all-hands monthly or bimonthly meeting?

7        A.    ██████████████████████████████████

8              ██████████████████████████████████

9    ███████████████████████████████████████████

12:01:11 10   ██████████████████████████████████████

11   ███████████   We would do team debriefs.  Those types of

12   things.

13       Q.    Okay.  And has that been the general subject

14   area since you started in 2007?

12:01:32 15     A.    Yes.

16       Q.    Okay.  And thinking about your team meetings,

17   have those meetings ever talked about recruiting

18   issues?

19            MR. RUBIN:  Objection.  Vague.

12:01:45 20            THE WITNESS:  No.

21   BY MS. DERMODY:

22       Q.    Okay.  And that's true for your manager

23   meeting as well as the all-hands?

24       A.    The -- if by "recruiting" do you mean the

12:01:56 25   volume of offers that we had to extend from the team

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    didn't know how it -- whether we'd be concerned or not.

2         Q.   Okay.  And did you then speak with Mr. Geshuri

3    about the list?

4         A.   I can't recall if I spoke or whether it was an

12:05:24  5    e-mail conversation.  But we had an interaction on the

6    list, yes.

7         Q.   And at some point did you physically observe a

8    list of companies to not cold-call into?

9         A.   I don't recall that.  My recollection is that

12:05:38 10    Genentech was on the list and there were other

11    companies on the list.

12         Q.   And you're not sure whether or not you

13    actually saw the list or just learned of it in some

14    other way?

12:05:52 15         A.   I don't believe I saw a physical list.  I

16    can't recall.  Arnnon may have said -- met me in the

17    hallway, or maybe it was e-mail or something like that,

18    but I don't recall specifics.

19         Q.   Mr. Wagner, placed in front of you is a

12:06:36 20    document that was previously marked at a deposition as

21    Plaintiff's Exhibit 1049.  Do you see that number

22    stamped on the document?

23         A.   Yes, I do.

24         Q.   Okay.  And you'll -- if you'll look on the

12:06:47 25    bottom left on that first page, you'll see a date that

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    says 3/7/2007.

2         Do you see that?

3    A.    I do.

4    Q.    Okay.  And in looking at this document, do you

12:07:01 5    recognize having seen this at some point?

6    A.    Yes.

7    Q.    Okay.  And when did you see this document?

8    A.    Yesterday.

9    Q.    Okay.  And if you want to take a moment to

12:07:15 10   read through it, if you need to.

11         If you can tell me whether looking at this

12   confirms what your knowledge was in 2007 as to what

13   companies were on the list.

14         MR. RUBIN:  Objection.  Lacks foundation.

12:07:30 15   THE WITNESS:  The only companies that I was

16   aware of or that I recall were Genentech, Intel and

17   perhaps Apple.  I'm not certain of that.

18   BY MS. DERMODY:

19   Q.    Okay.  Did you ever become aware of Intuit

12:07:53 20   being on the list?

21   A.    I think I became aware later.  I think that

22   may be the case.

23   Q.    Okay.  Did anyone ever tell you why Genentech

24   was on the list?

12:08:14 25   A.    No, they didn't tell me specifically.  I only

1    assumed it was because of Art Levinson.

2        Q.   Okay.  And how about Intel?  Did you ever have

3    an understanding of why Intel was on the list?

4        A.   I think it's the same answer, in that I don't

12:08:29  5    think I ever asked specifically why Intel's on the

6    list, but since Paul Otellini was on our board, I

7    assumed it was because he was on the board.

8        Q.   Okay.  And how about Apple?  Same question.

9    Did you ever have an understanding of why Apple was on

12:08:42  10    the list?

11            MR. RUBIN:  Objection.  Lacks foundation.

12            THE WITNESS:  Yeah, I -- I -- same -- same

13    response.  Although we didn't have -- I believe that

14    Eric Schmidt was on the Apple board at the time, but

12:08:59  15    I -- I assumed perhaps that was the reason, but I had

16    no basis to -- I just assumed that.

17            MS. DERMODY:  Okay.

18            THE WITNESS:  No one ever told me why these

19    companies were on the list.

12:09:06  20    BY MS. DERMODY:

21        Q.   Okay.  And same question with Intuit.  Did you

22    ever have an understanding as to why Intuit became to

23    be on the list?

24        A.   I think it's the same response.  I don't think

12:09:16  25    anyone ever said overtly Intuit is on the list because

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1   of X, but I assumed it was because Bill Campbell was an

2   advisor to Google.

3       Q.   Okay.  And did you have an understanding in

4   the 2007 period of what being on the list meant in

12:09:35 5   terms of what Google could or could not do?

