# Exhibit V to the Cisneros Declaration, Revised Version – Redacted

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION


IN RE:  HIGH-TECH EMPLOYEE     )

ANTITRUST LITIGATION           )

                               )   No. 11-CV-2509-LHK

THIS DOCUMENT RELATES TO:      )

ALL ACTIONS.                   )

_____)


HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY


VIDEO DEPOSITION OF SERGEY BRIN


MARCH 19, 2013


Reported by:  Rosalie A. Kramm, CSR No. 5469, CRR

10:16:28  1   BY MR. HEIMANN:

10:16:28  2       Q.   Now, are you familiar with the notion of

10:16:29  3   bidding wars in that context?

10:16:30  4       A.   I mean you're harping on this phrase.  My

10:16:31  5   interpretation -- I mean what might happen in a situation

10:16:32  6   is, you know, we have a candidate, decide we like them,

10:16:34  7   we make them an offer, they're thinking about it, and

10:16:35  8   they also get an offer from another company.  And they

10:16:36  9   say, you know, well, maybe if the compensation was a

10:16:38  10  little bit higher and, you know, we have to think about

10:16:39  11  whether we would alter our offer or not.

10:16:40  12           Typically we would not alter offers because,

10:16:41  13  you know, we have to -- I don't know, we presumably made

10:16:43  14  a pretty fair offer to begin with.  But sometimes for

10:16:44  15  specific positions it happens, and sometimes it might be

10:16:45  16  related to some other offer that this employee has, and

10:16:47  17  sometimes it's just whatever.  They think it is going to

10:16:48  18  be expensive to live in the Bay Area or, you know,

10:16:49  19  whatever.  Their spouse is -- is not sold on it or --

10:16:51  20  there are any number of reasons why there might be

10:16:52  21  multiple rounds of discussion with a candidate.

10:16:53  22           MR. HEIMANN:  Could you read the question back

10:16:54  23  to the witness, please.

10:16:54  24           (Record was read as follows:  "QUESTION:  Now,

10:16:54  25  are you familiar with the notion of bidding wars in that

10:16:54  1   context?")

10:16:54  2             THE REPORTER:  Do you want me to give him more

10:16:54  3   context?

10:16:54  4             MR. HEIMANN:  No.  That's okay.

10:16:55  5        Q.   I'm just asking if you are familiar with the

10:16:56  6   notion of bidding wars.

10:16:57  7        A.   I mean I --

10:16:57  8             MR. RUBIN:  Objection.  Form.

10:16:58  9             THE WITNESS:  I -- I mean I understand the

10:16:58 10   phrase.  I don't, you know --

10:16:59 11   BY MR. HEIMANN:

10:16:59 12        Q.   That's good.  What does it mean?

10:17:01 13             MR. RUBIN:  Objection.  Form.

10:17:01 14             THE WITNESS:  What does it mean?

10:17:02 15             I -- I think it's probably when people use it

10:17:03 16   in the context like that, I think that they're taking a

10:17:04 17   lot of metaphor.  I mean obviously nobody is really at

10:17:07 18   war.  So, you know, I think it is a colorful way of

10:17:08 19   describing a process of making offers and counteroffers

10:17:09 20   to candidates.

10:17:10 21   BY MR. HEIMANN:

10:17:10 22        Q.   A little bit further down in this email, "The

10:17:11 23   trick is" -- are you with me?

10:17:11 24        A.   "The trick is," yes.

10:17:12 25        Q.   "The trick is, we don't want to announce 'we

10:17:13  1    will match any other offers'.  This would encourage

10:17:14  2    gaming of us by candidates and competitors, and would

10:17:15  3    also likely drive inflation in the bidding war."

10:17:17  4            Do you see that?

10:17:17  5        A.   Uh-huh.

10:17:18  6        Q.   Now, do you have an understanding of what

10:17:18  7    "inflation in the bidding war" in this context means?

10:17:20  8        A.   Okay.  So this is me interpreting Shona from

10:17:22  9    nine years ago.  I think that she was saying that if it

10:17:23 10    was broadly believed that Google would match any other

10:17:24 11    offer from any other company, then it would cause

10:17:25 12    candidates to perhaps trick us, or competitors to trick

10:17:26 13    us by simply, you know, making an outlandish offer to a

10:17:28 14    candidate and say, oh, well, we're going to pay you $10

10:17:30 15    million, you know, just to start, and they would take

10:17:30 16    that to Google, and they would be under the impression

10:17:32 17    that Google would have to match that.

10:17:33 18            Yes.  So it would be silly to have either a

10:17:34 19    policy or a broad belief that we would simply blindly

10:17:35 20    match any other offer.

10:17:36 21        Q.   And then she went on to write, "We also don't

10:17:37 22    want to go out of alignment from an internal equity

10:17:38 23    perspective."  Do you see that?

10:17:39 24        A.   I do see that.

10:17:40 25        Q.   Do you have an understanding as to what

10:17:40  1   "internal equity" means in this context?

10:17:41  2       A.   In this case I imagine she was talking about

10:17:42  3   the notion that if we were to hypothetically match

10:17:43  4   another offer from another company, and it was way out of

10:17:45  5   whack, then other of our employees who are, let's say, at

10:17:47  6   the same level, a similar performance, might have a lower

10:17:48  7   compensation and be upset about that.

10:17:50  8       Q.   Was the notion of internal equity in that

10:17:51  9   context of any importance to Google in terms of its

10:17:52 10   practices with its employees?

10:17:54 11           MR. RUBIN:  Objection.  Form.

10:17:54 12           THE WITNESS:  Sorry.  Can you repeat that?

10:17:55 13   BY MR. HEIMANN:

10:17:55 14       Q.   Was the notion of internal equity in this

10:17:56 15   context of any significance to Google in terms of how it

10:17:58 16   dealt with its employees?

10:17:58 17           MR. RUBIN:  Same objection.

10:17:59 18           THE WITNESS:  I -- look, I -- I think we care

10:18:00 19   about fairness broadly and certainly with respect to

10:18:01 20   compensation of our employees, and if there is a

10:18:02 21   perception or a reality that some employees are getting

10:18:04 22   disproportionately higher compensation or, you know,

10:18:06 23   probably the worst thing is if they are getting

10:18:09 24   disproportionately lower compensation for similar

10:18:12 25   performance, that would work, you know, against fairness.

Deposition of Sergey Brin                          In Re: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
10:18:17  1   BY MR. HEIMANN:
10:18:17  2       Q.   When did you first become acquainted with Steve
10:18:20  3   Jobs?
10:18:26  4       A.   I don't remember exactly, but I think it was --
10:18:29  5   I'd say around 2000, plus or minus.
10:18:34  6       Q.   And how would you characterize your
10:18:36  7   relationship with him?
10:18:40  8       A.   Over -- back then or over time or --
10:18:42  9       Q.   Well, let's start at the beginning, and then
10:18:44 10   we'll move forward in time.
10:18:46 11       A.   I -- you know, I -- I think in the early years
10:18:50 12   I didn't, you know -- I didn't speak with him that often.
10:18:53 13   I probably spoken to him a dozen times.  But, you know, I
10:19:00 14   had a lot of respect and have a lot of respect for Steve.
10:19:04 15   He was very accomplished, very visionary.  You know, he
10:19:09 16   gave Larry and I advice over time about the company.
10:19:14 17           At various times we had some partnerships and
10:19:19 18   maybe a couple of times intersected at some social
10:19:22 19   events.
10:19:24 20       Q.   In that answer you used the term "early years,"
10:19:28 21   what do you mean by that?
10:19:29 22       A.   Kind of saying -- maybe 2000 to 2007-ish.  I
10:19:38 23   mean our relationship significantly declined after Apple
10:19:43 24   came out with the iPhone and Google came out with
10:19:46 25   Android.
```

10:19:46  1       Q.    And that is circa what?

10:19:48  2       A.    That was 2007, I think.

10:19:55  3       Q.    Well, it is a matter of record.

10:19:57  4       A.    Yeah.  Yeah.  We can look it up.  I don't want

10:19:59  5    to embarrass myself, but --

10:20:01  6       Q.    Not a problem.  All right.  So, I'm sorry,

10:20:03  7    could you describe how your relationship developed over

10:20:06  8    what -- during the good period, I guess you could say?

10:20:09  9       A.    I mean, look, Steve was always an emotional

10:20:13 10    fellow.  There were some rough patches.  And it's not

10:20:15 11    like I interacted with him that much, but, yeah, he

10:20:19 12    was -- I think he was generally friendly to us.  He saw

10:20:22 13    Larry and I as, you know, young entrepreneurs, and you

10:20:28 14    know, I think he gave us some advice.  We had some

10:20:32 15    business interaction, too.  And you know, from my point

10:20:39 16    of view he was just a very interesting and remarkable,

10:20:41 17    talented person.  I wish in retrospect I spent more time

10:20:46 18    with him.

10:20:46 19       Q.    How frequently did you have communications with

10:20:48 20    him in those periods before the i -- I'm sorry -- iPhone,

10:20:55 21    Android?

10:20:57 22       A.    I mean I'm going to say about a dozen times

10:21:00 23    total, probably, of any substantive interaction.  Like I

10:21:02 24    said, I wish I had more.

10:21:04 25       Q.    You are talking about a dozen over the several

10:21:06 1    years that we're talking about?

10:21:08 2         A.   Yeah, a dozen over -- yeah.  I mean I don't

10:21:10 3    know.  Probably a dozen over all time, but in that -- on

10:21:13 4    that order of magnitude.

10:21:14 5         Q.   And when you're saying "all time," are we

10:21:17 6    talking about 2000 up until his death in 2000 -- I

10:21:21 7    forgot, when was it, 2012?

10:21:23 8         A.   Yeah.  I mean -- yes.  Up until -- yeah, that

10:21:26 9    sounds about right, 2012, or was it 2011?

10:21:30 10        Q.   Again, that is a matter of record.

10:21:31 11        A.   Yes.

10:21:32 12        Q.   We don't have to worry about that.

10:21:34 13             So were these contacts for the most part by

10:21:37 14   telephone or in person or what?

10:21:40 15        A.   I had a few phone calls with him.  I took a few

10:21:43 16   walks with him.  And I had, like, a few meetings at his

10:21:47 17   house or his office.  I don't recall him ever coming here

10:21:50 18   to meet me.  So -- yeah.

10:21:54 19        Q.   I'd forgotten.  I knew this once, but either

10:21:56 20   you or your partner, Mr. Page, lived close by him.

10:22:01 21        A.   Yes.  My partner, Larry, lives near him, yeah.

10:22:04 22        Q.   But you didn't.

10:22:05 23        A.   I did not.

10:22:06 24        Q.   All right.  All right.  Do you recall a

10:22:10 25   conversation or a number of conversations with Mr. Jobs

10:22:14  1   in roughly mid-2000 -- well, early 2005, I'll pinpoint

10:22:20  2   it, but it is more the substance that I'm interested in,

10:22:23  3   where he was complaining to you about Google recruiting

10:22:25  4   from Apple?

10:22:28  5       A.   I hadn't recalled them specifically, but you

10:22:33  6   know, in preparation for this event, I reviewed some

10:22:36  7   emails that jogged my memory about that.

10:22:37  8       Q.   Tell me what you do remember about it.  I'll

10:22:40  9   get to the emails in a little bit.

10:22:42 10       A.   Okay.  You know, Steve at various times would

10:22:48 11   call me or, you know, send me an email or -- more often

10:22:56 12   than not it was when he was upset about something, and I

10:23:00 13   think the times you're referring to were with respect to

10:23:05 14   Google hiring out of Apple, and mostly, specifically with

10:23:13 15   respect to the Safari team.

10:23:16 16       Q.   Do you recall anything more about the substance

10:23:18 17   of the interaction you had with Mr. Jobs in -- in that

10:23:22 18   occasion?

10:23:23 19       A.   Once again, some of this recollection is just

10:23:26 20   based on me seeing emails which I reviewed yesterday.

10:23:30 21            But I remember he was quite irate about hiring,

10:23:34 22   you know, members of the technical Safari team, which he

10:23:38 23   was passionate about, and felt like -- he was just -- he

10:23:44 24   was emotional.  He would get angry about things.  That

10:23:48 25   made him particularly angry.

10:23:50  1        Q.   Do you remember anything more about the

10:23:53  2    exchange that you had with him?

10:23:54  3        A.   I think the first fellow that kind of upset him

10:23:58  4    was this fellow, ███████, I want to say, and -- what

10:24:05  5    else should I say about that?

10:24:08  6        Q.   I'm just trying --

10:24:08  7        A.   Yeah.

10:24:08  8        Q.   -- to understand what you recall of it at this

10:24:11  9    point.

10:24:11 10        A.   Yes.  Yes.  I mean it's very hard for me to

10:24:16 11    separate what I recall from the phone call versus the

10:24:20 12    email like yesterday about it.

10:24:21 13             You know, I just -- I recall Steve would call,

10:24:23 14    be agitated, and I'd have to try to calm him down.

10:24:29 15        Q.   Well, did you come to some understanding with

10:24:31 16    him in the course of the conversations about what he was

10:24:33 17    complaining about?

10:24:35 18             MR. RUBIN:  Objection.  Excuse me.  Objection.

10:24:36 19    Form.

10:24:37 20             THE WITNESS:  I mean I typically did not enjoy

10:24:39 21    discussing those kinds of business issues, so I would

10:24:41 22    hear him out, try to calm him down, and then I would

10:24:44 23    relay the concerns to the rest of the management team.

10:24:47 24    BY MR. HEIMANN:

10:24:48 25        Q.   Who in terms of the management team did you

10:24:49  1   relay those concerns to?

10:24:52  2        A.   Once again, this is upon my recollection based

10:24:55  3   upon reviewing emails.

10:24:56  4             I would have probably raised it at -- you know,

10:25:01  5   senior executive team, either by email or in a meeting,

10:25:06  6   and -- but probably mostly leave it in Eric Schmidt's

10:25:13  7   lap.

10:25:15  8        Q.   When you refer to the senior executive team,

10:25:18  9   are you talking about now the EMG?

10:25:20 10        A.   You know, the name varied over time, so I --

10:25:23 11   yes, probably EMG.  I can't remember what the email alias

10:25:27 12   was in that year precisely.

10:25:29 13        Q.   Whatever the term was --

10:25:30 14        A.   Yeah.

10:25:30 15        Q.   -- at the time.

10:25:31 16        A.   Yeah, the top level executives.  I probably

10:25:33 17   would have relayed that issue to them.

10:25:39 18        Q.   And you're saying that because -- not

10:25:41 19   necessarily that you actually remember it, but that's

10:25:43 20   what you typically would have done; is that right?

10:25:46 21             MR. RUBIN:  Objection.  Form.

10:25:51 22             THE WITNESS:  I mean it is what I typically

10:25:52 23   would have done, but my vague recollection is that I did

10:25:55 24   that in this case.

         25   //

```
10:25:56  1    BY MR. HEIMANN:

10:25:56  2        Q.   And did that specifically, as -- you referred

10:25:59  3    it to the team or you referred it to Schmidt, or exactly

10:26:03  4    what?

