# Google's Motion for Summary Judgment, Revised Version

MAYER BROWN LLP
LEE H. RUBIN (SBN 141331)
lrubin@mayerbrown.com
EDWARD D. JOHNSON (SBN 189475)
wjohnson@mayerbrown.com
DONALD M. FALK (SBN 150256)
dfalk@mayerbrown.com
ANNE M. SELIN (SBN 270634)
aselin@mayerbrown.com
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112
Telephone:    (650) 331-2000
Facsimile:    (650) 331-2061

*Attorneys for Defendant
Google Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| IN RE HIGH-TECH EMPLOYEE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Master Docket No. 11-CV-2509 LHK<br><br>**DEFENDANT GOOGLE INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:         March 20, 2014<br>Time:        1:30 p.m.<br>Courtroom: 8, 4th Floor<br>Judge:       The Honorable Lucy H. Koh |

**TABLE OF CONTENTS**

Page

INTRODUCTION ................................................................................................................. 1

SUMMARY OF UNDISPUTED FACTS ............................................................................. 2

    A.   Google Grew Rapidly By Aggressive Recruiting From Thousands of Sources .................................................................................................. 2

    B.   Google Created A "DNCC List" To Appease Select Few Key Business Partners ................................................................................................ 3

    C.   February 2005: Google Adds Apple To Its DNCC List ............................. 4

    D.   February 2005: Google Adds Intel To Its DNCC List ............................... 5

    E.   June 2007: Google Adds Intuit To Its DNCC List .................................... 5

    F.   Google Never Added—Or Even Discussed Adding—Adobe, LucasFilm, Or Pixar To Its DNCC List ....................................................... 6

ARGUMENT .......................................................................................................................... 6

    I.   NO DIRECT EVIDENCE SUPPORTS PLAINTIFFS' CLAIM AGAINST GOOGLE ........................................................................................ 7

    II.   THERE IS INSUFFICIENT CIRCUMSTANTIAL EVIDENCE TO CREATE A TRIABLE ISSUE THAT GOOGLE JOINED THE ALLEGED OVERARCHING CONSPIRACY TO SUPPRESS COMPENSATION ............................................................................................ 8

        A.   Plaintiffs Cannot Meet Their Burden Under Matsushita ........................... 8

            1.   There is no circumstantial evidence that Google knew or had reason to know of the alleged conspiracy ............................... 8

            2.   There is no circumstantial evidence that Google had any reason to believe that the benefits of its DNCC agreements depended on the existence and success of other agreements .......... 9

            3.   There is no circumstantial evidence to support an inference of a single overarching conspiracy other than the supposed parallel nature of the seven DNCC agreements, and that, alone, is not enough ................................................................... 10

            4.   No circumstantial evidence supports Plaintiffs' "hub and spoke" theory connecting Google's alleged DNCC agreements to the alleged agreements not involving Google ................ 11

        B.   Plaintiffs' Overarching Conspiracy Case Fails Irrespective of Matsushita ................................................................................................ 12

CONCLUSION ..................................................................................................................... 13

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*AD/SAT, Inc. v. Associated Press, et al.*,
　181 F.3d 216 (2d Cir. 1999) ................................................................................................. 6

*Bell Atlantic Corp. v. Twombly*,
　550 U.S. 544 (2007) ............................................................................................................ 7

*Copperweld Corp. v. Independence Tube Corp.*,
　467 U.S. 752 (1984) ............................................................................................................ 7

*Dickson v. Microsoft Corp.*,
　309 F.3d 193 (4th Cir. 2002) ............................................................................................. 11

*In re Citric Acid Litig.*,
　191 F.3d 1090 (9th Cir. 1999) ........................................................................................... 12

*In re Ins. Antitrust Litig.*,
　723 F. Supp. 464 (N.D. Cal. 1989), *rev'd on other grounds*, 938 F.2d 919 (9th Cir.
　1991) ...................................................................................................................... 7, 11, 12

*In re Ins. Brokerage Antitrust Litig.*,
　618 F.3d 300 (3d Cir. 2010) .......................................................................................... 7, 12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
　475 U.S. 574 (1986) .................................................................................................... passim

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
　465 U.S. 752 (1984) ........................................................................................................ 6, 7

*Richards v. Neilsen Freight Lines*,
　810 F.2d 898 (9th Cir. 1987) ........................................................................................ 11, 12

*Sun Microsystems Inc. v. Hynix Semiconductor Inc.*,
　608 F. Supp. 2d 1166 (N.D. Cal. 2009) ........................................................................ 6, 12

*Toys 'R Us v. FTC,*
　221 F.3d 928 (7th Cir. 2000) ................................................................................. 1, 7, 9, 12

