# EXHIBIT J

to the Declaration of
Lisa Cisneros Shaver in Support of
Plaintiffs' Supplemental Motion
for Class Certification

```
 1              UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                  SAN JOSE DIVISION

 4

 5   IN RE: HIGH-TECH EMPLOYEE      )

 6   ANTITRUST LITIGATION           )

 7                                  )   No.  11-CV-2509-LHK

 8   THIS DOCUMENT RELATES TO:      )

 9   ALL ACTIONS.                   )

10   _____)

11

12       VIDEOTAPED DEPOSITION OF MASON STUBBLEFIELD

13                ATTORNEYS' EYES ONLY

14               Friday, March 29, 2013

15

16

17

18

19

20

21

22

23

24   Reported By:

25   KATHLEEN WILKINS, CSR #10068, RPR-RMR-CRR-CCRR-CLR
```

10:41:17  1    actual steps were along the way of the whole

10:41:21  2    audit.

10:41:23  3        A.    We -- we have a system that we use to

10:41:25  4    capture the recommendations.  We would -- there

10:41:28  5    was some -- some reporting, some budget

10:41:30  6    information that would be available directly out

10:41:32  7    of that system.

10:41:33  8            And in some cases it would be

10:41:35  9    reporting -- pulling that data out into an Excel

10:41:38  10   file and then doing a number of different -- forms

10:41:41  11   of analysis on the data.  So looking at

10:41:44  12   differentiation.  So looking at merit increases,

10:41:47  13   increase recommendations by performance ratings,

10:41:50  14   looking at bonus recommendation by performance

10:41:52  15   ratings, looking to see ratios between those to

10:41:55  16   make sure that we're delivering for performance.

10:41:57  17           Looking at data across the different

10:41:59  18   leaders below the senior leader to make sure we

10:42:02  19   had consistency and compliance to budget at an

10:42:04  20   overall level.  And, again, looking for

10:42:07  21   consistency between performance ratings and pay

10:42:10  22   decisions.

10:42:11  23       Q.    And you said there was a system that

10:42:12  24   captures this.  Is there an internal site in your

10:42:19  25   database at Intuit where managers would log on and

| | | |
|---|---|---|
| 10:42:22 | 1 | input what their recommended ratings were and |
| 10:42:27 | 2 | merit increases would be for employees? |
| 10:42:32 | 3 | A.    Yes.   We've used a couple different |
| 10:42:34 | 4 | systems.   They're web-based online systems that a |
| 10:42:37 | 5 | manager would log into that would give them access |
| 10:42:39 | 6 | to their group of employees and ability to make |
| 10:42:42 | 7 | recommendations, capture those decisions. |
| 10:42:44 | 8 | Q.    And then how did you do the audit?  Did |
| 10:42:46 | 9 | you review all of those different recommendations? |
| 10:42:49 | 10 | A.    Pri- -- in general, no.  Not reviewed |
| 10:42:53 | 11 | each individual recommendation.  Organizations are |
| 10:42:55 | 12 | very large.  So we'd do audits looking for |
| 10:42:58 | 13 | patterns. |
| 10:42:58 | 14 | Q.    Okay.  Were there certain things that |
| 10:43:01 | 15 | would show up or would catch your eye as eye |
| 10:43:05 | 16 | opening in a recommendation? |
| 10:43:06 | 17 | A.    Sure. |
| 10:43:08 | 18 | Q.    What would that be? |
| 10:43:10 | 19 | A.    A pay increase that was outside a |
| 10:43:12 | 20 | guideline for the performance rating, perform a -- |
| 10:43:15 | 21 | any -- any inconsistencies.  We have a set of |
| 10:43:19 | 22 | guidelines and we would have exception reporting |
| 10:43:21 | 23 | to identify things that were outside of those |
| 10:43:24 | 24 | guidelines and would audit those. |
| 10:43:26 | 25 | Q.    So if -- so were there ranges of merit |

10:43:32  1   increase that would be appropriate for different

10:43:34  2   performance ratings?

10:43:34  3              MR. KIERNAN:  Object to form.  Sorry.

10:43:38  4   Object to form.

10:43:40  5              THE WITNESS:  We provide guidelines.

10:43:40  6   Intuit provides guidelines for what we would

10:43:44  7   expect a range of increase to be for a level of

10:43:46  8   performance.

