# Exhibit 58
## to the Declaration of Dean M. Harvey in Support of Plaintiffs' Opposition Briefs

| | |
|---|---|
| **From:** | Schwartz, Haidee |
| **To:** | adam.severt@usdoj.gov; ryan.struve@usdoj.gov |
| **CC:** | Parker, Richard |
| **Sent:** | 1/19/2010 8:56:20 AM |
| **Subject:** | Apple White Paper Submission |
| **Attachments:** | Apple Inc White Paper Submission to the DOJ - 01192010.pdf |

Dear Adam and Ryan:

Please find attached Apple's White Paper Submission to the DOJ. If you could please distribute to your team that would be much appreciated.

We look forward to meeting with you on Wednesday, Jan. 20 at 1:00 p.m.

Thank you.

Best,

Haidee


**Haidee L. Schwartz**
**O'Melveny & Myers LLP**
1625 Eye Street N.W.
Washington, D.C. 20006
Phone: (202) 383-5257
Fax: (202) 383-5414
hschwartz@omm.com

*This message and any attached documents contain information from the law firm of O'Melveny & Myers LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.*

231APPLE003854

CONFIDENTIAL TREATMENT REQUESTED

# APPLE INC.
# WHITE PAPER SUBMISSION TO THE DEPARTMENT OF JUSTICE – CIVIL INVESTIGATIVE DEMAND NO. 25361

## JANUARY 19, 2010

**Richard Parker (202) 383-5380**
**Haidee Schwartz (202) 383-5257**
**O'Melveny & Myers LLP**
**1625 Eye Street, N.W.**
**Washington, D.C. 20006-4001**

**George Riley (415) 984-8741**
**Luann Simmons (415) 984-8896**
**O'Melveny & Myers LLP**
**Two Embarcadero Center, 28th Floor**
**San Francisco, CA 94111-3823**

231APPLE003855

*Confidential Treatment Requested*
*Responsive to DOJ CID #25361*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

CLOSE COLLABORATIONS WITH THIRD PARTY DEVELOPERS HAVE BEEN, AND
REMAIN, ESSENTIAL TO APPLE'S SUCCESS ..................................................... 4

APPLE-ADOBE ................................................................................................ 7

APPLE - NVIDIA ............................................................................................. 9

APPLE-GOOGLE .............................................................................................. 11

APPLE-PIXAR .................................................................................................. 12

APPLE'S DECISIONS NOT TO COLD CALL ARE ANCILLARY AND REASONABLY
NECESSARY TO ITS PRO-COMPETITIVE COLLABORATIONS ........................... 14

BROADER EMPLOYEE NON-COMPETE CLAUSES ARE ANALYZED UNDER THE
RULE OF REASON AND ALMOST ALWAYS UPHELD ........................................ 17

APPLE'S NON-SOLICITATION PRACTICE IS LAWFUL UNDER THE RULE OF
REASON ......................................................................................................... 19

CONCLUSION .................................................................................................. 22

## INTRODUCTION

This paper addresses allegations by the Antitrust Division Staff that Apple has entered into separate bilateral agreements[1] with Adobe, Google, Nvidia, and Pixar to refrain from "cold calling"[2] each other's employees.  Staff has indicated that it may recommend an action to enjoin these alleged agreements on the theory that they are *per se* illegal.

The alternative to *per se* treatment, of course, is the rule of reason.  Application of the rule of reason to Apple's decisions not to solicit employees of certain companies would require the government to define relevant markets and to show that any anticompetitive effects from the alleged agreements outweigh the pro-competitive benefits.  There is no evidence that Apple's practices had any impact, much less an anticompetitive impact, on any relevant antitrust market; nor is there evidence of any intention by Apple to reduce wages or benefits by a single penny.  Thus, Apple clearly would prevail under the rule of reason.

That leaves only the claim of illegality under the *per se* rule.  Apple was party to a November 25, 2009 White Paper demonstrating that the courts have never condemned non-solicitation agreements or practices as *per se* illegal because such arrangements are not among those that almost always harm competition.  For decades, courts have narrowed the application of *per se* categorization in favor of a more reasoned focus on an agreement's purpose and effect.  Because there is no legal or economic basis to apply *per se* treatment here, the Division has no case against Apple whatsoever.

---

[1] Apple did not have bilateral agreements within the meaning of the antitrust laws with any of the four identified companies.  Apple's communication of its decision not to recruit from one of its collaborative partners does not constitute an agreement.  Any use of the term "agreement" in this paper reflects only Staff's characterization of Apple's recruiting decisions and not the facts of the situations at issue.

[2] We use the term "cold calls" to refer to the initiation of active solicitation of employee candidates that may occur through an unsolicited telephone call, an e-mail, or similar means.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

231APPLE003857

*Confidential Treatment Requested*
*Responsive to DOJ CID #25361*

This paper presents facts particular to Apple and its relationship with the four companies identified by Staff – Adobe, Google, Nvidia, and Pixar.  These facts demonstrate the clear applicability of the rule of reason in this case:  in each instance, Apple's decision not to solicit employees has been ancillary to a pro-competitive collaboration that has benefitted consumers with enhanced output, technological advances, and new products.

