UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

|  |  |  |
|---|---|---|
| IN RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION | ) ) ) ) ) ) ) ) | Case No.: 11-CV-02509-LHK<br><br>ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH ADOBE, APPLE, GOOGLE, AND INTEL |
| THIS DOCUMENT RELATES TO:<br><br>**ALL ACTIONS** | ) ) ) ) ) | |

Before the Court is a Motion for Preliminary Approval of Class Action Settlement with Defendants Adobe Systems Inc. ("Adobe"), Apple Inc. ("Apple"), Google Inc. ("Google"), and Intel Corp. ("Intel") (hereafter, "Remaining Defendants") brought by three class representatives, Mark Fichtner, Siddharth Hariharan, and Daniel Stover (hereafter, "Plaintiffs"). *See* ECF No. 920. The Settlement provides for $324.5 million in recovery for the class in exchange for release of antitrust claims. A fourth class representative, Michael Devine ("Devine"), has filed an Opposition contending that the settlement amount is inadequate. *See* ECF No. 934. Plaintiffs have filed a Reply. *See* ECF No. 938. Plaintiffs, Remaining Defendants, and Devine appeared at a hearing on June 19, 2014. *See* ECF No. 940. In addition, a number of Class members have submitted letters in

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH
ADOBE, APPLE, GOOGLE, AND INTEL

1   support of and in opposition to the proposed settlement. ECF Nos. 914, 949-51. The Court, having

2   considered the briefing, the letters, the arguments presented at the hearing, and the record in this

3   case, DENIES the Motion for Preliminary Approval for the reasons stated below.

4   **I.       BACKGROUND AND PROCEDURAL HISTORY**

5           Michael Devine, Mark Fichtner, Siddharth Hariharan, and Daniel Stover, individually and

6   on behalf of a class of all those similarly situated, allege antitrust claims against their former

7   employers, Adobe, Apple, Google, Intel, Intuit Inc. ("Intuit"), Lucasfilm Ltd. ("Lucasfilm"), and

8   Pixar (collectively, "Defendants"). Plaintiffs allege that Defendants entered into an overarching

9   conspiracy through a series of bilateral agreements not to solicit each other's employees in

10  violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and Section 4 of the Clayton

11  Antitrust Act, 15 U.S.C. § 15. Plaintiffs contend that the overarching conspiracy, made up of a

12  series of six bilateral agreements (Pixar-Lucasfilm, Apple-Adobe, Apple-Google, Apple-Pixar,

13  Google-Intuit, and Google-Intel) suppressed wages of Defendants' employees.

14          The five cases underlying this consolidated action were initially filed in California Superior

15  Court and removed to federal court. *See* ECF No. 532 at 5. The cases were related by Judge

16  Saundra Brown Armstrong, who also granted a motion to transfer the related actions to the San

17  Jose Division. *See* ECF Nos. 52, 58. After being assigned to the undersigned judge, the cases were

18  consolidated pursuant to the parties' stipulation. *See* ECF No. 64. Plaintiffs filed a consolidated

19  complaint on September 23, 2011, *see* ECF No. 65, which Defendants jointly moved to dismiss,

20  *see* ECF No. 79. In addition, Lucasfilm filed a separate motion to dismiss on October 17, 2011. *See*

21  ECF No. 83. The Court granted in part and denied in part the joint motion to dismiss and denied

22  Lucasfilm's separate motion to dismiss. *See* ECF No. 119.

23          On October 1, 2012, Plaintiffs filed a motion for class certification. *See* ECF No. 187. The

24  motion sought certification of a class of all of the seven Defendants' employees or, in the

25  alternative, a narrower class of just technical employees of the seven Defendants. After full

26  briefing and a hearing, the Court denied class certification on April 5, 2013. *See* ECF No. 382. The

27  Court was concerned that Plaintiffs' documentary evidence and empirical analysis were

28

2

insufficient to determine that common questions predominated over individual questions with respect to the issue of antitrust impact. *See id.* at 33. Moreover, the Court expressed concern that there was insufficient analysis in the class certification motion regarding the class of technical employees. *Id.* at 29. The Court afforded Plaintiffs leave to amend to address the Court's concerns. *See id.* at 52.

On May 10, 2013, Plaintiffs filed their amended class certification motion, seeking to certify only the narrower class of technical employees. *See* ECF No. 418. Defendants filed their opposition on June 21, 2013, ECF No. 439, and Plaintiffs filed their reply on July 12, 2013, ECF No. 455. The hearing on the amended motion was set for August 5, 2013.

On July 12 and 30, 2013, after class certification had been initially denied and while an amended motion was pending, Plaintiffs settled with Pixar, Lucasfilm, and Intuit (hereafter, "Settled Defendants"). *See* ECF Nos. 453, 489. Plaintiffs filed a motion for preliminary approval of the settlements with Settled Defendants on September 21, 2013. *See* ECF No. 501. No opposition to the motion was filed, and the Court granted the motion on October 30, 2013, following a hearing on October 21, 2013. *See* ECF No. 540. The Court held a fairness hearing on May 1, 2014, ECF No. 913, and granted final approval of the settlements and accompanying requests for attorneys' fees, costs, and incentive awards over five objections on May 16, 2014, ECF Nos. 915-16. Judgment was entered as to the Settled Defendants on June 20, 2014. ECF No. 947.

After the Settled Defendants settled, this Court certified a class of technical employees of the seven Defendants (hereafter, "the Class") on October 25, 2013 in an 86-page order granting Plaintiffs' amended class certification motion. *See* ECF No. 532. The Remaining Defendants petitioned the Ninth Circuit to review that order under Federal Rule of Civil Procedure 23(f). After full briefing, including the filing of an amicus brief by the National and California Chambers of Commerce and the National Association of Manufacturing urging the Ninth Circuit to grant review, the Ninth Circuit denied review on January 15, 2014. *See* ECF No. 594.

Meanwhile, in this Court, the Remaining Defendants filed a total of five motions for summary judgment and filed motions to strike and to exclude the testimony of Plaintiffs' principal

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH ADOBE, APPLE, GOOGLE, AND INTEL

**United States District Court**
For the Northern District of California

expert on antitrust impact and damages, Dr. Edward Leamer, who opined that the total damages to the Class exceeded $3 billion in wages Class members would have earned in the absence of the anti-solicitation agreements.[1] The Court denied the motions for summary judgment on March 28, 2014, and on April 4, 2014, denied the motion to exclude Dr. Leamer and denied in large part the motion to strike Dr. Leamer's testimony. ECF Nos. 777, 788.

On April 24, 2014, counsel for Plaintiffs and counsel for Remaining Defendants sent a joint letter to the Court indicating that they had reached a settlement. *See* ECF No. 900. This settlement was reached two weeks before the Final Pretrial Conference and one month before the trial was set to commence.[2] Upon receipt of the joint letter, the Court vacated the trial date and pretrial deadlines and set a schedule for preliminary approval. *See* ECF No. 904. Shortly after counsel sent the letter, the media disclosed the total amount of the settlement, and this Court received three letters from individuals, not including Devine, objecting to the proposed settlement in response to media reports of the settlement amount.[3] *See* ECF No. 914. On May 22, 2014, in accordance with this Court's schedule, Plaintiffs filed their Motion for Preliminary Approval. *See* ECF No. 920. Devine filed an Opposition on June 5, 2014.[4] *See* ECF No. 934. Plaintiffs filed a Reply on June 12, 2014. *See* ECF No. 938. The Court held a hearing on June 19, 2014. *See* ECF No. 948. After the hearing, the Court received a letter from a Class member in opposition to the proposed settlement and two letters from Class members in support of the proposed settlement. *See* ECF Nos. 949-51.

---

[1] Dr. Leamer was subject to vigorous attack in the initial class certification motion, and this Court agreed with some of Defendants' contentions with respect to Dr. Leamer and thus rejected the initial class certification motion. *See* ECF No. 382 at 33-43.

[2] Defendants' motions in limine, Plaintiffs' motion to exclude testimony from certain experts, Defendants' motion to exclude testimony from certain experts, a motion to determine whether the per se or rule of reason analysis applied, and a motion to compel were pending at the time the settlement was reached.

[3] Plaintiffs in the instant Motion represent that two of the letters are from non-Class members and that the third letter is from a Class member who may be withdrawing his objection. *See* ECF No. 920 at 18 n.11. The objection has not been withdrawn at the time of this Order.

[4] Devine stated in his Opposition that the Opposition was designed to supersede a letter that he had previously sent to the Court. *See* ECF No. at 934 n.2. The Court did not receive any letter from Devine. Accordingly, the Court has considered only Devine's Opposition.

