Richard M. Heimann (State Bar No. 63607)
Kelly M. Dermody (State Bar No. 171716)
Brendan P. Glackin (State Bar No. 199643)
Dean M. Harvey (State Bar No. 250298)
Anne B. Shaver (State Bar No. 255928)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008

Joseph R. Saveri (State Bar No. 130064)
James Dallal (State Bar No. 277826)
JOSEPH SAVERI LAW FIRM, INC.
505 Montgomery, Suite 625
San Francisco, California 94111
Telephone: 415.500.6800
Facsimile: 415.500.6803

*Co-Lead Class Counsel*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>All Actions | Master Docket No. 11-CV-2509-LHK<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR APPLICATION OF THE *PER SE* STANDARD** |

1171536.6

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................................... 1
ARGUMENT .................................................................................................................................. 2
    I.    Defendants Mischaracterize the Scope of the *Per Se* Rule ..................................... 2
    II.    Defendants Abandon "Reasonably Ancillarity" ........................................................ 9
CONCLUSION ............................................................................................................................. 10

# TABLE OF AUTHORITIES

Page

**CASES**

*Blackburn v. Sweeney*,
53 F.3d 825 (7th Cir. 1995)...................................................................................... passim

*Bogan v. Hodgkins and Northwestern Mutual Life Insurance Company*,
166 F.3d 509 (2d Cir. 1999) ............................................................................................ 7

*California Dental Ass'n v. F.T.C.*,
526 U.S. 756 (1999) ................................................................................................... 7, 8

*Consultants & Designers, Inc. v. Butler Service Group, Inc.*,
720 F.2d 1553 (11th Cir. 1983) ...................................................................................... 7

*Datagate, Inc. v. Hewlett-Packard Co.*,
60 F.3d 1421 (9th Cir. 1995) .......................................................................................... 5

*Eichorn v. AT&T Corp.*,
248 F.3d 131 (3d Cir. 2001) ........................................................................................... 7

*Fleischman v. Albany Med. Ctn.*,
728 F. Supp. 2d 130 (N.D.N.Y. 2010) ........................................................................... 2

*Freeman v. San Diego Ass'n of Realtors*,
322 F.3d 1133 (9th Cir. 2003) ........................................................................................ 9

*FTC v. Indiana Federation of Dentists*,
476 U.S. 447 (1986) ................................................................................................... 7, 8

*Hahn v. Oregon Physicians' Service*,
868 F.2d 1022 (9th Cir. 1989) ........................................................................................ 6

*Knevelbaard Dairies v. Kraft Food, Inc.*,
232 F.3d 979 (9th Cir. 2000) .......................................................................................... 5

*National Soc. of Professional Engineers v. United States*,
435 U.S. 679 (1978) ................................................................................................... 7, 8

*NCAA v. Board of Regents of the University of Oklahoma*,
468 U.S. 85 (1984) ......................................................................................................... 9

*Nichols v. Spencer International Press and Crowell-Collier Publishing Company*,
371 F.2d 332 (7th Cir. 1967) .......................................................................................... 7

*Palmer v. BRG of Ga.*
(1990) 498 U.S. 46 ......................................................................................................... 4

*Princo Corp. v. Int'l Trade Comm'n*,
616 F.3d 1318 (Fed. Cir. 2010) (en banc) ...................................................................... 9

*State of California, ex. rel. Harris v. Safeway, Inc.*,
651 F.3d 1118 (9th Cir. 2011) ................................................................................ 3, 8, 9

*UARCO v. Lam*,
18 F. Supp. 2d 1116 (D. Haw. 1998) .............................................................................. 7

*Union Circulation Co. v. F.T.C.*,
241 F.2d 652 (2d Cir. 1957) ........................................................................................... 6

*United States v. Brown*,
936 F.2d 1042 (9th Cir. 1991) ................................................................................ passim

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

*United States v. Cooperative Theatres of Ohio, Inc.*,
  845 F.2d 1367 (6th Cir. 1988) .................................................................................... passim

*United States v. Socony-Vacuum Oil Co.*,
  310 U.S. 150 (1940) .............................................................................................................. 5

