EXHIBIT 2

Daniel C. Girard (State Bar No. 114826)
Dena C. Sharp (State Bar No. 245869)
Elizabeth A. Kramer (State Bar No. 293129)
GIRARD GIBBS LLP
601 California Street, 14th Floor
San Francisco, California 94108
Telephone:     (415) 981-4800
Facsimile:     (415) 981-4846

*Counsel for Class Representative*
*Michael Devine*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

Master Docket No. 11-CV-2509-LHK

IN RE: HIGH-TECH EMPLOYEE
ANTITRUST LITIGATION
THIS DOCUMENT RELATES TO:
ALL ACTIONS

**EXPERT REPORT OF PROFESSOR
CHARLES SILVER IN SUPPORT OF CLASS
REPRESENTATIVE MICHAEL DEVINE'S
MOTION FOR ATTORNEYS' FEES,
REIMBURSEMENT OF EXPENSES, AND
SERVICE AWARD**

## I.      SUMMARY OF OPINIONS

- **Girard Gibbs (GG) made a remarkable contribution to these proceedings.**  Acting on behalf of a dissenting class representative, GG persuaded this Court to reject a $324.5 million settlement and joined efforts with Class Counsel to increase the settlement fund to $415 million.  In 30 years of studying and participating in class actions, I know of no other instance in which a settlement objector achieved a similar result.

- **GG overcame long odds**.  Most objections to class settlements fail.  The complaint "It isn't enough money" generally falls on deaf ears.  With $324.5 million –a substantial sum in absolute terms—already offered, the odds of prevailing on Mr. Devine's objection were exceptionally poor.  GG faced substantial risk of non-payment but prevailed on its long-shot objection and worked with Class Counsel to convince the Settling Defendants to sweeten their offer by 28 percent.  Few would have predicted that the Settling Defendants could be convinced to pay so much more.

- **GG bore exceptional risk**.  By opposing the proposed settlement, GG ran the risk that future negotiations would fail and the case would be lost.  Had the case been lost at trial, the firm and its lawyers would have been blamed for losing a $324.5 million settlement.  The firm put its reputation on the line by agreeing to represent Mr. Devine.

- **To motivate objectors' lawyers properly, the Court should exercise its discretion and set GG's fee as a percentage of the recovery.**  The Ninth Circuit allows a district court to apply the percentage method when awarding attorneys' fees from a fund.  There are many reasons why the Court should use the percentage method.  Non-class plaintiffs rarely employ the lodestar approach, which encourages weak settlements and delays.  Most federal judges apply the percentage method too; they reserve the lodestar method for

injunctive cases and for use as a cross check.  The percentage method is an especially appropriate way of compensating lawyers for objectors.  If a court rejects a settlement as insufficient, class members want objectors' counsel to extract the greatest possible amount of money from the defendants as quickly as possible.  They care about the results objectors' lawyers produce, not the time it takes to get them.  The percentage approach motivates objectors' counsel to maximize the recovery for class members by rewarding them for obtaining superior results and placing no premium on billable hours.

- **The requested fee—5 percent of the $90.5 million increase—is a bargain-basement rate**.  GG would have been justified in seeking an award of 25 percent of the $90.5 million contributed by Defendants to the settlement.  Twenty-five percent is the Ninth Circuit's benchmark rate.  It is also an amount that many judges have awarded in mega-fund cases and that is at or below the prevailing market rate paid by sophisticated clients.  Instead, GG requests only one-fifth of that amount.  Under the factors that courts in the Ninth Circuit are to consider when deviating from the benchmark, there is no basis for further reducing the fee.

## II.   CREDENTIALS

The ultimate decision as to the appropriate fee to award belongs to the Court.  In this report, I offer my perspective as an expert on class actions, attorneys' fees, and legal ethics, subjects I have studied and written about for years.  In this section, I briefly describe my credentials.  My resume appears below in Appendix A.

I have testified as an expert on attorneys' fees many times.  Judges have cited or relied upon my opinions when awarding fees in the following major cases, as well as many smaller ones: *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 991 F.Supp.2d

437 (E.D.N.Y. 2014) (awarding $544.8 million fee on recovery of $5.7 billion); *Silverman v. Motorola, Inc*., No. 07 C 4507, 2012 WL 1597388  (N.D. Ill. May 7, 2012) (unpublished) (fee award of 27.5 percent on recovery of $200 million); *In re Checking Account Overdraft Litigation*, 830 F.Supp.2d 1330 (S.D. Fla. 2011) (fee award of 30 percent on recovery of $410 million); *In re Enron Corp. Securities, Derivative & "ERISA" Litig*., 586 F. Supp. 2d 732 (S.D. Tex. 2008) ($688 million fee award on a $7.2 billion recovery); *Allapattah Services, Inc. v. Exxon Corp*., 454 F. Supp. 2d 1185 (S.D. Fla. 2006) (31.33 percent fee award on recovery exceeding $1 billion).

Professionally, I hold the Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure at the University of Texas School of Law, where I also serve as Co-Director of the Center on Lawyers, Civil Justice, and the Media.  I joined the Texas faculty in 1987, after receiving an M.A. in political science at the University of Chicago and a J.D. at the Yale Law School.  I received tenure in 1991.  Since then I have been a Visiting Professor at the University of Michigan School of Law, the Vanderbilt University Law School, and the Harvard Law School.

From 2003 through 2010, I served as an Associate Reporter on the American Law Institute's PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION (2010).  Many courts have cited the PRINCIPLES with approval, including the U.S. Supreme Court.

I have taught, researched, written, consulted with lawyers, and testified about class actions, other large lawsuits, attorneys' fees, professional responsibility, and related subjects for 30 years. I have published over 80 major writings, many of which appeared in peer-reviewed publications and many of which focus on subjects relevant to this Report.  My writings are cited and discussed in leading treatises and other authorities, including the MANUAL FOR COMPLEX LITIGATION, THIRD (1996) and the MANUAL FOR COMPLEX LITIGATION, FOURTH (2004).  In 2009, the Tort Trial and

Insurance Practice Section of the American Bar Association gave me the Robert B. McKay Award in recognition of my scholarship in the areas of tort and insurance law.

Finally, because awards of attorneys' fees may be thought to raise issues relating to the professional responsibilities of attorneys, I note that I have an extensive background, publication record, and experience as an expert witness testifying on matters relating to this field.  For example, I am a coauthor of William T. Barker and Charles Silver, PROFESSIONAL RESPONSIBILITIES OF INSURANCE DEFENSE COUNSEL (LexisNexis Mathew Bender, Updated 2014).  I also served as the Invited Academic Member of the Task Force on the Contingent Fee created by the Tort Trial and Insurance Practice Section of the American Bar Association.

## III.    DOCUMENTS REVIEWED

When preparing this Report, I reviewed the items listed below which, unless noted otherwise, were generated in connection with this case.  I also reviewed other items including, without limitation, cases and published scholarly works.

- Notice of Motion and Motion for Preliminary Approval of Class Action Settlement; Memorandum of Points and Authorities in Support Thereof
- Settlement Agreement (dated May 22, 2014)
- Class Representative Michael Devine's Memorandum in Opposition to Motion for Preliminary Approval of Class Action Settlement
- Reply Memorandum of Points and Authorities in Support of Motion for Preliminary Approval of Class Action Settlement
- Transcript of Proceedings before the Honorable Lucy H. Koh United States District Judge (May 1, 2014)
- Transcript of Proceedings before the Honorable Lucy H. Koh United States District Judge (June 19, 2014)
- Order Denying Plaintiffs' Motion for Preliminary Approval of Settlements with Adobe, Apple, Google, and Intel
- Petition for Writ of Mandamus
- Order (Mandamus Action, Requiring Response)

- Response of Plaintiff and Real Party in Interest Michael Devine to Petition for Writ of Mandamus

- Response of Plaintiffs and Real Parties in Interest Mark Fichtner, Siddharth Hariharan, and Daniel Stover to Petition for Writ of Mandamus

- Petitioner's Reply Brief in Support of Mandamus

- Motion by Economic Scholars for Leave to File Brief as Amici Curiae in Support of Petition for Writ of Mandamus

- Motion for the Chamber of Commerce of the United States of America and the California Chamber of Commerce to file a Brief as Amici Curiae in support of the Petition for Writ of Mandamus

- Real Party in Interest Michael Devine's Opposition to Motions for Leave to File Briefs as Amici Curiae

- Opposition of Plaintiffs and Real Parties in Interest Mark Fichtner, Siddharth Hariharan, and Daniel Stover to Motions for Leave to File Briefs as Amici Curiae

- Notice of Motion and Motion for Preliminary Approval of Class Action Settlement; Memorandum of Points and Authorities in Support Thereof

- Defendant's Brief in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement

- Settlement Agreement (dated January 7, 2015)

- Joinder of Class Representative Michael Devine to Motion for Preliminary Approval of Class Action Settlement and Request for Modification of Settlement Notice

- Transcript of Proceedings before the Honorable Lucy H. Koh United States District Judge (March 2, 2015)

- Order Granting Plaintiffs' Motion for Preliminary Approval of Class Action Settlement with Defendants Adobe Systems Incorporated, Apple Inc., Google Inc., and Intel Corporation, Approving Form and Manner of Notice, and Scheduling Final Approval Hearing

- A sampling of attorneys' fee agreements between Girard Gibbs and clients, including the Attorney Retainer Agreement between Girard Gibbs LLP and California State Teachers' Retirement System dated Sept. 28, 2012 and the Cost Proposal submitted to Kansas Division of Purchases by Stueve Siegel Hanson LLP and Girard Gibbs LLP in response to RFP 11996, dated May 12, 2009.

- Girard Gibbs LLP Time Records—Hi-Tech Matter

- Declaration of Daniel C. Girard in Support of Motion for Award of Attorneys' Fees, Reimbursement of Expenses, and Service Award

- Class Representative Michael Devine's Notice of Motion and Motion for Attorneys' Fees, Reimbursement of Expenses, and Service Award

- Daniel C. Girard Resume

## IV.   PROCEDURAL HISTORY OF THE LITIGATION

On May 22, 2014, Class Counsel filed a motion for preliminary approval of a proposed $324.5 million settlement.   Three of the four class representatives appointed by the Court and defendants Adobe, Apple, Google and Intel were parties to the settlement.   Believing that the settlement amount was inadequate, Michael Devine retained GG to oppose the proposed settlement.  On May 23, 2014, GG entered an appearance on behalf of Devine.  On June 5, 2014, GG filed a memorandum in opposition to preliminary approval.

After further briefing and oral argument, the Court denied preliminary approval on August 8, 2014.  Devine's attorneys presented the only argument in opposition to the settlement at the preliminary approval hearing.   The Settling Defendants filed a petition for writ of mandamus with the Ninth Circuit on September 4, 2014 seeking reversal of this Court's decision denying preliminary approval.   GG appeared as counsel for Devine in the appellate proceeding, and submitted a brief defending the Court's ruling.

While the appeal was pending, the parties resumed settlement negotiations through mediator Hon. Layn Phillips (Ret.).   GG participated in these negotiations on behalf of Devine. The negotiations, which lasted from mid-August 2014 to early January, 2015, were successful. The settling defendants withdrew their appeal and the parties, this time with Devine's support, submitted a $415 million settlement to the Court for review.   The second settlement reflects an increase of $90.5 million over the first one.

The Court preliminarily approved the second settlement on March 3, 2015.  The Court is scheduled to consider final approval and motions for attorneys' fees on July 9, 2015.   Class Counsel seek attorneys' fees equal to 25% of the original $324.5 million settlement.  Class Counsel do not seek to be compensated for any portion of the additional $90.5 million the Settling

Defendants agreed to pay after the Court rejected the initial settlement. GG requests a fee of 5 percent on the $90.5 million increase. If both motions are granted, the total fee will be $85.65 million, or 20.6 percent of the $415 million recovery. If the Court awards the fees and expenses requested by Class Counsel and GG, the class members' recovery will have increased from $242,015,000 to $327,990,000, an increase of 35 percent over the proposed settlement the Court rejected in August 2014.

