1  Richard M. Heimann (State Bar No. 63607)
   Kelly M. Dermody (State Bar No. 171716)
2  Brendan P. Glackin (State Bar No. 199643)
   Dean M. Harvey (State Bar No. 250298)
3  Anne B. Shaver (State Bar No. 255928)
   LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
4  275 Battery Street, 29th Floor
   San Francisco, CA 94111-3339
5  Telephone: (415) 956-1000
   Facsimile: (415) 956-1008
6
   *Co-Lead Class Counsel*
7
   [Additional counsel listed on signature page]
8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11                  SAN JOSE DIVISION

12

13  IN RE: HIGH-TECH EMPLOYEE          Master Docket No. 11-CV-2509-LHK
    ANTITRUST LITIGATION
14                                     **NOTICE OF MOTION AND MOTION
    THIS DOCUMENT RELATES TO:          FOR ATTORNEYS' FEES,
15                                     REIMBURSEMENT OF EXPENSES, AND
    ALL ACTIONS                        SERVICE AWARDS**
16
                                       Date:      July 9, 2015
17                                     Time:      1:30 pm
                                       Courtroom: Room 8, 4th Floor
18                                     Judge:     Honorable Lucy H. Koh

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ................................................................................................. 1

II. BACKGROUND ................................................................................................. 2

    A.   The United States Department of Justice Investigated Defendants' Conduct and Declined to Seek Any Penalties ...................................... 2

    B.   Class Counsel Investigated the Potential Case and Assessed Its Significant Risks ............................................................................................ 3

    C.   Class Counsel Were The Only Firms to Take On The Challenge and Agree to Prosecute a Private Action ................................................................ 5

    D.   Class Counsel Prosecuted This Case Tenaciously and with Great Skill on Behalf of the Class .................................................................................. 6

    E.   Class Counsel Obtained an Historic and Unprecedented Recovery ............ 12

III. ARGUMENT ..................................................................................................... 13

    A.   The Requested Fee is Reasonable and Appropriate .................................. 13

        1.   Class Counsel are Entitled to a Fee Under the Common Fund Doctrine ................................................................................... 14

        2.   The Court Should Calculate Class Counsel's Fee As a Percentage of the Common Fund ................................................................. 14

        3.   A Fee of Approximately 19.5 Percent is Significantly Less Than the Benchmark Fee of 25 Percent and is Reasonable ...................... 15

            a.   Class Counsel Achieved a Record-Setting Recovery ................... 16

            b.   The Fee Was 100% Contingent ................................................. 17

            c.   This Action Required Unusual Effort and Skill ........................... 17

            d.   A Comparison to Fee Awards in Other Cases Demonstrates the Reasonableness of the Fee Requested ............................... 19

        4.   A Lodestar-Multiplier "Cross-Check" Further Confirms the Reasonableness of the Fee .......................................................... 20

            a.   The Lodestar Reflects Efficient Prosecution of This Action ........ 20

            b.   Counsel Did Not Settle "Early" ................................................. 21

            c.   Class Counsel's Costs are Reasonable and Should be Reimbursed ............................................................................. 22

    B.   The Requested Service Awards are Reasonable and Appropriate ............. 22

IV. CONCLUSION ................................................................................................. 25

**Page**

**CASES**

*Allapattah Servs., Inc. v. Exxon Corp.*,
454 F. Supp. 2d 1185 (S.D. Fla. 2006) ................................................................. 19

*Beck, et al. v. Boeing Co.*,
Case No. 00-CV-0301-MJP, Dkt. 1067 (W.D. Wash Oct. 8, 2004) ........................ 24

*Beckman v. KeyBank, N.A.*,
293 F.R.D. 467 (S.D.N.Y. 2013) ................................................................. 21, 22

*Blum v. Stenson*,
465 U.S. 886 (1984) ................................................................................. 14, 20

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) ......................................................................................... 14

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) ........................................................................................... 5

*Castaneda v. Burger King Corp.*,
2010 U.S. Dist. LEXIS 78299 (N.D. Cal. Jul. 12, 2010) ................................... 15

*Cruz v. Sky Chefs, Inc.*,
2014 U.S. Dist. LEXIS 176393 (N.D. Cal. Dec. 19, 2014) ............................... 20

*Dyer v. Wells Fargo Bank, N.A.*,
2014 U.S. Dist. LEXIS 150129 (N.D. Cal. Oct. 22, 2014) ............................... 15

*Garner v. State Farm*,
2010 U.S. Dist. LEXIS 49482 (N.D. Cal. Apr. 22, 2010) ................................. 15

*Hawaii v. Standard Oil Co.*,
405 U.S. 251 (1972) ......................................................................................... 25

*In re Activision Secs. Litig.*,
723 F. Supp. 1373 (N.D. Cal. 1989) ................................................................. 15

*In re Apple iPhone/iPod Warranty Litig.*,
2014 U.S. Dist. LEXIS 52050 (N.D. Cal. Apr. 14, 2014) ................................. 15

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011) ............................................................................. 15

*In re Cardinal Health Inc. Sec. Litig.*,
528 F. Supp. 2d 752 (S.D. Ohio 2007) .......................................................... 21, 22

*In re High-Tech Emp. Antitrust Litig.*,
289 F.R.D. 555 (N.D. Cal. 2013) ..................................................................... 25

*In re Linerboard Antitrust Litig.*,
2004 U.S. Dist. LEXIS 10532 (E.D. Pa. Jun. 2, 2004) ..................................... 20

*In re Media Vision Tech. Sec. Litig.*,
913 F. Supp. 1362 (N.D. Cal. 1995) ................................................................. 22

*In re Omnivision Techs., Inc.*,
559 F. Supp. 2d 1036 (N.D. Cal. 2007) ........................................................ 15, 17

*In re Relafen Antitrust Litig.*,
2004 U.S. Dist. LEXIS 28801 (D. Mass. Apr. 9, 2004) ..................................... 20

*In re Rite Aid Corp. Sec. Litig.*,
   396 F.3d 294 (3d Cir. 2005)..........................................................................20, 22

*In re RJR Nabisco, Inc. Secs. Litig.*,
   88 Civ. 7905 (MBM), 1992 U.S. Dist. LEXIS 12702 (S.D.N.Y. Aug. 24, 1992)....................22

*In re Sumitomo Copper Litig.*,
   74 F. Supp. 2d 393, 400 (S.D.N.Y. 1999)..........................................................20

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2013 U.S. Dist. LEXIS 6607 (N.D. Cal. Jan. 14, 2013) ...........................................15

*In re Titanium Dioxide Antitrust Litig.*,
   No. 10-CV-00318 (RDB), 2013 U.S. Dist. LEXIS 176099 (D. Md. Dec. 13, 2013)...............24

*In re Vitamins Antitrust Litig.*,
   2001 U.S. Dist. LEXIS 25067 (D.D.C. July 16, 2001) ............................................20

*In re Wash. Pub. Power Supply System Sec. Litig.*,
   19 F.3d 1291, 1300 (9th Cir. 1994)............................................................14, 17, 20

*Ingram v. The Coca-Cola Co.*,
   200 F.R.D. 685 (N.D. Ga. 2001)......................................................................24

*Ivax Corp. v. Aztec Peroxides, LLC, et al.*,
   Case No. 02-CV-00593 (D.D.C. Aug. 24, 2005).................................................24

*Knight v. Red Door Salons, Inc.*,
   2009 U.S. Dist. LEXIS 11149 (N.D. Cal. Feb. 2, 2009)..........................................15

*Kramer v. Autobytel, Inc.*,
   2012 U.S. Dist. LEXIS 185800 (N.D. Cal. Jan. 27, 2012) ......................................15

*Kurzweil v. Philip Morris Cos.*,
   1999 U.S. Dist. LEXIS 18378 (S.D.N.Y. Nov. 30, 1999) .......................................20

*Larsen v. Trader Joe's Co.*,
   2014 U.S. Dist. LEXIS 95538 (N.D. Cal. July 11, 2014).........................................15

*Lieff, Cabraser, Heimann & Bernstein, LLP v. United States Dept. of Justice*,
   Case No. 11-cv-5105-HRL, Dkt. 1 (N.D. Cal. Oct. 18, 2011) ....................................7

*Marchbanks Truck Serv. v. Comdata Network, Inc.*,
   Case No. 07-CV-1078, Dkt. 713 (E.D. Pa. July 14, 2014) .......................................24

*Mills v. Elec. Auto-Lite Co.*,
   396 U.S. 375 (1970)......................................................................................22

*New England Carpenters Health Benefits Fund v. First Databank, Inc.*,
   No. 05-11148-PBS, 2009 U.S. Dist. LEXIS 68419 (D. Mass. Aug. 3, 2009)...............21, 22

*Reiter v. Sonotone Corp.*,
   442 U.S. 330 (1979)...................................................................................5, 25

*Rieckborn v. Velti PLC*,
   2015 U.S. Dist. LEXIS 13542 (N.D. Cal. Feb. 3, 2015)..........................................20

