**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

*In re: High-Tech Employee Antitrust Litigation*

Case No. 11-CV-2509-LHK

**DECLARATION OF BRIAN T. FITZPATRICK**

I.      **Background and qualifications**

1.      My name is Brian Fitzpatrick and I am a Professor of Law at Vanderbilt University in Nashville, Tennessee.  I joined the Vanderbilt law faculty in 2007, after serving as the John M. Olin Fellow at New York University School of Law in 2005 and 2006.  I graduated from Harvard Law School in 2000.  After law school, I served as a law clerk to The Honorable Diarmuid O'Scannlain on the United States Court of Appeals for the Ninth Circuit and to The Honorable Antonin Scalia on the United States Supreme Court.  I also practiced law for several years in Washington, D.C., at Sidley Austin LLP.  My C.V. is attached as Exhibit 1.

2.      Like my research at New York University before it, my teaching and research at Vanderbilt have focused on class action litigation.  I teach the Civil Procedure, Federal Courts, and Complex Litigation courses at Vanderbilt.  In addition, I have published a number of articles on class action litigation in such journals as the University of Pennsylvania Law Review, the Journal of Empirical Legal Studies, and the Vanderbilt Law Review.  My work has been cited by numerous courts, scholars, and popular media outlets, such as the New York Times, USA Today, and Wall Street Journal.  I am also frequently invited to speak at symposia and other events about class action litigation, such as the ABA National Institute on Class Actions in 2011 and the ABA Annual Meeting in 2012.  Since 2010, I have also served on the Executive Committee of the Litigation Practice Group of the Federalist Society for Law & Public Policy Studies.

1

3.     In December 2010, I published an article in the Journal of Empirical Legal Studies entitled *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical L. Stud. 811 (2010) (hereinafter "Empirical Study").  This article is what I believe to be the most comprehensive examination of federal class action settlements and attorneys' fees that has ever been published.  Unlike other studies of class actions, which have been confined to securities cases or have been based on samples of cases that were not intended to be representative of the whole (such as settlements approved in published opinions), my study attempted to examine *every* class action settlement approved by a federal court over a two-year period, 2006-2007.  *See id.* at 812-13.  As such, my study is an unbiased and representative sample of settlements.  Moreover, the number of settlements included in my study is several times the number of settlements per year that has been identified in any other empirical study of class action settlements: over this two-year period, I found 688 settlements, including 169 from the Ninth Circuit alone.  *See id.* at 817.  I presented the findings of my study at the Conference on Empirical Legal Studies at the University of Southern California School of Law in 2009, the Meeting of the Midwestern Law and Economics Association at the University of Notre Dame in 2009, and before the faculties of many law schools in 2009 and 2010.  This study has been relied upon by a number of courts, scholars, and testifying experts.  *See, e.g.*, *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (relying on article to assess fees); *In re Capital One Tel. Consumer Prot. Act Litig.*, 2015 WL 605203, at *12 (N.D. Ill. Feb. 12, 2015) (same); *In re Neurontin Marketing and Sales Practices Litigation*, 2014 WL 5810625, at *3 (D. Mass. Nov. 10, 2014) (same); *Tennille v. W. Union Co.*, 2014 WL 5394624, at *4 (D. Colo. Oct. 15, 2014) (same); *In re Colgate-Palmolive Co. Erisa Litig.*, 36 F.Supp.3d 344, 349-51 (S.D.N.Y. 2014) (same); *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, 991

F.Supp.2d 437, 444-46 & n.8 (E.D.N.Y. 2014) (same); *In re Federal National Mortgage Association Securities, Derivative, and "ERISA" Litigation*, 4 F.Supp.3d 94, 111-12 (D.D.C. 2013) (same); *In re Vioxx Products Liability Litigation*, 2013 WL 5295707, at *3-4 (E.D. La. Sep. 18, 2013) (same); *In re Black Farmers Discrimination Litigation*, 953 F.Supp.2d 82, 98-99 (D.D.C. 2013) (same); *In re Southeastern Milk Antitrust Litigation*, 2013 WL 2155387, at *2 (E.D. Tenn., May 17, 2013) (same); *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1081 (S.D. Tex. 2012) (same); *Pavlik v. FDIC*, 2011 WL 5184445, at *4 (N.D. Ill. Nov. 1, 2011) (same); *In re Black Farmers Discrimination Litig.*, 856 F. Supp. 2d 1, 40 (D.D.C. 2011) (same); *In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028, 1033 (N.D. Ill. 2011) (same); *In re MetLife Demutualization Litig.*, 689 F. Supp. 2d 297, 359 (E.D.N.Y. 2010) (same).

4. I have been asked by class counsel to opine on whether the attorneys' fees they have requested are reasonable. In order to formulate my opinion, I reviewed a number of documents provided to me by class counsel; I have attached a list of these documents in Exhibit 2. As I explain, based on my study of settlements across the country and in the Ninth Circuit in particular, I believe the request here is within the range of reasonable fee awards in federal class action settlements.

## II. Case background

5. Following government investigations into the same conduct, these consolidated lawsuits were filed alleging that the defendant companies conspired not to solicit each other's employees, thereby suppressing compensation, in violation of state and federal antitrust laws. After initially denying class certification, see class counsel moved for certification again with additional evidence, and, on October 24, 2013, the court certified a class of technical employees who worked at the defendant companies between 2005 and 2009. On May 16, 2014, the court

approved a $20 million settlement with three of the defendant companies. Thereafter, the remaining parties settled for $324.5 million, but, on August 8, 2014, the court rejected that settlement. The remaining parties have now entered into a new settlement agreement, and the plaintiffs have moved the court to approve it. The court preliminarily did so on March 3, 2015.

