UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE: HIGH-TECH EMPLOYEE ANTITRUST LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | Master Docket No. 11-CV-2509-LHK<br><br>**[PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |

This matter is before the Court on Plaintiffs' motion for final approval of the proposed class action settlement ("Settlement") between individual and representative Plaintiffs Michael Devine, Mark Fichtner, Siddharth Hariharan, and Daniel Stover ("Plaintiffs") and the Class they represent, and Adobe Systems, Incorporated, Apple Inc., Google Inc., and Intel Corporation (collectively, "Defendants").[1]  Having considered the Motion, the Settling Parties' Settlement Agreement, the pleadings and other papers filed in this Action, the statements of counsel and the parties, and all of the arguments and evidence presented at the Final Approval Hearing held on July 9, 2015, and for good cause shown, IT IS HEREBY ORDERED as follows:

1.  Unless otherwise defined herein, all terms that are capitalized herein shall have the meanings ascribed to those terms in the Settlement Agreement.

---

[1] Representative Plaintiff Brandon Marshall died on December 10, 2013.  Mr. Marshall's estate shall receive the settlement share to which Mr. Marshall is entitled pursuant to the terms of the Settlement.

1261468.2

[PROPOSED] ORDER GRANTING
FINAL APPROVAL
MASTER DOCKET NO. 11-CV-2509-LHK

2. The Court has jurisdiction over the subject matter of the Settlement Agreement with respect to and over all parties to the Settlement Agreement, including all Class Members and Defendants.

## I. The Settlement Is Fair, Adequate, and Reasonable

3. In evaluating a proposed class action settlement under Federal Rule of Civil Procedure 23(e), the standard is whether the settlement "is fundamentally fair, adequate, and reasonable." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982); accord *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993). A district court may consider some or all of the following factors when making this determination: "the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement." *Officers for Justice*, 688 F.2d at 625. The Court finds that the Settlement is fair, adequate, and reasonable in light of these factors.

4. First, the Settlement reflects the strength of Plaintiffs' case as well as the Defendants' position. This Court has been "exposed to the litigants and their strategies, positions and proof," *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1988) (quotation marks and citation omitted), and finds that the judicial policy favoring the compromise and settlement of class action suits is applicable here. *See Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 12 (9th Cir. 1992). The Court is also satisfied that the Settlement was reached after arm's length negotiations by capable counsel, and was not a product of fraud, overreaching, or collusion among the parties. *Id.* at 1290.

5. Second, the risks, expense, complexity, and likely duration of further litigation also support the Court's final approval of the Settlement. Following the Court's August 8, 2014 denial of preliminary approval of an earlier attempt to settle this case (Dkt. 974), the parties resumed vigorous litigation of pretrial matters. Plaintiffs filed a reply in support of their motion for application of the *per se* standard (Dkt. 988), and Defendants requested leave to file a

supplemental opposition (Dkts. 990 & 990-1), which Plaintiffs opposed (Dkt. 992). Plaintiffs also filed a motion to unseal all papers associated with their motion to compel (Dkt. 991), which Defendants opposed (Dkt. 994; *see also* Dkt. 1029).

6. Meanwhile, on September 4, 2014, Defendants filed a Petition for a Writ of Mandamus with the United States Court of Appeals for the Ninth Circuit, seeking an order vacating the Court's denial of preliminary approval and directing the Court to preliminarily approve the $324,500,000 settlement. (9th Cir. Case No. 14-72745, Dkt. 1.) On September 22, 2014, the Ninth Circuit issued an order stating that Defendants' "petition for a writ of mandamus raises issues that warrant a response," ordered Plaintiffs to file a response, set a date for Defendants' reply, and ordered that upon completion of briefing the matter be placed on the next available merits panel calendar for oral argument. (9th Cir. Dkt. 2; Dkt. 993.) Plaintiffs (and Michael Devine separately) opposed Defendants' petition (9th Cir. Dkts. 4 & 6), and Defendants filed a reply (9th Cir. Dkt. 10). Putative amici curiae Chamber of Commerce of the United States of America, California Chamber of Commerce, and economic scholars filed motions for leave to file amici curiae briefs in support of the petition (9th Cir. Dkts. 8 & 9), which the Ninth Circuit referred to the panel to be assigned to hear the merits of the petition (9th Cir. Dkt. 15). Plaintiffs (and Michael Devine separately) opposed the motions for leave to file amici curiae briefs. (9th Cir. Dkts. 13 & 16.) The Ninth Circuit scheduled oral argument on the petition for March 13, 2015. (9th Cir. Dkt. 19.)