6       A.   My only understanding at the time was that we

7   wouldn't cold-call employees at those companies.

8       Q.   And did you have an understanding at that time

9   as to whether those companies had a reciprocal

12:09:51 10  agreement with Google?

11      A.   I had no idea of that.

12      Q.   Okay.  You didn't know one way or the other?

13      A.   Correct.

14      Q.   Okay.  After the communication you had about

12:10:19 15  the potential Genentech hire and your follow-up with

16  Mr. Geshuri, did you speak with anyone else in the

17  company about the do-not-call policy?

18      A.   I can't recall any specific conversations

19  about that.

12:10:39 20      Q.   Okay.

21      A.   I do believe that I recall there may have been

22  offers to other folks from either Intel or maybe Intuit

23  where there might have been correspondence as to

24  whether it was appropriate to extend the offer -- an

12:11:03 25  offer that we were planning to do.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.    Okay.  And when you said there was

2    correspondence, would that have been within your team

3    or someplace else in the company or external?

4    A.    It would -- no, it would be internal to

12:11:18  5    Google.

6    Q.    And would you have been involved in those

7    types of discussions?

8    A.    What types of discussions?

9    Q.    I'm sorry.  Communications about an employee

12:11:27 10    at a company that was on the list.

11    A.    Only to the degree that we were extending an

12    offer to a person from Company X and whether there --

13    whether it was handled in the appropriate way, or

14    whatever we deemed to be appropriate.

12:11:44 15    Q.    Okay.  And who would you reach out to to ask

16    that question?

17    A.    I can't recall.  Perhaps Laszlo.  Perhaps

18    Arnnon.

19    Q.    Okay.  Do you recall approximately how many

12:12:06 20    times you might have had those communications about a

21    potential employee from a company on the list?

22    A.    Best of my -- I would call it a handful,

23    perhaps five or less, but I can't -- I can't remember.

24    That was an approximation.

12:12:25 25    Q.    Okay.  Do you recall any details about any of

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

                1        A.    Short answer is this is similar to that.

                2   Whether this is the same thing that Adrienne helped

                3   develop or whether we developed this later, in either

                4   case, it's something we used to train recruiters on our

02:22:20        5   compensation programs.

                6        Q.    Okay.  So turning to page 36297, you should

                7   have a caption at the top that says "Compensation

                8   Components."

                9           Do you see that?

02:22:52       10        A.    I do.

               11        Q.    And what is this page reflecting?

               12        A.    Well, it looks like it's reflecting some

               13   summary of details that follow in subsequent slides,

               14   and it goes by category -- bless you.  It goes by

02:23:13       15   category of compensation, the salary, and some features

               16   or things we wanted providers to understand related to

               17   our salary programs related to our bonus program, our

               18   long-term incentives and then the use of sign-on

               19   bonuses and relocation.

02:23:27       20        Q.    Under "Base Salary" where it says

               21   "Benchmarking," do you see that?

               22        A.    I do.

               23        Q.    Is the benchmarking what you testified to

               24   earlier today, benchmarking to the external market, the

02:23:39       25   value of those jobs in the marketplace?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1          A.    That is what I figure I meant.  I'm going to

2     look at what we say.

3               Yeah.  Yes.

4          Q.    And the next item down below "Benchmarking" is

02:23:57  5     "Leveling."

6               Can you just describe what that is?

7          A.    That would be assigning a candidate to the

8     appropriate level at Google.

9     ██████████████████████████████████  ████████

02:24:09 10   ████████████████████████████████████████████████

11   ████████████████████████████████████████████████

12   ██████████████████

13         Q.    So if you were to describe what the

14    expectation is for a recruiter under "Base Salary"

02:24:26 15   using these three items listed, "Benchmarking,"

16    "Leveling" and "Proposing a Base," what would be the

17    system that they would follow?

18               MR. RUBIN:  Objection.  Vague.

19               THE WITNESS:  Yeah, the system they would

02:24:39 20   follow for what?

21    BY MS. DERMODY:

22         Q.    For setting base salary.

23               MR. RUBIN:  Same objection.

24               THE WITNESS:  But they didn't set base salary.

02:24:46 25   BY MS. DERMODY:

1    Q.   Okay.  Is this just explaining how a base

2    salary is set?

3    A.   Correct.

4    Q.   Okay.  So they're explaining the base salary

02:24:53   5    as they understand it to the candidate?

6    A.   Yeah, typically they would -- a candidate

7    would get an offer, 

8

9

02:25:09  10

11

12

13

14

02:25:23  15                                                 We

16   have stock units, and not everybody has stock units.