10:26:03  5        A.   I mean Schmidt is on the team, therefore both.

10:26:07  6             I primarily probably would have left it to Eric

10:26:10  7    to handle, but I think I made everybody aware of it.

10:26:17  8        Q.   Okay.  Let's take a look at the emails

10:26:20  9    exchange.

10:26:21 10        A.   Okay.

10:26:21 11        Q.   That may help things along.  Let's start with

10:26:24 12    Exhibit 557.  I suspect this is one of the things you

10:26:41 13    looked at yesterday, but why don't you take a minute to

10:26:43 14    read through it quickly.

10:26:51 15        A.   All right.  Yeah.  Yes.

10:27:06 16        Q.   Okay.  So first of all, the email that starts

10:27:09 17    us off is your February 13th email that is 1:06 a.m.  Do

10:27:14 18    you think that's accurate, by the way?

10:27:16 19             MR. RUBIN:  Objection to form.

10:27:23 20             THE WITNESS:  I'm not sure, to be perfectly

10:27:25 21    honest.  I mean I -- it wouldn't have been shocking for

10:27:28 22    me to be up late like that, but I'm looking at the 4:29

10:27:32 23    response.  I don't know.  It's possible.  I'm not sure.

10:27:35 24    BY MR. HEIMANN:

10:27:35 25        Q.   Well, let's not worry about that.  I don't
```

10:27:37  1    think that is going to make or break the case here.

10:27:39  2            So you start off with an email to EMG at

10:27:41  3    google.com and to Joan -- is it Braddi?

10:27:46  4        A.   Braddi.

10:27:46  5        Q.   Braddi.  First of all, who was she at the time?

10:27:50  6        A.   Joan was -- I can't remember the exact title,

10:27:53  7    but she was a high-level executive for business

10:27:57  8    development, and I assume I copied her because she was in

10:28:00  9    charge of the Apple partnership.

10:28:03 10        Q.   And what was the Apple partnership?

10:28:06 11        A.   Once again, this is my recollection.  Hopefully

10:28:10 12    the timing lines up.  One thing would have been that we

10:28:13 13    powered the search box on the Safari browser.  There

10:28:17 14    might have been a few other elements to it, too.

10:28:20 15        Q.   All right.  And as best you recall, who was on

10:28:23 16    the EMG email at the time?

10:28:25 17        A.   All right.  Wow.  You want me to list all the

10:28:27 18    people?  Okay.

10:28:28 19        Q.   If you can, sure.

10:28:29 20        A.   I can try.  Omid Kordestani would have been on

10:28:33 21    it, Jonathan Rosenberg, Eric Schmidt, Larry Page.  Who

10:28:41 22    would have been on this alias?

10:28:45 23        Q.   Shona Brown?

10:28:46 24        A.   Maybe.  I don't remember.  Sorry.

10:28:48 25        Q.   That's okay.

10:28:49   1      A.   Not positive.  It's fluctuated over the years.

10:28:52   2           Susan Wojcicki might have been on it.  I can't

10:28:54   3   remember if she was on it that year.  There would have

10:28:57   4   been probably Alan Eustace at the time.  Urs Holzle.  I

10:29:12   5   can't recall if Wayne Rosen had resigned by then or not,

10:29:17   6   or retired, I should say.  Yeah.

10:29:19   7      Q.   I'm sorry.  I didn't mean to interrupt you.

10:29:21   8           Is it fair to say that over the time that there

10:29:25   9   was an EMG, which is executive management group, is what

10:29:29   10  it stands for, right?

10:29:30   11     A.   Correct.

10:29:31   12     Q.   Whoever the individuals were by name, it would

10:29:33   13  have been senior people at the company?

10:29:35   14     A.   Yeah.  Yeah.  It would have been the typical,

10:29:38   15  you know, if there was just some issue I wanted to -- to

10:29:43   16  get addressed or forward that was significant to the

10:29:48   17  company, but was not, like, obvious, I just need to talk

10:29:51   18  to this one person, I would just relay it to that list

10:29:54   19  and, you know, they'd be made aware.

10:29:56   20     Q.   Did Google have a general counsel at this

10:29:58   21  point?  This is after the IPO?

10:30:02   22     A.   Yes.  That would have been David Drummond.

10:30:05   23     Q.   Was he on the EMG as well or no?

10:30:07   24     A.   I assume so.  Yeah.  I can't swear to it.

10:30:13   25  Pretty sure.

10:30:13  1      Q.   It's all right.

10:30:14  2      A.   It has changed over time, so --

10:30:16  3      Q.   Fair enough.

10:30:16  4      A.   Yeah.

10:30:17  5      Q.   All right.  So in this email you start off by

10:30:19  6  saying, "So I got a call from Steve Jobs today" --

10:30:22  7      A.   Yes.

10:30:23  8      Q.   -- "who is very agitated.  It was about us

10:30:25  9  recruiting from the Safari team."

10:30:28 10      A.   Uh-huh.

10:30:28 11      Q.   "He made" -- I'm skipping a sentence here.  "He

10:30:32 12  made various veiled threats, too, though I'm not inclined

10:30:36 13  to hold them against him too much, as he seemed beside

10:30:37 14  himself (as Eric would say)."

10:30:41 15      A.   Parentheses.

10:30:42 16      Q.   Parentheses.  Thank you.  Right.

10:30:47 17           Is this some -- strike that.

10:30:49 18           Is this kind of interaction with Jobs something

10:30:52 19  that had occurred on prior occasions; by that I mean when

10:30:55 20  he was irritated and making threats?

10:30:57 21      A.   Generally, yes.  Steve being agitated was not

10:31:01 22  unusual.  Looking back -- I mean I can't recall whether

10:31:07 23  there were times before 2005 and after.  I imagine there

10:31:10 24  were both.  There certainly were times after.  And I'm

10:31:14 25  pretty sure there were times before.  Yes.  So Steve was,

10:31:17  1   you know, very passionate and he would get upset about

10:31:22  2   some things.  So it was not that shocking that he would,

10:31:25  3   you know, call up and express his anger.

10:31:28  4        Q.   All right.  And moving down a little in the

10:31:34  5   email, I'm picking up with the last sentence of the

10:31:37  6   second paragraph, you said, "I also said I would follow

10:31:40  7   up and check on our recruiting strategies" -- I'm not

10:31:45  8   sure what that --

10:31:45  9        A.   "WRT," with respect to.

10:31:49  10       Q.   Thank you -- "Apple and Safari.  He seemed

10:31:53  11  soothed.  So I just wanted to check what our status was

10:31:55  12  in various respects and what we want to do about

10:31:58  13  partner/friendly companies and recruiting.  On the

10:32:01  14  browser I know and told him that we have Mozilla people

10:32:05  15  working here."  And then dropping down a little bit more,

10:32:08  16  "I mentioned this to Steve, and he told me he was cool

10:32:16  17  with us hiring anyone who came to us, but was angry about

10:32:18  18  systematic solicitation."

10:32:21  19            Skipping down a bit more, "So please update me

10:32:24  20  on what you know here and on what you think we should

10:32:26  21  have as a policy."

10:32:27  22            Let me stop there.

10:32:28  23            So that is in effect a question you are putting

10:32:31  24  to the folks that you addressed the email to, fair?

10:32:36  25       A.   Sorry.  That being -- what do you mean by

10:32:38  1    "that"?

10:32:39  2         Q.    "Please update" --

10:32:41  3         A.    Everything you read?  Oh, so "Please update

10:32:42  4    me"?

10:32:43  5         Q.    "On what you think -- on what you think we

10:32:46  6    should have as a policy."

10:32:48  7         A.    Yes.  I wanted somebody in the group to just,

10:32:50  8    you know, think about it and get back to me so I could

10:32:53  9    say something intelligent.

10:32:55 10         Q.    Okay.  So now all of that was just so I could

10:32:57 11    ask this question.

10:32:58 12         A.    Okay.

10:32:59 13         Q.    What, if anything, do you recall of the

10:33:00 14    conversation or conversations that you had with the

10:33:02 15    senior people at Google at this point in time about that?

10:33:08 16         A.    Let's see.  Well, this was on Valentine's Day,

10:33:14 17    Shona's reply, on Monday.  We typically would have had

10:33:19 18    meetings on Mondays, so perhaps it would have been

10:33:22 19    discussed, but it is so long ago I just -- I don't

10:33:25 20    remember.

10:33:25 21         Q.    Fair enough.  As I'm sure you've been told, the

10:33:30 22    answer "I don't remember, I don't recall" is perfectly

10:33:33 23    acceptable --

10:33:35 24         A.    Yeah.

10:33:35 25         Q.    -- here if you don't.  All right.

10:36:03  1              MR. RUBIN:  Yeah, you shouldn't -- you

10:36:05  2      shouldn't get into anything --

10:36:09  3              THE WITNESS:  Sorry.

10:36:09  4              MR. RUBIN:  -- about what you did or didn't

10:36:09  5      review unless it refreshed your recollection.

10:36:12  6              THE WITNESS:  Sorry.

10:36:12  7              MR. RUBIN:  Mr. Heimann will know to pursue if

10:36:13  8      it did.

10:36:14  9              THE WITNESS:  Sorry.  Okay.

10:36:14 10      BY MR. HEIMANN:

10:36:14 11         Q.   So all I'm going to point out to you to assist

10:36:14 12      you in your review --

10:36:16 13         A.   Wait a minute.  I don't recall this particular

10:36:17 14      one.

10:36:18 15         Q.   All right.  So we start with Exhibit 1868, and

10:36:21 16      I think you'll see that they go in sequence in terms of

10:36:24 17      time from that point forward.  So why don't you just take

10:36:26 18      a minute to look those over, and then I'll ask you a few

10:36:30 19      questions about the sequence.

10:37:26 20         A.   You want me to review all of these, yes?

10:37:29 21         Q.   Yes.  I think that will make the questioning go

10:37:31 22      easier.

10:37:48 23         A.   Okay.

10:37:48 24         Q.   All right.  So let's start with Exhibit 1868,

10:37:51 25      and let me say, to orientate you, this is -- the ones we

10:37:56  1   looked at a moment ago were on Sunday and Monday, if the

10:38:01  2   dates and times are to be accepted, that those were the

10:38:03  3   first two.

10:38:04  4        A.   Uh-huh.

10:38:05  5        Q.   And now we've moved to Thursday of that week.

10:38:07  6   And Mr. Campbell writes to you with a copy to Mr. Page,

10:38:11  7   saying, "Steve," meaning Steve Jobs, "just called me

10:38:13  8   again, and he's pissed that we are still recruiting his

10:38:17  9   browser guy.  You should give him a call."

10:38:18 10            Do you see that?

10:38:19 11        A.   Yeah, it looks like the Valentine's love wore

10:38:23 12   off.

10:38:23 13        Q.   I would say so.

10:38:24 14            And then if you go to Exhibit 1869, Mr. Page

10:38:27 15   appears to have responded to Mr. Campbell's email a few

10:38:32 16   minutes after receiving it saying, "He called a few

10:38:35 17   minutes ago and demanded to talk to me.  Where are we

10:38:39 18   with the candidate?"

10:38:40 19            Do you see that?

10:38:41 20        A.   I do see that.

10:38:42 21        Q.   It would appear, at least as I interpret this,

10:38:44 22   that the "he called" is a reference to Mr. Jobs.

10:38:47 23        A.   I would assume so.

10:38:49 24        Q.   All right.  And then if you go to the next

10:38:51 25   exhibit in order, Exhibit 1870, Larry -- again, this is

10:38:55  1  just a couple of minutes later, again, if the time stamps

10:38:59  2  are to be believed, saying, "Sergey is going to call him

10:39:06  3  now."  Right?

10:39:08  4       A.   Uh-huh.

10:39:08  5       Q.   Again, you have to say "yes" or "no" or --

10:39:10  6       A.   Sorry.  Yes, I see that.

10:39:12  7       Q.   Then if we go to Exhibit 1871, this is an email

10:39:15  8  from you, again -- again on the 17th, this time

10:39:22  9  apparently around 8:20, and you're writing to the EMG and

10:39:26 10  to Joan and to Bill Campbell and to Arnnon as well,

10:39:31 11  right?

10:39:33 12       A.   Correct.

10:39:34 13       Q.   So you say in this email, "So I got another

10:39:37 14  irate call from Jobs today.  I don't think we should let

10:39:40 15  that determine our hiring strategy, but thought I would

10:39:43 16  let you know.  Basically he said, 'if you hire a single

10:39:48 17  one of these people, that means war.'  I said I could not

10:39:52 18  promise any outcome, but I would discuss it with the

10:39:54 19  executive team again.  I asked if he expected us to

10:39:58 20  withdraw offers, and he said, yes."

10:40:01 21            And then the email continues on, closing with,

10:40:07 22  "In any case, let's not make any new offers or contact

10:40:11 23  new people at Apple until we have had a chance to

10:40:13 24  discuss."

10:40:14 25            Do you see that?

10:40:14  1        A.    I do.

10:40:15  2        Q.    Now, once again, the question is, do you have

10:40:17  3   any recollection of the conversation or conversations

10:40:19  4   that you had with your executive team and Mr. Campbell

10:40:24  5   about this as reflected here?

10:40:27  6        A.    I mean my recollection is pretty much spurred

10:40:31  7   by the email, and, you know, roughly extends to the

10:40:34  8   email.  I mean this all looks correct.

10:40:39  9        Q.    But where I left off was you said you were

10:40:42 10   going to talk about it with your folks at -- the

10:40:46 11   executive folks at Google.

10:40:48 12        A.    Oh.

10:40:48 13        Q.    So my question is whether or not you have any

10:40:50 14   recollection of those conversations --

10:40:52 15        A.    Oh, the subsequent conversations?  I -- I mean