*United States v. Brown,*
　912 F.2d 1040 (9th Cir. 1990) ............................................................................... 1, 7, 9, 12

*United States v. Kostoff*,
　585 F.2d 378 (9th Cir. 1978) ........................................................................................... 7, 9

*White v. R.M. Packer Co., Inc.*,
　635 F.3d 571 (1st Cir. 2011) .................................................................................... 1, 7, 10

*Wilcox v. First Interstate Bank of Oregon, N.A.*,
    815 F.2d 522 (9th Cir. 1987).................................................................................................. 10

**OTHER AUTHORITIES**

Rule 56(b) of the Federal Rules of Civil Procedure...................................................................... 1

| | |
|---|---|
| 1 | **NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT** |
| 2 | **TO ALL PARTIES AND THEIR COUNSEL OF RECORD:** |
| 3 | **PLEASE TAKE NOTICE** that on March 20, 2014, at 1:30 p.m., or as soon thereafter as |
| 4 | this matter may be heard, in the United States District Court for the Northern District of Califor- |
| 5 | nia, Courtroom 8, 4th Floor, located at 280 South 1st Street, San Jose, California, the Honorable |
| 6 | Lucy H. Koh presiding, Defendant Google Inc. ("Google") will, and hereby does, move this |
| 7 | Court, pursuant to Rule 56(b) of the Federal Rules of Civil Procedure, for an Order granting |
| 8 | summary judgment in its favor. |
| 9 | This motion is based upon this Notice of Motion, the accompanying Memorandum of |
| 10 | Points and Authorities, the supporting Declaration of Anne Selin and the exhibits thereto; the |
| 11 | complete files in this action; argument of counsel; and such other further matters as this Court |
| 12 | may consider. |

Dated: January 9, 2014          MAYER BROWN LLP
                                LEE H. RUBIN
                                EDWARD D. JOHNSON
                                DONALD M. FALK
                                ANNE M. SELIN


                                By:    */s/ Lee H. Rubin*
                                       Lee H. Rubin

                                *Attorneys for Defendant GOOGLE INC.*

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Google does not dispute (for purposes of this motion) that it entered into three separate do-not-cold-call ("DNCC") agreements: with Apple and Intel not to cold-call each other's employees and with Intuit that Google would not cold-call Intuit's employees. But Plaintiffs' case against Google depends critically on something more than these three agreements. They claim that Google's DNCC agreements with Apple, Intel, and Intuit were part of an "overarching conspiracy" to suppress not only the compensation of Google's, Apple's, Intel's, and Intuit's employees, but also the compensation of Adobe's, Pixar's, and LucasFilm's employees. Consolidated Amended Complaint ("CAC") ¶¶ 1, 55. Yet, even after extensive discovery, Plaintiffs have been forced to concede that there is no direct evidence to support this extravagant claim. As a result, Plaintiffs' case relies entirely on circumstantial evidence of supposedly parallel conduct and opportunities to conspire. The undisputed evidence makes clear that such a record falls far short of entitling Plaintiffs to a trial against Google.

To survive summary judgment on their antitrust conspiracy claim, Plaintiffs must present evidence that: (1) Google knew or had reason to know about the full scope of the alleged overarching conspiracy and (2) Google was aware that any benefits it received from its DNCC agreements were "dependent upon the success" of the alleged conspiracy involving other DNCC agreements. *See United States v. Brown,* 912 F.2d 1040, 1043-44 (9th Cir. 1990) (internal citation omitted). Plaintiffs cannot meet this burden simply by pointing to parallels between the various DNCC agreements; that is not enough to establish even a "*prima facie* conspiracy case." *White v. R.M. Packer Co., Inc.*, 635 F.3d 571, 580 (1st Cir. 2011); *see Richards v. Neilsen Freight Lines*, 810 F.2d 898, 904 (9th Cir. 1987) (Kennedy, J.). Rather, because they rely entirely on circumstantial evidence to prove an antitrust conspiracy, Plaintiffs must present specific evidence that "tends to exclude the possibility" that Google was "acting independently" from the alleged overarching conspiracy. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Plaintiffs cannot possibly meet this burden when the following facts are undisputed:

- Google only knew about its three DNCC agreements with Apple, Intel and Intuit—it knew

nothing about the alleged agreements involving Adobe, Pixar, and LucasFilm.

- Google had no reason to believe that any benefits it sought to achieve through its DNCC agreements (namely, the protection of critical business relationships with Apple, Intel, and Intuit) were "dependent on the success" of the alleged overarching conspiracy involving Adobe, Pixar, and LucasFilm.