10:43:47  9   BY MS. DERMODY:

10:43:47  10      Q.    And then if a person -- if a manager had

10:43:50  11  recommended someone outside that guideline, would

10:43:53  12  that be something that you would audit?

10:43:55  13      A.    Would depend on how far outside the

10:43:57  14  guideline it was.  But likely it would be

10:43:59  15  something we'd look at to try to understand why

10:44:01  16  the recommendation was being made.

10:44:03  17      Q.    Okay.  And you mentioned that you were

10:44:06  18  involved in the audit process.

10:44:08  19              Was someone else also involved with you

10:44:11  20  reviewing the managers in your area?

10:44:14  21      A.    I had a staff of HR business partners

10:44:16  22  that worked with specific leaders inside the

10:44:19  23  organization, and so they would do similar audits.

10:44:22  24  The compensation team that I had been part of

10:44:25  25  before would also do similar audits, try to help

10:44:28  1    us in going through the process.

10:44:29  2        Q.    And was it your understanding that this

10:44:31  3    audit process was happening across the company

10:44:33  4    when managers were doing recommended merit raises

10:44:37  5    and bonuses?

10:44:39  6        A.    There's a level of audit that happens

10:44:41  7    across the organization.  I don't know that

10:44:43  8    it's -- that everyone else did exactly the same

10:44:46  9    things that I did, but there was a review process,

10:44:48 10    an audit process.

10:44:49 11        Q.    Are you aware of specific differences in

10:44:52 12    the audit process across the organization?

10:44:55 13        A.    I can't say that I'm aware of any

10:44:56 14    specific differences.

10:44:57 15        Q.    Okay.  And is this system that you

10:44:59 16    describe that captures the manager

10:45:02 17    recommendations, is that a system that is used

10:45:04 18    across the company?

10:45:07 19        A.    Yes.

10:45:07 20        Q.    Okay.  And were there times where you

10:45:19 21    disagreed with a recommendation that a manager

10:45:22 22    made?

10:45:22 23        A.    Yes.  I'm sure -- I'm sure there were.

10:45:23 24        Q.    And if that happened, would you decline

10:45:26 25    to approve that recommendation?

11:35:03  1      Q.    Sure.

11:35:04  2          Are there other monetary awards for

11:35:06  3  employees in the company?  And I'll stick with the

11:35:08  4  2005 to 2009 time period.

11:35:11  5      A.    So we have a recognition program that

11:35:14  6  provides monetary value for specific events,

11:35:17  7  specific results, behaviors, things from

11:35:20  8  employees.  We talked a bit about retention

11:35:25  9  bonuses, which would also be a monetary reward

11:35:27 10  that could -- is used in some situations, would be

11:35:30 11  available for employees.

11:35:35 12      Q.    In terms of the recognition program,

11:35:38 13  again, sticking with the earlier time period than

11:35:41 14  now, what program or programs existed that had

11:35:45 15  compensation as a -- as a form of the reward?

11:35:51 16      A.    With the recognition program

11:35:52 17  specifically?

11:35:52 18      Q.    Yes.

11:35:55 19      A.    The recognition program provides most

11:35:59 20  anyone in the organization an opportunity to

11:36:01 21  provide some value as recognition for a

11:36:04 22  contribution from someone else in the

11:36:06 23  organization.  In most cases, that's not cash.

11:36:10 24  It's actually done in the form of gift

11:36:13 25  certificates.  More like gift certificates or gift

11:36:16  1    cards where it's value and the person -- the

11:36:18  2    recipient turns that value into something that

11:36:21  3    they could keep as a more memorable item for the

11:36:25  4    recognition versus it just being cash.  It's got

11:36:27  5    monetary value.

11:36:29  6         Q.    Is that the spotlight program?

11:36:31  7         A.    Yes, that's the spotlight program.

11:36:38  8         Q.    And is there a range of value with these

11:36:41  9    gift certificates?

11:36:41 10         A.    Yes.

11:36:43 11         Q.    What would be the range?

11:36:46 12         A.    $50 to $500 to a monetary value of a

11:36:55 13    trip that could be a couple thousand dollars.

11:37:03 14         Q.    And for how long has the spotlight

11:37:05 15    program been around?

11:37:09 16         A.    I don't know exactly when it started,

11:37:10 17    but it's been a key part of Intuit's compensation

11:37:13 18    approach for a number of years.  Ten years or

11:37:15 19    more.

11:37:16 20         Q.    Okay.  So prior to your time maybe?