In summary, Apple provides consumers with innovative alternative technology platforms, such as the Macintosh operating system ("Mac OS"), the iPod, and the iPhone.  Apple must depend on key partners to develop compelling hardware, software, services, and content that can be used on these platforms.  Customers make decisions to purchase Apple products based in part on the availability of desirable complementary products.  Thus, collaborations with hardware, software, and content developers are uniquely important to Apple in the highly competitive markets in which it participates.

Apple's decisions not to cold call employees of certain key partners have promoted these crucial relationships by fostering the trust necessary to success.  These decisions have assured Apple's partners that Apple will not use the knowledge it gains through its collaborations to "cherry-pick" its partners' employees with aggressive solicitations that are uninvited by the targeted employees.  Such solicitations are disruptive to the relationship – at the same time one party is insisting that its partner devote significant resources and its most talented employees to a joint project, that same party is making uninvited solicitations to the partner's employees.  Such behavior is simply not conducive to collaborative partnerships.

Apple's non-solicitation is tailored to meet the company's objectives and is limited to cold calls only – that is, only uninvited solicitations of key partners' employees.  If an employee of a partner expresses any interest in changing employment, Apple will actively recruit that

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                                      231APPLE003858

*Confidential Treatment Requested*
*Responsive to DOJ CID #25361*

employee, assuming, of course, the employee is a desirable candidate.  Indeed, Apple has regularly recruited and hired employees from the four companies at issue.  Apple's non-solicitation decisions do not restrict the free flow of information regarding job opportunities, competing salaries, and benefits.  Apple readily makes such information available through a variety of means, and prospective candidates are free to use this information to pursue opportunities at Apple or to bid up their own salary and benefits at their current employer or at some other potential employer.

Apple intends to bring a senior executive to its meeting with Staff who will describe (i) the importance of its collaborations with key partners and the resulting consumer benefits; (ii) Apple's collaborations with the companies at issue; and (iii) why refraining from cold calling employees at partner companies is reasonably related and necessary to the collaborations and to Apple's continued success.

This paper provides an overview of the collaborations, which will be discussed in detail during our meeting.  It also describes Steve Jobs' unique role in the development, growth, and leadership of both Apple and Pixar.   Finally, we discuss the ancillary restraints doctrine and its application here.  We emphasize that the non-solicitation practice discussed here serves the same purpose as, yet is much less restrictive than, full-blown covenants not to compete and covenants not to hire, both of which are ubiquitous in joint ventures and employment contracts throughout our economy.  These covenants are governed by the rule of reason and are virtually always upheld in light of the breadth and diversity of labor markets both in this country and worldwide. Apple employs a much less restrictive non-solicitation practice that passes antitrust requirements by a wide margin.  Apple respectfully requests that the Division close its investigation.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    231APPLE003859

*Confidential Treatment Requested*
*Responsive to DOJ CID #25361*

## CLOSE COLLABORATIONS WITH THIRD PARTY DEVELOPERS HAVE BEEN, AND REMAIN, ESSENTIAL TO APPLE'S SUCCESS

Apple participates in highly competitive markets largely by offering alternative technology platforms to those of more established providers. Apple's Mac OS is the only viable alternative to Microsoft's desktop operating system. Macs are an alternative platform to PCs. iPods compete with an array of gaming, audio, video, and multimedia devices. The iPhone competes with mobile phones, PDAs, and other Internet access devices. Apple TV competes with video, digital image, and multimedia devices. And iTunes competes with other digital audio and video download services and playback applications, satellite and over-the-air radio and broadcast services, broadband provider offerings, free file exchange-sharing services, and other digital and brick and mortar audio and video retailers.

Offering new and innovative platforms requires collaboration with developers of complementary products. Such collaborations are uniquely important in the technology markets in which Apple competes. If compelling software and content – such as Adobe software, Google applications, and Pixar/Disney content – are not available, customers will choose other platforms with which they can use these offerings. Similarly, if the best processors are available only for the much larger PC market, Apple will fall behind. In short, Apple's success depends on collaboration with the developers of complementary products.

Apple's history bears this out. In the summer of 1997, when Steve Jobs returned to Apple, the company was near death, having lost nearly $2 billion in two years. At that time, there was widespread concern that application developers were fleeing the Mac platform because Apple's shrinking market share would not justify the costs required to maintain their applications on the Mac. In turn, customers would purchase PCs if they could not find versions of popular software titles that could run on the Mac. And if more customers abandoned the Mac platform,

CONFIDENTIAL - ATTORNEYS' EYES ONLY

231APPLE003860

*Confidential Treatment Requested*
*Responsive to DOJ CID #25361*

additional developers would follow suit resulting in a self-perpetuating downward spiral of customers and developers abandoning the Mac and Apple. Apple's ability to break out of this pattern depended in large part on its ability to collaborate with software developers, most prominently Microsoft.

Although Apple and Microsoft compete fiercely in the desktop operating system market, they also each develop software applications that run on the other company's operating system. Microsoft's Office software suite that includes Word, Excel, and PowerPoint has become virtually ubiquitous. Apple's dramatic decline raised the prospect that Microsoft would no longer support Office for the Mac. Because of the large percentage of consumers who rely on Microsoft Office, Apple likely would not have survived if Microsoft had stopped developing Office for the Mac.