4

**United States District Court**
For the Northern District of California

## II.    LEGAL STANDARD

The Court must review the fairness of class action settlements under Federal Rule of Civil Procedure 23(e). The Rule states that "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." The Rule requires the Court to "direct notice in a reasonable manner to all class members who would be bound by the proposal" and further states that if a settlement "would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(1)-(2). The principal purpose of the Court's supervision of class action settlements is to ensure "the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties." *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of S.F.*, 688 F.2d 615, 625 (9th Cir. 1982).

District courts have interpreted Rule 23(e) to require a two-step process for the approval of class action settlements: "the Court first determines whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted." *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004). At the final approval stage, the Ninth Circuit has stated that "[a]ssessing a settlement proposal requires the district court to balance a number of factors: the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

In contrast to these well-established, non-exhaustive factors for final approval, there is relatively scant appellate authority regarding the standard that a district court must apply in reviewing a settlement at the preliminary approval stage. Some district courts, echoing commentators, have stated that the relevant inquiry is whether the settlement "falls within the range of possible approval" or "within the range of reasonableness." *In re Tableware Antitrust Litig.*, 484

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH
ADOBE, APPLE, GOOGLE, AND INTEL

F. Supp. 2d 1078, 1079 (N.D. Cal. 2007); *see also Cordy v. USS-Posco Indus.*, No. 12-553, 2013 WL 4028627, at *3 (N.D. Cal. Aug. 1, 2013) ("Preliminary approval of a settlement and notice to the proposed class is appropriate if the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls with the range of possible approval." (internal quotation marks omitted)). To undertake this analysis, the Court "must consider plaintiffs' expected recovery balanced against the value of the settlement offer." *In re Nat'l Football League Players' Concussion Injury Litig.*, 961 F. Supp. 2d 708, 714 (E.D. Pa. 2014) (internal quotation marks omitted).

## III. DISCUSSION

Pursuant to the terms of the instant settlement, Class members who have not already opted out and who do not opt out will relinquish their rights to file suit against the Remaining Defendants for the claims at issue in this case. In exchange, Remaining Defendants will pay a total of $324.5 million, of which Plaintiffs' counsel may seek up to 25% (approximately $81 million) in attorneys' fees, $1.2 million in costs, and $80,000 per class representative in incentive payments. In addition, the settlement allows Remaining Defendants a pro rata reduction in the total amount they must pay if more than 4% of Class members opt out after receiving notice.[5] Class members would receive an average of approximately $3,750[6] from the instant settlement if the Court were to grant all requested deductions and there were no further opt-outs.[7]

The Court finds the total settlement amount falls below the range of reasonableness. The Court is concerned that Class members recover less on a proportional basis from the instant

---

[5] Plaintiffs also assert that administration costs for the settlement would be $160,000.

[6] Devine calculated that Class members would receive an average of $3,573. The discrepancy between this number and the Court's calculation may result from the fact that Devine's calculation does not account for the fact that 147 individuals have already opted out of the Class. The Court's calculation resulted from subtracting the requested attorneys' fees ($81,125,000), costs ($1,200,000), incentive awards ($400,000), and estimated administration costs ($160,000) from the settlement amount ($324,500,000) and dividing the resulting number by the total number of remaining class members (64,466).

[7] If the Court were to deny any portion of the requested fees, costs, or incentive payments, this would increase individual Class members' recovery. If less than 4% of the Class were to opt out, that would also increase individual Class members' recovery.

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH ADOBE, APPLE, GOOGLE, AND INTEL

settlement with Remaining Defendants than from the settlement with the Settled Defendants a year ago, despite the fact that the case has progressed consistently in the Class's favor since then. Counsel's sole explanation for this reduced figure is that there are weaknesses in Plaintiffs' case such that the Class faces a substantial risk of non-recovery. However, that risk existed and was even greater when Plaintiffs settled with the Settled Defendants a year ago, when class certification had been denied.

The Court begins by comparing the instant settlement with Remaining Defendants to the settlements with the Settled Defendants, in light of the facts that existed at the time each settlement was reached. The Court then discusses the relative strengths and weaknesses of Plaintiffs' case to assess the reasonableness of the instant settlement.

### A.      Comparison to the Initial Settlements

#### 1.      Comparing the Settlement Amounts

The Court finds that the settlements with the Settled Defendants provide a useful benchmark against which to analyze the reasonableness of the instant settlement. The settlements with the Settled Defendants led to a fund totaling $20 million. *See* ECF No. 915 at 3. In approving the settlements, the Court relied upon the fact that the Settled Defendants employed 8% of Class members and paid out 5% of the total Class compensation during the Class period. *See* ECF No. 539 at 16:20-22 (Plaintiffs' counsel's explanation at the preliminary approval hearing with the Settled Defendants that the 5% figure "giv[es] you a sense of how big a slice of the case this settlement is relative to the rest of the case"). If Remaining Defendants were to settle at the same (or higher) rate as the Settled Defendants, Remaining Defendants' settlement fund would need to total at least $380 million. This number results from the fact that Remaining Defendants paid out 95% of the Class compensation during the Class period, while Settled Defendants paid only 5% of the Class compensation during the Class period.[8]

At the hearing on the instant Motion, counsel for Remaining Defendants suggested that the

---

[8] One way to think about this is to set up the simple equation: $5/95 = \$20,000,000/x$. This equation asks the question of how much 95% would be if 5% were $20,000,000. Solving for x would result in $380,000,000.

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH ADOBE, APPLE, GOOGLE, AND INTEL

relevant benchmark is not total Class compensation, but rather is total Class membership. This would result in a benchmark figure for the Remaining Defendants of $230 million (92 divided by 8 is 11.5; 11.5 times $20 million is $230 million).[9] At a minimum, counsel suggested, the Court should compare the settlement amount to a range of $230 million to $380 million, within which the instant settlement falls. The Court rejects counsel's suggestion, which is contrary to the record. Counsel has provided no basis for why the number of Class members employed by each Defendant is a relevant metric. To the contrary, the relevant inquiry has always been total Class compensation. For example, in both of the settlements with the Settled Defendants and in the instant settlement, the Plans of Allocation call for determining each individual Class member's pay out by dividing the Class member's compensation during the Class period by *the total Class compensation during the Class period*. ECF No. 809 at 6 (noting that the denominator in the plan of allocation in the settlements with the Settled Defendants is the "total of base salaries paid to all approved Claimants in class positions during the Class period"); ECF No. 920 at 22 (same in the instant settlement); *see also* ECF No. 539 at 16:20-22 (Plaintiffs' counsel's statement that percent of the total Class compensation was relevant for benchmarking the settlements with the Settled Defendants to the rest of the case). At no point in the record has the percentage of Class membership employed by each Defendant ever been the relevant factor for determining damages exposure. Accordingly, the Court rejects the metric proposed by counsel for Remaining Defendants. Using the Settled Defendants' settlements as a yardstick, the appropriate benchmark settlement for the Remaining Defendants would be at least $380 million, more than $50 million greater than what the instant settlement provides.

Counsel for Remaining Defendants also suggested that benchmarking against the initial settlements would be inappropriate because the magnitude of the settlement numbers for Remaining Defendants dwarfs the numbers at issue in the Settled Defendants' settlements. This argument is premised on the idea that Defendants who caused more damage to the Class and who benefited more by suppressing a greater portion of class compensation should have to pay less than

---

[9] Again, $8/92 = \$20,000,000/x$ would lead to $x = \$230,000,000$.

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH
ADOBE, APPLE, GOOGLE, AND INTEL

United States District Court
For the Northern District of California

Defendants who caused less damage and who benefited less from the allegedly wrongful conduct. This argument is unpersuasive. Remaining Defendants are alleged to have received 95% of the benefit of the anti-solicitation agreements and to have caused 95% of the harm suffered by the Class in terms of lost compensation. Therefore, Remaining Defendants should have to pay at least 95% of the damages, which, under the instant settlement, they would not.

The Court also notes that had Plaintiffs prevailed at trial on their more than $3 billion damages claim, antitrust law provides for automatic trebling, *see* 15 U.S.C. § 15(a), so the total damages award could potentially have exceeded $9 billion. While the Ninth Circuit has not determined whether settlement amounts in antitrust cases must be compared to the single damages award requested by Plaintiffs or the automatically trebled damages amount, *see Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 964-65 (9th Cir. 2009), the instant settlement would lead to a total recovery of 11.29% of the single damages proposed by Plaintiffs' expert or 3.76% of the treble damages. Specifically, Dr. Leamer has calculated the total damages to the Class resulting from Defendants' allegedly unlawful conduct as $3.05 billion. *See* ECF No. 856-10. If the Court approves the instant settlements, the total settlements with all Defendants would be $344.5 million. This total would amount to 11.29% of the single damages that Dr. Leamer opines the Class suffered or 3.76% if Dr. Leamer's damages figure had been trebled.