*United States v. Topco Assoc., Inc.*
  (1972) 405 U.S. 596 ............................................................................................................. 4

**RULES**

Eleanor M. Fox & Lawrence A. Sullivan, *Cases and Materials on Antitrust* (1989) ...................... 4

**TREATISES**

Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (3d ed. 2010), vol. 7, ¶ 1509a, at 440-41 ......................................................... 4

# INTRODUCTION

*"I happen to be a big believer in the per se rule. . . . I understand why the [DOJ] went down that path."*

- Edward Snyder, Ph.D., Dean of the Yale School of Management, former Economist for USDOJ[1]

For quite some time the Defendants have hung their rule-of-reason hat on the peg of the agreements' "reasonable ancillarity" to their supposed joint collaborations. Now having realized the limits of that doctrine and the minimal nature of their own joint activity, they take a different tack: their conspiracy is so unique, so novel, and so unprecedented that it cannot be subject to *per se* analysis. No matter. As the case law makes clear, mere novelty alone cannot immunize an agreement from *per se* scrutiny. As explained below in **Part One**, the per se rule against naked restraints on competition is not so dead or so limited as Defendants would propose. **Part Two** will deal with Defendants' cursory treatment of reasonable ancillarity. It will also reconfirm that because Defendants have now virtually abandoned their "collaborations" as a defense for the conspiracy, evidence of those "collaborations" should be excluded as an irrelevant and prejudicial smoke screen.

Plaintiffs respectfully request that the Court grant Plaintiffs' Motion and enter the requested relief, Mot. at 15, specifically that: (1) Defendants' alleged conspiracy, and all of the six alleged bilateral anti-solicitation agreements, will be considered under per se analysis; and (2) evidence and references regarding any purported pro-competitive justifications will be excluded from the trial as irrelevant under Federal Rule of Evidence 401, and prejudicial, confusing to the jury, and wasteful of the jury's time, under Federal Rule of Evidence 403.

---

[1] Dkt. 833, Cisneros Decl. Ex. 4. Dean Edward Snyder has also been designated as an expert witness in this case by Intel Corporation. Defendants claim "Dr. Snyder never testified that he agreed with the DOJ's allegation that the DNCC agreements were per se illegal." Opp. at 7, n. 7. Actually, he did—he testified just as Plaintiffs have quoted him. Dkt. 833, Cisneros Decl. Ex. 4. Dr. Snyder did say "I do wish that the analysis of ancillary had been different, though." *Id.* at 101:21-22. But that is a different question than whether the no-cold-calling agreements should be considered per se illegal in the first instance.

# ARGUMENT

## I. Defendants Mischaracterize the Scope of the *Per Se* Rule

> *"In other words, the alleged conspiracy, unlike every category of restraint that is subject to the per se rule or 'quick look' analysis, involved neither output reduction nor price fixing."*
>
> - Opp. at 1

> *"Horizontal price fixing, market divisions, and certain group boycotts and tying arrangements are the only restraints to which a per se prohibition applies."*
>
> - Opp. at 3

Defendants claim that the per se rule applies only to "[h]orizontal price fixing, market divisions, and certain group boycotts and tying arrangements" and that price fixing or "output reduction" must be shown as an absolute prerequisite for application of the rule. Opp. at 1, 3. Their position depends on a distortion of case law.

For example, *United States v. Cooperative Theatres of Ohio, Inc.*, 845 F.2d 1367 (6th Cir. 1988), did not involve a "market division"—or, if it did, so does this case. In particular, the theater booking agents in that case agreed not to make "cold calls," *id.* at 1368, 1369, to each other's existing customers, while continuing to compete for new business. In affirming application of the per se rule, the Sixth Circuit, in terms directly applicable here, explained that:

> In sum, we find that the so-called "no-solicitation" agreement alleged in this case is undeniably a type of **customer** allocation scheme which courts have often condemned in the past as a *per se* violation of the Sherman Act. Furthermore, we find it unnecessary to engage in the "incredibly complicated and prolonged economic investigation" under the rule of reason standard where, as here, the alleged agreement is a "naked restraint" with no possible pro-competitive justification. Therefore, we hold that the district court correctly concluded that the agreement between the defendants not to call on each other's **customers** was an unreasonable restraint of trade as a matter of law.