## V.     ANALYSIS

The Court must decide how to compensate Class Counsel and GG for the results they obtained for the class.

### A.     Applying the Ninth Circuit's 25 Percent Benchmark Rate

The Ninth Circuit has adopted a benchmark for fee awards from common funds: 25 percent of the recovery. *See, e.g.*, *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) ("Because the benefit to the class is easily quantified in common-fund settlements, we have allowed courts to award attorneys a percentage of the common fund in lieu of the often more time-consuming task of calculating the lodestar. Applying this calculation method, courts typically calculate 25% of the fund as the "benchmark" for a reasonable fee award …."). Applying the benchmark would result in an award of $103.75 million in fees to Class Counsel and GG combined. As a group, however, the lawyers who secured the recovery for the class have requested only $85.65 million. The fees requested amount to only 20.65 percent of the fund, $18.1 million *less* than the benchmark amount. Under the Ninth Circuit's approach, which permits downward deviations from the 25 percent benchmark only when justified by a set of factors identified below, no further reduction is called for.

Although GG and Class Counsel have applied separately for attorneys' fees, from the perspective of the class members the attorneys for the class worked as a team. Class Counsel

8

prepared the case for trial and negotiated a $324.5 million recovery.  GG then brought outside pressure to bear on the Settling Defendants by prevailing on Devine's objection, defending this Court's ruling in the Ninth Circuit, and participating in the negotiations to improve the settlement. Class Counsel's decision not to seek a fee on the additional $90.5 million contribution to the settlement underscores the importance of the role played by GG in improving the deal.

In effect, the fee requests seek approval of a declining scale of fee percentages: 25 percent on the first $324.5 million plus 5 percent on the $90.5 million above that amount.  Sophisticated clients often use scales of percentages when compensating attorneys, as I show further below. Having personally examined or read about dozens of scaled fee agreements entered into by sophisticated clients, I can confidently report that a 25 percent/5 percent scale would raise no eyebrows if agreed to by a sophisticated client.

Federal judges have applied scales of percentages when awarding fees in class actions. Most recently, Judge John Gleeson did so in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 991 F.Supp.2d 437 (E.D.N.Y. 2014).  Like this case, the *Payment Card* litigation was an antitrust class action with the potential to generate an enormous verdict. When awarding fees from the settlement, which exceeded $5 billion, Judge Gleeson applied a declining scale that began at 33 percent on the first $10 million and bottomed out at 6% on everything above $4 billion.  Applying Judge Gleeson's scale here would produce a fee award more than $5 million *larger* than the amount ($85.65 million) that Class Counsel and GG jointly request, as the following table shows.

| REASONABLE FEE APPLYING JUDGE GLEESON'S SCALE OF DECLINING MARGINAL PERCENTAGES | | |
|---|---|---|
| Recovery Increment (millions) | Fee Percentage | Marginal Fee (millions) |
| $0-$10 | 33% | $3.3 |
| $10 -$50 | 30% | $12.0 |
| $50 -$100 | 25% | $12.5 |
| $100 -$415 | 20% | $63.0 |
| **Total** | **22%** | **$90.8** |

Judge Gleeson's scale is not particularly generous. When presiding over mega-fund settlements that equal or exceed $100 million, many judges have awarded fee percentages higher than the 20 percent marginal rate that Judge Gleeson applied. Appendix B contains a table that lists 50 mega-fund settlements with fee awards of 25 percent or more. Collectively, these cases generated over $12 billion in settlements and over $3.4 billion in fees, for a weighted average fee percentage of almost 29 percent. In this case, a 29 percent fee award would exceed $120 million, far more than the $85.65 million collective fee request before the court. *See also* Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993– 2008*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 248, 265 Table 7 (2010) (reporting median fee award of 19.9 percent for class actions with settlements ranging from $69.6 million to $175.5 million).

## B. The Court Should Exercise Its Discretion to Apply the Percentage Method

Ninth Circuit case law gives the Court discretion to use the percentage-of-the-recovery method or the lodestar method when awarding a fee from a common fund. *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011). When considering which method to use, a court should remember that, as guardian of the interests of absent class members, it should have

two objectives:  to fairly compensate lawyers for services that benefit class members and to motivate them to make class members better off.  The percentage method does both automatically. It is the method that normally governs lawyers' compensation in all types of contingency cases, including class suits.  It also creates a strong connection between the interests of class members and their lawyers by paying lawyers in proportion to the amounts they recover. A judge need only set the fee percentage at a reasonable rate and the lawyers will be properly compensated and motivated.

In the *Payment Card* antitrust case, Judge Gleeson also had the option of employing the percentage method or the lodestar approach.  He chose the former, for two reasons.  First, "[t]he percentage method better aligns the incentives of plaintiffs' counsel with those of the class members because it bases the attorneys' fees on the results they achieve for their clients, rather than on the number of motions they file, documents they review, or hours they work." *Payment Card*, 991 F.Supp.2d at 440.  *See also Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) ("In contrast [to the percentage method], the lodestar creates an unanticipated disincentive to early settlements, tempts lawyers to run up their hours, and compels district courts to engage in a gimlet-eyed review of line-item fee audits."). Second, Judge Gleeson was convinced that "[t]he percentage method [] accords with the overwhelming prevalence of contingency fees in the market for plaintiffs' counsel: when potential clients and lawyers bargain freely for representation, most contracts award the lawyer a percentage (commonly, about one third) of the client's recovery." *Payment Card*, 991 F.Supp.2d at 440 (citing Declaration of Professor Charles Silver Concerning the Reasonableness of Class Counsel's Request for an Award of Attorneys' Fees 25-34).

11

In preferring the percentage method, Judge Gleeson followed established practice in the federal courts. Judges now overwhelmingly prefer the percentage approach to the lodestar method. Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little?*, 158 U. Pa. L. Rev. 2043, 2052 (2010) ("The percentage-of-the-recovery method has now become the dominant method for awarding fees in class action cases."). I return to this point below.

### C. Applying the Factors Endorsed by the Ninth Circuit, Girard Gibbs' Request for a 5 Percent Fee is Reasonable

In the preceding section, I treated GG's fee request as part of a larger request submitted by all of the lawyers who contributed to the final settlement. Here and below, I consider GG's request both as part of a joint application and on its own. Applying the factors that the Ninth Circuit has directed district court judges to consider, I believe that the only conclusion possible is that the 5 percent request is reasonable.

As stated above, the Ninth Circuit permits district court judges to use the percentage-of-the-recovery method. But it also requires them to use appropriate discretion when selecting fee percentages, so as to avoid windfall awards that enrich lawyers needlessly. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir. 2002) ("The 25% benchmark rate, although a starting point for analysis, may be inappropriate in some cases. Selection of the benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case…. The question is … whether in arriving at its percentage [the district court] considered all the circumstances of the case and reached a reasonable percentage."). When the circumstances warrant, district judges have discretion to award fees above the benchmark too, however. In *Vizcaino*, the Ninth Circuit affirmed a fee award equal to 28 percent of a $96.9 million settlement

fund.[1]  Here, GG requests a fee of only 5 percent on the $90.5 million increase in the settlement fund—less than one-fifth the percentage the Ninth Circuit affirmed.  Considering the factors that mattered in *Vizcaino*, it seems inconceivable that a further reduction is required.

1.    Results Obtained and Risks Incurred

The results obtained and the risks incurred were the first two factors the Ninth Circuit cited in *Vizcaino* as its basis for affirming the district court's fee award.  The Ninth Circuit discussed the two factors together because an assessment of the quality of results obtained depends in part on the difficulties that had to be surmounted to get them.  *See Vizcaino*, 290 F.3d at 1048 (noting with approval the district court's findings "that counsel achieved exceptional results for the class" given the obstacles that had to be overcome and that "the case [was] extremely risky for class counsel for the reasons just stated").  I therefore discuss the results GG obtained and the risks the firm incurred.

I begin by noting, as mentioned above, that the result obtained here—a $90.5 million increase in a settlement fund that previously stood at $324.5 million—is truly exceptional.  Although there are other cases in which settlements increased in size following objections, they are few in number, and I know of no other instance in which an objector's law firm negotiated a similarly enormous increase in an existing mega-fund settlement offer.[2]  If it were easy to do, it would have happened before.

---

[1]  The *Vizcaino* settlement also included non-cash relief.  I consider only cash relief when calculating fee percentages.

[2]  The only example comparable to this one of which I am aware is the just-approved settlement in the litigation brought by former professional football players against the National Football League (NFL) relating to concussion injuries.  After the trial judge rejected the original settlement, worth an estimated $765 million, the parties proposed a second settlement pursuant to which the NFL's obligation is uncapped.  The value of the second settlement has been estimated at $1 billion.  See Ken Belson, Judge Approves Deal in N.F.L. Concussion Suit, New York Times, April 22, 2015,

The odds of accomplishing this result were long, for several reasons.  First, as mentioned above, the vast majority of objections fail.  Failure is especially likely when objections raise complaints that call for the exercise of discretion.  The complaint "It's not enough money" is the paradigm of this type.  As Professor Christopher Leslie observed,

> [H]istory shows that courts consistently approve proposed settlements over the objections of class members.  For example, judges routinely ignore objections that the monetary benefits of a proposed settlement are too low ….  Courts have approved proposed settlements in over 90% of the cases in which class members filed objections. When changes are made, they are usually cosmetic, not substantive.

Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 FLORIDA L. REV. 71, 105 (2007).  It is the rare objection that generates a significant improvement in a settlement.

Second, the complaint "It's not enough money" was particularly unlikely to succeed in this case, given that $324.5 million was already on the table when the objection was made.  Although comprehensive statistics on class actions are not kept, the initial settlement would surely have fallen in the top 1 percent to 2 percent of all recoveries.  Admittedly, this case was unusual.  The allegations were serious and supported by compelling evidence; the damages were substantial; the hurdle of class certification had been surmounted; and the case was ready for trial.  Class Counsel did an outstanding job preparing this case for trial, and they had every reason to believe that the

---

available at http://www.nytimes.com/2015/04/23/sports/football/nfl-concussion-settlement-is-given-final-approval.html?_r=0.  In the NFL case, however, objectors played no role in negotiating the increase.

prospects for obtaining judicial approval for the $324.5 million deal were good.  Experienced lawyers do not submit proposed settlements for judicial review expecting them to fail.

Third, when contemplating Devine's request for representation, the lawyers at GG had good reason to doubt that the Settling Defendants would willingly pay substantially more than $324.5 million to settle the case.  Class Counsel had no obvious reason to leave tens of millions of dollars on the table.  Assuming that the benchmark rate of 25 percent would have been applied to all dollars recovered, the failure to garner the additional $90.5 million cost Class Counsel $22.6 million in fees.  Despite this strong incentive to bargain hard, GG had to gamble that there was more money to be obtained so that, when confronted again, the Settling Defendants would offer substantially more.

Fourth, the lawyers at GG also bore the risk of a bad outcome after opposing the settlement that was originally proposed.  When summarizing my opinions above, I stated that the lawyers at GG, who have almost invariably served as class counsel, faced a sobering outcome if the case was ultimately lost.  They had no guarantee of securing better terms, and had they caused the case to be lost after $324.5 million was on the table, they would have faced considerable criticism from a number of quarters.

That bad outcomes can follow on the heels of successful objections in mega-fund cases is clear.  In 2011, Google offered $125 million to settle copyright infringement claims asserted by publishers and writers in connection with its Google Books project.  The district court judge rejected the offer, citing concerns raised by objectors.  Then, in continuing litigation by the writers, the same judge ruled in favor of Google on the merits, finding that the Google Books project "was legal under copyright's fair use doctrine."  Timothy B. Lee, *Google Books ruling is a huge victory for online innovation*, NEW YORK TIMES, November 14, 2013, available at

http://www.washingtonpost.com/blogs/the-switch/wp/2013/11/14/google-books-ruling-is-a-huge-victory-for-online-innovation/.  If the ruling stands, thousands of authors who might have collected payments under the settlement will wind up with nothing and the objectors will be to blame.[3]

Here, the prospect of losing on a dispositive ruling by the Court may have been remote, but there was a possibility of losing at trial or of having a favorable jury verdict overturned on appeal.  The risks on appeal were particularly serious.  Because class action trials are rare—they occur only about 1 percent of the time—the law governing the procedures to be used during class trials is poorly developed.  Consequently, appellate rulings are hard to predict.  On the frequency of class action trials, see Charles Silver, *We're Scared To Death: Class Certification and Blackmail*, 78 N.Y.U. L. REV. 1357, 1400 (2003).