*Roberts v. Texaco, Inc.*,
   979 F. Supp. 185 (S.D.N.Y. 1997)...................................................................23

*Six Mexican Workers v. Ariz. Citrus Growers*,
   904 F.2d 1301 (9th Cir. 1990)........................................................................14

*State of California v. eBay Inc.*,
Case No. 12-CV-5874-EJD-PSG, Dkt. 55-5 (N.D. Cal. May 1, 2014) ..................................... 12

*Staton v. Boeing Co.*,
327 F.3d 938 (9th Cir. 2003) .................................................................................................... 14, 23

*Steiner v. Am. Broad. Co.*,
248 F. App'x. 780 (9th Cir. 2007) ........................................................................................... 21

*Stop & Shop Supermarket Co. v. Smithkline Beecham Corp.*,
No. 03-4578, 2005 U.S. Dist. LEXIS 9705 (E.D. Pa. May 19, 2005) ..................................... 21

*Sullivan v. DB Invs., Inc.*,
667 F.3d 273 (3d Cir. 2011)
*cert. denied,* 132 S. Ct. 1876 (2012) ............................................................................ 22, 24, 25

*United States v. eBay Inc.*,
Case No. 12-CV-5869-EJD, Dkt. 36 (N.D. Cal. June 4, 2013) ................................................ 12

*Vedachalam v. Tata Consultancy Servs., Ltd.*,
2013 U.S. Dist. LEXIS 100796 (N.D. Cal. July 18, 2013) ...................................................... 15

*Velez v. Novartis Pharms. Corp.*,
No. 04 Civ. 09194 (CM), 2010 U.S. Dist. LEXIS 125945 (S.D.N.Y. Nov. 30, 2010) ........ 24, 25

*Vizcaino v. Microsoft Corp.*,
290 F.3d 1043 (9th Cir. 2002) ........................................................................................... passim

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
396 F.3d 96 (2d Cir. 2005) ....................................................................................................... 14

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
395 U. S. 100 (1969) .................................................................................................................. 5

**STATUTES**

18 U.S.C. § 3571(d) ...................................................................................................................... 2

**RULES**

Fed. R. Civ. P. 23(b)(3) ............................................................................................................ 4, 8

Fed. R. Civ. P. 23(h)(1) ............................................................................................................... 1

Fed. R. Civ. P. 54(d)(2) ............................................................................................................... 1

Fed. R. Civ. P. Rule 23 ................................................................................................................ 4

**OTHER AUTHORITIES**

Fed. Judicial Ctr., *Awarding Attorneys' Fees & Managing Fee Litig.* at 73 (2005) ..................... 14

Nantiya Ruan, *Bringing Sense to Incentives: An Examination of Incentive Payments to
Named Plaintiffs in Employment Discrimination Class Actions*, 10 Employment Rights
and Employment Policy Journal 395, 396-397 (2006) ............................................................. 23

**NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on July 9, 2015 at 1:30 pm., or as soon thereafter as this matter may be heard, before the Honorable Lucy H. Koh, United States District Court for the Northern District of California, located in Courtroom 8, on the 4th Floor of the Robert F. Peckham Federal Building, 280 South 1st Street, San Jose, California, Plaintiffs will, and hereby do, move the Court pursuant to Federal Rule of Civil Procedure 23(h)(1) and 54(d)(2) for an order awarding:

1. Attorneys' fees to Class Counsel in the amount of $81,125,000, which is approximately 19.5% of the total Settlement Fund of $415,000,000, and below the Ninth Circuit's benchmark of 25%;

2. Unreimbursed expenses Class Counsel necessarily incurred in connection with the prosecution of this action after accounting for partial reimbursement of expenses through the preceding settlements with Intuit, Inc., Lucasfilm Ltd., and Pixar; and

3. Service awards of up to $160,000 for each of the five Court-appointed Class Representatives.

This motion is based on this Notice of Motion and the accompanying Memorandum of Points and Authorities; the Declaration of Kelly M. Dermody; the Declaration of Brendan P. Glackin; the Declaration of Dean M. Harvey; the Declaration of Brian T. Fitzpatrick; the Declaration of Eric L. Cramer; the Declaration of James J. Sabella; and the Declarations of Class Representatives Mark Fichtner, Siddharth Hariharan, and Daniel Stover; argument by counsel at the hearing before this Court; any papers filed in reply; and all papers and records in this matter.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     INTRODUCTION

This case began with an investigation by the Antitrust Division of the United States Department of Justice ("DOJ").  After investigating the facts and reviewing expert submissions by Adobe Systems Inc., Apple Inc., Google Inc., Intel Corp., Intuit Inc., Lucasfilm Ltd., and Pixar (collectively, "Defendants"), the DOJ closed its investigation of Defendants' anti-solicitation agreements without seeking restitution of any kind.  That might have been the end of the story.  Indeed, for the seven months following public disclosure of the DOJ's investigation, it was.  Then, five courageous software engineers and former employees of Defendants retained Class Counsel to take up the challenge of prosecuting a precedent-setting and challenging class action that picked up where the DOJ left off.  Their first attorneys at Lieff, Cabraser, Heimann & Bernstein LLP ("LCHB") assembled a team of co-counsel, who together litigated this action relentlessly for four years.  The result of these efforts is an historic recovery for a wage suppression case.  Class Counsel went toe-to-toe with one of the most well-financed group of Defendants ever assembled, defeating motions to dismiss; completing massive discovery, including taking over 100 depositions; assembling a factual and expert record that the Court recognized was without precedent;[1] litigating two rounds of class certification and succeeding in certifying a class of over 64,000 high-tech workers; beating back two attempts at Ninth Circuit intervention; defeating motions for summary judgment; and briefing and arguing countless novel and complex issues.  Class Counsel took huge risks, invested an enormous amount of time and money, and secured a cash recovery for the Class that exceeds any recovery previously achieved in comparable cases.

Class Counsel seek only approximately 19.5 percent of the settlement fund.[2]  This is a reasonable percentage in light of all the circumstances.  *Vizcaino v. Microsoft Corp.*, 290 F.3d

---

[1] Order Granting Plaintiffs' Supp. Mot. for Class Certification, Dkt. 531, at 69 ("This Court could not identify a case at the class certification stage with the level of documentary evidence Plaintiffs have presented in the instant case.").

[2] This requested percentage locks in Class Counsel's prior request of a 25% benchmark fee in connection with the previously-rejected $324.5 million, ensuring that Class members receive all of the benefit of the additional monies Class Counsel secured in the instant $415 million settlement.

MOT. FOR ATTORNEYS' FEES, REIMBURSEMENT
OF EXPENSE, AND SERVICE AWARDS
MASTER DOCKET NO. 11-CV-2509-LHK

1043, 1048-50 (9th Cir. 2002).  Class Counsel seek $1,184,810.98 in unreimbursed out-of-pocket expenses that Class Counsel necessarily incurred (Class Counsel incurred total out-of-pocket expenses of over $4,884,655.29 prosecuting this action, however $3,699,844.31 in costs were previously reimbursed from the earlier settlements with Intuit, Lucasfilm, and Pixar).  Finally, Class Counsel seek service awards in an amount up to $160,000 each to the current Class Representatives, as well as to the estate of Brandon Marshall, to compensate them for their substantial time and effort, the significant risks they undertook on behalf of the Class with no guarantee that they would receive anything in return, and the valuable public service they provided to enforce the nation's antitrust laws.

## II.  BACKGROUND

### A.  The United States Department of Justice Investigated Defendants' Conduct and Declined to Seek Any Penalties

In 2009, the Antitrust Division of the United States Department of Justice ("DOJ") began investigating the recruiting practices of Defendants.  (Glackin Decl., ¶ 7.)  The DOJ reviewed Defendants' records, including email communications; interviewed witnesses; and reviewed detailed "white papers" assembled by lawyers and economic experts retained by Defendants.  The DOJ concluded that Defendants reached and implemented a series of bilateral agreements to restrain competition for labor in violation of Section One of the Sherman Act.

The DOJ could have prosecuted these violations as felonies, subjecting each corporate defendant to fines of up to $100,000,000, and subjecting individuals to fines of up to $1,000,000 and/or imprisonment not exceeding 10 years.  15 U.S.C. § 1.  In addition, the DOJ had the authority under the federal Criminal Fine Enforcement Act to seek to fine each Defendant twice the gross amount gained by the Defendant from the violation, or twice the gross amount of the loss suffered by the victims.  18 U.S.C. § 3571(d).  For example, the DOJ successfully used the Criminal Fine Enforcement Act to obtain a fine of $500,000,000 from AU Optronics Corporation of Taiwan for conspiring with other LCD manufacturers.[3]

---

[3] *See* http://www.justice.gov/atr/public/criminal/sherman10.pdf.  The DOJ's investigation into the LCD Panel price-fixing cartel resulted in 14 guilty pleas.  LCHB was Co-Lead Class counsel in the private LCD case and prosecuted the case to verdict for Plaintiffs at trial.  It remains the most

But, after reviewing the facts and the challenges of this case, the DOJ declined to seek penalties of any kind. Instead, the DOJ closed its investigation by filing stipulated proposed final civil judgments in which Defendants denied any wrongdoing. (Glackin Decl., ¶ 7.) Subsequent civil plaintiffs could not even use the stipulated proposed final judgments as *prima facie* evidence of Defendants' alleged misconduct, because the DOJ closed its investigation before taking any testimony. 15 U.S.C. § 16(a). This was not an inviting setting for the private bar to step in.