6. Pursuant to the settlement agreement, the class will release the defendants from, among other things, "all claims . . . arising from or related to the facts, activities or circumstances alleged in the Consolidated Amended Complaint or any other purported restriction on competition for employment or compensation . . . ." Settlement Agreement ¶ V.A.1. In exchange, the defendants will provide the class with $415 million in cash. *See id.* at ¶ III.A.1. After deducting fees, expenses, and service payments to the representative plaintiffs, this money will be distributed to class members *pro rata* based on their salaries during the affected time period. *See* Motion for Preliminary Approval p. 9. Class members will not have to file claim forms to receive these monies; it will be delivered to them automatically using data in the possession of the defendants. *See id*. In the event any money is leftover, it will be given in *cy pres* to an appropriate charity; none of it will revert to the defendant. *See* Settlement Agreement ¶ IV.A.8.[1]

7. Plaintiffs have now moved the court to approve a fee award of $81.125 million, or approximately 19.5% of the settlement fund. This is the same fee award class counsel had intended to seek from the $324.5 million settlement rejected by the court; that is, they are not seeking any additional fees for the additional monies reflected in the new settlement amount. In my opinion, this award is easily within the range of reasonableness.

---

[1] Defendants will only pay less than the full $415 million if four percent (*i.e.*, 2,578) or more class members opt out of the settlement, and then the settlement fund will be reduced in an equivalent percentage. *See* Settlement Agreement, ¶ VIII.T. As of May 4, 2015, it is my understanding that only 32 class members (or .05%) had opted out.

1244093.2

**III.    Assessment of the reasonableness of the request for attorneys' fees**

8.    This is a so-called "common fund" case, where the efforts by attorneys for the plaintiffs have created a common fund for the benefit of class members, but, because this is a class action and no fee shifting statute is applicable, the attorneys must be compensated from the fund they have created. At one time, courts that awarded fees in common fund class actions did so using the familiar lodestar approach. *See* Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little*, 158 U. Pa. L. Rev. 2043, 2051 (2010) (hereinafter "Class Action Lawyers"). Under this approach, courts awarded class counsel a fee equal to the number of hours they worked on the case (to the extent the hours were reasonable), multiplied by a reasonable hourly rate as well as by a discretionary multiplier that courts often based on the risk of non-recovery and other factors. *See id.* Over time, however, the lodestar approach fell out of favor in common fund class actions because it was difficult to calculate the lodestar (courts had to review voluminous time records and the like) and the method did not align the interests of class counsel with the interests of the class (because class counsel's recovery did not depend on how much the class recovered). *See id.* at 2051-52. According to my empirical study, the lodestar method is now used to award fees in only a small percentage of class action cases. *See* Fitzpatrick, *Empirical Study, supra*, at 832 (finding the lodestar method used in only 12% of settlements).

9.    The more popular method of calculating attorneys' fees is known as the "percentage-of-the-fund" method. Under this approach, courts select a percentage that they believe is fair to class counsel, multiply the settlement amount by that percentage, and then award class counsel the resulting product. The percentage-of-the-fund approach became popular because it corrected the deficiencies of the lodestar method—most particularly, it aligns the interests of class counsel with the interests of the class because, the more the class recovers, the more class counsel receives. *See* Fitzpatrick, *Class Action Lawyers, supra,* at 2052.

10.     In the Ninth Circuit, district courts have the discretion to use either the lodestar method or the percentage-of-the-fund method in common fund cases. *See In re Washington Public Power Supply Sys. Securities Litig.*, 19 F.3d 1291, 1295 (9th Cir. 1994) ("[D]istrict court has discretion to use either method in common fund cases.").   In light of the well-recognized disadvantages of the lodestar method and the well-recognized advantages of the percentage-of-the-fund method, most courts, as I noted, use the percentage method, and it is my opinion that courts should continue doing so unless special circumstances counsel otherwise.   Because there are no such special circumstances in this case, it is my opinion that the percentage-of-the-fund method should be used here.

11.     It should be noted that some courts that apply the percentage method in the Ninth Circuit (and elsewhere) "crosscheck" it with the lodestar method.   In my opinion, this is bad public policy.   This so-called "lodestar crosscheck" reintroduces the very same undesirable consequences of the lodestar method that the percentage-of-the-fund method was designed to correct in the first place.   In particular, if class counsel believes that courts will cap the percentage awarded at some multiple of their lodestar, then they will have precisely the same incentives they would if courts used the lodestar method alone: to be inefficient, perform unnecessary projects, delay results, and overbill and overstaff work in order to run up their lodestar. *See Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 n. 5 (9th Cir. 2002) ("The lodestar method is merely a cross-check on the reasonableness of a percentage figure, and it is widely recognized that the lodestar method creates incentives for counsel to expend more hours than may be necessary on litigating a case so as to recover a reasonable fee . . . .").   The lodestar crosscheck also caps the amount of compensation class counsel can receive from a settlement, thereby misaligning their incentives from those of class members, and blunting their incentive to

achieve the largest possible award for the class. *See* Fitzpatrick, *Class Action Lawyers, supra*, at 2065-66. Consider the following example. Suppose a class action lawyer had incurred a lodestar of $1 million in a class action case. If that counsel believed that a court would not award him a 25% fee if it exceeded twice his lodestar, then he would be rationally indifferent between settling the case for $8 million and $80 million (or any number higher than $8 million). Although I am not suggesting that class counsel here would have been tempted in this way— these are some of the finest class action lawyers in America—the decisions courts make today set the expectations for class action lawyers tomorrow, and it is bad public policy to create the expectation that the lodestar crosscheck will cap class counsel's fees under the percentage-of-the-fund method.