7. The renewed struggle over pretrial matters, including locking horns over seeking reinstatement of the prior settlement (in which Defendants accused Plaintiffs of breaching their contractual commitments in opposing Defendants' writ petition; 9th Cir. Dkt. 10), also reveal parties fundamentally at odds and counsel vigorously litigating on behalf of their clients' interests. The record is the opposite of what would be expected were counsel to have shared an interest in settling the case as expeditiously as possible. Only very late in 2014, after months of additional offers and counterproposals against a backdrop of preparing the case for trial, did the parties eventually reach an agreement on a Settlement amount, and even then an announcement of their agreement to settle waited additional weeks as they contested and ironed out every detail.

1      8.     At the time of the current Settlement, the following motions remained pending:
Defendants' motion to exclude Dr. Marx's testimony; Plaintiffs' motion to exclude Defendants' experts' testimony; Plaintiffs' motion for application of the *per se* standard; and Defendants' motions *in limine*. In addition, Plaintiffs and Defendants continued to engage in the exchange of extensive pretrial disclosures and conferences regarding trial exhibits, witnesses, the joint pretrial statement, the authentication of business records and potential depositions related thereto, and many other issues. (Decl. of Kelly M. Dermody, ¶¶ 12 and 14, Dkt. 1033.) Many important pretrial issues had yet been resolved, presenting significant risks to both sides. Trial itself presented a host of complex issues, including the liability and participation of seven different companies in an alleged common conspiracy, the impact of the alleged misconduct across a Class of approximately 64,466 individuals, and the proper measure of damages across the Class. The outcome at trial was uncertain, providing additional risks to both sides. In addition, any trial outcome would be subject to potential appeals, which would have (at best) substantially delayed any potential recovery achieved for the Class at trial.

       9.     Third, the extent of discovery completed and the stage of proceedings support approval. The factual investigation and legal analysis in the four years of this litigation were very substantial. During the discovery process, Class Counsel reviewed over 3.2 million pages of documents, and took or defended nearly 100 depositions, including deposing Defendant fact witnesses, taking or defending numerous expert depositions, and defending the five Class Representative depositions. (Dermody Decl., ¶ 4, Dkt. 1033.) Defendants also propounded document requests, for which Plaintiffs produced over 31,000 pages. (*Id.*) With expert assistance, Class Counsel analyzed over 15 gigabytes of employment-related compensation and recruiting data, and studied all Defendants' compensation systems. (*Id.*, ¶ 5.) The discovery process, which is now complete, has been thorough.

       10.    Fourth, the Settlement provides for substantial consideration—a total of $415 million (in addition to the $20 million secured earlier through settlements with Intuit, Inc., Lucasfilm Ltd., and Pixar). The Settlement appears to be, by far, the largest amount ever recovered in a class action asserting antitrust claims by employees against their employers, either

1  on an aggregate or per-class-member basis.  (*See* Dkt. 1075, Ex. A.)  This result is particularly
2  impressive in light of the fact that the Antitrust Division of the United States Department of
3  Justice resolved its investigation into the same alleged misconduct without seeking any penalties
4  or restitution.

5        11.    Fifth, the views of Plaintiffs' counsel, who are experienced in litigating and
6  settling antitrust and employment class actions, weigh in favor of final approval.  *Linney v.*
7  *Cellular Alaska P'Ship*, No. 96-3008-DJL, 1997 WL 450064, at *5 (N.D. Cal. July 18, 1997),
8  *aff'd* 151 F.3d 1234 (9th Cir. 1998).  Plaintiffs' counsel have conducted an extensive
9  investigation into the factual and legal issues raised in this Action and endorse the Settlement as
10 fair, adequate, and reasonable.