17   Here's how it works.

18        And so we wanted to give them the basics of --

19   each feature of the compensation program and have them

02:25:37  20   understand the benchmarking and leveling process, not

21   so they could explain our benchmarking to the -- to a

22   candidate, but rather just so they know we were being

23   thorough and had the right key points to understand,

24   like, you know, we benchmark to the tech market, et

02:25:54  25   cetera.

1      Q.   Okay.  Thank you.

2         If you could turn to page 36301, please.  And

3  the caption at the top should be "Leveling."

4         Do you see that?

02:26:13  5      A.   I do.  I do see that.

6      Q.   And the statement below that says, "When

7  leveling a job, Google aims to be internally consistent

8  and externally competitive."

9         Do you see that?

02:26:26 10     A.   Yes.

11     Q.   And why is it your understanding Google tries

12  to be internally consistent?

13     A.   By that what we're inferring is we want to be

14  consistent in how we apply things.  ███████████

02:26:41 15  ████████████████████████████████████████████

16  ███████████████████████████████████████

17  ███████████████████████████████████████

18  █████████████████████

19     Q.   And in what way are you trying to be

02:26:57 20  externally competitive?

21     A.   Well, the overall magnitude or starting point

22  of our pay levels for salary are related to our MRP.

23  So how we target that determines the opportunity for

24  where a new candidate might come in.

02:27:17 25        For example, I think it might be helpful, if

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    ███████████████████████████████████████

2    ███████████████████████████████████

3    ████████████████████████     ████████████████████

4    █████████████████████████████████████

02:27:33  5    ████████████████████████████████████████

6    ███████████████████

7          That's the goal.   ███████████████████████

8    ████████████████████████████████████████

9    ██████████████████

02:27:42  10        Q.    Okay.  If you could turn to page 36338.  It

11    should say "Roles and Responsibilities" at the top.

12          Do you see that?

13    A.    Yes.

14          Q.    Under the bullet for "Lead Recruiter's role,"

02:28:08  15    the third dash says, "Point of contact for compensation

16    communications."

17          Do you see that?

18    A.    I do.

19          Q.    And what does that indicate?

02:28:17  20    A.    I believe we tasked -- rather than train every

21    single recruiter, I believe what we did is we trained

22    the lead recruiters using these materials and then

23    asked them to train their staff to make sure they

24    understood things.

02:28:36  25          Q.    Okay.

1          A.    That's my recollection.

2          Q.    Okay.  And was it your understanding that the

3    discussion about compensation with the candidate would

4    be the responsibility of the lead recruiter, or could

02:28:49  5    it be any recruiter?

6          A.    ████████████████████████████████████████

7    ███████████████████████████████████████████████

8    ██████████████████████████████████████████

9          Q.    Okay.

02:29:01 10         A.    I just think they're just a scale and

11    volume-level issue if you did that.

12         Q.    And was that your understanding going back to

13    2007 or is that more recent times?

14         A.    No, that would be the understanding going back

02:29:13 15    in time.

16         Q.    I think that might be it for that document.

17              THE WITNESS:  I wonder if I could take a

18    two-minute bio break.

19              MS. DERMODY:  Absolutely, yes.  Thanks for

02:29:51 20    asking.

21              THE WITNESS:  Okay.

22              THE VIDEOGRAPHER:  Do we have a time for a

23    video change?

24              MS. DERMODY:  Yes, please.

02:29:56 25              THE VIDEOGRAPHER:  This is the end of video

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

             1    No. 3.  The time is 2:29 p.m.  We're going off the

             2    record.

             3            (RECESS TAKEN.)

             4            THE VIDEOGRAPHER:  This is the beginning of

02:38:48     5    video No. 4 in the deposition of Frank Wagner.  The

             6    time is 2:38 p.m.  We're back on the record.

             7    BY MS. DERMODY:

             8        Q.   Mr. Wagner, the document we -- I've just been

             9    talking about, Exhibit 1605 -- should be the top one.

02:39:04    10        A.   Exhibit 1606?

            11        Q.   Exhibit 1606.

            12             Can you please turn to page 36298.

            13        A.   Okay.

            14        Q.   And the top will say "Benchmarking Overview."

02:39:23    15             Do you see that?

            16        A.   I do.

            17        Q.   And four bullets down it says the "Peer

            18    comparator companies."

            19             Do you see that?

02:39:30    20        A.   I do.