10:40:58 16   I'm pretty sure that we later discussed it.

10:41:02 17        Q.    But that's the extent of what you can say about

10:41:04 18   it; is that fair?

10:41:05 19        A.    Yeah.  I think that -- yes.  Yes.  I -- I

10:41:09 20   can't -- I mean, once again, in preparation I reviewed

10:41:13 21   the various emails from this period and subsequent, so I

10:41:17 22   feel like I generally -- generally have read emails about

10:41:25 23   it, but that's about the extent of the recollection.

10:41:27 24             MR. HEIMANN:  All right.  Let's have a look at

10:41:29 25   Exhibit 1872.

10:41:29  1          (Exhibit 1872 was marked for identification.)

10:41:35  2          MR. HEIMANN:  This is another one in this same

10:41:37  3  sequence.

10:41:40  4          MR. RUBIN:  Thank you.

10:42:12  5  BY MR. HEIMANN:

10:42:12  6      Q.   To put this in context, you'll see this email

10:42:15  7  begins with the Bill Campbell email we looked at a moment

10:42:18  8  ago and Larry Page's response.  It should be on the

10:42:23  9  backside of that document that you're looking at.

10:42:35 10      A.   Okay.  What, out of curiosity, is the

10:42:43 11  significance of the redactions?

10:42:45 12      Q.   Well, that is a good question.  I don't know

10:42:47 13  why it is redacted, and it is not helpful, because it is

10:42:50 14  a person's name, and I think if you knew the name it

10:42:53 15  might help you to recall what this topic -- this

10:42:55 16  discussion is about.  But your counsel have redacted it.

10:42:58 17  So I can't help us there.

10:43:00 18          MR. RUBIN:  Well, I'll just represent these

10:43:01 19  were privacy redactions that were specifically provided

10:43:05 20  for in the Protective Order.

10:43:06 21          MR. HEIMANN:  All right.  I don't quarrel with

10:43:08 22  you, but can you tell him who it is so he at least has

10:43:10 23  the benefit of --

10:43:10 24          THE WITNESS:  I think I know who it is.

10:43:11 25          MR. RUBIN:  I certainly think one of them is a

10:43:14  1    fellow Mr. Brin mentioned, ████████, and I think we

10:43:18  2    have another email that mentions a couple of other names

10:43:20  3    that were produced, so I think we can find those in other

10:43:25  4    emails.

10:43:25  5            MR. HEIMANN:  That is right.  And that is one

10:43:27  6    of the questions I question why you've got it redacted

10:43:29  7    here, because the name does appear in other emails and it

10:43:31  8    just confuses matters to have it redacted in this email.

10:43:34  9            MR. RUBIN:  I was just indicating that that was

10:43:36 10    the intent, was to protect privacy of third parties.

10:43:37 11    That was the only intention that was provided for in the

10:43:37 12    Protective Order.  Whether every Google reviewer did it

10:43:42 13    consistently, obviously there have been inconsistencies,

10:43:46 14    but that was the intention.

10:43:47 15            THE WITNESS:  Okay.  Yes, I have reviewed this.

10:44:00 16    BY MR. HEIMANN:

10:44:01 17        Q.   All right.  Does that help refresh your

10:44:02 18    recollection to any extent about conversations at the

10:44:05 19    time?

10:44:05 20        A.   I mean, yes, in the sense that I -- you know, I

10:44:08 21    read the emails and I certainly believe that, and that's,

10:44:10 22    you know, pretty much the extent of my recollection.  I

10:44:12 23    am not sure I remember much beyond these.

10:44:16 24        Q.   Well, first of all, who is the -- who is the

10:44:18 25    gentleman whose name is redacted there?  Do you know?

10:44:20  1      A.    I believe -- by the way, I'm not positive every

10:44:24  2  single word redacted is the same person, but one person

10:44:27  3  who is very important here is probably, you know -- fills

10:44:30  4  in some of these blanks, is ██████████ .

10:44:33  5      Q.    All right.  Why don't we take a look at

10:44:34  6  Exhibit 199 while we're here.

10:44:59  7           Now, this is an email that you don't appear to

10:45:00  8  have been copied on, but you'll see that it was sent by

10:45:03  9  Mr. Campbell to Mr. Jobs the day after, if the dates are

10:45:08 10  correct, the exchange we were looking at with respect to

10:45:10 11  the exchange that you were involved in took place.

10:45:23 12      A.    It looks like this is on the Friday.

10:45:24 13      Q.    Right.  So Campbell writes to Jobs, "I am

10:45:26 14  heading out of town and wanted to give you the latest of

10:45:29 15  what I heard from Google after talking to Eric Schmidt.

10:45:33 16  Eric told me that he got directly involved and firmly

10:45:36 17  stopped all efforts to recruit anyone from Apple.

10:45:38 18  Unfortunately (and you will be rightfully pissed), they

10:45:42 19  had already extended an offer to Dave.  When I talked to

10:45:46 20  Eric, he simply felt that he could not rescind the offer,

10:45:50 21  but felt it was doubtful that Dave would take the offer

10:45:51 22  since Google stopped recruiting the other members of his

10:45:53 23  team."

10:45:54 24           Let me stop there.

10:45:55 25           Does that help refresh your memory at all as to

| | | |
|---|---|---|
| 10:46:02 | 1 | the conversations? |
| 10:46:03 | 2 | A.   Not really.  I mean -- I -- I'm actually not |
| 10:46:19 | 3 | even sure when we subsequently discussed this.  Because |
| 10:46:25 | 4 | this happened on Thursday, late.  This is Friday.  I'm |
| 10:46:29 | 5 | not sure we actually sort of talked about it between |
| 10:46:33 | 6 | those two.  Maybe we did.  An actual time might have been |
| 10:46:38 | 7 | the subsequent Monday.  I'm kind of speculating.  But it |
| 10:46:41 | 8 | looks -- if I believe this, at least Eric made a -- you |
| 10:46:44 | 9 | know, a -- you know, at least some kind of -- had a |
| 10:46:50 | 10 | conversation with Bill to relate to Steve to calm him |
| 10:46:53 | 11 | down. |
| 10:46:54 | 12 | Anyway, no, I'm not sure what exactly |
| 10:46:56 | 13 | discussion happened between those two dates. |
| 10:47:02 | 14 | Q.   Can you tell us whether or not in the |
| 10:47:03 | 15 | conversations that you had with Mr. Jobs during this |
| 10:47:05 | 16 | sequence you agreed on behalf of Google that Google would |
| 10:47:10 | 17 | not cold call Apple employees, and he, Jobs, agreed on |
| 10:47:15 | 18 | behalf of Apple that Apple would not cold call Google |
| 10:47:19 | 19 | employees? |
| 10:47:20 | 20 | MR. RUBIN:  Objection to form. |
| 10:47:21 | 21 | THE WITNESS:  No.  I don't believe that that |
| 10:47:22 | 22 | was said. |
| 10:47:25 | 23 | BY MR. HEIMANN: |
| 10:47:25 | 24 | Q.   Why do you -- |
| 10:47:26 | 25 | A.   In fact, if you read Exhibit 1871, and I assume |

11:13:09  1              MR. BULLOCK:  Objection.  Form.

11:13:10  2       A.    To my knowledge, no.

11:13:12  3       Q.    Do you have any actual knowledge or

11:13:14  4   specific knowledge about whether or not other

11:13:16  5   companies had agreements with Google not to cold

11:13:19  6   call their employees?

11:13:20  7              MR. BULLOCK:  Objection.  Form.

11:13:22  8       Q.    Not to cold call Google's employees?

11:13:26  9              MR. BULLOCK:  Objection.  Form.

11:13:27 10       A.    I have no idea.

11:13:28 11       Q.    You said before that Google didn't --

11:13:30 12   I'll use your words -- when you said before that

11:13:47 13   Google never asked for that type of policy, do you

11:13:50 14   have any basis for that statement?

11:13:53 15              MR. BULLOCK:  Objection.  Form.

11:14:00 16       A.    I can't say I'm privy to all executive

11:14:03 17   decisions at Google, but I'm reasonably sure that

11:14:14 18   Google never expected nor asked for any of that.

11:14:19 19              I can't say that other companies didn't

11:14:20 20   have similar policies, if Google was a partner of

11:14:23 21   theirs, not to recruit from Google.  Maybe they did,

11:14:26 22   but I don't know.

11:14:28 23       Q.    But I'm asking what is the basis for your

11:14:30 24   certainty that Google didn't ask anybody?

11:14:36 25       A.    I guess I wouldn't call it certainty.

| | | |
|---|---|---|
| 10:56:33 | 1 | Q.   So she's writing in April of 2005.  So two |
| 10:56:37 | 2 | months or so after the February exchange, and she is |
| 10:56:39 | 3 | saying, "Arnnon, I've kept in touch with" -- redacted -- |
| 10:56:42 | 4 | "from the Safari team at Apple."  I'm sure that is Dave |
| 10:56:46 | 5 | that we've been talking about in the context here. |
| 10:56:48 | 6 | Right?  Do you agree? |
| 10:56:52 | 7 | A.   I'm guessing it is.  Yes. |
| 10:56:56 | 8 | Q.   She says, "I have kept in touch with" -- |
| 10:56:58 | 9 | redacted -- "from the Safari team at Apple.  As you |
| 10:57:01 | 10 | recall, we offered him a position to which Steve Jobs |
| 10:57:04 | 11 | countered (and called Sergey - see thread below)." |
| 10:57:11 | 12 | A.   Yes. |
| 10:57:12 | 13 | Q.   And he says, "I think Dave will" -- dropping |
| 10:57:14 | 14 | down to the middle of the next paragraph, "I think Dave |
| 10:57:14 | 15 | will come and wanted to consider giving him another offer |
| 10:57:18 | 16 | that evening," et cetera. |
| 10:57:19 | 17 | Do you see that? |
| 10:57:20 | 18 | A.   Yes. |
| 10:57:20 | 19 | Q.   Now, if we move up to what I take it to be |
| 10:57:27 | 20 | Geshuri writing to Bill -- how do you say it again? |
| 10:57:33 | 21 | A.   Bill Coughran. |
| 10:57:34 | 22 | Q.   Coughran. |
| 10:57:36 | 23 | A.   Uh-huh. |
| 10:57:36 | 24 | Q.   And Geshuri -- who was he again?  I'm sorry. |
| 10:57:36 | 25 | A.   Arnnon Geshuri, he was one of the high-level |

10:57:38  1    execs in the HR.

10:57:44  2         Q.   On the EMG, right?

10:57:46  3         A.   No.  No.  He would not have been on the EMG.

10:57:48  4         Q.   All right.  He writes, "I wanted to get your

10:57:50  5    take on this."  Blank "is reaching out to us and we feel

10:57:55  6    that we not be in violation of our agreement with Apple

10:57:59  7    which states that we would not directly cold call into

10:58:02  8    the company, but would accept direct solicitation and/or

10:58:08  9    interest from a candidate."

10:58:10 10         Do you see that?

10:58:11 11         A.   I do see that.

10:58:12 12         Q.   How do you square your understanding as you

10:58:14 13    described it with what Mr. Geshuri is talking about with

10:58:16 14    respect to an agreement with Apple not to directly cold

10:58:20 15    call into the company?

10:58:22 16         MR. RUBIN:  Objection.  Form.

10:58:23 17         THE WITNESS:  Yeah.  I mean, look, I don't

10:58:24 18    think that Arnnon writing that email eight years ago was

10:58:30 19    very thoughtful about his choice of language.

10:58:32 20    BY MR. HEIMANN:

10:58:33 21         Q.   So you think he was just mistaken.

10:58:34 22         A.   I mean, I think we had made a decision not to

10:58:36 23    do that with respect to Apple.  He's calling it an

10:58:39 24    agreement.  I mean I think we told -- I think we relayed

10:58:42 25    to Steve, look, chill out.  We're not going to call in.

| | |
|---|---|
| 10:58:45 1 | But I wouldn't consider it an agreement.  There was no, |
| 10:58:50 2 | like, real tit-for-tat that was meaningful to us is any |
| 10:58:53 3 | way. |
| 10:58:54 4 | Q.   And do you have an explanation for how |
| 10:58:57 5 | Mr. Geshuri came to the understanding that it was an |
| 10:58:59 6 | agreement with Apple? |
| 10:59:01 7 | MR. RUBIN:  Objection to form. |
| 10:59:02 8 | THE WITNESS:  I am sure there are a lot of ways |
| 10:59:04 9 | he could have misunderstood.  I mean, for example, it was |
| 10:59:07 10 | our internal agreement to make that decision.  I just |
| 10:59:10 11 | don't think he was that careful with his choice of |
| 10:59:13 12 | prepositions and whatnot. |
| 10:59:14 13 | BY MR. HEIMANN: |
| 10:59:14 14 | Q.   So you just think he was just mistaken when he |
| 10:59:16 15 | says, "agreement with Apple which states," et cetera? |
| 10:59:19 16 | MR. RUBIN:  Objection.  Form. |
| 10:59:20 17 | THE WITNESS:  Look, I think my understanding, |
| 10:59:25 18 | you know, from what I recall back then, is that, you |
| 10:59:29 19 | know, we decided, look, it's not worth agitating Steve. |
| 10:59:32 20 | We're just going to commit not to do this.  It's not, |
| 10:59:37 21 | like, a contractual agreement or anything.  You know, we |
| 10:59:40 22 | could change our mind the next day. |
| 10:59:41 23 | BY MR. HEIMANN: |
| 10:59:42 24 | Q.   Well, I keep -- I want to focus on that.  I'm |
| 10:59:44 25 | sorry.  When you say it wasn't a contractual agreement, |

| | | |
|---|---|---|
| 10:59:48 | 1 | are you -- are you saying in order for there to be an |
| 10:59:51 | 2 | agreement in your mind it had to be contractual that you |
| 10:59:54 | 3 | were bound by? |
| 10:59:56 | 4 | MR. RUBIN:  Objection to form. |
| 10:59:57 | 5 | THE WITNESS:  I'm saying that we felt that to |
| 11:00:00 | 6 | maintain our relationship with Steve and Apple it was |
| 11:00:03 | 7 | worth it not to agitate him by, as you put it, "cold |
| 11:00:07 | 8 | calling" into Apple, and therefore we said, like, we |
| 11:00:11 | 9 | won't do that.  I don't think that constitutes an |
| 11:00:16 | 10 | agreement. |
| 11:00:17 | 11 | MR. HEIMANN:  Okay.  We can take a break. |
| 11:00:19 | 12 | MR. RUBIN:  Thanks. |
| 11:00:23 | 13 | THE VIDEOGRAPHER:  We are now off the record at |
| 11:00:24 | 14 | 12:00 o'clock. |
| 11:17:42 | 15 | (Recess was taken.) |
| 11:18:14 | 16 | THE VIDEOGRAPHER:  We are now on the record at |