- The alleged DNCC agreements between Google, Apple, Intel, and Intuit did not reflect "parallel" conduct from which to infer a conspiracy, as Plaintiffs contend. More importantly, there are no facts to suggest that these three agreements were connected with the LucasFilm-Pixar DNCC agreement, which was allegedly established 20 years beforehand with significantly more restrictive provisions. That disconnect alone is fatal to Plaintiffs' conspiracy claim, which requires evidence tying *all* seven defendants' conduct into a single common scheme.

- Google's list of DNCC companies (of which the DNCC agreements were only a part) changed over time and included multiple other non-defendant business partners—but never included Google's supposed co-conspirators Adobe, Pixar, and LucasFilm.

- Whoever Plaintiffs contend to be the "hub" of their alleged overarching conspiracy, there is no evidence whatsoever of the requisite "rim" linking the various DNCC agreements together.

And independent of the *Matsushita* standard, Plaintiffs still must prove Google shared a "unity of purpose"—and the same undisputed facts preclude Plaintiffs from establishing that Google (1) knew or had reason to know of the scope of the alleged conspiracy, and (2) had reason to believe that any benefits it sought by its conduct depended on the success of that conspiracy. For these reasons, Google is entitled to summary judgment.

## SUMMARY OF UNDISPUTED FACTS

**A.   Google Grew Rapidly By Aggressive Recruiting From Thousands of Sources**

Google grew from 101 technical employees in 2001 to 2,258 in 2005 (and over 11,000 by 2011)—the largest proportionate growth rate of any defendant. Declaration of Anne Selin ex. 33 ("GEX ex. 33"). That growth required aggressive and escalating recruiting efforts, especially af-

ter its 2004 IPO. GEX ex. 1 (Geshuri 43:20-44:10). The number of Google's recruiters increased to about 130 in 2005 and continued to expand to over 800 by mid-2007. *Id*.; GEX ex. 15. Google received millions of applications each year (GEX ex. 1 (Geshuri 43:20-44:10), ex. 2 (Bock 121:19-20)), and drew from thousands of sources for hiring by 2005 (GEX exs. 16-18, 34).

Despite Google's rapid growth and hiring, the flow of employees between Google and other defendants was minuscule before 2005—and unchanged during and after the 2005-2009 period in which Google had DNCC agreements with three defendants. Google hired only 0.8% of its employees from all co-defendants before 2005 (GEX ex. 35), and only 1.5% from 2005 to 2012 (GEX ex. 34). On the attrition side, Google did not lose a single employee to any defendant through 2005. GEX ex. 36. During and after the class period, only 0.9% of Google employees who left went to a co-defendant. *Id*. In contrast, the majority of employees who did leave Google went to startups. GEX ex. 3 (Wagner 37:6-15); exs. 19.

### B. Google Created A "DNCC List" To Appease Select Few Key Business Partners

Google's aggressive hiring triggered complaints from Google's partners. Even an effort to recruit one or two employees from a business partner could lead to a complaint. GEX ex. 20. As these complaints continued in tandem with Google's increased recruiting and growth, Google began discussing in early 2003 whether to implement a DNCC policy to avoid disrupting important relationships with a few strategic business partners. GEX ex. 4 (Brown 109:23-25, 110:3-6, 134-137). Google's initial response was ad hoc, however. For example, in July 2004, a manager simply asked the recruiting staff via email not to cold-call certain partners. GEX ex. 21.

In early 2005, Google's management decided to implement a more formal policy to address the growing problem, and created a DNCC list of companies that had important business or board-of-director/advisor relationships. GEX ex. 5 (Kordestani 77-89). According to the policy, Google would not "directly cold call" into a company on the DNCC list, but would continue to allow all other avenues of recruitment, including "internal or external references that indicate that an individual is 'looking'" as well as direct solicitation from a candidate. GEX ex. 22.

That first DNCC list included only Genentech, Apple, and Intel. GEX ex. 6 (Schmidt

76:2-77:17); ex. 23; ex. 4 (Brown 120:1-121:1). Genentech, as a biotech company, was not a meaningful source of hiring for Google; but its CEO, Art Levinson, sat on Google's Board and assisted the company, and Google did not want to do anything to disrupt that important relationship. GEX ex. 6 (Schmidt 76:2-77:2); ex. 7 (Brin 76:6-17). The Genentech agreement reflected the consistent pattern for Google's DNCC list: Google appeased an important business partner by foregoing a single method of recruiting into an insignificant source of hiring.