11:37:18 21         A.    Yes.  There was a recognition program

11:37:20 22    prior to my joining.

11:37:23 23         Q.    And do you know if retention bonuses

11:37:26 24    have ever been allocated to employees proactively

11:37:33 25    before there's even a counteroffer or another

11:37:36   1        offer out there for that employee?

11:37:38   2             A.    Yes.

11:37:39   3             Q.    And describe those situations.

11:37:43   4             A.    There's been situations in -- a few

11:37:47   5        different situations I can think of if there were

11:37:49   6        changes happening in a business, and we were

11:37:52   7        concerned that those changes in the business might

11:37:54   8        prompt attrition or contribute to attrition, we've

11:37:57   9        used proactive retention bonuses to try to lock

11:38:00  10        those employees for a given period of time.

11:38:04  11             If there were concerns about specific

11:38:05  12        skills or talent that were critical for us for a

11:38:09  13        project, we've used retention bonuses to try to

11:38:12  14        incent those employees to stay through the

11:38:16  15        completion of that project with the hope that

11:38:16  16        they'd stay much longer than that.

11:38:19  17             If we saw attrition in some area, we'd

11:38:23  18        use -- we use retention bonuses proactively to try

11:38:27  19        to secure, lock in, create the incentive for other

11:38:31  20        talent to stay.

11:38:35  21             Q.    And has that been the practice going

11:38:37  22        back to when you started in 2004?

11:38:41  23             MR. KIERNAN:  Object to form.

11:38:46  24             THE WITNESS:  Intuit's pretty

11:38:48  25        consistently provided a variety of tools for

| | | |
|---|---|---|
| 11:38:49 | 1 | managers to use at their discretion as they need |
| 11:38:52 | 2 | them to.  So we've had retention bonuses where a |
| 11:38:56 | 3 | tool that goes back to -- the start of my time as |
| 11:38:58 | 4 | one of the tools that was out there.  We primarily |
| 11:39:01 | 5 | use equity as our retention vehicle, and it's been |
| 11:39:05 | 6 | out there as well. |
| 11:39:06 | 7 | BY MS. DERMODY: |
| 11:39:07 | 8 | Q.    And is equity something that you have |
| 11:39:10 | 9 | used proactively to keep talent notwithstanding |
| 11:39:15 | 10 | any other offer that they might have in the |
| 11:39:17 | 11 | market? |
| 11:39:21 | 12 | MR. KIERNAN:  Object to form. |
| 11:39:23 | 13 | THE WITNESS:  Intuit includes equity as |
| 11:39:25 | 14 | part of the annual talent and pay process, and |
| 11:39:28 | 15 | based on the performance ratings, retention |
| 11:39:31 | 16 | ratings, employees are given a value of equity. |
| 11:39:34 | 17 | And so I would say in a lot of respects |
| 11:39:36 | 18 | that is a proactive retention tool.  So it's not |
| 11:39:39 | 19 | in response to anything other than the performance |
| 11:39:41 | 20 | and what we see as their value going forward. |
| 11:39:57 | 21 | BY MS. DERMODY: |
| 11:39:57 | 22 | Q.    And I think you testified earlier that |
| 11:39:58 | 23 | the compensation, including decisions about |
| 11:40:01 | 24 | equity, are generally made once a year; is that |
| 11:40:04 | 25 | right? |

11:40:06  1          A.     Yes.

11:40:09  2          Q.     Have you been aware of any decisions to

11:40:11  3    do midyear equity grants or midyear bonuses for a

11:40:16  4    group of people?

11:40:18  5          A.     I'm aware of a situation where Intuit

11:40:20  6    changed its process on equity and did equity

11:40:23  7    grants at midyear.  I'm not aware of any

11:40:26  8    situations where midyear bonuses were granted to

11:40:29  9    anyone.

11:40:29 10          Q.     Okay.  What was the midyear equity

11:40:33 11    grant?

11:40:34 12          A.     I think it was in 2008.  I'm not sure on

11:40:40 13    the year.  I think it was in 2008, a decision was

11:40:43 14    made to shift the equity grants from the normal

11:40:46 15    time period of July or August to February.

11:40:51 16          Q.     So that wasn't an additional grant in

11:40:53 17    that cycle; it was just changing the time period

11:40:55 18    of that grant?

11:40:58 19          A.     That's correct.  It just shifted the

11:40:59 20    time frame.