In August 1997, Apple and Microsoft announced an historic agreement that, among other things, guaranteed that Microsoft would support Office for the Mac for five years if certain conditions were met. Microsoft has continued to support Office even after the 1997 agreement expired, which is a testament to the success of the collaboration. The work with Microsoft, then and now, requires a high degree of trust on both sides. Apple shares confidential information with Microsoft's Mac Division under an NDA that prohibits such information from being used for any other purpose at Microsoft. Microsoft has a team of skilled and experienced engineers that work on Office for the Mac. These engineers are more valuable to Apple at Microsoft than they would be if they worked directly for Apple. Accordingly, Apple decided that it would not solicit employees from Microsoft's Mac Division unless those employees first indicated an interest in leaving Microsoft. That practice has been critical to the success of the Microsoft partnership.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                    231APPLE003861

*Confidential Treatment Requested*
*Responsive to DOJ CID #25361*

Intel has been an equally important collaboration partner.  Before Apple's historic turnaround, the company had become dependent on a single model of microprocessor, the Power PC, and a single supplier, IBM.  But the Power PC had fallen behind Intel's products in key performance metrics.  Apple concluded that it needed to convert to Intel microprocessors to remain competitive.

In June 2005, Apple announced that it would begin producing Intel-based Macs.  This was a watershed change for Apple because it required reengineering the Mac OS to run on an entirely different architecture.  Apple's collaboration with Intel required – and continues to require – a high degree of trust on both sides.  Throughout the relationship, Intel has had to share with Apple highly competitive, sensitive details about its microprocessors in advance of their general availability on the market.  Apple has had to provide competitively sensitive information about its operating system to Intel, including unannounced future features.  The trust essential to this relationship would have been significantly undermined if Apple's recruiters had been making cold calls to Intel employees.  Accordingly, Apple made the decision not to make cold calls to senior level Intel employees and has not done so throughout the relationship with Intel.

Apple's relationships with Microsoft and Intel are, of course, not at issue in this investigation.  We describe them here to illustrate the critical importance of collaborative activities to Apple's competitiveness, the necessity of trust to the success of the collaborations, and the promotion of this essential trust by Apple's decisions not to cold call the employees of key partners.  As demonstrated below, Apple's collaborations with Adobe, Nvidia, Google, and

6

CONFIDENTIAL - ATTORNEYS' EYES ONLY

231APPLE003862

*Confidential Treatment Requested*
*Responsive to DOJ CID #25361*

Pixar are no different.  Each of these collaborations has served significant pro-competitive goals, and Apple's decision not to cold call their employees was important to the relationship.[3]

**APPLE-ADOBE**

Adobe is one of the largest and most diversified software companies in the world.  Adobe makes many industry-leading software programs, including Acrobat (creation and sharing of pdf documents), Photoshop (photo/digital imaging editing), Flash (web design, development, and delivery, particularly for video), Illustrator (advanced computer drawing, graphics creation, and editing), Dreamweaver (design, development, and maintenance of websites and web applications), and many others.  Adobe promotes Flash as "the leading web design and development platform for creating expressive applications, content, and video that run consistently across operating systems and devices and reach over 98% of internet-connected desktop users."[4]

For more than twenty-five years, customers who use the Mac for content creation have been an important part of the Apple's business.  Because Adobe's software products serve those same customers, it is critical that Adobe's software products work effectively on Apple's operating system.  To achieve this goal, Apple and Adobe must work together closely.  Both parties have long considered the work they do together to be of the highest importance.  Bruce Chizen, Adobe's former CEO,[5] described the relationship as a "marriage" where "you're in it for

---

[3] The FTC and DOJ's joint *Antitrust Guidelines for Collaborations Among Competitors* (Apr. 2000) ("Guidelines"), do not require that parties' collaborations and the restraints ancillary to those collaborations be memorialized in a formal written document.  Rather, the Guidelines state that, "[a] competitor collaboration comprises a set of one or more agreements, other than merger agreements, between or among competitors to engage in economic activity, and the economic activity resulting therefrom." (*Id.* at 6).  And, that "[f]or purposes of these Guidelines, the phrase 'relevant agreement' refers to whichever of these three – the overall collaboration, an individual agreement, or a set of agreements – the evaluating Agency is assessing." (*Id.* at 7).

[4] Adobe information brochure on Flash, *available at* http://www.adobe.com/flashplatform/pdfs/platform_overview.pdf  (last visited 12/28/2009).

[5] Mr. Chizen served as CEO of Adobe from December 2000 through November 2007.

7

*Confidential Treatment Requested*
*Responsive to DOJ CID #25361*

the kids," i.e., customers.[6]  The relationship dates to the early 1980s when both companies were in their infancy.[7]  Together they co-developed PostScript for the Apple LaserWriter, a product that revolutionized the world of printing and ignited the desktop publishing revolution.  Since that time, Apple and Adobe have shared a focus on enhancing computing capabilities for visual expression, and frequently have helped publicly launch each company's new products.

In the late 1990s, when Apple was struggling, the company became concerned that Adobe might not offer its newest software on the Mac.  But based on the strength of the historical collaboration, Apple averted this crisis and Adobe continued to support the Mac platform.  More recently, when Apple switched from PowerPC to Intel processors, Adobe was among the most important of the third party software developers to create and support versions of their applications that ran, and performed well, on both types of systems.

Many of the heaviest users of Adobe products, particularly creative professionals, rely on Macs.  Adobe considers Apple customers its core customers.  And those creative professionals are among the most demanding of Apple's customers:  they work with large amounts of data, often on tight deadlines, and require cutting edge performance from their computer software and hardware.  When Adobe develops new software or a new version of its existing software, such as Photoshop, it works with Apple to ensure its users receive the benefit of the software's peak performance on Apple's product lines.  Photoshop, like many other Adobe products, was originally only released and available for Macs.  Adobe has released more applications on the Mac operating system than virtually any company other than Apple.