### 2.    Relative Procedural Posture

The discount that Remaining Defendants have received vis-à-vis the Settled Defendants is particularly troubling in light of the changes in the procedural posture of the case between the two settlements, changes that the Court would expect to have increased, rather than decreased, Plaintiffs' bargaining power. Specifically, at the time the Settled Defendants settled, Plaintiffs were at a particularly weak point in their case. Though Plaintiffs had survived Defendants' motion to dismiss, Plaintiffs' motion for class certification had been denied, albeit without prejudice. Plaintiffs had re-briefed the class certification motion, but had no class certification ruling in their favor at the time they settled with the Settled Defendants. If the Court ultimately granted certification, Plaintiffs also did not know whether the Ninth Circuit would grant Federal Rule of

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH ADOBE, APPLE, GOOGLE, AND INTEL

United States District Court
For the Northern District of California

1   Civil Procedure 23(f) review and reverse the certification. Accordingly, at that point, Defendants

2   had significant leverage.

3        In contrast, the procedural posture of the case swung dramatically in Plaintiffs' favor after

4   the initial settlements were reached. Specifically, the Court certified the Class over the vigorous

5   objections of Defendants. In the 86-page order granting class certification, the Court repeatedly

6   referred to Plaintiffs' evidence as "substantial" and "extensive," and the Court stated that it "could

7   not identify a case at the class certification stage with the level of documentary evidence Plaintiffs

8   have presented in the instant case." ECF No. 531 at 69. Thereafter, the Ninth Circuit denied

9   Defendants' request to review the class certification order under Federal Rule of Civil Procedure

10  23(f). This Court also denied Defendants' five motions for summary judgment and denied

11  Defendants' motion to exclude Plaintiffs' principal expert on antitrust impact and damages. The

12  instant settlement was reached a mere two weeks before the final pretrial conference and one

13  month before a trial at which damaging evidence regarding Defendants would have been presented.

14       In sum, Plaintiffs were in a much stronger position at the time of the instant settlement—

15  after the Class had been certified, appellate review of class certification had been denied, and

16  Defendants' dispositive motions and motion to exclude Dr. Leamer's testimony had been denied—

17  than they were at the time of the settlements with the Settled Defendants, when class certification

18  had been denied. This shift in the procedural posture, which the Court would expect to have

19  increased Plaintiffs' bargaining power, makes the more recent settlements for a proportionally

20  lower amount even more troubling.

21       **B.    Strength of Plaintiffs' Case**

22       The Court now turns to the strength of Plaintiffs' case against the Remaining Defendants to

23  evaluate the reasonableness of the settlement.

24       At the hearing on the instant Motion, Plaintiffs' counsel contended that one of the reasons

25  the instant settlement was proportionally lower than the previous settlements is that the

26  documentary evidence against the Settled Defendants (particularly, Lucasfilm and Pixar) is more

27  compelling than the documentary evidence against the Remaining Defendants. As an initial matter,

28

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH
ADOBE, APPLE, GOOGLE, AND INTEL

**United States District Court**
For the Northern District of California

1   the Court notes that relevant evidence regarding the Settled Defendants would be admissible at a

2   trial against Remaining Defendants because Plaintiffs allege an overarching conspiracy that

3   included all Defendants. Accordingly, evidence regarding the role of Lucasfilm and Pixar in the

4   creation of and the intended effect of the overarching conspiracy would be admissible.

5         Nonetheless, the Court notes that Plaintiffs are correct that there are particularly clear

6   statements from Lucasfilm and Pixar executives regarding the nature and goals of the alleged

7   conspiracy. Specifically, Edward Catmull (Pixar President) conceded in his deposition that anti-

8   solicitation agreements were in place because solicitation "messes up the pay structure." ECF No.

9   431-9 at 81. Similarly, George Lucas (former Lucasfilm Chairman of the Board and CEO) stated,

10   "we cannot get into a bidding war with other companies because we don't have the margins for that

11   sort of thing." ECF No. 749-23 at 9.

12         However, there is equally compelling evidence that comes from the documents of the

13   Remaining Defendants. This is particularly true for Google and Apple, the executives of which

14   extensively discussed and enforced the anti-solicitation agreements. Specifically, as discussed in

15   extensive detail in this Court's previous orders, Steve Jobs (Co-Founder, Former Chairman, and

16   Former CEO of Apple, Former CEO of Pixar), Eric Schmidt (Google Executive Chairman,

17   Member of the Board of Directors, and former CEO), and Bill Campbell (Chairman of Intuit Board

18   of Directors, Co-Lead Director of Apple, and advisor to Google) were key players in creating and

19   enforcing the anti-solicitation agreements. The Court now turns to the evidence against the

20   Remaining Defendants that the finder of fact is likely to find compelling.

21         **1.**      **Evidence Related to Apple**

22         There is substantial and compelling evidence that Steve Jobs (Co-Founder, Former

23   Chairman, and Former CEO of Apple, Former CEO of Pixar) was a, if not the, central figure in the

24   alleged conspiracy. Several witnesses, in their depositions, testified to Mr. Jobs' role in the anti-

25   solicitation agreements. For example, Eric Schmidt (Google Executive Chairman, Member of the

26   Board of Directors, and former CEO) stated that Mr. Jobs "believed that you should not be hiring

27   each others', you know, technical people" and that "it was inappropriate in [Mr. Jobs'] view for us

28   

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH
ADOBE, APPLE, GOOGLE, AND INTEL

to be calling in and hiring people." ECF No. 819-12 at 77. Edward Catmull (Pixar President) stated that Mr. Jobs "was very adamant about protecting his employee force." ECF No. 431-9 at 97. Sergey Brin (Google Co-Founder) testified that "I think Mr. Jobs' view was that people shouldn't piss him off. And I think that things that pissed him off were—would be hiring, you know— whatever." ECF No. 639-1 at 112. There would thus be ample evidence Mr. Jobs was involved in expanding the original anti-solicitation agreement between Lucasfilm and Pixar to the other Defendants in this case. After the agreements were extended, Mr. Jobs played a central role in enforcing these agreements. Four particular sets of evidence are likely to be compelling to the fact-finder.

*First*, after hearing that Google was trying to recruit employees from Apple's Safari team, Mr. Jobs threatened Mr. Brin, stating, as Mr. Brin recounted, "if you hire a single one of these people that means war." ECF No. 833-15.[10] In an email to Google's Executive Management Team as well as Bill Campbell (Chairman of Intuit Board of Directors, Co-Lead Director of Apple, and advisor to Google), Mr. Brin advised: "lets [sic] not make any new offers or contact new people at Apple until we have had a chance to discuss." *Id.* Mr. Campbell then wrote to Mr. Jobs: "Eric [Schmidt] told me that he got directly involved and firmly stopped all efforts to recruit anyone from Apple." ECF No. 746-5. As Mr. Brin testified in his deposition, "Eric made a—you know, a—you know, at least some kind of—had a conversation with Bill to relate to Steve to calm him down." ECF No. 639-1 at 61. As Mr. Schmidt put it, "Steve was unhappy, and Steve's unhappiness absolutely influenced the change we made in recruiting practice." ECF No. 819-12 at 21. Danielle Lambert (Apple's head of Human Resources) reciprocated to maintain Apple's end of the anti-solicitation agreements, instructing Apple recruiters: "Please add Google to your 'hands-off' list. We recently agreed not to recruit from one another so if you hear of any recruiting they are doing against us, please be sure to let me know." ECF No. 746-15.

---

[10] On the same day, Mr. Campbell sent an email to Mr. Brin and to Larry Page (Google Co-Founder) stating, "Steve just called me again and is pissed that we are still recruiting his browser guy." ECF No. 428-13. Mr. Page responded "[h]e called a few minutes ago and demanded to talk to me." *Id.*

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH ADOBE, APPLE, GOOGLE, AND INTEL

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

*Second*, other Defendants' CEOs maintained the anti-solicitation agreements out of fear of and deference to Mr. Jobs. For example, in 2005, when considering whether to enter into an anti-solicitation agreement with Apple, Bruce Chizen (former Adobe CEO), expressed concerns about the loss of "top talent" if Adobe did not enter into an anti-solicitation agreement with Apple, stating, "if I tell Steve it's open season (other than senior managers), he will deliberately poach Adobe just to prove a point. Knowing Steve, he will go after some of our top Mac talent like Chris Cox and he will do it in a way in which they will be enticed to come (extraordinary packages and Steve wooing)."[11] ECF No. 297-15.