*Id.* at 1373 (emphasis added). However one chooses to categorize *Cooperative Theatres*, one can simply replace the two instances of the word "customer" (bolded) with the word "employee" to learn the Sixth Circuit's view of the "no solicitation" agreements in *this* case.[2]

---

[2] Likewise, there is no mention of any restriction of output in *Cooperative Theatres*—or in *Blackburn v. Sweeney*, 53 F.3d 825 (7th Cir. 1995), or *United States v. Brown*, 936 F.2d 1042 (9th Cir. 1991), or *Fleischman v. Albany Med. Ctn.*, 728 F. Supp. 2d 130 (N.D.N.Y. 2010), or any of

*Footnote continued on next page*

Predictably, Defendants assign *Cooperative Theatres*—one of the main cases discussed in Plaintiffs' motion—to the middle of a long string cite. Opp. at 3. Their treatment of the others is no more persuasive. For instance, in the same string cite Defendants claim *Blackburn v. Sweeney*, 53 F.3d 825 (7th Cir. 1995), involved "an agreement between competing lawyers to allocate geographic markets". Opp. at 2. It did not. In reality, the agreement involved only the geographic scope of the lawyers' *advertising*—they remained free to accept clients and practice law throughout the entire state. *Blackburn*, 53 F.3d at 827. The Seventh Circuit in fact acknowledged that this kind of agreement did not fit within the classical definition of an agreement to "allocate markets," but found it did not matter because the effect of the agreement "sufficiently approximate[d]" such an agreement. *Id.* at 828. Defendants gloss over this crucial point because the Seventh Circuit's approach disproves their core premise that an agreement in order to be per se illegal must look exactly like an agreement that another court has already found to be per se illegal.

Similarly, in *United States v. Brown*, 936 F.2d 1042 (9th Cir. 1991)—same string cite—the Ninth Circuit did not consider an "agreement [that] allocated geographic markets between competing billboard companies." Opp. at 3. To the contrary, the agreement never *mentioned* geography. Rather, the companies agreed "that the companies would refrain from bidding on each other's former leaseholds for a period of one year after the space was lost or abandoned by the lessee-company." *Brown*, 936 F.2d at 1044. Here, both the conspiracy and the bilateral agreements in question are like the agreements to limit "cold calls," solicitation, bidding and advertising found to be per se illegal in *Cooperative Theatres*, *Blackburn*, and *Brown*. They are therefore subject to the same per se rule.

In a moment of candor, Defendants' own brief acknowledges that application of the per se rule depends on "'economic effect' not 'formalistic line drawing[.]'" Opp. at 4 (quoting *State of California, ex. rel. Harris v. Safeway, Inc.,* 651 F.3d 1118, 1133 (9th Cir. 2011). Plaintiffs wholeheartedly agree. As the motion pointed out, in authority Defendants do not address, the per

---

*Footnote continued from previous page*
the other cases cited by Plaintiffs in which courts applied a per se standard.

1171536.6 - 3 - PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR APPLICATION OF THE *PER SE* STANDARD
Master Docket No. 11-CV-2509-LHK

se rule applies where "the reasonableness judgment can be generalized for a class of behavior or for a class of claimed defenses" because "serious pernicious effects are likely to result from most of its concrete manifestations, and social benefits are likely to be absent or small or readily achievable in other ways[.]" Mot. at 2-3, quoting Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* (3d ed. 2010), vol. 7, ¶ 1509a, at 440-41, ¶ 1509b, at 448. The anticompetitive effects of the conspiracy and the agreements are manifest and Defendants do not even advance any social benefits for them; and this is a judgment confirmed by prior appellate authority.