### 2. The Market Rate

In *Vizcaino*, the Ninth Circuit said that district courts are not bound by market rates but have discretion to give them significant weight.  In fact, when upholding the district court's award, the Ninth Circuit noted with approval the lower court's finding that "the 28% rate [was] at or below the market rate." *Vizcaino,* 290 F.3d at 1049.  The district court had based this finding on the fee agreements between class counsel and the named plaintiffs and on evidence showing "the standard contingency fee for similar cases." *Id*.  The Ninth Circuit ruled that the district court's decision to give weight to the prevailing market rate "[did] not constitute an abuse of the court's discretion." *Id*.  Although the Ninth Circuit warned against exclusive reliance on the market rate because in

---

[3] The thousands of class members who opted out of the $180 million Agent Orange settlement met a similar fate.  After the settlement was approved, Judge Jack Weinstein dismissed all of their claims on summary judgment.  See Peter Shuck, AGENT ORANGE ON TRIAL: MASS TOXIC DISASTERS IN THE COURTS (1988).

some class action cases it may be "illusory," the market rate is a useful measure for GG's fees because of the firm's unique role in this case.  Here, the requested 5 percent fee award is well below the market rate, whether considered on its own or in combination with Class Counsel's fee request.

          *a)*       *The Fee Requests of Class Counsel and Girard Gibbs Combined*

I will begin by considering the 5 percent request as part of a combined application by all of the lawyers who helped create the $415 million settlement for 20.65 percent of the recovery as fees.  Sophisticated clients often pay fees of this amount or more in complex, high-dollar lawsuits.

Professor David Schwartz verified clients' preference for contingency fees in a study of patent cases.  He interviewed 44 experienced patent lawyers and reviewed 42 contingent fee agreements.  In ***all*** of the representations, the plaintiff patent holders promised their lawyers a percentage of the recovery, and the fees typically ranged from one-third to 40 percent of the recovery.

> On the whole, the contingent rates are similar to the "one-third" that a stereotypical contingent personal injury lawyer charges.  There are two main ways of setting the fees for the contingent fee lawyer: a graduated rate and a flat rate.  Of the agreements using a flat fee reviewed for this Article, the mean rate was 38.6% of the recovery.  The graduated rates typically set milestones such as "through close of fact discovery," "through trial," and "through appeal," and tied rates to recovery dates. As the case continued, the lawyer's percentage increased.  Of the agreements reviewed for this Article that used graduated rates, the average percentage upon filing was 28% and the average through appeal was 40.2%.

David L. Schwartz, *The Rise of Contingent Fee Representation in Patent Litigation,* 64 ALABAMA LAW REVIEW 335, 360 (2012).

Professor Schwartz's findings are consistent with reports found in patent blogs.  For example, the following passage appeared in Matt Cutler, *Contingent Fee Patent Litigation, and Other Options*, PATENT LITIGATION, http://intellectualproperty-rights.com/?page_id=30 (reviewed March 13, 2012).

> *Contingent Fee Arrangements*: In a contingent fee arrangement, the client does not
>
> pay any legal fees for the representation. Instead, the law firm only gets paid from
>
> damages obtained in a verdict or settlement. Typically, the law firm will receive
>
> between 33-50% of the recovered damages, depending on several factors—a
>
> strictly results-based system.

This item can now be found at http://patentlitigationstrategy.com/?page_id=30.

Professor Schwartz's study is the only one I know of that examines a large number of fee agreements entered into by sophisticated clients.  Consequently, in the rest of this discussion, I rely on anecdotal reports that I have found in press accounts and published cases.  These reports are consistent with Professor Schwartz's finding that high percentage fees prevail in patent engagements.

The most famous anecdotal report relates to the dispute between NTP Inc. and Research In Motion Ltd., the company that manufactures the Blackberry.  NTP, the plaintiff, promised its law firm, Wiley Rein & Fielding ("WRF"), a one-third contingent fee.  When the case settled for $612.5 million, WRF received more than $200 million in fees.  Yuki Noguchi, *D.C. Law Firm's Big BlackBerry Payday: Case Fees of More Than $200 Million Are Said to Exceed Its 2004 Revenue*, WASHINGTON POST, March 18, 2006, D03.

Turning from patent lawsuits to business representations more generally, many examples show that compensation as a significant percentage of recovery is common.  A famous case from

the 1980s involved the law firm of Vinson & Elkins (V&E).  ETSI Pipeline Project (EPP) hired

V&E to sue Burlington Northern Railroad and other defendants, alleging a conspiracy on their part

to prevent EPP from constructing a $3 billion coal slurry pipeline.  In a sworn affidavit, Harry

Reasoner, then V&E's managing partner, described the financial relationship between EPP and

V&E.

> The terms of our retention were that our client would pay all out-of-pocket expenses as
> they were incurred, but all legal fees were contingent upon a successful outcome.  We were
> paid 1/3 of all amounts received by way of settlement or judgment.  We litigated the matter
> for 5 years.   At the conclusion, we had settled with all defendants for a total of
> $634,900,000.00.  As a result, a total of $211,633,333.00 was paid as contingent legal fees.

*Declaration of Harry Reasoner*, filed in *In re Washington Public Power Supply System Securities
Litigation,* MDL No. 551 (D. Arizona, Nov. 30, 1990).

Several things about this example are noteworthy.  First, the contingency fraction was one-

third of the recovery in a massive case.  Second, the case was enormous, ultimately generating a

recovery greater than $600 million and a fee north of $200 million.  Third, the client was a

sophisticated business with access to the best lawyers in the country.  No claim of pressure or

undue influence by V&E could possibly be made.

Based on what lawyers who write about fee arrangements in business cases have said,

contingent percentages of one third or more remain common today.  In 2011, THE ADVOCATE, a

journal produced by the Litigation Section of the State Bar of Texas, published a symposium

entitled "Commercial Law Developments and Doctrine."  It included an article on alternative fee

arrangements, according to which:

A pure contingency fee arrangement is the most traditional alternative fee arrangement. In this scenario, a firm receives a fixed or scaled percentage of any recoveries in a lawsuit brought on behalf of the client as a plaintiff. Typically, the contingency is approximately 33%, with the client covering litigation expenses; however, firms can also share part or all of the expense risk with clients. Pure contingency fees, which are usually negotiated at approximately 40%, can be useful structures in cases where the plaintiff is seeking monetary or monetizable damages. They are also often appropriate when the client is an individual, start up, or corporation with limited resources to finance its litigation. Even large clients, however, appreciate the budget certainty and risk-sharing inherent in a contingent fee arrangement.

Trey Cox, *Alternative Fee Arrangements: Partnering with Clients through Legal Risk Sharing*, 66 THE ADVOCATE (TEXAS) 20 (2011).

*In re High Fructose Corn Syrup Antitrust Litigation* provides additional examples. According to Professor John C. Coffee, Jr., a nationally renowned authority on class actions who served as an expert witness in the case, the two named plaintiffs—Zarda Enterprises and Publix Supermarkets Inc.—agreed to pay fees of 30 percent and "more than 25%," respectively. Gray & Co., an opt-out claimant, promised its lawyers 33-40 percent of the recovery in parallel litigation, depending on the time of settlement. *Declaration of John C. Coffee, Jr*., submitted in *In re High Fructose Corn Syrup Antitrust Litigation,* M.D.L. 1087 (C.D. Ill. Oct. 7, 2004), pp. 1-2. Similarly, in *In re Rothstein Rosenfeldt Adler, PA*, 500 B.R. 811, 812-13 (Bankr. S.D. Fla. 2013), the court described a contingent fee agreement between a sophisticated client and counsel retained to

recover funds misappropriated by Scott Rothstein.  The contract entitled counsel to "a contingent fee of 35% on the first $20 million in recoveries, and 30% on all recoveries exceeding $20 million."

I recently learned about the fees a number of sophisticated business clients agreed to pay when serving as lead plaintiffs in three unrelated class actions.  The first case was the *Payment Card* litigation, discussed above.  In all, I reviewed retainer agreements entered into by 12 class merchants.  Although the agreements varied in important respects—indicating that they were negotiated agreements—they generally provided that class counsel would receive one-third of the class-wide recovery as fees.  Some of the clients agreed to make up from their own recoveries any shortfall between the promised one-third fee and the actual fee awarded by the court.  Others promised to pay a one-third fee from their own recoveries if they settled outside the class action.  These promises sent a strong signal that a one-third fee was reasonable in the eyes of sophisticated business clients who were involved in lawsuits in which billions of dollars in damages were sought.

The second case was *In re International Textile Group Merger Litigation*, C.A. No. 2009-CP-23-3346 (Court of Common Pleas, Greenville County, South Carolina), which settled in 2013 for relief valued at about $81 million.  Five sophisticated investors served as named plaintiffs in the case. Two, FURSA Alternative Strategies LLC and RAMIUS LLC, were, respectively, a hedge fund manager and a global investment manager.  All five clients agreed to pay 35 percent of the gross class-wide recovery as fees, with expenses to be separately reimbursed.  The 35 percent fee was bargained down after initially being set at over 40 percent.

The third case was *In re U.S. Foodservice, Inc. Pricing Litigation*, Case No. 3:07-md-1894 (AWT) (D. Ct.), which produced a $297 million settlement that was recently approved by the court.  One of the named plaintiffs, Thomas & King Inc., was formerly one of the largest operators of Applebee's franchises in the United States and the nation's eighth-largest restaurant franchise

company overall, with approximately 7,500 employees.  The other named plaintiff, Catholic Healthcare West/Dignity Health, was the fifth largest health system in the nation and the largest provider of non-profit hospital services in California.  Both clients were represented by counsel in their fee negotiations with class counsel, and both agreed that the fee award might be as high as 40 percent.

In all three of the cases just discussed, the named plaintiffs were sophisticated businesses with significant resources and ready access to the market for legal services.  Their willingness to pay fees ranging from one-third to 40 percent in large commercial class actions shows that, in their judgment, fees in this range were reasonable.  The 20.65% combined fee request of Class Counsel and GG in this case falls below this range.

I could add examples to those already discussed, but the cases I have cited illustrate my point.  When seeking to recover money in risky commercial lawsuits involving large stakes, sophisticated business clients routinely pay percentage-based fees; insofar as I have been able to discover, they rarely use the lodestar method.  The percentages they promise also typically fall in the neighborhood of 33.3 percent, although there is a good deal of variation.  By this standard, the combined request for 20.65 percent of the settlement fund as fees is below market and, therefore, reasonable.

b)      *Girard Gibbs' Fee Request Considered On Its Own*

Now consider GG's request for a 5 percent fee standing alone, that is, as GG's compensation for completing the discrete assignment of objecting to the proposed settlement and negotiating a $90.5 million improvement.  Although the evidence is thinner because there are fewer comparable cases, it provides a solid basis for concluding that a 5 percent fee is low.

Two pieces of evidence relate to prior limited engagements GG handled on contingency. In one representation, the California State Teachers Retirement System (CalSTRS) hired GG to

negotiate a pre-litigation settlement of claims against a financial institution and other parties.  The contract entitled the firm to 10 percent of the first $1 million and 15 percent of anything recovered above that amount.  *Attorney Retainer Agreement between Girard Gibbs LLP and California State Teachers' Retirement System*, dated Sept. 28, 2012.  GG and CalSTRS were to negotiate a second agreement to govern the litigation if GG's initial efforts to settle the claim failed.  In the second engagement, the Kansas Public Employees Retirement System (KPERS) engaged GG to negotiate a pre-filing settlement of a dispute relating to a secured lending program.  KPERS agreed to pay GG and its co-counsel an 8 percent fee in this matter.  *Cost Proposal submitted to Kansas Division of Purchases by Stueve Siegel Hanson LLP and Girard Gibbs LLP in response to RFP 11996*, May 12, 2009.  Like the contracts discussed above, neither contract embraced the lodestar method; neither even made time expended a factor that bore on the size of GG's fee.  Both contracts contained fee percentages higher than the 5 percent GG requests here.