**B.** **Class Counsel Investigated the Potential Case and Assessed Its Significant Risks**

LCHB opened an investigation the same day the DOJ filed the stipulated judgments: September 24, 2010. (Declaration of Kelly M. Dermody, Ex. 12, filed herewith.) For over seven months thereafter, LCHB investigated the facts, interviewed several leading econometricians and labor economists, and assessed the feasibility of proving liability and damages on a class-wide basis. LCHB attorneys and staff devoted over 334 hours to pre-filing investigation. (Glackin Decl., ¶ 9.)

The case presented several critical challenges. <u>First</u>, Defendants' agreements involved non-price restraints on competition for labor, unlike a conventional cartel to fix prices in a downstream product market. This created a host of issues by itself. Because the DOJ only alleged that Defendants entered into certain bilateral agreements not to solicit each other's employees, a civil litigant would have to quantify the effect of the agreements—and potentially each agreement individually—despite other substantial avenues of competition (such as applications in response to job postings). During the pre-filing investigation, Class Counsel anticipated Defendants would argue that their agreements should be subject to the rule of reason, rather than the *per se* rule, because of the labor context and the unusual nature of the restriction at issue. Class Counsel knew Defendants would also likely contend that the rule of reason applied because their restrictions related to technology collaborations. If Defendants prevailed in requiring the rule of reason, a plaintiff would have to prove both market power in a relevant antitrust market and that the anticompetitive effects of the restraints outweighed their

recent jury verdict for plaintiffs seeking damages in an antitrust class action in the Northern District of California.

procompetitive virtues.   In effect, a plaintiff might have to try its case against the social benefit of the iPhone, Pixar movies, Photoshop, and Intel microchips.  In retrospect it might seem obvious given the discovery and expert record that has been developed that the *per se* rule applies; but back in 2010, Class Counsel only knew that no such trial had ever before been attempted.

With respect to damages, assessing the impact of a reduction in solicitations (or "cold calls") on employee pay is a very different and more challenging task than assessing the impact of a price-fixing cartel on the price of a product.  This would be particularly true given the variety of job titles at issue across seven different companies, nationwide.  A plaintiff would have to delve into the structure of how compensation worked within and across seven large companies, and prove the relationship between increased solicitations and increased pay across all members of a proposed class.  This had never before been attempted in litigation, much less accomplished.

<u>Second</u>, in addition to the legal complexities, Class Counsel knew the resources of the Defendants would be essentially limitless.  No civil action had ever before been attempted against the combined resources of these seven companies, which together have a market capitalization of well over a trillion dollars.  Defendants would certainly spare no expense or effort in defending the case.  This concern would be felt with particular urgency to the individual named plaintiffs, who would be filing suit not only against the most powerful companies in their industry, but also against their own prior (and potentially future) employers.

<u>Third</u>, Class Counsel knew that obtaining monetary relief would require certifying a class of employment-related damages claims under Federal Rule of Civil Procedure 23(b)(3), a daunting undertaking given shifting Rule 23 standards over the past several years.  A nationwide class of tens of thousands of employees, asserting antitrust claims, across multiple companies, and across a variety of different positions, had never before been certified.  A plaintiff would need to demonstrate methodologies that would support a finding that evidence common to the class as a whole would predominate in demonstrating impact, and would need to demonstrate methodologies for calculating damages on a class-wide basis.  This would (and did) require millions of dollars of expert analysis, supported by facts developed during wide-ranging

discovery. As this Court knows, the examples of employee classes certified to bring Sherman Act damages claims are few and far between; none of them, successful or not, involved a class of this size and scope.

### C. Class Counsel Were The Only Firms to Take On The Challenge and Agree to Prosecute a Private Action

The challenges of this case are most eloquently demonstrated by the fact that no other firms or plaintiffs came forward to prosecute it. To "'open[] the door of justice' to individuals harmed by antitrust violations while at the same time penalizing antitrust violators, Congress chose to allow individuals to serve as private attorneys general in antitrust actions . . . ." (Order Granting Plaintiffs' Supp. Mot. for Class Certification, Dkt. 531 at 13, quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477,486 n.10 (1977).) Private antitrust actions serve "the high purpose of enforcing the antitrust laws," (*id.*, quoting *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U. S. 100, 130-31 (1969)), and "provide a significant supplement to the limited resources available to the Department of Justice for enforcing the antitrust laws and deterring violations," (*id.*, quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979)).

In the over seven months following the DOJ's stipulated proposed final judgments with Defendants, no cases were filed addressing the alleged misconduct. On May 4, 2011, LCHB filed a class action on behalf of individual and representative plaintiff Siddharth Hariharan. Going beyond the DOJ's allegations, the complaint charged that the bilateral agreements were part of a common understanding among all seven Defendants. (Compl. ¶¶ 48-85.) LCHB's own independent investigation found the relationship among the bilateral agreements in the overlapping members of Defendants' boards of directors, and by analyzing the timing and terms of Defendants' secret agreements. (*Id.*) This made possible joint and several liability among Defendants for all bilateral agreements at issue, and set the stage for methodologies that could demonstrate impact and damages on a class-wide basis. The complaint also explained the market at issue (skilled technical labor), and the economic mechanisms by which the misconduct harmed members of the class. (*Id.* ¶¶ 35-47, 83-85.)

Upon investigating the similar claims of Mark Fichtner, Daniel Stover, Brandon Marshall, and Michael Devine, LCHB filed four additional cases, and invited the firms of Berger & Montague, P.C., and Grant & Eisenhofer P.A. to participate in the case on behalf of Plaintiffs. In contrast to typical antitrust actions, no other law firm, and no other plaintiffs, filed cases asserting claims based on these agreements.[4] The Court consolidated the five cases on September 12, 2011 (Dkt. 64), and Plaintiffs filed a Consolidated Amended Complaint the next day (Dkt. 65). The Joseph Saveri Law Firm joined the case in June 2012, after Mr. Saveri departed LCHB.

### D. Class Counsel Prosecuted This Case Tenaciously and with Great Skill on Behalf of the Class

Defendants began by challenging the pleadings while seeking to stay discovery. All Defendants jointly, and Lucasfilm separately, moved to dismiss Plaintiffs' claims. (Dkts. 79 & 83.) Class Counsel successfully argued that the Consolidated Amended Complaint pled plausible violations of the Sherman Act, that plaintiffs suffered antitrust injury, and that Lucasfilm could not assert a defense under the "federal enclave doctrine" (this appears to have been the first time the "federal enclave doctrine" had ever been invoked to defend against an antitrust claim). (Dkt. 91 and 92.) The Court denied the motions to dismiss, with the exception that Plaintiffs' UCL claim for restitution and disgorgement was dismissed for failure to allege a vested interest. (Apr. 18, 2012 Order; Dkt. 119.)

Having obtained the DOJ production, Class Counsel then aggressively sought discovery. Class Counsel served 75 document requests, in response to which Defendants collectively produced over 325,000 documents (over 3.2 million pages). (Glackin Decl., ¶ 26.) Discovery was hard-fought. Prosecuting these discovery requests required extensive conferences and follow-up with Defendants' counsel regarding search terms, custodians, and search protocols, and regular requests to the Court when Defendants' responses were lacking or incomplete.

Class Counsel also prepared and took 101 depositions of fact, 30(b)(6) and expert witnesses, during which Class Counsel introduced 1,423 exhibits. (Glackin Decl., ¶¶ 4, 27, 29,

---

[4] Indeed, it was not until years later, after *settlement* of the case, that other firms and plaintiffs sought to bring claims based on similar alleged agreements uncovered and made public by Class Counsel's efforts.

44.) To accomplish this within the ambitious schedule, depositions were often double, triple, and quadruple-tracked for the same days (with class counsel taking depositions in four different locations simultaneously). (*Id.* ¶ 16.) This included March 29, 2013, a day in which Class Counsel took five depositions simultaneously. (*Id.*) Defendants opposed depositions of many of their chief executives, but Class Counsel successfully pushed back and took testimony from every relevant chief executive and other senior managers. These depositions yielded critical testimony, such as the admission by Pixar's Ed Catmull that the competition he hoped to avoid "messes up the pay structure. It does. It makes it very high . . . . That's just the reality we've got. And I do feel strongly about it." (Order Granting Plaintiffs' Supp. Mot. for Class Certification, Dkt. 531 at 51 (quoting Catmull Depo. at 179).) Class Counsel also deposed Defendants' human resources and other personnel relevant to proving impact and damages to the proposed class. In addition, class counsel deposed individuals with knowledge of collaborative commercial activities among the Defendants, in order to prepare for, and address, possible defenses arising out of a potential application of the rule of reason.