12. Courts usually examine a number of factors when deciding what percentage to award class counsel under the percentage-of-the-fund approach. *See* Fitzpatrick, *Empirical Study, supra,* at 832. In the Ninth Circuit, courts use 25% as the "'bench mark' percentage for the fee award," which "can then be adjusted upward or downward to account for any unusual circumstances involved in the case." *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989). *See also Six Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (stating that the 25% benchmark percentage "should be adjusted . . . when special circumstances indicate that the percentage recovery would be either too small or too large in light of the hours devoted to the case or other relevant factors"). In various cases, the Ninth Circuit has identified at least eight different factors that district courts can examine in deciding whether to increase or decrease an award from the benchmark:

(1)    the length the case has transpired, *see Six Mexican Workers*, 904 F.2d at 1311; *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002);

(2)    the results achieved by class counsel, *see Six Mexican Workers*, 904 F.2d at 1311; *Vizcaino*, 290 F.3d at 1048;

(3) the complexity of the case, *see Six Mexican Workers*, 904 F.2d at 1311; *In re Pacific Enters. Securities Litig.*, 47 F.3d 373, 379 (9th Cir. 1995);

(4) the risks the case involved, *see In re Pacific Enters. Securities Litig.*, 47 F.3d at 379; *Vizcaino*, 290 F.3d at 1048-49;

(5) the percentages awarded in other class action cases, *see Vizcaino*, 290 F.3d at 1050;

(6) any non-monetary benefits obtained by class counsel, *see In re Pacific Enters. Securities Litig.*, 47 F.3d at 379; *Vizcaino*, 290 F.3d at 1049; *Staton v. Boeing*, 327 F.3d 938, 946 (9th Cir. 2003).

(7) the percentages in standard contingency-fee agreements in similar individual cases, *see id.* at 1049; and

(8) class counsel's lodestar, *see id.* at 1050-51.

13. The award requested here is $81.125 million. If approved, this award would constitute approximately 19.5% of the common fund in this case. In my opinion, an award of 19.5% is easily within the range of reasonable fee awards under the Ninth Circuit's approach because it is significantly below the 25% benchmark, yet nearly all of the factors suggest the award should meet or exceed the benchmark.

14. Consider first (1) the length this case has transpired. This case has been litigated for longer than the typical class action. This case began in May of 2011 when the first of several consolidated actions was filed. It is now four years later. According to my empirical study, the average and median times in which settlements were reached in antitrust class actions were just over three years. *See* Fitzpatrick, *Empirical Study, supra*, at 820. In other words, class counsel here have gone longer than most class action lawyers have had to go without full payment for their work. (I say "full" payment because class counsel were already awarded some fees pursuant to the earlier $20 million settlement in this litigation.) Moreover, the case has hardly been idle during these four years. The initial settlement with Adobe, Apple, Google, and Intuit was reached one month before trial was scheduled to begin, and the subsequent settlement at

issue now was reached as the renewed trial date was approaching. The parties have been through motions to dismiss, millions of pages of discovery, over 100 depositions, five different motions for summary judgment, and motions to exclude experts and other evidence. *See* Motion for Preliminary Approval pp. 3-4. In other words, this case was not rushed to settlement for a quick fee award.

15. Consider next (2) the results achieved by class counsel, which are impressive. According to the class's experts, the class may have suffered as much as $3.05 billion in so-called "single damages" (i.e., excluding trebling) from all seven defendants' conduct in this litigation. *See* Order Denying Preliminary Approval p. 9. The two settlements ($20 million + $415 million) will recover for the class over 14% of these damages.[2] While that may seem like a modest percentage, in light of the many challenges in class action litigation, it is not at all unusual to see settlements recover similar percentages. Although I am aware of no published studies of recovery rates in antitrust class actions, in shareholder securities class actions, courts routinely approve settlements for similar fractions of the class's estimated damages. *See, e.g., Recent Trends in Securities Class Action Litigation: 2013 Full-Year Review*, available at http://www.nera.com/content/dam/nera/publications/archive2/PUB_2013_Year_End_Trends_1.2 014.pdf at 8, 33 (finding that the median securities fraud class action between 1996 and 2013 settled for between 1.3% and 7.0% of investor losses depending on the year). And, even in the antitrust context, the recovery here surpasses those achieved in many cases, *see, e.g., In re Tableware Antitrust Litig.*, No. C 04-3514-VRW, 2007 U.S. Dist. LEXIS 89998, at *7 (N.D. Cal. Nov. 28, 2007) (4% of estimated single damages)—including, most relevantly, the settlement

---

[2] There appears to be a difference of opinion among courts over whether antitrust settlements should be judged by the plaintiffs' estimated single damages or their estimated trebled damages. *See Sullivan v. DB Investments*, 667 F.3d 273, 324-25 (3d Cir. 2011) (citing cases exhibiting "disagreement"). Nonetheless, in my experience, the single-damages standard is more frequently used.

reached by the California Attorney General for similar misconduct against eBay Inc., *see State of California v. eBay, Inc.*, 5:12-cv-05874-EJD (N.D. Cal. May 1, 2014) (6.6% of estimated single damages), and the only other antitrust case in the Ninth Circuit of which I am aware brought by employees regarding lost compensation, *see Johnson, et al. v. Arizona Hosp. and Healthcare Ass'n, et al.*, 07-cv-01292-SRB (D. Ariz. Mar. 4, 2011) (9.4% of estimated single damages).