11       12.    Finally, the reaction of the Class Members supports the Court's final approval of
12 the Settlement.  Out of 64,466 Class Members, only 11 submitted objections (about .017 percent
13 of the Class, or about one in every 5,860 Class Members).  (Supp. Decl. of Kenneth Jue, ¶ 3.)  In
14 addition, only 56 Class Members have opted out of the Settlement (less than .09 percent of the
15 Class).  (*Id.*, ¶ 2.)  This number of opt-outs is only about one-third the number of Class Members
16 who opted-out of the prior approved settlements with Intuit, Lucasfilm, and Pixar.  (*See* Dkt. 915-
17 1.)  This number of opt-outs is also substantially below the 2,579 opt-outs (a rate of 4%) that was
18 required to provide Defendants with a pro rata reduction in the Settlement amount.  Thus,
19 Defendants will pay the full $415 million.  The low rates of objections and opt-outs are "indicia
20 of approval of the class."  *Hughes v. Microsoft Corp.*, 2001 U.S. Dist. LEXIS 5976, *24 (W.D.
21 Wash. Mar. 21, 2001) (finding indicia of approval when nine class members out of 37,155, or just
22 over .02%, who received notice submitted objections, and "less than 1%" opted out); *Sugarman v.*
23 *Ducati N. Am., Inc.*, 2012 U.S. Dist. LEXIS 3961, *8 (N.D. Cal. Jan. 12, 2012) (objections from
24 42 of 38,774 class members—more than .1 percent, or more than five times the rate of objection
25 as here—is a "positive response"); *Churchill Village, LLC v. General Electric*, 361 F.3d 566, 577
26 (9th Cir. 2004) (affirming district court's approval of settlement where forty-five of 90,000 class
27 members objected to the settlement (.05 percent), and 500 class members opted out (about .56
28 percent)).

13.     No objection here raises meritorious concerns. *See Browne v. Am. Honda Motor Co.*, No. 09-06750, 2010 U.S. Dist. LEXIS 145475, at *51 (C.D. Cal. July 29, 2010) ("The fact that there is opposition does not necessitate disapproval of the settlement. Instead, the court must independently evaluate whether the objections being raised suggest serious reasons why the proposal might be unfair.") (quoting *Boyle v. Arnold-Williams*, No. 01-5687, 2006 U.S. Dist. LEXIS 91920, *10-11 (W.D. Wash. Dec. 20, 2006) (quotations omitted)). This positive response from the Class strongly favors Settlement approval.[2]

14.     Six Class Members out of 64,466 object on the basis (in whole or in part) that the Settlement should be rejected because it should be larger: Shash Basavaraju (aka Shash Schaekar), David Hsu, Loren Kohnfelder, Dimitrios Loulourgas, Devesh Parekh, and Delia Terra. (Jue Supp. Decl., Exs. C, D, F, G, H, I, and K.)

- **Mr. Basavaraju** contends that he was underpaid at Intel beginning in 2004, a time period that predates Intel's participation in the alleged misconduct at issue. He then appears to have discussed job opportunities with recruiters from Apple and Google in 2007 (during the alleged conspiracy period), and applied to other companies that are not alleged to be part of the misconduct at issue (AMD, IBM, and Honeywell). He asserts that, in the last 9 years, he has lost approximately $400,000 in compensation, and lost other personal opportunities.

- **Mr. Hsu** believes his pay was suppressed by "at least $10,000 per year" because the United States Department of Energy offered him a salary that was $2,000 less than his ending salary at Intel. He objects to any settlement that would pay him less than the full amount of his own estimate of his damages.

- **Mr. Kohnfelder** asserts that the Court should reject the Settlement as too low because it would encourage similar misconduct in the future.