            21        Q.   And this list includes Apple, you'll see?

            22    Yes?

            23        A.   Mm-hmm, it does.

            24        Q.   And Intel?

02:39:41    25        A.   Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      Q.   And Intuit?

2      A.   Yes.

3      Q.   And Adobe?

4      A.   Yes.

02:39:47  5      Q.   Among others; correct?

6      A.   ████████████████████████

7      Q.   And does this refresh your recollection that

8  these are -- have been considered among the peer

9  comparator companies?

02:40:01  10     A.   ██████████████████████████████

11  ██████████████████████████████████████

12  ████████████    ██████████████████████

13  ██████████████████████████████████

14  ████████████████████████████████████

02:40:22  15  ██████████████████████████████████

16  ████████████████████

17     Q.   And so this document reflects that Apple would

18  be considered a peer comparator; is that correct?

19     A.   Yes, they would be part of the broader tech

02:40:37  20  market.

21     Q.   And same with Intel and Intuit and Adobe?

22     A.   Yes.

23     Q.   Okay.  Now, earlier this afternoon we looked

24  at a different exhibit which was marked as Exhibit

02:40:55  25  1602.  I think it's the very next one below Exhibit

1    1606.

2        A.    Yes.

3        Q.    And when we first introduced the document, I

4    mistakenly referred to it as 1062.  But as you look at

02:41:08  5    this document with the Bates number 379374, it's

6    Exhibit 1602; is that correct?

7        A.    Yes, and I didn't -- I did not hear you say

8    "1062."

9        Q.    Okay.  You can feel free to correct me if you

02:41:21  10    do.

11        A.    Okay.

12        Q.    Thank you.

13            (DEPOSITION EXHIBIT 1607 MARKED.)

14    BY MS. DERMODY:

02:41:47  15        Q.    The document we've marked as Exhibit 1607

16    should have the number 473938 on front.

17            Do you see that?

18        A.    473938, yes.

19        Q.    938.

02:42:06  20            Do you recognize this document?

21        A.    I do not, but let me -- let me look through it

22    and see if it refreshes my memory in any way.

23            Okay.  I have a general thought of what this

24    is.

02:43:07  25        Q.    Okay.  And what is that?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    There are other companies, I think.

2        Q.    Do you believe that the number of companies

3    beyond this is a small number, or is this a tiny

4    fraction of what's at the Deloitte quarterly meeting?

03:06:51  5        A.    This is about half, I would say.

6        Q.    Okay.  And at that meeting, did the companies

7    share their individual comp planning predictions?  Is

8    that how this was obtained?

9        A.    I think it might have been sent separately to

03:07:11 10    Deloitte, but I can't recall.

11        Q.    Okay.  So you either got it through Deloitte

12    identified by company or you got it directly from the

13    other companies?

14            MR. RUBIN:  Objection.  Lacks foundation,

03:07:24 15    mischaracterizes prior testimony.

16            THE WITNESS:  So say that question again.

17    BY MS. DERMODY:

18        Q.    Sure.

19            Is it your testimony that you either received

03:07:33 20    the information contained on Exhibit 1611 from the

21    companies themselves, or through Deloitte, separated by

22    company?

23            MR. RUBIN:  Same objection.

24            THE WITNESS:  Yeah, it could be either.  I

03:07:43 25    don't recall.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

BY MS. DERMODY:

Q.   Is it one of those two?

A.   I believe so.

Q.   Okay.  And was there any other information

03:07:51  that you received about compensation on a company basis

from any of these companies in this time period?

MR. RUBIN:  Objection.  Vague.

THE WITNESS:  In this time period?

Well, what we -- typically this is a forum at

03:08:10  which we discuss treatment of equity processes.  For

example, do you use an internally developed system to

administer equity grants or you do an externally

developed system.  Do you use performance-vesting or

time-vesting stock units?  Do you vest your equity

03:08:34  grants over three years or four years?  So if you have

a performance-based approach, do you use financial or

nonfinancial metrics?

So it's more process, typically, as opposed to

comp -- comp-specific details.

03:08:48  BY MS. DERMODY:

Q.   When you did talk about comp, did you talk

about compensation of particular types of employees to

benchmark where you were relative to other companies?

A.   You mean the pay levels of --

03:09:02  Q.   Yes.

1       A.    -- for specific jobs?

2       Q.    Yes.

3       A.    Never.

4       Q.    Did you talk about any of the recruiting

03:09:09  5   initiatives any of you were undertaking?

6       A.    No.

7       Q.    Other than talking about what you expected to

8    be your merit-increase levels, did you talk about bonus

9    information company by company?