| 11:18:15 | 17 | 12:18. |
| 11:18:16 | 18 | BY MR. HEIMANN: |
| 11:18:19 | 19 | Q.  Sir, I've put before you Exhibit 563, which is |
| 11:18:24 | 20 | an email internal to Apple that you don't appear on, nor |
| 11:18:31 | 21 | does anybody else from Google, as far as I can tell.  But |
| 11:18:34 | 22 | you'll notice the date is February 26th of 2005. |
| 11:18:42 | 23 | A.  Yeah. |
| 11:18:43 | 24 | Q.  Do you happen to know who Danielle Lambert or |
| 11:18:46 | 25 | Lambert is, or was at the time? |

11:18:50  1      A.    No, but I imagine it's pronounced Danielle.

11:18:53  2      Q.    I think you're right.

11:18:55  3            You'll see that she writes to

11:18:58  4   usrecruiting@group.apple.com.  Do you see that?

11:19:04  5      A.    Yeah.

11:19:04  6      Q.    And she writes in part, "Please add Google to

11:19:07  7   our 'hands-off' list.  We recently agreed not to recruit

11:19:13  8   from one another, so if you hear of any recruiting they

11:19:17  9   are doing against us, please be sure to let me know.

11:19:20 10   Please also be sure to honor our side of the deal."

11:19:23 11            Do you see that?

11:19:25 12      A.    Uh-huh.

11:19:25 13      Q.    Do you have any -- you have to say "yes" or

11:19:27 14   "no."

11:19:28 15      A.    Yes.  I see that.

11:19:29 16      Q.    Do you have any explanation for how it was that

11:19:31 17   Apple apparently was of the view and understanding that

11:19:34 18   an agreement had been reached between Google and Apple as

11:19:37 19   described here?

11:19:39 20            MR. RUBIN:  Objection.  Form.

11:19:40 21            THE WITNESS:  I mean I think I'd really have to

11:19:42 22   speculate, you know?

11:19:45 23   BY MR. HEIMANN:

11:19:45 24      Q.    Feel free.

11:19:47 25            MR. RUBIN:  Objection.  Form.

11:19:51  1          THE WITNESS:  You know, I think I would guess

11:19:52  2   that, you know, we did tell Steve that, you know, we

11:19:55  3   weren't going to sort of solicit out of Apple.  It is not

11:20:00  4   to say we wouldn't recruit people who came to us from

11:20:03  5   Apple or referred through any number of things.  But I

11:20:07  6   think, you know -- I don't know, he probably felt that it

11:20:14  7   would be a big deal to us if they do the same or

11:20:16  8   something like that.

11:20:18  9          I don't think it would be a big deal to us, you

11:20:22 10   know.  I don't -- I -- I can't imagine in 2005 we would

11:20:27 11   have had any meaningful number of people who would have

11:20:30 12   left Google for Apple or referred in any ways at all,

11:20:35 13   and -- even to-date, I -- I mean I don't know of any --

11:20:39 14   any individual examples of something like that.

11:20:44 15   BY MR. HEIMANN:

11:20:45 16          Q.   When you use the term "meaningful number," what

11:20:48 17   do you mean?

11:20:51 18          A.   I would guess that there are probably, you

11:20:53 19   know, somewhere between zero and, I don't know, five

11:20:58 20   people.  I -- if I had to guess one number, I bet there

11:21:01 21   would have been no people who had left Google for Apple,

11:21:06 22   certainly not as a result of just a call from somebody

11:21:09 23   from Apple.

11:21:10 24          It is possible there were one or two.  I never

11:21:12 25   heard of such an example, and, you know, looking forward

11:21:15  1   now, it's possible there might have been a handful, but

11:21:18  2   I'm not aware of any examples.

11:21:32  3        Q.   Was Google's board of directors informed of the

11:21:38  4   communications with Jobs at Apple about this topic?

11:21:44  5        A.   My recollection, which was refreshed based on

11:21:49  6   looking at emails recently, is that we decided, you know,

11:21:53  7   in order not to, you know, agitate Steve further, that we

11:21:58  8   wouldn't make such unsolicited calls into his -- into

11:22:03  9   Apple's employees.

11:22:04 10        We felt that we should think, you know, are

11:22:05 11   there other companies where we also don't wish to, you

11:22:09 12   know, needlessly aggravate the executives, and I believe

11:22:12 13   that Genentech was an example, and Art Levinson was on

11:22:18 14   our board, and so was Intel, and Paul Otellini was on our

11:22:23 15   board.  So I'm sure that we would have mentioned it to at

11:22:29 16   least those board members, probably might as well the

11:22:32 17   whole board.

11:22:33 18        Q.   Did the board of directors approve the policy?

11:22:38 19        A.   I don't recall there being, you know, sort of

11:22:42 20   any kind of official approval by the board.

11:22:47 21        Q.   You say "official approval."  I didn't ask

11:22:50 22   about official approval.  I asked about approval.

11:22:52 23        A.   I don't recall --

11:22:53 24             MR. RUBIN:  Objection to form.

11:22:54 25             THE WITNESS:  I don't recall a board approval.

11:22:56 1   BY MR. HEIMANN:

11:23:07 2       Q.   All right.  Let's take a look at Exhibit 640.

11:23:34 3            By the way, you mentioned Intel and Genentech a

11:23:38 4   moment ago.

11:23:39 5       A.   Correct.

11:23:40 6       Q.   Was the arrangement over recruiting reciprocal

11:23:44 7   with those two companies?

11:23:45 8            MR. RUBIN:  Objection.  Form.

11:23:51 9            THE WITNESS:  Yeah, first -- the arrangement.

11:23:52 10  BY MR. HEIMANN:

11:23:52 11      Q.   I'm sorry to interrupt you.  I'm trying to

11:23:55 12  search for a neutral term we can use.

11:23:57 13      A.   I mean I think that -- I don't think it would

11:23:58 14  have mattered to us whether they, you know, recruited

11:24:03 15  directly, whether they would recruit directly out of

11:24:06 16  Google or solicit.  I don't think it would have mattered

11:24:12 17  to us one way or the other.

11:24:14 18      Q.   All right.  Whether it would have mattered or

11:24:16 19  not, was the understanding reciprocal with -- let's start

11:24:19 20  with Intel.

11:24:21 21           MR. RUBIN:  Objection.  Form.

11:24:22 22           THE WITNESS:  I -- I don't recall.  If it had

11:24:26 23  been reciprocal, it would have been just as a matter of

11:24:29 24  politeness.

          25  //

| | | |
|---|---|---|
| 11:31:09 | 1 | original document, "Google Staffing, Attorney-Client |
| 11:31:13 | 2 | Privileged and Confidential."  That's at the bottom of |
| 11:31:17 | 3 | the first page. |
| 11:31:18 | 4 | A.   Yes. |
| 11:31:18 | 5 | Q.   Okay.  So whether or not any of that helps, can |
| 11:31:20 | 6 | you tell us whether you know what this thing is? |
| 11:31:26 | 7 | A.   I -- I -- I'm not sure.  I mean it looks |
| 11:31:28 | 8 | like -- I mean it is sort of a mishmash of stuff all |
| 11:31:36 | 9 | stapled together.  And there is a summary on the first |
| 11:31:39 | 10 | page.  Maybe it was like a report produced. |
| 11:31:44 | 11 | Anyway, I don't recall what it is. |
| 11:31:46 | 12 | Q.   All right.  Fair enough.  If we go to the last |
| 11:31:50 | 13 | page, and that appears to be subtitled, "Special |
| 11:31:53 | 14 | Agreements, Protocols, and Proposed Amendments." |
| 11:31:56 | 15 | Do you see that? |
| 11:31:57 | 16 | A.   Uh-huh. |
| 11:31:57 | 17 | Q.   And it begins, "We have an existing set of |
| 11:31:59 | 18 | special agreements and protocols that establish controls |
| 11:32:02 | 19 | over recruiting efforts and staffing activity." |
| 11:32:07 | 20 | It goes on, "Number one, we have established a |
| 11:32:10 | 21 | special protocol as agreed to by the board with three |
| 11:32:13 | 22 | companies, Genentech, Intel, and Apple," and it specifies |
| 11:32:17 | 23 | that Google cannot directly cold call into those |
| 11:32:21 | 24 | companies as a part of the recruiting effort. |
| 11:32:22 | 25 | Do you see that? |

11:32:23 1      A.   I do see that.

11:32:24 2      Q.   Does that assist you at all in telling us

11:32:26 3   whether or not the board of directors approved -- was

11:32:27 4   informed of and approved of the special agreements?

11:32:32 5           MR. RUBIN:  Objection.  Form.

11:32:34 6           THE WITNESS:  Look, I mean I see what this

11:32:35 7   document says, I don't -- I'm not sure who authored this

11:32:40 8   document or when or why or -- you know.  I -- I don't

11:32:45 9   have a recollection of the board, you know, making any

11:32:48 10  kind of decision or agreement with respect to this issue,

11:32:53 11  so -- yeah.

11:33:01 12  BY MR. HEIMANN:

11:33:01 13     Q.   Okay.  Did the -- whether you call it protocol

11:33:06 14  or agreement, with respect to each of these three

11:33:09 15  companies, was it company-wide?

11:33:13 16     A.   Was it company-wide with respect to them?

11:33:16 17     Q.   Yes.

11:33:16 18     A.   Or us?

11:33:17 19     Q.   No, them.

11:33:20 20     A.   Hmm.  That's a great question.  You know, I --

11:33:26 21  I think usually when we look at things like this, we're

11:33:29 22  thinking about typically technical or notable positions.

11:33:35 23  I don't know that -- I don't know if this, like,

11:33:44 24  contemplated the -- whatever, janitors or something.

11:33:48 25     Q.   So the answer is, you don't know the answer to

11:33:50  1    the question.

11:33:51  2         A.    Correct.

11:33:51  3         Q.    Did it include the subsidiaries of these three

11:33:54  4    companies, to the extent there were subsidiaries?

11:33:57  5         A.    I -- I mean, one, I don't know, but, two, I

11:34:01  6    don't think it's that I -- just that I don't know, I just

11:34:04  7    don't think it was thought through so carefully.

11:34:09  8         Q.    How about geographically?  Were there any

11:34:11  9    geographic limits?

11:34:12 10         A.    Were there any geographic limits?  I don't

11:34:17 11    recall any geographic limits.

11:34:20 12         Q.    Any time limits?

11:34:29 13         A.    Once again, you know, I view it as, you know,

11:34:31 14    just something we decided to do, but at any given time we

11:34:34 15    could have changed our mind.  We probably would have

11:34:38 16    given them a heads up, like, sorry, you know, it's -- we

11:34:42 17    feel like we want to solicit directly out of these

11:34:44 18    companies.  So I believe there is no time limit, simply a

11:34:50 19    commitment that we make for the time being, until we

11:34:52 20    change our mind.

11:34:53 21         Q.    Any limitations in terms of job title or

11:34:55 22    descriptions of the employees to which it applied?

11:35:02 23         A.    Once again, I -- I don't think that this was --

11:35:04 24    there is no, like, draft or anything.  I know you're

11:35:08 25    really focused on the word "agreement" or whatnot.  I

11:35:13  1    think this was a pretty informal commitment, and I don't

11:35:16  2    think it was thought through so carefully.

11:35:19  3         Q.   Was it enforced?

11:35:21  4         A.   Was it enforced?

11:35:23  5         Q.   At Google?  Did Google enforce it?

11:35:25  6              MR. RUBIN:  Objection.  Form.

11:35:28  7              THE WITNESS:  I'm -- I'm not aware of us, you

11:35:35  8    know, cold calling into those companies, at least during

11:35:40  9    roughly that period of time.  But I can't swear that it

11:35:44 10    didn't happen.

11:35:44 11    BY MR. HEIMANN:

11:35:45 12         Q.   Do you know whether or not Google enforced the

11:35:48 13    understanding or policy, whatever you call it?

11:35:52 14         A.   Do you mean, like, did we discipline recruiters

11:35:56 15    if they violated it?

11:35:58 16         Q.   That would be one way of enforcing it, yes, I

11:36:01 17    suppose.

11:36:01 18         A.   I don't know.  I mean, I don't -- like I said,

11:36:06 19    I'm not -- I can't recall a situation where we, you know,

11:36:10 20    did not honor that commitment, but it's possible it

11:36:13 21    happened.

11:36:13 22         Q.   All right.  Did -- did the -- did Google expand

11:36:16 23    the commitment beyond these three companies at any point?

11:36:22 24              MR. RUBIN:  Objection.  Form.

11:36:24 25              THE WITNESS:  Once again, I -- this is all from

11:36:27 1   my reading this particular document, and I can't swear to

11:36:30 2   what I actually recall happening or not.

11:36:32 3        I remember we were at least careful for some

11:36:36 4   other companies.  It is not that we wouldn't recruit out

11:36:38 5   of them, but we were a little bit more thoughtful about a

11:36:41 6   larger set at some point in the future.

11:36:44 7   BY MR. HEIMANN:

11:36:45 8        Q.   At what point?

11:36:48 9        A.   Well, if I'm to believe the date on this

11:36:50 10  document, which is in September 2005, this includes a

11:36:53 11  proposal to discuss other companies.  Though quite

11:37:00 12  frankly, I just don't recall the exact details of our

11:37:03 13  treatment of all these companies.

11:37:22 14       Q.   Exhibit 180.

11:37:30 15       A.   I'm sorry.  Is this one I already have

11:37:31 16  somewhere?

11:37:32 17       Q.   No, no, a new one.  I think you can probably

11:37:33 18  put aside the pile that you've got there.

11:37:37 19       A.   Okay.

11:37:37 20       Q.   Who knows, I may have to come back to it.

11:37:39 21       A.   Okay, we can build a small house with it or

11:37:42 22  something.

11:37:43 23       Q.   All right.  So this is an email exchange in

11:37:45 24  October, just to orientate you, in 2005.  The document we

11:37:49 25  were just look asking at, I think, was September 2005.

| | | |
|---|---|---|