### C. February 2005: Google Adds Apple To Its DNCC List

Google placed Apple on its first DNCC list in February 2005 after receiving a complaint about Google's recent recruitment of small group of Apple employees. GEX ex. 23; ex. 6 (Schmidt 48:19-25). At the time, Google and Apple were beginning several collaborative partnerships, including projects involving Apple's WebKit technology in Google's Chrome browser and integrating Google search into Apple's Safari browser. GEX ex. 6 (Schmidt 48:19-25, 51:18-52:10). A number of significant collaborations integrating Google services and Apple products followed the initiation of the Google-Apple DNCC agreement. GEX ex. 5 (Kordestani 88:3–7).[1] In contrast to Apple's increasing strategic importance to Google, Apple was not an important source of hiring for Google at the time (and remains an insignificant source today). GEX ex. 35. Apple remained strategically important to Google through 2009; in addition, Google CEO Eric Schmidt sat on Apple's board from 2006 through 2009. GEX ex. 6 (Schmidt 96:3-10). As a consequence, Google's decision to add Apple to its DNCC list was not difficult. GEX ex. 5 (Kordestani 135:5-136:20); ex. 6 (Schmidt 51:18-53:3), ex. 7 (Brin 74:3-17).

### D. February 2005: Google Adds Intel To Its DNCC List

Similarly, when Google placed Intel on its original DNCC list in February 2005, Google and Intel were engaged in several collaborations during their DNCC agreement.[2] Equally im-

---

[1] These collaborations included the integration of Google Maps and Gmail on the iPhone, and were reflected in numerous agreements between the parties including an iTunes Database and Use Agreement (October 2005), License Agreement (January 2007); Google Mail License Agreement (May 2007), Adsense API Agreement (August 2007); Cooperative Marketing and Services Agreement (December 2007); Contact Sync License Agreement (January 2008); and Master iTunes Affiliate Agreement (January 2008).
[2] These included licensing Chipset and IndexBench source code, running evaluations of Pixomatix Development Kit and Google Search Appliance, developing the WiMax mobile broadband network, working on the development of VIIV, and collaborations regarding Google TV,

4

portant, Intel CEO Paul Otellini was a member of Google's board who provided advice and assistance to Google on increasing its scale of operations. GEX ex. 8 (Otellini 16:12-14); ex. 4 (Brown 120:1-121:1); ex. 6 (Schmidt 77:6-17). As Mr. Otellini explained, when Google "wanted information from [Intel's] finance teams and HR teams, maybe the legal team as well, on just how companies grow," then Intel "made [its] experts in those areas available to them." GEX ex. 8 (Otellini 196:2-197:7). Moreover, Intel, like Apple, was not a significant source of hiring (GEX ex. 35), and Otellini did not request that Google refrain from cold-calling certain Intel employees until Spring 2006 (GEX ex. 8 (Otellini 62:11-21, 75:2-18))—more than a year after Google had added Intel to its DNCC list to ensure that this critical business relationship was not disrupted by Google's expansive recruitment efforts.

### E. June 2007: Google Adds Intuit To Its DNCC List

At the request of Intuit CEO Bill Campbell in June 2007, Google expanded its DNCC listing for Intuit—which had included only 18 Intuit employees—to encompass the whole company. GEX exs. 24-25. Campbell was a key senior advisor to Google and de facto member of Google's executive management group, and Google executives relied heavily on him for advice in growing the company. GEX ex. 4 (Brown 120:21-24); ex. 5 (Schmidt 42:19-25). According to both Google executives and Campbell, Google's agreement not to cold-call into Intuit helped facilitate this important relationship. GEX ex. 9 (Campbell 29:4-9, 46:15-23); ex. 5 (Kordestani 135:5-136:20). Plaintiffs concede (consistent with the DOJ's allegations) that—unlike the Apple and Intel agreements—the Intuit agreement was one-directional: Intuit could freely cold-call Google employees. Dkt. No. 187 at 13, No. 418 at 9; GEX ex. 9 (Campbell 32:8-12, 32:22-24). And like Apple and Intel, Intuit was not a significant source of hiring for Google (GEX ex. 35), so Google's decision to add Intuit to the DNCC list had no material downside and served to maintain a critical business relationship (GEX ex. 5 (Kordestani 135:5-136:20)).

### F. Google Never Added —Or Even Discussed Adding— Adobe, LucasFilm, Or Pixar To Its DNCC List

Plaintiffs do not dispute that Adobe, LucasFilm, and Pixar were never on Google's DNCC

---

search optimization, data center efficiency, Android, and Chrome. GEX ex. 8 (Otellini 83:14-24, 199:13-200:18); ex. 10 (Eustace 114:24-115:24).