11:40:59 21          Q.     And are you aware of any groups of

11:41:01 22    employees being identified to receive additional

11:41:05 23    equity grants outside the normal cycle?

11:41:07 24          A.     Yes.  I'm aware of some situations where

11:41:09 25    that's been done.

11:41:11  1      Q.    Okay.  And describe those.

11:41:12  2      A.    They'd be situations, oh, kind of like I

11:41:14  3   described before from a retention perspective.  If

11:41:16  4   we saw attrition with a group of employees or a

11:41:19  5   certain skill set and we were concerned about

11:41:21  6   that, we'd use proactive equity grants with others

11:41:24  7   that we're seeing this top talent to try to incent

11:41:28  8   them to stay or use as another retention tool.

11:41:32  9      Q.    Is that something that you've seen

11:41:34 10   happen going back to the 2005 time period?

11:41:40 11      A.    I don't recall it happening -- it's not

11:41:42 12   something that happens very often inside the

11:41:43 13   organization.  I can think of one situation where

11:41:45 14   it happened -- where it's happened, and that was

11:41:48 15   more recent.

11:41:49 16      Q.    Okay.  What was that situation?

11:41:50 17      A.    It was with our marketing organization

11:41:52 18   where we were seeing slightly higher attrition in

11:41:55 19   marketing and were concerned about it, and so we

11:41:57 20   had the managers identify specific employees that

11:42:00 21   they saw as being key for them, and manager

11:42:04 22   discretion to nominate or recognize them, and a

11:42:06 23   small group were given some additional grants.

11:42:19 24      Q.    And do you know, were these employees

11:42:20 25   that had threatened to leave?

11:42:25  1        A.    I don't know.  It was a proactive move

11:42:28  2     taken by the marketing leader, and the -- and the

11:42:31  3     staff across the marketing organization, in

11:42:33  4     looking at key skills, and trying to send them a

11:42:37  5     strong message about how we valued them.

11:42:45  6        Q.    And you said that happened more

11:42:46  7     recently, this past year, two years ago?

11:42:50  8        A.    Within the last year.

11:42:51  9        Q.    Okay.  And do you recall other

11:42:52 10     situations happening before that?

11:42:56 11        A.    I don't recall other situations like

11:42:59 12     that.

11:43:01 13        Q.    Is it possible that they happened but

11:43:04 14     you don't know?  Is that --

11:43:05 15        A.    Sure, it's possible.

11:43:30 16        Q.    Are there any other strategies that

11:43:32 17     you're aware Intuit has used to proactively retain

11:43:37 18     key talent?

11:43:40 19        A.    Yes.

11:43:41 20        Q.    And can you describe those that are

11:43:44 21     compensation-based?

11:43:46 22        A.    Most of the others would not be

11:43:48 23     compensation-based.

11:43:49 24        Q.    Okay.  Are those more work

11:43:54 25     assignment-based?

11:43:56  1        A.    It could be work assignment-based,

11:43:59  2     development-oriented, project work, learning and

11:44:03  3     development opportunities.

11:44:18  4        Q.    Are there any other compensation-based

11:44:21  5     strategies to retain key talent that you're aware

11:44:24  6     Intuit has used that you haven't already

11:44:26  7     described?

11:44:28  8        A.    No, I don't think so.

11:44:28  9        Q.    Okay.  Were you aware that at some point

11:44:40 10     in time, Intuit had a policy not to recruit into

11:44:44 11     certain companies?

11:44:46 12        A.    I'm not aware of any policy like that.

11:44:48 13        Q.    Okay.  Did you become aware of that at

11:44:50 14     some point in time?

11:44:51 15        A.    I'm not aware that Intuit ever had a

11:44:54 16     policy like that.

11:44:56 17        Q.    Were you aware that there was a practice

11:44:58 18     at Intuit not to recruit into some companies?

11:45:01 19        A.    No.  No, I was not.

11:45:02 20        Q.    Okay.  It's not something you ever heard

11:45:04 21     anyone talk about?

11:45:05 22        A.    No.

11:45:10 23        Q.    Were you aware that Intuit was

11:45:13 24     investigated by the Department of Justice in

11:45:15 25     connection with recruiting into other companies?

11:45:17  1          A.      Yes, I am aware of that.

11:45:19  2          Q.      And when did you become aware of that?