Similarly, when Apple introduces a new version of its Mac OS, such as Snow Leopard, or a new product line, such as the iPod touch, the companies work together to enable Adobe's

---

[6] *Adobe Systems Inc., On the Record: Bruce Chizen*, San Francisco Chronicle, E1, Apr. 24, 2005.
[7] Pia Sarkar, *Despite Squabbles, Apple and Adobe Have Benefitted from One Another*, San Francisco Chronicle, E1, Feb. 25, 2002.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                           231APPLE003864

*Confidential Treatment Requested*
*Responsive to DOJ CID #25361*

software to take advantage of Apple's advances. This collaboration requires Apple and Adobe to share prototypes of software and hardware, source code, and other highly proprietary and sensitive information. Adobe shares some of its most confidential and carefully guarded information with Apple and vice versa.

This highly successful collaboration requires a relationship of trust. Cold calling Adobe's employees would inject mistrust and fear into the relationship – fear that Apple would use the relationship to "poach" or "raid" Adobe's employees who have shown no interest in leaving their current positions. It would detract greatly from joint activities if Apple – while insisting on the highest level of performance from Adobe – also directed uninvited solicitations to Adobe's employees.

### APPLE - NVIDIA

Apple and Nvidia have a long-standing co-development relationship. Nvidia is a leader in hardware and software visual computing, offering graphics chips, and graphics processing units (GPUs). Apple relies on Nvidia and AMD (formerly ATI) to provide its graphics chips. Apple and Nvidia share plans and early conceptualization for future products, product roadmaps, prototypes, and full schematics. The companies have access to each other's source code (including multiple edits by both companies to shared source code every day for some shared code projects). They each have maintained laboratories at the other's facilities, and each has provided office space and security badges to the other's employees. Apple employees will spend weeks on end reporting for duty at Nvidia facilities and vice versa. Apple has access to Nvidia's most talented employees at all levels, including vice presidents, senior architects, managers, engineering project managers, and engineers.

9

*Confidential Treatment Requested*
*Responsive to DOJ CID #25361*

At any time, Apple and Nvidia are involved in many simultaneous projects, each of which typically takes six to nine months or longer to complete.  The list of Nvidia chips and processors or projects on which the companies have collaborated is extensive:

- In 2003, Apple used Nvidia graphics in the PowerBook and iMac.

- In 2004, Apple used versions of Nvidia's GeForce 5200 graphics cards in the Power Mac and PowerBook, and included Nvidia graphics in the Apple iMac G5.

- In 2005, Apple used Nvidia's GeForce 6600 in the Power Mac and Nvidia's GeForce FX Go5200 graphics processer in the PowerBook.

- In 2006, Apple used Nvidia's GeForce 7300 GT graphics in the iMac.

- In 2007, Nvidia's GeForce 8600M GT graphics controller was shipped with the MacBook Pro.

- In 2008, Nvidia GeForce 9400 or 8700 graphics processors were part of all Apple laptops, and the iMac included Nvidia's GeForce 8800 GS graphics.

- And, in 2009, Apple used Nvidia's GeForce 9400M graphics processor, known internally as the MCP79 graphics chipset, in the MacBook, MacBook Pro, and MacBook Air, as well as the Mac mini.  The development of Nvidia's MCP79 chipset resulted from the close collaboration between Apple and Nvidia – the two companies worked together in designing and developing the MCP79 from concept to production.

The Nvidia employees who work with Apple are, in fact, more valuable to Apple working at Nvidia on Apple projects than they would be working directly for Apple.  Nvidia's incentive and ability to work with Apple to produce these collaborative benefits would be significantly chilled if Apple were actively soliciting Nvidia's employees who had indicated no interest in working at Apple.

10

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    231APPLE003866

*Confidential Treatment Requested*
*Responsive to DOJ CID #25361*

**APPLE-GOOGLE**

Google offers search technologies and a host of related applications through the use of a targeted advertising program.  Apple and Google together have joined Apple's client side devices (laptops, desktops, phones, and other devices) with Google's back end services such as search and mapping.  The initial collaboration involved integrating Google search into Apple's Safari web browser, with Google search serving as the default search engine and as part of the Safari home page.  As Apple's product lines have grown, this relationship has simultaneously grown to encompass an increasing array of Apple devices.  The collaboration has been hugely successful for both companies.  For example, as of October 2009, Apple's iPhone was responsible for 30 to 40 times more mobile search queries on Google than any other source.[8]

Over time, the relationship has evolved to include the integration of additional Google applications and user services.  This integration has enabled Google Maps and Google "my location" functions, including third party applications using Google's location functions, to be incorporated on Apple's products.  Apple and Google also have collaborated in a variety of other ways:  to enable synchronization of a user's Google contacts onto the iPhone; to allow emails from a user's Google Gmail account to be automatically downloaded to the Mail application on the user's iPhone; to incorporate Google's anti-malware and anti-phishing applications on Apple devices; and to develop a method by which Apple TV accesses and displays YouTube videos and takes advantage of other YouTube capabilities.  Google also relies on Apple technology for Google products:  Apple's WebKit open source project provides the rendering engine for Google's Chrome browser.  Apple contributes substantial code and resources to the WebKit project, and engineers from both companies work closely on WebKit development projects such

---

[8] *Schmidt: Levinson Should Stay on Apple, Google Boards*, Reuters/PC Magazine.com, Oct. 2, 2009.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

231APPLE003867

as source code modifications and security fixes.  As with Apple's other key collaborations, a relationship of trust and open cooperation has been essential to the success of the companies' joint efforts.