This was the genesis of the Apple-Adobe agreement. Specifically, after Mr. Jobs complained to Mr. Chizen on May 26, 2005 that Adobe was recruiting Apple employees, ECF No. 291-17, Mr. Chizen responded by saying, "I thought we agreed not to recruit any senior level employees . . . . I would propose we keep it that way. Open to discuss. It would be good to agree." *Id*. Mr. Jobs was not satisfied, and replied by threatening to send Apple recruiters after Adobe's employees: "OK, I'll tell our recruiters that they are free to approach any Adobe employee who is not a Sr. Director or VP. Am I understanding your position correctly?" *Id*. Mr. Chizen immediately gave in: "I'd rather agree NOT to actively solicit any employee from either company . . . . If you are in agreement I will let my folks know." *Id*. (emphasis in original). The next day, Theresa Townsley (Adobe Vice President Human Resources) announced to her recruiting team, "Bruce and Steve Jobs have an agreement that we are not to solicit ANY Apple employees, and vice versa." ECF No. 291-18 (emphasis in original). Adobe then placed Apple on its "[c]ompanies that are off limits" list, which instructed Adobe employees not to cold call Apple employees. ECF No. 291-11.

Google took even more drastic actions in response to Mr. Jobs. For example, when a recruiter from Google's engineering team contacted an Apple employee in 2007, Mr. Jobs forwarded the message to Mr. Schmidt and stated, "I would be very pleased if your recruiting department would stop doing this." ECF No. 291-23. Google responded by making a "public example" out of the recruiter and "terminat[ing] [the recruiter] within the hour." *Id*. The aim of this

---

[11] Mr. Jobs successfully expanded the anti-solicitation agreements to Macromedia, a company acquired by Adobe, both before and after Adobe's acquisition of Macromedia.

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH
ADOBE, APPLE, GOOGLE, AND INTEL

United States District Court
For the Northern District of California

1   public spectacle was to "(hopefully) prevent future occurrences." *Id.* Once the recruiter was

2   terminated, Mr. Schmidt emailed Mr. Jobs, apologizing and informing Mr. Jobs that the recruiter

3   had been terminated. Mr. Jobs forwarded Mr. Schmidt's email to an Apple human resources

4   official and stated merely, ":)." ECF No. 746-9.

5          A year prior to this termination, Google similarly took seriously Mr. Jobs' concerns.

6   Specifically, in 2006, Mr. Jobs emailed Mr. Schmidt and said, "I am told that Googles [sic] new

7   cell phone software group is relentlessly recruiting in our iPod group. If this is indeed true, can you

8   put a stop to it?" ECF No. 291-24 at 3. After Mr. Schmidt forwarded this to Human Resources

9   professionals at Google, Arnnon Geshuri (Google Recruiting Director) prepared a detailed report

10  stating that an extensive investigation did not find a breach of the anti-solicitation agreement.

11         Similarly, in 2006, Google scrapped plans to open a Google engineering center in Paris

12  after a Google executive emailed Mr. Jobs to ask whether Google could hire three *former* Apple

13  engineers to work at the prospective facility, and Mr. Jobs responded "[w]e'd strongly prefer that

14  you not hire these guys." ECF No. 814-2. The whole interaction began with Google's request to

15  Steve Jobs for permission to hire Jean-Marie Hullot, an Apple engineer. The record is not clear

16  whether Mr. Hullot was a current or former Apple employee. A Google executive contacted Steve

17  Jobs to ask whether Google could make an offer to Mr. Hullot, and Mr. Jobs did not timely respond

18  to the Google executive's request. At this point, the Google executive turned to Intuit's Board

19  Chairman Bill Campbell as a potential ambassador from Google to Mr. Jobs. Specifically, the

20  Google executive noted that Mr. Campbell "is on the board at Apple and Google, so Steve will

21  probably return his call." ECF No. 428-6. The same day that Mr. Campbell reached out to Mr.

22  Jobs, Mr. Jobs responded to the Google executive, seeking more information on what exactly the

23  Apple engineer would be working. ECF No. 428-9. Once Mr. Jobs was satisfied, he stated that the

24  hire "would be fine with me." *Id.* However, two weeks later, when Mr. Hullot and a Google

25  executive sought Mr. Jobs' permission to hire four of Mr. Hullot's former Apple colleagues (three

26  were former Apple employees and one had given notice of impending departure from Apple), Mr.

27  Jobs promptly responded, indicating that the hires would not be acceptable. ECF No. 428-9.

28
                                                    14

Google promptly scrapped the plan, and the Google executive responded deferentially to Mr. Jobs, stating, "Steve, Based on your strong preference that we not hire the ex-Apple engineers, Jean-Marie and I decided not to open a Google Paris engineering center." *Id.* The Google executive also forwarded the email thread to Mr. Brin, Larry Page (Google Co-Founder), and Mr. Campbell. *Id.*

*Third*, Mr. Jobs attempted (unsuccessfully) to expand the anti-solicitation agreements to Palm, even threatening litigation. Specifically, Mr. Jobs called Edward Colligan (former President and CEO of Palm) to ask Mr. Colligan to enter into an anti-solicitation agreement and threatened patent litigation against Palm if Palm refused to do so. ECF No. 293 ¶¶ 6-8. Mr. Colligan responded via email, and told Mr. Jobs that Mr. Jobs' "proposal that we agree that neither company will hire the other's employees, regardless of the individual's desires, is not only wrong, it is likely illegal." *Id.* at 4-5. Mr. Colligan went on to say that, "We can't dictate where someone will work, nor should we try. I can't deny people who elect to pursue their livelihood at Palm the right to do so simply because they now work for Apple, and I wouldn't want you to do that to current Palm employees." *Id.* at 5. Finally, Mr. Colligan wrote that "[t]hreatening Palm with a patent lawsuit in response to a decision by one employee to leave Apple is just out of line. A lawsuit would not serve either of our interests, and will not stop employees from migrating between our companies . . . . We will both just end up paying a lot of lawyers a lot of money." *Id.* at 5-6. Mr. Jobs wrote the following back to Mr. Colligan: "This is not satisfactory to Apple." *Id.* at 8. Mr. Jobs went on to write that "I'm sure you realize the asymmetry in the financial resources of our respective companies when you say: 'we will both just end up paying a lot of lawyers a lot of money.'" *Id.* Mr. Jobs concluded: "My advice is to take a look at our patent portfolio before you make a final decision here." *Id.*

*Fourth*, Apple's documents provide strong support for Plaintiffs' theory of impact, namely that rigid wage structures and internal equity concerns would have led Defendants to engage in structural changes to compensation structures to mitigate the competitive threat that solicitation would have posed. Apple's compensation data shows that, for each year in the Class period, Apple had a "job structure system," which included categorizing and compensating its workforce

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH ADOBE, APPLE, GOOGLE, AND INTEL

United States District Court
For the Northern District of California

according to a discrete set of company-wide job levels assigned to all salaried employees and four associated sets of base salary ranges applicable to "Top," "Major," "National," and "Small" geographic markets. ECF No. 745-7 at 14-15, 52-53; ECF No.517-16 ¶¶ 6, 10 & Ex. B. Every salary range had a "min," "mid," and "max" figure. *See id*. Apple also created a Human Resources and recruiting tool called "Merlin," which was an internal system for tracking employee records and performance, and required managers to grade employees at one of four pre-set levels. *See* ECF No. 749-6 at 142-43, 145-46; ECF No. 749-11 at 52-53; ECF No. 749-12 at 33. As explained by Tony Fadell (former Apple Senior Vice President, iPod Division, and advisor to Steve Jobs), Merlin "would say, this is the employee, this is the level, here are the salary ranges, and through that tool we were then—we understood what the boundaries were." ECF No. 749-11 at 53. Going outside these prescribed "guidelines" also required extra approval. ECF No. 749-7 at 217; ECF No. 749-11 at 53 ("And if we were to go outside of that, then we would have to pull in a bunch of people to then approve anything outside of that range.").

Concerns about internal equity also permeated Apple's compensation program. Steven Burmeister (Apple Senior Director of Compensation) testified that internal equity—which Mr. Burmeister defined as the notion of whether an employee's compensation is "fair based on the individual's contribution relative to the other employees in your group, or across your organization"—inheres in some, "if not all," of the guidelines that managers consider in determining starting salaries. ECF No. 745-7 at 61-64; ECF No. 753-12. In fact, as explained by Patrick Burke (former Apple Technical Recruiter and Staffing Manager), when hiring a new employee at Apple, "compar[ing] the candidate" to the other people on the team they would join "was the biggest determining factor on what salary we gave." ECF No. 745-6 at 279.