Defendants claim there is "no judicial decision" about a conspiracy like the present case and that there must be one before the Court may apply per se analysis. To the contrary, no court has ever held that the *per se* rule cannot be applied until some other court has applied it first to identical conduct. This circular reasoning, if upheld, would make the per se rule a dead letter. Thus, in 1972, no court had held simple market division to be per se illegal under the Sherman Act—a proposition we now take for granted. Eleanor M. Fox & Lawrence A. Sullivan, *Cases and Materials on Antitrust* (1989), at 344 (emphasis added) ("Before 1972, although commentators often asserted that agreements by competitors to divide markets were, without more, per se unlawful, there was as yet no case explicitly so holding"). That did not stop the Supreme Court from finding such a division to be per se unlawful in *United States v. Topco Associates, Inc.,* 405 U.S. 596 (1972), even in the context of a then-novel joint venture between supermarkets to create a generic brand. Similarly, novelty and the absence of prior authority did not stop the Court from summarily reversing and granting summary judgment to the plaintiffs in *Palmer v. BRG of Georgia, Inc.,* 498 U.S. 46 (1990) (per curiam), despite the fact that the agreement to end competition occurred in the context of a licensing agreement. *Id.* at 49.

Defendants say their conspiracy was "highly unusual and extremely limited in at least six crucial respects." Opp. at 5. None of these "crucial" distinctions matter, as a matter of law. First they say they did not agree to suppress hiring; only to suppress cold calls and "information flow." *Id.* However, the same can be said of the agreements in *Cooperative Theatres* and *Blackburn*. In *Cooperative Theatres*, the defendants remained free to compete for non-solicited business; and in

*Blackburn*, the lawyers remained free to compete and practice throughout the state. Second, they say, the agreements did not set compensation levels—but as all the cases cited by both parties make clear, there are many per se illegal agreements beyond simple price fixing. Third, they say, the agreements applied only to less than all the Defendant pairs—but they cite no authority for the proposition that because the conspiracy could have been *worse* it is therefore not per se illegal. Fourth, they say, "the alleged conspiracy affected only one of many recruiting methods," Opp. at 5—but so did the agreements in *Blackburn* and *Cooperative Theatres*, which each affected only one method of competition. Fifth, they say, "the alleged conspiracy affected cold calling between only Defendant-pairs that had some type of collaborative or advisory relationship." *Id.* at 6. They cite no evidence for this, however, because it is not true,[3] and even if it were true it would only lead them to the "reasonably ancillary restraints" doctrine, which they have effectively abandoned. Sixth and last, they argue, they had only 2 percent of all high technology jobs in the United States, according to Dr. Snyder. Opp. at 6. However, it has long been hornbook law that lack of market power *is not a defense* for an otherwise naked restraint of trade. *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n. 59 (1940) ("[Such] agreements may or may not be aimed at complete elimination of price competition. The group making those agreements may or may not have power to control the market. But the fact that the group cannot control the market prices does not necessarily mean that the agreement as to prices has no utility to the members of the combination.").[4] Indeed, this is the very purpose of per se analysis: to avoid an inquiry into market power.[5]

---

[3] For example, Pixar and Lucasfilm did not have a "collaborative or advisory relationship"—they were direct competitors not only for employees but in the making of films. Similarly Pixar and Apple never had such a relationship—Steve Jobs just happened to control both companies until 2007, after which the agreement nevertheless continued. Defendants have still not articulated any way that their limited joint activity could possibly justify a conspiracy of this breadth and magnitude.

[4] *See Knevelbaard Dairies v. Kraft Food, Inc.*, 232 F.3d 979, 986 (9th Cir. 2000) (emphasis added) ("When a *per se* violation . . . has occurred, there is no need to define a relevant market or to show that the defendants had power within the market."); *Datagate, Inc. v. Hewlett-Packard Co.*, 60 F.3d 1421, 1425 (9th Cir. 1995) ("The foundational principle of *per se* antitrust liability is that some acts are considered so inherently anticompetitive that no examination of their impact on the market as a whole is required.").