Other contracts for limited engagements also support the reasonableness of GG's request. For example, when discussing fees awarded in the Synthroid litigation, the Honorable Frank H. Easterbrook of the Seventh Circuit described the compensation two groups of sophisticated clients agreed to pay their lawyers *after a settlement was already on the table*.

> [A] group of more than 100 [third party payers] … contracted with two law firms to represent them…. [T]he contracts provided for a 25% contingent fee at maximum. The "Porter Wright Group" (18 [third party payers] referred to collectively by their law firm's name) also negotiated with and hired counsel. Their setup allowed each insurance company to pick one of two fee options. Either the client paid Porter Wright's full costs and 70% of its normal hourly fees each month, with a 4% of recovery kicker at the end, or the client paid only costs each month

> but had to pony up 15% of the final settlement. Insurers are sophisticated purchasers
>
> of legal services, and these contracts define the market. Unfortunately, though, they
>
> identify a market mid-way through the case, after defendants already had agreed to
>
> pay substantial sums.

*In re Synthroid Marketing Litig.*, 264 F.3d 712, 727 (7th Cir. 2001).  In *Synthroid*, the lawyers' job

was merely to garner as large a portion of the settlement fund as possible for the third party payers

who hired them.  They bore minimal risk of non-payment.  Even so, their sophisticated clients

promised them fee percentages that greatly exceed the 5 percent GG requests.  Because GG

incurred a significant risk of non-payment, its fee should be even larger than the 25 percent and 15

percent fees the lawyers enjoyed in *Synthroid*.

Examples like *Synthroid* in which lawyers are hired only to negotiate are hard to come by.

But another context—opt out representations—also provides relevant information about fees.  Opt

out cases involve (former) class members who decide to exclude themselves from class actions

and litigate on their own.  Opt outs often bring high stakes cases because they are typically the

only class members with claims large enough to warrant individual lawsuits.  Representation of a

client in an opt-out case is analogous in some respects to the services GG provided here.  Opt-outs,

for example, benefit from the work done by the lawyers for the class plaintiffs.  The resemblance

is especially strong when the decision to opt out is made at the time a class-wide settlement is

proposed.  The opt-out claimant then enjoys access to existing discovery and knows something

about the defendant's willingness to negotiate.

How much do opt-out clients pay their lawyers?  Again, no database collects this

information, but there are known examples in which they paid contingent fees of 33 percent to 40

percent.  See *Declaration of John C. Coffee, Jr.*, submitted in *In re High Fructose Corn Syrup*

*Antitrust Litigation,* M.D.L. 1087 (C.D. Ill. Oct. 7, 2004), pp. 1-2 (reporting that Gray & Co., an opt-out claimant, promised its lawyers 33-40 percent of the recovery in parallel litigation, depending on the time of settlement).  These examples are consistent with a general assessment that appears in a report by Cornerstone Research, a law and economics consulting firm that tracks securities class actions.  Although the report's authors noted some examples of low fees in opt-out cases, they concluded that opt out claimants tend to pay larger percentages than judges typically award in class actions.  Amir Rozen, Joshua B. Schaeffer, and Christopher Harris, *Opt-Out Cases in Securities Class Action Settlements* 5 (Cornerstone Research 2013), available at http://www.cornerstone.com/Publications/Press-Releases/Securities-Report-Provides-Class-Action-Opt-Out-Statistics.

Using the compensation paid in opt-out cases as a benchmark takes into account the posture of this lawsuit when GG appeared on behalf of Devine.  A sizeable settlement was already on the table, reflecting the substantial efforts expended by Class Counsel to obtain discovery, prevail on class certification, and prepare for trial.  GG's involvement led to a $90.5 million improvement, but the improvement was made possible in part because the case was so far advanced.  The same dynamic operates in opt out cases that settle in the aftermath of class actions.  These cases succeed (when they do) in part because the class actions that precede them make them easier to litigate.  Fees in opt out cases should therefore be lower than those that lawyers normally charge in other contexts, but they still tend to greatly exceed the 5 percent that GG requests.

Finally, I invite the court to consider value-added fees of the sort that lawyers charge in contexts where settlement dollars are already on the table.  The eminent domain context provides an example.  In these cases, a government authority that seeks to acquire a property offers a certain amount for it.  The offer provides information about the government's willingness to pay, much

as the originally proposed $324.5 million settlement provided information about the Settling Defendants' willingness to pay in this case.  But the property owner may think that the offer is inadequate and seek to improve it by means of a legal proceeding.  Lawyers who represent property owners in these proceedings typically charge value-added fees.  They collect a percentage of the amount by which the final payment exceeds the original offer.  A leading treatise reports that fees usually fall "between 20 percent and 33 1/3 percent" of the increase.  8A-G15 NICHOLS ON EMINENT DOMAIN § G15.06.  By comparison, a 5 percent fee on a $90.5 million increase is obviously a bargain.

<em>c)</em>     <em>Summary of the Application of the Vizcaino Factors</em>

*Vizcaino* and other Ninth Circuit cases establish 25 percent of the recovery as the benchmark for fee awards from common funds.  Upward and downward departures are permitted when warranted by relevant circumstances, which *Vizcaino* also identified.  In this case, the question isn't whether a downward deviation from the benchmark is appropriate; it is whether GG's request for a 5 percent fee, which is already far below the benchmark, should be further reduced.  The answer has to be no.  The three *Vizcaino* factors discussed above—the results obtained, the risks incurred, and the prevailing rate for similar services in the private market—all warrant an award exceeding 5 percent.  The only factor pointing in the other direction is the time GG expended.  But it does not warrant a further reduction either.

According to GG's filings, the firm's unenhanced lodestar is approximately $520,000 (after applying billing judgment and deducting time that did not benefit the class) and the fee request is for $4.525 million, producing a multiplier of about 8.7.  Certainly, these numbers show that GG achieved an excellent result for the class efficiently and expeditiously.  GG ought to be rewarded, not punished, for doing so.  After all, the class cares about the result GG obtained, not about the time it took GG to get it. If the Court wants to motivate similarly experienced lawyers to provide

26

adversary process at the settlement stage, it will have to offer them a real incentive to increase class member recoveries. Giving time expended dispositive weight would do the opposite. It would send the message to all concerned that beyond a certain point, objectors' attorneys have nothing to gain by making settlements larger.

Moreover, as mentioned, the lawyers at GG already took time expended into account by requesting a fee that is 80 percent *below* the benchmark rate. No other factor identified in *Vizcaino* warrants this reduction. It is one thing to say that time expended matters; it is quite another to think that lawyers who obtain great results expeditiously should receive smaller contingent fees than are known to prevail in any sector of the market for legal services. Even in cases arising out of commercial airline crashes where carriers concede liability, fees run 15 percent or more—three times the rate GG requests here. *See* ABA Formal Opinion 94-389, n. 13 (1994) (reporting that "[i]n cases where airline insurers voluntarily … [made] an early settlement offer and concede[d] all legal liability, average contingent fee rates dropped to 17% and were often only charged on a portion of the recovery"). Another fee cut would put GG far below the market rate and would simply punish the firm's lawyers for doing a great job in the shortest possible time.

### D.     A Lodestar Cross-Check Supports the 5 Percent Fee Request

I have studied and described the limitations and shortcomings of the lodestar method in opinions submitted to courts and academic writings published over many years. *See, e.g.*, Charles Silver *Unloading the Lodestar: Toward a New Fee Award Procedure*, 70 TEXAS LAW REVIEW 865 (1992); and Charles Silver, *Due Process and the Lodestar Method: You Can't Get There from Here*, 74 TULANE LAW REVIEW 1809 (2000).

I am hardly alone in opposing the lodestar's use. Years before my first article appeared, the Honorable H. Lee Sarokin and Professor Arthur Miller led a Task Force commissioned by the Third Circuit. The Task Force's report criticized the lodestar approach on a host of grounds. *See*

27

Third Circuit Task Force, Court Awarded Attorney Fees (Oct. 8, 1985), reprinted in 108 F.R.D. 237 (1985). A chorus of voices has urged judges to minimize the use of the lodestar method over many years.

Interestingly, lodestar cross-checks no longer appear to exert any significant influence on federal judges, even in circuits where they are required. As my coauthors and I observe in an article that will appear in the Columbia Law Review later this year:

> There [is] no statistically significant difference between fee awards using a lodestar cross-check and fee awards under the percentage of the recovery approach. This result supports previous academic criticisms of the lodestar methodology. It also suggests that the time and resources lawyers devote to tracking lodestar amounts and the enormous number of hours that some judges spend reviewing firm billing records is largely a waste of time.

Lynn A. Baker, Michael A. Perino, and Charles Silver, *Is the Price Right?, An Empirical Study of Fee-Setting in Securities Class Actions,* 115 Columbia Law Review (forthcoming 2015), available at http://ssrn.com/abstract=2584649. This conclusion was based on an examination of over 400 securities class actions that settled from 2007 to 2012, in some of which judges made lodestar cross-checks while in others they did not.

### 1.   The Court has Discretion to Approve the Requested Multiplier

That federal district court judges now give dispositive weight to percentages is all to the good. By tying lawyers' rewards to class members' recoveries, the percentage method creates desirable incentives. More money for the client means more money for the lawyer, and a quicker recovery means a fee more quickly paid. By contrast, the lodestar weakens the link between fees and recoveries. Commentators agree that courts' use of the lodestar method contributed to the

problem of sell-out settlements—cheap settlements that failed to obtain appropriate values on class members' claims.  *See, e.g.*, Myriam Gilles & Gary B. Friedman, *Exploding the Class Action Agency Costs Myth: The Social Utility of Entrepreneurial Lawyers*, 155 U. PA. L. REV. 103, 140-148 (2006) (explaining the incentive problems created by lodestar cross-checks).  It may also inflate fees in some cases, by encouraging lawyers to expend time to increase their bills.

Although the lodestar is disfavored, in circuits where lodestar cross-checks are required judges must still do what the law requires.  Fortunately, they can ameliorate some of the lodestar's worst incentive effects by raising multipliers and hourly rates steeply as recoveries increase.  By doing so, they will incentivize lawyers to prefer larger recoveries to smaller ones.

Given the size of the recovery in this case, the Court has discretion to approve the fee request knowing that the multiplier is 8.7.  The history of fee awards in class actions provides one basis for this.  Judges tend to award higher lodestar multipliers in cases with larger recoveries.  See Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993–2008*, 7 JOURNAL OF EMPIRICAL LEGAL STUDIES 248, 274 (2010) (finding that multipliers correlate strongly with settlement size).  Judges have also granted large multipliers in cases where the circumstances warrant.  As Judge Melinda Harmon wrote when approving a $688 million fee award from the massive Enron settlement:

> In the Rite–Aid litigation, the district court ultimately awarded a lodestar multiplier of 6.96. *In re Rite Aid Sec. Litig.,* 362 F.Supp.2d 587 (E.D. Pa. 2005) (awarding 25% of the settlement fund of $126,800,000 and 6.96 multiplier). In *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1051 n. 6 (9th Cir. 2002), the Ninth Circuit performed a survey of multipliers and found "a range of 0.6–19.6, with most (20 of 24, or 83%) from 1.0 and 4.0 and a bare majority (13 of 24, or 54%) in the 1.5–3.0

> range." Nevertheless, insisting that the court must consider all relevant
> circumstances in determining the amount of a fee award, the Ninth Circuit affirmed
> the district court' increase of the standard benchmark of 25% to 28% in the fee
> award because of exceptional results, high risk, the wide-spread benefits of the
> litigation, and the market rate. *Id.* at 1048–49.

*In re Enron Corp. Sec., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 752 (S.D. Tex. 2008).  A
survey of settlements and fee awards published by CLASS ACTION REPORTS bears out these
observations.  It reports an average multiplier of 4.5 for the largest cases—those with settlements
exceeding $100 million—and multipliers in individual mega-fund cases reaching as high as 21.8.
*Attorney Fee Awards in Common Fund Class Actions*, 24 CLASS ACTION REPORTS 4 (April 2003).