Class Counsel also served 28 subpoenas on third parties, negotiating the production of 8,809 pages of documents. Class Counsel submitted a Freedom of Information Act request to the DOJ, and then filed a complaint for injunctive relief against the DOJ when the DOJ refused to provide documents in response to the request. *Lieff, Cabraser, Heimann & Bernstein, LLP v. United States Dept. of Justice*, Case No. 11-cv-5105-HRL, Dkt. 1 (N.D. Cal. Oct. 18, 2011). Defendants also propounded document requests, in response to which Plaintiffs produced over 31,000 pages, and took the depositions of the Named Plaintiffs. (*Id.*) Defendants served 34 subpoenas on third parties, including the then-current and former employers of the Named Plaintiffs. (*Id.*) Defendants' subpoenas resulted in 1,834 pages of documents produced, which Class Counsel also reviewed. (*Id.*)

With expert assistance, Class Counsel analyzed vast amounts of computerized employee compensation and recruiting data, including approximately 80,000 files of employment-related data exceeding 50 gigabytes. (Glackin Decl., ¶ 26.) As generally described in the Declaration of Brendan Glackin and as reflected in the Court file, Class Counsel retained four experts and

numerous consultants to review and analyze this data, documents produced in the action, deposition testimony, and other relevant facts; apply their relevant expertise to those facts; and form opinions regarding a range of assigned tasks. Those experts included Dr. Edward Leamer of the University of California, Los Angeles, who provided six expert reports consisting of 433 pages of analysis. Defendants deposed Dr. Leamer four times. Class Counsel retained Dr. Kevin Hallock of Cornell University, who provided two expert reports consisting of 232 pages of analysis. Defendants deposed him twice. Class Counsel also retained Dr. Alan Manning of the London School of Economics, who provided one expert report, and Dr. Matthew Marx of the Sloan School of Management at the Massachusetts Institute of Technology, who provided two expert reports. Defendants deposed them as well.

Class Counsel and their experts also reviewed and analyzed the expert analysis Defendants submitted. Defendants retained seven experts, who collectively submitted a total of 1,733 pages of expert reports, including detailed and extensive quantitative analyses. Plaintiffs' experts assessed these reports and provided responses to them. Class Counsel deposed Defendants' experts, including three depositions of Dr. Murphy.

The Court provisionally denied the motion on April 5, 2013. Although finding the Rule 23(a) factors satisfied, and finding proof of damages and the conspiracy to be admissible and common, the Court requested further briefing on whether the Rule 23(b)(3) predominance standard was met with respect to impact. (Apr. 5, 2013 Order Granting in Part, Denying in Part Motion for Class Certification, Dkt. 382.) The Court acknowledged that the documentary evidence Class Counsel assembled "weighs heavily in favor of finding that common issues predominate over individual ones for the purpose of being able to prove antitrust impact." (*Id.* at 33.) However, the Court found the partial record available at the time of the original motion to be inadequate: "the Court believes that, with the benefit of discovery that has occurred since the hearing on this motion, Plaintiffs may be able to offer further proof to demonstrate how common evidence will be able to show class-wide impact to demonstrate why common issues predominate over individual ones." (*Id.* at 45.)

This was a critical moment in the prosecution of the case, and one that highlighted the risks Class Counsel undertook in the representation. As of April 5, 2013, Class Counsel had devoted thousands of hours to prosecuting the action with no guarantee of any compensation.[5] Class counsel had also incurred substantial out-of-pocket costs, primarily to outside economic experts and consultants. No settlements had been obtained; there was no guarantee the class and Class Counsel would ever receive a nickel of this investment back. Class Counsel responded to the denial of class certification by renewing and redoubling their efforts, investing substantially more time and out-of-pocket costs, in another effort to certify the proposed class. Between April 6, 2013 (when the Court denied class certification), and October 24, 2013 (when the Court granted class certification), Class Counsel devoted thousands of additional hours of attorney and staff time, and substantial additional out-of-pocket costs.[6]

Class Counsel filed a Supplemental Motion for Class Certification to address the Court's request. (Dkts. 418 & 455.) Class Counsel marshaled additional documentary evidence, testimony, and expert analyses. (Decl. of Dean M. Harvey, Dkt. 418-1; Decl. of Lisa J. Cisneros, Dkt. 418-2; Leamer Supp., Dkt. 418-4; Hallock Rpt., Dkt. 418-3; Decl. of Anne B. Shaver, Dkt. 456; and Leamer Supp. Reply, Dkt. 457.) This included the addition of Dr. Kevin Hallock as an expert witness, who was the Donald C. Opatrny '74 Chair of the Department of Economics, the Joseph R. Rich '80 Professor, Professor of Economics and Human Resource Studies, and Director of the Institute for Compensation Studies at Cornell University. Class Counsel submitted additional evidence that the no-cold calling agreements at issue in this case were designed substantially to disrupt recruiting of Technical Class employees. Accordingly, Class Counsel focused their supplemental briefing and analysis on demonstrating impact to all or nearly all of the Technical Class. Defendants opposed the motion and submitted supplemental briefing, expert reports, and documents in support of their opposition. (Opp. to Supp. Mot. for Class Cert., Dkt. 439; Decl. of Christina Brown, Dkt. 445; Decl. of Lin Kahn, Dkt. 446; Murphy Supp. Rpt., Dkt. 440; Shaw Rpt., Dkt. 442.) Class Counsel deposed Defendants' experts and submitted another

---

[5] LCHB alone had invested well over 11,000 hours by that time. (Glackin Decl., ¶¶ 9, 18, 32.)
[6] LCHB alone invested thousands of hours in this period. (Glackin Decl., ¶ 46.)

extensive set of materials with their reply in support of class certification, including an additional expert analysis by Dr. Leamer.  (Dkt. Nos. 455-58.)

On October 24, 2013, the Court granted Plaintiffs' Supplemental Motion for Class Certification and certified the proposed Technical Class.  (Dkt. 531.)  As the Court's detailed analysis demonstrated, class certification was made possible by virtue of the extensive evidentiary and expert record Class Counsel assembled.  (*Id.*)

Plaintiffs reached settlements with Defendants Lucasfilm and Pixar, and with Defendant Intuit, and presented them to the Court on September 21, 2013.  (Dkt. 501.)  On October 30, 2013, the Court granted preliminary approval.  (Dkt. 540.)  Plaintiffs' Motions for Final Approval, Attorneys' Fees and Costs, and Service Awards with respect to those settlements have been resolved, after a hearing on May 1, 2014.  (Dkts. 915 & 916.)

On November 7, 2013, Defendants sought review of the Court's class certification order by the Ninth Circuit.  (Ninth Cir. Case No. 13-80223, Dkt. 1.)  The United States and California Chambers of Commerce filed amicus briefs, urging the Ninth Circuit to grant the petition and reverse the Court's order.  (*Id.*, Dkts. 8 and 9.)  Class Counsel opposed the petition (*Id.*, Dkt. 10), and the Ninth Circuit denied Defendants' petition on January 15, 2014 (Dkt. 594).

The Settling Defendants filed individually and collectively for summary judgment (on the grounds that Plaintiffs had not marshaled sufficient evidence that each of the defendants had participated in a single multilateral conspiracy to suppress compensation), for exclusion of the testimony of two of Plaintiffs' experts, Dr. Edward Leamer and Dr. Matthew Marx under *Daubert*, and to strike portions of Dr. Leamer's reply report as improper rebuttal.  (Dkts. 554, 556, 557, 559, 560, 561, 564, & 570.)  Class Counsel responded with another set of voluminous materials and legal analysis, including reports from two additional experts Class Counsel retained: Dr. Alan Manning, Professor of Economics at the London School of Economics (one of the world's leading authorities on employer market power); and Dr. Matthew Marx, Associate Professor of Technological Innovation, Entrepreneurship, and Strategic Management at the Massachusetts Institute of Technology Sloan School of Management.  (Dkts. 600-608.)

The Court denied all motions for summary judgment. (Dkts. 771 & 788.) The Court granted in part and denied in part the motions to exclude Dr. Leamer's testimony and strike portions of his reply report. (Dkt. 788.) Class Counsel filed a motion for application of the *per se* standard with supporting evidence (Dkt. 830) and Defendants opposed it (Dkt. 887). Defendants moved *in limine* to exclude various categories of evidence (Dkt. 855), and class counsel opposed their motions (Dkt. 882). Class Counsel also moved to compel production of a document, the identity of which remains under seal (Dkt. 789-2), and Defendants opposed it (Dkt. 878-1). Class Counsel also prepared extensively for trial, including by retaining a highly-experienced jury consultant to assist with jury research and selection. (Glackin Decl., ¶¶ 88-92.)