16.     Moreover, the settlement now under consideration recovers even more for the class than the $20 million settlement already approved by the court did: the $20 million settlement was with defendants who paid 1/20 of affected wages; this settlement for the other 19/20 of affected wages is more than 19 times as large (it is 20.75 times as large).  Finally, the settlement here recovers much more for the class than the government investigations against the defendants did; these investigations resulted in no restitution at all.  *See* Motion for Preliminary Approval pp. 17-18. The relief here appears impressive—especially in light of the complexities and risks class counsel faced, described below.

17.     Consider next (3) the complexity of the case.  This case was more complex than many class action cases.  As the defendants pointed out, there has never been a class action quite like this one that alleged an antitrust conspiracy by companies not to call each others' employees. *See* Defendants' Joint Response p. 6 ("Simply put, there is no judicial experience with a conspiracy remotely similar to the one alleged here.").  As I explain below, a particular complexity here was trying to prove a single conspiracy among all the defendants.  For these reasons, class counsel had to spend a great deal of money out of their own pockets on experts and other expenses in order to make this case viable—some $4.5 million.  *See* Motion for Preliminary Approval p. 21.  Of the 586 class action settlements over the two years in my empirical study for which I could find expense data, in only *eight* did class counsel front

expenses in greater amounts than class counsel did here. In other words, class counsel here had to make unusually costly investments in order to litigate an unusually complex case.

18. Consider next (4) the risks posed in these cases. This case was riskier to file and prosecute than many class action cases. First, although the government investigations found that the defendants had entered into bilateral agreements in violation of federal and state antitrust laws, as I alluded above, this case alleged a *single conspiracy* among *all* the defendants; at the time the case was filed, counsel had no assurance that the facts would bear that out. Moreover, even after discovery had been taken, it was by no means assured that a jury would have accepted this conclusion. Second, even if the jury had, it could still have found that agreements not to cold call did not violate the antitrust laws. Under the so-called "rule of reason" antitrust doctrine, a jury might have found that the anticompetitive harms did not outweigh the pro-competitive effects, and, even under the "per se rule" antitrust doctrine, a jury could have found that the restraints did not impact the class. These are risks that class counsel faced from the very inception of the case. Third, even if a jury would have found for the plaintiffs on these points, the jury still had to assess how much to award in damages. At the outset, class counsel had no access to compensation data and no guarantee that they would be able to prove any damages at all. And the subsequent litigation did not eliminate this risk. This case featured a hard fought battle of the experts (not to mention several outstanding motions to exclude expert testimony and other evidence); no matter the strength of the evidence uncovered by class counsel, it remains, of course, uncertain who would win this battle before the jury. Finally, even if the plaintiffs prevailed on all these matters, any verdict would have been subject to appeal. Not only would appeal have presented risks to the class, but it also would have delayed any compensation to the class by many months or even years.

1244093.2

19.     Consider next (5) the awards in other class action cases.  According to my empirical study, the most common percentages awarded by all federal courts in 2006 and 2007 using the percentage-of-the-fund method were 25%, 30%, and 33%, with nearly two-thirds of awards between 25% and 35%, and with a mean award of 25.4% and a median award of 25%.  *See* Fitzpatrick, *Empirical Study, supra,* at 833-34, 838.[3]  The numbers for the 111 settlements in the Ninth Circuit where the percentage-of-the-fund method was used were quite similar: the most common percentages were also 25%, 30%, and 33%, with the vast majority of awards also between 25% and 35%, and a mean of 23.9% and median of 25%.  My numbers agree with the other large-scale academic study of class action fee awards.  *See* Theodore Eisenberg & Geoffrey P. Miller, *Attorneys' Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical L. Stud. 248, 260 (2010) (finding mean and median of 24% and 25% nationwide, and 25% in Ninth Circuit).  All of these numbers exceed the fee requested here, as does the fee the court already awarded in the earlier settlement in this litigation.  *See* Order Granting Fees pp. 1-2 (awarding 25%).

20.     Indeed, in order to see more clearly where the fee request here falls among other awards, I graphed the distribution of the Ninth Circuit's percentage-of-the-fund awards from my study in Figure 1.  The figure shows what fraction of settlements (y-axis) had fee awards within each five-point range of fee percentages (x-axis).  Thus, for example, nearly half of all settlements (i.e., nearly .5 of all settlements) had fee awards that fell between 25% (inclusive) and 30%.  As the Figure shows, approximately 80% of fee awards in the Ninth Circuit equal or exceed 20% of the settlement—that is, *approximately 80% of fee awards exceed the fee request here*.

---

[3] The mean and median in antitrust cases were the same as those for all cases.  *See* Fitzpatrick, *Empirical Study*, *supra*, at 835.