- **Mr. Loulourgas** objects to the size of the settlement because, according to his estimate, it translates to approximately 63% of his estimated damages, should reflect the potential for "punitive damages," and should take into account the "miniscule" probability of a loss at trial.

- **Mr. Parekh** objects because damages to the Class are likely larger than what the Class will receive from the Settlement, and he prefers a trial to a settlement.

- **Ms. Terra** objects to the size of the settlement because, according to her estimate,

---

[2] Class Members Hsu, Veach, and Zavislak also objected to the request for attorneys' fees or the request for Class Representative service awards, which will be addressed separately in the Court's order granting Class Counsel's requests for fees, costs, and service awards.

it translates to approximately 55% of her full estimated damages, should reflect the potential for "punitive damages," and should take into account the "small" probability of a loss at trial.

15. In objecting to the size of the Settlement, none of these Class Members adequately take into account the risks and delays involved in proceeding to trial. They ignore that the Settlement provides the Class with a timely, certain, and meaningful cash recovery, while a trial—and any subsequent appeal—is highly uncertain, would entail significant additional costs, and in any event would substantially delay any recovery achieved. "'[T]he very essence of a settlement is compromise, a yielding of absolutes and an abandoning of highest hopes.'" *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1242 (9th Cir. 1998) (quoting *Officers for Justice*, 688 F.2d at 624) (affirming settlement approval). "Estimates of what constitutes a fair settlement figure are tempered by factors such as the risk of losing at trial, the expense of litigating the case, and the expected delay in recovery (often measured in years)." *In re Nucoa Real Margarine Litig.*, Case No. CV 10-00927 MMM (AJWx), 2012 U.S. Dist. LEXIS 189901, at *46 (C.D. Cal. June 12, 2012). Thus, "[t]he fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved." *Linney*, 151 F.3d at 1242 (internal quotation omitted).

16. The $415 million Settlement (in addition to the $20 million previously achieved) is—by a substantial margin—an historic achievement (Dkt. 1075, Ex. A), and followed a DOJ investigation into the same misconduct in which the DOJ closed its investigation without seeking penalties or restitution. The reasonableness of the Settlement is also confirmed by comparing it to Plaintiffs' damages estimate. The total settlements achieved in this action exceed 14 percent of Plaintiffs' proposed single damages estimate,[3] a damages estimate Defendants were prepared to vigorously contest. District courts in the Ninth Circuit routinely approve settlements with much larger differences between the settlement amount and estimated damages.[4] The substantial risks

---

[3] $435,000,000 / $3,065,184,307 (Dkt. 856-8, at 21) = ~ 14.2 percent.

[4] *See, e.g., In re Toys "R" Us-Del., Inc. Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438 (C.D. Cal. 2014) (granting final approval of a settlement providing for consideration reflecting 3% of possible recovery ($391.5 million value on exposure up to $13.05 billion)); *Reed v. 1-800 Contacts, Inc.*, Case No. 12-cv-02359 JM (BGS), 2014 U.S. Dist. LEXIS

*Footnote continued on next page*

1  Plaintiffs faced in proceeding to trial are discussed in Plaintiffs' prior reply memorandum in
2  support of preliminary approval. (Dkt. 938 at 10-14. *See also* Dkt. 1032 at 18-20.)

3  17.  That certain Class Members evaluate the risks differently, or would prefer to go to
4  trial despite those risks, does not prevent the Court from granting final approval to the Settlement.
5  *See Browne v. Am. Honda Motor Co.*, No. 09-06750, 2010 U.S. Dist. LEXIS 145475, at *51
6  (C.D. Cal. July 29, 2010) ("The fact that there is opposition does not necessitate disapproval of
7  the settlement. Instead, the court must independently evaluate whether the objections being
8  raised suggest serious reasons why the proposal might be unfair.") (quoting *Boyle v. Arnold-*
9  *Williams*, No. 01-5687, 2006 U.S. Dist. LEXIS 91920, *10-11 (W.D. Wash. Dec. 20, 2006)
10  (quotations omitted)).