03:09:22 10     A.    ██████████████████     ██████████████

11   █████████████████████████████████████████████

12   ████████████████████████████████████████

13   ███████████

14         ███████████████████████████████

03:09:36 15   █████████████████████████████████████████

16   ████████████████████████████████████  ██

17   ██████████████████

18         ████████████████████████████████████

19         And your other question was?

03:09:52 20     Q.    Whether you received other types of

21   company-level compensation information.

22     A.    ████████████████████████████████

23   ██████████████████████

24     Q.    Did you talk about expectations around

03:10:08 25   bonuses?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.    No.

2            MR. RUBIN:  Objection.  Lacks foundation.

3  BY MS. DERMODY:

4      Q.    And this is a document from 2008.  Did you

03:10:16  5  share information like this with these other companies

6  in subsequent years?

7            MR. RUBIN:  Objection.  Vague.

8            THE WITNESS:  Yeah, I don't recall.  I don't

9  believe so.  This context -- actually, if I recall, the

03:10:35  10  context of this was in October.  This is when the

11  economic circumstances and stock market was dropping

12  precipitously.  ████████████████████████████

13  ████████████████████████████████

14  ████████████████████████████████████████

03:10:51  15  ████████████████████████████

16       ███████████████████████████████████

17  ██████████████████████████████████████████

18  ███████████████████████████████████████

19  ███████████████████████████████████████

03:11:06  20  ███████████████████████████████████████

21  █████████████████████████████████████

22  BY MS. DERMODY:

23      Q.    Okay.  Did you receive from Deloitte a

24  selection of companies' compensation information of the

03:11:25  25  type listed here for any compensation measure, equity,

1              THE VIDEOGRAPHER:  This is the end of video

2    No. 4.  The time is 3:22 p.m.  We're going off the

3    record.

4              (RECESS TAKEN.)

03:36:33   5              THE VIDEOGRAPHER:  This is the beginning of

6    video No. 5 in the deposition of Frank Wagner.  The

7    time is 3:36 p.m.  We're back on the record.

8              (DEPOSITION EXHIBIT 1613 MARKED.)

9    BY MS. DERMODY:

03:36:47  10         Q.   All right, Mr. Wagner, I'll pass you a

11   document that we marked as Exhibit 1613.  This should

12   have the Bates number 473658.

13             Is that what you're looking at?

14         A.   Yes.

03:37:05  15         Q.   And do you recognize this document?

16         A.   Yes.  I vaguely remember the original, but I

17   recall the circumstances.

18         Q.   Okay.  And what is this?

19         A.   This is a note to Linus Upson, who's one of

03:37:49  20   our senior engineering directors at the time, now a

21   vice president, and there is a group of engineers

22   who -- Alan Eustace and the senior executives --

23   engineering executives asked us to review our proposed

24   salary model for 2007.

03:38:08  25         Q.   And you'll see there's a numbered list of

1    goals of the salary algorithms as listed in this

2    e-mail.

3          Do you see that?

4       A.   Yes.

03:38:22  5    Q.   And the first one says, "Ensure internal

6    equity by managing salaries within a reasonable range."

7          Do you see that?

8       A.   I do.

9       Q.   And what does that mean to you?

03:38:33 10    A.   What Tiffany is saying is that there will be a

11   distribution of salaries within a job level, and that

12   job could vary -- vary by -- typically it would be

13   based off performance.  That would be our philosophy.

14   So she called it "reasonable," whether appropriate or

03:38:57 15   whatever the number is.  ████████████████████████

16   ████████████████████████████████████████████████████

17   ████████████████████████████████

18          ████████████████████████████████████

19   ██████████████████████████████████          That is her

03:39:18 20   suggestion.

21       Q.   And the term "internal equity," is that

22   equivalent to "fairness"?

23       A.   I think that -- I don't know if it's exactly

24   equivalent to "fairness," but I would characterize it

03:39:34 25   as it's the appropriate relationship of pay based on

1    whatever factors we deem ideal or desired, which in our

2    case is generally performance.

3        Q.    And does that also include assigning a base

4    salary based on the employee's skill level and talent?

03:40:06 5        A.    Well, if you're in a particular job, then your

6    general skill level should be approximately the same as

7    everyone else.

8              Oops.  Do I have to go back at all or --

9              So the skill level is really similar to those,

03:40:27 10   and so -- and they meet the qualifications for a

11   particular job level, like level 4 on our methodology

12   for someone on the T ladder.  So that the

13   differentiation should be primarily based on

14   performance.

03:40:39 15       Q.    Okay.

16             (DEPOSITION EXHIBIT 1614 MARKED.)