| 11:47:59 | 1 | MR. HEIMANN:  Why don't we let Mr. Brin have |
| 11:48:02 | 2 | Exhibit 1875 at the same time. |
| 11:48:45 | 3 | THE WITNESS:  Okay. |
| 11:48:45 | 4 | BY MR. HEIMANN: |
| 11:48:46 | 5 | Q.  Have you had a chance -- I gave you two there |
| 11:48:48 | 6 | at once, right?  They are related. |
| 11:48:50 | 7 | A.  Yeah, I mean it looks like -- yeah, it looks |
| 11:48:53 | 8 | like roughly the same thread.  In one case, Eric replied |
| 11:48:57 | 9 | to Steve Jobs, in another case he forwarded the complaint |
| 11:49:00 | 10 | to maybe Shona, who then forwarded it on or something |
| 11:49:06 | 11 | like that. |
| 11:49:07 | 12 | Q.  So the question is this.  I had asked you |
| 11:49:09 | 13 | earlier about whether or not Google enforced the policy, |
| 11:49:14 | 14 | and with respect to these documents, these appear to be |
| 11:49:20 | 15 | instances -- this appears to be at least an instance in |
| 11:49:22 | 16 | which Mr. Jobs complained about what he thought was |
| 11:49:24 | 17 | recruiting going on on Google's part among Apple, or |
| 11:49:28 | 18 | Apple employees, right? |
| 11:49:30 | 19 | A.  That's what it appears to be, yes. |
| 11:49:32 | 20 | Q.  So the question is, were you made aware of |
| 11:49:34 | 21 | these kinds of complaints when they came in? |
| 11:49:37 | 22 | A.  Well, I am on the cc line of this particular |
| 11:49:42 | 23 | email, so, you know, I don't really recall it, to be |
| 11:49:46 | 24 | honest with you, nor have a recollection of it at all. |
| 11:49:50 | 25 | But somebody thought to copy me, it looks like. |

11:49:55  1        Q.    Yes, I see that.

11:49:56  2        A.    Yeah.

11:49:57  3        Q.    But I'm gathering from your answer that you

11:49:58  4    don't really recall this at all.

11:50:00  5        A.    No, sorry.

11:50:44  6        Q.    Exhibit 192 and Exhibit 250 together.

11:51:29  7        A.    Wow, Steve used a smiley.  God, I never got one

11:51:32  8    of those.

11:53:30  9        Q.    Okay?

11:53:31 10        A.    Yes.

11:53:31 11        Q.    Let's start with Exhibit 192.  This appears to

11:53:35 12    begin with an email from Stephanie Buran at Google to

11:53:48 13    folks, or a person at Apple.

11:53:50 14        A.    That is what it appears to be.

11:53:52 15        Q.    And that email is forwarded by Mr. Jobs to

11:53:55 16    Mr. Schmidt on March 7, 2007, with the statement, "I

11:54:00 17    would be very pleased if your recruiting department would

11:54:03 18    stop doing this."

11:54:04 19        A.    Correct.

11:54:05 20        Q.    All right.  And Mr. Schmidt responds

11:54:08 21    internally, initially, to that email by saying, "I

11:54:12 22    believe we have a policy of no recruiting, and this is a

11:54:16 23    direct inbound request," et cetera.

11:54:19 24              Do you see that?

11:54:20 25        A.    Yes.

| | | |
|---|---|---|
| 11:54:20 | 1 | Q.   And then if I'm reading -- |
| 11:54:26 | 2 | A.   I see how he uses the word "policy." |
| 11:54:29 | 3 | Q.   Pardon me? |
| 11:54:30 | 4 | A.   I see how he uses the word "policy." |
| 11:54:33 | 5 | Q.   He does? |
| 11:54:33 | 6 | A.   Yes. |
| 11:54:34 | 7 | Q.   We will come to other documents that use |
| 11:54:37 | 8 | different terms in a minute. |
| 11:54:38 | 9 | MR. RUBIN:  There is no question. |
| 11:54:40 | 10 | THE WITNESS:  Okay. |
| 11:54:40 | 11 | BY MR. HEIMANN: |
| 11:54:41 | 12 | Q.   And it appears to me that Mr. Geshuri, in |
| 11:54:47 | 13 | responding to Mr. Schmidt, says, "On this specific case |
| 11:54:51 | 14 | the sourcer who contacted this Apple employee should not |
| 11:54:54 | 15 | have, and will be terminated within the hour.  In general |
| 11:54:58 | 16 | we have a very clear 'do-not-call' policy, attached, that |
| 11:55:02 | 17 | is given to every staffing professional," et cetera. |
| 11:55:05 | 18 | Do you see that? |
| 11:55:06 | 19 | A.   Yes, I see that. |
| 11:55:08 | 20 | Q.   First of all, do you -- again, do you have any |
| 11:55:11 | 21 | recollection of being made aware of Google enforcing the |
| 11:55:15 | 22 | policy of no cold calling by, in this case, terminating |
| 11:55:21 | 23 | Google employees who engaged in it? |
| 11:55:24 | 24 | MR. RUBIN:  Objection.  Form. |
| 11:55:25 | 25 | THE WITNESS:  I -- I don't have a recollection |

13:03:12 1    about the agreements between Apple and Google on this

13:03:14 2    subject than you did.

13:03:16 3              MR. RUBIN:  Objection to form.

13:03:17 4              THE WITNESS:  But once again, you are

13:03:18 5    presupposing there was an agreement.  In your question

13:03:20 6    you are presupposing the answer you want to hear.

13:03:23 7    BY MR. HEIMANN:

13:03:23 8         Q.   Well, the question that I originally posed to

13:03:25 9    you --

13:03:25 10        A.   Yeah.

13:03:25 11        Q.   -- is, is it your view that he knew more about

13:03:28 12   the existence or non-existence of agreements relating to

13:03:31 13   recruiting than you did.

13:03:33 14        A.   I'm telling you --

13:03:33 15             MR. RUBIN:  Just let me -- objection to form.

13:03:35 16             THE WITNESS:  I'm telling you this has nothing

13:03:36 17   to do with agreements, nonagreements, things like that.

13:03:40 18   It's about Steve's ego and emotions.

13:03:44 19   BY MR. HEIMANN:

13:03:44 20        Q.   What is about Steve's ego and emotions?

13:03:47 21        A.   Alan just didn't want to agitate and piss off

13:03:50 22   Steve needlessly.

13:03:52 23        Q.   And how does that explain Mr. -- or

13:03:57 24   █████████'s understanding that a gentleman agreement

13:04:00 25   existed between Google and Apple regarding recruiting

13:04:03  1    employees or hiring employees from each other?

13:04:06  2        A.   I'm sure that Alan expressed some of the

13:04:09  3    sensitivity and -- to ███████ about Google hiring

13:04:17  4    people close to Steve and people Steve might care about,

13:04:20  5    and I don't know.  Who knows how Alan conveyed that and

13:04:25  6    what ███████ took away from that?  I wouldn't want to

13:04:31  7    speculate.

13:04:31  8        Q.   All right.  But in any event, you didn't take

13:04:34  9    any steps to correct any misimpressions when you received

13:04:36  10   this email.

13:04:38  11            MR. RUBIN:  Objection.  Form.

13:04:41  12            THE WITNESS:  No.  I mean I wouldn't -- I don't

13:04:43  13   think I ever even interacted directly with ███████ in

13:04:47  14   any way.

13:04:47  15   BY MR. HEIMANN:

13:04:48  16       Q.   Okay.  Did -- did you have an understanding of

13:04:52  17   Mr. Jobs' view about how Silicon Valley companies should

13:04:58  18   interact with each other with respect to hiring away

13:05:02  19   other companies' employees?

13:05:04  20            MR. RUBIN:  Objection.  Form.

13:05:06  21            THE WITNESS:  I think Mr. Jobs' view was that

13:05:09  22   people shouldn't piss him off.  And I think that things

13:05:14  23   that pissed him off were -- would be hiring, you know --

13:05:19  24   whatever.  Certain people that he deemed important at the

13:05:21  25   time or close to him or knew or, you know, who knows what

| | | |
|---|---|---|
| 13:05:27 | 1 | would trip his emotions exactly, but I think this |
| 13:05:31 | 2 | situation of ████████ specifically is because he was |
| 13:05:34 | 3 | close to ████████ in some way.  I don't personally know |
| 13:05:37 | 4 | their history, but I believe they were friends or |
| 13:05:39 | 5 | something. |
| 13:05:39 | 6 | BY MR. HEIMANN: |
| 13:05:40 | 7 | Q.   Well, didn't you have an understanding that |
| 13:05:41 | 8 | Mr. Jobs' view was that no one in Silicon Valley should |
| 13:05:44 | 9 | be trying to hire away employees of Apple from Apple? |
| 13:05:49 | 10 | A.   I'm sure that he wished that that was the case. |
| 13:05:52 | 11 | I don't think he was even that unreasonable.  But, yeah, |
| 13:05:57 | 12 | I mean I think there were certain times and certain |
| 13:06:00 | 13 | employees and solicitations at Apple. |
| 13:06:12 | 14 | Q.   Let's take a look at Exhibit 861.  This is an |
| 13:06:26 | 15 | email from June of 2006 that, as near as I can tell, is |
| 13:06:29 | 16 | internal to Apple.  I want to focus your attention on the |
| 13:06:33 | 17 | last paragraph of the email from Danielle Lambert or |
| 13:06:46 | 18 | "Lambert" to Steve Jobs. |
| 13:07:15 | 19 | A.   Okay.  I see it. |
| 13:07:16 | 20 | Q.   In this email the author wrote to Mr. Jobs, "We |
| 13:07:19 | 21 | have been diving into the search for someone to lead an |
| 13:07:23 | 22 | ad sales team and surfacing some good folks.  We are |
| 13:07:26 | 23 | researching Google to see who is there, and learn what we |
| 13:07:30 | 24 | can about their backgrounds, but are not directly calling |
| 13:07:33 | 25 | them directly, given the agreement you and Sergey struck |

13:07:38  1   not to recruit from one another.  We are tapping into the

13:07:41  2   other companies first to avoid having to go there.  Do

13:07:46  3   you agree with that approach?"

13:07:49  4           Can you explain how the folks at Apple

13:07:55  5   understood that you had reached an agreement with

13:07:57  6   Mr. Jobs not to recruit from one another in light of your

13:08:00  7   testimony that there wasn't any such agreement?

13:08:03  8           MR. RUBIN:  Objection.  Form.

13:08:04  9           THE WITNESS:  Yeah.  I mean I disagree with

13:08:05  10  your conclusion.  I mean first of all this says, "Do you

13:08:08  11  agree with that approach," implying that is not actually

13:08:12  12  a hard fact.

13:08:14  13          Secondly, I think you're delving in -- I don't

13:08:20  14  know Danielle Lambert, but I don't -- I think this is,

13:08:23  15  like, third-hand, fourth-hand, and you're looking at

13:08:27  16  words in the long run-on sentence that, who knows English

13:08:32  17  is her native language, but --

13:08:36  18          I don't -- I think this is like, you know,

13:08:43  19  Steve probably told her at some point that, like, oh,

13:08:46  20  Sergey and I chatted and he told me, you know, that they

13:08:49  21  won't be calling in to us, and therefore we shouldn't be

13:08:52  22  calling into them.  Maybe that soothed his ego.  We were

13:08:56  23  never concerned about it.

13:08:57  24          In fact, here, Danielle, or Dani, as she signs

13:09:00  25  her name, seems to think that it might be okay, which is

13:09:03   1   why she asks whether she should call into Google or not.

13:09:06   2   BY MR. HEIMANN:

13:09:14   3        Q.   Is that the best you can do?

13:09:16   4           THE WITNESS:  Is that the best I can do?

13:09:17   5           MR. RUBIN:  Objection.  Form.

13:09:23   6   BY MR. HEIMANN:

13:09:23   7        Q.   I asked you for an explanation.  Is that the

13:09:25   8   best explanation you can give us for how Ms. Lambert came

13:09:29   9   to say that you and Mr. Jobs struck an agreement not to

13:09:34 10   recruit from another?

13:09:37 11           MR. RUBIN:  Objection to form.

13:09:38 12           THE WITNESS:  Okay, that is kind of a weird

13:09:39 13   question, "is that the best I can do."  Like I said, I

13:09:41 14   think this is, you know, somebody pretty distant from any

13:09:43 15   conversation that Steve and I had.  I think her

13:09:46 16   perception may be that it is, quote, 'an agreement',

13:09:49 17   maybe Steve used that word or something.

13:09:51 18           You know, I always viewed it as a commitment

13:09:53 19   that we said we weren't going to do it, but we could

13:09:56 20   change our mind, and apparently even though they felt

13:09:59 21   like they shouldn't do it, they felt they could change

13:10:03 22   their mind, too.  Just like us.

13:10:04 23   BY MR. HEIMANN:

13:10:05 24        Q.   What is it that leads you to say that they felt

13:10:06 25   they could change their mind?

13:10:06  1        A.   There is the question, "Do you agree with that

13:10:07  2    approach?"

13:10:08  3        Q.   And the approach she suggested was not to

13:10:10  4    contact Google people directly?

13:10:12  5        A.   Yeah, which a perfectly good answer might have

13:10:14  6    been, no, you should hire out of Google.

13:10:16  7        Q.   Was that the answer?

13:10:17  8        A.   No.  He ignored that part of the email

13:10:19  9    entirely.

13:10:23  10       Q.   Do you know who she was at Google at the time?

13:10:25  11       A.   Who "she" who?

13:10:27  12       Q.   The author of the email we've just been talking

13:10:29  13   about, Danielle.

13:10:30  14       A.   She is not at Google.

13:10:32  15       Q.   I'm sorry.  I misspoke.

13:10:33  16            Do you know who she was at Apple at the time?

13:10:35  17       A.   No.

13:10:36  18       Q.   You said she was removed from the conversation.

13:10:38  19   What did you mean by that?

13:10:40  20       A.   I -- I didn't say she was removed from the

13:10:42  21   conversation.

13:10:43  22       Q.   I thought you said that she was --

13:10:44  23       A.   Oh, she was distant from the conversation.

13:10:47  24       Q.   Distant.

13:10:47  25       A.   Sorry.  I mean, removed as in -- yes.  I was

13:13:47  1      Q.   What's the basis for your testimony that

13:13:49  2  whoever communicated to him about this matter was not

13:13:52  3  very nuanced or careful about describing the

13:13:55  4  relationships and the policy?

13:13:59  5      A.   Well, because our business happens at very fast

13:14:03  6  speed, and kind of you're delving into very detailed

13:14:07  7  choices of words and emails that people fluttered off