5

list. CAC ¶¶ 56-108; GEX exs. 22, 26, 37 (No. 15). Yet from 2005 through 2009, Google added to or removed from its DNCC list many other companies depending on factors such as the company's sensitivity to Google recruiting efforts and the status of the business relationship. These companies were as varied as eBay, Dell, and OpenTV. GEX ex. 4 (Brown 133:14-22); exs. 27-30. For example, after Dell complained about Google's recruiting of Dell personnel, Google placed Dell on the list for only two months. GEX ex. 6 (Schmidt 134:17-135:5); ex. 27.

## ARGUMENT

To survive summary judgment, Plaintiffs must present "direct or circumstantial evidence that reasonably tends to prove that [each defendant] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto,* 465 U.S. at 768 (quotation omitted). Moreover, Plaintiffs must meet this burden for each defendant individually. *AD/SAT, Inc. v. Associated Press,* 181 F.3d 216, 234 (2d Cir. 1999). When no direct evidence exists and the claim is based entirely on circumstantial evidence (as is the case here), "special rules apply" because "antitrust law limits the range of permissible inferences from ambiguous evidence" proffered to show a conspiracy. *Sun Microsystems Inc. v. Hynix Semiconductor Inc.*, 608 F. Supp. 2d 1166, 1176 (N.D. Cal. 2009); *Matsushita*, 475 U.S. at 588. Thus, Plaintiffs need specific evidence that "tends to exclude the possibility" that Google was "acting independently" from the alleged overarching conspiracy. *Matsushita*, 475 U.S. at 588; *see also Monsanto*, 465 U.S. at 764. Plaintiffs cannot make this specific showing merely by pointing to parallels between the various DNCC agreements. Evidence of parallel conduct, alone, is not enough to establish even a "prima facie conspiracy case." *White*, 635 F.3d at 580. The more particularized showing required under *Matsushita* fully applies here where Plaintiffs have alleged a single overarching conspiracy consisting of several separate (and allegedly unlawful) agreements. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-69 (2007) (applying the *Monsanto/Matsushita* standard to a conspiracy claim based on parallel efforts to unlawfully exclude competitors); *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 321 & 335-36 (3d Cir. 2010) (applied to claim that parties to a series of bilateral agreements—which may have been unlawful themselves—entered a global conspiracy).

Nevertheless, independent of *Matsushita's* antitrust-specific burden, Plaintiffs face the

same fundamental burden of presenting evidence that Google shared a "unity of purpose" with its co-defendants— a bedrock prerequisite to establishing an overarching conspiracy. *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984) (quotation omitted). "Unity of purpose," at a minimum, requires proof that Google (1) knew or had reason to know of the scope of the alleged overarching conspiracy and (2) had reason to believe any benefit to Google depended on the success of that conspiracy. *See Brown,* 912 F.2d at 1043-44 (quoting *United States v. Arbelaez*, 719 F.2d 1453, 1458–59 (9th Cir. 1983)); *United States v. Kostoff*, 585 F.2d 378, 380 (9th Cir. 1978). Moreover, to avoid summary judgment on a "hub" and "rim" theory of conspiracy, Plaintiffs must offer specific evidence that connects each defendant's agreement to all the others. *In re Ins. Antitrust Litig.*, 723 F. Supp. 464, 483-84 (N.D. Cal. 1989), *rev'd on other grounds*, 938 F.2d 919 (9th Cir. 1991).

## I. NO DIRECT EVIDENCE SUPPORTS PLAINTIFFS' CLAIM AGAINST GOOGLE

Plaintiffs' sole liability theory is based on their claim that Google's alleged DNCC agreements with Apple, Intel and Intuit were part of an "overarching conspiracy" to suppress compensation of employees among *all* seven defendants. Yet, as Plaintiffs have conceded, they have no direct evidence to support that claim.[3] Indeed, there is no evidence at all that Google participated in a common scheme for any purpose, much less a scheme to suppress compensation that included Adobe, Pixar, and LucasFilm. Moreover, there is no direct evidence that Google even considered compensation in deciding to put Apple, Intel, and Intuit on its DNCC list. On the contrary, the only direct evidence indicates that Google entered into DNCC agreements with Apple, Intel and Intuit for the purpose of avoiding conflicts with those companies and their company executives who provided crucial business collaborations, advice, and assistance to Google. GEX ex. 9 (Campbell 29:4-9, 46:15-23); ex. 6 (Schmidt 48:19-52:4, 68:18-19, 74); ex. 4 (Brown 120:1-121:1); ex. 22.