11:45:22  3          A.      Probably soon after it -- or at the time

11:45:25  4     it became public.

11:45:26  5          Q.      Okay.  And I'm aware that there's more

11:45:28  6     than one set of investigations, so the only one

11:45:31  7     I'm concerned about is the one involving this

11:45:34  8     case, if that's clear to you.

11:45:37  9          A.      Okay.

11:45:38 10          Q.      Did you participate in the Department of

11:45:39 11     Justice investigation on behalf of Intuit?

11:45:42 12          A.      No, I did not.

11:45:43 13          Q.      You weren't interviewed by DOJ?

11:45:45 14          A.      No, I was not.

11:46:17 15          Q.      That one has already been marked, so I

11:46:19 16     can pass it right to you.  That should have the

11:46:22 17     deposition Exhibit 918.

11:46:25 18                  Do you see that?

11:46:26 19          A.      Yes.

11:46:28 20          Q.      Have you seen this document before?

11:46:34 21          A.      I have seen it before.

11:46:35 22          Q.      Prior to preparing for your deposition,

11:46:37 23     had you seen this before?

11:46:38 24          A.      No, I had not.

11:46:39 25          Q.      Have you ever talked to Mr. McNeal about

11:46:42  1    a do not contact list at Intuit?

11:46:47  2            A.    No.

11:46:49  3            Q.    Or how about Mr. Nguyen?

11:46:51  4            A.    No.

11:46:52  5            Q.    Or Miss Ross?

11:46:52  6            A.    No.

11:47:00  7            Q.    Do you have any type of relationship

11:47:01  8    with Mr. Bill Campbell?

11:47:05  9            A.    Yes.

11:47:06 10            Q.    Okay.  And do you have a regular

11:47:12 11    occasion to meet with him?

11:47:13 12            A.    Yes.

11:47:14 13            Q.    And what is that?

11:47:16 14            A.    There's a couple of situations.  So

11:47:19 15    Mr. Campbell is chairman of the board, so on a

11:47:23 16    quarterly basis, I, along with a couple of others,

11:47:26 17    meet with him to talk about board agendas, and

11:47:29 18    specifically the committee agendas.  I have

11:47:31 19    responsibility in working with him on the agenda

11:47:33 20    for the compensation organization development

11:47:35 21    committee.

11:47:35 22            And so prior to those meetings, we

11:47:37 23    review that agenda, and then he participates in

11:47:40 24    that committee meeting.  And so I -- I attend

11:47:44 25    those meetings, and so whenever that group meets

Deposition of Mason Stubblefield                    In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

| | | |
|---|---|---|
| 11:49:06 | 1 | at any other companies in the valley about |
| 11:49:09 | 2 | recruiting issues? |
| 11:49:11 | 3 | A.    What do you mean by "recruiting issues"? |
| 11:49:14 | 4 | Q.    About whether there should be certain |
| 11:49:16 | 5 | people off limits to recruiting across companies? |
| 11:49:19 | 6 | A.    No. |
| 11:49:47 | 7 | Q.    Let me ask you about Mr. Steve Jobs. |
| 11:49:50 | 8 | Did you have any relationship with him |
| 11:49:51 | 9 | when he was at -- still at Apple? |
| 11:49:58 | 10 | A.    No, none at all. |
| 11:49:59 | 11 | Q.    Okay. |
| 11:49:59 | 12 | (Whereupon, Deposition Exhibit 2738 |
| 11:49:59 | 13 | was marked for identification.) |
| 11:50:10 | 14 | BY MS. DERMODY: |
| 11:50:10 | 15 | Q.    The document placed in front of you as |
| 11:50:12 | 16 | Exhibit 2738 should bear an Intuit number on the |
| 11:50:15 | 17 | front cover, -43557. |
| 11:50:19 | 18 | Do you see that? |
| 11:50:19 | 19 | A.    Yes. |
| 11:50:19 | 20 | Q.    And in the document, I don't think there |
| 11:50:21 | 21 | are page numbers themselves, so bear with me as we |
| 11:50:24 | 22 | go through this. |
| 11:50:27 | 23 | If you look at the document, is this a |
| 11:50:30 | 24 | document or a spreadsheet that you recognize as |
| 11:50:33 | 25 | being used in the compensation area at Intuit? |