Another important element of the relationship between Apple and Google was the service of Dr. Eric Schmidt, Google's CEO, on Apple's Board of Directors from 2006-2009.  Apple elects not to cold call employees from companies associated with Apple's Board of Directors or from companies where Apple employees serve as directors.  This practice avoids creating an actual or apparent conflict of interest or any appearance of impropriety arising from a Board member's dual roles at different companies.  Apple's practice of not cold calling Google employees was clearly ancillary to the companies' relationship and had no anticompetitive effect.

### APPLE-PIXAR

Apple collaborates with Pixar in a fashion similar to the relationships described above.  But the relationship with Pixar is distinctive because Steve Jobs co-founded Pixar.[9]  From 1997 until 2006, Mr. Jobs was, Chairman, CEO, and majority shareholder of Pixar.  During this same period, he was the CEO and a Board member of Apple.[10]  As CEO of both firms, Mr. Jobs was positioned to identify the key employees of both companies.  Mr. Jobs would have been put in an untenable situation were Pixar to solicit Apple's best people and vice versa.  To avoid this conflict, each company individually followed a practice of not soliciting the other's employees without prior approval unless, of course, the employee initiated the contact.  That is an eminently practical solution to a very real problem.

---

[9] Steve Jobs co-founded Pixar with Ed Catmull when he bought the Graphics Group, a part of the Computer Division of Lucasfilm, from Lucasfilm in 1986.
[10] Mr. Jobs co-founded Apple in 1976.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    231APPLE003868

*Confidential Treatment Requested*
*Responsive to DOJ CID #25361*

Putting aside the absence of any anti-competitive effect, this solution cannot constitute an antitrust violation because there can be no agreement between Mr. Jobs and himself.  In *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984), the Supreme Court emphasized that the primary danger of "concerted activity" is that it "deprives the marketplace of the independent center of decisionmaking that competition assumes and demands."  *Id.* at 768-69.  As one court has stated, the Court's rationale in *Copperweld* was "essentially that a conspiracy with oneself is conceptually impossible."[11]  Similarly, it is not possible that Mr. Jobs, as CEO of Apple, could have engaged in a conspiracy with Mr. Jobs, as CEO of Pixar.  There can be no meeting of the "minds" when there is only one mind.

Following Disney's acquisition of Pixar, Mr. Jobs became a Director of the Walt Disney Company and its largest single shareholder.[12]  Disney's most recent proxy statement identifies Mr. Jobs as a "non-independent" outside director because of his involvement in Pixar.  Mr. Jobs is one of the three Pixar members of the Disney-Pixar six person steering committee, formed after Disney's acquisition of Pixar.  The other two Pixar members are Ed Catmull, President, and John Lasseter, Chief Creative Officer.  Because of Mr. Jobs' continuing important role with Pixar, Apple decided to continue its practice of not cold calling Pixar employees.  Continuing this practice avoids risking even the appearance of impropriety or interference based on Mr. Jobs' positions and contributions to each company.  Such a practice is clearly ancillary to Mr. Jobs' work with Pixar, not anticompetitive in any respect, and not a violation of the antitrust laws.

Moreover, as an outgrowth of their common ownership and resulting historical symbiotic relationship, Apple engineers have provided to Pixar software and tools, such as the uTest

---

[11] *D'Last Corp. v. Ugent*, 863 F. Supp. 763, 768 (N.D. Ill. 1994) (granting the defendants motion to dismiss the Section 1 claim based on the fact that one of the defendants was the president and sole or controlling shareholder of each of the corporate defendants).

[12] The Walt Disney Company 2009 Proxy Statement, at 4 (Jan. 16, 2009), *available at* http://media.disney.go.com/investorrelations/proxy/proxy_2009.pdf (last visited 12/28/2009).

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                        231APPLE003869

*Confidential Treatment Requested*
*Responsive to DOJ CID #25361*

software test tool and the source code for Apple's Shake software.  Pixar has, in turn, provided

important feedback and input to Apple on improvements to these products.  This collaboration

reflects Mr. Jobs' integral role in the leadership and direction of both Apple and Pixar, and

provides another reason why Apple's decision not to cold call Pixar employees fosters the pro-

competitive aspect of the companies' relationship.

### APPLE'S DECISIONS NOT TO COLD CALL ARE ANCILLARY AND REASONABLY NECESSARY TO ITS PRO-COMPETITIVE COLLABORATIONS

Apple's decisions not to cold call employees of certain key partners, including the four

companies discussed above, do not constitute bilateral agreements, as suggested by Staff.

However, even if such decisions could be considered agreements, they were ancillary and

reasonably necessary to Apple's pro-competitive collaborations.