## 2.    Evidence Related to Google

The evidence against Google is equally compelling. Email evidence reveals that Eric Schmidt (Google Executive Chairman, Member of the Board of Directors, and former CEO) terminated at least two recruiters for violations of anti-solicitation agreements, and threatened to terminate more. As discussed above, there is direct evidence that Mr. Schmidt terminated a

16

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH ADOBE, APPLE, GOOGLE, AND INTEL

recruiter at Steve Jobs' behest after the recruiter attempted to solicit an Apple employee. Moreover, in an email to Bill Campbell (Chairman of Intuit Board of Directors, Co-Lead Director of Apple, and advisor to Google), Mr. Schmidt indicated that he directed a for-cause termination of another Google recruiter, who had attempted to recruit an executive of eBay, which was on Google's do-not-cold-call list. ECF No. 814-14. Finally, as discussed in more detail below, Mr. Schmidt informed Paul Otellini (CEO of Intel and Member of the Google Board of Directors) that Mr. Schmidt would terminate any recruiter who recruited Intel employees.

Furthermore, Google maintained a formal "Do Not Call" list, which grouped together Apple, Intel, and Intuit and was approved by top executives. ECF No. 291-28. The list also included other companies, such as Genentech, Paypal, and eBay. *Id.* A draft of the "Do Not Call" list was presented to Google's Executive Management Group, a committee consisting of Google's senior executives, including Mr. Schmidt, Larry Page (Google Co-Founder), Sergey Brin (Google Co-Founder), and Shona Brown (former Google Senior Vice President of Business Operations). ECF No. 291-26. Mr. Schmidt approved the list. *See id.*; *see also* ECF No. 291-27 (email from Mr. Schmidt stating: "This looks very good."). Moreover, there is evidence that Google executives knew that the anti-solicitation agreements could lead to legal troubles, but nevertheless proceeded with the agreements. When Ms. Brown asked Mr. Schmidt whether he had any concerns with sharing information regarding the "Do Not Call" list with Google's competitors, Mr. Schmidt responded that he preferred that it be shared "verbally[,] since I don't want to create a paper trail over which we can be sued later?" ECF No. 291-40. Ms. Brown responded: "makes sense to do orally. i agree." *Id.*

Google's response to competition from Facebook also demonstrates the impact of the alleged conspiracy. Google had long been concerned about Facebook hiring's effect on retention. For example, in an email to top Google executives, Mr. Brin in 2007 stated that "the facebook phenomenon creates a real retention problem." ECF No. 814-4. A month later, Mr. Brin announced a policy of making counteroffers within one hour to any Google employee who received an offer from Facebook. ECF No. 963-2.

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH ADOBE, APPLE, GOOGLE, AND INTEL

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    In March 2008, Arnnon Geshuri (Google Recruiting Director) discovered that non-party

2  Facebook had been cold calling into Google's Site Reliability Engineering ("SRE") team. Mr.

3  Geshuri's first response was to suggest contacting Sheryl Sandberg (Chief Operating Officer for

4  non-party Facebook) in an effort to "ask her to put a stop to the targeted sourcing effort directed at

5  our SRE team" and "to consider establishing a mutual 'Do Not Call' agreement that specifies that

6  we will not cold-call into each other." ECF No. 963-3. Mr. Geshuri also suggested "look[ing]

7  internally and review[ing] the attrition rate for the SRE group," stating, "[w]e may want to consider

8  additional individual retention incentives or *team incentives* to keep attrition as low as possible in

9  SRE." *Id*. (emphasis added). Finally, an alternative suggestion was to "[s]tart an aggressive

10  campaign to call into their company and go after their folks—no holds barred. We would be

11  unrelenting and a force of nature." *Id*. In response, Bill Campbell (Chairman of Intuit Board of

12  Directors, Co-Lead Director of Apple, and advisor to Google), in his capacity as an advisor to

13  Google, suggested "Who should contact Sheryl [Sandberg] (or Mark [Zuckerberg]) to get a cease

14  fire? We have to get a truce." *Id*. Facebook refused.

15    In 2010, Google altered its salary structure with a "Big Bang" in response to Facebook's

16  hiring, which provides additional support for Plaintiffs' theory of antitrust impact. Specifically,

17  after a period in which Google lost a significant number of employees to Facebook, Google began

18  to study Facebook's solicitation of Google employees. ECF No. 190 ¶ 109. One month after

19  beginning this study, Google announced its "Big Bang," which involved an increase to the base

20  salary of *all* of its salaried employees by 10% and provided an immediate cash bonus of $1,000 to

21  all employees. ECF No. 296-18. Laszlo Bock (Google Senior Vice President of People Operations)

22  explained that the rationale for the Big Bang included: (1) being "responsive to rising attrition;" (2)

23  supporting higher retention because "higher salaries generate higher fixed costs;" and (3) being

24  "very strategic because start-ups don't have the cash flow to match, and big companies are (a) too

25  worried about internal equity and scalability to do this and (b) don't have the margins to do this."

26  ECF No. 296-20.

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH
ADOBE, APPLE, GOOGLE, AND INTEL

United States District Court
For the Northern District of California

1    Other Google documents provide further evidence of Plaintiffs' theory of antitrust impact.

2    For example, Google's Chief Culture Officer stated that "[c]old calling into companies to recruit is

3    to be expected unless they're on our 'don't call' list." ECF No. 291-41. Moreover, Google found

4    that although referrals were the largest source of hires, "agencies and passively sourced candidates

5    offer[ed] the highest yield." ECF No. 780-8. The spread of information between employees had

6    there been active solicitations—which is central to Plaintiffs' theory of impact—is also

7    demonstrated in Google's evidence. For example, one Google employee states that "[i]t's

8    impossible to keep something like this a secret. The people getting counter offers talk, not just to

9    Googlers and ex-Googlers, but also to the competitors where they received their offers (in the

10   hopes of improving them), and those competitors talk too, using it as a tool to recruit more

11   Googlers." ECF No. 296-23.

12    The wage structure and internal equity concerns at Google also support Plaintiffs' theory of

13   impact. Google had many job families, many grades within job families, and many job titles within

14   grades. *See, e.g.*, ECF No. 298-7, ECF No. 298-8; *see also* Cisneros Decl., Ex. S (Brown Depo.) at

15   74-76 (discussing salary ranges utilized by Google); ECF No. 780-4 at 25-26 (testifying that

16   Google's 2007 salary ranges had generally the same structure as the 2004 salary ranges).

17   Throughout the Class period, Google utilized salary ranges and pay bands with minima and

18   maxima and either means or medians. ECF No. 958-1 ¶ 66; *see* ECF No. 427-3 at 15-17. As

19   explained by Shona Brown (former Google Senior Vice President, Business Operations), "if you

20   discussed a specific role [at Google], you could understand that role was at a specific level on a

21   certain job ladder." ECF No. 427-3 at 27-28; ECF No. 745-11. Frank Wagner (Google Director of

22   Compensation) testified that he could locate the target salary range for jobs at Google through an

23   internal company website. *See* ECF No. 780-4 at 31-32 ("Q: And if you wanted to identify what

24   the target salary would be for a certain job within a certain grade, could you go online or go to

25   some place . . . and pull up what that was for that job family and that grade? . . . A: Yes.").

26   Moreover, Google considered internal equity to be an important goal. Google utilized a salary

27   algorithm in part for the purpose of "[e]nsur[ing] internal equity by managing salaries within a

28

19

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH
ADOBE, APPLE, GOOGLE, AND INTEL

reasonable range." ECF No. 814-19. Furthermore, because Google "strive[d] to achieve fairness in overall salary distribution," "high performers with low salaries [would] get larger percentage increases than high performers with high salaries." ECF No. 817-1 at 15.