[5] Plaintiffs do not concede that defendants do not have market power; the expert analysis of Dr. Manning and Dr. Leamer shows that employers have power over their employees and that

*Footnote continued on next page*

1    Defendants' cases do not support their wildly restrictive interpretation of the law.  For example, they cite *Hahn v. Oregon Physicians' Service*, 868 F.2d 1022, 1026 (9th Cir. 1989), for the proposition that "Horizontal price fixing, market divisions, and certain group boycotts and tying arrangements are the only restraints to which a per se prohibition applies." Opp. at 3.  In fact, *Hahn* says, of practices subject to the per se analysis, "Such practices **include** horizontal price-fixing, division of markets and certain group boycotts." *Hahn*, 868 F.2d at 1026 (emphasis added).  The list is not exhaustive.  Defendants have mischaracterized the law.

Defendants' "recruiting and hiring" cases are similarly unpersuasive. Opp. at 8.  The Second Circuit's decision in *Union Circulation Co. v. F.T.C.*, 241 F.2d 652 (2d Cir. 1957), concerned an agreement between magazine subscription solicitation agencies not to hire workers who had been employed by another of the agencies in the past year.  As Defendants themselves point out "this [High-Tech Employees litigation] is not a case about suppression of hiring" but a case about "suppression of information flow" and its consequences for prices (or in this case, pay). Opp. at 5 (quoting CMC Hr'g Tr. at 46:14-17).  The Second Circuit in *Union Circulation* analogized the 1-year temporary prohibition on hiring to group boycott decisions, and found it sufficiently different so as not to warrant per se treatment, and considered it "within the specific framework of the magazine-selling industry[.]"  241 F.2d at 657.  The court went on, however, to condemn the agreement virtually out of hand, not because of the effect on workers, but because of the effect on the magazine-selling industry:  "The tendency of the 'no-switching' agreements is to discourage labor mobility, and thereby the magazine-selling industry may well become static in its composition to the obvious advantage of the large, well-established signatory agencies and to the disadvantage of infant organizations." *Id.* at 658. *Union Circulation* thus is fully consistent with *Cooperative Theatres*, *Blackburn*, and *Brown*; but to the extent Defendants say it is not, the more recent decisions of the Ninth (*Brown*), Seventh (*Blackburn*), and Sixth (*Cooperative Theatres*) Circuits state the correct rule, one which this Court is bound to follow according to

---

*Footnote continued from previous page*
Defendants have it in this case.  However, Defendants have never even undertaken a market power analysis presumably because they understand it is legally irrelevant.

1171536.6                          - 6 -                    PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR
                                                            APPLICATION OF THE *PER SE* STANDARD
                                                            Master Docket No. 11-CV-2509-LHK

*Brown.*[6]

Defendants attempt to rely on *California Dental Ass'n v. F.T.C.*, 526 U.S. 756 (1999), for yet another non-existent categorical rule, specifically that where an "agreement restricts information, not output, application of either the per se or 'quick look' rule is inappropriate." Opp. at 9. *California Dental* does not state or support such a rule. To begin with, *California Dental* falls within an inapposite line of authority concerning the activities of professional associations that undertake many legitimate services for their members, including regulating their activity for the benefit of their professions and the public. In *National Society of Professional Engineers* v. *United States,* 435 U.S. 679 (1978), the association put "an absolute ban on competitive bidding" by its members. *Id.* at 692. In *FTC* v. *Indiana Federation of Dentists,* 476 U.S. 447 (1986), the restraint was "a horizontal agreement among the participating dentists to withhold from their customers a particular service they desire." *Id.* at 459. In both cases the Supreme Court summarily condemned the regulations, and in so doing laid the groundwork for what has come to be known as "quick look" analysis.