Plainly, a district court judge has discretion to approve a lodestar multiplier of 8.7 when
the circumstances warrant.  This case presents the best reason for doing so.  When an objector's
lawyers contend that a settlement proposed shortly before trial is inadequate and convince the
presiding judge that they are right, their compensation should be structured to encourage them to
negotiate a maximal increase as quickly as possible.  A lodestar multiplier will have this effect
only if it scales up rapidly with settlement size.  Otherwise, objectors' lawyers will not stand to
benefit if they recover larger amounts and cheap settlements will be an ineradicable problem.

### 2.    The Requested Hourly Rates are Reasonable

The table below shows the hourly rates for the GG lawyers and service providers who
worked on this case, which I obtained by reviewing a consolidated billing statement.  I begin by
noting that the matter was efficiently staffed.  Mr. Girard, Ms. Steiner, and Ms. Kramer accounted
for the vast majority of the hours billed.  Attorneys Sharp, Grzenczyk, and Polk and Paralegals
Mattu and Takemoto-Chock collectively account for only 11 percent of GG's total lodestar.

*Declaration of Daniel C. Girard in Support of Motion for Award of Attorneys' Fees, Reimbursement of Expenses, and Service Award (Draft)* ¶¶ 11-12.  GG cannot be accused of over-lawyering the case, a common problem when lawyers are paid by the hour.

| HOURLY RATES FOR GIRARD GIBBS ATTORNEYS AND SERVICE PROVIDERS | | |
|---|---|---|
| **Time Keeper** | **Rank** | **Charge** |
| Daniel C. Girard | Partner | $845 |
| Amanda M. Steiner | Partner | $650 |
| Dena C. Sharp | Partner | $565 |
| Scott M. Grzenczyk | Associate | $385 |
| Adam E. Polk | Associate | $385 |
| Elizabeth A. Kramer | Associate | $350 |
| Navneet K. Mattu | Paralegal | $190 |
| Mari Takemoto-Chock | Paralegal | $190 |

GG also represents that "[t]he hourly rates [shown in the table] are the same as the regular current rates charged for our services in non-contingent matters." *Declaration of Daniel C. Girard in Support of Motion for Award of Attorneys' Fees, Reimbursement of Expenses, and Service Award* ¶ 47.  This should be dispositive.  When sophisticated clients with good access to the market for legal services pay identified rates with their own dollars, any reason for questioning the reasonableness of those rates disappears.  RESTATEMENT (THIRD) OF LAW GOVERNING LAW § 34, Comment *c* (2000) ("Fees agreed to by clients sophisticated in entering into such arrangements (such as a fee contract made by inside legal counsel in behalf of a corporation) should almost invariably be found reasonable.").

A comparison to the hourly rates charged by GG to those charged by other law firms for comparable services also shows that the listed charges are reasonable.  My first basis for this assessment is my experience working with other California lawyers and studying fees awarded to California lawyers in other cases.  For example, one law firm that I worked with on a prior matter

31

served as counsel in the Flat Panel Antitrust Litigation, which produced a billion-dollar settlement. The firm's charges, which were granted by the court, ran from about $765 per hour for senior partners to $175 per hour for paralegals, figures that are clearly comparable to those requested here.  *See* Amended Order Granting Direct Purchaser Class Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Expenses, and Incentive Awards, *In Re: TFT-LCD (Flat Panel) Antitrust Litigation*, No. MDL 3:07-MD-1827 SI, 2011 WL 7575003 (N.D. Cal. Dec. 27, 2011).  I was not surprised to read in Mr. Girard's declaration that his firm's rates have been approved by courts in many successful cases.  *Declaration of Daniel C. Girard in Support of Motion for Award of Attorneys' Fees, Reimbursement of Expenses, and Service Award* ¶ 48.

I also consulted the results of surveys of law firms' billing rates taken by the NATIONAL LAW JOURNAL (NLJ) in various years.  The surveys contain information regarding the high, low, average, and median billing rates for partners and associates at large law firms that handle business matters and that typically have offices in metropolitan areas.  The number of firms participating in the NLJ surveys varies from year to year but always exceeds 100.  The NLJ surveys are often cited to courts as evidence supporting hourly rates in fee applications.  *See, e.g.*, *Parkinson v. Hyundai Motor Am.*, 796 F. Supp. 2d 1160, 1172-73 (C.D. Cal. 2010) (admitting into evidence and relying upon expert report by Professor William Rubenstein which was based in part on NLJ surveys).

Because the law firms included in the NLJ surveys are of the type that normally represent defendants in large lawsuits like this one, the rates they charge provide an especially helpful basis on which to assess the reasonableness of plaintiffs' attorneys' requested rates.  Class members deserve representation of the same caliber that large corporate defendants receive.  GG is well qualified to provide services of this quality.  In 2011, Securities Class Action Services ranked GG in a 3-way tie for #15 on its list of the top 50 law firms in terms of the total cash amount of

securities class action settlements in which the law firm served as lead or co-lead counsel. Securities Class Action Services, THE SCAS 50 FOR 2011 (2012).   In 2013, GG ranked #17. Institutional Shareholder Services, THE SECURITIES CLASS ACTION SERVICES TOP 50 FOR 2013 (2014),   http://www.issgovernance.com/file/publications/iss-securities-class-action-services-top-50-for-2013.pdf.

My examination of the 2010 NLJ survey showed that the hourly rates requested for the partners and associates at GG are reasonable.  Start with the lawyers who are partners in the firm: Mr. Daniel Girard, Ms. Amanda Steiner, and Ms. Dena Sharp.  Mr. Girard, one of the founding partners of his elite firm, has more than 30 years of experience under his belt.  During this time, he has obtained recoveries in more than 50 class actions and has been appointed to many litigation management committees.  He has also served at the highest levels of the profession, including two terms on the U.S. Judicial Conference Advisory Committee on Civil Rules.  In 2013, THE BEST LAWYERS IN AMERICA recognized him as the "Lawyer of the Year" in San Francisco for representing plaintiffs in mass tort lawsuits and class actions.  His record of accomplishment places him in the top tier of the plaintiffs' bar.  Ms. Steiner, a securities class action lawyer, has practiced for 17 years.  Her experiences include work on *Billitteri v. Securities America, Inc*., in which $150 million was recovered, and several other large matters, including *In re Lehman Brothers Holdings Securities and ERISA Litigation* and *In re SLM Corporation Securities Litigation*.  She has also been recognized as a Northern California Super Lawyer and selected to the Top 50 Women Northern California Super Lawyers.  Ms. Sharp, the youngest partner in the group, has 9 years of experience.  She specializes in managing discovery in large lawsuits.  In addition to *Billitteri*, *Lehman*, and *SLM*, she has worked on *In re Oppenheimer Rochester Funds Group Securities Litigation* and *In re Nexium Antitrust Litigation.*  In recognition of her litigation accomplishments

and her service to the bar, which includes participating in *The Sedona Conference Working Group on Electronic Document Retention and Production*, she has been selected every year since 2009 as a Rising Star by Northern California Super Lawyers.

The hourly charges requested for Mr. Girard, Ms. Steiner, and Ms. Sharp are comparable to those reported in the NLJ surveys for lawyers of similar experience and prominence. The 2010 NLJ survey reported that the range for "Partner Bill Rate High"—the category that includes senior partners—ran from $1,120 to $385 and averaged $700. The rates requested for all three partners fall in this middle of this range, and two of the three lawyers charge less than the average rate for lawyers at this level. The range for "Partner Bill Rate Low"—the category that includes junior partners—extended from $675 to $180 and averaged $327. Only Mr. Girard's charge exceeds the high end of this category, which is appropriate given his prominence.

More recent NLJ surveys show that hourly rates have risen to the point where Mr. Girard's charge seems low. Today, lawyers of his caliber often charge $1000 per hour or more. The sub-title to a report on the National Law Journal's 2014 billing survey communicated this point plainly: "$1,000 Per Hour Isn't Rare Anymore." Karen Sloan, *NLJ Billing Survey: $1,000 Per Hour Isn't Rare Anymore,* THE NATIONAL LAW JOURNAL (January 13, 2014). Reading the text of the article, one learns that "[n]early 20 percent of the firms included in THE NATIONAL LAW JOURNAL's annual survey of large law firm billing rates [in 2014] had at least one partner charging more than $1,000 an hour." One could easily assign Mr. Girard to the $1,000 per hour group.

The 2014 NLJ survey, which contained information for 159 of the largest law firms in the U.S., found a median rate (half above/half below) for the highest partner billing rate category of $775, a median low partner rate of $405. Again, by comparison to these rates, those charged by GG's partners are reasonable.

34

Turning from partners to associates, GG requests hourly rates for associates ranging from $350 per hour to $385.  These rates are within the range reported by the 2014 NJL survey.  The median high hourly rate for associates was $510 and the median low rate was $235. The average associate rate was found to be $370, which falls squarely in the middle of the range GG requests.

Finally, turning briefly from hourly rates to time expended, I note that, although I have not conducted a detailed audit of GG's time records, the 916 hours the firm invested in this matter appear to be reasonable and to have been necessary to secure the additional $90.5 million for the class members.  I reach this conclusion because of the challenges involved in objecting to the sufficiency of a mega-fund settlement, the work the firm undertook to advise Devine about the risks of litigation so he could fulfill his obligations to the class, the appellate briefing that was necessary once the defendants filed a petition seeking reversal of the district court's order, and the time and effort required to negotiate the $415 million settlement.  The matter also appears to have been appropriately staffed, as more junior attorneys were assigned less sophisticated projects while more senior attorneys performed work commensurate with their greater experience.  Nothing about the total quantity of hours seems unreasonable.

There is also no reason to expect the firm to have chalked up hours needlessly.  As I have explained in many reports and as Ninth Circuit judges have recognized in published opinions, when working on contingency plaintiffs' attorneys have incentives to expend too little time, not too much.  This is so for two reasons.  First, the risk of nonpayment encourages plaintiffs' attorneys to be frugal.  When paid a guaranteed hourly rate, a lawyer can expect every hour to be profitable and has an incentive to overwork.  When hired on contingency, the risk of non-payment discourages a lawyer from expending time that confers no benefit on the client because the lawyer gets paid only when and to the extent that the client recovers.  Second, a lawyer working on

contingency earns only a fraction of the amount by which each additional hour expended increases the client's recovery.  Because the marginal return on effort is split between the client and the lawyer according to the fee percentage, the lawyer has an incentive to stop working prematurely. As the court observed in *Parkinson v. Hyundai Motor Am.*, 796 F. Supp. 2d 1160, 1172-73 (C.D. Cal. 2010), "'lawyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees. The payoff is too uncertain, as to both the result and the amount of fee'" (quoting *Moreno v. City of Sacramento,* 534 F.3d 1106, 1112 (9th Cir.2008)).

## VI.    CONCLUSION

I have tried to provide, in the shortest possible space, an assessment of the reasonableness of GG's request for a fee award equal to 5 percent of the $90.5 million increase in the settlement. By comparing GG's request to practices prevailing in the market for legal services and to fee awards in other class actions, I have shown that:

- GG's fee should be set as a percentage of the increase in the recovery attributable to the firm's efforts;

- GG's request for a fee of 5 percent of the $90.5 million increase is reasonable when viewed on a standalone basis and when combined with Class Counsel's fee request; and

- A lodestar cross-check supports the reasonableness of GG's fee request because the firm's requested hourly rates and time expended are reasonable and because the Court has discretion to approve the requested multiplier under the circumstances of this case.