On May 22, 2014, Plaintiffs Mark Fichtner, Siddharth Hariharan, and Daniel Stover moved the Court to preliminarily approve a settlement agreement with Settling Defendants providing for a settlement fund of $324,500,000. The Court denied preliminary approval on August 8, 2014. (Dkt. 974.) Thereafter, the parties resumed arm's-length negotiations with the assistance of mediator Hon. Layn Phillips (Ret.), while continuing to litigate pre-trial matters. Class Counsel filed a reply in support of its motion for application of the *per se* standard (Dkt. 988), and Defendants requested leave to file a supplemental opposition (Dkts. 990 & 990-1), which Class Counsel Opposed (Dkt. 992). Class Counsel also filed a motion to unseal all papers associated with its motion to compel. (Dkt. 991.)

On September 4, 2014, Defendants filed a Petition for a Writ of Mandamus with the Ninth Circuit, seeking an order directing the Court to preliminarily approve the $324,500,000 settlement. (9th Cir. Case No. 14-72745, Dkt. 1.) On September 22, 2014, the Ninth Circuit issued an order stating that Defendants' "petition for a writ of mandamus raises issues that warrant a response," ordered Plaintiffs to file a response, set a date for Defendants' reply, and ordered that upon completion of briefing the matter be placed on the next available merits panel calendar for oral argument. (9th Cir. Dkt. 2; Dkt. 993.) Class Counsel opposed Defendants' petition (9th Cir. Dkts. 4 & 6), and Defendants filed a reply (9th Cir. Dkt. 10). Putative amici curiae Chamber of Commerce of the United States of America, California Chamber of Commerce, and economic scholars filed motions for leave to file amici curiae briefs in support of

the petition (9th Cir. Dkts. 8 & 9), which the Ninth Circuit referred to the panel to be assigned to hear the merits of the petition (9th Cir. Dkt. 15). Class Counsel opposed the motions for leave to file amici curiae briefs. (9th Cir. Dkts. 13 & 16.) The Ninth Circuit scheduled oral argument on the petition for March 13, 2015. (9th Cir. Dkt. 19.)

The parties' arms-length negotiations continued, and on January 7, 2015, Defendants agreed to a settlement that created a common fund of $415,000,000. This amount was $90,000,000 more than Defendants previously agreed to pay, and $35,000,000 more than the $380,000,000 referenced by the Court in denying the parties' earlier settlement (Dkt. 974 at 7, n.8). Up to this time, Plaintiffs and Defendants had continued to engage in the conferences regarding pre-trial disclosures and the authentication of business records and potential depositions related thereto, and other issues. (Glackin Decl., ¶ 94.)

### E. Class Counsel Obtained an Historic and Unprecedented Recovery

The settlement fund achieved here—a total of $415,000,000—is substantial, particularly in light of the very real risk that a jury could find no liability or award no damages, and any jury verdict would be subject to appellate review. When combined with the $20 million received from Plaintiffs' previous settlements with Defendants Pixar, Lucasfilm, and Intuit, the result for the Class in this litigation will total $435 million.

A relevant point of comparison is with the outcomes achieved by the United States Department of Justice ("DOJ") and the California Attorney General ("CA AG"). This action was preceded by a DOJ investigation concerning the same alleged misconduct at issue in this case. While the DOJ has the power to seek civil fines and/or restitution, it declined to do so here.

In addition, after the Court certified the proposed class in this action, the DOJ and the CA AG filed cases against eBay Inc. regarding an alleged agreement between eBay and Intuit not to poach each other's employees, which later became a no-hire agreement between the companies. *State of California v. eBay Inc.*, Case No. 12-CV-5874-EJD-PSG, Dkt. 55-5, ¶¶ 25-42 (N.D. Cal. May 1, 2014) ("CA AG Case"); *United States v. eBay Inc.*, Case No. 12-CV-5869-EJD, Dkt. 36, ¶¶ 14-25 (N.D. Cal. June 4, 2013) ("DOJ Case"). The alleged agreement there covers broader conduct than at issue in this case, and it lasted longer—from 2006 through 2011. (CA AG Case,

Dkt. 55-5, ¶ 41.) The DOJ and the California AG settled that case. The proposed settlement with

the DOJ is very similar to the previous settlement between the DOJ and the Defendants here:

while eBay agrees to modify its behavior going forward, eBay did not pay any money, either in

the form of penalties or compensation to victims. (DOJ Case, Dkt. 57 and 57-1.) The proposed

settlement with the CA AG includes a monetary component of $3.75 million, $2.375 million of

which will be distributed among approximately 13,990 claimants. The proposed settlement also

includes a release of the proposed class's claims. (CA AG Case, Dkt. 55, at 6.) On August 29,

2014 Judge Davila preliminarily approved the proposed settlement. (CA AG Case, Dkt. 62.)

Plaintiffs here obtained a substantially larger recovery than the AG deal, whether measured on an

aggregate or per-Class-member basis ($6,437.50 per Class member here versus $268.05 per class

member in the case before Judge Davila).[7] The fact that the settlement reflects a discount on

single damages is not a mark against it; this is the point of settlements.

## III.   ARGUMENT

### A.   The Requested Fee is Reasonable and Appropriate

Class Counsel have litigated this challenging case relentlessly for four years, through

motions to dismiss, extensive fact and expert discovery, two rounds of class certification, two

rounds of appellate briefing, and motions for summary judgment, securing an historic recovery of

$415,000,000 (in addition to the $20,000,000 previous achieved). Under these circumstances, it

would be appropriate for the Court to award the 25 percent "benchmark" applied in the Ninth

Circuit, or, indeed, to award fees in excess of 25 percent. Nevertheless, Class Counsel is limiting

its fee request on behalf of all Class Counsel to a maximum of approximately 19.5 percent. This

request is modest and manifestly reasonable, particularly in light of Ninth Circuit law regarding

attorneys' fees in class cases that are designed to ensure that class counsel have proper incentives

to take on difficult cases and pursue class members' best interests. Class Counsel assumed

substantial risks and devoted substantial resources in pursuing a recovery for the Class, and Class

Counsel litigated this case efficiently. Class Counsel should be properly rewarded for doing so

---

[7] Excluding deductions of proposed amounts for attorneys' fees and costs, plaintiff service awards, claims administrator costs, and the reserve fund, the per capita number is $5,071.53, compared to a per capita net recovery in the eBay case of $169.76.

and succeeding.

1. **Class Counsel are Entitled to a Fee Under the Common Fund Doctrine**

The common fund doctrine applies in the Ninth Circuit. *Staton v. Boeing Co.*, 327 F.3d 938, 967 (9th Cir. 2003). Under the doctrine, counsel have an equitable right to be compensated for their successful efforts in creating a common fund. *Staton*, 327 F.3d at 968; *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("... a litigant or a lawyer who recovers a common fund ... is entitled to a reasonable attorney's fee from the fund as a whole"); *In re Wash. Pub. Power Supply System Sec. Litig.*, 19 F.3d 1291, 1300 (9th Cir. 1994) (same).

2. **The Court Should Calculate Class Counsel's Fee As a Percentage of the Common Fund**

The most appropriate way to calculate a reasonable fee where, as here, contingency fee litigation has produced a common fund, is the percentage-of-the-fund method. *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984); *Vizcaino*, 290 F.3d at 1047; *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (common fund fee is generally "calculated as a percentage of the recovery"). The percentage method comports with the legal marketplace in other contingency fee cases, where counsel's fee is typically based upon a percentage of any recovery. *See* Fed. Judicial Ctr., *Awarding Attorneys' Fees & Managing Fee Litig.* at 73 (2005) (percentage method "helps ensure that the fee award will simulate marketplace rates, since most common fund cases are the kinds of cases normally taken on a contingency fee basis, by which counsel is promised a percentage of any recovery"). (*See also* Declaration of Brian T. Fitzpatrick ("Fitzpatrick Decl."), ¶¶ 3, 8-9 (referencing empirical study where percentage of the fund recovery used as basis for fees in 88% of 688 settlements reviewed).)

The percentage-of-the-fund method aligns class counsel's interests with those of the class, and properly incentivizes capable counsel, not to only accept challenging cases, but to push for the best result that can be achieved for the class. *See, e.g.*, *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 122 (2d Cir. 2005) (percentage method "directly aligns the interests of the class and its counsel") (citation omitted); *see also* Fitzpatrick Decl., ¶ 9. Moreover, the percentage-of-the-fund method encourages efficiency and discourages waste. The lodestar method, by contrast,

encourages counsel to bill time and to create opportunities to bill time.[8] (*See* Fitzpatrick Decl., ¶ 11.) Calculating the fee here as a percentage-of-the-fund, rather than merely as a function of counsel's billed time, rewards class counsel for assuming the risks of this case and efficiently prosecuting it.