**Figure 1: Percentage-method fee awards in the Ninth Circuit, 2006-2007**



21.     It should be noted that the settlement here is much larger than the typical class action settlement.  In my empirical study, only 14 settlements nationwide (2%) exceeded $400 million.  This is notable because my empirical study showed that settlement size had a statistically significant but inverse relationship with the fee percentages awarded by federal courts—*i.e.*, that federal courts awarded lower percentages in cases where settlements were larger.  *See* Fitzpatrick, *Empirical Study, supra,* at 838, 842-44.  Thus, for example, the mean and median fee percentages awarded in the eight percentage-of-the-fund settlements in my dataset between $250 million and $500 million were 17.8% and 19.5%, respectively.  *See id.* at 839. The fee request here is therefore right at the median for similarly sized settlements, and only slightly above the average for such settlements.  Thus, even if the court wished to award a lower-than-benchmark fee due to the size of the settlement here, the fee requested here is right in line

with what other courts have awarded in similarly sized settlements.  But Ninth Circuit law does not require smaller fee percentages in bigger settlements, *see Vizcaino*, 290 F.3d at 1047, 1050 & n.4 (noting that, although "it may be . . . appropriate to examine . . . the range of fee awards out of common funds of comparable size," the Ninth Circuit has "not adopt[ed]" the "increase-decrease rule" for "a megafund case"), and many courts do not do it.  *See, e.g., In re TFT-LCD (Flat Panel) Antitrust Litigation*, 2013 WL 1365900, *7-*8 (N.D.Cal., Apr. 3, 2013) (awarding 28.5% of $571 million in settlements); *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation*, No. 8:10ML-02151-JVS (C.D. Cal., Jun. 17, 2013) (awarding 26.4% of $757 million settlement).  In my opinion, it is better not to lower fee percentages because the settlement is large,[4] but, again, even if the court wanted to follow this practice, the fee request here is perfectly in line with it.

22.    Consider finally the remaining factors: (6) any non-monetary benefits, (7) the percentages in standard contingency-fee agreements in similar individual cases, and (8) class counsel's lodestar. One of these factors is inapplicable here—(6) any non-monetary benefits—because the defendants agreed to abandon their conspiracy pursuant to the government investigations.  But the other factors support the fee request.  First, it is well known that standard contingency-fee percentages in individual litigation are *at least* 33%, much greater than the percentage requested here.  *See, e.g.*, Lester Brickman, *ABA Regulation of Contingency Fees: Money Talks, Ethics Walks*, 65 Fordham L. Rev. 247, 248 (1996) (noting that "standard

---

[4] The reason I and other scholars think that courts should not lower fee percentages in bigger settlements is that doing so does little more than misalign the incentives of class counsel to fight for the largest settlement, and, indeed, may incentivize some class counsel to settle cases earlier for smaller sums.  *See, e.g., In re Cendant Corp. Litigation*, 264 F.3d at 284 n. 55 ("Th[e] position [that the percentage of a recovery devoted to attorneys fees should decrease as the size of the overall settlement or recovery increases] . . . has been criticized by respected courts and commentators, who contend that such a fee scale often gives counsel an incentive to settle cases too early and too cheaply." (alteration in original)); *Allapattah Servs. Inc. v. Exxon Corp.*, 454 F.Supp.2d 1185, 1213 (S.D.Fla. 2006) ("By not rewarding Class Counsel for the additional work necessary to achieve a better outcome for the class, the sliding scale approach creates the perverse incentive for Class Counsel to settle too early for too little.").

contingency fees" are "usually thirty-three percent to forty percent of gross recoveries" (emphasis omitted)); Herbert M. Kritzer, *The Wages of Risk: The Returns of Contingency Fee Legal Practice*, 47 DePaul L. Rev. 267, 286 (1998) (reporting the results of a survey of Wisconsin lawyers, which found that "[o]f the cases with a [fee calculated as a] fixed percentage [of the recovery], a contingency fee of 33% was by far the most common, accounting for 92% of those cases"). Second, although, as I explained above, it is my opinion that considering class counsel's lodestar when awarding fees under the percent method does more harm than good, if the court does consider it, the court should know that there is nothing unusual about the multiplier that would result from class counsel's request here: multipliers of this magnitude often occur in larger settlements, *see, e.g.*, *Vizcaino*, 290 F.3d at 1051 n.6 (noting multipliers of up to 19.6); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481 (S.D.N.Y. 2013) ("Courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers."); *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, No. 05-11148-PBS, 2009 U.S. Dist. LEXIS 68419, at *10 (D. Mass. Aug. 3, 2009) (multiplier of 8.3); *In re Cardinal Health Inc. Sec. Litig.*, 528 F. Supp. 2d 752, 768 (S.D. Ohio 2007) (multiplier of 6); *In re Rite Aid Corp. Secs. Litig.*, 362 F. Supp 2d 587, 589 (E.D. Pa. 2005) (multiplier of 6.96); *Stop & Shop Supermarket Co. v. Smithkline Beecham Corp.*, No. 03-4578, 2005 U.S. Dist. LEXIS 9705, at *60 (E.D. Pa. May 19, 2005) (multiplier of 15.6); *In re RJR Nabisco, Inc. Secs. Litig.*, 88 Civ. 7905 (MBM), 1992 U.S. Dist. LEXIS 12702 (S.D.N.Y. Aug. 24, 1992) (multiplier of 6), and the Ninth Circuit has already affirmed fee awards that resulted in bigger multipliers than would result here, *see, e.g., Steiner v. American Broadcasting Co.*, 248 Fed. Appx. 780, 783 (9th Cir. 2007) (affirming fee award where the lodestar multiplier was 6.85). Indeed, in light of the risks of nonpayment presented to class counsel by this litigation—the risk not only of tens of

thousands of unreimbursed hours of attorney and staff time, but also the risk of losing the entirety of their very substantial $4.5 million investment in expense—the multiplier here is fully justified.