11  18.  Class Members Mr. Hsu, Mr. Kohnfelder, Mr. Loulourgas, Mr. Mills, and Ms.
12  Terra offer details of their individual employment histories to suggest that the amounts they will
13  receive under the Settlement are insufficient to compensate them in full for the amount of wage
14  suppression they would attribute to the alleged conspiracy. Even if individual employees were
15  able to calculate with precision what their individual salaries would have been absent collusion,
16  such assessments do not take into account the risk, delay, and further costs associated with trial
17  and subsequent appeals.

18  19.  Lastly, Class Members Mr. Parekh, Mr. Schaekar, Mr. Smith, and Ms. Terra state
19  that the Settlement is not enough to punish the Defendants for their wrongdoing. These
20  objections are at odds with the historic nature of the recovery in this monopsony case.
21  (Rubenstein Decl. ¶ 41; Dkt. 1073-1.) An unprecedented, record-setting $415 million settlement
22  sends a strong message. A settlement does not need to provide for all possible recoverable
23  damages to deter wrongdoing. *See*, *e.g.*, *United States v. State of New Jersey*, 1995 U.S. Dist.

---

*Footnote continued from previous page*
255 (S.D. Cal. Jan. 2, 2014) (granting final approval where settlement represented 1.7% of possible recovery (net settlement fund of $8,288,719.16, resolving claims worth potentially $499,420,000)); *In re LDK Solar Secs. Litig.*, No. C 07-5182 WHA, 2010 U.S. Dist. LEXIS 73530, at *6 (N.D. Cal. Jun. 21, 2010) (granting final approval where settlement was 5% of estimated damages); *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 581 & n.5 (E.D. Pa. 2003) (gathering cases where courts approved settlements achieving single-digit percentages of potential recoveries).

1  LEXIS 22645, *39 (D.N.J. Mar. 14, 1995) ("The $7.125 million settlement amount satisfies the
2  United States' desire to provide a reasonable amount of compensation to identifiable victims of
3  alleged discrimination and sends a strong message to deter discrimination by other employers").[5]

4     20.    Taking the opposite view of the impact of Defendants' alleged misconduct, Class
5  member Kenneth Caviasca objects on the basis that "the case makes no sense," specifically that
6  "Cross hiring among companies that pay at a similar pay range would have no significant impact
7  on the company expenses or have even have [sic] a long term benefit for the moving employees."
8  (Jue Supp. Decl., Ex. B.) This objection does not comment on any aspect of the Settlement, but
9  rather opposes the claims alleged as being entirely baseless. Because this objection appears to
10 support no recovery for the Class, it appears Mr. Caviasca's interests are adverse to the Class and
11 the objection is accordingly overruled. *Wren v. RGIS Inventory Specialists*, No. 06-05778-JCS,
12 2011 U.S. Dist. LEXIS 38667, at *40-41 (N.D. Cal. Apr. 1, 2011) (overruling objections
13 submitted that "do not go to the fairness of the settlement").

14     21.    Class member Albert Smith objects because he prefers to have the case proceed to
15 trial, regardless of ***any*** settlement amount or potential recovery at trial: "If the jury finds that these
16 corporations did nothing, the defendants deserve to be completely exonerated in public. If the
17 jury finds that they violated the law, I do not care what the jury decides to award the class; I care
18 only that the companies are found guilty." (Jue Supp. Decl., Ex. J.) Mr. Smith's desire for a trial,
19 regardless of the probability of success or amount of recovery for the Class, is adverse to the
20 interests of the Class, and inconsistent with the well-established principle that "voluntary
21 conciliation and settlement are the preferred means of dispute resolution." *Officers for Justice*,
22 688 F.2d at 625.

---

[5] An additional Class Member submitted an anonymous comment, stating that the "settlement is too low." (Jue Supp. Decl., Ex. O.) This anonymous comment fails to comply with the requirements for objecting to the Settlement. (*See* Notice at 10.) The Court concludes this comment is without merit for the same reasons as explained above regarding Class Members who objected on the basis that the Settlement should be larger. Nelson Minar submitted a comment with his opt-out request, stating: "I do not feel that the settlement is sufficient." (Jue Supp. Decl., Ex. P.) The Court concludes this comment is also without merit for the same reasons as explained above regarding Class Members who objected on the basis that the Settlement should be larger.