17   BY MS. DERMODY:

18       Q.    The document I just passed you was marked as

19   Exhibit 1614, and it should have the number 473778.

03:41:09 20            Do you see that?

21       A.    Yes.

22       Q.    Do you recognize this document?

23       A.    I don't recall this document, but I see that

24   I'm copied upon it.

03:41:35 25       Q.    Who is Iveta Brigis?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        A.   Iveta Brigis is a People Operations employee

 2   that used to be on the compensation team.

 3        Q.   And in looking at the e-mail from Ms. Eng to

 4   Ms. Brigis, where she says, "█████████████████████████

03:41:59  5   ███████████████████████████████████████████████████

 6   █████████████████████████████████████████████████

 7   ██████████████"

 8        Do you see that?

 9        A.   ███████████████████████████████████

03:42:14 10        Yes, I see that.

11        Q.   If you could walk me through what this

12   sentence means.  It's got some acronyms and --

13        A.   It's a very complicated -- just the way that

14   they frame it using acronyms.

03:42:26 15        MR. RUBIN:  I'll just object.  Lacks

16   foundation.

17        Go ahead.

18        THE WITNESS:  ██████████████████████████

19   ████████████████████████

03:42:39 20   ██████████████████████████████████████

21   ████████████████████████████████████████████

22   █████████████████████████████████████████████████

23   ██████████████████████████  ███████████████████████

24   █████████

03:42:59 25   BY MS. DERMODY:
```



 1    Prasad's team to compile this and to report.

 2        Q.   And what was the purpose of doing this

 3    analysis?

 4        A.   ████████████████████████████████████

05:01:40 5   ████████████████████████████████████████

 6    ████████████████████████████████████████████

 7    ███████████

 8        Q.   After the time you arrived at Google, did

 9    there come a point where you formed the belief that

05:02:19 10  Google should raise its base salaries across all

11    employees?

12        A.   ████████████████████████████████████████

13    ████████████████    I formed an opinion that our current

14    compensation ████████████████████████████████████

05:02:48 15  ████████████████████

16        Q.   And do you know about what year you started to

17    form that opinion?

18        A.   2008.

19        Q.   Okay.  What was your role in moving Google

05:03:02 20  from one compensation philosophy to another in 2010, as

21    you described at the start of the day today?

22            MR. RUBIN:  Objection.  Vague.

23            THE WITNESS:  Well, I think in general terms

24    the compensation team provided the data to help our

05:03:22 25  executives make a decision about how to change its

1 compensation philosophy.

2 BY MS. DERMODY:

3  Q. ███████████████████████

4 ████████████████████████████████

05:03:43 5 ███████████████████████████

6  A. ████████████████████████████

7 ██████████████████████

8 ████████████ ██████████████████

9 ███████████████████████████████

05:04:02 10 ████

11  Q. And what was your opinion?

12  A. ███████████████████████

13 ███████████████████████████████

14 ██████████████████████████████

05:04:17 15 ███████████████████████████

16 ██████████

17  Q. And I think you expressed that as "our

18 opinion."

19  A. That's Frank Wagner's opinion.  You asked for

05:04:28 20 my opinion.

21  Q. Okay.

22  A. Sorry if I was not clear.

23  Q. No, that's fine.

24  And do you recall ever discussing whether it

05:04:40 25 would be appropriate to target certain employees versus

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    all employees for a salary bump?

2        A.   Our -- my opinion -- and remember that I was

3    also part of other folks on our team that participated

4    in discussions and analysis, and there was a tremendous

05:05:02  5    amount of back-and-forth on this.  So lots of

6    discussions.

7            My recollection is most of the compensation

8    folks on my team who participated in the analysis

9    looking at the data concluded as I did, ████████████

05:05:15 10   ██████████████████████████████████████████████████

11   ████████████████████████████████

12           So that was the opinion.  It was based off all

13   the data that we had available, so -- and we provided

14   data that was supportive to our senior leaders and

05:05:34 15   executives on that.

16           I don't know if that's responsive to your

17   question, if that's what you were getting at.

18       Q.   Yes.

19           And that data was regarding all employees

05:05:43 20   supporting that --

21       A.   Yes.

22           MR. RUBIN:  Just let me object.  Object as

23   lacks foundation.

24           THE WITNESS:  Yeah, I think that you mean --

05:05:53 25   so did we discuss whether we should do it for technical

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    employees only or sales employees only or G&A employees

2    only?

3                    MS. DERMODY:  Correct.

4                    THE WITNESS:  And we -- you know, the

05:06:04  5    compensation team, Frank Wagner formed an opinion, but