13:14:11  8  probably in a heartbeat.  So I'm sure that, you know, we

13:14:15  9  agree with them, we agree internally, we agree, it's

13:14:18 10  policy.  Like, we didn't care.

13:14:22 11      Q.   And is that the basis for your testimony that

13:14:23 12  he was not very thoughtful about what he wrote?

13:14:28 13      A.   I think if he thought that every single word of

13:14:30 14  his email was going to be carefully scrutinized in the

13:14:35 15  distant, many years future, I'm sure he could have

13:14:38 16  written it more accurately and inquired as to the nature

13:14:41 17  of these policies more carefully.

13:14:44 18      Q.   Let's take a look at Exhibit 253.

13:15:21 19      A.   I see it.

13:15:22 20      Q.   All right.  So this is an email from Apple

13:15:24 21  internally, subject, Google.  March 7, 2007.  Do you see

13:15:30 22  that?

13:15:30 23      A.   I do see it.

13:15:31 24      Q.   From Mark Bentley to a number of other

13:15:34 25  individuals.  Do you see that?

13:15:35   1          A.    I do see that.

13:15:36   2          Q.    Do you happen to know who Mr. Bentley was at

13:15:38   3    Apple?

13:15:39   4          A.    I have no recollection of Mr. Bentley.

13:15:41   5          Q.    All right.  And Mr. Bentley wrote, "Folks, I

13:15:44   6    know we all understand we can't recruit out of Google.

13:15:47   7    But can you please make sure your respective teams don't

13:15:51   8    get careless with this policy.  A Google recruiter sent

13:15:54   9    an unsolicited email to one of our engineers today, and I

13:15:58  10    forwarded it to Dani.  She's taking care of it and I want

13:16:01  11    to make sure we are honoring our side of the agreement."

13:16:05  12          I ask again, do you have any explanation for

13:16:06  13    how Mr. Bentley came to understand that there was an

13:16:10  14    agreement between the two companies on this subject?

13:16:12  15          MR. RUBIN:  Objection.  Form.

13:16:14  16          THE WITNESS:  Look, I'm not privy to the

13:16:17  17    internals of Apple's communications or what Steve said to

13:16:20  18    these folks or whatnot.  I only know my impression.  My

13:16:23  19    impression was that it was a commitment we made to Steve

13:16:25  20    so we wouldn't piss him off.  I think he seemed to feel,

13:16:29  21    and I'm sure, you know, we didn't mind that, you know,

13:16:31  22    they also didn't call in.  That was never particularly

13:16:34  23    important to us.

13:16:36  24          I guess they're being -- I don't know, they

13:16:41  25    feel like they're being diligent in something that's

| | | |
|---|---|---|
| 13:16:44 | 1 | important to Steve or us or something. |
| 13:16:45 | 2 | BY MR. HEIMANN: |
| 13:16:46 | 3 | Q.   Let's take a look at Exhibit 656, please. |
| 13:17:42 | 4 | A.   Uh-huh. |
| 13:17:42 | 5 | Q.   So this is an email exchange in April of 2007 |
| 13:17:45 | 6 | that begins with an email from Michael Dell -- excuse |
| 13:17:47 | 7 | me -- michael@dell.  Do you know who that is? |
| 13:17:54 | 8 | A.   I assume this is Michael Dell. |
| 13:17:56 | 9 | Q.   And it is to Eric Schmidt, correct? |
| 13:18:02 | 10 | A.   Yes. |
| 13:18:02 | 11 | Q.   And he wrote in part, "I learned recently that |
| 13:18:04 | 12 | Google extend an offer to one of our sales guys, Sean |
| 13:18:07 | 13 | Berg. |
| 13:18:08 | 14 | "Not real happy about this and not the kind of |
| 13:18:11 | 15 | think," I assume that means thing, "we would expect given |
| 13:18:15 | 16 | our partnership. |
| 13:18:16 | 17 | "We should discuss next time we are together, |
| 13:18:18 | 18 | but I think we should have a general understanding that |
| 13:18:21 | 19 | we are not actively recruiting from each other." |
| 13:18:24 | 20 | Do you see that? |
| 13:18:25 | 21 | A.   I do see that. |
| 13:18:26 | 22 | Q.   All right.  And then if I could skip up to |
| 13:18:30 | 23 | Mr. Schmidt's email, in which he says, "Let's put them on |
| 13:18:35 | 24 | the 'don't call into Dell' list for a while.  Thanks, |
| 13:18:40 | 25 | Eric."  Do you see that? |

13:18:42  1       A.   I do see that.

13:18:43  2       Q.   All right.  And then Shona -- Shona Brown steps

13:18:48  3   in at the last of the emails and says, "Maybe it makes

13:18:51  4   sense to just call EMG's attention to the 'do not call'

13:18:55  5   and sensitive lists.  They have not reviewed in a while."

13:19:00  6            Do you see that?

13:19:01  7       A.   I do see that.

13:19:02  8       Q.   And then if we could go to Exhibit 864, and --

13:19:35  9   sorry.

13:20:13 10       A.   Do you want me to review the whole thing?

13:20:15 11       Q.   I doubt it's necessary for you to read through

13:20:18 12   the whole thing, but I will be asking you if you can

13:20:20 13   identify that for us when we get to that point.

13:20:24 14       A.   Okay.  I'm sorry.  Do you want me to -- what do

13:21:04 15   you want me to do?

13:21:05 16       Q.   If you're ready, I'm ready to ask --

13:21:06 17       A.   I mean I scanned -- I scanned through it.

13:21:08 18       Q.   All right. I can ask a question now?

13:21:07 19       A.   Yeah.

13:21:09 20       Q.   Well, if you need to look at it more carefully,

13:21:12 21   in --

13:21:12 22       A.   It depends on your question.

13:21:14 23       Q.   -- in order to answer my question --

13:21:16 24       A.   Yeah.

13:21:15 25       Q.   -- I'll give you a chance.

15:44:42  1    on my -- the end of my answer -- my question.

15:44:45  2         A.   Okay.

15:44:45  3         Q.   Doing it, and I couldn't pick up the answer.

15:44:48  4    All right.

15:44:52  5              Without vouching for the accuracy of what

15:45:02  6    Mr. Colligan says in his declaration --

15:45:05  7         A.   I'm glad you're not asking me to do that.  Yes.

15:45:08  8         Q.   -- I'm saying me in asking the question.

15:45:11  9         A.   Okay.

15:45:11  10        Q.   -- the essence of the declaration in the email

15:45:14  11   exchange appears to be that Mr. Jobs sought an agreement

15:45:20  12   with Palm relating to not recruiting employees from

15:45:30  13   Apple.

15:45:33  14        A.   Actually, it says, "not hiring."

15:45:35  15        Q.   All right.  "Not hiring."  Fair correction.

15:45:42  16             First of all, were you aware of or did you hear

15:45:44  17   anything about this exchange when it took place or

15:45:48  18   afterwards?

15:45:49  19        A.   No, not that I can recall.

15:45:51  20        Q.   All right.  Do you know of any instance --

15:45:53  21   strike that.

15:45:55  22             Were you made aware of any instances in which

15:45:57  23   Jobs reached out to any other companies seeking

15:46:01  24   agreements of this sort and was rejected?

15:46:06  25        A.   Not that I recall.

| | | |
|---|---|---|
| 15:46:18 | 1 | Q.   Did you view in that exchange that you had |
| 15:46:21 | 2 | with -- with Jobs back in 2005, I think it was now -- did |
| 15:46:27 | 3 | you view his request as including a request that Google |
| 15:46:32 | 4 | agree not to hire as distinguished from not to recruit or |
| 15:46:36 | 5 | not cold call? |
| 15:46:39 | 6 | MR. RUBIN:  Objection.  Form. |
| 15:46:40 | 7 | THE WITNESS:  Boy, I can't remember what the |
| 15:46:41 | 8 | thing he said exactly on the call, no.  I mean I think I |
| 15:46:45 | 9 | summarized it as best I could in that email.  I don't |
| 15:46:48 | 10 | have any greater recollection than that. |
| 15:46:50 | 11 | BY MR. HEIMANN: |
| 15:46:51 | 12 | Q.   We can look at the email again if we need to, |
| 15:46:53 | 13 | but my recollection is at least at one point in your |
| 15:46:56 | 14 | description of his statements he said something along the |
| 15:46:58 | 15 | lines of, if you hire any of these people, we will be at |
| 15:47:03 | 16 | war, or some such thing. |
| 15:47:05 | 17 | A.   I mean I can look at it again, but, you know, |
| 15:47:07 | 18 | Steve was kind of irate and agitated and irrational about |
| 15:47:15 | 19 | lots of things, so -- |
| 15:47:17 | 20 | Q.   So -- |
| 15:47:17 | 21 | A.   I wouldn't -- I don't know.  I don't remember |
| 15:47:19 | 22 | what words he used now.  I can look it up and try to get |
| 15:47:23 | 23 | my summary as the best recounting. |
| 15:47:26 | 24 | Q.   Let's take a quick look at it, just for that |
| 15:47:28 | 25 | one point. |

15:47:29  1        A.    Okay.

15:47:29  2        Q.    It's -- it will be --

15:47:35  3        A.    Oh, here we go.  Exhibit 1871.

15:47:39  4        Q.    Okay.

15:47:39  5        A.    Yes.  That says the word "hire."

15:47:49  6        Q.    There it is.  You got it exactly right.  You

15:47:51  7    quote him as saying, "If you hire a single one of these

15:47:53  8    people, that means war."  And I guess my question to you

15:47:56  9    is, did you interpret that as a request that you agree

15:48:04 10    not to hire Apple people, or was that just something he

15:48:07 11    was saying in an angry mode that you took with a grain of

15:48:12 12    salt, or how did you interpret it?

15:48:15 13        A.    Yeah, I mean I think he was just really angry

15:48:17 14    at the time over this one particular fellow, and -- yeah.

15:48:22 15    I mean he was just kind of crazy.

15:48:26 16        Q.    All right.  Let's switch --

15:48:46 17              How did you interpret the kind of war that he

15:48:49 18    was talking about in the conversation that you had with

15:48:51 19    him?  I mean how would Apple go to war with Google in

15:48:56 20    terms of what he was saying to you, as you understood it?

15:49:02 21        A.    Boy, I mean I don't remember.  It is so many

15:49:05 22    years ago.  I don't think he meant ICBMs and nuclear

15:49:10 23    submarines and things like that.

15:49:11 24        Q.    All right.  I think that's fair.

15:49:26 25        A.    He -- I don't remember.  I think -- I think,

15:49:28  1   you know, we had our search deal, Safari that

15:49:31  2   periodically came up for renewal, and I assume he would

15:49:35  3   try to use a different search engine there, and -- I

15:49:39  4   don't remember now.  I'm sure there were various bad

15:49:41  5   things he could do if he was very angry.

15:49:43  6        Q.   Were there any potential patent issues between

15:49:46  7   the two companies at the time?

15:49:48  8        A.   I don't remember any specific patents.  I mean

15:49:52  9   Apple historically had significantly more patents than

15:49:56 10   Google.  I don't recall if he made threats with respect

15:50:09 11   to patents in our case or not.

15:50:11 12        Q.   All right.  I'm going to change topics once

15:50:13 13   again with you.

15:50:16 14             Did there come a point in time when Facebook

15:50:19 15   presented a problem for Google's retention of --

15:50:23 16             Let me stop there.  We have to change the tape.

15:50:26 17   We may as well do that now.

15:50:29 18             THE VIDEOGRAPHER:  This is the end of Video

15:50:30 19   No. 2.  We're now off the record at 3:50.

15:50:33 20             (Recess was taken.)

15:57:27 21             THE VIDEOGRAPHER:  We are now on the record at

15:57:28 22   3:57.  This is the beginning of Video No. 3.

15:57:33 23   BY MR. HEIMANN:

15:57:34 24        Q.   Okay.  So at some point did Facebook present a

15:57:37 25   problem for Google's retention of employees?

15:57:47  1        A.    Facebook ended up hiring away a modest number

15:57:51  2   of employees, and probably more so than any other company

15:57:54  3   I recall.

15:57:56  4        Q.    Okay.  Did -- at some point did Google come to

15:58:01  5   regard Facebook as a threat to Google's ability to retain

15:58:06  6   employees?

15:58:06  7        A.    It was -- you know, it was definitely up there

15:58:10  8   in terms of, you know, the companies that had hired away

15:58:13  9   employees from Google.  Like I said, Facebook was

15:58:16 10   probably number one.

15:58:17 11        Q.    Did Google take any steps to address that

15:58:21 12   concern?

15:58:22 13        A.    Yes.

15:58:22 14        Q.    What did Google do in that regard?  And let me

15:58:26 15   start back.  The time frame here, can you give us at

15:58:28 16   least an approximate time?

15:58:33 17        A.    I'd say the last few years, maybe three, four

15:58:41 18   years or so.

15:58:43 19        Q.    All right.  Let me show you a document that may

15:58:45 20   pinpoint that a little further.

15:58:47 21        A.    Yeah.

15:58:47 22        Q.    Exhibit 660.  I know it is hard to reach back

15:58:49 23   and --

15:58:50 24        A.    Yeah.

15:58:50 25        Q.    -- pinpoint dates.

15:59:58  1       A.    Okay.

15:59:59  2       Q.    All right.  Does this help you place in time

16:00:04  3   the situation with Facebook?

16:00:06  4       A.    Yeah, I guess this was closer to five or six

16:00:09  5   years ago.

16:00:12  6       Q.    So this would be -- would be a point in time

16:00:14  7   prior -- well prior to Facebook's IPO, correct?

16:00:19  8       A.    Yes.

16:00:20  9       Q.    But when -- during a period --

16:00:23 10       A.    Look up --

16:00:24 11       Q.    Sorry, I stepped on your answer.

16:00:24 12       A.    I need to look up when Facebook went public,

16:00:28 13   but, yeah, I'm pretty sure it was after '07.  It was a

16:00:33 14   couple of years ago now?

16:00:35 15       Q.    It was very recent, lawsuits all over the --

16:00:36 16       A.    Okay.

16:00:36 17       Q.    Much more recent than 2007.