Plaintiffs may assert that discussions between Pixar and LucasFilm (CAC ¶¶ 59-61) pro-

---

[3] Plaintiffs described the evidence in support of the alleged conspiracy in their Supplemental Answers to Defendants' Second Set of Interrogatories, GEX ex. 37, and Answers to Defendants' Interrogatory 16, GEX ex. 38. None of the evidence Plaintiffs cite provides direct evidence of a conspiracy involving Google.

7

vide direct evidence of a conspiracy to suppress compensation through DNCC agreements. But no direct evidence links Google and its DNCC agreements with either Pixar or LucasFilm—or even suggests that Google knew of the Pixar-LucasFilm agreement, let alone of discussions that took place about that agreement. That agreement allegedly occurred 20 years before Google's alleged DNCC agreements (and indeed, before Google even existed).

## II. THERE IS INSUFFICIENT CIRCUMSTANTIAL EVIDENCE TO CREATE A TRIABLE ISSUE THAT GOOGLE JOINED THE ALLEGED OVERARCHING CONSPIRACY TO SUPPRESS COMPENSATION

### A. Plaintiffs Cannot Meet Their Burden Under *Matsushita*

Lacking any direct evidence, Plaintiffs must point to specific circumstantial evidence that "exclude[s] the possibility" that Google acted independently from the other six defendants, including Adobe, Pixar, and LucasFilm, in order to be entitled to a trial on their conspiracy claim. *Matsushita*, 475 U.S. at 588. The evidence here falls far short of that demanding standard.

#### 1. There is no circumstantial evidence that Google knew or had reason to know of the alleged conspiracy

Plaintiffs cannot eliminate the possibility that Google acted independent of the alleged conspiracy because there is no testimony or other evidence to support the first requirement of a "unity of purpose": namely, that Google either knew or had reason to know of the alleged conspiracy. *Kostoff*, 585 F.2d at 380; *Brown*, 912 F.2d at 1043-44. Indeed, Google's DNCC agreements were never conditioned on the existence or expectation of any other agreement. GEX ex. 4 (Brown 109:24-25, 111:11-14, 242:2-8); ex. 6 (Schmidt 74:13-16, 125:12-16, 126:16-22, 127:17-23). Google had no communications with any defendant about cold-calling involving Adobe, LucasFilm, and Pixar. GEX ex. 5 (Kordestani 72:6-12); ex. 6 (Schmidt 221:19-222:12); ex. 11 (Page 78:6-11, 201:9-15). These three companies never appeared on Google's DNCC list, and Google could and *did* cold-call their employees—including lead plaintiff Siddarth Hariharan, whom Google cold-called while he worked at LucasFilm in 2008. GEX ex. 12 (Hariharan 174:12-24). Nor can Plaintiffs prove Google's knowledge of the scope of the alleged overarching conspiracy with evidence that Google "has become immersed in the overall enterprise" or was "so involved in the overall scheme that [its] knowledge can reasonably be inferred." *Brown*, 912

F.2d at 1044. There is no evidence that Google was "immersed" in any DNCC "enterprise" apart from its own DNCC list.

### 2. There is no circumstantial evidence that Google had any reason to believe that the benefits of its DNCC agreements depended on the existence and success of other agreements.

Plaintiffs also lack evidence that Google had any reason to believe its own benefits depended upon the success of the entire alleged overarching conspiracy. *See Brown*, 912 F.2d at 1043-44. Here, Plaintiffs cannot adduce any evidence showing that the benefit Google sought to derive from its DNCC agreements depended on the success of the overarching scheme alleged by Plaintiffs to involve all seven defendants. Plaintiffs' experts concede that it would have been in Google's independent interest to enter into bilateral agreements (which were the only ones that affected information flow into Google). GEX ex. 13 (Marx 91:7-92:4). The alleged overarching conspiracy includes three other companies (Adobe, Pixar, LucasFilm) who, during the alleged conspiracy period, remained able to cold-call Google (and vice-versa) and had no board, collaborative, or similar relationship with Google. As noted above, Google had no idea what Adobe, LucasFilm, and Pixar were doing with respect to cold-calling at any point in time; so of course Google had no reason to believe its DNCCs were "dependent upon the success" of deals they knew nothing about. *Brown*, 912 F.2d at 1043. Without evidence of interdependence, Plaintiffs' case fails. *See Barry v. Blue Cross of California*, 805 F.2d 866, 869 (9th Cir. 1986); s*ee also Richards*, 810 F.2d at 904.