| | | |
|---|---|---|
| 11:50:43 | 1 | A.    So -- yes. |
| 11:50:44 | 2 | Q.    And can you explain what this is? |
| 11:50:50 | 3 | A.    I can try. |
| 11:50:52 | 4 | So the first page that has the |
| 11:50:55 | 5 | performance rating and the award as -- the award |
| 11:50:58 | 6 | range is a description of the guideline -- or is |
| 11:51:03 | 7 | the guidelines that are there for IPA bonus awards |
| 11:51:07 | 8 | based on the performance ratings for an |
| 11:51:08 | 9 | individual, kind of the range of an expected bonus |
| 11:51:11 | 10 | payment. |
| 11:51:17 | 11 | The second page is a mix of things.  So |
| 11:51:22 | 12 | it looks like it's actually a collection of |
| 11:51:24 | 13 | multiple different documents that someone's put |
| 11:51:26 | 14 | together into a single page, because it would have |
| 11:51:28 | 15 | never been produced this way by itself.  The piece |
| 11:51:31 | 16 | at the top looks like a template that -- just some |
| 11:51:34 | 17 | dates that were used for stock grant eligibility |
| 11:51:37 | 18 | back in 2005.  And I'm not sure what the grant |
| 11:51:41 | 19 | date is because those don't look really |
| 11:51:44 | 20 | consistent. |
| 11:51:46 | 21 | Below that it's starting to describe the |
| 11:51:47 | 22 | way that guidelines were established and the tool |
| 11:51:50 | 23 | that managers used.  And the very bottom piece is |
| 11:51:54 | 24 | actually a screen shot of what -- of what -- of |
| 11:51:58 | 25 | the system that we used to use and the control |

| 11:52:00 | 1 | table inside that system and how values were set. |
| 11:52:02 | 2 | So it's a screen shot of PeopleSoft. |
| 11:52:05 | 3 | Q.    Okay. |
| 11:52:05 | 4 | A.    So this document on its own could never |
| 11:52:08 | 5 | have been produced by itself just based on it |
| 11:52:10 | 6 | being a collection of different things. |
| 11:52:11 | 7 | Q.    Okay.  On that nine blocker control |
| 11:52:17 | 8 | section -- |
| 11:52:17 | 9 | A.    Yes. |
| 11:52:17 | 10 | Q.    -- can you just walk me through what the |
| 11:52:19 | 11 | different columns are? |
| 11:52:28 | 12 | A.    I'll try. |
| 11:52:29 | 13 | So the first piece is just a value |
| 11:52:31 | 14 | that's kind of used behind the scenes to connect |
| 11:52:35 | 15 | based on a certain set of employee circumstances |
| 11:52:37 | 16 | what parameters or what values would show up in a |
| 11:52:40 | 17 | calculation that's done within the system.  So |
| 11:52:42 | 18 | it's just a value that's attached. |
| 11:52:46 | 19 | So the group values -- based on a group |
| 11:52:49 | 20 | value, it attaches to different things here.  The |
| 11:52:51 | 21 | group value essentially attaches to a combination |
| 11:52:53 | 22 | of a performance rating and a retention rating for |
| 11:52:56 | 23 | an employee. |
| 11:52:59 | 24 | The eligibility, I don't recall exactly |
| 11:53:01 | 25 | what O meant in the system.  T is -- was targeted. |

11:53:05  1    It just kind of drove, again, what was there from

11:53:08  2    an equity perspective if someone would be

11:53:10  3    participating in the program or not.

11:53:12  4            The multiplier was a multiplier off of a

11:53:15  5    base and how we scale grants to increase the

11:53:19  6    grants for higher performance and higher retention

11:53:21  7    employees.

11:53:22  8            Then the next two columns were

11:53:24  9    guidelines around shares and just kind of a base

11:53:27 10    set of guidelines of what we would expect someone

11:53:31 11    to get in those -- those criteria.

11:53:36 12       Q.    Okay.  I'm not sure if the page that

11:53:42 13    follows is an excerpt from the very last page or

11:53:48 14    these are different things.

11:53:51 15       A.    It's similar to what's on the very last

11:53:53 16    page, and so it may have been -- it may have been

11:53:56 17    part of a working product to get to what would end

11:53:59 18    up on that last page.  So it's from an Excel file

11:54:02 19    and it was essentially a way to build or manage

11:54:05 20    the targets that got put back into the control

11:54:07 21    table, the nine block control table.