To determine whether the *per se* label is appropriate for a particular restraint, courts

analyze whether the restraint is "naked" or "ancillary."[13]  While all ancillary agreements are

analyzed under the rule of reason, not all "naked" agreements are necessarily *per se* illegal.[14]  "A

non-ancillary restraint is not necessarily unlawful or evaluated under a per se rule; rather it is

simply evaluated independently of the joint venture …"[15]  For restraints analyzed under the rule

---

[13] *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 901 (9th Cir. 1983); *see also* Guidelines, *supra* note 3, at 8-9 ("If … participants in an efficiency-enhancing integration of economic activity enter into an agreement that is reasonably related to the integration and reasonably necessary to achieve its procompetitive benefits, the Agencies analyze the agreement under the rule of reason, even if it is of a type that might otherwise be considered per se illegal.").

[14] *See, e.g. Rothery Storage & Van Co. v. Atlas Van Lines*, 792 F.2d 210 (D.C. Cir. 1986), *cert. denied*, 479 U.S. 1033 (1987) (holding that horizontal restraints ancillary to a legitimate joint venture should be examined under the rule of reason); XI Philip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1912c3 (2d ed. 2005) ("While the most frequent application of the rule of reason involves restraints that are 'ancillary' to some underlying productive joint venture, a significant number of challenged agreements qualify for rule of reason treatment even though they are not realistically ancillary to anything.").

[15] *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 339 n.7 (2d Cir. 2008) ("a non-ancillary restraint is not necessarily unlawful or evaluated under a per se rule; rather it is simply evaluated independent of the joint venture …").

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                    231APPLE003870

of reason, "ancillarity increases the probability that the restraint will be found reasonable."[16]
Thus, it is helpful to distinguish between a "naked" and an "ancillary" restraint.

"Naked" restraints are "restriction[s] on competition … unaccompanied by new
production or products."[17] "'Ancillary' restraints are those that are part of a larger endeavor
whose success they promote."[18] As the Supreme Court has observed, an agreement is ancillary if
it is incidental to the "legitimate and competitive purposes of the business association." *Texaco*
*Inc. v. Dagher*, 547 U.S. 1, 7 (2006). When a restraint "may contribute to the success of a
cooperative venture that promotes greater productivity and output," it is ancillary and analyzed
under the rule of reason.[19] The Guidelines further explain that an agreement should be
reasonably necessary to a collaboration, but that it need not be the least restrictive alternative,
and the agencies will not search for a theoretically less restrictive alternative.[20] The Guidelines
require only that there is not a "practical, significantly less restrictive means … reasonably
available when the agreement was entered into."[21]

Apple's decision not to make uninvited solicitations to the employees of key partners
meets both the reasonably necessary and the not unduly restrictive elements of a valid ancillary
restraint. As described above in detail, trust is essential for the success of Apple's collaborations
with its partners, particularly when the parties must share valuable intellectual property and other
confidential information so that they can continue to innovate and release new products that
benefit the consumer. Apple's decision not to cold call employees of certain key partners
promotes this trust and fosters an environment in which highly confidential information can be

---

[16] *Aydin Corp.,* 718 F.2d at 901 (internal citations omitted).
[17] *Polk Bros., Inc. v. Forest City Enters., Inc.,* 776 F.2d 185, 188-189 (7th Cir. 1985).
[18] *Id.*
[19] *Polk Bros.,* 776 F.2d at 189.
[20] Guidelines, *supra* note 3, at 8-9.
[21] *Id.*

CONFIDENTIAL - ATTORNEYS' EYES ONLY

231APPLE003871

*Confidential Treatment Requested*
*Responsive to DOJ CID #25361*

shared for the benefit of the collaboration.  This decision assures the partner that Apple is not using the collaboration to gain an improper advantage, thereby driving the fear out of the relationship.  Apple's decisions not to actively solicit employees from the companies at issue have been ancillary and reasonably necessary to Apple's successful collaborations with each of these companies and to those companies' willingness to engage in future collaborations with Apple.

Apple's decision not to cold call employees of companies where Apple's Board members are employed also promotes important goals.  Apple, its shareholders and customers benefit from an independent Board composed of members with a variety of experience and knowledge.  Apple's Board seeks to comply with the highest standards of fiduciary duty.  By refraining from cold calling the companies employing its Board members, Apple avoids placing the members in an actual or apparent conflict of interest.

Apple's non-solicitation practice is also the least restrictive alternative practically available.  At the four companies discussed above, Apple is exposed to information about the identities and capabilities of its partners' key employees.  Apple did not decide to refrain from hiring or recruiting these employees.  Instead, Apple decided it would refrain only from direct and uninvited solicitations.  Cold calling these partners' employees could be perceived as an attempt to exploit the knowledge Apple gained through the relationships by going after the partners' best people.  And, from the employees' perspective, cold calls are uninvited and, in many instances, unwanted to the point of annoying.  Such cold calls are all that is restricted by this very narrow practice.  If, on the other hand, the employee initiates a discussion regarding employment with Apple, the practice does not preclude those discussions in any way.

16

*Confidential Treatment Requested*
*Responsive to DOJ CID #25361*

As discussed above in detail, at any one time, Apple is involved in many simultaneous projects with each of its partners.  These projects often involve access to and interaction with teams of employees at all levels within the partners' companies.  The composition and size of these collaborative teams can change frequently as priorities within the companies shift due to a variety of factors, such as emerging technologies and changes in customer demand, and as a result of employee turnover.  Apple's decision not to cold call any employees of select, key partners is reasonably necessary to establish the trust necessary for the broad dissemination of confidential information within its partners' companies.