In addition, Google analyzed and compared its equity compensation to Apple, Intel, Adobe, and Intuit, among other companies, each of which it designated as a "peer company" based on meeting criteria such as being a "high-tech company," a "high-growth company," and a "key labor market competitor." ECF No. 773-1. In 2007, based in part on an analysis of Google as compared to its peer companies, Mr. Bock and Dave Rolefson (Google Equity Compensation Manager) wrote that "[o]ur biggest labor market competitors are significantly exceeding their own guidelines to beat Google for talent." *Id.*

Finally, Google's own documents undermine Defendants' principal theory of lack of antitrust impact, that compensation decisions would be one off and not classwide. Alan Eustace (Google Senior Vice President) commented on concerns regarding competition for workers and Google's approach to counteroffers by noting that, "it sometimes makes sense to make changes in compensation, even if it introduces discontinuities in your current comp, to save your best people, and send a message to the hiring company that we'll fight for our best people." ECF No. 296-23. Because recruiting "a few really good people" could inspire "many, many others [to] follow," Mr. Eustace concluded, "[y]ou can't afford to be a rich target for other companies." *Id.* According to him, the "long-term . . . right approach is not to deal with these situations as one-off's but to have a *systematic approach* to compensation that makes it very difficult for anyone to get a better offer." *Id.* (emphasis added).

Google's impact on the labor market before the anti-solicitation agreements was best summarized by Meg Whitman (former CEO of eBay) who called Mr. Schmidt "to talk about [Google's] hiring practices." ECF No. 814-15. As Eric Schmidt told Google's senior executives, Ms. Whitman said "Google is the talk of the valley because [you] are driving up salaries across the board." *Id.* A year after this conversation, Google added eBay to its do-not-cold-call list. ECF No. 291-28.

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH ADOBE, APPLE, GOOGLE, AND INTEL

### 3.  Evidence Related to Intel

There is also compelling evidence against Intel. Google reacted to requests regarding enforcement of the anti-solicitation agreement made by Intel executives similarly to Google's reaction to Steve Jobs' request to enforce the agreements discussed above. For example, after Paul Otellini (CEO of Intel and Member of the Google Board of Directors) received an internal complaint regarding Google's successful recruiting efforts of Intel's technical employees on September 26, 2007, ECF No. 188-8 ("Paul, I am losing so many people to Google . . . . We are countering but thought you should know."), Mr. Otellini forwarded the email to Eric Schmidt (Google Executive Chairman, Member of the Board of Directors, and former CEO) and stated "Eric, can you pls help here???" *Id.* Mr. Schmidt obliged and forwarded the email to his recruiting team, who prepared a report for Mr. Schmidt on Google's activities. ECF No. 291-34. The next day, Mr. Schmidt replied to Mr. Otellini, "If we find that a recruiter called into Intel, we will terminate the recruiter," the same remedy afforded to violations of the Apple-Google agreement. ECF No. 531 at 37. In another email to Mr. Schmidt, Mr. Otellini stated, "Sorry to bother you again on this topic, but my guys are very troubled by Google continuing to recruit our key players." *See* ECF No. 428-8.

Moreover, Mr. Otellini was aware that the anti-solicitation agreement could be legally troublesome. Specifically, Mr. Otellini stated in an email to another Intel executive regarding the Google-Intel agreement: "Let me clarify. We have nothing signed. We have a handshake 'no recruit' between eric and myself. I would not like this broadly known." *Id.*

Furthermore, there is evidence that Mr. Otellini knew of the anti-solicitation agreements to which Intel was not a party. Specifically, both Sergey Brin (Google Co-Founder) and Mr. Schmidt of Google testified that they would have told Mr. Otellini that Google had an anti-solicitation agreement with Apple. ECF No. 639-1 at 74:15 ("I'm sure that we would have mentioned it[.]"); ECF No. 819-12 at 60 ("I'm sure I spoke with Paul about this at some point."). Intel's own expert testified that Mr. Otellini was likely aware of Google's other bilateral agreements by virtue of Mr. Otellini's membership on Google's board. ECF No. 771 at 4. The fact that Intel was added to

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH
ADOBE, APPLE, GOOGLE, AND INTEL

United States District Court
For the Northern District of California

Google's do-not-cold-call list on the same day that Apple was added further suggests Intel's participation in an overarching conspiracy. ECF No. 291-28.

Additionally, notwithstanding the fact that Intel and Google were competitors for talent, Mr. Otellini "lifted from Google" a Google document discussing the bonus plans of peer companies including Apple and Intel. Cisneros Decl., Ex. 463. True competitors for talent would not likely share such sensitive bonus information absent agreements not to compete.

Moreover, key documents related to antitrust impact also implicate Intel. Specifically, Intel recognized the importance of cold calling and stated in its "Complete Guide to Sourcing" that "[Cold] [c]alling candidates is one of the most efficient and effective ways to recruit." ECF No. 296-22. Intel also benchmarked compensation against other "tech companies generally considered comparable to Intel," which Intel defined as a "[b]lend of semiconductor, software, networking, communications, and diversified computer companies." ECF No. 754-2. According to Intel, in 2007, these comparable companies included Apple and Google. *Id.* These documents suggest, as Plaintiffs contend, that the anti-solicitation agreements led to structural, rather than individual depression, of Class members' wages.

Furthermore, Intel had a "compensation structure," with job grades and job classifications. *See* ECF No. 745-13 at 73 ("[W]e break jobs into one of three categories—job families, we call them—R&D, tech, and nontech, there's a lot more . . . ."). The company assigned employees to a grade level based on their skills and experience. ECF No. 745-11 at 23; *see also* ECF No. 749-17 at 45 (explaining that everyone at Intel is assigned a "classification" similar to a job grade). Intel standardized its salary ranges throughout the company; each range applied to multiple jobs, and most jobs spanned multiple salary grades. ECF No. 745-16 at 59. Intel further broke down its salary ranges into quartiles, and compensation at Intel followed "a bell-curve distribution, where most of the employees are in the middle quartiles, and a much smaller percentage are in the bottom and top quartiles." *Id.* at 62-63.

Intel also used a software tool to provide guidance to managers about an employee's pay range which would also take into account market reference ranges and merit. ECF No. 758-9. As

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH ADOBE, APPLE, GOOGLE, AND INTEL

*United States District Court*
For the Northern District of California

1    explained by Randall Goodwin (Intel Technology Development Manager), "[i]f the tool

2    recommended something and we thought we wanted to make a proposed change that was outside

3    its guidelines, we would write some justification." ECF No. 749-15 at 52. Similarly, Intel regularly

4    ran reports showing the salary range distribution of its employees. ECF No. 749-16 at 64.

5            The evidence also supports the rigidity of Intel's wage structure. For example, in a 2004

6    Human Resources presentation, Intel states that, although "[c]ompensation differentiation is

7    desired by Intel's Meritocracy philosophy," "short and long term high performer differentiation is

8    questionable." ECF No. 758-10 at 13. Indeed, Intel notes that "[l]ack of differentiation has existed

9    historically based on an analysis of '99 data." *Id.* at 19. As key "[v]ulnerability [c]hallenges," Intel

10   identifies: (1) "[m]anagers *(in)ability* to distinguish at [f]ocal"—"actual merit increases are

11   significantly reduced from system generated increases," "[l]ong term threat to retention of key

12   players"; (2) "*[l]ittle to no actual pay differentiation for HPs* [high performers]"; and (3) "[n]o

13   explicit strategy to differentiate." *Id.* at 24 (emphasis added).

14           In addition, Intel used internal equity "to determine wage rates for new hires and current

15   employees that correspond to each job's relative value to Intel." ECF No. 749-16 at 210-11; ECF

16   No. 961-5. To assist in that process, Intel used a tool that generates an "Internal Equity Report"

17   when making offers to new employees. ECF No. 749-16 at 212-13. In the words of Ogden Reid

18   (Intel Director of Compensation and Benefits), "[m]uch of our culture screams egalitarianism . . . .

19   While we play lip service to meritocracy, we really believe more in treating everyone the same

20   within broad bands." ECF No. 769-8.

21           An Intel human resources document from 2002—prior to the anti-solicitation agreements—

22   recognized "continuing inequities in the alignment of base salaries/EB targets between hired and

23   acquired Intel employees" and "parallel issues relating to accurate job grading within these two

24   populations." ECF No. 750-15. In response, Intel planned to: (1) "Review exempt job grade

25   assignments for job families with 'critical skills.' Make adjustments, as appropriate"; and (2)

26   "Validate perception of inequities . . . . Scope impact to employees. Recommend adjustments, as

27

28

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH
ADOBE, APPLE, GOOGLE, AND INTEL

appropriate." *Id.* An Intel human resources document confirms that, in or around 2004, "[n]ew hire salary premiums *drove* salary range adjustment." ECF No. 298-5 at 7 (emphasis added).

Intel would "match an Intel job code in grade to a market survey job code in grade," ECF No. 749-16 at 89, and use that as part of the process for determining its "own focal process or pay delivery," *id.* at 23. If job codes fell below the midpoint, plus or minus a certain percent, the company made "special market adjustment[s]." *Id.* at 90.