*California Dental*, in contrast, did not involve an absolute ban on advertising or discounting. Rather, like the State Bar, California Dental Association simply required that certain disclosures be made by dentists advertising particular fees or quality. For instance, the Association required of its members:

"Any communication or advertisement which refers to the cost of

---

[6] Defendants' citation to *Bogan v. Hodgkins and Northwestern Mutual Life Insurance Company*, 166 F.3d 509 (2d Cir. 1999), does not merit much discussion. That case involved *vertical* agreements between an insurance company and its agents restricting the agents' ability to hire each other's salespeople. Intra-firm cases like this have long been subject to rule of reason analysis. Similarly, *Consultants & Designers, Inc. v. Butler Service Group, Inc.*, 720 F.2d 1553 (11th Cir. 1983), concerned vertical agreements between a temp agency and its customers restricting (for 90 days) their ability to hire temp employees provided by the agency. In *Eichorn v. AT&T Corp.*, 248 F.3d 131 (3d Cir. 2001), AT&T Corporation, NCR Corporation, Lucent Technologies, and Texas Pacific Group agreed to restrict for only eight moths the hiring of certain employees upon Lucent's sale of Paradyne Corporation to Texas Pacific Group. The Seventh Circuit's decision in *Nichols v. Spencer International Press and Crowell-Collier Publishing Company*, 371 F.2d 332 (7th Cir. 1967), did not even reach the issue of whether the rule of reason should apply; it simply reversed summary judgment in favor of the defense. Finally, *UARCO v. Lam*, 18 F. Supp. 2d 1116 (D. Haw. 1998), concerned *vertical* non-compete agreements between two former employees and their previous employer—not a horizontal restriction between labor competitors. Like Defendants' other cases, it adds nothing to the present discussion.

> dental services shall be exact, without omissions, and shall make each service clearly identifiable, without the use of such phrases as 'as low as,' 'and up,' 'lowest prices,' or words or phrases of similar import."
>
> "Any advertisement which refers to the cost of dental services and uses words of comparison or relativity -- for example, 'low fees' -- must be based on verifiable data substantiating the comparison or statement of relativity. The burden shall be on the dentist who advertises in such terms to establish the accuracy of the comparison or statement of relativity."
>
> "Advertising claims as to the quality of services are not susceptible to measurement or verification; accordingly, such claims are likely to be false or misleading in any material respect."

526 U.S. at 760, n.1 (citation omitted).  The Supreme Court found these disclosure requirements to be different than the complete bans of *National Society of Professional Engineers* and *Indiana Federation of Dentists*, and hence subject to rule of reason analysis rather than "quick look" condemnation.

Although this line of authority has little bearing on the present matter, it illustrates the incorrectness of Defendants' proposed interpretation of the law.  The horizontal agreements in *National Society of Professional Engineers* and *Indiana Federation of Dentists* received the slightly more expansive "quick look" treatment only because they occurred in the context of professional organizations that otherwise served a socially useful purpose—otherwise they would have been condemned as per se illegal.  Likewise, the restraints in *California Dental* merited rule of reason treatment because they did not *ban* discount advertising but merely set requirements on it.  These cases do not stand for the proposition that restraints on competition involving information receive different treatment than other restraints; they stand for the proposition that restraints imposed by professional organizations receive more latitude under the law, but may still be held illegal without extensive rule of reason analysis.

The Ninth Circuit's *Safeway* decision similarly does not change the result.  That case concerned a highly unusual revenue-sharing arrangement between competing grocery stores faced with labor strikes.  Ordinarily a profit-pooling arrangement would be per se illegal.  However, the stores agreed to automatically end the agreement with the cessation of strike activity. "This temporary and short-term feature," 651 F.3d at 1135, proved to be one of the two key features

distinguishing the agreement from a per se illegal restraint. Of course, the agreements here were not "temporary and short-term" or "indefinite but temporary." *Id.* They were indefinite and *permanent* and brought to an end only by the Department of Justice. They also were not profit-pooling arrangements but direct restraints on the methods of competition for employees.

Defendants have failed to address the clear appellate authority, including binding Ninth Circuit authority, found in *Cooperative Theatres*, *Blackburn*, and *Brown*. They also have not—notably—explained how their agreements could ever, in and of themselves, have anything other than a pernicious effect on competition. Instead, they have offered a hodge-podge of irrelevant authority that they have mischaracterized. The Court should grant the motion and find that the per se standard applies to their conspiracy and to all of the six alleged bilateral anti-solicitation agreements.