These conclusions are consistent with positions taken in my academic writings on fee awards in class actions and other contexts, the first of which appeared in the CORNELL LAW REVIEW in 1991

and the most recent of which will be published in the COLUMBIA LAW REVIEW later this year. Having studied class actions and contingent fees for decades, I represent to the Court that, in my judgment, a 5 percent fee on a $90.5 million recovery is a bargain rate.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

DATED:  5/7/2015

_____
                                    CHARLES SILVER

**EXHIBIT A: RESUME OF PROFESSOR CHARLES SILVER**

# CHARLES SILVER

School of Law
University of Texas
727 East Dean Keeton Street
Austin, Texas 78705
(512) 232-1337 (voice)
csilver@mail.law.utexas.edu (preferred contact method)
Papers on SSRN at: http://ssrn.com/author=164490

## ACADEMIC EMPLOYMENTS

UNIVERSITY OF TEXAS SCHOOL OF LAW

| | |
|---|---|
| Roy W. and Eugenia C. McDonald Endowed Chair in Civil Procedure | 2004-present |
| Co-Director, Center on Lawyers, Civil Justice, and the Media | 2001-present |
| Robert W. Calvert Faculty Fellow | 2000-2004 |
| Cecil D. Redford Professor | 1994-2004 |
| W. James Kronzer Chair in Trial & Appellate Advocacy | Summer 1994 |
| Graves, Dougherty, Hearon & Moody Centennial Faculty Fellow | 1991-1992 |
| Assistant Professor | 1987-1991 |

HARVARD LAW SCHOOL

| | |
|---|---|
| Visiting Professor | Fall 2011 |

VANDERBILT UNIVERSITY LAW SCHOOL

| | |
|---|---|
| Visiting Professor | 2003 |

UNIVERSITY OF MICHIGAN LAW SCHOOL

| | |
|---|---|
| Visiting Professor | 1994 |

UNIVERSITY OF CHICAGO

| | |
|---|---|
| Managing Editor, Ethics: A Journal of Social, Political and Legal Philosophy | 1983-1984 |

## EDUCATION

JD 1987, Yale Law School
MA 1981, University of Chicago (Political Science)
BA 1979, University of Florida (Political Science)

## SPECIAL PROJECTS

Associate Reporter, Principles of the Law of Aggregate Litigation, American Law Institute (2010) (with Samuel Issacharoff (Reporter), Robert Klonoff and Richard Nagareda (Associate Reporters)).

Co-Reporter, Practical Guide for Insurance Defense Lawyers, International Association of Defense Counsel (2002) (with Ellen S. Pryor and Kent D. Syverud) (published on the IADC website in 2003 and revised and distributed to all IADC members as a supplement to the Defense Counsel J. in January 2004).

## BOOKS IN PROGRESS

*To Sue is Human: Medical Malpractice Litigation in Texas 1988-2005* (coauthored with Bernard Black, David Hyman, and William Sage).

*Health Law and Economics*, Edward Elgar (coedited with Ronen Avraham and David Hyman).

## BOOKS

*Law of Class Actions and Other Aggregate Litigation*, 2nd Edition, Foundation Press (2013) (with Richard Nagareda, Robert Bone, Elizabeth Burch and Patrick Woolley).

*Professional Responsibilities of Insurance Defense Counsel*, LexisNexis Mathew Bender (2012) (with William T. Barker); (Updated 2013); (Updated 2014).

## PUBLICATIONS AND WORKS IN PROGRESS

1.   "Philosophers and Fiduciaries" (in progress) (presented at several law schools and conferences).

2.   "The DOMA Sideshow" (in progress), available at http://ssrn.com/abstract=2584709.

3.   "Insurance Crisis or Liability Crisis? Medical Malpractice Claiming in Illinois, 1980-2010**,"** (with Bernard S. Black, David A. Hyman, and Mohammad H. Rahmati) (in progress), available at http://ssrn.com/abstract=2462942.

4.   "Is the Price Right? An Empirical Study of Fee-Setting in Securities Class Actions," Columbia L. Rev. (forthcoming 2015) (with Lynn A. Baker and Michael A. Perino).

5.   "The Treatment of Insurers' Defense-Related Responsibilities in the Principles of the Law of Liability Insurance: A Critique," Rutgers U. L. Rev. (forthcoming 2015) (with William T. Barker) (symposium issue).

6.   "The Economics of Plaintiff-Side Personal Injury Practice," U. Il. L. Rev. (forthcoming 2015) (with David A. Hyman and Bernard S. Black).

7.   "Fix Problems Where They Arise: The Liability System Is Not To Blame For The Problems of Healthcare," Oxford Handbook of American Health Law (Glenn I. Cohen, Allison Hoffman, and William Sage, eds.) (forthcoming 2015) (with David A. Hyman) (invited chapter).

8.   "Policy Limits, Payouts, and Blood Money: Another Look at Med Mal Settlements in the Shadow of Insurance," U.C. Irvine L. Rev. (forthcoming 2015) (with Bernard S. Black, David A. Hyman, and Myungho Paik) (invited symposium).

9.   "The Basic Economics of the Duty to Defend," in D. Schwarcz and P. Siegelman, eds., RESEARCH HANDBOOK IN THE LAW & ECONOMICS OF INSURANCE (forthcoming 2015) (peer-reviewed).

10.  "Does Tort Reform Affect Physician Supply? Evidence from Texas," Int'l Rev. of L. & Econ. (2015) (with David A. Hyman, Bernard S. Black and Myungho Paik) (peer-reviewed), available at http://dx.doi.org/10.1016/j.irle.2015.02.002.

11.  "Insurer Rights to Limit Costs of Independent Counsel," ABA/TIPS Insurance Coverage Litigation Section Newsletter 1 (Aug. 2014) (with William T. Barker).

12.  "Regulation of Fee Awards in the Fifth Circuit," 67 The Advocate (Texas) 36 (2014) (invited submission).

13.  "What Can We Learn by Studying Lawyers' Involvement in Multidistrict Litigation?  A Comment on Williams, Lee, and Borden, Repeat Players in Federal Multidistrict Litigation," 5 J. of Tort L. 181 (2014), DOI: 10.1515/jtl-2014-0010 (invited symposium).

14.  "Double, Double, Toil and Trouble: Justice-Talk and the Future of Medical Malpractice Litigation," 63 DePaul L. Rev. 574 (2014) (with David A. Hyman) (invited symposium).

15.  "Litigation Funding Versus Liability Insurance: What's the Difference?," 63 DePaul L. Rev. 617 (2014) (invited symposium).

16.  "Setting Attorneys' Fees In Securities Class Actions: An Empirical Assessment," 66 Vanderbilt L. Rev. 1677 (2013) (with Lynn A. Baker and Michael A. Perino).

17.  "Five Myths of Medical Malpractice," 143:1 Chest 222-227 (January 2013) (with David A. Hyman) (peer-reviewed).

18.  "How do the Elderly Fare in Medical Malpractice Litigation, Before and After Tort Reform? Evidence From Texas" (with Bernard Black, David A. Hyman, Myungho Paik, and William Sage), Amer. L. & Econ. Rev. (2012), doi: 10.1093/aler/ahs017 (peer-reviewed).

19.  "Ethical Obligations of Independent Defense Counsel," 22:4 Insurance Coverage (July-August 2012) (with William T. Barker), available at http://apps.americanbar.org/litigation/committees/insurance/articles/julyaug2012-ethical-obligations-defense-counsel2.html.

20.     "Health Care Quality, Patient Safety and the Culture of Medicine: 'Denial Ain't Just A River in Egypt,'" (coauthored with David A. Hyman), 46 New England L. Rev. 101 (2012) (invited symposium).

21.     "Medical Malpractice and Compensation in Global Perspective: How Does the U.S. Do It?", in Ken Oliphant & Richard W. Wright (eds.) MEDICAL MALPRACTICE AND COMPENSATION IN GLOBAL PERSPECTIVE (2013), originally published in 87 Chicago-Kent L. Rev. 163 (2012) (coauthored with David A. Hyman).

22.     "Justice Has (Almost) Nothing to Do With It: Medical Malpractice and Tort Reform," in Rosamond Rhodes, Margaret P. Battin, and Anita Silvers, eds., MEDICINE AND SOCIAL JUSTICE, Oxford University Press 531-542 (2012) (with David A. Hyman) (peer reviewed).

23.     "Will Tort Reform Bend the Cost Curve? Evidence from Texas" (with Bernard Black, David A. Hyman, Myungho Paik), 9 J. Empirical Legal Stud. 173-216 (2012) (peer-reviewed).

24.     "The Responsibilities of Lead Lawyers and Judges in Multi-District Litigations," 79 Fordham L. Rev. 1985 (2011) (invited symposium).

25.     "Fiduciaries and Fees," 79 Fordham L. Rev. 1833 (2011) (with Lynn A. Baker) (invited symposium).

26.     "The Impact of the Duty to Settle on Settlement: Evidence From Texas," 8 J. Empirical Leg. Stud. 48-84 (2011) (with Bernard Black and David A. Hyman) (peer reviewed).

27.     "Ethics and Innovation," 79 George Washington L. Rev. 754 (2011) (invited symposium).

28.     "O'Connell Early Settlement Offers: Toward Realistic Numbers and Two-Sided Offers," 7 J. Empirical Legal Stud. 379 (2010) (with Bernard Black and David A. Hyman) (peer reviewed).

29.     "Access to Justice in a World without Lawyers: Evidence from Texas Bodily Injury Claims," 37 Fordham Urb. L. J. 357 (2010) (with David A. Hyman) (invited symposium).

30.     "The Quasi-Class Action Method of Managing Multi-District Litigations: Problems and a Proposal," 63 Vanderbilt L. Rev. 107 (2010) (with Geoffrey P. Miller).

31.     "The Effects of 'Early Offers' on Settlement: Evidence From Texas Medical Malpractice Cases, 6 J. Empirical Legal Stud. 723 (2009) (with David A. Hyman and Bernard S. Black) (peer-reviewed).

32.     "Estimating the Effect of Damage Caps in Medical Malpractice Cases: Evidence from Texas," 1 J. Legal Analysis 355 (2009) (with David A. Hyman, Bernard S. Black, and William M. Sage) (inaugural issue) (peer-reviewed).

33. "The Impact of the 2003 Texas Medical Malpractice Damages Cap on Physician Supply and Insurer Payouts: Separating Facts from Rhetoric," 44 <u>The Advocate</u> 25 (2008) (with David A. Hyman and Bernard Black) (invited symposium).

34. "Defense Costs and Insurer Reserves in Medical Malpractice and Other Personal Injury Cases: Evidence from Texas, 1988-2004," 10 <u>Amer. Law & Econ. Rev.</u> 185 (2008) (with Bernard Black, David A. Hyman, and William M. Sage) (peer-reviewed).

35. "Incentivizing Institutional Investors to Serve as Lead Plaintiffs in Securities Fraud Class Actions," 57 <u>DePaul L. Rev.</u> 471 (2008) (with Sam Dinkin) (invited symposium), reprinted in L. Padmavathi, ed., SECURITIES FRAUD: REGULATORY DIMENSIONS (2009).

36. "Malpractice Payouts and Malpractice Insurance: Evidence from Texas Closed Claims, 1990-2003," 33 <u>Geneva Papers on Risk and Insurance: Issues and Practice</u> 177-192 (2008) (with David A. Hyman, Bernard S. Black, William M. Sage and Kathryn Zeiler) (peer-reviewed).

37. "Physicians' Insurance Limits and Malpractice Payments: Evidence from Texas Closed Claims 1990-2003," 36 <u>J. Legal Stud.</u> S9 (2007) (with Bernard Black, David A. Hyman, William Sage, and Kathryn Zeiler) (peer-reviewed).

38. "Do Defendants Pay What Juries Award? Post-Verdict Haircuts in Texas Medical Malpractice Cases, 1988-2003," <u>J. Empirical Legal Stud.</u> 3-68 (2007) (with Bernard Black, David A. Hyman, William M. Sage, and Kathryn Zeiler) (peer-reviewed).

39. Reasonable Attorneys' Fees in Securities Class Actions: A Reply to Mr. Schneider, 20 <u>The NAPPA Report</u> 7 (Aug. 2006).

40. "The Allocation Problem in Multiple-Claimant Representations," 14 <u>S. Ct. Econ. Rev.</u> 95 (2006) (with Paul Edelman and Richard Nagareda) (peer-reviewed).