### 3. A Fee of Approximately 19.5 Percent is Significantly Less Than the Benchmark Fee of 25 Percent and is Reasonable

In the Ninth Circuit, the "benchmark" fee in a common fund case is 25 percent of the fund created. *Vizcaino*, 290 F.3d at 1047. (*See also* Fitzpatrick Decl., ¶ 12.) A court should depart from the benchmark only if there are "special circumstances" justifying the departure. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 (9th Cir. 2011) (citations omitted). Courts in the Ninth Circuit often award fees that are in excess of the 25 percent benchmark. *See, e.g.*, *Vizcaino*, 290 F.3d at 1050 (affirming 28 percent award); *In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1047 (N.D. Cal. 2007) ("[I]n most common fund cases, the award exceeds that [25%] benchmark."). (*See also* Fitzpatrick Decl., ¶ 20 (empirical study showed approximately one-half of all class settlements in the Ninth Circuit awarded attorneys' fees of between 25-30% of the common fund).[9]) Here, Class Counsel seek less than the 25 percent benchmark: approximately 19.5% of the $415,000,000 common fund. This requested amount is also well

---

[8] The lodestar method's emphasis on time has drawn substantial criticism. *In re Apple iPhone/iPod Warranty Litig.*, 2014 U.S. Dist. LEXIS 52050, at *8 (N.D. Cal. Apr. 14, 2014) ("Whatever merits the lodestar method might have, particularly outside the context of a common fund case, it has also been subject to heavy criticism by commentators and in the courts.") (citation omitted). Among other things, awarding fees based on the lodestar method "does not encourage efficiency." *In re Activision Secs. Litig.*, 723 F. Supp. 1373, 1378 (N.D. Cal. 1989). Instead, as the Ninth Circuit observed, "the lodestar method creates incentives for counsel to expend more hours than may be necessary on litigating a case so as to recover a reasonable fee." *Vizcaino*, 290 F.3d at 1050 n.5; *see also In re Activision*, 723 F. Supp. at 1378 (noting that lodestar approach "encourages abuses such as unjustified work and protracting the litigation").

[9] *See also, e.g.*, *Castaneda v. Burger King Corp.*, 2010 U.S. Dist. LEXIS 78299 (N.D. Cal. Jul. 12, 2010) (33%); *Dyer v. Wells Fargo Bank, N.A.*, 2014 U.S. Dist. LEXIS 150129, at *14-17 (N.D. Cal. Oct. 22, 2014) (25%); *Larsen v. Trader Joe's Co.*, 2014 U.S. Dist. LEXIS 95538, at *31-32 (N.D. Cal. July 11, 2014) (28%); *Vedachalam v. Tata Consultancy Servs., Ltd.*, 2013 U.S. Dist. LEXIS 100796, at *4-5 (N.D. Cal. July 18, 2013) (awarding 30% and citing cases where 30% awarded); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2013 U.S. Dist. LEXIS 6607, at *47 (N.D. Cal. Jan. 14, 2013) (30%); *Kramer v. Autobytel, Inc.*, 2012 U.S. Dist. LEXIS 185800, at *13 (N.D. Cal. Jan. 27, 2012) (25%); *Garner v. State Farm*, 2010 U.S. Dist. LEXIS 49482, at *6 (N.D. Cal. Apr. 22, 2010) (30%); *Knight v. Red Door Salons, Inc.*, 2009 U.S. Dist. LEXIS 11149 (N.D. Cal. Feb. 2, 2009) (30%); *In re Omnivision*, 559 F. Supp. 2d at 1048 (28%); *In re Activision*, 723 F. Supp. at 1377 (30%).

within the Ninth Circuit practice, with the vast majority of fee awards being between 25-35% of the fund (*see* Fitzpatrick Decl., ¶ 19), and approximately 80% of fee awards constituting over 20% of the fund (*id.*, at ¶ 20). Even among settlements exceeding $400 million, the percentage requested here is consistent with the mean and median for fee awards in such cases in the Ninth Circuit. (*See* Fitzpatrick Decl., ¶ 21 (mean and median awards of 17.8% and 19.5%, respectively in settlements exceeding $400 million).)

Courts in the Ninth Circuit consider a number of factors in determining whether there is any basis to stray from the benchmark, including: (1) the results achieved; (2) the risks of contingency representation; (3) the complexities of the case and skill and effort required of counsel; (4) awards in similar cases; and (5) whether counsel devoted substantial time requiring counsel to forgo other work. *Vizcaino*, 290 F.3d at 1048-50. Consideration of these factors here confirms that there is no basis for any further downward departure from the benchmark. To the contrary, the circumstances would support an award of the benchmark fee, or indeed an award well in excess of the benchmark.

### a. Class Counsel Achieved a Record-Setting Recovery

This is an unusual case in that it involves antitrust claims brought by employees against their employers, seeking to recover lost compensation. There appear to be a total of seven such cases ever resolved, including this one. (*See* Exhibit A, attached hereto.) The recovery here is— by a substantial margin—the largest ever achieved. The $415,000,000 common fund is more than five times the previous record of $73,075,000. (*Id.*) A comparison of average net class member recoveries further illustrates the successful outcome here. The average Class member will recovery will be $5,071.53, which is more than three times the previous record of $1,430.17. (*Id.*) In addition, the restriction at issue here did not involve direct price restraints, or an alleged conspiracy to directly suppress pay by exchanging wage information, such as those previously litigated. The only directly analogous case is *eBay*, which resulted in total settlements of $3,750,000 and an average net class member recovery of $169.76. The aggregate recovery here is ***over a hundred times*** the recovery in eBay, and the average net class member recovery here is ***nearly thirty times greater***. The historic recovery achieved here supports the requested fee.

*Vizcaino*, 290 F.3d at 1049.

### b.     The Fee Was 100% Contingent

Courts have long recognized that the public interest is served by rewarding attorneys who assume representation on a contingent basis with an enhanced fee to compensate them for the risk that they might be paid nothing at all for their work. *See In re Wash.*, 19 F.3d at 1299 ("Contingent fees that may far exceed the market value of the services if rendered on a non-contingent basis are accepted in the legal profession as a legitimate way of assuring competent representation for plaintiffs who could not afford to pay on an hourly basis regardless whether they win or lose."); *Vizcaino*, 290 F.3d at 1051. Class Counsel prosecuted this case on a purely contingent basis, and agreed to advance all necessary expenses. This assumption of risk justifies a fee paid as a percent of recovery.

### c.     This Action Required Unusual Effort and Skill

The effort and skill displayed by counsel and the complexity of the issues involved are additional factors used in determining a proper fee. *Vizcaino*, 290 F.3d at 1048; *In re Omnivision*, 559 F. Supp. 2d at 1046-47. These factors strongly support the reasonableness of the fee requested here. This case is anything but cookie cutter in the class action field. Not only because of the unusual combination of antitrust claims in an employment context, but also because of the extraordinarily difficult and novel issues involved in showing how a reduction in employee solicitations had an impact across a class of tens of thousands of employees across seven employers, nationwide.

Class Counsel assembled a team of four law firms with resources and talent necessary to wage this difficult fight. (*See, e.g.*, Dermody Decl., ¶¶ 3-8; Declaration of Eric C. Cramer, ¶¶ 2-8; Declaration of James J. Sabella, ¶ 2.) Class Counsel contended with numerous complex and precedent-setting issues at every stage, any one of which could have sunk the case entirely. The Court's Order on Defendants' Motions to Dismiss was the first time a Court had ever assessed whether agreements not to recruit each other's employees could potentially violate the Sherman Act. The Court's two class certification orders—the first denying and the second granting class certification—are a testament to the factual and expert record Class Counsel worked relentlessly

to create and that made certification possible. Class Counsel also briefed a host of other complex issues, such as the application of the *per se* or rule of reason standard of review.

Class Counsel developed affirmative expert testimony and identified lines of attacking Defendants' experts. Class Counsel worked with Dr. Leamer as he provided six expert reports, and defended Dr. Leamer's four depositions. Dr. Leamer's work in this action received the American Antitrust Institute's 2014 Outstanding Antitrust Litigation Achievement in Economics Award.[10] Class Counsel also deposed defense expert Dr. Kevin Murphy twice, Defendants' primary expert in opposition to class certification, obtaining key admissions. Class Counsel worked with Dr. Hallock as he provided two expert reports, and defended Dr. Hallock in two depositions. Class Counsel also deposed Dr. Hallock's defense counterpart, Dr. Kathryn Shaw (Defendants' other expert in opposition to class certification), eliciting testimony that assisted the Court in concluding that Dr. Shaw's analysis was "unpersuasive," "conclusory and contrary to the overwhelming evidence in the record." (Class Cert. Order at 68.) At the merits stage, the parties marshalled a total of ten experts: four experts for Plaintiffs and six for Defendants. Class Counsel worked with all four Plaintiffs' experts during the drafting of their merits expert reports, defended their depositions, and deposed the six merits experts for Defendants.

The roles of the four firms were sometimes co-extensive, as each firm had substantial responsibility for reviewing the voluminous documentary record here. Each firm has described its work in greater detail in separate declarations.

LCHB conducted the pre-filing investigation and brought the case at the request of the Class Representatives. Glackin Decl. ¶¶ 7-15. As Lead or Co-Lead Counsel since inception, LCHB has handled or supervised nearly all aspects of the litigation, with the exceptions of document review performed independently by other firms and certain depositions. *Id.*, ¶ 2.