23.     For all these reasons, I believe the fee award requested here is easily within the range of reasonable awards.

24.     My compensation in this matter has been $595 per hour plus expenses.


Nashville, TN

May 7, 2015


Brian T. Fitzpatrick

1244093.2

# EXHIBIT 1

# BRIAN T. FITZPATRICK

Vanderbilt University Law School
131 21st Avenue South
Nashville, TN 37203
(615) 322-4032
brian.fitzpatrick@law.vanderbilt.edu

## ACADEMIC APPOINTMENTS

**VANDERBILT UNIVERSITY LAW SCHOOL**, *FedEx Research Professor*, 2014 to present
- *Professor*, 2012-present; *Associate Professor*, 2010-2012; *Assistant Professor*, 2007-10
- Classes: Civil Procedure, Federal Courts, Complex Litigation
- Hall-Hartman Outstanding Professor Award, 2008-2009
- Vanderbilt's Association of American Law Schools Teacher of the Year, 2009

## EDUCATION

**HARVARD LAW SCHOOL**, J.D., *magna cum laude*, 2000
- Fay Diploma (for graduating first in the class)
- Sears Prize, 1999 (for highest grades in the second year)
- *Harvard Law Review*, Articles Committee, 1999-2000; Editor, 1998-1999
- *Harvard Journal of Law & Public Policy*, Senior Editor, 1999-2000; Editor, 1998-1999
- Research Assistant, David Shapiro, 1999; Steven Shavell, 1999

**UNIVERSITY OF NOTRE DAME**, B.S., Chemical Engineering, *summa cum laude*, 1997
- First runner-up to Valedictorian (GPA: 3.97/4.0)
- Steiner Prize, 1997 (for overall achievement in the College of Engineering)

## CLERKSHIPS

**HON. ANTONIN SCALIA**, Supreme Court of the United States, 2001-2002

**HON. DIARMUID O'SCANNLAIN**, U.S. Court of Appeals for the Ninth Circuit, 2000-2001

## EXPERIENCE

**NEW YORK UNIVERSITY SCHOOL OF LAW**, Feb. 2006 to June 2007
*John M. Olin Fellow*

**HON. JOHN CORNYN**, United States Senate, July 2005 to Jan. 2006
*Special Counsel for Supreme Court Nominations*

**SIDLEY AUSTIN LLP**, Washington, DC, 2002 to 2005
*Litigation Associate*

## ACADEMIC ARTICLES

*An Empirical Look at Compensation in Consumer Class Actions,* NYU J. L. & BUS. (forthcoming 2015) (with Robert Gilbert)

*The End of Class Actions?*, 57 ARIZ. L. REV. 161 (2015)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure,* 98 VA. L. REV. 839 (2012)

Twombly *and* Iqbal *Reconsidered,* 87 NOTRE DAME L. REV. 1621 (2012)

*An Empirical Study of Class Action Settlements and their Fee Awards,* 7 J. EMPIRICAL L. STUD. 811 (2010) (selected for the 2009 Conference on Empirical Legal Studies)

*Do Class Action Lawyers Make Too Little?*, 158 U. PA. L. REV. 2043 (2010)

*Originalism and Summary Judgment,* 71 OHIO ST. L.J. 919 (2010)

*The End of Objector Blackmail?*, 62 VAND. L. REV. 1623 (2009) (selected for the 2009 Stanford-Yale Junior Faculty Forum)

*The Politics of Merit Selection*, 74 MISSOURI L. REV. 675 (2009)

*Errors, Omissions, and the Tennessee Plan*, 39 U. MEMPHIS L. REV. 85 (2008)

*Election by Appointment: The Tennessee Plan Reconsidered*, 75 TENN. L. REV. 473 (2008)

*Can Michigan Universities Use Proxies for Race After the Ban on Racial Preferences?*, 13 MICH. J. RACE & LAW 277 (2007)


## BOOK CHAPTERS

*Civil Procedure in the Roberts Court* in BUSINESS AND THE ROBERTS COURT (Jonathan Adler, ed., Oxford University Press, forthcoming 2015)

*Is the Future of Affirmative Action Race Neutral?* in A NATION OF WIDENING OPPORTUNITIES: THE CIVIL RIGHTS ACT AT 50 (Ellen Katz & Samuel Bagenstos, eds., Michigan University Press, forthcoming 2015)


## ACADEMIC PRESENTATIONS

*Private Attorney General: Good or Bad?*, 17th Annual Federalist Society Faculty Conference, Washington, DC (Jan. 3, 2015)

*Liberty, Judicial Independence, and Judicial Power*, Liberty Fund Conference, Santa Fe, NM (Nov. 13-16, 2014) (participant)

*The Economics of Objecting for All the Right Reasons,* 14th Annual Consumer Class Action Symposium, Tampa, Florida (Nov. 9, 2014)

*Compensation in Consumer Class Actions: Data and Reform*, Conference on The Future of Class Action Litigation: A View from the Consumer Class, NYU Law School, New York, New York (Nov. 7, 2014)

*The Future of Federal Class Actions: Can the Promise of Rule 23 Still Be Achieved?*, Northern District of California Judicial Conference, Napa, California (Apr. 13, 2014) (panelist)