1    22.    Class member Prabhakar Kotla objects because he incorrectly estimates that each Class member will receive an average of only 1% of what each Class member received from the earlier settlements with Intuit, Lucasfilm, and Pixar. (Jue Supp. Decl., Ex. E.) In fact, the average Class Member will receive about thirty times more from this Settlement than what the average Class Member received from the earlier settlements with Intuit, Lucasfilm, and Pixar. (An average net Class Member recovery of approximately $5,072 here, compared with an average net Class Member recovery from the earlier settlements of approximately $172.)

23.    Class member Davesh Parekh objects to the formula for allocating the Settlement. (Jue Supp. Decl., Exs. G and H.) He argues that the plan of allocation should take equity compensation into account. The plan of allocation is based upon each Class member's relative share of base salary paid on the basis of employment in Class position during the Class period. (Settlement Agreement, Ex. B.) While each Defendant used a different balance of base salary, bonuses, and equity compensation, all Defendants used base salary structures in a consistent and uniform manner, linked by systems of internal equity (as confirmed by the expert reports of Dr. Kevin Hallock) that caused the salary structures to move together. Thus, base salary provides a neutral and uniform metric by which to allocate the Settlement, consistent with Plaintiffs' expert opinions. "A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable." *In re Oracle Sec. Litig.*, No. 90-0931-VRW, 1994 U.S. Dist. LEXIS 21593, at *3 (N.D. Cal. June 16, 1994). The Settlement's plan of allocation is appropriate.

24.    Class members Mr. Hsu, Eric Veach and Mark Zavislak argue that each Class Member should have been provided their individual allocation amounts. (Jue Supp. Decl., Exs. C, L-N.) But a precise award estimate for each Class Member cannot be computed until the Notice Administrator confirms and processes all opt-outs (taking into account opt-outs who thereby will receive nothing and reallocating their shares of the Settlement fund to the remaining Class Members); considers the Court's determination of the requests for attorneys' fees, unreimbursed out-of-pocket costs, Named Plaintiff service awards, and Settlement administration costs; processes Defendants' Class Member data and resolves all data questions. The Notice

1  provided the Settlement's plan of allocation, apprising Class Members of how the Settlement
2  would be divided.  (Jue Decl., Ex. A at 6, Dkt. 1086-1: "How much money can I get from the
3  Settlement?".)  The Notice also provided the gross Settlement amount, as well as proposed
4  deductions for attorneys' fees, unreimbursed out-of-pocket costs, Class Representative service
5  awards, and costs of administering the Settlement.  (*Id.* at 6, 8.)  The Notice also provided contact
6  information for Class Counsel.  Hundreds of Class Members contacted Class Counsel directly,
7  through email or telephone, to ask questions.  (Decl. of Dean M. Harvey in Support of Plaintiffs'
8  Motion for Final Approval of Class Action Settlement, ¶ 2.)  When Class Members asked
9  questions regarding their individual allocation from the Settlement, Class Members were
10 informed about how the Settlement's plan of allocation worked, the likely average net recovery
11 (approximately $5,072), and why a more precise allocation estimate would not be possible until
12 further information became available.  (*Id.*, ¶ 2.)

13       25.     Accordingly, the Court finds that the Settlements are fair, adequate, and reasonable
14 within the meaning of Rule 23(e) of the Federal Rules of Civil Procedure.

15 **II.**     **The Notice Program Was Appropriate**

16       26.     Federal Rule of Civil Procedure 23(c)(2)(B) requires that the settling parties
17 provide settlement Class Members with "the best notice that is practicable under the
18 circumstances, including individual notice to all members who can be identified through
19 reasonable effort.  The notice must clearly and concisely state in plain, easily understood
20 language: (i) the nature of the action; (ii) the definition of the class certified; (iii) the class claims,
21 issues, or defenses; (iv) that a class member may enter an appearance through an attorney if the
22 member so desires; (v) that the court will exclude from the class any member who requests
23 exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a
24 class judgment on members under Rule 23(c)(3)."