6    it was still at the call of our executive team to do

7    whatever we did.

8    BY MS. DERMODY:

9        Q.   And your compensation team supported the

05:06:14  10   ultimate decision to make that change for all

11   employees; is that correct?

12       A.   Our opinion was that it would be a good thing

13   and that it would increase employee retention.  That

14   was our -- that was our hypothesis.

05:06:39  15                  (DEPOSITION EXHIBIT 1625 MARKED.)

16   BY MS. DERMODY:

17       Q.   I'm going to pass you Exhibit 1625.  That

18   should have the number at the bottom 506628.

19            Do you see that?

05:06:56  20       A.   I do.  Thanks.

21       Q.   And do you recognize this document?

22       A.   Yes.

23       Q.   And what is this?

24       A.   This is one of many discussions of documents

05:07:24  25   that we prepared for executive reviews, the OC review

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    related to what we called Project Big Bang.

2        Q.    And was Project Big Bang what we were talking

3    about earlier, the project that changed Google from

4    having one compensation philosophy to another one?

05:07:46  5        A.    Yes, it is the project that increased our

6    competitive targeting for salary compensation and total

7    cash compensation as well as the move to a more fixed

8    from a more variable pay.

9        Q.    On the first page -- sorry, the second page of

05:08:05 10    the document, the first page of the proposal, as you

11    look across the line here, is this reflecting what was

12    ultimately adopted?

13        A.    This proposal line right here, which is just

14    in the intro section?

05:08:20 15        Q.    Yes.

16        A.    So the flat 10 percent; ██████████████

17    ███████████████████████████████████████

18             There's a ghost writing here, so it's hard to

19    read these things.

05:08:38 20       █████████████████████████████████████████████

21    ████████████████████████████████████

22    ███████████████

23       ███████████████████████████████

24    █████████████  ████████████████████████████

05:08:57 25    ██████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      ████████████████████████████████████████

2      ████████████████████

3      A.   Yes, I do.

4      Q.   Do you know what that means?

05:10:39  5      A.   ████████████████████████████████

6      ██████████

7      Q.   ████████████████████████████████

8      ██████████████████████████████████████

9      A.   That's correct.

05:10:51 10      Q.   And was that adopted, that proposal?

11      A.   ████████████████████████████

12      Q.   Yes.

13      A.   ██████████████████████████████████

14      Q.   Okay.   ██████████████████████████

05:11:08 15      A.   That is correct.

16      Q.   Okay.  On the third page, where it says "page

17  3 of 3," at the top it says "Appendix."

18           Do you see that?

19      A.   I do.

05:11:19 20      Q.   It says, "Total Compensation Proposal."

21           And do you see where that is?

22      A.   Mm-hmm.

23      Q.   Can you --

24      A.   Sorry.  Yes, yes.  I'm sorry.  I was nodding

05:11:30 25  my head.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1       Q.    You're perfect.

2             Can you walk me through this line here so I

3       can understand what this reflects?

4       A.    Yes.

05:11:37   5   ████████████████████████████████

6       ██████████████████████████████████

7       ████████████████████████████

8       ███████████████████████████████████

9       ███████████████████████

05:11:57  10   ███████████████

11            So what that indicated is that our salaries in

12      the aggregate across all of Google would move from

13      ███████████████████   ██████████████

14      ████████████████████████████████

05:12:16  15   ██████████   So that our increase in cost in total

16      comp across,  ████████████████

17      █████████████   ███████████████

18      █████████████████████████████████

19      ████████████████████

05:12:34  20   Q.    Okay.  ██████████████████████

21      █████████████████████████

22      A.    Yeah,  ██████████████████████

23      ████████████████████████████████

24      █████████████

05:13:01  25            (DEPOSITION EXHIBIT 1626 MARKED.)

1    BY MS. DERMODY:

2         Q.    Passing you Exhibit 1626.  This should have

3    the number 416438.

4              Do you see that on the bottom?

05:13:26  5    A.    Yes.

6         Q.    And do you recognize this document?

7         A.    Yes.

8         Q.    And what is this?

9         A.    So this is a document -- it's an e-mail and my

05:14:00 10    response to a request from Alan Eustace about the

11    impact of the Big Bang proposal on actual salaries and

12    total cash -- or total compensation.

13        Q.    And as indicated in the middle of this page,

14    it appears that Mr. Eustace raised a question about the

05:14:23 15    effect on paychecks that this proposal would have.

16              Is that a fair characterization?

17        A.    He uses the term -- he calls it "paychecks."

18    I think he means gross compensation, because it