16:00:38 18       A.    Yes.  Yes.

16:00:40 19       Q.    All right.  So give me The Reader's Digest

16:00:45 20   version of this situation as you guys saw it with respect

16:00:48 21   to Facebook and the threat they posed?

16:00:51 22       A.    The Reader's Digest version?

16:00:54 23       Q.    Yes.  I don't want to spend the rest of the day

16:00:57 24   here.

16:00:58 25       A.    Well, I recall that Facebook hired away, you

16:01:01  1   know, some, multiple employees -- not a huge number, but

16:01:07  2   we took notice, and some notable employees.  Furthermore,

16:01:11  3   you know, as I wrote in my message here, which was then

16:01:15  4   forwarded on, there were a variety of other little

16:01:19  5   companies that were kind of getting spun up, either

16:01:22  6   competitors of Facebook or in the social space and, you

16:01:25  7   know, all these little groups would leave kind of --

16:01:28  8   everybody would want to start the next Facebook or --

16:01:30  9   this was pre-Instagram, but that kind of -- the idea that

16:01:33 10   you could have a very small start-up that gets a big

16:01:37 11   payout very quickly.

16:01:40 12       Q.   And how did that present a problem for Google?

16:01:42 13       A.   I think a lot of employees were seduced by

16:01:45 14   the -- the kind of promise of quick riches.

16:01:49 15       Q.   Quick riches presented by Facebook and the

16:01:52 16   other potential -- or I shouldn't say potential --

16:01:55 17   start-up companies?

16:01:56 18       A.   Correct.

16:01:57 19       Q.   And not everyone will understand why that is.

16:02:00 20   Can you explain why that is?

16:02:04 21       A.   Yeah, I think there was a bubble.  In fact, I'm

16:02:06 22   kind of impressed that I wrote this back in '07, but

16:02:09 23   there was quite of a sort of web 2.0 social bubble that,

16:02:13 24   you know, valued social companies very highly, sometimes

16:02:18 25   in acquisitions and, I can't recall if back then some of

16:02:23  1    them had gone public, even though Facebook did not, but

16:02:26  2    there was a real zeal and enthusiasm around it, and, you

16:02:33  3    know, it drew people to -- well, we should start our own

16:02:37  4    little company.  And from a technical point of view a lot

16:02:40  5    of these things are very easy, you know, there's not very

16:02:44  6    many technical obstacles, and I can see how that might

16:02:48  7    have been appealing.

16:02:48  8        Q.   And what steps if any did Google take in

16:02:51  9    response?

16:02:51 10        A.   I remember we started to monitor Googlers --

16:02:59 11    Google employees who were recruited away by Facebook and

16:03:03 12    also by Twitter and a few other companies, and we would

16:03:07 13    monitor how we did when we were recruiting the same

16:03:10 14    person when, you know, there was a certain individual who

16:03:13 15    was being recruited by Facebook and Google, for example,

16:03:17 16    or Twitter and Google.  So we maintained data on that,

16:03:20 17    and --

16:03:21 18        Q.   I'm sorry for interrupting.  What kind of data

16:03:24 19    are you talking about?

16:03:25 20        A.   Like I would get, I don't know, once a quarter

16:03:27 21    or something, a little table that said, you know,

16:03:29 22    whatever, Facebook hired 10 people from Google this

16:03:32 23    quarter, and Twitter hired three, and Google hired away

16:03:37 24    however many we did from those companies.

16:03:38 25        Q.   And did you attempt to ascertain what kind of

16:03:41  1    compensation these folks were being offered or receiving

16:03:45  2    who were being hired away?

16:03:47  3         A.   No, not --

16:03:48  4              MR. RUBIN:  Objection to form.  Sorry.

16:03:52  5              THE WITNESS:  No, I did not attempt to

16:03:53  6    ascertain that.  These were summaries, like.

16:03:57  7    BY MR. HEIMANN:

16:03:57  8         Q.   All right.  Did Google, if not --

16:03:59  9         A.   Yeah.

16:03:59  10        Q.   -- yourself personally, attempt to assemble

16:04:02  11   data on what kinds of compensation packages were luring

16:04:07  12   people away from Google?

16:04:09  13        A.   I'm sure somebody kept track of -- or somebody

16:04:13  14   certainly looked at the individual cases.

16:04:16  15        Q.   Why do you say certainly that happened?

16:04:19  16        A.   I mean I think that's what you do in any --

16:04:21  17   certainly for -- for any employee that you wish to

16:04:24  18   retain, or strongly wish to retain, you would, you know,

16:04:30  19   try to find out if they shared with you what their

16:04:33  20   compensation -- what their offer of compensation might

16:04:35  21   be, what they were interested in, what they had at Google

16:04:39  22   now.  I mean it is just basic management.

16:04:42  23        Q.   And what, if any, strategies did Google devise

16:04:45  24   to address that particular issue, the compensation

16:04:49  25   packages that were being offered to Google employees by

16:04:55  1   Facebook and the other companies?

16:04:56  2       A.   I remember for a period of time we were -- we

16:04:58  3   wanted to be quick and responsive in terms of making

16:05:02  4   counteroffers to retain some of the employees who were

16:05:06  5   being recruited away by Facebook, especially the ones we

16:05:09  6   really valued.

16:05:11  7       Q.   And in terms of job functions, what were the --

16:05:17  8   what were the key functions that you were most concerned

16:05:20  9   about in terms of your employees that were being

16:05:22 10   recruited away?  I mean, for example, were you concerned

16:05:26 11   about the sales guys?  Were you concerned about

16:05:30 12   engineers?  Were you concerned about top executive

16:05:32 13   talent?  Were there categories that were of greater

16:05:36 14   concern than others?

16:05:37 15       A.   I mean I don't think I was personally

16:05:38 16   intimately involved with, you know, the discussion about

16:05:41 17   the categories.  I imagine there were multiple

16:05:44 18   categories, though, that we cared about.

16:05:47 19       Q.   Which ones do you think you would have most

16:05:49 20   been concerned with?

16:05:53 21       A.   I think it's hard to say.  I mean I think there

16:05:56 22   are certainly, you know, technical talent we care about.

16:05:59 23   On the other hand, you know, there are a lot of people

16:06:02 24   who have deep business knowledge about ad systems and

16:06:05 25   things like that that we also care about.  You know, I

16:06:09   1      think it covers a bit of a mix.

16:06:29   2          Q.   Let me ask you to take a look at Exhibit 608.

16:06:44   3              So the document I showed you in the form of

16:06:46   4      Exhibit 660 was October of '07, and this is a document

16:06:50   5      dated November of 2007.

16:06:52   6          A.   Uh-huh.

16:06:55   7          Q.   Take a moment to look it over.

16:07:02   8          A.   Uh-huh.  I see it.

16:07:17   9          Q.   Can you explain to us what this reflects about

16:07:19  10      the strategy, or at least one of the strategies that

16:07:21  11      Google adopted to meet the issues that you were facing at

16:07:26  12      the time?

16:07:26  13          A.   I mean, look, I see what I see in this email,

16:07:34  14      the notion is that we would try to make the counteroffer

16:07:37  15      within one hour of us finding out that Facebook had made

16:07:41  16      an offer to one of our employees.

16:07:47  17          Q.   All right.  And if you can focus for a moment

16:07:49  18      on the email that looks like it starts the chain here,

16:07:54  19      and it is not clear to me, I'm trying to make this out,

16:08:01  20      but an email from Vijay Gill, I think it says.

16:08:06  21          A.   Yes.

16:08:09  22          Q.   And he says, in part, "Is this true," after

16:08:11  23      quoting what I gather was his understanding of the policy

16:08:13  24      change that was implemented at Google.

16:08:14  25          A.   Uh-huh.

16:08:14  1      Q.   "If so, it appears to reward folks applying to

16:08:17  2  Facebook and appears to contravene our equal pay for

16:08:20  3  equal performance policy.  I'm disturbed by this policy

16:08:22  4  even though I recently lost one engineer to Facebook."

16:08:26  5          Do you know what he's referring to when he

16:08:28  6  makes reference to Google's equal pay for equal

16:08:32  7  performance policy?

16:08:34  8      A.   I mean it's -- I know what I see here.  I think

16:08:36  9  it's just the notion of -- I -- I assume he's upset that,

16:08:43 10  you know, by countering we would therefore alter the

16:08:46 11  compensation of an individual that we presumably would

16:08:50 12  not have altered for an equal individual who hadn't --

16:08:53 13  did not have an offer from Facebook, and he perceives

16:08:56 14  that as unfair.

16:08:57 15      Q.   All right.  Was it, in fact, a policy at Google

16:09:00 16  at the time to attempt to compensate employees equally

16:09:07 17  for equal performance?

16:09:10 18      A.   I think there is a -- there is an idealism

16:09:13 19  about fairness, but, no, there was not a policy.  There

16:09:17 20  are any number of things that can influence an employee's

16:09:21 21  compensation, such as, you know, the timing of their

16:09:23 22  start and when they got their stock options, you know,

16:09:25 23  the day that happened, you know, when their reviews

16:09:30 24  happened to line up with, you know, various

16:09:34 25  accomplishments that they had; and quite frankly, you

16:09:37  1   know, some people end up unfortunately, you know, maybe

16:09:42  2   they got overcompensated too much to begin with or --

16:09:46  3         So, you know, ideally, you know, compensation

16:09:50  4   would completely follow performance, but I think the

16:09:54  5   realities of the world cause a lot of fluctuation.

16:09:58  6         Q.   So let me put it differently.

16:10:01  7         Recognizing that there are all sorts of -- of

16:10:05  8   things that can impact the actual compensation any given

16:10:10  9   employee receives in the end, was it nonetheless Google's

16:10:13 10   policy to attempt to be fair in -- in the form of equally

16:10:17 11   compensating for equal performance?

16:10:21 12         A.   I -- I think we definitely had that ideal.  You

16:10:25 13   know, when you say did we attempt, you know, we didn't do

16:10:29 14   so by trying to, I don't know, cut people's salaries, for

16:10:32 15   example, if we felt they weren't living up to a -- I mean

16:10:36 16   you can take that to different extremes.

16:10:38 17         Q.   Well, I'm not suggesting that you would take it

16:10:39 18   to extremes.  I'm really just trying to get at --

16:10:42 19         A.   I mean there is definitely an ideal of a

16:10:45 20   meritocracy and compensation to be determined by

16:10:49 21   contribution.

16:10:52 22         Q.   Let me ask you to take a look at Exhibit 614.

16:11:45 23         A.   Uh-huh.

16:11:47 24         Q.   Have you had a chance to look at -- this is a

16:11:50 25   long document, but I'm really going to be focusing on the

16:11:53  1   bottom of the first page.

16:11:55  2       A.   Uh-huh.

16:11:56  3       Q.   Again, you have to say "yes" or "no" or "I

16:11:59  4   don't know."

16:12:02  5            MR. RUBIN:  Was there a question?  You just

16:12:04  6   said, "focusing on the bottom of the first page," so I'm

16:12:07  7   not technically sure there was a question.

16:12:07  8   BY MR. HEIMANN:

16:12:07  9       Q.   The question is, have you had a chance to look

16:12:09 10   at the page I'm going to focus on.

16:12:12 11            MR. RUBIN:  Have you had a chance to look at

16:12:13 12   it, is the question?

16:12:15 13            THE WITNESS:  Have I only looked at the first

16:12:16 14   page?

16:12:17 15            MR. RUBIN:  No.  He's not limiting it.  He is

16:12:18 16   just asking, have you had a chance to look at the

16:12:20 17   document.

16:12:20 18            THE WITNESS:  I mean I glanced at it.

16:12:21 19   BY MR. HEIMANN:

16:12:22 20       Q.   Let's do this.  Let me point out what I'm going

16:12:23 21   to ask you --

16:12:24 22       A.   Okay.

16:12:24 23       Q.   -- and if you want to look at more of the

16:12:27 24   document than you have already, you are free to do so

16:12:30 25   before you try to answer the question.

16:21:25  1   neglected to designate this deposition as highly

16:21:34  2   confidential, Attorneys' Eyes Only, so I want to go ahead

16:21:39  3   and do that now.

16:21:39  4         MR. HEIMANN:  Fine.

16:21:41  5         THE WITNESS:  I assume that the speech for

16:21:42  6   Hanna's Bat Mitzvah is not --

16:21:47  7   BY MR. HEIMANN:

16:21:48  8       Q.   Sorry?

16:21:48  9       A.   I assume the speech for Hanna's Bat Mitzvah is

16:21:54  10  not going to be relevant to your questions.

16:21:56  11      Q.   I trust not.

16:23:52  12      A.   Okay.  I've read it.  What was the question

16:23:54  13  again?

16:23:54  14      Q.   All right.  So is this part of the effort you

16:23:59  15  referred to a moment ago on Mr. Rosenberg's part to

16:24:04  16  address the problem by talking directly with Sheryl

16:24:08  17  Sandberg?

16:24:12  18         MR. RUBIN:  Objection.  Form.

16:24:13  19         THE WITNESS:  Sorry.  When I was talking about

16:24:14  20  the non-solicitation agreement, I meant it in the sense