### 3. There is no circumstantial evidence to support an inference of a single overarching conspiracy other than the supposed parallel nature of the seven DNCC agreements, and that, alone, is not enough

Plaintiffs contend that the six alleged DNCC agreements were in "parallel" because each limits cold-calling, and therefore an inference arises that the agreements were part of an overarching conspiracy. But that is not the law. Evidence of parallel conduct, alone, is not even enough to establish a "*prima facie* conspiracy case." *White*, 635 F.3d at 580. Rather, Plaintiffs need specific evidence that "tends to exclude the possibility" that Google was "acting independently" from the alleged parallel conduct that forms the claimed conspiracy. *Matsushita*, 475 U.S. at 588. That evidence does not exist.

9

As a preliminary matter, the terms of all six agreements were not, in fact, parallel. Although each prohibited cold-calling in some form, the 1985 LucasFilm-Pixar DNCC agreement had materially more restrictive provisions regarding notification and bidding than any of Google's or any other defendant's DNCC agreements. GEX exs. 31, 32, 37. The glaring disconnect between the LucasFilm-Pixar agreement—which also preceded the alleged overarching conspiracy by 20 years—on its own is fatal to Plaintiffs' theory of overarching parallel conduct. Google's agreement with Intuit also differed from the other five agreements alleged to be part of the overarching conspiracy, because that agreement restricted only one party (Google), while permitting the other party (Intuit) to continue cold-calling at will. Dkt. No. 187 at 13, No. 418 at 9; GEX ex. 9 (Campbell 32:8-12, 32:22-24).

Even if the six disparate agreements were parallel in some sense, "[a] showing of interdependence is a *necessary* condition for inferring any conspiracy from parallelism." *Barry*, 805 F.2d at 869; *see also Richards*, 810 F.2d at 904; *Ins. Brokerage*, 618 F.3d at 332. But as explained above, there is no evidence of interdependence here.

Nor is there other circumstantial evidence that tends to exclude the possibility that in entering into DNCC agreements with Apple, Intel, and Intuit, Google was acting independently of an alleged conspiracy to suppress compensation. On the contrary, Google's broader use of its DNCC list further confirms that Google's conduct was unconnected to the alleged conspiracy. Google's DNCC list identified several other companies not alleged to be part of the conspiracy. GEX ex. 22. The companies on the DNCC list also changed over time as Google's relationships changed: some were removed from the list as their business importance to Google diminished, and some were added to the list for very short periods. GEX exs. 22, 27-30. That evidence is entirely at odds with a common scheme to suppress the compensation of the defendants' employees.

Google's undisputed practice also indicates that restricting cold-calling into a business partner's employees was a common accommodation that could be and was undertaken without the knowledge or agreement of any other company. What is more, the DNCC list was one part of a broader policy that Google implemented with respect to its own recruiting from an array of other non-defendant companies. That policy included (1) a "Sensitive Companies" list that permitted

Google to cold call into the listed companies but required Google to provide "courtesy" notice to a listed company after making an offer to a company employee; and (2) a "Restricted List" that limited Google from cold-calling into companies for director-level personnel where Google perceived a lack of cultural fit for the listed firms. GEX ex. 22. These independently driven recruiting policies (of which the DNCC list was an integral part) further separates Google's three DNCC agreements from any inference of an overarching "common scheme" among the seven defendants to suppress compensation. Even when firms address a business issue in similar ways, that "does not evidence an industrywide agreement when there is a legitimate business purpose for each firm's behavior." *Richards*, 810 F.2d at 904. Summary judgment is appropriate when "[t]he actions alleged to constitute a conspiracy are precisely those that could be motivated by independent self-interest." *Wilcox v. First Interstate Bank of Oregon, N.A.*, 815 F.2d 522, 528 (9th Cir. 1987). And the evidence here rebuts Plaintiffs' "allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice." *Id.* at 902. That is sufficient to warrant summary judgment in Google's favor.

### 4. No circumstantial evidence supports Plaintiffs' "hub and spoke" theory connecting Google's alleged DNCC agreements to the alleged agreements not involving Google

Perhaps recognizing that the purported parallels between the six DNCC agreements is not enough, Plaintiffs rely on a "hub and spoke" theory of conspiracy, with Apple's Steve Jobs at the hub, to explain the alleged "interconnected web" of agreements (CAC ¶ 55). But fundamental conspiracy law principles require evidence of both a "hub" and of a "rim" connecting each defendant's agreement to all the others. *See In re Ins. Antitrust Litig.*, 723 F. Supp. at 483-84; *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203-04 (4th Cir. 2002); *Toys 'R Us v. FTC*, 221 F.3d 928, 934 (7th Cir. 2000). Here, even if Mr. Jobs was some kind of hub, there is no evidence of a rim. The existence of bilateral agreements and nothing more is insufficient to support an inference of global conspiracy without evidence (beyond mere resemblance) that links the separate agreements together. *Richards*, 810 F.2d at 902-03; *In re Ins. Antitrust Litig.*, 723 F. Supp. at 483-84. Even the fact that the individual agreements may have been unlawful does not mean that those agreements were part of the same overarching conspiracy. *Ins. Brokerage,* 618 F.3d at 335-36, 350-51