11:54:10 22            This would be the basis for having --

11:54:12 23    having an input document to put those -- those

11:54:16 24    values into the system.  And then the last page,

11:54:19 25    the last page is a set of guidelines for what we

| | | |
|---|---|---|
| 11:54:22 | 1 | would expect as focal equity targets for different |
| 11:54:27 | 2 | levels of employees, different compensation |
| 11:54:29 | 3 | levels, and then the groups here tie back to those |
| 11:54:32 | 4 | groups from the control table.  This is a document |
| 11:54:38 | 5 | that was used to build the system or to structure |
| 11:54:40 | 6 | values in the system. |
| 11:54:41 | 7 | Q.    Okay.  So if you were to take -- under |
| 11:54:53 | 8 | the position where it says VP, we'll do the top |
| 11:54:56 | 9 | line. |
| 11:54:58 | 10 | A.    Okay. |
| 11:54:58 | 11 | Q.    300,000 plus, what is the 20,000 there? |
| 11:55:01 | 12 | Is that a guideline for the equity grant? |
| 11:55:04 | 13 | A.    A target number of stock options that |
| 11:55:06 | 14 | would be granted. |
| 11:55:07 | 15 | Q.    Okay.  And going over to that middle |
| 11:55:10 | 16 | column where it's I guess California/Massachusetts |
| 11:55:14 | 17 | locations; is that fair? |
| 11:55:16 | 18 | A.    Yes. |
| 11:55:16 | 19 | Q.    Are the groups corresponding to ratings |
| 11:55:20 | 20 | people are receiving or something different? |
| 11:55:22 | 21 | A.    The groups correspond to the combination |
| 11:55:24 | 22 | of a performance rating and a retention rating. |
| 11:55:34 | 23 | Q.    So if I'm trying to read that -- that VP |
| 11:55:37 | 24 | level at 300,000, is the guideline that if they |
| 11:55:42 | 25 | are rated a two level, the stock grant would be |

11:55:48   1   33,000 as opposed to 20,000?

11:55:50   2        A.   Yes.

11:55:51   3        Q.   Okay.

11:55:52   4        A.   That's correct.

11:56:38   5        Q.   Mr. Stubblefield, the document placed in

11:56:39   6   front of you should have a number in the front,

11:56:41   7   Exhibit 1761.

11:56:44   8             Do you see that?

11:56:44   9        A.   Yes.

11:56:47  10        Q.   If you'll open to the next page of it,

11:56:53  11   it starts what appears to be a PowerPoint, or

11:56:55  12   something like that, a presentation of some sort.

11:56:58  13             Do you recognize what this is?

11:57:01  14        A.   So in looking at the presentation, I'm

11:57:04  15   familiar with it.  I don't remember the -- I don't

11:57:06  16   know the exact context of how this was used.

11:57:09  17        Q.   If you look on the second page, there

11:57:12  18   are page numbers in the lower left corner.

11:57:16  19        A.   Yes.

11:57:16  20        Q.   Might be helpful.

11:57:18  21             You'll see that there is a date in the

11:57:19  22   middle where it says January 7, 2005.

11:57:22  23             Do you see that?

11:57:23  24        A.   Yes.

11:57:24  25        Q.   And do you know in this time period who

Deposition of Mason Stubblefield          In Re:  HIGH-TECH EMPLOYEE ANTITRUST LITIGATION

```
 1              I, Kathleen A. Wilkins, Certified

 2     Shorthand Reporter licensed in the State of

 3     California, License No. 10068, hereby certify that

 4     the deponent was by me first duly sworn and the

 5     foregoing testimony was reported by me and was

 6     thereafter transcribed with computer-aided

 7     transcription; that the foregoing is a full,

 8     complete and true record of said proceedings.

 9              I further certify that I am not of

10     counsel or attorney for either of any of the

11     parties in the foregoing proceeding and caption

12     named or in any way interested in the outcome of

13     the cause in said caption.

14              The dismantling, unsealing, or unbinding

15     of the original transcript will render the

16     reporter's Certificates null and void.

17              In witness whereof, I have hereunto set

18     my hand this day:  April 4, 2013.

19         ___x___ Reading and Signing was requested.

20         _____ Reading and Signing was waived.

21         _____ Reading and signing was not requested.

22         _____

23         KATHLEEN A. WILKINS

24         CSR 10068, RPR-RMR-CRR-CCRR-CLR

25
```

KRAMM COURT REPORTING          ATTORNEYS' EYES ONLY          Page: 161