## BROADER EMPLOYEE NON-COMPETE CLAUSES ARE ANALYZED UNDER THE RULE OF REASON AND ALMOST ALWAYS UPHELD

As discussed in the joint paper, regardless of whether a restrain is ancillary, courts universally analyze non-solicitation, and more restrictive non-compete, agreements under the rule of reason.[22]  Courts "have had inadequate experience with noncompetition and noninterference covenants to warrant a per se categorization."[23]  As the leading antitrust treatise observes:

> [D]uring the term of employment an employee may acquire significant amounts of information that would be valuable to rivals in the product market but is not adequately protected by the intellectual property laws.  Frequently given examples are customer lists, unpatented secret formulas, and methods of doing

---

[22] *Eichorn v. AT&T*, 248 F.3d 131, 144 (3d Cir. 2001) (citing *see, e.g., McDonald v. Johnson & Johnson*, 722 F.2d 1370 (11th Cir.), *cert. denied*, 469 U.S. 870 (1984); *Consultants & Designers, Inc. v. Butler Serv. Group, Inc.*, 720 F.2d 1553 (11th Cir. 1983); *Aydin Corp. v. Loral Corp.*, 718 F.2d 897 (9th Cir. 1983); *Lektro-Vend Corp. v. Vendo Co.*, 660 F.3d 255 (7th Cir. 1981), *cert. denied*, 455 U.S. 921 (1982)).

[23] *See, e.g., Aydin Corp.*, 718 F.2d at 900 (internal citations omitted) (and stating that "[o]ther circuits have likewise declined to apply a per se rule to noncompetition agreements."); *Bradford v. The New York Times*, 501 F.2d 51, 60 (2d Cir. 1974) ("Although employee restraints have been known to the common law since the 15th century, their evolving history illustrates that rule of reason considerations continue to apply; and a state court or, in a diversity case, a federal court applying state law, provides the usual forum for protecting the employee and whatever interest the public may have.  There is certainly a total absence of federal Sherman Act experience."); *United States v. Empire Gas Corp.*, 537 F.2d 296, 308 (8th Cir. 1976) (internal citations omitted) (holding that even when a company had more than 3,000 non-competition contracts of varying terms, the burden was on the plaintiff to show the unreasonableness of each restraint, and that without a record that these covenants affected competition in the relevant market, they could not be found to violate § 1 of the Sherman Act).

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                      231APPLE003873

business.  While such information might be a trade secret, it may not be readily protectable.[24]

Applying the rule of reason to an employee covenant not to compete, the Eleventh Circuit found that "[t]o use the per se rule as a means of avoiding rule of reason analysis when it is unclear what the result would be under the rule of reason would subvert the intention and purpose of the per se rule."[25]  The Court added: "[e]ver since the decision of the Supreme Court in *United States v. Addyston Pipe & Steel Co.*, 85 F. 271 (6th Cir. 1898), *modified*, 175 U.S. 211 (1899), there has been an unbroken line of cases holding that the validity of covenants not to compete under the Sherman Act must be analyzed under the rule of reason."[26]

For the same reasons, courts have held that no-hire agreements have a *de minimus* impact. *Eichorn v. AT&T Corp.*, 248 F.3d 131,144 (3d Cir. 2001) ("Because the agreement only precluded the plaintiffs from selling their services to one corporation, the court held it only had a 'de minimus impact on the employment market in general' and the per se rule was 'wholly inapplicable.'") (citing *Coleman v. Gen. Elec. Co.*, 643 F. Supp. 1229, 1243 (E.D. Tenn. 1986), *aff'd*, 822 F.2d 59 (6th Cir. 1987)).  The few courts that have analyzed more restrictive no-hire agreements between companies have done so under the rule of reason.[27]

Another restrictive approach would be covenants not to compete.  Covenants not to compete are ubiquitous in U.S. industry.   Companies use covenants not to compete to help protect their intellectual property, trade secrets, and other confidential information.  In California,

---

[24] XIII Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶2134d3 (2d ed. 2005).
[25] *Consultants & Designers, Inc*, 720 F.2d at 1562.
[26] *Id.* at 1560-61.
[27] *See Union Circulation Co. v. FTC*, 241 F.2d 652 (2d Cir. 1957) (applying rule of reason to an agreement among several magazine subscription sales agencies not to hire one another's agents for one year after termination); *see also Bogan v. Hodgkins*, 166 F.3d 509, 515 (2d Cir. 1999) (applying rule of reason to a multilateral "no switching" agreement among insurance firms); *Nichols v. Spencer Int'l Press Inc.*, 371 F.2d 332, 337 (7th Cir. 1967) (applying a "standard of reasonableness" to a multilateral no-hire agreement).

18

231APPLE003874

*Confidential Treatment Requested*
*Responsive to DOJ CID #25361*

however, covenants not to compete are unenforceable.[28]  Non-solicitations, which have more

limited effect, may be enforced in California.  The most prominent California case on non-

solicitation clauses distinguishes them from covenants not to compete because a non-solicitation

"restriction only slightly affects" employees, such employees "are not hampered from seeking

employment with" the company in question, "[a]ll they lose is the option of being contacted …

first" by the former employee,[29] and, such non-solicitation agreements have no overall negative

impact on trade or business.[30]

 In sum, Apple reasonably could have used bilateral no-hire agreements with its partners,

tailored to mirror covenants not to compete.  Instead, Apple chose a less restrictive approach by

deciding to limit cold calling the employees of certain, select partners.