### 4.    Evidence Related to Adobe

Evidence from Adobe also suggests that Adobe was aware of the impact of its anti-solicitation agreements. Adobe personnel recognized that "Apple would be a great target to look into" for the purpose of recruiting, but knew that they could not do so because, "[u]nfortunately, Bruce [Chizen (former Adobe CEO)] and Apple CEO Steve Jobs have a gentleman's agreement not to poach each other's talent." ECF No. 291-13. Adobe executives were also part and parcel of the group of high-ranking executives that entered into, enforced, and attempted to expand the anti-solicitation agreements. Specifically, Mr. Chizen, in response to discovering that Apple was recruiting employees of Macromedia (a separate entity that Adobe would later acquire), helped ensure, through an email to Mr. Jobs, that Apple would honor Apple's pre-existing anti-solicitation agreements with both Adobe and Macromedia after Adobe's acquisition of Macromedia. ECF No. 608-3 at 50.

Adobe viewed Google and Apple to be among its top competitors for talent and expressed concern about whether Adobe was "winning the talent war." ECF No. 296-3. Adobe further considered itself in a "six-horse race from a benefits standpoint," which included Google, Apple, and Intuit as among the other "horses." *See* ECF No. 296-4. In 2008, Adobe benchmarked its compensation against nine companies including Google, Apple, and Intel. ECF No. 296-4; *cf.* ECF No. 652-6 (showing that, in 2010, Adobe considered Intuit to be a "direct peer," and considered Apple, Google, and Intel to be "reference peers," though Adobe did not actually benchmark compensation against these latter companies).

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH ADOBE, APPLE, GOOGLE, AND INTEL

Nevertheless, despite viewing other Defendants as competitors, evidence from Adobe suggests that Adobe had knowledge of the bilateral agreements to which Adobe was not a party. Specifically, Adobe shared confidential compensation information with other Defendants, despite the fact that Adobe viewed at least some of the other Defendants as competitors and did not have a bilateral agreement with them. For example, HR personnel at Intuit and at Adobe exchanged information labeled "confidential" regarding how much compensation each firm would give and to which employees that year. ECF No. 652-8. Adobe and Intuit shared confidential compensation information even though the two companies had no bilateral anti-solicitation agreement, and Adobe viewed Intuit as a direct competitor for talent. Such direct competitors for talent would not likely share such sensitive compensation information in the absence of an overarching conspiracy.

Meanwhile, Google circulated an email that expressly discussed how its "budget is comparable to other tech companies" and compared the precise percentage of Google's merit budget increases to that of Adobe, Apple, and Intel. ECF No. 807-13. Google had Adobe's precise percentage of merit budget increases even though Google and Adobe had no bilateral anti-solicitation agreement. Such sharing of sensitive compensation information among competitors is further evidence of an overarching conspiracy.

Adobe recognized that in the absence of the anti-solicitation agreements, pay increases would be necessary, echoing Plaintiffs' theory of impact. For example, out of concern that one employee—a "star performer" due to his technical skills, intelligence, and collaborative abilities—might leave Adobe because "he could easily get a great job elsewhere if he desired," Adobe considered how best to retain him. ECF No. 799-22. In so doing, Adobe expressed concern about the fact that this employee had already interviewed with four other companies and communicated with friends who worked there. *Id.* Thus, Adobe noted that the employee "was aware of his value in the market" as well as the fact that the employee's friends from college were "making approximately $15k more per year than he [wa]s." *Id.* In response, Adobe decided to give the employee an immediate pay raise. *Id.*

United States District Court
For the Northern District of California

Plaintiffs' theory of impact is also supported by evidence that every job position at Adobe was assigned a job title, and every job title had a corresponding salary range within Adobe's salary structure, which included a salary minimum, middle, and maximum. *See* ECF No. 804-17 at 4, 8, 72, 85-86. Adobe expected that the distribution of its existing employees' salaries would fit "a bell curve." ECF No. 749-5 at 57. To assist managers in staying within the prescribed ranges for setting and adjusting salaries, Adobe had an online salary planning tool as well as salary matrices, which provided managers with guidelines based on market salary data. *See* ECF No. 804-17 at 29-30 ("[E]ssentially the salary planning tool is populated with employee information for a particular manager, so the employees on their team [sic]. You have the ability to kind of look at their current compensation. It shows them what the range is for the current role that they're in . . . . The tool also has the ability to provide kind of the guidelines that we recommend in terms of how managers might want to think about spending their allocated budget."). Adobe's practice, if employees were below the minimum recommended salary range, was to "adjust them to the minimum as part of the annual review" and "red flag them." *Id.* at 12. Deviations from the salary ranges would also result in conversations with managers, wherein Adobe's officers explained, "we have a minimum for a reason because we believe you need to be in this range to be competitive." *Id.*

Internal equity was important at Adobe, as it was at other Defendants. As explained by Debbie Streeter (Adobe Vice President, Total Rewards), Adobe "always look[ed] at internal equity as a data point, because if you are going to go hire somebody externally that's making . . . more than somebody who's an existing employee that's a high performer, you need to know that before you bring them in." ECF No.749-5 at 175. Similarly, when considering whether to extend a counteroffer, Adobe advised "internal equity should ALWAYS be considered." ECF No. 746-7 at 5.

Moreover, Donna Morris (Adobe Senior Vice President, Global Human Resources Division) expressed concern "about internal equity due to compression (the market driving pay for new hires above the current employees)." ECF No. 298-9 ("Reality is new hires are requiring base pay at or above the midpoint due to an increasingly aggressive market."). Adobe personnel stated

26

that, because of the fixed budget, they may not be able to respond to the problem immediately "but could look at [compression] for FY2006 if market remains aggressive."[12] *Id.*

### D.   Weaknesses in Plaintiffs' Case

Plaintiffs contend that though this evidence is compelling, there are also weaknesses in Plaintiffs' case that make trial risky. Plaintiffs contend that these risks are substantial. Specifically, Plaintiffs point to the following challenges that they would have faced in presenting their case to a jury: (1) convincing a jury to find a single overarching conspiracy among the seven Defendants in light of the fact that several pairs of Defendants did not have anti-solicitation agreements with each other; (2) proving damages in light of the fact that Defendants intended to present six expert economists that would attack the methodology of Plaintiffs' experts; and (3) overcoming the fact that Class members' compensation has increased in the last ten years despite a sluggish economy and overcoming general anti-tech worker sentiment in light of the perceived and actual wealth of Class members. Plaintiffs also point to outstanding legal issues, such as the pending motions in limine and the pending motion to determine whether the per se or rule of reason analysis should apply, which could have aided Defendants' ability to present a case that the bilateral agreements had a pro-competitive purpose. *See* ECF No. 938 at 10-14.

The Court recognizes that Plaintiffs face substantial risks if they proceed to trial. Nonetheless, the Court cannot, in light of the evidence above, conclude that the instant settlement amount is within the range of reasonableness, particularly compared to the settlements with the Settled Defendants and the subsequent development of the litigation. The Court further notes that there is evidence in the record that mitigate at least some of the weaknesses in Plaintiffs' case.

---

[12] Adobe also benchmarked compensation off external sources, which supports Plaintiffs' theory of Class-wide impact and undermines Defendants' theory that the anti-solicitation agreements had only one off, non-structural effects. For example, Adobe pegged its compensation structure as a "percentile" of average market compensation according to survey data from companies such as Radford. ECF No. 804-17 at 4. Mr. Chizen explained that the particular market targets that Adobe used as benchmarks for setting salary ranges "tended to be software, high-tech, those that were geographically similar to wherever the position existed." ECF No. 962-7 at 22. This demonstrated that the salary structures of the various Defendants were linked, such that the effect of one Defendant's salary structure would ripple across to the other Defendants through external sources like Radford.