## II. Defendants Abandon "Reasonably Ancillarity"

Defendants begin their discussion of "reasonable ancillarity" by conceding that doctrine could never apply to the multi-company conspiracy alleged by the Complaint. Opp. at 12. However, they offer no explanation or evidence supporting its application even to the six bilateral agreements at the core of the case. Defendants stitch together quotes from *NCAA v. Board of Regents of the University of Oklahoma*, 468 U.S. 85 (1984), and *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133 (9th Cir. 2003), but fail to grapple with the fact that for this line of authority to apply at all, the restraint must "involve[] an industry in which horizontal restraints on competition are *essential* if the product is to be available at all." *NCAA*, 468 U.S. at 101 (emphasis added); *see also Freeman*, 322 F.3d at 1151 (noting a restraint must be a "necessary consequence" of procompetitive conduct). And Defendants quote the very passage of *Princo* that makes clear why it does not apply: they also have failed to show that any of these six bilateral agreements formed "part of a larger endeavor whose success [it] promote[d]." Opp. at 13 (quoting *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1336 (Fed. Cir. 2010) (en banc).[7]

---

[7] Defendants refer to *Princo* and a number of other cases as "The very cases Plaintiffs cite…". Plaintiffs do not ask the Court to apply out-of-circuit authority to this analysis. Defendants first invoked all these cases in their reply brief in support of their motion to exclude Dr. Marx's testimony, in defense of the agreements' purported "reasonable ancillarity." Dkt. No. 698 at 5.

In fact, none of the documents or testimony in this case shows that any of these agreements were part of a *smaller* endeavor or indeed *any* endeavor.  Nor do the documents or testimony show that the company-wide non-solicitation agreements related to any collaboration or that they served any procompetitive ends.  They were reached between the highest executives of these firms without reference to any joint endeavors at all—and Defendants offer not a shred of evidence to the contrary.  As the Court has now found, "there is no documentary evidence that links the anti-solicitation agreements to any collaboration.  None of the documents that memorialize the collaboration agreements mentions the broad anti-solicitation agreements, and none of the documents that memorialize broad anti-solicitation agreements mentions collaborations.  Furthermore, even Defendants' experts conceded that those closest to the collaborations did not know of the anti-solicitation agreements.  In addition, Defendants' top executives themselves acknowledge the lack of any collaborative purpose."  Dkt. No. 974 at 29-30 (citations omitted).

Because there is no connection to whatever limited joint activity Defendants may have undertaken, the agreements should be condemned as per se illegal and evidence or references to joint activities should be excluded as irrelevant and misleading.

## **CONCLUSION**

For the foregoing reasons, the Court should grant the motion, instruct the jury in accordance with the per se standard with respect to the alleged conspiracy and all of the alleged bilateral anti-solicitation agreements, and exclude testimony about "collaborations" as irrelevant under Rule 401, and prejudicial, confusing to the jury, and wasteful of the jury's time, under Rule 403.

| | |
|---|---|
| Dated:  September 12, 2014 | Respectfully Submitted, |
| | |
| | By: */s/ Brendan Glackin* |
| |        Brendan Glackin |

Richard M. Heimann (State Bar No. 63607)
Kelly M. Dermody (State Bar No. 171716)
Brendan Glackin (State Bar No. 199643)
Dean Harvey (State Bar No. 250298)
Anne B. Shaver (State Bar No. 255928)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, California  94111-3339
Telephone:  415.956.1000
Facsimile:  415.956.1008

Joseph R. Saveri (State Bar No. 130064)
James G. Dallal (State Bar No.  277826)
JOSEPH SAVERI LAW FIRM, INC.
255 California, Suite 450
San Francisco, CA  94111
Telephone:  (415) 500-6800
Facsimile: (415) 500-6803

*Co-Lead Class Counsel*

Eric L. Cramer
Sarah Schalman-Bergen
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA  19103
Telephone:  (800) 424-6690
Facsimile:  (215) 875-4604

Linda P. Nussbaum
Peter A. Barile III
GRANT & EISENHOFER P.A.
485 Lexington Avenue, 29th Floor
New York, NY  10017
Telephone:  (646) 722-8500
Facsimile:  (646) 722-8501

*Class Counsel*