41. "Dissent from Recommendation to Set Fees Ex Post," 25 Rev. of Litig. 497 (2006) (accompanied Task Force on Contingent Fees, Tort Trial and Insurance Practice Section of the American Bar Association, "Report on Contingent Fees in Class Action Litigation," 25 Rev. of Litig. 459 (2006)).

42. "In Texas, Life is Cheap," 59 <u>Vanderbilt L. Rev.</u> 1875 (2006) (with Frank Cross) (invited symposium).

43. "Medical Malpractice Litigation and Tort Reform: It's the Incentives, Stupid," 59 <u>Vanderbilt L. Rev.</u> 1085 (2006) (with David A. Hyman) (invited symposium).

44. "A Rejoinder to Lester Brickman: *On the Theory Class's Theories of Asbestos Litigation,*" 32 <u>Pepperdine L. Rev.</u> 765 (2005).

45. "Medical Malpractice Reform Redux: Déjà Vu All Over Again?" XII <u>Widener L. J.</u> 121 (2005) (with David A. Hyman) (invited symposium).

46.     "Stability, Not Crisis: Medical Malpractice Claim Outcomes in Texas, 1988-2002," 2 J. Empirical Legal Stud. 207–259 (July 2005) (with Bernard Black, David A. Hyman, and William S. Sage) (peer-reviewed).

47.     "Speak Not of Error, Regulation (Spring 2005) (with David A. Hyman).

48.     "The Poor State of Health Care Quality in the U.S.: Is Malpractice Liability Part of the Problem or Part of the Solution?," 90 Cornell L. Rev. 893 (2005) (with David A. Hyman).

49.     "Merging Roles: Mass Tort Lawyers as Agents and Trustees," 31 Pepp. L. Rev. 301 (2004) (invited symposium).

50.     "Believing Six Improbable Things: Medical Malpractice and 'Legal Fear,'" 28 Harv. J. L. and Pub. Pol. 107 (2004) (with David A. Hyman) (invited symposium).

51.     "We're Scared To Death: Class Certification and Blackmail," 78 N.Y.U. L. Rev. 1357 (2003).

52.     "When Should Government Regulate Lawyer-Client Relationships? The Campaign to Prevent Insurers from Managing Defense Costs," 44 Ariz. L. Rev. 787 (2002) (invited symposium).

53.     "Introduction: Civil Justice Fact and Fiction," 80 Tex. L. Rev. 1537 (2002) (with Lynn A. Baker).

54.     "Does Civil Justice Cost Too Much?" 80 Tex. L. Rev. 2073 (2002).

55.     "Defense Lawyers' Professional Responsibilities: Part II—Contested Coverage Cases," 15 G'town J. Legal Ethics 29 (2001) (with Ellen S. Pryor).

56.     "A Critique of *Burrow v. Arce*," 26 Wm. & Mary Envir. L. & Policy Rev. 323 (2001) (invited symposium).

57.     "You Get What You Pay For: Result-Based Compensation for Health Care," 58 Wash. & Lee L. Rev. 1427 (2001) (with David A. Hyman).

58.     "The Case for Result-Based Compensation in Health Care," 29 J. L. Med. & Ethics 170 (2001) (with David A. Hyman).

59.     "Defense Lawyers' Professional Responsibilities: Part I—Excess Exposure Cases," 78 Tex. L. Rev. 599 (2000) (with Ellen S. Pryor).

60.     "What's Not To Like About Being A Lawyer?," 109 Yale L. J. 1443 (2000) (with Frank B. Cross) (review essay).

61.     "Due Process and the Lodestar Method: You Can't Get There From Here," 74 Tul. L. Rev. 1809 (2000) (invited symposium).

62.    "The Aggregate Settlement Rule and Ideals of Client Service," 41 <u>S. Tex. L. Rev.</u> 227 (1999) (with Lynn A. Baker) (invited symposium).

63.    "Representative Lawsuits & Class Actions," in <u>Int'l Ency. Of L. & Econ.</u>, B. Bouckaert & G. De Geest, eds., (1999) (peer-reviewed).

64.    "Preliminary Thoughts on the Economics of Witness Preparation," 30 <u>Tex. Tech L. Rev.</u> 1383 (1999) (invited symposium).

65.    "The Lost World: Of Politics and Getting the Law Right," 26 <u>Hofstra L. Rev.</u> 773 (1998) (invited symposium).

66.    "Flat Fees and Staff Attorneys: Unnecessary Casualties in the Battle over the Law Governing Insurance Defense Lawyers," 4 <u>Conn. Ins. L. J.</u> 205 (1998) (invited symposium).

67.    "I Cut, You Choose: The Role of Plaintiffs' Counsel in Allocating Settlement Proceeds," 84 <u>Va. L. Rev.</u> 1465 (1998) (with Lynn A. Baker) (invited symposium).

68.    "And Such Small Portions: Limited Performance Agreements and the Cost-Quality/Access Trade-Off," 11 <u>G'town J. Legal Ethics</u> 959 (1998) (with David A. Hyman) (invited symposium).

69.    "Mass Lawsuits and the Aggregate Settlement Rule," 32 <u>Wake Forest L. Rev.</u> 733 (1997) (with Lynn A. Baker) (invited symposium).

70.    "Professional Liability Insurance as Insurance and as Lawyer Regulation: A Comment on Davis, Institutional Choices in the Regulation of Lawyers," 65 <u>Fordham L. Rev.</u> 233 (1996) (invited symposium).

71.    "All Clients are Equal, But Some are More Equal than Others: A Reply to Morgan and Wolfram," 6-3 <u>Coverage</u> 47 (May/June 1996) (with Michael Sean Quinn).

72.    "Are Liability Carriers Second-Class Clients? No, But They May Be Soon-A Call to Arms against the Restatement of the Law Governing Lawyers," 6-2 <u>Coverage</u> 21 (Jan./Feb. 1996) (with Michael Sean Quinn).

73.    "Bargaining Impediments and Settlement Behavior," in <u>Dispute Resolution: Bridging the Settlement Gap</u>, D.A. Anderson, ed. (1996) (with Samuel Issacharoff and Kent D. Syverud).

74.    "The Legal Establishment Meets the Republican Revolution," 37 <u>S. Tex. L. Rev.</u> 1247 (1996) (invited symposium).

75.    "Do We Know Enough About Legal Norms?" in <u>Social Rules: Origin; Character; Logic; Change</u>, D. Braybrooke, ed. (1996).

76.    "The Professional Responsibilities of Insurance Defense Lawyers," 45 <u>Duke L. J.</u> 255 (1995) (with Kent D. Syverud), reprinted in <u>Ins. L. Anthol.</u> (1996) and 64 <u>Def. L. J.</u> 1 (Spring 1997).

77.    "Wrong Turns on the Three Way Street: Dispelling Nonsense About Insurance Defense Lawyers," 5-6 <u>Coverage</u> 1 (Nov./Dec.1995) (with Michael Sean Quinn).

78.    "Introduction to the Symposium on Bad Faith in the Law of Contract and Insurance," 72 <u>Tex. L. Rev.</u> 1203 (1994) (with Ellen Smith Pryor).

79.    "Does Insurance Defense Counsel Represent the Company or the Insured?" 72 <u>Tex. L. Rev.</u> 1583 (1994), reprinted in Practising Law Institute, <u>Insurance Law: What Every Lawyer and Businessperson Needs To Know</u>, Litigation and Administrative Practice Course Handbook Series, PLI Order No. H0-000S (1998).

80.    "Your Role in a Law Firm: Responsibilities of Senior, Junior, and Supervisory Attorneys," in F.W. Newton, ed., <u>A Guide to the Basics of Law Practice (3d)</u> (Texas Center for Legal Ethics and Professionalism 1996).

81.    "Getting and Keeping Clients," in F.W. Newton, ed., <u>A Guide to the Basics of Law Practice (3d)</u> (Texas Center for Legal Ethics and Professionalism 1996) (with James M. McCormack and Mitchel L. Winick).

82.    "Integrating Theory and Practice into the Professional Responsibility Curriculum at the University of Texas," 58 <u>Law and Contemporary Problems</u> 213 (1995) (with John S. Dzienkowski, Sanford Levinson, and Amon Burton).

83.    "Advertising and Marketing Legal Services," in F.W. Newton, ed., <u>A Guide to the Basics of Law Practice</u> (Texas Center for Legal Ethics and Professionalism 1994).

84.    "Responsibilities of Senior and Junior Attorneys," in F.W. Newton, ed., <u>A Guide to the Basics of Law Practice</u> (Texas Center for Legal Ethics and Professionalism 1994).

85.    "Thoughts on Procedural Issues in Insurance Litigation," VII <u>Ins. L. Anthol.</u> (1994).

86.    "A Model Retainer Agreement for Legal Services Programs: Mandatory Attorney's Fees Provisions," 28 <u>Clearinghouse Rev</u>. 114 (June 1994) (with Stephen Yelenosky).

87.    "Incoherence and Irrationality in the Law of Attorneys' Fees," 12 <u>Tex. Rev. of Litig.</u> 301 (1993).

88.    "A Missed Misalignment of Interests: A Comment on Syverud, The Duty to Settle," 77 <u>Va. L. Rev.</u> 1585 (1991), reprinted in VI <u>Ins. L. Anthol.</u> 857-870 (1992).

89.    "Unloading the Lodestar: Toward a New Fee Award Procedure," 70 <u>Tex. L. Rev.</u> 865 (1992).

90.    "Comparing Class Actions and Consolidations," 10 <u>Tex. Rev. of Litig.</u> 496 (1991).

91.    "A Restitutionary Theory of Attorneys' Fees in Class Actions," 76 <u>Cornell L. Rev.</u> 656 (1991).

92.    "Elmer's Case: A Legal Positivist Replies to Dworkin," 6 <u>L. & Phil.</u> 381 (1987) (peer-reviewed).

93.    "Justice In Settlements," 4 <u>Soc. Phil. & Pol.</u> 102 (1986) (with Jules L. Coleman) (peer-reviewed).

94.    "Negative Positivism and the Hard Facts of Life," 68 <u>The Monist</u> 347 (1985) (peer-reviewed).

95.    "Utilitarian Participation," 23 <u>Soc. Sci. Info.</u> 701 (1984) (peer-reviewed).

96.    "Public Opinion and the Federal Judiciary: Crime, Punishment, and Demographic Constraints," 3 <u>Pop. Res. & Pol. Rev.</u> 255 (1984) (with Robert Y. Shapiro) (peer-reviewed).