---

[10] *See* http://www.antitrustinstitute.org/content/2014-antitrust-enforcement-award-winners ("Dr. Leamer's work helped demonstrate that, even in a post-*Dukes* environment, economic analysis can help determine if a class action is the appropriate vehicle for employees to seek redress for alleged harms.") The other finalists for the award included the United States Department of Justice's experts in the e-books trial against Apple Inc., et al., and the United States Department of Justice's expert in the successful trial against Bazaarvoice, Inc. regarding an alleged anticompetitive merger. *See* http://www.antitrustinstitute.org/content/aai-2014-antitrust-enforcement-award-finalists-announced.

LCHB researched, drafted, served, and filed almost every pleading in this matter, including virtually all major briefs. *Id.* This includes oppositions to Defendants' motions to dismiss, both motions for class certification and replies in support, and the consolidated opposition to Defendants' motions for summary judgment. This work included researching, compiling, and filing substantial documentary evidence, all of which was handled by LCHB attorneys and support staff. The Declaration of Brendan Glackin contains a more complete description of the work performed by LCHB.

JSLF came into the case in 2012. LCHB and JSLF divided document review work approximately equally. LCHB took about half of the fact depositions, and JSLF took most of the balance. JSLF contributed to assembling facts and testimony relevant to various major briefs and Plaintiffs' discovery responses. JSLF wrote the first drafts of certain briefs and provided inserts, comments, and edits to others. LCHB and JSLF jointly conducted settlement negotiations. JSLF drafted settlement documents and assisted in the settlement and claims process.

G&E and B&M both joined the case in 2011. Both firms made contributions to document review, depositions, and brief-writing. Both firms contributed high-level and important work including comments and edits to the Rule 12 oppositions and class certification and expert papers; taking major depositions including expert depositions; and taking primary drafting responsibility for certain pre-trial submissions such as the *per se* briefs. Linda Nussbaum, then-of G&E, and Eric Cramer of B&M are both seasoned antitrust litigators who have each served many times as lead counsel in other cases, and each brought valuable strategic insights to the case. *See generally* Declaration of Brendan Glackin; Declaration of James Sabella; Declaration of Eric Cramer.

### d. A Comparison to Fee Awards in Other Cases Demonstrates the Reasonableness of the Fee Requested

A review of fee awards in other common fund cases underscores the reasonableness of the fee requested here. Fee awards of 25% or higher are standard.[11] (Fitzpatrick Decl., ¶¶ 19-20.)

---

[11] *See Vizcaino*, 290 F.3d at 1052 & n.9 (survey of awards in cases with class settlements between $50-200 million); *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1218 (S.D. Fla. 2006) (31⅓% fee for settlement fund of over $1 billion); *In re Linerboard Antitrust Litig.*, 2004

**4. A Lodestar-Multiplier "Cross-Check" Further Confirms the Reasonableness of the Fee**

The Court may engage in a lodestar "cross-check" when awarding a fee as a percentage of a common fund. *Vizcaino*, 290 F.3d at 1050-51. The purpose of a cross-check is not to re-calculate the fee, but is one of the tools used to ensure a reasonable fee. As "merely a cross-check on the reasonableness of a percentage figure," *id.* at 1050 n.5, "[t]he lodestar crosscheck need not entail either mathematical precision or bean counting." *Rieckborn v. Velti PLC*, 2015 U.S. Dist. LEXIS 13542, at *71 (N.D. Cal. Feb. 3, 2015) (citation and internal quotation and editing marks omitted); *see also Cruz v. Sky Chefs, Inc.*, 2014 U.S. Dist. LEXIS 176393, *19 (N.D. Cal. Dec. 19, 2014) (same). Here, even a partial cross-check confirms the reasonableness of the fee.

**a. The Lodestar Reflects Efficient Prosecution of This Action**

The cumulative lodestar of LCHB, Berger & Montague ("B&M"), and Grant & Eisenhofer ("G&E") to date is $14,279,278.50 using current billing rates. *See In re Wash.*, 19 F.3d at 1305 (courts apply each biller's current rates for all hours of work performed, regardless of when the work was performed, as a means of compensating for the "delay in payment."); *Vizcaino*, 290 F.3d at 1051 (affirming lodestar crosscheck using current billing rates). (*See also* Dermody Decl., ¶ 21 (rates are LCHB's customary rates billed to clients who have paid these rates on an hourly basis, and have been approved by numerous courts); Cramer Decl., ¶ 17 (B&M's rates have been accepted and approved by numerous courts.) The rates are "in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum*, 465 U.S. at 895-96 n.11. The hours reflect the extremely hard work and the very efficient manner in which Class Counsel prosecuted this case. (*See* Dermody Decl., ¶¶ 3-8, 16; Glackin Decl.; Cramer Decl., ¶ 15.)

U.S. Dist. LEXIS 10532, at *1-2 (E.D. Pa. Jun. 2, 2004) (30% fee; $202 million fund); *In re Relafen Antitrust Litig.*, 2004 U.S. Dist. LEXIS 28801, at *20-21 (D. Mass. Apr. 9, 2004) (33⅓% fee; $175 million fund); *In re Vitamins Antitrust Litig.*, 2001 U.S. Dist. LEXIS 25067, at *57-58 (D.D.C. July 16, 2001) (34.06% fee; $359 million fund); *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 400 (S.D.N.Y. 1999) (27.5% fee; $116 million fund); *Kurzweil v. Philip Morris Cos.*, 1999 U.S. Dist. LEXIS 18378, at *2 (S.D.N.Y. Nov. 30, 1999) (30% fee; $123 million fund); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 303 (3d Cir. 2005) (fee awards in the 25-30% range were "fairly standard" in class action settlements between $100-200 million).

### b. **Counsel Did Not Settle "Early"**

A primary function of the lodestar cross-check is to guard against a large fee award where counsel has settled early and done only a minimal amount of work. *Vizcaino*, 290 F.3d at 1050. That concern is clearly not an issue here. Class Counsel have aggressively litigated the case for four years, achieved a certified class, fended off a 23(f) petition, completed far-ranging discovery, defeated motions for summary judgment, incurred millions in costs, and secured a record-setting settlement. A fee in the amount of approximately 19.5% of the $415,000,000 common fund represents an effective multiplier on the cumulative lodestar of LCHB, B&M, and G&E of approximately 5.68 using current billing rates. LCHB, B&M, and G&E attorneys and staff have spent more than 28,191 hours working on this case. Class Counsel expended these resources despite the considerable risk in this case that they may receive no fee at all.[12]

A multiplier in that range is well-justified under the circumstances here. *See Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013) ("Courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers.") The following federal cases support that conclusion:

| Case | Percentage of Settlement | Multiplier |
|------|--------------------------|------------|
| *Steiner v. Am. Broad. Co.*, 248 F. App'x. 780, 783 (9th Cir. 2007) | 25% of $25.4 million | 6.85 |
| *Vizcaino*, 290 F.3d at 1051 n.6 | n/a | Noting maximum multiplier of up to 19.6 |
| *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 483 (S.D.N.Y. 2013) | 33% of $4.9 million | 6.3 |
| *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, No. 05-11148-PBS, 2009 U.S. Dist. LEXIS 68419, at *10 (D. Mass. Aug. 3, 2009) | 20% of $350 million | 8.3 |
| *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 768 (S.D. Ohio 2007) | 18% of $600 million | 6 |
| *In re Rite Aid Corp. Secs. Litig.*, 362 F. Supp 2d 587, 589 (E.D. Pa. 2005) | 25% of $127 million | 6.96 |
| *Stop & Shop Supermarket Co. v. Smithkline* | 20% of $100 million | 15.6 |

---

[12] Class Counsel's devotion to this case in lieu of other opportunities further supports the requested fee award here. *Vizcaino*, 290 F.3d at 1050.

| Case | Percentage of Settlement | Multiplier |
|---|---|---|
| *Beecham Corp.*, No. 03-4578, 2005 U.S. Dist. LEXIS 9705, at *60 (E.D. Pa. May 19, 2005) | | |
| *In re RJR Nabisco, Inc. Secs. Litig.*, 88 Civ. 7905 (MBM), 1992 U.S. Dist. LEXIS 12702 (S.D.N.Y. Aug. 24, 1992) | 25% of $72.5 million | 6 |

*See also New England Carpenters*, 2009 U.S. Dist. LEXIS 68419, at *9 (finding 8.3 multiplier justified where counsel "successfully achieved a mega-amount of $350,000,000"); *Beckman*, 293 F.R.D. at 482 (noting "the settlement amount is substantial"); *In re Cardinal Health*, 528 F. Supp. 2d at 770 (finding 6 multiplier justified by "excellent recovery, considerable effort and time, and high quality of lawyering"); *In re Rite Aid Corp.*, 362 F. Supp. 2d at 590 ("Suffice it to say that, through the exercise of their considerable skill, plaintiffs' counsel obtained a historic recovery for the class in a rare and complex kind of case where victory at trial would have been, at best, remote and uncertain.").