*The End of Class Actions?*, Conference on Business Litigation and Regulatory Agency Review in the Era of Roberts Court, Institute for Law & Economic Policy, Boca Raton, Florida (Apr. 4, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, University of Missouri School of Law (Mar. 7, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, George Mason Law School (Mar. 6, 2014)

*Should Third-Party Litigation Financing Come to Class Actions?*, Roundtable for Third-Party Funding Scholars, Washington & Lee University School of Law (Nov. 7-8, 2013)

*Is the Future of Affirmative Action Race Neutral?*, Conference on A Nation of Widening Opportunities: The Civil Rights Act at 50, University of Michigan Law School (Oct. 11, 2013)

*The Mass Tort Bankruptcy: A Pre-History*, The Public Life of the Private Law: A Conference in Honor of Richard A. Nagareda, Vanderbilt Law School (Sep. 28, 2013) (panelist)

*Rights & Obligations in Alternative Litigation Financing and Fee Awards in Securities Class Actions*, Conference on the Economics of Aggregate Litigation, Institute for Law & Economic Policy, Naples, Florida (Apr. 12, 2013) (panelist)

*The End of Class Actions?*, Symposium on Class Action Reform, University of Michigan Law School (Mar. 16, 2013)

*Toward a More Lawyer-Centric Class Action?,* Symposium on Lawyering for Groups, Stein Center for Law & Ethics, Fordham Law School (Nov. 30, 2012)

*The Problem: AT & T as It Is Unfolding*, Conference on *AT & T Mobility v. Concepcion*, Cardozo Law School (Apr. 26, 2012) (panelist)

*Standing under the Statements and Accounts Clause,* Conference on Representation without Accountability*, Corporate Law Center, Fordham Law School (Jan. 23, 2012)

*The End of Class Actions?*, Washington University Law School (Dec. 9, 2011)

*Book Preview Roundtable: Accelerating Democracy: Matching Social Governance to Technological Change*, Searle Center on Law, Regulation, and Economic Growth, Northwestern University School of Law (Sep. 15-16, 2011) (participant)

*Is Summary Judgment Unconstitutional?  Some Thoughts About Originalism*, Stanford Law School (Mar. 3, 2011)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Northwestern Law School (Feb. 25, 2011)

*The New Politics of Iowa Judicial Retention Elections: Examining the 2010 Campaign and Vote,* University of Iowa Law School (Feb. 3, 2011) (panelist)

*The Constitutionality of Federal Jurisdiction-Stripping Legislation and the History of State Judicial Selection and Tenure*, Washington University Law School (Oct. 1, 2010)

Twombly *and* Iqbal *Reconsidered,* Symposium on Business Law and Regulation in the Roberts Court, Case Western Reserve Law School (Sep. 17, 2010)

*Do Class Action Lawyers Make Too Little?*, Institute for Law & Economic Policy, Providenciales, Turks & Caicos (Apr. 23, 2010)

*Originalism and Summary Judgment*, Georgetown Law School (Apr. 5, 2010)

*Theorizing Fee Awards in Class Action Litigation*, Washington University Law School (Dec. 11, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Conference on Empirical Legal Studies, University of Southern California Law School (Nov. 20, 2009)

*Originalism and Summary Judgment*, Symposium on Originalism and the Jury, Ohio State Law School (Nov. 17, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, 2009 Meeting of the Midwestern Law and Economics Association, University of Notre Dame Law School (Oct. 10, 2009)

*The End of Objector Blackmail?*, Stanford-Yale Junior Faculty Forum, Stanford Law School (May 29, 2009)

*An Empirical Study of Class Action Settlements and their Fee Awards*, University of Minnesota School of Law (Mar. 12, 2009)

*The Politics of Merit Selection*, Symposium on State Judicial Selection and Retention Systems, University of Missouri Law School (Feb. 27, 2009)

*The End of Objector Blackmail?*, Searle Center Research Symposium on the Empirical Studies of Civil Liability, Northwestern University School of Law (Oct. 9, 2008)

*Alternatives To Affirmative Action After The Michigan Civil Rights Initiative*, University of Michigan School of Law (Apr. 3, 2007) (panelist)

## OTHER PUBLICATIONS

*Lessons from Tennessee Supreme Court Retention Election*, THE TENNESSEAN (Aug. 20, 2014)

*Public Needs Voice in Judicial Process*, THE TENNESSEAN (June 28, 2013)

*Did the Supreme Court Just Kill the Class Action?*, THE QUARTERLY JOURNAL (April 2012)

*Let General Assembly Confirm Judicial Selections*, CHATTANOOGA TIMES FREE PRESS (Feb. 19, 2012)

*"Tennessee Plan" Needs Revisions*, THE TENNESSEAN (Feb. 3, 2012)

*How Does Your State Select Its Judges?*, INSIDE ALEC 9 (March 2011) (with Stephen Ware)

*On the Merits of Merit Selection*, THE ADVOCATE 67 (Winter 2010)

*Supreme Court Case Could End Class Action Suits,* SAN FRANCISCO CHRONICLE (Nov. 7, 2010)

*Kagan is an Intellect Capable of Serving Court*, THE TENNESSEAN (Jun. 13, 2010)

*Confirmation "Kabuki" Does No Justice*, POLITICO (July 20, 2009)

*Selection by Governor may be Best Judicial Option*, THE TENNESSEAN (Apr. 27, 2009)