25       27.     The Court finds that the notice program, previously approved by the Court (Dkt.
26 1054 at 5), has been implemented and complies with Fed. R. Civ. P. 23(c)(2)(B).  Notice was sent
27 to all Class Members by first class mail.  The Notice, which was reviewed and approved by this
28 Court, provided a clear description of who is a member of the Class and Class members' rights

1 and options under the Settlement. The Notice explained how to receive money from the
2 Settlement, how to opt-out of the Settlement, how to object to the Settlement, how to obtain
3 copies of relevant papers filed in the case, and how to contact Class Counsel and the Notice
4 Administrator.

5     28. The Court ordered Heffler Claims Group (the claims administrator previously
6 appointed regarding the prior settlements with Intuit, Inc., Lucasfilm Ltd., and Pixar) to transmit
7 Class Member information in a secure manner to Gilardi & Co., LLC (the notice administrator
8 appointed to administer the instant Settlement; "Notice Administrator"). (Dkt. 1054 at 6-7.)
9 Heffler did so. (Jue Decl., ¶ 2, Dkt. 1086-1.) The Court ordered that the Notice Administrator
10 shall, by April 6, 2015, "cause the Settlement Notice to be mailed by first-class mail, postage
11 prepaid, to Class Members pursuant to the procedures described in the Settlement, and to any
12 Class Member who requests one; and, in conjunction with Class Counsel, shall maintain the case-
13 specific website providing case information, court documents relating to the Settlement and the
14 Notice." The Notice Administrator did so. (*Id.*, ¶¶ 3-7.) The Court found that this notice
15 "satisfies the requirements of the Federal Rules of Civil Procedure and of due process and,
16 accordingly, is approved for dissemination to the Class." (Dkt. 1054 at 5.)

17     29. Class Members had a variety of methods by which to view relevant documents,
18 contact the Notice Administrator or Class Counsel, opt-out of the Settlement, or object to the
19 Settlement. These methods included mail, telephone, a case-specific website, and email. (Jue
20 Decl., ¶¶ 3-7 and Ex. A, Dkt. 1086-1.) For instance, the Notice Administrator received 780 calls
21 to its toll-free telephone number. (*Id.* ¶ 6.) The Notice Administrator received 56 requests for
22 mailed copies of the Notice over the phone, by email, and by mail. (*Id.* ¶ 7.) The Notice
23 Administrator sent a copy of the Notice whenever one was requested. (*Id.*) Class Members also
24 contacted Class Counsel, through both email and telephone, with questions and requests. (Harvey
25 Decl., ¶ 2.) Class Counsel answered Class Member questions and responded to requests. (*Id.*)

26 **III.**     **The Plan of Allocation Is Fair, Reasonable, and Adequate**

27     30. The Plan of Allocation is fair, reasonable, and adequate. It will provide each Class
28 Member with a fractional share based upon each Class Member's total base salary received

during the conspiracy period. *See In re Oracle Sec. Litig.*, No. 90-0931-VRW, 1994 U.S. Dist. LEXIS 21593, at *3 (N.D. Cal. June 18, 1994) ("A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable."). The Plan of Allocation here is a simple, efficient way to allocate the Settlement funds to Class Members based on the extent of their injuries, which are proportional to their differing salaries. Such fractional shares are "cost- effective, simple, and fundamentally fair." *In re Airline Ticket Comm'n Antitrust Litig.*, 953 F. Supp. 280, 285 (D. Minn. 1997); *see also In re Electrical Carbon Prods. Antitrust Litig.*, 447 F. Supp. 2d 389, 404 (D.N.J. 2006) (finding pro rata distribution "eminently reasonable and fair to the class members."). The Court also notes that there will be no reversion of unclaimed funds to any Defendant. Accordingly, the Plan of Allocation is approved.

Dated: July __, 2015

LUCY H. KOH
United States District Judge