19    literally doesn't mean paycheck.  I think of that as

05:14:41 20    after tax, and I don't think that's what he meant here.

21              But it's about employee -- yes, the impact on

22    employee pay.

23        Q.    Okay.  ████████████████████████████████████

24    ██████████████████████████████████████████████████

05:14:59 25    ██████████████████████████████████████████████████

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  the HR business partners on this new compensation?

2      A.    Yes, I would have.

3      Q.    Okay.  If you turn to the seventh page of the

4  presentation, at the top it says, "Salary:  Three types

05:27:49  5  of increases."

6          Do you see that?

7      A.    I do.

8      Q.    And does this reflect the final decision about

9  salary that was adopted in the Big Bang initiative?

05:28:00 10      A.    Yes, that there were three types of increases

11  as suggested in this -- on this slide, yes.

12      Q.    And it says at the bottom of the same page,

13  "New base salaries will be effective January 1, 2011."

14          Do you see that?

05:28:15 15      A.    Yes.

16      Q.    And is that the date that this actually was

17  implemented?

18      A.    That's the date salary changes were effected.

19      Q.    And then on page 10 of this presentation, it

05:28:37 20  should say "Equity."

21          Do you see that?

22      A.    Yes.

23      Q.    Does this reflect what the change was to the

24  equity compensation part of total compensation?

05:28:49 25      A.    The first two bullets are accurate.  The

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    first -- the third bullet was not fully accurate.

2         Q.   And how -- what was different from the third

3    bullet of what was finally adopted?

4         A.   ████████████████████████████████

05:29:06  5    ████████████████████    ██████████████████████

6    ████████████████████

7         Q.   Okay.

8              (DEPOSITION EXHIBIT 1629 MARKED.)

9    BY MS. DERMODY:

05:29:41 10    Q.   I'm going to pass you Exhibit 1629.  This

11   should have the number at the bottom 509662.

12             Do you see that?

13        A.   Yes.

14        Q.   And do you recognize this document?

05:30:04 15    A.   Yes.

16        Q.   And what is this?

17        A.   This is a note from a member of my team

18   regarding the actual salary spend for Big Bang relative

19   to our preliminary estimates.

05:30:33 20    Q.   And does this reflect that the ultimate cost

21   of this program was 615 million?

22        A.   That's what is -- that's what it says here,

23   yes.

24        Q.   Do you have reason to believe that it was

05:30:50 25    anything different than that?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
         1        A.   I don't.

         2        Q.   Okay.

         3             (DEPOSITION EXHIBIT 1630 MARKED.)

         4    BY MS. DERMODY:

05:31:01 5        Q.   I'm passing you Exhibit 1630.  The document on

         6    the front should say INTUIT 39083.

         7             Do you see that?

         8        A.   It does.

         9        Q.   Okay.  And the second e-mail on the first page

05:31:36 10   is from Mr. Setty to the L-team, and it copies you.

         11            Do you see that?

         12       A.   I do.

         13       Q.   And that's from April 25th of 2011; is that

         14   right?

05:31:45 15       A.   Correct.

         16       Q.   Do you recognize this document?

         17       A.   Yes.

         18       Q.   Okay.  And what is this?

         19       A.   This is a summary of compensation changes that

05:32:03 20   Microsoft made in 2011.

         21       Q.   And as indicated on this document, does it

         22   reflect that Microsoft in part followed what Google was

         23   doing in terms of Google's compensation at the start of

         24   2011?

05:32:19 25            MR. RUBIN:  Objection.  Vague, lacks
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1                    REPORTER'S CERTIFICATE

 2           I, Anne Torreano, Certified Shorthand Reporter

 3   licensed in the State of California, License No. 10520,

 4   hereby certify that the deponent was by me first duly

 5   sworn, and the foregoing testimony was reported by me

 6   and was thereafter transcribed with computer-aided

 7   transcription; that the foregoing is a full, complete,

 8   and true record of said proceedings.

 9           I further certify that I am not of counsel or

10   attorney for either or any of the parties in the

11   foregoing proceeding and caption named or in any way

12   interested in the outcome of the cause in said caption.

13           The dismantling, unsealing, or unbinding of

14   the original transcript will render the reporter's

15   certificates null and void.

16           In witness whereof, I have subscribed my name

17   this 18th day of March, 2013.

18

19              [ ] Reading and Signing was requested.

20              [ ] Reading and Signing was waived.

21              [X] Reading and Signing was not requested.

22

23

24                        _____

25                        ANNE M. TORREANO, CSR No. 10520
```