16:24:18  21  of probably Sheryl's message at the bottom of page 2.

16:24:24  22  BY MR. HEIMANN:

16:24:25  23      Q.   Right.

16:24:26  24      A.   It says, "We are being very strict on the

16:24:28  25  Google non-solicit," which I assume means her -- her and

16:24:36   1   other employees' employment agreements at Google.  That's

16:24:41   2   what I was referring to.

16:24:42   3       Q.   So your understanding of this reference is, as

16:24:44   4   you described it, not to a general sort of mutual

16:24:47   5   non-solicitation agreement between the companies, but

16:24:50   6   rather specific to her contractual obligations.

16:24:55   7       A.   Yes.  That was what I was referring to.

16:24:57   8       Q.   All right.  And that's your interpretation of

16:24:59   9   what she's talking about here in this paragraph where she

16:25:01  10   refers to the Google non-solicit agreement.

16:25:05  11       A.   Correct.

16:25:05  12       Q.   All right.  We're going to switch topics again.

16:25:38  13   Let's go to Exhibit 1753.

16:26:19  14       A.   Okay.

16:26:19  15       Q.   All right.  So this is an email from June of

16:26:25  16   2004 from Shona Brown, correct?

16:26:32  17       A.   Yes.

16:26:32  18       Q.   And this would have been shortly before

16:26:35  19   Google's IPO, if I recall your testimony --

16:26:37  20       A.   Yes.

16:26:38  21       Q.   -- from earlier today?

16:26:39  22       A.   That's correct.

16:26:39  23       Q.   And this would have been shortly after Shona

16:26:42  24   Brown was hired by Google as well, correct?

16:26:45  25       A.   I don't remember the exact date of that.  I

16:26:48  1    don't remember when she started.

16:26:52  2        Q.   All right.  Fair enough.  So without having to

16:26:56  3    read through the document, in general, what was the

16:26:59  4    subject of the discussion as reflected in this email?

16:27:07  5        A.   It looks like the desire to ramp our

16:27:10  6    engineering hiring.

16:27:13  7        Q.   In a very significant way, correct?

16:27:16  8             MR. RUBIN:  Objection.  Form.

16:27:20  9             THE WITNESS:  Very significant?  Yeah.  I mean

16:27:23 10    I -- I know it certainly has flowerful language here,

16:27:29 11    "dramatically increase."  I don't know what it in

16:27:33 12    practical terms it ended up being, but -- yes.  This --

16:27:39 13    this reflects a desire to have a very significant

16:27:45 14    increase.

16:27:45 15    BY MR. HEIMANN:

16:27:46 16        Q.   All right.  And it also discusses -- well,

16:27:50 17    strike that.

16:27:50 18             So how did Google plan or intend to accomplish

16:28:08 19    the very dramatic increase in engineering talent they had

16:28:13 20    perceived to be needed as reflected in the email?

16:28:22 21        A.   I don't recall.

16:28:27 22        Q.   Not even generally?

16:28:31 23        A.   I mean the main thing that over time has

16:28:35 24    successfully increased hiring rates is having more

16:28:37 25    recruiters.

16:28:38   1        Q.    Okay.  And let's focus on the sources from

16:28:42   2    which those recruiters would seek engineering talent.

16:28:45   3    What were the principal sources as planned by Google?

16:28:50   4        A.    The most successful ones we had all the time, I

16:28:53   5    believe, were employee referrals.

16:28:56   6        Q.    Employee referrals meaning referrals of what?

16:28:58   7        A.    An employee will say, look, my friend Joe is a

16:29:01   8    great -- whatever, software engineer.

16:29:06   9        Q.    All right.  So let's be more basic about this.

16:29:09  10              One source of engineers that Google was looking

16:29:12  11    to hire would have been novice engineers just out of

16:29:18  12    school or not with much experience, right?

16:29:21  13        A.    Uh-huh.  Uh-huh.  Yep.

16:29:24  14        Q.    But that wasn't the principal source of

16:29:26  15    engineers you were interested in at this point in time,

16:29:28  16    was it?

16:29:29  17              MR. RUBIN:  Objection.  Form.

16:29:30  18              THE WITNESS:  I'm not sure about that.  I don't

16:29:31  19    know how many of them were out of school versus other

16:29:34  20    companies versus what.

16:29:35  21    BY MR. HEIMANN:

16:29:36  22        Q.    Well, one of the things you wanted to do is --

16:29:39  23    I think it is clearly reflected in this email, was to

16:29:42  24    hire a significant number of experienced engineers who

16:29:45  25    would be able to start producing for Google right away;

16:32:28  1          A.    Yes.

16:32:28  2          Q.    -- "(█████ new engineers) will require a fall

16:32:32  3     2004 campus hiring program that generates ██ hires, ██

16:32:37  4     percent campus hiring."  Isn't that what you are talking

16:32:39  5     about there?

16:32:40  6                MR. RUBIN:  Objection.  Form.

16:32:41  7                THE WITNESS:  Yeah, I mean I just meant

16:32:43  8     generally that there are multiple sources of hires, but,

16:32:45  9     yeah, campus hiring would cover some of those.  So what

16:32:48  10    was your question again?

16:32:51  11    BY MR. HEIMANN:

16:32:59  12         Q.    My question was whether or not this doesn't

16:33:00  13    indicate that your plans for campus hiring were to get ██

16:33:04  14    percent of what you wanted out of recent graduates from

16:33:07  15    school as opposed to seasoned engineers that you would

16:33:11  16    get elsewhere.

16:33:19  17         A.    Seasoned?  I don't know.  You are putting a lot

16:33:21  18    of qualifiers.  I mean our campus hiring does -- you

16:33:24  19    know, gives us a mix of employees.  You know, some of

16:33:29  20    them have relatively little experience.  By the way, a

16:33:32  21    relatively small percentage is -- is fresh bachelor's.

16:33:36  22    Typically they have a master's or Ph.D.  And some of them

16:33:40  23    had prior work experience elsewhere, and some of them are

16:33:43  24    proper faculty and, you know, they run projects.  For

16:33:49  25    example, under Google X right now, Google Glass project

16:33:53  1   is run by somebody I hired out of a university.

16:33:57  2          But anyhow, yeah, a portion of the hires here

16:34:01  3   is listed as coming from universities.

16:34:11  4          Q.   Was one of the sources for experienced

16:34:15  5   engineers that you were planning on hiring was to hire

16:34:19  6   them from other companies, other high-tech companies?

16:34:22  7          A.   Yeah.  A lot of employees come from other

16:34:25  8   companies.

16:34:27  9          Q.   And was one of the means by which you planned

16:34:29  10  on seeking out and soliciting those types of engineers

16:34:35  11  was to cold call directly into the companies that they

16:34:39  12  were working for at the time?

16:34:41  13         A.   I honestly can't tell you what the techniques

16:34:44  14  that the recruiters were using at the time.

16:34:48  15         Q.   All right.  If you can't tell us that, who

16:34:52  16  could answer that question?

16:34:54  17         A.   In 2004?  You want to know what the mix of the

16:34:59  18  referrals was?

16:35:00  19         Q.   Well, I'm sorry.  What do you mean when you say

16:35:02  20  "mix of referrals was"?

16:35:03  21         A.   So the mix of, you know, sort of sources.  You

16:35:06  22  are saying cold call.  I mean, for example, many of our

16:35:10  23  successful candidates -- in fact our data suggests that

16:35:13  24  over time that our more successful employees are usually

16:35:17  25  referred to by a friend at the company, at Google.  So,

16:35:20   1    for example, that would not be a cold call.

16:35:22   2         Q.   Well, it might be, couldn't it, if -- if, for

16:35:24   3    example, the Google employee identified engineer X in

16:35:32   4    company Y having no reason to believe that that engineer

16:35:35   5    was interested in leaving and going to work for somebody

16:35:38   6    else, but telling you, that is a good engineer,

16:35:41   7    contacting that person would be a cold call as -- as you

16:35:44   8    understand it; isn't that right?

16:35:46   9              MR. RUBIN:  Objection.  Form.

16:35:47  10              THE WITNESS:  I don't know.  I don't think

16:35:49  11    necessarily that would be.

16:35:50  12    BY MR. HEIMANN:

16:35:50  13         Q.   So you think under the terms of the policy that

16:35:52  14    Google had, if a Google employee identified another

16:35:57  15    company's engineer as a person that might be good for

16:35:59  16    the -- for Google, but with no reason to believe that

16:36:03  17    person had any interest, desire, or plans to leave the

16:36:10  18    company he was then working for, that wouldn't be a cold

16:36:12  19    call?

16:36:13  20              MR. RUBIN:  Objection to form.

16:36:14  21              THE WITNESS:  I think when you say without any

16:36:15  22    interest, desire, plans to leave, if somebody had

16:36:18  23    absolutely no chance of leaving, that would be kind of a

16:36:22  24    weird referral.  So I don't know if that's --

          25    //

1           I, Rosalie A. Kramm, Certified Shorthand

2   Reporter licensed in the State of California, License No.

3   5469, hereby certify that the deponent was by me first

4   duly sworn and the foregoing testimony was reported by me

5   and was thereafter transcribed with computer-aided

6   transcription; that the foregoing is a full, complete,

7   and true record of said proceedings.

8           I further certify that I am not of counsel or

9   attorney for either of any of the parties in the

10  foregoing proceeding and caption named or in any way

11  interested in the outcome of the cause in said caption.

12          The dismantling, unsealing, or unbinding of the

13  original transcript will render the reporter's

14  certificates null and void.

15          In witness whereof, I have hereunto set my hand

16  this day:   March 30, 2013.

17          ___X____ Reading and Signing was requested.

18          _____ Reading and Signing was waived.

19          _____ Reading and signing was not requested.

20

21                          _____

22                          ROSALIE A. KRAMM

23                          CSR 5469, RPR, CRR

24

25

**CORRECTIONS TO DEPOSITION TRANSCRIPT OF**
**SERGEY BRIN, DATED MARCH 19, 2013**
*In re High-Tech Employee Antitrust Litigation*
*Case No. 11-CV-2509-LHK (N.D. Cal.)*

| Page:Line | Amendment | Reason for Amendment |
|---|---|---|
| 12:13 | Insert "claims" after the word "complicated" | correction to transcript error |
| 14:23 | Replace: "is"<br><br>With: "was" | correction to transcript error |
| 20:5 | Insert "a" after the word "that's" | correction to transcript error |
| 25:25—26:1 | Replace: "and not very significant maintaining that relationship"<br><br>With: "and it was not very significant to maintain that relationship" | correction and clarification |
| 32:7 | Replace: "employees."<br><br>With: "employees?" | correction to transcript error |
| 35:12 | Replace: "expensively"<br><br>With: "extensively" | correction to transcript error |
| 37:16-17 | Replace: "taking a lot of metaphor"<br><br>With: "using a metaphor" | correction and clarification |
| 40:13 | Replace: "spoken"<br><br>With: "spoke" | correction to transcript error |
| 42:21 | Replace: "lives"<br><br>With: "lived" | correction to transcript error |
| 45:4 | Replace: "at—you know,"<br><br>With: "with, you know, the" | correction and clarification |

1

| Page:Line | Amendment | Reason for Amendment |
|---|---|---|
| 61:6 | Insert "days" after the phrase "those two" | correction and clarification |
| 61:12 | Replace: "exactly"<br><br>With: "exact" | correction to transcript error |
| 63:10 | Insert "that" after the word "indicate" | correction to transcript error |
| 64:1 | Insert "that" after the word "mind" | correction to transcript error |
| 65:5 | Replace: ", and I --"<br><br>With: "in" | correction and clarification |
| 65:20 | Replace: "other some"<br><br>With: "some other" | correction to transcript error |
| 69:1 | Delete "the" | correction to transcript error |
| 70:2 | Replace: "is"<br><br>With: "in" | correction to transcript error |
| 73:5 | Replace: "things"<br><br>With: "ways" | correction and clarification |
| 74:16 | Replace: "probably might as well the whole board"<br><br>With: "probably might have as well to the whole board" | correction and clarification |
| 95:23 | Replace: "manage"<br><br>With: "imagine" | correction to transcript error |
| 108:3 | Insert "a" before the phrase "fairly special circumstance" | correction to transcript error |
| 131:9 | Replace:  "Ever this group" | correction and |

| Page:Line | Amendment | Reason for Amendment |
|---|---|---|
| | With: "Ever? This group" | clarification |
| 143:14 | Replace: "relatively overlap in skillset" <br> With: "relatively overlapping in skillsets" | correction and clarification |
| 165:12 | Replace: "GNA" <br> With: "G & A" | correction to transcript error |
| 165:13 | Replace: "restriction" <br> With: "restrictions" | correction to transcript error |
| 190:10 | Replace: "flowerful" <br> With: "flowery" | correction to transcript error |
| 202:12 | Replace: "county" <br> With: "country" | correction to transcript error |
| 205:8 | Delete "The" | correction to transcript error |

Subject to the above changes, I certify that the transcript is true and correct.

Signature

Date 4/29/13

3