(alleged bilateral agreements that constituted "pervasive" and "pernicious industry practice" that may not be "lawful" did "not plausibly imply an industry-wide conspiracy"). Moreover, the mere opportunity to conspire (as alleged by Plaintiffs here due to Google's executives' board memberships and other ties to Steve Jobs and other defendant executives) is not enough to defeat summary judgment. *In re Citric Acid Litig.*, 191 F.3d 1090, 1103 (9th Cir. 1999) (courts will not "infer participation in the conspiracy from the opportunity to do so").

In *Toys 'R Us,* for example, Toys 'R Us entered into vertical agreements with multiple manufacturers to restrict supply to its competitors. 221 F.3d at 931-32. The illicit horizontal conspiracy (the "rim") was facilitated through Toys 'R Us (the "hub"), as each manufacturer agreed on the condition that all others would enter as well. *Id.* But there is no evidence of a similar "rim" here. It is undisputed that none of Google's DNCC agreements was conditioned on the existence of any other agreement. GEX ex. 4 (Brown 109:24-25, 111:11-14, 242:2-8); ex. 6 (Schmidt 74:13-16, 125:12-16, 126:16-22, 127:17-23). Nor did Google communicate with anyone about cold-calls that were neither to or from Google. *See Richards*, 810 F.2d at 904. And nothing else links Google to the agreements involving Adobe, Pixar, or LucasFilm.

Similarly, in *Insurance Brokerage*, the plaintiffs alleged a global conspiracy, consisting of a series of "broker-centered" agreements in which an insurance broker agreed with an insurer to steer clients to that insurer in exchange for contingent commissions. 618 F.3d at 312-13. In support of their global conspiracy theory, the plaintiffs in that case alleged that each of the broker-centered agreements between brokers and insurers operated in similar ways and under similar terms. *Id*. The Third Circuit held that the plaintiffs' allegations did not state a claim for a global conspiracy, concluding that each insurer's decision to enter into the broker agreements was in its own self-interest, and therefore no inference of collusion could be drawn. *Id*. at 335-36. *See* discussion in Dkt. 554, at 8. This case is no different.

**B.     Plaintiffs' Overarching Conspiracy Case Fails Irrespective of *Matsushita***

Google is entitled to summary judgment under general principles of conspiracy even without the "special rules" (*Sun*, 608 F. Supp. 2d at 1176) and "limit[ed] … range of permissible inferences" (*Matsushita*, 475 U.S. at 588) applicable to this kind of antitrust claim. Plaintiffs

simply have no evidence that could raise a triable issue of fact that Google acted with a "unity of purpose" with the other defendants. Specifically, for the same reasons described above, there is no evidence in the record to show that Google (1) knew or had reason to know of the alleged overarching conspiracy to suppress compensation, and (2) had any reason to believe that its benefits from its own conspiracy were "dependent upon the success" of the claimed overarching scheme involving the other six defendants—especially Adobe, Pixar, and LucasFilm, which were never linked in any way to Google's conduct. *Brown*, 912 F.2d at 1043 (quotation omitted). Without this crucial evidence, Plaintiffs "overarching conspiracy" claim fails as a matter of law. Moreover, Plaintiffs' entire impact and damages theory (based on the modeling of their expert, Dr. Leamer) is premised on the presence of *all* defendants in the "overarching conspiracy" and the alleged collective impact of *all* of their agreements. GEX ex. 14 (Leamer 1031:19-1032:5) (acknowledging his model does not measure any impact or damages from any particular bilateral agreement or any aggregation of bilateral agreements other than the alleged overarching conspiracy and that his model presumes—and depends upon—"linkages between all these firms"). Because Plaintiffs' impact and damages evidence must "measure damages resulting from the particular antitrust injury on which … liability in this action is premised," *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013), a finding that any defendant did not join the alleged overarching conspiracy with the other defendants requires judgment in favor of all defendants.

## CONCLUSION

For the foregoing reasons, Plaintiffs' federal and state antitrust claims against Google fail as a matter of law and Google is therefore entitled to summary judgment in its favor.

Dated:  January 9, 2014
MAYER BROWN LLP
LEE H. RUBIN
EDWARD D. JOHNSON
DONALD M. FALK
ANNE M. SELIN

By:  */s/ Lee H. Rubin*
   Lee H. Rubin

*Attorneys for Defendant GOOGLE INC.*