### APPLE'S NON-SOLICITATION PRACTICE IS LAWFUL UNDER THE RULE OF REASON

 The Division has never suggested it could prove an actual anticompetitive effect in a

properly defined relevant market in this case.  On the contrary, the Division has told Apple that it

is not even investigating actual anticompetitive effects and has maintained that non-solicitation

agreements are *per se* illegal, rendering evidence of actual effect irrelevant.

 For the reasons stated above, the *per se* rule is not applicable here and, under the rule of

reason, there realistically can be no anticompetitive effects from Apple's practices.  Employment

markets are broad and highly competitive.  Relevant labor markets include all jobs that are

reasonably good substitutes for employees seeking a job change.  *Todd v. Exxon*, 275 F.3d 191,

---

[28] California Business & Professions Code § 16600 ("every contract by which anyone is restrained from engaging in
a lawful profession, trade, or business of any kind is to that extent void."); in *Edwards v. Arthur Andersen LLP*, 44
Cal. 4th 937, 944, 950 (Cal. 2008), the California Supreme Court re-affirmed that non-competition agreements (with
very limited exceptions for sale of goodwill, dissolution of a partnership, or the sale of a business that meets specific
requirements), are prohibited; and confirmed that even narrowly tailored non-competition clauses violate § 16600
("California  courts have not embraced the Ninth Circuit's narrow-restraint exception.").
[29] *Loral Corp. v. Moyes*, 174 Cal. App. 3d 268, 279 (Cal. Ct. App. 1985); *see also, VL Systems v. Unisen, Inc.*, 152
Cal. App. 4th 708 (Cal. Ct. App. 2007).
[30] *Loral Corp*, 174 Cal. App. 3d at 280.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

231APPLE003875

*Confidential Treatment Requested*
*Responsive to DOJ CID #25361*

202 (2d Cir. 2001) (finding the relevant labor market to include all jobs that are reasonably good substitutes for the employees in question); *Eichorn v. AT&T*, 248 F.3d 131, 147-48 (3d Cir. 2001).  Software engineers, for example, are in demand in industries throughout the United States, indeed throughout the world.  This is why most, if not all, employee covenants not to compete are held to be lawful under the rule of reason.  XIII Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶2134d3 (2d ed. 2005) ("The vast majority of employee covenants not to compete are lawful under the antitrust laws for the simple reason that the employment market is highly competitive.").

Apple's decision not to cold call employees of key partners, companies that comprise a minute share of what courts recognize as broad and highly competitive labor markets, could never be expected to have any meaningful effect.  Apple employees can and do seek and obtain employment with Apple's partners and vice versa.  The record in this case demonstrates that such hiring occurs frequently.  The following chart includes the number of offers that Apple has made to employees of the four companies since 2002.

| Year | Number of Apple's Offers | | | |
|------|------------------|--------|--------|-------|
|      | **Adobe/Macromedia** | **Nvidia** | **Google** | **Pixar** |
| 2002 | - | - | - | 1 |
| 2003 | 5 | - | - | 0 |
| 2004 | 5 | - | - | 0 |
| 2005 | 8 | 2 | 3 | 2 |
| 2006 | 14 | 5 | 1 | 0 |
| 2007 | 5 | 6 | 3 | 2 |
| 2008 | 7 | 2 | 11 | - |
| 2009 | 4 | 11 | 12 | - |

Moreover, there is no evidence whatsoever of any intent to suppress wages, compensation, or opportunities in any way.  Clearly, there is no evidence that there has been any such effect on compensation packages or job opportunities.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

231APPLE003876

*Confidential Treatment Requested*
*Responsive to DOJ CID #25361*

The absence of any anticompetitive impact here would end the Division's case by itself. However, if there were such an anticompetitive impact, a court also would balance it against pro-competitive benefits.  Apple's collaborations with its partners have increased innovation, production, and quality and have provided very significant consumer benefits.  Weighed against what courts historically and consistently find to be *de minimus* or non-existent anticompetitive effects from even more restrictive no-hire agreements, Apple's decision not to cold call employees of select partners is both pro-competitive and lawful.

The absence of market-wide anticompetitive effects notwithstanding, the Division Staff has suggested only one theory by which any *individual* might be injured:  employees who do not receive cold calls would not understand or be prompted to understand their true economic value and thus would be disadvantaged in negotiating their compensation packages.  We are aware of no individual who has experienced that problem, and it is highly unlikely that anyone, let alone any meaningful number of people, would be injured in that way.

Information on job opportunities and compensation is pervasive.  Apple is a well-known, successful, and dynamic company with an extensive recruitment network.  In addition to posting employment opportunities on its own website, Apple's recruitment team takes advantage of the company's active employee referral program, services of external recruiters, and web-based job boards and services, such as Monster.com and LinkedIn.  The limited information that cannot be found on the web or in the trade press is easily obtained by calling friends, employment professionals, or by contacting Apple's recruiting department to learn what is available.

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                     231APPLE003877

*Confidential Treatment Requested*
*Responsive to DOJ CID #25361*

CONCLUSION

We respectfully submit that this case is governed by the rule of reason and that the Division's theory of individual harm is not credible, is directly contrary to established judicial precedent, and does not reflect economic reality.  For all the above reasons, this investigation should be closed.

CONFIDENTIAL - ATTORNEYS' EYES ONLY

231APPLE003878