United States District Court
For the Northern District of California

As to proving an overarching conspiracy, several pieces of evidence undermine Defendants' contentions that the bilateral agreements were unrelated to each other. Importantly, two individuals, Steve Jobs (Co-Founder, Former Chairman, and Former CEO of Apple) and Bill Campbell (Chairman of Intuit Board of Directors, Co-Lead Director of Apple, and advisor to Google), personally entered into or facilitated each of the bilateral agreements in this case. Specifically, Mr. Jobs and George Lucas (former Chairman and CEO of Lucasfilm), created the initial anti-solicitation agreement between Lucasfilm and Pixar when Mr. Jobs was an executive at Pixar. Thereafter, Apple, under the leadership of Mr. Jobs, entered into an agreement with Pixar, which, as discussed below, Pixar executives compared to the Lucasfilm-Pixar agreement. It was Mr. Jobs again, who, as discussed above, reached out to Sergey Brin (Google Co-Founder) and Eric Schmidt (Google Executive Chairman, Member of the Board of Directors, and former CEO) to create the Apple-Google agreement. This agreement was reached with the assistance of Mr. Campbell, who was Intuit's Board Chairman, a friend of Mr. Jobs, and an advisor to Google. The Apple-Google agreement was discussed at Google Board meetings, at which both Mr. Campbell and Paul Otellini (Chief Executive Officer of Intel and Member of the Google Board of Directors) were present. ECF No. 819-10 at 47. After discussions between Mr. Brin and Mr. Otellini and between Mr. Schmidt and Mr. Otellini, Intel was added to Google's do-not-cold-call list. Mr. Campbell then used his influence at Google to successfully lobby Google to add Intuit, of which Mr. Campbell was Chairman of the Board of Directors, to Google's do-not-cold-call list. *See* ECF No. 780-6 at 8-9. Moreover, it was a mere two months after Mr. Jobs entered into the Apple-Google agreement that Apple pressured Bruce Chizen (former CEO of Adobe) to enter into an Apple-Adobe agreement. ECF No. 291-17. As this discussion demonstrates, Mr. Jobs and Mr. Campbell were the individuals most closely linked to the formation of each step of the alleged conspiracy, as they were present in the process of forming each of the links.

In light of the overlapping nature of this small group of executives who negotiated and enforced the anti-solicitation agreements, it is not surprising that these executives knew of the other bilateral agreements to which their own firms were not a party. For example, both Mr. Brin and

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH ADOBE, APPLE, GOOGLE, AND INTEL

United States District Court
For the Northern District of California

1    Mr. Schmidt of Google testified that they would have told Mr. Otellini of Intel that Google had an

2    anti-solicitation agreement with Apple. ECF No. 639-1 at 74:15 ("I'm sure we would have

3    mentioned it[.]"); ECF No. 819-12 at 60 ("I'm sure I spoke with Paul about this at some point.").

4    Intel's own expert testified that Mr. Otellini was likely aware of Google's other bilateral

5    agreements by virtue of Mr. Otellini's membership on Google's board. ECF No. 771 at 4.

6    Moreover, Google recruiters knew of the Adobe-Apple agreement. *Id.* (Google recruiter's notation

7    that Apple has "a serious 'hands-off' policy with Adobe"). In addition, Mr. Schmidt of Google

8    testified that it would be "fair to extrapolate" based on Mr. Schmidt's knowledge of Mr. Jobs, that

9    Mr. Jobs "would have extended [anti-solicitation agreements] to others." ECF No. 638-8 at 170.

10   Furthermore, it was this same mix of top executives that successfully and unsuccessfully attempted

11   to expand the agreement to other companies in Silicon Valley, such as eBay, Facebook,

12   Macromedia, and Palm, as discussed above, suggesting that the agreements were neither isolated

13   nor one off agreements.

14        In addition, the six bilateral agreements contained nearly identical terms, precluding each

15   pair of Defendants from affirmatively soliciting any of each other's employees. ECF No. 531 at 30.

16   Moreover, as discussed above, Defendants recognized the similarity of the agreements. For

17   example, Google lumped together Apple, Intel, and Intuit on Google's "do-not-cold-call" list.

18   Furthermore, Google's "do-not-cold-call" list stated that the Apple-Google agreement and the

19   Intel-Google agreement commenced on the same date. Finally, in an email, Lori McAdams (Pixar

20   Vice President of Human Resources and Administration), explicitly compared the anti-solicitation

21   agreements, stating that "effective now, we'll follow a gentleman's agreement with Apple that is

22   similar to our Lucasfilm agreement." ECF No. 531 at 26.

23        As to the contention that Plaintiffs would have to rebut Defendants' contentions that the

24   anti-solicitation agreements aided collaborations and were therefore pro-competitive, there is no

25   documentary evidence that links the anti-solicitation agreements to any collaboration. None of the

26   documents that memorialize collaboration agreements mentions the broad anti-solicitation

27   agreements, and none of the documents that memorialize broad anti-solicitation agreements

28

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH
ADOBE, APPLE, GOOGLE, AND INTEL

**United States District Court**
For the Northern District of California

mentions collaborations. Furthermore, even Defendants' experts conceded that those closest to the collaborations did not know of the anti-solicitation agreements. ECF No. 852-1 at 8. In addition, Defendants' top executives themselves acknowledge the lack of any collaborative purpose. For example, Mr. Chizen of Adobe admitted that the Adobe-Apple anti-solicitation agreement was "not limited to any particular projects on which Apple and Adobe were collaborating." ECF No. 962-7 at 42. Moreover, the U.S. Department of Justice ("DOJ") also determined that the anti-solicitation agreements "were not ancillary to any legitimate collaboration," "were broader than reasonably necessary for the formation or implementation of any collaborative effort," and "disrupted the normal price-setting mechanisms that apply in the labor setting." ECF No. 93-1 ¶ 16; ECF No. 93-4 ¶ 7. The DOJ concluded that Defendants entered into agreements that were restraints of trade that were per se unlawful under the antitrust laws. ECF No. 93-1 ¶ 35; ECF No. 93-4 ¶ 3. Thus, despite the fact that Defendants have claimed since the beginning of this litigation that there were pro-competitive purposes related to collaborations for the anti-solicitation agreements and despite the fact that the purported collaborations were central to Defendants' motions for summary judgment, Defendants have failed to produce persuasive evidence that these anti-solicitation agreements related to collaborations or were pro-competitive.

## IV.    CONCLUSION

This Court has lived with this case for nearly three years, and during that time, the Court has reviewed a significant number of documents in adjudicating not only the substantive motions, but also the voluminous sealing requests. Having done so, the Court cannot conclude that the instant settlement falls within the range of reasonableness. As this Court stated in its summary judgment order, there is ample evidence of an overarching conspiracy between the seven Defendants, including "[t]he similarities in the various agreements, the small number of intertwining high-level executives who entered into and enforced the agreements, Defendants' knowledge about the other agreements, the sharing and benchmarking of confidential compensation information among Defendants and even between firms that did not have bilateral anti-solicitation agreements, along with Defendants' expansion and attempted expansion of the

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH
ADOBE, APPLE, GOOGLE, AND INTEL

anti-solicitation agreements." ECF No. 771 at 7-8. Moreover, as discussed above and in this Court's class certification order, the evidence of Defendants' rigid wage structures and internal equity concerns, along with statements from Defendants' own executives, are likely to prove compelling in establishing the impact of the anti-solicitation agreements: a Class-wide depression of wages.

In light of this evidence, the Court is troubled by the fact that the instant settlement with Remaining Defendants is proportionally lower than the settlements with the Settled Defendants. This concern is magnified by the fact that the case evolved in Plaintiffs' favor since those settlements. At the time those settlements were reached, Defendants still could have defeated class certification before this Court, Defendants still could have successfully sought appellate review and reversal of any class certification, Defendants still could have prevailed on summary judgment, or Defendants still could have succeeded in their attempt to exclude Plaintiffs' principal expert. In contrast, the instant settlement was reached a mere month before trial was set to commence and after these opportunities for Defendants had evaporated. While the unpredictable nature of trial would have undoubtedly posed challenges for Plaintiffs, the exposure for Defendants was even more substantial, both in terms of the potential of more than $9 billion in damages and in terms of other collateral consequences, including the spotlight that would have been placed on the evidence discussed in this Order and other evidence and testimony that would have been brought to light. The procedural history and proximity to trial should have increased, not decreased, Plaintiffs' leverage from the time the settlements with the Settled Defendants were reached a year ago.

The Court acknowledges that Class counsel have been zealous advocates for the Class and have funded this litigation themselves against extraordinarily well-resourced adversaries. Moreover, there very well may be weaknesses and challenges in Plaintiffs' case that counsel cannot reveal to this Court. Nonetheless, the Court concludes that the Remaining Defendants should, at a minimum, pay their fair share as compared to the Settled Defendants, who resolved their case with Plaintiffs at a stage of the litigation where Defendants had much more leverage over Plaintiffs.

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH ADOBE, APPLE, GOOGLE, AND INTEL

For the foregoing reasons, the Court DENIES Plaintiffs' Motion for Preliminary Approval of the settlements with Remaining Defendants. The Court further sets a Case Management Conference for September 10, 2014 at 2 p.m.

**IT IS SO ORDERED.**

Dated: August 8, 2014

LUCY H. KOH
United States District Judge

Case No.: 11-CV-02509-LHK
ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH ADOBE, APPLE, GOOGLE, AND INTEL