## NOTABLE SERVICE ACTIVITIES

Associate Reporter, American Law Institute Project on the Principles of Aggregate Litigation

Interested Party, Statistical Information Task Force, National Association of Insurance Commissioners, Model Medical Malpractice Closed Claim Reporting Law

Invited Academic Member, American Bar Association/Tort & Insurance Practice Section Task Force on the Contingent Fee

Chair, Dean Search Committee, School of Law, University of Texas at Austin

Chair, Budget Committee, School of Law, University of Texas at Austin

Coordinator, General Faculty Colloquium Series, School of Law, University of Texas at Austin

Sole Drafter, Assessment Report for the Juris Doctor Program at the School of Law, University of Texas at Austin, for the Commission on Colleges of the Southern Association of Colleges and Schools

## RECENT AWARDS

Distinguished Fellow, Searle Center on Law, Regulation, and Economic Growth, Northwestern University School of Law (2014)

Robert B. McKay Law Professor Award, Tort Trial & Insurance Practice Section, American Bar Association (2009)

Faculty Research Grants, University of Texas at Austin (various years)

## MEMBERSHIPS

American Bar Foundation

Texas Bar Foundation (Life Fellow)

State Bar of Texas (admitted 1988)

Tort Trial and Insurance Practice Section, American Bar Association

Society for Empirical Legal Studies

American Law and Economics Association

American Association for Justice

Association of American Law Schools

**EXHIBIT B: CLASS ACTIONS WITH RECOVERIES OF $100 MILLION OR MORE AND FEE AWARDS OF AT LEAST 25 PERCENT**

| Mega-Fund Class Actions with Fee Awards of 25% or More | | | |
|---|---|---|---|
| | **Case** | **Recovery (millions)** | **Fee Award** |
| 1 | *Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) | $1,060 | 31.33% |
| 2 | *In re Merry-Go-Round Enterprises, Inc.*, 244 B.R. 327 (Bankr. D. Md. 2000)[5] | $185 | 40.00% |
| 3 | *In re Combustion, Inc.*, 968 F.Supp. 1116 (W.D.La.1997) | $127 | 36.00% |
| 4 | *In re Vitamins Antitrust Litig.*, No. 99-197, 2001 WL 34312839 (D.D.C. July 16, 2001) | $365 | 34.60% |
| 5 | *In re Tricor Indirect Purchaser Antitrust Litigation,* C.A. No. 05-360, Order and Final Judgment Approving Settlement (Oct. 28, 2009); *In re Tricor Direct Purchaser Antitrust Litigation*, C.A. No. 05-340, Order and Final Judgment, 4/23/2009 | $316 | 33.33% |

| Mega-Fund Class Actions with Fee Awards of 25% or More | | | |
|---|---|---|---|
| | Case | Recovery (millions) | Fee Award |
| 6 | *Standard Iron Works v. Arcelormittal et al.*, No. 08-C-5214 (N.D. Ill., Oct. 22, 2014) | $164 | 33.33% |
| 7 | *City of Greenville v. Syngenta Crop Protection*, No. 3:10-cv-00188 (S.D. Ill. Oct. 23, 2012) | $105 | 33.33% |
| 8 | *In re Initial Pub. Offering Sec. Litig.*, 671 F.Supp.2d 467 (S.D.N.Y. 2009) | $510 | 33.30% |
| 9 | *In re Buspirone Antitrust Litig.*, No. 01-MD-1410 (S.D.N.Y. Apr. 11, 2003)[3] | $220 | 33.30% |
| 10 | *In re Relafen Antitrust Litig.*, No. 01-12239, 2004 U.S. Dist. LEXIS 28801 (D. Mass. Apr. 9, 2004) | $175 | 33.30% |
| 11 | *In re OSB Antitrust Litig.*, Master File No. 06-826 (March 4, 2009) | $111 | 33.30% |

| Mega-Fund Class Actions with Fee Awards of 25% or More | | | |
|---|---|---|---|
| | **Case** | **Recovery (millions)** | **Fee Award** |
| 12 | *In re Apollo Group Inc. Securities Litigation*, 2012 WL 1378677, at *9 (D.Ariz., April 20, 2012) | $145 | 33.00% |
| 13 | *In re Automotive Refinishing Paint Antitrust* Litigation, MDL No. 1426 (E.D. Pa. Jan. 3, 2008) | $106 | 32.70% |
| 14 | *Weatherford Roofing Co., et al. v. Employers National Ins. Co.*, No. 91-05637 (116th Dist. Ct, Dallas, TX) (Dec. 1, 1995) | $190 | 31.60% |
| 15 | *In Re (Bank of America) Checking Account Overdraft Litigation*, 830 F.Supp.2d 1330 (S.D. Fla. 2011) | $410 | 30.00% |
| 16 | *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st Cir. 1995) | $220 | 30.00% |

| Mega-Fund Class Actions with Fee Awards of 25% or More | | | |
|---|---|---|---|
| | Case | Recovery (millions) | Fee Award |
| 17 | *In re Linerboard Antitrust Litig.*, 2004 WL 1221350 (E.D. Pa. 2004) | $203 | 30.00% |
| 18 | *In re Home-Stake Prod. Co. Sec. Litig.*, MDL No. 153 (N.D.Okla. Jan. 2, 1990) | $185 | 30.00% |
| 19 | *In re: (Chase Bank) Checking Account Overdraft Litig.*, No. 1:09-MD-02036 (S.D. Fla. Dec., 19, 2012) | $162 | 30.00% |
| 20 | *In re: (Citizens Bank) Checking Account Overdraft Litig.*, No. 1:09-MD-02036 (S.D. Fla. Mar. 12, 2013) | $137.5 | 30.00% |
| 21 | *In re Informix Corp. Sec. Litig.*, Master File No. C-97-1289-CRB (N.D.Cal. Nov. 2, 1999) | $132 | 30.00% |
| 22 | *Kurzweil v. Philip Morris Co., Inc.*, Nos. 94 Civ. 2373(MBM), 94 Civ. 2546(BMB), 1999 WL 1076105 (S.D.N.Y. Nov. 30, 1999) | $123 | 30.00% |

| Mega-Fund Class Actions with Fee Awards of 25% or More | | | |
|---|---|---|---|
| | **Case** | **Recovery (millions)** | **Fee Award** |
| 23 | *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166 (E.D.Pa.2000) | $111 | 30.00% |
| 24 | *Klein v. O'Neal, Inc.*, 705 F.Supp.2d 632 (N.D.Tex. Apr. 9, 2010) | $110 | 30.00% |
| 25 | *In re Cardizem CD Antitrust Litig.*, No. 99-MD-1278, at 18-20 (E.D.Mich. Nov. 26, 2002) | $110 | 30.00% |
| 26 | *In re Prison Realty Sec. Litig.*, Civil Action No. 3:99-0458, 2001 U.S. Dist. LEXIS 21942 (M.D.Tenn. Feb. 9, 2001) | $104 | 30.00% |
| 27 | *In re: Managed Care Litig.*, No. 00-MD-1334, MDL1334, 2003 WL 22850070 (S.D. Fla. Oct. 24, 2003 | $150 | 29.00% |
| 28 | *Cooper v. IBM Personal Pension Plan*, 2005 WL 1981501 (S.D. Ill. 2005)[1] | $314 | 28.30% |

| Mega-Fund Class Actions with Fee Awards of 25% or More | | | |
|---|---|---|---|
| | **Case** | **Recovery (millions)** | **Fee Award** |
| 29 | *In re Oxford Health Plans, Inc. Sec. Litig.*, MDL 1222 (S.D.N.Y. June 2003) | $300 | 28.00% |
| 30 | *In re Deutsche Telekom AG Sec. Litig.*, No. 00-CV-9475-NRB (S.D.N.Y.2005) | $120 | 28.00% |
| 31 | *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2012 WL 1597388 (N.D. Ill. May 7, 2012) | $200 | 27.50% |
| 32 | *Alaska Elec. Pension Fund v. Pharmacia Corp.*, No. 03-1519 (D.N.J. Jan. 30, 2013) | $164 | 27.50% |
| 33 | *In re Sumitomo Copper Litig.*, 74 F.Supp.2d 393 (S.D.N.Y.1999) | $116 | 27.50% |
| 34 | *DeLoach V. Phillip Morris Cos.*, No. 1:00CV01235, 2004 WL 5508762 (M.D.N.C. Mar. 31, 2005 | $310 | 27.00% |

| Mega-Fund Class Actions with Fee Awards of 25% or More | | | |
|---|---|---|---|
| | **Case** | **Recovery (millions)** | **Fee Award** |
| 35 | *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 912 F.Supp. 97 (S.D.N.Y.1996) | $110 | 27.00% |
| 36 | *In re Am. Continental Corp./Lincoln Sav. & Loan Sec. Litig.*, MDL No. 834 (D. Ariz. July 24, 1990)[2] | $250 | 26.60% |
| 37 | *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897, 2000 WL 204112 (N.D. Ill. Feb. 10, 2000) | $697 | 25.00% |
| 38 | *In re Fructose Antitrust Litig.*, MDL No. 1087, Master File No. 94-1577 (C.D. Ill. Oct. 4, 2004) | $531 | 25.00% |
| 39 | *Spartanburg Regional Health Services Dist., Inc., et al. v. Hillenbrand Industries, Inc. et al.*, No. 7:03-2141-HFF (D. S.C. Aug. 15, 2006) | $468 | 25.00% |

| | Mega-Fund Class Actions with Fee Awards of 25% or More | | |
|---|---|---|---|
| | **Case** | **Recovery (millions)** | **Fee Award** |
| 40 | *In re Air Cargo Shipping Servs. Antitrust Litig. ("Air Cargo 1")*, No. 06–MD–1775, 2009 WL 3077396 (E.D.N.Y. Sept. 25, 2009) ($85 million); *In re Air Cargo Shipping Services Antitrust Litig. (Air Cargo II)*, No. 06–MD–1775, MDL 1775, 2011 WL 2909162 (E.D.N.Y. July 15, 2011) ($153.8 million); & *In re Air Cargo Shipping Services Antitrust Litig. (Air Cargo III)*, No. 06–MD–1775, MDL 1775, 2012 WL 3138596 (E.D.N.Y. Aug. 2, 2012) ($183.4 million) | $422.2 | 25.00% |
| 41 | *In Re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, No. M:02-cv-01486-PJH, MDL-02-1486 (N.D. Cal. Nov. 1, 2006) | $326 | 25.00% |

| | Mega-Fund Class Actions with Fee Awards of 25% or More | | |
|---|---|---|---|
| | **Case** | **Recovery (millions)** | **Fee Award** |
| 42 | *In re Rite Aid Corp. Sec. Litig. (Rite Aid I),* 146 F.Supp.2d 706 (E.D.Pa.2001)($193 million) & *In re Rite Aid Corp. Sec. Litig. (Rite Aid II),* 362 F.Supp.2d 587 (E.D.Pa.2005) ($126 million) | $319 | 25.00% |
| 43 | *In re Williams Sec. Litig.,* No. 02-cv-072-SPF-FHM (N.D. Okla. Feb. 12, 2007) | $311 | 25.00% |
| 44 | *Sullivan v. DB Investments, Inc.,* 04-CV 2819 (SRC) (May 22, 2008) (DeBeers antitrust litigation) | $292 | 25.00% |
| 45 | *In re Comverse Technology, Inc. Securities Litig.,* 2010 WL 2653354, 6 (E.D.N.Y., 2010) | $225 | 25.00% |
| 46 | *In re Lease Oil Antitrust Litig.,* 186 F.R.D. 403 (S.D.Tex.1999)[4] | $190 | 25.00% |

| Mega-Fund Class Actions with Fee Awards of 25% or More | | | |
|---|---|---|---|
| | **Case** | **Recovery (millions)** | **Fee Award** |
| 47 | *MBA Surety Agency, Inc. v. AT&T Mobility LLC*, No.1222-CC09746 (Mo. Cir. Ct. Mar. 7, 2013) | $152.6 | 25.00% |
| 48 | *In re Computers assocs. Class Action Sec. Litig.*, CV-98-4839 (TCP) (E.D. NY 2003)[6] | $136 | 25.00% |
| 49 | *In re Infant Formula Antitrut.*, MDL No. 878, (N.D. Fla. Sept. 7, 1993) | $125 | 25.00% |
| 50 | *In re Sunbeam Sec. Litig.*, 176 F.Supp.2d 1323 (S.D.Fla.2001) | $110 | 25.00% |
| 51 | *In Re: Chase Bank USA, N.A. "Check Loan" Contract Litigation,* 3:09 md-02032-MMC (D. N.J. 2012) | $100 | 25.00% |

[1] The Court awarded a graduated amount ranging from 17–29% of the recovery. After an appeal reversed a portion of the award, this table reflects the actual settlement and fee realized.

[2] The Court awarded an increasing graduated amount (25% of the first $150 million and 29% of any larger amount). This table reflects the values realized.

59

[3] The global settlement exceeded $500 million, of which $220 million was reserved for the Direct Purchaser Class. The trial court approved a fee equal to 33 1/3% of the Direct Purchaser fund.

[4] The Court awarded 25% in five settlements and a 15% fee award in two others. This table lists $190 million, the total recovery from all settlements.

[5] While technically not a class action, this case is equivalent to a class-action in which the fee was negotiated *ex ante*.

[6] The settlement fund was paid in shares of stock. Class counsel received a percentage of the stock as fees.

[7] The attorneys' fee award was not part of the final judgment. The settlement notice stated that class counsel would request 20% of the recovery as fees and the final judgment approving the settlement.

[8] This amount reflects only the cash relief. Additional non-cash relief was valued at $30 million.

[9] The fund amount excludes $10 million in a "Promotional Achievement Fund" and $43.5 million in "future pay equity adjustments."