### c. Class Counsel's Costs are Reasonable and Should be Reimbursed

"Reasonable costs and expenses incurred by an attorney who creates or preserves a common fund are reimbursed proportionately by those class members who benefit[.]" *In re Media Vision Tech. Sec. Litig.*, 913 F. Supp. 1362, 1366 (N.D. Cal. 1995) (citing *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 391-92 (1970)). In prosecuting this case over four years, Class Counsel have incurred total out-of-pocket expenses of $4,884,655.29. The remaining unreimbursed expenses total $1,184,810.98.[13] These should be awarded.

### B. The Requested Service Awards are Reasonable and Appropriate

The purpose of service awards is to "compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation, and to reward the public service of contributing to the enforcement of mandatory laws." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 333 n.65 (3d Cir. 2011) (en banc) (affirming antitrust class action settlement with common fund of $295 million, providing for service awards of $85,000 to each of two class

---

[13] LCHB understands that the Joseph Saveri Law Firm, Inc., will provide invoices regarding its incurred costs.

representatives) (citation and quotation omitted), *cert. denied,* 132 S. Ct. 1876 (2012). *See also Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003) ("[N]amed plaintiffs . . . are eligible for reasonable incentive payments").

The requested service awards of up to $160,000 for each Class Representative are reasonable and appropriate here.[14] First, the Class Representatives have expended substantial time and effort in assisting Class Counsel with the prosecution of the Class's claims. They have responded to extensive document requests on their lifetime employment history well beyond their experience with Defendants here and without regard to time period (and across all variety of physical and electronic locations); produced over 31,000 pages of documents; responded to interrogatories; given full-day depositions where Defendants probed every detail of their employment histories; attended hearings and mediations; and have otherwise devoted hundreds of hours consulting with Class Counsel regarding fact development and strategy. (Fichtner Decl. ¶¶ 7-8; Hariharan Decl. ¶¶ 7-8; Stover Decl. ¶¶ 7-8; Harvey Decl. ¶¶ 8-9.)

Second, the Class Representatives—all of whom worked in technical positions for Defendants—incurred the substantial risks of taking on leadership roles in this visible litigation against seven of the most prominent technology firms in the world. This case is unusual in that in terms of the Class Representatives, it takes the effect of an ordinary employment case and multiplies it. When a class representative is a "present or past employee" of a defendant, his or her "present position or employment credentials or recommendation may be at risk by reason of having prosecuted the suit, who therefore lends his or her name and efforts to the prosecution of litigation at some personal peril." *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 201 (S.D.N.Y. 1997).[15] *See also id.* at 188 (authorizing service awards ranging up to $85,000 in nationwide

---

[14] Class Counsel initially requested service awards of up to $80,000 for each Class Representative. However, as the Court indicated it would consider the higher amount requested by Plaintiff Michael Devine for himself, in the event it makes such an award Class Counsel respectfully request that the other Class Representatives not be treated less favorably for their similar time, risk, attention, and independent judgment about supporting settlements in this action.

[15] *See also* Nantiya Ruan, *Bringing Sense to Incentives: An Examination of Incentive Payments to Named Plaintiffs in Employment Discrimination Class Actions*, 10 Employment Rights and Employment Policy Journal 395, 396-397 (2006) (In addition to assuming responsibilities related to the investigation and discovery of their case, "[e]mployees, former and current, take huge risks when they agree to be named plaintiffs in a class action bringing legal claims of unlawful bad acts

employment discrimination class action from a common fund of $115 million); *Velez v. Novartis Pharms. Corp.*, No. 04 Civ. 09194 (CM), 2010 U.S. Dist. LEXIS 125945, at *73 (S.D.N.Y. Nov. 30, 2010) (granting service payments of $125,000 to each of 26 named plaintiffs); *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 694 (N.D. Ga. 2001) (awarding $300,000 service payments to each of four representative plaintiffs); *Beck, et al. v. Boeing Co.*, Case No. 00-CV-0301-MJP, Dkt. 1067 at 4 (W.D. Wash Oct. 8, 2004) (awarding $100,000 service payments to each of the named plaintiffs). These concerns are particularly strong in this high-profile action, where the Class Representatives' roles are unusually visible and easily verified by current and potential employers with nothing more than a web search.

The Class Representatives faced additional risks because this is a multi-defendant antitrust case against six (considering that Disney owns both Pixar and Lucasfilm) of the most dominant technology and entertainment firms there are. In addition, Defendants served subpoenas on 27 other high-technology companies, each of which employed a Class Representative, seeking broad categories of information regarding each Class Representative's job history, performance, and personnel files. Plaintiffs' request is consistent with service payments granted in other antitrust cases. *See*, *e.g.*, *Marchbanks Truck Serv. v. Comdata Network, Inc.*, Case No. 07-CV-1078, Dkt. 713 at 8 (E.D. Pa. July 14, 2014) (approving class action settlement, including service payment of $150,000 to lead class representative); *see also In re Titanium Dioxide Antitrust Litig.*, No. 10-CV-00318 (RDB), 2013 U.S. Dist. LEXIS 176099, at *8 (D. Md. Dec. 13, 2013) (granting service award to lead class representative of $125,000); *Sullivan v. DB Invs., Inc.*, Case No. 04-2819 (SRC), 2008 U.S. Dist. LEXIS 81146, at *108 (D.N.J. May 22, 2008) (approving service payments to class representatives, including $85,000 to two lead representatives of direct purchaser class), *affirmed en banc*, *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 333 n.65 (3d Cir. 2011), *cert. denied*, 132 S. Ct. 1876 (2012); *Ivax Corp. v. Aztec Peroxides, LLC, et al.*, Case No. 02-CV-00593 (D.D.C. Aug. 24, 2005) (awarding service payments to each class representative of $100,000 each).

by employers. Retaliation, isolation, ostracism by co-workers, 'black listing' by future employers, emotional trauma, and fear of having to pay defendants' legal fees are among the most obvious.").

1    Third, the class representatives should be rewarded for their "public service of

2    contributing to the enforcement of mandatory laws." *Sullivan*, 667 F.3d at 333 n.65 (citation and

3    quotation omitted). Here, the DOJ did not obtain any fines from Defendants, or compensation for

4    any of Defendants' employees. Without the Class Representatives' willingness to take the risks

5    of filing class action lawsuits, no recovery would have been possible. As this Court explained,

6    the "Supreme Court has long recognized that class actions serve a valuable role in the

7    enforcement of antitrust laws." *In re High-Tech Emp. Antitrust Litig.*, 289 F.R.D. 555, 563 (N.D.

8    Cal. 2013) (citing *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979)); *Hawaii v. Standard Oil

9    Co.*, 405 U.S. 251, 262 (1972)). Solely because the Class Representatives came forward here at

10   substantial personal risk, the Defendants will pay a total of $415,000,000 (on top of the $20

11   million already secured) into a common fund for the benefit of the Class.

12       Finally, the requested service awards are appropriate when compared to the substantial

13   recovery achieved. Courts assessing the reasonableness of requests for service awards may

14   compare the request against the size of the settlement fund. *See*, *e.g.*, *Novartis Pharms.*, 2010

15   U.S. Dist. LEXIS 125945, at *22-23 ("Plaintiffs seek, therefore, a total of $3,775,000.00 in

16   service award payments, which represents only approximately 2.4 percent of the entire monetary

17   award of $152.5 million (or approximately 2.1 percent of the entire value of the settlement of

18   $175 million)."). Plaintiffs' requested service awards here collectively represent less than 0.2%

19   of the $415,000,000 common fund.

20   **IV.    <u>CONCLUSION</u>**

21       For the reasons set forth above, Plaintiffs respectfully request that the Court grant the

22   motion in its entirety.

23

24

25

26

27

28

1    Respectfully submitted,

2    Dated:  May 7, 2015    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP

3    By:___/s/ Kelly M. Dermody_____

4    Richard M. Heimann (State Bar No. 63607)
     Kelly M. Dermody (State Bar No. 171716)
5    Brendan P. Glackin (State Bar No. 199643)
     Dean M. Harvey (State Bar No. 250298)
6    Anne B. Shaver (State Bar No. 255928)
     LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
7    275 Battery Street, 29th Floor
     San Francisco, CA  94111-3339
8    Telephone:  (415) 956-1000
     Facsimile:  (415) 956-1008
9
     ***Co-Lead Class Counsel***
10
     Eric L. Cramer
11   Sarah R. Schalman-Bergen
     BERGER & MONTAGUE, P.C.
12   1622 Locust Street
     Philadelphia, PA 19103
13   Telephone: (800) 424-6690
     Facsimile: (215) 875-4604
14
     Robert G. Eisler
15   GRANT & EISENHOFER P.A.
     485 Lexington Avenue, 29th Floor
16   New York, NY 10017
     Telephone: (646) 722-8500
17   Facsimile: (646) 722-8501

18   ***Class Counsel***

19

20

21

22

23

24

25

26

27

28