*Verdict on Tennessee Plan May Require a Jury*, THE MEMPHIS COMMERCIAL APPEAL (Apr. 16, 2008)

*Tennessee's Plan to Appoint Judges Takes Power Away from the Public*, THE TENNESSEAN (Mar. 14, 2008)

*Process of Picking Judges Broken*, CHATTANOOGA TIMES FREE PRESS (Feb. 27, 2008)

*Disorder in the Court*, LOS ANGELES TIMES (Jul. 11, 2007)

*Scalia's Mistake*, NATIONAL LAW JOURNAL (Apr. 24, 2006)

*GM Backs Its Bottom Line*, DETROIT FREE PRESS (Mar. 19, 2003)

*Good for GM, Bad for Racial Fairness*, LOS ANGELES TIMES (Mar. 18, 2003)

*10 Percent Fraud*, WASHINGTON TIMES (Nov. 15, 2002)

## OTHER PRESENTATIONS

*The New Business of Law: Attorney Outsourcing, Legal Service Companies, and Commercial Litigation Funding*, Tennessee Bar Association, Nashville, TN (Nov. 12, 2014)

*Hedge Funds + Lawsuits = A Good Idea?*, Vanderbilt University Alumni Association, Washington, DC (Sep. 3, 2014)

*Judicial Selection in Historical and National Perspective*, Committee on the Judiciary, Kansas Senate (Jan. 16, 2013)

*The Practice that Never Sleeps: What's Happened to, and What's Next for, Class Actions*, ABA Annual Meeting, Chicago, IL (Aug. 3, 2012) (panelist)

*Life as a Supreme Court Law Clerk and Views on the Health Care Debate*, Exchange Club of Nashville (Apr. 3, 2012)

*The Tennessee Judicial Selection Process—Shaping Our Future*, Tennessee Bar Association Leadership Law Retreat, Dickson, TN (Feb. 3, 2012) (panelist)

*Reexamining the Class Action Practice*, ABA National Institute on Class Actions, New York, NY (Oct. 14, 2011) (panelist)

*Judicial Selection in Kansas*, Committee on the Judiciary, Kansas House of Representatives (Feb. 16, 2011)

*Judicial Selection and the Tennessee Constitution*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Mar. 24, 2009)

*What Would Happen if the Judicial Selection and Evaluation Commissions Sunset?*, Civil Practice and Procedure Subcommittee, Tennessee House of Representatives (Feb. 24, 2009)

*Judicial Selection in Tennessee*, Chattanooga Bar Association, Chattanooga, TN (Feb. 27, 2008) (panelist)

*Ethical Implications of Tennessee's Judicial Selection Process*, Tennessee Bar Association, Nashville, TN (Dec. 12, 2007)


## PROFESSIONAL ASSOCIATIONS

Referee, Journal of Empirical Legal Studies
Reviewer, Oxford University Press
Reviewer, Supreme Court Economic Review
Member, American Bar Association

Member, Tennessee Advisory Committee to the U.S. Commission on Civil Rights
Board of Directors, Tennessee Stonewall Bar Association
American Swiss Foundation Young Leaders' Conference, 2012
Bar Admission, District of Columbia

**COMMUNITY ACTIVITIES**

Board of Directors, Nashville Ballet; Nashville Talking Library for the Blind, 2008-2009

# EXHIBIT 2

<u>Documents Reviewed:</u>

- Order Granting In Part and Denying In Part Defendants' Joint Motion To Dismiss; Denying Lucasfilm Ltd.'s Motion to Dismiss (document 119, filed 4/18/12)

- Order Granting in Part, Denying in Part Motion for Class Certification (document 382, filed 4/5/13)

- Order Denying Defendants' Individual Motions for Summary Judgment (document 771, filed 3/28/14)

- Plaintiffs' Motion for Application of the Per Se Standard (document 830, filed 4/10/14)

- Defendants' Joint Response to Plaintiffs' Motion for Application of the Per Se Standard (document 887, filed 4/18/14) ("Defendants' Joint Response")

- Order Granting Plaintiffs' Motion for Final Approval of Class Action Settlements with Pixar, Lucasfilm, and Intuit (document 915, filed 5/16/14)

- Order Granting Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Expenses, and Service Awards (document 916, filed 5/16/14) ("Order Granting Fees")

- Notice of Motion and Motion for Preliminary Approval of Class Action Settlement; Memorandum of Points and Authorities in Support Thereof (document 920, filed 5/22/14)

- Reply Memorandum of Points and Authorities in Support of Motion for Preliminary Approval of Class Action Settlement (document 938, filed 6/12/14)

- Order Denying Plaintiffs' Motion for Preliminary Approval of Settlements with Adobe, Apple, Google, and Intel (document 974, filed 8/8/14) ("Order Denying Preliminary Approval")

- Notice of Motion and Motion for Preliminary Approval of Class Action Settlement; Memorandum of Points and Authorities in Support Thereof (document 1032, filed 1/15/15) ("Motion for Preliminary Approval"), including Exhibit 1 thereto (document 1033-1, filed 1/15/15) ("Settlement Agreement")

- Order Granting Plaintiffs' Motion for Preliminary Approval of Class Action Settlement with Defendants Adobe Systems Incorporated, Apple Inc., Google Inc., and Intel Corporation, Approving Form and Manner of Notice, and Scheduling Final Approval Hearing (document 1054, filed 3/3/15)